FILED

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF TEXAS

22 OCT -7 PM 3:55

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
DEPUTY CLERK

| | |
|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-00398-LY |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN, | |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PLAINTIFFS' EXCHANGE ACT CLAIMS .................................................... 8

        A.      Jurisdiction And Venue................................................................................ 8

        B.      Parties........................................................................................................... 9

                1.      Plaintiffs........................................................................................... 9

                2.      Defendants ...................................................................................... 10

        C.      Summary Of Defendants' Fraud................................................................ 12

                1.      The Prospera Fraud ......................................................................... 12

                        a)      Natera Touts Prospera's Superiority Over AlloSure ................. 14

                                (1)     Natera Introduces Its Kidney Transplant Rejection
                                        Test................................................................................... 14

                                (2)     During The Class Period, Defendants Misleadingly
                                        Claim Prospera's Superiority ........................................... 18

                        b)      Defendants Knew Or Were Severely Reckless To Disregard
                                That Their Statements Were Not Supported By The
                                Underlying Clinical Study Data.................................................... 22

                        c)      Defendants' Misstatements And Omissions
                                Regarding Prospera ...................................................................... 29

                2.      The Panorama Fraud ........................................................................ 36

                        a)      Defendants Mislead Investors About The Revenues Generated
                                By Panorama And Demand For Microdeletion Testing .............. 37

                        b)      Unbeknownst To Investors, Deceptive Billing And
                                Sales Practices Fuel Panorama's Revenues And
                                Microdeletion Demand ................................................................ 40

                                (1)     Natera's Improper Undisclosed Relationship With
                                        Third-Party Prior Authorization Service........................... 40

                                (2)     Panorama And Microdeletion Revenues Were
                                        Propped Up By Improper Order Practices ......................... 47

|  |  |  | c) | Defendants' Misstatements And Omissions Regarding Panorama .................................................... 49 |
|  |  | 3. |  | As Natera's Stock Price Soars, Defendants Engage In Rampant Insider Trading.................................................................... 52 |
|  |  | 4. |  | Loss Causation: The Relevant Truth Is Revealed Through Two Partial Corrective Disclosures.................................................... 53 |
|  | D. |  |  | Additional Allegations Of Defendants' Scienter ................................... 57 |
|  |  | 1. |  | Defendants Knew Their Statements About Prospera Were Materially False or Misleading ................................................ 57 |
|  |  | 2. |  | Defendants Repeatedly Spoke About The Issues At The Center Of The Fraud And Had Access To Information Contrary To Their Statements ................................................................. 58 |
|  |  | 3. |  | Defendants' Fraud Involved The Core Operations Of Natera's Business................................................................. 58 |
|  |  | 4. |  | Natera Has A History Of Engaging In Improper Or Fraudulent Billing Practices ........................................................................ 60 |
|  |  | 5. |  | Defendants Had Motive And Opportunity To Commit Fraud................. 61 |
|  |  |  | a) | By Inflating Natera's Revenues, Defendants Chapman, Brophy, And Rabinowitz Substantially Increased Their Compensation.................................................... 61 |
|  |  |  | b) | Defendants Chapman, Brophy, And Rabinowitz Reaped Tens Of Millions Of Dollars From Insider Sales........................ 62 |
|  | E. |  |  | A Presumption Of Reliance Applies........................................................ 63 |
|  | F. |  |  | The Statutory Safe Harbor And Bespeaks Caution Doctrine Do Not Apply........ 65 |
|  | G. |  |  | Causes Of Action Against Defendants .................................................... 65 |
| III. |  |  |  | PLAINTIFFS' SECURITIES ACT CLAIMS .................................................... 71 |
|  | A. |  |  | Jurisdiction And Venue........................................................................... 71 |
|  | B. |  |  | Violations Of The Securities Act............................................................ 72 |
|  |  | 1. |  | Securities Act Parties ......................................................... 72 |
|  |  | 2. |  | Background On Natera's July 2021 SPO .................................. 76 |

3.  The Offering Documents Contained Untrue Statements Of Material Fact And Material Omissions In Violation Of Section 11 Of The Securities Act.............................................. 77

4.  Failure To Disclose Information Required Under SEC Regulation S-K........................................................................... 78

    a)   Item 105 ................................................................. 78

    b)   Item 303 ................................................................. 79

C.   Causes Of Action Against Securities Act Defendants .......................................... 81

IV.   CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS........................ 87

V.   PRAYER FOR RELIEF ................................................................................. 89

VI.   DEMAND FOR JURY TRIAL ...................................................................... 89

Court-appointed Lead Plaintiff British Airways Pension Trustees Limited ("BAPTL" or "Lead Plaintiff") and additional plaintiff Key West Police & Fire Pension Fund ("Key West P&F," and together with BAPTL, "Plaintiffs"), by and through their counsel, bring this federal securities class action on behalf of themselves and a class ("Class") consisting of all persons and entities that purchased or otherwise acquired the common stock of Natera, Inc. ("Natera" or the "Company") from February 26, 2020, through March 14, 2022, inclusive (the "Class Period"). Plaintiffs assert claims for violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants (defined below). Plaintiffs also assert claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, respectively, against the Securities Act Defendants (defined below).

Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and their own acts, and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things: (i) a review of Natera's SEC filings; (ii) wire and press releases published by Natera; (iii) interviews of former Natera employees; (iv) analyst reports and advisories and media reports about the Company; (v) judicial filings and opinions concerning Natera; and (vi) other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      Natera is a clinical genetic testing company that develops, markets, and commercializes a range of genetic tests in the areas of women's health, organ health, and oncology.

This securities fraud case concerns Defendants' misrepresentations and omissions about two of Natera's core products, Prospera, a non-invasive kidney transplant rejection test, and Panorama, Natera's non-invasive prenatal test (or "NIPT").

2.      Prospera and Panorama compete in increasingly lucrative markets, each estimated to be several billions of dollars in size. During the Class Period, Prospera and Panorama were significant drivers of revenue for Natera, the frequent topic of analyst commentary, and the subject of numerous statements Defendants made to the public.

**The Prospera Fraud**

3.      From the minute Natera announced it would launch Prospera and enter the growing transplant kidney rejection testing market, the Company sought to gain market share from its chief competitor and the dominant product in the area, CareDx, Inc.'s AlloSure test. Central to that strategy were Defendants' repeated statements to the market that Natera's test was clinically superior—more accurate and more sensitive—as compared to AlloSure. Defendants based their claims of superiority primarily on Natera's Prospera clinical study data (the "Sigdel study" or "Sigdel") versus a separate study of AlloSure (the "Bloom study" or "Bloom").

4.      In September 2020, for example, Defendant Steve Chapman, Natera's Chief Executive Officer ("CEO"), told investors that Prospera "generated performance data that was ***better than what was on the market from the competitors***."[1] Defendants made similar claims on Natera's website, representing that when "comparing published clinical validation studies, Prospera demonstrated better performance," citing Sigdel and Bloom. Defendants likewise claimed that, compared to AlloSure, Prospera was "[u]ltra-sensitive for more accurate

---

[1] Unless otherwise noted, all emphasis is added.

2

classification" and had a "[l]ower risk of missing active rejection," again basing those statements explicitly on comparisons between Prospera and AlloSure study data.

5.      All along, these statements were materially false and misleading. Despite repeated statements indicating that Sigdel and Bloom tested similar performance factors and could be used as reliable comparative assessments of success, Natera never conducted anything like a head-to-head empirical comparison of Prospera and AlloSure. Natera's Senior Medical Director of the Organ Health Group, Dr. Phillippe Gauthier, admitted this in his sworn March 2022 trial testimony taken in *CareDx, Inc. v. Natera, Inc.*, No. 1:19-cv-00662 (D. Del.), a federal lawsuit in which CareDx accused Natera of making false and misleading statements about Prospera's superiority over AlloSure based on purported scientific study data, i.e., Sigdel and Bloom (the "CareDx Trial"). In truth, the Sigdel and Bloom studies on which Defendants purported to base their claims had numerous, fundamental methodological differences that prevented a head-to-head comparison of Prospera's clinical performance versus that of AlloSure based on the studies.

6.      Defendants knew this, and they had known and recognized internally since at least 2018 that these differences made broad claims about Prospera's performance and superiority as compared to AlloSure inapt and misleading. For example, in a November 2018 internal email, Ramesh Hariharan—Natera's then-Vice President of Marketing & Medical Education—stated in no uncertain terms to several high-level employees, "*I don't think we can claim superiority*." In December 2018, Defendant Dr. Paul Billings, Natera's then-Chief Medical Officer ("CMO") and Senior Vice President of Medical Affairs, acknowledged in an email about comparing Natera's study against CareDx's: "The reviewers are trying for apples to apples. *Unfortunately, in these kinds of studies, that is not possible*." This same understanding was then consistently

3

communicated across the highest levels of Natera's management, as internal records reveal. *See* Section II.C.1.b., below.

7.      Further, and in spite of this understanding, Natera trained its sales representatives prior to and during the Class Period to promote Prospera as clinically superior to AlloSure. Specifically, these employees were trained to cite certain favorable data points from the Sigdel and Bloom studies, and to push the message that CareDx "cherry-picked" data while Natera did not. In a tacit and undisclosed acknowledgment of the misleading nature of these messages—which mirrored Defendants' public statements—in or around June or July 2020, these employees were abruptly instructed to cease making such comparisons to consumers.

8.      Unaware of the foregoing material adverse facts, investment analysts covering Natera accepted and repeated Defendants' claims of the clinical superiority of Prospera over AlloSure, reporting that Prospera's recent "coverage expansion levels the playing field and allows clinicians an equal choice between [CareDx] and NTRA [i.e., Natera], which in our view, may enable NTRA to switch some transplant centers from [CareDx]." And, critically, on the strength of Defendants' claims, Prospera sales steadily grew.

**The Panorama Fraud**

9.      As they continued to mislead the market about Prospera, Defendants also made materially false and misleading statements about Natera's flagship NIPT, Panorama. Using a blood draw from a pregnant woman, Panorama screens for genetic abnormalities called aneuploidies (where a fetus has a different number of chromosomes than are typical). The screen can provide important information about a pregnancy, such as indications of Down syndrome, as early as nine weeks into that pregnancy, and can also identify the gender of the baby.

10.     Before the start of the Class Period, Natera added additional screening for "microdeletions," which are small, missing parts of a chromosome that can adversely impact a baby's health and development. Testing for the risk of these incredibly rare diseases and conditions was distinct from the part of the Natera test that checked for aneuploidies, was not required by any medical protocols, and could be costly. Notably, these tests were not uniformly covered by a patient's medical insurance, and coverage was often rejected.

11.     Throughout the Class Period, Defendants told investors that Panorama was driving Natera's impressive revenue performance. For example, in an August 5, 2020 press release, Natera reported year over year revenue growth and proclaimed that the "*increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests*." Alongside these representations, Defendants assured the market that Natera's strong performance was underpinned in large part by growing demand for Panorama, which they represented could potentially generate hundreds of millions of dollars in future revenue. During an earnings call on February 25, 2021, for instance, Chapman referenced Panorama's microdeletions test and stated, "last year, we did 400,000 microdeletion tests, and that was at a growth rate of 37% year-on-year versus 2019. *So this is really a rocket ship that's growing*."

12.     These and similar statements created the misleading impression that Panorama-generated revenue was the result of organically growing demand. But, in fact, this revenue and purported demand were fueled by deceptive and improper business practices within Natera.

13.     *First*, Natera used a closely-related third-party company, My Genome My Life, Inc. ("MGML"), to indiscriminately submit prior authorization requests, which are often required by health insurers to determine whether they will cover the cost of a procedure. Natera, however, never disclosed the Company's close ties to MGML, in direct contravention of industry guidance

from the U.S. Office of the Inspector General ("OIG") aimed at curbing kickbacks and other improper practices in medical billing. Meanwhile, between 2018 and March 2022, Natera benefited from roughly *450,000* prior authorization submissions by MGML. These prior authorization requests, many times submitted without regard for the underlying necessity, and sometimes after the subject test was performed, inflated Natera's revenue through overall volume growth. They also boosted revenue because in instances where prior authorization was denied *after* a Panorama test was administered, the patient was liable for the cost.

14.     *Second*, Natera made microdeletion testing a default selection when ordering Panorama. This tactic represented a sharp deviation from standard industry practices. It meant that patients had to affirmatively *opt out* of microdeletion screening when ordering the NIPT. By automatically "opting in" patients to ordering this expensive test for exceedingly rare conditions, Natera inflated the number of microdeletion screens that were ordered, which created the impression that demand growth for microdeletion testing was organic, rather than the result of a default order form. And, because many insurers did not cover microdeletion screening, like with denied prior authorizations, running large numbers of microdeletion screens allowed Natera to pursue payment directly from patients for this additional test.

### Defendants Cash in on the Fraud

15.     None of the foregoing material, adverse facts about Prospera and Panorama were disclosed to investors until the very end of the Class Period. Accordingly, investors credited Defendants' rosy story of booming demand growth for Prospera and Panorama, causing Natera's stock price to *more than triple* across 2020 and well into 2021—from a closing price of $34.77 per share on the first day of the Class Period, to a Class Period high of over $129 per share in September 2021.

6

16.     Capitalizing on these inflated prices, in July 2021, with Natera's common stock price trading near its all-time high, the Company sold investors 5.175 million shares of its common stock at $113 per share in a secondary public offering (the "July 2021 SPO"). The July 2021 SPO was authorized by Defendants Chapman, Michael Brophy (Natera's Chief Financial Officer ("CFO")), and Matthew Rabinowitz (Natera's founder and current Executive Chairman), and the rest of the Company's Directors, and generated roughly $585 million in gross proceeds. This SPO came just 10 months after another public offering by Natera in September 2020 that yielded gross proceeds of roughly $287 million. All told, Natera sold more than *$870 million* worth of common stock to unsuspecting investors at artificially inflated prices in less than a year.

17.     Natera's highest-ranking leaders, Defendants Chapman, Brophy, and Rabinowitz, also seized their chance to cash in on the fraud. While in possession of material non-public information, they collectively unloaded over *$137 million* worth of Natera common stock through insider sales during the Class Period, lining their pockets and defrauding investors who traded contemporaneously with them, in violation of the federal securities laws banning insider trading.

**The Truth Emerges**

18.     When investors learned the truth about Defendants' fraud through two corrective disclosures in March 2022, they punished Natera's common stock price, erasing billions of dollars of value. On March 9, 2022, investment research firm Hindenburg Research, which had taken a short position in Natera, issued an explosive investigative report revealing that Natera engaged in deceptive sales and billing practices to drive up Panorama revenue (the "Hindenburg Report"). The report detailed Natera's use of MGML to submit prior authorizations, and how Natera was propping up microdeletion demand by forcing patients to opt out of receiving such screenings. Natera's common stock price cratered in direct response, *falling 33%* upon the disclosure.

19.     Just days later, on March 14, 2022, a federal jury found that Natera intentionally and willfully misled the public by falsely marketing Prospera as more accurate than, and superior to, AlloSure. The jury awarded CareDx $44.9 million in monetary damages, including *$23.7 million in punitive damages*. Transcripts of sworn testimony and prior-sealed documentary evidence from that trial, none of which was public prior to March 2022, included discussion of internal Natera emails and records showing that Defendants knew or were severely reckless to disregard their claims about Prospera's supposed superior performance were materially inaccurate and misleading. Following the verdict, one investment analyst wrote that the trial outcome "may have squashed competitive concerns [for the dominant AlloSure test] once and for all." Natera's claims of Prospera's superiority, which had propelled such impressive sales gains, were eviscerated. This news sent Natera common stock tumbling again, approximately *22%*.

20.     By the end of the Class Period, Natera's stock had fallen more than *70%* from its Class Period high of $129.09, erasing over *$8.5 billion* in shareholder value. This action seeks to recover the losses suffered by Natera investors, which were a foreseeable consequence of Defendants' false statements and omissions alleged herein.

## II.    PLAINTIFFS' EXCHANGE ACT CLAIMS

21.     In this part of the Complaint, Plaintiffs assert a series of fraud-based claims on behalf of the Class concerning Defendants' intentional or severely reckless misconduct. These claims are pleaded separately from Plaintiffs' Securities Act claims, below.

### A.     Jurisdiction And Venue

22.     Plaintiffs assert claims under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a)) and SEC Rule 10b-5, promulgated thereunder (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Natera's principal executive offices are located in this District, and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

25.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

### B.     Parties

#### 1.     Plaintiffs

26.     Lead Plaintiff BAPTL is a company established to hold the assets of the Airways Pension Scheme and the New Airways Pension Scheme. BAPTL acts as the Custodian Trustee of the assets of both schemes. Airways Pension Scheme and New Airways Pension Scheme are two of the United Kingdom's largest corporate defined benefit pension schemes, and as of June 1, 2021, had total assets of approximately £26.8 billion. As set forth in the accompanying certification attached as Exhibit A, BAPTL purchased Natera common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

27.     Additional plaintiff Key West P&F is a public pension fund for the benefit of active and retired police officers and firefighters of the City of Key West, Florida. As set forth in its previously-filed certification (ECF No. 9-2), Key West P&F purchased Natera common stock at

artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### 2. Defendants

28.     Defendant Natera is a Delaware corporation that maintains a corporate headquarters at 13011 McCallen Pass, Building A Suite 100, Austin, Texas 78753. Natera is a diagnostics company that specializes in cell-free DNA ("cfDNA") testing dedicated to oncology, women's health, and organ health. The Company operates one business segment—the development and commercialization of molecular testing services—and has three primary business lines: Women's Health; Organ Health; and Oncology. Natera was founded in California in 2003 as Gene Security Network, LLC. In 2007, the Company changed its name to Natera, Inc. Natera's common stock has traded on the NASDAQ under the ticker symbol "NTRA" since the Company went public in July 2015.

29.     Defendant Chapman served as the Company's CEO and a director on Natera's Board throughout the Class Period. Chapman joined Natera in 2010 as Vice President of Sales and Vice President of Commercial Operations, later becoming Chief Commercial Officer from March 2017 to August 2017, and Chief Operating Officer from August 2017 to January 2019. As COO, Chapman led the Company's commercial entry into the NIPT market. Chapman was appointed CEO in January 2019, and, according to Natera, "has been instrumental" in extending Natera's "core technology [and] achieving rapid commercial growth for the Prospera™ transplant assessment test."

30.     Defendant Brophy began serving as the Company's CFO on February 1, 2017, and remained in that role throughout the Class Period. Brophy previously served as Natera's Senior Vice President of Finance and Investor Relations starting in September 2016, and before that, as the Company's Vice President of Corporate Development and Investor Relations.

31.     Defendant Rabinowitz served as Natera's Executive Chairman throughout the Class Period. Rabinowitz co-found Natera in 2003 and served as its CEO from 2005 through 2018, when Chapman was appointed CEO, effective January 8, 2019. In connection with the announcement of Rabinowitz transitioning to Executive Chairman, Natera stated, "Rabinowitz will remain integrally involved as Executive Chairman focusing on the company's long-term business strategy and technology innovation."

32.     Defendant Billings was appointed as Natera's CMO and Senior Vice President of Medical Affairs in April 2018, and remained in those roles throughout the Class Period, until he resigned in December 2021. He was the highest ranking physician at Natera during the Class Period.

33.     Defendants Chapman, Brophy, Rabinowitz, and Billings are collectively referred to herein as the "Executive Defendants."

34.     The Executive Defendants, because of their positions with the Company, possessed the power and authority to control, and did in fact control, Natera's public statements to the market, including in SEC filings, press releases, the Company's website, and presentations to securities analysts, money and portfolio managers, institutional investors, and the media. In their respective roles, each Executive Defendant was directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market.

35.     Each Executive Defendant was provided with copies of the Company's SEC filings alleged herein to contain false or misleading statements or omissions of material fact prior to, and shortly after, their issuance, had final executive authority to control what they said, or had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Executive

11

Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.

36.    Natera and the Executive Defendants are collectively referred to herein as "Defendants."

### C.    Summary Of Defendants' Fraud

#### 1.    The Prospera Fraud

37.    Natera designed Prospera for use by physicians to assess whether a patient was rejecting a transplanted kidney and to evaluate the need for invasive diagnostic testing or a biopsy. Prospera measures the amount of donor-derived cfDNA ("dd-cfDNA") in the recipient's blood. Generally, dd-cfDNA is very low in stable transplant recipients, but is much higher if there is an organ rejection.

38.    The performance of kidney transplant rejection tests like Prospera is measured by metrics including specificity, sensitivity, and overall accuracy using area under the curve ("AUC") analysis.

a.    Sensitivity is the measure of the percentage of true positive test results. Thus, sensitivity quantifies the percentage of test results that correctly identify kidney rejection. Also called a "rule-out" scenario, if a positive test result is highly sensitive (i.e., it identifies true positives well), and a patient receives a negative test result, one can be fairly confident that the patient does not have the tested-for condition.

b.    Specificity is the measure of the percentage of true negative test results. Thus, specificity quantifies the percentage of test results that correctly identify where a transplant patient is not in active rejection. Also called a "rule-in" scenario, if a test result is highly specific (i.e., it identifies true negatives well), and a patient receives a positive test result, one can be fairly confident that the patient has the tested-for condition.

c.    AUC is a composite of sensitivity and specificity to calculate a measure for the overall accuracy of the test. The AUC is determined by drawing a graph for the range of potential test result cut-off values, with the test's true positive rate

(sensitivity) plotted on the y-axis and the false positive rate (specificity, plotted as 1-specificity) on the x-axis, and measuring the area under the curve. The chart plots all possible values for the test's sensitivity and specificity. If a test has only a random ability to identify true positives and negatives (and thus is not predictive or useful to make a diagnosis), the AUC will be 0.5—a straight diagonal, in which the true positive rate proportionally increases with the false positive rate at different cut-off points. As a test nears perfect diagnostic performance, the AUC will approach 1.0.

39.     There are approximately 20,000 kidney transplants a year and around 180,000 patients living with a transplanted kidney. A kidney transplant requires continuous monitoring to ensure that the kidney is not rejected by the recipient. Thus, the market for kidney transplant rejection tests prior to and during the Class Period was significant and lucrative.

40.     By 2020, Natera estimated it was billions of dollars in size. Indeed, Chapman stated during Natera's 4Q19 earnings call on February 26, 2020, "if you assume 20,000 new transplants per year in the United States, 7 tests per year in the first year and then quarterly for the next 2 years," "the revenue has the potential to make a meaningful impact on Natera's business."

41.     In an effort to break into this market with Prospera, Natera had to compete against the incumbent test in the field, CareDx's AlloSure. To that end, as discussed herein, Defendants engaged in a multi-year campaign of representing to investors, patients, and doctors that, on the all-important question of test result accuracy, Prospera was superior to AlloSure.

42.     Crucially, however, Defendants' representations rested on scientific and statistical data that did not support their claims. Sworn testimony in the CareDx Trial revealed that, prior to the Class Period, executives at the highest levels of Natera affirmatively acknowledged Defendants' statements of superiority were, at best, misleading. Internal company records and statements provided by former Natera employees, which are discussed below, corroborate these facts.

13

### a) Natera Touts Prospera's Superiority Over AlloSure

### (1) Natera Introduces Its Kidney Transplant Rejection Test

43.     When Natera entered the dd-cfDNA market for kidney rejection tests, the established product in the market was CareDx's AlloSure, which had commercially launched in 2017.

44.     On June 21, 2018, Natera announced that it had developed a new kidney rejection test (not yet named Prospera). Specifically, Natera stated that its "dd-cfDNA assay demonstrated 92% sensitivity in detecting acute rejection, identifying 48 out of 52 affected cases based on a cutoff of 1% dd-cfDNA." Natera then made a veiled reference to AlloSure, claiming its test was almost twice as sensitive as other available tests in detecting acute rejection of a transplanted kidney: "[t]his sensitivity compares favorably against competition, which reported only 59% sensitivity in a 2017 study." Billings, Natera's then-CMO and Senior Vice President of Medical Affairs, further stated "I look forward to working with the medical community to introduce this rapidly into clinical practice."

45.     Thereafter, Natera aimed to commercially launch Prospera in 2019, after receiving final coverage and payment determinations from key payers, and took steps towards establishing distribution relationships.

46.     All the while, Defendants and other Natera senior executives touted Prospera's superior performance to AlloSure. These statements were based on Natera's purported head-to-head comparison of separate scientific studies on Prospera and AlloSure. The Prospera study, titled *Optimizing Detection of Kidney Transplant Injury by Assessment of Donor-Derived Cell-Free DNA via Massively Multiplex PCR*, was routinely referred to as the Sigdel study. The AlloSure study, titled *Cell-Free DNA and Active Rejection in Kidney Allografts*, was known as the Bloom study.

14

47.     For example, on November 8, 2018, Natera held its 3Q18 earnings call, in which

Chapman stated:

> I'll highlight, again, the performance of our test in our robust clinical validation
> study completed in partnership with UCSF. This trial was nearly 2x the size of a
> clinical validation study published by Bloom et al., and also showed an improved
> area under the curve. Area under the curve is a metric that combines sensitivity and
> specificity and represents a fundamental power of a test. ***Natera uses specific
> molecular techniques that distinguish it from those used in Bloom et al., and we
> believe provide us with the competitive performance advantage***.

48.     On January 7, 2019, in a press release titled, "Natera Announces Publication of

Kidney Transplant Validation Study, Demonstrating Superior Data in Detection of Clinical and

Subclinical Rejection," Natera represented the following about Prospera:

> Clinical validation study results published in the *Journal of Clinical Medicine*,
> demonstrating the highly accurate performance of its [dd-cfDNA] test for active
> allograft rejection in kidney transplant recipients, ***including higher sensitivity and
> nearly 18% higher area under the curve (AUC) than the competitive dd-cfDNA
> assay***. The study also reports the first accurate detection of T-cell mediated
> rejection (TCMR) and subclinical rejection. This marks the successful completion
> of all 2018 commercialization milestones, and is in line with the company's plan to
> secure Medicare coverage and commercially launch its test in 2019.

49.     During the American Society of Transplantation CEOT Conference held on

February 21-23, 2019, Natera presented the following slide, which again represented to the market

that data for its kidney rejection test (soon to be named Prospera) demonstrated that it was superior

to CareDx's test:

**Stronger test performance demonstrated with unique clinical capabilities**

| | 🐟 natera | 🔥 CareDx |
|---|---|---|
| • Largest dd- cfDNA validation study (217 patients) | 217 | **107** |
| • Higher area under the curve; driven by superior clinical data | 0.87 | **0.74** |
| • First test to accurately detect TCMR (about 1/3 of all AR cases) | 10/10 | **3/11** |
| • First test to consistently detect subclinical rejection | 92% | **N/A** |
| • 5x higher repeatability at 0.6% donor fraction (CV) | 1.85 | **9.2** |

11

50.    In September 2019, Natera issued a physician brochure which introduced the Prospera name for its test. That brochure touted Prospera's purported advantages over AlloSure, specifically citing the Sigdel and Bloom studies in footnotes 2 and 5 (which are set forth in the second graphic below; highlighting added):

# Introducing Prospera

Prospera is powered by highly optimized, proprietary cell-free DNA (cfDNA) technology. As part of your tool kit, Prospera assesses all types of kidney transplant rejection[1] with the greatest precision.[1]

- Simpler and less invasive than biopsy
- More sensitive and specific than current assessment tools across all types of rejection[2,4,5]
- Up to 5x less variability than first-generation donor-derived cell-free DNA technology[1,3]

16

REFERENCES

1 Altug Y, Liang N, Ram R, et al. Analytical validation of a single-nucleotide polymorphism-based donor-derived cell-free DNA assay for detecting rejection in kidney transplant patients [published online February 19, 2019]. *Transplantation*. 2019. doi: 10.1007/TP.0000000000002685

2 Sigdel TK, Archila FA, Constantin T, et al. Optimizing detection of kidney transplant injury by assessment of donor-derived cell-free DNA via massively multiplex PCR. *J Clin Med*. 2018;8(1):pii E19.

3 Grskovic M, Hiller DJ, Eubank LA, et al. Validation of a clinical-grade assay to measure donor-derived cell-free DNA in solid organ transplant recipients. *J Mol Diagn*. 2016;18(6):890-902.

4 Bromberg JS, Brennan DC, Poggio E, et al. Biological variation of donor-derived cell-free DNA in renal transplant recipients: clinical implications. *J Appl Lab Med*. 2017;2(3):309-321.

5 Bloom RD, Bromberg JS, Poggio ED, et al. Cell-free DNA and active rejection in kidney allografts. *J Am Soc Nephrol*. 2017;28(7):2221-2232. doi: 10.1681/ASN.2016091034.

6 Huang E, Sethi S, Peng A, et al. Early clinical experience using donor-derived cell-free DNA to detect rejection in kidney transplant recipients. *Am J Transplant*. 2019; 19:1663-1670.

51. On December 19, 2019, Natera issued a press release to announce that it had received final Medicare coverage for Prospera, which the Company claimed "enabl[ed] the imminent commercialization of Prospera." This was significant because nearly all kidney transplant patients are eligible for Medicare. Thus, Medicare's determination that it would cover Prospera meant that Natera would receive reimbursement (i.e., get paid) for virtually all Prospera tests ordered by patients from Medicare. That, in turn, would provide Natera with a growing revenue stream.

52. In that same press release, Natera again took the opportunity to assert that its clinical data established that the soon-to-be-commercially-launched Prospera performed more effectively than "the competing dd-cfDNA assay"—citing the Sigdel and Bloom studies. Specifically, Defendants told investors that "[t]he Prospera test has been clinically and analytically validated for performance regardless of donor relatedness, rejection type, and clinical presentation" and that "*[i]n clinical validation, Natera reported higher sensitivity (89% vs. 59%) and higher area under the curve (0.87 vs. 0.74) than the competing dd-cfDNA assay*."

53. Analysts accepted Defendants' representations about Prospera and modeled strong acceptance of the product. For example, in a December 19, 2019 report, analyst Cowen wrote that the Medicare coverage determination led it to "Believe Prospera Could Be Key Source Of 2020 Revenue Growth." Another December 19, 2019 report by analyst Canaccord Genuity wrote, "The coverage expansion levels the playing field and allows clinicians an equal choice between

17

[CareDx] and NTRA, which in our view, may enable NTRA to switch some transplant centers from [CareDx], rather than only targeting centers that CDNA hasn't yet reached."

(2)   **During The Class Period, Defendants Misleadingly Claim Prospera's Superiority**

54.    Throughout the Class Period, both before and after commercial sales of Prospera commenced in mid-2020, Defendants continued representing that Prospera was superior to AlloSure and would provide strong revenues to the Company.

55.    For example, on February 26, 2020, Natera held its 4Q19 earnings call with investors. During the call, Chapman played up the expected financial benefits of Prospera's commercial launch, emphasizing Natera's "goal [] to have a successful commercial launch in 2020," and hailed Prospera's performance versus AlloSure, as purportedly demonstrated by Natera's "clinical validation data" (a reference to the Sigdel study):

> *[O]ur clinical validation data compared favorably against the first-generation test across many aspects of performance* including the detection of T cell-mediated rejection, the ability to detect subclinical rejection where there are no other clinical signs and the overall area under the curve. *Our study was approximately 2x larger than the competition and has now been evaluated by independent experts at Medicare who rated our strength of evidence more favorably than the first-generation test.* In our conversations, we find that transplant physicians are responding positively to these data.

56.    Defendants presented the following slide during the 4Q19 earnings call (which it also attached to a February 26, 2020 8-K), highlighting Prospera's clinical "outperformance" versus the "Other Commercial Assay" (i.e., AlloSure) based on comparisons of various data points from the Bloom and Sigdel studies (referenced in footnotes 1 and 2 in the slide):

18

# Prospera outperforms 1st generation dd-cfDNA test

Journal of
Clinical Medicine                    MDPI

Article
Optimizing Detection of Kidney Transplant Injury by
Assessment of Donor-Derived Cell-Free DNA via
Massively Multiplex PCR

Tara K. Sigdel [1,2], Felipe Acosta Archila [2] , Tudor Constantin [2,4,2], Sarah A. Prins [2,2] ,
Juliane Liberto [2], Izabella Damm [2], Padmaa Towfighi [2], Samantha Navarro [2], Ewer Kirkizlar [2],
Zachary P. Demko [2], Allison Ryan [2] , Styrmir Sigurjonsson [2], Reuben D. Sarwal [2],
Sze-Chuan Hsieh [2], Chitranon Chan-On [2], Bernhard Zimmermann [2] , Paul R. Billings [2],
Solomon Moshkevich [2] and Minnie M. Sarwal [2,*]

| | Natera[1] | [Other Commercial Assay][2] |
|---|---|---|
| Largest published renal transplant dd-cfDNA validation study[2] | 217 | 107 |
| Highest reported overall sensitivity[2] **ABMR and TCMR** | 89% | 59% |
| Highest reported performance to assess T-cell mediated rejection[2] *Sensitivity* | 100% | 27% |
| First, only test to identify subclinical rejection[2] *Sensitivity* | 92% | NA |

- More sensitive and specific than serum creatinine
- Assessed all types of rejection, including TCMR
- First published dd-cfDNA assay to identify subclinical rejection

 natera

1 Sigdel TK, et al. J. Clin. Med. 2019, 8, 19.
2 . Bloom RD, et al. J Am Soc Nephrol. 2017 Jul;28(7):2221-2232.
Not for reproduction or further distribution.

1 Sigdel TK, et al. J. Clin. Med. 2019, 8, 19.
2 . Bloom RD, et al. J Am Soc Nephrol. 2017 Jul;28(7):2221-2232.
Not for reproduction or further distribution.

57.    Analysts took note of Defendants' representations. On February 27, 2020, Canaccord Genuity issued a report with a "BUY" rating on Natera and noted Natera's "*[t]ransplant [segment] progressing nicely*." Another February 27, 2020 report by Cowen Equity Research stated that Cowen was maintaining its "Outperform" rating for Natera based, in part, on the "Base Case Assumptions" that "[t]ransplant adoption in 2020 occurs 50% [more] than CareDx rollout."

58.    On May 4, 2020, Natera issued a press release quoting Billings, proclaiming Prospera's "ability to *identify rejection with higher accuracy than first generation dd-cfDNA tests* and current standards of care[.]" The statement included two footnote references—one to the Sigdel study and one to the Bloom study. As Billings stated in sworn testimony in the CareDx

Trial, when Natera used the term "first generation dd-cfDNA tests" in the context of discussing Prospera, it was referring to AlloSure.

59. On May 6, 2020, Natera held its 1Q20 earnings call, during which Chapman once again lauded Prospera, stating, "[w]e've said for a long time that our unique product offering, *which has best-in-class sensitivity and negative predictive values*, including the ability to identify the important T cell-mediated rejection would be seen as a welcomed alternative for the transplant community."

60. Following Prospera's commercial launch in the summer of 2020, during the Morgan Stanley 18th Annual Global Healthcare Conference on September 14, 2020, Chapman similarly stated, "what you see in our peer-reviewed publication, the [Sigdel] study, that was our off-the-shelf version. *So we didn't even try on that version. We just took the off-the-shelf assay, ran it, and it generated performance data that was better than what was on the market from the competitors*."

61. In addition to their aforementioned public statements, during the Class Period, Natera's website contained marketing materials aimed at patients and clinicians that repeated the core message of Defendants' statements: Prospera had superior performance versus AlloSure based on what Natera presented as a direct, head-to-head study comparison. For example, Natera's website compared Natera's data against that of the "Other Commercial Assay," i.e., AlloSure, citing to the Sigdel and Bloom studies. A graphic depicting this false comparison was available until as recently as May 5, 2022.

62. Similarly, a brochure available on Natera's website as of at least June 2020, stated that Prospera was "[u]ltra-sensitive for more accurate classification," and claimed that, when

20

"comparing published clinical validation studies, Prospera demonstrated better performance,"

again citing Sigdel and Bloom:



## Ultra-sensitive for more accurate classification

**4** When comparing published clinical validation studies, Prospera demonstrated better performance in correctly classifying patients with active rejection—including cell-mediated rejection.[2,5] Other tests may incorrectly classify patients experiencing active rejection as normal (up to 1 out of 2 cases).[5]

**Of 100 active rejection cases, the number of patients who would be missed, and told they are normal:**

| Prospera[8] | 11/100 | First-generation dd-cfDNA[3] | 41/100 | Serum creatinine[4] | 48/100 |
|---|---|---|---|---|---|

| Sensitivity | 89% | Sensitivity | 59% | Sensitivity | 52% |

### REFERENCES

1 Altug Y, Liang N, Ram R, et al. Analytical validation of a single-nucleotide polymorphism-based donor-derived cell-free DNA assay for detecting rejection in kidney transplant patients [published online February 19, 2019]. *Transplantation.* 2019. doi: 10.1097/TP.0000000000002665

2 Sigdel TK, Archila FA, Constantin T, et al. Optimizing detection of kidney transplant injury by assessment of donor-derived cell-free DNA via massively multiplex PCR. *J Clin Med.* 2018;8(1):pii E19.

3 Grskovic M, Hiller DJ, Eubank LA, et al. Validation of a clinical-grade assay to measure donor-derived cell-free DNA in solid organ transplant recipients. *J Mol Diagn.* 2016;18(6):890-902.

4 Bromberg JS, Brennan DC, Poggio E, et al. Biological variation of donor-derived cell-free DNA in renal transplant recipients: clinical implications. *J Appl Lab Med.* 2017;2(3):309-321.

5 Bloom RD, Bromberg JS, Poggio ED, et al. Cell-free DNA and active rejection in kidney allografts. *J Am Soc Nephrol.* 2017;28(7):2221-2232. doi: 10.1681/ASN.2016091034.

6 Huang E, Sethi S, Peng A, et al. Early clinical experience using donor-derived cell-free DNA to detect rejection in kidney transplant recipients. *Am J Transplant.* 2019; 19:1663-1670.

63.     Another video available on Natera's website as of October 24, 2021, included the

following graphic comparing Prospera against AlloSure, again citing the Sigdel and Bloom studies

as the basis for the comparison (highlighting added):

## Lower risk of missing active rejection*

| | | |
|---|---|---|
| 25% | 95% | 84% |
| 10% | 98.3%* | 95%+ |

*calculated from all AR in Sigdel
+calculated from for-cause in Bloom

      b)      **Defendants Knew Or Were Severely Reckless To Disregard That Their Statements Were Not Supported By The Underlying Clinical Study Data**

64.     Defendants knew or were severely reckless to disregard that their attention-grabbing claims about Prospera's performance as compared to AlloSure based on comparisons of the data from the Sigdel and Bloom studies were unsupported.

65.     Natera's Senior Medical Director of the Organ Health Group, Dr. Gauthier, admitted in sworn testimony in the CareDx Trial that Natera did not have a "head-to-head" study versus AlloSure.

66.     This was because the Sigdel and Bloom studies had fundamental differences that prevented a comparison of Prospera's performance versus that of AlloSure based on the tests, which included the following.

67.     *First*, the sample set for the Sigdel and Bloom studies differed significantly. The Sigdel sample set was based primarily on the rejection samples available at the University of California, San Francisco biobank (a resource the university uses to collect and select samples for various studies). By contrast, the Bloom study established baseline inclusion and exclusion criteria,

accepted all qualified patients, and then performed biopsies across multiple sites. In other words, the sample set for the Bloom study was representative of the general kidney population, whereas the Sigdel study was not.

68.     *Second*, the Sigdel study mixed populations sets of "for cause" and "protocol" biopsy samples. The Bloom study did not. "For cause" kidney biopsies are conducted on patients who have presented a warning sign about possible active rejection. A "protocol" biopsy is conducted even though the patient has no prior indication of active rejection. Including "protocol" biopsies increased the chance of a test result accurately being negative, which therefore potentially inflated the rate of specificity (i.e., artificially improved Prospera's data about its accuracy).

69.     *Third*, the Sigdel study did not adhere to the Banff Classification of Allograft Pathology (the "Banff Rules"), which provide criteria for the diagnosis of types of kidney rejections. Only kidney transplant rejection studies conducted in accordance with the Banff Rules are accepted in the transplant research and scientific community. Unlike the Sigdel study, the Bloom study did adhere to the Banff Rules.

70.     *Fourth*, the underlying methodologies between the Sigdel and Bloom studies were vastly different. For example, the Sigdel study used data from just one site, whereas the Bloom study used data from numerous sites. And the Sigdel study was retrospective, whereas the Bloom study was prospective. Transcripts of sworn testimony taken in the March 2022 CareDx Trial, and the internal Natera records those trial witnesses testified about, reveal that it was widely acknowledged by Natera's senior management and other professionals within Natera that the Prospera study data did not support Defendants' public claims about Prospera's superiority. Prior to the CareDx Trial, however, the evidence identified here and submitted in connection with dispositive motions in the CareDx Trial was, at all times, under seal.

23

71.     On September 11, 2018, following Natera's 2Q18 earnings call, Natera's Senior Director of Scientific Communications and Clinical Research, Zachary Demko emailed Billings, copying Dr. Felipe Acosta, Natera's Lead Data Scientist, about potential journals that could publish the Sigdel study, admitting that "*the performance [of Prospera] isn't quite as high as we thought, and is not significantly better than CareDx's data.*"

72.     On September 16, 2018, Demko emailed Billings, copying Dr. Acosta, about Prospera. In it, Demko acknowledged that "there is still a risk there with the PLoS Medicine [journal] as *our numbers don't show significant difference with CareDx's* calling into question the novelty of our manuscript."

73.     Also in September 2018, Elizabeth Mihok, Natera's then-Senior Program Manager of R&D, held separate meetings with Dr. Allison Ryan, Natera's then-Vice President of R&D, Data Science and Billings to discuss Natera's claims regarding Prospera. Thereafter, Mihok memorialized the meetings in an email. Mihok stated: "After speaking with [Billings] and [Dr. Ryan], the following changes to transplant product performance claims were agreed upon." The communications then framed a new claim and an old claim. The old claim stated, "Test has significantly higher sensitivity and PPV than current commercialized tests." The new claim stated, "*Natera's overall test performance is about equivalent to other commercialized assays.*" The email explained that the reason for the change was that "*the statistical analysis does not support claims of significantly better performance.*" Mihok further acknowledged that "*[i]t is misleading to claim higher sensitivity without also stating that it came with the price of lower specificity.*" In addition, Mihok stated, "it would [be] very difficult to justify any claims of superior performance without extremely compelling data."

24

74.     Thereafter, in November 2018, Natera's then-Vice President of Marketing & Medical Education, Ramesh Hariharan, emailed Solomon Moshkevich, Natera's then-Senior Vice President, Products and Strategy, Anna Czene, Natera's then-Senior Director of Corporate and Marketing Communication, and Shephalie Lahri, Natera's then-Associate Director, Transplant Marketing and current Director, Marketing for Organ Transplantation, and stated, "*I don't think we can claim superiority*. Members of our stats team believe our better sensitivity was driven more by patient selection variables. *I would rather say compelling results in recent research study*."

75.     One month later, in December 2018, while the Sigdel study was being reviewed for publication, Billings emailed Moshkevich and Minnie Sarwal, the principal investigator for and co-author of the Sigdel study, about the comparison of the Sigdel and Bloom studies, warning that "*[t]he reviewers are trying for apples to apples. Unfortunately, in these kinds of studies, that is not possible*."

76.     Moshkevich concurred, stating that "*It's risky to claim that our product has superior clinical performance since our stats team found that the AUC comparison is not statistically significant*."

77.     Thereafter, on February 8, 2019, Natera's newly appointed CEO, Chapman, emailed Billings and identified "major risks" with the Sigdel study, including: (i) that it utilized a "single site study;" (ii) that it was a "retrospective study of the banked samples;" (iii) that "the major risk for the [Sigdel study] was the [principal investigator, responsible for preparing and carrying out the clinical trial protocol] with a reputation for massaging the data;" and (iv) "that the serum creatinine at 72 versus 54 in other studies is a major risk with the study."

78.     Nevertheless, the next month, during Natera's March 12, 2019 4Q18 earnings call, Chapman told investors regarding the yet-to-be-commercialized test, that "[o]ur published clinical

validation was 2x larger than other studies and the data showed a better overall area under the curve, superior detection of key cell [mediary] rejection and the ability to detect subclinical rejection where there are no other clinical signs." (second brackets in original).

79.     As the foregoing demonstrates, Natera employees, including Defendants and other high-ranking professionals, internally recognized that the Sigdel study did not demonstrate that Prospera had superior clinical performance to competing commercial tests. However, the Company continued to represent to the public that Prospera had proven superior accuracy.

80.     This was because Prospera's supposed superiority was viewed by Defendants as the key to its commercial success. Natera's marketing plan, as of June 19, 2019, included converting AlloSure users to Prospera users, as revealed by the testimony during the CareDx Trial of Shephalie Lahri, Natera's current Director of Marketing for Organ Transplant Unit for Natera, who was promoted from Associate Director, Transplant Marketing in March 2020. Dr. Gauthier similarly testified in the CareDx Trial that, from the introduction of Prospera in 2019 through the middle of 2021, Natera targeted CareDx's customers to replace them with Natera's Prospera test through marketing materials that showed Natera's performance.

81.     Dr. Gauthier also admitted that he trained the sales and marketing teams to highlight comparisons between Prospera and AlloSure, and to state that Prospera was superior to AlloSure based on a comparison of the Sigdel and Bloom studies. He further testified that he trained the sales and marketing team how to compare the Prospera product to the AlloSure product, and that one of Natera's major marketing claims regarding Prospera was that its AUC was superior to AlloSure. He likewise trained Natera's sales and marketing team to explain to AlloSure customers that Prospera had greater overall sensitivity for any type of rejection, and better sensitivity that led to better positive predictive value ("PPV") and negative predictive value ("NPV"). Positive

predictive value is the likelihood that an individual with a positive test result truly has the condition in question. Negative predictive value is the likelihood that an individual with a negative test result is truly unaffected and/or does not have the particular condition in question.

82.     Statements from FE-1 corroborate Dr. Gauthier's testimony. FE-1 served as a nephrology sales representative from 1Q20 to 4Q20 in Natera's Organ Health business. In this role, FE-1 handled Prospera sales for several states in a region of the Southern United States. FE-1 reported to a regional manager, who reported to Steve Wallace, Vice President of Organ Transplant. Wallace reported to Senior Vice President of Sales Phillip Grinnell, who reported to Chapman.

83.     FE-1 attended a week of training focused on Prospera when FE-1 joined Natera. FE-1 stated that all of the roughly 50 people hired as part of the Prospera sales force attended that training. FE-1 also recalled that Natera trained them to tell doctors that Prospera was superior to AlloSure based on comparisons of the Sigdel and Bloom studies, and to focus on certain favorable data points. Specifically, FE-1 recalled that Natera trained FE-1 and FE-1's colleagues to push the narrative that CareDx "essentially cherry picked" data and that Natera did not. FE-1 also explained that during this week-long training regarding Prospera, there was a significant emphasis placed on making comparisons of Prospera's PPV and NPV against AlloSure's, using the Sigdel and Bloom studies' data.

84.     FE-1 further stated that Prospera sales representatives could leave the Sigdel study with doctors, and that Natera had several "1-pagers" that sales representatives could leave behind. FE-1 explained that when FE-1 joined Natera, one of the "1-pagers" included aggressive language that CareDx was effectively lying about AlloSure, and comparing Prospera's and AlloSure's NPV.

Another "1-pager," according to FE-1, contained a bar chart graphic comparing Prospera's NPV against AlloSure's NPV, based on the Sigdel and Bloom studies.

85.     FE-1 then explained that Natera held weekly or bi-weekly nationwide conference calls that all organ transplant sales representatives and managers attended. FE-1 recalled that Steve Wallace, one of two Natera Vice Presidents of Organ Transplant, attended these meetings. FE-1 explained that in June or July 2020, FE-1 attended one of these meetings, during which the sales representatives were told they could no longer use the two "1-pagers" or present the Sigdel study to doctors or leave it with them. FE-1 did not recall any explanation given as to why those changes were made.

86.     FE-2, a Director in marketing for Natera from the fall of 2020 through the end of the Class Period, stated that Kate Stabrawa, Head of Communications and PR for Natera, and a direct advisor to Chapman, repeatedly told Chapman not to make public statements comparing Natera's products to CareDx's. Specifically, Stabrawa told FE-2 that she was frustrated Chapman was not listening to her on how to approach media or how to address competition or products, and often complained about Chapman saying at town hall meetings and other forums that Natera was better than CareDx. According to FE-2, Stabrawa advised Chapman directly to stop saying that Natera was better than CareDx, but he continued to do it.

87.     Unaware of the foregoing material adverse facts, investment analysts covering Natera accepted and repeated Defendants' claims of its clinical superiority over AlloSure. And, critically,

88.     On the strength of Defendants' claims, Prospera grew its share of the kidney rejection test market. Indeed, Defendants touted traction in the organ transplant sector since Prospera launched, and disclosed towards the end of the Class Period that unit volumes from its

Organ Health tests increased from 11,000 in 2020 to 42,000 in 2021, with a "majority of [the] volume" coming from Prospera.

89.     On March 14, 2022, a federal jury in the CareDx Trial returned a verdict based on evidence that Natera intentionally and willfully misled the public by using false advertisements to market Prospera as being more effective than AlloSure—including through statements that Defendants continued to make during the Class Period. All told, the jury awarded CareDx $44.9 million in monetary damages, including *$23.7 million in punitive damages*. The verdict publicly drove home the unfounded nature of Defendants' marketing claims about Prospera—claims which, to that point, had been highly successful in garnering kidney transplant test market share for Natera.

### c)     Defendants' Misstatements And Omissions Regarding Prospera

90.     On February 26, 2020, Natera held an earnings call to discuss its 4Q19 financial results. During his prepared remarks, Chapman stated:

> *[O]ur clinical validation data compared favorably against the first-generation test across many aspects of performance* including the detection of T cell-mediated rejection, the ability to detect subclinical rejection where there are no other clinical signs and the overall area under the curve. Our study was approximately 2x larger than the competition and has now been evaluated by independent experts at Medicare *who rated our strength of evidence more favorably than the first-generation test*. In our conversations, we find that transplant physicians are responding positively to these data.[2]

---

[2] For ease of reference, Plaintiffs have endeavored to highlight the materially false and misleading aspects of Defendants' Class Period statements in bold and italics. Additional text is provided often for context, but that context can also contribute to the false and misleading nature of Defendants' statements.

91.     Defendants presented the following slide during its 4Q19 earnings call, comparing Natera's study data against that of AlloSure, specifically referencing the Bloom and Sigdel studies in footnotes for the comparisons:

# Prospera outperforms 1ˢᵗ generation dd-cfDNA test

| | Natera[1] | Other 1ˢᵗ generation Assay[2] |
|---|---|---|
| Largest published renal transplant dd-cfDNA validation study[2] | 217 | 107 |
| Highest reported overall sensitivity[2] *ABMR and TCMR* | 89% | 59% |
| Highest reported performance to assess T-cell mediated rejection[2] *Sensitivity* | 100% | 27% |
| First, only test to identify subclinical rejection[2] *Sensitivity* | 92% | NA |

*Journal of Clinical Medicine*  **MDPI**

*Article*
**Optimizing Detection of Kidney Transplant Injury by Assessment of Donor-Derived Cell-Free DNA via Massively Multiplex PCR**

Tara K. Sigdel [1,*], Felipe Acosta Archila [2,†], Tudor Constantin [2,4,‡], Sarah A. Prins [2,‡], Juliane Liberto [1], Izabella Damm [1], Parhom Towfighi [1], Samantha Navarro [1], Ewo Kirkizlar [2], Zachary P. Demko [2], Allison Ryan [2], Styrmir Sigurjonsson [2], Reuben D. Sarwal [1], Sze-Chuan Hsieh [1], Chitranee Chan-On [1], Bernhard Zimmermann [2], Paul R. Billings [2], Solomon Moshkevich [2] and Minnie M. Sarwal [1,*]

- More sensitive and specific than serum creatinine
- Assessed all types of rejection, including TCMR
- First published dd-cfDNA assay to identify subclinical rejection

1. Sigdel TK, et al. J. Clin. Med. 2019,8, 19.
2. Bloom RD, et al. J Am Soc Nephrol. 2017;28(7):2221-1232
Not for reproduction or further distribution.

 **natera**

92.     The slide in ¶91 was also attached to Natera's February 26, 2020 8-K (which Brophy signed).

93.     In Natera's 2019 10-K for the year ended December 31, 2019, dated February 28, 2020 (deemed filed with the SEC March 2, 2020), Defendants stated, "In transplant rejection, ***published studies of our test performance in both clinical*** and analytical ***validation report higher sensitivity and higher area under the curve, or AUC, than both the current standard of care and the current commercially available test***."

94.     On March 11, 2020, Natera participated in the Barclays Global Healthcare Conference. During the conference, Brophy presented a slide deck and stated:

> Just a comment on the data as it relates to the first test that's on the market here. We feel like we're in a really good competitive position versus the competition here. So just as a reminder, ***our clinical validation data compared very favorably***

*against that the competition across many aspects of performance*, including the detection of T cell-mediated rejection, the ability to detect subclinical rejection, where generally subclinical means there are no other clinical signs. *And the overall kind of area under the curve was the probability that your test result is accurate*. Our study was about twice as large as the competition is now, has been evaluated by independent experts in Medicare, who rated our proof of evidence more favorably than the competition. So in the conversations we've had in the field, we find that the transplant physicians are responding very positively to that data.

95.    On May 4, 2020, Natera issued a press release titled, "Natera Announces Achievement of Key Recruitment Milestones in ProActive Study and Success in Prospera Early Access Program." Within that press release, Billings stated that, "[t]he strong interest in Prospera and the significant number of top centers ordering tests during the early access program reflects a desire for *more accurate, non-invasive testing methods, which Prospera fulfills through its ability to identify rejection with higher accuracy than first generation dd-cfDNA tests and current standards of care*[.]" The statement included two footnote references—one to the Sigdel study and one to the Bloom study.

96.    On May 6, 2020, Natera held its 1Q20 earnings call. During his prepared remarks, Chapman stated:

> We've said for a long time that our unique product offering, *which has best-in-class sensitivity and negative predictive values*, including the ability to identify the important T cell-mediated rejection would be seen as a welcomed alternative for the transplant community. That's exactly what we've seen. In very short order, we've now seen roughly 45% of the top 50 centers place orders and 37% of the top 100 centers by volume place orders. This is really incredible and shows the need for a test like ours in the market.

97.    On September 14, 2020, Natera attended the Morgan Stanley 18th Annual Global Healthcare Conference. During the conference, Chapman had the following exchange with Morgan Stanley analyst Tejas Rajeev Savant:

> **Savant**: . . . And then switching gears to Prospera. I mean obviously you have the final LCD in place. You're getting paid on your submissions. Can you share some color on commercial traction in the midst of the pandemic in terms of access to transplant centers and so on? And then secondly, over what time frame do you

31

expect to launch the quantification ability, which you recently sort of highlighted to warn folks who is at risk of false negatives? And how does that position you competitively?

**Chapman**: Yes. So I appreciate you asking about that. . . . So we started off with Prospera, what you see in our peer-reviewed publication, the [starwall] [sic] study, that was our off-the-shelf version. So we didn't even try on that version. We just took the off-the-shelf assay, ran it, and ***it generated performance data that was better than what was on the market from the competitors***.

(first brackets in original).

98.     In Natera's 2020 10-K for the year ended December 31, 2020, dated February 25, 2021 (deemed filed with the SEC on February 26, 2021), Defendants stated that, "Published studies of the performance of our Prospera transplant rejection test ***in both clinical and analytical validation report higher sensitivity and higher area under the curve, or AUC, than both the current standard of care and the competing test***."

99.     Furthermore, during the Class Period, Defendants also made materially false and misleading statements on Natera's website, repeating similar refrains about Prospera compared to AlloSure.

100.    A brochure available on Natera's website as of at least June 2020, contained the following statement that claimed Prospera was "***[u]ltra-sensitive for more accurate classification***," and claimed that, when "***comparing published clinical validation studies, Prospera demonstrated better performance***," and in support cited footnotes 2 and 5, referencing the Sigdel and Bloom studies:



## Ultra-sensitive for more accurate classification

# 4

When comparing published clinical validation studies, Prospera demonstrated better performance in correctly classifying patients with active rejection—including cell-mediated rejection.[2,5] Other tests may incorrectly classify patients experiencing active rejection as normal (up to 1 out of 2 cases).[5]

**Of 100 active rejection cases, the number of patients who would be missed, and told they are normal‡**

| Prospera[2] | 11/100 | First-generation dd-cfDNA[5] | 41/100 | Serum creatinine[5] | 48/100 |
|---|---|---|---|---|---|

| Sensitivity | 89% | Sensitivity | 59% | Sensitivity | 52% |
|---|---|---|---|---|---|

### REFERENCES

1 Altug Y, Liang N, Ram R, et al. Analytical validation of a single-nucleotide polymorphism-based donor-derived cell-free DNA assay for detecting rejection in kidney transplant patients [published online February 19, 2019]. *Transplantation*. 2019. doi: 10.1097/TP.0000000000002665

2 Sigdel TK, Archila FA, Constantin T, et al. Optimizing detection of kidney transplant injury by assessment of donor-derived cell-free DNA via massively multiplex PCR. *J Clin Med*. 2018;8(1):pii E19.

3 Grskovic M, Hiller DJ, Eubank LA, et al. Validation of a clinical-grade assay to measure donor-derived cell-free DNA in solid organ transplant recipients. *J Mol Diagn*. 2016;18(6):890-902.

4 Bromberg JS, Brennan DC, Poggio E, et al. Biological variation of donor-derived cell-free DNA in renal transplant recipients: clinical implications. *J Appl Lab Med*. 2017;2(3):309-321.

5 Bloom RD, Bromberg JS, Poggio ED, et al. Cell-free DNA and active rejection in kidney allografts. *J Am Soc Nephrol*. 2017;28(7):2221-2232. doi: 10.1681/ASN.2016091034.

6 Huang E, Sethi S, Peng A, et al. Early clinical experience using donor-derived cell-free DNA to detect rejection in kidney transplant recipients. *Am J Transplant*. 2019; 19:1663-1670.

101.   On Natera's website as of January 14, 2021, the Company stated that Prospera was

"***More sensitive and specific than current assessment tools across all types of rejection***," citing

footnotes 2 and 5 referencing the Sigdel and Bloom studies:

# Introducing Prospera

Prospera is powered by highly optimized, proprietary cell-free DNA (cfDNA) technology. As part of your tool kit, Prospera assesses all types of kidney transplant rejection  with the greatest precision.[1,3]

- Simpler and less invasive than biopsy
- More sensitive and specific than current assessment tools across all types of rejection[2,4,5]
- Up to 5x less variability than first-generation donor-derived cell-free DNA technology[1,3]

102.    On Natera's website as of June 14, 2021, the Company stated that Prospera was

"*[u]p to 5x less variable than first-generation donor-derived cell-free DNA technology*," citing

footnotes 1 and 3 referencing the Sigdel and Bloom studies:



References
[1]Sigdel TK, Archila FA, Constantin T, et al. Optimizing detection of kidney transplant injury by assessment of donor-derived cell-free DNA via massively multiplex PCR. J Clin Med. 2019;8(1):19.
[2]Altug Y, Liang N, Ram R, et al. Analytical validation of a single-nucleotide polymorphism-based donor-derived cell-free DNA assay for detecting rejection in kidney transplant patients. Transplantation, 2019.
[3]Bloom RD, Bromberg JS, Poggio ED, et al. Cell-free DNA and active rejection in kidney allografts. J Am Soc Nephrol. 2017;28(7):2221-2232. doi: 10.1681/ASN.2016091034.

103.    A video available on Natera's website as of October 24, 2021, included the

following graphic comparing Prospera against AlloSure, citing the Sigdel and Bloom studies:

## Lower risk of missing active rejection*

| | | |
|---|---|---|
| | | |
| 25% | 95% | 84% |
| 10% | 98.3%* | 95%⁺ |

*calculated from all AR in Sigdel
⁺calculated from for-cause in Bloom

104.    Defendants' statements in ¶¶90-98, 100-03 were materially false and misleading and omitted material facts when made because at no point did Natera conduct or possess a head-to-head study comparing Prospera and AlloSure, and the clinical data Defendants relied upon for the comparisons between Prospera and AlloSure did not support the comparisons Defendants drew. Internal Company emails and other communications from, e.g., September 2018, November 2018, and February 2019, show widespread recognition by responsible Natera executives that the Company did not have a scientific basis to claim that the Prospera test was clinically superior to competing tests (¶¶71-77), and identify numerous technical differences between the Sigdel and Bloom studies on which Defendants based their claims of superiority (¶¶65-70, 75, 77). Underscoring these facts, Natera management steadfastly directed its Prospera sales staff to promote the test's supposed clinical superiority to AlloSure, and but then abruptly instructed employees to stop making such claims (¶¶80-85). The unanimous federal jury verdict and findings that Natera made misleading statements asserting Prospera's clinical superiority to AlloSure, and awarding damages, including punitive damages (¶89)—rendered following the presentation of evidence in the form of internal Company records and sworn testimony from Natera management

and employees—is further evidence that Defendants' statements were materially false or misleading when made.

### 2. The Panorama Fraud

105.    NIPTs were first commercialized in 2011. Their popularity has ballooned since. By the start of the Class Period in 2020, the valuation for the NIPT market had reached approximately $2.8 billion.

106.    By the end of 2017, Natera claimed to have taken over as the NIPT market leader by volume in the United States. In November 2021, Chapman told analysts that Natera's share of the NIPT market was close to 40%, and that "[w]e track our market share, and we can see the competitive market shares as well through these detailed market surveys that we do. And we've been gaining share relative to the rest of the market."

107.    Natera's flagship NIPT, Panorama, is used to test for fetal chromosomal abnormalities. Using a blood sample from a pregnant woman, Panorama analyzes DNA from the placenta for certain chromosome conditions that could impact a baby's health in a process that can be performed as early as nine weeks into a pregnancy. During the Class Period, Panorama screened for several aneuploidies (disorders that are caused by the presence of an extra or missing copy of a chromosome), including Down syndrome. Through an additional screen at significant additional cost, Panorama could also test for five very rare microdeletion syndromes, one of which was 22q11.2 deletion syndrome (also known as DiGeorge syndrome). Microdeletions are small, missing parts of a chromosome. Natera billed for aneuploidy and microdeletion screening separately. Thus, where a patient's Panorama test included both aneuploidy and microdeletion screening, Natera would bill separate costs for each type of screening, generating revenues from both.

108.     Throughout the Class Period, Defendants told investors that Natera's positive revenue performance was driven, in large part, by Panorama. Indeed, according to Natera, in 2019, 2020, and 2021, Panorama was one of two tests that "represent[ed] the significant majority" of Natera's revenues. During this same time, Defendants drew the market's attention to what they suggested was organically growing demand for Panorama, including for microdeletion testing.

109.     In truth, however, these statements were materially false or misleading because Panorama revenue and the demand for the test were propped up to significant degree by deceptive business practices, discussed below in Section II.C.2.b.

<b>a)       Defendants Mislead Investors About The Revenues Generated<br>By Panorama And Demand For Microdeletion Testing</b>

110.     At the start of the Class Period, in a February 26, 2020 press release reporting results for 4Q19 and the fiscal year ended December 31, 2019, Natera disclosed "[t]otal revenues were $83.2 million in the fourth quarter of 2019 compared to $67.0 million for the fourth quarter of 2018, an increase of 24%." Defendants asserted: "***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests***."

111.     Likewise, in a May 6, 2020 press release, Defendants reported "[t]otal revenues were $94.0 million in the first quarter of 2020 compared to $66.8 million for the first quarter of 2019, an increase of 41%." Again, Defendants pointed to Panorama as key to the Company's performance, stating: "***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests***."

112.     Analysts latched onto these statements. On May 7, 2020, for instance, Piper Sandler published a report reiterating its "overweight" rating for Natera due to the Company's "record quarter for both test volume and revenues driven by strength in Panorama and Horizon testing."

37

113.    On August 5, 2020, Natera reported that for 2Q20, "[t]otal revenues were $86.5 million in the second quarter of 2020 compared to $74.4 million for the second quarter of 2019." The Company again noted Panorama's central role in the growth: "***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests.***"

114.    Analysts again seized on Defendants' statements. For example, an August 5, 2020 report by Piper Sandler noted that "Natera recognized revenue on 220,000 test results (just below record volumes of 221.5k in 1Q20) ***driven by Panorama and Horizon testing***. We believe this demonstrates the essential nature of Natera's tests." An August 6, 2020 report by Craig-Hallum Capital Group listed Natera as a "BUY" and noted "***Upside on prenatal products was from both better account penetration and market share gains.***"

115.    Alongside these positive representations about Panorama, Defendants touted the purported organic growth in the volume of Panorama tests performed, which they attributed in significant part to supposed increasing demand for its microdeletion screen. For example, during Natera's 4Q20 earnings call, Chapman stated, "last year, we did 400,000 microdeletion tests, and ***that was at a growth rate of 37% year-on-year versus 2019. So this is really a rocket ship that's growing***. We're running the tests. If we can get reimbursement, it's going to be—we're going to be off to the races."

116.    Similarly, during the JPMorgan Healthcare Conference on January 12, 2021, an analyst asked Chapman to discuss the potential financial impact of Natera receiving greater reimbursement for microdeletion screening. In response, Chapman again emphasized Natera's purported microdeletion demand, stating, in relevant part, that approximately 80% of all Panorama tests that doctors ordered now included orders for microdeletion screens:

> If you're conservative and you just say $250 a test, that puts you at $100 million in
> additional revenue and cash just from the book that we're running today. Now you

shouldn't think about it as being capped at that level because *we see doctors ordering the microdeletion test 8 out of 10 times, they place an order for Panorama*. So as we penetrate that additional 3 million tests in the average risk space, that microdeletion number is going to go up significantly as well. And it's pretty baked into our COGS as well.

117.    Chapman's statements had their intended impact. In a January 14, 2021 report, analysts at SVB Leerink wrote:

> We see potential for meaningful upside to revenues over time with microdeletion reimbursement given an already established base (>400k test/year run rate) and increasing penetration of NIPT into the average risk market.
>
> *With increasing market penetration and share gain for Panorama, we expect microdeletion volumes to move even higher*. At the current run rate and a $600 ASP assumption (some payers have already contracted the microdeletion code at $600 - $800), we calculate $60M+ revenue potential per quarter (current 4Q20E consensus estimate is $106M).

118.    A January 14, 2021 report from Canaccord Genuity likewise noted:

> Roughly ~80% of NTRA's NIPT test orders include add-on microdeletions testing, and NTRA gets paid on this "add-on" testing ~5-10% of the time. With an established microdeletions CPT code (81422) in place at $759.05/test, any material increase in the percentage of paid microdeletions claims will result in an explosive step function in NTRA's NIPT segment.

119.    During Canaccord Genuity's 41st Annual Growth Conference on August 11, 2021, Brophy again made statements about Panorama's purported microdeletion demand—i.e., how frequently microdeletion screens were ordered when a Panorama test was ordered—and expressed further confidence in attaining further growth. Specifically, Brophy stated "*we also get a microdeletion test ordered very frequently along with the NIPT. So for every 100 NIPTs there's . . . something like 75 microdeletion tests that get ordered*. So we're very well positioned to take this one kind of macro trend and see it really amplified in our business."

120.    Following this conference, Canaccord Genuity reported on August 11, 2021: "*Growth in NIPT is amplified for NTRA given additional tests are typically ordered with NIPT,*

*such as . . . microdeletion testing (75 for every 100 NIPT tests).* In our view, the company is still in the early stages of the robust Women's Heath opportunity."

121.    On September 10, 2021, Natera participated in the Wells Fargo Virtual Healthcare Conference. Wells Fargo analyst Daniel Leonard asked Brophy to "remind me what you're telling folks on microdeletions." In response, Brophy stated, in part, "Yes. I mean *microdeletions continues to be a very popular product for us* . . . roughly speaking, I mean, for every 100 NIPTs to [sic] get ordered, we get about 80 or so microdeletions orders."

**b)**    **Unbeknownst To Investors, Deceptive Billing And Sales Practices Fuel Panorama's Revenues And Microdeletion Demand**

122.    While Defendants were highlighting Panorama's impressive revenue performance and microdeletion demand, however, Natera was engaged in deceptive practices that inflated both metrics.

**(1)**    **Natera's Improper Undisclosed Relationship With Third-Party Prior Authorization Service**

123.    In contravention of well-established anti-kickback guidelines for medical billing industry participants, Natera was using a third-party company with which it maintained undisclosed intimate ties to provide free prior authorization services to practitioners and submit prior authorization requests for the Company's Panorama tests. That third-party submitted those requests without regard for the medical necessity on the underlying procedure and, thus, whether insurers would ultimately approve such requests. This directly enabled Natera to sell more tests and generate increased revenue.

124.    Prior authorization is a cost-control process through which health plans require physicians and other healthcare providers to obtain advance approval from a health insurer in order to qualify for payment coverage, either in full or in part. If a medical provider determines a patient

40

needs a specific service that requires a prior authorization, the medical provider must submit a request to the patients' health insurer, including information demonstrating that the requested service is medically necessary.

125.    In its 2Q17 10-Q filed with the SEC in August 2017, Natera disclosed that health insurers were increasingly requiring prior authorizations for Panorama. Historically, prior authorizations have been an administrative hurdle with negative financial consequences for Natera. In risk disclosures in its 2019, 2020, and 2021 10-Ks, the Company noted that completing prior authorization submissions "prior to conducting genetic testing as a condition to reimbursing for it [] has reduced and/or delayed the reimbursement amounts we receive for Panorama, Horizon and our other tests." Natera similarly told investors that prior authorization requirements had "impacted our results of operations, including our gross margins."

126.    Because prior authorization is a burdensome process, companies formed to assist practitioners with prior authorizations have emerged. Relevant here, right after Natera's August 2017 announcement warning of the increased need for prior authorizations for Panorama, in October 2017, MGML was established according to an application filed on Form 1023 with the Internal Revenue Service ("IRS") seeking tax-exempt status under Section 501(c)(3) of the Internal Revenue Code.

127.    Deepti Gupta was the driving force behind and architect of MGML. By way of background, MGML's Form 1023 was signed by Lymaraina D'Souza. According to Hindenburg, D'Souza told *The Capitol Forum*, a Washington, D.C.-based subscription research service, that Deepti Gupta recruited D'Souza in 2017 to assist with establishing MGML as a charity. MGML's Form 1023 also listed Marcy Miranda as MGML's Secretary. Miranda told Hindenburg that she agreed to serve as an MGML trustee as a favor to Deepti Gupta.

128.    On December 2, 2020, Gupta filed an Application for Reservation of an Entity Name for MGML with the Texas Secretary of State. By at least August 10, 2021, Gupta was listed as the "ADMINISTRATOR" of MGML in MGML's National Provider Identifier listing.

129.    At the time MGML was founded, and throughout the Class Period, Gupta maintained significant connections with Amar Kamath. Kamath held the position of Natera VP of Commercial Sales from October 2017 until May 2019, when he left the Company.

130.    Plaintiffs' investigation of public property records revealed evidence of close personal and business ties between Gupta and Kamath. For example, a May 2018 general warranty deed shows that Kamath and Gupta purchased a condominium in Travis County, Texas together. That same general warranty deed listed Kamath and Gupta as the grantees for the condominium, and listed a single "Grantee's Address" in Sparta, New Jersey for Gupta and Kamath. Additional property records obtained through Plaintiffs' investigation show that Gupta and Kamath continued to purchase properties together in both New Jersey and Texas in 2020 and 2021. Prior to these joint purchases, as detailed in the Hindenburg Report, Gupta and Kamath traveled together on a personal overseas trip in 2016, a fact reflected in photographs that were posted on Facebook.

131.    One person familiar with MGML's operations recounted to Hindenburg that, following the uptick in commercial payers increasingly mandating prior authorizations, Kamath "realized that his sales operation was up against the wall," which coincided with MGML's creation and Kamath starting his role as Natera's VP of Commercial Sales in October 2017.

132.    Just months later, in early 2018, Natera began using MGML to submit significant volumes of prior authorizations for Panorama testing. Defendants admitted this fact during a special investor call on March 10, 2022, that the Company held to address the March 9, 2022 Hindenburg Report. Specifically, Defendants admitted the arrangement, and revealed for the first

time the extent to which Natera used MGML to fuel its Panorama revenues. Between 2018 and March 10, 2022, Defendants confirmed that Natera routed roughly 450,000 Women's Health (including Panorama) prior authorizations through MGML. The approximately 450,000 prior authorizations through MGML amounted to roughly 25% of all prior authorizations that MGML completed since its founding. Natera also disclosed that in 2021 alone, 11% of its Women's Health prior authorizations were conducted by MGML. This totaled roughly 159,000 tests just in 2021.

133.   At all relevant times, the vast majority of all Natera Women's Health tests processed were Panorama. Although Natera stopped disclosing the number of total Panorama and Women's Health tests run starting with its 4Q19 financial results, for fiscal year 2018, Panorama accounted for 71.2% of the 603,400 Women's Health tests processed. And in 1Q19 through 3Q19, Panorama amounted to 70% of the 537,400 Women's Health tests processed over those nine months.

134.   In addition, Canaccord Genuity issued a report on March 10, 2022, stating that management confirmed roughly 70% of the prior authorizations MGML submitted for Natera were approved. Thus, in 2021 alone, MGML paved the way for over 110,000 Natera tests to obtain all-important prior authorization—the gateway to orders, and ultimately, payment. Also significant was the 30%—or roughly 47,000—of Natera's MGML prior authorizations that were denied. In the instances where denied prior authorizations occurred after a Panorama test was run, Natera was able to pursue the patient for the cost of the test.

135.   These facts are consistent with the accounts of a former Natera sales representative and individuals familiar with the Natera-MGML relationship interviewed by Hindenburg, all of whom stated that MGML submitted large numbers of prior authorizations on Natera's behalf, including many that lacked key support: "[MGML] would send it all in. It didn't matter if you

didn't meet that medical necessity requirement, it didn't matter. They would still send it in because Natera throws everything at the wall to see what sticks." Hindenburg also reported based on its sources that MGML would even conduct prior authorizations *after* a Panorama test was run.

136.    The undisclosed Natera-MGML ties implicated potential anti-kickback law violations and industry-standard practices. In particular, the U.S. Department of Health and Human Services Office of Inspector General ("OIG"). The OIG is dedicated to fighting waste, fraud, and abuse in, and improving the efficiency of, Medicare, Medicaid and more than 100 other Department of Health and Human Services programs. The OIG therefore routinely issues advisory opinions regarding matters under its purview, including the use of free prior authorization services.

137.    In September 2010, the OIG issued an opinion regarding free prior authorization services. That OIG opinion noted the need for companies to be transparent when third-party firms are used to provide free prior authorization services. The OIG reiterated this position in no fewer than three opinions issued on May 6, 2010, August 31, 2010, and August 30, 2012. These opinions state, for example, that third-party prior authorization companies should disclose their identity to insurers when the prior authorization request is submitted in order to avoid arrangements that potentially violate anti-kickback rules. This is because when a party in a position to benefit from referrals (Natera) provides free administrative services (MGML providing free prior authorizations for Panorama tests) to an existing or potential referral source (doctors ordering Panorama tests), there is a risk that at least one purpose of providing the services is to influence referrals (by relieving doctors of the burdens of prior authorization at no cost to them, doctors would order more Panorama tests than they would otherwise, leading to more revenue for Natera).

138.    In addition to the close personal relationship between key Natera and MGML executives, the companies were closely bound up in a mutually beneficial financial relationship.

As noted in ¶132 above, MGML helped Natera complete the onerous prior authorization task around 450,000 times from 2018 to March 2022, and roughly 159,000 times in 2021 alone. This facilitated additional Panorama orders by physicians. And the more Panorama tests received approved prior authorization, or were ordered before or pending prior authorization, the more revenue Natera generated. Natera disclosed on or around March 10, 2022 that it had paid MGML $1.8 million in 2021, and large sums in prior years, as well.

139.    Furthermore, according to individuals familiar with the Natera-MGML relationship interviewed by Hindenburg, the two firms worked hand in glove. For example, Natera sales representatives told doctors they could set them up for prior authorization services through MGML; Natera or MGML employees walked doctors through creating an account on an "insurance portal;" and Natera sales representatives shared the login information with MGML. Further, Natera provided MGML with the underlying billing code information for use in the prior authorization submission, contrary to the guidelines and practices just noted.

140.    Guidance from legal practitioners in the healthcare industry underscore the importance of the OIG's statements regarding transparency practices around prior authorization service arrangements, which Natera flouted. In an April 2021 issue of *Compliance Today Magazine*, partners in the Health Care and Life Sciences Group of the law firm Stinson LLP discussed the OIG's letters regarding transparent disclosure in connection with prior authorization personnel. Specifically, they advised companies integrate that sensitive practice "[t]o increase the defensibility" of their prior authorization programs, that such programs should avoid assuming "back-office provider functions," and that paperwork-related obligations remain with the medical provider, which in turn limits the chances of misrepresentations related to prior authorization requests.

45

141.    Notably, firms with significant healthcare practices have been issuing similar guidance related to the OIG letter since 2010. For example, in September 2010, the law firm Benesch, Friedlander, Coplan & Aronoff LLP, which boasts a Healthcare group that has decades of experience representing healthcare industry stakeholders, issued a Health Care Bulletin discussing the OIG's September 2010 letter advising that, [w]hen considering providing pre-authorization services, hospitals and other types of providers should take into account OIG guidance on these issues and the specific factors the OIG has used to evaluate these types of arrangements." Likewise, Hall Render, Killian, Heath & Lyman, P.C., one of the country's largest law firms focused on health law, wrote in a blog post following the August 2012 OIG opinion that providers looking to provide free prior authorization services "should proceed very carefully and be sure to structure a program with safeguards like those set forth in the [OIG's August 2012 advisory opinion]."

142.    When Hindenburg published its report detailing, among other things, Natera's undisclosed relationship with MGML, Defendants responded the next day, March 10, 2022, with a special investor call, in an effort to stem investor outcry. Tellingly, Defendants did not deny the underlying relationship between Natera's former executive and MGML. Instead, Chapman only weakly claimed his own limited knowledge of Natera's ignorance one way or the other about the underlying relationship, stating:

> The [Hindenburg] report makes an allegation that one of our former employees who left in 2019 had a personal relationship with a senior member of MGML. ***To my knowledge, we do not know whether or not that is true***, and regardless, we had no knowledge of any personal relationships between MGML and an employee of Natera at the time we selected MGML as our outside vendor.

143.    Later in the call, an analyst pointedly asked Chapman whether the Company was conducting prior authorizations *after* Panorama tests were conducted: "then there was also an allegation about typically -- or you tell me, but the purpose of prior authorization is to do it before

the test is ordered or the blood is drawn. Seems like the report suggests a lot of these were done after the blood is drawn." In a tacit omission, Chapman dodged the question.

144.    As detailed below, the revelations in the Hindenburg Report stunned investors, and drove a massive intra-day decline of over 52% in Natera's stock price.

> **(2)    Panorama And Microdeletion Revenues Were Propped Up By Improper Order Practices**

145.    Panorama's requisition (i.e., order) form *by default* caused patients to order microdeletion screening for one microdeletion (DiGeorge syndrome). Thus, *all* patients ordering Panorama screens would also receive this costly add-on test for extremely rare conditions, unless their physician *opted them out* of receiving such screens:

PANORAMA PRENATAL SCREEN (SEE DETAILS ON BACK)

**◉ Panorama®**   ☐ Enroll patient in the **Automatic Redraw Program** (see back)
☐ **PANORAMA PRENATAL PANEL PLUS 22Q.11.2**
   *Chromosomes 13, 18, 21, X and Y; Triploidy; 22q.11.2 deletion*
      *22q is not available for dizygotic twins or egg donors.*
      ☐ I DO NOT want 22q.11.2
      ☐ I WANT fetal sex reported
☐ **PANORAMA EXTENDED PANEL** *(Not available for twins or egg donors)*
      *Panorama Prenatal Panel PLUS 5 additional microdeletions*
         ☐ I WANT fetal sex reported

**ICD-10 CODE (REQUIRED):**
☐ O09.511   Supervision of elderly primigravida, 1st trimester
☐ O09.512   Supervision of elderly primigravida, 2nd trimester
☐ O09.521   Supervision of elderly multigravida, 1st trimester
☐ O09.522   Supervision of elderly multigravida, 2nd trimester
☐ Z34.81   Supervision of other normal pregnancy, 1st trimester
☐ Z34.82   Supervision of other normal pregnancy, 2nd trimester
☐ O28.5   Abnormal chromosomal & genetic finding on antenatal screening of mother
Other ICD-10 Code (see back) _____

146.    Defaulting patients into ordering microdeletion screening went against industry guidance issued in 2014 by the professional society The Society for Maternal Fetal Screening ("SMFM"). Citing "the risk of false positives with screening for rare disorders such as microdeletions," SMFM suggested that microdeletion screenings "*should be offered as 'opt-in.'*"

147. Moreover, Defendants knew, or were severely reckless to disregard, that most health insurers and other payers would either refuse to pay anything, or pay very little, for Panorama's microdeletion screening.

148. This was because health insurers often rely on practice guidelines issued by professional societies, such as The American College of Obstetricians and Gynecologists ("ACOG") and SMFM to make coverage determinations. During the Class Period, ACOG and SMFM did not recommend microdeletion screening, and, as a result, most health insurers did not cover the cost of microdeletion screening. As Brophy stated during the September 10, 2021 Wells Fargo Virtual Healthcare Conference, Natera's reimbursement from third-party payers was low because "the current status of the guidelines characterize microdeletions as saying, 'Hey, this is experimental. We don't know what the incidence of microdeletions is in the population. So it's experimental for now.'"

149. By causing patients to order microdeletion screening by default, in contravention of well-recognized industry guidance and norms, Natera inflated the number of patients receiving microdeletion screening as part of their Panorama test and, in turn, the revenue that Natera derived from Panorama. This improper practice created the impression of organic demand for microdeletion screening, when the extraordinary order rate for microdeletions was really the product of Defendants' automatic opt-in tactic. Moreover, given the limited health insurance reimbursement for microdeletions within the industry, Natera's large number of microdeletion screens appeared to investors as an organic source of significant untapped revenues. And, because most health insurers did not cover microdeletions, Natera's deceptive business practice enabled the Company to pursue payment from patients for the cost of microdeletion testing that their health insurance did not cover, padding Natera's revenue from additional tests.

c)   **Defendants' Misstatements And Omissions Regarding Panorama**

150.   On February 26, 2020, Natera filed an 8-K, signed by Brophy, that attached as an exhibit a press release reporting results for 4Q19 and the fiscal year ended December 31, 2019. In the press release, Natera and Brophy stated, "[t]otal revenues were $83.2 million in the fourth quarter of 2019 compared to $67.0 million for the fourth quarter of 2018, an increase of 24%. *The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests*."

151.   On May 6, 2020, Natera filed an 8-K, signed by Brophy, that attached as an exhibit a press release reporting results for 1Q20. In the press release, Natera and Brophy stated, "[t]otal revenues were $94.0 million in the first quarter of 2020 compared to $66.8 million for the first quarter of 2019, an increase of 41%. *The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests*."

152.   On August 5, 2020, Natera filed an 8-K, signed by Brophy, that attached as an exhibit a press release reporting results for 2Q20. In the press release, Natera and Brophy stated, "[t]otal revenues were $86.5 million in the second quarter of 2020 compared to $74.4 million for the second quarter of 2019. *The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests*."

153.   On January 12, 2021, Natera attended the JPMorgan Healthcare Conference. During the conference, JPMorgan analyst Tycho Peterson asked Chapman to discuss the potential financial impact of Natera receiving greater reimbursement for microdeletion screening. In response, Chapman emphasized Natera's purported microdeletion demand, stating, in relevant part:

> If you're conservative and you just say $250 a test, that puts you at $100 million in
> additional revenue and cash just from the book that we're running today. Now you

49

shouldn't think about it as being capped at that level because *we see doctors ordering the microdeletion test. 8 out of 10 times, they place an order for Panorama.* So as we penetrate that additional 3 million tests in the average risk space, that microdeletion number is going to go up significantly as well. And it's pretty baked into our COGS as well.

154.     During Natera's 4Q20 earnings call on February 25, 2021, Chapman gave prepared remarks, in which he stated:

> The next slide demonstrates that revenue growth is tracking nicely with volume growth, once again, accelerating meaningfully over what we've seen in the past. If you just zero in on product revenues on the right-hand side, you'll see revenue growth rates of 43%. This removes development revenue from partners, which was larger in 2019 than it is now. We saw recurring ASPs step up again in Q4 versus prior periods, and blended COGS remain in the low 200 range. *The combination of consistent gross profit per test and volume growth that we talked about in the past is working as expected, allowing us to get the women's health business to cash flow breakeven,* supporting even bigger investments in the oncology business.

155.     Later during the 4Q20 earnings call, Chapman stated, "As we mentioned in the prepared remarks, last year, we did 400,000 microdeletion tests, and *that was at a growth rate of 37% year-on-year versus 2019. So this is really a rocket ship that's growing.* We're running the tests. If we can get reimbursement, it's going to be -- we're going to be off to the races."

156.     During the Company's May 6, 2021 1Q21 earnings call, Chapman gave prepared remarks, stating, "[a]s our base of business has grown substantially, our growth rates have still continued to accelerate. *That acceleration is being driven by continued strong growth in the women's health business,* but also we are seeing some real benefit from oncology and organ health as well."

157.     On August 5, 2021, Natera held its earnings call to discuss the Company's financial results for 2Q21. During his prepared remarks, Chapman stated, "[t]otal revenues and product revenues were both up 64% and approximately 71% respectively, over the same period last year. *Net acceleration is being driven by continued strong growth in the Women's Health business* and big contributions from oncology and transplant."

50

158.    Later in his prepared remarks, Chapman stated, "[w]e were also very exciting [sic] to see the Women's Health business to go cash flow breakeven in the quarter. This was one of the top goals, I announced when I took over as CEO in 2019, and I'm proud that our team achieved this while simultaneously hitting record growth rates."

159.    During Canaccord Genuity's 41st Annual Growth Conference on August 11, 2021, Brophy touted Panorama's purported microdeletion demand and expressed further confidence in attaining future growth on the basis of Natera's technology. Specifically, Brophy stated:

> As a market leader we feel like we're very well position to get more than our fair share of that just natural increase in the NIPT testing market. When we grow the NIPT business, that gets amplified in our business by the fact that we very often also get a carrier screening ordered at the same time as the NIPTs. And *we also get a microdeletion test ordered very frequently along with the NIPT. So for every 100 NIPTs*, there's something like a little more than 40 carrier screening tests that get ordered and for every 100 NIPT users, *something like 75 microdeletion tests that get ordered*. So we're very well positioned to take this one kind of macro trend and see it really amplified in our business. So that's kind of about the women's health business.

160.    On September 10, 2021, Natera participated in the Wells Fargo Virtual Healthcare Conference. Wells Fargo analyst Daniel Leonard asked Brophy to "remind me what you're telling folks on microdeletions." In response, Brophy stated, in part, "Yes. I mean *microdeletions continues to be a very popular product for us*. . . . roughly speaking, I mean, for every 100 NIPTs to get ordered, we get about a 80 or so microdeletions orders."

161.    A few days later, on September 13, 2021, during a virtual conference for Morgan Stanley Global Healthcare, Brophy made a similar statement, claiming, "as NIPTs penetrate, we have a couple of different ways to magnify the impact of that penetration in our business. One is for every 100 NIPTs that get run, something like 40 to 43 carrier screen test get run. *The other is that for every 100 NIPTs that get run, something like 80 microdeletions test gets run*. So 1 trend 3 different products that can really drive a lot of outsized performance for us."

51

162.    During Natera's 3Q21 earnings call on November 4, 2021, Chapman gave prepared remarks, stating:

> Total revenues and product revenues were both up 61% and 62%, respectively, over the same period last year. *That acceleration is being driven by continued strong growth in the women's health products* and big contributions from oncology and transplant products.

163.    Defendants' statements in ¶¶150-62 were materially false and misleading and omitted material facts when made because they gave the market the impression that Natera's impressive Panorama revenues were the result of organic and growing demand, when in fact they were propped up by Natera's deceptive practices, including using the Company's prior authorization scheme with MGML (Section II.C.2.b.1) and opting patients into microdeletion testing (Section II.C.2.b.2), both in contravention of established industry guidance. None of the material facts relating to these practices were disclosed to investors.

### 3.    As Natera's Stock Price Soars, Defendants Engage In Rampant Insider Trading

164.    During the Class Period, the price of Natera common stock skyrocketed as a result of Defendants' misstatements and omissions, rising from a closing price of $34.77 per share on the first day of the Class Period to a Class Period high of over $129 per share in September 2021.

165.    Chapman, Brophy, and Rabinowitz took advantage of Natera's artificially inflated stock price to collectively sell over *$137 million* worth of their Natera common stock holdings while in possession of the material nonpublic information discussed herein, including at ¶¶200-10, 231-36.

166.    In particular, Chapman disposed of 846,645 shares of Natera common stock worth *$73,803,491.84*. Brophy disposed of 267,581 shares of Natera common stock worth *$25,218,695.89*. And Rabinowitz disposed of 508,356 shares of Natera common stock worth *$38,256,649.04*.

167.    Investors that traded contemporaneously with these insiders were damaged, as set forth below in ¶¶168-70, 222-23, 227, 231-41.

### 4.    Loss Causation: The Relevant Truth Is Revealed Through Two Partial Corrective Disclosures

168.    As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, Natera's common stock traded at artificially inflated prices during the Class Period. Relying on the integrity of the market price for Natera common stock and public information relating to Natera, Plaintiffs and other Class members purchased or otherwise acquired Natera common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases or acquisitions of Natera common stock during the Class Period at artificially inflated prices and the removal of that inflation upon the disclosures set forth below, Plaintiffs and the Class suffered economic losses (i.e., damages) under the federal securities laws.

169.    Defendants' materially false and misleading statements, material omissions, and deceptive course of conduct had their intended effect, directly and proximately causing Natera common stock to trade at artificially inflated prices during the Class Period. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Natera common stock served to maintain the price of Natera common stock at an artificially inflated level.

170.    Had Defendants been truthful about Prospera's claimed superiority compared to AlloSure and the Company's deceptive business practices for Panorama, Plaintiffs and other Class members would not have purchased or otherwise acquired their Natera common stock at the artificially inflated prices at which they traded. It was entirely foreseeable to Defendants that misrepresenting and concealing material facts from the public would artificially inflate the price

of Natera common stock. The economic losses (i.e., damages suffered by Plaintiffs and other Class members) were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact.

171.    Plaintiffs and other Class members suffered actual economic loss and were damaged when the material facts and/or foreseeable risks concealed or obscured by Defendants' misstatements and omissions were partially revealed and/or materialized through the disclosure of material, new information about Natera on March 9, 2022, and March 14, 2022.

172.    On March 9, 2022, Hindenburg published the Hindenburg Report, claiming "Natera's revenue growth has been fueled by deceptive sales and billing practices aimed at doctors, insurance companies and expectant mothers." The Hindenburg Report stated it was based on "more than 2 dozen interviews with former Natera employees, patients and industry experts, a review of hundreds of online complaints, FOIA requests to state Medicaid offices and state Attorneys General, and the company's financial filings." In particular, the Hindenburg Report stated that Natera began using MGML in 2018 and submitted large volumes of prior authorization requests for Natera's Panorama tests without regard to whether the prior authorizations would be approved or denied. In addition, the Hindenburg Report detailed that Natera opted patients into microdeletion screening with every Panorama test unless a physician specifically opted out of that screening, giving the impression that demand for those screens was organic, rather than the result of improper sales practices.

173.    In response to the Hindenburg Report, the price of Natera common stock fell as much as $28.65 per share, or more than 52%, from a close of $54.75 per share on March 8, 2022, to an intra-day low of $26.10 per share on March 9, 2022. The stock price closed down approximately 33% for the day.

174.     The market's reaction to the Hindenburg Report was swift and severe. SVB Leerink wrote in a March 9, 2022 report: "Bottom Line: NTRA shares closed down ~33% today following a short seller report that criticized NTRA's prior authorizations and billing practices for its core NIPT test (Panorama)." Similarly, a March 9, 2022 analyst report from Canaccord Genuity noted: "We expect the company will provide a formal announcement or defense of this short report given the share price reaction on 3/9 (30% decline). While short reports typically act as overhangs for a period of time, management could mitigate concerns with a public announcement. On the downside, the company could face challenges from regulatory or legal entities. Of course, a potentially tarnished image for Natera could be a headwind to Panorama adoption as well." On March 10, 2022, Piper Sandler wrote in a report that "Yesterday we spoke to many investors who had concerns about Natera's relationship with a prior authorization company called My Genome My Life (MGML). The concern sent the stock down 33% (and 50% intraday)." And in a follow up March 15, 2022 report, Canaccord Genuity again noted that "the Hindenburg short report contributed to a nearly 30% decline in NTRA stock last week."

175.     Defendants attempted to downplay and neutralize Hindenburg's revelations during a March 10, 2022 investor call. But rather than outright deny the Hindenburg's Report's central claim that MGML was founded by a person with close, personal ties to Natera's Vice President of Commercial Sales, Chapman distanced himself from knowledge about whether Natera was aware of the relationship at the time. Chapman also completely avoided a question about whether prior authorizations were being done after a test was conducted.

176.     The same day, March 10, 2022, analyst BTIG wrote: "Shares of NTRA plunged ~33% yesterday (to trade below 3x our 2023 EV/revs) and are up ~24-25% today following management's call today rebutting a short report published yesterday, which made various

allegations about NTRA's use of a prior authorization provider and around its billing practices." A March 21, 2022 report from Piper Sandler noted "[t]he report made several accusations that had a meaningful impact on the stock."

177.   As news regarding the Panorama fraud hit the market, on March 14, 2022, a federal jury in the CareDx Trial found that Natera had intentionally and willfully misled the public by utilizing false advertisements to market Prospera in violation of the federal Lanham Act, the Delaware Deceptive Trade Practices Act, and Delaware common law.

178.   In the lawsuit, CareDx alleged that Natera relied on results from its flawed Sigdel study to make misleading statements in 2018 and 2019 about Prospera, including that Prospera was more effective than AlloSure. While CareDx filed the action in 2019, Natera disputed CareDx's allegations. For example, starting in an April 16, 2019 Form S-3 filed with the SEC, Natera stated that it intended "to defend [the CareDx action] vigorously." Natera made similar statements in subsequently filed 10-Qs and 10-Ks through February 2022. Moreover, in the process of litigating the action, Natera consistently denied that it made false or misleading statements about Prospera as compared to AlloSure. For example, in May 2019, Natera argued that CareDx did not allege "facts showing that any of Natera's statements . . . were false, or that any of those statements could have deceived or actually did deceive anyone" and "failed to allege any facts showing that [Natera's statements] are 'false or misleading.'" CareDx Trial, ECF No. 9 at 2, 11. Similarly, in December 2020, Natera argued that "CareDx cannot prove that the advertising claims [regarding Prospera as compared to AlloSure] are literally false or misleading." CareDx Trial, ECF No. 196 at 2.

179.   Ultimately, the jury found that Natera was liable for false advertising when it claimed, among other things, that Prospera was "[m]ore sensitive and specific than current

assessment tools across all types of rejection," led to a "[l]ower risk of missing active rejection," and had exhibited "[s]tronger test performance demonstrated with unique clinical capabilities." The jury awarded CareDx $44.9 million in monetary damages, including $23.7 million in punitive damages.

180.    On this news, Natera common stock fell as much as $8.81 per share, or approximately 22.5%, from an intra-day high of $39.13 per share on March 14, 2022, to close at $30.32 per share on March 15, 2022.

181.    Analysts quickly noted that news of the jury verdict led to a significant decline in the Natera's stock price. For example, a March 15, 2022 report by analyst Craig-Hallum wrote:

> CareDx came out victorious in its false claims lawsuit against Natera, and may have squashed competitive concerns once and for all. We expect the company to run with this win to every transplant surgeon and argue the competing test has questions worth a further review. For Natera, the trial outcome combined with the short report creates an overhang for investors. . . . The -15% stock selloff on the legal decision juxtaposed with short claims on prenatal and this market environment is not a surprise.

182.    On March 15, 2022, Canaccord Genuity similarly noted that, after news of the verdict was released, "NTRA shares are trading about 10-15% lower, while CDNA [CareDx] shares are trading about 5-10% higher."

**D.    Additional Allegations Of Defendants' Scienter**

**1.    Defendants Knew Their Statements About Prospera Were Materially False or Misleading**

183.    As detailed in Section II.C.1.b., Chapman, Billings, and other high-ranking Natera employees had actual knowledge of nonpublic information that contradicted their public statements about Prospera's performance as compared to AlloSure. Those communications demonstrate that, internally, these Defendants and other important personnel at Natera were aware from day one that public statements claiming Prospera's superiority over AlloSure based on that

study data were false, or at best misleading, because: (i) Natera did not have a head-to-head comparison data against the Bloom study (¶¶65-70, 75, 77); and (ii) Prospera's performance data was not significantly better than, or was roughly equal to, AlloSure's (¶¶71-77).

### 2. Defendants Repeatedly Spoke About The Issues At The Center Of The Fraud And Had Access To Information Contrary To Their Statements

184. Throughout the Class Period, Defendants repeatedly spoke about Prospera's performance as compared to AlloSure, and the relevant underlying data and studies, and about Panorama, including how it drove the Company's revenues. These repeated statements demonstrate their knowledge of and access to information about those topics or, at the very least, that they were reckless in failing to investigate the very issues on which they spoke publicly. *See* ¶¶54-56, 58-63, 150-62.

185. Moreover, as detailed above in Section II.C.1.b., internal Natera communications from before the Class Period show that comparisons of the Sigdel study data and the Bloom study data were conducted and discussed among many high-ranking Natera employees, including Defendants Chapman and Billings, and Natera's Senior Director of Scientific Communications and Clinical Research, Senior Program Manager of R&D, Vice President of R&D, Data Science, Senior Vice President, Products and Strategy, Senior Director of Corporate and Marketing Communication, and Associate Director, Transplant Marketing, demonstrating that Defendants had access to those comparisons and the discussions related thereto.

### 3. Defendants' Fraud Involved The Core Operations Of Natera's Business

186. Defendants' fraud concerned Natera's sole business segment, which it has described as the development and commercialization of molecular testing services. Both Panorama and Prospera are molecular tests.

187.    Moreover, Panorama was one of Natera's most important revenue drivers. For example, in Natera's 2019 10-K, it stated, "We generate a majority of our revenues from the sale of Panorama," and made materially similar statements in its 2020 and 2021 10-Ks, stating "We generate a majority of our revenues from the sale of Panorama, our non-invasive prenatal test ('NIPT'), as well as Horizon, our Carrier Screening ('HCS') test." Similarly, in its 2020 10-K, Natera explained that product revenues, "which [we]re primarily generated from testing in women's health, were $367.2 million, $269.9 million, and $240.4 million for the years ended December 31, 2020, 2019 and 2018, respectively." Indeed, in his remarks during the March 11, 2020 Barclays Global Healthcare Conference, Brophy gave a summary of Natera's business, stating Natera's "core products are reproductive health diagnostics. So we are the market leader in what's called noninvasive prenatal testing."

188.    The market also understood Panorama to be central to Natera's business. For example, a Canaccord Genuity report from March 19, 2020, noted "NTRA's flagship Panorama test."

189.    In addition, Prospera was Natera's core first offering in one of the Company's three business segments. During the Class Period, Defendants also repeatedly highlighted Prospera as a key piece of the future growth of the Company. For example, during Natera's 3Q21 earnings call on November 5, 2021, Chapman noted he was "pleased with the level of commercial traction" Prospera obtained after its commercial launch, that Natera had "confidence that our commercial plan is working," and "we're in an even better position to build on the momentum we've seen thus far."

190.    Similarly, during Natera's February 25, 2021 4Q20 earnings call, Chapman said that "we continued to hit our internal volume growth targets for Prospera and we're very pleased

with how the transplant business is developing" and "we're keeping our finger on the pulse and it's an area that we think has an enormous opportunity to grow in the future." In Natera's 4Q21 earnings call held on February 24, 2022, the Company presented a slide for "2022 annual guidance" that listed one of the "Key drivers" for revenue as "growing contribution from new products," which included Prospera.

### 4. Natera Has A History Of Engaging In Improper Or Fraudulent Billing Practices

191. Natera's prior, related conduct also supports the conclusion that Defendants acted with scienter.

192. For years prior to the Class Period, Natera abused CPT (i.e., billing) codes in order to bilk federal and state health insurance programs out of money for Panorama tests. On March 8, 2018, the U.S. Department of Justice ("DOJ") announced that Natera agreed to pay roughly $11.4 million to resolve allegations that between January 1, 2013, through December 31, 2016, Natera knowingly submitted false or fraudulent claims seeking payment from federal and state health care programs for Natera's genetic testing services, including Panorama (including optional microdeletion panels) (the "DOJ Lawsuit").

193. Specifically, the settlement resolved allegations including that, from 2013 to 2016, Natera knowingly submitted false or otherwise fraudulent claims relating to Panorama seeking payment from government healthcare programs, including TRICARE and Medicaid, by billing for the microdeletion screening that the government program did not cover. The settlement also resolved claims that Natera improperly billed TRICARE, the FEHB, and Medicaid by using an improper CPT code for Panorama that misrepresented Natera's services (which allowed Natera to be reimbursed at a higher rate (or at all) than it would have if it used the correct CPT code), and by submitting claims for patients with low-risk pregnancies.

194.    In the settlement, Natera denied those allegations, indicating that the Company had investigated the DOJ Lawsuit allegations and, thus, Natera's billing practices.

195.    Chapman was Natera's VP of Sales and VP of Commercial Operations during the period in which the DOJ Lawsuit alleged that Natera was engaged in fraudulent billing practices with respect to Panorama. Rabinowitz was Natera's CEO at the time the conduct underlying the DOJ Lawsuit occurred, as well as when Natera settled the DOJ Lawsuit. Accordingly, it is implausible that Chapman and Rabinowitz were not aware of Natera's prior Panorama billing practices, and that they were not focused on or knowledgeable about them during the Class Period.

### 5.    Defendants Had Motive And Opportunity To Commit Fraud

#### a)    By Inflating Natera's Revenues, Defendants Chapman, Brophy, And Rabinowitz Substantially Increased Their Compensation

196.    Defendants Chapman, Brophy, and Rabinowitz had motive to engage in the misleading marketing and deceptive business practices that increased Natera's revenues, as the Company's short-term cash incentive plan provided annual cash bonuses to each of them. Natera's performance against annual revenue targets had a relative weighting of 55% in determining Chapman's, Brophy's, and Rabinowitz's annual cash bonuses.

197.    For example, in 2020, against a target metric of $352 million in revenues, Natera achieved $391 million in revenues. This performance had a 55% weight in determining Chapman's $296,884 bonus, Brophy's $170,678 bonus, and Rabinowitz's $180,263 bonus for 2020.

198.    Similarly, in 2021, against a target of $549.2 million, Natera achieved $625.5 million in revenues. This performance had a 55% weight in determining Chapman's $391,153 bonus, Brophy's $173,243 bonus, and Rabinowitz's $168,210 bonus for 2021.

199.    Chapman also had motive to engage in the deceptive billing practices that contributed to Natera's revenues because a significant portion of his total compensation in 2020

and 2021 hinged on Natera's ability to hit certain annual revenue targets. In 2020, 73% (roughly $5.9 million) of Chapman's total compensation (roughly $8 million) was the result of receiving performance-based restricted stock units ("PSUs") and options "tied to market valuation and revenue hurdles." Similarly, in 2021, 82% (roughly $18.6 million) of Chapman's total compensation (roughly $22.7 million) was the result of receiving PSUs and options "tied to market valuation and revenue hurdles."

### b)   Defendants Chapman, Brophy, And Rabinowitz Reaped Tens Of Millions Of Dollars From Insider Sales

200.   During the Class Period, Chapman, Brophy, and Rabinowitz, collectively disposed of *$137,278,836.77* worth of Natera common stock. These stock dispositions were executed at artificially inflated prices under suspicious circumstances.

201.   During the Class Period, Chapman disposed of 846,645 shares of Natera common stock at an average price of $91.76, worth over $73,803,491.84.

202.   Both the amount and timing of Chapman's trades were unusual and suspicious. For example, Chapman's sold approximately 93.90% of his total reported Natera common stock holdings during the Class Period (comprising common stock held at the beginning of the Class Period plus all shares that he acquired during the Class Period).

203.   Chapman's Class Period trades were also suspicious because they were dramatically out of line with his prior trading history. In particular, during a "Control Period" from January 3, 2018, to February 25, 2020, Chapman only sold 512,370 shares of Natera stock worth approximately $14,238,373.80. During the Control Period, Chapman disposed of significantly less stock than during the Class Period, at an average share price of $26.83.

204.   Comparatively, during the Class Period, Chapman sold an average of approximately 423,322.5 shares *per year*, for average yearly sales worth $36,901,762.4—*more*

*than two and a half times higher* than the value of his average yearly sales during the Control Period.

205.    During the Class Period, Brophy disposed of 267,581 shares of Natera common stock at an average price of $79.31, worth over $25,218,695.89.

206.    Both the amount and timing of Brophy's trades were unusual and suspicious. For example, the shares that Brophy disposed of during the Class Period represented approximately 78.15% of his total reported Natera common stock holdings during the Class Period (comprising common stock held at the beginning of the Class Period plus all shares that he acquired during the Class Period).

207.    Brophy's Class Period trades were also suspicious because they were out of line with his prior trading history. In particular, during the 25-month Control Period, Brophy only sold 234,042 shares at an average share price of $27.92, worth approximately $6,239,841.43.

208.    Comparatively, during the Class Period, Brophy sold an average of approximately 133,790.5 shares per year, for average yearly sales worth $12,609,347.9—*more than double* the value of his average yearly sales during the Control Period.

209.    During the Class Period, Rabinowitz disposed of 508,356 shares of Natera common stock at an average price of $79.26, worth over $38,256,649.04

210.    Both the amount and timing of Rabinowitz's trades were highly unusual and suspicious. In comparison, during the Control Period, Rabinowitz disposed of his common stock at an average share price of $27.55.

E.    **A Presumption Of Reliance Applies**

211.    At all relevant times, the market for Natera common stock was efficient for the following reasons, among others:

a.   Natera common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

b.   As a public company, Natera filed periodic reports with the SEC;

c.   Natera was followed by numerous securities analysts employed by major firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

d.   Natera regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

212.   As a result of the foregoing, the market for Natera common stock reasonably promptly digested current information regarding Natera from all publicly available sources and reflected such information in the price of Natera common stock. Purchasers and acquirers of Natera common stock during the Class Period suffered similar injury through their purchases and acquisitions of Natera common stock at artificially inflated prices, and a presumption of reliance applies.

213.   Further, at all relevant times, Plaintiffs and other Class members relied on Defendants to timely disclose material information as required by law. Plaintiffs and other Class members would not have purchased or otherwise acquired Natera common stock at artificially inflated prices if Defendants had timely disclosed all material information as required by law. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts concerning the Company and its business, Plaintiffs and other Class members are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**F.      The Statutory Safe Harbor And Bespeaks Caution Doctrine Do Not Apply**

214.    The statutory safe harbor and the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements alleged herein.

215.    The statements alleged to be materially false or misleading herein were all historical statements or all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

216.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Natera who knew that the statement was false when made.

**G.      Causes Of Action Against Defendants**

<u>**COUNT I**</u>

**Violations of Section 10(b) of the Exchange Act and
SEC Rule 10b-5 Promulgated Thereunder
Against Defendants**

217.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

218.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the Class; and (ii) cause Plaintiffs and the Class to purchase or otherwise

acquire Natera common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

219.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of Natera common stock in an effort to maintain artificially high market prices thereof in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

220.    During the Class Period, Defendants made the false statements specified above, which they knew or severely recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

221.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or severely recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Natera's true condition from the investing public and to support the artificially inflated prices of Natera's common stock.

222.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid for or otherwise acquired Natera common stock at inflated prices. Plaintiffs and the Class would not have purchased or otherwise acquired Natera's common stock at such prices, or at all, had they been aware that the market prices for Natera's common stock had been artificially inflated by Defendants' fraudulent course of conduct.

223.   As a direct and proximate result of Defendants wrongful conduct, Plaintiffs and the Class suffered damages in connection with their respective purchases or acquisitions of Natera's common stock during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Executive Defendants

224.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

225.   The Executive Defendants acted as controlling persons of Natera within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Executive Defendants had the power to influence and control—and did influence and control, directly or indirectly—the decision-making of the Company, including the content and dissemination of the various false and/or misleading statements. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued or had the ability to prevent the issuance of the statements or cause the statements to be corrected.

226.   In particular, each of the Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the activities giving rise to the securities violations as alleged herein, and exercised the same.

227.   As described above, the Company and the Executive Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by their acts and omissions as alleged

herein. By virtue of their positions as controlling persons, the Executive Defendants are liable under Section 20(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period.

## COUNT III

### Violations of Section 20A of the Exchange Act
### Against the Insider Trading Defendants

228. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

229. This Count is asserted for violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1(a), on behalf of Plaintiffs and all other Class members who purchased shares Natera common stock contemporaneously with the sales of Natera common stock by Defendants Chapman, Brophy, and Rabinowitz (the "Insider Trading Defendants"), while they were in possession of material nonpublic information ("MNPI") as alleged herein, including MNPI regarding the purported superiority of Prospera as compared to AlloSure and the fact that the Company was using deceptive practices to increase its Panorama revenues.

230. Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of [the Exchange Act] or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . securities of the same class."

231. As set forth herein, the Insider Trading Defendants violated Section 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act for the reasons stated in Counts I and II above. Additionally, the Insider Trading Defendants further violated Section 10(b) of the Exchange Act, Rule 10b-5, and Rule 10b5-1 promulgated thereunder

(17 C.F.R. § 240.10b5-1) by selling shares of Natera common stock while in possession of MNPI concerning Prospera and Panorama as alleged herein, which information they had a duty to disclose, and which they failed to disclose in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, as more fully alleged herein. *See* Sections II.C.1.c. and II.C.2.c.

232.    The Insider Trading Defendants learned of or were provided this MNPI during the Class Period through, among other ways, their control of Natera as the Company's senior executives, receipt of internal reports and studies, and preparation of the false and misleading statements at issue.

233.    During the Class Period, while in possession of the foregoing MNPI, the Insider Trading Defendants sold Natera common stock as set forth below.

234.    Chapman disposed of his shares of Natera common stock on the following dates: June 4, 2021 (4,709 shares at a value of $459,159.99); June 10, 2021 (1,158 shares at a value of $118,816.71); June 14, 2021 (26,092 shares at a value of $2,703,397.15); December 10, 2021 (1,145 shares at a value of $104,572.85); December 28, 2021 (2,604 shares at a value of $237,849.10); and January 5, 2022 (4,995 shares at a value of $412,636.95).

235.    Brophy disposed of his shares of Natera common stock on the following dates: June 4, 2021 (3,489 shares at a value of $340,201.57); June 10, 2021 (1,209 shares at a value of $124,049.81); December 10, 2021 (1,196 shares at a value of $109,230.68); and December 28, 2021 (914 shares at a value of $83,484.67).

236.    Rabinowitz disposed of his shares of Natera common stock on the following dates: June 10, 2021 (698 shares at a value of $71,616.96); and October 14, 2021 (122 shares at a value of $13,687.18).

237.    Contemporaneously with the Insider Trading Defendants' sales of Natera common stock set forth in ¶¶234-36, Plaintiffs purchased shares of Natera common stock at inflated prices, as reflected on their certifications (Exhibit A, filed herewith (BAPTL) and ECF No. 9-2 (Key West P&F)). Certain exemplary contemporaneous purchases are as follows.

238.    Lead Plaintiff BAPTL purchased 68,264 shares on June 8, 2021; 71,859 shares on June 9, 2021; 25,064 shares on June 10, 2021; 32,077 shares on June 11, 2021; 19,639 shares on June 14, 2021; and 19,187 shares on December 16, 2021.

239.    Additional plaintiff Key West P&F purchased 66 shares on October 19, 2021; 46 shares on December 31, 2021; and 92 shares on January 11, 2022.

240.    Upon information and belief, other Class members also purchased shares contemporaneously with the Insider Trading Defendants' sales identified above. As alleged herein, at the time of the Insider Trading Defendants' sales and Plaintiffs' and other Class members' contemporaneous purchases of Natera common stock, the price of Natera's common stock was artificially inflated and/or maintained by Defendants' material misstatements and omissions.

241.    Plaintiffs and other Class members have been damaged as a result of the violations of the Exchange Act alleged herein.

242.    By reason of the violations of the Exchange Act alleged herein, the Insider Trading Defendants are liable to Plaintiffs and other Class members who purchased shares of Natera common stock contemporaneously with the Insider Trading Defendants' respective sales of Natera common stock during the Class Period.

243.    Plaintiffs and other Class members who purchased contemporaneously with the Insider Trading Defendants' respective insider sales of Natera common stock seek disgorgement by the Insider Trading Defendants, as applicable, of profits gained or losses avoided from their

respective sales of Natera common stock contemporaneous with Plaintiffs' and other Class members purchases of Natera common stock.

244.    This action was brought within five years after the date of the last transaction that is the subject of the Insider Trading Defendants' violation(s) of Section 20A, and, with respect to the underlying violations of Section 10(b) of the Exchange Act alleged in this Count and in Count I above, was brought within five years after the date of the last transaction that violated section 20A of the Exchange Act by the Insider Trading Defendants.

## III.    PLAINTIFFS' SECURITIES ACT CLAIMS

### A.    Jurisdiction And Venue

245.    Plaintiffs' claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

246.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

247.    Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Natera's principal executive offices are located in this District, and because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of materially false and misleading information, occurred in this District.

248.    In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

**B.     Violations Of The Securities Act**

249.    In this part of the Complaint, Plaintiffs assert a series of strict liability and negligence claims based on the Securities Act on behalf of the Class. Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately from Plaintiffs' Exchange Act claims. To the extent that any challenged statement is construed as a statement of opinion or belief made in connection with the July 2021 SPO, any such statement is alleged to have been a materially misstated statement of opinion or belief when made at the time of the July 2021 SPO.

250.    This action was brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the July 2021 SPO.

**1.     Securities Act Parties**

251.    Additional plaintiff Key West P&F is a public pension fund for the benefit of active and retired police officers and firefighters of the City of Key West, Florida. As indicated on Key West P&F's certification (*see* ECF No. 9-2), Key West P&F purchased 1,374 shares of Natera common stock during the Class Period, including 389 shares of Natera common stock traceable to the July 2021 SPO at a price of $113.00 per share directly from Securities Act Defendant Morgan Stanley & Co. LLC. Key West P&F suffered damages as a result of the violations of the federal securities laws alleged herein.

252.    Each of the following defendants is statutorily liable under Sections 11, 12, and/or 15 of the Securities Act for the materially untrue statements contained in and incorporated (and thereby made anew) in the Offering Documents (as defined below).

253.    Securities Act Defendant Natera is described in full at ¶28.

254.   The Securities Act Defendants listed in the table below (the "Securities Act Individual Defendants") served, at times relevant to the claims alleged herein, as officers or directors of the Company and signed (or authorized their signatures to be affixed to) the Registration Statement (as defined below) as directors or officers of Natera in the positions stated below:

| Name | Position |
|---|---|
| Steve Chapman | CEO |
| Michael Brophy | CFO |
| Matthew Rabinowitz | Director and Executive Chairman |
| Roy Baynes | Director |
| Monica Bertagnolli | Director |
| Roelof F. Botha | Director |
| Rowan Chapman | Director |
| Todd Cozzens | Director |
| James I. Healy | Director |
| Gail Marcus | Director |
| Herm Rosenman | Director |
| Jonathan Sheena | Director |

255.   Each of the Securities Act Individual Defendants, either personally or by attorney-in-fact, signed the Registration Statement filed with the SEC.

256.   Each of the Securities Act Individual Defendants, by virtue of their management or director positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related to the Company. The Securities Act Individual Defendants

were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of Natera. By virtue of these duties, these officers and directors were required to supervise the preparation of and dissemination of the Offering Documents.

257.    All of the Securities Act Individual Defendants were control persons of Natera within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of Natera and as senior executives or directors of Natera. The Securities Act Individual Defendants, at the time they held positions with Natera, were able to, and did, exercise substantial control over the operations of Natera, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

258.    As officers, directors, and controlling persons of a publicly held company and under the federal securities laws, the Securities Act Individual Defendants had a duty to: (i) disseminate promptly complete, accurate, and truthful information with respect to Natera; (ii) correct any previously issued statements that had become materially misleading or untrue; and (iii) disclose any trends that would materially affect Natera's earnings and present and future operating results, so that the market price of Natera's publicly traded securities would be based upon truthful and accurate information.

259.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as a joint book-running managing underwriter for the July 2021 SPO and sold Natera shares in the July 2021 SPO, receiving certain fees and commissions. Morgan Stanley was allocated 1,440,000 shares (plus a proportionate share of the exercised overallotment of 675,000 additional shares) to sell to the investing public. Morgan Stanley acted as a joint representative of the underwriters in the July 2021 SPO.

260.     Defendant Goldman Sachs & Co. LLC served as a joint book-running managing underwriter for the July 2021 SPO and sold Natera shares in the July 2021 SPO, receiving certain fees and commissions. Goldman Sachs was allocated 1,260,000 shares (plus a proportionate share of the exercised overallotment of 675,000 additional shares) to sell to the investing public. Goldman Sachs acted as a joint representative of the underwriters in the July 2021 SPO.

261.     Defendant Cowen and Company, LLC served as a joint book-running managing underwriter for the July 2021 SPO and sold Natera shares in the July 2021 SPO, receiving certain fees and commissions. Cowen was allocated 675,000 shares to sell to the investing public (plus a proportionate share of the exercised overallotment of 675,000 additional shares).

262.     Defendant SVB Leerink LLC served as a joint book-running managing underwriter for the July 2021 SPO and sold Natera shares in the July 2021 SPO, receiving certain fees and commissions. SVB Leerink was allocated 675,000 shares to sell to the investing public (plus a proportionate share of the exercised overallotment of 675,000 additional shares).

263.     Defendant Robert W. Baird & Co. Incorporated served a co-manager underwriter for the July 2021 SPO and sold Natera shares in the July 2021 SPO, receiving certain fees and commissions. Baird was allocated 258,750 shares to sell to the investing public (plus a proportionate share of the exercised overallotment of 675,000 additional shares).

264.     Defendant BTIG, LLC served a co-manager underwriter for the July 2021 SPO and sold Natera shares in the July 2021 SPO, receiving certain fees and commissions. BTIG was allocated 135,000 shares to sell to the investing public (plus a proportionate share of the exercised overallotment of 675,000 additional shares).

265.     Defendant Craig-Hallum Capital Group LLC served a co-manager underwriter for the July 2021 SPO and sold Natera shares in the July 2021 SPO, receiving certain fees and

commissions. Craig-Hallum was allocated 56,250 shares to sell to the investing public (plus a proportionate share of the exercised overallotment of 675,000 additional shares).

266.    The Defendants described above in ¶¶259-65 are collectively referred to as the "Underwriter Defendants." The Underwriter Defendants are investment banking houses which specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the July 2021 SPO and shared more than $33 million in fees paid to the underwriting syndicate.

267.    Natera, the Securities Act Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

### 2.    Background On Natera's July 2021 SPO

268.    On or around July 20, 2021, the Company announced the July 2021 SPO. The July 2021 SPO was conducted pursuant to the Company's S-3 shelf registration statement filed with the SEC on July 20, 2021. On July 22, 2021, Natera filed the prospectus for the July 2021 SPO on Form 424B5 (the "Prospectus"), which incorporated and formed part of the registration statement (the "Registration Statement," and together with the Prospectus, the "Offering Documents").

269.    The Registration Statement was used to sell to the investing public 5.175 million shares of Natera common stock at $113 per share (including the full exercise of the Underwriter Defendants' overallotment option). Natera raised $585 million in gross offering proceeds its sale of common stock in the July 2021 SPO. Natera conducted the July 2021 SPO while Natera's common stock price was trading near its all-time high. Furthermore, in September 2020, just 10 months before the July 2021 SPO, Natera conducted another public offering that yielded gross proceeds of roughly $287 million. Together, Natera's two Class Period public offerings generated over $870 million in gross proceeds.

270.     The Offering Documents expressly incorporated and thus, reiterated and affirmed, the information disclosed in Natera's 10-K for the fiscal year ended December 31, 2020, among other documents.

271.     As described in further detail below, the Offering Documents contained or incorporated by reference (and thereby made anew) materially untrue statements of material fact and/or omissions concerning Prospera's supposed superior clinical performance over AlloSure. As a result, the Offering Documents contained untrue statements of material fact and omitted to state material facts required to make the statements therein not misleading

### 3.     The Offering Documents Contained Untrue Statements Of Material Fact And Material Omissions In Violation Of Section 11 Of The Securities Act

272.     Natera's 2020 10-K (dated February 25, 2021, and deemed filed with the SEC on February 26, 2021), incorporated by reference in the Offering Documents, stated that, "Published studies of the performance of our Prospera transplant rejection test *in both clinical* and analytical *validation report higher sensitivity and higher area under the curve, or AUC, than both the current standard of care and the competing test*."

273.     The Securities Act Defendants' statements in ¶272 above contained untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading. In reality, Natera did not have a head-to-head study comparing Prospera and AlloSure (i.e., the competing test), and the clinical validation data they relied upon for the comparisons between Prospera and AlloSure did not support Defendants' comparisons, as internal company records reflect dating back to as early as 2018:

　　　　　a.     Two September 2018 emails sent by Natera's Senior Director of Scientific Communications and Clinical Research stating that, based on the Sigdel study "the performance [of Prospera] isn't quite as high as we thought, and is not significantly better than CareDx's data," and "our numbers don't show a significance with CareDx's;"

77

b.     A September 2018 email sent by Natera's Senior Program Manager of R&D, stating that "the statistical analysis does not support claims of significantly better performance," that "[i]t is misleading to claim higher sensitivity without also stating that it came with the price of lower specificity," and that "it would [be] very difficult to justify any claims of superior performance without extremely compelling data;"

c.     A November 2018 email sent by Natera's then-Vice President of Marketing & Medical Education to Natera's then-Senior Vice President, Products and Strategy, stating, "I don't think we can claim superiority;"

d.     A December 2018 email from Natera's CMO regarding comparisons of the Sigdel and Bloom studies, stating, "[t]he reviewers are trying for apples to apples. Unfortunately, in these kinds of studies, that is not possible;"

e.     A February 8, 2019, email from Chapman identifying several "major risks" with the Sigdel study; and

f.     An email sent by Natera's then-Senior Vice President, Products and Strategy, stating, "It's risky to claim that our product has superior clinical performance since our stats team found that the AUC comparison is not statistically significant."

### 4.     Failure To Disclose Information Required Under SEC Regulation S-K

#### a)     Item 105

274.     Pursuant to Item 3 of Form S-3, the Offering Documents were required to furnish the information required by Item 105 of Regulation S-K, which requires the registrant to disclose under the caption "Risk Factors," "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105. Nevertheless, the Offering Documents failed to disclose information regarding material risks pursuant to Item 105. The disclosures in the Offering Documents therefore failed to adequately alert investors to the actual risks associated with an investment in Natera.

275.     As set forth herein, the Offering Documents omitted material information required to be stated therein regarding risks associated with the facts that: (i) Natera's impressive Panorama

revenues were the result of organic and growing demand, when in reality they were propped up by Natera's deceptive practices, including using the Company's prior authorization scheme with MGML and opting patients into microdeletion testing, both in contravention of established industry guidance; and (ii) Natera did not conduct or possess a head-to-head study comparing Prospera and AlloSure, and the clinical data on which statements comparing the tests were based did not support the comparisons the statements made.

276.    The Securities Act Defendants had a duty to disclose these material facts, which made investing in Natera through the July 2021 SPO risky. Because the Offering Documents failed to make the requisite disclosures, the Securities Act Defendants violated Item 105.

### b)    Item 303

277.    Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to identify: (i) "any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way," and "[i]f a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency;" and (ii) "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(1)(i), (b)(2)(ii). Such disclosures are required to be made by an issuing company in registration statements filed in connection with public stock offerings.

278.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on *currently known trends, events, and uncertainties that are reasonably expected to have material effects*, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

. . . .

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

279.   Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

280.   On April 7, 2003, the SEC issued a final rule addressing registrants' disclosure obligations under Item 303 ("2003 Rule"), and modified it on May 7, 2003. It emphasizes that MD&A disclosures are "of paramount importance in increasing the transparency of a company's financial performance and providing investors with the disclosure necessary to evaluate a company and to make informed investment decisions." The 2003 Rule further states that the MD&A provides "a unique opportunity for management to provide investors with an understanding of its view of the financial performance and condition of the company, an appreciation of what the financial statements show and do not show, as well as important trends and risks that have shaped the past or are reasonably likely to shape the future."

281.   The "Objective" of Item 303 is as follows:

The objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. The discussion and analysis must focus

specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations.

17 C.F.R. § 229.303(a).

282.    As described above, the Offering Documents failed to disclose the fact that Natera relied on several deceptive practices to prop up revenue and inflate demand for Panorama, including the Company's undisclosed use of MGML to indiscriminately submit large numbers of prior authorizations and opting patients into microdeletion testing, both in contravention of established industry guidance. This constituted a known trend or uncertainty that had or was reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from Natera's continuing operations.

283.    Defendants' reliance on these practices to generate important revenues was material, and given the risks associated with these practices, it was reasonably likely the Company's future revenues from continuing operations would be materially negatively impacted when it ceased conducting, or could no longer conduct, them.

284.    Because the Offering Documents failed to make the requisite disclosures, the Securities Act Defendants failed to comply with Item 303.

C.    **Causes Of Action Against Securities Act Defendants**

## COUNT III

### Violations of Section 11 of the Securities Act
### Against Natera and the Securities Act Individual Defendants

285.    Plaintiffs reallege every allegation contained in Section III, above, as if fully set forth herein.

286.    This Count is based on the Securities Act Defendants' statutory liability for untrue statements and omissions of material fact in the Offering Documents. This Count does not sound in fraud, and any allegations of knowing or severely reckless misrepresentations and/or omissions in the Offering Documents are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made at the time of the July 2021 SPO.

287.    This Count is asserted against Natera and the Securities Act Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired shares of Natera common stock pursuant to the Offering Documents.

288.    As alleged above, the Offering Documents contained untrue statements and omissions of material fact.

289.    None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

290.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated or necessary to make the statements identified above not misleading when they purchased or acquired the registered securities. As a direct and proximate result of the acts and omissions of the defendants named in this Count in violation of the Securities Act, Class members suffered substantial damage in connection with their purchases of Natera common stock sold through the July 2021 SPO.

291.     This claim is brought within one year of discovery of the untrue statements and omissions in the Offering Documents and within three years of their effective dates.

292.     By reason of the foregoing, the defendants named in this Count are liable under Section 11 of the Securities Act to Class members who purchased or otherwise acquired the securities sold pursuant and/or traceable to the Offering Documents.

## COUNT IV

### Violations of Section 12(a)(2) of the Securities Act
### Against Natera and the Underwriter Defendants

293.     Plaintiffs reallege every allegation contained in Section III, above, as if fully set forth herein.

294.     This Count is based on Natera's and the Underwriter Defendants' statutory liability for untrue statements and omissions of material fact in the Offering Documents. This Count does not sound in fraud, and any allegations of knowing or severely reckless misrepresentations and/or omissions in the Offering Documents are excluded from this Count, except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made and at the time of the July 2021 SPO.

295.     This Count is asserted against Natera and the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all persons who acquired shares of Natera common stock pursuant to the Offering Documents.

296.     Natera was a statutory seller of Natera common stock that was registered in the July 2021 SPO pursuant to the Offering Documents. Natera signed the Offering Documents, assisted in preparing the Offering Documents, participated in the selection of the Underwriter Defendants, and sold, offered, and/or solicited the sale of shares in the July 2021 SPO. In sum, Natera was a

seller, offeror, and/or solicitor of sales of the common stock sold in the July 2021 SPO pursuant to the Offering Documents.

297. The Underwriter Defendants were statutory sellers of Natera stock that was registered in the July 2021 SPO pursuant to the Offering Documents. By means of the Offering Documents, the Underwriter Defendants sold shares of Natera common stock that were registered in the July 2021 SPO to Class members. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the common stock sold in the July 2021 SPO by means of the Offering Documents.

298. As alleged above, the Offering Documents contained untrue statements and omissions of material fact.

299. By means of the Offering Documents (as well as instruments of transportation and communication in interstate commerce and the mails), Natera and the Underwriter Defendants, through the July 2021 SPO, solicited and sold Natera common stock to members of the Class.

300. Additional plaintiff Key West P&F purchased Natera common stock from Morgan Stanley's shares in the July 2021 SPO at the offering price of $113 per share. Other Class members purchased Natera common stock from each of the Underwriter Defendants in the July 2021 SPO at the offering price of $113 per share.

301. The Underwriter Defendants did not make a reasonable investigation or possess a reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, the Underwriter Defendants would have known of the material misstatements and omissions alleged herein.

302. Class Members purchased Natera common stock pursuant to the Offering Documents, which contained materially untrue statements and omissions of fact. Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Offering Documents contained untrue statements of material fact and omitted to state material facts when they purchased Natera common stock.

303. This action is brought within one year of the date when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based, and within three years of the date that the securities upon which this Count is brought were sold to the public.

304. By reason of the foregoing, Natera and the Underwriter Defendants are liable for violations of § 12(a)(2) of the Securities Act to Class members who purchased Natera common stock sold pursuant to the Offering Documents.

## COUNT V

### Violations of Section 15 of the Securities Act
### Against the Securities Act Individual Defendants

305. Plaintiffs reallege every allegation contained in Section III, above, as if fully set forth herein.

306. This Count is based on the Securities Act Individual Defendants' statutory liability for untrue statements and omissions of material fact in the Offering Documents. This Claim does not sound in fraud, and any allegations of knowing or severely reckless misrepresentations and/or omissions in the Offering Documents are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the July 2021 SPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the July 2021 SPO.

85

307. This Count is asserted against the Securities Act Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all persons who purchased or acquired shares of Natera common stock pursuant to the Offering Documents.

308. The Securities Act Individual Defendants, by virtue of their positions, and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Natera within the meaning of Section 15 of the Securities Act. These defendants also had the power and influence, and exercised the same, to cause Natera to engage in the acts described herein, including by causing Natera to conduct the July 2021 SPO pursuant to the Offering Documents.

309. During their tenures as officers and/or directors of Natera, each of the Securities Act Individual Defendants was a controlling person of the Company within the meaning of Section 15 of the Securities Act. By reason of their positions of control and authority as officers and/or directors of Natera, these defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.

310. As more fully described above, the Securities Act Individual Defendants caused Natera to conduct the July 2021 SPO and signed the Registration Statement pursuant to which that offering was conducted. Moreover, in their capacities as senior corporate officers or directors of the Company, Chapman, Brophy, and Rabinowitz had direct involvement in the day-to-day operations of the Company.

311. As a result of the foregoing, the Securities Act Individual Defendants, as a group and individually, were controlling persons of Natera within the meaning of Section 15 of the Securities Act.

312.    By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the wrongful conduct alleged herein and are liable to Class members who purchased Natera stock pursuant and/or traceable to the Offering Documents.

## IV.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

313.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and a Class consisting of all other persons and entities who purchased or otherwise acquired Natera common stock between February 26, 2020, through March 14, 2022, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of Natera, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

314.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Natera's common stock was actively traded on the NASDAQ (an open and efficient market) under the symbol "NTRA." Millions of Natera shares were traded publicly during the Class Period on the NASDAQ. As of February 18, 2022, Natera had approximately 95 million shares of common stock outstanding. Record owners and the other Class members may be identified from records maintained by Natera and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

315.     Plaintiffs' claims are typical of the claims of the other Class members, as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

316.     Plaintiffs will fairly and adequately protect the interests of the other Class members and have retained counsel competent and experienced in prosecuting class actions and securities litigation.

317.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

    c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts;

    d.    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts;

    e.    whether the market price of Natera common stock during the Class Period was artificially inflated due to the material misrepresentations alleged herein; and

    f.    the extent to which the members of the Class have sustained damages and the proper measure of damages.

318.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**V.   PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

    a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    b.    Awarding Plaintiffs and Class members compensatory damages and equitable relief against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    d.    Such other and further relief as the Court may deem just and proper.

**VI.   DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

Dated: October 7, 2022

Respectfully submitted,

**NIX PATTERSON, LLP**

*S/ Jessica Underwood*
Jessica Underwood (Bar No. 24093291)
8701 Bee Cave Road
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 495-1534
junderwood@nixlaw.com

*Liaison Counsel for Lead Plaintiff British Airways Pension Trustees Limited*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Joshua A. Materese (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
Daniel B. Rotko (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com

jdancona@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com
drotko@ktmc.com

*Lead Counsel for Lead Plaintiff British Airways
Pension Trustees Limited*

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**

Lauren McMillen Ormsbee
(*pro hac vice admission pending*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
(212) 554-1400
lauren@blbglaw.com

*Counsel for Additional Named Plaintiff Key
West Police & Fire Pension Fund*