IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated, | § § § § | Case No. 1:22-CV-398-DAE |
| *Plaintiff*, | § § | |
| v. | § § | |
| NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN, | § § § § § | |
| *Defendants*. | § § | |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants' Motion to Dismiss Plaintiffs'

Amended Complaint.  (Dkt. # 78.)  The Court finds this matter suitable for

disposition without a hearing.  After careful consideration of memoranda filed in

support of and in opposition to the Motion, the Court—for the reasons that

follow—**GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to

Dismiss.

BACKGROUND

Lead Plaintiff British Airways Pension Trustees Limited and

additional plaintiff Key West Police & Fire Pension Fund (together, "Plaintiffs")

1

filed this federal securities class action on behalf of those who purchased or

otherwise acquired the stock of Natera, Inc. ("Natera" or the "Company") between

February 26, 2020, and March 14, 2022 (the "Class Period").  (Dkt. # 60 at 5.)

Plaintiffs allege claims against Defendants for violations of Sections

10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1(a), and the rules and regulations

promulgated thereunder, including United States Securities and Exchange

Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.  (See id. at 1.)  Plaintiffs also

assert claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of

1933 (the "Securities Act"), 15 U.S.C. § 77k, 77l(a)(2), and 77o.  (Id.)

I.      The Company

Natera, a genetic testing company headquartered in Austin, Texas,

"develops, markets, and commercializes a range of genetic tests in the areas of

women's health, organ health, and oncology."  (Dkt. # 60 ¶¶ 1, 28.)  This lawsuit

concerns two of Natera's products: (1) Prospera, a non-invasive kidney transplant

rejection test, and (2) Panorama, a non-invasive prenatal test ("NIPT").  (Id. ¶ 2.)

A.      Prospera

"From the minute Natera announced it would launch Prospera and

enter the growing transplant kidney rejecting testing market, [Natera] sought to

gain market share from its chief competitor and the dominant product in the area,

2

CareDx, Inc.'s AlloSure test." (Id. ¶ 3.)  Natera officially launched Prospera in mid-2020.  (Id. ¶ 54.)  Before and during the Class Period, Defendants allegedly made false and misleading statements about Prospera's clinical superiority, with Defendants comparing a clinical study of Prospera (the "Sigdel study") to a study of AlloSure (the "Bloom study") even though differences in the studies—including the sample set and underlying methodologies—prevent a head-to-head comparison. (Id. ¶¶ 3–8, 66–70.)  Plaintiffs note emails from 2018 in which certain Natera executives stated, "I don't think we can claim superiority," and "[u]nfortunately, in these kinds of studies, [trying for apples to apples] is not possible."  (Id. ¶ 6.) Because of the strength of Defendants' claims regarding Prospera, Natera's Prospera sales increased steadily.  (Id. ¶ 8.)

   B.      Panorama

         Panorama, Natera's "flagship NIPT," screens for genetic abnormalities and "can provide important information about a pregnancy, such as indications of Down syndrome, as early as nine weeks into that pregnancy."  (Id. ¶ 9.)  According to Plaintiffs, Natera added screening for microdeletions—"small, missing parts of a chromosome that can adversely impact a baby's health and development"—before the start of the Class Period.  (Id. ¶ 10.)  This additional screening was "not required by any medical protocols" and was often not covered by the patient's medical insurance.  (Id.)

Plaintiffs allege that Defendants cultivated a misleading impression that the increased revenue from Panorama sales "was the result of organically growing demand."  (<u>Id.</u> ¶ 12.)  But this demand was actually driven by "deceptive and improper business practices."  (<u>Id.</u>)  Natera did not disclose that it had close ties to a third-party company, My Genome My Life, Inc. ("MGML"), which submitted prior authorization requests on Natera's behalf.  (<u>Id.</u> ¶ 13.)  The "driving force and architect of MGML" had "significant connections" with Natera's Vice President of Commercial Sales.  (<u>Id.</u> ¶ 127–29.)  Natera "benefitted from roughly $450,000 prior authorization submissions, many times submitted without regard for the underlying necessity, and sometimes after the subject test was performed, inflat[ing] Natera's revenue through overall volume growth."  (<u>Id.</u>)  Natera's requisition form for Panorama also automatically opted patients in for screening for one microdeletion,[1] "which created the impression that demand growth for microdeletion testing was organic, rather than the result of a default order form."  (<u>Id.</u> ¶ 14.)

## II.    The Executive Defendants

Defendant Steve Chapman ("Chapman") served as Natera's Chief Executive Officer and as a director on Natera's Board throughout the Class

---

[1] Panorama's order form contained an opt-*out* for the 22q.11.2 deletion (also known as DiGeorge syndrome) in its "Panorama Prenatal Panel Plus 22Q11.2." (<u>Id.</u> ¶ 145.)

Period.[2]  (Id. ¶¶ 4, 29.)  Defendant Michael Brophy ("Brophy") served as Natera's Chief Financial Officer.  (Id. ¶ 30.)  Defendant Matthew Rabinowitz ("Rabinowitz") co-founded Natera in 2003, served as its CEO from 2005 to 2018, and served as Natera's Executive Chairman during the Class Period.  (Id. ¶ 31.) Defendant Paul Billings ("Billings") served as Natera's Chief Medical Officer and Senior Vice President of Medical Affairs until his resignation in December 2021. (Id. ¶ 32.)  Chapman, Brophy, Rabinowitz, and Billings ("the Executive Defendants," and together with Natera, "Defendants") were "directly involved in preparing, reviewing, and approving the Company's public statements and disclosures to the market."  (Id. ¶ 34.)

III.    The Insider Trading Defendants

Plaintiffs allege that Chapman, Brophy, and Rabinowitz ("the Insider Trading Defendants") also sold shares of Natera common stock while in possession of material nonpublic information, including material nonpublic information "regarding the purported superiority of Prospera as compared to AlloSure and the fact that the Company was using deceptive practices to increase its Panorama revenues."  (Id. ¶ 229.)  "The Insider Trading Defendants learned of or were provided" the material nonpublic information "through, among other ways, their

---

[2] Before that, Chapman served as Natera's Chief Operating Officer and "led the Company's commercial entry into the NIPT market."  (Id. ¶ 29.)

control of Natera as the Company's senior executives, receipt of internal reports
and studies, and preparation of the false and misleading statements at issue." (Id. ¶
231.)

IV.    Securities Act Defendants

        Plaintiffs provide a list of directors or officers of Natera who signed
the Registration Statement filed with the SEC: Chapman, Brophy, Rabinowitz, Roy
Baynes ("Baynes"), Monica Bertagnolli ("Bertagnolli"), Roelof F. Botha
("Botha"), Rowan Chapman ("R. Chapman"), Todd Cozzens ("Cozzens"), James I.
Healy ("Healy"), Gail Marcus ("Marcus"), Herm Rosenman ("Rosenman"), and
Jonathan Sheena ("Sheena") (collectively, the "Securities Act Defendants"). (Id.
¶¶ 254–55.) Each of the Securities Act Defendants had the duty to: (1) "exercise
due care and diligence and the duty of full and candid disclosure of all material
facts" related to Natera, (2) "exercise reasonable care and prudent supervision over
the dissemination of information concerning the business, operations, and financial
reporting of Natera," (3) "disseminate promptly complete, accurate, and truthful
information with respect to Natera," (4) "correct any previously issued statements
that had become materially misleading or untrue," and (5) "disclose any trends that
would materially affect Natera's earnings and present and future operating results."
(Id. ¶¶ 256–58.)

## V.     The Underwriter Defendants

Plaintiffs have also alleged liability on the part of Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Cowen and Company, LLC, SVB Leerink LLC, Robert W. Baird & Co., BTIG, LLC, and Craig-Hallum Capital Group LLC (together, the "Underwriter Defendants"), who "served as the underwriters of the July 2021 SPO and shared more than $33 million in fees paid to the underwriting syndicate." (Id. ¶¶ 259–66.)  According to Plaintiffs, the offering documents for Natera's July 2021 secondary public offering contained materially untrue statements and material omissions regarding Prospera and Panorama. (Id. ¶¶ 271–84.)

## VI.    Pertinent Events

Natera's stock price more than tripled from 2020 to late 2021. (Id. ¶ 15.)  In July 2021, Natera "sold investors 5.175 million shares of its common stock at $113 per share in a secondary public offering," which yielded approximately $585 million in gross proceeds.[3]  (Id. ¶ 16.)  This came on the heels of a public offering in September 2020 that had generated about $287 million in gross proceeds. (Id.)  During the Class Period, Chapman, Brophy, and Rabinowitz

---

[3] The offering was authorized by Defendants Chapman, Brophy, Rabinowitz, and the rest of Natera's Directors. (Id. ¶ 16.)

"unloaded over $137 million worth of Natera common stock through insider sales."  (<u>Id.</u> ¶ 17.)

On March 9, 2022, an investigative report by Hindenburg Research was released.  (<u>Id.</u> ¶ 18.)  Hindenburg Research "detailed Natera's use of MGML to submit prior authorizations" and also noted that Natera "was propping up microdeletion demand by forcing patients to opt out of receiving such screenings." (<u>Id.</u>)  Natera's stock price dropped 33%.  (<u>Id.</u>)

Just five days later, on March 14, 2022, a federal jury awarded CareDx $44.9 million in damages after finding that Natera "intentionally and willfully misled the public by falsely marketing Prospera as more accurate than, and superior to, AlloSure."  (<u>Id.</u> ¶ 19.)  Natera's common stock price plunged again, this time by 22%.  (<u>Id.</u>)  "By the end of the Class Period, Natera's stock had fallen more than 70% from its Class Period high of $129.09, erasing over $8.5 billion in shareholder value."  (<u>Id.</u> ¶ 20.)

<u>LEGAL STANDARDS</u>

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"  <u>United States ex rel. Vavra v. Kellogg Brown & Root, Inc.</u>, 727 F.3d

343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d

191, 205 (5th Cir. 2007)).

      To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead

"enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009).

      In addition, when alleging claims under Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must:

(1)  specify each statement alleged to have been misleading, i.e.,
     contended to be fraudulent;

(2)  identify the speaker;

(3)  state when and where the statement was made;

(4)  plead with particularity the contents of the false representations;

(5)  plead with particularity what the person making the misrepresentation
     obtained thereby;

(6)  explain the reason or reasons why the statement is misleading, i.e.,
     why the statement is fraudulent.

ABC Arbitrage Plaintiffs Grp. v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002).

Further, if an allegation regarding a statement or omission is "made on information

and belief, the plaintiff must (7) state with particularity all facts on which that

belief is formed, *i.e.*, set forth a factual basis for such belief." Id. (citing 15 U.S.C.

§ 78u–4(b)(1)).  According to the Fifth Circuit, "this is the 'who, what, when,

where, and how' required under Rule 9(b) in our securities fraud jurisprudence and

under the PSLRA." Id.

DISCUSSION

Defendants contend that Plaintiffs (1) fail to state a claim under

Section 10(b) because Plaintiffs fail to plead falsity, scienter, and loss causation

(Dkt. # 78 at 9–25); (2) fail to state a claim under Sections 11 and 12 (id. at 25–

28); (3) fail to state a claim for secondary liability (id. at 28), and (4) brought

claims that are time-barred (id. at 36–37).  The Court addresses each argument in

turn.  First, however, the Court addresses Defendants' Request for Judicial Notice

and Consideration of Documents Incorporated by Reference (Dkt. # 80).

I.      Request for Judicial Notice/Consideration

When reviewing a Rule 12(b)(6) motion to dismiss, "a court must

limit itself to the contents of the pleadings, with two exceptions." In re BP p.l.c.

Sec. Litig., 843 F. Supp. 2d 712, 745 (S.D. Tex. 2012).  First, courts may consider

certain documents attached to the motion to dismiss; a court's consideration

restricted, however, "to documents that are referenced in the complaint and are

central to the plaintiffs' claim." Id. (citing Collins v. Morgan Stanley Dean Witter,

224 F.3d 496, 498–99 (5th Cir. 2000) and Scanlan v. Tex. A&M Univ., 343 F.3d

10

533, 536 (5th Cir. 2003)).  "Second, in securities cases, courts may take judicial

notice of the contents of public disclosure documents that the law requires be filed

with governmental agencies, such as the SEC, and that are actually filed with the

agency."  Id. (citing Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1018 n.1

(5th Cir. 1996)).  But these documents may be considered only to determine what

statements they contain, not for proving the truth of their contents.  Id.

        Defendants present twenty-two exhibits in support of their motion to

dismiss.  (Dkt. # 89 at 16.)  Defendants claim that all the exhibits are subject to

judicial notice, and that thirteen are incorporated by reference into the Amended

Complaint.  (Id.)  Plaintiffs, for their part, do not object to the Court taking judicial

notice of Exhibit 18 (Chapman's Form 4s), Exhibit 19 (Brophy's Form 4s), Exhibit

20 (Rabinowitz's Form 4s), Exhibit 21 (Natera's proxy statements), and Exhibit 22

(Natera's August 9, 2019 Form 10-Q) "for the sole purpose of establishing the

statements they contain."  (Dkt. # 84 at 9 n.3.)  "Plaintiffs also do not object to the

Court taking judicial notice of Defendants' Exhibit 9 (Natera's historical stock

price from Yahoo! Finance) for the sole purpose of establishing the price of

Natera's stock on a given day, nor do Plaintiffs object to the Court incorporating

Defendants' Exhibit 4 (the Sigdel Study) or Exhibit 15 (the Bloom Study) for the

sole purpose of establishing the existence of the Sigdel Study and the Bloom

Study."  (Id.)

The Court will take judicial notice of Exhibits 18, 19, 20, 21, and 22 for the purpose of determining what statements they contain, as well as Exhibit 9 for the purpose of establishing the price of Natera's stock.

The Court finds that the Sigdel study is cited repeatedly throughout the Amended Complaint and central to Plaintiffs' claims; the Court will thus consider the Sigdel Study (Exhibit 4). The Huang and Dar studies (Exhibits 6, 7, and 14), however, are referenced only in passing in the Amended Complaint and "are more central to Defendants' defenses"; the Court will therefore not consider them. See Scanlan, 343 F.3d at 537 (finding that a partial report attached to the defendant's motion was more central to the defendant's defenses).

The Court finds that taking judicial notice of investment analyst reports for the truth of the assertions contained in the reports is not proper. See, e.g., Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn, 53 F. Supp. 3d 882, 901–02 (E.D. La. 2014) (noting that courts consider newspaper articles and analyst reports "as an indication of the information available to the public at the time" rather than for "the truth of the assertions contained therein"). And none of the three reports are central to Plaintiffs' claims. The Court will therefore not consider Exhibits 1, 11, and 12.

The remaining documents, Exhibits 2, 3, 5, 8, 10, 13, 15, 16, and 17, were not relevant to the Court's analysis.  Defendants' requests as to these exhibits are denied as moot.

## II.    Section 10(b) Claims

The elements of a securities-fraud claim under Section 10(b) and Rule 10b–5 are "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, 552 U.S. 148, 157 (2008).

### A.    Representations regarding Prospera

Plaintiffs assert that Natera's claims regarding Prospera's clinical superiority materially misled investors.  (See Dkt. # 60 ¶¶ 87.)  For background, the performance of kidney transplant tests is measured by sensitivity (the measure of the percentage of true positive test results), specificity (the measure of the percentage of true negative test results), and overall accuracy using area under the curve ("AUC") analysis (a "composite of sensitivity and specificity to calculate a measure for the overall accuracy of the test").  (Id. ¶ 38.)

i.   <u>Natera's statements in SEC filings regarding Prospera</u>

Natera's 10-K for 2019 was deemed filed with the SEC on March 2, 2020, and contained the following statement: "In transplant rejection, published studies of our test performance in both clinical and analytical validation report higher sensitivity and higher area under the curve, or AUC, than both the current standard of care and the current commercially available test."  (<u>Id.</u> ¶ 93.)  Natera's 10-K for 2020, which was deemed filed with the SEC on February 26, 2021, contained a near-identical statement: "Published studies of the performance of our Prospera transplant rejection test in both clinical and analytical validation report higher sensitivity and higher area under the curve, or AUC, than both the current standard of care and the competing test."  (<u>Id.</u> ¶ 98.)  Defendants point out that both statements are based on the Sigdel study, which stated that "in comparison" to AlloSure, Prospera "showed a higher AUC value (0.87) as well as greater sensitivity (89%)."  (Dkt. # 78 at 4–5, 17; Dkt. # 80 at 50, 54.)

Along with pleading "the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading," <u>Carroll v. Fort James Corp.</u>, 470 F.3d 1171, 1174 (5th Cir. 2006), a plaintiff must establish "a substantial likelihood" that the disclosure of the omitted facts would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.  <u>Basic Inc. v.</u>

Levinson, 485 U.S. 224, 231–32 (1988).  "[D]etermining materiality is a 'fact-specific inquiry that requires consideration of the source, content, and context' of the allegedly omitted information."  Rougier v. Applied Optoelectronics, Inc, No. 4:17-CV-2399, 2019 WL 6111516, at *8 (S.D. Tex. Mar. 27, 2019) (citing Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 43 (2011)).  It is well-settled that "[t]he ability of a statement to provide accurate information, rather than the statement's literal truth, is the benchmark by which statements to the market are measured in securities fraud cases."  KB Partners I, L.P. v. Pain Therapeutics, Inc., No. A-11-CA-1034-SS, 2015 WL 7760201, at *9 (W.D. Tex. Dec. 1, 2015) (citing Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 248 (5th Cir. 2009)).

Plaintiffs do not adequately explain why these two statements—which reflect the findings of the Sigdel study—are materially misleading.  As one court recently observed, "[t]he fact that [a] particular study was not head-to-head does not mean that Defendants [are] not permitted to describe its results in marketing their drug."  Huang v. Higgins, 443 F. Supp. 3d 1031, 1048 (N.D. Cal. 2020).  In addition, "where a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study."  Nathenson v. Zonagen Inc., 267 F.3d 400, 420 (5th Cir. 2001) (citation omitted).  The Fifth Circuit has explained that "[m]edical researchers may well differ with respect to

what constitutes acceptable testing procedures, as well as how best to interpret data garnered under various protocols."  Id.

The cases cited by Plaintiffs are distinguishable.  The first, SEC v. Mapp, 2017 WL 5230358, at *7 (E.D. Tex. Nov. 9, 2017), included an allegation of manipulated lab tests.  The second, In re Novo Nordisk Sec. Litig., No. 3:17-CV-209-BRM-LHG, 2018 WL 3913912, at *3 (D.N.J. Aug. 16, 2018), included a claim that foreign regulators had determined that a drug showed "no added benefit" over existing products.  Here, Defendants were stating the results of a study, and were entitled to do so.[4]

ii.   Natera's other Prospera statements

Plaintiffs allege that Defendants made other false or misleading statements about Prospera during earning calls and in slide decks and materials on Natera's website, as follows:

[4] The Court also notes that the study was publicly available and does not purport to be a "head-to-head" study.  The Sigdel study—titled "Optimizing Detection of Kidney Transplant Injury by Assessment of Donor-Derived Cell-Free DNA via Massively Multiplex PCR"—was published online by the Journal of Clinical Medicine on December 23, 2018, and is available at http://www.ncbi.nlm.nih.gov/pmc/articles/ PMC6352163/.  The "total mix" of information includes information in the public domain and facts known or reasonably available to investors.  Sarafin v. BioMimetic Therapeutics, Inc., No. 3:11-0653, 2013 WL 139521, at *14 (M.D. Tenn. Jan. 10, 2013) (citing Litwin v. Blackstone Grp., L.P., 643 F.3d 706, 718 (2d Cir. 2011)).

16

On February 26, 2020, during Natera's earnings call with investors,

Chapman referenced the Sigdel study, stating:

> [O]ur clinical validation data compared favorably against the first-generation test across many aspects of performance including the detection of T cell-mediated rejection, the ability to detect subclinical rejection where there are no other clinical signs and the overall area under the curve.  Our study was approximately 2x larger than the competition and has now been evaluated by independent experts at Medicare who rated our strength of evidence more favorably than the first-generation test.

(Id. ¶ 55.)  Defendants also presented a slide during the call that "highlight[ed]

Prospera's clinical 'outperformance' versus the 'Other Commercial Assay' (i.e.,

AlloSure) based on comparisons of various data points from the Bloom and Sigdel

studies."  (Id. ¶ 56.)

On March 11, 2020, Brophy presented a slide deck at a healthcare

conference.  Brophy stated:

> Just a comment on the data as it relates to the first test that's on the market here.  We feel like we're in a really good competitive position versus the competition here.  So just as a reminder, our clinical validation data compared very favorably against that [sic] the competition across many aspects of performance, including the detection of T cell-mediated rejection, the ability to detect subclinical rejection, where generally subclinical means there are no other clinical signs.  And the overall kind of area under the curve was the probability that your test result is accurate.  Our study was about twice as large as the competition is now, has been evaluated by independent experts in Medicare, who rated our proof of evidence more favorably than the competition.  So in the conversations we've had in the field, we find that the transplant physicians are responding very positively to that data.

(Id. ¶ 94.)

On May 4, 2020, Natera's press release included a quote from Billings, with footnotes to the Sigdel study and the Bloom study.  (Id. ¶ 58.) Billings stated: "[t]he strong interest in Prospera and the significant number of top centers ordering tests during the early access program reflects a desire for more accurate, non-invasive testing methods, which Prospera fulfills through its ability to identify rejection with higher accuracy than first generation dd-cfDNA tests and current standards of care."  (Id. ¶ 95.)

Two days later, during another earnings call, Chapman praised Prospera, stating, "[w]e've said for a long time that our unique product offering, which has best-in-class sensitivity and negative predictive values, including the ability to identify the important T cell-mediated rejection would be seen as a welcomed alternative for the transplant community."  (Id. ¶ 59.)  On September 14, 2020, Chapman stated at a healthcare conference that "what you see in our peer-reviewed publication, the [Sigdel] study, that was our off-the-shelf version.  So we didn't even try on that version.  We just took the off-the-shelf assay, ran it, and it generated performance data that was better than what was on the market from the competitors."  (Id. ¶ 60.)

It is alleged that during the Class Period, "Defendants also made materially false and misleading statements on Natera's website, repeating similar

refrains about Prospera compared to AlloSure."  (<u>Id.</u> ¶ 99.)  The materials included a brochure, graphics, and a video.  (<u>Id.</u> ¶¶ 61–63.)

   The brochure stated that Prospera was "[u]ltra-sensitive for more accurate classification" and claimed that "[w]hen comparing published clinical validation studies, Prospera demonstrated better performance in correctly classifying patients with active rejection—including cell-mediated rejection."  (<u>Id.</u> ¶ 100.)

   A graphic on Natera's website as of January 14, 2021, stated that Prospera was "[m]ore sensitive and specific than current assessment tools across all types of rejection" and cited the Sigdel and Bloom studies.  (<u>Id.</u> ¶ 101.) Another graphic, which was on Natera's website as of June 14, 2021, stated that Prospera was "[u]p to 5x less variable than first-generation donor-derived cell-free DNA technology," and cited the Sigdel and Bloom studies.  (<u>Id.</u> ¶ 102.)

   Finally, the video included the below graphic:

**Lower risk of missing active rejection\***



| | | |
|---|---|---|
| 25% | 95% | 84% |
| 10% | 98.3%* | 95%+ |

*calculated from all AR in Sigdel
+calculated from for-cause in Bloom

(Id. ¶ 63.)

In support of their claims that Natera's Prospera statements were false and misleading, Plaintiffs state that "[i]nternal emails from high-level Natera employees reveal that by late 2018, it was well-known within Natera that comparisons of Bloom and Sigdel did not support representations claiming Prospera's superiority."  (Dkt. # 83 at 17.)  Two of these emails were about potential journals that might publish the Sigdel study—one email conveyed that "the performance [of Prospera] isn't quite as high as we thought, and is not *significantly* better than CareDx's data," while the second email acknowledged that "there is still a risk there with the PLoS Medicine [journal] as our numbers don't show sign *significant* difference with CareDx's[,] calling into question the novelty of our manuscript."  (Dkt. # 60 ¶¶ 71, 72) (emphasis added).

20

Another email memorialized the "changes to transplant performance claims" that had been agreed on in a meeting; a claim that the test had "*significantly* higher sensitivity and PPV than current commercialized tests" was changed to "Natera's *overall* test performance is *about equivalent* to other commercialized assays," with the reason for this change cited as being that "the statistical analysis does not support claims of better performance."  (Id. ¶ 73) (emphasis added).  The author further opined that "[i]t is misleading to claim higher sensitivity without also stating that it came with the price of lower specificity."  (Id.)

An internal email two months later noted that the email's author "[did not] think that we can claim superiority.  Members of our stats team believe our better sensitivity was driven more by patient selection variables.  I would rather say compelling results in recent research study."  (Id. ¶ 74.)  One month later came the statement that "reviewers are trying for apples to apples.  Unfortunately, in these kinds of studies, that is not possible," and a response agreeing that "[i]t's risky to claim that our product has superior clinical performance since our stats team found that the AUC comparison is not statistically significant."  (Id. ¶¶ 75, 76.)

The issue that the Court is grappling with is that these emails alone do not adequately explain the reason or reasons why these statements were materially

misleading, and Plaintiffs do not plead other facts to establish this.  The Sigdel study itself compared its results to those from the Bloom study and reported higher sensitivity and a higher AUC value.  According to Plaintiffs, based on these emails—which were sent before the Sigdel study was published—Natera "did not have a scientific basis to claim that the Prospera test was clinically superior to competing tests."  (Dkt. # 60 ¶ 104.)  But, beyond listing the ways in which the Sigdel and Bloom studies differed, Plaintiffs provide no further elucidation.  As previously noted, "where a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of that study." Nathenson, 267 F.3d at 420 (5th Cir. 2001).  And "[t]he fact that [a] particular study was not head-to-head does not mean that Defendants [are] not permitted to describe its results in marketing their drug."  Huang, 443 F. Supp. 3d at 1048.

Plaintiffs have not provided reasons explaining why, for example, it would be misleading to state that Natera's clinical validation data for Prospera "compared favorably" against AlloSure, other than the general argument that the Sigdel study was not a head-to-head study and some at Natera may have interpreted the results differently than the Sigdel study's authors before the publication of the study.  Nor has the Court found any explanation for why it was false or misleading for Defendants to state that independent experts at Medicare

had rated Prospera's strength of evidence more favorably.[5]  Without such facts, the

Court also finds that Plaintiffs fail to adequately plead scienter as to these

statements.

      B.     <u>Representations regarding Panorama</u>

              Defendants first argue that the Panorama claims should be dismissed

because of "the presumptive unreliability" of a short-seller report like the

Hindenburg Research report.  (Dkt. # 78 at 22.)  But Plaintiffs have alleged

corroborating facts (<u>see</u> <u>generally</u> Dkt. # 60 ¶¶ 124–48), and other courts have

found it permissible for plaintiffs to rely on short-seller reports to allege falsity at

the motion-to-dismiss stage.  <u>Bond v. Clover Health Invs., Corp.</u>, 587 F. Supp. 3d

641, 668 (M.D. Tenn. 2022) (citing <u>McIntire v. China MediaExpress Holdings,</u>

<u>Inc.</u>, 927 F. Supp. 2d 105 (S.D.N.Y. 2013); <u>Snellink v. Gulf Res., Inc.</u>, 870 F.

Supp. 2d 930, 939 (C.D. Cal. 2012).  This is because the reliability of short-seller

reports—here, the Hindenburg Research report—is a question of fact that the Court

---

[5] The Court has closely reviewed Plaintiffs' briefing, including the Surreply attached to Plaintiffs' Opposed Motion for Leave to File an Omnibus Sur-Reply (Dkt. # 97).  The Court finds that Plaintiffs have identified "new issues, theories, or arguments," <u>Donnelly v. Nissan Motor Co.</u>, No. 5:19-CV-0882-JKP, 2019 WL 6340153, at *2 (W.D. Tex. Nov. 26, 2019) and, within its sound discretion, **GRANTS** the Motion.  The Court has considered the Surreply (Dkt. # 97-1) attached to the Motion for Leave and there is nothing more the Clerk of Court needs to do regarding that filing.

cannot resolve at this time.  See <u>McIntire</u>, 927 F. Supp. 2d at 123–24 (collecting cases).

Second, Defendants argue that Plaintiffs "fail to identify an affirmative statement rendered false by the MGML allegations."  (DKt. # 78 at 24.) However, "a duty to speak the full truth arises when a defendant undertakes a duty to say anything."  <u>In re Concho Res. Inc.</u>, No. 4:21-CV-2473, 2023 WL 2297425, at *17 (S.D. Tex. Feb. 23, 2023) (quoting <u>Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.</u>, 58 F.4th 195, 217 (5th Cir. 2023)).  Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues ("[t]he increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests"), made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.  The same is true for Defendants' statements regarding microdeletions.

C.    <u>Scienter</u>

The PSLRA requires that a complaint in a securities case support allegations of scienter with "facts giving rise to a strong inference that the defendant acted with the required state of mind."  <u>Six Flags Ent. Corp.</u>, 58 F.4th at 214 (citing 15 U.S.C. § 78u-4(b)(2)(A)).  "A complaint adequately pleads scienter by alleging facts that support the defendant acted with an 'intent to deceive,

manipulate, or defraud or severe recklessness.'"  Id. (citing Lormand, 565 F.3d at
251).

When evaluating scienter, a court must (1) take the factual allegations
as true, (2) "consider the complaint's allegations in its entirety," and (3) "take into
account plausible inferences opposing as well as supporting a strong inference of
scienter."  Id.  The inference of scienter must be "cogent and compelling."  Id.
(citing Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 314 (2007)).

With respect to the Panorama claims, Plaintiffs rely on the fact that
Panorama was Natera's "flagship product," that Chapman, Brophy, and
Rabinowitz received large stock grants tied to revenue targets, that Chapman,
Brophy, and Rabinowitz sold large amounts of stock at inflated prices, and that
Natera previously settled with the DOJ "for abusive billing practices that increased
Natera's Panorama revenues" at a time that Chapman and Rabinowitz were in key
positions at Natera.  (Dkt. # 83 at 18–20.)  The Court finds that Plaintiffs have
supported a cogent inference of scienter, but only as to Chapman, Brophy, and
Rabinowitz.

D.   Loss Causation

Finally, Defendants contend that Plaintiffs have not established loss
causation.  (Dkt. # 78 at 32.)  For a complaint to adequately plead loss causation,
"it need only set forth 'a short and plain statement of the claim showing that the

pleader is entitled to relief' and provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 320 (5th Cir. 2014) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346 (2005)).  The complaint must include "sufficient allegations the misrepresentations actually *caused* plaintiffs' loss—it is insufficient to simply allege the misrepresentation 'touches upon' a later economic loss."  In re ArthroCare Corp. Sec. Litig., 726 F. Supp. 2d at 725–26; see also Congregation of Ezra Sholom v. Blockbuster, Inc., 504 F. Supp. 2d 151, 167 (N.D. Tex. 2007) ("To allege loss causation adequately, Plaintiffs must explicitly allege a corrective disclosure—i.e., a statement that corrects a previous misrepresentation or discloses a prior omission—that, when disclosed, negatively affected the value of the security.").

Plaintiffs adequately plead loss causation: they allege that on March 9, 2022, the release of the Hindenburg Research report regarding Natera's Panorama sales and billing practices led to a 33% decline in Natera's stock price.  (Dkt. # 60 ¶ 18.)  And the stock did not "sharply rebound" from this.  (Dkt. # 81 at 105.)

## II.   Section 11 and 12 Claims

"Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements" that impose liability for material misstatements and omissions in securities offering documents (for Section 11, the registration

statement; for Section 12(a)(2), the prospectus.  <u>In re Morgan Stanley Info. Fund
Sec. Litig.</u>, 592 F.3d 347, 358–59 (2d Cir. 2010).  Plaintiffs "allege that Natera's
Offering Documents were false because they incorporate by reference Natera's
Form 10-K filed February 26, 2021," which stated that "[p]ublished studies . . .
report higher sensitivity and higher [AUC]" for Prospera than "the competing test."
(Dkt. # 60 ¶ 98.)  According to Plaintiffs, the content of the internal emails from
2018 was "information a reasonable investor could consider significant in making
his investment decision."  (Dkt. # 83 at 33.)   But even applying the more lenient
notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure, the
Court finds that this statement is not actionable for the same reason as before—
Plaintiffs "do not explain how the 2018 emails could have rendered an accurate
report of results from a published, peer-reviewed study misleading."  (Dkt. # 93 at
18.)

       However, the Court finds that Defendants' challenges to Plaintiffs'
Item 303 and Item 105 claims (which require disclosure of "known trends") are
less successful when it comes to the Panorama-related claims.  As Plaintiffs note,
Defendants' assertion that the "misrepresentations and omissions about [] Natera's
deceptive billing practices were not sufficiently material to render investment in
the July 2021 SPO risky, or that the undisclosed risk could seriously affect its
present or future business" is "belied by the significant market reaction[] following

disclosure of the" Hindenburg Report.  (Dkt. # 83 at 34.)  Plaintiffs have thus

stated an actionable "omission."  <u>Silverstrand Invs. v. AMAG Pharms., Inc.</u>, 707

F.3d 95, 102 (1st Cir. 2013).

III.    <u>Claims for Secondary Liability</u>

        Defendants argue that the control-person claims under Section 20(a)

and Section 15 must be dismissed because Plaintiffs failed to allege a primary

claim under Section 10(b) and Section 11.  (Dkt. # 78 at 35.)  However, Plaintiffs

have adequately alleged the primary claim as to Chapman, Brophy, and

Rabinowitz with respect to the Panorama-related allegations.  Plaintiffs' control

person claims are therefore not subject to dismissal on this basis.  <u>See, e.g.,</u>

<u>Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.</u>, 514 F. Supp. 3d

942, 957 (S.D. Tex. 2021).

        Defendants also argue, in a conclusory fashion, that "Plaintiffs' claim

under Section 20A against Chapman, Brophy, and Rabinowitz" must fail "because

Plaintiffs fail to plead an underlying Section 10(b) violation and Plaintiffs do not

plead particularized facts establishing that Chapman, Brophy, or Rabinowitz sold

shares on the basis of material non-public information."  (Dkt. # 78 at 35.)

However, again, the Court has already found "an independent, predicate violation

of the 1934 Act or of its rules and regulations," with respect to the Panorama

claims.  <u>See</u> <u>In re Dell Inc., Sec. Litig.</u>, 591 F. Supp. 2d 877, 912 (W.D. Tex.

28

2008).  And Plaintiffs do plead that the Insider Trading Defendants traded Natera stock while in possession of material nonpublic information about Panorama. (Dkt. # 60 ¶ 228–44.)

IV.   <u>Statute of Limitations</u>

Defendants argue that all of Plaintiffs' claims are time-barred.  (Dkt. # 78 at 36.)   Specifically, Defendants argue that the deadline for Plaintiffs' Securities Act Claims expired in July 2022, and that the deadline for Plaintiffs' Prospera-related Exchange Act claims expired in April 2021.  (<u>Id.</u>)

Securities Act claims must be filed within "one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  "This standard is generally referred to as 'inquiry notice,' and it applies 'when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'"  <u>Sudo Props., Inc. v. Terrebonne Par. Consol. Gov't</u>, 503 F.3d 371, 376 (5th Cir. 2007) (quoting <u>DeBenedictis v. Merrill Lynch & Co., Inc.</u>, 492 F.3d 209, 216 (3d Cir. 2007)).   The Fifth Circuit has explained that "[t]his fact-intensive inquiry [of what constitutes inquiry notice] is typically appropriate for consideration by a jury."  <u>Margolies v. Deason</u>, 464 F.3d 547, 553 (5th Cir. 2006).

"What constitutes a sufficient *storm warning* isn't subject to precise definition, depending instead upon pertinent facts and their context." In re Venator Materials PLC Sec. Litig., 547 F. Supp. 3d 624, 667 (S.D. Tex. 2021). Such occurrences may include "disclosures in the media, a sudden drop in stock price, filing for bankruptcy, an SEC investigation, and warnings in a prospectus." Id. (quoting In re Franklin Bank Corp. Sec. Litig., 782 F. Supp. 2d 364, 384 (S.D. Tex. 2011)). Notice of "the entire wrong" is not necessary for an investor to be on inquiry notice, but "the facts relied upon to support inquiry notice must rise to a level of more than mere suspicion; they must be sufficiently confirmed or substantiated to a point at which the defendants are incited to investigate." Id. (citations omitted). "[T]he information constituting storm warnings must be such that it relates directly to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants." Id. (citations omitted).

Defendants argue that "inquiry notice has existed here with respect to the Panorama claims since at least December 14, 2020, when The Capitol Forum published an article regarding Natera's purported connection to MGML." (Dkt. # 78 at 36.) The Court agrees with Plaintiffs, however, that whether this report was publicly distributed or known about, as well as the contents of the report, are

questions of fact that the Court is unable to resolve at this stage.[6]  See Alaska Elec.
Pension Fund v. Bank of Am. Corp., 175 F. Supp. 3d 44, 67 (S.D.N.Y. 2016).
Defendants' assertions regarding Prospera and the CareDx trial similarly involve
questions of fact—in addition, the Court has already found that, as currently pled,
the Prospera statements are not actionable.

CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the
Complaint (Dkt. # 78) is **GRANTED IN PART** and **DENIED IN PART**.

Plaintiffs' Panorama-related claims under Section 10(b) of the
Exchange Act and 17 CFR § 240.10b-5 against Natera, Chapman, Brophy, and
Rabinowitz can proceed, as can Plaintiffs' Panorama-related claims under Section
20(a) and 20A of the Exchange Act against Chapman, Brophy, and Rabinowitz.
Similarly, Plaintiffs' Panorama-related claims under Sections 11, 12(a)(2), and 15
of the Securities Act may proceed.

Plaintiffs' Prospera-related claims, and all claims against Billings, are
DISMISSED WITHOUT PREJUDICE.  In light of the complexity of the issues
presented by Plaintiffs' theory of liability, Plaintiffs have leave to file a second

---

[6] Defendants do not contend that Plaintiffs' Panorama-related Exchange Act claims
are untimely.

amended complaint, should they choose to do so, within **sixty (60) days** of the date of this Order.

      **IT IS SO ORDERED**.

      **DATED**: Austin, Texas, September 11, 2023.

                                    _____
                                    David Alan Ezra
                                    Senior United States District Judge