# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN,<br><br>Defendants. | Case No. 1:22-cv-00398-DAE |

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................... 1

II.  STATEMENT OF FACTS ....................................................................................... 3

III.  ARGUMENT ........................................................................................................... 5

    A.  The Proposed Class Satisfies Rule 23(a) ................................................... 6

        1.  Numerosity Is Satisfied ................................................................. 6

        2.  Commonality Is Satisfied ............................................................... 6

        3.  Typicality Is Satisfied .................................................................... 7

        4.  Adequacy Is Satisfied .................................................................... 8

    B.  The Proposed Class Satisfies Rule 23(b)(3) ............................................. 9

        1.  Predominance Is Established for the Securities Act Claims ...................... 9

        2.  Predominance Is Established for the Rule 10b-5 Claims .......................... 10

            a.  Basic's Fraud-on-the-Market Presumption of Reliance Applies .............................................................................. 10

                i.  The Nasdaq Is a Presumptively Efficient Market .............. 11

                ii.  The *Cammer* and *Krogman* Factors Are Satisfied ........... 11

            b.  The *Affiliated Ute* Presumption of Reliance Applies ................... 16

        3.  Predominance Is Established for the Section 20A Claims ........................ 18

        4.  Predominance Is Established for the Control Person Claims ..................... 18

        5.  Damages for Plaintiffs' Claims Can Be Calculated Through a Common Methodology ............................................................... 18

        6.  Superiority Is Established Under Rule 23(b)(3) ....................................... 19

    C.  Lead Counsel Should be Appointed as Class Counsel Under Rule 23(g) ........... 20

IV.  CONCLUSION ....................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. United States*,
   406 U.S. 128 (1972) ....................................................................................2, 16-17

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ...................................................................................5

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ................................................................................................9

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) ...............................................................................6, 10, 17

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) .......................................................................................10, 11

*Basile v. Valeant Pharm. Int'l*,
   2017 WL 3641591 (C.D. Cal. Apr. 18, 2017) .......................................................18

*Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*,
   2016 WL 4098741 (D. Minn. July 28, 2016) ........................................................18

*Buettgen v. Harless*,
   2011 WL 1938130 (N.D. Tex. May 19, 2011) ........................................................13

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ....................................................................11, 13

*City of Pontiac Gen. Emps.' Ret. Sys. Ret. Sys. v. Dell Inc.*,
   2018 WL 1558571 (W.D. Tex. Mar. 29, 2018)...................................................8, 11

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*,
   2015 WL 5097883 (D.N.J. Aug. 31, 2015) ...........................................................14

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   2017 WL 2608243 (S.D. Tex. June 15, 2017).....................................................7, 10

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
   2023 WL 6300569 (S.D. Tex. Sept. 27, 2023).........................................................7

*In re Dynegy, Inc. Sec. Litig.*,
   226 F.R.D. 263 (S.D. Tex. 2005) .............................................................................7

*In re Elec. Data Sys. Corp. Sec. Litig.*,
  226 F.R.D. 559 (E.D. Tex. 2005), *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005) ............................................................. 9

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
  2005 WL 3704688 (S.D. Tex. Dec. 5, 2005) ................................................... 9-10

*In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ..................................................... 2, 16, 18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................... 9, 10

*In re FirstEnergy Corp. Sec. Litig.*,
  2023 WL 2709373 (S.D. Ohio Mar. 30, 2023), *opinion clarified*, 2023 WL 8105252 (S.D. Ohio Apr. 18, 2023) ....................................................... 17, 18, 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 268 (2014) ...................................................................... 10, 11, 17

*Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) ................................................................. 17

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ................................................................................... 10

*KB Partners I, L.P. v. Barbier*,
  2013 WL 2443217 (W.D. Tex. June 4, 2013) ......................................... 7, 12, 20

*Krogman v. Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ......................................................... 11, 15, 16

*Lehocky v. Tidel Techs., Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004) ......................................................... 12, 13, 16

*Marcus v. J.C. Penney Co., Inc.*,
  2016 WL 8604331, at *3 (E.D. Tex. Aug. 29, 2016), *R. & R. adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017) ............................................. 8, 9, 13, 15

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F. Supp. 3d 415 (S.D.N.Y. 2014) ............................................................ 15

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ................................................ 18

*Mullen v. Treasure Chest Casino, L.L.C.*,
  186 F.3d 620 (5th Cir. 1999) ....................................................................... 6

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
    2021 WL 229310 (N.D. Cal. Jan. 21, 2021) ................................................................. 16

*Prause v. TechnipFMC, PLC*,
    2020 WL 3549686 (S.D. Tex. Mar. 9, 2020) ........................................................*passim*

*In re Reliant Energy ERISA Litig.*,
    2005 WL 2000707 (S.D. Tex. Aug. 18, 2005) ............................................................. 6

*In re Reliant Sec. Litig.*,
    2005 WL 8152605 (S.D. Tex. Feb. 18, 2005) ...................................................... 10, 18

*In re Robinhood Ord. Flow Litig.*,
    2022 WL 9765563 (N.D. Cal. Oct. 13, 2022) .........................................................17-18

*Rooney v. EZCORP, Inc.*,
    330 F.R.D. 439 (W.D. Tex. 2019) ...........................................................................*passim*

*Rougier v. Applied Optoelectronics, Inc.*,
    2019 WL 6111303, at *4 (S.D. Tex. Nov. 13, 2019), *R. & R. adopted*, 2019
    WL 7020349 (S.D. Tex. Dec. 20, 2019) ................................................................*passim*

*Smilovits v. First Solar, Inc.*,
    295 F.R.D. 423 (D. Ariz. 2013) ................................................................................. 6

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ................................................................................ 18

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*,
    875 F. 3d 79 (2d Cir. 2017) ...................................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................................. 2

*Turocy v. El Pollo Loco Holdings, Inc.*,
    2018 WL 3343493 (C.D. Cal. July 3, 2018) ............................................................ 19

*Unger v. Amedisys*,
    401 F.3d 316 (5th Cir. 2005) .................................................................................... 12

*In re Vale S.A. Sec. Litig.*,
    2022 WL 122593 (E.D.N.Y. Jan. 11 2022*), R. & R. adopted*, 2022 WL
    969724 (E.D.N.Y. Mar. 31, 2022) ........................................................................... 13

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...............................................................................................6-7

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020) ........................................................................................ 16

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................................................ *passim*

**GLOSSARY OF DEFINED TERMS**

| Term | Definition |
|------|-----------|
| ¶[•] | Paragraph in the Complaint |
| BAPTL | Lead Plaintiff, British Airways Pension Trustees Limited |
| BLB&G | Bernstein Litowitz Berger & Grossmann LLP |
| Coffman Report | Expert Report of Chad Coffman, CFA attached as Exhibit B to the Materese Declaration |
| Coffman Rpt., ¶[•] | Paragraphs in the Coffman Report |
| Class | All persons and entities who purchased or otherwise acquired Natera common stock between February 27, 2020 and March 8, 2022, inclusive, and were damaged thereby |
| Class Period | Between February 27, 2020 and March 8, 2022, inclusive |
| Complaint | Consolidated Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 60) |
| Defendants | The Exchange Act Defendants and the Securities Act Defendants, collectively |
| Ex. [•] | Exhibits to the accompanying Materese Declaration |
| Exchange Act | The Securities Exchange Act of 1934 |
| Exchange Act Defendants | Defendants Natera, Steve Chapman, Michael Brophy, and Matthew Rabinowitz, collectively |
| Executive Defendants | Defendants Steve Chapman, Michael Brophy, and Matthew Rabinowitz, collectively |
| July 2021 SPO | Natera's secondary public offering of common stock, conducted in July 2021, as alleged in, e.g., ¶¶268-69 |
| Key West | Additional Plaintiff, Key West Police & Fire Pension Fund |
| KTMC | Kessler Topaz Meltzer & Check, LLP |
| Materese Declaration | Declaration of Joshua A. Materese in Support of Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, filed herewith |

| Term | Definition |
|---|---|
| MGML | My Genome My Life, Inc. |
| Motion | Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel |
| MTD Order | The Court's September 11, 2023 Order Granting in Part and Denying in Part Defendants' Motion to Dismiss (Dkt. No. 104) |
| Natera or the Company | Natera, Inc. |
| Nix Patterson | Nix Patterson, LLP |
| Offering Documents | Natera's Form S-3 shelf registration statement filed with the SEC on July 20, 2021, and Form 424B5 prospectus, filed with the SEC on July 22, 2021, collectively |
| OIG | U.S. Office of the Inspector General |
| Plaintiffs | BAPTL and Key West, collectively |
| Rule(s) | Federal Rule(s) of Civil Procedure |
| Securities Act | The Securities Act of 1933 |
| Securities Act Defendants | Natera, the Securities Act Individual Defendants, and the Underwriter Defendants, collectively |
| Securities Act Individual Defendants | Defendants Steve Chapman, Michael Brophy, and Matthew Rabinowitz, Roy Banes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herm Rosenman, and Jonathan Sheena, collectively |
| Underwriter Defendants | Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Cowen and Company, LLC, SVB Leerink LLC, Robert W. Baird & Co. Incorporated, BTIG, LLC, and Craig-Hallum Capital Group LLC, collectively |

Plaintiffs respectfully submit this Motion to: (1) certify the proposed Class pursuant to Rule 23(a) and 23(b)(3)[1]; (2) appoint Plaintiffs as Class Representatives; and (3) appoint KTMC and BLB&G as Class Counsel, and Nix Patterson as Liaison Counsel.[2]

## I.    <u>INTRODUCTION</u>

This securities fraud class action arises from Defendants' repeated misstatements and omissions concerning Natera's flagship product, Panorama. Throughout the Class Period, Defendants told investors that Natera's impressive revenue performance was driven by Panorama and touted the purportedly growing demand for the product. All the while, Defendants concealed from investors that Panorama revenue and demand was, in fact, fueled by Natera's deceptive and improper business practices. When investors finally learned the truth, Natera's stock price fell ***33%*** in one day, harming the putative Class. On these facts, Plaintiffs allege claims under: (1) Section 10(b) of the Exchange Act against the Exchange Act Defendants; (2) Section 20(a) of the Exchange Act against the Executive Defendants; (3) Section 20A of the Exchange Act against the Executive Defendants; (4) Section 11 of the Securities Act against Natera and the Securities Act Individual Defendants; (5) Section 12(a)(2) of the Securities Act against Natera and the Underwriter Defendants; and (6) Section 15 of the Securities Act against the Securities Act Individual Defendants, as controlling persons of Natera.

The Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil

---

[1]    Excluded from the Class are Defendants, the officers and directors of Natera, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

[2]    Unless otherwise noted, all emphasis is added and internal citations and quotations are omitted. A proposed form of Order is submitted herewith. In addition, attached as Ex. A to the Materese Declaration is Plaintiffs' completed response to W.D. Tex. L.R. 23, Appendix A.

enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313 (2007). Thus, "in the context of securities fraud suits" courts construe Rule 23 "liberally." *In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006). This case is no exception, and satisfies all prerequisites for certification under Rule 23.

*First*, Rule 23(a)(1)'s numerosity requirement is satisfied given that Natera common stock was traded on a national exchange, the Nasdaq, and the proposed Class is estimated to contain thousands of shareholders such that joinder of all Class members would be impractical.

*Second*, Rule 23(a)(2)'s commonality requirement is met because this case involves numerous common questions of law and fact regarding, *inter alia*, falsity, materiality and damages.

*Third*, under Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the proposed Class because they arise from a common course of alleged misconduct, are based on common legal claims, and will be proven by the same, common evidence.

*Fourth*, Rule 23(a)(4)'s adequacy requirement is met because the proposed Class Representatives are qualified and competent to represent the Class, each has a significant financial interest in the outcome of the litigation and has demonstrated their commitment to vigorously prosecuting this action, and neither has conflicts with other Class members. Likewise, proposed Class Counsel is highly experienced in prosecuting securities class actions.

*Fifth*, Rule 23(b)(3)'s requirements are also satisfied. Common questions predominate over any individual questions. The primary elements of Plaintiffs' Exchange Act and Securities Act claims are issues that affect all Class members alike and will be established with common proof. Moreover, for Plaintiffs' Exchange Act claims, both the fraud-on-the-market presumption and the presumption under *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972),

establish reliance. Further, while not required for predominance, damages are subject to common methodologies and formulas that can be applied class-wide. In addition, the class action device is a superior method of fairly and efficiently adjudicating the proposed Class's claims, as it would be inordinately costly and inefficient for each Class member to litigate their own separate action.

***Finally***, Lead and Additional Counsel and Liaison Counsel are qualified to serve as Class Counsel and Liaison Class Counsel, respectively, and satisfy Rule 23(g). KTMC, BLB&G, and Nix Patterson are highly experienced litigators who have successfully prosecuted securities fraud class actions like this one throughout the United States for many years.

For the reasons below, Plaintiffs respectfully request that the Court grant this Motion.

## II.    <u>STATEMENT OF FACTS</u>

Natera is a diagnostics company that specializes in testing related to oncology, women's health, and organ health. ¶28. Prior to and throughout the Class Period, one of Natera's flagship products was Panorama, which screens for certain fetal chromosomal abnormalities. ¶107. For a significant added fee, Panorama could also screen for rare microdeletion syndromes. *Id.*

During the Class Period, Natera's revenues soared, and the Company and its executives repeatedly represented that Panorama drove that growth. ¶¶150-52, 156-58, 162. For example, on May 6, 2020, Natera announced a 41% increase in total revenues "driven primarily by sales of . . . Panorama and Horizon tests." ¶151. At the same time, the Exchange Act Defendants assured investors that Panorama's impressive revenue performance was due to increased demand, which also portended significant future revenues. ¶¶11, 115-21, 153-62. Natera bragged to investors that add-on microdeletion screening was ordered "8 out of 10 times" a physician ordered a Panorama test (¶153) and that its Panorama franchise was "***a rocket ship that's growing***" (¶155).

In truth, these and similar statements were materially false and misleading because they omitted the fact that Panorama revenues and demand were inflated by numerous deceptive and

improper business practices. ¶¶150-63. Among these was Natera's undisclosed use of a closely-related third-party company, MGML, to submit Panorama prior authorization requests—a burdensome process that insurers required in order to determine if they would cover patient costs. ¶¶123-24, 136-37. Between 2018 and 2022, MGML facilitated the indiscriminate submission of roughly 450,000 prior authorization requests for Natera in a wave of inappropriate filings that inflated Natera's Panorama revenues through volume growth. ¶¶132-35, 138; MTD Order at 24. Yet, Natera never disclosed its relationship with MGML despite obvious red flags, including the fact that the OIG had issued opinions warning that failing to disclose a relationship like the one between Natera and MGML could potentially violate anti-kickback laws. ¶¶123, 127-31, 136-41.

In another example, Natera artificially juiced demand for Panorama's expensive microdeletion screenings through an order form that, by default, opted patients into receiving a microdeletion screening unless a physician affirmatively opted the patient out. ¶¶14, 145. This practice deviated sharply from standard industry guidance on microdeletions, and inflated the number of microdeletion screens ordered. ¶¶14, 149. Rather than disclose these facts to investors, Defendants made material misrepresentations which created the misimpression that microdeletion screening demand—and the associated revenues—was organically growing, rather than the result of a default choice that flouted applicable guidance. *Id.* Moreover, because many insurers did not cover the cost of microdeletion screening, Natera could pursue payment for that additional service directly from patients. *Id.* The failure to disclose these facts rendered materially misleading Natera's statements regarding Panorama microdeletion screening. ¶¶146, 149; MTD Order at 24.

As the Exchange Act Defendants repeatedly misled the market about Panorama demand and revenues during the Class Period, Natera's stock price soared, and Natera and the Executive Defendants cashed in. ¶¶15, 164-66. Indeed, with Natera's stock price near its all-time high, the

Company conducted the July 2021 SPO—guided by the Underwriter Defendants—selling **$585 million** of common stock to unsuspecting investors. ¶¶259-65, 268-69. Yet, the July 2021 SPO Offering Documents were materially misleading because they failed to disclose that Natera's revenues were inflated by deceptive business practices. ¶¶274-84.[3] The Executive Defendants also capitalized on the fraud, unloading over **$137 million** worth of their personally held Natera common stock during the Class Period while in possession of material nonpublic information about the Company's Panorama-derived revenues, and reaping significant amounts of related compensation. ¶¶164-66, 200-10, 232-36.

Investors were completely in the dark until March 9, 2022, when Hindenburg Research, an investment firm, published a report before market open laying bare Defendants' misrepresentations. The report revealed that Natera's Panorama revenues were inflated through several improper practices, including its use of MGML (with which Natera had previously unknown ties) to indiscriminately submit prior authorizations, and Natera's deceptive Panorama requisition form. ¶¶172-75. In response to these new disclosures about the Company's core product, the price of Natera common stock plummeted roughly 33%. ¶173; MTD Order at 26.

## III.    ARGUMENT

Plaintiffs "bear[] the burden of showing that the proposed class satisfies the requirements of Rule 23." *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *4 (S.D. Tex. Nov. 13, 2019), *R. & R. adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019). The "question is not whether the plaintiff . . . will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009). While

---

[3]    Moreover, the July 2021 SPO took place just 10 months after another public offering by Natera for $287 million. ¶269. All told, Natera sold over $870 million in stock to investors at artificially inflated prices during the Class Period. *Id*.

the Rule 23 analysis is "rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," merits questions may be considered "only to the extent[] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013).

### A.    The Proposed Class Satisfies Rule 23(a)

#### 1.    Numerosity Is Satisfied

Rule 23(a)(1) requires that proposed Class members be "so numerous that joinder of all members is impracticable." Numerosity "is generally assumed to have been met in a class action suit involving nationally traded securities, since the putative class is likely sufficiently numerous, geographically dispersed, and difficult to identify." *Prause v. TechnipFMC, PLC*, 2020 WL 3549686, at *2 (S.D. Tex. Mar. 9, 2020).

Here, numerosity is satisfied. Natera common stock traded on the Nasdaq, a developed and efficient exchange. *See* Coffman Rpt., ¶26 n.31; *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 431 (D. Ariz. 2013) (noting the Nasdaq is "a major, well-developed stock exchange"). In addition, during the Class Period, there was an average of 78.25 million shares of Natera common stock outstanding, with an average weekly trading volume of 4.48 million shares (i.e., 5.19% of shares outstanding). Coffman Rpt., ¶¶26, 29, 70; *see, e.g.*, *Rooney v. EZCORP, Inc*., 330 F.R.D. 439, 445 (W.D. Tex. 2019) (numerosity met with 50 million shares outstanding and average weekly trading volume on the Nasdaq of 2.7 million shares); *Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999) (class of "100 to 150 members[]" "generally satisfies" numerosity).

#### 2.    Commonality Is Satisfied

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." This is "not demanding," *In re Reliant Energy ERISA Litig*., 2005 WL 2000707, at *2 (S.D. Tex. Aug. 18, 2005), and "a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

359 (2011) (cleaned up). The presence of "some plaintiffs having different claims or claims that require some individualized analysis does not defeat commonality." *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 269 (S.D. Tex. 2005).

Numerous common questions exist here, including, e.g., whether the Defendants omitted or misrepresented facts; whether those facts were material; and whether Natera's common stock price was artificially inflated (and by how much). Courts regularly hold that such questions satisfy Rule 23(a)(2). *See, e.g.*, *Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *7 (S.D. Tex. Sept. 27, 2023) ("Whether Cabot's representations were materially false and impacted the stock price are common questions of law and fact."); *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *2 (S.D. Tex. June 15, 2017) (similar).

### 3.       Typicality Is Satisfied

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." This requirement "is not demanding," *KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *11 (W.D. Tex. June 4, 2013), and is met "by showing that class representatives' claims arise from a similar course of conduct and share the same legal theory." *Cobalt*, 2017 WL 2608243, at *2.

Here, Plaintiffs, like the other Class members, purchased or acquired Natera common stock during the Class Period at prices artificially inflated by Defendants' misconduct and suffered damages when the relevant, previously-concealed truth was disclosed to the market and the price of Natera common stock declined. Thus, Plaintiffs' and the Class's claims arise from "the exact same misrepresentations, omissions, and course of conduct," and "are based on the same legal theories"—i.e., violations of Sections 10(b), 20(a), and 20A of the Exchange Act, and Sections 11, 12(a)(2), and 15 of the Securities Act—that may be proved with common evidence on a class-wide basis. *Rougier*, 2019 WL 6111303, at *6; s*ee also Prause*, 2020 WL 3549686, at *3 (typicality

met where "each class member's claim arises from the same allegedly false and misleading information as Plaintiff[s]' claim[s]").

### 4.    Adequacy Is Satisfied

Rule 23(a)(4) requires that the proposed class representatives "fairly and adequately protect the interests of the class." Here, courts evaluate three factors: "(1) the zeal and competence of the representative[s'] counsel; (2) the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees; and (3) the risk of conflicts of interest between the named plaintiffs and the class they seek to represent." *Prause*, 2020 WL 3549686, at *4 (alterations in original). Each factor is met in this case.

*First*, Plaintiffs have demonstrated their willingness and ability to serve as Class Representatives. They have actively overseen this litigation by, e.g., communicating regularly with counsel regarding case issues, reviewing drafts of pleadings and court filings, litigating a case schedule dispute, and propounding and responding to discovery. Exs. C, D; s*ee Prause*, 2020 WL 3549686, at *5 (plaintiffs adequate, given "fundamental understanding" of the action, including alleged misstatements and individual defendants' connection to the case); *City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 2018 WL 1558571, at *4 (W.D. Tex. Mar. 29, 2018) ("maintaining regular contact with counsel regarding the status of this action" supported adequacy).

*Second*, Plaintiffs' and the Class's interests are directly aligned, as their alleged claims are based on the same economic injuries and were caused by the same wrongful conduct, and Plaintiffs seek to maximize recovery for the Class. *See id.* at *4 (interests aligned where plaintiffs asserted "common right of achieving a maximum potential recovery for the class"); *Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331, at *3 (E.D. Tex. Aug. 29, 2016), *R. & R. adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017) (proposed class representatives "interests are aligned with the Class's interests and both suffered the same injury").

*Third*, KTMC and BLB&G are among the most experienced securities fraud class action law firms in the country. *See* Exs. E, F. Both firms have devoted substantial resources to prosecuting this action, including by: (1) conducting a thorough investigation into Plaintiffs' claims; (2) preparing and filing the Complaint; (3) successfully opposing Defendants' motions to dismiss; (4) retaining and consulting with experts; and (5) propounding document requests, interrogatories, and non-party discovery. *See J.C. Penney*, 2016 WL 8604331, at *11. (class counsel adequate where experienced in litigating securities class actions, defeated motion to dismiss and filed motion for class certification). Moreover, Nix Patterson is more than qualified to serve as Liaison Counsel, given its extensive experience in complex litigation within this Circuit and around the country. *See* Ex. G.

### B.    The Proposed Class Satisfies Rule 23(b)(3)

The Class satisfies Rule 23(b)(3), which requires that: (1) common questions of law or fact "predominate" over individual issues; and (2) a class action to be "superior" to other available methods of adjudication. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*"). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Prause*, 2020 WL 3549686, at *6. "Predominance does not require all questions of law or fact to be common, but only that common questions predominate over individual questions." *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 570 (E.D. Tex. 2005), *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005). Where, as here, claims are based upon violation of the securities laws, "[p]redominance is a test readily met." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

### 1.    Predominance Is Established for the Securities Act Claims

Plaintiffs need not establish "scienter, causation . . . or reliance" to show liability for their Securities Act claims under Sections 11 and 12(a)(2), *In re Enron Corp. Sec., Deriv. & "ERISA"*

*Litig.*, 2005 WL 3704688, at *17 (S.D. Tex. Dec. 5, 2005), but "need only show a material misstatement or omission" in the Offering Documents. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). The required questions and proofs implicated by Plaintiffs' Securities Act claims—i.e., (1) whether there was an actionable misrepresentation or omission in the Offering Documents, and, if so, (2) whether it was material—are common to class members and susceptible to common evidence. Under these circumstances, predominance is easily established. *See, e.g.*, *In re Reliant Sec. Litig.*, 2005 WL 8152605, at *9 (S.D. Tex. Feb. 18, 2005); *Prause*, 2020 WL 3549686, at *7 (predominance established in Section 11 case); *Cobalt*, 2017 WL 2608243, at *4 (predominance established in case alleging Section 11 and Section 12(a)(2) claims).

### 2.      Predominance Is Established for the Rule 10b-5 Claims

The falsity, materiality, scienter, and loss causation elements of Plaintiffs' Rule 10b-5 claims all raise common questions of law and fact that support a finding of predominance. *See Amgen*, 568 U.S. at 475 ("essential elements" of Rule 10b-5 claim, including materiality, are subject to common proof); *Halliburton I*, 563 U.S. at 809-15 (loss causation is a class-wide issue). Thus, for such claims, predominance "often turns on the element of reliance." *Id.*, 563 U.S. at 810. Here, reliance is a common question susceptible to class-wide proof because Plaintiffs and the Class can invoke *Basic*'s "fraud-on-the-market" presumption of reliance or, in the alternative, the *Affiliated Ute* presumption of reliance.

### a.      Basic's Fraud-on-the-Market Presumption of Reliance Applies

Reliance is a common question susceptible to class-wide proof here because Plaintiffs and the Class are entitled to rely on the fraud-on-the-market presumption established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 268 (2014) ("*Halliburton II*"). Under the fraud-on-the-market presumption, reliance on material statements and omissions is presumed where the security traded

in an efficient market. *Basic*, 485 U.S. at 247. The presumption is based on the premise that "the price of stock traded in an efficient market reflects all public, material information—including material misstatements so that anyone who buys or sells the stock at the market price may be considered to have relied on those misstatements." *Dell*, 2018 WL 1558571, at *5 (quoting *Halliburton II*, 573 U.S. at 263). To invoke the *Basic* presumption, Plaintiffs must demonstrate that: (1) the alleged misrepresentations were made publicly; (2) Class members purchased or acquired shares between the making of such misrepresentations and alleged revelations of the truth; and (3) Natera stock traded in an efficient market. *See Halliburton II*, at 573 U.S. at 277-78. Plaintiffs can establish each of these prerequisites.

**First**, Defendants' alleged misrepresentations were made publicly in Natera's SEC filings and earnings calls. ¶¶150-62. **Second**, Plaintiffs and Class members purchased or acquired Natera common stock during the Class Period between the time of Defendants' alleged misrepresentations and the alleged corrective disclosure. *See* Dkt. Nos. 9-2, 60-1. **Third**, as detailed below (and in the Coffman Report), Natera common stock traded in an efficient market during the Class Period.

### i.    The Nasdaq Is a Presumptively Efficient Market

During the Class Period, Natera traded on the Nasdaq—a well-developed, automated, and highly efficient market—which supports a finding of market efficiency. *See* Coffman Rpt., ¶26 n.31; *Rougier*, 2019 WL 6111303, at *11 ("Most courts agree that whether a security is listed on the NASDAQ is a good indicator that the stock trades in an efficient market.").

### ii.    The *Cammer* and *Krogman* Factors Are Satisfied

In addition, "the Fifth Circuit has adopted eight factors for gauging whether a security trades in an efficient market" based on *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001). *See Rougier*, 2019 WL 6111303, at *10. The five *Cammer* factors are: "(1) the average weekly trading volume expressed

as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3; and (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Id.* The three additional *Krogman* factors are: "(1) the company's market capitalization; (2) the bid-ask spread for stock sales; and (3) float[.]" *Id.* These factors "must be weighed analytically, not merely counted, as each of them represents a distinct facet of market efficiency." *Unger v. Amedisys*, 401 F.3d 316, 323 (5th Cir. 2005). The factors are not "an exhaustive list, and in some cases one of the above factors may be unnecessary." *Id.*

*Cammer* **Factor 1**. A high average trading volume is "one of the strongest factors for gauging market efficiency" because it "suggests significant investor interest in a company and implies that many investors are executing trades based on newly available or disseminated corporate information." *Rougier*, 2019 WL 6111303, at *11. A "substantial presumption" of an efficient market applies where the average weekly trading volume is "1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%." *Lehocky v. Tidel Techs., Inc*., 220 F.R.D. 491, 508 (S.D. Tex. 2004). Here, the average weekly trading volume for Natera Common Stock during the Class Period was 5.19% of shares outstanding, far exceeding the 1-2% threshold. Coffman Rpt., ¶29.

*Cammer* **Factor 2**. Significant analyst coverage of a company's stock offers "persuasive evidence of market efficiency because those investment professionals make buy or sell recommendations to their investor clients, and thereby help incorporate market information into the market price of the stock." *KB Partners*, 2013 WL 2443217, at *7. During the Class Period, at

least 30 firms published analyst reports on Natera (Coffman Rpt., ¶35), well above the number courts have deemed supportive of a finding of market efficiency. *See Buettgen v. Harless*, 2011 WL 1938130, at *7 (N.D. Tex. May 19, 2011) (4 analysts); *see also J.C. Penney*, 2016 WL 8604331, at *7 (25 analysts supported market efficiency).

> **_Cammer_ Factor 3.** Market makers "are firms that make a market in a particular security by maintaining bid and ask prices and standing ready to buy or sell at publicly-quoted prices." *Rougier*, 2019 WL 6111303, at *12. A "large number of market makers from sizable firms" supports a finding of market efficiency. *Lehocky*, 220 F.R.D. at 508-09 (20-25 market makers "tipp[ed] towards a finding of market efficiency"); *see also Cammer*, 711 F. Supp. at 1283 n. 30 (11 market makers sufficient). Throughout the Class Period, there were 103 market makers for Natera common stock, supporting a finding of market efficiency. Coffman Rpt., ¶43.

> **_Cammer_ Factor 4.** A company's eligibility to use SEC Form S-3 "is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. During the Class Period, Natera was eligible to file Form S-3, and between 2019 and 2022, Natera filed five Form S-3 ASRs, reserved for "well-known seasoned issuers." Coffman Rpt., ¶46; *J.C. Penney*, 2016 WL 8604331, at *9 (S-3 eligibility supported market efficiency).

> **_Cammer_ Factor 5.** A cause-and-effect relationship between "unexpected corporate events or financial releases and an immediate response in the price of the stock" can be an "important indicator of market efficiency." *Rougier*, 2019 WL 6111303, at *12.[4]

---

[4]   Notably, numerous courts have found that the fifth *Cammer* factor is not required to demonstrate market efficiency. *See In re Vale S.A. Sec. Litig.,* 2022 WL 122593, at *8 (E.D.N.Y. Jan. 11 2022*)* ("[I]f the first four *Cammer* factors and the three *Krogman* factors are satisfied, the Court need not consider . . . evidence supporting *Cammer* factor 5[.]"). *R. & R. adopted*, 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320 (S.D.N.Y. 2016) (rejecting argument that fifth *Cammer* factor was needed to demonstrate efficiency), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F. 3d 79 (2d Cir. 2017).

This *Cammer* factor is satisfied here, as Mr. Coffman conducted an event study to determine whether Natera's common stock reacted to new, Company-specific information during the Class Period, and found that it did. *See* Coffman Rpt., ¶¶50-53. An event study is a well-established methodology to determine whether a particular stock price reacts to new company-specific information and is generally accepted by courts when evaluating *Cammer* factor five. *See Rougier*, 2019 WL 6111303, at *15 ("Event studies are commonly used in securities fraud class actions."); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) (event study methodology "widely accepted in the academic community and in the courts" to show cause-and-effect relationship contemplated by *Cammer*).

Mr. Coffman's event study analyzes the existence of a cause-and-effect relationship by comparing Natera's common stock returns on eleven days when earnings announcements were published ("event dates") against trading days without such news related to the Company ("non-event dates"). Coffman Rpt., ¶¶59-64. Mr. Coffman's event study controls for market and industry factors that would impact the price of Natera common stock. *Id.*, ¶50. Mr. Coffman found that of the eleven event dates, six resulted in statistically significant price movements above the 95% confidence level. *Id.*, ¶61. By contrast, of the 61 non-event dates during the Class Period, Natera's stock price had a statistically significant price movement on just two days. *Id.*, ¶63.

Mr. Coffman opined that these results—(1) a statistically significant price reaction at the 95% confidence level or greater on 54.55% of event dates, but on only 3.28% of the non-event dates, and (2) an average Natera common stock price change of 7.18% on event dates after controlling for market and industry factors, versus a 2.25% average price change on the 61 non-event dates—demonstrate a cause-and-effect relationship between new, Company-specific information and changes in the price of Natera common stock. *Id.*, ¶¶63-64. This supports a finding

of market efficiency. *EZCORP*, 330 F.R.D. at 449 (granting class certification where Coffman served as economic expert and offered similar event study analysis); *J.C. Penney*, 2016 WL 8604331, at *7 (event study "revealed immediate stock price reactions to public disclosures of unexpected material information which supports a finding that the stock traded on an efficient market").

***Krogman* Factor 1.** Market capitalization "may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. Thus, "[t]he higher a company's market capitalization, the more likely that its shares trade in an efficient market." *J.C. Penney*, 2016 WL 8604331, at *7. Natera's Class Period market capitalization averaged $7.32 billion—higher than most Nasdaq stocks during the Class Period. Coffman Rpt., ¶70. Courts have found much lower market capitalization levels support market efficiency. *See, e.g.*, *Rougier*, 2019 WL 6111303, at *13 ($1.0 billion); *J.C. Penney*, 2016 WL 8604331, at *7 ($2.2 billion).

***Krogman* Factor 2.** The bid-ask spread is "the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Krogman*, 202 F.R.D. at 478. A "narrow bid-ask spread is indicative of higher trading volume" and suggests an efficient market. *Rougier*, 2019 WL 6111303, at *13. Conversely, a large bid-ask spread "is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478. Here, the average bid-ask spread in each month of the Class Period was between 0.04% and 0.19%, supporting market efficiency. Coffman Rpt., ¶73; *see, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (.27% bid-ask spread "indicative of an efficient market").

***Krogman* Factor 3.** The public float is the percentage of shares that are held by the public

as opposed to company insiders. *See Krogman*, 202 F.R.D. at 478. "When stocks are predominantly held by insiders as opposed to the public, stock prices are less likely to reflect all available information about the security." *Rougier*, 2019 WL 6111303, at *13. A large public float indicates "there is a large proportion of shares that are available to non-insiders," and supports market efficiency. *Id.* Here, Natera's public float was over 92%, and insiders held only 7.39% of all outstanding shares of Natera common stock during the Class Period. Coffman Rpt., ¶74; *see Enron*, 529 F. Supp. 2d at 753 (92% public float supported market efficiency).

**Additional Indicia of Market Efficiency.** The Coffman Report identifies three other factors that suggest market efficiency. ***First***, Natera common stock was owned by 655 institutional investors, comprising 95.6% of the public float, which, combined with the high trading volume during the Class Period, supports a finding of market efficiency. Coffman Rpt., ¶75; *see Lehocky*, 220 F.R.D. at 508 ("a high level of institutional interest in a security serves to increase the efficiency of the market"). ***Second***, the lack of autocorrelation (trends or correlations in daily stock price movements irrespective of new information) in Natera's stock price bolsters a finding of market efficiency. Coffman Rpt., ¶79; *see Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2021 WL 229310, at *6 (N.D. Cal. Jan. 21, 2021) (lack of autocorrelation supported market efficiency). ***Third***, the considerable amount of Natera options trading during the Class Period supports market efficiency. Coffman Rpt., ¶80; *see Weiner v. Tivity Health, Inc*., 334 F.R.D. 123, 132 (M.D. Tenn. 2020) (options trading supported market efficiency).

For all these reasons, the market for Natera common stock was efficient during the Class Period and Plaintiffs are entitled to rely on the fraud-on-the-market presumption of reliance.

**b.    The *Affiliated Ute* Presumption of Reliance Applies**

Under *Affiliated Ute*, "positive proof of reliance is not a prerequisite to recovery" where, as here, the alleged claims involve "primarily a failure to disclose"—i.e., an omission. 406 U.S. at

153-54. In such cases, reliance is presumed if "the facts withheld [were] material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Id.*[5] Courts routinely apply *Affiliated Ute* even where "plaintiffs' claims are based on a combination of omissions and misstatements." *Haw. Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Entm't. Holdings, Inc.*, 338 F.R.D. 205, 216 (S.D.N.Y. 2021); *see In re FirstEnergy Corp. Sec. Litig.*, 2023 WL 2709373, at *19 (S.D. Ohio Mar. 30, 2023) ("the theory behind the *Affiliated Ute* presumption . . . is not undermined simply because a defendant makes misstatements at the same time it omits material information"), *opinion clarified*, 2023 WL 8105252 (S.D. Ohio Apr. 18, 2023); *In re Robinhood Ord. Flow Litig.*, 2022 WL 9765563, at *13 (N.D. Cal. Oct. 13, 2022) (denying motion to dismiss and motion to deny class certification, and applying *Affiliated Ute* presumption of reliance in "mixed case of both misrepresentations and omissions").

Here, Plaintiffs' claims predominantly concern Defendants' omission of the fact that Natera's impressive Panorama revenues were driven by deceptive and improper business practices. ¶¶123-49, 163. Put differently, as pled, "[n]one of the material facts related to th[o]se practices were disclosed to investors," rendering Defendants' public disclosures materially misleading. ¶163; *see, e.g.*, ¶¶150-63, 231, 274-76, 282-84. The Court recognized as much in its MTD Order, holding that the Panorama misstatements were "made ***while concealing that Panorama revenues were inflated by deceptive practices***," and that "[t]he same is true for Defendants' statements regarding microdeletions." MTD Order at 24. Thus, the *Affiliated Ute* presumption of reliance applies. *See Robinhood,* 2022 WL 9765563, at *13 (applying *Affiliated Ute* where largest source

---

[5]    Materiality is a class-wide issue that need not be proved at this stage. *See Amgen*, 568 U.S. at 467 ("[B]ecause [t]he question of materiality . . . is an objective one . . . materiality can be proved through evidence common to the class."); *Halliburton II*, 573 U.S. at 281-83 (same).

of revenue was omitted from discussion of profits on company's website).[6]

### 3.    Predominance Is Established for the Section 20A Claims

Predominance is also satisfied for Plaintiffs' Section 20A claims. *See, e.g.*, *Enron*, 529 F. Supp. 2d at 700 ("Common legal and factual issues for § 20A claimants include whether Defendants violated § 10(b) and whether Defendants traded contemporaneously with Plaintiffs."). Whether the Executive Defendants traded on the basis of material non-public information and what constitutes "contemporaneous trading," are common questions susceptible to common proof. *See, e.g.*, *Basile v. Valeant Pharm. Int'l*, 2017 WL 3641591, at *12 (C.D. Cal. Apr. 18, 2017), at *12 ("violations of the duty to disclose or abstain" predominated for Section 20A claims).

### 4.    Predominance Is Established for the Control Person Claims

Common questions also predominate for Plaintiffs' control person claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. *See Rougier*, 2019 WL 6111303, at *8 (predominance met "[b]ecause § 20(a) requires proof of an underlying violation of § 10(b) and Rule 10b-5, the elements of the claims overlap and will be subject to the same class-wide proof"); *Reliant*, 2005 WL 8152605, at *9 (predominance met for alleged violation of Section 15).

### 5.    Damages for Plaintiffs' Claims Can Be Calculated Through a Common Methodology

Plaintiffs' proposed damages methodologies for their claims also entail myriad common, class-wide issues, further supporting a finding of predominance. *See EZCORP*, 330 F.R.D. at 450 (issues related to calculation of damages predominate where plaintiffs "demonstrate that their

---

[6]    *See also FirstEnergy*, 2023 WL 2709373, at *19-20 (applying *Affiliated Ute* in case alleging omissions and misrepresentations); *Beaver Cnty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at *7 (D. Minn. July 28, 2016) (applying *Affiliated Ute* where information was "completely omitted" from corporate disclosure); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *7 (N.D. Cal. Apr. 21, 2016) (applying *Affiliated Ute* where defendants omitted key transactions in SEC filings); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y. 2013) (applying *Affiliated Ute* where defendants omitted scheme).

theory of damages is consistent with their theory of liability").

For the Securities Act claims, damages are determined by statutory formula, readily satisfying the predominance requirement. *See FirstEnergy*, 2023 WL 2709373, at *15-16 (predominance met for Section 11 and 12 claims because damages are calculated pursuant to statutory provisions); Coffman Rpt., ¶¶92-95.

For the Rule 10(b)-5 claims, the predominance requirement is "easily satisfied" since, Plaintiffs "invoke[e] the *Basic* presumption and seek[] out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier*, 2019 WL 6111303, at *15. Here, Mr. Coffman has proposed a widely-accepted event study methodology that can be used to calculate out-of-pocket damages on a class-wide basis. *See* Coffman Rpt., ¶¶81-82; *Rougier*, 2019 WL 6111303, at *15; *EZCORP*, 330 F.R.D. at 451 (finding Coffman's proposed event study "consistent with the proposed theory of liability" and holding "calculation of damages is a common question susceptible of measurement on a classwide basis").

For Section 20A claims, "computing individual damages . . . is relatively straightforward and guided by the statute and case law," satisfying predominance. *Turocy v. El Pollo Loco Holdings, Inc.*, 2018 WL 3343493, at *18 (C.D. Cal. July 3, 2018); *see* Coffman Rpt., ¶¶88-91.

### 6.    Superiority Is Established Under Rule 23(b)(3)

Rule 23(b)(3) also requires that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Courts analyze four factors when evaluating superiority: "(1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class

action." *EZCORP*, 330 F.R.D. at 451. Here, each factor supports certification.

      ***First***, the proposed Class likely contains thousands of investors whose individual damages are small enough to render individually-controlled litigation prohibitively expensive. *See Prause*, 2020 WL 3549686, at *7 (superiority met where "[t]he costs . . . of individual litigation would prove prohibitive for potential class members"); *EZCORP*, 330 F.R.D. at 451 (same). ***Second***, Plaintiffs know of no other pending individual actions concerning the claims alleged here. ***Third***, concentrating litigation in this forum is desirable given the "geographic dispersal of investors" and Natera's headquarters within this district, *id.*, and doing so would "promote[] judicial efficiency and economy, as well as uniformity of decisions." *Prause*, 2020 WL 3549686, at *7. ***Fourth***, there will be no difficulties in managing this securities fraud case as a class action. Indeed, superiority is "easily satisfied" in securities fraud class actions. *See KB Partners*, 2013 WL 2443217, at *14.

### C.    Lead Counsel Should be Appointed as Class Counsel Under Rule 23(g)

      Rule 23(g)(1)(A) requires that in appointing class counsel, the court must consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions . . . and the types of claims asserted in the action; (iii) counsel's knowledge of the law; and (iv) the resources that counsel will commit to representing the class." As discussed above in Section III.A.4., KTMC and BLB&G have extensive experience litigating securities class actions and have demonstrated their willingness to dedicate substantial resources to prosecuting this action. For those reasons, KTMC and BLB&G should be appointed Class Counsel and Nix Patterson should be appointed Liaison Class Counsel.

## IV.    <u>CONCLUSION</u>

      For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) certify this action as a class action; (2) appoint Plaintiffs as Class Representatives; and (3) appoint KTMC and BLB&G as Class Counsel and Nix Patterson as Liaison Class Counsel.

Dated: June 4, 2024                    Respectfully submitted,

**NIX PATTERSON, LLP**
By: /s/ Jessica Underwood
Jessica Underwood (Bar No. 24093291)
Cody Hill (Bar No. 24095836)
Jeffrey J. Angelovich (Bar No. 00786988)
8701 Bee Cave Road
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 495-1534
junderwood@nixlaw.com
codyhill@nixlaw.com
jangelovich@nixlaw.com

*Liaison Counsel for Lead Plaintiff British
Airways Pension Trustees Limited*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice)*
Joshua E. D'Ancona (admitted *pro hac vice*)
Joshua A. Materese (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
Vanessa M. Milan (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jdancona@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com
vmilan@ktmc.com

*Lead Counsel for Lead Plaintiff British
Airways Pension Trustees Limited*

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
Lauren McMillen Ormsbee (admitted *pro hac
vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020

21

(212) 554-1400
lauren@blbglaw.com

*Counsel for Additional Plaintiff*
*Key West Police & Fire Pension Fund*

## <u>CERTIFICATE OF SERVICE</u>

I, Jessica Underwood, hereby certify that on June 4, 2024, I caused a true and correct copy of the foregoing Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

Dated: June 4, 2024                          _/s/ Jessica Underwood_____
                                             Jessica Underwood