# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN,

Defendants.

No. 1:22-cv-00398-DAE

# EXPERT REPORT OF CHAD COFFMAN, CFA

**June 4, 2024**

# Table of Contents

**Page**

**I. INTRODUCTION ... 3**
**II. QUALIFICATIONS ... 4**
**III. SUMMARY OF OPINIONS ... 5**
**IV. OVERVIEW OF THE COMPANY AND ALLEGATIONS ... 6**
**V. DISCUSSION OF RELIANCE ELEMENT IN SECTION 10(B) CLAIMS ... 8**
**VI. *CAMMER* FACTORS ... 11**
**VII. APPLICATION OF EFFICIENCY FACTORS TO NATERA COMMON STOCK ... 12**
A. OVERVIEW ... 12
B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME ... 14
C. *CAMMER* FACTOR 2: ANALYST COVERAGE ... 16
D. *CAMMER* FACTOR 3: MARKET MAKERS ... 18
E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ... 20
F. *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION ... 21
G. *KROGMAN* FACTOR 1: MARKET CAPITALIZATION ... 30
H. *KROGMAN* FACTOR 2: THE BID-ASK SPREAD ... 32
I. *KROGMAN* FACTOR 3: PUBLIC FLOAT ... 33
J. ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP ... 33
K. ADDITIONAL FACTOR: AUTOCORRELATION ... 34
L. ADDITIONAL FACTOR: OPTIONS ... 35
**VIII. DAMAGES ... 35**
**IX. CONCLUSION ... 43**

## I. INTRODUCTION

1. My name is Chad Coffman. I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation. I have been asked by counsel for the Plaintiffs in this matter – Lead Plaintiff, British Airways Pension Trustees Limited, and Additional Plaintiff Key West Police & Fire Pension Fund— to examine and opine on whether the market for Natera, Inc. ("Natera" or the "Company") common stock ("Natera Common Stock") was efficient during the proposed class period, February 27, 2020 through March 8, 2022 ("Class Period").[1,2] In addition, I have been asked to opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)"), and Section 20A. I have also been asked to explain the methodology to compute damages for all class members in connection with the claims under Sections 11, and 12(a)2 of the Securities Act of 1933 (the "Securities Act") for class members in connection with shares purchased in the July 22, 2021 secondary offering ("July 2021 SPO") and sold prior to the date of this report.

2. The materials I have considered in forming my opinions are summarized in **Appendix A**. Peregrine Economics is being compensated at an hourly rate of $950 per hour for

[1] *See* Amended Class Action Complaint for Violations of the Federal Securities Laws filed October 7, 2022, in *John Harvey Schneider v. Natera, Inc., et. al.*, No. 1:22-cv-00398-DAE, ("Complaint") p. 3 and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, *John Harvey Schneider v. Natera, Inc., et. al.*, No. 1:22-cv-00398-DAE, at ECF No. 104 ("MTD Order"). In the MTD Order, the Court sustained Plaintiffs' claims of Defendants' alleged fraudulent conduct regarding Natera's Panorama product during the proposed Class Period, but dismissed certain other alleged claims (related to a Natera product called Prospera). Plaintiffs' counsel has informed me that the proposed Class Period is stated in Plaintiffs' motion for class certification, which will be filed herewith.

[2] The Class Period of February 27, 2020 through March 8, 2022 begins with an alleged false statement regarding Panorama after market close on February 26, 2020 and concludes with an alleged corrective disclosure that issued before market open on March 9, 2022.

my work on this matter, and at rates between $270 and $475 for members of my staff who performed work in connection with this report under my direction and supervision. My compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II. QUALIFICATIONS

3. I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4. I, along with several others, founded Peregrine Economics in January 2024. Before starting Peregrine Economics, I served as the President of Global Economics Group, which I co-founded in March 2008. Prior to starting Global Economics Group, I was employed by Chicago Partners for over twelve years. At both Global Economics Group and Chicago Partners, I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (The Hon. Daniel Weinstein (Ret.)) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5. My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III. SUMMARY OF OPINIONS

6. After analyzing Natera's Common Stock during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for Natera's Common Stock was efficient during the Class Period.

7. I have also formed the opinion that, consistent with Plaintiffs' theory of liability, damages in this action can be calculated on a class-wide basis using a common methodology. These opinions are based upon my analysis described below.

8. The remainder of this report is organized as follows: **Section IV** provides an overview of Natera's business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory. **Section VI** introduces the *Cammer* factors and other factors that financial economists and courts apply when evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for Natera's Common Stock during the Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

9. I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV. OVERVIEW OF THE COMPANY AND ALLEGATIONS

10. Natera is a company that uses molecular and bioinformatics technology to develop diagnostics products.[3] Natera described its business during the Class Period as follows:

> We are a diagnostics company with proprietary molecular and bioinformatics technology that we are applying to change the management of disease worldwide. Our cell-free DNA, or cfDNA, technology combines our novel molecular assays, which reliably measure many informative regions across the genome from samples as small as a single cell, with our statistical algorithms which incorporate data available from the broader scientific community to identify genetic variations covering a wide range of serious conditions with best-in-class accuracy and coverage. Our technology has been proven clinically and commercially in the women's health space, in which we develop and commercialize non- or minimally- invasive tests to evaluate risk for, and thereby enable early detection of, a wide range of genetic conditions, such as Down syndrome. We are now translating our success in women's health and applying our core technology to the oncology market, in which we are commercializing a personalized blood-based DNA test to detect molecular residual disease and monitor disease recurrence, as well as to the organ health market, initially with a test to assess kidney transplants for rejection. We seek to enable even wider adoption of our technology through our global cloud-based distribution model. In addition to our direct salesforce in the United States, we have a global network of over 100 laboratory and distribution partners, including many of the largest international laboratories.[4]

11. For the fiscal year ended December 2020, Natera reported revenue of $391 million[5], and listed total assets of $932.2 million.[6] As of December 31, 2020, Natera employed approximately 1,815 full-time employees[7] and its Common Stock traded on the Nasdaq Global Select Market ("Nasdaq") under the ticker "NTRA."[8]

---

[3] Natera SEC Form 10-K for the fiscal year ended December 31, 2020, p. 6.

[4] Natera SEC Form 10-K for the fiscal year ended December 31, 2020, p. 6.

[5] Natera SEC Form 10-K for the fiscal year ended December 31, 2020, p. 6.

[6] Natera SEC Form 10-K for the fiscal year ended December 31, 2020, p. 90.

[7] Natera SEC Form 10-K for the fiscal year ended December 31, 2020, p. 27.

[8] Natera SEC Form 10-K for the fiscal year ended December 31, 2020, p. 71.

12. The Complaint alleges claims under Section 10(b) that Natera and the Executive Defendants[9,10] issued false and misleading statements and omitted material information during the Class Period, ultimately causing damages to purchasers of Natera Common Stock who unknowingly bought Natera Common Stock at artificially inflated prices and were damaged when the stock price ultimately reflected the concealed information.[11] The Complaint also alleges claims related to alleged insider trading under Section 20A of the Exchange Act,[12] and claims under Sections 11 and 12(a)2 of the Securities Act[13] against various defendants.

13. More specifically, the Section 10(b) claims at issue in this case concern Defendants' materially false or misleading statements regarding the company's key non-invasive prenatal test ("NIPT"), Panorama. The Complaint alleges that Natera attributed the Company's strong revenue performance to organically growing demand for Panorama, when the demand was in fact driven in part by deceptive business practices.[14] These practices allegedly included non-disclosure of using a closely-related third-party company to submit prior-authorization requests, often required by health insurers, for Panorama.[15] Additionally, Natera allegedly required

---

[9] Complaint ¶¶28-36.

[10] The Executive Defendants are Natera's CEO and director, Steve Chapman; Natera's CFO, Michael Brophy; Natera's Executive Chairman, Matthew Rabinowitz. *See*, Complaint ¶¶28-36 and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss.

[11] Complaint ¶168.

[12] The Insider Trading Defendants are Chapman, Brophy and Rabinowitz. Complaint ¶¶229-243.

[13] The Securities Act Defendants are: (i) Natera; (ii) the "Securities Act Individual Defendants" (defined as the Executive Defendants (Chapman, Brophy and Rabinowitz) and Natera Directors Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herm Rosenman, and Jonathan Sheena); and (iii) the "Underwriter Defendants" (defined as Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Cowen and Company, LLC, SVB Leerink LLC, Robert W. Baird & Co. Incorporated, BTIG, LLC, and Craig-Hallum Capital Group LLC). Complaint ¶¶252-267. Plaintiffs have claims under Section 11 of the Securities Act against Natera and the Securities Act Individual Defendants; and claims under Section 12(a)(2) of the Securities Act against Natera and the Underwriter Defendants.

[14] Complaint ¶¶9-14.

[15] Complaint ¶13.

physicians to opt-out of microdeletion screening, a costly add-on test for rare conditions, when ordering Panorama.[16] The Complaint alleges that these tactics go against industry guidance and/or standard practices.[17] The Complaint further alleges that through a corrective disclosure, the market finally learned the truth about Natera's deceptive scheme, and that, once revealed, the price of Natera Common Stock declined, harming investors who had bought at inflated prices.[18] The alleged corrective disclosure in this matter concerned an investigative report about Natera issued by investment research firm Hindenburg Research ("Hindenburg Report").[19]

14. Plaintiffs' Securities Act claims assert liability against the Securities Act Defendants for alleged material misstatements or omissions in the Offering Documents issued in connection with Natera's July 2021 secondary public offering of common stock.[20]

## V. DISCUSSION OF RELIANCE ELEMENT IN SECTION 10(b) CLAIMS

15. Class members' reliance on the alleged misstatements and material omissions is a required element for Plaintiffs' Section 10(b) claims. As relevant to this Report, Plaintiffs assert the fraud on the market theory of reliance in this matter.[21] The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or

[16] Complaint ¶14.

[17] Complaint ¶¶13-14.

[18] Complaint ¶¶18, 168-176.

[19] Complaint ¶18.

[20] Complaint ¶¶ 245-312.

[21] Complaint ¶222 and Sections II.C.2.c & II.E. I understand from counsel that Plaintiffs also assert another theory of reliance for their Section 10(b) claims, that is not addressed herein.

omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[22]

16. The Supreme Court reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[23]

17. As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, common stock prices reflect what is publicly known about a company. If a company provides the market with misleadingly positive information regarding its financial strength or business practices, the market price will be inflated compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiffs assert there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated price.

18. Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market"

---

[22] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[23] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

theory is an empirical exercise.[24] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[25] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[26]

19. The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[27] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not

[24] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

[25] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no.2 (1970): 383.

[26] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[27] *Basic,* 485 U.S. at 241.

necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

20. In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

## VI. *CAMMER* FACTORS

21. In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[28]

22. The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[29]

---

[28] *Cammer, v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

[29] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

23. While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to prove a particular market is "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

24. In addition to the five *Cammer* factors, I also evaluate, in subsequent sections, the three widely-recognized *Krogman* factors to examine further the efficiency of the market for Natera Common Stock during the Class Period.[30] These factors are the: 1) company's market capitalization, 2) stock's bid-ask spread, and 3) percentage of stock not held by insiders (the float). Finally, in subsequent sections, I also consider three additional factors to assess market efficiency during the Class Period: 1) the amount of institutional ownership of Natera Common Stock, 2) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 3) options trading. Consideration of these three factors can provide additional evidence of market efficiency (or inefficiency), alongside the *Cammer* and *Krogman* factors.

## VII. APPLICATION OF EFFICIENCY FACTORS TO NATERA COMMON STOCK

### A. OVERVIEW

25. After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for Natera Common

[30] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).

Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that Natera Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays Natera Common Stock closing price and trading volume for each day throughout the Class Period.

26. In summary, and as discussed more fully below, there are several factors indicating that Natera Common Stock traded in an efficient market during the Class Period. First, the average weekly trading volume of Natera Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average weekly trading volume for Natera Common Stock was 4.48 million shares, which represents 5.19% of shares outstanding, higher than the average security traded on the New York Stock Exchange ("NYSE") and/or Nasdaq.[31] Second, numerous securities analysts followed and reported on Natera during the Class Period. Third, Natera Common Stock was actively traded on the Nasdaq, fulfilling the *Cammer* factor regarding market makers. Fourth, Natera filed Form S-3ASRs before, during, and after the Class Period and met the important eligibility criteria for filing a Form S-3 throughout the Class Period. Fifth, there was a strong cause-and-effect relationship between new Company-specific information and the market price of Natera Common Stock during the Class Period. Sixth, Natera Common Stock had a large market capitalization. Seventh, Natera Common Stock had a low bid-ask spread relative to other exchange-traded common stocks. Eighth, insider holdings were low while institutional ownership was high during the Class

[31] Although Natera trades on the Nasdaq, not the NYSE, both exchanges are used as bases of comparison in various parts of this Report, as both exchanges are generally considered to be open, developed and efficient markets by economists.

Period. Ninth, the autocorrelation coefficient was not statistically significant at the 95% confidence level for the Class Period. Finally, there was active trading in Natera options throughout the Class Period. My analyses of all of these factors support the conclusion that Natera Common Stock traded in an open, developed, and efficient market at all relevant times during the Class Period.

### B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

27. The first *Cammer* factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[32]

28. Volume as a fraction of shares outstanding is an important indicator of market efficiency. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[33] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects

---

[32] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[33] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, et al. *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3, pp. 44-45.

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud, et al. "Liquidity and Asset Prices," *Foundations and Trends in Finance* 1, no. 4 (2005): 317.

information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[34]

29. Natera Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for Natera Common Stock during the Class Period was 5.19% of shares outstanding, compared to 2.66% for the NYSE and Nasdaq. Based on this figure, the weekly trading volume for Natera Common Stock far exceeds the 1% or 2% threshold cited by *Cammer.*[35] **Exhibit 3** plots Natera Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[36] Indeed, the average weekly trading volume for Natera Common Stock during the Class Period was 4.48 million shares. This volume of trading supports the conclusion that the market for this security was efficient throughout the Class Period.

30. Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[37] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this

---

[34] Randall S. Thomas & James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 105, 108. Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter was an Associate Professor of Finance at Wake Forest University.

[35] *Cammer* 711 F. Supp. at 1293-94 (D.N.J. 1989).

[36] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[37] Turnover velocity is simply the average trading volume as a percentage of shares outstanding (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

measure is that once quoted in annualized terms, Natera's Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics.

31. For example, over the Class Period, the annualized turnover velocity ratio for Natera's Common Stock was 259.44% compared with the NYSE and Nasdaq average of 138.48% for the Class Period.[38] Thus, Natera Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE and Nasdaq, further supporting that it traded in an efficient market.

32. In short, the relatively high trading volume in Natera Common Stock throughout the Class Period supports the conclusion that the market for Natera Common Stock was efficient.

### C. *CAMMER* FACTOR 2: ANALYST COVERAGE

33. The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[39]

34. Analyst coverage can be important evidence of efficiency. Significant analyst coverage implies that there is public interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

35. During the roughly two-year Class Period, there was an abundance of analyst coverage for Natera. **Exhibit 4** shows that there were at least 478 reports on Natera issued during the Class Period and 30 separate firms that had equity analysts issue such reports,

---

[38] Turnover velocity for the NYSE and Nasdaq is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[39] *Cammer*, 711 F. Supp. at 1286.

including major firms such as Canaccord Genuity, Piper Sandler, J.P. Morgan, and Cowen.[40] These reports served the purpose of disseminating Natera-specific information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of Natera by securities analysts supports the conclusion that Natera Common Stock traded in an efficient market throughout the Class Period.

36. Further, since 1989, when the *Cammer* decision was rendered, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[41] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

37. Information regarding the market price, the current bid-ask spread, and the ability to trade online is also available almost instantaneously via the Internet. Thus, in addition to the substantial analyst coverage of Natera, there were many other publicly disseminated sources of information about the Company. For example, there was substantial public press regarding Natera. A search for articles classified as related to Natera by Factiva over the Class Period

---

[40] The number of analyst reports I identify is likely understated since many are not available through third party data providers.

[41] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships. *See*, http://www.rss-specifications.com/ and *see also*, http://www.rss-specifications.com/what-is-rss.htm.

resulted in 1,206 unique articles.[42] In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Class Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding Natera in the public arena throughout the Class Period.

38. In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding Natera provides evidence of a robust and active market for public information about the Company and evidence that Natera's Common Stock traded in an efficient market during the Class Period.

### D. *CAMMER* FACTOR 3: MARKET MAKERS

39. A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[43] With respect to this third factor, *Cammer* states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[44]

---

[42] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities. I identified 1,206 unique articles as a result of two searches: 1) one search for "All Sources" with the company field "Natera, Inc." and 2) a separate search for "Major News and Business Sources" with keyword field "Natera" but excluding news with the company field "Natera, Inc." Both searches were conducted for the period "February 27, 2020 – March 8, 2022" and excluded the phrase "NASDAQ New 52-Week Highs and Lows". Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all published news during this period as the Factiva database is limited to certain sources and content type.

[43] *See* https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[44] *Cammer*, 711 F. Supp. at 1293.

40. The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[45]

41. Natera Common Stock traded on a major exchange (i.e., Nasdaq) with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[46] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as Nasdaq and the NYSE, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[47]

42. Nasdaq is one of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on decentralized market makers providing liquidity for trading, the Nasdaq relies on a computerized system to match orders and provide quotes.[48] The minimum requirements to be listed on the Nasdaq and

---

[45] Brad Barber, et al. "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law* 19, (1994), 291.

[46] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the Nasdaq National Market System."

[47] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; s*ee* Introduction and Appendices at https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf. *See also*, William Sharpe, et al. *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3, pp. 45-53; Frank J. Fabozzi, et al. *Foundations of Financial Markets and Institutions*, (4th ed.) Prentice Hall, (2010), Chapter 18 – Appendix A.

[48] For Nasdaq, *see* https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities.

remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

43. Nevertheless, according to Bloomberg, throughout the Class Period, there were 103 market makers for Natera Common Stock.[49] Therefore, Natera Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market for it during the Class Period.

### E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

44. The fourth *Cammer* factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[50]

45. SEC Form S-3 allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[51] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement.

---

[49] Bloomberg RANK function.

[50] *Cammer*, 711 F. Supp. at 1287.

[51] For additional information, *see*, www.sec.gov/about/forms/forms-3.pdf.

46. A Form S-3 allows a company to register unspecified amounts of different specified types of securities using a single form. I have found no evidence that Natera was not S-3 eligible throughout the Class Period. In fact, Natera filed Form S-3ASRs before, during, and after the Class Period (on October 15, 2019, September 9, 2020, July 20, 2021, September 10, 2021 and November 15, 2022).[52] While a Form S-3 is a registration statement for specified transactions by certain issuers, a Form S-3ASR is a type of Form S-3, but only "well-known seasoned issuers" are eligible to file S-3ASRs.[53] Therefore, Natera meets this *Cammer* efficiency factor, which supports the conclusion that Natera Common Stock traded in an efficient market.

### F. *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

47. The fifth *Cammer* factor relates to how the price of a security reacts to new, company-specific information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[54]

48. Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon to establish such a causal connection, both inside and outside of the context of litigation, is called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[55] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies

---

[52] *See* https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001604821&type=S-3&dateb=&owner=exclude&count=40&search_text=.

[53] *See*, https://www.sec.gov/about/forms/forms-3.pdf.

[54] *Cammer,* 711 F. Supp. 1291.

[55] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13.

have been used for over 50 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[56]

49. For purposes of an event study, sources of new information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements in particular instances is sufficiently large that simple random movement can be rejected as the cause.

50. To analyze cause and effect, I performed an event study to determine whether Natera Common Stock reacted to earnings announcements (which regularly provide new information to the market about a company) in a manner significantly different from how the stock moved on days with no Natera-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about Natera and the market price of Natera Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

51. A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[57] I have performed

---

[56] John J. Binder. "The Event Study Methodology Since 1969," *Review of Quantitative Finance and Accounting* 11, (1998): 111.

[57] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable"). In this case, the daily percentage change in Natera Common Stock (the Natera daily return) is the dependent variable and the contemporaneous daily returns for a market and industry index are the independent variables. For a general discussion of regression analysis, *see* Damodar N. Gujarati, *Basic Econometrics*, (3rd ed.) McGraw Hill (1995), Chapters 1-3.

such an analysis in this matter where I evaluate the relationship between Natera Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return (the "Market Index") and an industry index, hereafter referred to as the "Industry Index."[58,59]

52. For each trading day analyzed over the roughly two-year Class Period, I constructed a regression model using data from the prior 120 trading days.[60] By using such a "rolling" estimation window, it allows for the relationship between Natera Common Stock, industry and market factors, as well as firm-specific volatility, to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[61]

53. The model I applied here, as specified above, indicates that there is a positive correlation between Natera Common Stock and the control variables. In other words, the movement of the Market Index and Industry Index helps explain the price movements of Natera Common Stock during the Class Period. For instance, choosing a day in the Class Period purely as an example, May 20, 2021, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 2.51 which means that a 1% rise in the S&P 500 predicts a 2.51% increase in returns for Natera Common Stock. The estimated coefficient for the Industry Index is 1.51, meaning that the expected return for Natera Common

---

[58] The Industry Index is the Nasdaq Biotechnology Total Return Index, which Natera compares itself to in its 10-Ks during the Class Period (10-K FY 2020 - 2022). *See*, Natera SEC Form 10-K for the fiscal years ended December 31, 2020, December 31, 2021 and December 31, 2022.

[59] The returns of the Industry Index are net of the S&P 500 Total Return Index.

[60] A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 15. ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.")

[61] Phillip A. Braun, "Good News, Bad News Volatility, and Betas," *The Journal of Finance* 50, no. 5 (1995): 1575, 1597.

Stock is about a 1.51% increase for every 1% increase in the Industry Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Class Period.

54. Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much unexplained price movement remains in Natera Common Stock after controlling for the Market Index and Industry Index. For instance, on the example date, May 20, 2021, the model predicted that absent any new, value relevant firm-specific information, the price of Natera Common Stock would increase by 4.31%, where the S&P 500 was up 1.06% and the Industry Index was up 1.22%.[62] Because of the inherent randomness observed in stock price returns, and in accordance with basic event study principles, I do not expect the model to predict returns exactly.

55. In this example, I observe an actual return of 1.48%. Thus, the "abnormal return" for this day is -2.83% (the actual return of 1.48% minus the predicted return of 4.31%). To tell if this abnormal return of -2.83% is sufficiently large that I can reject random movement as the explanation, I rely on the standard deviation of the errors from the regression model.

56. The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of -2.83% represents 1.03 standard deviations or a t-statistic of -1.03 (abnormal return of -2.83% divided by the

[62] The predicted return of 4.31% is found as follows: 2.51 * 1.06% (coefficient on Market Index *times* Market Index return) + 1.51 * 1.22% (coefficient on Industry Index Return *times* Industry Index Return) + 0.20% (constant term from regression).

standard deviation of the errors of 0.027).[63] Using the standard assumption that, in the absence of new value relevant company-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[64,65] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation.

57. Since our example has a t-statistic of -1.03, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value relevant firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

58. **Exhibit 6** shows that the standard deviation of the errors for Natera Common Stock varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing Company-specific volatility.

---

[63] The standard deviation of the errors is plotted in **Exhibit 6.** The standard deviation of the errors is also known as the standard error. The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd ed.) (2011): 243. ("An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error. The standard error gives the likely magnitude of this random error, with smaller standard errors indicating better estimates.")

[64] Basic statistics state that for a normally distributed variable, 5% of the observations are expected to fall outside 1.96 standard deviations from the mean. The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd ed.) (2011): 342. ("The normal distribution has the property that the area within 1.96 standard errors of the mean is equal to 95% of the total area.")

[65] The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well. *See*, David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.

59. To analyze cause-and-effect, I examined the price response of Natera Common Stock to the eleven earnings announcements or pre-announcements during the Class Period. *See* **Exhibit 7**.

60. There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[66] Also, newly released earnings reports by a company are an objective set of news events to identify and test. Considering the fifth earnings release listed in **Exhibit 7** as an example, afterhours on November 5, 2020 the Company announced positive third quarter results that were above expectations.[67] In response, the market price of Natera Common Stock increased by 7.45%, compared to the predicted return of -1.06%. Thus, the abnormal return on November 6, 2020 was 8.51%. With a t-statistic of 3.28, this abnormal price movement is statistically significant at the 99% level, and I therefore have scientific evidence that Natera Common Stock reacted rapidly to this new information.

61. Similar to this example, I analyzed the market reaction to Natera's other earnings announcements and pre-announcements I identified above. In total, of the eleven earnings

---

[66] William H. Beaver, "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research* 9, (1971): 119-163; Joseph Aharony & Itzhak Swary. "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.

[67] *See*, "Natera Reports Third Quarter 2020 Financial Results," *PR Newswire,* November 5, 2020 4:05 PM ET; "Very Solid Beat & Raise, Outlook Remains Bright," *Cowen*, November 6, 2020; "Natera Does It Again: Record 3Q20 Volumes Drive Revenue Beat & Raise," *Piper Sandler,* November 6, 2020.

announcements and pre-announcements Natera issued during the Class Period, six resulted in statistically significant price movements above the 95% confidence level.[68,69]

62. **Exhibit 7** presents a summary of the earnings releases during the Class Period.

63. I then compared these results against the 61 days during the Class Period where I identified no Natera-related news. The criteria for these no-news days were (1) an absence of articles about Natera from the Factiva database, (2) no new analyst reports about Natera issued to my knowledge, and (3) no new Natera SEC filings. Of these 61 days, there were only two days with a statistically significant price movement. Thus, on days with earning announcements or pre-announcements during the Class Period there was a statistically significant price reaction at the 95% confidence level or greater 54.55% of the time, compared to days with no Natera-related news, when there was statistically significant reactions only 3.28% of the time.[70,71] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of Natera Common Stock.

64. Furthermore, on the 61 days with no news, the average change in price of Natera Common Stock was 2.25%, after controlling for market and industry factors, while the average change in Natera Common Stock on earnings announcement or pre-announcement dates after controlling for market and industry factors was 7.18%. In other words, the average magnitude of stock price movement on earnings announcement or pre-announcement days was over 3 times

[68] It is not unusual to observe many earnings announcements that are not statistically significant. This happens, for instance, in quarters where there was insufficient surprise and/or the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information.

[69] Of the six earnings announcements statistically significant at the 95% confidence level, four of these were also statistically significant at the 99% level. There was also one pre-announcement that was statistically significant at the 90% level.

[70] This difference between 54.55% and 3.28% is itself statistically significant at the 99% confidence level.

[71] Based on randomness alone, one would expect 5% of the no news days to be statistically significant. The observed rate of 3.28% is not statistically significantly different than 5%.

higher than on days with no news.[72] Again, this demonstrates that on days when important Company-specific information is released to the market, Natera's stock price moves much more than on days where there is no Company-specific news. This provides further evidence of a cause-and-effect relationship between Company-specific news and changes in the price of Natera Common Stock, and thus constitutes evidence of an efficient market.

65. The bar charts below summarize this analysis while **Exhibit 8** gives more detail.




[72] This difference between 7.18% and 2.25% is itself statistically significant at the 99% confidence level.




66. Finally, when important Company-specific news is released to the market (e.g. earnings or pre-earnings announcements), the daily trading volume of Natera Common Stock also tends to be much higher[73] than on days where there is no news. *See*, **Exhibit 9**. For instance, the average daily trading volume of the eleven days with earnings or pre-earnings announcements was 1.89 million. Compare this to the average daily trading volume of 0.75 million for days where there is no Natera news in the Class Period.[74] The bar chart below summarizes this analysis.

[73] William H. Beaver, "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research* 6, (1968): 69, 84.

[74] This difference between 1.89 million and 0.75 million is itself statistically significant at the 99% confidence level.




67. The bar charts above reflect a strong cause-and-effect relationship between new, Company-specific news and rapid changes in the price of Natera Common Stock. The earnings and pre-earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news.

68. In conclusion, the event study analysis presented in this section demonstrates a clear cause-and-effect relationship between new material news and changes in the market price of Natera Common Stock during the Class Period.

## G. *KROGMAN* FACTOR 1: MARKET CAPITALIZATION

69. In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[75] The *Krogman* Court held, "[m]arket capitalization, calculated as the number

[75] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[76] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[77] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

70. Natera Common Stock had a higher market capitalization than the majority of NYSE and Nasdaq stocks during the Class Period, thus suggesting this factor is supportive of efficiency. There were at minimum 78.25 million shares of Natera Common Stock outstanding throughout the Class Period.[78] Based on the market price, the market capitalization for Natera Common Stock averaged $7.32 billion during the Class Period, as shown in **Exhibit 9. Exhibit 10** shows that during the Class Period, Natera Common Stock's market capitalization ranged from the 75th to 87th percentile of the combined NYSE and Nasdaq markets for the applicable quarters during the Class Period.[79] In other words, over the Class Period, Natera Common Stock had a higher market capitalization than at least 75% of the firms on the combined NYSE and Nasdaq exchanges.

71. Given that the market capitalization for Natera Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for Natera Common Stock.

---

[76] *Krogman*, 202 F.R.D. at 478.

[77] Randall S. Thomas & James F. Cotter, "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 117.

[78] Shares outstanding data obtained from SEC filings.

[79] Bloomberg.

### H. *KROGMAN* FACTOR 2: THE BID-ASK SPREAD

72. The second *Krogman* factor considers the bid-ask spread for a security, reasoning that: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[80] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies because the cost of the trade could be greater than the perceived inefficiency. Thus, a narrow bid-ask spread supports the presence of an efficient market where the prices reflect publicly available information.

73. I analyzed bid-ask spreads for Natera Common Stock during the Class Period. **Exhibit 11** shows that during this period, the time-weighted average percentage bid-ask spread for Natera Common Stock in each month was between 0.04% and 0.19%. This is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and Nasdaq in February 2022 (the month of the Class Period during which Natera had the largest percentage bid-ask spread).[81,82,83] **Exhibit 11** demonstrates that Natera Common

---

[80] *Krogman*, 202 F.R.D. at 478.

[81] Note that since the proposed Class Period starts on February 27, 2020 and ends on March 8, 2022, quotes data for February 2020 and March 2022 do not cover the whole months.

[82] Quote data for Natera and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[83] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and Nasdaq for February 2022 and then randomly generated a list of 100 common stock securities. I then calculated the time-weighted average monthly bid-ask spread for February 2022.

Stock had a monthly average bid-ask spread of 0.19% in February 2022, while a randomly selected group of 100 other common stocks on the NYSE and Nasdaq had an average bid-ask spread of 0.62%.[84] Accordingly, Natera Common Stock's bid-ask spread was low during the Class Period, and this factor further supports market efficiency for Natera Common Stock.

### I. *KROGMAN* FACTOR 3: PUBLIC FLOAT

74. The *Krogman* Court's final factor is that the public float (i.e., the shares not held by insiders) is considered to be indicative of market efficiency. As shown in **Exhibit 12**, during the Class Period, insiders held only 7.38% of all outstanding shares of Natera Common Stock, meaning that over 92% of Natera's shares were held by non-insiders. This large percentage of shares held by non-insiders supports market efficiency.

### J. ADDITIONAL FACTOR: INSTITUTIONAL OWNERSHIP

75. Institutional investors are considered to be sophisticated and well-informed, with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 12** shows, 656 separate institutions owned Natera Common Stock during the Class Period, holding on average 95.6% of public float. The substantial level of institutional ownership of Natera Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

---

[84] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, "Dealer versus auction markets: A paired comparison of execution costs on Nasdaq and the NYSE," *Journal of Financial Economics* 41, no. 3 (1996): 313.

## K. ADDITIONAL FACTOR: AUTOCORRELATION

76. If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

77. Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[85]

78. A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return on a given day.[86] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

79. **Exhibit 13** displays the autocorrelation coefficient for Natera Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class Period is not statistically different than zero, meaning there is no evidence of statistically significant autocorrelation. This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also

---

[85] Doron Avramov, et al. "Liquidity and Autocorrelations in Individual Stock Returns," *The Journal of Finance* 61, no. 5 (2006): 2365, 2367-68; Michael C. Jensen, "Some Anomalous Evidence Regarding Market Efficiency," *Journal of Financial Economics* 6, nos. 2/3 (1978): 95-101.

[86] William H. Greene, *Econometric Analysis*, (6th ed.) Prentice Hall (2008), Chapter 19, p. 644.

supports the conclusion that Natera Common Stock traded in an efficient market throughout the Class Period.

### L. ADDITIONAL FACTOR: OPTIONS

80. In addition to the factors analyzed above, there was also considerable option trading in Natera Common Stock during the Class Period.[87] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[88] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[89] Thus, this factor also supports that Natera Common Stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

81. Counsel for the Plaintiffs also asked me to opine on whether per share damages could be measured for all purchasers of Natera Common Stock during the Class Period under Section 10(b) of the Exchange Act using a common methodology that is consistent with the Plaintiffs' theory of liability.[90] There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act and Rule 10b-5. This method, typically referred to as the "out-of-pocket" method, states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share

---

[87] For instance, according to Bloomberg, there were 30,243 Natera Common Stock put contracts and 58,704 Natera Common Stock call contracts that traded during the Class Period.

[88] Stephen A. Ross, "Options and Efficiency," *Quarterly Journal of Economics* 90, no. 1 (1976): 75.

[89] Raman Kumar, et al. "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *The Journal of Finance* 53, no. 2 (1998): 717.

[90] *See*, Section III and Section IV.

at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ("PSLRA") "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[91] The out-of-pocket method has been applied in virtually every Rule 10b-5 matter in which I have observed or participated as a consulting, testifying, or neutral expert.

82. Once the inflation per share has been quantified on each day during the class period, the computation of damages for each class member is formulaic based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Therefore, there is a well-accepted method to compute damages in Section 10(b) matters such as this.

83. Separate and apart from whether there is a common method for computing damages is the question of how to quantify the artificial inflation per share that is an input to the damages methodology. The quantification of the artificial inflation per share requires a detailed loss causation analysis.[92] Nevertheless, whatever the method for determining the artificial inflation per share, it would be common to all class members.

84. For example, the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth that was concealed by the alleged material omissions and/or misrepresentations, such as the price

[91] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

[92] I have not been asked to conduct a loss causation analysis at this time. In my experience, loss causation analyses are often informed by information learned in discovery.

reaction to the Hindenburg Report allegations (i.e., a "corrective disclosure").[93,94] Such an event study would also need to consider whether and to what extent any non-fraud related information (i.e., "confounding information") contributed to the observed price movement. If there is such confounding information, disaggregating the price impact of corrective disclosures from confounding information may utilize valuation techniques and may depend on information learned through discovery. Determining the specific valuation approach necessary to perform a loss causation analysis that reasonably disaggregates corrective and confounding information is an inherently case-specific question that depends on specific facts and circumstances. Examples of such techniques include, but are not limited to, fundamental valuation analysis such as discounted cash flow methods, valuation multiple methods (i.e., price to earnings multiples, price to EBITDA multiples, price to revenue multiples, etc.), use of academic studies regarding the value of certain types of information, and other available valuations whether from securities analysts or made available through discovery. Regardless of the technique used, disaggregation is performed on a class-wide basis – in other words, the specific methodology applies regardless of the identity or circumstances of any individual class member.

85. The loss causation analysis would also require an analysis of whether and/or how inflation per share may have evolved over the Class Period. Again, the nature of this analysis is intensely factual, case-specific, and may depend on information learned through discovery. For example, an often-used method is to assume "constant dollar inflation," which implies that the artificial inflation was the same dollar amount during the given period. In certain circumstances, it may be more reasonable to apply "constant percentage inflation," which implies the price was

---

[93] Complaint ¶¶18, 172-173.

[94] The event study I have performed for this report is for Market Efficiency purposes and is not an attempt at valuing artificial inflation.

inflated by a consistent percentage in the absence of additional disclosures. In other cases, the artificial inflation has evolved based upon the nature and timing of specific misstatements or the inflation varied on a daily basis as a result of information contained in internal documents obtained in discovery. To summarize, the determination of how artificial inflation may have evolved over the Class Period is also a case-specific, fact-specific loss causation exercise that can rely on valuation techniques including, but not limited to, event studies, fundamental valuation, contemporaneous valuations or documents, or some combination of the above. Once again, however, all of these loss causation methodologies are class-wide in nature and do not depend on the identity or circumstance of any specific investor.

86. Accordingly, although I have not been asked to calculate class-wide damages in this report, and such calculations may depend, in part, on the completion of discovery, and full development of the case record, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that Rule 10b-5 damages in this action are subject to a well-settled, common methodology that can be applied to the Class as a whole.

87. I have also been asked by Counsel to evaluate whether damages with respect to the Insider Trading Defendants' alleged violations of Section 20A of the Exchange Act can be assessed on a class-wide basis utilizing a common methodology that is consistent with Plaintiffs' theory of liability.

88. Based on my expertise, experience, and my understanding of insider trading claims under Section 20A of the Exchange Act from counsel, it is my opinion that damages for Plaintiffs' claims under Section 20A can be calculated using multiple potential methodologies,

each of which can be applied on a class-wide basis, involves common, class-wide evidence, and is consistent with Plaintiffs' claims.

89. One method for measuring Section 20A damages looks to the losses the selling defendant avoided by disposing of the shares before the market price reflected the impact of the negative, material nonpublic information at issue. For example, if a Section 20A defendant sold shares at a price of $100 per share while in possession of material, nonpublic information, and then, a reasonable time after the relevant information was disclosed to the market, the share price fell to $70, the damages (i.e., loss avoided) per share would equate to $30 per share. Multiplying the per-share loss-avoided amount by the number of shares sold by a selling defendant in violation of Section 20A at the relevant time would yield total damages under Section 20A for the shares in question. The key inputs in this analysis, the stock price and number of shares sold, are objective factors that would be analyzed in a common fashion as to all affected Class members.

90. Another potential method of calculating damages under Section 20A looks to the amount of artificial inflation in the stock at the time of the defendant's sale. This is also a reasonable way of quantifying the losses a Section 20A defendant avoided through his or her sale of the relevant security. Once the amount of artificial inflation has been determined (as previously described in this report), that measure can be multiplied by the number of shares sold, which yields total Section 20A damages related to the sales at issue for purposes of Section 20A. This calculation involves common evidentiary inputs for all Class members who traded contemporaneously with a Section 20A defendant.

91. Accordingly, it is my opinion that Section 20A damages can be calculated based on either of methodologies set forth above, each of which are common to all Class members and utilize common evidence.

92. Moreover, Plaintiffs' claims under the Securities Act also give rise to damages that may be measured through a common methodology that relies on standard inputs. Section 11 damages calculations are based on Section 11(e) of the Securities Act which establishes the statutory formula by which damages for Section 11 claims are calculated. Specifically, Section 11(e) states the following:

> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought.[95]

93. Given that there is a statutorily defined formula for Section 11 damages, it is clear that damages under Section 11 can be calculated on a Class-wide basis.

94. Section 11 allows Defendants to offset some or all of these damages if they can prove that financial losses under the statutory formula were not caused by the false statements or omissions. Section 11 provides:

> if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein

[95] 15 U.S.C. § 77k(e).

> or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.[96]

95. Any negative causation evidence would be applicable Class-wide as opposed to relevant for any specific investor. Therefore, even to the extent there is negative causation, damages can still be calculated on a Class-wide basis.

96. I understand Section 12(a)2 of the Securities Act governs liability for untrue statements and/or omissions of material fact in prospectuses or oral communications used to sell securities. Regarding recoverable damages, the statute provides, in relevant part, that a purchaser of a security sold "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading" may bring suit, to among other things "recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."[97]

97. Thus, Section 12(a)(2) provides the remedy of rescission, minus income received from the security (i.e., dividends), together with interest on the price paid for the security, running from the date of payment, except where the plaintiff no longer owns the security.[98] As Section 12 damages represent rescission for investors that continue to hold, the Natera Common Stock sold to them by means of the prospectus at issue must be tendered in fact after judgment is made, and income received through judgment would also have to be considered. Thus, it is my understanding that computing Section 12 damages for investors who still hold Natera Common

---

[96] 15 U.S.C. § 77k(e).

[97] 15 U.S.C. § 77l(a)(2).

[98] 15 U.S.C. § 77l(a)(2).

Stock sold to them by means of the prospectus at issue is premature because it depends on income and interest through the date of judgment as well as the value of the security as of the date of judgment.

98. If a Class Member who purchased Natera Common Stock sold pursuant to the prospectus at issue no longer owns the shares, then damages are still "the substantial equivalent of rescission."[99] In other words, for Natera Common Stock sold to investors pursuant to the prospectus at issue and resold prior to judgment, the statute calls for "damages" to be computed,[100] which I understand to be the amount paid for each share of Natera Common Stock sold pursuant to the prospectus at issue, plus interest from the date of purchase through the date of sale, minus any income received, minus the sale price.

99. For each share purchased in the SPO and not sold before the entry of judgment, Section 12 damages are measured as the amount paid for the security, plus interest accrued through the date of judgment, minus any income received (i.e., the dividends paid out on the common stock until the date of judgment).[101] The investor would then return his or her share of Natera Common Stock to the Company on the date of judgment. From an economic point of view, this is equivalent to deducting the value of Natera Common Stock on the date of judgment from Section 12 damages.

---

[99] *See,* Loss, Louis. (1983). *Fraud and Civil Liability Under the Federal Securities Laws.* Washington, D.C.: The Federal Judicial Center, p. 36: ("It seems clear in statutory context that, when the plaintiff in section 12 no longer owns the security, damages are to be measured so as to result in the substantial equivalent of rescission—namely, the difference between the purchase price and the plaintiff's resale price (plus interest) less any income or return of capital (with interest) that the plaintiff received on the security."). *See also,* Randall v. Loftsgaarden, 478 U.S. 647 (1986), citing H. R. Rep. No. 85, 73rd Cong., 1st Sess., 9 (1933) ("under § 12, the buyer can 'sue for recovery of his purchase price, or for damages not exceeding such price'").

[100] 15 U.S.C. § 77l(a)(2).

[101] As Section 12(a)(2) damages are recessionary for investors that continue to hold, and shares must be tendered after judgment is made (*see,* 15 U.S.C. § 77l(a)(2)), and any income received through judgment would also have to be considered, it is my understanding that computing Section 12(a)(2) damages is premature before judgment.

100. As with Section 11 of the Securities Act, Plaintiffs' Counsel has informed me that Section 12 provides an affirmative defense of "negative causation" by which Defendants have the opportunity to potentially reduce some or all of the damages under the statutory formula to the extent they can prove that the declines in value were caused by something other than the alleged securities violations. In this regard, Section 12(b) states that:

> In an action described in subsection (a)(2), if the person who offered or sold such security proves that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from such part of the prospectus or oral communication, with respect to which the liability of that person is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading, then such portion or amount, as the case may be, shall not be recoverable.[102]

101. Similar to Section 11, any negative causation evidence would be applicable Class-wide as opposed to relevant for any specific investor. Therefore, even to the extent there is negative causation, damages can still be calculated on a Class-wide basis.

## IX. CONCLUSION

102. In sum, every factor analyzed supports my opinion that Natera Common Stock traded in an efficient market during the Class Period. Furthermore, damages in this matter can be calculated on a class-wide basis using a common methodology.

103. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 4, 2024.

Chad Coffman

[102] 15 U.S.C. § 77l(b).

# Exhibit 1
# Summary of Efficiency Factors for Natera Inc.

| Factor | Summary of Factor | Natera |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 5.19%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 4.48 million shares traded weekly on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 30 securities analysts issued 478 analyst reports which implies that important information relevant to trading Natera Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because Natera's shares were exchange-traded on the Nasdaq during the Class Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were at least 103 market makers for Natera Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • Natera filed Form S-3ASR's before, during, and after the Class Period (on October 15, 2019, September 9, 2020, July 20, 2021, September 10, 2021 and November 15, 2022). I have found no evidence to believe that Natera was not S-3 eligible throughout the Class Period, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Natera Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 3/31/2020 and 3/31/2022, Natera's market capitalization was $2.35 billion and $3.92 billion, respectively, which is at least the 75th percentile of all NYSE and Nasdaq stocks. Natera Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the average percentage bid-ask spread for Natera Common Stock in each month ranged from 0.041% to 0.187%. Natera's average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the Nasdaq and NYSE in February 2022 (the month when Natera had the largest bid-ask spread). This supports a finding of efficiency. |
| Float and Institutional Ownership | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • On average over 92% of Natera shares were held by non-insiders. 656 institutions held the vast majority of the public float throughout the Class Period which further supports the finding that Natera Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading Natera Common Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 30,243 Natera Common Stock put contracts and 58,704 Natera Common Stock call contracts that traded during the Class Period. Natera Common Stock therefore easily meets this criterion. |

# Exhibit 2
# Natera Common Stock Price & Volume
# 2/27/2020 - 3/31/2022




Sources: Complaint and S&P Capital IQ.

# Exhibit 3
## Natera Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding
## 2/27/2020 - 3/8/2022




Source: S&P Capital IQ, SEC Filings.

Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on February 27, 2020 through March 8, 2022. The last week consists of two trading days (i.e., 3/7/2022 and 3/8/2022), and therefore, the average of the daily trading volume on these days is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding. The last week is excluded from the median calculation.

# Exhibit 4
## Summary of Securities Analyst Reports Issued for Natera

| | Analyst Name | Reports Issued During the Class Period: 2/27/2020 - 3/8/2022 |
|---|---|---|
| [1] | Jefferson Research & Management | 102 |
| [2] | Canaccord Genuity | 39 |
| [3] | Global Data | 30 |
| [4] | SVB Leerink | 30 |
| [5] | Piper Sandler | 27 |
| [6] | S&P Global Compustat | 25 |
| [7] | Craig-Hallum Capital Group LLC | 25 |
| [8] | buysellsignals | 23 |
| [9] | Marktfeld | 21 |
| [10] | Cowen | 19 |
| [11] | BTIG | 18 |
| [12] | J.P. Morgan | 17 |
| [13] | SADIF-Investment Analytics S.A. | 17 |
| [14] | Baird | 12 |
| [15] | Wright Investors Service | 11 |
| [16] | Watchdog Research | 9 |
| [17] | Wells Fargo Securities, LLC | 8 |
| [18] | ValuEngine | 7 |
| [19] | Truist Securities | 7 |
| [20] | CGS-CIMB / CIMB Research | 6 |
| [21] | Raymond James & Associates | 6 |
| [22] | Seeking Alpha | 5 |
| [23] | Validea | 4 |
| [24] | Gradient Analytics, LLC | 2 |
| [25] | Plunkett Analysis | 2 |
| [26] | The Economy Matters | 2 |
| [27] | Disclosure Insight | 1 |
| [28] | MarketLine | 1 |
| [29] | PriceTarget Research | 1 |
| [30] | Quant IP GmbH | 1 |
| | **Total** | **478** |

Source: Counsel, Seeking Alpha, and CapIQ.
Note: Many analyst reports are not available through third party data providers. Therefore, this almost certainly understates the total amount of analyst coverage.

# Exhibit 5
# Coefficients from Rolling Event Study Regression for Natera
# 2/27/2020 - 3/9/2022




Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is the Nasdaq Biotechnology Total Return Index, which Natera compares itself to in its 10-Ks during the Class Period (10-K FY 2020 - 2022). The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, the alleged corrective disclosure date, and one outlier (3/19/2020: Natera's announcement that the Company would provide remote access to its tests during COVID) have been removed from estimation.

# Exhibit 6
# Standard Deviation of the Errors for Rolling Event Study Regression for Natera Common Stock
# 2/27/2020 - 3/9/2022




Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is the Nasdaq Biotechnology Total Return Index, which Natera compares itself to in its 10-Ks during the Class Period (10-K FY 2020 - 2022). The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, the alleged corrective disclosure date, and one outlier (3/19/2020: Natera's announcement that the Company would provide remote access to its tests during COVID) have been removed from estimation.

# Exhibit 7
## Event Study Analysis of Natera Earnings Announcements and Pre-Announcements

| | | | | | | | | Rolling Regression Model (120-day window) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Stat | P-Value | Sig Level |
| 1 | 2/26/2020 | 4:10 PM | 2/27/2020 | Q4 2019 Earnings | Natera Reports Fourth Quarter and Year 2019 Financial Results *Source -PRNewswire* | $37.25 | 7.13% | 13.23% | $4.60 | 4.66 | 0.00 | *** |
| 2 | 4/13/2020 | 7:04 AM | 4/13/2020 | Q1 2020 Pre-Announcement | Natera Announces Preliminary First Quarter 2020 Financial Results *Source -PRNewswire* | $29.84 | -7.24% | -5.99% | -$1.93 | -1.52 | 0.13 | |
| 3 | 5/6/2020 | 4:05 PM | 5/7/2020 | Q1 2020 Earnings | Natera Reports First Quarter 2020 Financial Results *Source -PRNewswire* | $43.51 | 21.37% | 20.54% | $7.36 | 5.15 | 0.00 | *** |
| 4 | 8/5/2020 | 4:05 PM | 8/6/2020 | Q2 2020 Earnings | Natera Reports Second Quarter 2020 Financial Results *Source -PRNewswire* | $55.17 | 7.75% | 8.03% | $4.11 | 2.09 | 0.04 | ** |
| 5 | 11/5/2020 | 4:05 PM | 11/6/2020 | Q3 2020 Earnings | Natera Reports Third Quarter 2020 Financial Results *Source -PRNewswire* | $82.08 | 7.45% | 8.51% | $6.50 | 3.28 | 0.00 | *** |
| 6 | 2/25/2021 | 4:05 PM | 2/26/2021 | Q4 2020 Earnings | Natera Reports Fourth Quarter and Year 2020 Financial Results *Source -PRNewswire* | $116.09 | 6.74% | 6.63% | $7.21 | 2.42 | 0.02 | ** |
| 7 | 5/6/2021 | 4:05 PM | 5/7/2021 | Q1 2021 Earnings | Natera Reports First Quarter 2021 Financial Results *Source -PRNewswire* | $101.83 | 5.73% | 3.92% | $3.78 | 1.41 | 0.16 | |
| 8 | 7/19/2021 | 8:46 AM | 7/19/2021 | Q2 2021 Pre-Announcement | Natera Reports Preliminary Second Quarter 2021 Results *Source -PRNewswire* | $106.58 | -5.78% | -4.77% | -$5.40 | -1.82 | 0.07 | * |
| 9 | 8/5/2021 | 4:05 PM | 8/6/2021 | Q2 2021 Earnings | Natera Reports Second Quarter 2021 Financial Results *Source -PRNewswire* | $117.30 | -1.96% | 0.06% | $0.07 | 0.02 | 0.98 | |
| 10 | 11/4/2021 | 4:05 PM | 11/5/2021 | Q3 2021 Earnings | Natera Reports Third Quarter 2021 Financial Results *Source -PRNewswire* | $115.97 | 4.79% | 6.76% | $7.48 | 2.90 | 0.00 | *** |
| 11 | 2/24/2022 | 4:05 PM | 2/25/2022 | Q4 2021 Earnings | Natera Reports Fourth Quarter and Full Year 2021 Financial Results *Source -PRNewswire* | $66.94 | 2.62% | -0.50% | -$0.32 | -0.22 | 0.83 | |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and an Industry Index. The Industry Index is the Nasdaq Biotechnology Total Return Index, which Natera compares itself to in its 10-Ks during the Class Period (10-K FY 2020 - 2022). The returns of the Industry Index are net of the S&P 500 Total Return Index. Earnings announcements, pre-announcements, the alleged corrective disclosure date, and one outlier (3/19/2020: Natera's announcement that the Company would provide remote access to its tests during COVID) have been removed from estimation.

(2) "***" Denotes statistical significance at the 99% confidence level or greater. "**" Denotes statistical significance at the 95% confidence level or greater. "*" Denotes statistical significance at the 90% confidence level or greater.

# Exhibit 8

## Event Study Results for Natera Earnings Announcements and Pre-Announcements vs. Days with No News during the Class Period

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [(1)] | 11 | 61 |
| Significant Days at 95% Confidence Level | 6 | 2 |
| % Significant Days at 95% Confidence Level [(2)] | 54.55% | 3.28% |
| Average Absolute Abnormal Return [(3)] | 7.18% | 2.25% |
| Average Volume (Millions) [(4)] | 1.9 | 0.8 |

Notes:
(1) For the purposes of this analysis, I selected the 61 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued.
(2) 54.55% rate of statistical significance is statistically significantly different than 3.28% at the 99% confidence level using either a Chi-Square test or Fisher's Exact test.
(3) 7.18% absolute return is statistically significantly different than 2.25% based on a t-test for difference of means at the 99% confidence level.
(4) The difference between 1.9 million and 0.8 million is statistically significant at the 99% confidence level.

# Exhibit 9
# Natera Common Stock Market Capitalization
# 2/27/2020 - 3/31/2022




Sources: Complaint, S&P Capital IQ, and SEC Filings.

# Exhibit 10
# Natera Common Stock
# Market Capitalization Rankings

| Last trading day of: | Market Capitalization (billions) | Percentile Rank on NYSE & Nasdaq |
|---|---|---|
| Q1 2020 | $2.35 | 75% |
| Q2 2020 | $3.97 | 79% |
| Q3 2020 | $6.16 | 83% |
| Q4 2020 | $8.58 | 85% |
| Q1 2021 | $8.88 | 85% |
| Q2 2021 | $10.05 | 86% |
| Q3 2021 | $10.54 | 87% |
| Q4 2021 | $8.89 | 86% |
| Q1 2022 | $3.92 | 78% |

Source: Bloomberg, S&P Capital IQ and SEC Filings.

**Exhibit 11**
**Natera Common Stock Average Monthly Bid-Ask Percentage Spread**
**2/27/2020 - 3/8/2022**




Source: Thomson Reuters Eikon and TICK Data.
Note: February 2020 and March 2022 data are limited to the Class Period.

# Exhibit 12
## Natera Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 3/31/2020 | 78,652 | 246 | 7,072 | 4,148 | 75,728 | 8.99% | 71,688 | 91% | 95% |
| 6/30/2020 | 79,717 | 278 | 6,402 | 5,041 | 78,356 | 8.03% | 75,512 | 95% | 96% |
| 9/30/2020 | 85,281 | 316 | 6,416 | 5,867 | 84,732 | 7.52% | 79,388 | 93% | 94% |
| 12/31/2020 | 86,223 | 378 | 6,047 | 5,070 | 85,247 | 7.01% | 82,109 | 95% | 96% |
| 3/31/2021 | 87,430 | 398 | 6,256 | 5,644 | 86,817 | 7.16% | 84,031 | 96% | 97% |
| 6/30/2021 | 88,498 | 421 | 6,341 | 6,865 | 89,022 | 7.17% | 83,308 | 94% | 94% |
| 9/30/2021 | 94,538 | 437 | 6,332 | 5,611 | 93,817 | 6.70% | 90,488 | 96% | 96% |
| 12/31/2021 | 95,140 | 419 | 6,329 | 5,070 | 93,881 | 6.65% | 90,768 | 95% | 97% |
| 3/31/2022 | 96,259 | 367 | 6,907 | 5,027 | 94,379 | 7.18% | 90,488 | 94% | 96% |
| **Total Institutions over Class Period:** | | **656** | | | **Class Period Average:** | **7.38%** | | **94.40%** | **95.60%** |

Sources: S&P Capital IQ and SEC filings.

# Exhibit 13
# Natera Common Stock
# Test for Autocorrelation During the Class Period

| Quarter | Coefficient on Previous Day's Abnormal Return [1] | t-Statistic | Sig Level [2] |
|---|---|---|---|
| Q1 2020 | -0.05 | -0.21 | |
| Q2 2020 | -0.09 | -0.68 | |
| Q3 2020 | 0.13 | 1.04 | |
| Q4 2020 | -0.13 | -1.05 | |
| Q1 2021 | -0.03 | -0.23 | |
| Q2 2021 | -0.20 | -1.56 | |
| Q3 2021 | 0.07 | 0.51 | |
| Q4 2021 | 0.01 | 0.06 | |
| Q1 2022 | 0.24 | 1.59 | |
| **Class Period[2]** | **-0.02** | **-0.43** | |

Source: S&P Capital IQ.
Notes:
(1) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements, pre-announcements, the alleged corrective disclosure date, and one outlier (3/19/2020: Natera's announcement that the Company would provide remote access to its tests during COVID) have been removed from estimation.

(2) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

# Appendix A
# Documents Considered

**Court Documents**

- Amended Class Action Complaint for Violations of the Federal Securities Laws filed October 7, 2022, in *John Harvey Schneider v. Natera, Inc., et. al.*, No. 1:22-cv-00398-DAE.
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss filed September 11, 2023, in *John Harvey Schneider v. Natera, Inc., et. al.*, No. 1:22-cv-00398-DAE.

**Court Decisions and Securities Law**

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.
- Randall v. Loftsgaarden, 478 U.S. 647 (1986), citing H. R. Rep. No. 85, 73rd Cong., 1st Sess., 9 (1933).
- 15 U.S.C. § 77k(e).
- 15 U.S.C. § 77l(a)(2).
- 15 U.S.C. § 77l(b).

**SEC Filings**

- Natera Inc. SEC Form 10-K filings submitted throughout the Class Period.
- Natera Inc. SEC Form 10-Q filings submitted throughout the Class Period.
- Natera Inc. SEC Form 8-K filings submitted during the Class Period.
- Natera Inc. SEC Forms S-3ASR filed on October 15, 2019, September 9, 2020, July 20, 2021, September 10, 2021 and November 15, 2022.
- Natera Inc. SEC Forms 424B5 filings submitted during the Class Period.

**Security Data**

- Historical data for Natera Inc. Common Stock, the Industry Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Trade and quote data for Natera Inc. Common Stock during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and Nasdaq for February 2022 were obtained from Tick Data, *see*

https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and Nasdaq for February 2022 were identified using Thomson Reuters Eikon.

- Institutional and insider holdings data was obtained from S&P Capital IQ.
- Natera Inc. Common Stock options data was obtained from Bloomberg.
- Natera Inc. Common Stock market makers data was obtained from Bloomberg, using the RANK function.
- Natera Inc. Common Stock market capitalization percentiles were obtained from Bloomberg.
- Turnover velocity data for NYSE and Nasdaq were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

**<u>Natera Inc. News</u>**

- Natera Inc. news headlines and select articles downloaded from Factiva for the Class Period. The Factiva search for news over the Class Period resulted in 1,206 unique articles as a result of two searches: 1) one search for "All Sources" with the company field "Natera, Inc." and 2) a separate search for "Major News and Business Sources" with keyword field "Natera" but excluding news with the company field "Natera, Inc." Both searches were conducted for the period "February 27, 2020 – March 8, 2022". Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- Natera Inc. earnings conference call and investor call transcripts during the Class Period.
- Natera Inc. earnings and guidance update press releases during the Class Period, including but not limited to:
  - "Natera Reports Third Quarter 2020 Financial Results," *PR Newswire*, November 5, 2020 4:05 PM ET.

**<u>Natera Inc. Analyst Reports</u>**

- Natera Inc. analyst reports supplied by Counsel or S&P Capital IQ for the period of February 27, 2020 – March 8, 2022, including but not limited to:
  - "Very Solid Beat & Raise, Outlook Remains Bright," *Cowen*, November 6, 2020.
  - "Natera Does It Again: Record 3Q20 Volumes Drive Revenue Beat & Raise," *Piper Sandler*, November 6, 2020.
- Seeking Alpha articles or reports for Natera Inc. published during the Class Period under the site's "Analysis" section.

**<u>Academic Articles</u>**

- Aharony, Joseph & Swary, Itzhak. "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35, no. 1, (1980): 1-12.

- Amihud, Yakov, et al. “Liquidity and Asset Prices,” *Foundations and Trends in Finance* 1, no. 4 (2005): 269-364.
- Avramov, Doron, et al. “Liquidity and Autocorrelations in Individual Stock Returns,” *The Journal of Finance* 61, no. 5 (2006): 2365-2394.
- Barber, Brad, et al. “The Fraud-on-the-Market Theory and the Indicators of Common Stocks’ Efficiency,” *The Journal of Corporation Law* 19, (1994), 285-312.
- Beaver, William H. “The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior,” *Empirical Research in Accounting: Selected Studies, 1968*, supplement to the *Journal of Accounting Research* 6, (1968): 67-92.
- Binder, John J. “The Event Study Methodology Since 1969,” *Review of Quantitative Finance and Accounting* 11, (1998): 111-137.
- Braun, Phillip A. “Good News, Bad News Volatility, and Betas,” *The Journal of Finance* 50, no. 5 (1995): 1575-1603.
- Fabozzi, Frank J., et al. *Foundations of Financial Markets and Institutions*, (4th ed.) Prentice Hall, (2010), Chapter 18 – Appendix A.
- Fama, Eugene F. “Efficient Capital Markets: A Review of Theory and Empirical Work,” *The Journal of Finance* 25, no. 2 (1970): 383-417.
- Greene, William H. *Econometric Analysis*, (6th ed.) Prentice Hall (2008), Chapter 19, p. 644.
- Gujarati, Damodar N. *Basic Econometrics*, (3rd ed.) McGraw Hill (1995), Chapters 1-3.
- Huang, Roger D. & Stoll, Hans R. “Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE,” *Journal of Financial Economics* 41, no. 3 (1996): 313-357.
- Jensen, Michael C. “Some Anomalous Evidence Regarding Market Efficiency,” *Journal of Financial Economics* 6, nos. 2/3 (1978): 95-101.
- Kumar, Raman, et al. “The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis,” *The Journal of Finance* 53, no. 2 (1998): 717-732.
- Loss, Louis. (1983). *Fraud and Civil Liability Under the Federal Securities Laws*. Washington, D.C.: The Federal Judicial Center.
- MacKinlay, A. Craig. “Event Studies in Economics and Finance,” *Journal of Economic Literature* 35, no. 1 (1997): 13-39.
- May, Robert G. “The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes,” *Empirical Research in Accounting: Selected Studies, 1971*, supplement to the *Journal of Accounting Research* 9, (1971): 119-163.
- Ross, Stephen A. “Options and Efficiency,” *Quarterly Journal of Economics* 90, no. 1 (1976): 75-89.
- Sharpe, William, et al. *Investments*, (5th ed.) Prentice Hall (1995), Chapter 3.

- Tabak, David I. & Dunbar, Frederick C. "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.
- The National Academies Press, *Reference Manual on Scientific Evidence*, (3rd Ed.) (2011).
- Thomas, Randall S. & Cotter, James F. "Measuring Securities Market Efficiency in the Regulatory Setting," *Law and Contemporary Problems* 63, no. 3, (2000): 105-122.


**<u>Other</u>**


- https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers
- https://www.nyse.com/publicdocs/nyse/NYSE_IPO_Guide_Third_Edition.pdf
- https://www.nasdaqtrader.com/Trader.aspx?id=TradingUSEquities
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.htm
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf

# CHAD W. COFFMAN, MPP, CFA

Peregrine Economics
125 South Wacker Drive
Suite 2610
Chicago, Illinois 60606
Mobile: (815) 382-0092
Email: ccoffman@peregrine-econ.com

## EMPLOYMENT:

**Peregrine Economics**
President (2024 - Current)

Peregrine Economics provides independent economic and financial analysis. Peregrine applies big picture thinking and proven economic tools to build a clear narrative around complex problems. Practice areas include: Data Science, General Damages, Labor & Employment, Regulatory Economics, and Securities Valuation.

**Global Economics Group, LLC**
President (2008 - 2023)

**Market Platform Dynamics, LLC**
Chief Financial Officer & Chief Operating Officer (2010 – 2023)

**Chicago Partners, LLC**
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA** Chartered Financial Analyst, 2003

**M.P.P.** University of Chicago, 1997
Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.** Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing: Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options. Performed econometric analysis of various measures of option spread using tens of millions of trades.

**Testimony in the last four years:**

- Testifying expert in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying expert in Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee. Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying expert in Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado. Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York. Filed expert report February 13, 2020.

- Testifying Expert in In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert declaration in Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York. Filed declaration May 13, 2020.

- Testifying Expert in In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey. Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City. Filed expert report May 18, 2020.

- Testifying Expert in Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division. Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York. Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division. Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida. Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert declaration in In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division. Filed declaration September 28, 2020.

- Testifying Expert in Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021. Filed expert report May 8, 2024.

- Testifying Expert in City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York. Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey. Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California. Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York. Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois. Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023. Filed expert rebuttal report on February 6, 2024.

- Testifying Expert in Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County). Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al.,

Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey. Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023. Deposition December 13, 2023.

- Testifying Expert in Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York. Filed expert report on October 15, 2021.

- Testifying Expert in Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-

WJM, United States District Court for the District of New Jersey. Filed expert report on November 1, 2021.

- Testifying expert in In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York. Filed expert report December 1, 2021.

- Expert declaration in Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division. Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York. Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey. Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York. Filed expert report July 15, 2022.

- Testifying Expert in BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.), et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal. Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023.

- Testifying Expert in In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara. Filed expert report December 12, 2022.

- Testifying Expert in In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah. Filed expert report March 3, 2023.

- Testifying Expert in Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland. Filed expert report March 16, 2023. Deposition September 14, 2023. Filed expert rebuttal report November 13, 2023.

- Testifying Expert in Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee, and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division. Filed expert report March 20, 2023.

- Testifying Expert in In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts. Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California. Filed expert report August 18, 2023.

- Testifying Expert in Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division. Filed expert report August 30, 2023. Deposition November 8, 2023. Filed expert rebuttal report on January 26, 2024. Filed expert report February 12, 2024. Deposition February 22, 2024. Filed expert rebuttal report on March 8, 2024. Filed expert report April 5, 2024.

- Testifying Expert in Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division. Filed expert report September 15, 2023. Deposition January 4, 2024. Filed expert rebuttal report on April 17, 2024.

- Testifying Expert in John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey. Filed declaration October 23, 2023.

- Testifying Expert in In Re Concho Resources Inc. Securities Litigation, No. 4:21-cv-02473, United States District Court Southern District of Texas, Houston Division. Filed expert report December 7, 2023. Filed expert rebuttal report on May 8, 2024.

- Testifying Expert in Reginald T Allison, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Oak Street Health, Inc., et al., Defendants, Case No. 1:22-cv-00149, United States District Court, Northern District of Illinois. Filed expert report December 15, 2023. Deposition January 23, 2024. Filed expert rebuttal report April 22, 2024.

- Testifying Expert in Boston Retirement System, et al., Plaintiff, v. Uber Technologies, Inc., et al., Defendants, Case No. 3:19-cv-06361, United States District Court, Northern District of California. Filed expert report February 1, 2024. Filed expert rebuttal report March 12, 2024. Deposition April 12, 2024.

- Testifying Expert in In Re Plantronics, Inc. Securities Litigation, Case No. 4:19-cv-07481-JST, United States District Court Northern District of California Oakland Division. Filed expert report February 8, 2024.

- Testifying Expert in Robert Ciarciello, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Bioventus Inc., Kenneth M. Reali, Mark L. Singleton, Gergory O. Anglum, and Susan

M. Stalnecker, Defendants, Case No. 1:23-cv-00032-CCE-JEP, United States District Court Middle District of North Carolina. Filed expert report March 7, 2024. Filed expert report March 27, 2024. Deposition April 8, 2024. Filed expert rebuttal report May 10.

- Testifying Expert in Michael Pardi, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Tricida, Inc. and Gerritt Klaerner, Defendants. Case No. 4:21-cv-00076-HSG, United States District Court, Northern District of California. Filed expert report April 30, 2024.

- Testifying Expert in Miriam Edwards, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. McDermott International, Inc., David Dickson, and Stuart Spence, Defendants. Case No. 4:18-cv-04330, United States Southern District Court, Southern District of Texas, Houston Division. Filed expert report April 30, 2024.

- Testifying Expert in Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Taskus Inc., Bryce Maddock, Jaspar Weir, Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, Jacqueline D. Reses, and BCP FC Aggregator L.P., Defendants, United States District Court, Southern District of New York. Filed expert report May 10.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant in various class action matters regarding race, age, or gender discrimination.

Selected Experience in Antitrust, General Damages, and Other Matters:

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.
- Volunteer for Chicago Food Depository.
- Volunteer for Habitat for Humanity ReStore.