**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |  |
|---|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>      v.<br><br>NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN,<br><br>              Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:22-cv-00398-DAE |

**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF**
**CLASS REPRESENTATIVES AND CLASS COUNSEL**

**TABLE OF CONTENTS**

**Page**

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     BACKGROUND ........................................................................................................2

        A.      Natera...............................................................................................................2

        B.      The Capitol Forum and The New York Times Reports............................................3

        C.      The Hindenburg Report ...................................................................................3

        D.      Plaintiffs' Claims ............................................................................................4

        E.      Lead Plaintiff and its Investment Advisor, BlackRock ..............................................4

III.    ARGUMENT .............................................................................................................5

        A.      Plaintiffs Will Be Required to Prove Reliance on an Individualized Basis..............5

                1.      The *Basic* Presumption Does Not Apply Because Plaintiffs Bought
                        Stock After the "Truth" Was Revealed.........................................................6

        B.      The Class Will Be Required to Prove Reliance on an Individualized Basis
                Because There Was No Price Impact.........................................................................11

                1.      No Front End Price Impact .......................................................................12

                2.      No Back End Impact Upon First Disclosure ...........................................13

        C.      A Gap Exists Between the Alleged Misstatements and the Hindenburg
                Report..........................................................................................................................15

        D.      Plaintiffs Will Be Forced to Litigate Damages on an Individualized Basis. .........17

        E.      *Affiliated Ute* Does Not Apply..................................................................................18

        F.      Plaintiffs Are Atypical and Inadequate Because They Lack Standing to
                Pursue Their Claims Under Sections 11 and 12. ..................................................19

IV.     CONCLUSION..........................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)..................................................................................................6, 14

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    77 F.4th 74 (2d Cir. 2023) .............................................................................................16

*Basic v. Levinson*,
    485 U.S. 224 (1998)............................................................................................. *passim*

*Caiafa v. Sea Containers Ltd.*,
    331 F. App'x 14 (2d Cir. 2009) .....................................................................................19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ......................................................................................6

*City of Sunrise General Employees Retirement Plan v. Fleetcor Technologies*,
    2018 WL 4293143 (N.D. Ga. 2018) ...............................................................................9

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...................................................................................................17, 18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    309 F.R.D. 251 (N.D. Tex. 2015)..................................................................................14

*Espy v. J2 Glob., Inc.*,
    99 F.4th 527 (9th Cir. 2024) .........................................................................................14

*Ferris v. Wynn Resorts Ltd.*,
    2023 WL 2337364 (D. Nev. Mar. 1, 2023) ..................................................................11

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    594 U.S. 113 (2021)............................................................................................. *passim*

*Grigsby v. BofI Holding, Inc.*,
    979 F.3d 1198 (9th Cir. 2020) ......................................................................................13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)...............................................................................1, 5, 6, 11, 18

*Howard v. Arconic Inc.*,
    2021 WL 2561895 (W.D. Pa. June 23, 2021)...............................................................10

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
    818 F.3d 775 (8th Cir. 2016) ..................................................................................11

*In re Allstate Corp. Sec. Litig.*,
    966 F.3d 595 (7th Cir. 2020) .............................................................................5, 11

*In re Apache Corp. Sec. Litig.*,
    2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ...................................................6, 13, 14

*In re BP p.l.c. Sec. Litig.*,
    2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).................................................................9

*In re Carter-Wallace, Inc. Sec. Litig.*,
    150 F.3d 153 (2d Cir. 1998).......................................................................................7

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) .................................................................................20

*In re Enron Corp. Sec.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) .....................................................................18

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
    2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024)......................................................12, 16

*In re Kosmos Energy Ltd. Sec. Litig.*,
    299 F.R.D. 133 (N.D. Tex. 2014) ...............................................................................8

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
    245 F. Supp. 3d 870 (S.D. Tex. 2017), *aff'd*, 777 F. App'x 726 (5th Cir. 2019) ....................19

*In re Qualcomm Inc. Sec. Litig.*,
    2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) .......................................13, 14, 15, 17

*In re TransDigm Group, Inc. Sec. Litig.*,
    440 F. Supp. 3d 740 (N.D. Ohio 2020)........................................................................9

*Jedrzejczyk v. Skillz Inc.*,
    2022 WL 2441563 (N.D. Cal. July 5, 2022)..............................................................20

*Krim v. pcOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2005) ...................................................................................20

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
    601 U.S. 257 (2024)..................................................................................................19

*Mandalevy v. BofI Holding, Inc.*,
    2018 WL 3032588 (S.D. Cal. June 19, 2018).............................................................9

iii

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) .......................................................................................13

*Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*,
   482 F.3d 372 (5th Cir. 2007) .......................................................................................8, 19

*Rivera v. Wyeth-Ayerst Lab'ys*,
   283 F.3d 315 (5th Cir. 2002) ..........................................................................................19

*Slack Techs., LLC v. Pirani*,
   598 U.S. 759 (2023)..........................................................................................................19

*Stephens v. Uranium Energy Corp.*,
   2016 WL 3855860 (S.D. Tex. July 15, 2016)..................................................................18

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ..........................................................................................20

**Rules**

Fed. R. Civ. P. 23 ............................................................................................... *passim*

## I.    PRELIMINARY STATEMENT[1]

One of the many problems Plaintiffs face in this case is their failure and inability to prove reliance on a classwide basis, as they must to proceed with claims under the Exchange Act. Plaintiffs allege that Natera violated the Exchange Act by stating, throughout the putative class period, that Natera's revenue growth was "driven primarily by sales of Natera's Panorama and Horizon tests," and by reporting year-over-year growth in microdeletions testing,[2] without also disclosing that 11% of Natera's prior authorizations were submitted by a third-party payment processor, My Genome My Life ("MGML") with ties to a former Natera employee (¶ 13) and that Panorama's order form, purportedly, "made microdeletions testing a default selection" (¶ 14). Plaintiffs do not, however, argue that any investor actually relied on these alleged omissions when trading Natera stock.  Instead, Plaintiffs argue that they are "entitled to rely on the fraud-on-the-market presumption," whereby reliance on the challenged statements is presumed from investors' reliance on the market price of the stock.  (Mot. at 10.)

Plaintiffs cannot invoke the fraud-on-the-market presumption in this case, however, because they have failed to meet their initial burden of showing that they purchased stock *before* "the truth was revealed to the market."  (*See* Mot. at 10.)  Plaintiffs allege the truth was revealed on March 9, 2022, when Hindenburg Research (a short seller that expressly disclaimed the accuracy and completeness of its reporting) issued a report that "detailed Natera's use of MGML to submit prior authorizations, and how Natera was propping up microdeletion demand by forcing patients to opt out of receiving such screenings."  (¶ 18.)  Hindenburg Research, however, has

---

[1] References to "¶" are to paragraphs of Plaintiffs' Amended Class Action Complaint (the "Complaint," Dkt. 60).    References to "Ex. __" are to the exhibits annexed to the contemporaneously filed Declaration of Christina L. Costley ("Costley Decl.").  References to "Motion" or "Mot." are to Plaintiffs' Motion for Class Certification, dated June 4, 2024 (Dkt. 136.)

[2] Microdeletions are small, missing parts of a chromosome.  (¶ 107.)  Natera's Panorama panel screens for aneuploidies (extra or missing chromosomes, *e.g.*, Down Syndrome).  Natera's requisition form gives physicians the option to order: (1) the Panorama panel alone; (2) the Panorama panel "Plus 22Q.11.2" (which includes screening for DiGeorge syndrome, the most common microdeletion); or (3) The Panorama Extended Panel (which includes five additional microdeletions).  (*See* ¶ 145.)  Contrary to Plaintiffs' mischaracterization, only the "Plus 22Q.11.2" microdeletion is even arguably available on an opt-out basis; the Extended Panel has always been ordered with its own opt-in checkbox.

provided a sworn affidavit in support of Defendants' Opposition confirming that: (1) the Hindenburg Report did not reveal that Natera's prior statements were false; and (2) "all information" in the Report came from "publicly available" sources  (Ex. 1 ¶¶ 5-8)[3] – sources that were revealed to the market *before* Lead Plaintiff (and most of the putative class) bought stock.

Plaintiffs' Motion faces other obstacles.  Even if the fraud-on-the-market presumption applies (it does not), Defendants easily rebut it by showing that it is more likely than not that the statements at issue did not impact Natera's stock price.  First, Defendants show that it is unlikely there was a price impact when the statements were made because, as both Defendants' and Plaintiffs' proposed experts agree, omissions generally do not affect stock price.  Second, Defendants show that there is no price impact based on the Hindenburg Report because the information in the Report was not new to the market, and when it was first disclosed, there was no price reaction.  Finally, the attenuation between the contents of the Hindenburg Report and the contents of Natera's allegedly misleading statements is too great to infer price impact from the stock price drop that accompanied publication of the Report.

Plaintiffs' Securities Act claims likewise cannot be litigated on a classwide basis because Lead Plaintiff admits it did not buy in the offering and has not proposed any basis to trace shares for the other members of the putative class.

## II.   BACKGROUND

### A.   Natera

Natera is a genetic testing company.  Its lead product is Panorama, a non-invasive prenatal test ("NIPT").  (¶¶ 1, 28, 106.)  While Panorama primarily screens for disorders caused by the presence of an extra or missing chromosome (*e.g.*, Down syndrome), physicians have the option to add screening for certain microdeletions.  (¶ 107.)  The Panorama requisition form, which physicians use to order Panorama screening, was available on Natera's website throughout the

---

[3] The Hindenburg Report has since been thoroughly discredited by an initial investigation by Natera's analysts, an independent internal investigation by the outside directors of Natera's board, and a seventeen-month formal investigation by the Securities and Exchange Commission ("SEC").

putative class period.  (Costley Decl. ¶ 4, Ex. 2.)

### B.    The Capitol Forum and The New York Times Reports

Beginning in 2020, The Capitol Forum – an investigative news agency – issued a series of reports on various aspects of Natera's Panorama business.  (Exs. 7-8, 11-21.)  In articles published on July 1 and December 14, 2020, The Capitol Forum detailed its extensive investigation into Natera's use of a third-party entity, MGML, to process prior authorizations for Panorama.  (Exs. 7-8.)  Those articles reported, specifically, that MGML's founder, Deepti Gupta (a.k.a. Vicki Seth) had a longstanding "close personal relationship" with former Natera employee Amar Kamath, and "anti-kickback regulations could be in play."  (Ex. 8 at 1; *see* Ex. 7.)  The articles further reported that MGML described itself as a non-profit but did not appear to be in compliance with tax and other regulatory requirements.  (Ex. 7 at 3-4; Ex. 8 at 1, 7-10.)

The Capitol Forum distributed summaries of its articles by email to Natera's investors.  (*See* Exs. 11-21.)  Natera's analysts also saw the reports and repeatedly questioned Natera's executives about them.  (*See id*.)  Natera's stock price did not decline following the publication of the July 1 and December 14, 2020 reports.  (*See* Ex. 4 (Skinner Report) ¶ 41 n.78, Ex. 2b at 3, 7.)

On January 1, 2022, The New York Times published a news article, about Natera and other companies that offer NIPTs, which questioned the utility of microdeletion screening and hypothesized that certain microdeletion tests "are incorrect about 85 percent of the time."  (Ex. 9.)  The article also reported that companies like Natera (whose test requisition form was available on its website) "sell microdeletion testing as an optional add-on to the Down screening."  (*Id*. at 5.)  And it reported (as Natera had previously stated in its SEC filings) that insurers often do not cover screening for microdeletions.  (*Id.* at 10; Ex. 24 at 4, 8; Ex. 25 at 2, 4-5.)  Again, following release of this news, Natera's stock price did not react in any statistically significant way.  (Ex. 4 (Skinner Report), Ex. 2b at 16.)

### C.    The Hindenburg Report

On March 9, 2022, Hindenburg Research ("Hindenburg") – a short seller that stood "to realize significant gains" if it succeeded in driving down Natera's stock and that expressly

disclaimed the "accuracy" and "completeness" of its reporting (Ex. 10 at 44-45) – released a report on Natera (the "Hindenburg Report" or "Report") that asserted two primary claims about its Panorama business. *First*, repeating (and directly citing) The Capitol Forum's reporting in its July and December 2020 articles, the Report alleged that a former Natera employee had a "close personal relationship" with an alias-using MGML administrator, and speculated MGML's practices violated a guidance opinion issued by the Department of Health and Human Services concerning anti-kickback laws. (*Id.* at 1-2, 9-27.) *Second*, the Report alleged that Natera employed a "tricky sales practice" by using a test requisition form that "require[d] physicians to specifically opt-out of its controversial microdeletion screens." (*Id.* at 2, 22-24, 43.) Hindenburg has now confirmed, in accordance with its Report's disclaimer, that "'all information contained' therein was 'obtained from public sources,' including … Natera's SEC filings … Natera's website … articles by the Capitol Forum … and the New York Times." (Ex. 1 ¶ 5.)

### D.    Plaintiffs' Claims

Plaintiffs' Exchange Act claims center on eleven (11) statements made by Natera between February 26, 2020 and November 4, 2021 about revenue from Panorama and microdeletions screening, which Plaintiffs allege were misleading by omission. Plaintiffs also assert Securities Act claims, alleging that the Offering Materials issued in connection with Natera's July 2021 secondary public offering ("SPO") omitted these same "deceptive practices." (*See* ¶¶ 277-84.)

### E.    Lead Plaintiff and its Investment Advisor, BlackRock

On July 26, 2022, the Court appointed British Airways Pension Trustees Limited ("BAPTL") as Lead Plaintiff. (Dkt. 36.) BAPTL purchased Natera stock over an eight-month period beginning in June 2021, nearly one year after The Capitol Forum began reporting on Natera's relationship with MGML and years after Natera's test requisition form for Panorama had been posted on its website. (*See* Ex. 23 at 2.) BAPTL admits that it did not purchase stock or otherwise participate in Natera's July 2021 SPO. (Ex. 6 at 189:12-15.) BAPTL claims that it gave its investment advisor, BlackRock, "complete discretion" over its investments and made all Natera purchases at BlackRock's direction. (*Id.* at 98:11-99:7.)

4

## III.    ARGUMENT

To certify a class, Plaintiffs must show that both "reliance upon the misrepresentation or omission" and "economic loss [damages]" can be proven on a classwide basis, without individualized issues predominating. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (*Halliburton II*) (internal quotation marks omitted). As further discussed below, Defendants have demonstrated that individualized questions of reliance and damages predominate and preclude class certification under Rule 23(b)(3).

### A.    Plaintiffs Will Be Required to Prove Reliance on an Individualized Basis.

Historically, securities fraud claims could not be brought as class actions because it was impossible to prove reliance on a classwide basis. In *Basic v. Levinson*, 485 U.S. 224 (1998), however, the Supreme Court held that plaintiffs could satisfy the "reliance" element of a securities fraud claim by showing that they relied on the market price of the security, which is presumed to "reflect[] all publicly available information," including any material misrepresentations. *Id*. at 246. This is the so-called "fraud-on-the-market presumption," which shifted the reliance inquiry to whether all individuals who bought securities relied on the price set by the market. *Id*. *Basic* allows the "market itself [to] provide[] the causal connection between a misrepresentation and the price of the stock." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 605 (7th Cir. 2020)

Plaintiffs have the initial burden of establishing that the fraud-on-the-market presumption applies. At the class certification stage, plaintiffs must demonstrate, *inter alia*: "[1] that the stock traded in an efficient market, and [2] that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268 (both of these prerequisites "must still be proved at the class certification stage"). After plaintiffs meet their initial burden of showing *Basic* applies, the burden then shifts to defendants to rebut the burden by showing that it is "more likely than not" that the alleged misstatements had no price impact. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021).

In this case, Plaintiffs cannot rely on the fraud-on-the-market presumption *both* because Plaintiffs have not met, and cannot meet, their initial burden of showing that they purchased stock

before the truth was revealed *and* because Defendants have rebutted the fraud-on-the-market presumption by showing it is more likely than not that the allegedly misleading statements did not affect the market price of Natera's stock.

### 1. The *Basic* Presumption Does Not Apply Because Plaintiffs Bought Stock After the "Truth" Was Revealed.

To invoke *Basic's* fraud-on-the-market presumption, plaintiffs first must demonstrate that they purchased stock *before* the truth was revealed to the market. *See Halliburton II*, 573 U.S. at 268; *Goldman*, 594 U.S. at 119 ("market timing [] must be satisfied by plaintiffs before class certification" (citation and quotation marks omitted)). Absent such a showing, plaintiffs cannot invoke *Basic* and therefore cannot certify a class. Similarly, even in plaintiffs buy stock before the truth has been revealed, the "class period ends" once the truth has been disseminated. *See In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *8 (S.D. Tex. Feb. 9, 2024); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 97 (S.D.N.Y. 2015) (same).

Information is "disseminated" to the market when it is publicly available – from any source. "In an efficient market" (which Plaintiffs claim the market for Natera's stock is), "*all* publicly available information is rapidly incorporated into, and thus transmitted to investors through, the market price." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (emphasis added); *see Basic*, 485 U.S. at 246; (Dkt. 136-3 ("Coffman Report") ¶ 19 ("efficiency implies that *all* publicly available information is reflected" in the stock price) (emphasis added)).

There is no requirement that the information be easily accessible or available to a majority of investors. *See Basic*, 485 U.S at 248; (*cf.* Ex. 3 (Coffman Dep. Tr.) at 169:21-23 ("from an economic point of view, I don't think there's a must have widely disseminated for there to be a partial corrective disclosure")). This is because the efficient-market theory is premised on the idea that "information-hungry" market participants (such as market makers and analysts) will seek an informational edge in trading stock and will aggressively pursue any material information about the company. *See Basic*, 485 U.S. at 249 n.29; *Bonanno*, 2016 WL 4585753, at *5 ("all public information is incorporated into the market price no matter how far flung it may be"). An efficient

6

market even absorbs "complex scientific" and "technical" information.  *See In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998).  Thus, for example, other courts have held that, for purposes of the efficient market, there is no difference between information "found in a specialized medical journal" and information "in a statement addressed to participants in financial markets, so long as the journals are used by analysts."  *Id*.

        **a.**        **The Capitol Forum Details Natera's Relationship With MGML.**

Plaintiffs did not buy stock until June and July of 2021 – well *after* the "truth" had been revealed.  (*See* Ex. 23; Dkt. No. 9-2.)  Plaintiffs allege that Natera's statements on February 26, 2020, May 6, 2020, August 5, 2020, and November 4, 2021 were deceptive because Natera told investors that its quarterly revenue growth was driven by sales of Panorama without also disclosing Natera's relationship with MGML.  (*See* ¶¶ 150-52, 157, 163.)  Natera's use of MGML, however, had already been discussed, in great detail, in news reports published by The Capitol Forum on July 1, 2020 and December 14, 2020 and emailed to Natera's investors and analysts.  The Capitol Forum reported, amongst other things, that: (1) MGML processed thousands of prior authorization requests for Natera per week for roughly three years; (2) the registered owner of MGML used an alias and had a longstanding personal relationship (verified by property records and Facebook posts) with a former Natera executive; and (3) MGML was set up as a non-profit but did not seem to be in compliance with regulatory requirements governing non-profits.  (*See* Exs. 7-8.)  This is the same information that Plaintiffs claim the Hindenburg Report later "revealed."  (*See* ¶ 18 (alleging that Hindenburg "reveal[ed] that Natera engaged in deceptive sales and billing practices to drive up Panorama revenue"); ¶ 142 (alleging that Hindenburg "published its report detailing, among other things, Natera's undisclosed relationship with MGML").)  Hindenburg explicitly credited The Capitol Forum as its source on MGML (¶ 18) *and* has submitted a sworn declaration in support of this Motion confirming this.  (*See* Ex. 1 (Wood Decl.) ¶ 5; Ex. 10 at 19, 42.)

Plaintiffs ignore The Capitol Forum articles in their Motion, even though it is their burden

to show that they purchased stock prior to publication of these reports. (*See* Mot. at 5.)[4]  There is no question Plaintiffs were aware of the articles: Plaintiffs referenced them in both the Complaint (¶ 27) and in opposition to Defendants' Motion to Dismiss (Dkt. 83 at 29) and sought discovery related to Capitol Forum in connection with this Motion (*see* Ex. 28 at 23).  Under these circumstances, Plaintiffs' failure to even attempt to meet their threshold burden under *Basic* is alone grounds to deny this Motion.  *See In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 148-50 (N.D. Tex. 2014) ("inadequate showing" in opening brief prevented plaintiff from meeting burden of establishing adequacy and predominance).

Even if Plaintiffs were permitted to supplement the record on reply, however, it is unclear how they would avoid the fulsome disclosures in The Capitol Forum articles.  Earlier in the case, Plaintiffs argued the articles were not "publicly distributed or known about" (Dkt. 83 at 29),[5] but Natera has now produced evidence that the articles were published online, distributed by email to Natera's investors, and seen by Natera's analysts (*see* Exs. 7-21).  During his deposition, Plaintiffs' proposed expert, Mr. Coffman, suggested that Plaintiffs may argue that only "widely disseminated" information – which he defines as information seen by 50%[6] or more of a company's investors (Ex. 3 at 59:21-60:20) – is incorporated into a company's stock price, but he did not perform analysis to determine whether the Capitol Forum articles met this threshold.  In fact, he testified that he had not reviewed articles at all (although he acknowledged that he was aware of them).  (*Id*. at 78:20-79:19, 80:14-83:4.)  In addition, Mr. Coffman later clarified there was no requirement that a corrective disclosure be "widely disseminated."  (*Id.* at 163:22-164:24.)

---

[4] Plaintiffs' treatment of The Capitol Forum articles contrasts sharply with the effort they put into meeting their burden of showing market efficiency, to which they devoted seven pages of their brief (Mot. at 10-16) and twenty-four pages of their expert report (Coffman Report ¶¶ 25-80).

[5] The Court previously held these were "questions of fact that the Court is unable to resolve at [the pleading] stage." (Dkt. 104 at 30-31.)  Class certification, however, is an "essentially factual" inquiry during which disputed questions of fact must be decided.  *See Regents of Univ. of California v. Credit Suisse First Bos. (USA), Inc.*, 482 F.3d 372, 380 (5th Cir. 2007).

[6] Mr. Coffman offered no support for this.  No analysis to support this.  It was purely a wild guess. This approach would turn *Basic* on its head.  The whole point of *Basic* is to avoid an individualized inquiry into which investors saw which disclosure.

To be clear: Mr. Coffman's proposed theory that information must be "widely disseminated" is neither stated in any case nor consistent with the academic literature. (*See* Ex. 4 (Skinner Report) ¶¶ 16, 89-90; Ex. 3 (Coffman Dep. Tr.) at 163:22-164:24.) The Supreme Court has repeatedly held that *all* public information is incorporated into the price of stock traded in an efficient market and the academic literature says the same. To the extent courts have even hinted at any further requirement, it is simply to note that the public information should be available to analysts or other "information hungry" market participants, who then trade on that information and cause it to be incorporated into the market price. *See Basic*, 485 U.S. at 248-49, n.29. Here, that factor plainly is met because Natera's investors received emails from The Capitol Forum summarizing its reporting and Natera's analysts questioned Natera about the articles. *See Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at *13 (S.D. Cal. June 19, 2018) ("The fact that a market participant would have had to jump through a bureaucratic hoop to obtain this information does not mean that the information was not 'public.'").

In any event, whatever the minimum requirement of "dissemination" is, articles from The Capitol Forum satisfy it because every court that has reached this issue has confirmed that The Capitol Forum's news reports are publicly available for these purposes. *See In re TransDigm Group, Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 771 (N.D. Ohio 2020) (granting motion to dismiss where information in later corrective disclosure "had previously been summarized by The Capitol Forum"); *City of Sunrise General Employees Retirement Plan v. Fleetcor Technologies*, 2018 WL 4293143 (N.D. Ga. 2018) (information released in Capitol Forum report was corrective).[7]

### b.      Natera Previously Disclosed its Panorama Testing Form.

Plaintiffs similarly have not met, and cannot meet, their burden of showing that they purchased stock before Natera revealed the format of its Panorama requisition form. Plaintiffs

---

[7] Since neither Lead Plaintiff bought stock before the "truth" was revealed, Plaintiffs also have not met, and cannot meet, their separate burden, under Rule 23(a), of establishing that they are adequate class representatives, and that their claims are typical of the class. *See* Fed. R. Civ. P. 23(a)(3)-(4); *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *10 (S.D. Tex. Dec. 6, 2013) (a proposed class representative's claims are atypical if the representative is "subject to a unique defense" that is reasonably likely to be a major focus of the litigation).

allege that Natera misled investors by making statements on January 12, 2021, February 25, 2021, August 11, 2021, and September 10, 2021 about the frequency in which physicians ordered microdeletions testing without also disclosing that the requisition form "caus[ed] patients to order microdeletion screening by default." (¶ 149; *see* ¶¶ 153, 155, 159, 160.)  Natera, however, had published the requisition form on its website by 2020 (Costley Decl. ¶ 4, Ex. 2), and disclosed in a press release as early as 2014 that the microdeletions test would "become standard on Panorama's prenatal panel" (Ex. 29 at 2).  Natera, moreover, had processed over two million tests by August 2019, such that the requisition form had been seen by countless patients and physicians by then. (Ex. 30 at 2.)  This was all well before Plaintiffs bought Natera stock.  (Ex. 23; Dkt. No. 9-2.)

Plaintiffs also allege that Natera's February 25, 2021, January 12, 2021, and August 11, 2021 statements were misleading because Natera failed to disclose "limited health insurance reimbursement for microdeletions within the industry."  (¶ 149.)  Again, however, Natera repeatedly disclosed in its SEC filings, well in advance of the class period, the low reimbursement rate for microdeletion tests and its "adverse impact on [Natera's] revenues."  (*See, e.g.*, Ex. 24 at 4, 8; Ex. 25 at 2, 4-5; *see also* Ex. 4 (Skinner Report) ¶¶ 39-40, n.76 (citing disclosure of this same information on February 26, 2021, May 6, 2021, and November 4, 2021).)

As with The Capitol Forum articles, there is no dispute that these statements were publicly available to "information hungry" market participants.  Plaintiffs argue here that Natera's SEC filings are "publicly available" (Mot. at 11), and they have previously argued in this case that the market price of Natera's stock incorporates statements made on Natera's website (¶¶ 100-103). *See Howard v. Arconic Inc.*, 2021 WL 2561895, at *14 (W.D. Pa. June 23, 2021) ("[I]t is certainly plausible that any rational seller of securities would operate on the belief that investors would visit the Company's website.") (relied on by Plaintiffs' MtD Opp. (Dkt. 83) at 10).  Since Plaintiffs have failed to meet their threshold burden, under *Basic*, of establishing that they bought stock before disclosure of the "truth," no member of the proposed class can bring a claim with respect to the Microdeletion Omissions and no member of the proposed class who bought stock after 2020 can bring a claim with respect to the Panorama Omissions.  At a minimum, if a class is certified

10

(and it cannot be on the Motion of these Lead Plaintiffs), it should consist of investors who purchased stock from February 26, 2020 through December 14, 2020.

**B.     The Class Will Be Required to Prove Reliance on an Individualized Basis Because There Was No Price Impact.**

Even if *Basic's* presumption of reliance applied here (it does not), Defendants can rebut *Basic* by showing a lack of price impact at either the time the statement was made ("front end" price impact) *or* the time the statement was corrected ("back end" price impact). *See Halliburton II*, 573 U.S. at 279-80 (defendants rebut *Basic* by showing that *either* the "asserted misrepresentation (*or* its correction) did not affect the market price of the defendant's stock" (emphasis added)); *see also IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) ("overwhelming evidence of no 'front-end' price impact rebutted the *Basic* presumption").[8]  If defendants show an absence of either front or back end price impact, then "*Basic's* fraud-on-the-market theory and presumption of reliance collapse" and a class cannot be certified.  *See Halliburton II*, 573 U.S. at 264, 278-80.

The price impact inquiry is not limited to consideration of whether a company's stock price went up or down.  Under *Basic*, "any showing" that severs the link between the market price and the alleged misrepresentation is enough to rebut the presumption of reliance.  More recently, in *Goldman*, the Supreme Court confirmed that courts must "assess all the evidence of price impact," "qualitative as well as quantitative," "direct and indirect," "aided by a good dose of common sense … and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Goldman*, 594 U.S. at 126-27.  Courts conduct this inquiry *even when* it "overlaps with materiality or any other merits issue."  *Id.* at 124.

---

[8]  Some courts allow "inflation maintenance theory" – the idea that a misrepresentation or omission *maintained* a stock price rather than increasing it – to substitute for front end price impact.  *See Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *6 (D. Nev. Mar. 1, 2023); *but see Best Buy*, 818 F.3d at 782 (no price impact based solely on lack of front end price movement).  On the back end, though, courts uniformly agree that a lack of negative stock price movement at the time of the corrective disclosure is sufficient to rebut the fraud-on-the-market presumption.  *See, e.g.*, *In re Allstate*, 966 F.3d at 613-14 (remanding based on insufficient evidence of negative price movement after corrective disclosure).

Defendants have shown that it is more likely than not that there was no price impact for several reasons, including the nature of the statements, the fact that Natera's stock price did not decline when the "truth" was first revealed, and the disconnect between the alleged misstatements and the allegations made in the Hindenburg Report.

### 1.    No Front End Price Impact

There is no front end price impact in this case.  Plaintiffs allege that Natera's statements were misleading by omission – they do not contend that the statements themselves were affirmatively false.  (*See* Mot. at 3-4 (statements were "false and misleading because they omitted the fact that Panorama revenues and demand were inflated by numerous deceptive and improper business practices");[9] ¶163 (alleging that "[n]one of the material facts relating to these practices were disclosed to investors").)  As both Plaintiffs' and Defendants' proposed experts agree, omissions generally do not impact stock price on the front end.  (*See* Ex. 3 (Coffman Dep. Tr.) at 105:15-20; Ex. 4 (Skinner Report) ¶¶ 13, 33-35.)  When a plaintiff claims that a statement "was misleading by omission," courts instead assess price impact using *Goldman's* price impact analysis (which used back end price impact as a proxy for front end).  (*See infra* at 16-17 (discussing, *e.g.*, *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *8 (S.D.N.Y. Mar. 29, 2024)).)

Purely as a matter of "common sense," it is unlikely that the challenged statements impacted Natera's stock price.  These were not new statements: Natera had reported since 2015 that its revenue growth was driven by Panorama and Horizon (Ex. 31 at 2-3; *see* Ex. 36 at 3) and on November 6, 2019, shortly before the putative class period began, Natera reiterated this and also reported that "today, we're seeing about 80% of our orders include [an] order for micro-deletion testing."  (Ex. 37 at 13-14); *see In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) ("alleged corrective disclosures [that] only repeated already public information" have no price impact).  Nor were these statements made alone.  For example, the

---

[9] Although Plaintiffs continue to argue that "revenues and demand were inflated," they have previously clarified that they are *not* claiming that Natera actually misstated revenue or demand. (Dkt. 140 at 14 (admitting Plaintiffs' claims are "not predicted upon an assertion that Defendants misrepresented their reported financial results or violated a rule of accounting").)

February 26, 2020 and February 25, 2021 statements were made on the same day that Natera announced results that beat guidance.  (Ex. 32 at 2; Ex. 33 at 2.)  The May 6, 2020 and February 25, 2021 statements were made on the same day that Natera announced record growth.  (Ex. 34 at 1; Ex. 33 at 2.)  And the August 5, 2020 statement was made the same day that Natera announced that it had overcome Covid headwinds.  (Ex. 35 at 2.)  To the extent Natera's stock price was impacted on these dates, it is far more likely that these announcements – and not the information purportedly omitted from statements Natera had made for years – impacted Natera's stock price.

## 2.     No Back End Impact Upon First Disclosure

There was also no back end price impact.  When considering whether a corrective disclosure impacted the price of a company's stock, the court considers "*all* probative evidence" *Goldman*, 594 U.S. at 122 (emphasis in original), including confounding factors to which the price movement may have been attributed.  *See Goldman*, 594 U.S. at 122 (courts must consider "qualitative" evidence); *In re Apache*, at 2024 WL 532315, at *14 (considering alternative reasons that presented a "more likely" explanation for the price decline).  "Because publicly available information in an efficient market is generally reflected in the price of a security, the disclosure of confirmatory information – or information already known by the market – will not cause a change in stock price."  *See Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020); *see also Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (the "mere repackaging of already-public information by an analyst or short-seller" reveals only the short-seller's opinion, not "the falsity of a company's prior factual representations") (citation and quotation marks omitted).

The market price of Natera's stock did not react when the allegedly "corrective" information was first revealed.  As discussed above, Hindenburg Research has submitted a declaration on this Motion confirming that its report was based entirely on information "obtained from public sources," including, specifically, The Capitol Forum articles.  (*See* Ex. 1 ¶ 5.)  The Capitol Forum articles include all the same information that Plaintiffs allege made the Hindenburg Report corrective, including that "Natera began using MGML in 2018" (¶ 172), it used MGML to submit "large volumes" (11%) of its prior authorizations (*id.*), and what Plaintiffs describe as

13

Hindenburg's "central claim that MGML was founded by a person with close, personal ties to Natera's [former] Vice President of Commercial Sales" (¶ 175). *See Espy v. J2 Glob., Inc.*, 99 F.4th 527, 542 (9th Cir. 2024) (information in Hindenburg report was already "reflected in [the] stock price" where the Report "was based only on a careful reading of public documents, including . . . investor presentations, press releases, employees' LinkedIn profiles, board members' resumes, public corporate records, and SEC filings"). Natera's stock price did not, however, decline when The Capitol Forum articles revealed this information. (*See* Ex. 4 (Skinner Report) ¶ 41 n.78, Ex. 2b at 3, 7.) The absence of a stock price reaction when the information was first disclosed is sufficient to establish a lack of price impact. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 272 (N.D. Tex. 2015) (no price impact where defendant "demonstrated that the disclosure that allegedly caused the price reaction was already disclosed to the market … to no price reaction"); *In re Qualcomm*, 2023 WL 2583306, at *13 (same); *cf. Amgen*, 568 U.S. at 464 ("immaterial misrepresentations and omissions 'by definition do not affect stock price'").

Natera's analysts also viewed the information in the Hindenburg Report as confirmatory, not revelatory. None of Natera's analysts revised their revenue expectations for Natera after publication of the Hindenburg Report, despite Plaintiffs' claims that the report revealed that Natera's revenue growth and demand were "propped up" by deceptive practices. (*See*, *e.g.*, Exs. 26-27.) Canaccord Genuity stated outright that the Hindenburg allegations were "old news" and that "the company's fundamentals have not changed." (*See* Ex. 26 at 1.) And Morgan Stanley similarly stated, "we do not see these [allegations] as changing our fundamental view of the company." (Ex. 27 at 1.) In similar circumstances, courts have repeatedly confirmed that – even when a later disclosure is accompanied by a significant stock price drop – there is still no price impact. *See In re Apache*, 2024 WL 532315, at *10 (no price impact where the later report "repeat[s] old news"); *In re Qualcomm*, 2023 WL 2583306, at *12 (announcement of regulatory investigations into alleged anticompetitive practices insufficient for price impact because company's practices had previously been disclosed).

The most likely explanation for the stock price drop that followed release of the

14

Hindenburg Report was fear by the market that Natera was under attack by an activist short seller and could face heightened regulatory scrutiny as a result – *not* the repackaging of already public information about Natera's use of MGML and the format of its Panorama requisition form. "Whether it's true or not, a short-seller report can often send shares of a stock plummeting in a hurry." The Motley Fool, *Should You Buy Natera Stock Despite the Scathing Short-Seller Report From Hindenburg?*, https://www.fool.com/investing/2022/03/18/should-you-buy-natera-stock-despite-the-scathing-s/; (*see also* ¶ 174 ("short reports typically act as overhangs for a period of time") (quoting a Canaccord Genuity analyst report)). Academic articles confirm that a stock price decline is expected when a short seller targets a company. (*See, e.g.*, Ex. 4 (Skinner Report) ¶ 64 n.130; *see id* ¶¶ 63-70; Alexander Ljungqvist *et al.*, *How Constraining Are Limits to Arbitrage?*, The Review of Financial Studies (Mar. 5, 2016), *available at* https://ssrn.com/abstract=2356414 (noting an average abnormal stock price decline of about 7.5% when a company is targeted by a short seller).) Academic research also indicates that stock price often falls when there is a threat of regulatory investigation or action, regardless of the accuracy of that threat. In this instance, Natera's analysts concluded that regulatory inquiries were "inevitable" because of the level of attention that the Hindenburg Report attracted "alone." (*See, e.g.*, Ex. 5 at 3.) This was coupled with the stock price decline caused by Hindenburg's speculation that Natera was already the subject of an active regulatory investigation.[10] *See In re Qualcomm*, 2023 WL 2583306, at *14 (S.D. Cal. Mar. 20, 2023) (no price impact, despite stock price drop that followed announcement of regulatory investigation, because practices being investigated already had been disclosed). All of these factors explain why Natera's stock price fell upon release of the Hindenburg Report; none of them mean that Natera's prior statements were false or misleading. (*See* Ex. 1 ¶¶ 6, 8 (Hindenburg confirming the article was not intended to show Natera's statements were false).)

C.   **A Gap Exists Between the Alleged Misstatements and the Hindenburg Report.**

The Hindenburg Report also cannot be used to show price impact because the alleged

---

[10] Hindenburg based this speculation on a response to a FOIA request (Ex. 10 at 38) – information available on request to anyone but incarcerated felons. Mich. Comp. Laws Ann. §15.231 *et seq.*

misstatements were too dissimilar from the allegedly corrective information. *See Goldman*, 594 U.S. at 123.

In its recent *Goldman* decision, the Supreme Court held that, in inflation maintenance cases in particular, courts must scrutinize statements alleged to be corrective disclosures to determine whether they actually reveal that a company's prior statements were false or misleading. *Goldman*, 594 U.S. at 123 (no price impact "when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," such as, for example, "when the earlier misrepresentation is generic"). Courts apply heightened scrutiny and conduct a "searching price impact analysis," under *Goldman*, whenever "(1) 'there is a considerable gap' in genericness between the earlier statement and the subsequent disclosure, (2) the corrective disclosure does not directly refer to the alleged misstatement, and (3) the plaintiff claims the earlier generic statement was misleading by omission." *Kirkland Lake Gold.*, 2024 WL 1342800, at *8 (S.D.N.Y. Mar. 29, 2024) (quoting *Goldman*, 77 F.4th at 102).

The gap between the alleged misstatements and the corrective disclosure in this case is even greater than the "mismatch" in *Goldman*. The Hindenburg Report does not refer directly to, or purport to correct, any alleged misstatements by Natera; in fact, Hindenburg Research states outright in its Declaration that the Report was not intended to, and did not, take a position about whether Natera's prior statements were false or misleading. (Ex. 1 ¶¶ 6. 8.) Under *Goldman* and its progeny, it is not enough to for the prior disclosure and the corrective disclosure to simply "touch[] upon a similar subject," but here, they do not even do that. Natera never said anything in its SEC filings about its Panorama requisition form or the way Natera processed prior authorizations nor did Natera claim, even at a generic level, to be in compliance with the OIG or industry guidance that Plaintiffs allege the conduct described in the Hindenburg Report "implicated." (*See* ¶ 136 (alleging Natera "implicated potential" OIG guidance but not alleging that Natera purported to be in compliance with such guidance); ¶ 146 (alleging that "[d]efaulting patients into ordering microdeletion screening went against industry guidance issued in 2014 by [a] professional society" but not alleging that Natera purported to be in compliance with this

16

guidance).)  Likewise, the Hindenburg Report does not discuss Natera's revenue or what products drove revenue.  This case is the absolute definition of a plaintiff looking in a "rearview mirror" and trying to match negative news with statements about entirely different topics.  *See Goldman*, 77 F.4th at 101.  As a result, even if the Court were inclined to treat the Hindenburg Report as a corrective disclosure, there is no basis to infer price impact from the post-Hindenburg stock price decline.  *See In re Qualcomm*, 2023 WL 2583306, at *12 (no price impact where alleged corrective disclosures were "far more specific than" statements about defendants' business practices).

### D.    Plaintiffs Will Be Forced to Litigate Damages on an Individualized Basis.

Class certification should be denied for the independent reason that Plaintiffs have not shown that they will be able to calculate damages on a classwide basis under their theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

To satisfy Rule 23(b)(3)'s predominance requirement, Plaintiffs must demonstrate that their damages are measurable on a classwide basis using a common methodology that is consistent with their theory of liability.  *Comcast* 569 U.S. at 35.  This means "that a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory."  *Id*.  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.* Moreover, the proposed methodology cannot be based on "speculative" inferences because "[s]uch a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity."  *Id*. at 35-36. In *Comcast*, the plaintiffs alleged four theories of antitrust liability, of which just one was capable of classwide proof.  *Id.* at 30-31.  Nevertheless, the plaintiffs' expert proposed a damages model that assumed plaintiffs prevailed on all four theories.  *Id.*  The Supreme Court held that class certification was improper because it authorized "a methodology that identifies damages that are not the result of the wrong."  *Id.* at 37.

Plaintiffs here have not identified a method of excluding those investors who read The Capitol Forum articles or saw Natera's requisition form (again, distributed in the millions) from claiming damages.  Individuals who bought or held Natera stock with knowledge of this

17

information cannot be included in the plaintiff class because they cannot invoke the fraud-on-the-market presumption. *See Halliburton II*, 573 U.S. at 269 (*Basic's* "presumption of reliance [does] not apply" to those who are aware of allegedly omitted information).[11]  Mr. Coffman's proposed damages model, however, would use the same method of measuring damages for all investors – "regardless of the identity or circumstances of any individual class member." (Coffman Report ¶ 84; *see also id.* ¶ 85.)  This means that Plaintiffs' model would not differentiate between those investors who bought with knowledge of the alleged omissions and those who did not.

Defendants are not aware of any method available to identify or exclude those investors. The Capitol Forum articles were distributed via email that then passed from investor to investor. Natera published the requisition form on a public website.  There is no single list or definitive source identifying which investors saw this information, nor is there any conceivable way of obtaining that information short of taking discovery from every member of the putative class.  In short, Plaintiffs' damages model "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35.

### E.      *Affiliated Ute* Does Not Apply.

Plaintiffs bring this claim under Rule 10b-5(b) (the provision governing allegedly false statements), *not* subsections (a) (scheme liability) or (c) (fraudulent course of conduct).  (*See* Dkt. 104 at 23-23 (reviewing "[r]epresentations regarding Panorama")), *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860, at *22 (S.D. Tex. July 15, 2016) ("While Rule 10b-5(b) imposes liability for deceptive statements, Rules 10b-5(a) and (c) impose liability for deceptive conduct."); *see also In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 681-82 (S.D. Tex. 2006) ("The Fifth Circuit has repeatedly limited the *Ute* presumption to cases with claims based primarily on alleged omissions under subsections (a) and (c)," not (b)).

In addition, *Affiliated Ute* applies only when a defendant has an "independent duty to

---

[11] Under a traditional view of *Basic*, this would not prevent certification of the class because the class would simply end after publication of The Capitol Forum reports and the class's claims would be time-barred.  Plaintiffs here, however, have ignored The Capitol Forum reports and ask the Court to end the class period years after their publication.

disclose material information." *Credit Suisse First Bos. (USA)*, 482 F.3d at 384 ("to invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure"). As the Supreme Court recently confirmed, however, Section 10(b) does not give rise to a claim for pure omissions liability – there is no independent duty of disclosure in such cases. *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-66 (2024).

## F.      Plaintiffs Are Atypical and Inadequate Because They Lack Standing to Pursue Their Claims Under Sections 11 and 12.

The Motion also should be denied as to the Section 12(a)(2) and Section 11 claims because Plaintiffs cannot show: (i) a direct purchase in the July 2021 SPO (as required to establish standing for their Section 12(a)(2) claim), (ii) a purchase traceable to the July 2021 SPO (as required to establish standing for their Section 11 claim), or (iii) that they purchased shares before the allegedly omitted information was disclosed, as is necessary to establish standing to proceed under any claim based on alleged omissions. *See Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023) (under Section 11, "securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading"); *Caiafa v. Sea Containers Ltd.*, 331 F. App'x 14, 16 (2d Cir. 2009) ("[C]laims under Section 12(a)(2) may be brought by those who have purchased securities in 'initial public offerings' but not by those who purchased securities in a 'secondary market.'"). When a plaintiff "does not have individual standing to assert a claim, [it] may not do so even if [it] meets the other Rule 23(a) requirements." *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 932 (S.D. Tex. 2017), *aff'd*, 777 F. App'x 726 (5th Cir. 2019).

The corporate representative for BAPTL – the *only* lead plaintiff appointed by the Court – testified that BAPTL did not purchase shares in the July 2021 SPO and has not performed any analysis to determine whether its shares are traceable to the SPO. There is no question, therefore, that BAPTL lacks standing to bring these claims, and therefore, that a class cannot be certified based on BAPTL's Motion. *See Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 319 (5th Cir. 2002) ("[s]tanding is an inherent prerequisite to the class certification"); *Krim v. pcOrder.com, Inc.*, 402

19

F.3d 489, 500 (5th Cir. 2005) (affirming denial of class certification and dismissal of Section 11 claim in part due to lead plaintiff's failure to establish stock purchase traceable to at-issue offering).

Plaintiffs try to rectify this by adding a second lead plaintiff, Key West, which was not appointed by the Court and does not purport to qualify as a lead plaintiff under the Reform Act. Key West also does not satisfy the standing requirements for either Section 11 or Section 12(a)(2). With respect to the Section 12(a)(2) claim, although Key West purports to have purchased shares "in or traceable to the offering" (¶ 152) – inadequate allegations that courts have disparaged as "a coy choice of words," *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 900 (4th Cir. 2014) – the only supporting evidence it has produced is a certification that it purchased shares at the $113/share SPO price. (Dkt. 9-2.) But "given the volume of other shares on the market from the prior offering" (here, 87,429,785 shares), "even alleging that someone bought shares on the day of the … Offering at the offering price is inadequate to establish statutory standing [under Section 12(a)(2)] at this stage, due to a significant possibility that the shares purchased originated from the prior offering but were being traded at the secondary offering price." *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *7 (N.D. Cal. July 5, 2022); (*see* Ex. 22).

Key West faces similar difficulties with respect to the Section 11 claim. The Fifth Circuit has held that it is nearly impossible to trace shares under Section 11 unless the "stock has only entered the market via a single offering." *Krim*, 402 F.3d at 496; *see In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013). In *Krim*, the Fifth Circuit rejected a plaintiff's attempt to prove Section 11 standing based on statistical tracing, even when the stock had "at least a 90% chance of being" traceable to the subject offering. 402 F.3d at 496. Here, in contrast, the 5,175,000 shares issued in the July 2021 SPO amounted to only 5.5% of the total Natera shares outstanding following the SPO. (Ex. 22 at 2.) There is no basis, under these circumstances, to conclude that either Plaintiff has standing to bring these claims, and thus, no basis to certify a class.

## IV.     CONCLUSION

For the reasons discussed above, Plaintiffs' Motion should be denied.

Dated: August 16, 2024

**KATTEN MUCHIN ROSENMAN LLP**

*/s/ Bruce G. Vanyo*
Bruce G. Vanyo (admitted *pro hac vice*)
Christina L. Costley (admitted *pro hac vice*)
Paul S. Yong (admitted *pro hac vice*)
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: (310) 788-4400
Fax: (310) 788-4471
bruce@katten.com
christina.costley@katten.com
paul.yong@katten.com

Eric R. Hail
State Bar No. 24047579
Ted A. Huffman
State Bar No. 24089015
Megan C. McKennon
Texas State Bar No. 24102184
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
Tel: (214) 765-3600
Fax: (214) 765-3602
eric.hail@katten.com
ted.huffman@katten.com
megan.mckennon@katten.com

*Counsel for Defendants Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, Paul Billings, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herm Rosenman, and Jonathan Sheena*

**O'MELVENY & MYERS LLP**

*/s/ Danny S. Ashby*
Danny S. Ashby
State Bar No. 01370960
2501 N. Harwood Street, Suite 1700
Dallas, Texas 75201
T: (972) 360-1900
F: (972) 360-1901
dashby@omm.com

21

Jonathan Rosenberg (admitted *pro hac vice*)
jrosenberg@omm.com
1301 Avenue of the Americas, 17th Floor
New York, New York 10019
T: (212) 326-2000
F: (212) 326-2061

*Counsel for Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, Cowen and Company, LLC, SVB Leerink LLC, Robert W. Baird & Co., BTIG, LLC, and Craig-Hallum Capital Group LLC*

22

## CERTIFICATE OF SERVICE

I, Bruce G. Vanyo, hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on August 16, 2024 which caused an electronic copy of that document to be served on all counsel of record who have appeared in this matter.

*/s/ Bruce G. Vanyo*