# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

\- - -

| | | |
|---|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated, Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN, Defendants. | : | NO. 1:22-cv-00398-DAE |

\- - -

July 19, 2024

\- - -

Videotaped videoconference deposition of CHAD COFFMAN, CFA, held in the offices of Kessler Topaz Meltzer Check, LLP, 280 King of Prussia Road, Radnor, Pennsylvania 19087, commencing at 9:40 a.m. on the above date, before Teresa M. Beaver, a Professional Court Reporter and Notary Public.

\- - -

ESQUIRE DEPOSITION SOLUTIONS
1835 Market Street
5th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

A P P E A R A N C E S :

KESSLER TOPAZ MELTZER CHECK, LLP
BY: JOSHUA E. D'ANCONA, ESQUIRE
280 King of Prussia Road
Radnor, Pennsylvania 19087
jdancona@ktmc.com
Counsel for the Plaintiffs

KATTEN MUCHIN ROSENMAN LLP
BY: CHRISTINA L. COSTLEY, ESQUIRE
BY: THOMAS ARTAKI, ESQUIRE
(VIA VIDEOCONFERENCE)
BY: BRUCE G. VANYO, ESQUIRE
BY: BRETT WILSON, ESQUIRE
BY: CAROLINE SABATIER, ESQUIRE
2121 Avenue of the Stars
Suite 1100
Los Angeles, California 90067
christina.costley@katten.com
bruce@katten.com
brett.wilson@katten.com
Counsel for the Defendants
Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, Paul Billings, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herm Rosenman, and Jonathan Sheena

A P P E A R A N C E S :

(VIA VIDEO TELECONFERENCE)
O'MELVENY & MYERS, LLP
BY: DANNY S. ASHBY, ESQUIRE
BY: KOBINA QUAYE, ESQUIRE
2501 N. Harwood Street
Suite 1700
Dallas, Texas 75201
dashby@omm.com
Counsel for the Defendants
Morgan Stanley & Co., LLC, Goldman Sachs & Co., LLC, Cowen and Company, LLC, SVB Leerink LLC, Robert W. Baird & Company, BTIG, LLC, and Craig-Hallum Capital Group LLC

\- - -

A L S O P R E S E N T :

BRYAN FRYD, CORNERSTONE RESEARCH

ROBERT FOULK, VIDEOGRAPHER

(VIA VIDEOCONFERENCE)

PATRICK FALLON, SUMMER ASSOCIATE

HEATHER HERNDON, SUMMER ASSOCIATE

\- - -

I N D E X


| WITNESS | | PAGE |
|---|---|---|
| CHAD COFFMAN, CFA | | |
| BY MS. COSTLEY | | 7 |


E X H I B I T S


| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Expert Report of Chad Coffman, CFA | 8 |
| Exhibit 2 | Natera: Pioneers in Deceptive Medical Billing - Hindenburg Research | 32 |
| Exhibit 3 | Capitol Forum document - Natera Company Uses Third-Party Nonprofit to Increase Likelihood of Insurance Reimbursement; Nonprofit Has Limited Paper Trail, Close Connections With Natera dated July 1st, 2020 | 78 |
| Exhibit 4 | Capitol Forum document - Natera: Charity Apparently Established to Process Insurance Prior Authorizations Has Close Ties to Former Senior Vice-President of Natera dated December 14, 2020 | 80 |

DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

Request For Production of Documents

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

Questions Marked

| Page | Line | Page | Line |
|---|---|---|---|
| None | | | |

THE VIDEOGRAPHER: The following is a recorded deposition. The deponent today is Chad Coffman in the matter of Snyder versus Natera, Incorporated, et al.

This deposition is being taken on July 19th, 2024. My name is Robert Folk, Jr. I'm the video operator. The court reporter is Terri Beaver and at this time counsel will introduce themselves for the record.

MS. COSTLEY: Christina Costley, Katten Muchin Rosenman on behalf of the Natera defendants.

MR. ARTAKI: Thomas Artaki from Katten Muchin Rosenman on behalf of the Natera defendants.

MR. D'ANCONA: Joshua D'Ancona from Kessler Topaz Meltzer Check on behalf of the witness and the plaintiffs.

THE VIDEOGRAPHER: I'm going to go off the record for a second at 9:41.

\- - -

(Whereupon, there was a brief recess.)

\- - -

THE VIDEOGRAPHER: Back on the record. 9:42. And at this time the court reporter will swear in the witness.

\- - -

CHAD COFFMAN, CFA, after having been duly sworn, was examined and testified as follows:

\- - -

THE VIDEOGRAPHER: You may begin the questioning. We're on the record at 9:42.

\- - -

EXAMINATION

\- - -

BY MS. COSTLEY:

Q. Good morning.

A. Good morning.

Q. How do you want me to address you?

A. Anything is fine. Mr. Coffman is fine.

Q. I'd like to have his report marked as Exhibit 1. Exhibit first in order

for the case.
MR. D'ANCONA: Excuse me, Christina. I think the audio might not be muted on this Zoom link.
THE WITNESS: I'm just getting a little bit of feedback.
THE VIDEOGRAPHER: Off the record. 9:43.
\- - -
(Whereupon, there was a brief recess.)
\- - -
THE VIDEOGRAPHER: We're on the record. 9:45.
BY MS. COSTLEY:
Q. I'm showing you a document that has been marked as Exhibit 1.
\- - -
(Whereupon, Deposition Exhibit 1, Expert Report of Chad Coffman, CFA, was marked for identification.)
\- - -
BY MS. COSTLEY:
Q. Do you recognize that document?

A. Yeah, other than the front page which says Exhibit B, which I don't think I prepared, this appears to be a report I prepared on this matter.

Q. Does this report reflect all of your opinions thus far in this case?

A. Yes.

Q. You are not at this time issuing or giving an opinion on loss causation; correct?

A. I'm not. That's correct.

Q. Are you qualified to give an opinion on loss causation?

A. If I were asked to and to analyze loss causation, yes.

Q. Is that something that you've done in other cases?

A. Yes.

Q. And why have you not done so here?

A. I haven't been asked to.

Q. You don't at this point have any opinion on the amount of damages in this case; do you?

A. No.

Q. Have you formed any opinions that are not reflected in your report?

A. No.

Q. Have you reviewed any documents that are not listed in your report?

A. Well, just to be clear, you know, I want to make sure we're limiting your question to this case.

I have formed opinions about this case.

Q. That's fair.

A. Go ahead.

Q. Have you reviewed any documents in connection with this case that are not listed in this report?

A. Since the time I filed the report, I reviewed the Hindenburg report. That's the only document that I did not list in the report that since then I have reviewed.

Q. Okay. And do you want to change any of the opinions in your report before we get started?

A. No.
Q. When were you hired in connection with this case?
A. I don't recall an exact date, but it was some time in early 2024; several months ago.
Q. And how many discussions have you had with counsel in this case?
A. I don't recall an exact number.
Q. Would you say it's more than five or less than five?
A. Going back to the time I was hired, it's probably more than five, but probably not many more than five.
Q. So less than ten?
A. That sounds right, yes.
Q. So somewhere between five and ten conversations with counsel?
A. To the best of my recollection, that's accurate, yes.
Q. And about how many hours have you spent on this case?
A. Me personally, I don't know an exact number.

Q. Would you say it's about 100?
A. No. It's much let's than 100.
Q. Do you keep track of your hours for purposes of billing?
A. I do. So, it's a knowable thing. I just don't know as I sit here right now.
Q. And who has helped you in connection with your report? I'm not asking who has helped you at Kessler, but who has helped you on the economics end?
A. So, there were three people that I recall being involved that supported me and worked at my direction on this case; Mark Hedstrom, Mary Kubick and Katie Donemeyer.
Q. And how much are you being paid for your testimony in this case?
A. I think I listed my hourly rate in the report. Just a second. For my time it's 950 per hour.
Q. Do you have an overall budget for the case?
A. No.
Q. Do you have a sense of what your

fees to date have been in this case?

A. I don't know an exact number. I mean I have a general sense.

Q. What's your general sense?

A. More than 30,000, less than 100,000. I mean that's I think about as accurate I can be without going back to our billing records.

Q. Okay. And you are the CEO of your company; correct?

A. No.

Q. What is your position?

A. President and cofounder.

Q. President and cofounder.

So, do you keep a general eye on how much you are making on testimony in cases like this?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Not -- not that way, no. I mean I have a general idea of how the company is doing. I have a general idea of the revenues from my practice, but that's not something I track super closely on a

day-by-day basis or anything.

BY MS. COSTLEY:

Q. You don't have a general sense of how much you will make on testimony for a case like this?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I mean of course I have a general sense based on experience, but my experience is also that it's hard to predict what my total hours and what the hours of my staff will be on a case throughout the entire case.

So, I don't know at this point.

BY MS. COSTLEY:

Q. So, what does it generally cost for you and your colleagues to provide an expert report and testimony through class certification?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That can vary a lot, depending on the case and about the issues confronted and the scope of the

opinion.
BY MS. COSTLEY:
Q. Can you give me a range?
A. I think again it's changed somewhat over time because of billing rates and things like that, but right now, it could be anywhere from let's say 30 to $40,000 on the low end to well over $100,000 if there are difficult issues to confront or the scope is beyond just one security or things like that.
So, it's -- it's really hard to say.
Q. How many hours did you spend preparing for your testimony today?
A. Do you mean after the report specifically preparing for deposition?
Q. Yes.
A. In total, probably six or seven hours.
Q. And your CV lists 56 cases in which you have provided testimony or an expert report since 2020. Is that correct?
A. I haven't done a count myself,

but I have no reason to dispute that that could be accurate.
Q. So that's generally a different case every month or so?
MR. D'ANCONA: Objection to the form.
THE WITNESS: Again, if you're talking about on average, again, that's not something I've ever calculated, but it's -- I have no reason to dispute that, yes.
BY MS. COSTLEY:
Q. So, you're prolific. Would that be fair to say?
MR. D'ANCONA: Objection to the form.
THE WITNESS: I don't know what that really means.
BY MS. COSTLEY:
Q. Have you ever provided testimony for the defense in one of these cases?
A. I've been engaged by defendants in these types of cases and by neutrals, but I have not offered expert testimony on the record for a defendant in one of -- in a

class action securities case, if that's what you mean by these cases.

Q. Have you ever issued an opinion that a market was not efficient?

A. I've come to the conclusion that there was insufficient evidence to give an opinion that a particular market was not efficient in those specific circumstances. I was not asked to prepare a report that addressed that question then.

Q. So in all 56 cases listed on your CV, you came to the conclusion that the market was sufficient?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know if in every securities case listed, if I was -- if I gave a report at the class cert stage.

I don't know if the count is specifically related to class cert-related reports that you are giving me; but in each of the cases where I issued a market efficiency opinion, it was that the market for that particular security that was in the

report was efficient, but there may have been other securities and certainly other cases where there were other securities where I determined there was insufficient evidence to support that there was an efficient market. So there would not have been an opinion in those reports that -- or related to those matters that the market was efficient.

BY MS. COSTLEY:

Q. But those aren't listed on your CV; correct?

A. Because I --

MR. D'ANCONA: Objection to the form.

THE WITNESS: Because I didn't issue a report or there might be, I'd have to go back and check, I don't recall specifically if there were cases where I issued an opinion where the market was efficient for the common stock, but did not offer an opinion with respect to other securities that might have been issued in the case.

BY MS. COSTLEY:

Q. And when you issue an opinion as to damages in the securities class action, that necessarily involves a determine that the market was efficient; does it not?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know that that would necessarily always have to be the case. In the cases I've been involved with and issued opinions about damages about publically-traded securities, they've been in markets that I believed were efficient, but I think you're asking me a legal question about whether it's required to have an efficient market.

And certainly I think in a case involving perhaps Section 11 claims where it's a statutory formula, I don't know that there's a requirement for an efficient market or that you would need to calculate damages. So, I don't necessarily agree with your statement, no.

Q. So in a 10B case, if the market was not efficient, how would you calculate

damages on a class-wide basis?

A. I think it would depend on what the rationale was for why it was efficient or not efficient for just a period of time or like so -- and my understanding is that the rationale for why efficiency is a question is whether is -- is -- for a -- issues related to reliance.

That doesn't necessarily mean that you couldn't look at the economic loss somebody suffered independent of that. So I don't know that it's a requirement. I'm just not -- and I'm trying to think through all the possible scenarios where that could be an issue and maybe it would -- you could conceivably have a situation where you believe that the market was sufficiently efficient, that on some corrective disclosure that the price decline still reflected the economic value of the fraud, but at other times maybe the market wasn't efficient.

So, I think it's an incomplete hypothetical, that I would have to understand the specific circumstances whether it would

be in the case where there was a market that was inefficient for some period of time or something like that, whether that would impede the calculation of damages.

Q. But you did believe the market was efficient in all of the 10B securities fraud cases listed on your CV, including those where you only issued an opinion as to damages; correct?

MR. D'ANCONA: Objection to the form. Misstates testimony.

THE WITNESS: That's a complex question because I'm trying to recall some cases where there were more securities involved than just common stock.

Certainly all the cases that are listed on my CV that I issued a market efficiency report for or calculated damages for, I know I had the belief that the market was efficient for the common stock.

There may be cases on that list where there were other securities involved where there were damages calculations involved where efficiency may have been more

of a question. I'm just trying to recall and, you know, through you're asking me about a lot of different cases.

BY MS. COSTLEY:

Q. That's fair.

A. And a lot different circumstances.

So, I don't know that I can make a blanket statement to that effect.

Q. Section 8 in your report of this case is nearly identical to Section 8 of your report in the Grubhub case and the Pluralsight securities class action where you opine in nearly identical terms the damages could be measured for all purchasers using a common methodology.

Does that surprise you?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Not at all. That's in some ways the whole point, which is that when there are claims in a class action case involving an inflated purchase price, as a result of alleged misrepresentations and/or

omissions, there's a well-accepted methodology for computing damages in those types of matters.

So, the damages methodology itself doesn't change from case to case. So the description of why it's an appropriate method and how damages are calculated doesn't differ from case to case. So there would be no reason to change how that's described from case to case.

That's part of the point I'm making.

BY MS. COSTLEY:

Q. What is your understanding of plaintiff's theory of liability in this case?

A. Well, that's described in my report, but sort of just off the top of my head, my understanding is that plaintiffs are alleging that Natera made misrepresentations and/or omissions that failed to disclose to the market that the demand it was -- the demand for its Panorama product was at least in part impacted by deceptive business practices, including the methods by which

preauthorizations were done and that physicians had to opt out of the micro deletion portion of the test and other billing issues that were generated from those sorts of things. I mean that's my general understanding.

Q. Is this a case about whether Natera's revenue was accurate, to the best of your understanding?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Do you mean the revenue numbers themselves?

BY MS. COSTLEY:

Q. Correct.

A. My understanding is plaintiffs are not alleging that the revenue numbers themselves were incorrect, but that the statements gave the market a misperception about the -- how those revenues were generated. That's my understanding.

Q. So, the statements gave the market a misperception about the source of the revenue?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know about the source.

My understanding is that plaintiffs aren't saying that the revenue was coming from some source that wasn't disclosed as much as the factors that were impacting the demand for that product, the Panorama product.

Q. And do you have any recollection of what the specific alleged misstatements in this case are?

A. I mean I have some general recollection. I haven't memorized the alleged statements, but I have a general understanding of the statements that were listed in the complaint.

Q. And what is that understanding?

A. Again, I would -- you know, I would want to go back to the complaint because they are obvious in there and I've read them, but my understanding is they were generally positive statements about the

growth of the Panorama product and that it was doing well and at least according to plaintiffs, left the impression that that was due to organic growth, not due to at least in part deceptive business practices.

Q. So, are you familiar with the term half truth statement?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I'm not -- not specifically. I mean I've heard the phrase half truth before, but I've never come across it as a well-defined term in this type of circumstance.

BY MS. COSTLEY:

Q. What do you understand it to mean?

MR. D'ANCONA: Objection to the form.

Are you asking in the legal context?

MS. COSTLEY: I'm asking just based on the context in which he wrote his report.

THE WITNESS: I didn't use the term half truth in the report. I don't think I considered a definition of half truth when I was preparing my report.

BY MS. COSTLEY:

Q. So what do you understand the term to mean?

MR. D'ANCONA: Objection to the form.

THE WITNESS: The term --

MR. D'ANCONA: Asked and answered.

THE WITNESS: The term half truth?

BY MS. COSTLEY:

Q. Yeah.

A. Something that has elements of truth, but the either deceptive or omits things in some way that render it misleading.

Q. Would you say that the statements here fit within your understanding of half truth?

MR. D'ANCONA: Objection. Asking for a legal conclusion.

THE WITNESS: I would have to go statement-by-statement to give you a view of that, if I even have a view of that.

I don't know as I sit here.

BY MS. COSTLEY:

Q. It's fair to say, though, that based on your review of the complaint you don't see any -- didn't see any instance in which Natera denied that it used a specific type of requisition form; did you?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't recall anything in the complaint about Natera specifically denying that, no.

BY MS. COSTLEY:

Q. And you didn't see anywhere in the complaint where Natera denied, for example, that it used a third-party payment processor; do you?

MR. D'ANCONA: Objection to the form. Let's not do a memory test on his recollection of the complaint. If you'd like to ask him about the complaint, I'm sure you

have a copy. Let's let the witness review it rather than asking for a memory test.

MS. COSTLEY: This is a very experienced witness. I don't think he needs to be coached.

MR. D'ANCONA: If you want to ask him about the complaint, show him the complaint.

MS. COSTLEY: I'm asking him about his recollection of the complaint.

MR. D'ANCONA: If you want to ask him about what's in the complaint, show him a copy of the complaint.

MS. COSTLEY: I'm asking him about his recollection. We could go ahead.

THE WITNESS: Could I have the question restated, please?

\- - -

(Whereupon, the following portion of the record was read by the court reporter:

"QUESTION: And you didn't see anywhere in the complaint where Natera denied, for example, that it used a

third-party payment processor; do you?")

\- - -

MR. D'ANCONA: Objection to the form.

If you have memorized and recall the complaint perfectly, feel free to answer.

THE WITNESS: As I sit here, I don't have a specific recollection of that, but whether it's in there or not, I don't know.

BY MS. COSTLEY:

Q. Okay. Let me direct your attention to Paragraph 2 of your report, please.

In Paragraph 2 you write, The materials I have considered in forming my opinion are summarized in Appendix A.

Did you review all of the documents listed in Appendix A to your report?

A. I did not personally review every single document listed in Appendix A. Some of it would have been reviewed by my team. Other things that I cite often I may

not have even -- I would have personally reviewed in the past, but not necessarily in the context of preparing this report because it's something that I cite to all the time.

But I did not personally review is the short answer. I did not personally review everything that's listed in Appendix A.

Q. You only list two analysts by reports by name in Appendix A. Is that correct?

A. That's true. Those are the two reports I believe I specifically cite to in the report, but there were many more analysts reports I and my team had access to.

I provide a summary bullet point saying analyst reports supplied by counsel or S&P Capital IQ for a particular period, including but not limited to, and then I list two reports and I list those specific reports because I actually cite to them in the report.

Q. So you did consider additional analyst reports; is that correct?

A. That's correct, yes.

Q. And you didn't list them?

A. No. I summarized what I relied upon and I believe -- any and all analyst reports that were available to me were produced as part of my backup material.

Q. And then you testified this morning that you did review the Hindenburg report, but you reviewed it subsequent to writing your report; is that correct?

A. Correct. I had seen and considered the description of the Hindenburg report in the complaint and plaintiff's allegations with respect to what it contained. I had not reviewed the Hindenburg report itself prior to my report.

Q. Can we mark the Hindenburg report as Exhibit 2.

\- - -

(Whereupon, Deposition Exhibit 2, Natera: Pioneers in Deceptive Medical Billing - Hindenburg Research, was marked for identification.)

\- - -

BY MS. COSTLEY:

Q. I'm showing you a document that's been marked as Exhibit 2. It's titled Natera: Pioneers in Deceptive Medical Billing and it states that it was published on March 9th, 2022.

When you referred previously to having reviewed the Hindenburg report, is this the report that you reviewed?

A. Give me just a second.

This looks like the report I reviewed, yes.

Q. And in your report you describe analyst reports for the period February 27th, 2020 through March 8th, 2020.

That's the day before --

MR. D'ANCONA: I'm sorry, Christine. Where are you referencing or where are you looking for that question?

MS. COSTLEY: I believe I'm looking at --

MR. D'ANCONA: Exhibit Appendix A.

MS. COSTLEY: I believe so.

MR. D'ANCONA: I believe I have it. Analyst reports.

MS. COSTLEY: Yeah, it's under Appendix A under Natera, Incorporated analyst reports.

MR. D'ANCONA: Yes, thank you.

BY MS. COSTLEY:

Q. You describe analyst reports for the periods February 27th, 2020 through March 8th, 2020, which is the day before --

MR. D'ANCONA: '22.

MS. COSTLEY: Yeah, we should say 2022. Which is the day before publication of the Hindenburg report; is that correct?

THE WITNESS: That's correct, yes.

BY MS. COSTLEY:

Q. So, you have not reviewed any analyst reports that discussed or commented on the Hindenburg report. Is that correct?

A. I've seen reference to some in the complaint. I have not personally reviewed all the analyst reports after the

filing of the Hindenburg report that wasn't necessary for the opinions that I'm giving in this matter to date.

Q. Did you review any of the analyst reports from after publication of the Hindenburg report?

A. Again, I don't believe it was necessary for -- to give the opinions I'm giving to date in this case. So, no, I did not.

Q. Okay. And you said you didn't review them because it wasn't necessary for the opinions you're giving in this case.

Is there any other reason you didn't review them?

A. No.

Q. Did you review any documents about Natera from before the class period?

A. There was some documents I did. For example, under SEC filings I list some SEC filings that were filed prior to the class period that was relevant to one of the market efficiency factors I analyzed.

I certainly collected security

data from prior to the class period as well. Given my event study methodology, I needed some data from before the class period.

So, yes, I reviewed some documents and/or data from prior to the class period.

Q. Would you agree that information publically available before the class period would already be incorporated into Natera's stock price as of the start of that class period?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I guess it would depend on what you mean by available, but if it's something that's widely disseminated in a public way, my opinion is it would be reflected in the market price.

BY MS. COSTLEY:

Q. So, and I want to come back to your use of widely disseminated in a public way.

But I guess for these purposes, would you agree that Natera's SEC filings

from prior to the class period would be incorporated into Natera's stock price at the start of the class period?

A. As long as those SEC filings were publically available, that would be consistent with my belief, yes.

Q. And would you agree that Natera's earnings reports that were disseminated prior to the class period would be incorporated into the stock price of Natera's -- into Natera's stock price at the time of the class period?

MR. D'ANCONA: Objection to the form.

BY MS. COSTLEY:

Q. I'll withdraw it and ask it more cleanly.

Would you agree that Natera's earnings reports from prior to the class price would be incorporated into Natera's stock price at the beginning of the class period?

A. If you're talking about their publically released earnings announcements,

yes.
Q. What about Natera's conference call transcripts from prior to the class period? Would those be incorporated into Natera's stock price at the start of the class period?
A. My experience is those are generally widely publically available. Again, I would have to confirm that, if I were answering that specific question.
As I sit here right now, I have no reason to believe they wouldn't be if they were widely disseminated and publically available.
Generally speaking, earnings conference call transcripts are publically available and would be incorporated rapidly in the market price in an efficient market, yes.
Q. So, you on occasion in your report and right now are using the phrase widely available.
Are you using widely available as a synonym for publically available?

A. I think I used the word widely disseminated. That could be something different than publically available. There is a distinction between those.

Q. And what is that distinction?

A. Well, I've certainly seen examples of things that were, technically speaking, publically available in the sense that people could theoretically have accessed them, but there's -- there was no supporting evidence that it was actually widely disseminated in a source or form that most investors would typically look at to evaluate securities.

So, there's certainly been information in matters that I've been involved in before where it was again, technically publically available in the sense that you could in theory access it or see it. But that there was significant evidence that it was not widely disseminated or incorporated into what -- how people were evaluating the stock.

Q. So --

A. Or security. Sorry.

Q. Your testimony is that if information is publically available, but not widely disseminated, it still may not be reflected in a company's stock price even if that stock trades on an efficient market?

A. Correct.

MR. D'ANCONA: Objection to the form.

THE WITNESS: Correct. Let me give you one example from a case I was involved in.

There was a clear case where a -- there was a news article published in a foreign language in a foreign country about a company that was very clearly technically publically available. Somebody could find it, somebody could access it. There was no restriction to getting it.

But it wasn't until an English translation of that was published days or weeks later, I forget the specifics of it, that analysts and the general public clearly had that information widely disseminated and

the market price reacted to when it was published in the English language.

So, there can certainly be examples of information that's publically available but there's clear evidence it wasn't widely disseminated amongst investors or in a location or venue where investors would normally look for information.

Q. And in that case, how long did it take for the publically available but not widely disseminated information to be reflected in the stock price?

A. Well, in that particular example, it was obvious that once there was an English version of that article that was widely disseminated, it reacted very rapidly, within a day.

But I don't recall how long of a time elapsed. I remember it was more than one day of time where it elapsed. But I don't recall the specifics beyond that.

Q. Was it more than a month?

MR. D'ANCONA: Objection to form.

THE WITNESS: I don't recall how long transpired in that particular case. I just don't recall.
BY MS. COSTLEY:
Q. Was it more than a year?
A. I don't believe it was more than a year, but again, I just don't recall the specifics.
Q. So, in your report you gave an opinion that damages could be measured in this case on a class-wide basis. Is that correct?
A. Yes.
Q. So I guess I'm confused about how you would be able to measure damages on a class-wide basis if some class members are reviewing publically available information but that information is not incorporated in the stock price?
MR. D'ANCONA: Objection to the form.
Is that a question?
MS. COSTLEY: Yeah. Can you help me understand that?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Well, the economic logic behind the class-wide damages methodology is that the stock price is trading in an artificially inflated level and if the -- and if what was concealed from investors was disclosed, that the market price would trade at a different price, lower is what's being alleged in this case.

That difference between what the market price was at the time and what the market price quote unquote should have been in the absence of the misrepresentations or had there been a corrective disclosure, is the same for all class members, regardless of what information they did or did not review.

BY MS. COSTLEY:

Q. But wouldn't you have to probe every class member to find out if they were aware of this publically-available information that is not reflected in the stock price?

MR. D'ANCONA: Objection to the

form. Asks for a legal conclusion.

THE WITNESS: Yeah, I was going to say that sounds like a legal question to me. From an economic perspective, in terms of measuring how much they were impacted by the artificially-inflated price, no.

BY MS. COSTLEY:

Q. Do you understand that the Basic presumption -- what is your understanding of the Basic presumption?

MR. D'ANCONA: Objection to the form. Referencing the Supreme Court opinion?

MS. COSTLEY: Yes.

MR. D'ANCONA: Objection to the form.

THE WITNESS: Again, I'm not an attorney, but my general understanding is that Basic says that in a semi-strong, efficient market, investors can be presumed to have relied upon information that is widely disseminated, publically available, because the market price would reflect all of that information already.

BY MS. COSTLEY:

Q. And you reference the Basic's decision in your report; do you not?
A. I do.
Q. And do you reference any part of Basic where it uses the phrase widely disseminated?
A. I don't recall it, whether or not it uses that specific term. I'm referring to the economic logic that's underlying it, which is that the economic logic supporting a semi-strong efficient market, which is what the Basic decision was basing its decision upon, is the general theory of market efficiency and semi-strong market efficiency.
I'm telling you from my perspective as a financial economist that the semi-strong efficient market hypothesis, at least as it's implied in the real world, depends on widely-disseminated information.
Q. And is there an academic literature, a book, anything that says information must be widely disseminated to be reflected in the market price of a stock that

trades in an efficient market?

A. I recall specific language talking about from academic articles, talking about obviously public information. I don't recall which articles talk specifically about widely-disseminated information. That's certainly an issue I've dealt with in prior cases where I know I've cited to literature that uses the phrase obviously publically available or widely-disseminated information. But as I sit here right now, I don't -- I can't cite to you a specific source.

Q. You didn't cite any such sources in your report in this case; did you?

A. I don't think I cite any specific article in my report that uses that term, but, like as I've said, there are -- there are articles out there that make clear that when talking about semi-strong efficiency, that there's an assumption that the information you're talking about is widely available.

Q. Which articles are those?

A. I just told you, I don't

remember the names of them off the top of my head.

Q. Okay. What is the threshold for what is widely available?

A. I don't know that there's a bright line determination for that.

Certainly if the information appears in a source that is clearly considered by -- or that is in the type of -- give me just a second.

If it's from a source that's clearly widely publically available and accessed and disseminated to the public, it's -- and in a location that it would normally be considered by most investors or any investor that was looking to become reasonably well informed, then it's clearly widely publically disseminated and available.

So, the types of things I'm thinking of are SEC filings, public news, publically available analyst reports; the types of sources that most investors would be looking for information about a company.

I think there's a gray area when

it comes to other claims about things being technically publically available when they are not clearly widely disseminated.

And in those cases I think it requires a detailed assessment of the extent to which that information was widely available.

Q. So, you just stated that only information that is available to most investors would be considered widely available?

MR. D'ANCONA: Objection to form.

THE WITNESS: No. I think I said that there are certain types of information that are clearly available to most investors that that would easily meet the presumption that it was widely disseminated and publically available.

I said there's a gray area when it comes to information that is technically public, in the sense that somebody could in theory access it.

But it may not be automatically

widely publically available.
And I'm saying that that, in those circumstances, it requires a detailed assessment of -- to what extent the information was widely available.
BY MS. COSTLEY:
Q. So, and you're using this phrase, information has to be available to most investors or it is subject to a further inquiry to meet the standard that it is widely available and publically disseminated.
Where does that standard, the information must be widely available and publically disseminated, where does that standard come from? Is that in any case?
MR. D'ANCONA: Objection to the form.
THE WITNESS: Well, no. I mean you're asking me my views on what types of information are widely available. I've tried to answer your question.
I believe that the -- when I talk about market efficiency and I've talked about this consistently in many different

matters, that what's rapidly incorporated into market prices is information that's widely disseminated.

I have been involved in cases where certain types of information that are technically publically available fall into a gray area about the degree to which they are widely disseminated and would be rapidly incorporated in the market price.

In those circumstances, it's required further analysis to come to a view as to whether the information was widely disseminated. I gave you one example. Let me give you another example.

In another matter, there was information distributed at retail locations in pamphlet form that was alleged to therefore be publically available and would have been incorporated into the market price.

In that specific circumstance, I don't think typical investors would be going to look at pamphlets that had been distributed at retail locations as a typical source they would go to to learn information

about a publically traded company for investment purposes.

Was the information public? Technically, yes.

Is it in a place where it was widely disseminated and would be looked at by most investors? No.

So, I had a particular view in that case and the court actually ended up agreeing with me that that wouldn't -- the type of technically public information that would not be in a place that would necessarily be reflected in the market price.

I'm not setting out a bright line threshold test of what level of widely disseminated is that the court should consider or that any economist should consider in any given circumstance.

I'm just saying if there's a question about whether the information was actually widely disseminated and available to -- even if we don't use the words most, large numbers of investors -- then you're in a gray area that requires additional

analysis.

Q. And the analytical framework that you're setting forth right now, that doesn't appear in any sort of academic treatise or book, does it?

MR. D'ANCONA: Objection to form.

THE WITNESS: I don't know if it does or doesn't.

What I'm -- certainly there's been the -- there is literature out there that talks about markets that are generally semi-strong efficient, not being perfectly efficient and that the theory is meant to describe how markets behave, when there's quote, unquote, obviously public information.

I believe that's a quote from Fama in one of the articles I've cited in the past, that it's not meant to cover, you know, things that are theoretically public but no one is really accessing or very few numbers of people are accessing.

So, all I'm saying is there's a gray area when it comes to information that's

not obviously widely disseminated.
BY MS. COSTLEY:
Q. And what I'm trying to get at is what your definition of widely disseminated is.
So, I think you testified earlier that if information is available to a -- to most investors, then it is widely disseminated; correct?
MR. D'ANCONA: Objection to the form.
THE WITNESS: No. I think I gave you examples of the types of information, some types of information that are obviously widely disseminated and publically available, to the extent that they would be incorporated rapidly into the market price.
I think I've given you examples of types of information that at least in certain circumstances clearly weren't rapidly reflected in the market price, even though they were technically publically available.
I'm saying there's a gray area

in between that for which there's not a bright line test.

BY MS. COSTLEY:

Q. So, your judgment of whether something is widely available or not is based on whether or not it is immediately incorporated into the stock price?

MR. D'ANCONA: Objection to the form.

THE WITNESS: No. That has it backwards.

BY MS. COSTLEY:

Q. That's what I thought, too.

A. No. What I'm saying is is it sufficiently widely available that it's clear that it would be rapidly incorporated into the market price? That's a question or that's -- that's an implication of an efficient market is that anything that's widely disseminated in a public way would be rapidly incorporated into the market price.

And my report is designed to test whether that's true, at least with respect to earnings announcements and

information that's clearly widely available.

You're now asking me how I define -- how I would assess whether something is widely available and whether it's subject to that opinion, that it would be rapidly incorporated.

That's where I'm saying there's a gray area around what is sufficiently widely disseminated for it to be incorporated into the market price.

Q. When you talk about this gray area, this is not something that's in the academic literature, the treatises. This is something you're testifying about today?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Well, no. I think there's not a great area when it comes to information that is obviously publically available and widely disseminated.

And I think there's distinctions in the literature drawn between things that are obviously publically available and not necessarily obviously publically available.

That's not something -- and then what I'm saying, and it's my opinion at least, is that when you do have something that's not obviously widely available and publically disseminated, then you're confronted with a question. You know, is this sufficiently available to be subject to the logic of the efficient market that it would be incorporated in the market price.

I'm saying there are circumstances where that's not an obvious answer and that there might be certain specific circumstances that need to be evaluated and taken into account to evaluate that question.

Q. Okay. So, if information is available to let's say most investors, you would agree that information is widely available; correct?

A. If you could literally demonstrate that it was available to a majority of investors or that a majority of investors -- see, one of the assumptions of the efficient market hypothesis is that

information is costless. In the real world, obviously it's not. But if you're talking about information that a majority of investors could access in a costless way, in terms of it's on internet or on the SEC's website, then yes, I would think that would be considered widely disseminated public information.

Q. Okay. And if it was information that a majority of investors could access but it was behind a pay wall, let's say a New York Times article, would that be something that you would expect to be incorporated into the stock price in an efficient market?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I think that could depend on the circumstances. I mean obviously the New York Times is something that many, many people have access to and so I think generally, at least among financial economists, it would be hard to argue that things in the New York Times aren't widely disseminated and publically available.

There's just so many people with subscriptions to that.

Other services that are behind a pay wall, I think it would -- it could depend on the circumstances. I just don't -- I don't think I can offer a blanket opinion about that.

BY MS. COSTLEY:

Q. Okay. So, what if information was published in an analyst report? Analyst reports are behind a pay wall typically; aren't they?

MR. D'ANCONA: Objection to form.

THE WITNESS: Some are, some aren't and some are much more widely disseminated than others.

BY MS. COSTLEY:

Q. Is it your testimony today that information released in an analyst report would not in all cases be incorporated into the stock price of a stock traded in an efficient market?

MR. D'ANCONA: Objection to the

form. Assumes facts.

THE WITNESS: Again, I think it would depend -- could, in theory, depend on how widely disseminated the analyst report is.

I could imagine circumstances where very few people access a particular report where there would at least be a gray area or question about the extent to which it would be incorporated in the market price.

If you're talking about analyst reports issued by some of the major banks that are seen over and over again and clearly have wide subscription to, I think that's less of a question and those analyst reports are -- would be considered widely disseminated and incorporated quickly.

So I think in theory, it could depend. I think I've answered the question the best I can.

Q. Okay. So, I wanted to drill down on your threshold for when -- what degree or -- let me withdraw that.

I want to drill down on your

definition of how many investors or what percentage of investors would have to see a statement for it to be incorporated into the stock price of a stock traded in a -- in an efficient market.

I think you said if it's more than 50 percent, more than 50 percent of investors have seen something, then you would expect that to be incorporated into the stock price. Is that correct?

MR. D'ANCONA: Objection to the form. Misstates prior testimony.

THE WITNESS: I don't think I said it exactly that way, but I think that the way you're phrasing it now that if you could demonstrate that at least half of the -- half of investors saw a particular statement or accessed a particular statement, then yes, I believe that would be rapidly incorporated in the market price.

BY MS. COSTLEY:

Q. What about if 25 percent of investors saw information would that be rapidly incorporated into the stock price of

a stock traded in an efficient market?

MR. D'ANCONA: Objection to form.

THE WITNESS: That's not something I think I've ever formally seen tested, but I think -- I think the logic is clearly that if a substantial number of investors have access to the information, that it would rapidly be incorporated into the market price.

What substantial means, again, I think depends on, you know, could depend on the specific facts and circumstances. Again, I don't have a particular threshold. I don't think there's a particular threshold that the literature talks about.

So, I think these are unique questions and unique circumstances about whether specific information might be considered widely disseminated or not.

Q. Okay. If information is available to market makers, would that be sufficient for you to expect it to be incorporated into the price of a stock that

trades in an efficient market?

MR. D'ANCONA: Objection to form.

THE WITNESS: I don't know that I've seen anything that would allow me to make a blanket statement about that.

So, it's something, again, it would depend, it could depend on the specific circumstance. I don't know that I could make a broad statement about that.

BY MS. COSTLEY:

Q. Let me ask you a hypothetical.

If information was not seen by 99 percent of investors, but it was seen by a company's market makers, would you expect that information to be incorporated in the stock price of a stock traded in an efficient market?

MR. D'ANCONA: Objection. Form.

THE WITNESS: That's not a circumstance I've ever seen or come across and I don't think I'm prepared to speculate about what the answer to that would be. I just don't know.

BY MS. COSTLEY:

Q. Okay. But you are familiar with the definition of an efficient market that's used in Basic; correct?

A. Yes.

MR. D'ANCONA: Christina, we've been going about an hour. Is this a good time for a break?

MS. COSTLEY: Yeah, we can break now.

MR. D'ANCONA: Thanks.

THE VIDEOGRAPHER: Going off the record. 10:44.

\- - -

(Whereupon, there was a recess.)

\- - -

THE VIDEOGRAPHER: We're on the record. 11:03.

BY MS. COSTLEY:

Q. So, before the break we were talking about your definition of what widely disseminated means; correct?

A. I think we were talking about what, in my view, widely disseminated means,

yes.

Q. And let me go back to that line of questioning.

If information was available to let's say only one percent of investors but that one percent of investors included a company's analyst, would you say that the information had been widely disseminated?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I'm not sure I heard exactly. You're saying -- I'm not sure I completely heard your question right.

Were you saying one person?

BY MS. COSTLEY:

Q. One percent.

A. Oh, one percent. Okay. Do you mind reasking the question? I wasn't picking up on exactly what she was saying there. Can you reask the question?

\- - -

(Whereupon, the following portion of the record was read by the court reporter:

"QUESTION: If information was available to let's say only one percent of investors but that one percent of investors included a company's analyst, would you say that the information had been widely disseminated?")

\- - -

MR. D'ANCONA: Objection to the form.

THE WITNESS: In your question when you say analyst, do you mean that it's like a securities analyst that issues reports?

BY MS. COSTLEY:

Q. Yes.

A. I'm trying to understand what you mean by analyst.

Q. That's exactly what I mean by analyst.

A. Again, if that analyst then wrote a report that clearly made that information publically available in a widely disseminated report, I think the answer to that would be pretty obvious.

If they didn't do that, then again, I think you would -- I don't know that I could speculate about, in all circumstances, what my view would be on that.

I think it would depend on the facts and circumstances and what other evidence may or may not be available of the extent to which the market appreciated the information.

I'm not going to speculate about that.

Q. And you testified earlier that some analyst reports may not be widely disseminated. Is that correct?

A. I said it's possible.

Yes, there are times where a specific piece of analysis is available only to a small number of people. I've seen or at least I recall instances of that.

But I -- so, it's theoretically possible, yes.

Q. Can I direct your attention to Exhibit 4 of your report? Exhibit 4 lists the names of 30 analysts; is that correct?

A. Or firms that issue analyst reports.
Q. And conclude --
A. I'm sorry. Let me finish my answer.
There's also -- I list as specific analyst named something like Seeking Alpha as well, which is really a third -- a site where multiple analysts can post things.
So it's not really -- each one of these isn't an individual person necessarily, but it's a source of a report.
Q. And you concluded that there were a total of 478 reports issued by these 30 entities during the class period; correct?
A. Yes. Yeah. At least that's what's was available to me. Again, as I make the point in the report, it's conceivably possible there are other reports that were not available to me, both by these entities and potentially other entities, but there's at least 478 reports out there that I identify.
Q. And did you do any sort of

analysis to determine whether any of these 478 reports were widely disseminated?

A. I didn't do any additional research about any individual one. There are clearly names on here that I recognize that in my experience are widely available, in the sense that I've seen the reports, I've seen them referenced by the news media.

So, for example, Canaccord Genuity, Cowen, J.P. Morgan, Baird, Wells Fargo, Raymond James, these are firms that issue analyst reports that I've seen examples of these reports in many different cases and I've seen many examples of the general media or financial economic sources like Bloomberg reporting on their reports and what they say frequently.

So, I'm confident at least in a substantial number of these that they were widely available.

But I did not do my own investigation with respect to every single report on here, no.

Q. And you used the phrase widely

available. Do you use the phrase widely available as a synonym for widely disseminated?

A. Yes. I'm not drawing a distinction between those two terms.

Q. So, you would assume, without conducting any further analysis, that analyst reports issued by the entities that you just mentioned in your last question, that all of those reports were publically -- were widely available?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Unless I had some reason to believe otherwise. It's just been my experience in doing these sorts of analyses over 20 years that those -- that the reports issued by those funds are generally widely disseminated and publically available and reported on by the media. So unless I had some other evidence to suggest otherwise, yes.

But again, it's -- if there was some reason to question it about one of them,

you know, that's something I would have to consider.

But generally speaking, I view those as widely disseminated, because I've seen evidence of them being widely disseminated in numerous other cases.

BY MS. COSTLEY:

Q. And for the entities that are listed on Exhibit 4 that you didn't mention, will you have to perform some sort of analysis before concluding that the reports issued by those entities were widely available?

A. Not all of them.

I mean I tried to give you a couple obvious examples. Some of these I've seen as well. Others I've seen less often and before giving a specific opinion about one of them, I might want to do a little more work.

But there's certainly others on this list that I've seen many examples of that I think are obviously widely publically available.

Q. Is Seeking Alpha a source you'd want to do more research about whether their reports were widely available?

A. No. These are generally available. And I think is a source of information that is regularly cited to in the public arena.

Q. You testified earlier that you previously acted as an expert in a case that involved pamphlets. Is that correct?

A. That was one source of information that an opposing expert was alleging contained information that in an efficient market would have been considered by investors and priced into the stock and I disagreed with that.

Q. What case was that?

A. I believe it was the Tivity case. I'm not 100 percent sure, though.

Q. And in that case, were the defendants claiming that the information in the pamphlets was corrective?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Between the opposing expert and what defendants were claiming, they were claiming there were a number of different sources, the pamphlets was just one by which theoretically an investor could have learned information that was alleged to have been concealed until a corrective disclosure.

I think that's the best way I can describe it.

BY MS. COSTLEY:

Q. And if there had been -- I'm going to ask this as a hypothetical not tethered to that case. If an investor had seen the information in the pamphlets before that information was repeated in a format that you view as being widely available or widely disseminated, would you agree that that individual would have had an advantage trading in the company's stock?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Again, in a hypothetical scenario, not tied to that

particular case, I think it would depend on what the nature of the information was and it's import.

So, I don't think I could speculate about the degree to which or whether somebody would have some important advantage over the -- over in trading the stock.

BY MS. COSTLEY:

Q. Would they have had any advantage in trading the stock?

MR. D'ANCONA: Objection.

THE WITNESS: Potentially. I mean any time an investor, a private investor has some information themselves that's not generally available to the public, that has some value relevance to the firm, theoretically they could have an advantage in trading a stock, yes. I mean that's theoretically possible.

Whether that occurred in any particular circumstance is something that would have to be investigated. It's theoretically possible.

BY MS. COSTLEY:
Q. So, I sort of skipped ahead in my outline.
I did want to go back to a question I probably should have asked at the beginning.
And are you using the semi-strong form of efficiency for your testimony in this case when you talk about efficiency, you're talking about a semi-strong efficiency?
A. In terms of the opinion that I giving when I say in my opinion the market is efficient, yes, I'm talking about that the market was semi-strong efficient.
Q. And in your report, you wrote that semi-strong efficiency implies that all publically available information is reflected in the securities current market price and that the security price adjusts to new publically available information rapidly and in an unbiased fashion; correct?
I think that's in your report at Paragraph 19.

MR. D'ANCONA: Objection to form.

THE WITNESS: I don't know if you read the words exactly right, but it sounds right, yes.

BY MS. COSTLEY:

Q. So, you would agree that in an efficient market -- let me strike that.

I just want to be clear today. When I'm using the term efficient market, I understand that to mean semi-strong for efficiency. Is that how you understand what you understand the term efficient market to mean today?

A. Yes.

Q. So, if -- in an efficient market, you would not expect the repetition of previously-reported information to affect the stock price; correct?

MR. D'ANCONA: Objection to form.

THE WITNESS: Unless there was a change in context somehow. I think it's important to consider, you know, just because

the words are repeated, possibly doesn't necessarily mean there isn't some new context that now makes that new information; in other words, if the company makes a statement and then the world changes in some important way and then they make the same statement after that, and that becomes a new context, then that could in theory be new value relevant information. Something had to change.

But if we're talking about, you know, in the same context, using the, you know, conveying the exact same information where investors aren't expecting it to have changed, then typically you wouldn't expect it to move the stock price in an efficient market. And in an efficient market, news is typically incorporated in the stock price in a very short period of time; isn't that true?

MR. D'ANCONA: Objection to form.

THE WITNESS: I think I used the term rapidly when I define market efficiency and by rapidly, I mean within one day or a small number of days is the definition of

rapidly I have in mind when I make that statement.

BY MS. COSTLEY:

Q. And in this case, your event study used daily returns; correct?

A. That was the bases of my cause and effect was to use daily returns.

You can look at -- there are certain times you want to look at other length event windows, but in this particular case, for the purpose I'm using it for yes, I used daily returns.

Q. Is it your view that Natera's stock price incorporates news within a day?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That's the test I'm using for valuating cause and effect.

It's not necessarily the case that in all circumstances new information would be incorporated within one day.

So, in other words, in a specific information disclosure that we're being evaluated, there might be other

analyses that would suggest looking at either shorter or longer event windows than that to test the impact.

But for purposes of the cause and effect test I perform for evaluating market efficiency, I use one day as the benchmark.

MS. COSTLEY: This will be Exhibit 3.

\- - -

(Whereupon, Deposition Exhibit 3, Capitol Forum document - Natera Company Uses Third-Party Nonprofit to Increase Likelihood of Insurance Reimbursement; Nonprofit Has Limited Paper Trail, Close Connections With Natera dated July 1st, 2020, was marked for identification.)

\- - -

BY MS. COSTLEY:

Q. I'm showing you a document that's been marked as Exhibit 3. The title is Natera Company Uses Third-Party Nonprofit to Increase Likelihood of Insurance Reimbursement; Nonprofit Has Limited Paper

Trail, Close Connections With Natera. This document is dated July 1st, 2020 and it is published by an entity called Capitol Forum.

Have you reviewed this document previously?

A. I don't believe I have, no.

Q. Are you familiar with Capitol Forum?

A. I've heard of them before. I'm not intimately familiar with them. I don't know that much about them, but I have heard of them before.

Q. And what is your understanding of what kind of entity Capitol Forum is?

A. It's a firm that produces research about publically-traded companies. Whether it does other things, I don't know. But that's the context I've seen them in before.

MS. COSTLEY: Off the record.

THE VIDEOGRAPHER: 11:20.

\- - -

(Whereupon, there was a brief recess.)

- - -

THE VIDEOGRAPHER: We're back on the record. 11:21.

- - -

(Whereupon, Deposition Exhibit 4, Capitol Forum document - Natera: Charity Apparently Established to Process Insurance Prior Authorizations Has Close Ties to Former Senior Vice-President of Natera dated December 14, 2020, was marked for identification.)

- - -

BY MS. COSTLEY:

Q. I'm showing you a document marked four. Natera: Charity Apparently Established to Process Insurance Prior Authorizations Has Close Ties to Former Senior Vice-President of Natera. It's dated December 14th, 2020 and this article is also published by the Capitol Forum.

Have you previously reviewed this document?

A. I don't believe so.

Q. When you were preparing your

report, did you do any sort of search to see if the information that was reported in the Hindenburg report had previously been reported to the market?

A. No. I was not being asked any questions to which that would be a relevant thing for me to look at, no.

Q. Okay. So that would not be relevant to your determination about whether the market reaction that occurred following release of the Hindenburg report was a market reaction to new information?

MR. D'ANCONA: Objection to the form. Misstates testimony.

THE WITNESS: Yeah, I'm not giving an opinion about whether or to what degree the market reacted to the Hindenburg report. That's not part of what I was asked to do.

BY MS. COSTLEY:

Q. Okay. So do you have any opinion about whether the Hindenburg report was a corrective disclosure?

A. I don't. That's not been a

question I've been asked to evaluate. I understand that's what plaintiffs allege and I understand why they allege it, but I have not independently been asked to form that opinion and I haven't done the analysis that would be necessary to form that opinion.

Q. Okay. Let me ask you then just hypothetically, what if before publication of the Hindenburg report an investor read in a report published by Capitol Forum that all of the same information that was in the Hindenburg report? Would that investor have been able to earn an excess return by trading on the information reported in this report?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I just want to make sure I understand your hypothetical.

You're saying if an investor knew all, I think is the word you used, so every piece of information that was in the Hindenburg report by reading that information in a prior report, would they have the ability to earn excess return? I don't know.

It's not something I've considered and I would have a lot more questions about -- that I would want to evaluate before trying to answer that question.

BY MS. COSTLEY:

Q. Okay. Would the out-of-pocket methodology that you use in your report, would that methodology apply to that investor if he purchased stock during the class period but with knowledge of everything reported in the Hindenburg report?

MR. D'ANCONA: Objection to the form.

THE WITNESS: From the point of view of whether it's measuring the economic loss that they suffered as a result of their purchase based on the other assumptions and assuming liability and other things, yes. It wouldn't change whether or not they paid and inflated price or the degree to which the stock price was inflated or the amount of loss they suffered upon the corrective disclosure. All of those things are true class wide for each investor. It has nothing

to do with what knowledge that particular
investor may or may not have had.
BY MS. COSTLEY:
Q. So, that information is true as
to -- would you say that an insider who had
insider information would be damaged in the
same amount as an ordinary shareholder upon
release of a corrective disclosure? I'm
speaking hypothetically here.
MR. D'ANCONA: Objection to the
form.
THE WITNESS: I think from a
purely economic point of view, if they had a
relevant class period purchase that they
purchased at an inflated price and held
through the corrective disclosure, they would
have suffered the same economic loss as a
result of the misstatements and then the
correction of the misstatements in that
circumstance.
Whether they could actually
legally recover for other reasons is a
separate question.
BY MS. COSTLEY:

Q. It would be hard to say that somebody was relying on the market price of a stock when they had knowledge that was contrary to the market price; right?

MR. D'ANCONA: Objection. Calls for a legal conclusion.

THE WITNESS: Well, yeah, I think you're drawing a lot of connections there that your hypothetical isn't really addressing, in terms of what information they knew and when and why they would or wouldn't be legally able to have a claim.

But in terms of whether the out-of-pocket methodology properly measures the price impact or the economic loss they suffered as a result of the inflation that was in the price, I don't -- I think that that's still valid.

If there are other reasons, they would not be entitled to a claim, those -- you know, I'm not addressing those legal reasons.

Q. Do you recall in your report talking about an individual's ability to earn

an excess return by trading on information not reflected in the stock price?

A. I think I probably made -- if memory serves, I made a reference to something like that in the auto correlation section of my report.

Let me go to that because I think that's what you're referring to.

Yeah. Paragraph 76 of my report, when I'm talking about autocorrelation, I say autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means the past price movements are not fully reflected in the current price, which would suggest market efficiency.

Is that the language you're referring to or are you referring to different language?

Q. I'm referring to that language amongst others, yes.

So is it your testimony now that

a trader would not profit from taking advantage of information that was not available publically?

MR. D'ANCONA: Objection to form.

THE WITNESS: Your question is confusing to me. I think there might have been a double negative in there.

BY MS. COSTLEY:

Q. There was definitely a double negative. There was definitely a double negative. I'll come back to this.

You say in Paragraph 49 of your report that, For purposes of an event study, sources of new information may include, for example, company press releases, earnings reports, SEC filings and news reports or analyst reports.

MR. D'ANCONA: Did you say 29?

MS. COSTLEY: 49.

THE WITNESS: Yeah, yes, I say that.

BY MS. COSTLEY:

Q. Are all of these sources widely

available?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I think company press releases would generally be widely available. That's usually the point is to put it on a widely-disseminated wire service. Earnings reports again, generally if we're talking about quarterly earnings announcements and earnings calls, yes.

SEC filings, generally yes to the extent that they are available to the EDGAR service the SEC has. I think those are clearly widely available.

News reports, again, I gave an example earlier of a unique situation where a news report wasn't obviously widely disseminated, even though it was technically publically available.

So, I think generally speaking, if you're talking about obviously widely disseminated, public press, yes, but there could be examples where it's a grayer area that would require more analysis.

And the same would apply to analyst reports. There are certain analyst reports that are clearly widely available and referenced by the news media and are generally -- that are clearly widely disseminated and then there are other examples that may not be.

Q. And when you talk about analyst reports being widely available, are you distinguishing between analyst reports that are available for purchase and analyst reports that are available at no cost?

A. That's not the only distinction I'm drawing, but that is a part of the distinction that may be relevant.

In other words, there are analyst reports issued by, for example, well-known investment banks that my understanding would not necessarily be free of charge, but that based on my understanding and experience are widely disseminated amongst investment professionals.

And then there are, I've seen examples over the years of analyst reports

that are published to a much smaller audience where it would be more of a question of whether it would be appropriate to consider it widely available or not or widely disseminated or not.

Q. If I can direct your attention to your Exhibit 4. That's the summary of securities analyst reports issued for Natera.

A. Uh-huh.

Q. You obtained these reports through a third-party data provider; correct?

A. Some of them I did; some of them I received from counsel.

Q. Did you pay for any of these reports?

A. Well, we paid for a subscription to Capital IQ. I don't recall paying for an individual analyst report, but at least I'm not aware of us doing that in this matter. Whether a member of my team may have, I don't know for -- with absolute certainty. But I don't have a specific recollection of paying for an individual report.

Q. Do you pay for CapIQ?

A. Yes.
Q. Does the fact that you pay for CapIQ affect your view as to whether or not any of the reports that you obtained through CapIQ are widely available?
MR. D'ANCONA: Objection to the form. Are you asking -- just so I'm clear, when you say do you pay for CapIQ, you're asking Mr. Coffman if he personally pays for CapIQ, or are you saying hypothetically does one need to pay for CapIQ?
MS. COSTLEY: He just testified that I believe his company pays for CapIQ; correct?
THE WITNESS: Correct. That's a better way to say it, rather than me as my company has a subscription to CapIQ.
BY MS. COSTLEY:
Q. Does the fact that -- and you pay for a subscription to CapIQ so you can access analyst reports through it; correct?
A. That's one of the reasons, yes.
Q. And does the fact that you pay for a subscription to access these reports

affect your view of whether or not these reports are widely disseminated?

A. No. Because again, I think there's a couple relevant steps in what you're asking that are -- that are sort of being left unsaid, which is CapIQ maintains a historical database of analyst reports. The relevant question, I think you're asking for purposes of this case and for market efficiency, is whether they are widely disseminated at the time and rapidly incorporated in the market price at the time. That may -- that's a separate question.

So, the fact that my company pays for CapIQ does not affect my opinion one way or the other about whether these were widely disseminated to the market at the time.

Q. So, if the reports were free, why do you pay for CapIQ?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Well, CapIQ offers a number of different services, bundled

services. Access to analyst reports is just one of them.

And it provides an efficient way to collect and understand what analyst reports are out there and available beyond just access to those reports individually.

Q. Did you go through the reports listed on Exhibit 4 to determine which of these reports are available on a paid basis and which are available on a free basis?

A. I did not assess that for each report, no.

Q. Have you ever performed an assessment like that in any case in which you provided testimony?

A. I don't recall having done that specific thing, no.

Q. Isn't that the type of analysis you would do if it were important to determine whether or not an analyst report would be expected to effect the price of a stock in an efficient market?

MR. D'ANCONA: Objection to form.

THE WITNESS: It could be a relevant question for a particular analyst report at a particular time, given the particular information that was being discussed.

I would say that sort of analysis isn't generally necessary for every analyst report and certainly not for the purpose I'm looking at analyst reports here, which was for the purposes of assessing market efficiency and the factor of whether there was substantial analyst coverage of the company. That's all I was analyzing it for in this circumstance.

Whether doing a detailed analysis of how the cost of obtaining an analyst report may or may not be relevant to whether it was widely disseminated or not, it theoretically could be a relevant question, but I don't recall investigating that specific thing in another case.

BY MS. COSTLEY:

Q. And you say in Paragraph 35 of your report that reports serve the purpose of

disseminating Natera-specific information along with commentary, news, updates, analyses and recommendations of the analyst to investors. Is that correct?

A. I say that and some of them do all of those things, some of them do a subset of those things but that's -- I think the academic literature recognizes that broadly speaking analyst reports do serve those functions.

Q. You would generally agree that securities analyst play an important role of providing information about a company to investors?

MR. D'ANCONA: Object to the form.

THE WITNESS: I think the academic literature is consistent with them having the capability to do that and certainly empirically in certain circumstances has demonstrated that that's the case.

I think that is generally true, but if you're talking about a specific

circumstance or a specific piece of information or a specific question then, you know, that would require more detailed analysis.

But generally speaking, analysts perform an important function of analysis and information dissemination, yes.

Q. And is it your understanding that analysts typically expend time and resources to identify relevant information and then provide analyses and recommendations based on that to investors?

MR. D'ANCONA: Objection to the form.

THE WITNESS: There are many analysts that serve that role, yes.

Some less so, but there are certainly examples of analysts that perform that role.

BY MS. COSTLEY:

Q. You would agree that a typical investor, an individual investor, may not spend the same amount of time or resources; correct?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Compared to what? I just want to make sure I understand your question.

BY MS. COSTLEY:

Q. Compared to an analyst.

MR. D'ANCONA: Objection to the form.

THE WITNESS: I think it depends on the investor, but I'm sure you could come up with examples of analysts that spend much more time with respect to the information about a company than certain individual investors.

But I think that can -- that could certainly vary across investors.

BY MS. COSTLEY:

Q. Would you agree that that's typically true?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know that I have a basis to say it's typically true.

I would say that, you know, analysts are generally expected to be well informed about a company. Many investors are well informed about a company as well; some less so.

So, I think it varies. I think it's fair to say analysts are generally expected to be well informed about a company.

Q. And if information is available to analysts, even if it's not reviewed by an individual investor, you would agree that that information is widely available, would you not?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I guess I'm a little confused by your question. I want to clarify it.

You're saying if there's information that an analyst has, that that implies the information is widely available?

Q. No. I'm asking you if under your understanding of economics and how stock traded in an efficient market performs, if

you would expect information known to analysts to be incorporated into the stock price?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I think that could depend on whether or not they then disseminate that particular information.

I mean just because an analyst knows something doesn't necessarily imply that that information is then widely disseminated, unless they are reporting on it in their reports.

BY MS. COSTLEY:

Q. So, what are some circumstances in which an analyst would not report on material information about a stock in that report?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know. It's -- I would be speculating to know under what circumstances that could occur.

It's not impossible, but I would

be speculating. I don't know.

BY MS. COSTLEY:

Q. Would you agree that information in an analyst report would generally be incorporated into the stock price of a stock traded in an efficient market?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Could I have that reread, please?

- - -

(Whereupon, the following portion of the record was read by the court reporter:

"QUESTION: Would you agree that information in an analyst report would generally be incorporated into the stock price of a stock traded in an efficient market?")

- - -

THE WITNESS: To the extent that analyst report was widely disseminated, that -- my view is that at least the analyst views or opinions or their reporting would be

incorporated into the public -- the market price rapidly.

Any individual analyst view may just be that individual analyst view, though. I'm not saying that if they give a view, the fact that their opinion is out there and widely disseminated would be incorporated into the market price.

It doesn't necessarily mean that the market as a whole accepts their view and, therefore, you can assume that whatever the subject matter of that opinion is fully incorporated in the market price.

But certainly that their view is out there and published would be incorporated if it's widely disseminated, yes.

BY MS. COSTLEY:

Q. Are you familiar with the term investment research report? I think it's a term you use in your report. That's why I asked.

A. Investment research report?

Q. Yes.

A. If it's in my report, could you

point me to it? Because again, I don't recall using that term off the top of my head.

And I think that could mean multiple things.

Q. Would you describe the Hindenburg report as an investment research report? Would you describe it as an analyst report?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I think it could be described as an analyst report. I think it could be described as a research report fairly.

This term investment research report, I don't think has a technical meaning that I'm -- that I'm thinking of.

So, I -- but it's an investment -- it's a research report about a publically-traded company disseminated with, my understanding, is an intended audience to be investors. That, I can say.

BY MS. COSTLEY:

Q. Let's turn to your discussion in your event study.

You state in Paragraph 48 of your report that an event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.

And is that correct?

A. I say that, yes.

Q. You also state in Paragraph 49 that the event to be performed by Natera is a clear cause and effect relationship between new public information about Natera and the market price of Natera common stock.

A. I'm sorry. What paragraph are you reading from? I just want to make sure I'm following along.

MS. COSTLEY: 49.

MR. D'ANCONA: 49?

THE WITNESS: I don't see the language you're describing in 49. That's why I was struggling.

BY MS. COSTLEY:

Q. Let me withdraw the question

then.

So, I asked you about Paragraph 48. And the fact that you said in your report that an event study is A well-accepted statistical method utilized to impact -- utilized to isolate the impact of information on market prices.

And you said that's what it says in your report.

Do you disagree with that?

A. No. That's an opinion, I mean that's a view I hold, yes, that's true.

Q. And your event study does not measure the stock price impact of new information not publically released on a specific date; correct?

A. I don't know what you mean by new information not publically released.

Q. Well, okay. Let's -- let me put it like this: If there was let's say an omission alleged on this specific day in connection with a statement, a statement allegedly misleading by omission, your event study would not measure the effect of that

omission; correct?

A. On the date of the omission itself?

Q. Yes.

MR. D'ANCONA: Objection to the form.

THE WITNESS: I would say generally speaking, in most circumstances, that's right. You could imagine a situation where the market was expecting the company to say something and the fact that it didn't and it omitted that fact may have some impact on the price. So you could construct a hypothetical that's different than that, but generally speaking when people talk about omissions or thinking about omissions, they are talking about things that the company have said, but didn't and, therefore, the market price isn't reacting on that information. That's consistent generally with my understanding, yes.

BY MS. COSTLEY:

Q. Would you agree that the abnormal return on a given day from an event

study analysis cannot reliably disentangle the act of one specific piece of information when there are multiple pieces of information disclosed simultaneously on the same day?

A. Well, the event study analysis itself that identifies the abnormal return and tests whether or not the abnormal return is statistically significant or not, that by itself can't distinguish between individual pieces of information, the impact of individual pieces of information that are released simultaneously.

There are other analyses that, you know, sometimes are discussed under the umbrella of the quote, unquote, event study that may be able to do that, but the formal event study where you're looking at the abnormal return and testing whether it's significant or not, by itself, cannot isolate the impact of multiple pieces of information occurring at the same time.

Q. And in your event study in this case, did you attempt to isolate the impact of any specific piece of information?

A. That was not necessary for the opinions I'm providing at this time. So, no, I did not do that.

Q. Then you say in Paragraph 49 in your report that, For purposes of an event study, sources of new information may include, for example, company press releases, earnings releases, SEC filings and news reports or analyst reports.

Is that correct?

A. I think you said earnings releases instead of earnings reports, but otherwise, yes, that's a statement I made.

Q. Did you test whether Natera's stock price responded to company press releases or SEC filings beyond those that are listed in your Exhibit 7?

A. No.

Q. Did you test whether Natera's stock price responded to news reports or analyst reports?

A. Not specifically. On the dates of the earnings announcements that are listed in Exhibit 7, there were also numerous news

reports and analyst reports issued the same day. So, indirectly the effect of those might be incorporated into the test I'm performing, but I didn't seek to independently evaluate whether those sources caused changes in Natera's stock price.

Q. And the reasons you can't tell whether those reports that came out on the same day as the earnings releases are reflected in the stock price or not is because you haven't attempted to disentangle the source of the stock price increase from other sources of information; correct?

MR. D'ANCONA: Objection to the form.

THE WITNESS: There's a couple of different ideas in there that I want to be careful about.

So, I didn't attempt to evaluate whether there's empirical evidence that the market price, in fact, responded or didn't respond specifically to news reports or analyst reports issued on the same day as earnings announcements.

I'm looking at the entire price movement on that day as a whole and not trying to disentangle between those things.

Once -- as a result of the results of my cause and effect test and all the other analyses, I've concluded the market for Natera was efficient during this period and so it is my opinion that for the widely disseminated information on those days, including news reports and analyst reports, that the market price would reflect what's in those reports.

So that there is a subtle distinction there, but I think an important one.

BY MS. COSTLEY:

Q. Is that true for every trading day, not just the trading days in your event analysis; correct?

A. Correct.

MR. D'ANCONA: Objection to the form.

THE WITNESS: My opinion applies to the entirety of the class period, not just

the days on which the earnings announcements occur.

I mean to be clear, my test involves more than just the earnings dates. It involves the earnings dates which are the treatment group and it involves the no news days which are the control group and a comparison between those and a statistical test between those two groups.

So and I'm using that test along with the other efficiency factors to reach the opinion that the market was semi-strong efficient throughout the class period on all days of the class period; not just the earnings announcement days.

BY MS. COSTLEY:

Q. Why didn't you test any of the other news events that may contain new information? Why didn't you use them in your event study?

MR. D'ANCONA: Objection to the form.

THE WITNESS: It wasn't necessary to. I think the tests I've

designed to look for cause and effect is sufficient and provides the scientific evidence needed to show cause and effect.

I didn't see a need to go beyond that.

BY MS. COSTLEY:

Q. And in Exhibit 7 you analyzed earnings announcement and preannouncements that Natera issued during the class period; correct?

A. Yes.

Q. And you state in Paragraph 68 that, It's not unusual to observe many earnings announcements that are not statistically significant. This happens, for instance, in quarters where there was insufficient surprise and/or the firm roughly met expectations, if the firm offered little change in guidance and/or if there was a mix of both positive and negative information. Correct?

MR. D'ANCONA: Objection. That's not what Paragraph 68 said.

THE WITNESS: Footnote 68.

MS. COSTLEY: Yeah. I'm sorry. I believe Footnote 68.

THE WITNESS: I believe you read correctly what's in Footnote 68, yes.

BY MS. COSTLEY:

Q. Generally speaking, would you agree it's common for earnings announcements to include a mix of information?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Could I have that read back, please?

- - -

(Whereupon, the following portion of the record was read by the court reporter:

"QUESTION: Generally speaking, would you agree it's common for earnings announcements to include a mix of information?")

- - -

THE WITNESS: That is common, yes.

BY MS. COSTLEY:

Q. And some might be positive news and some might be negative; correct?

A. Yes, there is often a mix of positive and negative news in earnings announcements.

Q. And often there are several different pieces of positive or negative information; correct?

A. That often occurs, yes.

Q. So in other words, you would agree that multiple companies' specific factors can impact a stock price on any given day; correct?

A. That's certainly possible, yes. It can happen and does happen.

Q. Did you assess the direction of the news, in other words, the expected impact for each of the announcement days analyzed in Exhibit 7?

A. I evaluated whether the price movement I observed was in obvious conflict with the nature of the news that was disclosed.

So, I -- for each of the

earnings announcements, I evaluated what was being disclosed, how the analysts were interpreting what was new and important information and whether it was positive or negative or some mix and I didn't see any example of the price movement being an obvious conflict with how the analysts were describing what the new information was and how it impacted their view of the company.

Q. Did you document that analysis?

A. Not in a formal way, no.

Q. Then how do you know that the statistically significant price changes are consistent with the price responses that would be expected in an efficient market?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Well, I think in the cases where there was a statistically significant price movement, there was clearly new information that was directionally consistent with the movement in the price.

So for example, on a day where there was a positive statistically

significant movement, it was easy to identify important value relevant positive information that was conveyed to the market.

BY MS. COSTLEY:

Q. So as a hypothetical, imagine that a company announced that it had beat its quarterly earnings expectations by 30 percent, but their residual return was negative and statistically significant.

Would that be consistent with market efficiency?

MR. D'ANCONA: Objection to the form.

THE WITNESS: It could be if they also issue negative information, which there are many cases where companies will outperform expectations in the current quarter but offer forward-looking guidance that's much worse than expected. So in that circumstance, you could -- that would be an obvious reason to observe the sort of thing you're describing.

So, no, that fact alone doesn't allow you to conclude anything. You would

need to do a further analysis than what you're describing.

BY MS. COSTLEY:

Q. Okay. For the days in Exhibit 7 that are not associated with statistically significant abnormal returns, did you evaluate the news to check whether there was, quote, insufficient surprise and/or the firm roughly met expectations if there was little change in guidance or if there was a mix of both positive and negative information?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Again, I looked to see whether the price movement that was observed was obviously inconsistent with the nature of the information that was being reported and how analysts were describing what was new and important to them. I didn't see any example of that.

So, I didn't make an effort to identify all the reasons why that was the case, but that was part of my analysis was to perform that evaluation.

BY MS. COSTLEY:
Q. How do you know that the lack of statistically significant price movement on those dates is consistent with the finding of market efficiency?
A. Because --
MR. D'ANCONA: Objection to form.
THE WITNESS: Because in the circumstances where the price didn't move in a statistically significant way, there were clear examples of a mix of news that was positive and negative and/or, for example, I remember one -- one of the earnings announcements that was generally perceived as positive and the abnormal return was positive, but just not quite statistically significant. I didn't see, you know, anything inconsistent with market efficiency.
So I was really looking for are there, you know, is there an obvious deviation from what would be expected given the information that was being disclosed and I didn't find any example of that in these

earnings announcements or preannouncements.
BY MS. COSTLEY:
Q. So when there's a stock price reaction to multiple pieces of news, for example, when there's a misrepresentation made on the same day as other confounding news, that does not necessarily prove price effects with respect to both pieces of news; correct?
MR. D'ANCONA: Objection to the form.
THE WITNESS: I just want to make sure I understand your question. Are you saying there's -- on the same day there's a misrepresentation --
BY MS. COSTLEY:
Q. By the company.
A. By the company and other news of some kind?
Q. Yeah. Let's say they say they beat earnings expectations by 30 percent.
A. Uh-huh.
Q. And the stock price goes up. That does not necessarily prove a price

effect with respect to both pieces of information; correct?

MR. D'ANCONA: Objection to the form.

THE WITNESS: If the statements are made simultaneously and you're not able to somehow do an event study that parses out those two things by time, then there would need to be some additional analysis to evaluate the extent to which those pieces of information impacted the stock price.

BY MS. COSTLEY:

Q. So is one form of the analysis you could do to see whether let's say one of the pieces of information had already been released to the market?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That could be a relevant part of the analysis, yes.

BY MS. COSTLEY:

Q. And what other analysis would you do?

MR. D'ANCONA: Objection to the

form.

THE WITNESS: I think it would depend on the facts and circumstances and what type of information was being disclosed. So, there could be, you know, reasons to believe certain pieces of information wouldn't be particularly value relevant. There's reasons to believe some pieces of information would and there's valuation methodologies that might be relevant. There's literature that might be relevant.

So, I think disentangling the effect of multiple simultaneous pieces of information requires a very circumstance-specific analysis.

So it's hard to generalize, but there are methods that can be applied generally to try to evaluate the impact of multiple pieces of information. And that could include, from your prior question, analysis of what information the market already knew.

BY MS. COSTLEY:

Q. So, in Line 1 of your report --

in Exhibit 7, Line 1 of your events study you identify a stock price increase on February 26, 2020.

And the complaint alleges that on February 26th, 2020, Natera made an allegedly misleading statement about Panorama; correct?

A. That's consistent with my understanding, yes.

Q. And that statement that Natera allegedly made was misleading by omission; correct?

A. It's alleged to be misleading. I understand plaintiffs are alleging that it failed to disclose the types of information I described earlier. Whether -- so it's certainly omitted, allegedly omitted certain facts. I just don't want to get into the -- if there's a legal distinction between misrepresentations and omissions, I just want to be clear, I'm not drawing any of those distinctions. I want to be careful in answering your question.

My understanding is there were

allegedly omitted facts in the statement they made.

Q. The reason I'm interested in this, when you're an economist, of course, is I'm interested in whether or not you would have expected to see a stock price increase based on the omission of facts?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Again, I think it turns to a degree on what the market expected to hear. So, I don't think I can offer a broad generalization about that.

I think as we talked about earlier, generally speaking, if there's some unexpected negative information that's withheld from the market by omission, you wouldn't necessarily -- you wouldn't generally expect the price to increase as a result of -- unless there was reason for the market to be surprised by that omission in some way you wouldn't expect that to necessarily have its own independent positive impact on the price.

But the statement they are making about the profitability of a product could certainly have a positive impact on the price.

So, I think -- I don't think it's possible to just generalize about that.

BY MS. COSTLEY:

Q. So you haven't done any analysis with respect to the stock price increases that occurred on February 26th, 2020? You haven't done any sort of analysis to determine whether that increase was as a result of the allegedly misleading by omission statement or whether it was as a result of, for example, the report of fourth quarter in year 2019 financial results?

MR. D'ANCONA: Objection to the form of the question.

THE WITNESS: My analysis shows there's a statistically significant positive movement on that day. I have not attempted to attribute any particular piece of information as the cause of that or set of information as the cause of that.

I have not tried to isolate what did or did not cause that on that particular day; other than it was the earnings announcement generally.

BY MS. COSTLEY:

Q. And you would agree is that an omission wouldn't have caused that?

MR. D'ANCONA: Objection to the form. Asked and answered.

THE WITNESS: Again, I think that would require careful analysis of -- that would require a more careful analysis. I don't know. I can't offer a general answer to that because to the extent the positive statement itself had a positive impact and failed to disclose certain other things, could that be interpreted as having an impact on the price? Theoretically it could. It's not something I've analyzed. I'm not offering the opinion it did.

I am just saying I would be speculating to say that what they are alleging as an omission, you know, didn't have an impact on the price. I can't go that

far.

BY MS. COSTLEY:

Q. And so when you previously testified about how I think you were talking about unusual circumstances in which an omission could drive the price higher if the company was expecting to hear news that day? Is that an accurate summary --

MR. D'ANCONA: Let me object.

MS. COSTLEY: -- of your prior testimony?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Not about the company hearing news. It's about whether investors were expecting to hear certain things or not hear certain things.

You could -- you could devise an example where an omission could have a price impact on a particular day.

I just haven't studied this question carefully enough to offer an opinion about what may or may not have impacted the price on that day other than it was -- there

was an earnings announcement on that day and there seems to be -- there is evidence of a cause and effect relationship between those.

BY MS. COSTLEY:

Q. So let me ask with respect to your understanding of the allegations in this case.

Is the information that was allegedly omitted on February 26th, 2020 the type of information that investors would have drawn some specific impression from not hearing?

MR. D'ANCONA: Objection.

BY MS. COSTLEY:

Q. Let me withdraw it.

Is the omission that is alleged in this case with respect to the February 26th, 2020 statement is that the type of omission that you would have expected to send the stock price higher?

MR. D'ANCONA: Objection to the form of the question.

THE WITNESS: This is not a question I've studied carefully. I would be

speculating.

Generally speaking, I don't think there was an expectation of the market hearing the concealed information that plaintiffs are alleging was concealed.

But at the same time, my understanding is there were positive statements made about Panorama and that may have positively influenced the stock price on that day.

So to the extent the failure to disclose what is allegedly omitted did not mitigate the stock price increase on that day is possible.  This is just not a question I've analyzed.  I'm not offering an opinion whether that did happen or didn't happen.

I'm just saying I can't unilaterally, even based on the assumptions you're giving me and my understanding of the claim, say that there's no relevant price impact here that's totally unrelated to plaintiff's case.

I can't give you that opinion.

BY MS. COSTLEY:

Q. It would be great if you would, though.

What about the positive -- if the positive statements about Panorama, what statements do you have in mind? What are the positive statements about Panorama?

MR. D'ANCONA: Objection to the form.

THE WITNESS: My recollection is on this date there were positive statements about the growth of the Panorama product and the revenues that have been generated. I would have to go back to recall exactly the wording, but that's my general recollection.

BY MS. COSTLEY:

Q. Let's put in the complaint.

MR. D'ANCONA: Christina, I just want to let you know that lunch has been delivered. We've been going about an hour. If we could find a good breaking time, it would be --

MS. COSTLEY: This is a good breaking time.

MR. D'ANCONA: Right now?

MS. COSTLEY: Yeah, before we introduce the complaint.

THE VIDEOGRAPHER: Going off the record at 12:12.

\- - -

(Whereupon, there was a luncheon recess.)

\- - -

THE VIDEOGRAPHER: We're on the record. 12:58.

BY MS. COSTLEY:

Q. Good afternoon.

A. Good afternoon.

Q. I'm very hopeful that we're going to get this done in the next couple of hours.

You testified before the break that you have not done an analysis to attribute the abnormal return on February 26th, 2020 to any specific piece of information released that day; correct?

A. If you mean a specific piece of information within the earnings announcement or earnings call, that's correct, yes.

It's my opinion that the price clearly moved in response to the earnings announcement and information, but I haven't analyzed what part of the earnings announcement or what specific statements moved the price.

Q. And is that true for all days in your Exhibit 7?

A. Yes. I have not made any effort to attribute the price movement on any of those days to a specific piece of information.

Q. Is that true for every day in the class period?

A. Again, I just want my last answer to be sufficiently clear so it can't be misinterpreted.

Clearly my findings are consistent with the earnings announcements or earnings calls generally being the cause of the price movements on the earnings dates that are statistically significant, but I haven't, within those earnings announcements, determined what portion of the earnings

announcements are moving the price.

And on now to your most recent question, I have not made an effort to assign a causal connection between any specific piece of information and the price movement on any other day of the class period, either.

Q. And there are some days where Natera issued earnings announcements and the stock price cannot go up; correct?

A. Well, there are some days they issued earnings announcements and the price went down, yes.

Q. And does that impact your opinion about whether the market was efficient in any way?

A. Well, I think there are some of the announcements that are -- well, there's event eight is a day where the market moved negatively and in a way that was statistically significant in the 90 percent level.

I think that has -- provides some evidence of a market movement that wasn't positive and that has some influence

on my view that this was an efficient market.

Q. Why is that?

A. Well, again, within the financial economics literature and field, the 90 percent confidence interval is something that's often also addressed or used or relied upon to draw inferences.

In this case there is one event on Exhibit 7 that was negative and statistically significant at the 90 percent level. I think that provides some additional evidence of cause and effect that I haven't specifically focused on in the report. And I don't include it as a statistically significant day in my Exhibit 8, which is based on using the 95 percent confidence interval, but it provides some additional economic evidence of a cause and effect relationship between the news on that day and the price movement.

Q. Did you evaluate the news on July 19th, 2021 to see if it was the type of news that you would expect to move the stock in a positive direction or in a negative

direction?

A. I reviewed the information to evaluate whether a negative statistically significant stock price reaction is something that would be inconsistent with principles of market efficiency and it was not.

It was consistent with -- there was certainly new value relevant negative information that was part of that earnings announcement.

Q. And what was that new value relevant information?

A. I don't remember the exact specifics as I sit here.

Q. Okay. And if there had not been new negative news in that earnings announcement, would the fact that the stock price declined on that date have affected your market efficiency analysis?

MR. D'ANCONA: Objection to the form.

THE WITNESS: It might have. It wouldn't have affected, I don't think that alone would have affected my conclusion that

the market was efficient. It's something that I would have investigated more fully, like was there other negative information that day.

You know, sometimes, you know, it's not unusual to see an event be statistically significant by, for random reasons once in a while. You expect to see that five percent of the time, in fact.

So, one event like that would not, certainly not change my conclusion, but it's something I would have evaluated further and noted and taken into account.

Q. Okay. You say in Paragraph 51 of your report you performed an event study analysis to evaluate the relationship between Natera common stock's daily returns, the percentage change in price controlling for the S&P 500 total returns (the market index) and an industry index.

How did you choose your industry index?

A. Well, the first thing I noted that is in Natera SEC filings, they compare

their own performance to the NASDAQ biotech index. So, that was one thing.

Second, there have been a number of reports, market efficiency analyses and other types of analyses I've performed involving this industry where I've relied upon the NASDAQ biotechnology index as a relevant industry index. So I'm familiar with that index and for consistency, between the company, referring to it as what they compare themselves against and my personal experience of having used that index in a number of cases, both in terms of being consistent and appropriately reflecting their industry, I thought that was a reasonable index to use.

Q. Is it the only industry index that you considered?

A. I believe so. I don't recall testing another index.

Q. Do you know what Natera's business model is?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I describe the company in the early part of my report and I generally understand that their business model is to try to earn profits by selling access to biological tests.

BY MS. COSTLEY:

Q. Do you know if there are any other companies that provide genetic testing and diagnostics?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I think there are other companies involved in that business, yes.

BY MS. COSTLEY:

Q. Did you include those companies in this index?

A. I didn't make an effort to isolate down to those particular companies, no.

Q. Do you know if they are included in the index that you did select?

A. Not as I sit here right now, no.

Q. And how did you choose your

market index, the S&P 500 total return index?
A. That's an index I consistently use as a broad market index to reflect general movements in the stock market.
Q. Is that the only market index that you considered?
A. Yes.
Q. And in Footnote 58 and in your testimony about three questions back, you stated that the industry index you used is what Natera compares itself to in the 10Ks; correct?
A. Yes.
Q. Do you know what market index the company compares itself to?
MR. D'ANCONA: Objection to the form.
THE WITNESS: I saw that, but I don't recall what it was at the time as I sit here right now.
BY MS. COSTLEY:
Q. Does the NASDAQ composite index sound correct?
MR. D'ANCONA: Objection.

THE WITNESS: It could be, yes.
BY MS. COSTLEY:
Q. It wasn't the S&P 500 total return index, though, was it?
MR. D'ANCONA: Objection to the form.
THE WITNESS: No.
BY MS. COSTLEY:
Q. Why did you use the S&P 500 total return index instead of the index that Natera compares itself to?
A. Because for the broad market index, I think it's important to look beyond the NASDAQ and the S&P 500 total return index is what I've used as a market index, a general stock market index in virtually every report I've filed.
So, it's also part of an effort to be consistent from case to case on how I'm modeling the general market index.
Q. Did you test how the results of your event study changed when you used the S&P 500 total return -- strike that.
Did you test how the results of

are event study changed when you used the NASDAQ composite index?

MR. D'ANCONA: Objection to form.

THE WITNESS: That's not something I tested, no.

BY MS. COSTLEY:

Q. Why not?

A. I didn't see that there was a need to. I selected a market index that I thought was reasonable.

Q. You state in Exhibit 7 that earnings announcements and preannouncements the alleged corrective disclosure date and one outlier have been removed from your estimation. Is that correct?

A. That sounds familiar, but let me look at the footnote just to be sure. Yes.

Q. Do you have a standard methodology that you utilize to determine which days will be excluded from your regression?

A. I consistently exclude earnings announcements and preannouncements and any

alleged corrective disclosure dates. That's something I do consistently.

I also evaluate whether there's any individual days that are exerting an outsized influence on the regression, such that it makes sense to exclude them as outliers.

Q. What is your basis for excluding that information?

A. Well, the goal of the analysis is to have a regression model that reflects how the subject security in this case, Natera, is correlated with the control indices and a measure of the volatility in the absence of firm-specific news.

And so if there are dates upon which there's obvious important firm-specific news that could impact the price, those are relevant dates to consider excluding.

And so certainly earnings announcements, as I describe in my report, are generally recognized as having important firm-specific value relevant information, at least in many cases. And those were the

events I was testing.

So, I felt it was important to exclude those and I do that consistently from report to report.

Same thing with alleged corrective disclosures. Typically, there's clear firm-specific information, whether it's corrective or not. Clearly at least an allegation of important firm-specific information being released on those days. So I think it's important to exclude and then in terms of looking for outliers, again, my process is to look for individual returns that are clearly tied to firm-specific news that are having an outsized impact on the estimation of the regression itself, such that by leaving those outliers in, you would be getting a biased result in terms of the coefficients and/or the volatility relative to what you're trying to measure.

Q. So, just so I'm clear, you look at the stock price movement first and then you decide whether or not a statement that was made on that particular day should be

excluded as an outlier; is that correct?

MR. D'ANCONA: Objection to form.

THE WITNESS: Again, for the first -- for the initial categories I described, no.

So the earnings announcements and the corrective disclosures, those are left out without respect to looking at the stock price movement.

For the outliers, it's not a matter of so much as looking at the price movement or its direction or what relevance it may have to the case. It's asking is this -- does this data point, because of it's unusual size, have an influence on the estimation of the regression parameters such that it's clearly having an outsized impact on what you're trying to measure.

And then if that day also has clear firm-specific news, then there's a justification to exclude it and a need to exclude it from the regression so it's not biasing the results.

Q. But -- maybe I'm just missing something here.

But if you are looking at the stock price movement to decide whether a specific date should be excluded, isn't that introducing bias into the process?

A. No, because again, it's not -- it's not removing that date because it has some relevance to the case or it's not removing it because that's the date of interest.

It's simply a day -- it would bias the results not to exclude it.

So, again, the idea of what you're trying to do is create a model that is a -- an accurate depiction of how the firm -- the firm's security price is correlated with the industry indices, the industry index, the market index and get a measure of its volatility in the absence of important firm-specific news.

So, if there's a day that clearly has a big price movement with firm-specific news, that's from the

statistical analysis having an important impact on those regression estimates and there's a big impact on whether you include it or exclude it in terms of what those parameter estimates look like, then it's important to evaluate whether it's an outlier with news that needs to be excluded or something that's important to leave in the regression.

In this case, it was clear there was a firm-specific announcement that was driving a large price impact that was having an outsized impact on the regression estimates.

Q. When you say in this case, are you talking about the stock price movement on March 19th, 2020?

A. That's correct, yes.

Q. And have you tested how the results of your event study change if you do not exclude March 19th, 2020?

A. Well, March 19th, 2020 would -- I have not specifically tested that --

Q. Okay.

A. But -- because I made the decision to exclude that before I ran any of the tests on Exhibit 7 or Exhibit 8. It was independent of how it would or wouldn't impact any results that are shown here.

I will note that the only time anything would be affected is if March 19th, 2020 is in the estimation window for a particular date; which would probably only be relevant for events two, three and four on Exhibit 7. So I don't think it has the capability of impacting any other result outside of those three events.

On Exhibit 7, it could have some impact on the no news dates in that 120-day window prior to March 19th or in the 120 days following March 19th.

But I haven't specifically tested what impact that decision had on the significance of any particular date.

Q. So you didn't test to see whether the alleged stock price movement or the stock price -- let me withdraw that.

You didn't test to see whether

the stock price movement that occurred on, for example, August 5th, 2020, was no longer statistically significant had the March 19th, 2020 stock price movement been included in the regression analysis?

A. No, that's not something I ever tested. It was obvious to me that March 19th, 2020 was an outlier that needed to be included to not bias the results and I didn't perform any alternative tests if a different decision on that had been made.

Q. Does it cause you any concern if that's the case?

MR. D'ANCONA: Objection to the form.

THE WITNESS: No, not at all.

BY MS. COSTLEY:

Q. Okay. You state in Paragraph 1 of your report that the proposed class period in this case is February 27th, 2020 through March 8th, 2022.

This period covers the period with the COVID-19-related market disruption that began in early 2020; correct?

A. Yes. Well, it includes the period where COVID became a big issue and it includes -- so and the period over which there were pandemic-related restrictions in general life.

That's another reason why I think it's important to have run a rolling regression like I did to evaluate the -- how that period might or might not have been different than other periods, but that's something I explicitly addressed.

Q. Did your study model account for the impact of COVID-19 on the financial markets broadly and Natera specifically?

MR. D'ANCONA: Objection.

THE WITNESS: Well, on the markets broadly, no, there would be no reason to do that.

I mean I incorporate the markets, broad markets return and the industry return in my events study.

So, to the extent COVID was affecting the broad market and the industry, I'm explicitly controlling for that in the

regression.

Also, because I'm using 120-day rolling period to the extent the correlation between Natera and those indices may have been altered or changed as a result of COVID is something that would explicitly be accounted for in my model and, in fact, if you look at Exhibit 6 of my report, you see that the period starting in March of 2020 when COVID really, the impacts of COVID really started to happen between then and over the next six months of, you know, through August or September of 2020, you know, Natera common stock exhibited much more volatility during that period than at other times.

So I'm explicitly addressing that and incorporating that into my analysis.

Q. Let's look at Line 1 of Exhibit 7, the February 26, 2020 stock price drop.

A. Uh-huh.

Q. Or stock price increase.

By using a generic estimation period of 120 trading days prior to this date

to estimate an abnormal return, that means you're using data that's dating back to August of 2019; correct?

MR. D'ANCONA: Objection to the form.

THE WITNESS: The estimation window would extend prior to that date by approximately six months, yes.

BY MS. COSTLEY:

Q. And that was prior to any COVID-related disruptions; correct?

A. Yes.

Q. So that means that the majority of your estimation window is prior to the sharp increase in volatility caused by the pandemic and predominantly from a period unaffected by COVID-19; correct?

MR. D'ANCONA: Objection to the form.

THE WITNESS: For event one, that's true. And event one occurs prior to what I understand are the -- when COVID-19 really became something that was impacting the market in a substantial way.

BY MS. COSTLEY:
Q. Well then, I'll ask the same question with respect to event two on April 13th, 2020.
THE WITNESS: That event --
MR. D'ANCONA: Objection to the form. What's the question?
MS. COSTLEY: It's the same question.
The 120-day event window would include data that predates the COVID-19 pandemic; correct?
THE WITNESS: For event two, it would be, yes.
BY MS. COSTLEY:
Q. And so that would mean the majority of your estimation window is prior to the sharp increase in volatility caused by the pandemic; correct?
MR. D'ANCONA: Objection to the form.
THE WITNESS: For that event window, I believe that's true, yes.
BY MS. COSTLEY:

Q. And it would --

A. It would also incorporate some time during the COVID -- you know, since COVID had started. It would incorporate some of both.

Q. So, you just testified that February 26th is before the COVID window opens; correct?

A. Well, I don't think I've defined a specific COVID window, but I generally understand that when the market started to be severely impacted by COVID-related concerns was in early March some time.

Q. Okay. So, April 13th, 2020 would mean that 120-day event window, what, 43 days of that would be affected by the COVID pandemic and increase in volatility that occurred then?

A. I don't know if it's exactly 43. You're talking about 43 calendar days. It's unclear how many trading days that would be. It would be less than that in terms of trading days.

Q. So we're talking about what?

Like one-third of the trading window would have been affected?

MR. D'ANCONA: Objection to the form.

BY MS. COSTLEY:

Q. Let me withdraw that. Say about a third of the estimation window would have been affected?

A. I think for event two it would probably be less than that.

Q. Okay. And what about for event three? That's May 6th, 2020. Going back 120 days, that window would also date back to a time prior to the COVID-19 pandemic-related volatility; correct?

MR. D'ANCONA: Objection to form.

THE WITNESS: Yes.

BY MS. COSTLEY:

Q. Did you perform any analysis to test whether the relationship between Natera stock and the market industry indices changed during the period of market disruption caused by the COVID-19 pandemic?

A. I think Exhibit 5 shows some information related to that, which is that the coefficient -- so I take into account that the coefficients in their regression may have changed over time including over the COVID-19-pandemic period and take that explicitly into account.

Q. If the volatility in Natera stock was lower in the estimation period compared to the period in which you were calculating abnormal returns, this would have the effect of overstating statistical significance; correct?

MR. D'ANCONA: Objection to form.

THE WITNESS: That's theoretically possible, but whether or not -- I'll stop there. It's theoretically possible.

BY MS. COSTLEY:

Q. Okay. What were you going to add?

A. I was thinking about whether there was anything I wanted to add.

Q. You state in Paragraph 61 of your report that of the 11 earnings announcements and preannouncements Natera issued during the class period, six resulted in statistically significant price movements above the 95 percent confidence level.

A. Yes.

Q. Is the 95 percent confidence level the threshold applied for your analyses in the report?

A. As I described earlier, that's what I've used as the threshold in this report. That doesn't mean it's the only threshold that would be reasonable or that one could consider it, but that's the one I'm using for my tests in Exhibit 7 and Exhibit 8, yes.

Q. Is a 95 percent confidence level a threshold you apply in your auto correlation analyses?

A. Again, I would have noted as the footnote indicates things that were significant at the 90 percent level as well. But implicitly, yes, I'm using the 95 percent

confidence interval as well there to draw my conclusions.

Q. To what footnote are you referring?

A. Exhibit 13, which is where I show my test for autocorrelation and in Footnote 2, I say three stars denotes significance at the 99 percent level. Two stars indicates significance at the 95 percent level and one star indicates significance at the 90 percent level.

Q. And why did you include events -- let me pull that back. Let me strike that.

Why did you perform an analyses at the 90 percent confidence level?

A. Because as I testified in an earlier answer, in the financial economics literature and in my own view, there's nothing magical about the 95 percent confidence level. It's probably the most used standard.

But there are many cases in which findings at the 90 percent level

provide important economic evidence and academics in the financial economics field draw inferences from results that are significant at the 90 percent level as well.

Q. Has a court ever criticized your use of the 90 percent confidence interval, the 90 percent confidence level?

MR. D'ANCONA: Objection to form.

THE WITNESS: I don't know if criticized is the right word. I certainly think there have been courts, I can recall courts that said they would only apply the 95 percent confidence level or that's the level they were going to apply for purposes of that case.

But I don't know if criticized would be the right word.

BY MS. COSTLEY:

Q. What's the upshot of using a 90 percent confidence level versus a 95 percent confidence level?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know what you mean by the word upshot.

BY MS. COSTLEY:

Q. Well, what are the implications for your analysis?

MR. D'ANCONA: Objection to the form.

THE WITNESS: It's really describing the probability of a type one error, which is that you're going to draw a causal inference when one doesn't really exist.

So, with a 95 percent confidence interval you're effectively stating that you're willing to draw that inference with a five percent probability of being wrong and making an error. A 90 percent confidence interval implies you're willing to accept a 150 percent chance of being wrong at the threshold level.

Obviously results that are well higher than the threshold level, you know, the probability of a type one error is much less than that at the threshold level.

But that's effectively what the meaning is of where you're setting the threshold.

BY MS. COSTLEY:

Q. Do you see in Paragraph 7 of your report that you formed the opinion consistent with plaintiff's theory of liability, the damages in this action can be calculated on a class-wide basis using a common methodology.

Is that correct?

A. Yes.

Q. What specific information did you consider in forming your damages methodology opinion?

A. I considered the complaint and I considered the court's opinion on the motion to dismiss and I considered discussions with plaintiff's counsel to make sure I understood that -- that my understanding of the allegations in the complaint as it relates to the Panorama statements were consistent with my understanding.

And I then evaluated whether

there was an economic coherence to what they were alleging and whether the type of information they were alleging was concealed from the market could in a reasonably economic way be expected to inflate the stock price and whether the type of information revealed on the alleged corrective disclosure had the capability, at least reasonable economic capability of dissipating that inflation.

So, I made those evaluations in -- before reaching the opinion that I'm providing on this.

Q. Would you agree that one of the things the complaint alleges to have been omitted from the public statements made by Natera was the existence of a relationship between a Natera employee and an individual at a company called MGML?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I recall that part of plaintiff's allegation relates to preauthorizations through MGML and the nature

of MGML and I recall there being -- I would have to go back to the complaint to see exactly what they allege was not disclosed about the relationship with MGML, but I know that the nature of MGML and its relationship to the company was certainly something that was discussed in the complaint.

Q. And would you agree that another thing discussed in the complaint is an allegation that Natera purportedly required physicians to opt out of microdeletion testing?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That's consistent with my understanding with one thing plaintiffs alleged was undisclosed, yes.

BY MS. COSTLEY:

Q. Do you draw a distinction between statements alleged to be false versus statements that are just alleged to be misleading?

MR. D'ANCONA: Objection to the form to the extent it calls for any sort of

legal conclusion.

THE WITNESS: I don't -- not in how I'm economically evaluating the impact or potential impact of those misstatements.

In other words, whether you characterize it as a false statement or something that omitted something, the ultimate analysis that would need to be performed for damages is how much lower would the stock price have been had there been an earlier corrective disclosure and for that, how you characterize the statement whether it's sort of affirmatively false or just concealing something is not a relevant distinction to me.

BY MS. COSTLEY:

Q. And how do you define the term corrective disclosure?

MR. D'ANCONA: Objection to the form.

THE WITNESS: My understanding, it's an event where there's a revelation of some portion of the relevant truth that's been concealed to investors through the

alleged misstatements or omissions.
BY MS. COSTLEY:
Q. And for a disclosure to be corrective, does it have to be publically available?
MR. D'ANCONA: Objection to the form, to the extent it calls for a legal conclusion. Sorry.
THE WITNESS: I don't want to necessarily characterize what it's necessary to do in all cases. I'm trying to conceive of ways that it wouldn't be, but certainly in all of the cases I've been involved in the alleged corrective disclosure involved a disclosure publically in some way of some portion of the alleged -- of the information that's alleged to have been withheld.
Q. And would it need to be widely disseminated?
MR. D'ANCONA: Objection to the form to the extent it's calling for any sort of legal conclusion about corrective disclosures.
THE WITNESS: Again, I don't

know about whether it would need to be or whether you could conceive of a way or conceive of a situation where it wouldn't be.

In my experience, at least with all the alleged corrective disclosures I've dealt with, it's at least being alleged that the information was widely disseminated to the market in some way.

So, I, you know, I don't want to speculate about all possible situations and whether you could imagine a corrective disclosure that wasn't widely disseminated somehow.

So, I just -- I'm just trying to be circumspect in my answer.

But generally speaking, the corrective disclosures or at least alleged corrective disclosures I've dealt with in my career have almost always been in some widely disseminated form.

BY MS. COSTLEY:

Q. But there's no like economic requirement that a corrective disclosure be widely disseminated before it can be used to

measure any stock price inflation, for example?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I'm not aware of any explicit requirement. I'm trying to think of a situation that would actually fit what you're saying where, you know, is it conceivable that some corrective information could be revealed to some small subset of the market and for it to have some small impact on the price that's measurable and then to have some later sort of more fully widely disseminated revelation of the same information and the market wouldn't fully impound the information until that later date and both price movements could be relevant to a measurement of the dissipation of artificial inflation, I think that's conceivable.

So, I don't want to make some sort of blanket statement, but I would imagine a situation where that might be relevant.

Q. Is there an economic reason why a statement could only be deemed a corrective disclosure if upon its release the company stock price goes down?

A. I'm sorry, could I have that read back, please?

\- - -

(Whereupon, the following portion of the record was read by the court reporter:

"QUESTION: Is there an economic reason why a statement could only be deemed a corrective disclosure if upon its release the company stock price goes down?")

\- - -

THE WITNESS: No.

BY MS. COSTLEY:

Q. Okay. So, when you're identifying if something is a corrective disclosure, you don't start by looking for a stock price drop and then try to identify a disclosure made that day. Correct?

MR. D'ANCONA: Objection to the form.

THE WITNESS: No, that's not how I would typically perform a loss causation analysis, no.

BY MS. COSTLEY:

Q. And if a statement was released to the market, that revealed everything that a plaintiff had alleged had been omitted, you wouldn't say that statement was not a corrective disclosure just because the stock price didn't fall upon its release; would you?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Again, I just want to make sure I understand your hypothetical. In your hypothetical, there's a -- some sort of widely-disseminated disclosure of everything the plaintiffs are alleging was concealed from the market and you're asking just because there wasn't a price reaction on that day, does that somehow imply it wasn't fully corrective or does that prevent it from being fully corrective, the answer would be no.

BY MS. COSTLEY:
Q. All right. Because you don't -- your analysis isn't circular; right? You don't start by saying something caused the stock price to go down and, therefore, that's the corrective disclosure; correct?
MR. D'ANCONA: Objection to form.
THE WITNESS: Again, I'm not performing that analysis here. I'm not doing a loss causation analysis here.
So, but if I were to be performing a loss causation analysis and in the past when I've approached my loss causation analyses, I don't start from the price reaction. I start from the information that's being disclosed and then evaluate is this a relevant date to test for a stock price reaction to that information.
BY MS. COSTLEY:
Q. And when you were testifying earlier about the efficient market and whether information has to be widely disseminated to be expected to have an impact

on the stock price, does that same analysis, that same expectation of wide dissemination apply to corrective disclosures?

MR. D'ANCONA: Objection to the form.

THE WITNESS: When you say does it apply to corrective disclosures, in other words, is -- I want to make sure I'm very clear on what you're asking me.

Are you saying does that have an influence over whether that should be deemed corrective or whether it -- whether no further statements after that could be deemed corrective? I just want to make sure I understand exactly what you're asking.

BY MS. COSTLEY:

Q. Yeah. I'm asking in the first instance. I'm not asking you to say whether that would preclude a subsequent statement from also being deemed a corrective disclosure.

A. You're saying in order -- my interpretation of your question then is for something to be a corrective disclosure, must

it be widely disseminated?

Q. Correct.

A. I think I gave an example before of where at least theoretically you could imagine something having some level of price impact without it being widely disseminated. I can't exclude the possibility of that.

So, I'm not -- I mean again, my general experience has been that whatever corrective disclosure I've been analyzing in cases such as this, the corrective disclosure was clearly widely disseminated.

Whether you could construct a situation where it doesn't need to be widely disseminated -- widely disseminated but just how partially disseminated for some small subset and for it to still have a price impact, I can't entirely exclude that possibility.

I don't think there's, from an economic point of view, I don't think there's a must have widely disseminated for there to be a partial corrective disclosure.

Q. And I'm asking you to take the

price impact aspect of this out of it because I think we agreed that you can't start by looking at whether or not a corrective disclosure has a price impact to decide whether it's corrective.

A. Just to be clear, that's not -- I'm not suggesting in any way that that's how you would evaluate it in terms of whether it is corrective or not.

I'm saying if you believed there was a corrective disclosure or information that was corrective that only went to some small subset of the market, it wasn't widely disseminated but it went to some small number of people, my interpretation of your question is does that preclude it from being a corrective disclosure? And I'm saying not necessarily.

I could imagine a situation where that could still have at least some degree, maybe not a full impact, but some degree of price impact. And so I don't -- I wouldn't just on principle say that you must have a widely disseminated disclosure for

something to be potentially corrective at some level.

Q. Okay. So a statement doesn't have to be widely disseminated to be corrective; is that correct?

A. Well, no. Now I think you're making the question much broader, which is can you take a statement that's not widely disseminated and deem that it's somehow fully corrective? I don't think you can do that either.

I thought your question was is it conceivable you could have some sort of -- some sort of partial correction from something that's not widely disseminated, but it wouldn't necessarily be a full correction because until it's fully widely disseminated, I'm saying I can't rule out that possibility.

I also don't think you can conclude that just because hypothetically corrective information was publically available but not widely disseminated, that that means the information was out there and already fully reflected in the price and,

therefore, a corrective disclosure has been made, end of analysis. I don't think you can do that, either.

Q. What further analysis would you have to perform? Would that an analysis be whether or not it impacted the price?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That wouldn't be the starting point of the analysis, but would the price reaction or lack thereof at different times provide some level of economic evidence about whether the market appreciated that information at the time of the -- at certain times, it might have some probative impact.

But whether -- but from a loss causation standpoint, you should start from the information and then analyze the price impacts.

BY MS. COSTLEY:

Q. Okay.

A. But could there be relevant economic evidence about how widely it was

disseminated by looking at price movements, it might have some economic relevance and some probative evidence to that question.

Q. But it's not the starting point?

A. It's not the starting point, no.

Q. Okay. You state in Paragraph 13 of your report that the complaint alleges Natera attributed the company's strong performance to organically growing demand for Panorama when demand was, in fact, driven in part by deceptive business practices.

Based on your understanding of the allegations, was Natera's revenue during the proposed class period misstated?

A. I don't know. I don't interpret plaintiff's allegation as including a numerical misstatement of revenue.

Q. So, is it your understanding that Natera should have reported lower revenue during the proposed class period?

A. I personally have no idea. I'm not -- I don't understand the plaintiffs to be alleging that in their complaint.

Q. Is it your understanding that

plaintiffs are alleging Natera should have disclosed that it was engaging in business practices that plaintiffs allege were deceptive?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know that they are alleging those specific words should have been disclosed, but my understanding is that plaintiffs are alleging for the statements they made to not be misleading, it needed to include additional information about the business practices they were involved in.

BY MS. COSTLEY:

Q. If Natera had disclosed earlier in the proposed class period that it was using MGML to process prior authorizations, what effect would you expect that statement to have on Natera stock price?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know. That's not something I've considered or

analyzed.
BY MS. COSTLEY:
Q. Would you expect market participants to have reduced their expectations of Natera's future revenue?
MR. D'ANCONA: Same objection.
THE WITNESS: I don't know. That's not an issue I've analyzed.
BY MS. COSTLEY:
Q. Okay. Would you have expected a statistically significant price increase following each of the alleged misrepresentations in this case?
MR. D'ANCONA: Objection to the form.
THE WITNESS: I didn't form a specific expectation about that.
BY MS. COSTLEY:
Q. And you wouldn't form an expectation about that; correct? Because this is an omissions case?
MR. D'ANCONA: Objection to the form.
THE WITNESS: Again, I don't

have any particular expectations. Is it possible that they made positive statements about Panorama that are alleged to be misleading that could have had some positive impact on the stock price? And that that might provide some evidence of price impact related to those statements, even though they are effectively alleging omissions, I can't rule that out.

In other words, would -- if the plaintiffs are alleging there should have been some mitigating effect as a result of information that was omitted, but it could be shown that the pos -- the positive statements without that mitigating impact actually caused the stock price to increase, I don't think that's -- it might not be direct evidence of the value of the omissions, but it might be relevant economic evidence of a price impact indirect -- indirect economic evidence of price impact in this case.

I just -- I haven't formed that expectation. I haven't analyzed it. I'm just saying I can't rule that out.

BY MS. COSTLEY:
Q. Do you have an opinion about when the purported truth about the alleged misstatements in this case were revealed to the market?
MR. D'ANCONA: Objection to the form.
THE WITNESS: No. I have an understanding of what plaintiffs are alleging that is, but I haven't formed my own opinion about that, no.
BY MS. COSTLEY:
Q. What's your understanding of what plaintiffs are alleging?
A. My understanding is plaintiffs are alleging that the relevant truth was disclosed when the Hindenburg report was published.
Q. Let's go back to Exhibit 2, which I believe is the Hindenburg report.
A. Okay.
Q. Are you aware that Hindenburg research disclosed it had a short position in Natera's shares?

A. Yes.
Q. Would you agree that if an investor has a short position in a company's stock, that investor would benefit if the stock price went down?
A. Absent all other economic considerations, yes.
Q. Do you know whether Hindenburg disclosed that it would benefit if Natera's stock price went down?
MR. D'ANCONA: Objection to the form.
THE WITNESS: I think they probably -- I don't know whether they explicitly -- I don't recall whether they explicitly said that, but it would not surprise me if they did. They clearly indicated they had a short position.
BY MS. COSTLEY:
Q. Have you done any analysis of the Hindenburg report to determine whether any of the information in the report was released for the first time on March 9th, 2022?

A. No.
Q. And why not?
A. It wasn't necessary for the opinions I was being asked to give or the -- it wasn't relevant to the questions I was being asked to form opinions on is a better way to say it.
Q. Are you aware that the Hindenburg report includes a statement that all of the information in the report was obtained from public sources?
MR. D'ANCONA: Objection to the form.
THE WITNESS: I don't recall that specific statement. I'm not saying it's not there. Just off the top of my head, I don't recall it.
BY MS. COSTLEY:
Q. If the report made that statement, would that affect your opinion of whether or not this document would be a corrective disclosure?
MR. D'ANCONA: Objection to the form.

THE WITNESS: Not necessarily. There have certainly been matters I've been involved with where an alleged corrective disclosure was either an analyst report or news article that collected and synthesized and summarized information in a new way for the market that made the impact of that, all those pieces of information clear to the market, then any of the individual pieces of information.

So, it -- that alone would not, in my mind, preclude it from potentially being a corrective disclosure. But I haven't formed an opinion one way or the other on that question.

BY MS. COSTLEY:

Q. Would it cause you any concern about using a statement as -- let me withdraw that.

Would it cause you any concern about using this document as a corrective disclosure if you were to form the understanding that the information in the report came exclusively from public sources?

MR. D'ANCONA: Objection to form.

THE WITNESS: I think it would -- I don't know if concern is the right word, as much as it would suggest the need for careful analysis of where that information came from if, what the sources were, whether they were previously widely disseminated or not; whether there's any new sort of analysis that's being done by putting that information together.

So, I don't think concern is the right word, but certainly does it suggest additional analyses that would be necessary, yes.

BY MS. COSTLEY:

Q. Okay. And in the Hindenburg report, the authors, the anonymous authors refer, for example, to prior reporting done by Capitol Forum.

And that's on Page 19, if you want to refer to that.

MR. D'ANCONA: Objection to form, if that's a question.

THE WITNESS: I want to make sure my prior answer is clear, too.

The question you were asking is about whether it would cause me concern. I assume in determining whether or not it was corrective or not. Again, I want to be absolutely clear. I have not been asked to, nor have I done a loss conversation analysis to evaluate whether this article is or is not corrective. I'm answering that in the hypothetical, not because I've done any of the relevant analysis that would need be to done.

Q. I understand you haven't done the analysis in this case.

But your expertise does extend to opining on matters related to the loss causation, does it not?

A. I mean I'm an experienced expert in analyzing loss causation, so, yes.

I'm not suggesting otherwise. I just wanted to make sure my answer is interpreted not as something that would be necessary to give the opinions I've already

given in this case.

It might be relevant to ultimately, if I were asked or someone else were asked to evaluate loss causation, these could be relevant questions, but it's not relevant to the opinions I've given to date.

Now your question was do they mention the Capitol Forum report and you referred me to Page 19.

Q. 19. Second paragraph, in the middle of the page.

Did you review the Capitol Forum reports reference on Page 19 of the Hindenburg report?

A. I had not seen the Capitol Forum reports prior to this deposition.

Q. So that's a no, you didn't review them?

A. No. There was no need to for the opinions I was being asked to or for the questions I was being asked to form opinions on.

Q. If you had been asked to form an opinion on loss causation, would you have

thought it necessary to review the Capitol Forum reports referenced in this article?

A. I think that would be a natural thing to do is to understand what the source of the information was and if there was previous disclosure of some of this information, in whatever form, that would be something important to review as part of a loss causation analysis, yes.

Q. On Page 45 of the Hindenburg report, Hindenburg states, Hindenburg research makes no representation --

A. I'm sorry. Give me just a second.

Q. Page 45.

A. I see that. Can you point me where you're exactly reading from on that page?

Q. Sure.

A. I think I see it. Hindenburg research makes no representation. I think I see where you're reading from. Go ahead.

Q. Express or implied as to the accuracy, timeliness or completeness of any

such information or with regard to the results to be obtained from its use.

Do you know whether any part of the Hindenburg report has since been found to be untrue?

MR. D'ANCONA: Objection to form.

THE WITNESS: That's not something I evaluated. I don't know.

BY MS. COSTLEY:

Q. Would you agree that the Hindenburg report only includes opinions and not facts?

MR. D'ANCONA: Objection to form.

THE WITNESS: I mean there's certain things that are reported in here as facts that I think are -- would be facts. I think there's opinions as well, but I don't know that it would be proper to characterize everything in here as just opinion and not facts.

BY MS. COSTLEY:

Q. An opinion can't be a corrective

disclosure; correct?

MR. D'ANCONA: Objection to form, to the extent it calls for a legal conclusion.

THE WITNESS: That's an interesting question. I don't know.

BY MS. COSTLEY:

Q. Have you ever seen an opinion treated as a corrective disclosure?

A. I've seen reports that express opinions and that provide the underlying basis for those opinions alleged as corrective disclosures and that I've concluded contained information that was corrective.

I don't know that it was the -- I don't know that it's ever been the opinion itself that was considered corrective, but certainly bases for whatever opinion might have been being expressed and information and facts that were cited in those pieces that had opinions I believe have served as the basis of disclosures that were either allegedly corrective or that I personally

have opined were corrective.

So, I think just because a document expresses an opinion doesn't mean it can't be a corrective disclosure.

Q. But if a document expresses only an opinion, you have not, in your experience, seen that treated as a corrective disclosure; correct?

MR. D'ANCONA: Objection to form.

THE WITNESS: I don't know that that's the case. And I'm trying to think through it over my experience. But for example, a -- an accountant's -- an accounting firm's opinion that previous financial statements shouldn't be relied upon, yeah, I could imagine that being a corrective disclosure.

I think I've seen -- it would have been a long time ago -- but I think I've seen cases where that's alleged as a corrective disclosure. I don't think you can make that broad a generalization.

BY MS. COSTLEY:

Q. Have you ever seen opinions like the ones expressed in this report? Not from a company's analyst or from -- let me withdraw that.

Have you ever seen opinions like the ones expressed in this report treated as corrective disclosures?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Again, I want to be careful that it's not clear to me that the only thing in this report are opinions. I think there are alleged facts that underlie the opinions that are being given in this report.

I've certainly seen other short reports alleged as corrective disclosures in other matters.

I don't know that I'm thinking of all the possibilities of ways in which opinions might or might not be held to be corrective of, you know, or opinions of third parties to be held corrective or not corrective for whatever variety of reasons

you could possibly imagine.
I'm just not willing to testify to just because something is an opinion means it can't be a corrective disclosure. I don't think I can go that far.
BY MS. COSTLEY:
Q. Are you aware that Natera held an investor conference the day after Hindenburg Research issued this report and that Natera disagreed with the characterizations made in the report?
A. I've seen reference to that, yes.
Q. Are you aware that the stock price increased after Natera's investor call?
MR. D'ANCONA: Objection to form.
THE WITNESS: I'm generally aware that the price went up on that day.
I haven't carefully studied all the reasons it may or may not have gone up or down.
But I generally understood that the price went up in -- again, I haven't done

enough work to know whether there's a causal connection or whether it's statistically significant, but I do recall seeing information consistent with the price going back up after the call.

BY MS. COSTLEY:

Q. In the absence of other company-specific news released that day, you would attribute any abnormal return to the information disclosed by the company in that call; would you not?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I think there's some -- I mean not necessarily, given the way you've asked the question. I think there's other things that would have to be a part of it before I would reach that conclusion.

BY MS. COSTLEY:

Q. What other things?

A. I would want to study the exact timing of when that call was, whether it was before market hours, during market hours, after market hours, to make sure I was

looking at an event window and a price response during an appropriate event window.

I would want to look to see whether there was or wasn't any other firm-specific information.

If during an appropriate event window there was a statistically significant movement in the price and the only firm-specific information I could identify was the call, then barring some other confounding piece of information, it would be, I mean based on the general application of the event study methodology, I would be willing to draw a causal inference between the information, the whole -- the totality of the firm-specific information that was released on that day and the stock price movement.

But there's a number of different steps that are relevant to get to that opinion that -- and would also want to evaluate to what extent, what was being said was new and not repetitive information.

Q. Are you aware that Natera's

board of directors initiated an independent investigation into the claims made in the Hindenburg report with the assistance of the law firm WilmerHale and concluded that there was no wrongdoing?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That's not something I was aware of or had focused on, no. There was no need to focus on that.

BY MS. COSTLEY:

Q. Are you aware that Natera has not faced any regulatory or legal action from any agency related to the claims made in the Hindenburg report?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That's not something I've investigated. I don't know.

BY MS. COSTLEY:

Q. Are you aware that the SEC conducted an investigation into the claims made in the Hindenburg report and decided to take no action against Natera?

MR. D'ANCONA: Objection to the form.

THE WITNESS: That was not something I focused on, no. I was not aware of.

BY MS. COSTLEY:

Q. Does that affect your opinion as to whether or not the claims made in the report are accurate?

A. I don't have an opinion about whether the claims in the report are accurate or not.

Q. Are you aware that Natera has not restated any of its financial statements?

A. I don't know that I've looked personally at enough information to know whether that took place or not. I have not seen reference in anything I've reviewed to them restating financial statements.

Q. You testified earlier that the stock price change on a given day measures the impact of all information revealed during that day.

If it is found that some of the

claims made in the Hindenburg report were false, you would agree that the price change reflected that false information; would you not?

MR. D'ANCONA: Objection to the form.

THE WITNESS: It's possible, especially to the extent that it was new and value relevant information. It's possible.

BY MS. COSTLEY:

Q. Did you do any analysis to exclude the stock price to be attributable to false information in the Hindenburg report?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I haven't given any opinion or analyzed the stock price impact of the Hindenburg report.

BY MS. COSTLEY:

Q. And you've also not done any analysis to exclude the portion of the stock price drop attributable to the opinions in the Hindenburg report; correct?

A. I don't know what you mean by

exclude. Exclude from what?

Q. Well --

A. I haven't made -- I haven't presented a calculation. I mean look, my event study and the backup material that was provided you shows that there was a statistically significant negative price movement on the date the Hindenburg report was released.

I haven't given any opinion about price impact, the impact of the Hindenburg report, what caused the price movement on that day.

So, I don't know what your question means by have I excluded. I haven't quantified anything with respect to that.

Q. You agree that plaintiffs are required at this stage to articulate a methodology to measure damages in a manner that is consistent with their theory of liability; correct?

MR. D'ANCONA: Objection to the form to the extent it calls for a legal conclusion.

THE WITNESS: I don't know what their requirements are. All I know is the question I've been asked and what opinion I've formed is as a result of that question.

So, I don't -- I'm not in a position to characterize what they need to do or don't need to do.

BY MS. COSTLEY:

Q. Were you asked to articulate a methodology to measure damages in a manner that is consistent with their theory of liability?

A. Yes. I was asked whether there is a method, a class-wide method for calculating damages for the types of claims they are making and given their theory of liability in this case and I opine that yes, there is a class-wide methodology for measuring damages consistent with their theory of liability.

Q. You would agree that an appropriate damages methodology would not measure losses caused by factors unrelated to the current allegations; correct?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Well, when you say current allegations, I assume you mean whatever the relevant allegations are at the time a loss causation analysis is being performed.

But -- whether or not there's a class-wide methodology consistent with -- with plaintiff's theory of the case isn't impacted by the question you're asking, I agree that when one ultimately needs to quantify as part of a loss causation analysis the artificial inflation per share that flows into that methodology, there's a need to exclude from that inflation per share the impact of anything that is unrelated to the claims in the case, the relevant claims in the case at the time.

BY MS. COSTLEY:

Q. You say in Paragraph 84 of your report if that the most widely used technique to quantify artificial inflation starts with from an event study that measures price

reactions to disclosures that revealed the relevant truth that was concealed by the alleged material omission and/or misrepresentations, such as the price reaction to the Hindenburg report allegations; i.e., a corrective disclosure.

Have you performed any analysis to determine that an event study can be used to calculate daily inflation in this case specifically?

A. I think I've done enough work to know, because I've already performed an event study, that one could construct an event study to isolate the impact of firm-specific information on the alleged corrective disclosure date.

I think a loss causation analysis would need to obviously identify what portion of that decline that's observed on that date relates specifically to what plaintiffs are alleging was withheld from the market as a result of the alleged misstatements and/or omissions.

And that that would be a natural

starting point for evaluating the degree to which the stock price was inflated. But one would have to perform additional analysis to ask the question, you know, if, let's say we all agree that there was a three dollar per share, I'm just making this number up, three dollar per share dissipation of artificial inflation on the corrective disclosure date, one would have to evaluate whether and to what degree that was appropriate to use for prior dates as whether that's a measure of the artificial inflation on prior dates.

In many cases it is. In some cases you have to consider other things.

But that would be the starting point of for evaluating at least my understanding and probably the best starting point for how to evaluate the level of artificial inflation on each day during the class period or at least the potential for artificial inflation on earlier days.

Q. Would that allow you to measure which specific statements caused the alleged inflation?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Again, to the extent that each of the alleged misstatements omitted the same relevant truth, I don't know that it would make sense to think of each statement as somehow contributing some portion or cause to that.

It may be that just whatever that decline and value was on the corrective disclosure could be equally attributed to all the different misstatements. There may be other reasons why that's not the case. That's something that would have to be evaluated in a detailed loss causation analysis.

But the analysis itself doesn't automatically tell you which statements it relates to. That's a separate analysis.

BY MS. COSTLEY:

Q. You're talking about an analysis that's performed using the stock price decline that follows the alleged corrective disclosure; am I correct?

A. That's what I've been making reference to is an event study analysis of the impact of the corrective information and then using that as a proxy for how the inflation or how the price may have been inflated earlier.

That's sort of the general approach I'm referring to, yes.

Q. So that's under an inflation maintenance theory?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Not necessarily. I mean that could be one way to think about inflation in a case, but not necessarily, no.

BY MS. COSTLEY:

Q. Let me ask this: If a company makes a statement prior to the class period and then it repeats that same statement during the class period, is that an inflation maintenance case or is that some other sort of case?

MR. D'ANCONA: Objection to the form, to the extent it appears to be asking

for some sort of legal conclusion.

THE WITNESS: I don't know. Again, it may be that circumstances change that at the time they first made the statement it wasn't false and misleading for some reason and then later circumstances changed and it made it false and misleading later, you know, whether you call that inflation maintenance or creating inflation or from an economic point of view, I don't see a distinction.

Again, the relevant economic concept that I understand at least somebody who would be asked to do a loss causation analysis would be trying to evaluate the amount by which the price was inflated as a result of not disclosing the relevant truth.

So, the analysis would seek to ask the hypothetical, if the relevant truth were actually disclosed at each earlier point during the class period, how much lower would the stock price have traded?

Whether you call that a misrepresentation case or a price maintenance

case or omissions case, like none of those, what I understand, might be relevant legal distinctions matter to the economic analysis, which is just trying to evaluate and to the damages analysis, which is just trying to evaluate the degree by which the price was inflated.

BY MS. COSTLEY:

Q. And is that because you measure the degree by which the price was inflated using the amount of the stock price decline that occurred following the alleged corrective disclosure?

A. No. I think my earlier answer applies to any way you might want to try to evaluate the artificial inflation.

In other words, whether the -- whether the measure of the artificial inflation is derived from looking at some price movement at the time of the misstatement or some fundamental valuation analysis or with respect to the drop in the price on the corrective disclosure, it doesn't change what the goal of the analysis

is, which is to measure the amount by which the price was inflated relative to a situation where the relevant truth was disclosed.

Q. So, let me ask this: In an omissions case, where you typically wouldn't expect to see a stock price increase at the time of the alleged misstatement, how do you measure damages?

MR. D'ANCONA: Objection to the form. Calls for speculation.

THE WITNESS: Again, in most cases, whether it's an omissions case or not, in the vast majority of cases I've seen, the starting point for measuring artificial inflation is to look at the stock price reaction at the time the relevant truth is disclosed.

There have been other cases where, for a variety of reasons, it became relevant to look at other metrics, including fundamental evaluation analyses, how the price moved at the time of misrepresentation or others or valuations of potential

confounding information. There have been other inputs as well.

I haven't -- I don't think you can broadly say that just because something is an omissions case, wherever that relevant distinction even is, that the only way to analyze it would be to look at the price decline at the end of the class period.

That strikes me as the most likely relevant way to look at it in this case, but I -- but what -- I don't -- I can't broadly say that in all omissions cases there's one way to measure damages and it has to be done that particular way, in terms of how you -- just to be clear -- how you quantify the artificial inflation.

Obviously the way you calculate damages, using the out-of-pocket methods, is the same for all class members in all circumstances, but how you quantify the artificial inflation, I don't want to presume that there's only one way to do that.

BY MS. COSTLEY:

Q. So, I guess what I'm wondering

is in a case where -- let's do a hypothetical. Let's assume we're talking about a hypothetical case where it is undisputed that the alleged misstatements are all misleading by omission and the alleged corrective disclosure has a significant disconnect from the alleged misrepresentation.

I'm just wondering how you go about calculating damages in a case like that?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know what you mean by significant disconnect.

BY MS. COSTLEY:

Q. Okay. So, let's say the alleged misstatement was we generated $500 million in revenue last year. And the corrective disclosure was this company kills babies. There -- would you agree that there's a disconnect between the corrective disclosure and the alleged misrepresentation in that case?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Not necessarily. It would depend on the context of what the corrective disclosure meant and how it relates to how they earn revenue. No. I don't think -- based just on your hypothetical, I don't think that's necessarily a significant disconnect.

BY MS. COSTLEY:

Q. Have you read the supreme court's Goldman decision?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Portions of it, I think.

BY MS. COSTLEY:

Q. Are you aware that it uses the phrase disconnect?

A. Not specific. Again, I read it a while ago. I don't recall the specific phrases used.

MR. D'ANCONA: Christina, it's been over an hour and 20 minutes. Would it

be a good time for a little comfort break?

MS. COSTLEY: Can we go ten more minutes and I think we can --

MR. D'ANCONA: I mean sure.

MS. COSTLEY: Do you want to go now? I'm going to let you take over in like ten minutes. I'm going to be done.

THE WITNESS: I could use a two-minute break just to go to the washroom. Thanks.

THE VIDEOGRAPHER: We're off the record. 2:25.

- - -

(Whereupon, there was a recess.)

- - -

THE VIDEOGRAPHER: We're on the record. 2:36.

BY MS. COSTLEY:

Q. You state in Footnote 94 of your report that, The event study I have performed for this report is for market efficiency purposes and is not an attempt at valuing artificial inflation.

Can you think of any reason why

the event study used here would not be appropriate to quantify inflation?

A. I mean the general event study setup, no.

Whether there would be a need to look at something other than a one-day event window is something I would have to evaluate.

There have been -- I don't think this issue is present here, but there are sometimes cases where it makes sense to exclude the industry impact on a corrective disclosure date. I've come across that.

I've certainly come across cases where it makes sense to look at either intra-day windows or multi-day windows, because of the nature of the information. That's what I'm talking about there. There would just be more analysis necessary.

The general form of the event study, I don't think I -- I can't think of a reason it would not be relevant, but the specific application of what event window and which dates to test and over what time period, that's more of a question still in my

mind.

Q. In Paragraph 85 of your report, you wrote, The loss causation analysis would also require an analysis of whether and/or how inflation per share may have evolved over the class period.

Based on your understanding of the allegations in the case, do you believe that inflation per share did evolve over the class period?

A. I haven't formed an opinion one way or the other on that. I haven't performed the loss causation analysis.

Q. Do you have an initial view on that?

A. No.

Q. Did you analyze Natera's stock price over the class period?

A. Generally speaking, I looked at the pattern of their -- of the pricing of the stock over the class period, yes.

Q. Would you agree that Natera's stock price changed dramatically over the course of the proposed class period?

MR. D'ANCONA: Objection to the form.

THE WITNESS: I don't know exactly what you mean by dramatic, but were there substantial changes in the price? Orders of magnitude of the price, yes.

BY MS. COSTLEY:

Q. It went from about $20 per share to over $100 per share in just a matter of months; right?

MR. D'ANCONA: Objection to the form.

THE WITNESS: Yeah. Exhibit 2 to my report plots the price over time, which I was obviously generally aware of, yes. It varied from as low as around $20 a share to just over 120 -- not just over, to over $120 per share, yes.

Q. Can you explain why the price roughly doubled between September, 2020 and March, 2021?

A. I have not analyzed all the factors that would or wouldn't explain that.

Q. Would you analyze any of the

factors that explain that?

A. Not enough to give an opinion as to why the price went up to that degree, no.

Q. Do you have any educated guesses on why it went up to that degree?

A. Well, this was the period in which the economy was recovering from COVID. My understanding is also the volume of tests that were being performed that the company was engaging in increased over time and the company was growing over this period.

There could be a whole multitude of other reasons that are contributing to that that I haven't analyzed.

Q. Do you have any explanation for why the price fell back to its September, 2020 levels in late 2021 and early 2022?

A. Again, I haven't analyzed all of the things that explain that, but it certainly, I'm aware that the market index and industry index explain a substantial portion of that.

Q. Do these changes have any bearing on your calculation of inflation?

A. I haven't calculated inflation.
Q. Do you think they would have any bearing on calculation of inflation?
MR. D'ANCONA: Objection to the form.
THE WITNESS: It's possible that something -- one would want to consider, if one were asked to evaluate -- actually quantify what the artificial inflation was.
BY MS. COSTLEY:
Q. Someone who purchased stock at $120 per share might have been damaged -- let me withdraw that.
Would somebody who purchased stock at $120 per share have been damaged by the same amount as somebody who purchased it at $20 per share?
MR. D'ANCONA: Objection to the form. Calls for speculation.
THE WITNESS: Well, someone who purchased at $20 a share may have impacts from the 90-day look-back calculation that would impact their damages in a way that somebody that purchased at $120 might not.

So, just by, as a result of the statutory cap, there might be some limitation on damages that's relevant to the person that purchased at $20 a share.

In terms of how much artificial inflation was paid, I just don't know. It's not something I've analyzed.

Q. Do you have an opinion about whether the Hindenburg report was widely available using your definition of widely available from earlier in the deposition?

A. I haven't specifically analyzed that, but I did see reference to, in the complaint, to there being not only the company issuing the response to it but also analysts' commentary about it in the immediate aftermath of it.

So, I think there are facts I'm aware of that would lead me to believe that at least the important aspects of the content were widely disseminated. Whether the report itself was, I have not independently evaluated that at this point.

MS. COSTLEY: I don't have any

further questions.

MR. D'ANCONA: No questions.

We can go off the record.

THE VIDEOGRAPHER: This completes the recorded deposition of Chad Coffman. We're now going off the record at 2:44.

THE COURT REPORTER: Would you like a copy of the deposition?

MR. D'ANCONA: Yes.

\- - -

C E R T I F I C A T E

I hereby certify that the proceedings and evidence noted are contained fully and accurately in the notes taken by me on the deposition of the above matter, and that this is a correct transcript of the same.

Teresa M. Beaver

----------------------------

Teresa M. Beaver

DATE: July 22, 2024

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)