# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN,<br><br>Defendants. | Case No. 1:22-cv-00398-DAE |

**EXPERT REPORT OF DOUGLAS J. SKINNER**

**AUGUST 16, 2024**

# Table of Contents


I. Qualifications ..... 1

II. Assignment and Compensation ..... 2

III. Summary of Opinions ..... 4

IV. Background and Allegations ..... 8

- A. Background on Natera ..... 8
- B. Summary of Plaintiffs' Allegations ..... 9

V. Stock Price Behavior in an Efficient Market ..... 12

VI. Stock Price Changes Following Alleged Omissions Cannot Be Used to Reliably Infer That the Alleged Omissions Affected Natera's Stock Price ..... 14

- A. Event Studies ..... 14
- B. An Event Study Analysis Cannot Measure the Effect of the Allegedly Omitted Information at the Time of the Alleged Omission ..... 17

VII. Allegedly Omitted Information Regarding Natera's Purportedly Deceptive Business Practices That Was Publicly Available Well Before the Alleged Corrective Disclosure Would Have Previously Been Incorporated into Natera's Stock Price in an Efficient Market ..... 19

- A. Allegedly Corrective Information Regarding MGML Was Publicly Available Before the Release of the Hindenburg Report ..... 19
- B. Allegedly Corrective Information Regarding Natera's Microdeletion Ordering and Billing Practices Was Publicly Available Well Before the Hindenburg Report Was Published ..... 25

VIII. Natera's Abnormal Stock Price Decline on March 9, 2022 Following the Hindenburg Report Cannot Be Used to Reliably Infer That the Alleged Misrepresentations Affected the Price of Natera's Stock ..... 29

- A. The Stock Price Decline on March 9, 2022 Cannot Be Used to Reliably Infer That the Alleged Misrepresentations Affected Natera's Stock Price ..... 31
- B. Several Factors Other than the Alleged Corrective Information in the Hindenburg Report Likely Had a Negative Effect on Natera's Stock Price on March 9, 2022 ..... 33
- C. Additional Evidence Suggests That One Cannot Use Natera's Stock Price Change on March 9, 2022 to Infer That the Alleged Misrepresentations Affected Natera's Stock Price ..... 38

IX. Mr. Coffman Fails to Provide a Methodology Capable of Measuring Class-Wide Damages under Section 10(b) of the Exchange Act for Natera Common Stock in a Manner Consistent with Plaintiffs' Theory of Liability ..... 43

# I. Qualifications

1. I am the Sidney Davidson Distinguished Service Professor of Accounting at the University of Chicago, Booth School of Business. I have been a tenured full professor at the University of Chicago since 2005, and previously served as Deputy Dean for Faculty and Interim Dean. Prior to my appointment at the University of Chicago, I was the KPMG Professor of Accounting at the Ross School of Business, University of Michigan, where I held tenured and tenure-track appointments from 1989 until 2005 and served as chair of the accounting department.

2. I hold a B. Econ. (First Class Honors in Accounting and Finance) from Macquarie University in Sydney, Australia, and an M.S. and Ph.D. (Applied Economics: Accounting and Finance) from the University of Rochester. I have taught undergraduate upper-class students, full-time and part-time MBA students, Executive MBA ("EMBA") students, executives, consultants, and Ph.D. students. I have taught introductory financial accounting, intermediate financial accounting, accounting for financial instruments, corporate financial reporting and analysis, financial statement analysis, managerial (cost) accounting, corporate finance, investments, valuation, and empirical methods in accounting research. Most recently, I have taught Corporate Finance and Valuation, as well as Managerial Accounting, in the University of Chicago's EMBA program at our campuses in Chicago, London, and Hong Kong, and a Ph.D. class in empirical capital markets research, also at the University of Chicago.

3. From 2006 to 2021 I was Senior Editor of the *Journal of Accounting Research*, one of the preeminent academic accounting journals in the world. Before moving to Chicago, I was Co-Editor of the *Journal of Accounting and Economics*, also one of the world's leading academic accounting journals. I also served as editor of the *Review of Accounting Studies*, and for several terms on the editorial board of *The Accounting Review*. I am a member of the American Accounting Association and the American Finance Association. I frequently present my research at major accounting and finance conferences and prominent universities. I have supervised doctoral students who have accepted faculty positions at major business schools around the world including Stanford, Harvard, Wharton, MIT, Columbia, Cornell, Michigan, Yale, and Chicago.

4. I have published research on a variety of topics in accounting, auditing, capital markets, investments, and corporate finance, including how security prices respond to corporate disclosures (including event studies of earnings disclosures); corporate managers' incentives to disclose forward-looking information, including guidance; the payout practices of public companies (i.e., firms' dividend and repurchase decisions); corporate managers' financial reporting, disclosure, and capital management decisions; how accounting information is used in contracts between the various corporate stakeholders; and the nature of corporate debt agreements.

5. My research is published in leading accounting and finance journals, including *The Accounting Review*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, the *Journal of Business*, *The Journal of Finance*, and the *Journal of Financial Economics*. My research has been featured in articles in *The Wall Street Journal*, *The New York Times*, *The Financial Times*, *The Economist*, and *Business Week*.

6. I serve as an Independent Trustee and chair of the Audit Committee of Harbor Funds, Harbor Funds II, and Harbor ETF Trust.

7. A copy of my curriculum vitae, including my publications, is attached as **Appendix A**. A list of my expert work over the last four years, including reports, depositions, and trial testimony, is attached as **Appendix B**.

## II. Assignment and Compensation

8. I have been retained by counsel for Natera, Inc. ("Natera" or "the Company"), Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Ramesh Hariharan (collectively, the "Defendants") to evaluate the following topics, assuming, as Plaintiffs claim, that Natera's common stock traded in an efficient market during the period from February 27, 2020 through March 8, 2022 (the "Proposed Class Period"[1]):

---

[1] I understand that Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and seek to certify a class consisting of: "All persons and entities who purchased or otherwise acquired Natera common stock between February 27, 2020 and March 8, 2022, inclusive, and were damaged thereby…. Excluded from the Class are Defendants, the officers and directors of Natera, members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest." Plaintiffs' Motion for Class Certification and Appointment

(i) whether stock price changes following alleged omissions provide information about the value of the allegedly omitted information;

(ii) whether, in an efficient market, publicly reported information about Natera, such as that in articles published by *The Capitol Forum* on July 1, 2020 and December 14, 2020,[2] would be rapidly incorporated into the Company's stock price;

(iii) whether Natera's stock price decline on March 9, 2022, after the release of a short-seller report (the "Hindenburg Report") by Hindenburg Research ("Hindenburg"),[3] can be used to reliably infer that the alleged misrepresentations affected the price of Natera's common stock.

9. I have also been asked to review and respond to the Expert Report of Chad Coffman, CFA ("Mr. Coffman"), dated June 4, 2024 (the "Coffman Report"), submitted on behalf of Plaintiffs. Specifically, I have been asked to evaluate whether Mr. Coffman has articulated a methodology capable of reliably measuring damages under Section 10(b) of the Exchange Act on a class-wide basis for Natera common stock in a manner consistent with Plaintiffs' theory of liability in this matter.

10. In formulating my opinions, I have relied on my knowledge, prior experience, academic research on relevant topics, experience as a journal editor reviewing academic research articles, and formal training in economics, finance, and accounting. A list of the materials I considered in preparing this report is attached as **Appendix C**.

---

of Class Representatives and Class Counsel, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-DAE, June 4, 2024 ("Motion for Class Certification"), pp. vi, 1. Plaintiffs also allege violations under Section 20(a) and 20A of the Exchange Act. *See* Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-LY, October 7, 2022 ("Complaint"), ¶¶ 224–244. Plaintiffs further allege violations of Section 11 of the Securities Act of 1933 ("Securities Act") for alleged misrepresentations made in the Offering Documents issued in connection with Natera's July 2021 secondary public offering, in which Natera sold 5.175 million shares of common stock at $113 per share. *See* Complaint, ¶¶ 16, 282 ("[T]he Offering Documents failed to disclose the fact that Natera relied on several deceptive practices to prop up revenue and inflate demand for Panorama, including the Company's undisclosed use of MGML to indiscriminately submit large numbers of prior authorizations and opting patients into microdeletion testing, both in contravention of established industry guidance."). Plaintiffs define Natera's Offering Documents as comprising the Natera Form 424B5, filed on July 22, 2022, and the Natera Form S-3 Registration Statement, filed on July 20, 2021. *See* Complaint, ¶ 268. Finally, Plaintiffs allege violations under Section 12(a)(2) and Section 15 of the Securities Act. *See* Complaint, ¶¶ 293–312.

[2] "Natera: Company Uses Third Party Non-Profit to Increase Likelihood of Insurance Reimbursement; Non-Profit Has Limited Paper Trail, Close Connections with Natera," *The Capitol Forum*, July 1, 2020 ("July 2020 *Capitol Forum* Article"); "Natera: Charity Apparently Established to Process Insurance Prior Authorizations Has Close Ties to Former Senior VP of Natera," *The Capitol Forum*, December 14, 2020 ("December 2020 *Capitol Forum* Article").

[3] "Natera: Pioneers in Deceptive Medical Billing," Hindenburg Research, March 9, 2022.

11. I am being compensated at my standard billing rate of $1,125 per hour in this case. I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter. My work on this case is ongoing; I reserve the right to modify or supplement my opinions in the event I become aware of additional information.

## III. Summary of Opinions

12. Based on my analysis to date, as well as my skills, knowledge, expertise, education, and training, I have formed the following opinions.

13. *First*, stock price changes following alleged omissions cannot be used to reliably infer that those alleged omissions affected the price of Natera common stock. I understand that Plaintiffs allege that a number of Defendants' statements regarding Natera revenue were misleading because Defendants failed to disclose that the growth in Panorama revenues was "propped up by" the Company's purportedly improper billing practices. However, because stock prices in an efficient market can only react to information that is publicly disclosed—and not to information allegedly *omitted*—any changes in the Company's stock price following alleged omissions do not measure the effect of any allegedly omitted information.

14. *Second*, allegedly omitted information regarding the Company's billing practices for Panorama—including information in the Hindenburg Report that Plaintiffs allege as corrective—had in fact been publicly available well before the release of the Hindenburg Report. In an efficient market, this information would have previously been incorporated into Natera's stock price. Indeed, the Hindenburg Report itself indicated that the claims therein were based on public information sources. Specifically:

   a. Plaintiffs allege that the Hindenburg Report's claims regarding Natera's reliance on My Genome My Life ("MGML") for prior authorizations for Panorama, the report's claims regarding a relationship between an MGML official and a former Natera employee, and the report's claims regarding the resulting connection between MGML and Natera, were corrective. However, *The Capitol Forum* had

previously published articles—in July 2020 and December 2020—that discussed Natera's reliance on MGML for prior authorizations and the purported relationship between the MGML official and the former Natera employee. In fact, the Hindenburg Report cited *The Capitol Forum* as a source for its claims regarding MGML. If Natera's common stock traded in an efficient market during the Proposed Class Period, as Mr. Coffman claims, this information would have been incorporated into Natera's stock price when first published—and so over a year before the Hindenburg Report was released on March 9, 2022.

b. Plaintiffs allege that the Hindenburg Report's claims that Panorama's order form required doctors and patients to "opt out" of microdeletion testing and the Hindenburg Report's claims that most insurers would not pay for microdeletion testing were corrective. However, as early as 2014, Natera had publicly disclosed that the microdeletions test would "become standard on Panorama's prenatal panel." Moreover, the order form itself was publicly available, with a URL indicating it was available online in November 2020. Further, as early as February 2021, Natera had publicly disclosed that most insurers were not covering microdeletion testing, and discussed the relatively low reimbursement rates for microdeletion tests in subsequent conference calls with market participants. Indeed, analyst commentary following the Hindenburg Report characterized these claims as previously known. If Natera's common stock traded in an efficient market during the Proposed Class Period, as Mr. Coffman claims, this information would have been incorporated into Natera's stock price when first disclosed—months or years before the Hindenburg Report was published.

15. *Third*, even setting aside that allegedly omitted information had been publicly available before the Hindenburg Report was released, Natera's abnormal stock price decline following the Hindenburg Report cannot be used to reliably infer that the alleged misrepresentations affected the price of Natera's stock, for at least the following reasons:

a. Securities analysts who followed the Company did not lower their estimates of Natera's future revenues following the release of the Hindenburg Report, inconsistent with Plaintiffs' claims that the alleged misrepresentations created a

misleading impression of demand for Panorama and that the truth regarding this demand and its implications for Natera revenues was revealed by the Hindenburg Report. In fact, *none* of the 11 contributors that published estimates of the Company's fiscal year ("FY") 2022 and FY 2023 revenues lowered those estimates in the week following the release of the Hindenburg Report.

b. Several factors other than information that Plaintiffs allege to be corrective in the Hindenburg Report likely affected Natera's stock price on March 9, 2022. These factors include: (i) the release of a short report by a prominent short seller Hindenburg Research; (ii) heightened risks of regulatory and/or legal costs triggered by release of the Hindenburg Report and/or the claims contained therein (even if unfounded); (iii) market concerns regarding possible reputational harm to the Company, its products (including Panorama), and/or its management (including management "distraction") triggered by the release of the Hindenburg Report and/or the claims contained therein (even if unfounded); and (iv) confounding negative information conveyed by the Hindenburg Report that Plaintiffs do not allege as corrective (e.g., Hindenburg's claims regarding other Natera products, including Horizon).

c. Evidence from after the Proposed Class Period further suggests that one cannot use Natera's stock price change on March 9, 2022 to infer that the alleged misrepresentations affected Natera's stock price. After the Company responded to the claims in the Hindenburg Report in an investor conference call on March 10, 2022, including by explaining that there would be "minimal, if any, impact to [its] business" if the Company stopped using MGML, Natera's stock price experienced a positive and statistically significant abnormal return of 18.9% based on my event study analysis. Moreover, securities analysts described the March 9, 2022 stock price decline that followed the Hindenburg Report as an overreaction to the report and its contents. Additionally, Natera's revenues for FY 2022 and FY 2023 (as subsequently reported) exceeded analysts' consensus estimates from prior to the Hindenburg Report. Further, I understand that: Natera has not faced any regulatory or legal actions from any agency related to claims

made in the Hindenburg Report; the U.S. Securities and Exchange Commission ("SEC") investigated certain claims in the Hindenburg Report and issued a "no-action" letter to the Company; there has been no restatement of or other adjustment to Natera's financial statements for the relevant periods (including to its reported revenues); there have been no regulatory actions, including fines, as a result of the purportedly problematic billing practices at issue in this matter; and Natera's Board of Directors, with the assistance of WilmerHale, undertook an independent investigation of claims made in the Hindenburg Report, and concluded those claims were "unfounded."

16. *Fourth*, Mr. Coffman fails to provide a damages methodology capable of measuring class-wide damages under Section 10(b) of the Exchange Act in a manner consistent with Plaintiffs' theory of liability in this matter. Although Mr. Coffman suggests that one could use the Company's stock price decline following the release of the Hindenburg Report as the first step in measuring inflation, such an approach fails for the same reasons, discussed above, that movements in the Company's stock price cannot be used to reliably infer that alleged omissions affected Natera's stock price. Moreover, Mr. Coffman fails to articulate a methodology that can reliably measure class-wide damages and artificial inflation based on the repetition in the Hindenburg Report of information that had previously been publicly reported. If the market for Natera's stock were efficient, as Mr. Coffman claims, this information would have previously been incorporated into Natera's stock price, which means that re-publication of the same information in the Hindenburg Report would not have affected the Company's stock price on March 9, 2022. At deposition, Mr. Coffman drew a distinction—generally unsupported in the academic literature—between "publicly available" and "widely disseminated" information and suggested that although information may be publicly available to and known by some investors, the information needs to be widely disseminated to be reflected in the stock price.[4] If Mr. Coffman is correct that some information, such as the allegedly corrective information previously reported by *The Capitol Forum*, was known to some market participants but not incorporated into Natera's stock price until the Hindenburg Report was released, he has failed to offer a class-wide damages methodology capable of addressing the fact that certain potential

[4] Deposition of Chad Coffman, CFA, dated July 19, 2024 ("Coffman Deposition"), 38:20–39:4, 40:2–7.

class members purportedly knew some or all of the alleged relevant truth before the Hindenburg Report was released. Mr. Coffman offers no reliable explanation for why it is appropriate to apply "a common methodology" to investors in "the Class as a whole" when that proposed class includes both investors who purportedly knew some or all of the alleged relevant truth and those who did not.

## IV. Background and Allegations

### A. Background on Natera

17. Natera is a genetics testing and diagnostics company founded in California in 2003 and incorporated in Delaware in 2007, with headquarters in Austin, Texas.[5] During the Proposed Class Period, Natera's common stock traded on the Nasdaq stock exchange under the ticker symbol NTRA.[6]

18. During the Proposed Class Period, Natera developed and commercialized molecular testing services "applying its proprietary technology in the fields of women's health, oncology and organ health."[7] In women's health, the Company "provide[d] testing to support a spectrum of women's health needs, from family planning and prenatal testing to hereditary cancer screening," including its Panorama and Horizon tests and other reproductive health products.[8] Natera reported revenues of $391 million in 2020, which grew to $820 million in 2022; in its 2022 10-K filing, the Company indicated that "Panorama and Horizon together represent the significant majority of [its] revenues."[9]

19. As discussed in more detail below, Plaintiffs allege misrepresentations regarding Natera's revenues from its Panorama test. As the Company explained in its SEC filings, Panorama is a non-invasive prenatal test ("NIPT") that screens for common genetic conditions that affect

---

[5] Natera Form 10-K for Fiscal Year Ended December 31, 2020, filed on February 26, 2021 ("Natera 2020 10-K"), pp. 1, 29, 94.

[6] Natera 2020 10-K, p. 71. *See also* Natera Form 10-K for Fiscal Year Ended December 31, 2021, filed on February 26, 2022 ("Natera 2021 10-K"), p. 72; Natera Form 10-K for Fiscal Year Ended December 31, 2022, filed on March 1, 2023 ("Natera 2022 10-K"), p. 68.

[7] Natera 2020 10-K, p. 94.

[8] Natera 2020 10-K, p. 8. According to the Company, "Horizon helps couples determine if they are carriers of genetic mutations that cause specific diseases…. The blood or saliva sample required for Horizon can be obtained simultaneously with the blood sample required for Panorama, which makes it easier for us to offer, and for patients to take, both tests." Natera 2020 10-K, p. 10.

[9] Natera 2022 10-K, p. 6.

pregnancies and is used to "assess the risk of fetal genetic abnormalities by non-invasively screening for fetal chromosomal abnormalities [and to] identify fetal sex for single birth pregnancies as well as of each fetus in twin pregnancies."[10] As part of the Panorama test, Natera offers "microdeletions panel screens for five of the most common genetic diseases caused by microdeletions."[11]

### B. Summary of Plaintiffs' Allegations

20. I understand that Plaintiffs allege that Natera made false and misleading statements and omissions during the Proposed Class Period, which "created the misleading impression that Panorama-generated revenue was the result of organically growing demand" when in fact "this revenue and purported demand were fueled by deceptive and improper business practices within Natera" (the "alleged misrepresentations").[12, 13]

21. In the Complaint, Plaintiffs allege that revenue from Panorama was "fueled by" two purportedly improper practices.[14] *First*, Plaintiffs allege that Natera had "an improper undisclosed relationship with [a] third-party prior authorization service," MGML, and used that "company … to indiscriminately submit prior authorization requests."[15] Plaintiffs further allege that Natera "never disclosed the Company's close ties to MGML, in direct contravention of industry guidance."[16] *Second*, Plaintiffs allege that Natera "made microdeletion testing a default selection when ordering Panorama," which "represented a sharp deviation from standard industry

---

[10] Natera 2020 10-K, p. 8.

[11] Natera 2020 10-K, p. 9 ("Microdeletions are missing sub-chromosomal pieces of DNA, and can have serious health implications depending on the location of the deletion.").

[12] Complaint, ¶ 12. *See also* Complaint, ¶ 109 ("In truth, however, these statements were materially false or misleading because Panorama revenue and the demand for the test were propped up to significant degree by deceptive business practices…"); Coffman Report, ¶ 13 ("The Complaint alleges that Natera attributed the Company's strong revenue performance to organically growing demand for Panorama, when the demand was in fact driven in part by deceptive business practices"); Motion for Class Certification, p. 1 ("Throughout the Class Period, Defendants told investors that Natera's impressive revenue performance was driven by Panorama and touted the purportedly growing demand for the product. All the while, Defendants concealed from investors that Panorama revenue and demand was, in fact, fueled by Natera's deceptive and improper business practices.").

[13] I understand Plaintiffs also allege that Natera made false and misleading statements concerning another of Natera's products, Prospera, for which allegations have been dismissed. *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-DAE, September 11, 2023 ("MTD Order"), p. 31. References to Plaintiffs' theory of liability in this report refer to those alleged misrepresentations that remain actionable in this matter.

[14] Complaint, ¶ 11.

[15] Complaint, § II.C.2.b.(1); Complaint ¶ 13.

[16] Complaint, ¶ 13.

practices" and "meant that patients had to affirmatively opt out of microdeletion screening when ordering the NIPT."[17] Plaintiffs claim that these "order practices" "propped up" Panorama revenues.[18]

22. Specifically, Plaintiffs allege that the following statements were false or misleading:[19]

a. On February 26, 2020, in an 8-K filing "reporting results for 4Q19 and the fiscal year ended December 31, 2019:" "The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests."[20]

b. On May 6, 2020, in an 8-K filing "reporting results for 1Q20:" "The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests."[21]

c. On August 5, 2020, in an 8-K filing "reporting results for 2Q20:" "The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests."[22]

d. On January 12, 2021, at the JPMorgan Healthcare Conference: "[W]e see doctors ordering the microdeletion test 8 out of 10 times [] they place an order for Panorama."[23]

e. On February 25, 2021, during "Natera's 4Q20 earnings call:" "The combination of consistent gross profit per test and volume growth that we talked about in the past is working as expected, allowing us to get the women's health business to cash flow breakeven. …'[L]ast year, we did 400,000 microdeletion tests, and that was at a growth rate of 37% year-on-year versus 2019. So this is really a rocket ship that's growing. We're running the tests. If we can get reimbursement, it's going to be – we're going to be off to the races.'"[24]

---

[17] Complaint, ¶ 14.
[18] Complaint, § II.C.2.b.2.
[19] In this summary, I have included the language that Plaintiffs emphasized in the Complaint. The full statements that Plaintiffs included in the Complaint are available at Complaint, ¶¶ 110–121, 150–162.
[20] Complaint, ¶¶ 110, 150 (emphasis removed).
[21] Complaint, ¶¶ 111, 151 (emphasis removed).
[22] Complaint, ¶¶ 113, 152 (emphasis removed).
[23] Complaint, ¶¶ 116, 153 (emphasis removed).
[24] Complaint, ¶¶ 115, 154 (emphasis removed).

f. On May 6, 2021, during Natera's Q1 2021 earnings call: "That acceleration is being driven by continued strong growth in the women's health business, but also we are seeing some real benefit from oncology and organ health as well."[25]

g. On August 5, 2021, on an "earnings call to discuss the Company's financial results for 2Q21:" "Net acceleration is being driven by continued strong growth in the Women's Health business and big contributions from oncology and transplant."[26]

h. On August 11, 2021, at Canaccord Genuity's 41st Annual Growth Conference: "Growth in NIPT is amplified for NTRA given additional tests are typically ordered with NIPT, such as … microdeletion testing (75 for every 100 NIPT tests)."[27]

i. On September 10, 2021, at the Wells Fargo Virtual Healthcare Conference: "[M]icrodeletions continues to be a very popular product for us."[28]

j. On September 13, 2021, "during a virtual conference for Morgan Stanley Global Healthcare:" "[A]s NIPTs penetrate, we have a couple of different ways to magnify the impact of that penetration in our business. One is for every 100 NIPTs that get run, something like 40 to 43 carrier screen test[s] get run. The other is that for every 100 NIPTs that get run, something like 80 microdeletions test[s] get[] run. So 1 trend 3 different products that can really drive a lot of outsized performance for us."[29]

k. On November 4, 2021, during Natera's Q3 2021 earnings conference call: "That acceleration is being driven by continued strong growth in the women's health products and big contributions from oncology and transplant products."[30]

23. Plaintiffs allege that the relevant truth was revealed when short-seller Hindenburg Research released the Hindenburg Report on March 9, 2022 claiming "that Natera engaged in

[25] Complaint, ¶ 156 (emphasis removed).
[26] Complaint, ¶ 157 (emphasis removed).
[27] Complaint, ¶¶ 119–120 (emphasis removed).
[28] Complaint, ¶¶ 121, 160 (emphasis removed).
[29] Complaint, ¶ 161 (emphasis removed).
[30] Complaint, ¶ 162 (emphasis removed).

deceptive sales and billing practices to drive up Panorama revenue."[31] According to Plaintiffs, the Hindenburg Report "detailed Natera's use of MGML to submit prior authorizations, and how Natera was propping up microdeletion demand by forcing patients to opt out of receiving such screenings."[32] Plaintiffs allege that "Natera's common stock price cratered in direct response, falling 33% upon the disclosure."[33]

## V. Stock Price Behavior in an Efficient Market

24. In an efficient market, stock prices represent the market's consensus expectation of the present value of future cash flows to shareholders,[34] and fully reflect all publicly available information.[35] Financial economists differentiate among three forms of market efficiency: weak form, semi-strong form, and strong form.[36] I understand that semi-strong form market efficiency is most relevant in the present context[37] and refer to semi-strong form efficiency when discussing

---

[31] Amended Complaint, ¶ 18. *See also* Amended Complaint, ¶ 172 ("On March 9, 2022, Hindenburg published the Hindenburg Report, claiming 'Natera's revenue growth has been fueled by deceptive sales and billing practices aimed at doctors, insurance companies and expectant mothers.' The Hindenburg Report stated it was based on 'more than 2 dozen interviews with former Natera employees, patients and industry experts, a review of hundreds of online complaints, FOIA requests to state Medicaid offices and state Attorneys General, and the company's financial filings.' In particular, the Hindenburg Report stated that Natera began using MGML in 2018 and submitted large volumes of prior authorization requests for Natera's Panorama tests without regard to whether the prior authorizations would be approved or denied. In addition, the Hindenburg Report detailed that Natera opted patients into microdeletion screening with every Panorama test unless a physician specifically opted out of that screening, giving the impression that demand for those screens was organic, rather than the result of improper sales practices.").

[32] Complaint, ¶ 18.

[33] Complaint, ¶ 18.

[34] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed., McGraw-Hill/Irwin, 2017 ("Brealey, Myers, and Allen (2017)"), p. 336.

[35] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417 ("Fama (1970)"), p. 383; Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices*, Basic Books, Inc., 1976, p. 133.

[36] Fama (1970), p. 383.

[37] At deposition, Mr. Coffman testified that he was referring to semi-strong form efficiency. *See* Coffman Deposition, 74:12–15 ("In terms of the opinion that I [am] giving when I say in my opinion the market is efficient, yes, I'm talking about that the market was semi-strong efficient."). *See also* Coffman Report, ¶¶ 15, 19; Complaint, ¶¶ 211–212 ("At all relevant times … the market for Natera common stock reasonably promptly digested current information regarding Natera from all publicly available sources and reflected such information in the price of Natera common stock.").

market efficiency in this report.[38] Under semi-strong form efficiency, stock prices react fully and rapidly to newly available public information.[39]

25. The basic idea behind efficient markets is that competition among investors and other market participants quickly eliminates opportunities to trade and profit on new public information, eliminating what are known as arbitrage opportunities and thus ensuring that the market is efficient.[40] According to Nobel laureate Eugene Fama, in an efficient market "prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs."[41] In other words, an efficient market does not require that the public information necessarily be widely disseminated or known to every market participant, or that all investors trade on the publicly available information. What *is* necessary is that some market participants have access to the information and trade on it to the point where that information is incorporated into the stock price.[42]

26. While all publicly available information is reflected in a company's stock price in an efficient market, it is not the case that all information affects stock prices. For example, it could be that information does not affect market expectations about the present value of a company's future cash flows—because the information was already publicly known (i.e., is not new), because it did not affect market expectations about future cash flows and/or risks (i.e., was not value-relevant), or because it was consistent with the market's prior expectations (i.e., was not a

---

[38] Weak form efficiency requires that "past price (or return) histories" cannot be used to predict future prices. Strong form efficiency requires that prices also reflect non-public information possessed by "any investor or groups." Fama (1970), p. 388.

[39] Fama (1970), pp. 383–417. Academic studies find that in an efficient market, new, value-relevant information is incorporated quickly into stock prices, generally within a trading day. *See, e.g.*, Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617 ("Fama (1991)"), pp. 1601–1602 ("The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements. The result is so common that this work now devotes little space to market efficiency. The fact that quick adjustment is consistent with efficiency is noted, and then the studies move on to other issues."). Greene and Watts (1996) find that price adjusts rapidly over the first post-announcement half hour on both the NYSE and NASDAQ. *See* Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1 (1996): 19–42, pp. 19–20.

[40] In financial economics, arbitrage refers to the practice of taking advantage of a temporary mispricing by trading in such a manner as to generate a virtually guaranteed profit. *See, e.g.*, Shleifer, Andrei, and Robert W. Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52, no. 1 (1997): 35–55, p. 35 ("[Arbitrage] is defined as 'the simultaneous purchase and sale of the same, or essentially similar, security in two different markets for advantageously different prices.'").

[41] Fama (1991), p. 1575.

[42] *See* Fama (1970), p. 388 ("[T]he market may be efficient if 'sufficient numbers' of investors have ready access to available information."). Mr. Coffman testified at deposition that "if a substantial number of investors have access to the information, that [*sic*] it would be rapidly incorporated into the market price.… I don't think there's a particular threshold [number] that the literature talks about." Coffman Deposition, 61:7–16.

surprise).[43] Because expected future cash flows depend in part on expected future revenues,[44] news that changes market expectations about future revenues is typically "value-relevant" and would generally be expected to affect stock prices.[45]

27. In an efficient market, a company's stock price reacts quickly to new information when it becomes publicly available; conversely, market participants cannot react to information that is not publicly available. Additionally, the re-publication or repetition of previously reported information would not be expected to change stock prices in an efficient market because that information would have been rapidly incorporated into the stock price when it first became publicly available.[46]

## VI. Stock Price Changes Following Alleged Omissions Cannot Be Used to Reliably Infer That the Alleged Omissions Affected Natera's Stock Price

### A. Event Studies

28. Event studies use financial market data to isolate and evaluate the economic impact of a company-specific event, such as a press release or financial restatement, on securities prices. In an efficient market, event studies can be used to measure the price impact (if any) of new public information. The use of event studies is well accepted in the academic literature.[47]

---

[43] For example, Brealey, Myers, and Allen (2017) state that "[i]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows ($C_t$) and the opportunity cost of capital (r)." Brealey, Myers, and Allen (2017), p. 336.

[44] *See, e.g.*, Brealey, Myers, and Allen (2017), pp. 140, 230–231.

[45] Information affecting the appropriate, risk-adjusted discount rate would also change the expected *present value* of future cash flows and is also typically value-relevant.

[46] *See, e.g.*, Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 9th ed., McGraw-Hill/Irwin, 2010 ("Ross, Westerfield, and Jaffe (2010)"), p. 440 ("According to the efficient-market hypothesis, a stock's abnormal return at time t, $AR_t$, should reflect the release of information at the same time, t. Any information released before then, though, should have no effect on abnormal returns in this period because all of its influence should have been felt before. In other words, an efficient market would already have incorporated previous information into prices."). Mr. Coffman agreed during his deposition that the repetition of "the exact same information where investors aren't expecting it to have changed" would not be "expect[ed] to move the stock price in an efficient market," and that information would be incorporated into the stock price "within one day or a small number of days" in an efficient market. *See* Coffman Deposition, 76:10–18; 76:21–77:24.

[47] For example, Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, "Event-Study Analysis," in *The Econometrics of Financial Markets*, Princeton University Press, 1997, pp. 149–180 ("Campbell, Lo, and MacKinlay (1997)"), p. 149, state that "[t]he usefulness of [event studies] comes from the fact that, given rationality in the marketplace, the effect of an event will be reflected immediately in asset prices. Thus the event's economic impact can be measured using asset prices observed over a relatively short time period."

29. To assess whether a disclosure (event) affects securities prices, an event study compares the actual stock price change (return) on the event date to an estimate of what that return would have been absent any new public information.[48] To do this, the event study accounts for other factors that affect the returns of a particular security, such as overall market movements and industry news. This is typically done by estimating the normal relation between the security's returns and market and industry returns during an "estimation period," which allows the researcher to compute an "abnormal" or "residual" return on the event date, that is, the stock's actual return minus the "expected" return accounting for the effect of these other factors. Once this is done, the researcher performs a statistical analysis to assess whether this abnormal return is statistically significant.[49] This involves computing a *t*-statistic, the ratio of the abnormal return to its standard error (a measure of the typical volatility of the abnormal returns measured during the estimation period). A sufficiently large (in absolute value) *t*-statistic allows one to reject the null hypothesis and conclude that the abnormal return is statistically significant.[50] A statistically significant abnormal return indicates that the return can reliably be distinguished from one based solely on market and industry movements, and allows one to conclude, with some level of confidence, that new, firm-specific information moved the stock price. Abnormal returns that are not statistically significant cannot be reliably attributed to any new information regarding the company, as they cannot be distinguished from the typical price fluctuations of the company in the absence of new information (i.e., they are not reliably different from zero).

30. I performed an event study analysis to assess Natera's daily abnormal stock price movements during the Proposed Class Period. Specifically, I used a two-factor linear regression model to estimate the relationship between daily returns on Natera stock and daily total (including dividends) returns on both the overall market—for which I use the Center for Research in Security Prices ("CRSP") value-weighted NYSE/AMEX/Nasdaq/ARCA total return index—and the industry—for which I construct an equal-weighted total return index based on

---

[48] Detailed discussions of event study methodology can be found in Campbell, Lo, and MacKinlay (1997), Chapter 4, and in Kothari, S.P., and Jerold B. Warner, "Econometrics of Event Studies," in *Handbook of Corporate Finance: Empirical Corporate Finance*, Volume 1, B. E. Eckbo ed., Elsevier, 2007, pp. 5–36.

[49] For example, the researcher can test whether the abnormal return is reliably different from zero (i.e., one tests the null hypothesis that the news did not affect the stock price).

[50] The size of the *t*-statistic necessary to establish statistical significance depends on the degrees of freedom (which is based on the number of observations used for estimation and the complexity of the model being estimated) as well as the relevant "p-value" (confidence level) for the test. *See, e.g.*, Dielman, Terry E., *Applied Regression Analysis*, 4th ed., South-Western, 2005, pp. 80–84.

the returns of the common stock of publicly traded U.S. companies that Natera identified as its competitors during the Proposed Class Period and that are also mentioned as competitors in securities analyst reports.[51] Returns are continuously compounded.[52] I estimate this relationship over three estimation periods that span from February 27, 2020, when the Proposed Class Period begins, through March 11, 2022. Although the Proposed Class Period ends on March 9, 2022 with the release of the Hindenburg Report, I extend the analysis period by two days to include the dates on which the Company hosted a conference call in response to the Hindenburg Report (March 10, 2022)[53] and Hindenburg Research posted an update to the Hindenburg Report (March 11, 2022). The first estimation period extends from the beginning of the Proposed Class Period on February 27, 2020 through April 30, 2020. This period was particularly affected by COVID-19-related market disruptions, including rapidly changing stock return volatility.[54] The

[51] To construct the industry index, I identified U.S. companies mentioned as competitors in Natera's Form 10-K filings for both FY 2019 and FY 2020 (*see* Natera 2019 10-K, pp. 19–20; Natera 2020 10-K, p. 16) that were publicly traded throughout the Proposed Class Period. I confirmed that each company was mentioned as a competitor of Natera by securities analysts during the Proposed Class Period. The companies in the industry index are: Adaptive Biotechnologies Corporation, CareDx, Inc., Exact Sciences Corporation, Guardant Health, Inc., Illumina, Inc., Invitae Corporation, Laboratory Corporation of America Holdings, Myriad Genetics, Inc., OPKO Health, Inc., and Quest Diagnostics Incorporated.

[52] Continuously compounded (also known as logarithmic or log) returns are standard in the academic literature. *See, e.g*., Campbell, Lo, and MacKinlay (1997), p. 11. In this report and exhibits, Natera's abnormal returns are reported as simple (arithmetic) returns for ease of interpretation and comparison to the results from Mr. Coffman's event study analysis.

[53] "Natera Special Investor Call in Response to Misleading Short Seller Report," March 10, 2022 ("Natera March 10, 2022 Investor Call").

[54] *See, e.g*., Baker, Scott R., et al., "The Unprecedented Stock Market Reaction to COVID-19," *The Review of Asset Pricing Studies* 10, no. 4 (2020): 742–758, p. 746 ("It's worth stressing that large daily stock market moves during this period were in both directions. Indeed, the S&P 500 index plunged 33% from February 21 to its trough on March 23. It then rose 30% from its bottom by the last trading day in April.…"); Pástor, Ľuboš, and M. Blair Vorsatz, "Mutual Fund Performance and Flows During the COVID-19 Crisis," *The Review of Asset Pricing Studies* 10, no. 4 (2020): 791–833, pp. 792–793 ("In the equity market, the S&P 500 index experienced its steepest descent in living memory, losing 34% of its value in the 5-week period between February 19 and March 23, 2020, before bouncing back by over 30% by the end of April.… We define the crisis period as the 10-week period between February 20 and April 30, 2020. We choose February 20 as the starting date because the stock market peaked on February 19 before its rapid descent. We choose April 30 as the ending date because it is a month-end by which the market largely rebounded, and also because it puts the market bottom on March 23 roughly in the middle of the crisis period. The 10-week crisis period is thus roughly evenly split between the crash and the recovery."). When the model is estimated over the entire Proposed Class Period, the variance of the abnormal returns from February 27, 2020 through April 30, 2020 is statistically significantly different (i.e., higher) than the variance of the abnormal returns during the remainder of the Proposed Class Period. Specifically, I used a statistical analysis known as a Levene's test to investigate whether there were statistically significant changes in abnormal return volatility in the period from February 27, 2020 through April 30, 2020 compared to the period from May 1, 2020 through March 11, 2022. *See* LeBlanc, David C., *Statistics: Concepts and Applications for Science*, Jones and Bartlett Publishers, 2004, p. 243 ("The Levene Test is used … to test the Null hypothesis that two population variances are equal"). Based on this test, I find evidence that the variance in Natera's abnormal returns is higher during the period affected by COVID-19-related market disruptions.

remainder of the analysis period is divided into two estimation periods of approximately equal length: May 1, 2020 through April 6, 2021, and April 7, 2021 through March 11, 2022.[55]

31. **Exhibit 1** compares Natera's daily closing stock price to corresponding levels of the market index, the industry index, and the Nasdaq Biotechnology total return index (which Mr. Coffman uses as the industry index in his event study)[56] during the Proposed Class Period. **Exhibit 2a** reports the regression estimation results while **Exhibit 2b** reports the estimated daily abnormal returns for Natera common stock from February 27, 2020 (the first day of the Proposed Class Period) through March 11, 2022.

32. Though a useful tool, event study analysis is subject to certain limitations. First, an event study measures the price impact of all new information revealed during the study's event window; it cannot reliably identify the stock price impact of a specific piece of company-specific information when multiple pieces of information are disclosed simultaneously. Second, an event study cannot measure the price impact of information that is not made publicly available. Third, an event study measures the market's reaction to the total mix of new, unexpected, firm-specific information when that information is released to the market; it cannot be used to measure the price reaction to the same information at a different point in time or under different circumstances or to evaluate the price reaction to different information.

### B. An Event Study Analysis Cannot Measure the Effect of the Allegedly Omitted Information at the Time of the Alleged Omission

33. I understand that Plaintiffs claim that certain statements made by Defendants during the Proposed Class Period "were materially false and misleading and omitted material facts when made because they gave the market the impression that Natera's impressive Panorama revenues were the result of organic and growing demand, when in fact they were propped up by Natera's deceptive practices, including using the Company's prior authorization scheme with MGML

---

[55] In estimating these regressions, I exclude returns for impact dates of the alleged misrepresentations and the alleged corrective disclosures as pled in the Complaint; the publication date and subsequent trading day for *The Capitol Forum* Articles (i.e., July 1, 2020; July 2, 2020; December 14, 2020; and December 15, 2020); the date of the Natera March 10, 2022 Investor Call; and the date Hindenburg Research published an update to the Hindenburg Report (March 11, 2022). *See, e.g.*, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39, p. 15 ("Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[56] Coffman Report, footnote 58.

[and] opting patients into microdeletion testing [], both in contravention of established industry guidance."[57, 58]

34. As discussed in **Section VI.A**, in an efficient market, event studies can be used to assess the stock price impact of newly available company-specific information. However, an event study analysis does not measure the stock price impact of information that was not released on a given date, including information alleged to have been omitted. Indeed, Mr. Coffman testified that "generally speaking when people talk about omissions or thinking about omissions, they are talking about things that the company [could] have said, but didn't and, therefore, the market price isn't reacting on that information."[59] Thus, any stock price changes associated with alleged omissions do not measure the impact of any allegedly *omitted* information regarding "the Company's prior authorization scheme with MGML [and] opting patients into microdeletion testing [], both in contravention of established industry guidance."[60]

35. For example, after market close on August 5, 2020, Natera reported financial results for Q2 2020 including that "[t]he increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests."[61] According to Plaintiffs, this statement was misleading because Panorama's revenues "were propped up by Natera's deceptive practices" and "[n]one of the material facts relating to these practices were disclosed to investors."[62] An event study analysis could be used to measure the collective effect on Natera's stock price of the information Natera released on this date, including its reported revenues. However, as an economic matter, an event study analysis does not measure the effect, if any, of information that Plaintiffs allege was omitted (and so not disclosed) on this date—namely, that Natera's reported revenues were allegedly "propped up by Natera's deceptive practices."[63] In other words, the +9.3% abnormal stock price response to the August 5, 2020 disclosures (on August 6, 2020) is not informative regarding the impact on Natera's stock price, if any, of a hypothetical alternative disclosure that,

[57] Complaint, ¶ 163.
[58] Prior authorization "is a health plan cost-control process by which physicians and other health care providers must obtain advance approval from a health plan before a specific service is delivered to the patient to qualify for payment coverage." "Prior Authorization Practice Resources," *American Medical Association*, available at https://www.ama-assn.org/practice-management/prior-authorization/prior-authorization-practice-resources.
[59] Coffman Deposition, 105:7–21.
[60] Complaint, ¶ 163.
[61] Complaint, ¶ 152.
[62] Complaint, ¶ 163.
[63] Complaint, ¶ 163.

under Plaintiffs' allegations, would have revealed that the reported revenues were "propped up" by the allegedly deceptive business practices.[64]

## VII. Allegedly Omitted Information Regarding Natera's Purportedly Deceptive Business Practices That Was Publicly Available Well Before the Alleged Corrective Disclosure Would Have Previously Been Incorporated into Natera's Stock Price in an Efficient Market

36. Plaintiffs claim the Hindenburg Report "detailed Natera's use of MGML to submit prior authorizations, and how Natera was propping up microdeletion demand by forcing patients to opt out of receiving such screenings."[65] As discussed in **Section VII.A**, information regarding Natera's use of MGML to submit prior authorizations and that entity's business practices was publicly available more than a year before the Hindenburg Report was released. As discussed in **Section VII.B**, information regarding Natera's microdeletion ordering and billing practices was publicly disclosed months or even years before the Hindenburg Report was released.[66]

37. If, as Plaintiffs and Mr. Coffman assert, the market for Natera common stock was efficient during the Proposed Class Period, the information that was publicly available prior to the Hindenburg Report would have been quickly incorporated into the Company's stock price when it first became publicly available—and so well before the Hindenburg Report was released.

### A. Allegedly Corrective Information Regarding MGML Was Publicly Available Before the Release of the Hindenburg Report

38. Plaintiffs identify certain claims in the Hindenburg Report pertaining to MGML they allege as corrective:

---

[64] **Exhibit 2b**. The abnormal return is also positive and statistically significant according to Mr. Coffman's event study. *See* Coffman Report, Exhibit 7.

[65] Complaint, ¶ 18.

[66] The Hindenburg Report indicates that the information presented in the report is obtained from public sources: "To the best of our ability and belief, all information contained herein … has been obtained from public sources we believe to be accurate and reliable." Hindenburg Report, p. 45. The report further states, "Hindenburg Research makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use." Hindenburg Report, p. 45. The report also indicates that Hindenburg conducted "more than 2 dozen interviews with former Natera employees, patients and industry experts." Hindenburg Report, p. 1. I express no opinion regarding whether any of the claims in the Hindenburg Report are true (although, as discussed in **Section VIII.C**, an investigation by WilmerHale found that the claims in the Hindenburg Report are unfounded).

> In particular, the Hindenburg Report stated that Natera began using MGML in 2018 and submitted large volumes of prior authorization requests for Natera's Panorama tests without regard to whether the prior authorizations would be approved or denied.[67]
>
> In contravention of well-established … guidelines[,] … Natera was using a third-party company with which it maintained undisclosed intimate ties to provide free prior authorization services to practitioners and submit prior authorization requests for the Company's Panorama tests.[68]
>
> At the time MGML was founded, and throughout the Class Period, [MGML employee] Gupta maintained significant connections with Amar Kamath [who was Natera's] VP of Commercial Sales from October 2017 until May 2019.[69]
>
> [There were] close personal and business ties between Gupta and Kamath."[70]
>
> These facts are consistent with the accounts of a former Natera sales representative and individuals familiar with the Natera-MGML relationship interviewed by Hindenburg, all of whom stated that MGML submitted large numbers of prior authorizations on Natera's behalf, including many that lacked key support…. Hindenburg also reported based on its sources that MGML would even conduct prior authorizations after a Panorama test was run.[71]

As discussed below, allegedly corrective information identified by Plaintiffs regarding Natera's purported connection to MGML was publicly available well before the release of the Hindenburg Report. As such, in an efficient market, this information would have been incorporated into Natera's stock price well before the Hindenburg Report was released.

39. Starting no later than 2017, Natera disclosed in its SEC filings that third-party payers (i.e., commercial and government payers) were requiring prior authorization as a condition for reimbursing patients for genetic tests like Panorama.[72] For example, by the beginning of the Proposed Class Period Natera had disclosed:

---

[67] Complaint, ¶ 172.
[68] Complaint, ¶ 123.
[69] Complaint, ¶ 129.
[70] Complaint, ¶ 130.
[71] Complaint, ¶ 135 (emphasis removed).
[72] Plaintiffs acknowledge this in the Complaint. *See* Complaint, ¶ 125 ("In its 2Q17 10-Q filed with the SEC in August 2017, Natera disclosed that health insurers were increasingly requiring prior authorizations for Panorama. Historically, prior authorizations have been an administrative hurdle with negative financial consequences for Natera.").

> [E]ven if we are under contract with a third-party payer, the contract does not guarantee reimbursement for all testing we perform…. In addition, the terms of certain of our agreements require us to seek prior authorization from the third-party payer, require a physician or qualified practitioner's signature on test requisitions, or put in place other controls and procedures prior to conducting a test. To the extent we or the physicians ordering our tests do not follow these requirements, we may be subject to claims for recoupment of reimbursement amounts previously paid to us, or may not receive some or all of the reimbursement payments to which we would otherwise be entitled, which has occurred in some cases, and which may have an adverse impact on our revenues.[73]

> [T]hird-party payers have been increasingly requiring prior authorization to be obtained prior to conducting a test, as a condition to reimbursing for the test.[74]

> Recall that in Q4 of 2018 and Q1 of 2019, we took a significant [average sales price] hit in response to several factors, including the expansion of prior authorization policies.[75]

40. In addition, throughout the Proposed Class Period Natera disclosed various risks related to reimbursement as a result of requirements for prior authorization and related third-party payer practices. Such disclosures included that third-party payers may not reimburse for Panorama tests or for microdeletion screening, in which case Natera's future revenues would be adversely affected.[76]

---

[73] Natera Form 10-Q for the Fiscal Quarter Ended March 31, 2017, filed on May 10, 2017, pp. 63–64.

[74] Natera Form 10-K for Fiscal Year Ended December 31, 2017, filed on March 15, 2018, p. 54. *See also* Natera 2020 10-K, p. 31.

[75] Natera Q4 2019 Earnings Call Transcript, February 26, 2020.

[76] *See, e.g.*, Natera 2020 10-K, p. 31, Natera 2021 10-K, p. 33 ("[T]hird-party payers, such as commercial insurance companies and government insurance programs, may decide not to reimburse for Panorama or Horizon, may not reimburse for uses of Panorama for the average-risk pregnancy population or for the screening of microdeletions, or may set the amounts of any reimbursements at prices that do not allow us to cover our expenses; in fact, many third-party payers currently have negative coverage determinations or otherwise do not reimburse for microdeletions screening and we expect low reimbursement rates for microdeletions screening to continue, at least in the near term; also, most state Medicaid programs currently either reimburse at low rates or do not reimburse for our tests."); Natera 2020 10-K, p. 50, Natera 2021 10-K, p. 52 ("[I]f a third-party payer denies coverage, it may be difficult for us to collect from the patient, and we may not be successful in doing so. …[W]e cannot always collect the full amount due for our tests when third-party payers deny coverage, cover only a portion of the invoiced amount or the patient has a large deductible, which may cause payers to raise questions regarding our billing policies and patient collection practices. We believe that our billing policies and our patient collection practices are compliant with applicable laws."); Natera 2020 10-K, p. 49, Natera 2021 10-K, p. 51 ("If third-party payers do not reimburse for NIPT for average-risk pregnancies or microdeletions in the future, our future revenues and results of operations would be adversely affected, particularly to the extent that we continue to perform large volumes of tests for which third-party payors do not reimburse…. In addition, a CPT code for microdeletions took effect in January 2017. We have experienced low average reimbursement rates for microdeletions under this code, and we expect that this code

41. Information related to MGML that Plaintiffs allege was omitted from statements made by Defendants but revealed by the Hindenburg Report had in fact been previously reported in articles published earlier during the Proposed Class Period. Specifically, *The Capitol Forum* published articles on July 1, 2020 and December 14, 2020 (together, "*The Capitol Forum* Articles") that contained claims, relying in part on anonymous sources and former employees, regarding Natera's reliance on MGML for prior authorizations and a purported relationship between MGML's founder and a former Natera employee.[77, 78] On each of the relevant dates, Natera's abnormal return was *not* statistically significant (i.e., the abnormal return was not reliably different from zero).[79] In fact, the Hindenburg Report cited *The Capitol Forum* as a source for the MGML-related claims it conveyed, stating, for example, that "The Capitol Forum[] *first reported on issues with MGML in 2020, including its connection to Natera*."[80]

42. *The Capitol Forum* Articles make a number of claims that are repeated in the Hindenburg Report regarding Natera's purported relationship with MGML, which Plaintiffs allege as corrective.[81] For example:

---

will continue to cause our microdeletions reimbursement to remain low, at least in the near term due to third-party payers declining to reimburse and as a result of reduced reimbursement, under the code, which has had, and we expect to continue to have, an adverse effect on our revenues.").

[77] July 2020 *Capitol Forum* Article; December 2020 *Capitol Forum* Article.

[78] *The Capitol Forum* published a number of other reports during the Proposed Class Period that raised questions about Natera's billing practices. *See,* for example, "Natera: Company Using Incorrect Billing Codes to Inflate Insurance Cost, According to Billing Experts," *The Capitol Forum*, March 2, 2020; "Natera: Company Using Questionable Billing Practices with State Medicaid Programs to Inflate Charges, According to Billing Expert," *The Capitol Forum*, June 12, 2020; "Natera: State Attorneys General Express Concern over Unbundling Practice," *The Capitol Forum*, August 14, 2020; "Natera: Company Appears to Be Improperly Billing Federal Tricare Program to Evade Non-reimbursement Policy," *The Capitol Forum*, October 8, 2020; "Natera: Colorado Medicaid Data Indicates State Significantly Increased Denial Rate for Natera Claims," *The Capitol Forum*, October 29, 2020; "Natera: Experts Raise Concerns about Size of Prompt Pay Discounts and Company Billing Practices," *The Capitol Forum*, August 5, 2021.

[79] For each of the two *The Capitol Forum* Articles, there was no statistically significant change in Natera's stock price on either the publication date or the subsequent trading day following each article (i.e., on July 1, July 2, December 14, or December 15 of 2020) according to both my event study and Mr. Coffman's event study. *See* **Exhibit 2b**; COFFMAN_000017; COFFMAN_008781, Sheet "Event Study." For both *Capitol Forum* Articles, I also reviewed public press and analyst reports from market close on the previous trading day through market close on the subsequent trading day (i.e., June 30 through July 2, 2020, and December 11 through December 15, 2020) to determine if other information came to the market that could have affected Natera's stock price on those days. I did not identify any other new Company-specific information that could have affected Natera's stock price on July 1, 2020, July 2, 2020, or December 14, 2020. A news article reported after market close on December 14, 2020 that the U.S. Patent and Trademark Office denied a patent challenge from another company against Natera. *See* "Illumina Can't Sink Natera Genetic Test IP in Patent Board Fight," *Bloomberg Law*, December 14, 2020.

[80] Hindenburg Report, p. 19 (emphasis added). *See also* Hindenburg Report, p. 42 ("As noted in our report, *The Capitol Forum* began reporting on the relationship between Natera and MGML in July 2020.").

[81] In addition, as noted above, Plaintiffs allege as corrective claims made in the Hindenburg Report that MGML sought prior authorizations after a Panorama test was run. *See* Complaint, ¶ 135. However, the Hindenburg Report

a. Regarding Natera's purported reliance on MGML for prior authorization requests prior to and during the Proposed Class Period, *The Capitol Forum* reported:

> Genetic testing company Natera (NTRA) is using a third-party charity called My Genome My Life to process some prior authorizations for its genetic tests, according to sources familiar with the matter who spoke on the condition of anonymity.[82]
>
> According to sources knowledgeable of MGML's operations, the organizations [*sic*] processed thousands of requests for Natera tests per week for roughly three years. …[MGML processed] hundreds of thousands of prior authorizations. …[S]ources stated that the lion's share of MGML's revenue appeared to come directly from Natera.[83]

b. Regarding a relationship between an MGML official and a former Natera employee, and MGML's purported connection to Natera, *The Capitol Forum* reported:

> [S]ources familiar with the innerworkings of the organization and documents reviewed by The Capitol Forum indicate that the organization has close ties to Natera…. According to sources, My Genome My Life had a close working relationship, which internal documents and communications between the two organizations that were viewed by *The Capitol Forum* confirm. The documents reveal and sources stated that Amar Kamath, Natera's Senior Vice President for Commercial Sales, was a key person in the relationship between Natera and My Genome My Life.[84]
>
> Documents and interviews *The Capitol Forum* conducted indicate that the key employee at MGML is a woman by the name of Deepti Gupta, who has close personal relationships with Amar Kamath, including owning a property together. Sources also state that Kamath was instrumental in pushing Natera to use MGML over other third parties for prior authorizations…. Kamath referred to Gupta as "Vicki Seth" in

itself noted that "some payors permit a grace period after a procedure" and stated that Natera had previously disclosed risks to reimbursement associated with when the prior authorization is completed. *See* Hindenburg Report, p. 45.

[82] July 2020 *Capitol Forum* Article, p. 1.

[83] December 2020 *Capitol Forum* Article, pp. 2, 8, and 9.

[84] July 2020 *Capitol Forum* Article, pp. 1–2.

> correspondence between Natera employees and MGML, according to documents reviewed by *The Capitol Forum*.[85]
>
> Connection between Kamath and Gupta. Amar Kamath, the former Senior Vice President for Commercial Sales at Natera, and Deepti Gupta have several personal connections, and Kamath was in his position at Natera when MGML was formed and began processing prior authorizations for Natera.[86]

43. Correspondence between market participants, including securities analysts, buy-side ("institutional") investors, and Natera executives shows that market participants were aware of claims by *The Capitol Forum* about Natera at the time *The Capitol Forum* Articles were published. Some market participants, in fact, reached out to Natera to inquire about claims made in the reports. For example, following publication of *The Capitol Forum* article on December 14, 2020, a portfolio manager at Bridger Capital LLC reached out to Natera's Chief Financial Officer ("CFO").[87] The email correspondence indicates that Bridger Capital LLC received notification of at least some of *The Capitol Forum*'s publications.[88] Similarly, internal company emails show that several other securities analysts and buy-side investors had access to reports *The Capitol Forum* published about Natera during the Proposed Class Period and discussed those reports with Natera executives.[89] At least two securities analysts—J.P. Morgan

---

[85] December 2020 *Capitol Forum* Article, p. 1.

[86] December 2020 *Capitol Forum* Article, p. 6 (emphasis removed).

[87] NTRA 0247211–213. *See also* "Blake Goodner," Duke-Margolis Center for Health Policy, available at https://healthpolicy.duke.edu/people/blake-goodner.

[88] Bridger Capital received reports on Natera from *The Capitol Forum* throughout the Proposed Class Period, including *The Capitol Forum* reports on March 2, 2020 (NTRA 0247246–247), June 12, 2020 (NTRA 0247232–234), August 14, 2020 (NTRA 0247217–220), October 8, 2020 (NTRA 0247227–229; NTRA 0247238–240), and August 5, 2021 (NTRA 0247206–208). Bridger Capital (as part of investment management firm Bridger Management, LLC) was an investor in Natera during the Proposed Class Period, and held approximately 1.5 million shares as of March 31, 2020, and 0.3 million shares as of December 31, 2021. These holdings represented 2.0% and 0.3% of Natera's outstanding common shares, respectively, and made Bridger the 14th and 69th largest institutional holder, of all holdings by institutions that filed SEC Form 13Fs for the quarters ending on March 31, 2020 and December 31, 2021, respectively. *See Eikon*. According to *FactSet*, "Bridger Management LLC (Bridger) is a registered investment advisor and hedge fund manager headquartered in New York City. The firm … is a direct subsidiary of Bridger Management II LP. Bridger serves as the investment adviser, with discretionary trading authority, to private, pooled investment vehicles, the securities of which are offered through a private placement memorandum to accredited investors." As of the beginning of 2020, Bridger Management LLC had approximately $2.4 billion of assets under management ("AUM"). *See FactSet*.

[89] *See also* emails from employees at RTW Investments, LP, and at Gilder Gagnon Howe & Co. LLC following *The Capitol Forum* reports on March 2, 2020 and on August 5, 2021, respectively (NTRA 0247248–250; NTRA 0247200–202; NTRA 0247214–216). RTW Investments, LP, was an investor in Natera during the Proposed Class Period, owning approximately 1.3 million shares as of March 31, 2020, and 1.9 million shares as of December 31, 2021. These holdings represented 1.6% and 2.0% of Natera's outstanding common shares, and made RTW

and Craig Hallum—who published analyst reports covering Natera during the Proposed Class Period also communicated with Natera executives regarding *The Capitol Forum* articles about the Company.[90]

44. In sum, claims regarding Natera's reliance on MGML for prior authorizations, including for Panorama, and the purported relationship between MGML's founder and a former Natera employee included in the Hindenburg Report that Plaintiffs point to were in the public domain well before the Hindenburg Report that Plaintiffs allege as corrective was released. If Natera's common stock traded in an efficient market during the Proposed Class Period, as Mr. Coffman concludes, then this information would have been incorporated into Natera's stock price at the time it was first published—over a year before the Hindenburg Report was released on March 9, 2022.

### B. Allegedly Corrective Information Regarding Natera's Microdeletion Ordering and Billing Practices Was Publicly Available Well Before the Hindenburg Report Was Published

45. In the Complaint, Plaintiffs claim "the Hindenburg Report detailed that Natera opted patients into microdeletion screening with every Panorama test unless a physician specifically opted out of that screening, giving the impression that demand for those screens was organic,

---

Investments, LP, the 16th and 9th largest institutional holder, of all holdings by institutions that filed SEC Form 13Fs for the quarter ending on March 31, 2020 and December 31, 2021, respectively. *See Eikon*. Gilder Gagnon Howe & Co. LLC was also an investor in Natera during the Proposed Class Period, owning approximately 1.1 million shares as of March 31, 2020, and 1.5 million shares as of December 31, 2021. These holdings represented 1.5% and 1.6% of Natera's outstanding common shares, and made Gilder Gagnon Howe & Co. LLC the 20th and 13th largest institutional holder, of all holdings by institutions that filed SEC Form 13Fs for the quarter ending on March 31, 2020 and December 31, 2021, respectively. *See Eikon*.

[90] J.P. Morgan analyst Tycho Peterson emailed Natera CFO Mike Brophy, copying Mr. Peterson's colleague Eleni Apostolatos, on October 8, 2020 following *The Capitol Forum* report titled "Natera: Company Appears to Be Improperly Billing Federal Tricare Program to Evade Non-reimbursement Policy" and asked if Mr. Brophy could comment on the report ("[W]e got this from a client earlier (guess it came from Capital [*sic*] Forum). Any color you can provide?"). *See* NTRA 0247235; NTRA 0247198–199. The same J.P. Morgan analysts published several reports on Natera during the Proposed Class Period. *See, e.g.*, "3Q20 Recap: Time to Shine... Pipeline to Move the Needle in '21 w/Average-risk NIPT Upside; Reiterate OW, PT to $90," *J.P. Morgan*, November 5, 2020. Craig Hallum analyst Alexander Nowak emailed Mr. Brophy on October 8, 2020 to inquire about *The Capitol Forum* report released that day ("…Looks like standard billing to me and someone trying to spin this negative…. Any thoughts on this would be helpful."). *See* NTRA 0247230–231; NTRA 0247241–242. The same Craig Hallum analyst published several reports on Natera during the Proposed Class Period. *See, e.g.*, "Growth Acceleration Underway, from Prenatal Right Now-Cancer Is Next. Reiterate Buy Rating, Raising Price Target To $92.," *Craig Hallum*, November 6, 2020. Note that both of these analysts are considered by Mr. Coffman in his *Cammer* Factor 2 analysis in support of his opinion of "evidence that Natera's Common Stock traded in an efficient market during the Class Period." Coffman Report, ¶ 38, Exhibit 4.

rather than the result of improper sales practices."[91] Specifically, Plaintiffs claim the Hindenburg Report revealed that "Panorama's requisition (i.e., order) form by default caused patients to order microdeletion screening for one microdeletion (DiGeorge syndrome),"[92] which "went against industry guidance."[93] Additionally, Plaintiffs claim the Hindenburg Report revealed that most "payers would either refuse to pay anything, or pay very little, for Panorama's microdeletion screening,"[94] which "enabled the Company to pursue payment from patients for the cost of microdeletion testing that their health insurance did not cover, padding Natera's revenue from additional tests."[95]

46. As discussed below, allegedly omitted information regarding issues related to microdeletion testing and billing had been publicly available well before the Hindenburg Report was released. In fact, as early as 2014, Natera disclosed in a press release that the microdeletion test would "become standard on Panorama's prenatal panel:"

> Beginning on March 1, screening for 22q11.2 deletion syndrome (also known as DiGeorge syndrome) will become standard on Panorama's prenatal panel, which already includes screening for trisomy 21 (Down syndrome), trisomy 18, trisomy 13, triploidy, and sex chromosome aneuploidies.[96]

47. Moreover, the order form itself—which would have been used by physicians to order Panorama testing—is publicly available online; the website URL indicates it was made available online in November 2020.[97] The form, under the section for "Panorama Prenatal Screen," displays a checkbox to indicate "I DO NOT want 22q.11.2 [microdeletion test]."[98]

48. With respect to Plaintiffs' claim that the Hindenburg Report revealed that most "payers would either refuse to pay anything, or pay very little, for Panorama's microdeletion

---

[91] Complaint, ¶ 172.
[92] Complaint, ¶ 145.
[93] Complaint, ¶ 146.
[94] Complaint, ¶ 147.
[95] Complaint, ¶ 149.
[96] "Natera Expands Panorama™ Non-Invasive Prenatal Test to Screen for Clinically Significant Microdeletions," Natera, February 5, 2014.
[97] *See* "Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf," *Natera*, available at https://www.natera.com/wp-content/uploads/2020/11/Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf.
[98] *See* "Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf," *Natera*, available at https://www.natera.com/wp-content/uploads/2020/11/Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf.

screening,"[99] Natera had warned investors of exactly this risk before the Hindenburg Report was released:

> [W]hile we have obtained a [Current Procedure Terminology ("CPT")] code for microdeletions and CMS has set a price for microdeletions testing, *we have experienced low average reimbursement rates for microdeletions testing* under this code, and we expect that this code will continue to cause our microdeletions reimbursement to remain low, at least in the near term, because *third-party payers are declining to reimburse* under the new code or reimbursing at a much lower rate than we had previously received before the CPT code was established.[100]

49. Natera also discussed its limited reimbursement on earnings conference calls during the Proposed Class Period. For example, on May 6, 2021, Mr. Chapman noted that Natera was "doing hundreds of thousands of these tests every year that are not [being] reimbursed;"[101] and on November 4 of that year, Mr. Brophy stated that "percent paid rates on microdels are in that … single-digit percentage kind of range."[102] Analysts reported on this low reimbursement rate in their reports. For example, J.P. Morgan analysts noted that "coverage for the [microdeletion] test remains almost inexistent,"[103] and Cowen analysts stated that Natera "gets paid on this 'add-on' testing roughly 5% of the time."[104]

50. Similarly, more than two months before the Hindenburg Report was released, *The New York Times* published an article that made a number of claims regarding Natera's prenatal tests.[105] The article suggested that some insurance companies do not cover microdeletion testing, noting

---

[99] Complaint, ¶ 147.

[100] Natera 2020 10-K, p. 18 (emphasis added). *See also* Natera 2021 10-K, p. 19; Natera Form 10-Q for the Fiscal Quarter Ended June 30, 2021, filed on August 6, 2021, p. 41; Natera Form 10-Q for the Fiscal Quarter Ended September 30, 2021, filed on November 5, 2021, p. 42.

[101] Natera Q1 2021 Earnings Call Transcript, May 6, 2021.

[102] Natera Q3 2021 Earnings Call Transcript, November 4, 2021.

[103] "J.P. Morgan Healthcare Conference Takeaways," *J.P. Morgan*, January 12, 2021

[104] "Full Steam Ahead for NTRA's Bustling Oncology Engine; Room for Upside in Q4," *Cowen*, November 5, 2021. *See also* "SMART Study Results Published; Solid Step Toward Microdeletion Reimbursement; Reiterate Buy," *Canaccord Genuity*, January 20, 2022 ("Natera receiv[es] reimbursement … on only a single-digit percentage of these tests"); "2022+ Setup Illustrated Through Pictures; Macro-Drive Driven PT Trim," *Cowen*, February 17, 2022 ("NTRA has indicated that … it currently gets paid 5-10% of the time" for microdeletion testing).

[105] "When They Warn of Rare Disorders, These Prenatal Tests are Usually Wrong," *The New York Times*, January 1, 2022.

that companies like Natera "view[] microdeletions as a major business opportunity—especially if they can persuade more doctors to order them and more insurers to cover them."[106]

51. Moreover, analyst commentary following the Hindenburg Report indicated that the report's claims about Natera's microdeletion billing practices were previously known to the market.[107] For example, analysts at Canaccord Genuity stated on March 9, 2022 that the discussions about microdeletions are "not necessarily a new debate" and that the "extent of billing violations that the report mentioned are broad but are generally 'old news' with respect to Natera and the NIPT industry."[108] Piper Sandler analysts stated, "[w]e view the report as highlighting multiple previously reported issues that the company has dealt with, some of which (such as the NYT article on micro-deletions) we consider non-issues for the company and more likely misunderstandings on the part of the writers."[109] Morgan Stanley analysts stated, "we believe the majority of the points made in the report are known to investors and have been transparently communicated … by management (including … that a majority of microdeletion testing volume is not currently reimbursed)."[110]

52. In sum, claims regarding Natera's microdeletion testing and billing practices that had been in the public domain well before the Hindenburg Report was published on March 9, 2022 and that Plaintiffs allege as corrective would have been incorporated into Natera's stock price at the time they were first made—months (if not years) before the Hindenburg Report was released—if Natera's stock traded in an efficient market, as Mr. Coffman claims.

---

[106] "When They Warn of Rare Disorders, These Prenatal Tests are Usually Wrong," *The New York Times*, January 1, 2022. The Hindenburg Report referenced this article in a different context. *See* Hindenburg Report, pp. 2, 21–22, 39.

[107] Some of the analysts who issued these reports are those whose reports, in Mr. Coffman's view, are widely available. *See* Coffman Deposition, 68:3–6 ("There are clearly names on here that I recognize that in my experience are widely available.… So, for example, Canaccord Genuity, Cowen, J.P. Morgan, Baird, Wells Fargo, Raymond James, these are firms that issue analyst reports that I've seen examples of these reports in many different cases.… So, I'm confident at least in a substantial number of these that they were widely available.").

[108] "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate BUY," *Canaccord Genuity*, March 9, 2022.

[109] "NTRA: Trading below Signatera Value in Intraday," *Piper Sandler*, March 9, 2022.

[110] "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022. *See also* "Thoughts on Short Report," *Baird*, March 9, 2022 ("Microdeletions billing practices. We don't give this much merit.… Our take: Base NIPT and microdeletions have two separate codes, so it shouldn't be a surprise that they're billed separately. We don't think there's much more to say there."); "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022 ("Microdeletion testing was recently featured in a scathing New York Times exposé that reported how high rates of false positives result in tragic consequences.").

## VIII. Natera's Abnormal Stock Price Decline on March 9, 2022 Following the Hindenburg Report Cannot Be Used to Reliably Infer That the Alleged Misrepresentations Affected the Price of Natera's Stock

53. In the Complaint, Plaintiffs claim that "[i]n response to the Hindenburg Report, the price of Natera common stock … closed down approximately 33% for the day."[111] As detailed in **Exhibit 2b**, according to my event study regression analysis there was a statistically significant abnormal stock price decline of 37.3% on March 9, 2022.[112] As discussed further below, there was also a statistically significant, *positive* abnormal return of 18.9% the next day (March 10, 2022) following a press release and investor call held by the Company[113] in which management provided responses to the Hindenburg Report.[114]

54. In this section, I analyze factors, other than the allegedly corrective information, which likely affected Natera's stock price on March 9, 2022 following the release of the Hindenburg Report before market open on that date. In **Section VIII.A**, I show that, even absent these other factors, one cannot simply attribute the price decline following the Hindenburg Report to information that Plaintiffs allege as corrective that had been previously reported. First, in an efficient market, the publicly available information about Natera's business practices would have previously been incorporated into Natera's stock price, and thus, re-publication of this information in the Hindenburg Report would not have affected Natera's stock price on March 9, 2022. Second, inconsistent with Plaintiffs' claim that the alleged misrepresentations "inflated Natera's revenue" and "created the misleading impression that Panorama-generated revenue was the result of organically growing demand,"[115] none of the securities analysts that followed Natera lowered their revenue estimates as a result of the purported revelations in the Hindenburg Report, which suggests that the stock price decline following the Hindenburg Report on March 9,

---

[111] Complaint, ¶ 173. *See also* Complaint, ¶ 18.
[112] According to Mr. Coffman's event study, Natera's abnormal return on March 9, 2022 was -38.9%, which he finds is statistically significant. *See* COFFMAN_000017; COFFMAN_008781, Sheet "Event Study."
[113] *See* Natera March 10, 2022 Investor Call.
[114] Mr. Coffman's event study analysis does not extend beyond March 9, 2022 according to the materials he produced with his report. *See* COFFMAN_000017; COFFMAN_008781, Sheet "Event Study." Hindenburg Research added a section to the Hindenburg Report on March 11, 2022 titled "Update 3/11: Natera—Pioneers in Avoiding Talking About Deceptive Medical Billing." According to my event study analysis, the abnormal return of -1.6% on March 11, 2022 is not statistically significant. *See* **Exhibit 2b**.
[115] Complaint, ¶¶ 12–13.

2022 cannot be used to reliably infer that the alleged misrepresentations regarding the sources and expected growth of Natera's revenue affected the Company's stock price on that date.

55. As discussed in **Section VIII.B**, several factors other than any alleged correction of the alleged misrepresentations likely affected Natera's stock price on March 9, 2022, including (i) the release of a report by a well-known short seller, Hindenburg Research; (ii) heightened risk of regulatory and/or legal costs triggered by the Hindenburg Report and claims therein (even if unfounded); (iii) market concerns regarding potential reputational harm to the Company, its products (including Panorama), and/or its management triggered by the Hindenburg Report and claims therein (even if unfounded); and (iv) confounding negative information conveyed by the Hindenburg Report that Plaintiffs do not alleged to be corrective (e.g., Hindenburg's claims about Horizon, among others).

56. Developments after the Proposed Class Period further support that one cannot infer that the alleged misrepresentations affected Natera's stock price based on the decline in the Company's stock price on March 9, 2022 (**Section VIII.C**). For example, on March 10, 2022, the Company held an investor conference call in which management responded to claims in the Hindenburg Report and made additional disclosures.[116] Further, risks related to possible regulatory and legal consequences that may have resulted from the issuance of the Hindenburg Report, including claims made therein, have not materialized as of the date of this report. And, as of the date of this report, in spite of investigations by both the Company's Board of Directors and the SEC of certain of the claims made in the Hindenburg Report, I understand there have been no findings of wrongdoing by the Company or its management. Moreover, the Company has not restated any of its financial statements (including restatements or adjustments to reported revenues), including those issued prior to and during the Proposed Class Period, which are the subject of Plaintiffs' claims.[117]

---

[116] Natera March 10, 2022 Investor Call. As discussed below, the Company also issued a press release late in the day on March 9, 2022 in response to the Hindenburg Report. *See* "Natera Responds to Misleading Short Seller Report," *PR Newswire*, March 9, 2022.

[117] The Company's revenue recognition practices, including those for Panorama, were specifically reviewed by its external auditors, as noted in the Company's 2021 and 2022 10-K filings (in fact, the auditor identified the Company's treatment of its genetic test revenues as a "critical audit matter" and so paid special attention to the related accounting and internal controls). The Company's audit opinions were unqualified throughout the relevant periods. *See* Natera 2021 10-K, pp. 91–92; Natera 2022 10-K, p. 85.

### A. The Stock Price Decline on March 9, 2022 Cannot Be Used to Reliably Infer That the Alleged Misrepresentations Affected Natera's Stock Price

57. As discussed in **Section VII**, the repetition in the Hindenburg Report of allegedly omitted information regarding Natera's business practices for Panorama that had been made publicly available prior to the publication of the Hindenburg Report would not have affected Natera's stock price on March 9, 2022 if Natera's stock traded in an efficient market during the Proposed Class Period, as Mr. Coffman claims. Moreover, there are differences between what Plaintiffs allege as misrepresentations and claims made in the Hindenburg Report that Plaintiffs allege as being corrective. From an economic perspective, these differences imply that the stock price change following publication of the Hindenburg Report cannot be used to reliably infer that the alleged misrepresentations affected Natera's price.

58. Plaintiffs claim that during the Proposed Class Period "Defendants told investors that Panorama was driving Natera's impressive revenue performance" and that "Natera's strong performance was underpinned in large part by growing demand for Panorama, which they represented could potentially generate hundreds of millions of dollars in future revenue."[118] Plaintiffs further claim that the alleged misrepresentations "created the misleading impression that Panorama-generated revenue was the result of organically growing demand [but] in fact, this revenue and purported demand were fueled by deceptive and improper business practices within Natera."[119]

59. However, inconsistent with Plaintiffs' allegations that the claims made in the Hindenburg Report revealed that Natera's revenue growth and the demand for Panorama were "fueled by" "deceptive" practices and despite Plaintiffs' claims that the alleged misrepresentations created a "misleading impression" of demand,[120] securities analysts did not lower their revenue estimates following the Hindenburg Report. In **Exhibit 3a** I examine FY 2022 and FY 2023 revenue estimates by securities analysts covering Natera around the date the Hindenburg Report was released. As shown in the exhibit, 11 contributors provided estimates of FY 2022 and FY 2023

[118] Complaint, ¶ 11.
[119] Complaint, ¶ 12.
[120] Complaint, ¶ 12.

revenues for Natera around this date. None lowered their revenue estimates for Natera during the week immediately following the publication of the Hindenburg Report.[121]

60. Indeed, following the Hindenburg Report, and consistent with their unchanged estimates of the Company's future revenues, analysts commented that they did not expect a valuation impact based on claims in the Hindenburg Report regarding the Company's business practices, including with respect to Panorama revenues and demand for the microdeletion tests. Canaccord Genuity analysts stated "the company's fundamentals have not changed due to the emergence of the Hindenburg short report."[122] Similarly, Morgan Stanley analysts commented that "we do not see these [allegations] as changing our fundamental view of the company,"[123] and Cowen analysts noted "MGML-related issue[s] (if any) could be resolved quickly and without any major impact to the business."[124]

61. In sum, although Plaintiffs claim the alleged misrepresentations created a "misleading impression" of Panorama's revenue and growth, the alleged corrective disclosure (i.e., the Hindenburg Report) did not lead securities analysts to lower their revenue estimates for Natera. The fact that securities analysts did not lower their revenue estimates after the alleged truth was revealed in the Hindenburg Report supports the conclusion that the stock price decline on March 9, 2022 cannot be used to reliably infer that the alleged misrepresentations regarding Natera's revenues, expected revenue growth, and/or the demand for Panorama affected the price of Natera's common stock.

---

[121] I also examined average and median analyst consensus FY 2022 and FY 2023 revenue estimates as obtained from *Eikon* for the one-week period following the Hindenburg Report. Consistent with the findings presented in **Exhibit 3b**, there was no change in analyst consensus estimates of the Company's FY 2022 and FY 2023 revenues during this period. In my review of analyst reports over this period, I did not identify any commentary suggesting that increased forecasted revenue for other products could offset a decline in projected revenue for Panorama. One analyst, Piper Sandler, lowered its revenue estimates modestly on March 21, 2022 (by approximately 2% and 3% for FY 2022 and FY 2023, respectively)—nearly two weeks later—but attributed the decline to adding "conservatism" to its model to account for possible "reputational damages," rather than to adjusting for any impact to revenue from learning about alleged "deceptive and improper business practices within Natera" (Complaint, ¶ 12). Indeed, the Piper Sandler analysts noted, "we've found historically that industry sales reps will aim to take advantage of bad PR. We've spoken to sales reps that will target physicians with negative news articles about their competitors.… Net-net, we're lowering numbers to reflect conservatism in reputational damages and potential distractions." "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.

[122] "Effective Short Report Rebuttal Via Conference Call; Prior Authorization Concerns Are Overblown; BUY," *Canaccord Genuity*, March 10, 2022.

[123] "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022.

[124] "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022.

### B. Several Factors Other than the Alleged Corrective Information in the Hindenburg Report Likely Had a Negative Effect on Natera's Stock Price on March 9, 2022

62. Several factors other than the information Plaintiffs allege to be corrective likely affected Natera's stock price on March 9, 2022, including (i) the release of a short report by Hindenburg Research, a well-known short seller; (ii) heightened risks of regulatory and/or legal costs triggered by the Hindenburg Report and the claims therein (even if unfounded); (iii) market concerns regarding potential reputational harm to the Company, its products (including Panorama), and/or its management, triggered by the Hindenburg Report and the claims therein (even if unfounded); and (iv) confounding negative information conveyed by the Hindenburg Report that Plaintiffs have not alleged to be corrective (e.g., Hindenburg's claims about Horizon, among others).

63. *First*, academic research shows that the release of a report by an activist short seller often triggers a negative reaction in the target firm's stock price. Short sellers are investors or investment funds that seek to (i) identify overvalued stocks (i.e., with fundamental values below current stock price); and (ii) profit by taking "short" positions in the stock, which they then close out after a fall in the stock price to realize trading profits.[125] Short-selling activity can generally put downward pressure on the stock price that leads to a lower market price.[126] Activist short sellers are short sellers who take action that may cause a decline in the price of a target stock, such as publishing reports that claim the target company is overvalued.[127]

64. Hindenburg, a prominent short seller that had received "Top Short Seller Honors," describes itself as an investment research firm that "specializes in forensic financial research"

---

[125] Jiang, Haiyan, Ahsan Habib, and Mostafa Monzur Hasan, "Short Selling: A Review of the Literature and Implications for Future Research," *European Accounting Review* 31, no. 1 (2022): 1–31. *See also* Brendel, Janja, and James Ryans, "Responding to Activist Short Sellers: Allegations, Firm Responses, and Outcomes," *Journal of Accounting Research* 59, no. 2 (2021): 487–528 ("Brendel and Ryans (2021)"), p. 490 ("The activists intend to cover their short positions at a profit after the reports are released and the targets' stock price falls.").

[126] *See, e.g.*, Asquith, Paul, Parag A. Pathak, and Jay R. Ritter, "Short Interest, Institutional Ownership, and Stock Returns," *Journal of Financial Economics* 78, no. 2 (2005): 243–276, for a discussion of short selling.

[127] *See, e.g.*, Brendel and Ryans (2021), p. 488 ("Activist short sellers are hedge funds or individuals who take short positions in a company's stock prior to publishing research reports that claim the target firm is overvalued."). *See also* Paugam, Luc, Hervé Stolowy, and Yves Gendron, "Deploying Narrative Economics to Understand Financial Market Dynamics: An Analysis of Activist Short Sellers' Rhetoric," *Contemporary Accounting Research* 38, no. 3 (2021): 1809–1848, p. 1810 ("These organizations often take (usually openly) 'short' positions on the stocks of target firms, and thus benefit from declines in the stock price of target firms.").

and that focuses on activist short-selling.[128] Hindenburg had a short position in Natera stock at the time it released the Hindenburg Report, which it disclosed, and "[stood to realize significant gains in the event that the price of any stock covered [therein] declines."[129] Hindenburg's track record and reputation as a short seller may explain the negative and statistically significant abnormal return for Natera on March 9, 2022. Peer-reviewed academic literature analyzing the market response to the publication of short-seller reports finds that short-seller reports published by "credible" short sellers tend to be associated with statistically significantly larger declines in the price of target companies' stock than short-seller reports published by other short sellers.[130] Consistent with this, an analyst at Canaccord Genuity noted on March 9, 2022 that "many of the 'points' made by the author [of the Hindenburg Report] are not entirely new information (albeit with a negative spin in the report)," suggesting the release of a report by Hindenburg, a known, prominent short seller, including the negative "spin" contained in its report on Natera, may have itself contributed to the price decline on March 9, 2022.[131]

---

[128] "About Us," *Hindenburg Research*, available at https://hindenburgresearch.com/about-us/. Hindenburg Research notes on its website that it received "Top Short Seller" honors from *Activist Insight* for both 2020 and 2021. *See* "About Us," Hindenburg Research, available at https://hindenburgresearch.com/about-us/. For discussions of short campaigns by Hindenburg Research, see, for example, "Clover Health Disputes Short Seller's Negative Report. What to Know," *Barron's,* February 5, 2021; "Short Seller Trains Sights on EV Startup Lordstown, Prompting Share Slide," *The Wall Street Journal*, March 12, 2021; "Meet the Short Seller Who Hopes Stocks Crash and Burn," *CNN Business*, June 25, 2021; "The Man Who Moves Markets," *The Atlantic*, February 2, 2023; "From Carl Icahn to Gautam Adani: How Short-Seller Hindenburg Is Making a Name for Itself," *CNBC*, March 19, 2024; "Activist Short Sellers Bring Many a Mighty Down," *California Management Review*, June 12, 2023 ("True to its name, Hindenburg prides itself in sinking the stock prices of firms it sells short.").

[129] Hindenburg Report, pp. 2, 44–45 ("After extensive research, we have taken a short position in shares of Natera…. You should assume that as of the publication date of any short-biased report or letter, Hindenburg Research (possibly along with or through our members, partners, affiliates, employees, and/or consultants) along with our clients and/or investors has a short position in all stocks (and/or options of the stock) covered herein, and therefore stands to realize significant gains in the event that the price of any stock covered herein declines. Following publication of any report or letter, we intend to continue transacting in the securities covered herein, and we may be long, short, or neutral at any time hereafter regardless of our initial recommendation, conclusions, or opinions.").

[130] *See, e.g.*, Ljungqvist, Alexander, and Wenlan Qian, "How Constraining Are Limits to Arbitrage?," *The Review of Financial Studies* 29, no. 8 (2016): 1975–2028 ("Ljungqvist and Qian (2016)"), p. 2022 ("Credibility is key: as our evidence shows, [arbitrageurs] who lack (or lose) a track record of producing reliable evidence are ignored by investors and so cannot move prices by publishing their reports."); Brendel and Ryans (2021), p. 488 ("Activist short sellers are hedge funds or individuals who take short positions in a company's stock prior to publishing research reports that claim the target firm is overvalued."). Hindenburg Research published its first report in 2017, after the sample period of Ljungqvist and Qian (2016), which spans 2006 through 2011. *See* "About Us," Hindenburg Research, available at https://hindenburgresearch.com/about-us/. The short seller is also not included in Brendel and Ryans (2021) because the authors require for inclusion in their sample from 1996 to 2018 that short-seller reports explicitly state the targeted company is overvalued, and Hindenburg Research's reports in 2017 and 2018 do not appear to meet this criterion.

[131] "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate Buy," *Canaccord Genuity*, March 9, 2022.

65. *Second*, a short-seller report may increase the risk a company will face heightened regulatory scrutiny or legal action,[132] which are generally associated with stock price declines;[133] these consequences may follow even when the short sellers' claims are unfounded. For example, the academic literature shows that the SEC is more likely to investigate companies with higher visibility and media coverage.[134] Moreover, the academic literature also shows that "firms that have no ultimate action taken against them" nonetheless experience a price decline "when they disclose the existence of [an SEC] investigation."[135] The authors note that these "findings are consistent with regulatory investigations creating a stigma that attaches to firms and managers, even if they are ultimately exonerated."[136]

66. The Hindenburg Report made claims regarding regulatory scrutiny of Natera, and securities analysts identified heightened risk of regulatory action in reports discussing the Hindenburg Report. For example, the Hindenburg Report stated that "Michigan's Department of Attorney General ['(AG)'] declined Hindenburg's [Freedom of Information Act ('FOIA')] request on the grounds that 'the request seeks information related to an open and ongoing

---

[132] *See, e.g.*, Ljungqvist and Qian (2016), p. 2007 ("The reports not only make an impression on investors; they also influence the SEC, the stock exchanges, and (perhaps inevitably) trial lawyers…. 36% are formally investigated by the SEC or the Department of Justice (DoJ).").

[133] The academic literature documents negative stock price effects of government investigations. For example, Dechow, Sloan, and Sweeney (1996) analyze companies subject to accounting enforcement actions by the SEC for violations of Generally Accepted Accounting Principles ("GAAP") and document an abnormal stock price decline following the announcement of the SEC investigation. *See* Dechow, Patricia M., Richard G. Sloan, and Amy P. Sweeney, "Causes and Consequences of Earnings Manipulation: An Analysis of Firms Subject to Enforcement Actions by the SEC," *Contemporary Accounting Research* 13, no. 1 (1996): 1–36. *See also* Nourayi, Mahmoud M., "Stock Price Responses to the SEC's Enforcement Actions," *Journal of Accounting and Public Policy* 13, no. 4 (1994): 333–347, which documents a negative market reaction to the announcement of SEC investigations.

[134] *See, e.g.*, Kedia, Simi, and Shiva Rajgopal, "Do the SEC's Enforcement Preferences Affect Corporate Misconduct?," *Journal of Accounting and Economics* 51, no. 3 (2011): 259–278, p. 261 ("We also find significant evidence that the SEC is more likely to investigate firms that attract higher media coverage after their restatement announcement. This is consistent with … the SEC catering to political pressures stemming from visible reporting violations highlighted by the media."). *See also* Holzman, Eric R., Nathan T. Marshall, and Brent A. Schmidt. "When Are Firms on the Hot Seat? An Analysis of SEC Investigation Preferences," *Journal of Accounting and Economics* 77, no. 1 (2024): 101610, p. 3 ("SEC investigations are positively associated with events where … third parties allege firm misdeeds. This is consistent with the SEC prioritizing cases that are easily identified and likely require less resources or effort to resolve.").

[135] Solomon, David H., and Eugene Soltes, "Is 'Not Guilty' the Same as 'Innocent'? Evidence from SEC Financial Fraud Investigations," *Journal of Empirical Legal Studies* 18, no. 2 (2021): 287–327 ("Solomon and Soltes (2021)"), p. 303. This article uses abnormal returns measured over three-day windows around the times of the announcements (from one day before to one day after the disclosure). When researchers do not know the exact timing of the news, it is customary to use event windows of two or three days. In this case, the authors obtain event dates from press releases and regulatory filings and are able to obtain the day but not the time of the initial disclosures.

[136] Solomon and Soltes (2021), p. 291.

Department investigation.'"[137] Although no further details were included, the Hindenburg Report implied that there was an active investigation by the Michigan AG.

67. Securities analysts discussed possible heightened risk of regulatory and legal actions as a consequence of the Hindenburg Report, including the possibility of lawsuits and fines. Analysts at Canaccord Genuity noted that Natera "could be penalized" via a "fine [or] lawsuit,"[138] and Morgan Stanley analysts noted that a "bear case outcome" might involve "a fine/financial penalty."[139] Analysts from Piper Sandler said the "downside is most likely a fine by the DOJ" and noted that a "DOJ/OIG [Office of Inspector General] investigation is inevitable" due to "the level of attention alone."[140] Importantly, the heightened risk of regulatory and legal costs resulting from the Hindenburg Report may not have occurred following a hypothetical truthful disclosure by the Company. This is consistent with commentary by analysts at Piper Sandler, who attribute the "inevitable" "DOJ/OIG investigation" to "the level of attention *alone*."[141]

68. *Third*, the Hindenburg Report likely had additional negative effects on Natera, including reputational harm and management distraction, concerns which were discussed by securities analysts (and could occur even if the claims were unfounded). While Raymond James analysts, for example, did "not expect any of these dynamics to put [Natera's oncology] business at material risk at this stage," they did note "potential reputational harm."[142] Piper Sandler analysts similarly "added in 'reputational damages' to [their] model,"[143] and noted that Natera's competitors could try to exploit the negative publicity Natera was facing. The Piper Sandler analysts discussed the potential costs of reputational damages and management distraction:

---

[137] Hindenburg Report, p. 38. Note that on March 10, 2022, Natera executives stated that the Company "[has] not received any communication from the Michigan AG and [is] not aware of any such investigation." Natera March 10, 2022 Investor Call. As of the date of this report, I have seen no further public indication or action regarding an investigation by the Michigan AG.

[138] "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate BUY," *Canaccord Genuity*, March 9, 2022.

[139] "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022.

[140] "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler,* March 21, 2022. *See also* "Mgmt Feedback Addresses Key Questions Arising from the Short Seller Report," *SVB Leerink,* March 9, 2022 ("[W]e believe investors are likely to focus on … any litigation risk that may arise"); "Our Post Call Thoughts, NTRA Counters Short Report; Buy, PT to $100," *BTIG*, March 10, 2022 ("We think that the most likely scenarios range from NTRA avoiding any fault in this matter at all, to potentially NTRA possibly paying a settlement agreement in the event a formal investigation occurs").

[141] "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022 (emphasis added).

[142] "Quick Take From Initial Management Comments on Short Report," *Raymond James*, March 9, 2022.

[143] "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.

> We added in "reputational damages," to our model, but from our experience, negative news coverage modestly impacts physician ordering behavior.
>
> *Whether or not it's deserved, we think this will be time-consuming and likely a distraction for management.* The time burden becomes more likely if Natera were to face DOJ/OIG criminal investigations. Beyond that, management will be facing investor questions for several months, and these events have already affected the cost of equity. We note that consensus cash burn over the next couple years exceeds current cash balance, implying there will be equity dilution impacts. *We've found historically that industry sales reps will aim to take advantage of bad PR.* We've spoken to sales reps that will target physicians with negative news articles about their competitors. That said, when a physician orders a test from an esoteric lab, the order patterns becomes sticky. Past interviews with physicians have found that most do not involve themselves in industry matters (particularly the smaller diagnostics industry as opposed to the much larger pharmaceutical industry). *Net-net, we're lowering numbers to reflect conservatism in reputational damages and potential distractions.*[144]

69. *Finally*, the Hindenburg Report included negative claims about the Company distinct from those Plaintiffs allege as corrective information revealed in the report. For example, the Hindenburg Report included claims about Natera's purported lack of a competitive "moat" around its NIPT products (including Horizon as well as Panorama), including that "[r]ival NIPTs have comparable accuracy for the most common tests and are frequently cheaper"[145] as well as Natera's reliance on Illumina's sequencing platform to process Panorama, Horizon, Signatera, and Prospera tests.[146] Cowen analysts noted that Natera's "use of [Illumina] sequencers for NIPT applications is a material risk."[147] I understand that this matter does not involve alleged misrepresentations regarding Natera's reliance on Illumina's sequencing platform, the competitive position of any Natera product, including Panorama, or about any other Natera product (such as Horizon, Signatera, or Prospera).

70. Thus, any abnormal stock price change on March 9, 2022 due to the Hindenburg Report itself cannot be used to reliably infer that the alleged misrepresentations affected Natera's stock price.

---

[144] "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022 (emphasis added).

[145] Hindenburg Report, p. 1.

[146] Hindenburg Report, p. 6.

[147] "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022 (emphasis removed).

### C. Additional Evidence Suggests That One Cannot Use Natera's Stock Price Change on March 9, 2022 to Infer That the Alleged Misrepresentations Affected Natera's Stock Price

71. Additional evidence from after the Proposed Class Period further supports that the abnormal stock price decline on March 9, 2022, after the release of the Hindenburg Report, does not demonstrate that the alleged misrepresentations affected Natera's stock price.

72. *First*, after briefly responding to the Hindenburg Report in a press release during market hours on March 9, 2022,[148] Natera responded more fully in a conference call before market open on March 10, 2022.[149] The Company's executives stated that they "disagree with the characterization of the services [they] offer to physicians, as well as the law to which the Hindenburg report inaccurately cites" and that "the Hindenburg report is a gross mischaracterization of the federal government's position."[150] With respect to MGML, the executives stated that:

> There are other companies in the market that offer similar prior authorization services to those offered by MGML, and *if needed, we would be in a position to cease using MGML with minimal, if any, impact to our business…. We feel strongly that there [would] be no impact on volume.*

---

[148] The relevant portion of the press release reads in full:

"We disagree with the accuracy of the recent report generated by short sellers Hindenburg Research in an attempt to make a quick profit. This is the same story short sellers have been pitching for many years. Prior authorization is an insurance company-initiated process requiring health care providers to qualify for payment for services. The AMA states that 'prior authorization is overused and existing processes present significant administrative and clinical concerns.' There are many companies, both private and not-for-profit, that provide prior authorization services to both physician offices and clinical laboratories to ensure patients get access to needed testing. MGML is one of these companies which is neither owned, operated nor controlled by Natera. Most clinical laboratories, including large national laboratories and specialty diagnostics laboratories, rely on these companies. We are proud of the performance and value of our tests, which has been the subject of over 100 peer-reviewed publications that studied over 1.3 million patients. In 2021, we performed over 1.5 million tests and only 82 patients shared a negative comment to the BBB and Natera consistently responded. We're proud to have an A+ rating with BBB and work hard to ensure every patient has a positive experience. The report also references the *New York Times* article on microdeletions which was full of inaccuracies, resulting in multiple corrections. Natera has shown industry-leading performance in the largest prospective study on screening for 22q recently published[] in one of the world's leading ObGyn journals. 22q is billed using a CPT code provided by the American Medical Association. Natera maintains a mature compliance program and we believe our procedures in regard to prior authorization services and billing are compliant with applicable laws."

The remainder of the press release consists of three sections, "About Natera," "Forward-Looking Statements," and "Contacts." *See* "Natera Responds to Misleading Short Seller Report," *PR Newswire*, March 9, 2022.

[149] Natera March 10, 2022 Investor Call.

[150] Natera March 10, 2022 Investor Call.

> *We have no influence over MGML*. They don't – there's nothing special that they're doing for Natera. They're not directing traffic to us in any way. *We don't have any control over their operations*. So all of those allegations are completely false.
>
> [M]any companies, in fact, hire these employees [to handle prior authorizations] themselves and do the [prior authorization] services themselves.
>
> [Contrary to the implication that] MGML performed prior authorizations on 44% of Natera's volume[,] … [i]n reality, *MGML performed prior authorization services on roughly 11% of our volume in 2021, and we estimate less than 7% of our volumes going forward in 2022*. The report also implies that Natera is the majority customer of MGML. That allegation is also not correct. Based on the volume of prior authorizations represented on MGML's website, we estimate that we make up approximately 25% of MGML's historical volume.
>
> With regards to MGML… we don't believe whether it's a non-profit or not has any implication. …[W]e don't believe whether it's a nonprofit or for-profit has anything to do with whether it's compliant or not.[151]

73. With respect to claims about microdeletion testing and billing, the Company stated that:

> Our requisition form was designed with expert physician input to accommodate demand for the addition of the single 22q microdeletion…. *We don't think there's any issue with the test order form*. And as a reminder, every test Natera processes is ordered by a physician or other authorized healthcare provider.
>
> There is no serious dispute about the appropriate CPT code. The report is simply wrong.[152]

74. Securities analysts generally characterized the Company's response in positive terms. For example, on March 10, 2022 analysts at Baird stated that "[f]ollowing the investor call this morning, we feel even more strongly that yesterday's sell-off was overdone."[153] Similarly, also on that date, analysts at BTIG stated that they "think yesterday's weakness in the stock was overblown"[154] while analysts at Cowen stated that Natera "hosted an Analyst call in response to a

[151] Natera March 10, 2022 Investor Call (emphasis added).
[152] Natera March 10, 2022 Investor Call (emphasis added).
[153] "Highlights from Investor Call on Short Report," *Baird*, March 10, 2022.
[154] "Our Post Call Thoughts, NTRA Counters Short Report; Buy, PT to $100," *BTIG*, March 10, 2022.

short report [and the analysts] believe NTRA addressed the core allegations in the report."[155] With respect to Natera's reliance on MGML, the Cowen analysts noted:

> With the ability to bring prior authorizations in house or switch to another vendor, we believe any MGML-related issue (if any) could be resolved quickly and without any major impact to the business.[156]

75. According to my event study regression analysis, Natera's stock price experienced a positive and statistically significant abnormal return of 18.9% on March 10, 2022, following the conference call and associated analyst commentary.[157] This suggests that inferences drawn from the Hindenburg Report on March 9, 2022, as reflected in the stock price decline on that date, were likely more negative than would have been drawn from a hypothetical disclosure of the alleged relevant truth by the Company.[158]

76. Furthermore, consistent with the tenor of the Company's response in its March 9, 2022 press release and March 10, 2022 investor call, analysts at Piper Sandler published a report on March 21, 2022 stating that it hosted a "Key Opinion Leader" ("KOL") call with Gordon Brown of A&R Consultants on March 18, 2022 in which "the speaker said the short report likely grossly embellished what happens regularly in the lab industry, [and that Piper Sandler] spoke to a former employee who vouched that Natera didn't cross legal barriers that he knew of":

> KOL Call From Friday. In our speaker's view, the short report was an embellishment, and was written by someone who doesn't really understand the overall prior authorization process and how they work. He views prior authorization groups as common in healthcare, providing a valuable service for physicians and insurers, and thinks that if anything illegal was being done by one, that it would have been quickly picked up by an insurer and addressed. While not fully aware of MGML's relationship with NTRA, he said it was hard to say they did anything explicitly illegal based off of the short report.

---

[155] "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022.

[156] "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022.

[157] **Exhibit 2b**.

[158] Note that, even if one considers the combined stock price changes on March 9, 2022 and March 10, 2022, one still cannot simply infer that the alleged misrepresentations affected Natera's stock price for the reasons discussed in Sections **VIII.A** and **VIII.B**.

> [Moreover, in] Mr. Brown's view, the short report on Natera written two weeks ago was a "hit piece" by someone clearly trying to exaggerate the negatives of how reimbursement works in lab diagnostics. He thinks that the report misrepresented elements such as double billing. Also, allegations about the inclusions of micro deletions on bills/requests being [i]llegal don't make sense to him because they would quickly be caught by insurance companies. In other words, if Natera was doing something illegal by billing them for microdeletions, the insurance companies would likely have found this years ago.[159]

77. *Second*, securities analysts observed that any expected valuation impact of the Hindenburg Report claims related to Natera's business practices would be smaller than implied by the stock price reaction on March 9, 2022. For example, Canaccord Genuity analysts commented that the "share weakness appears overdone."[160] Baird analysts also described "the sell-off" as "overdone"[161] and the Piper Sandler analysts echoed that view:

> Overall, we view the decline as bringing the stock's value below our view of what we think the company's MRD [minimal residual disease] offering is worth…. The massive decrease in stock price during the day has, in our view, likely brought the value of the stock (at today's lows) below the value of its Signatera test. On a 2024 basis, we estimate Signatera as having ~$550M in revenue, and at a 4x multiple (the median of the company's comps), and accounting for net cash, this results in a value of ~$29 per share (which is above where the company has traded at its lows today). In our view, this would imply no value in the non MRD business (reproductive medicine [including Panorama], BRCA, transplant and other business), and *which is likely in our view an overreaction*.[162]

78. *Third*, Plaintiffs' claims that the Hindenburg Report revealed that Natera's revenues were "propped up" by deceptive practices are contradicted by Natera's product revenue performance after the Hindenburg Report. Natera's reported annual revenue and number of overall tests processed both *increased* following the publication of the Hindenburg Report, as shown in

---

[159] "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.
[160] "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate BUY," *Canaccord Genuity*, March 9, 2022.
[161] "Highlights from Investor Call on Short Report," *Baird*, March 10, 2022 ("Following the investor call this morning, we feel even more strongly that yesterday's sell-off was overdone.").
[162] "NTRA: Trading below Signatera Value in Intraday," *Piper Sandler*, March 9, 2022 (emphasis added). *See also* "Quick Take from Initial Management Comments on Short Report," *Raymond James*, March 9, 2022 ("Lastly, we note that this report was virtually entirely focused on women's health, which while a large portion of the business, is increasingly a smaller portion of the investment thesis, with oncology becoming the larger focus moving forward. From our perspective, we do not expect any of these dynamics to put that business at material risk at this stage, at least beyond potential reputational harm.").

**Exhibit 4a** and **Exhibit 4b**. Furthermore, Natera's FY 2022 total revenue of $820 million[163] exceeded the guidance of $770 million to $790 million it issued as part of its 4Q 2021 disclosures (on February 24, 2022),[164] as well as the consensus analyst estimate as of the day before the Hindenburg Report, of $782 million.[165] Similarly, Natera's FY 2023 total revenue of $1.1 billion exceeded the median (average) analyst consensus estimate of $977 million ($986 million) as of the day before the Hindenburg Report.[166, 167]

79. *Fourth*, I understand that Natera has not faced any regulatory or legal action from any agency related to claims made in the Hindenburg Report, and I am not aware of any findings that Natera engaged in wrongdoing. I understand that the SEC investigated certain of the claims made in the Hindenburg Report, and following its investigation, sent Natera a no-action letter stating that, "[b]ased on the information [it has] as of this date, [it does] not intend to recommend an enforcement action by the Commission against Natera."[168] I further understand that the DOJ, the OIG, and the Michigan AG have also not taken any action against Natera. In addition,

---

[163] *See* **Exhibit 4a**.

[164] Natera Form 8-K, filed on February 24, 2022, Ex. 99.1, p. 2.

[165] The consensus estimate reported here is the median analyst estimate; the average estimate on March 8, 2022 was $781 million. *See* **Exhibit 3b**. Natera's total revenue in each quarter of FY 2022 ($194.1 million in 1Q 2022, $198.2 million in 2Q 2022, $210.6 million in 3Q 2022, and $217.3 million in 4Q 2022) exceeded the corresponding median analyst consensus estimates (of $174.3 million for 1Q 2022, $186 million for 2Q 2022, $200.7 million for 3Q 2022, and $215.5 million for 4Q 2022) and the corresponding average analyst consensus estimates (of $175.8 million for 1Q 2022, $185.8 million for 2Q 2022, $201.5 million for 3Q 2022, and $217.2 million for 4Q 2022) as of the day before the Hindenburg Report. *See* Natera Form 10-Q for the Fiscal Quarter Ended March 31, 2022, filed on May 6, 2022, p. 6; Natera Form 10-Q for the Fiscal Quarter Ended June 30, 2022, filed on August 5, 2022, p. 6; Natera Form 10-Q for the Fiscal Quarter Ended September 30, 2022, filed on November 9, 2022, p. 6; Natera Form 8-K, filed on February 28, 2023, Ex. 99.1, p. 1; *Eikon*. Additionally, Natera increased its 2022 revenue guidance from $770–$790 million to $790–$810 million on May 5, 2022. *See* Natera Q1 2022 Earnings Call Transcript, May 5, 2022.

[166] *See* **Exhibit 4a**; **Exhibit 3b**.

[167] Furthermore, Natera processed more tests—2.067 million in 2022 and 2.496 million in 2023 as shown in **Exhibit 4b**—than analysts projected prior to the Hindenburg Report. For example, a report published by BTIG on February 25, 2022 forecasted 1.988 (2.418) million tests for FY 2022 (FY 2023). *See* "Natera Unveils Oncology and Transplant Businesses Well Ahead of Our Thinking (and We Re-Constructed Our Model). Buy, Trim PT to $125," *BTIG*, February 25, 2022. Similarly, a report published by Baird on February 24, 2022 forecasted 1.885 (2.164) million accessioned tests for FY 2022 (FY 2023), lower than Natera's actual accessioned tests of 2.004 (2.427) million. *See* "Remains a Top Pick for 2022," *Baird*, February 24, 2022; Natera Form 10-K for Fiscal Year Ended December 31, 2023, filed on February 29, 2024, pp. 72–73 ("A test is accessioned when we receive the test at our laboratory, the relevant information about the test is entered into our computer system, and the test sample is routed into the appropriate workflow. This number is a subset of the number of tests that we process, which includes tests distributed through our Constellation licensees…. During the year ended December 31, 2023, we processed approximately 2,496,100 tests, comprised of approximately 2,426,500 tests accessioned in our laboratories. During the year ended December 31, 2022, we processed approximately 2,066,500 tests, comprised of approximately 2,004,000 tests accessioned in our laboratories.").

[168] Declaration of Christina L. Costley in Support of the Natera Defendants' Motion for Judgment on the Pleadings, *In re Natera, Inc. Securities Litigation*, May 30, 2024, Exhibit 5.

Natera has not restated any of its financial statements (with no restatements or adjustments to revenues reported during any of the relevant periods) and was not issued any regulatory fines relating to the Panorama billing practices at issue in this matter.

80. Moreover, Natera's Board of Directors initiated an independent investigation into the claims of the Hindenburg Report, with assistance from the law firm WilmerHale. According to the Company's Q3 2022 investor presentation, the "Board of Directors complete[d] [an] independent investigation with the assistance of WilmerHale [and] determine[d] short seller allegations of wrongdoing against [the] [C]ompany are unfounded."[169]

81. In sum, this additional evidence further supports that the abnormal stock price decline on March 9, 2022 reflects risks or concerns that likely would not have accompanied a hypothetical earlier disclosure of the alleged relevant truth by the Company, and therefore cannot be used to demonstrate that the alleged misrepresentations affected Natera's stock price.

## IX. Mr. Coffman Fails to Provide a Methodology Capable of Measuring Class-Wide Damages under Section 10(b) of the Exchange Act for Natera Common Stock in a Manner Consistent with Plaintiffs' Theory of Liability

82. I understand that, following the Supreme Court's ruling in *Comcast*, plaintiffs are required to demonstrate at class certification that they will be able employ a common class-wide methodology to measure damages attributable to their liability theory.[170] I further understand that Mr. Coffman was asked to "opine on whether calculating damages in this action is subject to a common methodology under Section 10(b) of the Exchange Act and SEC Rule 10b-5 adopted thereunder (collectively 'Section 10(b)')."[171]

---

[169] Natera Form 8-K, filed on November 8, 2022, Ex. 99.2, p. 3.

[170] *Comcast v. Behrend*, 569 U.S. 27 S.Ct., 2013 ("*Comcast*"), at 35 (emphasis added) ("It follows that a model purporting to serve as evidence of damages in this class action *must measure only those damages attributable to [Plaintiffs' liability] theory*. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).").

[171] Coffman Report, ¶ 1. *See also* Coffman Deposition, 196:13–20 ("I was asked whether there is a method, a class-wide method for calculating damages for the types of claims [Plaintiffs] are making and given their theory of liability in this case and I opine that yes, there is a class-wide methodology for measuring damages consistent with their theory of liability."). Although I was not asked to respond to Mr. Coffman's discussion of damages for Plaintiffs' other claims, I note that Mr. Coffman states that "damages for Plaintiffs' claims under Section 20A can be calculated using multiple potential methodologies," including "the amount of artificial inflation in the stock at the time of the defendant's sale." Coffman Report, ¶¶ 84, 88–90. As explained in **Sections IX.A–IX.B**, Mr. Coffman fails to provide a methodology for measuring inflation attributable to Plaintiffs' theory of liability in this matter.

83. Mr. Coffman fails to provide a methodology capable of measuring class-wide damages in a manner consistent with Plaintiffs' theory of liability in this matter. Instead, Mr. Coffman offers a generic and formulaic description of the calculation implied by the "out-of-pocket" method without demonstrating whether or how it could actually be used to reliably measure damages here.[172] Specifically, Mr. Coffman opines that "consistent with Plaintiffs' theory of liability, damages in this action can be calculated on a class-wide basis using a common methodology"[173] and proposes to use the "out-of-pocket" method for calculating damages for violations of Section 10(b). He explains that this approach "states that damages are equal to the artificial inflation in the share price at the time of purchase minus the artificial inflation per share at the time of sale."[174]

84. Mr. Coffman acknowledges that the out-of-pocket method requires the quantification of artificial inflation per share[175] but fails to explain *how* one could actually measure any artificial inflation attributable to Plaintiffs' claims in this case. Although Mr. Coffman fails to specify a methodology he could use to measure artificial inflation attributable to Plaintiffs' allegations in this matter, he seems to indicate that an event study (potentially in combination with other unspecified "valuation techniques") could be used as part of an approach to back-cast inflation over the Proposed Class Period.[176] He states that "the most widely-used technique to quantify artificial inflation starts from an event study that measures price reactions to disclosures that revealed the relevant truth that was concealed by the alleged material omissions and/or misrepresentations, such as the price reaction to the Hindenburg Report allegations (i.e., a 'corrective disclosure')"[177] and testified that this approach would be "the most likely relevant way" to measure inflation in this case.[178]

---

[172] *See* Coffman Report, ¶ 81 ("There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act and Rule 10b-5. This method [is] typically referred to as the 'out-of-pocket' method."). *See also* Coffman Report, ¶¶ 7, 81–86.
[173] Coffman Report, ¶ 7.
[174] Coffman Report, ¶ 81. Mr. Coffman further contends that "if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the Private Securities Litigation Reform Act of 1995's ('PSLRA') '90-day lookback' provision, a formulaic limit on damages that also can be applied class-wide."
[175] Coffman Report, ¶¶ 82–83.
[176] Coffman Report, ¶ 84. Backcasting typically involves using a measure of the stock price decline that plaintiffs attribute to an alleged corrective disclosure to measure inflation earlier during the Proposed Class Period.
[177] Coffman Report, ¶ 84.
[178] Coffman Deposition, 205:3–16. *See also* Coffman Deposition, 198:24–199:2 ("[T]hat would be a natural starting point for evaluating the degree to which the stock price was inflated."); Coffman Deposition, 204:12–18 ("[I]n most cases … in the vast majority of cases I've seen, the starting point for measuring artificial inflation is to look at the stock price reaction at the time the relevant truth is disclosed.").

85. As explained in **Section VIII**, however, the stock price movement that followed the release of the Hindenburg Report cannot be used to reliably infer that the alleged misrepresentations affected Natera's stock price. For the same reasons, that stock price movement cannot reliably serve as a measure of inflation absent additional analysis. Although Mr. Coffman asserts that the abnormal return could be adjusted to reflect the stock price effects of "non-fraud related information (i.e., 'confounding information')," [179] he provides no details of how one could actually make such an adjustment—particularly in light of the fact that, as noted above, securities analysts did not reduce their prior estimates of Natera revenues following the allegedly corrective information despite Plaintiffs' claims that the alleged misrepresentations created a "misleading impression" regarding Natera's revenue growth.

86. As discussed below, Mr. Coffman's general damages framework is untethered from Plaintiffs' theory of liability in this matter and ignores the specific facts and circumstances at issue here. Specifically, Mr. Coffman fails to articulate a methodology that can reliably measure class-wide damages and artificial inflation based on the repetition in the Hindenburg Report of allegedly corrective information that was previously reported, including in articles published by *The Capitol Forum*.

87. As explained in **Section VII**, information that Plaintiffs allege was omitted regarding Natera's business practices had been publicly available prior to the release of the Hindenburg Report. If Natera's common stock traded in an efficient market during the Proposed Class Period, as Mr. Coffman claims, newly available public information would have been rapidly incorporated into Natera's stock price at the time it became publicly available. Thus, in an efficient market, the repetition in the Hindenburg Report of claims or information already in the public domain would not affect Natera's stock price on March 9, 2022, as explained in **Section VIII.A.**

88. At deposition, Mr. Coffman drew a distinction between "publicly available" information and "widely disseminated" information and suggested that although information may be publicly available to and known by some investors, the information needs to be "widely disseminated" to

---

[179] Coffman Report, ¶ 84.

be reflected in the stock price.[180] Such a distinction is generally unsupported in the academic literature in the field of financial economics. As explained in **Section V**, in an efficient market, "prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs;"[181] what is necessary is that some informed market participants have access to the information and trade on it to the point where that information is incorporated into the stock price.[182] However, even if Mr. Coffman's perspective were correct such that the relevant information in *The Capitol Forum* Articles was "technically publicly available" and known to some market participants but not "widely disseminated" and thus not incorporated into Natera's stock price until the Hindenburg Report was released, then Mr. Coffman has failed to offer a class-wide damages methodology capable of addressing the fact that certain potential class members purportedly knew some or all of the relevant truth prior to the release of the Hindenburg Report.

89. Specifically, if Mr. Coffman were correct, his testimony suggests that although some market participants and investors received and reviewed allegedly omitted information, such as that in *The Capitol Forum* Articles, prior to the Hindenburg Report, as the evidence discussed in **Section VII** indicates, the information in these reports would not have been incorporated into Natera's stock price until it was repeated in the Hindenburg Report. Under Mr. Coffman's methodology, investors who knew some or all of the alleged relevant truth and yet chose to purchase and hold Natera stock would nonetheless be entitled to the same amount of damages as other potential class members who did not receive and review that information. Mr. Coffman offers no reliable explanation for why it is appropriate to apply "a common methodology" to investors in "the Class as a whole"—that is, to both those who purportedly knew some or all of the alleged relevant truth and those who did not.

---

[180] Coffman Deposition, 38:20–39:4, 40:2–7 ("Q. So, you on occasion in your report and right now are using the phrase widely available. Are you using widely available as a synonym for publically [*sic*] available?
A. I think I used the word widely disseminated. That could be something different than publically [*sic*] available. There is a distinction between those…. Q. Your testimony is that if information is publically [*sic*] available, but not widely disseminated, it still may not be reflected in a company's stock price even if that stock trades on an efficient market? A. Correct.").

[181] Fama (1991), p. 1575.

[182] *See* Fama (1970), p. 388 ("[T]he market may be efficient if 'sufficient numbers' of investors have ready access to available information."). Mr. Coffman seems to acknowledge this during his deposition, stating that "if a substantial number of investors have access to the information, that [*sic*] it would be rapidly incorporated into the market price…. I don't think there's a particular threshold [number] that the literature talks about." Coffman Deposition, 61:7–16.

90. Mr. Coffman also testified that a corrective disclosure could be "an analyst report or news article that collected and synthesized and summarized information in a new way for the market that made the impact of that, all those pieces of information clear to the market, [more than] any of the individual pieces of information."[183] To the extent Mr. Coffman is suggesting that a report "synthesiz[ing]" or "summariz[ing]" previously available public information would affect the stock price, such a suggestion necessarily implies that information is not (always) impounded into the stock price when it is released, but only later when it is "synthesized" or "summarized." This suggestion, too, is inconsistent with the academic literature on market efficiency, and would lead to similar challenges in measuring damages on a class-wide basis. Mr. Coffman provides no methodology to distinguish between those investors who need information to be "synthesized" or "summarized" and those who do not, and would treat them the same for purposes of measuring damages—even if the latter type of investor understood some or all of the alleged relevant truth prior to the Hindenburg Report.

Submitted on August 16, 2024



Douglas J. Skinner, Ph.D.

[183] Coffman Deposition, 180:1–10.

**Appendix A**

**DOUGLAS J. SKINNER**
Deputy Dean for Faculty
Sidney Davidson Distinguished Service Professor of Accounting
The University of Chicago Booth School of Business
5807 South Woodlawn Avenue
Chicago, IL 60637
Phone: 773-702-7137
dskinner@chicagobooth.edu
Google Scholar
SSRN

## Education

B.Ec. (First Class Honours), Accounting/Finance, Macquarie University, 1985.
M.S., Applied Economics, University of Rochester, 1988.
Ph.D., Accounting (major area), Finance (minor area), University of Rochester, 1989.

## Appointments

University of Chicago, Booth School of Business
- Sidney Davidson Distinguished Service Professor of Accounting, 2023-
- Deputy Dean for Faculty, 2015-2016, 2017-2024.
- Interim Dean, 2016-2017.
- Eric J. Gleacher Distinguished Service Professor of Accounting, 2014-2022.
- John P. and Lillian A. Gould Professor of Accounting, 2006-2013.
- Executive Director, Accounting Research Center, 2011-2016.
- Professor of Accounting and Neubauer Family Faculty Fellow, 2005-2006.
- Neubauer Faculty Fellow and Visiting Professor of Accounting, 2003-2004.

Independent Trustee and Audit Committee Chair, Harbor Funds, Harbor Funds II, and Harbor ETF Trust, 2020-

Senior Fellow, Asian Bureau of Finance and Economic Research (ABFER), 2017-

University of Melbourne, Faculty of Business and Economics
- Professorial Fellow, 2010-.

*Journal of Accounting Research*
- Senior Editor, 2006-2021.

*Journal of Accounting & Economics*
- Editor, 2000-2005.
- Associate Editor, 1994-2000.

University of Michigan Business School (now Ross School of Business)
KPMG Professor of Accounting, 1998-2005
Accounting Area Chair, 2001-2003
Professor of Accounting, 1997-2005
Associate Professor of Accounting, 1993-1997
Assistant Professor of Accounting, 1989-1993

Coopers & Lybrand (Sydney)
Auditor, 1980-82.

**Scholarly Honors and Awards**

FARS 2020 Best Paper Prize for "Run EDGAR Run: SEC Dissemination in a High Frequency World." With Jonathan L Rogers and Sarah L. C. Zechman.

Distinguished Ph.D. Mentoring Award, 2020, Financial Reporting Section, American Accounting Association.

BlackRock prize for best paper, 2015 Review of Accounting Studies conference ("The role of the media in disseminating insider trading news." With Jonathan Rogers and Sarah Zechman.)

Hillel J Einhorn Excellence in Teaching Award, 2014.

Emory Williams Award for Teaching Excellence, 2013.

FARS 2009 Best Paper Prize for "Earnings Momentum and Earnings Management." With James Myers and Linda Myers.

Jensen Prize for best paper in Corporate Finance and Organizations published in the *Journal of Financial Economics* in 2004. ("Are Dividends Disappearing? Dividend Concentration and the Consolidation of Earnings." With Harry DeAngelo and Linda DeAngelo.)

CQA/IBES Research Competition, 1998. ("Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio." With Richard Sloan. Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.)

KPMG Peat Marwick Faculty Fellow 1993-1996.
KPMG Peat Marwick Research Fellow 1991-1993.
Deloitte Haskins & Sells Foundation Doctoral Fellow 1986-88.
University of Rochester Sproull Fellow 1985-1987.

**Main Publications**

"Options Markets and Stock Return Volatility." Journal of Financial Economics 23, 1, June 1989: 61-78.

"Options Markets and the Information Content of Accounting Earnings Releases." Journal of Accounting & Economics 13, 3, October 1990: 191-211.

"Dividends and Losses." With Harry DeAngelo and Linda DeAngelo. Journal of Finance 47, 5, December 1992: 1837-1863.

"The Investment Opportunity Set and Accounting Procedure Choice: Preliminary Evidence." Journal of Accounting & Economics 16, 4, October 1993: 407-445.

"Accounting Choice in Troubled Companies." With Harry DeAngelo and Linda DeAngelo. Journal of Accounting & Economics 17, 1-2, January 1994: 113-143.

"How Do Taxes Affect Investors' Stock Market Realizations? Evidence from Tax-Return Panel Data." With H. Nejat Seyhun. Journal of Business 67, 2, April 1994: 231-262.

"Why Firms Voluntarily Disclose Bad News." Journal of Accounting Research 32, 1, Spring 1994: 38-60. (This article is abstracted in The CFA Digest 24, 4, Fall 1994.)

"Reversal of Fortune: Dividend Policy and the Disappearance of Sustained Earnings Growth." With Harry DeAngelo and Linda DeAngelo. Journal of Financial Economics 40, 3, March 1996: 341-371.

"Earnings Disclosures and Stockholder Lawsuits." Journal of Accounting & Economics 23, 3, November 1997: 249-282.

"Determinants of the Valuation Allowance for Deferred Tax Assets under SFAS-109." With Gregory S. Miller. The Accounting Review 73, 2, April 1998: 213-233.

"An Empirical Examination of Conference Calls as a Voluntary Disclosure Medium." With Richard Frankel and Marilyn Johnson. Journal of Accounting Research 37, 1, Spring 1999: 133-150.

"Earnings Management: Reconciling the Views of Accounting Academics, Practitioners, and Regulators." With Patricia Dechow. Paper delivered at the AAA/FASB Financial Reporting Issues Conference in December, 1999. Accounting Horizons, 14, 2, June 2000: 235-250.

"Special Dividends and the Evolution of Dividend Signaling." With Harry DeAngelo and Linda DeAngelo. Journal of Financial Economics, 57, 3, September 2000: 309-354.

"Earnings Surprises, Growth Expectations, and Stock Returns or Don't Let an Earnings Torpedo Sink Your Portfolio." With Richard Sloan. Review of Accounting Studies, 7, 2/3, June/September 2002: 289-312.

- Winner, 1998 Chicago Quantitative Alliance/IBES Research Competition.

"Large Sample Tests of the Debt Covenant Hypothesis." With Ilia Dichev. Journal of Accounting Research, 40, 4, September 2002: 1091-1123.

"The Role of Supplementary Statements with Management Earnings Forecasts." With Amy P. Hutton and Gregory S. Miller. Journal of Accounting Research 41, 5, December 2003: 867-890.

"Employee Stock Options, EPS Dilution, and Stock Repurchases." With Daniel Bens, Venky Nagar, and M. H. Franco Wong. Journal of Accounting and Economics, 36, 1-3, December 2003: 51-90.

"Are Dividends Disappearing? Dividend Concentration and the Consolidation of Earnings." With Harry DeAngelo and Linda DeAngelo. Journal of Financial Economics, 72, 3, June 2004: 425-456.

- Jensen Prize for best paper, Corporate Finance and Organizations.

"Earnings Momentum and Earnings Management." With James Myers and Linda Myers. Journal of Accounting, Auditing and Finance, 22, 2, Spring 2007: 249-284.

- FARS Best paper prize, 2009.

"Does Earnings Guidance Affect Market Returns? The Nature and Information Content of Aggregate Earnings Guidance." With Carol Anilowski and Mei Feng. Journal of Accounting and Economics 44, 1-2, September 2007: 36-63.

"The Evolving Relation between Earnings, Dividends, and Stock Repurchases." Journal of Financial Economics 87, 3, March 2008: 582-609.

"Accounting for Intangibles – A Critical Review of Policy Recommendations." Accounting and Business Research 38, 3, 2008: 191-204.

"A reply to Lev's rejoinder to 'Accounting for Intangibles – A Critical Review of Policy Recommendations.'" Accounting and Business Research 38, 3, 2008: 215-216.

"The Rise of Deferred Tax Assets in Japan: The Role of Deferred Tax Accounting in the Japanese Banking Crisis." Journal of Accounting and Economics 46, 2-3, 2008: 218-239. Lead article.

"Corporate Payout Policy." With Harry DeAngelo and Linda DeAngelo. Foundations and Trends in Finance 3, 2-3, 2008: 95-287.

“Management Forecasts in Japan: An Empirical Study of Forecasts that are Effectively Mandated” (Previously titled “When Voluntary Disclosure Isn’t Voluntary: Management Forecasts in Japan.”) With Kazuo Kato and Michio Kunimura. The Accounting Review 84, 5 (September 2009): 1575-1606.

“Earnings Guidance and Market Uncertainty.” With Jonathan Rogers and Andrew Van Buskirk. Journal of Accounting and Economics 48, 1 (October 2009): 90-109.

“Implications for GAAP from an analysis of positive research in accounting.” With S. P. Kothari and Karthik Ramanna. (Previously titled: “What Should GAAP Look Like? A Survey and Economic Analysis.”) Journal of Accounting and Economics 50, 2-3 (December 2010): 246-286. (Invited review paper.)

“What Do Dividends Tell Us About Earnings Quality?” With Eugene Soltes. Review of Accounting Studies 16, 1 (March 2011): 1-28.

“Measuring Securities Litigation Risk.” With Irene Kim. Journal of Accounting and Economics 53, 1-2 (February-April 2012): 290-310.

“Audit Quality and Auditor Reputation: Evidence from Japan.” With Suraj Srinivasan. The Accounting Review 87, 5 (September 2012): 1737-1765.

“The Politics of Accounting Standard-Setting: A Review of Empirical Research.” With Brandon Gipper and Brett J. Lombardi. Australian Journal of Management 38, 3 (December 2013): 523-551.

“Payout policy through the financial crisis: The growth of repurchases and the resilience of dividends.” With Eric Floyd and Nan Li. Journal of Financial Economics 118, 2 (November 2015): 299-316.

“The role of the media in disseminating insider trading news.” With Jonathan L. Rogers and Sarah L. C. Zechman. Review of Accounting Studies 21, 3 (September 2016): 711-739.

- *BlackRock prize for best paper, Review of Accounting Studies conference, 2015.*

“Is Japan Really a “Buy”? The Corporate Governance, Cash Holdings, and Economic Performance of Japanese Companies.” With Kazuo Kato and Meng Li. Journal of Business Finance & Accounting 44, 3 & 4 (March/April 2017): 480-523.

“Run EDGAR Run: SEC Dissemination in a High Frequency World.” With Jonathan L Rogers and Sarah L. C. Zechman. Journal of Accounting Research 55, 2 (May 2017): 459-505.

- *FARS Best paper prize, 2020.*

“Importing Activists: Determinants and Consequences of Increased Cross-border Shareholder Activism.” With Mark G. Maffett and Anya Nakhmurina. Journal of Accounting & Economics 74, 2-3 (November-December 2022). https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3721680

"Corporate Managers' Perspectives on Forward-Looking Guidance: Survey Evidence." With Andrew C. Call, Paul Hribar, and David Volant. Forthcoming, *Journal of Accounting & Economics*, 2024. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4214740

**Conference Proceedings**

"Stock Returns, Trading Volume, and Bid-Ask Spreads Around Earnings Announcements: Evidence from the NASDAQ National Market System." Proceedings: Seminar on the Analysis of Security Prices, 36, 1, May 1991: 289-329. SSRN version https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2143649

**Current Working Papers**

"The Evolution of Audit Market Structure and the Emergence of the Big Four: Evidence from Australia." With Matthew Pinnuck and Colin Ferguson (deceased). Revised, May 2023. Under revision. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2431727

"Moving Forward: Management Guidance and Earnings Announcement Returns." With Yao Lu. April 2020, Revised September 2020. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3687764

"Do Actions Speak Louder than Words? The Relation Between Payouts and Guidance Since 2000." With Yao Lu. August 2023. Under revision. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4322036

**Invited Discussions and Commentaries (non-refereed)**

"Are Disclosures About Bank Derivatives and Employee Stock Options 'Value Relevant'?" Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 393-405.

"What Motivates Managers' Choice of Discretionary Accruals?" With Victor L. Bernard. Journal of Accounting & Economics 22, 1-3, Aug.-Dec. 1996: 313-325.

"Do Options Markets Improve Informational Efficiency?" Contemporary Accounting Research 14, 2, Summer 1997: 193-201.

"How Well Does Net Income Measure Firm Performance? A Discussion of Two Studies." Journal of Accounting & Economics, 26, 1-3, January 1999: 105-111.

"Should Firms Disclose Everything to Everybody? A Discussion of 'Open versus closed conference calls: The determinants and effects of broadening access to disclosure.'" Journal of Accounting and Economics 34, 1-3, January 2003: 181-187.

'Comments on "The Effects of Taxes on Market Responses to Dividend Announcements and Payments: What Can We Learn from the 2003 Dividend Tax Cut?"' by Raj Chetty, Joseph Rosenberg, and Emmanuel Saez, in Alan J. Auerbach, James R. Hines, Jr., and Joel Slemrod, eds., Taxing Corporate Income in the 21st Century (Cambridge University Press, 2007): 36-40.

'Discussion of "The implications of unverifiable fair-value accounting: Evidence from the political economy of goodwill accounting"' Journal of Accounting and Economics 45, 2-3, August 2008, 282-288.

'Discussion of "Accounting standards and debt covenants: Has the "Balance Sheet Approach" led to a decline in the use of balance sheet covenants?"' Journal of Accounting and Economics 52, 2-3, November 2011: 203-208.

"Accounting research in the Japanese setting." The Japanese Accounting Review, 1, 2011: 135-140.

"How should we think about earnings quality? A discussion of "Earnings quality: Evidence from the field." With Mark W. Nelson. Journal of Accounting and Economics 56, 2-3 (December 2013): 34-41.

"The Evolving Disclosure Landscape: How Changes in Technology, the Media, and Capital Markets Are Affecting Disclosure." With Gregory S. Miller. Journal of Accounting Research 53, 2 (May 2015): 221-239.

**Other Publications**

"Are the SEC's Safe Harbor Provisions Effective in Encouraging the Disclosure of Forward-Looking Information?" Financial Analysts Journal 51, 4, July-August 1995: 38-44.

"Issues in Foreign Exchange Hedge Accounting." With Michael H. Moffett. Journal of Applied Corporate Finance 8, 5, Fall 1995: 82-94.

"Bad News Rings True." With Amy P. Hutton and Gregory S. Miller. Investor Relations Quarterly 6, 2, 2004: 49-56.

"Japan's Window Dressing Hid Olympus Fraud," Bloomberg Opinion, November 30, 2011, https://www.bloomberg.com/opinion/articles/2011-12-01/japan-s-window-dressing-hid-olympus-fraud-commentary-by-douglas-skinner

"Why U.S. Companies Continue to Pay Dividends," Bloomberg Opinion, April 11, 2012, https://www.bloomberg.com/opinion/articles/2012-04-11/why-u-s-companies-continue-to-pay-dividends

"Corporate America is Enriching Shareholders at the Expense of the Economy." fivethirtyeight.com July 15, 2014. http://fivethirtyeight.com/features/corporate-america-is-enriching-shareholders-at-the-expense-of-the-economy/

The Financial Accounting Standards Committee of the AAA is charged with responding to requests by standards setters on issues related to financial reporting. As a member of that Committee from 1999 until 2002 I contributed to comment letters to the Financial Accounting Standards Board (FASB), the International Accounting Standards Committee (IASC), and the U.S. Securities and Exchange Commission (SEC). Published versions of these comment letters for which I served as principal author are as follows:

- Response to the FASB Preliminary Views: Reporting Financial Instruments and Certain Related Assets and Liabilities at Fair Value. (with J. M. Wahlen, Chair, J. R. Boatsman, R. H. Herz, G. J. Jonas, K. G. Palepu, S. G. Ryan, K. Schipper, and C. M. Schrand). Accounting Horizons December 2000, Vol. 14, No. 4, pp. 501-508.
- Implications of Accounting Research for the FASB's Initiatives on Disclosure of Information about Intangible Assets. With L. A. Maines, Chair, E. Bartov, P. M. Fairfield, D. E. Hirst, T. E. Iannaconi, R. Mallett, C. M. Schrand, L. Vincent. Accounting Horizons June 2003, Vol. 17, No. 2, pp. 175-185.

**Selected Media Coverage**

"Dividends, Wall Street's Battered Status Symbol," The New York Times, February 13, 2016.

"As Stock Prices Slump, Don't Count on Buybacks," Wall Street Journal, January 25, 2016.

"Fast Traders Are Getting Data From SEC Seconds Early," Wall Street Journal, October 29, 2014.

"High-frequency traders said to get SEC filings early," Financial Times, October 29, 2014.

"Certain Traders May Get Early Looks at S.E.C. Filings, Paper Finds," The New York Times, October 29, 2014.

"Flush with Cash, Apple Plans Buyback and Dividend," The New York Times, March 19, 2012.

**Professional Activities**

*Journal of Accounting Research:* Senior Editor, 2006-2021.

*Accounting and Finance*, Editorial Board, 2012-2016.

*Asia-Pacific Journal of Accounting & Economics*, Associate Editor, 1999-2005.

*Journal of Accounting & Economics*:
Editor, 2000-2005.
Associate Editor, 1994-2000.

*The Accounting Review*, Editorial Advisory and Review Board, 1992-1996; 1997-1999.

*Review of Accounting Studies*, Co-Editor, 1999-2000.

Ad hoc referee for numerous accounting and finance journals.

Member: American Accounting Association, American Finance Association.

American Accounting Association Committees:
- Financial Accounting Standards Committee, 1999-2002.
- AAA/FASB Annual Financial Reporting Issues Conference Organizing Committee, 1999, 2000, 2005.
- 2001-2002 Competitive Manuscript Prize Committee.

**Ph.D. Committees (chronological order with initial placements)**

*At Michigan:*
Arun Kumar (Finance)
Christine Botosan. Washington University, St Louis.
Li Li Eng. Singapore National University.
Karen Nelson. Stanford.
Lillian Mills. Arizona.
Brian Bushee. Harvard Business School.
Marlene Plumlee (Chair). Utah.
David Heike (Finance). Western Ontario.
Timothy Burch (Finance). Miami (FL).
Gregory Miller (Chair). Harvard Business School.
Mark Bradshaw. Harvard.
Anchada Charoenrook (Finance). Vanderbilt.
Darren Roulstone (Co-chair). Chicago.
Linda Myers (Chair). Washington (Seattle).
Irem Tuna (Chair). Wharton.
Scott Richardson. Wharton.
Fai Cang (Finance). Vanderbilt.
Jef Doyle. Utah.
Irene Kim (Chair). Duke.
Mei Feng (Chair). Pittsburgh.
Wei Tang (Chair). Georgetown.

*At Chicago:*
Regina Wittenberg Moerman. Wharton.
Yu Gao. Minnesota.
Eugene Soltes (Chair). Harvard Business School.
Ningzhong Li. London Business School.

Lawrence Takeuchi (finance).
Pepa Kraft. NYU.
Jeff Ng. Chinese University of Hong Kong.
Anna Costello. (Chair). MIT.
Alon Kalay. Columbia.
Jonathan Milian. (Chair). Florida International University.
Meng Li (Co-chair). UT-Dallas.
Joao Granja. MIT.
Christine Cuny. NYU.
Joshua Madsen (Chair). Minnesota.
Marina Niessner (finance). Yale.
Eric Floyd. Rice.
Nan Li (Chair). Toronto.
Gerardo Perez Cavazos (Chair). Harvard Business School.
Frank Zhou (Chair). Wharton.
Matthew Bloomfield. Wharton.
Brett Lombardi (Chair). Monash (Australia).
Oleg Kuriukhin. Cornerstone Research.
Anya Nakhmurina. Yale SOM.
Johanna Shin. Capital Group.
Yao Lu. Cornell (Johnson).

**Recent presentations, discussions, and talks.**

2024: ABFER Singapore (discussant); FASB Financial Reporting Conference (discussant); Tulane mini-accounting conference.

**Douglas J. Skinner; Expert Reports and Testimony, Last Four Years.**

Expert reports and depositions; *SEB Investment Management AB, Individually and on behalf of others similarly situated v. Symantec Corporation and Gregory S. Clark*, United States District Court Northern District of California, Case No.: 3:18-cv-02902-WHA (2020, 2021).

Expert report and deposition; *In re Allergan plc Securities Litigation*, United States District Court for the Southern District of New York, Civil Action No. 18-cv-12089 (2020, 2021).

Expert reports and depositions; *Alexandre Pelletier, Individually and on behalf of others similarly situated v. Endo International plc et al.*, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 2: 17-cv-05114-MMB (2020, 2021).

Expert reports and depositions; *Purple Mountain Trust v. Wells Fargo & Company, et al.*, United States District Court Northern District of California, Civil Action No. 3:18-cv-03948-JD (2020, 2021).

Expert reports and deposition; *Washtenaw County Employees Retirement System, Individually and on behalf of others similarly situated v. Walgreen Co. et al.,* United States District Court Northern District of Illinois Eastern Division, No. 1:15-cv-3187 (2020, 2021).

Export report and deposition; *In re Novo Nordisk Securities Litigation*, United States District Court District of New Jersey, Master File No.: 3:17-cv-00209-BRM-LHG (2020, 2021).

Affidavit (expert report) and deposition; *Badesha Harpreet and Cronos Group Inc., et al.*, Ontario Superior Court of Justice, Court File No.: CV-20-00641990-00CP (2021).

Expert report and deposition; *Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzales Coronado Trust, Individually and on Behalf of All Others Similarly Situated v. Kevin Davis and Amir Rosenthal*, United States District Court Southern District of New York, Civil Action No. 1:16-CV-3591-GHW (2021).

Expert report, deposition, and trial testimony; *In Re CVR Refining, LP Unitholder Litigation.* In the Court of Chancery of the State of Delaware. Consolidated C.A. No. 2019-0062-KSJM (2021).

Expert reports, declaration, and depositions; *Christakis Vrakas, et al., v. United States Steel Corporation, et al.*, United States District Court Western District of Pennsylvania, Civil Action No. 17-579 (2021).

Expert report and deposition; *Gabby Klein et al., Individually and on behalf of others similarly situated v. Altria Group Inc., et al.*, United States District Court Eastern District of Virginia, Richmond Division, Civil Action No. 3:20-cv-00075-DJN (2021).

Expert report and deposition; *In Re Google Play Developer Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:20-cv-05792-JD (2022).

Expert report; *In Re Maxar Technologies, Inc. Shareholder Litigation*, Superior Court of California, County of Santa Clara, Case No.: 19CV357070 (2022).

Expert report, deposition; *In Re Google Play Store Antitrust Litigation*, United States District Court Northern District of California, Case No. 3:21-md-02981-JD (2022, 2023).

Trial testimony; *Epic Games, Inc. vs. Google, LLC., et al.*, United States District Court Northern District of California, No. 3:20-cv-05671-JD (2023).

Expert report, deposition; *United States of America et al. vs. Google LLC*, United States District Court for the Eastern District of Virginia, Civil Action No. 1:23cv00108 (2024).

Expert declaration, deposition; *Richard J. Tornetta, individually and on behalf of all others similarly situated and derivatively on behalf of nominal defendant Tesla, Inc. v. Elon Musk, et al., and Tesla, Inc., Nominal Defendant.* In the Court of Chancery of the State of Delaware, Civil Action No. 2018-0408-KSJM (2024).

Expert report; *The State of Texas, et al., vs. Google LLC*, United States District Court Eastern District of Texas Sherman Division, Civil No. 4:20-CV-957-SDJ (2024).

# Documents Considered List

## Academic Articles


- Asquith, Paul, Parag A. Pathak, and Jay R. Ritter, "Short Interest, Institutional Ownership, and Stock Returns," *Journal of Financial Economics* 78, no. 2 (2005): 243–276
- Baker, Scott R., et al., "The Unprecedented Stock Market Reaction to COVID-19," *The Review of Asset Pricing Studies* 10, no. 4 (2020): 742–758
- Brendel, Janja, and James Ryans, "Responding to Activist Short Sellers: Allegations, Firm Responses, and Outcomes," *Journal of Accounting Research* 59, no. 2 (2021): 487–528
- Dechow, Patricia M., Richard G. Sloan, and Amy P. Sweeney, "Causes and Consequences of Earnings Manipulation: An Analysis of Firms Subject to Enforcement Actions by the SEC," *Contemporary Accounting Research* 13, no. 1 (1996): 1–36
- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417
- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617
- Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1 (1996): 19–42
- Holzman, Eric R., Nathan T. Marshall, and Brent A. Schmidt, "When Are Firms on the Hot Seat? An Analysis of SEC Investigation Preferences," *Journal of Accounting and Economics* 77, no. 1 (2024): 101610
- Jiang, Haiyan, Ahsan Habib, and Mostafa Monzur Hasan, "Short Selling: A Review of the Literature and Implications for Future Research," *European Accounting Review* 31, no. 1 (2022): 1–31
- Kedia, Simi, and Shiva Rajgopal, "Do the SEC's Enforcement Preferences Affect Corporate Misconduct?," *Journal of Accounting and Economics* 51, no. 3 (2011): 259–278
- Ljungqvist, Alexander, and Wenlan Qian, "How Constraining Are Limits to Arbitrage?," *The Review of Financial Studies* 29, no. 8 (2016): 1975–2028
- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39

- Nourayi, Mahmoud M., “Stock Price Responses to the SEC’s Enforcement Actions,” *Journal of Accounting and Public Policy* 13, no. 4 (1994): 333–347
- Pástor, Ľuboš, and M. Blair Vorsatz, “Mutual Fund Performance and Flows During the COVID-19 Crisis,” *The Review of Asset Pricing Studies* 10, no. 4 (2020): 791–833
- Paugam, Luc, Hervé Stolowy, and Yves Gendron, “Deploying Narrative Economics to Understand Financial Market Dynamics: An Analysis of Activist Short Sellers’ Rhetoric,” *Contemporary Accounting Research* 38, no. 3 (2021): 1809–1848
- Solomon, David H., and Eugene Soltes, “Is ‘Not Guilty’ the Same as ‘Innocent’? Evidence from SEC Financial Fraud Investigations,” *Journal of Empirical Legal Studies* 18, no. 2 (2021): 287–327
- Shleifer, Andrei, and Robert W. Vishny, “The Limits of Arbitrage,” *The Journal of Finance* 52, no. 1 (1997): 35–55


**Analyst Reports**


- “3Q20 Recap: Time to Shine... Pipeline to Move the Needle in ‘21 w/Average-risk NIPT Upside; Reiterate OW, PT to $90,” *J.P. Morgan*, November 5, 2020
- “Growth Acceleration Underway, From Prenatal Right Now-Cancer Is Next. Reiterate Buy Rating, Raising Price Target To $92.,” *Craig Hallum*, November 6, 2020
- “J.P. Morgan Healthcare Conference Takeaways,” *J.P. Morgan*, January 12, 2021
- “Full Steam Ahead for NTRA’s Bustling Oncology Engine; Room for Upside in Q4,” *Cowen*, November 5, 2021
- “SMART Study Results Published; Solid Step Toward Microdeletion Reimbursement; Reiterate Buy,” *Canaccord Genuity*, January 20, 2022
- “2022+ Setup Illustrated Through Pictures; Macro-Drive Driven PT Trim,” *Cowen*, February 17, 2022
- “Remains a Top Pick for 2022,” *Baird*, February 24, 2022
- “Natera Unveils Oncology and Transplant Businesses Well Ahead of Our Thinking (and We Re-Constructed Our Model). Buy, Trim PT to $125,” *BTIG*, February 25, 2022
- “Strong 2022 Guide; First Look at Oncology & Transplant Volume Ramp,” *Cowen*, February 25, 2022

- "Mgmt Feedback Addresses Key Questions Arising from the Short Seller Report," *SVB Leerink,* March 9, 2022
- "NTRA: Trading Below Signatera Value in Intraday," *Piper Sandler*, March 9, 2022
- "Quick Take From Initial Management Comments on Short Report," *Raymond James*, March 9, 2022
- "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate BUY," *Canaccord Genuity*, March 9, 2022
- "Thoughts on Short Report," *Baird*, March 9, 2022
- "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022
- "Effective Short Report Rebuttal Via Conference Call; Prior Authorization Concerns Are Overblown; BUY," *Canaccord Genuity*, March 10, 2022
- "Highlights from Investor Call on Short Report," *Baird*, March 10, 2022
- "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022
- "Our Post Call Thoughts, NTRA Counters Short Report; Buy, PT to $100," *BTIG*, March 10, 2022
- "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022
- Analyst reports covering Natera that were published from February 26, 2020 through April 30, 2022 and available from counsel, Eikon, or S&P Capital IQ

**Data**

- Bloomberg Law
- Center for Research in Security Prices (CRSP)
- Eikon
- Factiva
- FactSet
- S&P Capital IQ

**Depositions**

- Deposition of Chad Coffman, CFA, dated July 19, 2024

**Earnings Conference Call and Investor Presentation Transcripts**

- Natera Q4 2019 Earnings Call Transcript, February 26, 2020
- Natera Q1 2021 Earnings Call Transcript, May 6, 2021
- Natera Q3 2021 Earnings Call Transcript, November 4, 2021
- Natera Q1 2022 Earnings Call Transcript, May 5, 2022
- "Natera Special Investor Call in Response to Misleading Short Seller Report," March 10, 2022
- Natera earnings conference call and investor call transcripts from Q4 2019 through Q1 2022

**Expert Reports**

- Expert Report of Chad Coffman, CFA, dated June 4, 2024, including all documents cited therein and backup materials

**Legal Documents and Pleadings**

- Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-LY, October 7, 2022
- *Comcast v. Behrend*, 569 U.S. 27 S.Ct., 2013
- Declaration of Christina L. Costley in Support of the Natera Defendants' Motion for Judgment on the Pleadings, *In re Natera, Inc. Securities Litigation*, May 30, 2024, Exhibit 5
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-DAE, September 11, 2023
- Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-DAE, June 4, 2024

**Produced Documents**

- NTRA_0046740–741
- NTRA_0046742–751
- NTRA_0247198–199
- NTRA_0247200–202
- NTRA_0247203–205
- NTRA_0247206–208
- NTRA_0247209–210
- NTRA_0247211–213
- NTRA_0247214–216
- NTRA_0247217–220
- NTRA_0247221–223
- NTRA_0247224–226
- NTRA_0247227–229
- NTRA_0247230–231
- NTRA_0247232–234
- NTRA_0247235
- NTRA_0247236–237
- NTRA_0247238–240
- NTRA_0247241–242
- NTRA_0247243–245
- NTRA_0247246–247
- NTRA_0247248–250
- NTRA_0247251
- NTRA_0247252

**Public Press**

- "Natera Expands Panorama™ Non-Invasive Prenatal Test to Screen for Clinically Significant Microdeletions," *Natera*, February 5, 2014
- "Natera: Company Using Incorrect Billing Codes to Inflate Insurance Cost, According to Billing Experts," *The Capitol Forum*, March 2, 2020
- "Natera: Company Using Questionable Billing Practices with State Medicaid Programs to Inflate Charges, According to Billing Expert," *The Capitol Forum*, June 12, 2020
- "Natera: Company Uses Third Party Non-Profit to Increase Likelihood of Insurance Reimbursement; Non-Profit Has Limited Paper Trail, Close Connections with Natera," *The Capitol Forum*, July 1, 2020
- "Natera: State Attorneys General Express Concern Over Unbundling Practice," *The Capitol Forum*, August 14, 2020
- "Natera: Company Appears to Be Improperly Billing Federal Tricare Program to Evade Non-Reimbursement Policy," *The Capitol Forum*, October 8, 2020
- "Natera: Colorado Medicaid Data Indicates State Significantly Increased Denial Rate for Natera Claims," *The Capitol Forum*, October 29, 2020
- "Illumina Can't Sink Natera Genetic Test IP in Patent Board Fight," *Bloomberg Law*, December 14, 2020
- "Natera: Charity Apparently Established to Process Insurance Prior Authorizations has Close Ties to Former Senior VP of Natera," *The Capitol Forum*, December 14, 2020
- "Clover Health Disputes Short Seller's Negative Report. What to Know," *Barron's*, February 5, 2021
- "Short Seller Trains Sights on EV Startup Lordstown, Prompting Share Slide," *The Wall Street Journal*, March 12, 2021
- "Meet the Short Seller Who Hopes Stocks Crash and Burn," *CNN Business*, June 25, 2021
- "Natera: Experts Raise Concerns About Size of Prompt Pay Discounts and Company Billing Practices," *The Capitol Forum*, August 5, 2021
- "When They Warn of Rare Disorders, These Prenatal Tests Are Usually Wrong," *The New York Times*, January 1, 2022
- "Natera: Pioneers in Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022

- "Natera Responds to Misleading Short Seller Report," *PR Newswire*, March 9, 2022.
- "The Man Who Moves Markets," *The Atlantic*, February 2, 2023
- "Activist Short Sellers Bring Many a Mighty Down," *California Management Review*, June 12, 2023
- "From Carl Icahn to Gautam Adani: How Short-Seller Hindenburg Is Making a Name for Itself," *CNBC*, March 19, 2024
- Natera earnings and guidance update press releases from Q4 2019 through Q1 2022

**SEC Filings**

- Natera Form 10-K filings for the period 2017–2023
- Natera Form 10-Q for the Fiscal Quarter Ended March 31, 2017, filed on May 10, 2017
- Natera Form 10-Q for the Fiscal Quarter Ended June 30, 2021, filed on August 6, 2021
- Natera Form 10-Q for the Fiscal Quarter Ended September 30, 2021, filed on November 5, 2021
- Natera Form 10-Q for the Fiscal Quarter Ended March 31, 2022, filed on May 6, 2022
- Natera Form 10-Q for the Fiscal Quarter Ended June 30, 2022, filed on August 5, 2022
- Natera Form 10-Q for the Fiscal Quarter Ended September 30, 2022, filed on November 9, 2022
- Natera Form 424B5, filed on July 22, 2022
- Natera Form 8-K, filed on February 24, 2022
- Natera Form 8-K, filed on November 8, 2022
- Natera Form 8-K, filed on February 28, 2023
- Natera Form S-3 Registration Statement, filed on July 20, 2021

**Textbooks**


- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed., McGraw-Hill Education, 2017
- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, "Event-Study Analysis," in *The Econometrics of Financial Markets*, Princeton University Press, 1997, pp. 149–180
- Dielman, Terry E., *Applied Regression Analysis*, 4th ed., South-Western, 2005
- Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices*, Basic Books, Inc., 1976
- Kothari, S.P., and Jerold B. Warner, "Econometrics of Event Studies," in *Handbook of Corporate Finance: Empirical Corporate Finance*, Volume 1, B. E. Eckbo ed., Elsevier, 2007, pp. 5–36
- LeBlanc, David C., *Statistics: Concepts and Applications for Science*, Jones and Bartlett Publishers, 2004
- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 9th ed., McGraw-Hill/Irwin, 2010


**Websites**


- "About Us," *Hindenburg Research*, available at https://hindenburgresearch.com/about-us/
- "Blake Goodner," *Duke-Margolis Center for Health Policy*, available at https://healthpolicy.duke.edu/people/blake-goodner
- "Prior Authorization Practice Resources," *American Medical Association*, available at https://www.ama-assn.org/practice-management/prior-authorization/prior-authorization-practice-resources
- "Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf," *Natera*, available at https://www.natera.com/wp-content/uploads/2020/11/Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf


**In addition to the documents on this list, I considered all documents and data cited and referenced in my report, appendices, and exhibits to form my opinions.**

**Exhibit 1**

# Natera, Inc.
# Closing Stock Price and Market and Industry Indices
## 11/26/19 – 6/6/22




Source: *CRSP*; *Eikon*; Motion for Class Certification; MTD Order

Note: Prices are pegged to Natera's closing stock price of $34.77 on February 26, 2020, the trading day before the beginning of the Proposed Class Period. The market index is the CRSP value-weighted NYSE/AMEX/Nasdaq/ARCA total return index. The industry index is an equal-weighted total return index based on the returns of the common stock of Adaptive Biotechnologies Corporation, CareDx, Inc., Exact Sciences Corporation, Guardant Health, Inc., Illumina, Inc., Invitae Corporation, Laboratory Corporation of America Holdings, Myriad Genetics, Inc, OPKO Health, Inc., and Quest Diagnostics Incorporated. The Nasdaq Biotechnology index is the Nasdaq Biotechnology total return index.

Exhibit 2a

# Natera, Inc.
# Regression Estimation Results[1]

| | Estimation Period: 2/27/20 – 4/30/20 | | Estimation Period: 5/1/20 – 4/6/21 | | Estimation Period: 4/7/21 – 3/11/22 | |
|---|---|---|---|---|---|---|
| | Coefficient[2] | p-Value | Coefficient[2] | p-Value | Coefficient[2] | p-Value |
| Market Index[3] | -0.350 | 0.387 | 0.128 | 0.469 | 0.597 * | 0.003 |
| Industry Index[4] | 1.539 * | 0.000 | 1.033 * | 0.000 | 1.049 * | 0.000 |
| Intercept | -0.004 | 0.688 | 0.000 | 0.961 | -0.001 | 0.517 |
| Number of Observations | 44 | | 226 | | 227 | |
| Adjusted R-Squared | 0.642 | | 0.498 | | 0.594 | |

Source: *CRSP*; *Eikon*; Motion for Class Certification; MTD Order

Note:
[1] The regression models are estimated using daily logarithmic returns over three estimation periods, excluding the impact dates of the alleged misrepresentations and the alleged corrective disclosure as pled in the Complaint, the publication date and the subsequent trading day following *The Capitol Forum* Articles (i.e., July 1, 2020; July 2, 2020; December 14, 2020; and December 15, 2020), March 10, 2022, and March 11, 2022.
[2] Coefficients marked with an asterisk (“*”) denote statistical significance at the 5% level using a two-tailed test.
[3] The market index is the CRSP value-weighted NYSE/AMEX/NASDAQ/ARCA total return index.
[4] The industry index is an equal-weighted total return index based on the returns of the common stock of Adaptive Biotechnologies Corporation, CareDx, Inc., Exact Sciences Corporation, Guardant Health, Inc., Illumina, Inc., Invitae Corporation, Laboratory Corporation of America Holdings, Myriad Genetics, Inc, OPKO Health, Inc., and Quest Diagnostics Incorporated.

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 2/27/20 | $37.25 | 7.13% | -4.10% | -2.56% | 10.28% | $3.57 | 0.12 |
| 2/28/20 | $37.91 | 1.76% | -0.86% | 1.68% | -0.75% | -$0.28 | 0.90 |
| 3/2/20 | $36.96 | -2.49% | 4.03% | -0.35% | -0.24% | -$0.09 | 0.97 |
| 3/3/20 | $36.56 | -1.08% | -2.46% | -4.24% | 5.21% | $1.98 | 0.40 |
| 3/4/20 | $40.17 | 9.87% | 3.76% | 8.23% | -1.09% | -$0.39 | 0.86 |
| 3/5/20 | $39.43 | -1.84% | -3.15% | -0.11% | -2.41% | -$0.96 | 0.69 |
| 3/6/20 | $38.29 | -2.89% | -1.78% | -2.09% | 0.05% | $0.02 | 0.99 |
| 3/9/20 | $33.27 | -13.11% | -7.93% | -5.87% | -7.00% | -$2.59 | 0.23 |
| 3/10/20 | $31.07 | -6.61% | 4.44% | -1.85% | -2.05% | -$0.68 | 0.73 |
| 3/11/20 | $31.02 | -0.16% | -5.00% | -8.80% | 13.42% * | $4.46 | 0.04 |
| 3/12/20 | $28.31 | -8.74% | -9.68% | -11.67% | 6.98% | $2.24 | 0.27 |
| 3/13/20 | $30.80 | 8.80% | 8.55% | 10.62% | -3.79% | -$1.05 | 0.52 |
| 3/16/20 | $22.19 | -27.95% | -11.82% | -15.78% | -9.86% | -$2.89 | 0.09 |
| 3/17/20 | $22.71 | 2.34% | 5.31% | 1.45% | 2.30% | $0.52 | 0.71 |
| 3/18/20 | $17.27 | -23.95% | -5.96% | -8.89% | -13.80% * | -$2.93 | 0.02 |
| 3/19/20 | $24.17 | 39.95% | 1.43% | 14.23% | 15.02% * | $2.80 | 0.02 |
| 3/20/20 | $25.10 | 3.85% | -3.72% | 0.33% | 2.33% | $0.57 | 0.70 |
| 3/23/20 | $23.24 | -7.41% | -2.69% | -2.90% | -3.68% | -$0.91 | 0.54 |
| 3/24/20 | $26.39 | 13.55% | 9.16% | 10.52% | 0.75% | $0.17 | 0.90 |
| 3/25/20 | $26.09 | -1.14% | 1.64% | 5.51% | -8.12% | -$2.06 | 0.17 |
| 3/26/20 | $25.90 | -0.73% | 5.75% | 6.99% | -8.43% | -$2.11 | 0.15 |
| 3/27/20 | $25.46 | -1.70% | -3.30% | -5.17% | 5.81% | $1.55 | 0.35 |
| 3/30/20 | $28.79 | 13.08% | 2.90% | 2.16% | 10.93% | $2.94 | 0.09 |
| 3/31/20 | $29.86 | 3.72% | -1.23% | -1.83% | 6.65% | $1.98 | 0.29 |
| 4/1/20 | $26.36 | -11.72% | -4.50% | -6.82% | -2.80% | -$0.82 | 0.64 |
| 4/2/20 | $27.71 | 5.12% | 1.95% | 1.83% | 3.30% | $0.89 | 0.59 |
| 4/3/20 | $27.21 | -1.80% | -1.58% | -4.56% | 5.31% | $1.51 | 0.39 |
| 4/6/20 | $29.92 | 9.96% | 6.79% | 11.90% | -5.01% | -$1.33 | 0.40 |
| 4/7/20 | $29.78 | -0.47% | 0.05% | -2.18% | 3.37% | $1.02 | 0.58 |
| 4/8/20 | $31.30 | 5.10% | 3.38% | 3.54% | 1.17% | $0.35 | 0.85 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 4/9/20 | $32.17 | 2.78% | 1.83% | 2.86% | -0.59% | -$0.18 | 0.92 |
| 4/13/20 | $29.84 | -7.24% | -1.01% | -1.25% | -5.42% | -$1.70 | 0.36 |
| 4/14/20 | $31.19 | 4.52% | 2.82% | 5.71% | -2.75% | -$0.81 | 0.64 |
| 4/15/20 | $32.13 | 3.01% | -2.31% | -2.77% | 7.08% | $2.29 | 0.26 |
| 4/16/20 | $33.56 | 4.45% | 0.42% | 1.98% | 1.88% | $0.61 | 0.76 |
| 4/17/20 | $33.66 | 0.30% | 2.77% | 3.96% | -4.26% | -$1.40 | 0.47 |
| 4/20/20 | $34.98 | 3.92% | -1.56% | 3.40% | -1.47% | -$0.49 | 0.81 |
| 4/21/20 | $35.09 | 0.31% | -2.92% | -1.15% | 1.43% | $0.50 | 0.81 |
| 4/22/20 | $36.07 | 2.79% | 2.19% | 2.42% | 0.19% | $0.07 | 0.97 |
| 4/23/20 | $36.10 | 0.08% | 0.13% | -0.14% | 0.72% | $0.26 | 0.91 |
| 4/24/20 | $36.85 | 2.08% | 1.30% | 2.18% | -0.43% | -$0.16 | 0.94 |
| 4/27/20 | $37.44 | 1.60% | 1.75% | 6.33% | -6.65% | -$2.37 | 0.26 |
| 4/28/20 | $36.39 | -2.80% | -0.23% | -2.15% | 0.79% | $0.30 | 0.90 |
| 4/29/20 | $36.57 | 0.49% | 2.89% | 2.99% | -2.64% | -$0.95 | 0.66 |
| 4/30/20 | $37.04 | 1.29% | -1.31% | -2.94% | 5.95% | $2.24 | 0.34 |
| 5/1/20 | $35.07 | -5.32% | -2.80% | -3.15% | -1.77% | -$0.65 | 0.47 |
| 5/4/20 | $36.07 | 2.85% | 0.48% | 3.44% | -0.73% | -$0.25 | 0.77 |
| 5/5/20 | $36.31 | 0.67% | 0.87% | 1.21% | -0.68% | -$0.24 | 0.78 |
| 5/6/20 | $35.85 | -1.27% | -0.59% | -0.32% | -0.85% | -$0.31 | 0.73 |
| 5/7/20 | $43.51 | 21.37% | 1.33% | 0.69% | 20.31% * | $8.07 | 0.00 |
| 5/8/20 | $43.57 | 0.14% | 1.86% | 2.05% | -2.16% | -$0.93 | 0.38 |
| 5/11/20 | $46.57 | 6.89% | -0.04% | 5.18% | 1.47% | $0.64 | 0.56 |
| 5/12/20 | $46.07 | -1.07% | -2.04% | -1.71% | 0.98% | $0.46 | 0.69 |
| 5/13/20 | $46.95 | 1.91% | -1.90% | -2.19% | 4.54% | $2.14 | 0.07 |
| 5/14/20 | $45.12 | -3.90% | 1.03% | 0.31% | -4.32% | -$1.99 | 0.07 |
| 5/15/20 | $45.23 | 0.24% | 0.52% | 4.21% | -4.00% | -$1.77 | 0.10 |
| 5/18/20 | $45.93 | 1.55% | 3.34% | 1.72% | -0.63% | -$0.29 | 0.80 |
| 5/19/20 | $45.95 | 0.04% | -0.97% | -1.66% | 1.92% | $0.89 | 0.44 |
| 5/20/20 | $46.53 | 1.26% | 1.74% | 1.91% | -0.91% | -$0.42 | 0.71 |

Exhibit 2b

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 5/21/20 | $45.50 | -2.21% | -0.66% | -0.53% | -1.58% | -$0.73 | 0.52 |
| 5/22/20 | $45.47 | -0.07% | 0.27% | 1.08% | -1.19% | -$0.54 | 0.63 |
| 5/26/20 | $43.27 | -4.85% | 1.42% | -4.03% | -0.89% | -$0.40 | 0.72 |
| 5/27/20 | $43.27 | 0.01% | 1.50% | 1.85% | -2.04% | -$0.88 | 0.40 |
| 5/28/20 | $43.44 | 0.39% | -0.35% | -0.10% | 0.55% | $0.24 | 0.83 |
| 5/29/20 | $43.85 | 0.94% | 0.47% | 0.87% | 0.00% | $0.00 | 1.00 |
| 6/1/20 | $43.48 | -0.84% | 0.66% | 1.65% | -2.58% | -$1.12 | 0.29 |
| 6/2/20 | $45.01 | 3.52% | 0.84% | 1.16% | 2.19% | $0.96 | 0.38 |
| 6/3/20 | $43.35 | -3.69% | 1.49% | -1.25% | -2.60% | -$1.16 | 0.29 |
| 6/4/20 | $41.20 | -4.96% | -0.30% | -1.30% | -3.62% | -$1.54 | 0.14 |
| 6/5/20 | $40.54 | -1.60% | 2.50% | 1.30% | -3.21% | -$1.30 | 0.19 |
| 6/8/20 | $41.23 | 1.70% | 1.42% | 2.44% | -0.97% | -$0.39 | 0.69 |
| 6/9/20 | $41.90 | 1.63% | -0.95% | -0.14% | 1.90% | $0.79 | 0.45 |
| 6/10/20 | $42.38 | 1.15% | -0.67% | 0.76% | 0.45% | $0.19 | 0.85 |
| 6/11/20 | $39.52 | -6.75% | -5.82% | -8.38% | 2.86% | $1.23 | 0.25 |
| 6/12/20 | $40.93 | 3.57% | 1.41% | 0.66% | 2.69% | $1.08 | 0.28 |
| 6/15/20 | $43.29 | 5.77% | 1.07% | 3.67% | 1.77% | $0.73 | 0.48 |
| 6/16/20 | $44.59 | 3.00% | 1.76% | -0.05% | 2.84% | $1.25 | 0.26 |
| 6/17/20 | $45.43 | 1.88% | -0.41% | -0.81% | 2.80% | $1.27 | 0.26 |
| 6/18/20 | $45.99 | 1.23% | 0.12% | 0.75% | 0.45% | $0.20 | 0.86 |
| 6/19/20 | $46.47 | 1.04% | -0.46% | -0.64% | 1.78% | $0.83 | 0.48 |
| 6/22/20 | $46.32 | -0.32% | 0.67% | 7.13% | -7.23% * | -$3.24 | 0.00 |
| 6/23/20 | $46.63 | 0.67% | 0.39% | 1.01% | -0.41% | -$0.19 | 0.87 |
| 6/24/20 | $45.05 | -3.39% | -2.57% | -4.31% | 1.46% | $0.68 | 0.56 |
| 6/25/20 | $47.53 | 5.51% | 1.13% | 2.02% | 3.21% | $1.47 | 0.20 |
| 6/26/20 | $45.90 | -3.43% | -2.29% | -1.10% | -2.03% | -$0.95 | 0.41 |
| 6/29/20 | $47.70 | 3.92% | 1.45% | 2.43% | 1.20% | $0.55 | 0.63 |
| 6/30/20 | $49.86 | 4.53% | 1.47% | 4.53% | -0.33% | -$0.16 | 0.89 |
| 7/1/20 | $49.56 | -0.60% | 0.40% | 0.25% | -0.91% | -$0.45 | 0.71 |
| 7/2/20 | $48.08 | -2.99% | 0.50% | 1.18% | -4.21% | -$2.04 | 0.08 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 7/6/20 | $46.59 | -3.10% | 1.49% | 1.92% | -5.16% * | -$2.42 | 0.03 |
| 7/7/20 | $47.14 | 1.18% | -1.03% | -0.50% | 1.84% | $0.87 | 0.46 |
| 7/8/20 | $48.45 | 2.78% | 0.84% | 2.83% | -0.24% | -$0.11 | 0.92 |
| 7/9/20 | $49.19 | 1.53% | -0.57% | -0.51% | 2.15% | $1.05 | 0.39 |
| 7/10/20 | $46.92 | -4.61% | 1.04% | -1.46% | -3.28% | -$1.59 | 0.18 |
| 7/13/20 | $45.89 | -2.20% | -1.12% | -1.43% | -0.58% | -$0.27 | 0.81 |
| 7/14/20 | $48.29 | 5.23% | 1.33% | 2.17% | 2.76% | $1.29 | 0.27 |
| 7/15/20 | $48.73 | 0.91% | 1.18% | 2.01% | -1.29% | -$0.62 | 0.60 |
| 7/16/20 | $46.97 | -3.61% | -0.40% | -1.87% | -1.66% | -$0.80 | 0.50 |
| 7/17/20 | $48.10 | 2.41% | 0.36% | 2.44% | -0.16% | -$0.07 | 0.95 |
| 7/20/20 | $49.81 | 3.56% | 0.86% | 1.87% | 1.49% | $0.72 | 0.55 |
| 7/21/20 | $49.23 | -1.16% | 0.23% | 0.82% | -2.02% | -$0.99 | 0.41 |
| 7/22/20 | $49.50 | 0.55% | 0.51% | -0.26% | 0.76% | $0.38 | 0.76 |
| 7/23/20 | $48.41 | -2.20% | -1.09% | -0.96% | -1.07% | -$0.53 | 0.66 |
| 7/24/20 | $46.52 | -3.90% | -0.70% | -2.89% | -0.85% | -$0.41 | 0.73 |
| 7/27/20 | $47.54 | 2.19% | 0.90% | 3.22% | -1.20% | -$0.56 | 0.62 |
| 7/28/20 | $46.09 | -3.05% | -0.69% | -2.70% | -0.17% | -$0.08 | 0.94 |
| 7/29/20 | $46.68 | 1.28% | 1.34% | 1.04% | 0.04% | $0.02 | 0.99 |
| 7/30/20 | $47.55 | 1.86% | -0.38% | 1.57% | 0.29% | $0.14 | 0.91 |
| 7/31/20 | $48.02 | 0.99% | 0.45% | -2.16% | 3.24% | $1.57 | 0.20 |
| 8/3/20 | $49.78 | 3.67% | 0.87% | 3.28% | 0.16% | $0.08 | 0.95 |
| 8/4/20 | $49.35 | -0.86% | 0.45% | -0.34% | -0.56% | -$0.28 | 0.82 |
| 8/5/20 | $51.20 | 3.75% | 0.75% | 0.84% | 2.77% | $1.39 | 0.27 |
| 8/6/20 | $55.17 | 7.75% | 0.47% | -1.41% | 9.29% * | $4.99 | 0.00 |
| 8/7/20 | $52.87 | -4.17% | 0.02% | -2.78% | -1.33% | -$0.73 | 0.59 |
| 8/10/20 | $51.33 | -2.91% | 0.27% | -1.76% | -1.14% | -$0.60 | 0.64 |
| 8/11/20 | $50.37 | -1.87% | -0.79% | -2.16% | 0.48% | $0.25 | 0.85 |
| 8/12/20 | $53.49 | 6.19% | 1.30% | 2.16% | 3.72% | $1.91 | 0.14 |
| 8/13/20 | $56.38 | 5.40% | -0.06% | 2.51% | 2.75% | $1.49 | 0.27 |
| 8/14/20 | $54.63 | -3.10% | -0.07% | -2.17% | -0.87% | -$0.49 | 0.72 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 8/17/20 | $62.78 | 14.92% | 0.50% | 4.66% | 9.58% * | $5.49 | 0.00 |
| 8/18/20 | $65.28 | 3.98% | 0.14% | -0.27% | 4.26% | $2.73 | 0.09 |
| 8/19/20 | $65.95 | 1.03% | -0.44% | -0.06% | 1.15% | $0.75 | 0.64 |
| 8/20/20 | $66.01 | 0.09% | 0.28% | 0.25% | -0.19% | -$0.13 | 0.94 |
| 8/21/20 | $65.88 | -0.20% | 0.16% | 0.00% | -0.21% | -$0.14 | 0.93 |
| 8/24/20 | $65.49 | -0.59% | 0.89% | -1.89% | 1.28% | $0.85 | 0.61 |
| 8/25/20 | $65.46 | -0.05% | 0.34% | -0.43% | 0.37% | $0.24 | 0.88 |
| 8/26/20 | $64.83 | -0.96% | 0.87% | -0.89% | -0.15% | -$0.10 | 0.95 |
| 8/27/20 | $64.34 | -0.76% | 0.17% | -3.63% | 3.10% | $2.04 | 0.22 |
| 8/28/20 | $64.39 | 0.08% | 0.69% | 0.76% | -0.78% | -$0.50 | 0.75 |
| 8/31/20 | $63.71 | -1.06% | -0.16% | -0.01% | -1.01% | -$0.65 | 0.68 |
| 9/1/20 | $64.12 | 0.64% | 0.85% | -0.60% | 1.17% | $0.75 | 0.64 |
| 9/2/20 | $64.32 | 0.31% | 1.21% | 2.03% | -1.89% | -$1.20 | 0.44 |
| 9/3/20 | $64.07 | -0.39% | -3.40% | -5.10% | 5.62% * | $3.72 | 0.03 |
| 9/4/20 | $64.73 | 1.03% | -0.81% | -1.66% | 2.91% | $1.89 | 0.25 |
| 9/8/20 | $61.79 | -4.54% | -2.68% | -0.28% | -3.92% | -$2.49 | 0.11 |
| 9/9/20 | $63.12 | 2.15% | 1.98% | 3.08% | -1.24% | -$0.76 | 0.61 |
| 9/10/20 | $61.74 | -2.19% | -1.56% | 0.56% | -2.54% | -$1.58 | 0.30 |
| 9/11/20 | $59.61 | -3.45% | -0.02% | 0.34% | -3.78% | -$2.29 | 0.12 |
| 9/14/20 | $61.70 | 3.51% | 1.54% | 3.91% | -0.70% | -$0.42 | 0.78 |
| 9/15/20 | $61.33 | -0.60% | 0.54% | 1.49% | -2.17% | -$1.32 | 0.38 |
| 9/16/20 | $61.15 | -0.29% | -0.31% | -0.55% | 0.33% | $0.20 | 0.90 |
| 9/17/20 | $60.94 | -0.34% | -0.79% | -2.65% | 2.58% | $1.60 | 0.30 |
| 9/18/20 | $60.52 | -0.69% | -0.88% | 1.80% | -2.38% | -$1.43 | 0.33 |
| 9/21/20 | $62.76 | 3.70% | -1.25% | -0.41% | 4.31% | $2.67 | 0.09 |
| 9/22/20 | $64.01 | 1.99% | 0.93% | 0.48% | 1.38% | $0.87 | 0.58 |
| 9/23/20 | $62.33 | -2.62% | -2.40% | -2.61% | 0.39% | $0.25 | 0.87 |
| 9/24/20 | $64.88 | 4.09% | 0.20% | 2.94% | 1.00% | $0.63 | 0.69 |
| 9/25/20 | $68.62 | 5.76% | 1.57% | 4.13% | 1.24% | $0.81 | 0.62 |
| 9/28/20 | $70.05 | 2.08% | 1.66% | 0.97% | 0.87% | $0.60 | 0.73 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 9/29/20 | $72.67 | 3.74% | -0.40% | 2.07% | 1.63% | $1.15 | 0.51 |
| 9/30/20 | $72.24 | -0.59% | 0.69% | 1.52% | -2.21% | -$1.59 | 0.37 |
| 10/1/20 | $72.89 | 0.90% | 0.79% | 1.69% | -0.92% | -$0.66 | 0.71 |
| 10/2/20 | $70.78 | -2.89% | -0.77% | -0.48% | -2.30% | -$1.66 | 0.35 |
| 10/5/20 | $70.72 | -0.08% | 1.83% | 3.00% | -3.30% | -$2.30 | 0.18 |
| 10/6/20 | $71.41 | 0.98% | -1.19% | 0.64% | 0.48% | $0.34 | 0.85 |
| 10/7/20 | $72.56 | 1.61% | 1.70% | 1.50% | -0.15% | -$0.10 | 0.95 |
| 10/8/20 | $71.40 | -1.60% | 0.85% | 3.21% | -4.86% * | -$3.44 | 0.04 |
| 10/9/20 | $73.58 | 3.05% | 0.86% | 1.58% | 1.30% | $0.93 | 0.60 |
| 10/12/20 | $73.60 | 0.03% | 1.35% | -1.48% | 1.41% | $1.05 | 0.57 |
| 10/13/20 | $73.00 | -0.82% | -0.50% | 0.27% | -1.02% | -$0.75 | 0.68 |
| 10/14/20 | $71.91 | -1.49% | -0.60% | -3.24% | 2.00% | $1.48 | 0.42 |
| 10/15/20 | $71.70 | -0.29% | -0.08% | -0.26% | 0.00% | $0.00 | 1.00 |
| 10/16/20 | $71.08 | -0.86% | -0.07% | 0.81% | -1.67% | -$1.19 | 0.49 |
| 10/19/20 | $72.55 | 2.07% | -1.42% | 1.15% | 1.07% | $0.76 | 0.67 |
| 10/20/20 | $70.35 | -3.03% | 0.38% | -0.60% | -2.47% | -$1.77 | 0.31 |
| 10/21/20 | $67.99 | -3.35% | -0.34% | -2.12% | -1.14% | -$0.80 | 0.64 |
| 10/22/20 | $71.39 | 5.00% | 0.61% | 3.02% | 1.75% | $1.20 | 0.48 |
| 10/23/20 | $71.19 | -0.28% | 0.38% | 0.84% | -1.18% | -$0.84 | 0.63 |
| 10/26/20 | $68.87 | -3.26% | -1.81% | -1.11% | -1.90% | -$1.34 | 0.44 |
| 10/27/20 | $70.64 | 2.57% | -0.30% | 4.29% | -1.73% | -$1.18 | 0.48 |
| 10/28/20 | $66.66 | -5.63% | -3.28% | -3.02% | -2.17% | -$1.52 | 0.37 |
| 10/29/20 | $68.33 | 2.51% | 1.05% | -0.35% | 2.75% | $1.86 | 0.27 |
| 10/30/20 | $67.26 | -1.57% | -1.31% | -5.42% | 4.45% | $3.11 | 0.08 |
| 11/2/20 | $67.52 | 0.39% | 1.21% | 0.19% | 0.04% | $0.03 | 0.99 |
| 11/3/20 | $71.50 | 5.89% | 1.88% | 3.01% | 2.47% | $1.69 | 0.32 |
| 11/4/20 | $75.07 | 4.99% | 1.96% | 3.40% | 1.19% | $0.86 | 0.63 |
| 11/5/20 | $76.39 | 1.76% | 2.11% | 2.11% | -0.67% | -$0.50 | 0.79 |
| 11/6/20 | $82.08 | 7.45% | 0.00% | -1.21% | 8.82% * | $7.04 | 0.00 |
| 11/9/20 | $78.54 | -4.31% | 1.06% | -1.63% | -2.80% | -$2.27 | 0.25 |

Exhibit 2b

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 11/10/20 | $76.80 | -2.22% | -0.06% | 0.56% | -2.76% | -$2.14 | 0.26 |
| 11/11/20 | $78.97 | 2.83% | 0.80% | 3.23% | -0.59% | -$0.45 | 0.81 |
| 11/12/20 | $83.48 | 5.71% | -0.97% | -0.75% | 6.68% * | $5.45 | 0.01 |
| 11/13/20 | $82.81 | -0.80% | 1.33% | 0.90% | -1.88% | -$1.55 | 0.44 |
| 11/16/20 | $81.84 | -1.17% | 1.23% | -1.41% | 0.14% | $0.12 | 0.95 |
| 11/17/20 | $83.08 | 1.52% | -0.15% | 0.10% | 1.44% | $1.19 | 0.56 |
| 11/18/20 | $80.83 | -2.71% | -0.90% | -0.89% | -1.68% | -$1.38 | 0.49 |
| 11/19/20 | $82.86 | 2.51% | 0.58% | 0.41% | 2.01% | $1.64 | 0.42 |
| 11/20/20 | $85.40 | 3.07% | -0.43% | 2.20% | 0.83% | $0.69 | 0.74 |
| 11/23/20 | $85.99 | 0.69% | 0.80% | 1.07% | -0.51% | -$0.43 | 0.84 |
| 11/24/20 | $83.02 | -3.45% | 1.51% | -1.52% | -2.09% | -$1.78 | 0.39 |
| 11/25/20 | $84.55 | 1.84% | 0.02% | -0.29% | 2.15% | $1.81 | 0.39 |
| 11/27/20 | $88.13 | 4.23% | 0.40% | 2.80% | 1.26% | $1.08 | 0.61 |
| 11/30/20 | $88.27 | 0.16% | -0.57% | 1.76% | -1.55% | -$1.35 | 0.53 |
| 12/1/20 | $91.19 | 3.31% | 0.96% | 1.19% | 1.94% | $1.73 | 0.44 |
| 12/2/20 | $90.76 | -0.47% | 0.12% | 0.94% | -1.44% | -$1.30 | 0.56 |
| 12/3/20 | $88.97 | -1.97% | 0.23% | 0.67% | -2.66% | -$2.39 | 0.28 |
| 12/4/20 | $87.47 | -1.69% | 1.05% | 1.73% | -3.53% | -$3.09 | 0.15 |
| 12/7/20 | $90.36 | 3.30% | -0.02% | 1.55% | 1.68% | $1.49 | 0.50 |
| 12/8/20 | $92.63 | 2.51% | 0.43% | 0.77% | 1.66% | $1.51 | 0.51 |
| 12/9/20 | $94.49 | 2.01% | -0.96% | -1.59% | 3.84% | $3.63 | 0.13 |
| 12/10/20 | $98.82 | 4.58% | 0.26% | 3.91% | 0.49% | $0.47 | 0.84 |
| 12/11/20 | $96.56 | -2.29% | -0.23% | -1.63% | -0.58% | -$0.57 | 0.81 |
| 12/14/20 | $98.47 | 1.98% | -0.33% | -0.46% | 2.51% | $2.46 | 0.32 |
| 12/15/20 | $98.80 | 0.34% | 1.31% | -1.09% | 1.32% | $1.31 | 0.60 |
| 12/16/20 | $95.80 | -3.04% | 0.14% | -0.71% | -2.33% | -$2.27 | 0.34 |
| 12/17/20 | $101.35 | 5.79% | 0.79% | 1.28% | 4.32% | $4.23 | 0.09 |
| 12/18/20 | $101.67 | 0.32% | -0.21% | 0.84% | -0.51% | -$0.52 | 0.83 |
| 12/21/20 | $105.61 | 3.88% | -0.29% | 2.29% | 1.52% | $1.56 | 0.54 |
| 12/22/20 | $111.32 | 5.41% | 0.06% | 2.33% | 2.92% | $3.13 | 0.24 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 12/23/20 | $110.04 | -1.15% | 0.14% | -1.43% | 0.32% | $0.36 | 0.90 |
| 12/24/20 | $111.74 | 1.54% | 0.23% | -1.59% | 3.22% | $3.60 | 0.20 |
| 12/28/20 | $106.26 | -4.90% | 0.38% | -2.41% | -2.52% | -$2.78 | 0.30 |
| 12/29/20 | $99.39 | -6.47% | -0.37% | -1.68% | -4.76% * | -$4.94 | 0.05 |
| 12/30/20 | $98.85 | -0.54% | 0.33% | 1.85% | -2.44% | -$2.40 | 0.32 |
| 12/31/20 | $99.52 | 0.68% | 0.36% | -0.74% | 1.41% | $1.40 | 0.57 |
| 1/4/21 | $96.31 | -3.23% | -1.31% | 0.20% | -3.25% | -$3.19 | 0.18 |
| 1/5/21 | $100.04 | 3.87% | 0.90% | 1.99% | 1.67% | $1.62 | 0.50 |
| 1/6/21 | $103.21 | 3.17% | 0.80% | 1.69% | 1.30% | $1.31 | 0.60 |
| 1/7/21 | $108.78 | 5.40% | 1.63% | 3.61% | 1.40% | $1.46 | 0.57 |
| 1/8/21 | $111.17 | 2.20% | 0.47% | 1.15% | 0.94% | $1.03 | 0.70 |
| 1/11/21 | $110.31 | -0.77% | -0.56% | 1.65% | -2.36% | -$2.59 | 0.33 |
| 1/12/21 | $110.83 | 0.47% | 0.42% | 1.38% | -0.99% | -$1.08 | 0.69 |
| 1/13/21 | $113.28 | 2.21% | 0.09% | 0.69% | 1.48% | $1.65 | 0.55 |
| 1/14/21 | $115.91 | 2.32% | 0.00% | 1.83% | 0.43% | $0.48 | 0.86 |
| 1/15/21 | $120.16 | 3.67% | -0.85% | 0.62% | 3.13% | $3.68 | 0.21 |
| 1/19/21 | $123.90 | 3.11% | 0.85% | 2.60% | 0.31% | $0.37 | 0.90 |
| 1/20/21 | $123.38 | -0.42% | 1.20% | 1.22% | -1.80% | -$2.21 | 0.46 |
| 1/21/21 | $119.99 | -2.75% | -0.09% | -2.37% | -0.29% | -$0.36 | 0.91 |
| 1/22/21 | $119.75 | -0.20% | -0.15% | 0.28% | -0.46% | -$0.56 | 0.85 |
| 1/25/21 | $119.00 | -0.63% | 0.24% | 0.87% | -1.53% | -$1.82 | 0.53 |
| 1/26/21 | $109.59 | -7.91% | -0.29% | -3.11% | -4.80% * | -$5.58 | 0.05 |
| 1/27/21 | $100.20 | -8.57% | -2.48% | -1.75% | -6.58% * | -$6.98 | 0.01 |
| 1/28/21 | $108.64 | 8.42% | 0.93% | 2.72% | 5.35% * | $5.50 | 0.04 |
| 1/29/21 | $106.64 | -1.84% | -1.76% | -0.36% | -1.25% | -$1.35 | 0.61 |
| 2/1/21 | $111.55 | 4.60% | 1.73% | 3.50% | 0.74% | $0.79 | 0.77 |
| 2/2/21 | $119.03 | 6.71% | 1.40% | 0.89% | 5.55% * | $6.37 | 0.03 |
| 2/3/21 | $114.64 | -3.69% | 0.14% | -1.03% | -2.66% | -$3.12 | 0.28 |
| 2/4/21 | $116.44 | 1.57% | 1.13% | -0.69% | 2.16% | $2.51 | 0.39 |
| 2/5/21 | $119.07 | 2.26% | 0.61% | 0.80% | 1.35% | $1.58 | 0.59 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 2/8/21 | $118.56 | -0.43% | 0.98% | 2.48% | -3.03% | -$3.56 | 0.21 |
| 2/9/21 | $119.04 | 0.40% | 0.10% | 0.33% | 0.06% | $0.07 | 0.98 |
| 2/10/21 | $118.29 | -0.63% | -0.03% | -0.59% | 0.00% | -$0.01 | 1.00 |
| 2/11/21 | $117.74 | -0.47% | 0.19% | 1.34% | -1.84% | -$2.15 | 0.45 |
| 2/12/21 | $124.36 | 5.62% | 0.47% | 3.23% | 2.16% | $2.57 | 0.39 |
| 2/16/21 | $119.86 | -3.62% | -0.11% | -2.10% | -1.46% | -$1.80 | 0.55 |
| 2/17/21 | $114.84 | -4.19% | -0.23% | -1.88% | -2.26% | -$2.68 | 0.36 |
| 2/18/21 | $114.05 | -0.69% | -0.66% | -1.21% | 0.66% | $0.76 | 0.79 |
| 2/19/21 | $119.61 | 4.88% | 0.27% | 1.31% | 3.45% | $4.00 | 0.17 |
| 2/22/21 | $111.01 | -7.19% | -0.96% | -4.97% | -2.04% | -$2.41 | 0.40 |
| 2/23/21 | $111.09 | 0.07% | -0.13% | -1.62% | 1.80% | $2.02 | 0.47 |
| 2/24/21 | $112.83 | 1.57% | 1.13% | 0.29% | 1.12% | $1.25 | 0.65 |
| 2/25/21 | $108.76 | -3.61% | -2.66% | -3.16% | -0.01% | -$0.01 | 1.00 |
| 2/26/21 | $116.09 | 6.74% | -0.38% | 0.86% | 5.86% * | $6.57 | 0.02 |
| 3/1/21 | $123.49 | 6.37% | 2.48% | 3.69% | 2.16% | $2.53 | 0.39 |
| 3/2/21 | $118.02 | -4.43% | -0.90% | -2.54% | -1.74% | -$2.13 | 0.48 |
| 3/3/21 | $108.70 | -7.90% | -1.47% | -5.40% | -2.27% | -$2.65 | 0.35 |
| 3/4/21 | $102.15 | -6.03% | -1.67% | -5.14% | -0.54% | -$0.59 | 0.83 |
| 3/5/21 | $102.99 | 0.82% | 1.74% | -0.89% | 1.54% | $1.59 | 0.54 |
| 3/8/21 | $93.27 | -9.44% | -0.59% | -2.64% | -6.82% * | -$6.79 | 0.00 |
| 3/9/21 | $99.30 | 6.47% | 1.69% | 5.96% | 0.08% | $0.08 | 0.97 |
| 3/10/21 | $98.71 | -0.59% | 0.68% | -0.91% | 0.27% | $0.27 | 0.91 |
| 3/11/21 | $103.98 | 5.34% | 1.42% | 5.18% | -0.19% | -$0.19 | 0.94 |
| 3/12/21 | $104.04 | 0.06% | 0.15% | -1.25% | 1.35% | $1.41 | 0.59 |
| 3/15/21 | $109.06 | 4.83% | 0.71% | 2.71% | 1.89% | $1.98 | 0.45 |
| 3/16/21 | $104.19 | -4.47% | -0.43% | -0.34% | -4.07% | -$4.34 | 0.09 |
| 3/17/21 | $106.00 | 1.74% | 0.36% | 0.83% | 0.84% | $0.87 | 0.74 |
| 3/18/21 | $98.84 | -6.75% | -1.80% | -3.72% | -2.80% | -$2.93 | 0.25 |
| 3/19/21 | $103.32 | 4.53% | 0.18% | 2.67% | 1.71% | $1.71 | 0.49 |
| 3/22/21 | $104.31 | 0.96% | 0.48% | 1.87% | -1.01% | -$1.04 | 0.68 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 3/23/21 | $100.35 | -3.80% | -1.20% | -3.45% | -0.08% | -$0.08 | 0.97 |
| 3/24/21 | $96.61 | -3.73% | -0.91% | -3.95% | 0.49% | $0.50 | 0.84 |
| 3/25/21 | $94.98 | -1.69% | 0.66% | 0.23% | -1.99% | -$1.91 | 0.42 |
| 3/26/21 | $93.64 | -1.41% | 1.54% | -0.04% | -1.55% | -$1.46 | 0.53 |
| 3/29/21 | $91.47 | -2.32% | -0.53% | -2.32% | 0.15% | $0.14 | 0.95 |
| 3/30/21 | $97.15 | 6.21% | 0.00% | 1.64% | 4.45% | $4.16 | 0.08 |
| 3/31/21 | $101.54 | 4.52% | 0.56% | 4.47% | -0.16% | -$0.16 | 0.95 |
| 4/1/21 | $102.92 | 1.36% | 1.28% | 1.55% | -0.39% | -$0.39 | 0.87 |
| 4/5/21 | $105.99 | 2.98% | 1.15% | 1.54% | 1.23% | $1.28 | 0.62 |
| 4/6/21 | $104.83 | -1.09% | 0.03% | 0.74% | -1.84% | -$1.93 | 0.45 |
| 4/7/21 | $101.42 | -3.25% | -0.15% | -3.60% | 0.73% | $0.77 | 0.74 |
| 4/8/21 | $105.71 | 4.23% | 0.59% | 0.88% | 3.01% | $3.10 | 0.17 |
| 4/9/21 | $104.98 | -0.69% | 0.55% | -1.21% | 0.35% | $0.37 | 0.87 |
| 4/12/21 | $103.75 | -1.17% | -0.07% | -0.83% | -0.17% | -$0.18 | 0.94 |
| 4/13/21 | $107.32 | 3.44% | 0.40% | 2.63% | 0.52% | $0.54 | 0.81 |
| 4/14/21 | $101.24 | -5.67% | -0.29% | -0.69% | -4.73% * | -$4.96 | 0.03 |
| 4/15/21 | $106.35 | 5.05% | 1.01% | 2.02% | 2.35% | $2.40 | 0.28 |
| 4/16/21 | $106.95 | 0.56% | 0.26% | -1.40% | 2.00% | $2.15 | 0.36 |
| 4/19/21 | $104.93 | -1.89% | -0.69% | -1.73% | 0.43% | $0.46 | 0.84 |
| 4/20/21 | $104.06 | -0.82% | -0.91% | -1.79% | 1.73% | $1.83 | 0.43 |
| 4/21/21 | $109.61 | 5.33% | 1.13% | 3.28% | 1.24% | $1.30 | 0.57 |
| 4/22/21 | $106.94 | -2.44% | -0.73% | 1.55% | -3.49% | -$3.76 | 0.10 |
| 4/23/21 | $111.79 | 4.54% | 1.20% | 1.13% | 2.67% | $2.90 | 0.22 |
| 4/26/21 | $115.92 | 3.69% | 0.44% | 2.11% | 1.28% | $1.44 | 0.56 |
| 4/27/21 | $115.11 | -0.70% | -0.02% | -0.45% | -0.12% | -$0.14 | 0.96 |
| 4/28/21 | $113.14 | -1.71% | 0.01% | -0.90% | -0.69% | -$0.79 | 0.75 |
| 4/29/21 | $109.34 | -3.36% | 0.35% | -1.80% | -1.61% | -$1.81 | 0.45 |
| 4/30/21 | $110.02 | 0.62% | -0.80% | -0.63% | 1.88% | $2.07 | 0.39 |
| 5/3/21 | $109.55 | -0.43% | 0.21% | -2.54% | 2.27% | $2.52 | 0.30 |

Exhibit 2b

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 5/4/21 | $106.84 | -2.47% | -0.84% | -1.97% | 0.18% | $0.20 | 0.93 |
| 5/5/21 | $104.92 | -1.80% | -0.01% | -2.35% | 0.79% | $0.84 | 0.72 |
| 5/6/21 | $96.31 | -8.21% | 0.48% | -1.18% | -7.23% * | -$7.32 | 0.00 |
| 5/7/21 | $101.83 | 5.73% | 0.87% | 0.39% | 4.85% * | $4.79 | 0.03 |
| 5/10/21 | $90.59 | -11.04% | -1.23% | -6.12% | -4.15% | -$4.14 | 0.05 |
| 5/11/21 | $90.25 | -0.38% | -0.66% | -0.60% | 0.75% | $0.68 | 0.73 |
| 5/12/21 | $87.16 | -3.42% | -2.25% | -2.41% | 0.53% | $0.48 | 0.81 |
| 5/13/21 | $88.92 | 2.02% | 0.98% | 0.17% | 1.35% | $1.18 | 0.54 |
| 5/14/21 | $93.19 | 4.80% | 1.76% | 3.30% | 0.34% | $0.30 | 0.88 |
| 5/17/21 | $91.81 | -1.48% | -0.14% | -1.05% | -0.21% | -$0.20 | 0.92 |
| 5/18/21 | $90.19 | -1.76% | -0.60% | 1.37% | -2.72% | -$2.46 | 0.20 |
| 5/19/21 | $86.75 | -3.81% | -0.38% | -0.59% | -2.90% | -$2.58 | 0.17 |
| 5/20/21 | $88.03 | 1.48% | 1.12% | 3.10% | -2.29% | -$1.96 | 0.29 |
| 5/21/21 | $86.05 | -2.25% | -0.03% | 0.29% | -2.43% | -$2.12 | 0.26 |
| 5/24/21 | $86.42 | 0.43% | 0.94% | 2.22% | -2.31% | -$1.97 | 0.28 |
| 5/25/21 | $90.51 | 4.73% | -0.27% | 0.72% | 4.21% | $3.72 | 0.06 |
| 5/26/21 | $89.57 | -1.04% | 0.45% | 0.77% | -2.01% | -$1.80 | 0.35 |
| 5/27/21 | $92.57 | 3.35% | 0.29% | 0.77% | 2.44% | $2.21 | 0.27 |
| 5/28/21 | $94.14 | 1.70% | 0.10% | -0.75% | 2.53% | $2.37 | 0.25 |
| 6/1/21 | $92.00 | -2.27% | 0.17% | -2.38% | 0.22% | $0.21 | 0.92 |
| 6/2/21 | $93.45 | 1.58% | 0.17% | 0.58% | 0.95% | $0.88 | 0.66 |
| 6/3/21 | $94.67 | 1.31% | -0.52% | -1.68% | 3.55% | $3.37 | 0.11 |
| 6/4/21 | $97.51 | 3.00% | 0.84% | 0.59% | 1.95% | $1.86 | 0.37 |
| 6/7/21 | $102.17 | 4.78% | 0.16% | 3.85% | 0.70% | $0.69 | 0.75 |
| 6/8/21 | $104.58 | 2.36% | 0.18% | -0.39% | 2.76% | $2.86 | 0.21 |
| 6/9/21 | $104.27 | -0.30% | -0.29% | 0.70% | -0.76% | -$0.79 | 0.72 |
| 6/10/21 | $105.56 | 1.24% | 0.40% | 2.43% | -1.43% | -$1.48 | 0.51 |
| 6/11/21 | $103.88 | -1.59% | 0.31% | -0.05% | -1.63% | -$1.71 | 0.45 |
| 6/14/21 | $103.75 | -0.13% | 0.13% | 0.52% | -0.65% | -$0.68 | 0.76 |
| 6/15/21 | $101.32 | -2.34% | -0.30% | -1.30% | -0.73% | -$0.75 | 0.74 |

Exhibit 2b

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 6/16/21 | $100.95 | -0.37% | -0.47% | -0.34% | 0.37% | $0.37 | 0.87 |
| 6/17/21 | $103.26 | 2.29% | -0.14% | 3.41% | -1.07% | -$1.07 | 0.62 |
| 6/18/21 | $102.88 | -0.37% | -1.25% | -1.72% | 2.33% | $2.43 | 0.29 |
| 6/21/21 | $109.30 | 6.24% | 1.36% | 1.61% | 3.74% | $3.92 | 0.09 |
| 6/22/21 | $110.86 | 1.43% | 0.49% | 0.64% | 0.55% | $0.60 | 0.80 |
| 6/23/21 | $114.96 | 3.70% | -0.01% | 1.55% | 2.14% | $2.40 | 0.33 |
| 6/24/21 | $119.72 | 4.14% | 0.65% | -0.13% | 3.98% | $4.66 | 0.07 |
| 6/25/21 | $115.15 | -3.82% | 0.32% | 0.60% | -4.51% * | -$5.28 | 0.03 |
| 6/28/21 | $116.63 | 1.29% | 0.11% | 1.41% | -0.16% | -$0.19 | 0.94 |
| 6/29/21 | $116.38 | -0.21% | 0.00% | 0.05% | -0.17% | -$0.19 | 0.94 |
| 6/30/21 | $113.53 | -2.45% | 0.04% | -1.58% | -0.74% | -$0.85 | 0.73 |
| 7/1/21 | $116.06 | 2.23% | 0.42% | 0.77% | 1.25% | $1.43 | 0.57 |
| 7/2/21 | $116.86 | 0.69% | 0.50% | -1.16% | 1.73% | $2.02 | 0.43 |
| 7/6/21 | $117.89 | 0.88% | -0.30% | -0.06% | 1.22% | $1.43 | 0.58 |
| 7/7/21 | $116.52 | -1.16% | 0.11% | -1.51% | 0.46% | $0.54 | 0.83 |
| 7/8/21 | $117.29 | 0.66% | -0.90% | -0.77% | 2.13% | $2.51 | 0.33 |
| 7/9/21 | $120.94 | 3.11% | 1.29% | 2.20% | 0.11% | $0.13 | 0.96 |
| 7/12/21 | $119.51 | -1.18% | 0.22% | -1.17% | 0.01% | $0.02 | 1.00 |
| 7/13/21 | $116.50 | -2.52% | -0.59% | -2.05% | 0.07% | $0.09 | 0.97 |
| 7/14/21 | $113.47 | -2.60% | -0.24% | -3.85% | 1.74% | $2.04 | 0.43 |
| 7/15/21 | $112.47 | -0.88% | -0.39% | -0.10% | -0.45% | -$0.51 | 0.83 |
| 7/16/21 | $113.12 | 0.58% | -0.76% | 1.07% | 0.01% | $0.02 | 1.00 |
| 7/19/21 | $106.58 | -5.78% | -1.46% | 0.02% | -4.88% * | -$5.39 | 0.02 |
| 7/20/21 | $107.25 | 0.63% | 1.69% | 2.39% | -2.72% | -$2.86 | 0.20 |
| 7/21/21 | $117.09 | 9.17% | 0.97% | 0.97% | 7.56% * | $8.42 | 0.00 |
| 7/22/21 | $116.82 | -0.23% | 0.03% | -0.05% | -0.11% | -$0.12 | 0.96 |
| 7/23/21 | $114.00 | -2.41% | 0.89% | 0.42% | -3.26% | -$3.75 | 0.13 |
| 7/26/21 | $110.54 | -3.04% | 0.16% | -2.53% | -0.39% | -$0.45 | 0.86 |
| 7/27/21 | $108.96 | -1.43% | -0.59% | -0.79% | -0.16% | -$0.17 | 0.94 |
| 7/28/21 | $110.97 | 1.84% | 0.30% | 2.87% | -1.22% | -$1.32 | 0.57 |

Exhibit 2b

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 7/29/21 | $112.16 | 1.07% | 0.45% | -0.56% | 1.49% | $1.67 | 0.49 |
| 7/30/21 | $114.52 | 2.10% | -0.56% | -1.29% | 3.95% | $4.52 | 0.07 |
| 8/2/21 | $112.33 | -1.91% | -0.14% | 0.39% | -2.14% | -$2.43 | 0.32 |
| 8/3/21 | $110.84 | -1.33% | 0.68% | 1.19% | -2.85% | -$3.16 | 0.18 |
| 8/4/21 | $114.52 | 3.32% | -0.40% | 1.82% | 1.72% | $1.92 | 0.43 |
| 8/5/21 | $119.64 | 4.47% | 0.72% | 1.50% | 2.50% | $2.90 | 0.25 |
| 8/6/21 | $117.30 | -1.96% | 0.08% | -2.62% | 0.86% | $1.03 | 0.69 |
| 8/9/21 | $114.83 | -2.11% | -0.04% | -0.62% | -1.35% | -$1.57 | 0.53 |
| 8/10/21 | $105.67 | -7.98% | 0.07% | -2.71% | -5.23% * | -$5.85 | 0.01 |
| 8/11/21 | $102.56 | -2.94% | 0.24% | -1.46% | -1.48% | -$1.55 | 0.49 |
| 8/12/21 | $102.09 | -0.46% | 0.20% | 1.01% | -1.53% | -$1.56 | 0.48 |
| 8/13/21 | $100.91 | -1.16% | 0.03% | -2.23% | 1.29% | $1.33 | 0.55 |
| 8/16/21 | $101.10 | 0.19% | -0.08% | 0.07% | 0.26% | $0.26 | 0.91 |
| 8/17/21 | $100.17 | -0.92% | -0.78% | 0.27% | -0.64% | -$0.64 | 0.77 |
| 8/18/21 | $100.94 | 0.77% | -0.89% | -1.51% | 3.03% | $3.09 | 0.17 |
| 8/19/21 | $103.31 | 2.35% | -0.23% | -1.40% | 4.11% | $4.24 | 0.06 |
| 8/20/21 | $108.02 | 4.56% | 0.87% | 3.17% | 0.76% | $0.79 | 0.73 |
| 8/23/21 | $110.68 | 2.46% | 1.05% | 2.89% | -1.08% | -$1.16 | 0.62 |
| 8/24/21 | $114.76 | 3.69% | 0.42% | 1.05% | 2.39% | $2.68 | 0.27 |
| 8/25/21 | $115.17 | 0.36% | 0.26% | 1.13% | -0.88% | -$1.00 | 0.68 |
| 8/26/21 | $114.97 | -0.17% | -0.65% | -1.13% | 1.51% | $1.76 | 0.49 |
| 8/27/21 | $117.97 | 2.61% | 1.10% | 2.17% | -0.23% | -$0.26 | 0.92 |
| 8/30/21 | $119.81 | 1.56% | 0.30% | 0.94% | 0.48% | $0.57 | 0.82 |
| 8/31/21 | $118.43 | -1.15% | -0.11% | -0.22% | -0.77% | -$0.92 | 0.72 |
| 9/1/21 | $121.82 | 2.86% | 0.20% | 1.89% | 0.83% | $0.99 | 0.70 |
| 9/2/21 | $123.57 | 1.44% | 0.41% | 1.37% | -0.16% | -$0.19 | 0.94 |
| 9/3/21 | $123.76 | 0.15% | -0.01% | -0.80% | 1.10% | $1.37 | 0.61 |
| 9/7/21 | $122.48 | -1.03% | -0.42% | -0.96% | 0.32% | $0.40 | 0.88 |
| 9/8/21 | $118.97 | -2.87% | -0.35% | -1.07% | -1.46% | -$1.78 | 0.50 |
| 9/9/21 | $120.06 | 0.92% | -0.29% | 0.13% | 1.04% | $1.24 | 0.63 |

Exhibit 2b

# Natera, Inc.

## Daily Stock Returns[1]

## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 9/10/21 | $120.15 | 0.08% | -0.73% | -1.37% | 2.07% | $2.51 | 0.35 |
| 9/13/21 | $120.25 | 0.08% | 0.20% | -2.29% | 2.53% | $3.07 | 0.25 |
| 9/14/21 | $120.06 | -0.16% | -0.62% | -1.06% | 1.44% | $1.75 | 0.51 |
| 9/15/21 | $120.24 | 0.15% | 0.85% | 2.25% | -2.56% | -$3.04 | 0.23 |
| 9/16/21 | $120.37 | 0.11% | -0.09% | 0.51% | -0.28% | -$0.34 | 0.90 |
| 9/17/21 | $126.36 | 4.98% | -0.74% | 2.51% | 2.83% | $3.45 | 0.20 |
| 9/20/21 | $119.68 | -5.29% | -1.82% | -2.67% | -1.39% | -$1.75 | 0.52 |
| 9/21/21 | $123.70 | 3.36% | 0.09% | 0.98% | 2.35% | $2.85 | 0.28 |
| 9/22/21 | $125.68 | 1.60% | 1.00% | -0.06% | 1.16% | $1.44 | 0.59 |
| 9/23/21 | $123.54 | -1.70% | 1.21% | 0.34% | -2.66% | -$3.30 | 0.21 |
| 9/24/21 | $118.12 | -4.39% | -0.01% | -2.82% | -1.38% | -$1.69 | 0.52 |
| 9/27/21 | $115.12 | -2.54% | -0.10% | -1.75% | -0.57% | -$0.67 | 0.79 |
| 9/28/21 | $107.26 | -6.83% | -2.08% | -3.38% | -2.10% | -$2.39 | 0.33 |
| 9/29/21 | $107.62 | 0.34% | -0.01% | 0.01% | 0.42% | $0.45 | 0.85 |
| 9/30/21 | $111.44 | 3.55% | -0.95% | 1.24% | 2.90% | $3.17 | 0.19 |
| 10/1/21 | $112.39 | 0.85% | 1.06% | -1.72% | 2.16% | $2.43 | 0.32 |
| 10/4/21 | $109.46 | -2.61% | -1.29% | -3.08% | 1.52% | $1.72 | 0.49 |
| 10/5/21 | $111.07 | 1.47% | 0.95% | 0.99% | -0.04% | -$0.04 | 0.99 |
| 10/6/21 | $111.00 | -0.06% | 0.28% | -0.43% | 0.32% | $0.35 | 0.88 |
| 10/7/21 | $116.58 | 5.03% | 0.99% | 2.91% | 1.41% | $1.57 | 0.52 |
| 10/8/21 | $114.07 | -2.15% | -0.25% | -2.20% | 0.41% | $0.47 | 0.85 |
| 10/11/21 | $111.71 | -2.07% | -0.63% | -0.42% | -1.17% | -$1.32 | 0.59 |
| 10/12/21 | $108.89 | -2.52% | 0.02% | 1.18% | -3.64% | -$3.99 | 0.09 |
| 10/13/21 | $110.85 | 1.80% | 0.48% | 0.91% | 0.64% | $0.70 | 0.77 |
| 10/14/21 | $113.37 | 2.27% | 1.60% | 1.39% | -0.06% | -$0.06 | 0.98 |
| 10/15/21 | $110.77 | -2.29% | 0.57% | -0.56% | -1.96% | -$2.20 | 0.36 |
| 10/18/21 | $111.39 | 0.56% | 0.33% | -0.86% | 1.38% | $1.53 | 0.53 |
| 10/19/21 | $113.67 | 2.05% | 0.68% | 2.70% | -1.08% | -$1.19 | 0.62 |
| 10/20/21 | $112.43 | -1.09% | 0.39% | -0.07% | -1.16% | -$1.31 | 0.59 |
| 10/21/21 | $112.32 | -0.10% | 0.29% | -0.13% | -0.05% | -$0.05 | 0.98 |

**Exhibit 2b**

# Natera, Inc.

## Daily Stock Returns[1]

## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 10/22/21 | $114.93 | 2.32% | -0.17% | -0.18% | 2.72% | $3.10 | 0.22 |
| 10/25/21 | $116.00 | 0.93% | 0.55% | 0.39% | 0.28% | $0.33 | 0.90 |
| 10/26/21 | $115.97 | -0.03% | -0.01% | -0.75% | 0.87% | $1.01 | 0.69 |
| 10/27/21 | $113.98 | -1.72% | -0.75% | -1.80% | 0.72% | $0.84 | 0.74 |
| 10/28/21 | $117.20 | 2.83% | 1.12% | 3.25% | -1.14% | -$1.29 | 0.60 |
| 10/29/21 | $114.57 | -2.24% | 0.10% | -3.68% | 1.71% | $2.02 | 0.43 |
| 11/1/21 | $119.00 | 3.87% | 0.57% | 2.01% | 1.48% | $1.70 | 0.50 |
| 11/2/21 | $114.11 | -4.11% | 0.20% | -0.77% | -3.35% | -$3.92 | 0.12 |
| 11/3/21 | $111.91 | -1.93% | 0.73% | -0.01% | -2.26% | -$2.54 | 0.29 |
| 11/4/21 | $110.67 | -1.11% | 0.30% | 0.20% | -1.40% | -$1.55 | 0.52 |
| 11/5/21 | $115.97 | 4.79% | 0.40% | -1.48% | 6.29% * | $7.18 | 0.01 |
| 11/8/21 | $116.78 | 0.70% | 0.20% | 0.66% | -0.01% | -$0.02 | 0.99 |
| 11/9/21 | $113.21 | -3.06% | -0.29% | -3.57% | 0.98% | $1.15 | 0.65 |
| 11/10/21 | $107.00 | -5.49% | -1.05% | -0.55% | -4.25% * | -$4.71 | 0.05 |
| 11/11/21 | $113.21 | 5.80% | 0.24% | 0.17% | 5.56% * | $6.12 | 0.01 |
| 11/12/21 | $115.04 | 1.62% | 0.71% | 0.24% | 1.02% | $1.16 | 0.64 |
| 11/15/21 | $115.85 | 0.70% | -0.03% | -1.91% | 2.87% | $3.36 | 0.19 |
| 11/16/21 | $115.00 | -0.73% | 0.40% | 1.17% | -2.08% | -$2.39 | 0.33 |
| 11/17/21 | $112.49 | -2.18% | -0.44% | -1.35% | -0.42% | -$0.48 | 0.85 |
| 11/18/21 | $105.08 | -6.59% | 0.03% | -3.25% | -3.21% | -$3.56 | 0.13 |
| 11/19/21 | $103.18 | -1.81% | -0.29% | -1.25% | -0.24% | -$0.25 | 0.91 |
| 11/22/21 | $99.07 | -3.98% | -0.62% | -1.30% | -2.20% | -$2.24 | 0.30 |
| 11/23/21 | $95.53 | -3.57% | -0.03% | -0.53% | -2.93% | -$2.86 | 0.17 |
| 11/24/21 | $96.10 | 0.60% | 0.32% | 3.01% | -2.58% | -$2.43 | 0.23 |
| 11/26/21 | $94.66 | -1.50% | -2.23% | -0.89% | 0.87% | $0.84 | 0.69 |
| 11/29/21 | $91.20 | -3.66% | 1.01% | -1.00% | -3.13% | -$2.91 | 0.14 |
| 11/30/21 | $91.46 | 0.29% | -1.91% | -1.69% | 3.38% | $3.14 | 0.13 |
| 12/1/21 | $89.10 | -2.58% | -1.51% | -3.31% | 1.94% | $1.79 | 0.38 |
| 12/2/21 | $91.78 | 3.01% | 1.54% | 1.62% | 0.46% | $0.41 | 0.83 |
| 12/3/21 | $86.56 | -5.69% | -1.14% | -2.94% | -1.92% | -$1.75 | 0.37 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 12/6/21 | $86.26 | -0.35% | 1.18% | 0.93% | -1.91% | -$1.64 | 0.37 |
| 12/7/21 | $92.56 | 7.30% | 2.16% | 4.95% | 0.80% | $0.70 | 0.71 |
| 12/8/21 | $96.59 | 4.35% | 0.43% | 2.22% | 1.81% | $1.69 | 0.41 |
| 12/9/21 | $91.58 | -5.19% | -1.08% | -4.36% | 0.09% | $0.09 | 0.97 |
| 12/10/21 | $89.41 | -2.37% | 0.62% | -0.33% | -2.30% | -$2.08 | 0.28 |
| 12/13/21 | $90.05 | 0.72% | -0.99% | 0.82% | 0.54% | $0.48 | 0.80 |
| 12/14/21 | $88.19 | -2.07% | -0.77% | -0.86% | -0.63% | -$0.57 | 0.77 |
| 12/15/21 | $93.04 | 5.50% | 1.51% | 4.35% | 0.09% | $0.08 | 0.97 |
| 12/16/21 | $89.23 | -4.10% | -1.00% | -3.10% | -0.19% | -$0.17 | 0.93 |
| 12/17/21 | $95.64 | 7.18% | -0.63% | 6.12% | 1.18% | $1.06 | 0.59 |
| 12/20/21 | $91.99 | -3.82% | -1.23% | -1.97% | -0.96% | -$0.92 | 0.65 |
| 12/21/21 | $95.00 | 3.27% | 1.99% | 1.89% | 0.17% | $0.16 | 0.94 |
| 12/22/21 | $93.87 | -1.19% | 0.96% | -0.10% | -1.55% | -$1.46 | 0.47 |
| 12/23/21 | $93.80 | -0.07% | 0.69% | -0.60% | 0.25% | $0.23 | 0.91 |
| 12/27/21 | $91.25 | -2.72% | 1.20% | -1.04% | -2.25% | -$2.09 | 0.29 |
| 12/28/21 | $90.34 | -1.00% | -0.24% | -1.28% | 0.59% | $0.54 | 0.78 |
| 12/29/21 | $90.05 | -0.32% | 0.06% | 0.17% | -0.44% | -$0.40 | 0.84 |
| 12/30/21 | $93.15 | 3.44% | -0.10% | 3.03% | 0.41% | $0.37 | 0.85 |
| 12/31/21 | $93.39 | 0.26% | -0.24% | -0.36% | 0.88% | $0.82 | 0.69 |
| 1/3/22 | $91.33 | -2.21% | 0.62% | 0.67% | -3.16% | -$2.90 | 0.14 |
| 1/4/22 | $88.04 | -3.60% | -0.24% | -4.03% | 0.89% | $0.82 | 0.68 |
| 1/5/22 | $82.39 | -6.42% | -2.19% | -5.35% | 0.55% | $0.49 | 0.80 |
| 1/6/22 | $82.44 | 0.06% | 0.02% | 0.09% | 0.05% | $0.04 | 0.98 |
| 1/7/22 | $75.15 | -8.84% | -0.42% | -2.00% | -6.57% * | -$5.24 | 0.00 |
| 1/10/22 | $74.42 | -0.97% | -0.19% | 2.63% | -3.43% | -$2.53 | 0.11 |
| 1/11/22 | $76.54 | 2.85% | 1.09% | 2.46% | -0.29% | -$0.22 | 0.89 |
| 1/12/22 | $73.60 | -3.84% | 0.18% | -4.52% | 0.93% | $0.71 | 0.67 |
| 1/13/22 | $68.35 | -7.13% | -1.44% | -3.34% | -2.84% | -$2.06 | 0.18 |
| 1/14/22 | $67.37 | -1.43% | 0.02% | 1.62% | -3.00% | -$2.02 | 0.16 |
| 1/18/22 | $61.08 | -9.34% | -1.93% | -3.57% | -4.61% * | -$3.04 | 0.03 |

Exhibit 2b

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 1/19/22 | $61.17 | 0.15% | -0.94% | -1.36% | 2.27% | $1.40 | 0.30 |
| 1/20/22 | $63.07 | 3.11% | -1.10% | -0.12% | 4.02% | $2.51 | 0.07 |
| 1/21/22 | $62.74 | -0.52% | -1.99% | -2.56% | 3.55% | $2.28 | 0.11 |
| 1/24/22 | $64.40 | 2.65% | 0.42% | -1.34% | 3.95% | $2.53 | 0.07 |
| 1/25/22 | $62.88 | -2.36% | -1.24% | -4.53% | 3.37% | $2.21 | 0.13 |
| 1/26/22 | $63.24 | 0.57% | -0.36% | -2.01% | 3.05% | $1.95 | 0.17 |
| 1/27/22 | $61.90 | -2.12% | -0.81% | -2.33% | 0.92% | $0.58 | 0.67 |
| 1/28/22 | $65.47 | 5.77% | 2.25% | 2.73% | 1.56% | $0.97 | 0.47 |
| 1/31/22 | $70.65 | 7.91% | 2.24% | 7.07% | -0.78% | -$0.51 | 0.72 |
| 2/1/22 | $72.81 | 3.06% | 0.85% | 1.20% | 1.36% | $0.97 | 0.53 |
| 2/2/22 | $71.20 | -2.21% | 0.47% | -2.02% | -0.28% | -$0.20 | 0.90 |
| 2/3/22 | $68.26 | -4.13% | -2.33% | -0.94% | -1.71% | -$1.21 | 0.43 |
| 2/4/22 | $69.75 | 2.18% | 0.72% | 1.77% | -0.02% | -$0.01 | 0.99 |
| 2/7/22 | $69.98 | 0.33% | -0.18% | 0.38% | 0.14% | $0.10 | 0.95 |
| 2/8/22 | $70.20 | 0.31% | 0.91% | -0.14% | 0.01% | $0.01 | 1.00 |
| 2/9/22 | $73.42 | 4.59% | 1.63% | 4.46% | -0.96% | -$0.67 | 0.66 |
| 2/10/22 | $71.05 | -3.23% | -1.63% | -2.37% | 0.31% | $0.23 | 0.88 |
| 2/11/22 | $69.58 | -2.07% | -1.77% | -3.17% | 2.47% | $1.78 | 0.26 |
| 2/14/22 | $67.20 | -3.42% | -0.41% | -2.01% | -1.00% | -$0.70 | 0.64 |
| 2/15/22 | $70.11 | 4.33% | 1.76% | 3.14% | 0.05% | $0.03 | 0.98 |
| 2/16/22 | $71.50 | 1.98% | 0.03% | -0.92% | 3.06% | $2.18 | 0.16 |
| 2/17/22 | $65.70 | -8.11% | -2.12% | -5.59% | -1.05% | -$0.75 | 0.63 |
| 2/18/22 | $63.89 | -2.75% | -0.83% | -1.52% | -0.60% | -$0.39 | 0.78 |
| 2/22/22 | $62.99 | -1.41% | -1.12% | -1.02% | 0.42% | $0.27 | 0.85 |
| 2/23/22 | $60.76 | -3.54% | -1.81% | -3.25% | 1.05% | $0.67 | 0.63 |
| 2/24/22 | $65.23 | 7.36% | 1.61% | 7.09% | -0.95% | -$0.57 | 0.66 |
| 2/25/22 | $66.94 | 2.62% | 2.21% | 1.78% | -0.48% | -$0.31 | 0.83 |
| 2/28/22 | $65.75 | -1.78% | -0.04% | -0.62% | -1.02% | -$0.68 | 0.64 |
| 3/1/22 | $64.36 | -2.11% | -1.50% | -0.68% | -0.42% | -$0.27 | 0.85 |
| 3/2/22 | $63.14 | -1.90% | 1.78% | -1.80% | -0.96% | -$0.62 | 0.65 |

**Exhibit 2b**

# Natera, Inc.
## Daily Stock Returns[1]
## Analysis Period: 2/27/20 – 3/11/22

| Date | Natera Closing Stock Price | Natera Return | Market Index Return[2] | Industry Index Return[3] | Abnormal Return[4] | Abnormal Dollar Change | p-Value |
|---|---|---|---|---|---|---|---|
| 3/3/22 | $60.05 | -4.89% | -0.81% | -2.62% | -1.64% | -$1.03 | 0.44 |
| 3/4/22 | $56.48 | -5.95% | -1.02% | -3.27% | -1.92% | -$1.14 | 0.37 |
| 3/7/22 | $52.53 | -6.99% | -2.91% | -2.06% | -3.15% | -$1.75 | 0.14 |
| 3/8/22 | $54.75 | 4.23% | -0.44% | 1.06% | 3.44% | $1.84 | 0.12 |
| 3/9/22 | $36.80 | -32.79% | 2.63% | 5.38% | -37.30% * | -$17.05 | 0.00 |
| 3/10/22 | $42.61 | 15.79% | -0.42% | -2.14% | 18.85% * | $7.63 | 0.00 |
| 3/11/22 | $38.98 | -8.52% | -1.37% | -5.87% | -1.62% | -$0.69 | 0.46 |

Source: *CRSP*; *Eikon*; Motion for Class Certification; MTD Order

Note:
[1] The regression models are estimated using daily logarithmic returns over three estimation periods, February 27, 2020 to April 30, 2020, May 1, 2020 to April 6, 2021, and April 7, 2021 to March 11, 2022, excluding the impact dates of the alleged misrepresentations and the alleged corrective disclosure as pled in the Complaint, the publication date and the subsequent trading day following *The Capitol Forum* Articles (i.e., July 1, 2020; July 2, 2020; December 14, 2020; and December 15, 2020), March 10, 2022, and March 11, 2022. Returns are reported as simple (arithmetic) returns.
[2] The market index is the CRSP value-weighted NYSE/AMEX/NASDAQ/ARCA total return index.
[3] The industry index is an equal-weighted total return index based on the returns of the common stock of Adaptive Biotechnologies Corporation, CareDx, Inc., Exact Sciences Corporation, Guardant Health, Inc., Illumina, Inc., Invitae Corporation, Laboratory Corporation of America Holdings, Myriad Genetics, Inc, OPKO Health, Inc., and Quest Diagnostics Incorporated.
[4] Abnormal returns marked with an asterisk (“*”) denote statistical significance at the 5% level using a two-tailed test.

**Exhibit 3a**

# Natera, Inc.
## Analyst Revenue Estimates Before and After Release of the Hindenburg Report
### FY 2022 and FY 2023

*($ in millions)*

| | Estimate Dates | | FY 2022 Revenue Estimate | | | FY 2023 Revenue Estimate | | |
|---|---|---|---|---|---|---|---|---|
| Contributor[1] | Before Hindenburg Report[2] | After Hindenburg Report (Through 4/30/22)[3] | Before Hindenburg Report[2] | After Hindenburg Report[3] | Revision | Before Hindenburg Report[2] | After Hindenburg Report[3] | Revision |
| | | | $(a_1)$ | $(b_1)$ | $((b_1) - (a_1)) / (a_1)$ | $(a_2)$ | $(b_2)$ | $((b_2) - (a_2)) / (a_2)$ |
| Baird | 2/24/22 | No Update | $789 | $789 | 0.0% | $1,002 | $1,002 | 0.0% |
| BTIG | 2/25/22 | 3/10/22 | $777 | $777 | 0.0% | $960 | $960 | 0.0% |
| Canaccord Genuity | 2/24/22 | 3/10/22 | $782 | $782 | 0.0% | $951 | $951 | 0.0% |
| Cowen | 2/25/22 | 4/20/22 | $784 | $784 | 0.0% | $960 | $960 | 0.0% |
| Craig Hallum | 2/25/22 | No Update | $780 | $780 | 0.0% | $972 | $972 | 0.0% |
| Goldman Sachs | 3/8/22 | 4/19/22 | $774 | $774 | 0.0% | $986 | $986 | 0.0% |
| J.P. Morgan | 2/24/22 | No Update | $776 | $776 | 0.0% | $968 | $968 | 0.0% |
| Morgan Stanley | 2/25/22 | No Update | $785 | $785 | 0.0% | $977 | $977 | 0.0% |
| Piper Sandler[4] | 2/28/22 | 3/21/22 | $767 | $753 | -1.9% | $980 | $952 | -2.9% |
| Raymond James | 2/28/22 | 3/9/22 | $785 | $785 | 0.0% | $988 | $988 | 0.0% |
| SVB Leerink | 2/25/22 | No Update | $789 | $789 | 0.0% | $1,103 | $1,103 | 0.0% |
| **Average** | | | **$781** | **$779** | **-0.2%** | **$986** | **$984** | **-0.3%** |
| **Median** | | | **$782** | **$782** | **0.0%** | **$977** | **$972** | **-0.5%** |

Source: Analyst Reports; *Eikon*

Note:

[1] Analyst estimates are presented for all contributors that included FY 2022 and FY 2023 revenue estimates in at least one report published between February 1, 2022 and March 8, 2022 and that also published a report between March 9, 2022 and April 30, 2022.

[2] Based upon the most recent report that includes revenue estimates prior to the Hindenburg Report. *Eikon* shows that these estimates did not change between the indicated date and March 8, 2022. Piper Sandler revenue estimates prior to the Hindenburg Report, obtained from *Eikon*, were updated on February 28, 2022.

[3] Based upon the first report after the Hindenburg Report with revenue estimates. "No Update" indicates that the analyst did not publish a report with revenue estimates between March 9, 2022 and April 30, 2022. *Eikon* shows that these analysts did not change their estimates between these dates.

[4] Piper Sandler lowered its revenue estimates on March 21, 2022 by approximately 2% and 3% for FY 2022 and FY 2023, respectively. Piper Sandler attributed the decline to adding "conservatism" to account for possible "reputational damages" to its model. Specifically, the analysts stated that "we added conservatism in our model for a rather ambiguous worst case scenario and reduced growth across the portfolio (including Signatera which is unlikely to be impacted)…. [W]e've found historically that industry sales reps will aim to take advantage of bad PR. We've spoken to sales reps that will target physicians with negative news articles about their competitors… Net-net, we're lowering numbers to reflect conservatism in reputational damages and potential distractions." "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.

Exhibit 3b

# Natera, Inc.
## Weekly Analyst Revenue Estimates
*($ in millions)*

| FY 2022 Revenue | 3/8/22 | 3/15/22 | 3/22/22 | 3/29/22 | 4/5/22 | 4/12/22 | 4/19/22 | 4/26/22 | 5/3/22 | 5/10/22 | 5/17/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Baird | $789 | $789 | $789 | $789 | $789 | $789 | $789 | $789 | $789 | $807 | $807 |
| BTIG | $777 | $777 | $777 | $777 | $777 | $777 | $777 | $777 | $777 | $800 | $800 |
| Canaccord Genuity | $782 | $782 | $782 | $782 | $782 | $782 | $782 | $782 | $782 | $805 | $805 |
| Cowen | $784 | $784 | $784 | $784 | $784 | $784 | $784 | $784 | $784 | $803 | $803 |
| Craig Hallum | $780 | $780 | $780 | $780 | $780 | $780 | $780 | $780 | $780 | $812 | $812 |
| Goldman Sachs | $774 | $774 | $774 | $774 | $774 | $774 | $774 | $774 | $774 | $803 | $803 |
| J.P. Morgan | $776 | $776 | $776 | $776 | $776 | $776 | $776 | $776 | $776 | $807 | $807 |
| Morgan Stanley | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $804 | $804 |
| Piper Sandler | $767 | $767 | $753 | $753 | $753 | $753 | $755 | $755 | $755 | $755 | $795 |
| Raymond James | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $785 | $815 | $815 |
| SVB Leerink | $789 | $789 | $789 | $789 | $789 | $789 | $789 | $789 | $789 | $810 | $810 |
| **Average** | **$781** | **$781** | **$780** | **$780** | **$780** | **$780** | **$780** | **$780** | **$780** | **$802** | **$805** |
| **Median** | **$782** | **$782** | **$782** | **$782** | **$782** | **$782** | **$782** | **$782** | **$782** | **$805** | **$805** |
| Number of Estimates | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Number of Upward Revisions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 10 | 1 |
| Number of Downward Revision | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| FY 2023 Revenue | 3/8/22 | 3/15/22 | 3/22/22 | 3/29/22 | 4/5/22 | 4/12/22 | 4/19/22 | 4/26/22 | 5/3/22 | 5/10/22 | 5/17/22 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Baird | $1,002 | $1,002 | $1,002 | $1,002 | $1,002 | $1,002 | $1,002 | $1,002 | $1,002 | $1,020 | $1,020 |
| BTIG | $960 | $960 | $960 | $960 | $960 | $960 | $960 | $960 | $960 | $965 | $965 |
| Canaccord Genuity | $951 | $951 | $951 | $951 | $951 | $951 | $951 | $951 | $951 | $983 | $983 |
| Cowen | $960 | $960 | $960 | $960 | $960 | $960 | $960 | $960 | $960 | $985 | $985 |
| Craig Hallum | $972 | $972 | $972 | $972 | $972 | $972 | $972 | $972 | $972 | $979 | $979 |
| Goldman Sachs | $986 | $986 | $986 | $986 | $986 | $986 | $986 | $986 | $986 | $1,027 | $1,027 |
| J.P. Morgan | $968 | $968 | $968 | $968 | $968 | $968 | $968 | $968 | $968 | $950 | $950 |
| Morgan Stanley | $977 | $977 | $977 | $977 | $977 | $977 | $977 | $977 | $977 | $980 | $980 |
| Piper Sandler | $980 | $980 | $952 | $952 | $952 | $952 | $956 | $956 | $956 | $956 | $984 |
| Raymond James | $988 | $988 | $988 | $988 | $988 | $988 | $988 | $988 | $988 | $1,024 | $1,024 |
| SVB Leerink | $1,103 | $1,103 | $1,103 | $1,103 | $1,103 | $1,103 | $1,103 | $1,103 | $1,103 | $1,109 | $1,109 |
| **Average** | **$986** | **$986** | **$984** | **$984** | **$984** | **$984** | **$984** | **$984** | **$984** | **$998** | **$1,000** |
| **Median** | **$977** | **$977** | **$972** | **$972** | **$972** | **$972** | **$972** | **$972** | **$972** | **$983** | **$984** |
| Number of Estimates | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Number of Upward Revisions | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 9 | 1 |
| Number of Downward Revision | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |

**Exhibit 3b**

# Natera, Inc.
# Weekly Analyst Revenue Estimates

(*$ in millions*)

Source: Analyst Reports; *Eikon*; “Strong 2022 Guide; First Look at Oncology & Transplant Volume Ramp,” *Cowen*, February 25, 2022

Note: Analyst revenue estimates are presented for all contributors that included FY 2022 and FY 2023 revenue estimates during the period indicated in the exhibit. Figures in green denote an upward revision in revenue estimate and figures in red denote a downward revision in revenue estimate, by analyst. *Eikon* did not include FY 2023 estimates from Cowen from March 1, 2022 through April 18, 2022, so the estimates for that period are obtained from the Cowen report published on February 25, 2022. Subsequent estimates from Cowen, like those for other analysts, are as reported by *Eikon*.

Exhibit 4a

# Natera, Inc.
## Reported Annual Revenue
2017 – 2023




Source: Natera Form 10-K filings

**Exhibit 4b**

# Natera, Inc.
## Number of Overall Tests Processed
2017 – 2023




Source: Natera Form 10-K filings