# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
------------------------------------x

JOHN HARVEY SCHNEIDER, Individually
and on Behalf of All Others
Similarly Situated,

Plaintiff,

-against- Civil Action No.
1:22-cv-00398-DAE

NATERA, INC., STEVE CHAPMAN,
MICHAEL BROPHY, MATTHEW RABINOWITZ,
and RAMESH HARIHARAN,

Defendants.

-------------------------------------x

August 2, 2024
9:37 a.m.

Videotaped 30(b)(6) Deposition of Lead Plaintiff BAPTL by RICHARD PILSWORTH, taken by Defendants, pursuant to Notice, held at the offices of Katten Muchin Rosenman LLP, 50 Rockefeller Plaza, New York, New York, before Joseph R. Danyo, a Shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S :

KESSLER TOPAZ MELTZER & CHECK LLP
Attorneys for Lead Plaintiff
280 King of Prussia Road
Radnor, Pennsylvania 19087

By: STUART BERMAN, ESQ.
JOSHUA MATERESE, ESQ.

KATTEN MUCHIN ROSENMAN LLP
Attorneys for Defendants Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, Paul Billings, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herm Rosenman and Jonathan Sheena
2121 Avenue of the Stars
Suite 1100
Los Angeles, California 90067

By: PAUL S. YONG, ESQ.

-and-

KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, New York 10020-1605

By: CAROLINE SABATIER, ESQ.
THOMAS ARTAKI, ESQ. (Via Zoom)

-and-

KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661-3693

By: BRETT WILSON, ESQ. (Via Zoom)

A P P E A R A N C E S : (Continued)

O'MELVENY & MYERS LLP
Attorneys for the Underwriter Defendants
2801 North Harwood Street
Suite 1600
Dallas, Texas 75201

By: DANNY S. ASHBY, ESQ. (Via Zoom)
BRITTA NORDSTROM, ESQ. (Via Zoom)

Also Present:

SILVIO FACCHIN, Videographer

~oOo~

Pilsworth

THE VIDEOGRAPHER: This is media label 1 in the video-recorded deposition of Richard Pilsworth in the matter of John Harvey Schneider, individually and on behalf of all others similarly situated versus Natera, Inc., et al. This deposition is being taken in New York City, New York, on August 2, 2024. 09:37

My name is Silvio Facchin. I am a certified legal video specialist, the court reporter is Joe Danyo, and we're both representing Esquire Deposition Solutions. 09:37

We're now going on the record. The time is 9:37 a.m. Counsel's appearances are reflected in the stenographic record. 09:37

R I C H A R D P I L S W O R T H, having been first duly sworn by Joseph R. Danyo, a Notary Public, was called as a witness and testified as follows:

EXAMINATION BY MR. YONG:

Q. Good morning, Mr. Pilsworth. Can you please state and spell your full name for the record. 09:38

Pilsworth

A. Sure. It's Richard Pilsworth. Middle name? Not needed. That's fine. My surname is Pilsworth. P-i-l-s-w-o-r-t-h.
Q. Have you ever used any other names? 09:38
A. No.
Q. So, as you heard, my name is Paul Yong, and I'm an attorney at the law firm Katten Muchin Rosenman, and our firm represents the Natera defendants in this action. 09:38 I'm joined here by my colleague Caroline Sabatier, and I'm here to ask you some questions in your capacity as a representative of Lead Plaintiff British Airways Pension Trustees Limited as part of a Rule 30(b)(6) deposition. 09:39
A. Yep.
Q. That's your understanding?
A. Yes, yes. I understand.
Q. So I'm going to go over some ground rules for the deposition. 09:39 You were just placed under oath by the court reporter. That oath is the very same oath that you would be given if you were appearing before a judge or a jury in court. Do you understand?
A. I understand. Yes. 09:39

Pilsworth

Q. And the same rules including laws that govern perjury apply here as they would in front of a judge or a jury. Do you understand?

A. I understand. 09:39

Q. So the court reporter will be taking down all of my questions as well as all of your answers. Therefore it is important that you let me finish my question before you respond. And it is also important that you respond verbally to 09:39 each question. The court reporter can't take down a nod of your head or an uh-huh. Do you understand?

A. I understand.

Q. Okay, and, if you don't hear a 09:39 question clearly, can you let me know and I will go ahead and repeat it?

A. Sure.

Q. And the same goes for, if you don't understand a question, just let me know, and I 09:40 will do my best to try to rephrase it.

A. Okay.

Q. If you answer a question, I'm going to assume that you heard it, that you understood it, and you've given me your best answer on 09:40

Pilsworth

behalf of British Airways Pension Trust Limited. Do you understand?

A. Yes.

Q. This deposition is also being videotaped by a videographer, so I would ask that you please try to stay in frame while we're on the record. 09:40

A. Okay.

Q. Mr. Pilsworth, are you represented here today by counsel? 09:40

A. I am represented by counsel. Yes.

Q. Alright. Can you identify the names of your counsel for me?

A. Yes. Stuart Berman and Josh Materese. The law firm is Kessler Topaz Meltzer Check LLP. 09:40

Q. So, even if your counsel here objects to one of my questions, you still need to answer it, unless your counsel expressly instructs you not to answer. Do you understand? 09:40

A. I do.

Q. Okay. Again, if you have any questions, just speak up, and we'll try to make sure that you understand what's going on. 09:41

Pilsworth

A. Okay.

Q. Is there any reason why you feel that you would not be able to give truthful and accurate testimony today on behalf of British Airways Pension Trust Limited? 09:41

A. No.

Q. Are you currently taking any drugs or any other medication that would interfere with your ability to give truthful and accurate testimony today? 09:41

A. No.

Q. So today, if at any time you want to take a short break, let me know. However, I ask that, if there's a question pending, that you go ahead and try to answer it, and then we can take a break afterwards. Do we have your agreement on that? 09:41

A. That makes sense.

Q. Okay. So, before we get started, I want to make sure we're all on the same page when it comes to like certain terms and abbreviations. 09:41

A. Sure.

Q. Can you agree that, if we refer to the amended complaint, that I'm referring to the 09:41

Pilsworth
amended class action complaint for violations of the Federal Securities Laws that was filed in the case caption Schneider versus Natera, Inc., et al., on October 7, 2022? 09:42
A. Sure. That works.
Q. I know that's a mouthful, and can we agree today that if I refer to British Airways or BAPTL or Lead Plaintiff, you'll understand that I'm referring to Lead Plaintiff British Airways 09:42 Pension Trust Limited?
A. And in turn, we tend to use the phrase BAPTL.
Q. BAPTL. I was hoping you were going to say that because it really is a mouthful, and 09:42 BAPTL is an entity that holds assets of Airways Pension Scheme and New Airways Pension Scheme. Correct?
A. That's correct.
Q. So, just for the sake of simplicity, 09:42 if I refer to BAPTL or Lead Plaintiff, are you agreeable that this also encompasses Airways Pension Scheme and New Airways Pension Scheme collectively?
MR. BERMAN: Objection to form. 09:43

Pilsworth

A. It's just in this case it just relates to New Airways Pension Scheme. 
Q. So, and I guess, related to that, if there comes a point in the deposition where you think, you know, you need to clarify or there's a, you know, we need to further distinguish between BAPTL on the one hand and New Airways Pension Scheme on the other hand, can you let me know? 09:43 09:43
A. Sure.
Q. If I refer to Key West or Additional Plaintiff, can you agree that we're referring to Additional Plaintiff Key West Police and Fire Pension Fund? 09:43
A. Okay.
Q. If I refer to Plaintiffs plural, this is BAPTL and Additional Plaintiff Key West collectively.
A. Okay. 09:43
Q. And then, if I refer to Natera, do you have an understanding that I'm referring to Defendant Natera, Inc.?
A. Okay.
Q. Okay, and then can we agree that, if 09:43

Pilsworth

I refer to the Natera Defendants, you'll understand that I'm referring to Natera, Steve Chapman, Michael Brophy, Matt Rabinowitz, Roy Banes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James Healy, Gail Marcus, Herm Rosenman and Jonathan Sheena collectively? 09:44

A. Yes.

Q. Okay. Can you agree that if I refer to the underwriter Defendants, that you'll 09:44 understand I'm referring to Morgan Stanley & Company LLC, Goldman Sachs & Company LLC, Cowen and Company LLC, SVB Leerink LLC, Robert W. Baird & Company Incorporated, BTIG, LLC and Craig-Hallum Capital Group LLC collectively? 09:44

A. Okay.

Q. Alright, and can we agree that if I refer to Defendants plural, that you'll understand I'm referring to the Natera Defendants and the underwriter Defendants collectively? 09:44

A. Yes.

Q. That was a mouthful again. Okay. So can we agree that, if I refer to Hindenburg, I'm referring to an entity called Hindenburg Research? 09:45

Pilsworth

A. Yes.

Q. And, if I refer to a Hindenburg report, I'm referring to a report titled Natera Pioneers and Deceptive Medical Billing that was dated March 9th, 2022? 09:45

A. Yes.

Q. Okay. At any point, if you're unclear about what I'm referring to or any of the terminology or abbreviations, can you agree that you'll let me know, and I'll do my best to clarify? 09:45

A. Okay.

Q. And, if you don't speak up, I'm going to assume that you understood the question. Can you agree to this? 09:45

A. Okay.

Q. So this is a Rule 30(b)(6) deposition of BAPTL. Because BAPTL is not a natural human being, you, Richard Pilsworth, are here to answer questions as the designated representative of BAPTL. Do you understand? 09:45

A. Yes.

Q. Unless I specify otherwise, when I refer to you or your, I mean BAPTL and not 09:45

Pilsworth

Richard Pilsworth the individual.

A. Okay. Yep.

Q. Okay, and, unless you specify otherwise, when you answer and refer to I or my or mine, I'll interpret that that you're speaking on behalf of BAPTL, the entity, and not Richard Pilsworth, the individual. 09:46

MR. BERMAN: Objection to form. I'm sure his testimony will be clear, and I guess, to the extent that you're unclear, you can certainly ask, but I'm not going to agree that every time he says "I," he's referring to BAPTL. It's depending on the question and the response, I can't. 09:46 09:46

MR. YONG: Fair enough.

Q. But, generally, again, if you're unclear about my question whether it refers to you specifically, Richard Pilsworth, the individual, or the entity, BAPTL, please let me know. 09:46

A. Okay.

Q. Otherwise, you know, as we're in the context of a Rule 30(b)(6) deposition, I'm going to assume that you're speaking on behalf of 09:46

Pilsworth

BAPTL. Okay?

A. Okay. Yep.

Q. Okay. Do you have any other questions before we move on to some of the more hopefully substantive portion of the deposition? 09:47

A. No.

Q. Alright. I'm going to introduce our first exhibit.

(BAPTL Exhibit 1, Notice of Rule 30(b)(6) Deposition of Lead Plaintiff, was so marked for identification, as of this date.) 09:47

Q. Alright. So, Mr. Pilsworth, you have a document that has been marked as BAPTL Exhibit 1. This document has a title of Notice of Rule 30(b)(6) Deposition of Lead Plaintiff. I guess on the second page it's dated July 29, 2024. 09:48

A. Yes.

Q. Okay. Can you take a moment to review BAPTL Exhibit 1 on your own, and let me know when you've had a chance to review. 09:49

A. Okay.

Q. Have you seen BAPTL Exhibit 1 before?

A. I have. 09:49

Pilsworth

Q. When was the first time you saw BAPTL Exhibit 1?
A. It was about a month ago. There was a previous form to the document, to be clear. 09:49
Q. So you say a month ago. You're saying sometime perhaps in early July, late June?
A. Late June, I think.
Q. Who first showed BAPTL Exhibit 1 to you? 09:50
A. Darren Check of Kessler Topaz.
Q. And that's your attorney?
A. Yes.
Q. Okay. Have you reviewed BAPTL Exhibit 1 with your counsel? 09:50
A. I have.
Q. Approximately how much time in total have you spent reviewing BAPTL Exhibit 1 prior to the start of today's deposition?
MR. BERMAN: Objection to form. 09:50
A. I would say -- difficult, I mean you sort of look at it as part of a wider package of documents, so it's difficult to sift this out. It's like sifting milk out from tea, but.
Q. Well, that's an expression we don't 09:50

Pilsworth

hear in the U.S. often.

A. Yeah, I feel I've spent sufficient time reviewing it.

Q. Do you feel you spent more than an hour? 09:50

A. Oh, certainly. Yes.

Q. Who other than Mr. Check have you discussed BAPTL Exhibit 1 with?

A. With Josh and Stuart. 09:51

Q. Okay. Those are your two attorneys at Kessler Topaz that are here with you today?

A. Yes. That's correct. Yes.

Q. Can you turn to page 9 of BAPTL Exhibit 1. At the top of page 9, do you see the heading that reads Topics of Examination? 09:51

A. Yes.

Q. Then, beginning on page 9 of BAPTL Exhibit 1 and going through page 12, do you see that there's a list of 39 topics? 09:51

A. Yes.

Q. Have you fully reviewed topics 1 through 39 prior to today's deposition?

A. I have. Yes.

Q. Are you fully prepared to testify on 09:51

Pilsworth

behalf of BAPTL regarding all of topics 1 through 39 today?

MR. BERMAN: Objection. Just for the record, we have objected to certain topics to which there has not been any sort of resolution to our objections, so our objections stand, but you can answer the question. 09:52

A. Yes, I'm prepared to testify on behalf of all of those questions on behalf of BAPTL. 09:52

Q. Okay, and are there any specific topics within topics 1 through 39 that you feel that you're not fully prepared to testify today on behalf of BAPTL? 09:52

MR. BERMAN: Same objection.

You can answer.

A. No.

Q. Okay. As we go through today's deposition, if I ask you a question and you don't know the answer, go ahead and just tell me that you don't know the answer. I don't want you to guess. 09:52

A. Okay. 09:52

Pilsworth

Q. And, if you think someone else like another human being at BAPTL might know the answer, but you don't, can you agree that you'll let me know who that person might be that knows the answer? 09:52

MR. BERMAN: Objection to form.

You can answer.

A. Yes.

Q. Okay. Let's put aside BAPTL Exhibit 1 for now. Okay. So I'm going to ask you now some questions about your personal background as Richard Pilsworth. So the following questions you can answer on behalf of yourself. 09:53

A. Okay. 09:53

Q. The human being. I know it's confusing, but again let me know if you ever aren't sure whether the question refers to you, Richard Pilsworth, or BAPTL, the entity.

A. Okay. 09:53

Q. Okay. So, Mr. Pilsworth, where do you live?

A. I live in London in the U.K.

Q. Okay. And did you travel to attend to this deposition? 09:53

Pilsworth

A. I did.

Q. And how many days are you here in New York?

A. Four days. 09:53

Q. About the same as I am too. Mr. Pilsworth, what is your title at BAPTL?

A. General counsel.

Q. Are you a licensed solicitor?

A. Yes. 09:54

Q. Are you a licensed U.S. lawyer?

A. No.

Q. So, Mr. Pilsworth, since you are a licensed solicitor, can you confirm your understanding that you are being deposed as the 09:54 designated 30(b)(6) representative of BAPTL and not in your capacity as counsel for BAPTL?

A. Yes.

MR. BERMAN: Objection to form. Obviously it might depend on your 09:54 question. I don't think he can give you a blanket sort of acknowledgment. It depends on what your question is.

MR. YONG: Understood. I'm sure you'll object on the basis of privilege if 09:54

Pilsworth

we get to that point, and we can deal with that then.

MR. BERMAN: I'm just objecting to the form of your question to the extent that you are asking for a blanket acknowledgment, so that's all. 09:54

MR. YONG: Okay. We can move on and if we need to revisit, we can.

MR. BERMAN: Sure. 09:54

Q. Mr. Pilsworth, have you ever had your deposition taken?

A. No.

Q. So this is your first time being deposed? 09:55

A. Correct.

MR. BERMAN: And, just for the record, you're asking him personally?

MR. YONG: Correct.

Q. I guess I will ask the other question. Has BAPTL been deposed as a 30(b)(6) deponent before? 09:55

A. No.

Q. Mr. Pilsworth, have you ever given testimony in a court proceeding before? 09:55

Pilsworth

A. No.

MR. YONG: Let's mark BAPTL Exhibit 2.

(BAPTL Exhibit 2, Page from LinkedIn profile of Richard Pilsworth, was so marked for identification, as of this date.) 09:55

Q. Mr. Pilsworth, you have in front of you a document marked as BAPTL Exhibit 2. 09:56

A. Yes.

Q. Do you recognize BAPTL Exhibit 2?

A. I do.

Q. What is BAPTL Exhibit 2?

A. It's a page from LinkedIn summarizing 09:56 my, I guess, work experience.

Q. Okay.

A. Education as well.

Q. Okay, and is it your understanding that the information in BAPTL Exhibit 2 is 09:56 correct?

A. That's correct. Yes.

Q. Did you write the information in BAPTL Exhibit 2?

A. I did. 09:56

Pilsworth

Q. So, Mr. Pilsworth, you obtained a bachelor's degree from Oxford, correct?

A. Correct.

Q. Did you have a particular concentration of study at Oxford? 09:56

A. Very high. Sorry. Maybe I don't understand the question.

Q. We have a different education system here. What was your focus at the University of Oxford? 09:57

A. Oh. Subject matter you mean?

Q. Yes.

A. Okay. English language and literature. 09:57

Q. Did you take any coursework related to securities when you were at Oxford?

A. No.

Q. Then after graduating from Oxford, you then went to law school, correct? 09:57

A. Correct.

Q. Did you have a particular concentration or area of study at Oxford? Again --

A. I understand. So there are certain 09:57

Pilsworth

defined subjects that you have to, legal subjects you have to cover to become a lawyer in the U.K., and, as you can see, this is a one-year accelerated course, so, which is very common to do in the U.K., and so we covered the main topics which are the basic topics. 09:57

Q. Did you undertake any courses related to securities?

A. No. 09:58

Q. Did you take any courses related to the U.S. equity markets?

A. No.

Q. After graduating from law school, you then worked at a private law firm. Is that correct? 09:58

A. That's correct.

Q. What was the name of that law firm?

A. Simmons & Simmons now LLP.

Q. How many years did you work at Simmons & Simmons law firm? 09:58

A. Almost ten years. Sorry. Almost 11 years.

Q. What type of law did you specialize in at Simmons & Simmons? 09:58

Pilsworth

A. Pensions and employee benefits.

Q. While at the Simmons & Simmons law firm, did you work on any U.S.-based matters?

A. Yes. 09:58

Q. What percentage of your work was U.S.-based?

MR. BERMAN: Objection to form.

A. It's difficult to quantify. It was, to be clear, I suppose the relevance of your 09:59 question is it was all from a U.K. law perspective, so we had U.S. clients. They might have products or something like that in the U.S., but we were advising from a U.K. law perspective.

Q. While at the Simmons & Simmons law 09:59 firm, did you work with any U.S.-based law firms?

A. Yes.

Q. Can you recall which U.S.-based law firms you worked with?

MR. BERMAN: Objection. 09:59

A. I honestly can't recall. A long time now. A lot, but I can't recall.

Q. Did you say a lot?

A. Yeah. You would do a corporate deal. There would be a U.S. law firm in the corporate 09:59

Pilsworth

deal. No surprises.
Q. Approximately how many different U.S.-based law firms did you work with when you were at Simmons & Simmons? 09:59
MR. BERMAN: Objection.
If you know.
A. I couldn't honestly put a number on it.
Q. Okay. Was it more than ten? 10:00
A. It was maybe about ten.
Q. Okay. While at the Simmons & Simmons law firm, did you do any work involving the Kessler Topaz law firm?
A. No. 10:00
Q. Were you aware of the Kessler Topaz law firm?
A. No.
Q. While at Simmons & Simmons, did you do any work involving the Bernstein Litowitz law firm? 10:00
A. No.
Q. Were you aware of the Bernstein Litowitz law firm?
A. No. 10:00

Pilsworth

Q. Okay. While at Simmons & Simmons, did you ever work with the Katten Muchin Rosenman law firm?
A. No. 10:00
Q. Were you aware of the Katten Muchin Rosenman law firm?
A. No. I don't think so.
Q. While at Simmons & Simmons, did you ever work with the O'Melveny & Myers law firm? 10:00
A. No.
Q. Were you aware of the O'Melveny & Myers law firm?
A. No.
Q. While you were at the Simmons & Simmons law firm, did you do any work related to the U.S. securities markets? 10:00
MR. BERMAN: Objection to form.
A. No.
Q. Okay. So when did you leave the Simmons & Simmons law firm? 10:01
A. April 2015.
Q. Okay, and why did you decide to leave?
A. Because there was an interesting role 10:01

Pilsworth

at British Airways Pensions.

Q. Okay, and what interested you in working at BAPTL?

A. It's a large defined benefit pension scheme in the U.K. It's quite unusual to have an in-house legal role in that kind of environment. Yeah. It just has lots of interesting legal issues to deal with. So it was a good career move. 10:01 10:01

Q. Okay. Was BAPTL a client of Simmons & Simmons?

A. No.

Q. Had you done any work with BAPTL while you were at Simmons & Simmons? 10:01

A. No.

Q. You previously testified that your current position is general counsel at BAPTL, correct?

A. That's right. Yes. 10:02

Q. Who do you report to?

A. I report to the CEO.

Q. Okay, and what's the CEO's name?

A. It's Vinod Ehzuvan.

Q. And prior to becoming general counsel 10:02

Pilsworth

of BAPTL, what was your role?
A. It has been, as you can see from the document, some shades of being a legal advisor within the organization. 10:02
Q. Okay, and immediately before your role as general counsel, what was your role?
A. Head of risk and legal.
Q. And how was your role as head of risk and legal different from your current role as general counsel? 10:02
A. I think it's really just a change in the sense of being the trusted advisor to the CEO and the board.
Q. Are you the highest ranked in-house attorney at BAPTL? 10:03
A. I am.
Q. Between the year 2020 through present, what role, if any, do you have in BAPTL's investment decisions? 10:03
MR. BERMAN: Objection to form.
A. So it's not something that we're involved in on a day-to-day basis.
Q. During the 2020 through 2022 time period, who was the person at BAPTL that was 10:03

Pilsworth

responsible for BAPTL's investment decisions?

A. It's something that we delegate to a manager. So it's not someone -- there is no one at British Airways Pensions who is responsible for the actual investment decisions. 10:04

Q. So from the time you joined BAPTL I believe you said in 2015 through present?

A. Yep.

Q. The investment decisions at BAPTL were delegated to external entities? 10:04

MR. BERMAN: Objection to form.

A. So there was an in-house asset manager until 2021.

Q. Okay. Who was that in-house asset manager? 10:04

A. It was an entity, add another acronym for you, British Airways Pension Investment Management Limited. Again, it's a mouthful, so we call it BAPIML. 10:04

Q. Okay, and how many people worked within BAPIML?

A. It was around 40.

Q. Were you one of the 40 individuals that were a part of BAPIML? 10:05

Pilsworth

A. No.
Q. Do those 40 individuals still work at BAPTL?
A. No. None of them. 10:05
Q. None?
A. None.
Q. When did those 40 individuals leave BAPTL?
A. So the official transfer date was when Black Rock took on the investment mandate, so the 1st of June 2021. 10:05
Q. What is the name of the person who was in charge of BAPIML?
A. So the CEO of BAPIML was an individual at the very end of the life of -- do you mean at the very moment it transferred over? 10:05
Q. Between, yeah, between 2020 and when it transferred over in 2021.
A. There was a lady called Michele McGregor Smith. 10:06
Q. And what is Michele McGregor Smith doing currently, if you know?
A. She is doing some independent kind of non-exec roles. 10:06

Pilsworth

Q. And how frequently did you work with Michele McGregor Smith when you were at BAPTL?
MR. BERMAN: Objection to form.
A. Reasonably frequently. 10:06
Q. Can you give me some more detail about what reasonably frequently means?
A. I would maybe speak to her once a month, maybe slightly more than once a month, something like that. 10:06
Q. Okay. Can you explain what type of investments I guess BAPIML made on behalf of BAPTL?
MR. BERMAN: Objection to form.
A. So the whole range of investments. 10:07
So there were equity traders, bond traders, property swaps, private equity, liability management.
Q. And did those investments include U.S. equities? 10:07
A. They did.
Q. And did BAPIML invest in individual U.S. companies' securities?
A. They did.
Q. Do you know if BAPIML took both short 10:07

Pilsworth
and long positions in U.S. securities?
MR. BERMAN: Objection to form.
A. I don't know.
Q. Did you ever ask Ms. Smith whether BAPIML was taking long or short positions in U.S. companies' securities? 10:07
MR. BERMAN: Objection. Counsel, relevance.
MR. YONG: Well -- 10:08
MR. BERMAN: This is, again, we objected with regard to some of the scope, and you guys never --
MR. YONG: Right, but the relevant class period includes, you know, the period -- 10:08
MR. BERMAN: Well, why don't you establish whether they made any investments in Natera that are relevant to what we're talking about. I don't see the relevance. I'll allow a bit of latitude. 10:08
MR. YONG: Understood. You can make your objections, and I ask that you also, you know, refrain from speaking objections, but, you know, let's have the 10:08

Pilsworth

deponent testify, and we can regroup later if we need to. Can you read back the pending question.

(Record read) 10:08

A. No.

Q. Do you know the names of any specific U.S. companies that BAPIML was investing in?

MR. BERMAN: Objection to form.

A. I wouldn't want to speculate. 10:09

Q. Okay. Do you know how many different U.S. companies' securities BAPIML had invested in?

MR. BERMAN: Objection.

A. That was kind of my point. Quite a lot. 10:09

Q. When you say quite a lot, do you mean more than ten?

A. Yes.

Q. Is it more than 20? 10:09

A. I would say yes.

Q. Is it more than 50?

A. I would say around that, but again I am guessing at this point.

MR. BERMAN: I don't think anyone 10:10

Pilsworth

wants you to guess.
If you know, you can answer.
A. In which case, I don't know.
Q. Just to give a rough estimate based on your recollection, 50 sounds about right? 10:10
MR. BERMAN: Objection. That's not what he testified to.
MR. YONG: Okay. We can move on.
THE VIDEOGRAPHER: We are now going off the record. The time is 10:10 a.m. 10:10
(Recess taken)
THE VIDEOGRAPHER: We are back on the record. The time is 10:11 a.m. This is the beginning of media label number 2. 10:11
BY
Q. Mr. Pilsworth, can you briefly explain your role in overseeing the securities class action litigation?
A. Sure. So I was approached by Katten Muchin Rosenman to do claims monitoring for us in April 2022, and they presented the allegations in this case. We reviewed the internal trade data that we had and looked and considered what the losses were, and we internally made a 10:11 10:12

Pilsworth

recommendation to our investment committee that we should take a Lead Plaintiff role, and then the investment committee approved that recommendation. Then we made the motion for acting as Lead Plaintiff, and I reviewed the complaint that came alongside that to certify the document for that. 10:12

Then there was an amended complaint, and I reviewed that and certified that as well, and then there was the motion to dismiss, and I reviewed those, the sort of to and fro on that, and obviously then we were successful in getting rid of that motion to dismiss, and then we've moved into discovery phase more recently. 10:12 10:13

So that was something that we handled internally, and I was kind of in charge of it personally and produced those documents to the Defendants, and then the whole time through sort of liaising with Kessler Topaz as we went along. 10:13

Q. Mr. Pilsworth, do you consider yourself to be the person that's most knowledgeable at BAPTL concerning this securities class action lawsuit?

MR. BERMAN: Objection to form. 10:13

Pilsworth

A. I do.

Q. And are you the key point of contact with your counsel at Kessler Topaz regarding this litigation? 10:13

A. I am.

Q. Do you consider yourself to be the person I guess most knowledgeable at BAPTL concerning the claims that are being alleged in this securities class action? 10:14

MR. BERMAN: Objection to form.

A. I am.

Q. Mr. Pilsworth, do you personally invest in the U.S. stock market?

A. No. 10:14

MR. BERMAN: Objection. Relevance. Scope.

MR. YONG: I think the relevance will be clear in a second.

MR. BERMAN: You're asking him personally whether he invested? 10:14

MR. YONG: Yes.

MR. BERMAN: That was the question?

A. So Richard Pilsworth?

Q. Richard Pilsworth. 10:14

Pilsworth

A. No.
Q. Alright. So I'm going to say that this is going to be kind of the end of the personal section at least for now. So for the remainder of the deposition I want to remind you that, unless I expressly specify otherwise, that you're respond on behalf of BAPTL, the entity, as the designated Rule 30(b)(6) designee. Okay? 10:14
A. Okay. 10:14
Q. Are you aware that your outside counsel has produced documents in this litigation on behalf of BAPTL?
A. Yes.
Q. Did you identify the documents that counsel produced in this litigation on behalf of BAPTL? 10:15
MR. BERMAN: Objection to form.
A. I don't think I understand the question. 10:15
Q. Sure.
A. What do you mean by identify?
Q. So how do you know? Okay. Let's take a step back. So you testified that you are aware that your outside counsel has produced 10:15

Pilsworth

documents in this litigation, right?

A. Yes.

Q. How do you know that?

MR. BERMAN: Objection to form. 10:15

A. Because they send me documents to review, so I would see documents that then ultimately might get filed in court or something like that.

Q. Right, but did BAPTL provide any documents to your counsel at Kessler Topaz that you're aware were produced in this litigation? 10:15

MR. BERMAN: Objection to form.

A. Are you talking about the discovery?

Q. Sure. In the discovery process. 10:15

A. Yeah. So your question was whether documents that BAPTL produced --

Q. In the discovery process.

A. And were provided to the Defendants. Yes. 10:16

Q. And who collected those documents?

A. So it was something that, as I said, I managed, and it was in conjunction with our head of IT.

Q. And who is your head of IT? 10:16

Pilsworth

A. An individual called Jeff Gager, G-a-g-e-r.

Q. Approximately how many documents did BAPTL collect as part of discovery in this litigation? 10:16

A. I'm not totally sure. To put a precise figure on it, I would say about 50.

Q. Did you review all approximately 50 documents that were collected as part of this litigation in discovery? 10:16

MR. BERMAN: Objection to form.

A. Yes, I did.

Q. Do any of the documents stand out to you in your mind sitting here right now? 10:17

MR. BERMAN: Objection to form.

A. Yes. A number of them.

Q. Can you identify which documents stand out to you?

MR. BERMAN: Objection to form. 10:17

A. Okay. So we produced an investment management agreement between New Airways Pension Scheme and Black Rock, a statement of investment principles, a couple of statements of investment principles, class action policy. Yeah. I 10:17

Pilsworth

probably can dredge my mind for a few more. Is it relevant for me to carry on?

Q. If there are any others that come to mind, can you identify them? 10:17

A. Okay. So there was some e-mail exchanges with Black Rock which specifically referred to Natera.

Q. How many e-mail exchanges with Black Rock? 10:18

A. I think it was three.

MR. BERMAN: Let him ask the question.

Q. How many e-mail exchanges with Black Rock that specifically referenced Natera do you recall? 10:18

A. So they're part of e-mail chains. I think there's three documents that were disclosed, but it is within those e-mail chains if you see what I mean. It would be like a parent document. Is that the term? 10:18

Q. Yes. Are there any other e-mail communications other than the three e-mail chains that you just identified in which BAPTL was communicating with Black Rock regarding Natera? 10:18

Pilsworth

MR. BERMAN: Objection to form.

A. No.

Q. What steps did you take to confirm that there were no other e-mail chains or strike that. What steps did you take to confirm that there were no other e-mail communications between BAPTL and Black Rock concerning Natera? 10:19

MR. BERMAN: Objection to form.

A. We did a very detailed kind of search based on the terms that I understand were agreed with the Defendants. So basically it's a search that's done of Mimecast, it's an e-mail system, a document retention system, Mimecast, and effectively our retention policy is that we would keep effectively all e-mails forever. So I can be confident that, if there was something that referred to Natera, we would have found it. 10:19 10:19

Q. Does BAPTL communicate with Black Rock through any other means of communication other than e-mail? 10:20

A. Yes.

Q. What forms of communication?

A. Telephone, Teams calls.

Q. Can you say that one more time. 10:20

Pilsworth

A. Telephone and Teams calls.

Q. Telephone and Teams calls?

A. Yes.

Q. How often do Black Rock and BAPTL have telephone calls? 10:20

MR. BERMAN: Objection to form.

A. It would depend, you know, what's going on at the time. It might be a particularly busy period of activity demanding more 10:20 interaction. If you're talking about just regular BAU, there are weekly calls. BAU, sorry, business as usual.

Q. Thank you. I think you saw the confusion on my face. How often does Black Rock 10:20 and BAPTL have Teams meetings?

MR. BERMAN: Objection to form.

A. Some of those, sorry, when I was talking about weekly calls, I would say they might be Teams meetings. They might be telephone 10:21 calls, but more likely Teams meetings.

Q. When you say Teams, are you referring to Microsoft Teams?

A. That's correct. Yeah.

Q. Is that a video conferencing 10:21

Pilsworth

platform?

A. Exactly.

Q. Are there any other forms of communication used between BAPTL and Black Rock? 10:21

A. No.

Q. Are you aware of any texting between Black Rock and BAPTL?

A. Not so far as I'm aware.

Q. What about WhatsApp messaging? 10:21

A. Again, not so far as I'm aware.

Q. How often do you, Richard Pilsworth, interact with Black Rock?

MR. BERMAN: Objection to form.

A. So what do you mean by interact? 10:22

Q. How often do you exchange e-mails with Black Rock?

MR. BERMAN: Objection to form.

A. It's a similar, probably there would be a weekly e-mail that we get from Black Rock, 10:22 just market oversight, what's going on in the market, what's happened to our investment. We're talking like really big picture kind of level here. So that would be weekly e-mail that I receive. 10:22

Pilsworth

Q. And do you respond to those e-mails?
A. If there's something relevant for me to talk about. The e-mails would say cover things like what have we got coming up, the fact that there's a main board meeting coming up or an investment meeting coming up, committee meeting coming up, you know, what's the work that is on the horizon. 10:22
Q. What is the name of your key contacts at Black Rock? 10:23
MR. BERMAN: Objection to form.
You're talking of him personally?
Q. Okay. That's a fair point. So, Mr. Pilsworth, personally who are the names of your key contacts at Black Rock? 10:23
A. My key contact is a lady called Esther Perkins.
Q. And what's Ms. Perkins' title?
A. She's our what we call our outsourced CIO. Chief investment officer. 10:23
Q. Approximately how many e-mails do you exchange with Ms. Perkins a month?
A. It literally just depends what's going on, whether it's a busy period or not, so 10:23

Pilsworth

it is very difficult to put a number on it. I mean it could easily be four, because she sends me four e-mails, and I don't reply in a month generally. 10:24

Q. And how often do you have Teams communications with Ms. Perkins?

MR. BERMAN: Again, you're talking about him personally?

Q. Yes, in your personal capacity. 10:24

MR. BERMAN: I'm just confused, because before you said you were not going to be asking any more questions personally, and now you're asking all your questions that way. I just want to make sure. 10:24

MR. YONG: I know. I know. Fair enough.

MR. BERMAN: And, if you're not sure which anything he's referring to, please make sure. 10:24

A. So, again, it would be the same point. I could go a month without talking to her at all on Teams.

Q. Okay. How often does BAPTL, the 10:24

Pilsworth

entity, have communications with Ms. Perkins?

A. So there's a weekly call at BAPTL with Esther.

Q. And how long do those weekly calls go? 10:24

A. Half an hour I think.

Q. And how many e-mail communications between anyone at BAPTL occur -- strike that. Has BAPTL had any discussions with Ms. Perkins about this litigation? 10:25

MR. BERMAN: Objection to form.

A. I contacted Ms. Perkins to tell her that we intended to be, to put the motion forward to become a Lead Plaintiff, and this was in the context of the litigation hold letter that we then subsequently sent. So it was really just a courtesy rather than turning up cold. 10:25

Q. And when did you contact Ms. Perkins about this litigation? 10:25

A. Probably June 2022, maybe July.

Q. Was this communication made by e-mail?

A. No. It would have shown up on the material in discovery. So you would have had it, 10:26

Pilsworth

because that would have said Natera, so I guess you would have had it. So it must have been a phone call.

Q. Do you recall how long that phone call was? 10:26

A. Maybe five minutes just the formalities of who's the best person to send the document to when we send it.

Q. And what was -- do you recall what Ms. Perkins' -- strike that. Do you recall what Ms. Perkins' reaction was when you informed her about the lawsuit? 10:26

MR. BERMAN: Objection to form.

A. So the first time she heard about it, so I think she was neutral about it, because she didn't really know one way or another, you know, any more details about it than the fact that it was something that we were intending to become Lead Plaintiff for. 10:26 10:27

Q. In the documents that have been produced by your counsel on behalf of BAPTL in this action, there are references to an entity named British Airways Pension Services Limited. What is British Airways Pension Services Limited? 10:27

Pilsworth

A. So it's the employing entity, so to keep the trustee companies clean from having to have their own, you know, employment contracts and then all the governance that comes around that, we're employed by British Airways Pension Services Limited. 10:27
Q. Okay. From your perspective, is there any material distinction between BAPTL and British Airways Pension Services Limited in the context of this litigation? 10:27
MR. BERMAN: Objection to form.
A. Did you say is there any difference?
Q. Like -- yes.
A. Any distinction. Quite a big one. 10:28
So BAPTL held the Natera shares. BAPSL did not.
Q. Can you describe the relationship between BAPTL and New Airways Pension Scheme?
A. So BAPTL acts as the custodian trustee of the New Airways Pension Scheme. 10:28
Q. Okay. Are there any entities associated with BAPTL that have transacted in Natera securities?
MR. BERMAN: Objection to form.
A. No. 10:28

Pilsworth

Q. Did New Airways Pension Scheme transact in Natera securities?

A. BAPTL transacted in Natera securities on behalf of the New Airways Pension Scheme. 10:29

Q. Okay, and just to confirm, Airways Pension Scheme, is it your understanding that that entity has never transacted in Natera securities?

A. Correct. 10:29

MR. BERMAN: Objection to form.

Q. Okay. So, other than this current action, has BAPTL ever served as a Lead Plaintiff in a securities class action?

A. No. 10:29

Q. Other than this current action, has BAPTL ever attempted to serve as Lead Plaintiff in a securities class action?

A. No.

Q. Do you know in which court this 10:29 lawsuit is pending?

A. It's in Texas. Austin, Texas.

Q. So, if I told you that this lawsuit was in the Federal Court in the Western District of Texas, does that sound right? 10:29

Pilsworth

A. That sounds right. Yep.
Q. Are you, Richard Pilsworth, willing to appear to testify at trial in this action, if necessary, which would take place in Texas? 10:30
A. I am.
Q. As a 30(b)(6) designee of BAPTL, what is your understanding of the claims that are alleged in the amended complaint?
A. To my understanding is that there was 10:30 sort of deceptive business practices that Natera undertook and which artificially inflated the share price of Natera, and then, when the truth about those practices became clear to the market, the investors suffered a loss. 10:30
Q. Can you identify what the deceptive business practice is that you believe Natera engaged in?
A. So there's a number of examples. The two key examples I'm aware of are there was a 10:30 prior authorization practice. This is an affiliated company to Natera called My Genome My Life, which issues prior authorization forms so that effectively payments got made that wouldn't have otherwise been made, and then there was also 10:31

Pilsworth

an auto-opt-in for two parts to this Panorama product.

One part is that there's a significant additional fee for a test for sort of rare lost bits of chromosomes, and there was an auto-opt-in on the form, which asked for that additional test to be undertaken. 10:31

Q. Okay. Can you identify any other deceptive business practices that you believe the Defendants engaged in? 10:31

A. I'm relying on my legal counsel to put all those details in. They've been doing the investigations on this.

Q. Okay. Do you have an understanding of the damages that would be awarded to the alleged class if this lawsuit is successful? 10:32

A. I would be speculating.

Q. Have you done any calculations to estimate what the damages would be that would be awarded to the alleged class if this lawsuit was successful? 10:32

MR. BERMAN: Objection to form.

A. My understanding is that damages is something that an expert would kind of come in 10:32

Pilsworth

and give an opinion on later on. So it's not something that's within my sort of knowledge.

Q. Okay. Have you done any mental math to estimate the amount of damages? 10:32

MR. BERMAN: Objection. Are you referring to him personally?

Q. Yeah. I'll ask the question. So have you, Richard Pilsworth, done any mental math to estimate the damages in this action? 10:33

A. No.

Q. Has BAPTL done any calculations or math to estimate the damages in this action?

A. No. We're relying on our lawyers.

Q. Do you know what the class period at issue is in this litigation? 10:33

A. Yeah. It's the 27th of February 2020 through to the 8th of March 2022.

Q. I believe I think you may be off by one day. I think my understanding is that it's February 26, 2020 through March 8, 2022. Is that correct? Let's just make sure you got the date right. 10:33

A. Apologies.

Q. No worries. Did you ask your 10:33

Pilsworth

counsel -- strike that. Where did your understanding that the class period starts on February 27, 2020 come from?

MR. BERMAN: Objection to form. 10:34

A. So that my understanding is that that was the start of the misstatements and omissions to the market by Natera.

Q. Okay. Do you have an understanding of why February 27, 2020 is the start of the class period from your perspective? 10:34

A. I think it's the same answer as my previous answer.

Q. What was your previous answer just so the record is clear? 10:34

A. It's the first time when a misstatement and omission was made to the market in respect of Panorama.

Q. Are you aware of any other misstatements or omissions that were made prior to February 27, 2020 that were made to the market about Panorama? 10:35

MR. BERMAN: Objection to form.

A. No.

Q. Are you alleging that certain 10:35

Pilsworth

information was omitted during the alleged class period?

MR. BERMAN: Objection to form.

A. Yes. 10:35

Q. Can you identify that information?

A. As I said, I'm relying on my lawyers who've done the more detailed investigation on that.

Q. Okay. So previously you I guess identified two examples of deceptive business practices. Do you recall that? 10:35

A. Yes.

Q. What were those two examples?

MR. BERMAN: Objection. Asked and answered. Counsel, you just referenced the fact that he told you. You want to go back and read them? 10:36

MR. YONG: Well, the question is slightly different. 10:36

Q. So why don't you go ahead and answer, Mr. Pilsworth.

MR. BERMAN: You just asked him to repeat his answer. Can we go back and read the answer? 10:36

Pilsworth

Q. Okay. I'll ask the question again. What information are you claiming was omitted by Defendants during the class period?

MR. BERMAN: Objection to form. 10:36

You can answer.

A. So the deceptive business practices were not made clear to the market.

Q. And what were the deceptive business practices that were not made clear to the market? 10:36

MR. BERMAN: Objection. Asked and answered.

You can answer again.

A. So the prior authorizations by My Genome My Life and the auto-opt-in for the tests 10:36 that had the additional significant fee.

Q. You previously testified that the end of the class period is March 8, 2022, right?

A. Yes.

Q. What is your understanding of the 10:37 significance of the March 8, 2022 date?

MR. BERMAN: Objection to form.

A. It's the point at which the truth became clear to the market.

Q. And what was the truth? 10:37

Pilsworth

A. So the business practices that I just referred to a minute ago. So there was the Hindenburg report that was issued that laid those bare. That's the allegation. 10:37

Q. Do you recall when Plaintiffs filed the amended complaint in this action?

A. I think that was October 2022.

Q. If I represented to you that the amended complaint was filed in October 7, 2022, does that sound right? 10:38

A. That sounds right.

Q. Okay. Since the filing of the amended complaint on October 7, 2022, do you know whether the court in this case has subsequently dismissed certain of the claims pled in the amended complaint? 10:38

A. I am aware of that. Yes.

Q. And how did you become aware of that?

A. Because -- 10:38

MR. BERMAN: I don't think he's asking for you to divulge conversations you've had with counsel, so, to the extent you can answer without divulging communications with counsel, please. 10:38

Pilsworth

A. I was updated by counsel.
Q. Okay. Are you aware that there was a written opinion on Defendants' motion to dismiss?
A. You're talking about an opinion of Court? 10:38
Q. Yes.
A. Yes, I am.
Q. Did you read that written opinion?
A. Yes, I did. 10:39
Q. Okay. What is your understanding of which claims were dismissed by the court?
A. So there were two Natera products in the original complaint that were the subject of the allegations. So there was a product called Prospera, and then the claims in respect of Prospera were dismissed. Claims with respect to Panorama were upheld by the court. 10:39
MR. BERMAN: Counsel, we've been going for a little over an hour. Can we take a break shortly? 10:39
MR. YONG: Sure. I have one more question, and then let's take a natural break.
MR. BERMAN: Sure. 10:39

Pilsworth

Q. Is BAPTL currently asserting security fraud claims on the basis of Prospera?
A. No.
MR. BERMAN: Objection to form. 10:39
MR. YONG: Okay. We can take a short break.
THE VIDEOGRAPHER: We're now going off the record. The time is 10:39 a.m.
(Recess taken) 10:39
THE VIDEOGRAPHER: We are back on the record. The time is 10:59 a.m. This is the beginning of media label number 3.
BY MR. YONG:
Q. Welcome back, Mr. Pilsworth. 10:59
A. Thank you.
Q. I think we just came back from a 20-minute break. Is that right?
A. Yes.
Q. Okay. 10:59
MR. YONG: So let's introduce our next exhibit. So this will be BAPTL Exhibit 3.
(BAPTL Exhibit 3, Document Bates stamped BAPTL-000322 and 000323, was so 10:59

Pilsworth
marked for identification, as of this date.)
Q. So you've just been handed a document that has been marked as BAPTL Exhibit 3. I will represent to you that this document was produced by your counsel in this litigation with the Bates range of BAPTL 000322 through BAPTL 000323. Do you recognize BAPTL Exhibit 3? 11:00
A. I do. 11:00
Q. What is BAPTL Exhibit 3?
A. It says the retainer agreement between BAPTL and KTMC for acting on behalf of BAPTL in this class action.
Q. And when was the first time that you saw BAPTL Exhibit 3? 11:00
A. Probably just shortly before the 20th of June, 2022.
Q. Okay, and what is the date of this document? 11:01
A. 20th of June, 2022.
Q. And this document is addressed to you, Richard Pilsworth, correct?
A. That's right. Yes.
Q. Okay, and why is the document -- what 11:01

Pilsworth

is your understanding for why the document is addressed to you, Richard Pilsworth?

MR. BERMAN: Objection to form.

A. Because I'm the primary contact with KTMC in BAPTL. 11:01

Q. Okay, and just so we're clear, KTMC you're referring to Kessler Topaz, the law firm?

A. Yes. That's right. Yes.

Q. And is Kessler Topaz lead counsel in this action? 11:01

A. That's right.

Q. Is BAPTL represented by any law firm other than Kessler Topaz in this action?

MR. BERMAN: Objection to form. 11:01

You can answer.

A. I guess, because we've got an additional plaintiff, so technically, but, in terms of like the direct relationship that we have, we only have a direct relationship, contractual relationship with KTMC. 11:02

Q. What is the name of the law firm that you do not have a direct relationship with?

A. Bernstein Litowitz.

Q. Okay, and what is your understanding 11:02

Pilsworth

of who Bernstein Litowitz represents in this action?

A. So they represent Key West Police and Fire Pension Fund. 11:02

Q. Are there any other law firms other than Kessler Topaz and Bernstein Litowitz that is representing BAPTL in this litigation?

A. Yes. So there is Nix Patterson who are the local counsel in Texas. 11:02

Q. Are there any other law firms?

A. Not to my knowledge.

Q. Did BAPTL have any interactions with the Kessler Topaz law firm prior to June 20th, 2022? 11:03

MR. BERMAN: Objection to form.

A. We did. So KTMC does claims monitoring and claims filing for BAPTL.

Q. And when did Kessler Topaz begin its claims monitoring for BAPTL? 11:03

A. I believe it was around 2020.

Q. Okay, and I will represent to you that your counsel produced a monitoring agreement between BAPTL and Kessler Topaz dated March 30th, 2020. Does that date sound correct? 11:03

Pilsworth

A. That rings a bell. Yes.
Q. Okay. Can you provide the names of the specific attorneys at Kessler Topaz that you have a relationship with in connection with this securities class action? 11:03
MR. BERMAN: Objection. Asked and answered.
You can answer again.
A. Darren Check, Stuart Berman and Josh Materese. 11:04
Q. Are there any other attorneys at Kessler Topaz that you have a relationship with in connection with this litigation?
MR. BERMAN: Objection to form. 11:04
A. Not in any significant way. No.
Q. Can you provide the names of any specific attorneys at Bernstein Litowitz that you have a relationship with in connection with this litigation? 11:04
MR. BERMAN: Objection to form.
A. So I haven't been in sort of direct dialogue with Bernstein Litowitz. It has all been done through KTMC.
Q. Have you ever spoken to any attorneys 11:04

Pilsworth

at Bernstein Litowitz concerning this litigation?
A. No.
Q. Have you ever exchanged any e-mails with any attorneys at Bernstein Litowitz concerning this litigation? 11:05
A. No.
Q. Okay. So BAPTL Exhibit 3, there are three signatures. Do you see that?
A. Yes. 11:05
Q. Who are the three signatures of BAPTL Exhibit 3?
A. Darren Check for Kessler Topaz and then on behalf of BAPTL is me Richard Pilsworth and a former colleague Maria Penna. 11:05
Q. Who is Maria Penna?
A. So she's signing in this capacity as an authorized signatory of BAPTL.
Q. And do you have an understanding for why Ms. Penna was signing BAPTL Exhibit 3 as an authorized signature for BAPTL? 11:05
MR. BERMAN: Objection to form.
A. So, because she was appointed as an authorized signatory, so we have an internal governance thing that we sign, when we sign 11:06

Pilsworth

documents, we have two authorized signatories to sign them. It's not actually a requirement. Only one of us needs to sign them, but it's just a good governance thing. 11:06

Q. Okay, and are you one of the authorized signatories for BAPTL?

A. I am.

Q. Okay. So I would like to direct your attention to the second paragraph on the first 11:06 page of BAPTL Exhibit 3, and again this has been Bates stamped by your counsel as BAPTL 000322. That paragraph begins with the words, "Kessler Topaz will file a motion requesting that BAPTL be appointed as a Lead Plaintiff." 11:06

Do you see that?

A. Yes.

Q. Can you read that full paragraph out loud for the record?

MR. BERMAN: Out loud? 11:07

MR. YONG: Yeah.

A. Okay. "Kessler Topaz will file a motion requesting that BAPTL be appointed as a Lead Plaintiff in the litigation and that its selection of our firm as lead counsel be approved 11:07

Pilsworth

by the Court. In the event that we are approved as Lead Counsel, any fees and expenses resulting from a successful outcome of the litigation will be paid solely and entirely out of the class' recovery in an amount approved by the Court. In no event, however, shall Kessler Topaz seek to be paid fees in excess of the following amounts depending on the stage of the litigation at which the class's recovery is determined." 11:07 11:08

Q. Okay, and then on BAPTL Exhibit 3 directly underneath that second paragraph that you just read aloud, there is a chart with three columns and I guess one row. Do you see that?

A. Yes. 11:08

Q. The first column has a heading of "Commencement of Action through Date of Decision on Motion to Dismiss," and underneath is a number that says 19 percent. Do you see that?

A. I do. 11:08

Q. What is your understanding of what the 19 percent means?

A. So it would be a contingent fee that's payable to KTMC of 19 percent of the recoveries. 11:08

Pilsworth

Q. And can you explain what your understanding of what a contingent fee is?

A. So it means that, if the Plaintiffs do not win the litigation, then no fee is payable, and, if Plaintiffs win, then this is the fee that is payable. 11:08

Q. Okay, and what is your understanding of the phrase "class recovery" as used in BAPTL Exhibit 3? 11:09

MR. BERMAN: Objection to form.

A. Can you draw my attention to where it is?

Q. Sure. If you look at, for example, in that second paragraph that you read aloud in the second sentence? 11:09

A. Oh, I see. Yeah. So that would be the sort of labeled recoveries for all potential, you know, all parties who sit in the class.

Q. Okay. Would that include a class-wide settlement? 11:09

A. That would include a class-wide settlement. Yeah.

Q. Okay. Okay. Looking back at BAPTL Exhibit 3, right, at the chart with the three 11:09

Pilsworth

columns, the second column has a heading that says, "Decision on Motion to Dismiss through Date of Completion of All Discovery," and underneath it has a number that reads 22 percent. Do you see that? 11:10

A. Yes.

Q. And what is your understanding of what the 22 percent means?

MR. BERMAN: Objection. Asked and answered. 11:10

You can answer again.

A. So, rather than 19 percent in my previous answer, 22 percent depending on the stage of the litigation. 11:10

Q. Okay. So it's your understanding that the 22 percent represents a contingent fee?

A. Yes.

Q. And then the third and I guess final column on BAPTL Exhibit 3 the heading reads, "Date of Completion of All Discovery through End of the Case." 11:10

What is your understanding of what the 25 percent represents?

A. Yeah, so 25 percent of the recoveries 11:10

Pilsworth

as a contingent fee that KTMC would receive.

Q. So there are, just to kind of summarize, there are three, the three columns represent three phases I guess of the litigation? 11:10

A. Yep.

Q. And then the numbers underneath I guess represent the contingent fee amount that is associated with each of those three phases?

A. Yep. 11:11

Q. Were you involved in any discussions relating to the 19 percent, 22 percent and 25 percent figures that are set forth in the chart on BAPTL Exhibit 3?

MR. BERMAN: Objection to form. 11:11

A. I was.

Q. Okay, and what was your involvement?

MR. BERMAN: Again, I am going to caution you, to the extent you're revealing communications with counsel, 11:11 that's not what he's looking for.

So if you can answer the question without doing that.

A. I can't.

Q. Okay. Let me ask the question one 11:11

Pilsworth

more time. Without revealing the contents of any of your privileged communications with counsel, can you describe your discussions relating to the 19 percent, 22 percent and 25 percent figures that are set forth on BAPTL Exhibit 3? 11:11

MR. BERMAN: Same objection.

A. There was a discussion about whether this was a reasonable level of fees.

Q. And what is your understanding of why there are three different figures of 19 percent, 22 percent and 25 percent on BAPTL Exhibit 3? 11:12

MR. BERMAN: Objection. Asked and answered.

You can answer again. 11:12

A. So I guess the point is that, depending on how much work KTMC has had to do, so say the claim settled or otherwise reached a conclusion earlier in the litigation process KTMC would have done less work and therefore a lower fee. 11:12

Q. And how do you know that KTMC did less work?

A. Well, because we're sitting here today. We wouldn't have got to this point today 11:12

Pilsworth

if we had completed it in stage 1. So that's extra work that they're doing right now.

Q. And is this 19 percent, 22 percent and 25 percent structure still in effect currently in this action? 11:13

A. It is.

Q. Has BAPTL done any estimations for the potential amount of payment to Kessler Topaz if there's a class recovery under the fee structure set forth in BAPTL Exhibit 3? 11:13

MR. BERMAN: Objection to form.

A. And this is BAPTL?

Q. BAPTL.

A. The organization. No. 11:13

Q. Have you, Richard Pilsworth, personally done any estimation of the potential amount of fees that will be paid to Kessler Topaz if there's a class recovery under the fee structure set forth in BAPTL Exhibit 3? 11:13

MR. BERMAN: Objection. Beyond the scope.

You can answer.

A. Personally, no.

Q. Okay, and you haven't done any mental 11:13

Pilsworth

math to estimate the fee payment?

MR. BERMAN: Counsel.

A. No.

MR. BERMAN: He has answered your question. 11:14

MR. YONG: Okay. I ask you to please limit your speaking objection.

MR. BERMAN: Well, I can ask that you just ask the question one time. 11:14

MR. YONG: Yeah. You can object to form.

Q. In your capacity as a 30(b)(6) designee, do you have an understanding of what the term "Date of Completion of All Discovery" 11:14 means as it is used in the second and third columns of the chart on BAPTL Exhibit 3?

A. I believe I do, but I would rely on my lawyers to correct me if I'm wrong.

Q. Well, what is your understanding of 11:14 what the term "Date of Completion of All Discovery" means as used in BAPTL Exhibit 3?

A. So it would be all discovery that the Plaintiffs make and then all discovery that the Defendants I mean all Defendants make. 11:14

Pilsworth

Q. And, when you say all discovery, does that include all fact depositions?

A. I don't know, to be honest.

Q. Okay. Does the term "all discovery" include all of expert discovery? 11:15

A. I would have thought so. Yeah. I don't know specifically.

Q. Okay, but you signed BAPTL Exhibit 3 on behalf of BAPTL, correct? 11:15

MR. BERMAN: Counsel. Seriously? You asked that question one minute ago. Do you want to have it repeated back? You asked the question. It's one of the first questions you asked on this exhibit. 11:15

Q. Okay. Go ahead and answer.

A. Sorry. Can you repeat the question.

MR. YONG: Sure. Can you repeat the question.

(Record read) 11:15

A. Correct.

Q. Do you know whether the date of completion of all discovery has been met as of today's date of August 2nd, 2024?

A. It has not. 11:16

Pilsworth

Q. Which of the three phases set forth in the chart on BAPTL Exhibit 3 is this litigation currently at?

A. It would be in the middle of the three. 11:16

Q. Okay, and what is the fee percentage that's associated with this stage?

A. 22 percent.

Q. Okay. So, if there was a class recovery in this current phase, Kessler Topaz would get a 22 percent fee award, correct? 11:16

A. Correct.

Q. Do you agree that if there is a class recovery prior to the date of completion of all discovery, this would result in a lower fee payment to Kessler Topaz as a proportion of class recovery than after the date of completion of all discovery? 11:16

MR. BERMAN: Objection. Counsel, I don't even understand your question. 11:16

Do you understand the question?

THE WITNESS: No. No.

MR. YONG: Again, Counsel --

MR. BERMAN: No, no, I don't want him 11:16

Pilsworth

answering a question I don't even understand. So if you could rephrase your question so I can understand it.

MR. YONG: Can we have the question reread. 11:17

(Record read)

A. I agree with that.

Q. What is your general understanding of BAPTL's duties as the representative of the alleged class in this action? 11:17

A. So effectively vigorously prosecute the action and act in the best interests of the class.

Q. Do you believe that BAPTL has a duty as Lead Plaintiff for the alleged class to maximize the potential fee payment to Lead Counsel? 11:18

MR. BERMAN: Objection to form.

A. No. 11:18

Q. And why not?

A. Well, in any case, it's the Court that would ultimately decide on what the fee is that would go to Kessler Topaz, so, you know, that would be a point at which there would be a 11:18

Pilsworth

discussion about that.

Q. Okay, but, if the Court decides why, I mean I'm just trying to square away why there's this 3-column chart in BAPTL Exhibit 3, if you're saying that the court will decide. 11:18

MR. BERMAN: Objection. Asked and answered.

You can answer again.

A. It's not going to be higher than. It says in here it's not going to be higher than these figures. 11:18

Q. Are there some situations where it may be advantageous for the class to settle at a certain stage rather than face an increased risk of zero recovery if the case is dismissed by the court? 11:19

MR. BERMAN: Objection to form.

A. Sorry. Can you repeat the question.

MR. YONG: Sure. Can you read the question again. 11:19

(Record read)

A. It's hypothetically, that's possible.

Q. Okay. Do you think that the fee structure on Exhibit 3 creates a financial 11:19

Pilsworth

incentive for Kessler Topaz as Lead Counsel to continue litigating this lawsuit through the date of completion of all discovery in this action?

MR. BERMAN: Objection to form. 11:20

A. I don't believe it does personally.

Q. And why not?

A. Because I think, if there was a possibility to settle earlier with reasonable people, we need to act in the best interests of 11:20 the class. If you weigh up the financials of that, there would be circumstances where that's not something that would be in KTMC's interest.

Q. Okay. I would like to turn your attention back to BAPTL Exhibit 3, and let's look 11:20 at the bottom of the first page Bates stamped BAPTL 000322. I direct your attention to under that 3-column chart we were just looking at there's a paragraph that begins with the words "Kessler Topaz also agrees." Do you see that? 11:21

A. Yes.

Q. Can you read that first sentence aloud for the record.

A. "Kessler Topaz also agrees to advance all costs and expenses which are incurred in the 11:21

Pilsworth

investigation, prosecution and litigation of this case, including any travel and lodging expenses incurred by any representative of BAPTL with respect to this case." 11:21

Q. Has Kessler Topaz advanced all costs and expenses that have been incurred in this case?

A. Yes.

Q. Can you identify what costs and expenses have been advanced by Kessler Topaz in this case? 11:21

A. So in this case, fee, salaries and costs of people who worked on this and legal fees. That's a cost of Kessler Topaz, right? You frowned when I said that. 11:22

Q. Whose salaries are you referring to? I think that was my frown.

A. So there are lawyers at Kessler Topaz, right? 11:22

Q. Correct.

A. And they don't work for free. So there's a cost to them working on this litigation, and so I'm just saying that is a cost that Kessler Topaz has borne. Does that make 11:22

Pilsworth

sense?

Q. Okay. Maybe and we may circle back to that, but are there any other costs and expenses that come to mind? 11:22

A. So investigation of the complaint. So I understand that Kessler Topaz uses a specific firm that does the investigation process.

Q. And what specific firm is that? 11:22

A. I'm not aware of its name.

Q. Have you had any discussions with that specific firm?

A. No.

Q. Have you exchanged any e-mails with that specific firm? 11:23

A. No.

Q. Do you know where that specific firm is located?

A. Nope. 11:23

Q. Have you ever asked Kessler Topaz what the name of that specific firm is?

A. No.

Q. And why not?

MR. BERMAN: Objection to form. 11:23

Pilsworth

A. I'm confident that Kessler Topaz is doing a good job, an excellent job actually, of prosecuting this case. So I don't feel the need to find out that kind of detail. 11:23

Q. Do you have an understanding of the total amount of costs and expenses that Kessler Topaz has advanced in connection with this case?

MR. BERMAN: Objection to form.

A. Not at this stage. No. I would expect to see it later. 11:23

Q. Okay, and do you have any internal I guess tracking?

A. No.

MR. BERMAN: Objection. 11:24

Q. Do you think that the total amount of costs and expenses that Kessler Topaz has advanced in connection with this case is more than $10,000?

MR. BERMAN: Objection. 11:24

A. I imagine it is, yeah.

Q. Okay. Do you think it's more than $100,000?

MR. BERMAN: Objection.

A. Yes. 11:24

Pilsworth

Q. Do you think it's more than $500,000?
A. Yes.
Q. Do you think it's more than a million dollars? 11:24
A. Yes.
Q. Do you think it's more than $3 million?
MR. BERMAN: Objection to the whole line of questioning. 11:24
Answer if you know.
A. I don't know, to be perfectly honest.
Q. Okay, but you do think it's more than a million dollars, correct?
A. That wouldn't surprise me. I'm 11:24 guessing, but that wouldn't surprise me.
MR. BERMAN: I don't think we want you to guess.
THE WITNESS: Yeah, sorry. Apologies. 11:24
A. That wouldn't surprise me.
Q. Okay. Let's turn back to BAPTL Exhibit 3, and let's look back at that first page. That is again Bates stamped BAPTL 000322, and let's look at the very, very bottom of the 11:25

Pilsworth

page. You see the last two words on the page. There's a sentence beginning with the words "In no," and it goes to the next page, "event."
Can you read that sentence aloud. 11:25
A. Yes. "In no event will BAPTL be responsible for any fees, costs or expenses associated with this litigation."
Q. Has BAPTL paid any fees, costs or expenses associated with this litigation? 11:25
A. No.
Q. Do you know the approximate total amount of fees, costs and expenses that have been incurred in connection with this litigation to date? 11:25
MR. BERMAN: Objection to form.
A. We talked about this a minute ago. So the previous set of answers.
Q. Okay. Can you answer the question, though? 11:25
A. Repeat the question, please.
MR. YONG: Can you reread the question for the witness.
(Record read)
A. That's what we just spoke about 11:26

Pilsworth

earlier. I would be guessing, so, no, I don't.
Q. Do you know who is paying for the fees, costs and expenses that have been incurred in connection with this litigation to date? 11:26
MR. BERMAN: Objection. Asked and answered.
You can answer again.
A. Kessler Topaz.
Q. And Kessler Topaz is Lead Counsel for the class? 11:26
A. Yes.
Q. Mr. Pilsworth, you previously testified that you traveled from the U.K. to New York to attend this deposition, correct? 11:26
A. That's correct.
Q. And you previously testified that you're staying in New York for I think it was four days?
A. Yep. That's correct. 11:27
Q. When did you arrive in New York?
A. Wednesday.
Q. And today is Friday?
A. Friday.
Q. When do you head back to the U.K.? 11:27

Pilsworth

A. Saturday evening.

Q. How many times have you met with your attorneys from the Kessler Topaz law firm while you've been in New York? 11:27

A. I met with them yesterday as part of preparation for this deposition.

Q. And where did you meet with your attorneys yesterday?

A. At the hotel we're staying at. 11:27

Q. And what hotel is that?

A. The Algonquin Hotel.

Q. And that's in New York City?

A. Yes.

Q. So you're staying in the same hotel as your two attorneys here today? 11:27

A. I am.

Q. Do you know who's paying for your hotel while you're here in New York?

A. Kessler Topaz. 11:28

Q. Do you know approximately how much a night your hotel costs?

A. I do not.

Q. Mr. Pilsworth, while you've been here in New York, have you had any meals with your 11:28

Pilsworth

attorneys from the Kessler Topaz law firm?
A. We had a meal in the diner next door to the hotel yesterday, and I can assure you it was not an expensive meal. 11:28
Q. Do you recall the name of the diner?
MR. BERMAN: Counsel, seriously, we're going to be here all day.
A. Red Flame Grill Diner I think is the name. 11:28
Q. And who paid for that bill?
A. Kessler Topaz.
Q. Let's turn back to BAPTL Exhibit 3, second page, which is Bates stamped BAPTL 000323. I would like to direct your attention to midway 11:29 through the top paragraph on that page with the sentence that begins with the words, "Further, in the course of the lawsuit, we may."
Do you see that? I'll give you a second to try and find it. 11:29
A. Yeah. Okay.
Q. Can you read out loud beginning from that sentence to the end of the paragraph.
A. "Further, in the course of the lawsuit, we may, with notice to you and your 11:29

Pilsworth

consent, retain and/or work with other law firms, in which case, we would divide any legal fees we receive with such other firms."

Q. Okay. Can you continue reading through the end of the paragraph. 11:29

A. Okay. "You agree that we may divide fees with other attorneys for serving as local counsel, of counsel, as referral fees, as co-counsel, or for other services performed. The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent in assisting the prosecution of the action. The division of fees with other counsel is our sole responsibility and will not increase the fees described above." 11:29 11:30

Q. Okay. Thank you, and, in that paragraph, when the word "we" is used, what entity is "we" referring to?

MR. BERMAN: Objection to form. 11:30

A. Kessler Topaz.

Q. And then the word "you" as used in that paragraph, what does "you" refer to?

MR. BERMAN: Objection to form.

A. BAPTL. 11:30

Pilsworth

Q. You previously testified that there are two other law firms that I guess you have a relationship in connection with this litigation, correct? 11:30

MR. BERMAN: Objection to form. Misstates his testimony.

Q. Do you recall mentioning a law firm by the name of Bernstein Litowitz a few minutes ago? 11:30

A. I do. Yeah.

Q. Do you recall mentioning the name of a firm called Nix Patterson?

A. I do.

Q. And what is the relationship that BAPTL has with Bernstein Litowitz? 11:31

MR. BERMAN: Objection. Asked and answered.

A. We have no direct contractual relationship. 11:31

Q. Okay. Do you have an understanding of who is paying the fees for Bernstein Litowitz?

A. I don't know.

Q. Have you ever asked?

A. No. 11:31

Pilsworth

Q. Do you have an understanding of who is paying the fees of Nix Patterson in connection with this litigation?

A. I don't. 11:31

Q. Have you ever asked?

A. No.

Q. Do you have an understanding of the total amount of fees that Bernstein Litowitz has incurred in connection with this litigation? 11:31

MR. BERMAN: Objection to form.

A. I don't.

Q. Okay. Same question for Nix Patterson?

MR. BERMAN: Objection. 11:31

A. I don't.

Q. Can you briefly describe the role of Additional Plaintiff Key West in this litigation?

MR. BERMAN: Objection to form.

A. So I understand that Key West purchased Natera common stock in the secondary public offering in July 2021, and so, as a sort of belt and braces point to ensure standing, they've been added as an additional Plaintiff. 11:32

Q. And where does that understanding 11:32

Pilsworth

come from?

MR. BERMAN: I'll caution you not to discuss conversations with counsel, so, if you can answer without doing so, please. 11:32

A. So I believe it is in the amended complaint, but I might be wrong. Otherwise, it was discussions that I've had with counsel.

Q. Okay. When was the first time that BAPTL became aware of Key West in connection with 11:32 this litigation?

A. I think it was at the time of the amended complaint, I think.

Q. Okay, and if I represent to you that the amended complaint was filed on October 7, 11:33 2022, does that help you recall?

A. Yeah. I think that's right.

Q. Was it before October 7, 2022 that you first became aware of Key West in connection with this litigation? 11:33

A. Yeah. I suppose, the exact date aside, I don't know whether this is what your question is getting at, but I was aware that they were going to be joined as Additional Plaintiff before they were in fact joined because of 11:33

Pilsworth

discussions with counsel.

Q. Has anyone at BAPTL had any communications with anyone at Key West regarding this litigation? 11:34

A. No.

Q. Has BAPTL made any effort to initiate communications with anyone at Key West regarding this litigation?

MR. BERMAN: Objection to form. 11:34

A. No.

Q. Why not?

A. Because at this stage we're communicating through our lawyers, and there's no seminal decision that was needed to be made. So 11:34 I would expect, for example, if there was a settlement deal to be discussed, I would expect at that stage absolutely to be in direct contact with Key West.

Q. And what steps did you go through to 11:34 confirm that there have not been any communications between BAPTL and anyone at Key West regarding this litigation?

MR. BERMAN: Objection to form.

A. Because it would have only been me. 11:35

Pilsworth
So in my knowledge.
Q. When you say "me," you're referring to?
A. Personally me. 11:35
Q. Richard Pilsworth?
A. Richard Pilsworth. Yeah.
Q. Did BAPTL have any relationship with Key West prior to Key West becoming involved in this litigation? 11:35
MR. BERMAN: Objection to form.
A. No.
Q. What steps have you done to confirm that there was no relationship between Key West and BAPTL prior to their involvement in this litigation? 11:35
MR. BERMAN: Objection to form.
A. I've been, as you know from documents here, I've been at British Airways Pension getting on for ten years, so I'm reasonably confident that, you know, I've been managing the class actions of British Airways Pensions for that period, so it's what's in my knowledge. 11:35
Q. Alright, and it is your understanding that Additional Plaintiff Key West is represented 11:35

Pilsworth

by a different law firm than BAPTL, correct?
A. Correct.
Q. As the designated representative for the Lead Plaintiff of the class, do you think that it is important for BAPTL to be represented by a different law firm than Additional Plaintiff Key West in this litigation? 11:36
MR. BERMAN: Objection to form.
A. It's a strange question. We've entered into a relationship with Kessler Topaz before Key West came on the scene, so. 11:36
MR. YONG: Can you read the question one more time, Joe, to give him an opportunity to see if that maybe clarifies things. 11:36
(Record read)
A. It's a strange question. I guess everyone has their own relationships with law firms. So, you know, they've gone with the law firm that they presumably had a relationship with before. We've gone with Kessler Topaz. I'm confident that Kessler Topaz is prosecuting this on our behalf, and that's the right thing to carry on doing. I'm not quite sure what the 11:37 11:37

Pilsworth

question is getting at. Sorry.

Q. What is the basis for your understanding that Key West had a relationship with the Bernstein Litowitz law firm? 11:38

MR. BERMAN: Objection to form.

A. I'm guessing. Apologies.

Q. So you have no basis for that understanding?

A. Correct. 11:38

Q. And you previously said that BAPTL has no relationship with the Bernstein Litowitz law firm. Is that correct?

A. That's correct.

Q. Has Bernstein Litowitz ever had any 11:38 discussions with BAPTL about offering portfolio monitoring services to BAPTL?

A. Sorry. Which? Has Bernstein Litowitz ever had discussions with us, BAPTL, about claims monitoring? 11:38

MR. BERMAN: I'm going to caution you that, to the extent that Bernstein Litowitz is proposed counsel in this case, are you asking for communications between the Lead Plaintiff and proposed co-counsel 11:38

Pilsworth

in this case, because I'm going to instruct to the extent that you're having to answer the question where you are revealing conversations with counsel, I would instruct you not to answer the question, but if you can answer the question otherwise, please do so. 11:38

I don't know if that's where you were going, but you can ask the question differently. 11:39

MR. YONG: Why don't we get the question reread just so the record is clear.

(Record read) 11:39

MR. BERMAN: I would instruct you not to answer that question. If counsel wants to ask a different question, which I think can accomplish the same answer that you're looking for without asking whether they've had discussions. 11:39

MR. YONG: Are you instructing your witness not to answer?

MR. BERMAN: To the extent your question is asking for discussions that 11:39

Pilsworth

BAPTL may have had with Bernstein Litowitz, yes.

Q. Is there an attorney-client relationship between BAPTL and Bernstein Litowitz? 11:40

A. No.

Q. Okay. So, without revealing any communications between you and Kessler Topaz, has Bernstein Litowitz ever had discussions with 11:40 BAPTL about offering portfolio monitoring services to BAPTL?

MR. BERMAN: Same objection. Counsel, you can ask the question differently where you're not asking about 11:40 discussions he had with proposed co-counsel in this case. I'm sure you can. Otherwise, I'll instruct him not to answer, and he can take my advice or not, and you can take it up later, but you can 11:40 ask the question differently.

MR. YONG: Counsel, are you instructing your witness not to answer?

MR. BERMAN: I'm instructing him not to answer based on the question you're 11:40

Pilsworth

asking. You're asking BAPTL have they had any conversations with proposed co-counsel in this case. Is that what your question is? 11:40

MR. YONG: I mean my question is the question that's currently pending right now on the record.

MR. BERMAN: And all I'm suggesting is that there is another question that you 11:41 could ask that you're not asking him to reveal discussions with counsel. That's all.

MR. YONG: I'm going to ask the question one more time. 11:41

Q. Can you please answer?

MR. BERMAN: Again, I object to the extent that he's asking for you to reveal discussions you've had with proposed co-counsel in this case. 11:41

So I'm instructing you not to answer. You can take my advice or not, but you can answer if you choose to.

A. I'm going to take my counsel's advice. 11:41

Pilsworth

Q. Okay. So, just to confirm, you are unable to answer whether you had discussions with Bernstein Litowitz about offering portfolio monitoring services to BAPTL without disclosing attorney-client privileged information? 11:41

MR. BERMAN: Objection. I wouldn't say he's unable but. Can we go off the record? Would that help?

MR. YONG: No. Let's stay on the record. 11:42

MR. BERMAN: Alright.

Q. Is BAPTL approached by law firms concerning portfolio monitoring services?

A. Yes, we are. 11:42

Q. Has BAPTL ever been approached by Bernstein Litowitz regarding portfolio monitoring services for BAPTL?

MR. BERMAN: Objection to form.

You can answer. 11:42

A. No.

Q. Have you ever approached Bernstein Litowitz about the possibility of Bernstein Litowitz offering portfolio monitoring services to BAPTL? 11:43

Pilsworth

MR. BERMAN: Objection to form.
You can answer.
A. No.
Q. When was the first time that you became aware of the Bernstein Litowitz law firm? 11:43
MR. BERMAN: Objection to form.
You can answer.
A. In connection with this litigation.
Q. Have you had any discussions with Bernstein Litowitz about any other potential litigations other than this current lawsuit? 11:43
MR. BERMAN: Objection. Again, same objection. I'm going to instruct you to the extent he's asking questions about revealing discussions you had with proposed co-counsel in this case, I'm going to instruct you not to answer. There are other questions you can ask if you're looking for information, but that's -- 11:44 11:44
MR. YONG: Counsel, are you instructing your client not to answer?
MR. BERMAN: I am, if you're going to ask the question about discussions he's 11:44

Pilsworth

having with proposed co-counsel in the case, yes, I am.

Q. Are you going to follow your counsel's instruction? 11:44

A. I am.

Q. Do you know whether Additional Plaintiff Key West is represented by any law firm other than Bernstein Litowitz in this litigation?

A. Not as far as I'm aware. 11:44

Q. Can you explain Black Rock's role in making investment decisions on behalf of BAPTL?

A. I would say Black Rock had complete discretion to select the assets that were purchased. 11:45

Q. And what do you mean by complete discretion?

A. So BAPTL is not involved in the decision-making process around investments.

Q. And I guess, during the alleged class period at issue in this case, were all investment decisions regarding public equities I guess fully delegated to BAPTL's outside manager? 11:45

MR. BERMAN: Objection to form.

A. During the class period, obviously it 11:45

Pilsworth

spans the period when there was an in-house manager and then Black Rock, so at all times the trustee had no involvement in selecting assets to purchase, no involvement in the investment decision-making process throughout the class period. 11:46

Q. Okay, and again just so the record is clear, what is the period in which there was an in-house manager? 11:46

A. So that covers the period from the start of the class period up to the 31st of May 2021, and then Black Rock took over the mandate from the 1st of June 2021.

Q. And that entity was -- 11:46

A. British Airways Pension Investment Management Limited.

Q. Do you have an understanding -- and that is abbreviated as BAPIML?

A. BAPIML. 11:47

Q. Okay. Do you have an understanding of why the in-house BAPIML investment manager was replaced with Black Rock?

A. I do.

Q. Okay, and what's that understanding? 11:47

Pilsworth

A. So there was a process to determine whether basically the costs and efficiency of having an in-house manager was still the appropriate model for this sort of investment management of NAPS' assets. New Airways Pension Scheme's assets. And so it was a tender process to determine whether there was a better model and whether there was cheaper costs effectively for them. 11:47 11:47

Q. Okay, and what was the outcome of that process?

A. The appointment of Black Rock in April 2021, and then it took over the mandate on the 1st of June 2021. 11:48

Q. You mentioned cheaper costs. Can you expand on that a little bit.

A. So there was a specific issue -- it's quite complicated. Just a forewarning. There was a specific issue that in the U.K. broker 11:48 research got split out from being something that we provided free of charge to an investment manager. So the costs for someone like Black Rock, they're investing for multiple clients, and so, if they're having to pay for that broker 11:48

Pilsworth

research as a separate cost, they can spread that over multiple, multiple clients. They manage trillions. Right?

Q. When you say trillions, what are you referring to? 11:49

A. Black Rock manages literally I think it's in the trillions of dollars of assets. So they're able to spread that cost of getting that broker research over that base, whereas BAPIML 11:49 was having to spread that over the cost of just the assets of APS and NAPS, sorry, Airways Pension Scheme and New Airways Pension Scheme, and so that was something that had become a big drag on the efficiency of the operation. 11:49

Q. Okay, and you mentioned I think that Black Rock has multiple clients. Do you know who the other clients of Black Rock are for investment management?

MR. BERMAN: I'm sorry. I'm going to 11:49 object to scope. You're asking him to identify Black Rock's clients?

MR. YONG: Well, I'm just saying he has mentioned multiple clients.

Q. Okay. So what is your understanding 11:50

Pilsworth

for your statement that Black Rock has multiple clients? I know it may be funny, but I just want your answer.

MR. BERMAN: I'll object to the form. 11:50
It's beyond the scope.
But you can answer, if you know.

A. I do not expect that there's a single client that has over a trillion dollars of assets, and therefore my expectation is that 11:50 Black Rock has more than one client. I mean actually technically they have two clients, because they have APS and NAPS. So I know they have multiple clients.

Q. You mentioned broker research and 11:50 spreading that cost across I guess multiple bases. What is broker research?

A. So it's research that a broker would provide on a particular stock to say this is something that they might give a recommendation 11:50 to say buy or sell.

Q. Okay.

A. For example.

Q. From the beginning of the class period through when I guess Black Rock was 11:51

Pilsworth

retained by BAPTL, who did the broker research at BAPTL?

MR. BERMAN: Objection to form.

A. No one did the broker research in BAPTL. 11:51

Q. Who did the broker research on behalf of BAPTL?

A. So BAPIML had in the same way as Black Rock has. They had complete discretion to invest the assets. So BAPIML would receive the broker research and determine what to buy and sell. 11:51

Q. Okay, and what is I guess the organizational relationship between BAPIML on the one hand and BAPTL on the other hand? 11:51

MR. BERMAN: Objection to form.

A. So BAPIML was the in-house investment manager, so effectively acting the same as Black Rock operating under an IMA. Even though it was an in-house organization, there was a formal investment management agreement between BAPIML and Airways Pension Scheme and New Airways Pension Scheme. 11:52

Q. And you mentioned there were roughly 11:52

Pilsworth

40 individuals associated with BAPIML?
A. Right.
Q. And they are no longer I guess with BAPIML? 11:52
A. That's right. Yep.
Q. What entity employed those 40 individuals?
A. What entity did employ them?
Q. Yes. 11:52
A. BAPIML.
Q. BAPIML, and is BAPIML a subsidiary of BAPTL?
MR. BERMAN: Objection to form.
A. It is and was. Yep. 11:52
Q. So BAPIML still exists as a legal entity?
A. Yes.
Q. And what functions does BAPIML currently have? 11:53
A. It does not undertake any. It was deregulated, so it's no longer FCA-regulated. It basically is just a dormant company at the moment.
Q. And when was it deregulated? 11:53

Pilsworth

A. In August 2021 from memory.

Q. And when was I guess let's call it the reduction in force of the 40 individuals at BAPIML completed? 11:53

A. So it was, in the U.K. when you transfer services from one company to another, there's some legal provisions which basically automatically transfer the employment from that outgoing service provider to the incoming service provider. 11:53 So on the 1st of June, 2021 everyone who worked for BAPIML automatically transferred from being employed by BAPIML to being employed by Black Rock.

Q. And how many individuals were responsible for broker research at BAPIML? 11:54

A. I would be guessing. I don't know.

Q. Is it more than five?

MR. BERMAN: Objection.

Again, without guessing, if you can answer his question. 11:54

A. I don't know.

Q. Was it all 40?

A. No.

Q. Would you say it was roughly half? 11:54

Pilsworth

MR. BERMAN: Same objection.
A. I would be guessing.
Q. Okay, but it wasn't all 40? 11:54
A. No.
Q. So it was less than 40?
A. Exactly.
Q. Do you have an understanding of how many individuals at Black Rock do broker research? 11:54
MR. BERMAN: Objection to form. Related to all of their clients or just BAPTL? I just want to clarify what we're talking about.
Q. Are there designated employees of Black Rock that only work for BAPTL? 11:54
MR. BERMAN: Objection. Beyond the scope.
If you know.
A. There are not in the context of equities. 11:55
Q. What about in other contexts?
A. I referred to the outsourced chief investment officer Esther. She works exclusively for Airways Pension Scheme and New Airways 11:55

Pilsworth

Pension Scheme.

Q. Do you have an understanding of what Ms. Perkins' salary is roughly?

MR. BERMAN: Objection. Beyond the scope. 11:55

If you know.

A. I don't know.

Q. Ms. Perkins is the name of the outsourced chief investment officer that you're referring to, correct? 11:55

A. Yes.

Q. Do you have an understanding of how many individuals at Black Rock are responsible for broker research with respect to public equities? 11:56

MR. BERMAN: Objection to form. Beyond the scope.

You can answer if you know.

A. I don't know. 11:56

Q. Do you know if it's more or less than the number of individuals responsible for broker research at BAPIML?

MR. BERMAN: Same objection.

A. I would be guessing. 11:56

Pilsworth
Q. To what extent did Black Rock's capabilities in broker research influence BAPTL's decision to retain Black Rock?
MR. BERMAN: Objection to form. 11:56
A. It wasn't a significant -- the issue is the costs on BAPIML's end --side of the fence. The issue was broker research costs on BAPIML's side of the fence.
So that was a hard cost that inflated 11:57 the cost of running the operation. So it wasn't relevant in the sense that we knew that other investment managers who were part of the tender process had the same profile as Black Rock in the sense that they had multiple clients, and so they 11:57 could spread that cost. So it just wasn't a relevant factor. Do you understand?
Q. Did BAPTL do any diligence into Black Rock's broker research capabilities in that tender process? 11:57
MR. BERMAN: Objection to form.
A. I don't know.
Q. Did you ever ask whether anyone at BAPTL conducted any diligence into Black Rock's capabilities in broker research as part of the 11:58

Pilsworth
tender process?
MR. BERMAN: Objection to form.
A. Did I ever ask?
Q. Um-hum. 11:58
A. No.
Q. Why not?
A. It wasn't something that, as I said, it wasn't a relevant part of the mix of factors that came into any decision-making. 11:58
Q. Right, and I'm just going to remind you, right, that you are sitting here testifying on behalf of BAPTL, the entity, and not Richard Pilsworth. Does that change your response?
MR. BERMAN: Do you want to have the question read back? 11:58
THE WITNESS: Yeah. Thank you.
MR. YONG: Go ahead.
(Record read)
A. So you said did you ever ask if anyone at BAPTL -- 11:59
Q. I can rephrase. Did BAPTL ever make any inquiry?
A. I would be guessing.
Q. What is the total amount of assets 11:59

Pilsworth

that is managed by Black Rock on behalf of BAPTL?
A. It is around 15 billion pounds.
Q. And approximately how much of that is in USD? 11:59
MR. BERMAN: Objection.
If you know.
A. I don't know.
Q. Okay. How many other entities did BAPTL consider as part of the tender process? 12:00
MR. BERMAN: Objection to form.
You can answer.
A. It was a very wide-ranging process. My recollection is that we actually approached almost the entire asset management market, and 12:00 you may actually think -- be skeptical about that, but it's true. So I think it was somewhere in the region of 500.
Q. And 500 what?
A. Asset managers. 12:00
Q. Okay.
A. We sent out the initial tender document to.
Q. Can you recall any specific asset managers? Obviously I'm not going to ask you to 12:00

Pilsworth

repeat all 500, but just so we can have some examples of what those entities are.

MR. BERMAN: Objection.

You can answer if you can. 12:00

A. I mean I guess maybe a more helpful way of saying it would be asset managers for large pension schemes were ultimately the kind of asset managers who were in the mix at the end of the process. 12:01

So, for example, someone like legal and in general investment management, for example.

Q. Do you have any other examples that come to mind? 12:01

A. Not that spring to mind, no.

Q. During the tender process, were there any discussions between Black Rock and BAPTL about individual public equities that would be invested in on behalf of BAPTL? 12:01

MR. BERMAN: Objection to form.

A. No, and I say that on the basis that the discussions with Black Rock were all at a strategic level effectively, so you're talking about what are your skills in public equities, 12:02

Pilsworth

what are your skills in sort of your expertise in bond trading. It was that kind of level of discussion, not what did you buy last week.

Q. And what is your understanding of Black Rock's skills in public equities? 12:02

A. Difficult to know whether I'm qualified as a lawyer to answer that question.

Q. Well, you're sitting here as the designated representative of BAPTL, so you're not a lawyer. 12:02

MR. BERMAN: Objection to the comment. He is a lawyer.

Q. I mean you're sitting here in your capacity as the 30(b)(6) representative of BAPTL. 12:02 So --

A. My understanding --

MR. BERMAN: I object to the form of the question.

Q. Okay. Let's make sure so the record 12:03 is clear. What is BAPTL's understanding of Black Rock's skills in public equities?

MR. BERMAN: Objection to form.

A. Our understanding is that they are a highly skilled firm. Otherwise, we wouldn't have 12:03

Pilsworth

used them.

Q. What is your -- strike that. What is BAPTL's understanding of Black Rock's expertise in public equities? 12:03

MR. BERMAN: Objection.

You can answer.

A. What is BAPTL's?

Q. Understanding.

MR. YONG: Can I have the question reread. 12:03

(Record read)

A. Effectively, it's the same answer, because again we wouldn't have hired them if we thought that they didn't have the appropriate level of skill to invest the mandate. That would be a negligent decision as a fiduciary that's acting on behalf of pension scheme members. 12:04

Q. Okay, and what do you think about -- strike that. What is BAPTL's understanding about Black Rock's capabilities to conduct research into the public equities in which it invests on behalf of BAPTL? 12:04

MR. BERMAN: Objection to form.

A. I think, strictly speaking, your 12:04

Pilsworth

question is about the broker research. Broker research often comes from the brokers, not from Black Rock itself. Do you understand the distinction? 12:05

Q. No. Can you explain that a little more.

A. So there would be brokers who were trying to sell or buy particular stocks. They're the ones who's recommending it. Black Rock as 12:05 the asset manager is the one that's making the decision to purchase so they may also undertake some internal broker research. I don't know.

MR. BERMAN: I don't want you to guess. 12:05

A. I don't want to guess.

Q. Do you know what entities conduct broker research with Black Rock?

MR. BERMAN: Objection. This is beyond the scope. I've given you a lot of 12:05 latitude here. If you want to bring a Black Rock designee, you can probably do that, but you're asking questions about Black Rock's internal structures and stuff and what's their resources. You know he's 12:06

Pilsworth

not in a position to do that, so this is beyond the scope.

So you can answer to the extent you know. 12:06

A. I don't.

Q. Has BAPTL ever taken a short position in any securities?

A. Not to my knowledge.

Q. And what is the basis for that knowledge? 12:06

A. Having spoken to a colleague of mine.

Q. Who is that colleague?

A. Helen Gregory. She is the director, sorry, head of investment operations at British Airways Pensions. 12:06

Q. Has BAPTL ever had any conversations with Black Rock concerning any short positions in any securities?

MR. BERMAN: Objection to form. 12:06

A. I don't know.

Q. Have you ever asked Black Rock whether any of the positions that Black Rock has taken on behalf of BAPTL are in a short position?

MR. BERMAN: Objection, beyond the 12:07

Pilsworth

scope.

You can answer.

A. And this is you said have you?

Q. As BAPTL. 12:07

A. And that's as BAPTL.

MR. BERMAN: You're asking generally, not specifically to Natera, correct?

MR. YONG: Correct.

A. I don't know. 12:07

Q. So you don't know either way whether there are short positions or there are not?

A. I know the answer in respect to Natera, but that wasn't the question you asked.

Q. No, and what was the answer with respect to Natera so we have it one more time? 12:07

A. So we did not hold any short positions. We did not hedge Natera common stock that we held at any time, and that is something that was confirmed to me by Helen Gregory. 12:08

Q. When did you have this discussion with Ms. Gregory?

A. In preparation for this deposition.

Q. How long was your conversation with Ms. Gregory? 12:08

Pilsworth

A. Probably around about 20 minutes.
Q. What else was discussed other than whether there was a short position in Natera securities? 12:08
A. So that was a specific question that I saw here, so that was why I specifically asked that question, and I also asked some questions around just the general investment process that we have with Black Rock and the relationship that 12:08 we have with Black Rock.
Q. Do you know whether Ms. Gregory was ever asked to be the designated 30(b)(6) designee for this deposition?
MR. BERMAN: Objection to form. 12:09
A. She wasn't.
Q. Okay. Let's move on to the next exhibit.
MR. BERMAN: Do you want to take a break soon? 12:09
MR. YONG: Yeah. I guess it's over an hour. Okay. This is a good natural breaking point.
THE VIDEOGRAPHER: We are now going off the record. The time is 12:09 p.m. 12:09

Pilsworth

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 12:35 p.m. This is the beginning of media label 4. 12:35

BY MR. YONG:

Q. Welcome back, Mr. Pilsworth. We are coming back from another approximately 20-minute break?

A. That's correct. 12:35

MR. YONG: I'm going to introduce the next exhibit, which I believe is going to be BAPTL Exhibit 4.

(BAPTL Exhibit 4, Document Bates stamped BAPTL 000315 and 000316, was so 12:35 marked for identification, as of this date.)

Q. Mr. Pilsworth, you were just handed a document that has been marked as BAPTL Exhibit 4, a two-page document. I will represent to you 12:36 that Exhibit 4 was produced by your counsel in this litigation with Bates stamp BAPTL 000315 through BAPTL 000316. Do you recognize BAPTL Exhibit 4?

A. I do. 12:36

Pilsworth

Q. Can you describe what BAPTL Exhibit 4 is?

A. It says a formal confirmation from State Street as the custodian bank for New Airways Pension Scheme confirming all the trades that happened in Natera's common stock, and it's in the period 1st of June 2021 to 30th of June 2022. 12:36

Q. Do you believe that the information contained in BAPTL Exhibit 4 is true and correct? 12:37

A. I do.

Q. BAPTL Exhibit 4 is dated June 13, 2024. Is that correct?

A. That's right. 12:37

Q. I would like you to turn to the second page of BAPTL Exhibit 4 which has been Bates stamped as BAPTL 000316.

A. Yep.

Q. Can you confirm that all of BAPTL's transactions in Natera securities are accurately listed on this page? 12:37

MR. BERMAN: Objection to form.

A. So far as I'm aware. State Street know their stuff, right? 12:37

Pilsworth

Q. So you have no reason to believe that any of the information in BAPTL Exhibit 4 is incorrect?
A. Absolutely. 12:37
Q. Did BAPTL make any transactions in Natera securities before the start of the alleged class period?
MR. BERMAN: Objection.
You can answer. 12:38
A. Not as far as I'm aware. I'll say no.
Q. We're all lawyers, right?
A. Yes.
Q. Did BAPTL make any transactions in 12:38 Natera securities after the alleged class period ended?
MR. BERMAN: Objection to form.
A. Yes. Some sales effectively.
Q. Okay, and on what date was those 12:38 sales?
A. So I think strictly speaking, one of these actually does come at the end of the class period, and there's one that has, yeah, sorry, I'm just trying to get my head around the 12:39

Pilsworth

American form of the dates. So that is the 6th of April, the very last one, and that's a sale. So that is after the end of the class period, right? Strictly speaking. Anyway, there were more after that. 12:39

Q. And what is the basis for your understanding that there were more sales after the 6th of April 2022?

A. This is -- we checked our internal records for the sales. 12:39

Q. And was a record of those sales produced as part of this litigation?

A. No, because it wasn't part of the class period. 12:39

Q. You just testified that the sale, just so that we're talking about the same thing, on the last row --

A. Yeah.

Q. -- was after the end of the class period. Do you have an understanding for why the sale on the last row of this chart that has a contractual settlement date of April 6, 2022 is included in BAPTL Exhibit 4? 12:40

A. I think it was just an error on the 12:40

Pilsworth

part of State Street. They just did a slightly wider period.

Q. When did you first notice that there was an error? 12:40

MR. BERMAN: Objection to form. In fairness, the first page identifies the period in which they're producing it. Your question is in error. I'm not sure that's correct since that's what they 12:40 intended to provide.

Q. Okay. Good. When did you first notice that there was a sale that postdated the end of the class period included in BAPTL Exhibit 4? 12:41

A. To be honest, pretty much now.

Q. What do you mean pretty much? Are you talking about --

A. I was just looking at the document. I was thinking, hey, wait a minute. 12:41

Q. Did you review BAPTL Exhibit 4 to prepare for today's 30(b)(6) deposition?

A. Yes. There's a couple of different -- there's an internal record we have of all of the transactions. This is the formal 12:41

Pilsworth

State Street record of all the transactions, and so, yeah, I had looked at it. Sometimes you overlook things.

Q. When did BAPTL first purchase shares in Natera securities? 12:41

A. So it is the 10th of June 2021.

Q. And you are looking at the first column with the heading Contractual Settlement Date? 12:42

A. That's correct. Yes.

Q. Do you know what the difference between the first column which has the heading Contractual Settlement Date versus the column that is second to the right called Trade Date? 12:42

A. Trade Date, so the trade date would be the date when the trade was initiated, but the contractual settlement is the point at which BAPTL acquires the shares is my understanding.

Q. Okay, and if you see sort of in the middle of the chart there's a heading called Local Unit Price. Do you know what that means? 12:42

A. That would be the stock price.

Q. And is that the stock price as of the trade date? 12:42

Pilsworth

A. I would be guessing.

MR. BERMAN: Don't guess.

A. I don't want to guess.

Q. Okay. What is "NAPS Equities Transition" as it is used in BAPTL Exhibit 4? 12:43

A. So that's the name of a custody account that State Street held specifically for the purposes of the transition when Black Rock took over the mandate, the investment management mandate. 12:43

Q. Okay.

A. On the 1st of June 2021.

Q. Okay. Are you aware of a term called Project Richmond? 12:43

A. Yes.

Q. What is Project Richmond?

A. So Project Richmond was the process, having done the tender process, which we talked about earlier, to determine that we wanted to partner with, sort of go exclusive with Black Rock. We then did the negotiation process for the IMA and all of that kind of how the transition would work over to Black Rock, and so that process was called Project Richmond. 12:43 12:44

Pilsworth

Q. Okay. Just so the record is clear, when you say IMA, what does that stand for?

A. Investment management agreement.

Q. When was Project Richmond completed? 12:44

A. If you're talking about when did we sign the document, that was I think it was the 15th of April 2021. When did we sign the IMAs, when we're talking about when did they complete, I suppose it carried on to cover the period of 12:44 the transition.

Q. And what is your understanding for why Natera securities are included as part of Project Richmond?

A. Because the previous asset manager 12:44 BAPIML held a lot of equities, and then when that was being transferred over to Black Rock managing the equities, Black Rock would take a view of well, some of these we like and we'll keep. Some of them, you know, we don't think they're the 12:45 right things to hold. So that was the transition part of the process.

Q. So did BAPIML hold Natera securities on behalf of BAPTL prior to the transition?

A. No. BAPTL held -- sorry. Can you 12:45

Pilsworth

repeat the question.

Q. Did BAPIML hold Natera securities on behalf of BAPTL prior to the transition?

A. Just to be clear, BAPIML never held any assets. It was always BAPTL. 12:45

Q. Okay. So did BAPTL hold Natera securities prior to the transition?

A. No.

Q. You previously testified that Black Rock took a view of some of the equities and decided which ones to keep? 12:46

A. Yep.

Q. Can you explain that process?

A. Not personally, no, because it was a Black Rock investment decision, not anything that anyone at BAPTL could speak to. 12:46

Q. You previously testified that Black Rock would take a view of some of these we like and we will keep. Who is the "we" that you're referring to? 12:46

A. BAPTL in that instance, but the point is that Black Rock has the delegated authority to make that decision on behalf of BAPTL.

Q. And, when you refer to "we liked," 12:47

Pilsworth

who is the "we"?

A. So that would be Black Rock's view as investment manager.

Q. And what is your understanding for the reasons for why BAPTL as investment manager liked Natera securities? 12:47

A. Black Rock as investment manager.

MR. BERMAN: Yeah. Objection to form. Black Rock is the investment manager. 12:47

Q. I may have misspoken. Did you have any discussions with Black Rock in connection with Project Richmond about Natera securities?

MR. BERMAN: Objection to form. 12:47

A. I believe there's some e-mails which have been disclosed which have Project Richmond at the top of them and refer to Black Rock stock, but my understanding, again from speaking to Helen Gregory, was that there weren't discussions about that. 12:48

That was an e-mail chain just explaining the fact that they had historically as in, you know, already done this, they bought Natera securities. This wasn't an e-mail saying 12:48

Pilsworth

please can we. It was an e-mail saying we have done. Do you see the distinction?

Q. And you're referring to I think what you described as the three e-mail chains that were produced in the context of this litigation in discovery? 12:48

A. Yes.

Q. If I told you that I guess the parent e-mail date of those three chains was June 9, 2021, June 10, 2021 and June 11, 2021, does that sound right? 12:48

A. That sounds right.

Q. Let's look back at BAPTL Exhibit 4, the second page, the chart. I would like to direct your attention to the row I guess the first row that has a trade date of June 28, 2021. Do you see that? 12:49

A. Yes.

Q. And on that row with the trade date of June 28, 2021, NAPS Equities Transition, it shows that there was a sale. Is that correct? 12:49

A. It shows as a sale. Yes.

Q. And how many shares of Natera stock were sold? 12:50

Pilsworth

A. 216,903.

Q. That is 216,903 shares of Natera stock?

A. That's right. 12:50

Q. Then, if you go down one row, there's another transaction with a trade date of June 28, 2021. Do you see that?

A. Yes.

Q. And is that a buy? 12:50

A. That's correct.

Q. And what is the amount of shares that were bought?

A. It says 216,903, so the same amount as in the row above. 12:50

Q. Okay, and the fund name that is associated with that buy is NAPS Global Horizon?

A. That's correct.

Q. And what is NAPS Global Horizon?

A. So that was a different custody account at State Street. So, strictly speaking, they show it as a buy and a sell, but it's what they refer to as an in and out. So it's just really transferring between two accounts. 12:50

Q. Okay, and the share price for both 12:51

Pilsworth

transactions on June 28, 2021 was $115.08. Do you see that?

A. Yes.

Q. Okay. When was BAPTL's first purchase of Natera stock? 12:51

A. The trade date was the 8th of June 2021.

Q. And was that after BAPTL retained Black Rock as its asset manager? 12:52

A. Correct.

Q. Approximately how long after?

A. Seven days.

Q. Okay, and can you identify all the dates on which BAPTL made purchases of Natera stock? 12:52

MR. BERMAN: Objection.

A. Trade date, so, again, just getting my head around the U.S. configuration, the 8th of June, 2021, 9th of June, 2021, 10th of June 2021, 12:52 11th of June, 2021, 14th of June, 2021. As I said, I'm going to pass over the 28th of June trade dates, because that's an in and out. It's not actually a buy/sell, as I discussed a moment ago. Then the 16th of December 2021, 8th of 12:53

Pilsworth

February 2022, 9th of February 2022.

Q. Do you have an understanding of why the purchases were made on these particular dates? 12:53

A. No.

MR. BERMAN: Objection to form.

A. And that's, I can say that as BAPTL.

Q. Okay, and let's, just to be clear, all of your responses since we've come back from 12:53 break have been on behalf of BAPTL, correct?

MR. BERMAN: We can assume so, but I don't remember all the questions.

A. Yeah. I can't remember all the questions. 12:53

Q. Okay. I just want to make sure. I'm just trying to, just for housekeeping purposes, to make sure that the record is clear. That has been your understanding that you've been answering on behalf of BAPTL? 12:54

MR. BERMAN: Objection.

You can answer.

A. I think that's correct.

Q. Okay. Did BAPTL review any Natera SEC filings in connection with any of its 12:54

Pilsworth

purchases of Natera stock as set forth in BAPTL Exhibit 4?

A. No.

Q. Do you know if Black Rock reviewed any Natera SEC filings in connection with the purchases of Natera stock as set forth in BAPTL Exhibit 4? 12:54

MR. BERMAN: Objection to form.

A. We don't know as BAPTL. 12:54

Q. Okay. Did BAPTL ever ask Black Rock whether it reviewed any Natera SEC filings in connection with the purchases of Natera stock as set forth in BAPTL Exhibit 4?

A. We did not. 12:55

Q. Is there a reason for why not?

MR. BERMAN: Objection to form.

A. Because Black Rock's role is to discharge its obligations under the IMA, so they invest the assets as they see fit, and that's 12:55 what they did.

Q. Did BAPTL review any Natera press releases in connection with any of its purchases of Natera stock as set forth in BAPTL Exhibit 4?

A. No. 12:55

Pilsworth

Q. Do you know if Black Rock reviewed any Natera press releases in connection with the purchases of Natera stock?

MR. BERMAN: Objection to form. 12:55

A. No.

Q. Did you ever ask Black Rock that question?

A. No.

Q. Same question. Strike that. Did BAPTL review any Natera earnings call transcripts in connection with any of its purchases of Natera stock as set forth in BAPTL Exhibit 4? 12:55

A. No.

Q. Do you know if Black Rock reviewed any Natera earnings call transcripts in connection with the purchases of Natera stock? 12:56

MR. BERMAN: Objection to form.

A. We do not know.

Q. Did you ever ask Black Rock that question? 12:56

A. No.

Q. Did BAPTL review any third-party analyst reports concerning Natera in connection with any of its purchases of Natera stock as set 12:56

Pilsworth

forth in BAPTL Exhibit 4?

A. No.

Q. Do you know if Black Rock reviewed any analyst reports in connection with the purchases of Natera stock as set forth in BAPTL Exhibit 4? 12:56

MR. BERMAN: Objection to form.

A. No.

Q. Did you ever ask Black Rock that question? 12:56

A. No.

Q. Let's take a step back. As BAPTL, are you generally familiar with what analyst reports are? 12:57

MR. BERMAN: Objection to form.

A. Broadly speaking, yes.

Q. And is it BAPTL's understanding that analyst reports are available publicly?

MR. BERMAN: Objection to form. 12:57

A. Again, broadly speaking, yes.

Q. What is your understanding of why analysts publish analyst reports?

MR. BERMAN: Objection to form.

A. To give their view on whether they 12:57

Pilsworth

recommend the sale or purchase of a stock.
Q. And what is -- do you have an understanding about how analysts come to those recommendations? 12:57
MR. BERMAN: Objection to form.
A. We don't.
Q. Do you know if analysts conduct research into the company in connection with making their recommendations? 12:58
MR. BERMAN: Objection to form.
A. I would be guessing.
MR. BERMAN: Only if you know.
A. I would say yes, but yeah.
Q. Okay. Do you generally find that 12:58 securities analysts' research to be reputable?
MR. BERMAN: Objection to form.
A. I don't know.
Q. Are you familiar with an analyst called Piper Sandler? 12:58
A. No.
Q. Did BAPTL review any short seller reports concerning Natera in connection with any of its purchases of Natera stock at set forth in BAPTL Exhibit 4? 12:59

Pilsworth

A. No.

Q. Do you know if Black Rock reviewed any short seller reports in connection with the purchases of Natera stock? 12:59

MR. BERMAN: Objection to form.

A. No.

Q. Did you ever ask?

A. No.

Q. Did BAPTL review any other reports concerning Natera prior to purchasing Natera stock as set forth in BAPTL Exhibit 4? 12:59

MR. BERMAN: Objection to form.

A. No.

Q. Do you know if Black Rock reviewed any other reports in connection with purchasing Natera stock? 12:59

MR. BERMAN: Objection to form.

A. No.

Q. Did you ever ask that question? 12:59

A. No.

Q. Are you aware of an entity named The Capitol Forum?

A. I am aware of it, yeah, from some of the paperwork, and in, yeah, some of the court 12:59

Pilsworth

documents. Yes.

Q. When did you first become aware of the entity called Capitol Forum?

A. I can't remember whether it was in the original complaint or the amended complaint, but one of those two. 01:00

Q. Okay. What was the date of the amended complaint?

A. That was October 2022. 01:00

Q. And then what was the date of the original complaint?

A. So actually the original complaint is the Harvey Schneider complaint. Is that the one you're talking about? 01:00

Q. Sure. How about for the Harvey Schneider complaint?

A. I believe that's --

MR. BERMAN: Only if you know. I don't want you guessing. 01:00

A. April 2022. I don't know the exact date.

Q. When did you first review the Harvey Schneider complaint?

MR. BERMAN: Objection to form. 01:00

Pilsworth

A. June 2022.

Q. How did you obtain the Harvey Schneider complaint?

A. From Kessler Topaz. 01:01

Q. Prior to being provided the Harvey Schneider complaint by Kessler Topaz, were you aware that there was a securities class action filed against Natera and the other Defendants? 01:01

A. Prior to receiving it from Kessler Topaz, no. That's the first time.

Q. Do you know whether The Capitol Forum is referenced in the Hindenburg report?

MR. BERMAN: Objection to form. 01:01

A. I don't know.

Q. Has BAPTL ever read any articles released by The Capitol Forum report regarding Natera?

A. No. 01:02

Q. What steps did BAPTL take to investigate whether it had read any articles released by The Capitol Forum regarding Natera?

MR. BERMAN: Objection to form.

A. This is my knowledge. I would be the 01:02

Pilsworth

only person that would have read the reports in the sense that they would have been provided to me by Kessler Topaz. Do you understand? We're talking about the period after the end of the class period. 01:02

Q. Sure. For the period after the end of the class period. What is your basis for your statement that you Richard Pilsworth would be the only person that would have read the reports? 01:03

MR. BERMAN: Objection. Asked and answered.

You can answer again.

A. Because I was working with KTMC on this. 01:03

Q. Did you ever ask your attorneys at Kessler Topaz to read The Capitol Forum reports concerning Natera?

MR. BERMAN: Objection. Are you asking him about his conversations with his lawyers? 01:03

MR. YONG: Without disclosing the content of any of your communications with your attorneys. 01:03

Pilsworth

MR. BERMAN: Objection to form.

A. I'm aware that my lawyers are doing the investigations into this. I would expect them to have read it, so I don't need to ask the question. 01:03

Q. Other than your lawyers at Kessler Topaz, has BAPTL had any other discussions with anyone about any Capitol Forum articles concerning Natera? 01:04

MR. BERMAN: Objection to form.

A. Not so far as I'm aware.

Q. Did you take any steps to confirm whether there were any discussions with anyone other than the attorneys at Kessler Topaz about 01:04 any Capitol Forum reports concerning Natera?

MR. BERMAN: Objection. Asked and answered.

You can answer again.

A. There was the discovery process to 01:05 which I considered it to have been a robust process, so whether that might have raised it, other than that, it is what is in my knowledge.

Q. Is BAPTL still currently holding any shares of Natera stock? 01:05

Pilsworth

A. No.

Q. What is your basis for your understanding that BAPTL is not holding any shares of Natera stock currently? 01:06

A. In preparation for today, again, going back to the conversation I referenced earlier with Helen Gregory, it's one of the things we checked. She has access to the internal trade data that we hold. 01:06

Q. When was BAPTL's last sale of Natera stock?

MR. BERMAN: Objection.

If you know.

A. I believe in the conversation it was 01:07 May 2022. During May 2022.

Q. Are you aware that the amended complaint includes allegations based on a July 2021 secondary public offering of Natera securities? 01:07

A. Yes.

Q. In fact, I think you referenced the July 2021 SPO earlier. Is that what you were referring to?

A. Yes. 01:07

Pilsworth

Q. Generally, does BAPTL have an understanding of what a secondary public offering is?

MR. BERMAN: Objection to form. 01:07

You can answer.

A. Yes, generally.

Q. What is BAPTL's understanding?

A. So it's a situation where the company wants to raise some money from the market and 01:08 issues a prospectus to give investors a fair view, it should be a fair view of the company, and then on the basis of that prospectus individuals or investors would purchase the stock. 01:08

Q. Did BAPTL purchase Natera securities in the July 2021 secondary public offering?

A. On the basis of this document, I don't believe so. Sorry. I'm referring to BAPTL 4. 01:08

Q. Thank you. You're helping me out here. If we look at BAPTL Exhibit 4, there were no purchases of Natera securities by BAPTL in July of 2021, correct?

A. Correct. 01:08

Pilsworth

Q. Do you know whether BAPTL was ever -- strike that. Do you know whether BAPTL ever considered purchasing shares in Natera's July 2021 secondary public offering? 01:09

MR. BERMAN: Objection to form.

A. BAPTL never would have considered it because the investment discretion was delegated to Black Rock.

Q. You previously referenced I think offering documents and a prospectus. Do you recall that? 01:09

A. Yep.

Q. Okay. What is your general understanding of the offering documents that are I guess in connection with a secondary public offering? 01:09

MR. BERMAN: Objection to form.

A. I would be speculating.

Q. During the alleged class period, did BAPTL ever review any offering documents from Natera that were filed in connection with the July 2021 secondary public offering? 01:09

A. No.

Q. Do you know if Black Rock ever 01:10

Pilsworth

reviewed any offering documents from Natera that were filed in connection with the 2021 secondary public offering?

MR. BERMAN: Objection to form. 01:10

A. No.

Q. Did you ever ask Black Rock that question?

A. No.

Q. Do you have an understanding as to whether there is a distinction between purchasing shares directly in a public offering versus purchasing shares in the open secondary market? 01:10

MR. BERMAN: Objection to form.

A. I have an understanding from my lawyers effectively. 01:10

Q. Does BAPTL have an understanding -- other than your understanding that is derived from your lawyers, does BAPTL have an understanding of the distinction between purchasing shares directly in a public offering versus purchasing shares in the open secondary market? 01:11

MR. BERMAN: Objection to form.

A. In the specific context of the NASDAQ 01:11

Pilsworth

market, no.

Q. What about outside the specific context of the NASDAQ market?

A. Personally, for example, I'm familiar with offering documents that would make up the U.K. public offering, but I wouldn't hold myself out as knowing anything about what a U.S. public offering involves. 01:11

Q. Do you have an understanding if Black Rock knows anything about what a U.S. public offering involves? 01:11

MR. BERMAN: Objection to form.

A. I don't know.

Q. Are you aware of any members of the alleged class that purchased Natera shares directly in the July 2021 secondary public offering only, but did not purchase shares in the open secondary market? 01:12

MR. BERMAN: Objection to form. 01:12

A. I know Key West purchased them in the secondary public offering. I don't know whether they never bought any other shares.

Q. And what is the basis for that understanding? 01:12

Pilsworth

A. From conversations with my lawyers.

Q. Do you know how many other members of the proposed class would fall in this same category? 01:12

MR. BERMAN: Objection.

A. Can you just confirm which category you mean?

Q. The category of potential class members that purchased shares directly in the 01:13 July 2021 secondary public offering only, but did not purchase shares in the open secondary market.

A. I don't know.

Q. Did you take any steps to find this information out? 01:13

MR. BERMAN: Objection to form.

A. No.

Q. Are you aware of any members of the alleged class that purchased Natera shares directly in the July 2021 secondary public 01:13 offering and also separately purchased shares in the open secondary market?

MR. BERMAN: Objection to form.

A. I don't know.

Q. Do you know how many members of the 01:13

Pilsworth

proposed class would fall into that category?

A. No.

Q. Did you take any steps to find this information out? 01:13

MR. BERMAN: Objection to form.

A. No.

Q. Are you aware of any members of the alleged class that purchased shares only in the secondary market? 01:14

MR. BERMAN: Objection. Asked and answered.

Answer again.

A. BAPTL.

Q. Are you aware of any other members of 01:14 the proposed class other than BAPTL?

A. No.

MR. BERMAN: Let him ask a question.

Q. Let me ask it one more time. You're predicting me. Are you aware of any other 01:14 members of the proposed class other than BAPTL that purchased Natera shares only in the secondary market?

MR. BERMAN: Objection.

A. No. 01:14

Pilsworth

Q. Did you undertake any steps to find this information out?

MR. BERMAN: Objection to form.

A. No. 01:14

Q. You previously testified that BAPTL -- strike that. You previously testified that your understanding is that BAPTL did not hold any Natera securities in a short position. Correct? 01:14

A. Correct.

Q. Does the alleged class in this case include persons who purchased Natera securities in connection with taking a short position?

MR. BERMAN: Objection to form. 01:15

A. I would be speculating.

Q. Why would you be speculating?

A. Because I don't know.

Q. You previously mentioned Hindenburg. Correct? 01:15

A. Yes.

Q. Do you believe that Hindenburg Research is a member of the proposed class?

MR. BERMAN: Objection to form.

A. I don't believe it is. 01:15

Pilsworth

Q. Why not?

A. I'm guessing they were a short seller or they were linked to a short seller, so this is a guess, so forget it. 01:15

MR. BERMAN: Again, I think he's asking questions that you know. If you know, you know.

A. I don't know.

MR. YONG: Okay. Counsel, I would again -- 01:15

MR. BERMAN: You want him to guess?

MR. YONG: I do not want him to guess.

MR. BERMAN: I don't want him to guess either. 01:16

A. I don't know.

Q. Okay.

MR. BERMAN: I just want to keep the record clean, that's all. 01:16

MR. YONG: The same here. I think we've been going for a little north of an hour. So I think we're going to take inventory of hunger levels, et cetera. Do you want to take a quick break or go off 01:16

Pilsworth

the record?

MR. BERMAN: Sure.

THE WITNESS: Can we now go off the record? 01:16

THE VIDEOGRAPHER: We are going off the record. The time is now 1:16 p.m.

(Lunch recess: 1:16 p.m.)

Pilsworth
Afternoon Session
1:57 p.m.

THE VIDEOGRAPHER: We are back on the record. The time is 1:57 p.m. This is the beginning of media label number 5. 01:57

R I C H A R D P I L S W O R T H, having been previously sworn, testified further as follows:

EXAMINATION (Continued)

BY MR. YONG: 01:57

Q. Okay. Welcome back, Mr. Pilsworth. We just had a nice short lunch, and we will finish this thing out. So I'm going to introduce the next exhibit, which I think will be marked as BAPTL Exhibit 5. 01:57

(BAPTL Exhibit 5, Schneider v. Natera Amended Class Action Complaint, was so marked for identification, as of this date.)

Q. Mr. Pilsworth, you were just handed a document that has been marked as BAPTL Exhibit 5. Do you recognize BAPTL Exhibit 5? 01:58

A. I do.

Q. What is BAPTL Exhibit 5?

A. It says Amended Class Action 01:58

Pilsworth

Complaint in the matter.

Q. Okay. I would like you to turn to page 1 of the amended complaint. The actual number 1 which on the top of the page says page 5 of 94 if you look at the stamp. 01:59

A. Yes.

Q. Are you there?

A. Yes.

Q. I turn your attention to the second paragraph on this page. I will spare you the reading this time. So the first sentence on the second paragraph of page 1 of the amended complaint reads, "Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and their own acts and upon information and belief as to all other matters, including the investigation of Plaintiffs' counsel, which included, among other things:(i) a review of Natera's SEC filings; (ii) wire and press releases published by Natera; (iii) interviews of former Natera employees; (iv) analyst reports and advisories and media reports about the Company; (v) judicial filings and opinions concerning Natera; and (vi) other publicly available 01:59 01:59 01:59 02:00

Pilsworth

information."

Do you have any basis to disagree with the statements that I just read?

A. No. 02:00

Q. Okay. As referenced on page 1 of the amended complaint under (i), can you identify which Natera SEC filings that BAPTL reviewed prior to filing the amended complaint on October 7, 2022? 02:00

MR. BERMAN: Objection. Asked and answered.

You can answer again.

A. I previously answered I don't know, and I rely on the investigation of my lawyers. 02:00

Q. Okay. When you say you don't know, is the answer none?

MR. BERMAN: Maybe you could repeat the question so he's focused on the question. 02:01

Q. Okay. Did BAPTL review any Natera SEC filings prior to the filing of the amended complaint on October 7, 2022?

MR. BERMAN: And, to be clear, you are referring to them alone, not them and 02:01

Pilsworth

their agents or lawyers, correct?

MR. YONG: Yes. BAPTL the entity.

A. In that case, no.

Q. Okay. As referenced on page 1 of the amended complaint under (ii), can you identify what wire and press releases published by Natera that BAPTL reviewed prior to the filing of the amended complaint on October 7, 2022? 02:01

MR. BERMAN: Objection. Asked and answered. 02:01

You can answer again.

A. Again, no. I relied on the investigations of my counsel.

Q. Okay. As referenced on page 1 of the amended complaint under (iii), can you identify what interviews of former Natera employees that were conducted prior to the filing of the amended complaint on October 7, 2022? 02:01

MR. BERMAN: Objection to form. 02:02

A. No. I relied on the interviews undertaken by counsel.

Q. Do you know how many former Natera employees were interviewed?

A. No. 02:02

Pilsworth

Q. Do you have an understanding if it was more than one?

A. I don't know.

Q. Did BAPTL review any summaries from any interviews with former Natera employees? 02:02

MR. BERMAN: Objection to form.

A. No. I relied on the investigations of my counsel.

Q. Do you know the names of any of the former Natera employees that were interviewed? 02:02

A. No. I relied on the investigations of my counsel.

Q. As referenced on page 1 of the amended complaint under (iv), can you identify what analyst reports and advisories and media reports about Natera that BAPTL reviewed prior to filing the amended complaint on October 7, 2022? 02:02

MR. BERMAN: Objection. Asked and answered. 02:03

Answer again.

A. No. I relied on investigations of my counsel.

Q. Did BAPTL review any analyst reports 02:03

Pilsworth

and advisories and media reports about Natera prior to the filing of the amended complaint on October 7, 2022?

MR. BERMAN: Objection. Asked and answered. 02:03

A. No. I relied on the investigations of my counsel.

Q. As referenced on page 1 of the amended complaints under (v), can you identify what judicial filings and opinions concerning Natera that BAPTL reviewed prior to the filing of the amended complaint on October 7, 2022? 02:03

MR. BERMAN: Objection to form.

A. No. I relied on the investigations and advice of my counsel. 02:03

Q. As referenced on page 1 of the amended complaint under (vi), can you identify what other publicly available information that BAPTL reviewed prior to filing the amended complaint on October 7, 2022? 02:04

MR. BERMAN: Objection to form.

A. No. I relied on the investigations of my counsel.

Q. Okay. Just to summarize, BAPTL did 02:04

Pilsworth

not review any information falling within the categories listed on (i) through (vi) on page 2 of the amended complaint prior to the filing of the amended complaint? 02:04

MR. BERMAN: Objection to form.

A. That's correct, because I relied on the investigations of my counsel.

Q. Okay. I would like to turn your attention to the first unnumbered paragraph on 02:04 page 1 of the amended complaint. So it is the same page.

A. Okay.

Q. In the middle of the paragraph, do you see there is a definition of class period, 02:04 and it's defined as February 26, 2020 through March 14, 2022 inclusive? Do you see that?

A. I do. Yep.

Q. So you previously testified that you believed the alleged class period ends on 02:05 March 8, 2022, correct?

A. That's correct.

Q. Okay. Can you confirm that BAPTL's position is that the alleged class period ends on March 8, 2022 and not March 14, 2022? 02:05

Pilsworth

MR. BERMAN: Objection to form.

A. I can confirm.

Q. So what is the end of the class period? 02:05

A. 8th of March 2022.

Q. Did BAPTL review the Hindenburg report prior to filing the amended complaint on October 7, 2022?

MR. BERMAN: Objection to form. 02:05

A. No. I relied on the review of my counsel.

Q. You previously referred to the Hindenburg report in your earlier testimony today. Do you recall? 02:05

A. Yes.

Q. When was the first time that BAPTL became aware of the Hindenburg report?

A. I believe it was part of the motion to act as Lead Plaintiff, I believe. 02:06

Q. Approximately what date was that?

A. So that would have been around June 2022.

Q. Who made BAPTL aware of the Hindenburg report? 02:06

Pilsworth

A. Kessler Topaz.
Q. Who specifically at Kessler Topaz made BAPTL aware of the Hindenburg report?
A. It would have been Darren Check. 02:06
Q. Has BAPTL had any interactions with Hindenburg Research?
MR. BERMAN: Objection to form.
A. No.
Q. Has BAPTL tried to have any interactions with Hindenburg Research? 02:06
MR. BERMAN: Objection to form.
A. No.
Q. Was BAPTL aware of Hindenburg Research generally prior to becoming aware of the Hindenburg report? 02:07
MR. BERMAN: Objection to form.
A. No.
Q. Are you aware of anything written in the Hindenburg report that BAPTL believes is inaccurate? 02:07
MR. BERMAN: Objection to form.
A. No. I have relied on the investigations of my counsel.
Q. So you're not aware of anything 02:07

Pilsworth

inaccurate in the Hindenburg report?

MR. BERMAN: Objection.

A. I've relied on the investigations of my counsel. 02:07

Q. Is the answer no?

A. No.

Q. Is it correct that BAPTL is claiming that it does not have any conflicts of interest with other members of the alleged class? 02:07

MR. BERMAN: Objection to form.

A. That's correct.

Q. Can you explain all the steps that BAPTL has taken to confirm that it does not have any conflicts of interest with other members of the alleged class? 02:07

MR. BERMAN: Objection to form.

A. My understanding is that the way that the class works is that we're all investors who by definition have the same interests, because 02:08 we're all taking -- we all had losses in the same circumstances, we are all seeking to maximize recoveries. There is no reason why we would have any conflicts of interest.

Q. Right, but did you take any steps 02:08

Pilsworth

other than the answer you just gave previously to verify that BAPTL does not have any conflicts of interest with other members of the alleged class? 02:08

MR. BERMAN: Objection to form.

A. No.

Q. Does BAPTL know the identities of any of the other members of the alleged class?

A. Apart from Key West, no. 02:08

Q. So BAPTL is aware of only one other member of the alleged class?

A. That's correct.

Q. Key West, they are the Additional Plaintiff, correct? 02:09

A. That's correct.

Q. And who represents Key West?

MR. BERMAN: Objection. Asked and answered.

A. Bernstein Litowitz. 02:09

Q. You previously mentioned the name John Schneider. Do you recall?

A. Yes.

Q. Who is John Schneider?

A. My understanding is that he's an 02:09

Pilsworth

individual who made the initial complaint, which launches the period when Lead Plaintiffs need to come forward to put themselves forward as Lead Plaintiff. 02:09

Q. Have you had any communications with Mr. Schneider?

A. No. I'm answering on behalf of BAPTL.

Q. Do you know who represents Mr. Schneider? 02:10

A. No.

Q. Do you know if Mr. Schneider is represented by Kessler Topaz?

A. No, as I don't know. 02:10

Q. Do you think that there would be a conflict of interest if Mr. Schneider was also represented by Kessler Topaz?

MR. BERMAN: Objection to the form.

A. No. He's an individual who is a class member, so, on that basis, no. 02:10

Q. So is it your understanding that there's no conflict of interest between BAPTL and any other member of the alleged class? Strike that. Strike that. Has BAPTL had any 02:11

Pilsworth

communications with any members of the alleged class?

A. So, as I've said, answered earlier, we haven't directly communicated with Key West. No is the answer to your question. We have communicated indirectly through lawyers. 02:11

Q. When you say communicated indirectly, do you mean that your lawyers at Kessler Topaz have communicated with Key West lawyers? 02:11

A. That's my understanding. Yes.

Q. Do you have an understanding if your lawyers at Kessler Topaz have communicated directly with Key West?

A. I would imagine that they would approach their counsel before they approach the client directly. 02:12

Q. But did you ever ask that question?

A. No.

Q. I'm going to ask some questions now about your preparation for this Rule 30(b)(6) deposition. We have kind of touched on some of it before, but I just want to make sure that we cover all the bases. When did you first start preparing for today's Rule 30(b)(6) 02:12 02:12

Pilsworth

deposition?
A. In June.
Q. June of 2024?
A. Yes. 02:13
Q. Was your preparation done at the request of your counsel?
A. Yes, it was.
MR. BERMAN: Objection to form.
Q. Including virtual meetings like Teams or phone calls, how many times have you met with your attorneys to prepare for today's Rule 30(b)(6) deposition? 02:13
A. Three to four times.
Q. Okay. When was the first time that you met with your attorneys in preparation for today's Rule 30(b)(6) deposition? 02:13
MR. BERMAN: Objection. To clarify, when you say "met," does that still include virtual calls or telephone calls? 02:13
Q. Okay, Let's take a step back. You previously testified that you had three or four meetings with your attorneys to prepare for today's deposition, correct?
MR. BERMAN: Objection. To clarify, 02:13

Pilsworth

your exact question was including virtual meetings.

Q. Yes. I'm going to get there. So does that three or four times include virtual meetings? 02:13

A. It does.

Q. Okay, and that also includes in-person meetings?

A. Yes. 02:14

Q. So just so we can set the baseline, when I say meet, it will include, you know, non-in-person meetings.

A. Okay.

Q. When was the first time that you met with your attorneys to prepare for today's Rule 30(b)(6) deposition? 02:14

A. I believe that was in early July of this year.

Q. Okay. Approximately how long did you meet with your attorneys in early July of this year to prepare for today's deposition? 02:14

A. I think the first meeting was reasonably short. It was maybe 45 minutes.

Q. And was this meeting done virtually? 02:14

Pilsworth

A. That was done virtually. Yeah.
Q. Was that via Teams?
A. Yes, it was. Yeah. Teams.
Q. Who was present during this Teams meeting I guess in early July? 02:14
A. Darren would have been present. I'm trying to remember. I think possibly, I think it was probably you two as well in that first meeting I think. 02:15
Q. When you say Darren, are you referring to Darren Check?
A. Darren Check, apologies, yeah.
Q. Did you look at any documents during this early July meeting with your attorneys? 02:15
A. This is in the first meeting was more of a scene setting kind of this is what the role is, this is how it might work, more administrative. Subsequent meetings we looked at documents. 02:15
Q. Okay. When was the second time you met with your attorneys to prepare for today's Rule 30(b)(6) deposition?
A. Mid-July.
Q. Approximately how long did you meet 02:15

Pilsworth

for in mid-July?
A. That was around an hour.
Q. Who was present during that meeting?
A. That was all three, so Darren Check and Josh and Stu. 02:16
Q. Just so the record is clear, Josh, you're referring to Josh Materese?
A. Materese.
Q. And then Stu is Stu Berman, who is here right now? 02:16
A. Yes.
Q. Did you look at any documents during this mid-July meeting?
A. Yes, we did. 02:16
Q. Approximately how many documents did you look at?
A. I think maybe five.
Q. This meeting was conducted virtually?
A. Yes. 02:16
Q. So the documents, were they shared via like screen share?
A. I think they were e-mailed over before.
Q. Okay. Were any of the approximately 02:16

Pilsworth

five documents that you reviewed during this mid-July meeting marked as exhibits during today's deposition?

A. Certainly Exhibit 1 because that was really the main meat of what we were talking about. The other documents, as I said, would probably have just been ancillary discussion points. 02:17

Q. Okay, and was there anyone else from BAPTL that attended this mid-July meeting? 02:17

A. No.

Q. Did you take any notes during this mid-July meeting?

A. Yes, I did. 02:17

Q. Were these notes taken by hand?

A. Yes.

Q. Are you still in possession of your notes?

A. Yes. 02:17

Q. Did you bring your notes with you to New York?

A. I did.

Q. Are your notes in this office right now? 02:17

Pilsworth

A. No.

Q. Are they at the Algonquin Hotel?

A. They are.

Q. What was the third time that you met with your attorneys in preparation for today's Rule 30(b)(6) deposition? 02:18

A. So that was last week.

Q. And last week, can you put a date on it? 02:18

A. I think it was Friday morning. I think it was last Friday morning.

Q. Was that done virtually?

A. That was done virtually again, yes.

Q. When you say Friday morning, what was the date? Late July? Let's call it late July 2024. I know it is getting late. 02:18

A. Yes. Late July.

Q. Approximately how long did you meet with your attorneys in late July? 02:18

A. That was about an hour, hour and a half.

Q. And who was present at this meeting?

A. It was, again, the four of us including Darren Check. 02:18

Pilsworth

Q. So four of us, can you name all four people?

A. Josh Materese, Stu Berman, myself, Darren Check. 02:19

Q. Did you look at any documents during this late July meeting?

A. So, again, the focus of it was Exhibit 1, and then it was probably more of a process of saying just -- 02:19

MR. BERMAN: I don't think he's going to ask what you discussed.

A. Yeah. Sorry. Sorry. Yeah. Sorry.

Q. Approximately how many documents did you look at? 02:19

A. Again, probably four to five.

Q. Were they the same documents that you reviewed in the mid-July meeting?

A. As I said, Exhibit 1 obviously was, and there were some different documents. 02:19

Q. Were any of the documents that you reviewed in the late July meeting marked as exhibits today?

MR. BERMAN: Again, I'm going to object to the extent that this is getting 02:20

Pilsworth

into attorney-client privilege. I'm trying to give you some latitude.

Q. I understand. Without revealing any communications with your lawyers, privileged communications with your lawyers, did you review any documents at the late July meeting with your attorneys that were marked as exhibits during today's deposition? 02:20

A. As I said, certainly Exhibit 1. The 30(b)(6) notice. 02:20

Q. Okay. Was there anyone else from BAPTL that was present at this late July meeting?

A. No.

Q. When was the fourth time that you met with your attorneys in preparation for today's Rule 30(b)(6) deposition? 02:20

A. That was yesterday.

Q. That was the meeting that happened in person? 02:20

A. Yes. That's right.

Q. Approximately how long was that meeting?

A. Around about, if we exclude the Red Flame Grill lunch, around about six hours. 02:21

Pilsworth

Q. Who was present during the meeting that occurred yesterday?

A. The same individuals I referred to before, and there was also an associate called Vanessa. I'm afraid I can't remember her surname. 02:21

Q. Is Vanessa's last name Milan, M-i-l-a-n?

A. Yes. That's right. 02:21

Q. Does that sound like the right spelling?

A. (Witness nodding).

Q. And was Vanessa at the meeting in person? 02:21

A. That's right.

Q. Did you look at any documents during the meeting that occurred yesterday with your attorneys?

A. I did. 02:21

MR. BERMAN: And I'm going to caution you again, we're getting into territory of privilege, so.

MR. YONG: Yes.

Q. Approximately how many documents did 02:21

Pilsworth
you look at at yesterday's meeting?
A. In the region of 35.
Q. Did you review, were any of the documents that you reviewed yesterday marked as exhibits during today's deposition? 02:22
A. Yes.
Q. Can you identify which documents?
A. All of them except Exhibit 2.
Q. Was there anyone else from BAPTL present during yesterday's meeting? 02:22
A. No.
Q. Did you consider asking anyone else from BAPTL to attend yesterday's meeting?
MR. BERMAN: Objection to form. 02:22
A. No, I did not.
Q. Did you ask anyone else from BAPTL to attend yesterday's meeting?
A. No.
MR. BERMAN: Objection to form. 02:23
Q. Why not?
A. Because I believe I'm the person who has the best knowledge from BAPTL to take on this role today.
Q. Okay. Did you take notes -- strike 02:23

Pilsworth

that. Did you take notes during yesterday's meeting with your attorneys?
A. I did.
Q. And were those notes taken by hand? 02:23
A. Yes.
Q. Do you have those notes with you physically in this office today?
A. No.
Q. Where are they? 02:23
A. In the Algonquin Hotel.
Q. Next door to the Red Grill?
A. Yes.
Q. Other than the four meetings that we just discussed, were there any other meetings? 02:23
A. No.
MR. BERMAN: Let him ask the question.
THE WITNESS: Sorry. I thought he had finished. Apologies. 02:23
Q. No, I paused. I paused. I apologize. Other than the four meetings that we just discussed with your attorneys, were there any other meetings in preparation for today's 30(b)(6) deposition? 02:23

Pilsworth

A. No.

MR. BERMAN: Objection to form.

Q. Have you communicated with any current or former employees of BAPTL about today's Rule 30(b)(6) deposition? 02:24

MR. BERMAN: Objection. Other than his prior testimony?

Q. You can answer.

A. I referred to discussions I had with Helen Gregory. Otherwise, I haven't conferred with anyone at BAPTL. 02:24

Q. What is Helen Gregory's role?

A. The title is head of investment operations and finance, and it's essentially a role of now that -- there was a bigger role when BAPTL was an in-house asset manager. Now that everything is outsourced to Black Rock, it's really just managing the custodian relationship more. So the relationship with State Street. 02:24 02:24

Q. Was your counsel present during your discussion with Ms. Gregory?

A. No.

Q. Was anyone else present?

A. No. 02:25

Pilsworth

Q. Have you communicated with anyone from Black Rock about today's 30(b)(6) deposition?

MR. BERMAN: Objection. Asked and answered. 02:25

You can answer again.

A. I communicated, as I said, with Esther Perkins, but it was really a courtesy to say that we were going to be sending a litigation 02:25 hold notice.

Q. So let me ask the question one more time. Have you communicated with anyone from Black Rock about today's Rule 30(b)(6) deposition? 02:25

A. No.

Q. Do you think it would have been helpful to communicate with someone from Black Rock in preparation for today's Rule 30(b)(6) deposition? 02:26

MR. BERMAN: Objection to form.

A. My understanding is that if you wish to call Black Rock to give evidence or depose them, that's something that you can do.

Q. I would like to strike that response 02:26

Pilsworth

as nonresponsive, but we'll move on. Did you communicate with anyone formerly associated with BAPIML about today's Rule 30(b)(6) deposition?

MR. BERMAN: Objection to form. 02:26

A. No.

Q. Did you personally prepare any outline for today's deposition?

MR. BERMAN: Objection to form.

A. What do you mean by outline? 02:27

Q. Did you prepare any documents in preparation for today's deposition?

MR. BERMAN: Objection to form.

A. No.

Q. Did you prepare any talking points for today's deposition? 02:27

MR. BERMAN: Objection.

A. I had discussions with my lawyers. As I said, I took notes from those discussions. I'm not going to say what was in the notes, 02:27 because that's subject to privilege.

Q. And what is your basis for it being subject to privilege?

MR. BERMAN: Objection.

You don't have to answer that 02:28

Pilsworth

question.

Q. Are you going to follow your counsel's instruction not to answer?

A. I am. 02:28

Q. Did anyone else prepare any documents that were provided to you in preparation for today's deposition?

MR. BERMAN: Objection to form.

A. Kessler Topaz did. 02:28

Q. And what were those documents?

MR. BERMAN: To the extent you can answer without disclosing what we were discussing or communicating.

A. I think that would be difficult. 02:28

MR. BERMAN: Then I will instruct you not to answer.

Q. Are you going to follow your counsel's instruction not to answer?

A. I am. 02:28

Q. You testified earlier today that BAPTL first learned about the claims at issue in this lawsuit from the Kessler Topaz law firm, correct?

A. Correct. 02:29

Pilsworth

Q. Okay. I'm going to introduce the next exhibit, which I think hopefully will be the last one. I believe this is BAPTL Exhibit 6.

(BAPTL Exhibit 6, Retainer Agreement Bates stamped BAPTL 000318 through 000321, was so marked for identification, as of this date.) 02:29

Q. You have been handed a document that has been marked as BAPTL Exhibit 6. Do you recognize BAPTL Exhibit 6? 02:30

A. Yes, I do.

Q. Was BAPTL Exhibit 6 one of the documents that you reviewed with your attorneys in preparation for today's deposition? 02:30

MR. BERMAN: Objection to form.

A. It was.

Q. Previously today in your testimony, you referred to a monitoring arrangement with Kessler Topaz? 02:30

A. Yes.

Q. Can you explain what BAPTL Exhibit 6 is in connection with that arrangement?

A. There was a feed of data that goes from State Street showing all of the trades that 02:30

Pilsworth

BAPTL undertakes, and that is reviewed by Kessler Topaz to determine whether there may be class action recoveries or suits that it would be appropriate for us to be involved in. That's the monitoring bit. There's a filing part of the agreement as well. 02:31

Q. And on what date was this monitoring agreement entered into?

A. March 2020. I guess we'll call it the 30th of March, 2020, the last person to sign. 02:31

Q. Does BAPTL have portfolio monitoring agreements with any law firms other than Kessler Topaz?

A. We do. 02:31

Q. How many portfolio monitoring agreements does BAPTL have?

A. Three in total.

Q. Can you identify who the law firms associated with those portfolio monitoring agreements are? 02:31

A. Robbins Geller and Pomerantz. To answer your question, and Kessler Topaz.

Q. Did the Robbins Geller law firm approach you about participating in a securities 02:32

Pilsworth

class action against Natera?

A. They did.

Q. Do you recall when Robbins Geller approached you about participating in a securities class action against Natera? 02:32

A. So around the same time as Kessler Topaz. April 2022. Late April.

Q. Did the Pomerantz law firm approach you about participating in a securities class action against Natera? 02:32

A. No.

Q. Did any other law firms approach you about participating in a securities class action against Natera? 02:33

A. No.

Q. Does BAPTL pay any fees to Kessler Topaz in connection with this portfolio monitoring arrangement?

MR. BERMAN: Objection to form. 02:33

A. In respect of portfolio monitoring is your question?

Q. Yes.

A. No, we don't.

Q. I would like to turn your attention 02:33

Pilsworth

to page 3 of the document marked BAPTL Exhibit 6 and next to the number 10, do you see that?

A. Yes.

Q. Can you read the two sentences next to number 10. 02:33

A. "The firm shall be compensated for its services under this agreement in the amount of 10,000 U.S. dollars, exclusive of VAT, annually beginning on the day that Firm is able to commence the monitoring process. This annual fee shall be valid for three years from the date of commencement and shall be reevaluated for renewal at that time." 02:34

Q. Okay. Is there a reason for why BAPTL has not paid any fees to the Kessler Topaz law firm in connection with its portfolio monitoring? 02:34

MR. BERMAN: Objection to form.

Misstates his testimony. 02:34

A. There's a distinction between the monitoring and the claims filing, so we pay the 10,000. Now it's slightly more, but the payment is for the claims filing, not the claim monitoring. 02:34

Pilsworth

Q. Okay. So is the claims monitoring being offered for free?
A. Yes.
MR. BERMAN: Objection to form. 02:35
Q. Does BAPTL pay any fees to the Robbins Geller law firm in connection with its portfolio monitoring?
A. No.
Q. So that's also being offered for free? 02:35
A. Yes.
Q. Has BAPTL ever paid any fees to the Kessler Topaz law firm?
MR. BERMAN: Objection to form. 02:35
A. Yes.
Q. How much?
A. I have to do the sums, but we are talking in the region of $50,000 U.S. dollars.
Q. And that's in connection with what exactly? 02:35
A. In connection with the claims filing.
Q. And what exactly is claims filing?
A. That's the process where, once there is a sum of money that is available for the class 02:36

Pilsworth

members to enjoy, for lack of a better word, there is a notice that is put out to the world to say come get your money or you lose it, and so this is the process whereby Kessler Topaz on our behalf files the forms to make sure that we receive that money. 02:36

Q. And then, other than the claims filing, BAPTL has not paid any other fees to the Kessler Topaz law firm? 02:36

A. That's correct.

Q. Alright. So, Mr. Pilsworth, it is currently 2:36 p.m. Eastern time. According to my count, we've taken I guess two breaks and one lunch during today's Rule 30(b)(6) deposition. Is that correct? 02:36

MR. BERMAN: I haven't been keeping track.

A. I don't know whether there were two or three breaks plus lunch. 02:37

Q. But roughly?

A. Yes.

Q. I think the first break was approximately 20 minutes?

A. Yes. 02:37

Pilsworth

Q. And the second break was also roughly 20 minutes?

A. That's right.

Q. And then we broke for lunch for a little bit longer? 02:37

A. Yeah.

Q. Without revealing any attorney-client communications you had with your attorneys during the breaks that we took today, did you communicate with your attorneys? 02:37

MR. BERMAN: Objection to form.

A. I did.

Q. Can you identify which of your attorneys you communicated with? 02:37

A. Josh Materese and Stu Berman.

Q. Did you communicate with any other attorneys during any of the breaks?

A. No.

Q. Did you communicate with anyone else at BAPTL during any of the breaks? 02:37

A. No.

Q. Did you communicate with your counsel during every single one of the breaks that we took today? 02:38

Pilsworth

A. I did.

MR. BERMAN: Objection to form.

Q. Again, during these two or three breaks, again, without revealing the contents of your communications with your counsel, did your counsel provide you with feedback on your responses to my questions today? 02:38

MR. BERMAN: Objection to form.

A. I feel like that is straying into privilege. 02:38

Q. It's a yes or no question.

MR. BERMAN: If you understand the question or maybe you want to clarify or read it back. 02:38

MR. YONG: Why don't we read the question one more time and see if we need more clarification.

(Record read)

A. Yes. 02:39

Q. Did your counsel ever comment that you were doing a good job?

MR. BERMAN: Objection. Seriously?

Q. It's a yes or no answer.

MR. BERMAN: You can answer. 02:39

Pilsworth

A. Yes.

Q. So, yes, they did say that you were doing a good job?

A. Yes. 02:39

Q. During your breaks today, again, without revealing the contents of your communications with your counsel, did you review any documents?

A. No. 02:39

Q. During any of the breaks that we took today, did you refer back to any notes that you took in preparation for today's 30(b)(6) deposition?

A. No. 02:40

MR. YONG: That's all the questions I have. I believe that Danny Ashby from the O'Melveny & Myers law firm, who is representing Underwriter Defendants, has some questions. I think a short amount of questions. 02:40

Danny, are you on the line?

Let's take a quick break.

THE VIDEOGRAPHER: We are now going off the record. The time is 2:40 p.m. 02:40

Pilsworth

(Recess taken)

THE VIDEOGRAPHER: We are back on the record. The time is 2:43 p.m. This is the beginning of media label 6. 02:43

MR. BERMAN: For the record, before you start, underwriter's counsel, I don't believe underwriter's counsel has been identified as part of the 30(b)(6) notice that we received, so, to the extent that 02:43 we are talking about topics that are identified in 30(b)(6), we will allow some latitude here. Otherwise, I reserve objections.

EXAMINATION BY MR. ASHBY: 02:43

Q. Good afternoon. How are you?

A. I'm fine. Thank you.

Q. I introduced myself earlier today, but I'm Danny Ashby with O'Melveny & Myers, and I represent the underwriters. 02:44

A. Okay.

Q. I just have a few questions for you. Do you have handy BAPTL 4 again?

A. Yes.

Q. You described that as a report that 02:44

Pilsworth

State Street provided to you that indicates the purchases of Natera common stock during the class period, correct?

A. Yes. That's right. 02:44

Q. And do I understand you to say that BAPTL purchased Natera common stock only in the secondary market?

MR. BERMAN: Objection to form.

You can answer. 02:44

A. Yes.

Q. To your knowledge, there were no purchases of Natera common stock by BAPTL in the July 2021 secondary public offering?

A. Correct. 02:45

Q. Now I see on BAPTL 4 that three of the purchases were after the July 2021 secondary public offering. Is that right?

A. That's correct. Yes. 20th of December 2021, 10th of February 2022, 11th of February 2022. That's the contractual settlement dates. 02:45

Q. Yep, and all the other purchases occurred before the July 2021 secondary public offering, correct? 02:45

Pilsworth

A. That's correct. Yes.

Q. And, for the purchases in the secondary market after the July 2021 secondary public offering, do you know if any of those purchases involved Natera stock that was issued in the July 2021 secondary public offering? 02:45

MR. BERMAN: Objection to form.

You can answer if you know.

A. I don't know. 02:46

Q. And have you done any analysis to try to determine that?

A. None at this stage. No.

MR. ASHBY: That's all I have. Thank you very much. I appreciate it. 02:46

MR. YONG: Are we done? No other questions.

MR. BERMAN: We are done.

MR. YONG: Before we go off the record, I would like to state on the record that we reserve our rights because Mr. Pilsworth was not adequately prepared to answer all of the questions regarding topics 1 through 39. So we reserve our rights to compel additional Rule 30(b)(6) 02:46

Pilsworth

testimony from BAPTL.

MR. BERMAN: Do you mind just sharing, I thought you were joking, but okay. Which topics are you referring to? 02:46

MR. YONG: I think some of these --

MR. MATERESE: You can't say something on the record if you don't know the topics.

MR. YONG: Anything related to the investment decisions. 02:47

MR. MATERESE: What are the numbers?

MR. YONG: Anything involving the investment decisions. I'm just reserving my rights, Josh. 02:47

MR. MATERESE: Just name the topics.

MR. BERMAN: Why don't you send us whatever, you know, if you want to just send us after this a letter identifying what topics you believe he was not adequately testified on, we will take it under advisement. 02:47

MR. YONG: Okay, yeah, we can address this later. We don't have to do it here. Okay? 02:47

Pilsworth

MR. BERMAN: Okay.

MR. YONG: Okay.

THE VIDEOGRAPHER: We are now going off the record. The time is 2:47 p.m., this is the end of media label 6 concluding this video-recorded deposition. We are off the record. 02:47

(Time noted: 2:47 p.m.)

______________________

Subscribed and sworn to
before me this____day of______, 2024.

____________________

C E R T I F I C A T I O N

I, JOSEPH R. DANYO, a Shorthand Reporter and Notary Public, within and for the State of New York, do hereby certify:

That I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 4th day of August, 2024.

Joseph R. Danyo

JOSEPH R. DANYO

STATE OF NEW YORK

My Commission Expires 2/20/2027

I N D E X


| Witness | Examination by | Page |
|---|---|---|
| RICHARD PILSWORTH | Mr. Yong | 4 |
| | Mr. Ashby | 188 |


E X H I B I T S


| BAPTL | | Page |
|---|---|---|
| Exhibit 1 | Notice of Rule 30(b)(6) Deposition of Lead Plaintiff | 14 |
| Exhibit 2 | Page from LinkedIn profile of Richard Pilsworth | 21 |
| Exhibit 3 | Document Bates stamped BAPTL-000322 and 000323 | 58 |
| Exhibit 4 | Document Bates stamped BAPTL 000315 and 000316 | 118 |
| Exhibit 5 | Schneider v. Natera Amended Class Action Complaint | 151 |
| Exhibit 6 | Retainer Agreement Bates stamped BAPTL 000318 through 000321 | 179 |


~oOo~

DEPOSITION ERRATA SHEET

Our Assignment No. 11459751
Case Caption: John Harvey Schneider v Natera, INC.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____day of_______________ 2024.

_______________________________

RICHARD PILSWORTH

Subscribed and sworn to on the_____day of ___________, 2024 before me.

__________________________

Notary Public in and for the State of New York.

DEPOSITION ERRATA SHEET

Page No.___ Line No.___ Change to:________________

______________________________________________

Reason for Change:_____________________________

Page No.___ Line No.___ Change to:________________

______________________________________________

Reason for Change:_____________________________

Page No.___ Line No.___ Change to:________________

______________________________________________

Reason for Change:_____________________________

Page No.___ Line No.___ Change to:________________

______________________________________________

Reason for Change:_____________________________

Page No.___ Line No.___ Change to:________________

______________________________________________

Reason for Change:_____________________________

Page No.___ Line No.___ Change to:________________

______________________________________________

Reason for Change:_____________________________

Page No.___ Line No.___ Change to:________________

______________________________________________

Reason for Change:_____________________________

SIGNATURE:_______________________ DATE:_____________

RICHARD PILSWORTH

DEPOSITION ERRATA SHEET

Page No.___ Line No.___ Change to:________________

__________________________________________________

Reason for Change:________________________________

Page No.___ Line No.___ Change to:________________

__________________________________________________

Reason for Change:________________________________

Page No.___ Line No.___ Change to:________________

__________________________________________________

Reason for Change:________________________________

Page No.___ Line No.___ Change to:________________

__________________________________________________

Reason for Change:________________________________

Page No.___ Line No.___ Change to:________________

__________________________________________________

Reason for Change:________________________________

Page No.___ Line No.___ Change to:________________

__________________________________________________

Reason for Change:________________________________

Page No.___ Line No.___ Change to:________________

__________________________________________________

Reason for Change:________________________________

SIGNATURE:_____________________ DATE:_____________

RICHARD PILSWORTH