# EXHIBIT 28

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN,<br><br>Defendants. | Case No. 1:22-CV-398-DAE |

**PLAINTIFFS' FIRST SET OF REQUESTS**
**FOR PRODUCTION OF DOCUMENTS TO THE NATERA DEFENDANTS**

Pursuant to Federal Rules of Civil Procedure ("Rules") 26 and 34, Lead Plaintiff British Airways Pension Trustees Limited ("BAPTL" or "Lead Plaintiff") and additional plaintiff Key West Police & Fire Pension Fund ("Key West P&F," and together with BAPTL, "Plaintiffs") hereby request the Natera Defendants respond to and produce for inspection within 30 days of the date of these Document Requests at the law offices of Kessler Topaz Meltzer & Check, LLP, all documents described below in accordance with the definitions and instructions that follow.

## DEFINITIONS

Unless stated otherwise, the terms set forth below are defined as follows:

1. "Action" refers to the lawsuit captioned above.

2. "Board of Directors" means Natera, Inc.'s Board of Directors.

3. "Communication" or "Communications" means the transmittal of information in (in the form of facts, ideas, inquiries, or otherwise), and shall have the broadest meaning under Local Civil Rule CV-26(b)(1). For purposes of this definition, Communications include the transmittal of words, numbers, pictures, charts, studies, or graphs, by any means, including personal delivery, speech, writings, Documents, language (machine, foreign or otherwise) of any kind, computer electronics or Electronically-Stored Information, sound, radio or video signals, telecommunication, telephone, electronic messaging or chat applications (e.g., via tweet, text message, instant message, iMessage, Blackberry, Bloomberg, WhatsApp, Skype, Slack, Microsoft Teams, Zoom), internet message board posts, email, facsimile, mail, film, photographic film of all types, or other media of any kind. The term "Communication" also expressly includes all discussions, conversations, correspondence, negotiations, agreements, presentations, understandings, Meetings, notices, requests, responses, demands, complaints, press, publicity, or trade releases.

4. "Complaint" means the Amended Class Action Complaint, filed in the Action on October 7, 2022 (ECF No. 78).

5. "¶ ___" means a paragraph in the Complaint.

6. "Concern" or "concerning" means relating to, referring to, describing, evidencing, reflecting upon, regarding or constituting, and shall have the broadest meaning possible under Local Civil Rule CV-26(b)(7).

7. "Defendants" means Natera, the Executive Defendants, the Director Defendants and the Underwriter Defendants.

8. “Director Defendants” refers to the following individuals: (i) Roy Baynes; (ii) Monica Bertagnolli; (iii) Roelof F. Botha; (iv) Rowan Chapman; (v) Todd Cozzens; (vi) James I. Healy; (vii) Gail Marcus; (viii) Herm Rosenman; and (ix) Jonathan Sheena.

9. “Document” means any document or electronically stored information as described in Rule 34(a) and has the broadest possible meaning under Rule 34(a) and Local Civil Rule CV-26(b)(2). As used herein, Document includes electronic or computerized data compilations; electronic files and backup tapes; hard drives and images of hard drives; all drafts; agreements; Communications; correspondence; ESI; letters; memoranda; records; presentations; books; reports; transcripts or summaries of conversations or interviews; diaries; graphs; charts; diagrams; tables; photographs; recordings; tapes; telegrams; facsimiles; microfilms; minutes; transcripts or summaries of Meetings or conferences; records and reports of consultants; press releases; stenographic, handwritten or any other notes; work papers; checks and check vouchers; check stubs or receipts; and any paper or writing of whatever description, regardless of the location or manner in which it is stored, including on any desktop; laptop; network server or drive; hard drive; Electronic Media; database; application; software; cloud storage, whether or not printed out. This definition specifically includes emails, written or otherwise memorialized exchanges and/or Electronic Messages in electronic messaging or chat applications, including text messages, instant messages, internet message board posts, tweets, Blackberry messages, iMessages, Bloomberg messages, WhatsApp messages, Skype Messages, Slack messages, Microsoft Teams messages, and Zoom messages. A draft or non-identical copy of any Document is a separate Document within the meaning of this term.

10. “Document Request” or “Request” means these requests for Documents and information contained herein.

11. "DOJ" means the United States Department of Justice.

12. "Electronically-Stored Information" or "ESI" includes the following:

i. all items covered by Rule 34(a)(1)(A), including both information that is fixed in a tangible form and information that is stored electronically in a medium from which it can be retrieved and examined;

ii. information or data that is generated, received, processed, and recorded by computers and other electronic devices, including Metadata (as defined in Appendix A);

iii. files, information, or data saved on Archival Systems or Storage (as defined in Appendix A), or Back-up Systems or Storage (as defined in Appendix A);

iv. internal or external web sites; and

v. output resulting from the use of any software program or application, including word processing Documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, Electronic Messages, bulletin board programs, operating systems, source code, PRF files, PRC files, batch files, ASCII files, and all miscellaneous media on which they reside regardless of whether said electronic data exists in an active file, a deleted file, or file fragment; activity listings of electronic mail receipts and transmittals; and all items stored on computer memories, hard disks, diskettes, floppy disks, CD-ROMs, DVD-ROMs, magnetic tape, microfiche, or on any other media for digital data storage or transmittal, including personal digital assistants, "smart phone" devices (e.g., iPhone) and tablets (e.g., iPad), or similar mobile devices, hand-held wireless devices (e.g., BlackBerry) or similar devices, and file folder tabs, or containers and labels appended to, or relating to, any physical storage device associated with each original or copy of all Documents requested herein.

13. "Electronic Media" means any magnetic or other storage media device used to record ESI. Electronic Media devices may include computer memories, hard disks, diskettes, floppy disks, memory sticks, thumb drives, CDs, CD-ROMs, DVDs, DVD-ROMs, personal digital assistant devices (e.g., iPad, iPhone, tablets, or other "smart phone," Palm Pilot, BlackBerry, or other mobile devices), magnetic tapes of all types, microfiche, Archival Systems or Storage, Back-Up Systems or Storage, or any other vehicle for digital storage or transmittal, including but not limited to, any containers or labels appended to, or relating to, any physical original or copy of such storage device.

14. "Electronic Message" means any non-email electronic communication or media content exchanged between two or more users of a software application, including but not limited to text messages, chats, SMS or MMS messages sent over cellular networks and text, chat, or other instant messages sent over the Internet, including ephemeral messages and encrypted messages, and shall include but not be limited to messages sent using iMessage, WhatsApp, Facebook Messenger, Twitter (direct message), Slack, Google Chat, Microsoft Teams, Vibr, Signal, Telegram, Snap Chat, and other such applications.

15. "Employee" means any Person who at any time during the Relevant Period acted or purported to act on behalf of You, including all present and former officers, directors, executives, partners, principals, managers, staff personnel, accountants, agents, representatives, in-house attorneys, independent contractors, advisors, and consultants.

16. "Executive Defendants" means Steve Chapman, Michael Brophy, and Matthew Rabinowitz.

17. "FDA" means the U.S. Food and Drug Administration.

18. "FY" means Fiscal Year.

19. "Governmental Agency" means any agency or entity of the federal government, of a state or local government, or of a foreign government, including the SEC, the DOJ, the FDA, or the Federal Trade Commission.

20. "Guidance" means the Company's projected sales, profits, revenues, and earnings for Natera's fiscal year, including factors or drivers that could influence these metrics.

21. "HIPAA" means the Health Insurance Portability and Accountability Act of 1996.

22. "Identify," with respect to Persons, means to give, to the extent known, the Person's full name, present or last known address, email address, and telephone number, and when referring to a natural person, additionally, the present or last known place of employment. Once a Person has been identified in accordance with this paragraph, only the name of that Person need be listed in response to subsequent discovery requesting the identification of that Person. "Identify," with respect to documents, means to give, to the extent known, the: (i) type of document; (ii) general subject matter; (iii) date of the document; and (iv) author(s), addressee(s), and recipient(s). The term "Identify" shall be construed as broadly as possible in accordance with Local Civil Rules CV-26(b)(3) and CV-26(b)(4).

23. "Include" or "Including" means including without limitation.

24. "July 2021 SPO" means Natera's secondary public offering occurring in July 2021 wherein the Company sold investors 5.175 million shares of its common stock at $113 per share.

25. "Meeting(s)" means the contemporaneous presence of any natural persons (including by telephone, video conference, or instant messaging) for any purpose, whether or not such presence was by chance or prearranged, and whether or not the Meeting was formal or informal or occurred in connection with some other activity. The term "Meeting" also includes agendas, meeting invites, calendar events, pre-meeting packages, meeting materials, presentations,

notes, emails, minutes, and/or recordings related to such Meetings and Documents sufficient to identify the attendees at the Meeting.

26. "Michigan AG" means the Michigan Department of Attorney General.

27. "Michigan AG Investigation" means the Michigan AG's investigation into Natera's billing practices.

28. "Natera" or the "Company" means Natera, Inc., and any of its direct or indirect parent companies, subsidiaries, divisions, affiliates, predecessors, successors, present and former officers, directors (including the Director Defendants acting collectively and all directors, individually), Employees, partners, agents, accountants, auditors, attorneys, representatives, advisors, and all other Persons acting or purporting to act on its behalf.

29. "Natera Defendants" means Natera, the Executive Defendants and the Director Defendants.

30. "Panorama" means Natera's non-invasive prenatal test which is used to test for fetal chromosomal abnormalities.

31. "Person" or "Persons" means any natural person(s) or business, legal or governmental entity or association, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations, and all other entities, and shall have the broadest meaning possible under Local Civil Rule CV-26(b)(6).

32. "Policy" or "Policies" means policies, procedures, practices, guidelines, or protocols.

33. "Prospectus" means the Company's prospectus filed on Form 424B5 with the SEC on July 22, 2021 in connection with the July 2021 SPO.

34. “Refer” or “relate” means comprise, explicitly or implicitly refer to, reflect, record, memorialize, embody, discuss, evaluate, consider, review, report on, be reviewed in conjunction with, or be created, generated, or maintained as a result of the subject matter of the Request.

35. “Registration Statement” means the Company’s S-3 shelf registration statement filed with the SEC on July 20, 2021 in connection with the July 2021 SPO.

36. “SEC” means the United States Securities and Exchange Commission.

37. “Underwriter Defendants” refers to (i) Morgan Stanley & Co. LLC; (ii) Goldman Sachs & Co. LLC; (iii) Cowen and Company, LLC; (iv) SVB Leerink LLC; (v) Robert W. Baird & Co. Incorporated; (vi) BTIG, LLC; and (vii) Craig-Hallum Capital Group LLC, and each of all of the divisions, subdivisions, affiliates, predecessors, successors, joint ventures, present and former officers, directors, Employees, representatives, agents, attorneys, accountants, advisors and all other Persons acting or purporting to act on the entities’ behalf.

38. “You” or “Your” refers to the Natera Defendants.

## INSTRUCTIONS

1. “All,” “any,” and “each” shall each be construed as encompassing any and all.

2. The connectives “and” and “or” shall be construed either disjunctively or conjunctively as necessary to bring within the scope of a Request all Documents that might otherwise be construed to be outside of its scope.

3. The singular shall include the plural, and the disjunctive shall include the conjunctive, and vice versa.

4. The past tense shall include the present tense and vice versa.

5. If You withhold or redact any Document or portion thereof on the basis of any claim of privilege and/or work product objection to these Requests, You may withhold only the

Document that contains the privileged information (and not any non-privileged family member), and may only redact the portion(s) of the Document that are privileged. When doing so, you must, at the time of production, as applicable (i) produce a single-page slip sheet for any withheld family member stating that the Document has been "WITHHELD FOR PRIVILEGE" or "WITHHELD FOR WORK PRODUCT," or affix the words "REDACTED – ACP" or "REDACTED – WP" over the redacted portion of the Document; (ii) OCR any slip sheets so that they become searchable and generate a text file of the text extracted therefrom; and (iii) populate a Metadata field positively and negatively identifying whether a Document contains redactions (e.g., Is Redacted: Yes/No). Additionally, at the time of production, please furnish a log that in all respects complies with Rule 26(b)(5) and includes all necessary information to evaluate the privileged claimed. Privilege logs shall be produced in an Excel format that allows Plaintiffs to search and sort any and all columns and entries of the privilege log. Privilege logs shall initially be generated form the following Metadata fields corresponding to the withheld Documents (or their equivalent):

i. Document Type

ii. Sent Date/Time

iii. Create Date/Time

iv. Date/Time Viewed/Edited

v. Date/Time Last Modified

vi. Custodian

vii. All Custodians

viii. Author

ix. Viewed/Edited By

x. Last Saved/Edited By

xi. Sender/From

xii. Recipient(s)/To

xiii. CC

xiv. BCC

xv. Title

xvi. File Name

xvii. Subject

xviii. Attachment Name

xix. Attachment Count

xx. File Extension

xxi. File Path

xxii. Duplicate File Path

xxiii. Hash Value

xxiv. Family ID

xxv. Conversation ID or Thread ID

In addition, You shall include columns on the privilege log identifying, for each Document withheld or redacted: (i) a unique Document ID or Bates number; (ii) the log production date; (iii) the specific privilege being asserted; (iv) the Person on whose behalf the privilege and/or work product claims is asserted; (v) a brief description of the subject matter of the Document (e.g., agreement, letter, memorandum, tape, etc.) and a precise statement of the facts upon which the claim of privilege and/or work product is based, in sufficient detail that, without revealing privileged information, will allow the validity of the claim to be assessed, including the identity of any lawyers involved in the claim.

6. At the time You produce a privilege log, You shall also (i) provide a list of the attorneys (whether internal or outside counsel) whose names appear on the log; (ii) identify such attorneys on the log with an asterisk next to their name, each time their names or email addresses appear; (iii) provide a list of all non-parties identified in the log and their relationship to You; and (iv) identify such non-parties with a double asterisk next to their names, each time their name or email address appears in the log. Where Metadata in the Sender/From, Recipient/To, CC, and BCC fields reveal only an email address, You shall provide a key identifying the individuals associated with such email addresses.

7. In responding to these Requests, You shall produce all responsive Documents which are in Your possession, custody, or control.

8. All Documents responsive to the Requests herein that are archived (including in the cloud) or stored on backup tapes or hard drives shall be produced.

9. With respect to ESI formatting and production, You shall follow the Instructions set forth herein and in Appendix A hereto and, if entered by the Court or agreed to by the parties prior to Your production of Documents in response to these Requests, the instructions set forth in any forthcoming "ESI Protocol" for this Action. To the extent these Instructions for these Requests are inconsistent with the ESI Protocol, the Court-entered or agreed upon ESI Protocol shall control from the time it is entered.

10. Pursuant to Rule 34(b), You are to produce for inspection and copying by Plaintiffs original Documents as they are kept in the usual course of business in their original folders, binders, covers, and containers or facsimile thereof and label the Documents to correspond to the categories in these Requests, or, with respect to ESI, in either TIFF or TIFF along with Native Format, as set forth in more detail in Appendix A. If the original is not in Your possession, custody,

or control, then You are to produce a copy thereof, and all non-identical copies which differ from the original or from the other copies produced for any reason, including copies that bear handwritten, electronic, or other notations. If You decline to search or produce ESI on the ground that such ESI is not reasonably accessible because of undue burden or cost, identify such information by category or source and provide detailed information regarding the burden or cost You claim is associated with the search or production of such ESI.

11. Pursuant to Rule 34(b)(2), to the extent You intend to withhold responsive Documents on the basis of any of Your objections (except privilege or work product, as discussed herein), You shall, at the time of responding to these Requests, identify the specific limitations You propose to apply to Your responses, including identifying the custodians and data sources to be searched, the time period to be queried, search methodology to be applied, and procedures for validating Your search. You shall not produce any Documents subject to the identified limitations until the Parties have met and conferred regarding the same. To the extent the Parties cannot reach agreement on the limitations that will control Your responses to these Requests, You shall promptly seek a Protective Order from the Court.

12. These Requests are specifically intended to encompass any ESI, including information that is fixed in a tangible form and information that is stored in a medium from which it can be retrieved and examined including data or information maintained in any form of computer memory or on computer hard drives or diskettes, including any word processing or spread sheet programs or electronic mail systems, or in any form of electronic or computer-related, or cloud storage, whether or not You currently have "hard copy" printouts of the same.

13. All Documents responsive to these Requests shall be produced with all Metadata contained within such Documents, as they were produced in the usual course of business.

i. ESI should not be produced in a form that removes or degrades the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means.

ii. ESI should not be produced without first discussing production formatting issues with Lead Counsel. If You decline to search or produce ESI on the ground that such ESI is not reasonably accessible because of undue burden or cost, identify such information by category or source and provide detailed information regarding the burden or cost You claim is associated with the search or production of such ESI.

14. You are to produce each Document requested herein in its entirety, with attachments and enclosures and without deletion or excision (except as qualified above) regardless of whether You consider the entire Document to be relevant or responsive to the Requests. Each document that You cannot legibly copy should be produced in its original form. Documents not otherwise responsive to any of the Requests herein must be produced if such Documents are attached to a Document that is responsive to these Requests. Whenever a Document or group of Documents is removed from a file folder, binder, file drawer, file box, notebook, or other cover or container, the Document or group of Documents must be produced with information identifying the cover or container.

15. A copy of a Document that varies in any way whatsoever from the original or from any other copy of the Document—whether by reasons of Metadata that differs in any respect, or by reason of any handwritten or other notation or any omission—constitutes a separate Document and must be produced, whether or not the original of the Document is within Your possession, custody, or control. Accordingly, all prior versions and all drafts of Documents and emails must be produced.

16. If a Document responsive to these Requests was at any time in Your possession, custody, or control, but is no longer available for production, as to each such Document, state the following information:

i. whether the Document is missing or lost;

ii. whether the Document has been destroyed;

iii. whether the Document has been transferred or delivered, voluntarily or involuntarily, to another Person, the name and address of that Person, and at whose request the transfer or delivery was made; and

iv. whether the Document has been otherwise disposed of, and, if so, a precise statement of the circumstances (including date) surrounding the disposition of the Document.

17. If in responding to these Requests, You claim any ambiguity in interpreting a Request or a Definition or Instruction applicable thereto, such claim shall not be utilized by You as a basis for refusing to produce responsive Documents, but there shall be set forth as part of Your response the language You claim to be ambiguous and the interpretation chosen or used in responding to the Request.

18. With respect to any category of Documents as to which You contend production is in some way "burdensome" or "oppressive," please state the specific reason for that objection.

19. If no Documents or materials exist that are responsive to a particular Request, state so in writing.

20. These Requests are continuing requests, and You are required to supplement Your productions with any new or newly discovered materials responsive to these Requests in accordance with Rule 26(e).

## RELEVANT TIME PERIOD

Unless otherwise specifically indicated within a Request, the Requests herein refer to the period from January 1, 2019 to September 30, 2022, inclusive (the "Relevant Period"), and include all Documents that relate to such period, even though prepared or published outside of the Relevant Period.

## DOCUMENTS REQUESTED

1. Documents, organizational charts, or other graphic presentations or representations sufficient to describe the organization of the Company, including:

   i. the locations of any offices or facilities;

   ii. the organizational units and the nature of their operations; and

   iii. all teams, committees, or other groups within the Company with responsibilities related to Panorama.

The time period applicable to this request is January 1, 2018 through September 30, 2022.

2. Documents, organizational charts, or other graphic presentations or representations sufficient to identify all Employees having responsibility for:

   i. regulatory, compliance, marketing, sales and/or business matters concerning Panorama;

   ii. financial budgets, forecasts, performance tracking, and modeling concerning Panorama; and

   iii. Your public disclosures in SEC filings, press releases, media articles, or on conference calls, or in any other public statements or presentations.

The time period applicable to this request is January 1, 2018 through September 30, 2022.

3. All Documents concerning the Company's Policies for preparing, reviewing, editing, approving, modifying, and/or distributing Natera's press releases, SEC filings, public statements and opening statements, talking points, presentation materials (such as slide decks), questions and answers, or other remarks by the Company or its representatives prepared in connection with any call, conference, presentation or Meeting with analysts, investors or the media.

4. All Documents reviewed, considered, relied upon or otherwise providing the basis for the statements referenced in ¶¶106, 108, 110-11, 113, 115-16, 119, 121, 125, 132, 142, 148 and 150-62 of the Complaint, including Documents concerning the preparation, review, editing, approval, modification, and/or distribution of such statements.

5. All Documents concerning the Company's Policies regarding transactions of Natera securities by executives, officers, directors, or Employees of the Company, including:

i. any Documents concerning any changes to, or violations of, those Policies; and

ii. any Documents or Communications related to those Policies concerning Defendants.

6. All Documents concerning any Director Defendants' or Executive Defendants' transactions in Natera common stock, including Documents concerning transactions made pursuant to Rule 10b5-1 plans and Documents concerning any proposed or actual changes to Rule 10b5-1 plans.

7. All Documents concerning insider transactions in Natera securities by the Executive Defendants or other corporate executives at the Executive Vice President level or above.

8. All Documents concerning the preparation or dissemination of the Registration Statement or Prospectus (and any Documents incorporated by reference therein) filed with the SEC in connection with or concerning the July 2021 SPO, including any Documents concerning whether any disclosure or statement concerning Natera should or should not be made in connection with the July 2021 SPO.

9. All Documents concerning any third-party entity or Person engaged by You to assist in the underwriting process for the July 2021 SPO.

10. All Documents concerning any actual or potential agreement between You and any of the Underwriter Defendants, concerning underwriting arrangements, due diligence, or fees in connection with or concerning the July 2021 SPO.

11. All Documents concerning any "road show" or any other presentation, solicitation or Communication to investors, potential investors, or financial institutions investing on behalf of clients, for the July 2021 SPO, including Documents reflecting any Person attending such "road show" or investor presentation, and any Communications with such Person.

12. All Documents concerning the July 2021 SPO price of Natera common stock, including any analyses and models supporting the July 2021 SPO price.

13. All Documents concerning monies earned, or projected to be earned, in connection with the July 2021 SPO, by You, any of the Defendants, any Natera Employee or insider, and pre-July 2021 SPO investors.

14. All Documents concerning the Executive Defendants' compensation in FY2019, FY2020, FY2021, and FY2022, including any Policies related thereto and any Documents concerning factors or drivers that could influence the Executive Defendants' compensation,

including any Documents related to performance-based bonuses, restricted stock units and options tied to Natera's market valuation and revenue targets.

15. All Documents concerning compensation of the Company's Employees related to sales of Panorama, including any Policies related thereto.

16. All Documents concerning the Company's projected and actual sales, profits, revenues, and earnings (specifically including Documents concerning factors or drivers that could influence these metrics) in FY2019, FY2020, FY2021, and FY2022.

17. All Documents concerning the projected and actual sales, profits, revenues, and cash flows (specifically including Documents concerning factors or drivers that could influence these metrics) for the Company's Women's Health business in FY2019, FY2020, FY2021, and FY2022.

18. All Documents concerning the projected and actual sales, profits, profit margins and revenues (specifically including Documents concerning factors or drivers that could influence these metrics) related to Panorama FY2019, FY2020, FY2021, and FY2022.

19. All Documents concerning the Company's Guidance for Natera's FY2019, FY2020, FY2021, and FY2022 including the inputs, assumptions, models, forecasts, budgeting, performance tracking, and software used to generate, update and monitor such projections, and Policies and other Documents regarding its issuance.

20. All Documents concerning the Company's Guidance related to the Company's Women's Health business for FY2019, FY2020, FY2021, and FY2022 including the inputs, assumptions, models, forecasts, budgeting, performance tracking, and software used to generate, update and monitor such projections, and Policies and other Documents regarding its issuance.

21. All Documents concerning the Company's Guidance related to Panorama for FY2019, FY2020, FY2021, and FY2022 including the inputs, assumptions, models, forecasts, budgeting, performance tracking, and software used to generate, update and monitor such projections, and Policies and other Documents regarding its issuance.

22. All Documents concerning the Company's Policies regarding billing practices and procedures, including the Company's Policies concerning invoices, receipts, and billing records related to Panorama and any changes to, or violations of, those Policies.

23. All Documents concerning the Company's Policies regarding discounts for patients and payment options.

24. All Documents concerning the Company's Policies regarding Natera's pricing structure for Panorama, including any changes thereto during the Relevant Period;

25. All Documents concerning the Company's management and structure with respect to the billing department, including any Documents related to the Company's decision to outsource billing department functions, in whole or in part.

26. All Documents concerning the use of Current Procedural Terminology ("CPT"), International Classification of Diseases ("ICD"), or Healthcare Common Procedure Common System ("HCPCS") codes associated with the billing, reimbursement, and financial reporting processes for Panorama including:

i. Documents concerning any changes or updates to CPT, ICD, or HCPCS codes related to Panorama;

ii. Documents concerning the use of CPT, ICD or HCPCS codes related to Panorama; and

iii. Documents concerning contracts, agreements, or Communications with healthcare providers or insurers regarding CPT, ICD, or HCPCS codes and billing practices related to Panorama.

27. All Documents concerning Medicare or Medicaid billing practices for Panorama including:

i. Documents concerning billing records submitted to Medicare or Medicaid related to Panorama including copies of claims submitted by, or on behalf of, the Company to Medicare or Medicaid;

ii. Documents concerning Medicare or Medicaid reimbursement requests, approvals, or denials related to Panorama;

iii. Documents concerning the Company's compliance with applicable Medicare or Medicaid billing regulations; and

iv. Documents concerning internal audits, investigations, or reviews related to Medicare or Medicaid billing practices.

28. All Documents concerning the Company's Policies and compliance with applicable regulations, including HIPAA, and any internal or external reports of failures to comply with such regulations by You.

29. All Documents concerning the Company's Policies related to prior authorizations for Panorama, and any changes thereto, including all Documents concerning or responding to guidance or advisory opinions from the Office of the Inspector General ("OIG") for the Department of Health and Human Services regarding prior authorizations and anti-kickback statutes.

30. All Documents concerning the Company's use of prior authorization providers, including My Genome My Life ("MGML"), to submit prior authorizations for Panorama testing, including:

i. Documents concerning interactions between the Company's Employees and representatives of prior authorization providers;

ii. Documents concerning prior authorizations for Panorama that were submitted by prior authorization providers and subsequently rejected;

iii. Documents concerning billing codes shared by Natera with prior authorization providers; and

iv. Documents concerning any contracts, agreements, or Communications between the Company and prior authorization providers.

The time period applicable to this request is January 1, 2018 through September 30, 2022.

31. All Documents concerning interactions between the Company's Employees and healthcare providers regarding prior authorizations for Panorama, billing codes, use of insurance portals, payment options and billing practices, including:

i. Documents concerning Meetings, presentation materials and training materials regarding interactions between the Company's Employees and healthcare providers;

ii. Documents concerning the Company's Policies with respect to interactions between the Company's Employees and healthcare providers.

32. All Documents concerning interactions between the Company's Employees and patients regarding prior authorizations for Panorama, billing codes, use of insurance portals, payment options and billing practices, including:

i. Documents concerning Meetings, presentation materials and training materials regarding interactions between the Company's Employees and patients;

ii. Documents concerning the Company's Policies with respect to interactions between the Company's Employees and patients.

33. All Documents concerning the Company's development, design, and use of Panorama's requisition (i.e., order) form as, for example, referenced in ¶145 of the Complaint, including:

i. All Documents concerning Panorama's microdeletion screening;

ii. All Documents concerning Your inclusion of 22Q11.2 screening as a default selection in the Panorama Prenatal Panel Screen; and

iii. All Documents concerning the Company's Policies regarding the guidelines from The Society for Maternal-Fetal Medicine.

34. All Documents concerning the Company's marketing materials for Panorama, including:

i. Documents concerning Natera's payment options, including a cash pay option;

ii. Documents concerning Natera's "Price Transparency Program";

iii. Documents concerning Natera's "NIPT Gender Sender";

iv. Documents concerning Natera's medical legal review process and any Policies related thereto; and

v. Documents concerning marketing material that was shared by and between Natera's sales personnel.

35. All Documents concerning the Hindenburg Research report titled "Natera: Pioneers In Deceptive Medical Billing" published on March 9, 2022 ("Hindenburg Report"), including any Documents related to calls with investors concerning the Hindenburg Report and any Documents relied on or referenced in any investigation by the Company in connection with the Hindenburg Report.

36. All Documents concerning the Company's internal discussions of, and responses to, industry reports, media articles, or investor media concerning Natera or Panorama, including, but not limited to the following:

i. the New York Times article titled "When They Warn of Rare Disorders, These Prenatal Tests Are Usually Wrong" published on January 1, 2022; and

ii. articles or reports from The Capitol Forum addressing Natera or Panorama.

37. All Documents concerning any investigation by any Governmental Agency, including the SEC, DOJ and Michigan AG, whether formal or informal, concerning Panorama, including:

i. Documents produced by You in such investigation;

ii. Documents received by You in such investigation;

iii. Communications with the SEC, DOJ, or Michigan AG or other Governmental Agency in the course of such investigation;

iv. Documents concerning the results or findings of such investigation; and

v. transcripts or notes of all depositions, interviews or Meetings taken in connection with any such investigation or proceeding.

38. All Documents concerning any inspection, investigation, examination, audit, review, whistleblower report, or inquiry, including ethics, compliance, and internal audit inquiry, whether formal or informal, internal or external, concerning Panorama.

39. All Documents concerning the Company's internal discussions of, and responses to, any external complaints regarding Panorama, including from online sources such as industry forums, social media platform and consumer review websites, including but not limited to www.Yelp.com and www.Cafepharma.com.

40. All Documents concerning the Meetings, including committee Meetings, of the Board of Directors.

41. All Documents concerning changes in the price of the Company's common stock during the Relevant Period including Documents concerning market, shareholder, analyst, media, or investor reactions.

42. All Documents concerning Plaintiffs.

43. All Documents upon which Defendants intend to rely for their defense of the claims asserted in this Action, including all Documents concerning any affirmative defense(s) that You assert (or intend to assert) in Your Answer to the Complaint. <u>This Request is without limit as to time period.</u>

44. Pursuant to Rule 26(a)(1)(A)(iv), all insurance policies or agreements, including directors and officers liability insurance policies or agreements, which Defendants may use to satisfy all or part of a possible judgment in this Action or to indemnify or reimburse for payments made to satisfy a possible judgment in this Action.

45. All Documents concerning Your preservation, search for, collection, maintenance, destruction, or alteration of Documents, files, ESI, and Electronic Media that were undertaken with

respect to this Action. This Request includes Documents sufficient to describe any efforts You undertook to preserve Documents related to allegations in this Complaint, including the date, general subject matter, and recipients of any litigation hold or request to preserve Documents (whether or not related to this Action) and Documents concerning Document preservation sent to or received from any non-party to this Action.

46. Documents sufficient to show the Company's Policies for the destruction, retention, or preservation of Documents, files, ESI, and other Electronic Media.

47. Without limitation as to time period, all Documents concerning any response by You to any interrogatories or request for admission propounded, or to be propounded, by Plaintiffs in the above-captioned litigation.

Dated: November 16, 2023

Respectfully submitted,

**NIX PATTERSON, LLP**

*/s/ Jessica Underwood*
Jessica Underwood (Bar No. 24093291)
8701 Bee Cave Road
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 495-1534
junderwood@nixlaw.com

*Liaison Counsel for Lead Plaintiff British Airways Pension Trustees Limited*

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Joshua A. Materese (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
Andrew M. Rocco (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

gcastaldo@ktmc.com
jdancona@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com
arocco@ktmc.com

*Lead Counsel for Lead Plaintiff British Airways Pension Trustees Limited*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Lauren McMillen Ormsbee (admitted *pro hac vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
lauren@blbglaw.com

*Counsel for Additional Named Plaintiff Key West Police & Fire Pension Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2023, a true and correct copy of the foregoing document was sent via electronic and overnight mail to the recipients listed below.

Bruce G. Vanyo (admitted *pro hac vice*)
Christina L. Costley (admitted *pro hac vice*)
Paul S. Yong (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2029 Century Park East, Suite 2600
Los Angeles, CA 90067
Telephone: (310) 788-4400
Facsimile: (310) 788-4471
bruce@katten.com
christina.costley@katten.com
paul.yong@katten.com

Eric R. Hail
State Bar No. 24047579
Ted A. Huffman
State Bar No. 24089015
Megan C. McKennon
State Bar No. 24102184
**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
Telephone: (214) 765-3600
Facsimile: (214) 765-3602
eric.hail@katten.com
ted.huffman@katten.com
megan.mckennon@katten.com

Sarah L. Eichenberger (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
50 Rockefeller Plaza
New York, NY 10020
Telephone: (212) 940-8800
Facsimile: (212) 940-8776
sarah.eichenberger@katten.com

*Counsel for Defendants Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herm Rosenman, and Jonathan Sheena*

Dated: November 16, 2023

*/s/ Jessica Underwood*
Jessica Underwood

# APPENDIX A

## DOCUMENT AND ESI PRODUCTION SPECIFICATIONS
## DEFINITIONS

1. "Archival Systems or Storage" mean long-term repositories for the storage of records that preserve the content of the Documents or data stored therein, prevent or track alterations to such Documents and data, and control access to electronic records.

2. "Back-up Systems or Storage" refers to computer systems used to store copies of electronic information on back-up media (magnetic tapes, CDs, DVDs, hard drives, or other storage), to permit recovery of the information in the event of loss or damage to the original data.

3. "Custodian" means any individual who may have discoverable Documents (defined herein).

4. "Custodial Data Source" means any data source that belong to or that a Custodian has or had administrative control over, whether or not created or generated by such Custodian, including but not limited to personal computers, laptops, tablets, email (whether stored locally or centrally), mobile devices, Electronic Messages (defined herein), collaboration tools (e.g., Teams, Slack, eRooms, etc.), social media, Network (defined herein) servers, drives or folders, local hard drives, Network home or personal file shares, cloud storage systems, Structured Data (defined herein) systems, removable storage, removable storage media, online data storage such as Dropbox or Google Drive, OneDrive, and physical files.

5. "Extracted Text" means the text extracted from a Native (defined herein) Document, and includes all header, footer, and document body information when available.

6. "Hard-Copy Document" means Documents existing in paper form at the time of collection.

7. "Hyperlinked Documents" means any non-public Document linked to another

Document by hyperlink, document stub, or pointer embedded within the principal Document that, when clicked, will direct the user to the non-public Document so-linked. Examples of Hyperlinked Documents included Documents stored in SharePoint, OneDrive, Teams, Google Drive, Google Workspace, Slack, Box, etc., that are linked via hyperlink, document stubs or pointers embedded in emails, Electronic Messages, and other Documents.

8. "Load File" means an electronic file used to import required production information into a document database, including, Document images, Extracted Text (defined herein) or OCR (defined herein) text, Native Files, and Metadata, as well as information indicating unitization (i.e., Document breaks and relationships (e.g., parent-child relationships for email families)).

9. "Metadata" means structured information about a Document or ESI that is: (i) created by the file system or application, embedded in the Native File, and as modified through ordinary business, which describes characteristics of the Document, such as origins, usage, and/or validity of the Document; (ii) generated automatically by the operation of a computer or other information technology system or application when the Native File is created, modified, transmitted, deleted, or otherwise altered by a user of such system or application; (iii) collected about a Document, such as the media device and Custodian, Custodial or Non-Custodial Data Source (defined herein) from which it was collected; and (iv) created when processing a Document for production, such as Bates numbers, redactions status, privilege status, confidentiality status, and embedded status, and includes the fields identified in the Metadata Tables herein.

10. "Native Format" or "Native File" means the format of ESI in the application in which such ESI was originally created and/or used by You in the normal course of its business. For example, the native format of a Microsoft Word document is a .doc or .docx file; the native format of a Microsoft PowerPoint document is a .ppt or .pptx file; and the native format of a

Microsoft Excel workbook is a .xls or .xslx file.

11. "Network" or "Shared Storage Systems" shall mean any data storage device accessible to multiple users remotely over a computer network.

12. "Non-Custodial Data Source" means any data source that is not regarded as belonging to or that a Custodian has administrative control over, including data sources used by any party (or department, business unit, or division thereof), or Network or Shared Storage Systems, Back-up Systems or media, or Archival Systems or Storage. Non-Custodial Data Sources include, but are not limited to, databases, file servers, SANs, NASs, email servers or platforms, web servers or platforms, online and cloud data stores such as SharePoint, Dropbox, Box, Google Drive, and Google Workspace, online email systems such as Outlook and Google Mail, communication or coordination platforms such as Slack, Teams, Zoom, or Skype for Business, third-party-hosted Software as a Service (SaaS) platforms such as Zoho, document management systems (iManage, Box, NetDocuments, etc.), record management systems (RMS), content management systems (CMS), departmental/project/collaborative/shared storage spaces, e-rooms, Structured Data stores, application data, social media, source code repositories, and Hard-Copy Document repositories. Information that serves to identify or locate such material, such as file inventories, file folders, indices, and Metadata, are also included in this definition.

13. "OCR" means optical character recognition and refers to the technology used to read Hard-Copy Documents or electronic images of Documents, and output the text within those images in a Searchable Text (defined herein) format.

14. "Searchable Text" means the Native text extracted from an Electronic Document and any text generated from an OCR process being applied to a Hard-Copy Document or electronic image.

15. "Search Term" means a word or a combination of words or phrases designed to capture potentially relevant ESI, and includes strings of words and phrases joined by proximity and Boolean connectors or other syntax.

16. "Structured Data" means data that resides in a fixed field within a record or file, or stored in a structured format, such as databases (such as Excel, Oracle, SQL, Access) or data sets, according to specific form and content rules as defined by each field of the database.

17. "Tagged Image File Format" or "TIFF" refers to the CCITT Group IV graphic file format for storing bit-mapped images of Documents and ESI.

18. "TAR" means a process for prioritizing or coding a collection of ESI using a computerized system, using algorithms or systematic rules, that harnesses human judgments of subject matter expert(s) on a smaller set of Documents and then extrapolates those judgments to the remaining Documents in the collection. TAR systems generally incorporate statistical models and/or sampling techniques to guide the process and to measure overall system effectiveness.

19. "Text File" is a file containing the full text of Native Files extracted directly from the Native File, or, in the case of Hard-Copy Documents or scanned PDF documents, subject to OCR, a file containing the text resulting from the OCR.

## INSTRUCTIONS

Documents shall be collected, processed, and produced in accordance with the procedures below.

1. Documents that are regularly maintained in a known location, or in a location that is knowable upon reasonable inquiry, shall be collected and produced in their entirety, and without regard to whether or not each Document in the collection has been or would be identified by applicable search methodologies, unless privileged, which Documents may be withheld, in whole

or part, or redacted, pursuant to the procedures described below. You shall indicate any such categories of Documents that will be produced in accordance with this provision, and should prioritize production of such Documents.

2. Documents for which text-based search methodologies (like keywords, search terms, or TAR) are inadequate or ineffective (SMS, MMS, text, chat, and other Electronic Messages, images, videos, voice messages, etc.), must be collected and reviewed manually, without the use of text-based search methodologies.

3. You shall use reasonable methods of collection and processing that preserve: (i) the integrity of Document Metadata; (ii) any parent-child and family group relationships, including but not limited to the association between parent emails and child attachments, and parent Documents and child Documents or ESI embedded therein; and (iii) the relationship between Documents, including, but not limited to, emails (e.g., Outlook, Gmail) and messaging or communication posts (e.g., Slack, Google Hangouts, Google Chat), containing hyperlinks, document stubs or pointers to other internal or non-public Documents (e.g., Documents stored in Google Workspace, Microsoft SharePoint, OneDrive, or Zendesk), and those hyperlinked, stubbed or internal or non-public Documents so-linked, which shall be so-linked in the Metadata produced. Electronic Messages shall also be collected and processed in a manner that preserves the full conversation thread and any relevant contextual messages.

4. The following file types do not need to be collected from Custodial and Non-Custodial Data Sources:

a. System or executable files, including but not limited to .exe and .dll;

b. Standard system file extensions, including but not limited to BIN, CAB, CHK, CLASS, COD, COM, DLL, DRV, INF, INI, JAVA, LIB, and SYS;

c. Structural files not material to individual file contents that do not contain substantive content, including but not limited to CSS, XSL, XML, and DTD;

d. Electronic files that match the hash value when compared to the National Software Reference Library reference data set (RDS Hash), published by the National Institute of Standards and Technology (NIST), of known traceable system and application files;

e. Data that is fragmented, in slack or unallocated space;

f. Random access memory (RAM), cache memory, or data in temporary or cache files, including internet history, web browser cache, and cookie files; and

g. Data stored on photocopiers, scanners, and fax machines.

5. Prior to review, You shall apply standard de-duplication tools to cull exact duplicate Documents from the collection, based on bit-for-bit identity of their MD5 or SHA-1 hash values, and in a manner that does not break up Document families. The following Documents are not exact duplicates and should not be eliminated from the Document collection prior to review (or production): (i) attachments, unless the parent email and all attachments are also duplicates; (ii) emails that include content in the BCC or other blind copy field shall, compared to emails that do not include content in those fields, even if all remaining content in the email is identical; (iii) "near-duplicate" documents (that are not an exact match based on their hash values); and (iv) lesser included emails, compared to a more inclusive email thread. De-duplication shall be performed across the entire Document collection (global de-duplication), and a "DUPLICATE_CUSTODIAN" (or similarly titled) Metadata field shall be populated to identify each all other Custodians, separated by a semicolon, who were a source of the document, and a "DUPLICATE_FILEPATH" (or similarly titled) Metadata field shall be populated to identify each

filepath location, separated by a semicolon that was a source of the Document. To ensure accuracy, the CUSTODIAN-ALL and FILEPATH-DUP Metadata fields shall be captured by an automated process and may not be populated manually. Should the DUPLICATE_CUSTODIAN or DUPLICATE_FILEPATH Metadata fields produced become outdated due to rolling productions, You shall produce an overlay file for each subsequent production, updating the DUPLICATE_CUSTODIAN and DUPLICATE_FILEPATH fields for the affected Documents to identify all Custodians and FilePaths identified in prior productions and any newly identified Custodians and FilePaths identified in the supplemental production. A Producing Party shall use a uniform description of a particular custodian across productions, and entity/departmental custodians should be identified with a description of the entity or department, to the extent applicable. De-duplicated Documents shall be deemed produced from the custodial files of each identified custodian for all purposes in this litigation, including for use at deposition and trial. No other method shall be used to identify or eliminate duplicates from review, and no other culling or filtering method shall be used to reduce the Document collection for review (e.g., email thread suppression, date range filtering, email domain or filename filtering, file extension filtering, etc.).

6. You shall meet and confer prior to application of Search Terms, Technology Assisted Review, or other text based search methodology to be used to identify or classify documents for review or production.

7. In addition to the specifications provided below, Documents should not be produced in a form that removes or degrades the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means; and to the extent You are unwilling or unable to produce Documents in accordance with the specifications below, You should not produce such Documents in a different format without first

discussing production formatting issues with Plaintiffs' counsel:

a. Images. Unless otherwise specified herein, all Documents shall be produced as single-page, black and white Group IV Tagged Image File Format (TIFF) files of 300 DPI resolution, with corresponding multipage text and necessary Load Files (as discussed below). Page size shall be 8.5x11 inches unless, a particular item requires a different page size. Any Hard-Copy Documents shall be scanned and produced electronically in the same format as TIFF format, and shall include multipage, document-level OCR Text Files with Unicode compliant (UTF-8) text that maximizes text quality. Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process. Original document orientation shall be maintained (i.e., portrait to portrait, and landscape to landscape). If an original Document contains color, the Document shall be produced in color, as single-page, 300 DPI JPG images with JPG compression and a high quality setting as to not degrade the original image. All Documents containing hidden content, tracked changes, comments, notes, or other similar information, shall be imaged so that such information is captured on the produced image file, and the author, date, and time of any tracked changes is visible. Each TIFF/JPG image of an Electronic Document shall be created directly from the corresponding Native File, and all TIFFs/JPGs shall show any and all text and images that would be visible to the reader using the Native software that created the document (e.g., for emails, the BCC line). You need not enhance an image beyond how it was kept in the usual course of business, but if the image does not accurately reflect the Document as it was kept in the usual course of business, including all comments, edits, tracking, etc., You shall produce the Document in Native form (as discussed below).

b. Natives Files. The following Documents shall be produced in Native

Format with TIFF image placeholders that are Bates-stamped in accordance with the procedures outlined above, and which are brandished with the statement "DOCUMENT PRODUCED IN NATIVE": (i) all spreadsheet and similar files (e.g., Microsoft Excel and .csv); (ii) all slide presentations (e.g., Microsoft PowerPoint); (iii) all Documents with hidden content, tracked changes, comments or notes; (iv) all Microsoft Access files; (v) all audio and video files (e.g., .wav, .mpg, .mp4, etc.) and digital photographs; and (vi) Documents where the TIFF or JPG version is not reasonably usable. Each Native File shall be named according to the Bates number it has been assigned and shall be linked directly to its corresponding record in the Load File using the NATIVELINK field. The text and Metadata for the underlying electronic file, including the original file name, shall also be provided per the procedures set forth herein. Following production, Plaintiffs may request that imaged Documents not identified in this paragraph be produced in Native format, if they: (i) are unreadable or illegible; (ii) are cut-off or missing data or information; (iii) cannot be utilized at a deposition or authenticated and/or entered at trial in their imaged format; or (iv) Plaintiffs otherwise reasonably believe they should be produced in Native Format, which reasons they shall articulate. You shall produce any Native Files requested based on (i)-(iii) above without objection and, with respect to requests premised on (iv), shall either produce the Native File(s) requested or respond in writing with an explanation for why You will not produce such files. Spreadsheet files requiring redaction shall, to the extent reasonably possible, be redacted within the Native File, using native redaction tools, and the redacted Native File will be produced as provided herein. To the extent use of native redaction tools are not possible, or other Documents required to be produced in Native Format require redactions, You shall produce such Documents as TIFF or JPG

images (if the Document contains color), and redactions applied, provided the TIFF images are reasonably usable. If redacting TIFF images, You should make reasonable efforts to cause such images to legibly present all other non-privileged information in the Document, including hidden data, comments, and tracked changes.

c. Electronic Messages. Electronic Messages shall be produced in a searchable format that preserves the presentational features of the original message, such as emojis, images, video files, animations, and the like, and shall be produced with its full conversation thread along with any relevant contextual messages You reasonably identify, unitized by conversation day, and shall not be converted to non-unitized file formats such as PDF or TIFF. To the extent Plaintiffs reasonably believe additional contextual messages are necessary to understand a particular responsive message, they shall identify the responsive message by Bates number, and Parties will meet and confer regarding what, if any, contextual messages exist for production. To the extent Plaintiffs believe that an Electronic Message was not produced in a searchable format that preserved the presentation features of the original message, they shall identify the message by Bates number, and You will reproduce it in a searchable format that preserves the presentation features of the original message, if possible. To the extent ephemeral messaging tools or applications (e.g., Snap, Signal, etc.) were utilized by any of Your Employees to communicate regarding business matters, You shall disclose this fact to Plaintiffs and the parties will meet and confer regarding the availability of such data for collection and production, and the appropriate production format.

d. Collaboration Tools. If responsive Documents and ESI exist within collaboration platforms (e.g., Slack, Teams, SharePoint, Google Workspace, Google

Drive, etc.), You shall meet and confer regarding the appropriate production format and Metadata to be produced for such Documents. To facilitate these discussions, You shall disclose all applicable collaboration tools and versions containing responsive Documents and ESI.

e. Preservation of Families. Parent-child relationships between electronic files (e.g., the association between an attachment and its parent email, or a spreadsheet embedded within a word processing document) must be preserved by producing attachments sequentially after the parent Document (except where the attachment is a non-substantive, automatically generated embedded file (e.g., logos) or formatting file (e.g., .ole), assigning sequential Bates numbers to all files within a parent-child group, and by providing accurate attachment ranges for those files in the Metadata fields identified below. If any part of a Document family is responsive, the entire Document family shall be produced, except and to the extent the parent or child is subject to a valid claim of attorney-client privilege or work product (discussed below). Where a Document family contains non-privileged attachments and a parent email that is fully privileged, the header information for that email shall also be produced. Document families shall be produced in a manner that maintains the parent-child relationship that have been maintained in the ordinary course of business, with attachments produced sequentially after the parent email.

f. Hyperlinked Documents. For Documents (including, but not limited to emails and Electronic Messages) that identify, contain or point to other internal or non-public Documents (e.g., in SharePoint, Google Vault, etc.), via hyperlinks, document stubs, or pointers embedded within the parent Document, You shall (i) extract the version of the Documents located at the hyperlink, Document stub or pointer, at the time it was shared;

and (ii) produce the Documents in an manner that maintains the parent-child relationship between the parent Document containing the hyperlink, document stub, or pointer, and the internal or non-public Document so-linked, stubbed or pointed to therein, and shall link those Documents in the associated Metadata produced.

g. Structured Data. To the extent Documents responsive to a discovery request are contained within a structured database, You shall meet and confer regarding appropriate methods of production form such databases, including whether relevant information may be provided by querying the database and generating a report in a reasonably usable and exportable electronic file as well as the appropriate content and format of any such report to be generated. In furtherance of these discussions, You shall disclose the database and database schematics, including identifying the available fields, reports, and queries that may run to identify responsive information in a reasonably usable and exportable electronic file for review by Plaintiffs. Plaintiffs may make reasonable requests for additional information, including explanations of codes and abbreviations, different reports or report formats, and specific data from identified fields.

h. Embedded Objects. Objects, Documents or files embedded in Documents and ESI (such as embedded MS Office files, etc.), or images, videos, and other files embedded in RTF files, shall be extracted as separate files and produced as an attachment to the parent Document in which it is embedded, with the parent-child relationship preserved as set forth herein. However, You need not extract and produce as separate files, logos and other similar image files embedded in emails or document headers or footers also shall not be extracted and produced as separate Documents as long as they are displayed in the Document in which they are embedded. All embedded objects, documents

or files extracted and produced as Documents under this procedure shall be subject to the same production requirements set forth herein, and in the Load File shall refer to the parent Document in which the file was embedded, and be marked with a "Yes" under the "Is Embedded" Metadata field.

i. Compressed Files. Compressed file types (e.g., .ZIP, .RAR, .CAB, .Z) should be decompressed so that the lowest level document or file is extracted.

j. Encrypted Data. If any responsive Document or data source is password-protected, encrypted, or not readable, You shall make all efforts to access the Document or data source (e.g., unlock any passwords or encryption), and produce the unlocked or decrypted Documents responsive ESI and any additional information necessary to access it. In the event You are unable to access the Document or data source, You shall produce a slip-sheet for each encrypted or password protected Document that cannot successfully be unlocked or decrypted, indicating that the Document cannot be processed; (ii) provide the Metadata for the Document specified herein; and (iii) meet and confer regarding any other appropriate action that may be undertaken to access and produce the encrypted or password protected Documents.

k. Dynamic Fields. All dynamic date and time fields, where such fields are processed to contain a value, and all Metadata pertaining to dates and times, will be processed with a single, standardized date and time setting that is consistent across each party's productions, Universal Coordinated Time (UTC), and in a way that maintains the date/time shown in a document as it was last saved by the Custodian or end user, not the date of collection or processing (i.e., force off auto data). Dates and times that are hard-coded within a file will be produced as part of the document text.

l. Bates Numbering. All Documents that You produce in TIFF or JPG format shall be electronically branded with a legible, unique Bates number on each page, but the Bates number should not be included in the Extracted Text file accompanying the production. The Bates number shall: (1) identify Your name; (2) maintain a constant length of eight numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters and dashes, no special characters or embedded spaces; and (4) be sequential within a given Document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source Document, You shall, at Plaintiffs' request, produce a copy that is not so obscured. Each TIFF/JPG file shall be named with the same page-level Bates number branded on the underlying image. Native Files shall be produced with a corresponding slip-sheet branded with a unique Bates Number, and the Native File shall be named with the corresponding Bates Number. If a member of a Document family that has otherwise been determined to be responsive cannot be technically processed (e.g., unsupported file format, file corruption, inaccessible password-protected Document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed"; the associated Metadata for the file with the technical problem shall be produced if technically possible.

m. Naming Conventions. TIFF or JPG image files shall be named according to the Bates number branded on the image (e.g., ABC-00000004.jpg). For Documents produced in Native File format, no Bates numbering or confidentiality legend should be added to the content of the Document. Instead, Native Files shall be named according to the Bates number identified on the TIFF image placeholder for the Document (e.g., ABC-

00000007.xlsx).

n. Confidentiality Legend. For Documents produced subject to a claim of confidentiality under any applicable protective order entered in this action, You shall electronically brand the appropriate confidentiality designation onto each page of the TIFF or JPG image of the Document, or, for Native Files, in the name of the Native File produced, but should not include the confidentiality designation in the Extracted Text of the Document. If the designation conceals, interferes with, or otherwise obscures any information from the source Document, You shall, at Plaintiffs' request, produce a copy that is not so obscured.

o. Load File. Each Document production shall be accompanied by comma delimited load files (i.e., an image load file, in standard .opt image cross-reference file format, and an extracted text file in standard .dat file format). Image load files shall be produced showing the Bates number of each page, the appropriate unitization of the Documents (i.e., distinct Documents shall not be merged into a single record, and single Documents shall not be split into multiple records), and the entire family range, and shall logically group all corresponding images, text and data together in a directory structure with a common key to load the data. The image key shall be named the same as the Bates number of the page. Metadata load files shall contain the metadata fields listed in Appendix A hereto and include a field with the full path and filename to files produced in native format. Image and Metadata load files shall be named to mirror the delivery volume, and volume names shall be consecutive for each production. Metadata load files must also contain the relative location of the OCR text file.

p. Text File. Each Document shall be accompanied Text File containing a full

text extraction of the Document, and be created by extracting text directly from the underlying Native File unless the ESI must be redacted prior to production, in which case, the Text File shall be generated by applying industry standard OCR technology to the redacted version of the ESI. Each Text File shall be named with the beginning Bates number of the electronic file to which the Text File relates. Text Files shall be identified in the Metadata Load File.

q. Metadata. All Documents responsive to these Requests shall be produced with a delimited, database Load File that contains the Metadata fields identified in the Metadata Table appended to these Requests. The Metadata produced should have the correct encoding to enable preservation of the Documents' original language. For Documents that do not conform to the Metadata fields set forth in Table 1, such as Electronic Messages and data from collaboration tools, You shall identify the available Metadata to be produced for Documents identified from within those platforms, and the parties will meet and confer regarding the appropriate Metadata fields to be produced.

r. Production Media. You may deliver productions on Electronic Media (such as a CDROM, DVD, or external hard drive) or via a secure internet transfer tool (such as SFTP or ShareFile). Each production shall be labeled with the production date, the Bates range, and a volume number, if appropriate.

s. Security. To maximize the security of information in transit, any Electronic Media on which Documents are produced may be encrypted. In such cases, You shall transmit the encryption key or password to Plaintiffs, under separate cover, contemporaneously with sending the encrypted Electronic Media.

8. Privileged Redactions. You may only redact Documents or portions thereof subject to a proper claim of privilege or attorney work product, which redactions should be narrowly tailored to the specific Document or portion thereof that is privileged, not factual, contextual, or other non-privileged information, and redactions for relevance are not permitted. Redactions should be applied by marking the legend with the word "Redacted." To the extent that a Document family contains a combination of privileged and non-privileged Documents, and the parent Document is privileged in its entirety, a copy of the privileged parent Document showing the sender, recipient information, date and subject matter shall be produced, with the remainder of the Document redacted. To the extent that a Document family contains a combination of privileged and non-privileged Documents, and an attachment is privileged, the privileged attachments will be represented in the production with a placeholder TIFF image endorsed with a sequential Bates number that bears the legend "Document Withheld as Privileged." For all Documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the Metadata Load File to indicate the family relationship: BegDoc, EndDoc, BegAttach, EndAttach, and ParentID. To the extent a Document is produced with redactions, You must also, at the time of production, produce a Load File with a Metadata field titled "Redacted" populated with the words "Yes" or "No," as applicable.

**TABLE 1**
**Metadata Fields for Emails and E-Docs**

| Field Name | Example/Format | Description |
|---|---|---|
| BEGBATES | ABC0000001 (Unique ID) | The Document ID number associated with the first page of the document. |
| ENDBATES | ABC0000003 (Unique ID) | The Document ID number associated with the last page of the document. |
| BEGATTACH | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the first attachment. |
| ENDATTACH | ABC0000008 (Unique ID Parent-Child Relationships) | The Document ID number associated with the last page of the last attachment. |
| PARENT ID | ABC0000001 (Unique ID Parent-Child Relationships) | The Document ID number associated with first page of parent document. |
| PGCOUNT | The number of pages in a document (image records). | Numeric |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| VOLUME | VOL001 | The name of CD, DVD, or Hard Drive. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Database Name, etc. | The source from which the document was collected. |
| RECORDTYPE | Options: eMail, Attachment, Scanned Doc, eFile | The record type of a document. |
| CUSTODIAN | Smith, Joe | The custodian of a document from which the document originated. |
| CUSTODIAN-ALL | Smith, Joe; Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SENTDATE | MM/DD/YYYY | The date the email or calendar entry was sent. |
| SENTTIME | HH:MM | The time the email or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry. |
| MEETING START TIME | HH:MM | Start time of calendar entry. |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry. |
| MEETING END TIME | HH:MM | End time of calendar entry. |
| FROM | Joe Smith <jsmith@email.com> | The display name and email address of the author of an email/calendar item. An email address should always be provided. |
| TO | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email address of the recipient(s) of an email/calendar item. An email address should always be provided for every email if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the copyee(s) of an email/calendar item. An email address should always be provided for every email if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>; tjones@email.com | The display name and email of the blind copyee(s) of an email or calendar item. An email address should always be provided for every email if a blind copyee existed. |
| SUBJECT | | The subject line of an email/calendar item. |

| Field Name | Example/Format | Description |
|---|---|---|
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | Email Importance Flag. |
| FILE UNREAD | Yes, No, Blank | Indicates whether the document has been read. For emails, this field should reflect Yes if unread, and No, if read. For attachments and non-email documents, this should be blank. |
| CONVERSATION INDEX / THREAD TEXT | 01c72ac4c | ID used to tie together email threads. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| LASTACCESSEDDATE | MM/DD/YYYY | The date the document was last accessed. |
| LASTACCESSEDTIME | HH:MM | The time the document was last accessed. |
| AUTHOR | jsmith | The author of a document from extracted metadata. |
| LASTSAVEDBY | Jsmith | The name of the last person to save the file. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| TITLE | | The extracted document title of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILEPATH/FOLDER | /JsmithPC/Users/Jsmith/Desktop<br>Joe Smith/E-mail/Inbox<br>Joe Smith/E-mail/Deleted Items | Location in which the original document was stored in the usual course of business. This field should be populated for both e-mail, e-files and hard copies. |
| FILE MANAGER / APPLICATION DESCRIPTION | Microsoft Excel, Word, etc. | Native File application. |
| FILEEXT | XLS | The file extension of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| TIMEZONEPROCESSED | PST, CST, EST, etc | The time zone the document was processed in. **NOTE:** This should be the time zone where the documents were located at time of collection. |
| HASH | | The MD5 or SHA-1 Hash value assigned to a document. The same hash method (MD5 or SHA-1) should be used throughout production. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of the document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document. There should be a folder on the deliverable containing a separate text file per document These text files |
| CONFIDENTIALITY | Confidential/Attorneys' Eyes Only/Public | Confidentiality designation per any applicable confidentiality or protective order. |
| REDACTED | Yes or No | Indication of whether the document has been redacted to withhold information protected by the attorney-client privilege or attorney work product doctrine. |
| WITHHELD | Yes or No | Indication of whether the document has been withheld on the basis of a claim of attorney-client privilege or attorney work product. |

| Field Name | Example/Format | Description |
|---|---|---|
| HIDDEN DATA | Yes or No | Indication of whether hidden data exists in the document. For example, hidden Excels or PowerPoint comments or slides. |
| IS EMBEDDED | Yes or No | Indication of whether a file is embedded in another document. |

## Metadata for Text Messages, iMessages, Chat, and other Electronic Messages

| | | |
|---|---|---|
| CONTROL ID | ABC0000001 (Unique ID) | Begin and end bates number of a document if it differs from DocID; this can be provided in one bates range field or 2 separate fields for the beginning and ending number. |
| FAMILY ID | ABC0000001 (Unique ID) | Group the file belongs to, used to identify attachments to the message. |
| CONVERSATION ID / CONVERSATION INDEX | 01c72ac4c | Group the file belongs to, used to identify other messages and attachments in a conversation. |
| CUSTODIAN | John Smith | Name of the person designated as custodian of this data |
| FROM | +1(234)567-8900 John Smith (owner); John Smith <jsmith@icloud.com> | The name and phone number or email address of the sender of the message. |
| TO | +1(234)567-8900 John Smith (owner); +12345678900 Jane Doe; Jane Smith <jsmith@icloud.com> | The names and phone numbers or email addresses of ALL recipients of the message |
| CONVERSATION PARTICIPANTS | +1(234)567-8900 John Smith (owner); +12345678900 Jane Doe; Jane Smith <jsmith@icloud.com> | The names and phone numbers or email address of ALL participants in the message, including the sender. |
| MSG DATE TIME SENT | MM/DD/YYYY; HH:MM | Date and time when the message was sent. |
| MSG DELIVERED DATE TIME | MM/DD/YYYY; HH:MM | Date and time when the message was delivered |
| MSG READ DATE TIME | MM/DD/YYYY; HH:MM | Date and time when the message was read |
| CONVERSATION START DATE TIME | MM/DD/YYYY; HH:MM | Date and time when the conversation started. |
| CONVERSATION LAST ACTIVE DATE TIME | MM/DD/YYYY; HH:MM | Date and time when the conversation ended. |
| BODY | | Body or extracted text of short-message communication. |
| REACTIONS | | Any reactions from other users of the chat. |
| MSG SOURCE/ APPLICATION NAME | iMessage, What'sApp, Virb, Slack, Teams, Google Chat, etc. | Name of the application where message resided. |
| MESSAGE TYPE | SMS, MMS, text message, iMessage, chat, instant message, etc. | Indicates the type of the message. |
| DIRECTION | | Indicates direction of the message from perspective of the phone owner. |
| CHAT NAME | | Name of the thread within the application the chat is sent. |
| CHAT CHANNEL | | Name of the chat channel within the application the chat is sent. |
| CHAT MESSAGE NUMBER | | The order number that a message appears sequentially in a message thread. |

| | | |
|---|---|---|
| CHAT GROUP NUMBER | | Numeric identification number assigned to unique chat groups. |
| ATTACHMENT COUNT | Numeric | Number of attachments to the message. |
| ATTACHMENT NAMES | | Semicolon delimited list of names of the attachments to this message. |
| ATTACHMENT PATH | | Relative path to Native File. |
| ATTACHMENT TYPE | Image, Video, Link, eDoc, etc. | The type of document attached to the message. |
| ATTACHMENT DATE | MM/DD/YYYY or Blank | The date associated with attachment. |
| ATTACHMENT ID | | Unique attachment identifier generated by chat platform. |
| ATTACHMENT SIZE | Numeric | Size of the file in bytes. |
| MESSAGE READ | Read or Sent | Indicates whether a message was read or sent. |
| MESSAGE UNREAD | Yes or No | Indicates whether the message went unread. |
| DELETED | Yes or No | Indicates whether the message was deleted. |
| DELETED ON | MM/DD/YYYY or Blank | Date when the message was deleted. |
| DELETED BY | John Smith or Blank | Name of the person who deleted the message. |
| EDITED | Yes or No | Indicates whether the message was edited. |
| EDITED ON | MM/DD/YYYY or Blank | Date and time when the message was edited. |
| EDITED BY | John Smith or Blank | Name of the person who edited the message. |
| EDIT PRIOR VERSION | | Text of the message before edit |
| ATTACHMENT EXTENSION | .doc, .jpg, .wav, etc. | Extension of the document. |
| SORT DATE TIME | MM/DD/YYYY; HH:MM | Date and time of parent document indicated by Family ID. |
| HASH | | Hash value that uniquely identifies content of this message. |
| DEVICE NAME | | Name of the device messages was collected from. |