**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-00398-DAE |
| Plaintiff, | |
| v. | |
| NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
<u>CLASS REPRESENTATIVES AND CLASS COUNSEL</u>**

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................... 1

II.    ARGUMENT .......................................................................................................... 1

    A.     Plaintiffs and the Class May Invoke the *Basic* Presumption of Reliance ............... 1

    B.     Defendants Fail to Show an Absence of Price Impact ............................................ 2

        1.     Defendants Fail to Show an Absence of Front-End Price Impact ............... 3

        2.     Defendants Fail to Show an Absence of Back-End Price Impact ............... 4

            a.     *The Capitol Forum* Articles Were Not Publicly Available ........... 5

            b.     Defendants' Deceptive Microdeletion Practices Were Not Previously Disclosed ........................................................................ 8

            c.     The Hindenburg Report Revealed New Information ..................... 9

            d.     There is No Mismatch Between the Front-End and Back-End ........................................................................................... 11

            e.     Supposed Confounding Information Does Not Fully Explain the Decline ........................................................... 12

    C.     The *Affiliated Ute* Presumption of Reliance Also Applies.................................... 14

    D.     Individualized Damages Issues Do Not Predominate over Class-wide Issues ................................................................................................................... 14

    E.     Class Certification Should be Granted on the Securities Act Claims .................. 15

III.   CONCLUSION ....................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972) ...................................................................................................... 14

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ....................................................................................11-12

*Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*,
623 F. Supp. 3d 470 (E.D. Pa. 2022) ................................................................. 3, 4, 9, 10

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ...................................................................................................... 13

*In re Apache Corp. Sec. Litig.*,
2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ..................................................................... 11

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ....................................................................................*passim*

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
955 F.3d 254 (2d Cir. 2020), *vacated on other grounds*, 594 U.S. 113 ................................. 3

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................................................ 6

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) .................................................................................... 7, 10

*Bonanno v. Cellular Biomed. Grp., Inc.*,
2016 WL 4585753 (N.D. Cal. Sept. 2, 2016) ................................................................... 7

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
2023 WL 2932485 (D. Conn. Apr. 13, 2023) ................................................................... 2

*In re Carter-Wallace, Inc. Sec. Litig.*,
150 F.3d 153 (2d Cir. 1998) ............................................................................................ 7

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ...................................................................................... 15

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ............................................................ 4, 10

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
2024 WL 1060079 (S.D. Cal. Mar. 11, 2024) ........................................................9

*City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs.*,
2018 WL 4293143 (N.D. Ga. May 5, 2018) ..........................................................6

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
2017 WL 2608243 (S.D. Tex. June 15, 2017)................................................15-16

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...............................................................................................14

*Cory v. Stewart*,
103 F.4th 1067 (5th Cir. 2024)..............................................................................13

*DBW Partners, LLC v. Bloomberg, L.P.*,
2019 WL 5892489 (D.D.C. Nov. 12, 2019) ...........................................................6

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
2023 WL 6300569 (S.D. Tex. Sept. 27, 2023), *leave to appeal denied*, 2023
WL 8794620 (5th Cir. Nov. 17, 2023) .................................................2-3, 4, 12, 14

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ..........................................................................11

*Espy v. J2 Glob., Inc.*,
99 F.4th 527 (9th Cir. 2024) ..................................................................................11

*Ferris v. Wynn Resorts Ltd.*,
2023 WL 2337364 (D. Nev. Mar. 1, 2023) ..........................................................12

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) .................................................................................9

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ....................................................................................*passim*

*Grigsby v. BofI Holding, Inc.*,
979 F.3d 1198, 1202-03 (9th Cir. 2020).................................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .........................................................................2, 6, 8, 15

*Homyk v. ChemoCentryx, Inc.*,
2024 WL 1141699 (N.D. Cal. Mar. 6, 2024), *leave to appeal denied*, 2024
WL 2745788 (9th Cir. May 23, 2024)..............................................................3, 11

*Howard v. Arconic Inc.*,
   2021 WL 2561895 (W.D. Pa. June 23, 2021) ........................................................9

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
   818 F.3d 775 (8th Cir. 2016) ..............................................................................4

*Jedrzejczyk v. Skillz Inc.*,
   2022 WL 2441563 (N.D. Cal. July 5, 2022) ......................................................15

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
   2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024)......................................................4

*Krim v. pcOrder.com, Inc.*,
   402 F.3d 489 (5th Cir. 2005) ........................................................................15, 16

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ..............................................................................12

*Mandalevy v. BofI Holding, Inc.*,
   2018 WL 3032588 (S.D. Cal. June 19, 2018) ......................................................7

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ..........................................................................11

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019) ..........................................................................5

*MiMedx Grp., Inc. v. DBW Partners LLC*,
   2018 WL 4681005 (D.D.C. Sept. 28, 2018)..........................................................6

*Pearlstein v. BlackBerry Ltd.*,
   2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ........................................................2

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ................................................................................6

*In re Qualcomm Inc. Sec. Litig.*,
   2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ................................................4, 11

*Regents of Univ. of Cal. v. Credit Suisse First Bos., Inc.*,
   482 F.3d 372 (5th Cir. 2007) ..............................................................................14

*Rooney v. EZCORP, Inc.*,
   330 F.R.D. 439 (W.D. Tex. 2019) ........................................................................5

*Sanders v. RealReal, Inc.*,
   2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ....................................................6

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019)................................................................9, 11, 13

*Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*,
    2024 WL 1497110 (S.D.N.Y. Apr. 5, 2024) ...................................................................8, 10-11

*In re TransDigm Grp., Inc. Sec. Litig.*,
    440 F. Supp. 3d 740 (N.D. Ohio 2020) ..................................................................................6

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011), *aff'd*, 838 F.3d 223 (2d Cir. 2016) ...........................15

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ...................................................................................................13

*Weiner v. Tivity Health, Inc.*,
    334 F.R.D. 123 (M.D. Tenn. 2020), *leave to appeal denied*, *In re Tivity
    Health, Inc.*, 2020 WL 4218743 (6th Cir. July 23, 2020) .........................................................8

## I.     <u>INTRODUCTION</u>

Defendants' challenge to the certification of Plaintiffs' Exchange Act claims requires that they rebut the *Basic* presumption by showing **no** price impact—i.e., disproving any connection between the alleged misstatements and artificial inflation in Natera's stock price—both when the misstatements were made and when the truth was revealed. They fail to do so. Defendants' statements touting growing Panorama revenue led to undisputed statistically significant stock price increases, which, alone, is sufficient to infer price impact. And when the March 9, 2022 Hindenburg Report revealed that Natera had relied on allegedly misrepresented deceptive practices to inflate Panorama demand, it spurred an undisputed statistically significant decline. Here, "the strong link between misrepresentation[s] and corrective disclosure provide[s] sturdy ground to use the back-end price drop as a proxy for front-end inflation." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 98 (2d Cir. 2023) ("*ATRS*"). Moreover, market analysts universally attributed the back-end decline to the corrective disclosure and said that it revealed **new** information—confirming that Defendants' fraud was **not** previously known. Defendants' other arguments improperly assume they prevail on their price impact challenge, and likewise fail. [1]

Class certification should also be granted on the Securities Act claims. Proposed Class Representative Key West has provided uncontroverted evidence that it purchased directly from an Underwriter Defendant in the July 2021 SPO. That is sufficient to show standing at this stage.

## II.    <u>ARGUMENT</u>

### A.     **Plaintiffs and the Class May Invoke the *Basic* Presumption of Reliance**

Defendants do not dispute that the market for Natera's stock was efficient throughout the

---

[1]     Unless otherwise stated, emphasis is added and internal citations and alterations omitted. Undefined terms are defined in Plaintiffs' Motion (ECF 136). "DX" refers to the exhibits to Defendants' opposition brief (ECF 154) ("Opp."). "PX" refers to the exhibits filed with this Reply.

Class Period (Opp. 5-6) or that Plaintiffs purchased Natera stock after Defendants' misstatements and before the March 9, 2022 corrective disclosure. Nothing more is required: while "the burden of proving [*Basic's*] prerequisites . . . rests with plaintiffs," once market efficiency is established, Plaintiffs need only show that they "purchased the stock at the market price during the relevant period." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276, 279 (2014) ("*Halliburton II*"); *see Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *15 (S.D.N.Y. Jan. 26, 2021) ("market timing" shown where "[p]laintiffs allege that they bought [company] stock during the [c]lass [p]eriod and suffered losses when . . . the truth was disclosed"). Defendants assert that the *Basic* presumption is unavailable because Plaintiffs cannot "show[] that they purchased stock before the truth was revealed." Opp. 5-6. *See also id.* at 9 n.7 (challenging Plaintiffs' adequacy and typicality on this basis). But **disproving** price impact is Defendants' burden, *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126 (2021), and their arguments improperly shift the burden of **proving** price impact to Plaintiffs. *Halliburton II*, 573 U.S. at 279 (declining to "jettison" *Basic* by "revising the prerequisites for invoking it"). Even if Plaintiffs were required to show that Defendants' fraud had not been fully revealed prior to their purchases (they are not), there is ample evidence that the Hindenburg Report revealed new, corrective information. *See infra* §II.B.2.c.

## B. Defendants Fail to Show an Absence of Price Impact

To rebut the *Basic* presumption, Defendants "must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff." *Goldman*, 594 U.S. at 125-26 (alteration in original). "[T]he inquiry is whether Defendants have proven **a complete lack** of price impact," which is a "daunting task." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 2023 WL 2932485, at *11-12 (D. Conn. Apr. 13, 2023); *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 2023 WL 6300569, at *13 (S.D. Tex. Sept. 27, 2023) (presumption stands absent showing of "no price impact"), *leave to appeal denied*, 2023 WL 8794620 (5th Cir. Nov. 17, 2023). Any showing of

price impact—either at the front- *or* back-end—defeats their challenge. *Homyk v. ChemoCentryx, Inc.,* 2024 WL 1141699, at *5 (N.D. Cal. Mar. 6, 2024), *leave to appeal denied*, 2024 WL 2745788 (9th Cir. May 23, 2024). Contrary to Defendants' claim (Opp. 8), Plaintiffs "need not prove price impact directly," but may "present evidence of price impact to demonstrate the shortcomings of the defendant's rebuttal evidence." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 (2d Cir. 2020), *vacated on other grounds*, 594 U.S. 113.

### 1.    Defendants Fail to Show an Absence of Front-End Price Impact

There is no dispute that there were statistically significant price increases associated with many of Defendants' misstatements. *See* Opp. 12-13; ECF 155-4 ("Skinner Rpt.") ¶35, Ex. 2b; Coffman Report, Ex. 7; PX 1 (Reply Expert Report of Chad Coffman, CFA) ("Coffman Reply") ¶¶47-54.[2] This shows front-end price impact. *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 494 (E.D. Pa. 2022) (price impact based on statistically significant price increase after misstatements); *Homyk,* 2024 WL 1141699 at *5 (same).

Defendants assert that there can be no front-end price impact because "omissions generally do not impact stock price." Opp. 12. But Plaintiffs do not assert "pure omission" claims. *See* Opp. 19 (citing *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263-66 (2024)). As the Court found, the undisclosed deceptive practices that inflated Panorama revenue rendered Defendants' *affirmative statements* false or misleading. MTD Order at 4, 23-24; *see* ¶¶123-49, 153-61. Defendants cannot show that their failure to disclose these practices did not contribute *at all* to the price increases. *See* Coffman Reply ¶¶41-42, 47, 54; *Homyk,* 2024 WL 1141699, at *4-

---

[2]    There is no dispute that the price increases after the May 6, 2020, August 5, 2020 and February 25, 2021 misstatements were statistically significant. Mr. Coffman found statistically significant increases after the February 26, 2020 and November 4, 2021 misstatements, in an opinion Defendants' expert does not criticize. Coffman Reply ¶¶47, 53 & nn.86-87.

5 (front-end price impact for statements "that were misleading due to a failure to disclose . . . privately raised concerns"); *Energy Transfer*, 623 F. Supp. 3d at 492-93 (front-end price impact for statement that was "more optimistic than the truth privately known").[3] In fact, Dr. Skinner disclaimed any opinion as to what caused the price increases. PX 2 ("Skinner Tr.") 120:23-122:5.

Defendants' argument that it "is unlikely" that their misstatements caused price increases because they were "not new" (Opp. 12) is equally unavailing. On each of the dates with front-end price impact, Natera reported ***continuing*** revenue growth as a result of ***growing*** Panorama demand, *see* ¶¶150-62, which helped drive the price increases. Coffman Reply ¶¶43-47; *see Energy Transfer*, 623 F. Supp. 3d at 491-94 (front-end price impact where company "had provided the same timeline three months earlier," because "updates" are "almost always new information").[4]

Since Defendants offer no evidence showing an absence of front-end price impact, their price impact challenge fails. *In re Chi. Bridge & Iron Co. N.V. Sec. Litig*., 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020) (once front-end price impact is established, "Defendants are not entitled to rely on . . . back-end arguments to rebut the *Basic* presumption").

### 2.    Defendants Fail to Show an Absence of Back-End Price Impact

"Front-end price impact may be inferred from a back-end price drop when a corrective disclosure shows that the defendant's previous statements were untrue ***or that the defendant failed to disclose the truth***[.]" *Cabot*, 2023 WL 6300569, at *7. "[T]he back-end price drop . . . operates

---

[3]    Contrary to Defendants' claim (Opp. 12), *Goldman* did not hold that there can be no front-end price impact for misleading statements. The plaintiffs there relied ***exclusively*** on an inflation-maintenance theory. *See* 594 U.S. at 119-20; *see also In re Kirkland Lake Gold Ltd. Sec. Litig*., 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024) ("undisputed" lack of front-end price impact).

[4]    Defendants rely on (Opp. 11-12) inapposite cases. *See In re Qualcomm Inc. Sec. Litig*., 2023 WL 2583306, at *13 (S.D. Cal. Mar. 20, 2023) (analyzing back-end price impact); *IBEW Loc. 98 Pension Fund v. Best Buy Co.,* 818 F.3d 775, 782 (8th Cir. 2016) (plaintiff's expert conceded no front-end price impact).

as an indirect proxy for . . . the amount that the misrepresentation fraudulently propped up the stock price." *ATRS*, 77 F.4th at 80. Here, Defendants repeatedly claimed that Natera's revenue growth was "driven" by Panorama demand and described microdeletion testing as "***a rocket ship that's growing***." ¶¶150-62. On March 9, 2022, the Hindenburg Report challenged the "narrative accompanying Natera's stock rally"—including ***these specific*** misstatements—revealing that Natera's "ever-increasing revenue" was the result of a "grab bag of deceptive billing practices." DX 10 at 3, 40. In response, Natera's stock price plunged ***33%*** in a statistically significant manner (a fact that is undisputed, Skinner Rpt. ¶53), and analysts unanimously attributed the decline to the facts that Plaintiffs alleged as corrective in the Hindenburg Report. *See* Coffman Reply ¶¶25-33. These facts overwhelmingly demonstrate price impact. *See Rooney v. EZCORP, Inc.,* 330 F.R.D. 439, 450 (W.D. Tex. 2019) (statistically significant price adjustment following corrective disclosure "is evidence the original misrepresentation did, in fact, affect the stock price."); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 396 (N.D. Ga. 2019) (existence of price decline and analyst commentary attributing the decline to the negative news "is, of course . . . evidence of price impact"). Defendants fail to demonstrate that the entirety of the decline was unrelated to the correction of their misstatements, and so their back-end price impact challenge fails.

### a.    *The Capitol Forum* **Articles Were Not Publicly Available**

Defendants argue that the Natera-MGML relationship was previously disclosed in "news reports" by *The Capitol Forum* ("TCF") in July and December 2020, and claim they "produced evidence" these articles "were published online, distributed by email to Natera's investors, and seen by Natera's analysts." Opp. 7-8. None of these assertions are supported by the record.

It is undisputed that TCF is a costly, subscription-based service that severely restricts the use of its content. *See* Coffman Reply ¶¶56, 68-69 (TCF subscription "cost ***$24,000*** annually in 2017"); Skinner Tr. 137:20-140:24 (TCF articles "sit behind a paywall"); DX 7-8 (prohibiting

"reproduction or distribution . . . without prior written permission"); PX 12 (Natera's PR firm: "***Capitol Forum has a high paywall and strict rules about sharing their research***").[5] Courts have similarly recognized that TCF is not a mass media outlet. *See Sanders v. RealReal, Inc.*, 2021 WL 1222625, at *2 (N.D. Cal. Mar. 31, 2021) (TCF is "a ***private*** consumer protection group"); *MiMedx Grp., Inc. v. DBW Partners LLC*, 2018 WL 4681005, at *6 (D.D.C. Sept. 28, 2018) (TCF is not "a member of the mass media"); *see also* Skinner Tr. 137:2-19 (TCF is "a private entity"). TCF has even sued media outlets for republishing its content, *see DBW Partners, LLC v. Bloomberg, L.P.*, 2019 WL 5892489, at *2 (D.D.C. Nov. 12, 2019), which explains the absence of ***any*** public commentary on TCF's articles about Natera. *See* Coffman Reply ¶¶62-65.[6]

While *Basic* assumes that "public information" (Opp. 9) is reflected in stock prices, the Supreme Court has repeatedly rejected bright-line rules. *See Basic Inc. v. Levinson*, 485 U.S. 224, 249 & n.29 (1988) (when news "credibly entered the market and dissipated the effects of the misstatements" is "a matter for trial"); *Halliburton II*, 573 U.S. at 271 ("a single market can process different kinds of information more or less efficiently, ***depending on how widely the information is disseminated***"). Consistent with *Basic*, courts have rejected arguments that all marginally public information is necessarily incorporated into stock prices. *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) ("[I]t is plausible that . . . the efficient market

---

[5]    Defendants now describe TCF as "an investigative news agency" (Opp. 3), but during the Class Period, they said it was "***not a reputable organization***." PX 3.

[6]    Defendants cite two cases in which TCF articles were pled as corrective disclosures (Opp. 9), but neither supports their arguments. In *Fleetcor*, the TCF articles were disseminated by media outlets and associated with stock price declines, and one coincided with a short-seller report. *See City of Sunrise Gen. Emps.' Ret. Plan v. Fleetcor Techs.*, 2018 WL 4293143, at *4, 14 (N.D. Ga. May 5, 2018); *see also* Fineman, Joshua, "FleetCor Down; Capitol Forum Discusses Potential Regulatory Risk," *Bloomberg Law* (March 1, 2017). In *TransDigm*, the TCF article cited "publicly available historical price data," and the corrective disclosures "simply regurgitated" this information. *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 770-72 (N.D. Ohio 2020).

was not aware of the hidden meaning of . . . data [that] is only available to a narrow segment of the public and not the public at large."); *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 794-95 (9th Cir. 2020) ("[S]ome information, although nominally available to the public, can still be new if the market has not previously understood its significance.").[7] As Mr. Coffman testified, whether information is incorporated into a stock price in an efficient market "depend[s] on how widely disseminated [it] is." DX 3 at 58:19-59:5; *see id.* at 59:7-10 ("[W]here very few people access a particular report" there is a "question about the extent to which it would be incorporated in the market price[.]"); Coffman Reply ¶¶72-76. Dr. Skinner agrees it is "***necessary***" that investors have "access to the information" for it to be "incorporated into the stock price." Skinner Rpt. ¶¶25, 88; *see* Skinner Tr. 87:10-88:1 ("information costs . . . are relevant to assessing market efficiency").[8]

Defendants submit copies of the two relevant TCF articles, dated July 1 and December 14, 2020, both obtained from the Federal Trade Commission. DX 7-8 (stamped "blasky@ftc.gov"). Critically, Defendants provide no evidence these articles were ever accessed by analysts or republished in publicly-accessible sources. *See* Skinner Tr. 148:19-149:4 ("I did not come across any public press or analyst reports that reference [TCF] articles[.]"). Instead, Defendants cite

---

[7]    Defendants rely on *Mandalevy v. BofI Holding, Inc.*, 2018 WL 3032588, at *13 (S.D. Cal. June 19, 2018) (Opp. 9), which held that difficult to access information (such as FOIA records) is necessarily reflected in stock prices. The Ninth Circuit rejected this in *BofI*, 977 F.3d at 795-97, and again in *Grigsby v. BofI Holding*, Inc., 979 F.3d 1198, 1202-03 (9th Cir. 2020). Defendants' other cases (Opp. 6-7) involved information that was readily available publicly. *See Bonanno v. Cellular Biomed. Grp., Inc.*, 2016 WL 4585753, at *4-5 (N.D. Cal. Sept. 2, 2016) ("aggregation" of "hyperlinks to internet sources" was not "new information"); *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156-57 (2d Cir. 1998) ("technical journals" ***may*** be public information).

[8]    While Defendants claim that Mr. Coffman's opinion is unsupported (Opp. 9), their expert conceded it directly tracks the opinion of "Nobel laureate Eugene Fama." Skinner Rpt. ¶¶25, 88 & nn.42, 182 (citing Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," 25 J. FINANCE 383, 388 (1970) (a "market may be efficient if '***sufficient numbers***' of investors have ***ready access*** to available information")); *see id.* at 383 (prices "adjust to . . . information that is ***obviously publicly available***," such as earnings announcements).

promotional emails—seven sent to the same entity—that include snippets of *other* articles. *See* DX 11-21; Coffman Reply ¶¶66-67. Only *one* references MGML, and most do not relate to Panorama. *See* DX 11-13 (Horizon "unbundling"); DX 14-15 (Medicaid "unbundling"); DX 16-18 (Horizon overbilling).[9] The emails show that Natera consistently denied TCF's allegations. *See, e.g.*, DX 17 ("[l]aughable"); DX 20 ("this one is particularly weak"); DX 21 ("even a little more sad than the others"). The one email that references MGML (DX 19) does not include any of the supporting facts contained in the underlying TCF article. *Compare* DX 19 *with* DX 8.

Defendants concede that "Natera's stock price did not decline" in response to the July 1 or December 14, 2020 TCF articles (Opp. 3), which *supports* Plaintiffs' position. *See* Coffman Reply ¶¶70-71; *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 2024 WL 1497110, at *23 (S.D.N.Y. Apr. 5, 2024) ("lack of price movement" to purportedly corrective information "supports [p]laintiffs' theory that investors believed [the misstatements] up until the corrective disclosure"). Absent "direct, more salient evidence," *Halliburton II*, 573 U.S. at 282, Defendants' speculation that some Natera investors were aware of this information (Opp. 7-9) is insufficient to rebut price impact. *See Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 135 (M.D. Tenn. 2020) (price impact not rebutted where defendant "presented no proof that any investor knew, or likely would have known" about corrective information), *leave to appeal denied*, *In re Tivity Health, Inc.*, 2020 WL 4218743, at *1 (6th Cir. July 23, 2020) ("Speculation alone does not defeat predominance.").

### b.    Defendants' Deceptive Microdeletion Practices Were Not Previously Disclosed

Defendants fail to demonstrate that the truth about Natera's deceptive microdeletion practices was known prior to the Hindenburg Report. The "format of [the] Panorama requisition form" (Opp. 9-10) is not the substance of the corrective disclosure. Rather, Hindenburg revealed

---

[9]    DX 16 appears to be an excerpt of an article forwarded by an unnamed J.P. Morgan client.

that Natera boosted revenues by duping doctors into ordering microdeletion screenings, a scheme that was facilitated by the form and aided by MGML. ¶¶145-49, 172; *see* DX 10 at 24-27. Supplying the form to doctors and hosting it on Natera's website did not disclose these deceptive practices or their impact on Panorama revenues. Coffman Reply ¶60; *see In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008) (FDA warning letter to doctors about off-label marketing "would not necessarily trigger a market reaction because it did not contain enough information to significantly undermine [company's] pronouncements concerning demand"); *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc*., 2024 WL 1060079, at *13 (S.D. Cal. Mar. 11, 2024) ("significance" of previously-reported data was "not revealed until the corrective disclosure"). Defendants' only cited authority (Opp. 10) **undercuts** their arguments. *See Howard v. Arconic Inc*., 2021 WL 2561895, at *14-15 (W.D. Pa. June 23, 2021) ("close question" whether investors rely on "technical" statements on company website that are "not directed at investors").[10]

### c.     The Hindenburg Report Revealed New Information

Defendants agree that "confirmatory information . . . will not cause a change in stock price." Opp. 13. Applying "common sense," *Goldman*, 594 U.S. at 122, the market's reaction to the Hindenburg Report demonstrates that investors were previously **unaware** of Natera's MGML relationship or other deceptive practices. Coffman Reply ¶¶25-38, 70-71. It defies "common sense" to suggest that Natera would "find its share price cratering . . . upon the publication of stale, already-known information." *In re Signet Jewelers Ltd. Sec. Litig*., 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019); *see Energy Transfer*, 623 F. Supp. 3d at 508 (argument that corrective disclosure was old news "is refuted by the contemporary evidence of the market's reaction").

---

[10]     Natera's risk disclosures (Opp. 10) did not reveal Defendants' fraud since they said nothing about Defendants' deceptive practices. Nor did *The New York Times* report (DX 9). Plaintiffs' claims are not based on the "utility of microdeletion screening." Opp. 3.

Defendants claim that "Natera's analysts also viewed the information . . . as confirmatory" (Opp. 14), but they submit only one analyst report published on March 9, 2022, and it says the opposite. *See* DX 26 (Canaccord: "***not enough is known about***" MGML and "***[t]he extent of billing violations . . . mentioned are broad***"). In truth, analysts said the Hindenburg Report revealed "***new news . . . which requires further research***," PX 4 (Craig Hallum), and that "issues . . . such as the company's relationship with 'MGML,' ***are more novel***, but with an ***unknown degree of seriousness***." PX 5 (Piper Sandler); *see also* PX 6 (Piper Sandler: "[W]e spoke to many investors who had concerns about Natera's relationship with [MGML]. The concern sent stock down 33%[.]"); PX 7 (Nephron Research: Hindenburg Report "clearly had an impact on Natera's stock"). Other analysts said the disclosure raised new questions. *See, e.g.*, PX 8 (Leerink: "***questions will remain***" about Natera's "***prior authorizations and billing practices***") (emphasis in original); *see also* Coffman Reply ¶¶25-32. Moreover, contrary to Defendants' claim (Opp. 14), analysts ***did*** lower their revenue estimates after the disclosure. *See* Coffman Reply ¶¶79-84; PX 9 (discussing "impact on Natera's P&L from . . . the recent short report").[11]

On these facts, Defendants cannot show an absence of price impact. *See Chi. Bridge*, 2020 WL 1329354, at *8 (price impact where disclosure "raised new concerns"); *Energy Transfer*, 623 F. Supp. 3d at 504 (price impact where decline occurred alongside "online dissemination and discussion" of corrective information); *Sjunde AP-Fonden*, 2024 WL 1497110, at *23 (price impact based on "analyst reports tying the drop in stock price to the corrective disclosure").[12]

---

[11]    Hindenburg's declaration (DX 1) is not "probative evidence" of price impact. *Goldman*, 594 U.S. at 122. It is clear that "the market reasonably perceived [Hindenburg's] allegations as true." *BofI*, 977 F.3d at 792. The declaration is also contradicted by the Hindenburg Report, which relied on ***non-public*** sources and challenged Natera's statements as false. DX 10 at 1-3, 24, 40.

[12]    Defendants' reliance on *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013) (Opp. 13) is misplaced. *Meyer* recognized that a short-seller report may serve as a corrective disclosure if it "reveal[s] to the market something previously hidden or actively concealed." *Id.* at 1999 n.10.

Defendants are also wrong that Hindenburg disclosed "the same information" as TCF. Opp. 7, 13. Hindenburg's investigation included "more than 2 dozen interviews with former Natera employees, patients and industry experts." DX 10 at 1. Hindenburg revealed that "MGML masks that it is a third party by submitting information to insurance companies under practitioners' login credentials," aided by Natera sales reps "in direct contravention of longstanding HHS anti-kickback guidance," and that Natera used MGML to further its deceptive billing practices. *Id.* at 1-2, 16-17, 20-21, 26-27, 32; *see* Coffman Reply ¶¶55-61; Skinner Tr. 145:7-17; 178:4-6; 182:2-12 (conceding that the Hindenburg Report revealed new information). Defendants fail to show that these revelations provided **no** new value-relevant information. *See ATRS*, 77 F.4th at 91-92 (price impact not rebutted based on "qualitative difference" between pre-disclosure reports and corrective disclosures); *Homyk*, 2024 WL 1141699, at \*5-6 (earlier reports "omit[ted] key details" and "relevant implications"); *Signet*, 2019 WL 3001084, at \*15-16 (earlier reports did not reveal the "volume of the allegations, their salacious details" or "the scope of the [company's] liability").[13]

### d.      There is No Mismatch Between the Front-End and Back-End

Defendants' claims of "mismatch" (Opp. 16-17) misconstrue *Goldman* and misrepresent the Hindenburg Report. "[T]he inflation-maintenance theory" does not require "a precise match." *ATRS*, 77 F.4th at 98; *accord Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (a "disclosure need not precisely mirror" the misstatements). The disclosure must only be sufficiently related to the statements to "render[] [them] false." *ATRS*, 77 F.4th at 98.

---

[13]      Defendants' cases (Opp. 14) are distinguishable. *See Qualcomm*, 2023 WL 2583306 at \*12-13 (information available from "several analysts and legal sources" and "mirror[ed]" the corrective disclosures); *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at \*10 (S.D. Tex. Feb. 9, 2024) (resignation due to known fraud not corrective); *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 272 (N.D. Tex. 2015) (amount of asbestos exposure already public); *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 542 (9th Cir. 2024) (disclosure based solely on public sources).

There is no mismatch here. Defendants touted growth in Panorama revenues, but concealed it was driven by deceptive practices, including MGML pre-authorizations and deceptive billing practices. ¶¶150-63. Hindenburg revealed that these undisclosed practices had contributed to Panorama growth, ¶¶172-73, and analysts attributed the March 9 decline to these revelations. *Supra* at 10; *see Cabot*, 2023 WL 6300569, at *11 (no mismatch where "[a] public observer could reasonably conclude" that misstatements were "contradicted by the … revelation"); *Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *9-10 (D. Nev. Mar. 1, 2023) (no mismatch where "the market understood the corrective disclosures as related to the defendants' denials").

Defendants are flat wrong that the Hindenburg Report "does not discuss Natera's revenue or what products drove revenue." Opp. 17. Hindenburg specifically called out Natera's statements about the drivers of its revenue. *See* DX 10 at 3 ("The narrative accompanying Natera's stock rally has been that [] Panorama . . . will drive sales growth and profitability[.]"); *id.* at 24 ("Chapman called microdeletion screening: '. . . a rocket ship that's growing.'") (alleged in ¶155). Hindenburg revealed that these statements were false. *See* DX 10 at 40 ("Natera has engaged in a grab bag of deceptive billing practices" and employed a "'do whatever it takes' approach to keep its short-term numbers rosy," including "questionable methods for generating revenue"). This direct match easily satisfies *Goldman*. *See ATRS*, 77 F.4th at 98 (an "easy inflation maintenance case" is one where the misstatements are "expressly identified as such by the corrective disclosure").

### e.    Supposed Confounding Information Does Not Fully Explain the Decline

There is no requirement at class certification to "show that the [] misrepresentation was the sole cause" of Plaintiffs' loss. *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 688 (5th Cir. 2015). Accordingly, "merely suggesting that another factor also contributed" does not rebut price impact. *Waggoner v. Barclays PLC*, 875 F.3d 79, 105 (2d Cir. 2017). But that is all Defendants do. *See* Coffman Reply ¶¶85-91, 100; Skinner Tr. 205:25-213:19 (Dr. Skinner did not quantify the impact

of any supposed confounding information and does not "claim it accounts for the full stock price decline"). Defendants' speculation fails to show that the correction of their misstatements played *no* part in the decline. Defendants suggest the "most likely explanation" for the decline was fear that "Natera was under attack by an activist short seller and could face heightened regulatory scrutiny." Opp. 14-15. Because this was a foreseeable consequence of fraud, any decline due to this factor is not confounding. Coffman Reply ¶89; *see Cory v. Stewart*, 103 F.4th 1067, 1080 n.70 (5th Cir. 2024) (misstatement "is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misstatement"). Indeed, analysts connected Hindenburg's *revelations* to the price decline. *See* PX 10 (Baird: "[B]illing probes are bad and create overhangs for stocks"); PX 11 (Morgan Stanley: "bear case outcomes" include "a fine/financial penalty"); Coffman Reply ¶¶25-33, 89 & n.146.

Defendants' other arguments implicate premature "[m]erits questions." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see Goldman*, 594 U.S. at 122 n.2 (same). Defendants argue that short-seller reports can lead to stock price declines, whether "true or not." Opp. 15. But if Hindenburg's claims are "true," then no part of the decline was due to confounding news. *See Signet*, 2019 WL 3001084, at *17 (rejecting argument that "bad publicity" contributed to stock price decline). Similarly, "an average abnormal stock price decline of about 7.5%" (Opp. 15) due to short-seller reports fails to explain the *39%* abnormal decline on March 9, 2022. *See* Coffman Reply ¶¶87-88, Ex. 1.[14] In short, Defendants have not "excluded" the correction of their misstatements as "a contributor to the price drop." *Cabot*, 2023 WL 6300569, at *12.

---

[14]    This remains true even after accounting for the stock price increase on March 10 (after Defendants tried to refute Hindenburg's allegations). *Id.* ¶¶93-95, Ex. 1 (28% abnormal decline over two-day window). This confirms that the decline was not solely due to investor "fear."

**C.    The *Affiliated Ute* Presumption of Reliance Also Applies**

Reliance is presumed for claims based "primarily [on] a failure to disclose." *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153 (1972); *Regents of Univ. of Cal. v. Credit Suisse First Bos., Inc.*, 482 F.3d 372, 383-84 (5th Cir. 2007) (same). Defendants repeatedly cast Plaintiffs' claims as omissions (Opp. 1-2, 4, 10, 12-13, 18), but say *Affiliated Ute* does not apply. *Id.* 18-19. They cannot have it both ways. As the Court found, Defendants touted Panorama as "a key source of Natera's revenues . . . while concealing that Panorama revenues were inflated by deceptive practices," which gave rise to a duty to disclose. MTD Order at 24. Defendants are also incorrect that the presumption only applies to claims under Rule 10b-5(a) or (c) (which Plaintiffs allege, *see* ¶¶217-23)). The Fifth Circuit has held that Rule 10b-5(a) or (c) claims are "***more likely*** to be based primarily on omission," not that they are the ***only*** claims. *Regents*, 482 F.3d at 384.

**D.    Individualized Damages Issues Do Not Predominate over Class-wide Issues**

Plaintiffs' theory of liability assumes that the information revealed by Hindenburg had ***not*** been previously disclosed, and Plaintiffs' damages methodology unquestionably "measure[s] only those damages attributable to that theory." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see* Coffman Report ¶¶84-85; Coffman Reply ¶¶101-06. It is only by disregarding Plaintiffs' theory of liability that Defendants can claim that individualized issues predominate. Opp. 17-18.

Even assuming the Class did include investors who read the TCF articles or were somehow aware of Natera's deceptive practices, that would not defeat certification. "That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Halliburton II*, 573 U.S. at 276; *see In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *4 (S.D. Tex. June 15, 2017) (argument that some class members had "actual knowledge" of fraud did not defeat certification); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 584-85 (S.D.N.Y. 2011) ("issues of

individual reliance" do not "defeat class certification"), *aff'd*, 838 F.3d 223 (2d Cir. 2016).

### E.    Class Certification Should be Granted on the Securities Act Claims

Defendants' sole challenge—that Plaintiffs lack standing—fails because Key West has provided "supporting evidence" (Opp. 20) showing that it purchased Natera shares on the day of the July 2021 SPO, at the $113 offering price, and directly from Securities Act Defendant (and offering underwriter) Morgan Stanley. ECF No. 9-2; ¶251. This establishes Key West's standing under ***both*** Section 12(a)(2) (which requires a direct purchase, 15 U.S.C.A. § 77*l*) ***and*** Section 11, without resort to any traceability analysis. *See Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 498 (5th Cir. 2005) ("Section 11 *is* available for anyone who purchased directly in the offering ***and*** any aftermarket purchasers who can demonstrate that their shares are traceable to the registration statement in question[.]") (first emphasis in original); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013) (same). Defendants elected not to seek ***any*** discovery from Key West, and so their claims that Key West cannot establish a direct purchase ring hollow.[15]

To the extent Defendants suggest that it will be "nearly impossible" (Opp. 20) for other Class members to establish that their shares are traceable, that is no bar to class certification. *Cobalt*, 2017 WL 2608243, at *5 ("tracing is a merits issue that the court need not consider at the class certification stage"). Defendants effectively ask this Court to rule that ***no*** evidence of traceability could ever suffice, but the Fifth Circuit has rejected any rule that would "categorically exclude aftermarket purchasers" from a Securities Act class. *Krim,* 402 F.3d at 495.

### III.    CONCLUSION

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion.

---

[15]    Unlike Key West, the plaintiff in *Skillz* (Op. 20) did "not allege direct purchases from the secondary offering." *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *7 (N.D. Cal. July 5, 2022).

Dated: October 4, 2024

Respectfully submitted,

**NIX PATTERSON, LLP**
By: /s/ *Jessica Underwood*
Jessica Underwood (Bar No. 24093291)
Cody Hill (Bar No. 24095836)
Jeffrey J. Angelovich (Bar No. 00786988)
8701 Bee Cave Road
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 495-1534
junderwood@nixlaw.com
codyhill@nixlaw.com
jangelovich@nixlaw.com

*Liaison Counsel for Lead Plaintiff British
Airways Pension Trustees Limited*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Gregory M. Castaldo (admitted *pro hac vice)*
Joshua E. D'Ancona (admitted *pro hac vice*)
Joshua A. Materese (admitted *pro hac vice*)
Evan R. Hoey (admitted *pro hac vice*)
Vanessa M. Milan (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
jdancona@ktmc.com
jmaterese@ktmc.com
ehoey@ktmc.com
vmilan@ktmc.com

*Lead Counsel for Lead Plaintiff British
Airways Pension Trustees Limited*

**BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP**
Jesse Jensen (admitted *pro hac vice* )
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Telephone: (212) 554-1400

16

Facsimile: (212) 554-1444
jesse.jensen@blbglaw.com

*Counsel for Additional Plaintiff*
*Key West Police & Fire Pension Fund*

**<u>CERTIFICATE OF SERVICE</u>**

I, Jessica Underwood, hereby certify that on October 4, 2024, I caused a true and correct copy of the foregoing Reply Memorandum of Law in Further Support of Lead Plaintiffs' Motion for Class Certification and Appointment of Class Representatives and Class Counsel to be filed electronically with the Clerk of the Court using the ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*/s/ Jessica Underwood*
Jessica Underwood
