# EXHIBIT 1

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS**

—————————————————————

JOHN HARVEY SCHNEIDER, Individually
and on Behalf of All Others Similarly
Situated,

               Plaintiff,

    v.

NATERA, INC., STEVE CHAPMAN,
MICHAEL BROPHY, MATTHEW
RABINOWITZ, and RAMESH
HARIHARAN,

               Defendants.

—————————————————————

No. 1:22-cv-00398-DAE

**<u>EXPERT REPLY REPORT OF CHAD COFFMAN, CFA</u>**

**October 4, 2024**

# Table of Contents

Page

I.    INTRODUCTION ............................................................................................................1

II.   SUMMARY OF OPINIONS ..........................................................................................2

III.  THERE IS CLEAR ECONOMIC EVIDENCE SUPPORTING PRICE IMPACT
      FROM THE ALLEGED MISSTATEMENTS AND OMISSIONS IN THIS
      MATTER ........................................................................................................................8

IV.   DR. SKINNER FAILS TO ESTABLISH A LACK OF PRICE IMPACT FROM
      THE ALLEGED MISSTATEMENTS AND OMISSIONS IN THIS MATTER AND
      HE FAILS TO CONSIDER IMPORTANT ECONOMIC EVIDENCE .....................21

      A.   DR. SKINNER'S DISMISSAL OF THE PRICE INCREASES FOLLOWING THE
           ALLEGED MISSTATEMENTS AND OMISSIONS IS FLAWED AND HE HAS
           NOT PROVEN A LACK OF FRONT-END PRICE IMPACT .............................. 23

      B.   THE CAPITOL FORUM REPORTS DID NOT REVEAL THE ALLEGED
           CORRECTIVE INFORMATION TO THE MARKET PRIOR TO THE
           HINDENBURG REPORT .................................................................................. 30

           i.    The Hindenburg Report Contained New Information Not Included in the
                 Two Capitol Forum Articles.......................................................................... 31

           ii.   There Is No Evidence That the Two Capitol Forum Articles Were Available
                 or Disseminated in a Manner Consistent What is Considered "Obviously
                 Public Information" Which is Readily Incorporated Into Market Prices ...... 34

           iii.  Dr. Skinner Presents No Evidence to Disturb My Conclusion that Natera
                 Common Stock Traded in an Efficient Market Throughout the Class Period
                 ...................................................................................................................... 40

      C.   THE STATISTICALLY SIGNIFICANT ABNORMAL PRICE DECLINE ON
           MARCH 9, 2022 SUPPORTS THAT THE ALLEGED MISSTATEMENTS AND
           OMISSIONS IMPACTED THE PRICE OF NATERA COMMON STOCK AND
           DR. SKINNER'S SUGGESTION OTHERWISE IS FLAWED............................ 43

           i.    Updated Analyst Estimates Are Not Required to Establish That Important
                 New Information Was Disclosed and It Is Not Surprising That Analysts
                 Maintained Their Estimates Following the Hindenburg Report ................... 43

           ii.   Potential Confounding Information Does Not Prove a Lack of Price Impact
                 of the Hindenburg Report.............................................................................. 46

           iii.  The Developments After the Class Period Do Not Prove a Lack of Price
                 Impact from the Alleged Misstatements and Omissions............................... 51

**V.    DR. SKINNER'S DAMAGES-RELATED CONCERNS DO NOT DISTURB MY OPINION THAT THERE IS A WELL-ESTABLISHED DAMAGES METHODOLOGY THAT CAN BE APPLIED CLASS-WIDE....................................56**

## I.    INTRODUCTION

1.    My name is Chad Coffman.  I am the President of Peregrine Economics, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, litigation.

2.    On June 4, 2024, I submitted an expert report (the "Coffman Report" or "Report") in this matter, in which I opined on the efficiency of the market for Natera, Inc. ("Natera" or the "Company") Common Stock ("Natera Common Stock") and the availability of a class-wide damages methodology in this case.[1,2]  In my Report, I concluded that the market for Natera Common Stock was efficient throughout the Class Period and that damages in this matter are subject to a common approach and a methodology that can be applied class-wide.[3]

3.    Following the submission of my Report, counsel for Plaintiffs provided me with a copy of the August 16, 2024 Expert Report of Dr. Douglas J. Skinner (the "Skinner Report").  I have been asked by counsel for Plaintiffs to review and respond to the Skinner Report.  My responses are set forth in this document (my "Reply Report").  In sum, the Skinner Report (i) does not affect any of the opinions expressed in my Report, and (ii) states opinions about newly raised, additional questions that are fundamentally flawed, including because they are unsupported and in many cases contradicted by economic evidence.

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meanings given to them in the Coffman Report, all emphasis throughout this Reply Report is added, and all times cited within this Reply Report are in Eastern Time ("ET").  Throughout this report the term "efficiency" refers to "semi-strong market efficiency" as defined in the Coffman Report (¶¶ 18 – 19).

[2] Coffman Report ¶ 86.

[3] Coffman Report ¶¶ 1, 6 – 7.  As mentioned in the Coffman Report, I analyzed a Class Period of February 27, 2020 through March 8, 2022 as the Class Period begins with an alleged false statement regarding Panorama after market close on February 26, 2020 (see Coffman Report footnote 2).

4.    In formulating my opinions set forth in this Reply Report, I have relied upon the analyses already described in my Report, my analyses of Dr. Skinner's opinions as stated in the Skinner Report and the materials and analyses set forth therein, testimony provided by Dr. Skinner during his deposition,[4] my knowledge, experience, and formal training in economics, finance, and statistics, and my understanding of the allegations and facts set forth in this lawsuit. All of the materials I considered in forming my opinions are identified in **Appendix A** to this report in addition to Appendix A to the Coffman Report.

5.    My qualifications and hourly rate of compensation for work in this matter were identified in my Report and I do not repeat them here.  I have attached the latest version of my curriculum vitae as **Appendix B**.

6.    I reserve the right to amend this report to reflect new information that becomes available to me in light of further proceedings in this matter, including additional discovery and/or future rulings from the Court.

## II.    SUMMARY OF OPINIONS

7.    Dr. Skinner does not address my opinion that the market for Natera Common Stock was efficient during the Class Period or any of the analyses used to support that opinion, including, but not limited to my event study analysis, which he does not criticize in any regard with respect to its design, implementation or results.[5]  Therefore there is no dispute that Natera Common Stock traded in an efficient market during the Class Period.

8.    There is also clear economic evidence that the allegedly misrepresented facts and information at issue (e.g., deceptive business practices regarding Panorama that contributed to

---

[4] Deposition of Douglas J. Skinner, in John Harvey Schneider v. Natera, Inc., et. al., No. 1:22-cv-00398-DAE, September 13, 2024 ("Skinner Deposition").

[5] Coffman Report Section VII and Skinner Deposition 20:2-21:2.

Natera's revenues) were value-relevant and affected Natera's Common Stock price during the

Class Period.  In other words, there is clear economic evidence of so-called "price impact" in this

matter.  Dr. Skinner does not dispute that there were statistically significant price increases on

several of the alleged misstatement dates.  Nor does he dispute the statistically significant price

decline at the 95% confidence level (as well as beyond the 99% confidence level) on the alleged

corrective disclosure date, March 9, 2022, in the wake of the Hindenburg Report that allegedly

disclosed corrective information.[6, 7]  Dr. Skinner also does not dispute that immediately

following the publication of the Hindenburg Report, there was market discussion in analyst

reports, news articles, and a company conference call that centered on the alleged corrective

information contained in the Hindenburg Report, with some market participants explicitly

attributing the price decline in Natera Common Stock to the alleged corrective information

contained in the Hindenburg Report.

9.      Despite this, Dr. Skinner claims that, assuming the market for Natera Common

Stock was efficient, the economic evidence is inconsistent with a finding that the alleged

misstatements and omissions during the Class Period, or the alleged corrective information about

Natera in the Hindenburg Report, had any effect on Natera's Common Stock price.  In other

words, he suggests that the evidence supports a finding of a lack of price impact from the alleged

misstatements and omissions.  I understand that it is Defendants' burden to show that there was a

complete absence of price impact from the alleged misstatements and omissions on Natera

Common Stock.  I further understand that to do so, Dr. Skinner would have to demonstrate that

---

[6] Indeed, Dr. Skinner performs his own event study and finds a p-value of 0.00 on March 9, 2022, thus demonstrating that one can reject the null hypothesis of no price impact from the news on that day with over 99% confidence.

[7] Hindenburg Research published a report on March 9, 2022 titled "Natera: Pioneers In Deceptive Medical Billing." (the "Hindenburg Report").

there was no effect from the allegedly misrepresented information on Natera's Common Stock price in connection with all of the alleged misstatement/omission dates (i.e., no so-called "front-end price impact") *and* no such effect on the alleged corrective disclosure date (i.e., no so-called "back-end price impact"). He has not done so.

10. First, despite the undisputed evidence of statistically significant increases in Natera's Common Stock price in connection with multiple alleged misstatement dates, Dr. Skinner attempts to establish a lack of front-end price impact by suggesting that a price movement following an affirmative misstatement that leaves out important negative information cannot demonstrate price impact. Dr. Skinner's argument is unfounded and inconsistent with the economic evidence. If a company makes a positive announcement but omits important qualifying negative information, the resulting positive price increase will be larger than if the announcement had included the negative information. Notably, along with several other alleged misstatement dates, the alleged misrepresentation by omission on the first day of the Class Period, February 26, 2020,[8] is associated with a statistically significant price increase according to the Event Study I performed in connection with my Report (as well as additional event studies that I perform in this Reply Report). While Dr. Skinner does not find the stock price movement on this date statistically significant, this result is only due to a fundamental flaw in his event study design. In particular, he adopts a methodology that allows sharply increased *future* volatility caused by the COVID-19 pandemic in March – April, 2020 to influence his statistical test for February 27, 2020. In addition, Dr. Skinner acknowledges but does not analyze the

[8] Plaintiffs allege that the Class Period began when Defendants made false and misleading statements in a press release on February 26, 2020 (*see,* Complaint ¶ 110). Because the press release was issued after market hours on February 26, 2020, the market impact date of the press release is the following trading day, February 27, 2020 (*see,* "Natera Reports Fourth Quarter and Year 2019 Financial Results" *PR Newswire*, February 26, 2020, 4:10 PM). Throughout this Reply Report, when I refer to the statistically significant price increase in response to the February 26, 2020 alleged misstatement, I am referencing the statistically significant price increase on February 27, 2020.

statistically significant increases in Natera's Common Stock price on numerous other alleged misstatement events during the Class Period, doing nothing to establish a lack of price impact. To suggest that a statistically significant price increase following an affirmative statement that leaves out negative, qualifying information is meaningless in the context of price impact is flawed from an economic perspective.

11.    Next, Dr. Skinner attempts to establish a lack of back-end price impact (i.e., on the alleged corrective disclosure date).  To do so, Dr. Skinner alleges that the Hindenburg Report was largely (although not entirely) a re-publication of information that was released to the market in two articles by The Capitol Forum (the "Two Capitol Forum Articles")[9] and therefore was already incorporated into the price of Natera Common Stock before the alleged corrective disclosure date.  However, he also admits that some of the information published in the Hindenburg Report that Plaintiffs allege was corrective was *not* previously contained in the Two Capitol Forum Articles.[10]  Dr. Skinner made no attempt to measure the price impact of this concededly new, allegedly corrective information in the Hindenburg Report regarding Natera's deceptive business practices that the Two Capitol Forum Articles did not contain, and he does not demonstrate that it had no effect on Natera's Common Stock price.  While Dr. Skinner asserts

---

[9]  For purposes of this Reply Report, when I reference the Two Capitol Forum Articles, I am referring to The Capitol Forum articles published on July 1, 2020 and December 14, 2020, which are the two articles focused on by Dr. Skinner (i.e., "Natera: Company Uses Third Party Non-Profit to Increase Likelihood of Insurance Reimbursement; Non-Profit Has Limited Paper Trail, Close Connections with Natera," *The Capitol Forum*, July 1, 2020 and "Natera: Charity Apparently Established to Process Insurance Prior Authorizations Has Close Ties to Former Senior VP of Natera," *The Capitol Forum*, December 14, 2020).  *See*, Skinner Report ¶ 41: ("Specifically, The Capitol Forum published articles on July 1, 2020 and December 14, 2020…that contained claims, relying in part on anonymous sources and former employees, regarding Natera's reliance on MGML for prior authorizations and a purported relationship between MGML's founder and a former Natera employee.")

[10] *See,* Skinner Report footnote 81; Skinner Deposition 145:13 – 17 ("Correct. I think this is an example of something that, as the footnote says, something plaintiffs allege is corrective claims named in Hindenburg that were not necessarily in The Capitol Forum articles."); and Skinner Deposition 214:7 – 13 ("So I think what I'm trying to convey there is that it's certainly possible that some of the information that was conveyed by the Hindenburg report was not necessarily preempted by the information in The Capitol Forum articles.")

that other allegedly corrective information about Natera was previously disseminated by the Two Capitol Forum Articles, he ignores that the Two Capitol Forum Articles are not information to which investors have ready access, but are a lesser-known, online, subscription-based source available only behind a substantial paywall.  The economic evidence in this case does not support Dr. Skinner's assumption that the Two Capitol Forum Articles were distributed in a manner consistent with what is considered "public information" which is readily incorporated into market prices.  For example, Dr. Skinner does not address the fact that there was *no* analyst or news commentary on *any* of the information contained in the Two Capitol Forum Articles at *any* time during the Class Period.  This non-response is irreconcilable with the proposition, which Dr. Skinner assumes but does not attempt to demonstrate, that the Two Capitol Forum Articles were widely disseminated and incorporated into the market price of Natera Common Stock.  Crucially, the total absence of market, analyst, or press reaction to the paywalled Two Capitol Forum Articles during the Class Period starkly contrasts with the clear and immediate response to the Hindenburg Report's disclosure of the allegedly corrective information.  This response included reactions from analysts who covered Natera and whom Dr. Skinner relies on for other purposes, as well as news outlets, Natera itself, and the market overall, reflected by a statistically significant price decline.  In sum, the economic evidence supports a conclusion that the information about Natera that Plaintiffs allege was corrective was widely disclosed to the market, and first reflected in the market price, through the Hindenburg Report on March 9, 2022, and not before, as Dr. Skinner assumes.

12.    Dr. Skinner also asserts that the abnormal decline in Natera's Common Stock price on the corrective disclosure date cannot be used to conclude that Plaintiffs' alleged misrepresentations affected the price of Natera Common Stock.  He claims there was

confounding information that "likely" affected the price of Natera Common Stock on March 9, 2022, but he does nothing to demonstrate this supposition empirically, let alone measure any effect of the supposedly confounding information he points to, or show that it caused the entire relevant stock price decline. Dr. Skinner's unsupported speculation cannot show what did or did not contribute to the price movements at issue.

13. By the same token, his assertion that the damages methodology presented in my Report cannot separate the impact of potentially confounding information from the impact of the corrective information conflates several issues. First, the relevance and applicability of the out-of-pocket methodology described in my Report is not called into question by the presence of confounding information. Second, the issue Dr. Skinner raises is not with regard to the overall damages methodology, but speaks to the question of loss causation, which I understand is a merits issue and his suggestion that Plaintiffs will not be able to perform a proper loss causation analysis is speculative and premature. In any event, the methodology presented in my Report, the out-of-pocket method, can easily handle Dr. Skinner's speculative concerns, should they eventually be borne out in this case.

14. Finally, Dr. Skinner attempts to suggest a lack of price impact by pointing to the fact that following the Hindenburg Report, analysts did not revise their estimates, Natera was not the subject of regulatory or legal action, and Natera's revenue increased. Beyond the fact that Dr. Skinner ignores contrary evidence, none of these points about subsequent events carries economic weight when evaluating whether the alleged false and misleading statements and omissions impacted the price of Natera Common Stock during the Class Period.

15. As a result of the foregoing, nothing in the Skinner Report disturbs my opinions (i) that the market for Natera Common Stock was efficient throughout the Class Period and (ii) that

economic damages in this matter can be calculated on a class-wide basis based on a common approach and methodology consistent with Plaintiffs' theory.  Further, the Skinner Report fails to demonstrate a lack of price impact from the alleged misstatements and omissions at either the back-end or the front-end, due to several fundamental flaws.

III.    **THERE IS CLEAR ECONOMIC EVIDENCE SUPPORTING PRICE IMPACT FROM THE ALLEGED MISSTATEMENTS AND OMISSIONS IN THIS MATTER**

16.    Plaintiffs allege that beginning on February 26, 2020, Defendants made a series of false and misleading statements and omissions regarding Panorama, Natera's non-invasive prenatal test ("NIPT").[11]  Specifically, the Complaint alleges that Defendants falsely attributed Natera's strong revenue growth to organic demand for Panorama, when in fact it was partly driven by deceptive practices.[12]  These included allegedly failing to disclose the use of a closely related third-party company (i.e., My Genome My Life, Inc. "MGML") to submit improper prior-authorization requests and setting microdeletion screening—a costly add-on for rare conditions often not covered by insurance—as the default option on order forms, requiring physicians to opt out rather than opt in.[13]

17.    Plaintiffs further allege that the false and misleading nature of the misstatements and omissions ultimately became known through a corrective disclosure at the end of the Class Period.[14]  Namely, before market open on March 9, 2022,[15] Hindenburg Research published a

---

[11] Complaint ¶¶ 150 – 163.  As I stated in my Report, in the MTD Order, the Court sustained Plaintiffs' claims of Defendants' alleged fraudulent conduct regarding Natera's Panorama product during the proposed Class Period, but dismissed certain other alleged claims (related to a Natera product called Prospera).  Throughout the remainder of this Reply Report, when I refer to Plaintiffs' allegations I am referring to the surviving claims regarding Panorama.

[12] Complaint ¶¶ 9 – 14.

[13] Complaint ¶¶ 13 – 14.

[14] Complaint ¶¶ 18, 168-176.

[15] *See,* for example, "BRIEF-Hindenburg Research Says Have Taken A Short Position In Shares Of Natera," *Reuters News,* March 9, 2022, 8:19 AM.

report on Natera, titled "Natera: Pioneers In Deceptive Medical Billing," (the "Hindenburg Report") which detailed allegedly corrective information about Natera's engagement in deceptive business practices to generate revenue from Panorama, Natera's relationship with MGML and its use of MGML to submit prior authorizations, and Natera's practice of making microdeletion testing the default option on order forms to increase demand for the screening, among other revelations.[16]

18.    More specifically, the Hindenburg Report dove extensively into the background of MGML, a supposed non-profit organization that assisted patients and doctors with obtaining pre-authorization for the Panorama test.  According to the Hindenburg Report, Natera was not obtaining prior authorization *before* beginning the testing, instead running it through afterwards and "[s]ince these 'prior-authorizations' were actually done after the test in many cases, the prior-authorization denial didn't block screening from happening but instead allowed Natera to require cash payment for the balance from its patients."[17]  Additionally, the Hindenburg Report exposed that:

> Natera surreptitiously pushes screening for microdeletions by requiring providers to specifically opt-out of the screen, defying industry group policy recommendations… Around 75%-80% of Natera's key Panorama screenings include microdeletions, with the company hyping the potential revenue opportunity to investors. Virtually no payors cover the test for the above reasons.[18]

19.    The Hindenburg Report discussed that MGML was formed just 3 months after Natera highlighted prior authorization requirements as a key risk factor.[19]  After MGML was created, "Natera's sales reps suddenly began pitching doctors on free prior authorization help

---

[16] Complaint ¶ 18 and "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[17] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[18] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[19] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

through the entity."[20]  The Hindenburg Report claimed that MGML's supposed President, a women by the name of "Vickie Seth" was actually "a pseudonym for a woman who shares a mailing address and a close personal relationship with Natera's former VP of sales at the time MGML was created."[21]  The Hindenburg Report further alleged that MGML was created when the Natera VP was concerned about the need for prior authorizations hurting the company, and was formed with the purpose of avoiding that obstacle.[22]

20.    According to the Hindenburg Report, MGML used practitioners' login credentials to submit information to insurance companies.[23]  This action is described as "in direct contravention of longstanding HHS anti-kickback guidance calling for transparency by third party prior authorization providers."[24]  The issue stemmed from MGML's close relationship with Natera, wherein "Natera sales reps help doctors' offices access insurance prior authorization portals, then share the passwords with MGML."[25]  Consequently, MGML exploited these shared passwords to submit prior authorizations on behalf of doctors' offices, leaving the practitioners unaware of the reasons behind patients receiving unexpectedly high bills.[26]  The Hindenburg Report noted that this had caused some doctors to refuse to work with MGML.[27]

21.    The Hindenburg Report also included extensive information that revealed Natera had engaged in deceptive billing practices by "surreptitiously push[ing] screening for

---

[20] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[21] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[22] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[23] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[24] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[25] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[26] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[27] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

microdeletions by requiring providers to specifically opt-out of the screen, defying industry group policy recommendations" as most insurance companies did not cover these screenings, which frequently resulted in false positives and mental anguish for patients.[28]  The Hindenburg Report noted that "Natera lures patients in with promises of low testing costs and the prospect of learning a child's gender early, leading many expectant mothers to unknowingly agree to an expensive added screen for 'microdeletions' that is rarely covered by insurance."[29]

22.    Furthermore, the Hindenburg Report stated that after obscuring that patients were receiving additional screenings by default, Natera "then 'unbundles' the microdeletion screen from the primary screen, and apparently bills BOTH insurers and expectant mothers, often collecting cash from both, then obfuscating the double billing" which can "more than double[] the bill for screenings to $8,000" with patients and practitioners unaware until the bill arrives.[30]

23.    The Hindenburg Report further stated that patients are then left responsible for bills worth thousands of dollars, when they had anticipated it being far less.  The Hindenburg Report continued that when patients often contacted Natera to complain about their shockingly high bills, the Company would "regularly resolve these complaints by discounting patient's required insurance deductibles and not telling the insurers, a practice that raised questions of insurance fraud."[31]

24.    Within hours of the release of the Hindenburg Report, on the afternoon of March 9, 2022, Natera issued a press release, attempting to refute some of the allegations in the

---

[28] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[29] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[30] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[31] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

Hindenburg Report, in particular, those regarding MGML and Natera's procedures around prior authorization. The press release included the following language:

> We disagree with the accuracy of this report which was generated in an attempt to make a quick profit by short sellers Hindenburg Research, who are currently under criminal investigation by the Department of Justice for illegal trading tactics.
>
> …
>
> There are many companies, both private and not-for-profit, that provide prior authorization services to both physician offices and clinical laboratories to ensure patients get access to needed testing. MGML is one of these companies which is neither owned, operated nor controlled by Natera.
>
> …
>
> Natera maintains a mature compliance program and we believe our procedures in regard to prior authorization services and billing are compliant with applicable laws.[32]

25.    Analysts who covered Natera began issuing reports based upon the disclosures in the Hindenburg Report on March 9, 2022, with firms such as Piper Sandler, SVB Leerink and others discussing the news, and with some attributing the stock price decline at least in part to the alleged corrective information in the Hindenburg Report. These analyst reports offer evidence that the information disclosed in the Hindenburg Report, such as that regarding the MGML-Natera relationship, was received by investors as new and value-relevant. For example:

> *Piper Sandler*: "Natera has been trading down >40% in intraday trading since yesterday's close, following the release of a short report by Hindenburg Research. We view the report as highlighting multiple previously reported issues that the company has dealt with, some of which (such as the NYT article on micro-deletions) we consider non-issues for the company and more likely misunderstandings on the part of the writers. **Other issues brought up, such as the company's relationship with "MGML," are more novel, but with an unknown degree of seriousness.**"[33]

---

[32] "NATERA RESPONDS TO MISLEADING SHORT SELLER REPORT," *PR Newswire*, March 9, 2022, 2:33 PM.

[33] "NTRA: Trading Below Signatera Value in Intraday," *Piper Sandler*, March 9, 2022.

12

*Piper Sandler (report on March 10, 2022)*: "Yesterday we spoke to many investors who had **concerns about Natera's relationship with a prior authorization company called My Genome My Life (MGML). The concern sent the stock down 33% (and 50% intraday).**"[34]

*SVB Leerink*: "Bottom Line: **NTRA shares closed down ~33% today following a short seller report that criticized NTRA's prior authorizations and billing practices for its core NIPT test (Panorama)**….Though **we believe questions will remain**, we see NTRA mgmt confidently addressing that: (1) Signatera volumes are unrelated and unlikely to see any impact; (2) NTRA did not "doublebill" the payers and the patients for any code; (3) the short report incorrectly portrayed third parties which are utilized industry wide; and (4) lack of any financial transaction or incentives between the ordering physicians and NTRA remains in place with strong compliance. Still, **we believe investors are likely to focus on**: (1) **potential impact to NIPT volumes arising from any future changes in prior-auth practices**?, (2) potential for elevated compliance within NTRA that could impact the strong Signatera ramp?, and (3) **any litigation risk that may arise**?"[35]

*Raymond James*: This morning, **Hindenburg Research released a report highlighting what it believes are several improprieties in the billing and sales functions of Natera, primarily associated with prior authorizations and a third party entity, My Genome My Life (MGML), that assists in the prior authorization process**.[...]We take some solace in a few points, including that the NTRA sales rep at issue left the firm of their own volition to another job in the industry several years ago. Still, **some questions remain unanswered** in terms of the size and scope of donations (including in context of other organizations), the exact mix of MGML impact, how reps interact with doctors as they attempt to navigate prior authorizations, etc.[36]

*Baird*: Patient/healthcare system impact aside, **billing probes are bad and create overhangs for stocks.** We'd prefer not to see them. If any were to arise from this report, we think they'd likely focus on whether the prior-auth service violates anti-kickback statutes, which could result in settlements, other payments/billing oversight, etc.[37]

*Craig Hallum*: Hindenburg Research issued a negative report on NTRA… The only piece that was **new news is the My Genome My Life entity which requires further research**.[38]

---

[34] "Natera - My Genome My Life Isn't Over, Natera Is Just Getting Started," *Piper Sandler*, March 10, 2022.

[35] "Mgmt Feedback Addresses Key Questions Arising from the Short Seller Report," *SVB Leerink*, March 9, 2022.

[36] "Quick Take From Initial Management Comments on Short Report," *Raymond James*, March 9, 2022.

[37] "Thoughts on Short Report," *Baird*, March 9, 2022.

[38] NTRA_0072821 – 23.

26. Throughout the day, news media reported on the Hindenburg Report and its allegations as to Natera's practices, directly attributing the stock price decline to the Hindenburg Report. For example:

> *Benzinga*: **Natera Inc (NASDAQ: NTRA) shares are trading lower by 31.2% at $37.66 after Hindenburg Research issued a short report on the stock.**[39]

> *Dow Jones Institutional News*: **Shares of Natera Inc. (NTRA) plummeted 32.9% in active afternoon trading Wednesday toward a 22-month low, enough to pace all of the Nasdaq's decliners, after noted short seller Hindenburg Research** called the Texas-based genetic testing services company, "Pioneers in deceptive medical billing." Trading volume ballooned to 33.9 million shares, compared with the full-day average of less than 1 million shares.[40]

> *Investing.com*: **Clinical genetic testing company Natera Inc (NASDAQ:NTRA) is down 48% after Hindenburg Research released a short report on the company** titled 'Natera: Pioneers In Deceptive Medical Billing.'[41]

27. There is no dispute that the market price of Natera Common Stock declined in a statistically significant manner on March 9, 2022. I performed an event study in connection with Report (the "Coffman Event Study") and while Dr. Skinner does not criticize the Coffman Event Study, he performs his own event study (the "Skinner Event Study").[42] As shown in **Exhibit 1**, the Coffman Event Study indicates that the decline in Natera Common Stock on March 9, 2022 is statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) after controlling for market and industry effects.[43] Similarly, the Skinner Event Study indicates that Natera Common Stock experienced a decline that is also statistically significant at the 95% confidence level (as well as beyond the 99% confidence level) after controlling for

---

[39] "So What's Happening With Natera Shares?," *Benzinga*, March 9, 2022, 3:48 PM.

[40] "Natera Loses More Than $1.7 Billion In Market Cap, Even After Company Calls Hindenburg Report 'misleading' – MarketWatch" *Dow Jones Institutional News*, March 9, 2022, 3:04 PM.

[41] "Natera Plunges After Hindenburg Short Report," *Investing.com*, March 9, 2022.

[42] Skinner Report ¶ 30.

[43] According to the Coffman Event Study, Natera Common Stock declined by 38.89%, or $21.29 per share, with a t-statistic of -16.46.

market and industry effects.[44]  In addition, there was heavy trading volume of 41.7 million shares on this day, which is over forty times greater than the daily average trading volume during the Class Period.[45]  Trading in Natera Common Stock was also halted at least 3 times on March 9, 2022 due to high volatility in the stock.[46]  Given the statistically significant stock price decline using the scientific event study method, one can reasonably conclude that the firm-specific news contained in the Hindenburg Report caused the Natera Common Stock price decline on this day.

28.    That information, coupled with the multiple analysts and news stories that referenced what Plaintiffs allege as corrective information – most notably, Natera's relationship with MGML, and MGML's improper prior authorization actions on behalf of Natera – as contributing at least in part to the stock price decline, provide clear contemporaneous economic evidence that the alleged misstatements and omissions had an impact on the price of Natera Common Stock.

29.    Further economic evidence that the information disclosed in the Hindenburg Report was important to investors came the following morning, on March 10, 2022.  That day, Natera held a special investor conference call, and continued to deny the allegations made by the Hindenburg Report, spending most of the call on efforts to refute the improper relationship with MGML that Hindenburg reported (and which Plaintiffs allege was corrective).  On the call, Natera stated:

> Natera works with multiple groups, including MGML. MGML is neither owned, operated nor controlled by Natera. The report makes an allegation that one of our

---

[44] Skinner Report Exhibit 2b.  According to the Skinner Event Study, Natera Common Stock declined by 37.30%, or $17.05 per share, with a p-value of 0.00.

[45] The daily average trading volume over the Class Period was 896,437 according to historical volume data obtained from S&P Capital IQ.

[46] *See*, "Natera Inc. (NTRA) Paused due to volatility," *Dow Jones Institutional News*, March 9, 2022 12:11 PM; "Natera Inc. (NTRA) Paused due to volatility," *Dow Jones Institutional News*, March 9, 2022 12:17 PM; "Natera Inc. (NTRA) Paused due to volatility," *Dow Jones Institutional News*, March 9, 2022 12:27 PM.

former employees who left in 2019 had a personal relationship with a senior member of MGML. To my knowledge, we do not know whether or not that is true, and regardless, we had no knowledge of any personal relationships between MGML and an employee of Natera at the time we selected MGML as our outside vendor.

we were not the only customer of MGML. We understand that MGML offers prior authorization services to other diagnostic laboratories that also seek to provide prior authorization support services to physicians. The offering of a prior authorization service to physicians, whether by Natera directly or through an outside vendor such as MGML is not a new idea, and many sectors of the specialty diagnostic testing industry offer similar services to their constituent providers.

The report also implies that MGML performed prior authorizations on 44% of Natera's volume. That allegation is completely inaccurate. In reality, MGML performed prior authorization services on roughly 11% of our volume in 2021, and we estimate less than 7% of our volumes going forward in 2022. The report also implies that Natera is the majority customer of MGML. That allegation is also not correct. Based on the volume of prior authorizations represented on MGML's website, we estimate that we make up approximately 25% of MGML's historical volume.[47]

30.    Natera then addressed the allegations related to billing practices, stating:

We don't think there's any issue with the test order form. And as a reminder, every test material processes is ordered by a physician or other authorized healthcare provider. When billing for 22q, Natera uses the appropriate CPT code, 81422, which was published by the American Medical Association in response to the Natera's application for a new code specific to this testing. There is no serious dispute about the appropriate CPT code.

The report makes a further allegation that Natera routinely caps copayments and deductibles. This is also a false and our intensive collections have been the source of many of the online complaints. We make substantial efforts to collect patient copayments and deductibles. We understand that medical billing is very complex and confusing, so we offer complementary pretest cost estimates, and if we anticipate a patient who has ordered the test and is likely to have a substantial copayment or deductible, we attempt to contact them to see whether they would prefer to pay cash or continue with their insurance. Despite our best efforts, patients may still be confused.[48]

---

[47] "Shareholder/Analyst Call," *S&P Global Market Intelligence*, March 10, 2022.

[48] "Shareholder/Analyst Call," *S&P Global Market Intelligence*, March 10, 2022.

31.    Analysts were active on the call, asking the Company many questions about the Hindenburg Report and its allegations, with a significant focus on the MGML-related information that Hindenburg had reported.  For example:

*Canaccord Genuity*: Basically just why MGML?

*Goldman Sachs*: Extra detail is super helpful. So you mentioned that the volume going through MGML is only about 7% of women's health. It's good to hear. Can you tell us about [ how many other PA vendors do ] you currently work with?"[49]

*BTIG*: I appreciate the 11% in 2021. Is it safe to say that it was higher than that in 2020 and 2019? And then there was also an allegation about typically -- or you tell me, but the purpose of prior authorization is to do it before the test is ordered or the blood is drawn. Seems like the report suggests a lot of these are done after the blood is drawn. And then maybe, my final question is just the commentary that perhaps some of your sales reps are going into doc offices, and essentially, whether it was your reps or MGML, were acting on behalf of the doctor's offices to provide the authorization. Can you just talk about that at a high level, at an industry level? And then maybe, what MGML was doing? Were they acting on behalf of the offices? Or were the clinicians really providing the authorization themselves?[50]

32.    These questions by analysts demonstrate their interest in the topic and support the notion that the news about MGML was new and value-relevant.  Following the special investor conference call, analysts issued updated reports, with several highlighting Natera's efforts to answer questions about the MGML-related reports by Hindenburg.  For example:

*Piper Sandler*: Revenue and growth not expected to be impacted. Natera said that if it ceased its relationship with MGML the impact would be "minimal if any" and reiterated that it would likely have no impact on volume. MGML offered a "generic back end administrative service," in NTRA's view. NTRA also noted that it works with multiple other groups that provide prior authorizations, and that such organizations are used widely by pharma as well as in specialty diagnostics providers.[51]

*Canaccord Genuity*: We are providing our updated views regarding the Hindenburg short report following the company's conference call on Thursday, March 10 and our discussions with management. NTRA shares traded more than 30% lower on

---

[49] "Shareholder/Analyst Call," *S&P Global Market Intelligence*, March 10, 2022.

[50] "Shareholder/Analyst Call," *S&P Global Market Intelligence*, March 10, 2022.

[51] "Natera - My Genome My Life Isn't Over, Natera Is Just Getting Started," *Piper Sandler*, March 10, 2022.

17

3/9, but are trading roughly 20% higher on 3/10 (solid given broader market underperformance). During its conference call, management provided thorough rebuttals, in our view, to the criticisms outlined in the short report…Overall, we remain highly confident that the company is undertaking best practices and that the "issues" highlighted in the Hindenburg report lack support. Given the share price pullback (presumably entirely due to the short report), we recommend aggressively accumulating shares at current levels.[52]

*Cowen*: This morning, NTRA hosted an Analyst call in response to a short report issued on Wednesday morning. We believe NTRA addressed the core allegations in the report, which centered around 1) its relationship with prior auth provider MGML; and 2) NIPT billing/ coding allegations.[53]

33.   News media continued to discuss the story, covering both the conference call and the price reaction in Natera Common Stock.  For instance:

*Benzinga*: Natera, Inc. (NASDAQ: NTRA) jumped 21.9% to $44.87. Shares closed down more than 30% Wednesday. The company responded and said it disagreed with the accuracy of the report. Analysts at Canaccord and Piper defended the stock.[54]

*Dow Jones Institutional News*: --Up 22.28% at today's intraday high; largest intraday percent increase since March 19, 2020, when it rose as much as 40.94%.[55]

34.   Following the special investor call and Natera's refutations of the Hindenburg Report, on March 10, 2022, Natera Common Stock increased in a statistically significant manner, after controlling for market and industry effects (see **Exhibit 1**).[56]  The increased trading volume continued on this day, with 17.1 million shares traded, 19 times greater than the daily average

---

[52] "Effective short report rebuttal via conference call; prior authorization concerns are overblown; BUY," *Canaccord Genuity*, March 10, 2022.

[53] "SHORT REPORT WEAKNESS OVERBLOWN; REITERATE OUTPERFORM FOLLOWING BUSINESS UPDATE," *Cowen*, March 10, 2022.

[54] "45 Stocks Moving In Thursday's Mid-Day Session," *Benzinga*, March 10, 2022, 12:25 PM.

[55] "Natera Up Nearly 22%, on Pace for Largest Percent Increase Since March 2020 -- Data Talk," Dow Jones Institutional News, March 10, 2022 11:30 AM.

[56] Based on the Coffman Event Study, Natera Common Stock increased by 17.73%, or $6.53 per share, with a t-statistic of 7.47, which is statistically significant beyond the 99% confidence level.  Based on the Skinner Event Study, Natera Common Stock increased by 18.85%, or $7.63 per share, with a p-value of 0.00, which is statistically significant beyond the 99% confidence level.

18

trading volume during the Class Period.  The statistically significant price reaction to additional information from the Company provided on the special investor call about the MGML-related assertions and other contents of the Hindenburg Report provides further evidence that at least some of the disclosures in the Hindenburg Report were new and important to investors.  **Exhibit 1** also demonstrates that over a two-day event window (i.e., analyzing the cumulative event study results for March 9, 2022 and March 10, 2022), the cumulative price decline in Natera Common Stock was statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

35.    On the following day, March 11, 2022, Hindenburg Research published an update to its report from two days prior (the "Updated Hindenburg Report").[57]  In this report, Hindenburg discussed Natera's response and defended its reputation.  Of note, while Natera had initally accused Hindenburg Research of being under criminal investigation, Natera later retracted that part of the press release after Hindenburg Research claimed it was false and sent a cease-and-desist letter.[58]  Hindenburg also alleged that Natera "artfully ignored many of the major issues raised in our report, set up then assailed multiple straw-men arguments, and dodged key questions during the question and answer."[59]

---

[57] "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.

[58] Hindenburg Research updated its short report on March 11, 2022 (*see,* Hindenburg Research (@HindeburgRes), "UPDATE: We have added our response to $NTRA in a new section to our report, titled: Natera—Pioneers in Avoiding Talking About Deceptive Medical Billing The company artfully ignored many of the major issues raised in our report and dodged key questions."), *X (f/k/a Twitter),* March 11, 2022, https://x.com/HindenburgRes/status/1502368509799682049).

The Updated Hindenburg Report stated: "The company opened its press release by stating that our report was 'an attempt to make a quick profit by short sellers Hindenburg Research, who are currently under criminal investigation by the Department of Justice for illegal trading tactics.' **That allegation was false, and the company has since removed it from its original press release after we sent a cease and desist letter**." (*see,* "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.).

[59] "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.

36.     The Updated Hindenburg Report asserted that Natera "also made several key admissions."  These included admissions with respect to claims about unbundling, prior-authorizations, and relations with MGML, including:

> Natera acknowledged that it unbundles its microdeletion screen from its main Panorama screen, setting up the prospect of billing both patients and insurers for the same overall test. We view this as important, given how much of the resultant billing chaos seems to result from that decision….
>
> Our report detailed substantial issues relating to circumvention of payor requirements. Chapman led the call with a missive about his frustration with the prior authorization process, potentially attempting to justify the company's efforts to circumvent or undermine the insurance-initiated process….
>
> Chapman decried prior authorizations as a major issue that has limited patient access to care, which, of course, has also resulted in challenges for Natera in its efforts to bill for that patient care and generate additional revenue. This is precisely a key issue we raised….
>
> On the issue of the magnitude of Natera's relationship with MGML, Natera focused its response on the 2021-2022 timeframe. This is despite our report calling into question MGML's role dating back to its formation in 2018.
>
> According to multiple interviews with people familiar with MGML's operations, it was almost entirely focused on prior authorizations for Natera screens….
>
> The lack of disclosure around prior numbers relative to its overall business is, we believe, telling. The company likely has these number at-hand and the opacity in Chapman's answers indicates to us that the company's relationship with MGML may have been closer than the company wishes to acknowledge….[60]

37.     The Updated Hindenburg Report outlined questions that analysts asked related to the Hindenburg Report, which the Company purportedly dodged.  For example, an analyst asked about the timeline of prior authorizations, stating that "it seems like that the report suggests a lot of these [prior-authorizations] are done after the blood is drawn?"[61]  Natera offered no answer to

---

[60] "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.

[61] "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.

this, according to the call transcript and Hindenburg Research.  Additionally, Hindenburg reported that Natera did not answer the question "[o]ut of the kind of Natera prior authorizations that are performed by MGML, what portion of those are denied or ultimately approved and how does that compare to the other like third-party prior auth companies out there?"[62]  The Updated Hindenburg Report also criticized Natera for not answering questions that Hindenburg raised in its initial report, particularly about the relationship between the MGML and Natera, and how it bills customers, and what had led to all of the negative reviews regarding the company.[63]

38.    As a result of the foregoing, there is clear economic evidence that the alleged misstatements and omissions and their alleged correction in the Hindenburg Report had an impact on the price of Natera Common Stock.

## IV.   DR. SKINNER FAILS TO ESTABLISH A LACK OF PRICE IMPACT FROM THE ALLEGED MISSTATEMENTS AND OMISSIONS IN THIS MATTER AND HE FAILS TO CONSIDER IMPORTANT ECONOMIC EVIDENCE

39.   Dr. Skinner makes three primary arguments related to price impact, specifically:

(1) stock price changes following alleged omissions cannot be used to reliably infer that those alleged omissions affected the price of Natera Common Stock;[64]

(2) allegedly omitted information regarding the Natera's billing practices for Panorama had been publicly available before the release of the Hindenburg Report;[65] and

(3) Natera's abnormal stock price decline following the Hindenburg Report cannot be used to infer that the alleged misrepresentations affected the price of Natera Common Stock.[66]

---

[62] "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.

[63] "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.

[64] Skinner Report ¶ 13 and Section VI.

[65] Skinner Report ¶ 14 and Section VII.

[66] Skinner Report ¶ 15 and Section VIII.

40.    Dr. Skinner has not demonstrated that there was no price impact on Natera Common Stock from the alleged misstatements and omissions. *First*, Dr. Skinner's suggestion that a price increase following a misstatement that omits material negative facts cannot be used to infer price impact is flawed. Natera Common Stock experienced statistically significant price increases following numerous of the alleged misstatements that omitted important negative, qualifying information and Dr. Skinner's suggestion that those price increases do not provide any evidence of price impact is illogical. He has not proven a lack of front-end price impact. *Second*, the economic evidence is inconsistent with Dr. Skinner's suggestion that information contained in the Two Capitol Forum Articles was already incorporated into the price of Natera Common Stock prior to the alleged corrective disclosure. Dr. Skinner fails to consider important economic evidence that the Hindenburg Report was not a "re-publication" of information contained in the Two Capitol Forum Articles and that investors did not have ready access to the Two Capitol Forum Articles. He also opted not to empirically evaluate the portion of allegedly corrective information included in the Hindenburg Report that he admits was not discussed in the Two Capitol Forum Articles. Third, Dr. Skinner points to certain factors to attempt to suggest an absence of back-end price impact – i.e., a lack of changed analyst estimates, certain supposedly confounding information that could possibly have affected Natera's Common Stock price, and various post-Class Period developments (some of which are months or years after the end of the alleged Class Period), but none of his arguments establish a lack of price impact or detract from the economic evidence supporting the presence of price impact in this matter. I address each of these points in detail below.

A.   **DR. SKINNER'S DISMISSAL OF THE PRICE INCREASES FOLLOWING THE ALLEGED MISSTATEMENTS AND OMISSIONS IS FLAWED AND HE HAS NOT PROVEN A LACK OF FRONT-END PRICE IMPACT**

41.   Dr. Skinner argues that "any stock price changes associated with alleged omissions do not measure the impact of any allegedly omitted information" regarding, e.g., Natera's alleged improper relationship with MGML and opting patients into microdeletion screening.[67]  He reasons that this is because "an event study analysis does not measure the stock price impact of information that was not released on a given date, including information alleged to have been omitted."[68]

42.   First and foremost, Dr. Skinner is suggesting that a price increase in response to an affirmative misstatement about a topic that leaves out important, negative, qualifying information about that topic cannot provide evidence of price impact.  This conclusion is overly broad and incorrect.  To illustrate this point, imagine a cell phone company announces a groundbreaking new battery that allows phones to last a week without charging, causing its stock price to rise.  However, the company fails to mention that it is aware it is facing severe regulatory hurdles that will prevent the battery from ever being sold.  Investors are initially excited about the represented potential for increased sales and profits, but this excitement is misplaced since those benefits will likely never materialize.  If investors had known about the regulatory issues, the stock price would not have increased as much.  In this example, to suggest that the omission of an important, negative qualifying fact did not impact the stock price of the company would be absurd.  Dr. Skinner is claiming as such in this matter, but he is not capable of proving that the

---

[67] Skinner Report ¶ 34.

[68] Skinner Report ¶ 34.

23

observed stock price increases following some of the alleged omissions would have been the same if the omissions had been revealed on those dates.  He simply sidesteps the question.

43.   In addition, Dr. Skinner's argument is flawed because there is evidence that Natera's positive statements about higher-than-expected revenue driven by Panorama impacted the stock price starting at the beginning of the Class Period, while concealing information that was important to investors, and would have lowered the stock price if revealed before the Hindenburg Report.  At the start of the Class Period, on February 26, 2020, Natera announced that revenue for the fourth quarter of 2019 was $83.2 million, which was higher than the analyst consensus estimate of $77.9 million.[69]  Natera noted that "[t]he increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests."[70]

44.   Analysts took note of how Natera's Panorama test contributed to the revenue increase during the quarter.  For example, Canaccord Genuity wrote that "[r]evenues of $83.2M (+24% Y/Y) beat our/Street's $77.9M (+16%), driven by strong NIPT volume growth and sequential ASP improvements."[71]  They observed that Natera's revenue guidance for 2020 relied on continued strength in the NIPT department – and the key role that prior authorizations played as a factor in the Company's expected revenues:

> Natera's revenue guide assumes 1) continued momentum in NIPT volume growth (NTRA is seeing strong growth through the first two months of Q1); 2) modest ASP

---

[69] "Natera Reports Fourth Quarter and Year 2019 Financial Results" *PR Newswire*, February 26, 2020, 4:10 PM; "Solid execution across the board; 2020 guide leaves room for upside; BUY; PT to $46," *Canaccord Genuity*, February 27, 2020.

[70] "Natera Reports Fourth Quarter and Year 2019 Financial Results" *PR Newswire*, February 26, 2020, 4:10 PM.

[71] "Solid execution across the board; 2020 guide leaves room for upside; BUY; PT to $46," *Canaccord Genuity*, February 27, 2020.

erosion (simply for conservatism) due to prior authorizations; 3) no change to ACOG's recommendations for avg. risk NIPT.[72]

45.    Other analysts also commented on the NIPT test volume growth.  Cowen described that "Q4 revenue beat expectations" in part because "Q4 volume of 200K tests was 2-3K above our original forecast."[73]  Craig-Hallum wrote that "[m]anagement issued 2020 revenue guidance at $335-350M (Street: $335M)…This also implies prenatal test volume grows ~20% y/y, better than 9% modeled originally."[74]

46.    A later report from March 10 shows that Canaccord Genuity continued to be encouraged about Natera's prospects due to Panorama's reported continued volume growth:

> NTRA has been firing on all cylinders in its base NIPT business and its oncology and transplant growth offshoots, and the company feels good about the resiliency of its business model during this period of uncertainty. We feel good about the sustainability of NIPT test volume growth[75]

47.    On the market date of Natera's earnings release, February 27, 2020, the Coffman Event Study shows a stock price increase of 13%, after controlling for market and industry factors, which is statistically significant at the 99% level.  To the extent that Natera omitted the true extent of the improper business practices used to generate volumes and revenue for Panorama (including in regard to MGML and prior authorizations), as Plaintiffs allege, that would suggest that this market price increase was too high and introduced some artificial inflation.  As noted above, analysts were focused on prior authorizations as a factor that

---

[72] "Solid execution across the board; 2020 guide leaves room for upside; BUY; PT to $46," *Canaccord Genuity*, February 27, 2020.  Other analysts also commented on the role that prior authorization costs and dynamics played in Natera's revenue guidance.  *See,* for example, "4Q19 Above Expectations & Conservative 2020 Guidance," *Piper Sandler,* February 26, 2020 and "FQ4 2019 Earnings Call," *S&P Global Market Intelligence*, February 26, 2020.

[73] "NATERA CLOSES OUT SOLID 2019; STRONG MOMENTUM INTO 2020," *Cowen*, February 27, 2020.

[74] "Q4 Beat And 2020 Guide Upside Closes Out An Excellent 2019.  The Next Leg Higher Is When Cancer/Transplant Flow Into The Model.  Reiterate BUY, $49 Price Target.," *Craig-Hallum*, February 27, 2020.

[75] "Five companies we expect to weather the storm: EXAS, QTRX, GH, CSTL, NTRA; Chart on P. 2," *Canaccord Genuity*, March 10, 2020.

influenced Natera revenues, and, as described extensively in **Section III**, the relevant information about MGML and default opt-ins for microdeletions testing was important to investors. Thus, if Natera had disclosed this adverse information prior to the Hindenburg Report, the stock price would have incorporated the information sooner. The statistically significant price increase on February 27, 2020 is consistent with the notion of front-end price impact.

48.   I understand that Dr. Skinner does not observe a statistically significant price increase on February 27, 2020, according to the Skinner Event Study. However, this finding is fundamentally flawed and therefore does not disturb the opinion I offer here. Specifically, Dr. Skinner employs three fixed estimation periods in the Skinner Event Study, the first of which spans February 27, 2020 through April 30, 2020.[76] In other words, the results of the Skinner Event Study (including as to statistical significance) for the first day of the Class Period, February 27, 2020, are estimated based on the returns and volatility in Natera Common Stock during an almost entirely *future* period from February 27 through April 30, 2020. For comparison, the event study results for February 27, 2020 in the Coffman Event Study are based on the returns and volatility of the *prior* 120 trading days (roughly 6 months).[77]

49.   Dr. Skinner explains that the period of February 27, 2020 – April 30, 2020 "was particularly affected by COVID-19-related market disruptions, including rapidly changing stock return volatility." While that is true for that period as a whole, it was not until later during that period, and critically, after February 27, 2020, that volatility started to notably rise due to

---

[76] Skinner Report ¶ 30.

[77] In my Report, I explained how for each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months). By using such a "rolling" estimation window, it allows for the relationship between Natera Common Stock, industry and market factors, as well as firm-specific volatility, to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature. *See,* Coffman Report ¶ 52.

26

COVID-19.  To illustrate this point, consider the Chicago Board Options Exchange (CBOE) Volatility Index, also called the VIX, which provides a barometer for market uncertainty, and rises to higher levels when the market expects more uncertainty.[78]  **Exhibit 2A** plots the price of the VIX during the estimation window I used in the Coffman Event Study as well as the estimation window Dr. Skinner uses in the Skinner Event Study to compute results for February 27, 2020.  The VIX reached an all-time high closing price on March 16, 2020,[79] after the Federal Reserve Bank held an unscheduled meeting to cut interest rates to near zero,[80] New York City announced that it would close its public schools,[81] and Ohio and Illinois ordered bars and restaurants to shut down to prevent the spread of COVID.[82]  The closing price of the VIX on March 16, 2020 was $82.69, which is over twice as high as the closing price on February 27, 2020, which was $39.16 (a higher VIX price indicates higher expected volatility).[83]

50.    Moreover, **Exhibit 2A** shows that the VIX closing price was elevated after February 27, 2020, indicating extraordinary market volatility in the later days and weeks during the estimation window used in the Skinner Event Study for February 27, 2020.  Similarly, **Exhibit 2B** demonstrates that Natera's volatility (as measured by the standard deviation of abnormal returns) also did not increase until after February 27, 2020.  This stands in stark contrast to the

---

[78] *See* https://www.cboe.com/tradable_products/vix/.

[79] I obtained historical closing prices for the CBOE Volatility Index from S&P Capital IQ.

[80] "Federal Reserve issues FOMC statement," *Federal Reserve Bank*, March 15, 2020, 5:00 PM, available at: https://fraser.stlouisfed.org/title/federal-open-market-committee-meeting-minutes-transcripts-documents-677/meeting-march-15-2020-unscheduled-587319.

[81] "New York City to close schools; bars, restaurants around U.S. ordered closed over coronavirus," *NBC News*, March 15, 2020, 5:16 PM.

[82] "New York City to close schools; bars, restaurants around U.S. ordered closed over coronavirus," *NBC News*, March 15, 2020, 5:16 PM.

[83] S&P Capital IQ.

lower volatility observed in the period before February 27, 2020, which I used in my estimation window for the Coffman Event Study to obtain results for the same date.

51.    An estimation window that begins on February 27, 2020 and extends through April 30, 2020, as used by Dr. Skinner, is not representative of the true firm-specific volatility as of February 27, 2020, because it includes periods of extreme heightened volatility driven by the impact of future COVID-19 events.  This leads to an overstatement of volatility and an understatement of statistical significance of the price movement on February 27, 2020 according to the Skinner Event Study.

52.    In summary, Dr. Skinner's model estimates results for February 27, 2020 (a date prior to much of the volatility of the COVID-19 pandemic)[84] using data and volatility from during the height of market volatility from the COVID-19 pandemic.  Only by measuring the large Natera Common Stock price movement on February 27, 2020 in light of volatility that entered the market weeks after can one find that price movement to be statistically insignificant. Indeed, whether I employ the prior 120-day estimation window from my Report, or smaller estimation windows around February 27, 2020, such as 20 days prior, or five days prior and five days after, there is still a statistically significant price increase on February 27, 2020, as shown in **Exhibit 3**.  In other words, when one applies volatility from a more appropriate period that does not incorporate the extremely heightened volatility of the period between March and April 2020, the statistical significance of the Natera Common Stock price movement on February 27, 2020 is

---

[84] The World Health Organization declared COVID-19 a pandemic on March 11, 2020.  *See,* https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

plain. Dr. Skinner himself acknowledged that if he had used an estimation window of dates prior to February 27, 2020 the statistical significance of February 27, 2020 may have been higher.[85]

53.    As further evidence consistent with front-end price impact, according to the Coffman Event study, Natera experienced price increases that were statistically significant at the 95% level or higher on four of the other alleged misstatement dates.[86] The Skinner Event Study also finds statistical significance on all four of these dates as well as on an additional alleged misstatement date.[87]

54.    Given the economic logic I have outlined above combined with the fact that February 27, 2020 is associated with a statistically significant price increase under any reasonable event study model, Dr. Skinner fails to prove a lack of front-end price impact from this alleged misstatement along with the other alleged misstatements associated with undisputed statistically significant price increases. Further, as explained above in **Section III**, there is empirical evidence that the alleged misstatements and omissions had back-end price impact based on the market's response to the allegedly corrective information released in the Hindenburg Report on March 9, 2022.

---

[85] Skinner Deposition 49:10 – 18 ("I would just say that if I had chosen a different estimation window -- for example, if I had chosen an estimation window for the 60 trading days that preceded February 27, 2020, it could well be that the estimated volatility was lower, and the statistical significance of the abnormal return on that day, along with the abnormal return itself, may have been different and may have been higher.")

[86] The market dates of these misstatements are May 7, 2020, August 6, 2020, February 26, 2021, and November 5, 2021.

[87] Along with the four misstatement dates the Coffman Event Study finds statistically significant and positive, the Skinner Event Study also finds May 7, 2021 (the market date of the May 6, 2021 misstatement) to have a statistically significant price increase. *See* Skinner Exhibit 2b.

**B.   THE CAPITOL FORUM REPORTS DID NOT REVEAL THE ALLEGED CORRECTIVE INFORMATION TO THE MARKET PRIOR TO THE HINDENBURG REPORT**

55.   Dr. Skinner argues that information regarding "Natera's use of MGML to submit prior authorizations and that entity's business practices" as well as "Natera's microdeletion ordering and billing practices" was publicly available before the Hindenburg Report was released.[88]  He claims that the information in the Hindenburg Report that Plaintiffs claim was corrective was not new, instead that it was a "re-publication" of what was revealed earlier by the Two Capitol Forum Articles and therefore could not affect the stock price of Natera Common Stock on the date of the Hindenburg Report, as in an efficient market the information would have already been incorporated into the stock price.[89]

56.   First, Dr. Skinner fails to consider important evidence that the Hindenburg Report was not a mere "re-publication" of information contained in the Two Capitol Forum Articles, and did in fact contain new information that impacted the price of Natera Common Stock on March 9, 2022.  Second, Dr. Skinner omits that the Two Capitol Forum Articles were costly and difficult to obtain and that economic evidence indicates that they were not noted or picked up by any news or analyst report during the Class Period, or otherwise disseminated in a manner consistent with what is considered "public information" which is readily incorporated into market prices. Third, Dr. Skinner's citation to the Two Capitol Forum Articles does not bring the efficiency of the market for Natera Common Stock into question, and instead relies upon a straw man of theoretically perfect market efficiency where any information, regardless of cost or distribution,

---

[88] Skinner Report ¶ 36.

[89] Skinner Report ¶¶ 27, 37.

30

is instantaneously and fully reflected in market prices, a version of market efficiency that neither exists, nor is the relevant standard.

### i. The Hindenburg Report Contained New Information Not Included in the Two Capitol Forum Articles

57.    According to Dr. Skinner, the Two Capitol Forum Articles included some of the corrective information that was later revealed to the market in the Hindenburg Report.[90]  First and foremost, Dr. Skinner concedes that not all of the allegedly corrective information included in the Hindenburg Report was discussed in the Two Capitol Forum Articles.  Specifically, Dr. Skinner concedes that the alleged corrective information contained in the Hindenburg Report that MGML sought prior authorizations after a Panorama test was run was not previously disclosed by the Two Capitol Forum Articles.[91]  When asked during the Skinner Deposition if it was his opinion that all of the allegedly corrective information in the Hindenburg Report was previously publicly available, Dr. Skinner replied: "[m]y opinion is not that absolutely all of that information was necessarily in the public domain prior to that time."[92]

58.    Indeed, the Hindenburg Report disclosed for the first time that "'prior authorizations' submitted by MGML were done after the test had already been performed" which "set patients up for unexpected out-of-pocket costs as they learn only after the screening whether

---

[90] Skinner Report ¶¶ 38, 42.

[91] *See,* Skinner Report footnote 81; Skinner Deposition 145:13 – 17 ("Correct. I think this is an example of something that, as the footnote says, something plaintiffs allege is corrective claims named in Hindenburg that were not necessarily in The Capitol Forum articles."); and Skinner Deposition 214:7 – 13 ("So I think what I'm trying to convey there is that it's certainly possible that some of the information that was conveyed by the Hindenburg report was not necessarily preempted by the information in The Capitol Forum articles.").

[92] Skinner Deposition 178:4 – 6.

insurance would have approved coverage."[93, 94]   Additionally, the Hindenburg Report revealed

that:

> Natera surreptitiously pushes screening for microdeletions by requiring providers to specifically opt-out of the screen... Around 75%-80% of Natera's key Panorama screenings include microdeletions, with the company hyping the potential revenue opportunity to investors. Virtually no payors cover the test.[95,96]

---

[93] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[94] While Dr. Skinner admits this was new information in the Hindenburg Report, he tries to qualify this by claiming that according to the Hindenburg Report, "some payors permit a grace period after a procedure" and that "Natera had previously disclosed risks to reimbursement associated with when the prior authorization is completed." (*See,* Skinner Report footnote 81).  I further understand that Dr. Skinner argues "throughout the Proposed Class Period Natera disclosed various risks related to reimbursement as a result of requirements for prior authorization and related third-party payer practices. Such disclosures included that third-party payers may not reimburse for Panorama tests or for microdeletion screening, in which case Natera's future revenues would be adversely affected." (*See,* Skinner Report ¶ 40).

However, Dr. Skinner omits the Hindenburg Report's claim that even though a grace period may sometimes be permitted, "the norm is that prior authorizations come prior."  Additionally, Natera's risk statement mentioned in the Hindenburg Report says that "third-party payers are increasingly requiring that prior authorization be obtained prior to conducting genetic testing as a condition to reimbursing for it, which may reduce or delay the reimbursement amounts we receive for Panorama or our other tests."  Finally, Natera merely stating that a lack of reimbursement from third-payer payers could adversely impact revenues is not the same as disclosing that prior authorizations submitted by MGML were done after the test had already been performed.

[95] "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[96] While not disclosed by the Two Capitol Forum Articles, Dr. Skinner argues that the requirement to opt out of the 22q.11.2 microdeletion (DiGeorge Syndrome) test was previously disclosed by both a Natera press release from 2014, and an order form available online (*see* Skinner Report ¶¶ 46-47).  The press release states that "Natera…today announced the expansion of the Panorama™ non-invasive prenatal test (NIPT) to screen for **five clinically relevant microdeletion syndromes**.  The **expanded test** will become available on March 1, 2014…Beginning on March 1, screening for 22q11.2 deletion syndrome (also known as DiGeorge syndrome) will become standard on Panorama's prenatal panel, which already includes screening for trisomy 21 (Down syndrome), trisomy 18, trisomy 13, triploidy, and sex chromosome aneuploidies. Expecting parents will have the additional option to screen for 1p36 deletion, Angelman, Cri-du-chat, and Prader-Willi syndromes." According to the order form that Dr. Skinner cites, there are two versions of the Panorama test that a physician can order for the patient: 1) the Panorama Prenatal Panel, which includes the DiGeorge Syndrome microdeletion test among other tests; and 2) the Panorama **Extended** Panel, which includes all of the Prenatal Panel tests, along with the other four microdeletion tests Natera offers. The press release does not make it clear that the DiGeorge Syndrome test would be a part of the basic prenatal panel and not only the extended panel, with all of the other microdeletion tests. Finally, the order form referenced by Dr. Skinner does not show up on the Natera webpage that gives information about Panorama, nor is there any indication on that page that the DiGeorge Syndrome test needs to be opted out of. Dr. Skinner simply provides a link to a pdf, with no indication of how a typical patient would navigate to that page when seeking information about the test.  *See* "Natera Expands Panorama™ Non-Invasive Prenatal Test to Screen for Clinically Significant Microdeletions," *Natera*, February 5, 2014 and "Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf," *Natera*, available at https://www.natera.com/wp-content/uploads/2020/11/Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf.

59.    Neither of these pieces of information were contained in the Two Capitol Forum Articles and Dr. Skinner does not claim as such.[97]

60.    Furthermore, Dr. Skinner claims that the order form for Panorama itself was publicly available online in November 2020 showing that physicians would have to opt out of "22q.11.2."[98]  It is unlikely that an investor would seek out this medical form in the first place, find the one section listing "22.q.11.2 deletion" among numerous other medical codes, and decipher that a line reading "I DO NOT want 22.q.11.2" meant that physicians had to opt out of the costly microdeletion testing rather than opt in.  Indeed, I am not aware of any analyst reports or news outlets discussing the order form or its implications.  Dr. Skinner's argument related to the order form falls far short of establishing that investors were aware of the alleged corrective information prior to March 9, 2022.

61.    Clearly, the Hindenburg Report contained new information that Dr. Skinner failed to consider when he stated that "allegedly omitted information regarding the Company's billing practices for Panorama—including information in the Hindenburg Report that Plaintiffs allege as corrective—had in fact been publicly available well before the release of the Hindenburg Report."[99]  The Hindenburg Report contained valuable information for investors and the market, such as the timeline of Natera's tests being performed before obtaining prior authorization from insurance companies, the improper and potentially illegal relationship that Natera had with

---

[97] Another example of new corrective information first released in the Hindenburg Report was that "Natera converted patient information into a giant Google Docs spreadsheet and shared it with MGML. In addition to it being 'not exactly HIPAA compliant' to share sensitive patient information via a Google doc shared across borders with MGML's workers in Bangalore, India, the process also puts Natera in charge of selecting the CPT codes under which tests were submitted for prior authorization. Natera's involvement shields doctors from the coding process and likely explains why practitioners appear unaware they are ordering 2 separate screens subject to separate insurance considerations."  "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.

[98] Skinner Report ¶ 47.

[99] Skinner Report ¶ 14.

MGML, and the order form that defaulted to including microdeletion testing rarely covered by insurance. All of these allegations were not included in the Two Capitol Forum Articles, and the market learned of them with the publication of the Hindenburg Report.

**ii.    There Is No Evidence That the Two Capitol Forum Articles Were Available or Disseminated in a Manner Consistent What is Considered "Obviously Public Information" Which is Readily Incorporated Into Market Prices**

62.    Theoretically perfect market efficiency, wherein all information is costless and instantaneously available to all investors and therefore instantaneously reflected in market prices, is not something that can be assumed, and is not a condition that financial economists presume describes the real world functioning of the market. Dr. Fama suggests that for market efficiency to hold, it is satisfactory if "sufficient numbers" of investors have "ready access" to information.[100] Therefore, when considering the Two Capitol Forum Articles, one must assess whether these were publicly available in such a way that enough investors had access for the information to be reflected in Natera's Common Stock price. To evaluate this, one can analyze whether there is any evidence that the Two Capitol Forum Articles were widely disseminated or reported on by investment analysts whose function it was to cover Natera, or by news outlets or other sources that investors rely upon for information, such as company press releases, SEC filings, Seeking Alpha or Factiva, for example. It is also reasonable to consider, given the potentially explosive content of the articles, if there is evidence of a price response following the release of the Two Capitol Forum Articles. However, as outlined below, there is *no* indication that *any* of these sources or standard indicators responded to or picked up on the Two Capitol

---

[100] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417, p. 388.

Forum Articles during the Class Period, undercutting the claim that the Two Capitol Forum Articles were publicly available in the economic sense.

63.    *First*, I am unable to find any evidence that any of the numerous securities analysts following Natera reported to investors on the existence of the Two Capitol Forum Articles or their contents, including the allegedly corrective information.  I similarly found no source from the general media, including through Factiva or Seeking Alpha, that reported on the Two Capitol Forum Articles or any of their contents and Dr. Skinner does not cite to any such sources. Investment analysts and news media are standard places that economists typically look for evidence that a piece of value-relevant information, such as information about a key prior authorization provider for Natera, was publicly disclosed.  Dr. Skinner agrees with that proposition and admits that he could not find any analyst report, news report, or other source on Factiva, which reported on the existence of the Two Capitol Forum Articles.[101]

64.    By way of specific example, the Two Capitol Forum Articles were published on July 1, 2020 and December 14, 2020.  Between July 1, 2020, and the alleged corrective disclosure of March 9, 2022, there were at least 406 analyst reports published about Natera.[102] However, not one of these hundreds of analyst reports mentioned, let alone described, what was included in the Two Capitol Forum Articles, or referenced those Capitol Forum articles at all. These reports are authored by analysts, whose jobs are to track and report on new value-relevant information pertaining to the company.  Despite this, they did not address or mention anything

---

[101] Skinner Report footnote 79 and Skinner Deposition 148:19 – 149:4 ("I did not come across any public press or analyst reports that reference The Capitol Forum articles based on the search that I did.").

[102] Coffman Efficiency Report Backup Materials Data and Documents to Turn Over\1. Data and Programs\4. Ex 4\Analyst Reports.xlsx

disclosed in the Two Capitol Forum Articles in any of their numerous reports between the first of the Two Capitol Forum Articles and the Hindenburg Report.

65.    By contrast, as I discussed in **Section III**, numerous analysts commented and focused on the release of the Hindenburg Report.  In addition, when the Hindenburg Report was published, within hours Natera issued a press release and the following morning held a special investor conference call to address the contents in the report, including the portions Dr. Skinner asserts were already public.  On that call, at least eight separate firms had analysts who participated in the call and asked numerous questions directly about the allegations mentioned in the Hindenburg Report.[103]  Meanwhile, analysts did not publicly ask the Company questions about any of the information included in the Two Capitol Forum Articles, nor did the Company respond in any public way to the Two Capitol Forum Articles as it did promptly with the Hindenburg Report.  The fact that analysts began asking questions and were seeking additional information about the contents of the Hindenburg Report on the March 10, 2022 conference call indicates that they did not have this information before.  Similarly, the fact that numerous analysts published articles focusing on the allegedly corrective information about, e.g., the relationship between Natera and MGML, on March 9 and 10, 2022, is clear economic evidence that neither the analysts nor the market more broadly possessed this information previously— regardless of whether some of it had been reported in an obscure, paywalled source.  As noted above, news outlets also reported on the Hindenburg Report on or around March 9, 2022.  The foregoing is further evidence the market did in fact learn about the corrective information for the first time from the release of the Hindenburg Report, and not earlier, as Dr. Skinner suggests.

---

[103] Analysts recorded as attending include Robert W. Baird & Co.; Goldman Sachs Group, Inc.; Nephron Research LLC; Canaccord Genuity Corp.; BTIG, LLC; Cowen and Company, LLC; SVB Leerink LLC; and Morgan Stanley. *See*, "Shareholder/Analyst Call," *S&P Global Market Intelligence*, March 10, 2022.

66.    Without being able to point to any public news articles or analyst reports, Dr.

Skinner argues that internal emails between certain market participants and Natera executives

"shows that market participants were aware of claims by The Capitol Forum about Natera at the

time The Capitol Forum Articles were published."[104]  Specifically, he claims:

> Some market participants, in fact, reached out to Natera to inquire about claims made in the reports. For example, following publication of The Capitol Forum article on December 14, 2020, a portfolio manager at Bridger Capital LLC reached out to Natera's Chief Financial Officer ("CFO"). The email correspondence indicates that Bridger Capital LLC received notification of at least some of The Capitol Forum's publications. Similarly, internal company emails show that several other securities analysts and buy-side investors had access to reports The Capitol Forum published about Natera during the Proposed Class Period and discussed those reports with Natera executives. At least two securities analysts—J.P. Morgan and Craig Hallum—who published analyst reports covering Natera during the Proposed Class Period also communicated with Natera executives regarding The Capitol Forum articles about the Company.[105]

67.    First and foremost, it is important to note that Dr. Skinner stops short of claiming

that the email correspondence he cites to provides ***any*** evidence that the information contained in

the Two Capitol Forum articles was incorporated into the price of Natera Common Stock.  The

most Dr. Skinner can say is that these emails took place, but he does not provide any proof that

any market participants traded on information reflected in the emails.  Furthermore, the emails

from The Capitol Forum that he cites to are merely notice of The Capitol Forum publishing an

article and solicitations for business, and there is no evidence that these emails contained or

attached the articles themselves.  Moreover, Dr. Skinner cites to no correspondence surrounding

the first of the Two Capitol Forum Articles (i.e., the July 2020 article) and the only

correspondence he discusses following the second of the Two Capitol Forum Articles (i.e., the

December 2020 article) is a portfolio manager at Bridger Capital LLC reaching out to Natera's

---

[104] Skinner Report ¶ 43.

[105] Skinner Report ¶ 43.

CFO merely stating "These guys just won't stop First Medicaid and now charities to support payments."[106]  The Natera emails cited by Dr. Skinner do not provide evidence of investors actually obtaining the Two Capitol Forum Articles – at most they provide evidence that the second of the Two Capitol Forum Articles (i.e., the December 2020 article) was briefly excerpted and described as being available in what appear to be otherwise boilerplate solicitation emails to potential customers of The Capitol Forum.  Dr. Skinner's citation to Natera emails falls short of demonstrating that the information contained in the Two Capitol Forum Articles was reflected in the price of Natera Common Stock prior to the publication of the Hindenburg Report.

68.    *Second*, The Capitol Forum is not an easily accessible source of information nor is it as well known as other common sources.  Indeed, Dr. Skinner's testimony supports how difficult it is to obtain articles from The Capitol Forum.  He notes that he did not have access to all of the articles published by The Capitol Forum during the Class Period, which illustrates the exact point I am trying to make, that is, that gaining access to articles from The Capitol Forum is exceedingly difficult or costly.[107]

69.    I discussed during the Coffman Deposition how information in a publication which one must pay to access like the New York Times would nevertheless likely be widely disseminated and publicly available.[108]  However, The Capitol Forum is quite different from the New York Times or Hindenburg Research; its reports are far more expensive to obtain and far

---

[106] NTRA 0247211–213.

[107] Skinner Report footnote 78; Skinner Deposition 135:13 – 17: (" I also know for sure that when I asked about this whenever it was when I was initially working on the report, we did not have access to all of The Capitol Forum articles from the class period.") and Skinner Deposition 136:21 – 137:8: ("As I mentioned, these are the set of Capitol Forum, meaning in Paragraph 41 in Footnote 78, and listed in my 'Documents Considered List,' eight Capitol Forum articles published during the course of the proposed class period. I recall that not all of The Capitol Forum articles were available to us.").

[108] Deposition of Chad Coffman, CFA, in John Harvey Schneider v. Natera, Inc., et. al., No. 1:22-cv-00398-DAE, July 19, 2024 ("Coffman Deposition") 57:17-24.

less well known.  While The Capitol Forum does not list its pricing publicly, it was estimated to cost $24,000 annually in 2017 and described as one of the four "priciest content subscriptions" at the time.[109]  Also in 2017, the CEO of The Capitol Forum noted that the publication "targets law firms, along with government executives, particularly the Federal Trade Commission and the Department of Justice."[110]  The high cost of The Capitol Forum is a hindrance to investors obtaining information from this source, and the publication itself acknowledges it is targeting a niche set of sophisticated readers.  By contrast, the New York Times costs $25 a month[111] and Hindenburg Research publishes its reports for free on its website, and offers the option to have the reports emailed directly to subscribers at no cost.[112]

70.  *Third*, as I discussed above in **Section III**, Dr. Skinner does not dispute that there is a statistically significant price decline at the 95% confidence level (as well as beyond the 99% confidence level) on the alleged corrective disclosure date, March 9, 2022, in the wake of the Hindenburg Report that allegedly disclosed corrective information.[113]  This provides direct economic evidence that investors were reacting to new information contained in the Hindenburg Report on March 9, 2022.  Conversely, according to the Coffman Event Study and the Skinner Event Study, the price movements following the Two Capitol Forum Articles are not statistically significant.[114]  Given the obviously explosive content of the Two Capitol Forum Articles, and the obvious price reaction to the Hindenburg Report, the event study analysis is also entirely

---

[109] https://digiday.com/media/4-priciest-content-subscriptions-stack/.

[110] https://digiday.com/media/4-priciest-content-subscriptions-stack/.

[111] https://www.nytimes.com/subscription, accessed September 27, 2024.

[112] https://hindenburgresearch.com/.

[113] Skinner Report ¶ 53 and Exhibit 2b.

[114] Coffman Efficiency Report Backup Materials Data and Documents to Turn Over\1. Data and Programs\5. Ex 5-7\NTRA Event Study.xlsx and Skinner Report footnote 79 and Exhibit 2b.

consistent with the conclusion that the Two Capitol Forum Articles were not widely or obviously publicly available.

71.    The foregoing factors are entirely consistent with the fact that the market clearly reacted to the allegedly corrective information in the Hindenburg Report, despite some of the information also appearing earlier, in some part, in the Two Capitol Forum Articles.  Ultimately, the lack of statistically significant price movements or analyst or news commentary at the time of the Two Capitol Forum Articles, the statistically significant price reaction on the market date of the Hindenburg Report, the analyst and market reaction to the Hindenburg Report, and Natera's public response to the Hindenburg Report in the form of a press release and special investor conference call, is economic evidence consistent with the idea that the Hindenburg Report was in fact when the market first learned and reflected the alleged corrective information, and that this did not occur through the Two Capital Forum Articles.[115]  Dr. Skinner's opinion ignores this extensive, standard economic evidence about when this information entered the market, fundamentally undermining his opinion.

### iii.    Dr. Skinner Presents No Evidence to Disturb My Conclusion that Natera Common Stock Traded in an Efficient Market Throughout the Class Period

72.    Dr. Skinner does not contest my opinion that Natera Common Stock traded in an efficient market during the Class Period.  Furthermore, Dr. Skinner does not dispute any of the

---

[115] Dr. Skinner agrees that "in general, analysts do tend to issue reports when something important happens at the company that they think is potentially value relevant" which makes lack of analyst reports following the two The Capitol Forum Articles notable.  Additionally, when asked if he had any evidence that market participants traded on the information in the Two Capitol Forum Articles, Skinner responded that it was an assumption exclusively based on the market being efficient, "Well, I think, again, I've been asked to assume that the market was efficient, and I believe Mr. Coffman's opinion is that the market was efficient. So if the market was efficient and the information is publicly available, then it would have been incorporated into the stock price." *See*, Skinner Deposition 98:20-99:2; 147:3-147:15.

eleven efficiency factors I analyzed in the Coffman Report, that are standard and established factors considered to determine whether a stock traded in an efficient market.[116]

73.    However, Dr. Skinner asserts that "if the market for Natera common stock was efficient during the Proposed Class Period, the information that was publicly available prior to the Hindenburg Report would have been quickly incorporated into the Company's stock price when it first became publicly available—and so well before the Hindenburg Report was released."[117]  I addressed above in **Section IV.B.ii** how the Two Capitol Forum Articles did not broadly reveal the alleged corrective information to the market.  Although there is no dispute over the efficiency of the market for Natera Common Stock during the Class Period, for completeness, I address below why Dr. Skinner's discussion of the Two Capitol Forum Articles does not in any way suggest that the market for Natera Common Stock was inefficient.

74.    Dr. Skinner cites literature by Dr. Fama when claiming that "[u]nder semi-strong form efficiency, stock prices react fully and rapidly to newly available public information" and that "an efficient market does not require that the public information necessarily be widely disseminated or known to every market participant, or that all investors trade on the publicly available information."[118]  However, Dr. Skinner omits essential words from the articles that he cites to.  Indeed, Dr. Fama calls the efficient markets model, which "is the hypothesis that security prices at any point in time 'fully reflect' *all* available information,"[119] an "obviously []

---

[116] Skinner Deposition 20:2 - 21:2.

[117] Skinner Report ¶ 37.

[118] Skinner Report ¶ 25.

[119] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417, p. 388.

extreme null hypothesis."[120]  And that therefore, "like any other extreme null hypothesis, we do not expect it to be literally true."[121]  Dr. Skinner is conflating the theoretical efficient markets model with the reality of markets in claiming that "all publicly available information is reflected in a company's stock price in an efficient market."[122]  As the Fama articles that Dr. Skinner cites discuss, that idea is clearly not true in reality.

75.    In the real environment that markets operate in, there are trading costs and information costs that prevent the market from reacting to "all" new information.  This is related to the previously discussed high paywall that the Two Capitol Forum Articles were behind.  As a result, Fama asserts multiple times that "prices seem to efficiently adjust to **obviously publicly available information**," citing announcements of stock splits, annual reports, and new security issues as examples.[123]  Dr. Skinner is ignoring the description of "obviously public information" and failing to consider if that is a relevant description of the Two Capitol Forum Articles.

76.    Given the obscure nature of The Capitol Forum and the substantial paywall to access the source combined with the lack of analyst or news source coverage of the Two Capitol Forum Articles (or any market reaction at all), it is not surprising that the price of Natera Common Stock did not incorporate the information contained in those articles.  Thus, Dr. Skinner's suggestion that the Two Capitol Forum Articles were publicly available and therefore should have been incorporated into the price of Natera Common Stock before the Hindenburg

---

[120] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417, p. 388.

[121] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417, p. 388.

[122] Skinner Report ¶ 26.

[123] Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417, p. 388.

Report has no bearing on my opinion that Natera Common Stock traded in an efficient market throughout the Class Period.

> **C.    THE STATISTICALLY SIGNIFICANT ABNORMAL PRICE DECLINE ON MARCH 9, 2022 SUPPORTS THAT THE ALLEGED MISSTATEMENTS AND OMISSIONS IMPACTED THE PRICE OF NATERA COMMON STOCK AND DR. SKINNER'S SUGGESTION OTHERWISE IS FLAWED**

77.    Despite the clear economic evidence of price impact (as I outlined in **Section III**), Dr. Skinner makes further arguments in an attempt to sever the link between the undisputed statistically significant price decline following the Hindenburg Report and the alleged misstatements and omissions.  In particular, Dr. Skinner argues that:

(1) analysts following Natera did not lower their estimates following the Hindenburg Report;[124]

(2) confounding information "may have" or "likely" affected Natera's stock price on March 9, 2022;[125] and

(3) post-Class Period developments do not demonstrate that the alleged misstatements and omissions impacted Natera's Common Stock Price.[126]

78.    As I will explain in further detail below, none of the assertions made by Dr. Skinner establish a lack of price impact.

> **i.    Updated Analyst Estimates Are Not Required to Establish That Important New Information Was Disclosed and It Is Not Surprising That Analysts Maintained Their Estimates Following the Hindenburg Report**

79.    Dr. Skinner alleges that "inconsistent with Plaintiffs' claim that the alleged misrepresentations 'inflated Natera's revenue' and 'created the misleading impression that Panorama-generated revenue was the result of organically growing demand,' none of the securities analysts that followed Natera lowered their revenue estimates as a result of the

---

[124] Skinner Report ¶ 15 and Section VIII.A.

[125] Skinner Report ¶ 15 and Section VIII.B.

[126] Skinner Report ¶ 15 and Section VIII.C.

purported revelations in the Hindenburg Report."[127]  He also states that "analysts commented that they did not expect a valuation impact based on claims in the Hindenburg Report regarding the Company's business practices, including with respect to Panorama revenues and demand for the microdeletion tests."[128]  This argument is flawed because Dr. Skinner considers only analyst reports within a week of the Hindenburg Report, despite evidence that analysts do not always quickly update their forecasts following a short seller report.  Additionally, it is not necessary for analysts to change their estimates to show price impact – the market price clearly reacted.  Regardless, he focuses on revenue estimates, which ignores other estimates that analysts updated following the Hindenburg Report.

80.    First, Dr. Skinner ignores that analysts may be biased toward crediting the explanations of management and downplaying the impact of short seller reports, like the Hindenburg Report, which call into question the analysts' prior investment theses and valuations of the company.  Dr. Skinner himself cites to literature that alludes to this issue: Ljungqvist and Qian note the "well-known tendency among analysts to avoid annoying the top management at the companies they cover."[129]  Indeed, Ljungqvist and Qian note that analysts can be "slow to update their recommendations" in the face of a short report.[130]

81.    Even still, I note that at least one analyst firm (Piper Sandler), did lower its revenue estimates for Natera twelve days after the Hindenburg Report, stating "[n]et-net, we're lowering

---

[127] Skinner Report ¶ 54.

[128] Skinner Report ¶ 60.

[129] Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, p. 1986.

[130] Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, p. 1986.

numbers to reflect conservatism in reputational damages and potential distractions."[131] Dr. Skinner addresses this analyst report in a footnote, but dismisses its importance with claims that it was "nearly two weeks later," and that the change was solely due to potential reputational damages resulting from the Hindenburg Report.[132] Dr. Skinner's argument first fails because as mentioned above, it is normal for analysts to be slow to update their forecasts following a short report according to literature relied upon by Dr. Skinner.[133] Second, if the relevant truth was revealed earlier, any reputational impacts would have been incorporated into the price reaction earlier as well, thus the Piper Sandler forecast change due to reputational damages is in fact relevant to the alleged misstatements and omissions.

82.    Furthermore, Dr. Skinner ignores that BTIG lowered its price target from $125 to $100 and its multiple from 15x to 12x in the wake of the Hindenburg Report.[134] Dr. Skinner relied on this BTIG report in his analysis but dismissed it because the analyst did not revise its specific revenue estimates.[135] This is an unsupported narrow view; Dr. Skinner does not explain why he chose to ignore the analyst's downward revision of financial indicators other than revenue following the Hindenburg Report.

83.    Regardless, a forecast change is unnecessary for establishing price impact, and Dr. Skinner does not make the claim that it is necessary. Ultimately, Dr. Skinner is ignoring the most direct, relevant, and scientifically sound test of price impact, which is to evaluate whether (1) there was a release of information that revealed the relevant truth that was allegedly concealed

---

[131] "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.

[132] Skinner Report footnote 121.

[133] Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, p. 1986.

[134] "Our Post Call Thoughts, NTRA Counters Short Report; Buy, PT to $100," *BTIG*, March 10, 2022.

[135] Skinner Report footnotes 140 and 154 and Skinner Report Exhibit 3a.

by the misstatement/omission; and (2) whether there was a statistically significant price reaction to the information.  As described in more detail in **Sections III** and **IV.B**, the Hindenburg Report contained novel information (as analysts covering Natera immediately noted) economically connected to the misstatements and omissions by revealing that Panorama's revenue and demand were bolstered by undisclosed deceptive business practices.  Additionally, as discussed in **Section III**, Natera Common Stock experienced a statistically significant price decline following the Hindenburg Report, which is not disputed, or reliably attributed to anything other than the alleged corrective information,[136] by Dr. Skinner.

84.    Simply put, investors paid close attention to Natera's emphasis on Panorama's strong revenue performance and microdeletion demand, analysts paid close attention to Defendants' representations about prior authorization issues as a factor affecting Natera's revenues, the Hindenburg Report contained new information that brought light to Natera's previous misstatements and omissions on those issues, and Natera Common Stock immediately experienced a statistically significant price decline on March 9, 2022.  There is thus evidence that the market price of Natera was impacted by the alleged misstatements and omissions.  Dr. Skinner's inapt and limited focus on analyst estimates does not establish a lack of price impact or detract from the strong economic evidence of price impact.

ii.    **Potential Confounding Information Does Not Prove a Lack of Price Impact of the Hindenburg Report**

85.    Dr. Skinner claims that "[s]everal factors other than the information Plaintiffs allege to be corrective likely affected Natera's stock price on March 9, 2022."[137]  Specifically, he points to supposed confounding information, the fact that the Hindenburg Report was a short report,

---

[136] I discuss purported confounding information in greater detail below in Section C.ii.

[137] Skinner Report ¶ 62.

and that a short report can trigger risks of regulatory or legal costs and potential reputational harm.  Importantly, Dr. Skinner never claims that these other factors actually did affect Natera's Common Stock price, or that they caused the *entire* price decline on March 9, 2022.  Dr. Skinner's argument is speculative and he only goes as far as saying these other factors "likely affected" or "may have" affected Natera's Common Stock price.

86.   *First*, the potentially confounding information that Dr. Skinner claims was released within the Hindenburg Report is that "the Hindenburg Report included claims about Natera's purported lack of a competitive "moat" around its NIPT products (including Horizon as well as Panorama), including that "[r]ival NIPTs have comparable accuracy for the most common tests and are frequently cheaper" as well as Natera's reliance on Illumina's sequencing platform to process Panorama, Horizon, Signatera, and Prospera tests."[138]  Setting aside whether Dr. Skinner is factually correct that such a view should be considered new information at all, Dr. Skinner makes no attempt to value the supposed impact from this purported confounding information to suggest it could explain the magnitude of the price decline in Natera Common Stock on March 9, 2022.  Furthermore, he presents no examples of analysts or news sources mentioning this supposed confounding information following the Hindenburg Report.  Merely mentioning this information from the Hindenburg Report in no way demonstrates that there was a complete absence of price impact from the alleged misstatements and omissions on Natera Common Stock.  Thus, Dr. Skinner's argument regarding this potentially confounding information fails.

87.   *Second*, Dr. Skinner claims that the mere fact that Hindenburg, a "prominent short seller"[139] published a report "*may* explain the negative and statistically significant abnormal

[138] Skinner Report ¶ 69.

[139] Skinner Report ¶ 64.

47

return for Natera on March 9, 2022."[140]  Dr. Skinner cites academic literature indicating that reports published by credible short sellers are linked to a statistically significant decline in the stock prices of the target companies.[141]  Therefore, he suggests that the Hindenburg Report, which had a "negative spin," may have influenced Natera's Common Stock price.  In other words, Dr. Skinner is attempting to suggest that the market price of Natera Common Stock declined due to the mere publication of the Hindenburg Report, rather than the specific contents of the Hindenburg Report (which Plaintiffs claim were corrective and which analysts viewed as new and value-relevant).  This is speculative and Dr. Skinner has made no effort to measure the portion of the price decline on March 9, 2022, if any, was due to the mere publication of the Hindenburg Report as opposed to its contents.  Moreover, Dr. Skinner overlooks whether these "credible short sellers" are also more likely to publish accurate reports, which could contribute to the statistically significant decline in stock price.  According to a source cited to by Dr. Skinner, Ljungqvist and Qian, it is not only a short seller's credibility that elicits a stock price decline in the wake of a short report, but also that the report contains new information:

> [I]t is only reports by credible [short sellers] that generate profits, net of shorting fees: absent credibility, prices do not fall significantly. Credibility matters, but not absolutely. To be listened to, a [short seller] also has to have something new to say. We show that reports that present new facts previously unknown to investors result in longs selling and rapid price corrections, whereas reports that merely reinterpret known data do not.[142]

88.   In other words, Dr. Skinner himself cites to academic literature supporting that new information from a credible short seller can impact stock prices, undermining his own argument. His suggestion, without any analysis or support, that the market "may" have been reacting to

---

[140] Skinner Report ¶ 64.

[141] Skinner Report ¶ 64.

[142] Alexander Ljungqvist and Wenlan Qian, *How Constraining are Limits to Arbitrage?*, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, p. 1978.

mere publication of the Hindenburg Report rather than its contents does not prove a lack of price impact from the alleged misstatements and omissions in this matter.

89.    *Third*, Dr. Skinner further asserts that since the "Hindenburg Report made claims regarding regulatory scrutiny of Natera," that fact alone may result in an increased risk of a company actually facing such investigation or inquiry.[143]  He cites that "the SEC is more likely to investigate companies with higher visibility and media coverage" and that a company may have a stigma attached to being investigated, even if they end up being exonerated.[144]  Dr. Skinner also claims that "the Hindenburg Report likely had additional negative effects on Natera, including reputational harm and management distraction," resulting in at least one analyst revising their model to include reputational damages. [145]  Again, Dr. Skinner makes no attempt to quantify the supposed impact, if any, from these factors related to regulatory or legal scrutiny and reputational harm.  Furthermore, Dr. Skinner does not explain how regulatory or legal scrutiny and/or reputation harm stemming from the claims made in the Hindenburg Report would be unrelated to Plaintiffs' alleged misstatements and omissions or why they would need to be treated as confounding information in the first place.  In other words, Dr. Skinner fails to consider if regulatory or legal scrutiny and reputational harm would be directly caused by the revelation of the truth allegedly concealed (i.e., deceptive and improper billing and business practices).  This is not in fact confounding information, but an expected consequence of the type of misconduct alleged in this matter.[146]  For Dr. Skinner to merely suggest, without any analysis

---

[143] Skinner Report ¶¶ 65 – 66.

[144] Skinner Report ¶ 65.

[145] Skinner Report ¶ 68.

[146] In fact, certain analysts that Dr. Skinner cites to himself in the Skinner Report directly tie the risk of regulatory or legal scrutiny and/or reputational harm to the specific alleged information that Plaintiffs allege is corrective.  *See,* for example, analyst reports published after the Hindenburg Report: "Thoughts on Short Report," *Baird*, March 9, 2022

or support, that regulatory and legal investigations or reputational harm are somehow disconnected or separate from the alleged corrective disclosures of deceptive business practice, is unfounded and fails to establish a lack of price impact from the alleged misstatements and omissions on Natera Common Stock.

90. In conclusion, Dr. Skinner does not assert that any of these potential confounding factors actually were confounding, or actually did, in his opinion, have any effect on Natera's Common Stock price. His argument hinges entirely on speculation. And by extension, Dr. Skinner does not empirically evaluate or measure any stock price impact of any of the potential confounding factors he speculates may exist.

91. Nevertheless, even if these factors could be demonstrated to be confounding through actual empirical analysis, disaggregating the impact of the potentially confounding information above is a loss causation issue ubiquitous in securities litigation which can be addressed on a class-wide basis. As stated in my Report, a loss causation analysis would have to account for any confounding information that may have contributed to the price movement on the alleged corrective disclosure dates.[147] There, I specifically mentioned potential methodologies for evaluating the impact of confounding information.[148] If Dr. Skinner is correct about there being potentially confounding information on March 9, 2022, that is separate and distinct from the disclosure of the allegedly corrective information that the Plaintiffs allege and the analysts discussed, a loss causation analysis would have to evaluate the valuation impact (if any) of such new information. But that does not imply a lack of price impact from the corrective

---

("billing probes are bad and create overhangs for stocks. We'd prefer not to see them.") and "Buy the Dip, Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022 ("we see among possible bear case outcomes a fine/financial penalty for NTRA.").

[147] Coffman Report ¶¶ 83 – 84.

[148] Coffman Report ¶ 84.

information.  My understanding is that loss causation, which includes disaggregation, is not a matter to be proven at class certification.  Regardless, such a loss causation analysis would apply in the same manner for all class members and would be dependent on the same proof on a class-wide basis, and the damages methodology I outlined in my Report is flexible enough to incorporate any of the concerns described by Dr. Skinner.  Dr. Skinner has not established, nor does he go as far as claiming, that the other factors he cites explain the entire statistically significant abnormal price decline on March 9, 2022 and his arguments fail to establish a lack of price impact.

### iii.   The Developments After the Class Period Do Not Prove a Lack of Price Impact from the Alleged Misstatements and Omissions

92.   Dr. Skinner argues that certain events that occurred after the Hindenburg Report suggest that one cannot use Natera's stock price change on March 9, 2022 to infer that the alleged misrepresentations affected Natera's stock price.[149]  His arguments are flawed.

93.   Dr. Skinner claims that analysts described the stock price decline on March 9, 2022 as "overdone."[150]  This argument fails because regardless of whether some particular analysts thought the market was overreacting to the claims in the Hindenburg Report, analysts also point out that investors did indeed react to the Hindenburg Report, and specifically mentioned the disclosures about MGML and other deceptive sales tactics as notable issues from the Hindenburg Report.[151]  The individual opinions from a few analysts about a supposed overreaction does not undermine the statistically significant price decline in Natera Common Stock, reflecting the collective opinion of the overall market as a whole.

---

[149] Skinner Report ¶ 71.

[150] Skinner Report ¶ 77.

[151] *See* Section III.

94.    As I acknowledge above in **Section III**, following Natera's conference call and Natera's refutations of the Hindenburg Report on March 10, 2022, the price of Natera Common Stock increased in a statistically significant manner.  Dr. Skinner attempts to use this price increase to discredit the clear economic evidence of price impact on March 9, 2022 following the Hindenburg Report.  His arguments fall short.  Dr. Skinner points to analyst reports commenting that the Hindenburg Report's claims were "embellished," suggesting that inferences drawn from the Hindenburg Report were likely more negative than would have been drawn from a hypothetical disclosure of the alleged relevant truth by the Company.[152]  Again, the mere possibility that the Hindenburg Report's claims were overstated has no bearing upon (1) whether there were misrepresentations in this matter, (2) whether Natera's stock price was impacted by those misstatements, or (3) whether there is evidence of a significant price decline upon the March 9, 2022 disclosure (which Dr. Skinner does not contest).  Therefore, his argument is simply irrelevant.  The price reaction on the Corrective Disclosure Event, after controlling for market and industry effects and removing the impact of any confounding information, is the market's best estimate for the value of the alleged fraud and incorporates all varieties of potential future outcomes and their respective probabilities of manifesting.[153]

95.    Furthermore, **Exhibit 1** demonstrates that over a two-day event window (i.e., analyzing the cumulative event study results for March 9, 2022 and March 10, 2022), the

---

[152] Skinner Report ¶¶ 75 – 76.

[153] *See* David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19: ("Event studies can also measure the size of a stock price movement as the basis for a damages calculation. For example, in cases of securities fraud, experts commonly measure changes in the alleged inflation in a stock price by the movement in that stock price in the wake of a corrective disclosure, after controlling for market, industry, and other company-specific influences. This results from the disclosure's removing the inflation, and an event study measures the change in inflation in the stock at the time of the disclosure. Often, courts find that this is the best estimate of the inflation per share if the defendant had a duty to disclose the same information that the corrective disclosure revealed.")

cumulative price decline in Natera Common Stock was statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).  In other words, the price increase on March 10, 2022 did not fully offset the price decline on March 9, 2022 and the overall price movement from March 9 to March 10, 2022 was still negative, indicating that the market reacted statistically significantly negatively overall to the set of information released over these two days.

96.    Next, Dr. Skinner argues that one cannot infer price impact from the March 9, 2022 stock price decline due to the alleged misrepresentations because "Natera's reported annual revenue and number of overall tests processed both increased following the publication of the Hindenburg Report," and exceeded analyst consensus estimates.[154]  This is irrelevant.  Simply because the Company's revenue increased and/or beat analysis estimates in periods of time following the Hindenburg Report does not preclude Defendants from having made false and misleading statements that affected Natera's stock price.

97.    To illustrate this point, consider the example from **Section III**, where the cell phone company's stock price rises following a new battery announcement, but undisclosed regulatory hurdles prevent those benefits from ever materializing, inflating the stock price.  Now, suppose the company later discloses the regulatory hurdles, causing the stock price to decline.  Further, imagine the company increases revenue the following year by launching a new and improved camera in its devices.  In this example, this revenue increase does not change the fact that the company's failure to disclose the regulatory hurdles initially impacted its stock price.

98.    Dr. Skinner is attempting to make a similar claim as it relates to Natera and his line of reasoning fails for the same reasons.  Natera may still have been engaging in the very same

---

[154] Skinner Report ¶ 78.

deceptive tactics following the publication of the Hindenburg Report, continuing to prop up the Company's revenue.  Additionally, there may have been other factors contributing to the revenue and test volume growth following the publication of the Hindenburg Report, such as improvements in the various other tests Natera provides.  For example, in the earnings call for the fourth quarter and fiscal year 2022, Natera CFO Brophy states that "[r]evenues were up significantly, with the majority of the outperformance driven by growth in Signatera clinical and also pharma."[155]  Regardless of the reasons for the revenue and test volume increases in the time period after the Hindenburg Report, the increases are irrelevant.  Whether a company's financial performance changed in the months or years following a final alleged corrective disclosure in a matter such as this is neither a necessary nor standard way of evaluating price impact and Dr. Skinner cites to no authority suggesting otherwise.

99.   Finally, Dr. Skinner states that Natera has not faced any regulatory or legal action from any agency related to claims made in the Hindenburg Report, and did not restate any of its financial statements during the relevant period.[156]   Regardless, Natera not facing any regulatory or legal action related to the Hindenburg Report is flawed because the market reaction to the Hindenburg Report's claims would imbed the market's understanding that these were allegations, not a final determination, and take into account the entire range of potential outcomes.  In addition, I am not aware of any requirement, and Dr. Skinner has not provided a source for one, that states that a company must re-state its financials in order to demonstrate that alleged misstatements and omissions impacted the stock price of the company.  This is another irrelevant claim.

---

[155] "FQ2 2023 Earnings Call Transcripts," *S&P Global Market Intelligence*, August 3, 2023.

[156] Skinner Report ¶ 79.

100. In conclusion, Dr. Skinner has not established a lack of price impact. He is asking the Court to ignore the economic evidence of the statistically significant price decline on March 9, 2022 in reaction to the Hindenburg Report, as well as the analyst reports and news articles I discussed at length above in **Section III** tying the stock price decline in Natera Common Stock to the corrective information contained in the Hindenburg Report, along with Natera's public response in the form of press release and conference call. Dr. Skinner instead is asking the Court to believe that the corrective information was publicly disclosed earlier in an obscure and difficult to access source, The Capitol Forum, even though all of the most fundamental economic evidence is inconsistent with his view—indeed, at the time of the Two Capitol Forum Articles in question, there was no reaction by analysts, news articles, any source in Factiva, or in the price of Natera Common Stock. He speculates that the statistically significant price decline on March 9, 2022 was instead "likely affected" by other factors (despite there being no evidence of such). Dr. Skinner suggests that there is not evidence of price impact from the alleged corrective disclosure unless analysts have revised their estimates downward, Natera is the subject of regulatory or legal action, Natera restates its financials, and Natera's revenue declines for some indeterminate period of time into the future. However, these are irrelevant standards that Dr. Skinner has created himself that are not necessary to establish price impact and do not preclude Defendants from having issued false and misleading statements and omissions that impacted the price of Natera Common Stock during the Class Period. In sum, at both the front-end when the alleged misstatements were made, and the back-end when the alleged corrective information was revealed, Dr. Skinner has not demonstrated that the alleged misstatements had no effect on Natera's Common Stock price.

## V.    DR. SKINNER'S DAMAGES-RELATED CONCERNS DO NOT DISTURB MY OPINION THAT THERE IS A WELL-ESTABLISHED DAMAGES METHODOLOGY THAT CAN BE APPLIED CLASS-WIDE

101. Dr. Skinner claims that I "fail[ed] to provide a methodology capable of measuring class-wide damages in a manner consistent with Plaintiffs' theory of liability in this matter" instead providing "a generic and formulaic description."[157]  He claims that the stock price reaction cannot serve as a measure of inflation because of the arguments I have addressed in the preceding sections, that is, he claims there "may" be confounding information, the information in the Hindenburg Report was, in part, merely a republication of information in the Two Capitol Forum Articles, and that some of the alleged class members may have had access to, and may have traded Natera Common Stock, using the information contained in the Two Capitol Forum Articles, while others did not.

102. First, on the topic of potential confounding information about which Dr. Skinner speculates, I have already addressed this above in **Section IV.C.i.** and stated that my Report did describe potential methodologies for evaluating the impact of confounding information, should any actually be demonstrated to exist in this case.  Contemplating the appropriate methodologies to disaggregate any confounding information is premature, as this is part of a loss causation analysis.  If Dr. Skinner is correct and there is no impact of the alleged corrective information on March 9, 2022, the out-of-pocket methodology can still handle that by assuming that $0.00 of artificial inflation dissipated from the price of Natera Common Stock on that date.  Indeed, the damages model is dependent on Plaintiffs being able to prove their liability claims to the finder of fact.

---

[157] Skinner Report ¶ 83.

103.  Similarly, I have above addressed the conceded fact that there is new, corrective information contained in the Hindenburg Report, and it is not merely a "republication" of the Two Capitol Forum Articles.  Additionally, there is economic evidence—including analyst and press reports, and stock price and Company reaction—that the corrective information was not incorporated into the stock price of Natera Common Stock prior to the publication of the Hindenburg Report, and the evidence does not support Dr. Skinner's claims otherwise.[158]  Dr. Skinner does not claim that all of the allegedly corrective information that was published on March 9, 2022, was published somewhere previously (e.g., the claim that Natera and MGML submitted prior authorization requests after Panorama tests were performed).

104.  As a result, it is not necessary to present a damages methodology that would account for certain investors trading on the information contained in the Two Capitol Forum Articles because there is no evidence that this occurred.  Furthermore, the relevant economic question is whether the price of Natera Common Stock reflected the public information available in the market, rather than whether all market participants had identical information.  Not all holders of a company's stock give the same level of attention to information about a company; for any publicly traded company there can be sophisticated investors who comb through every piece of news related to that company and there can also be passive investors who are less

---

[158] Dr. Skinner also argues: "To the extent Mr. Coffman is suggesting that a report 'synthesiz[ing]' or 'summariz[ing]' previously available public information would affect the stock price, such a suggestion necessarily implies that information is not (always) impounded into the stock price when it is released, but only later when it is 'synthesized' or 'summarized.' This suggestion, too, is inconsistent with the academic literature on market efficiency, and would lead to similar challenges in measuring damages on a class-wide basis. Mr. Coffman provides no methodology to distinguish between those investors who need information to be 'synthesized' or 'summarized' and those who do not, and would treat them the same for purposes of measuring damages—even if the latter type of investor understood some or all of the alleged relevant truth prior to the Hindenburg Report." (*See,* Skinner Report ¶ 90.)

This argument is irrelevant.  I am not claiming that the Hindenburg Report merely served to synthesize or summarize the Two Capitol Forum Articles.  As I have discussed at length within this Reply Report, the Hindenburg Report revealed new, value-relevant, and allegedly corrective information to the market on March 9, 2022.

focused on that company's news.  I am not aware of a requirement to present a damages methodology that would somehow account for every individual investor's slightly different knowledge about a company, and Dr. Skinner does not claim this is required.  Rather, it is important to consider the information that was incorporated into the price of Natera Common Stock, not what each individual investor had access to at any single point in time, and the out-of-pocket damages methodology I presented in my Report addresses this on a class-wide basis by utilizing the price of Natera Common Stock's reflection of available public information at the time of the Hindenburg Report.

105.  Lastly, it bears emphasis that my proposed damages methodology is meant to correspond to Plaintiffs' theory of liability and alleged claims.  Dr. Skinner poses certain proposed issues with my methodology that all presuppose the additional facts beyond what Plaintiffs allege, and which in many ways contradict what Plaintiffs have alleged, are true.  Dr. Skinner's challenges to my damages methodology do not correspond to the claims Plaintiffs have asserted, as set forth in the Complaint, and to that extent they are not relevant to the assignment I was asked to perform in proposing a damages methodology.

106.  I am not aware of any evidence, and Dr. Skinner has not presented any, to demonstrate that there are unique circumstances in this matter that would preclude damages from being calculated for the Class as a whole.

_Chad Coffman_
Chad Coffman

Executed on October 4, 2024.

58

# Exhibit 1
## One-Day and Multi-Day Window Event Study Analysis of Natera Common Stock

| | | | | | | One-Day Window Results [1] | | | | | Multi-Day Window Cumulative Results [2] | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Market Date | Day | Closing Price | Raw Return | Volume (millions) | Abn. Return | Abn. Dollar Change | t-Stat | p-Val | Sig Level[3] | Event Window | Days in Window | Abn. Return | Abn. Dollar Change | t-Stat | p-Value | Sig Level[3] |
| 3/9/22 | Wed | $36.80 | -32.79% | 41.7 | -38.89% | -$21.29 | -16.46 | 0.00 | *** | 3/8/22 Close to 3/9/22 Close | 1 | -38.89% | -$21.29 | -16.46 | 0.00 | *** |
| 3/10/22 | Thu | $42.61 | 15.79% | 17.1 | 17.73% | $6.53 | 7.47 | 0.00 | *** | 3/8/22 Close to 3/10/22 Close | 2 | -28.06% | -$14.77 | -8.38 | 0.00 | *** |
| 3/11/22 | Fri | $38.98 | -8.52% | 4.4 | -5.05% | -$2.15 | -1.76 | 0.08 | * | 3/8/22 Close to 3/11/22 Close | 3 | -31.69% | -$16.92 | -7.19 | 0.00 | *** |

Source: S&P Capital IQ.
Notes:
(1) The results are based on the Coffman Event Study.
(2) Results are calculated based on the cumulative results of the Coffman Event Study.
(3) *** Denotes statistical significance at the 99% confidence level or greater. ** Denotes statistical significance at the 95% confidence level or greater. * Denotes statistical significance at the 90% confidence level or greater.

**Exhibit 2A**
**CBOE Volatility Index During Estimation Windows Used in the Coffman Event Study and the Skinner Event Study for February 27, 2020**



Sources: S&P Capital IQ, Coffman Efficiency Report, Skinner Report.

**Exhibit 2B**
## CBOE Volatility Index and Natera's Volatility During Estimation Windows Used in the Coffman Event Study and the Skinner Event Study for February 27, 2020



Sources: S&P Capital IQ.

Notes:

(1) The VIX Closing Price is divided by 1,000 to facilitate comparison with the percentage data series.

(2) The abnormal returns of the Coffman 20 Day Model are based on a rolling regression of the previous 20 trading days. The abnormal returns of the Coffman 5 Day Model are based on a rolling regression of the previous 5 trading days and the subsequent 5 trading days. The regression models control for the same indices utilized in the Coffman Event Study. 8/8/19 (an earnings announcement) and the same dates that I excluded from estimation in the Coffman Event Study have been removed from estimation (it was not necessary to exclude 8/8/19 from estimation in the Coffman Event Study because it was not within any relevant 120 trading day estimation period).

(3) Standard deviations are calculated for the abnormal returns of the previous 20 trading days, excluding the same dates that were excluded from the regression models described in footnote 3.

# Exhibit 3
# Summary of Statistics for Natera, Inc. Common Stock on February 27, 2020

| # | Estimation Window Scenario | Coffman Models [1] | | | | Skinner Models [2] | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Abn. Return | Abn. Dollar Change | t-Stat | Sig Level [3] | Abn. Return | Abn. Dollar Change | t-Stat | Sig Level [3] |
| 1 | 120 Days Before | 13.23% | $4.60 | 4.66 | *** | 10.43% | $3.63 | 3.81 | *** |
| 2 | 20 Days Before | 12.28% | $4.27 | 5.26 | *** | 8.64% | $3.00 | 3.92 | *** |
| 3 | 5 Days Before and 5 Days After | 10.33% | $3.59 | 2.68 | ** | 8.49% | $2.95 | 3.24 | ** |

Sources: Complaint, S&P Capital IQ, and Skinner Backup.

Notes:

(1) The results for the "120 Days Before" Estimation Window Scenario are based on the Coffman Event Study. The results for the "20 Days Before" Estimation Window Scenario ("Coffman 20 Day Model") and the "5 Days Before and 5 Days After" Estimation Window Scenario ("Coffman 5 Day Model") rely on the exact same assumptions as the Coffman Event Study, with the only change being the estimation window indicated by the Estimation Window Scenario column.

(2) The regression models control for the indices utilized in the Skinner Event Study (i.e., the CRSP Index and an equal-weighted index of the companies Dr. Skinner identifies as peers). The same dates that I excluded from estimation in the Coffman Event Study are excluded from these models. Results are based on the estimation window specified in the Estimation Window Scenario column, except for the '120 Days Before' Estimation Window Scenario. The backup material provided by Dr. Skinner includes data for the CRSP index starting 62 trading days prior to February 27, 2020, preventing the use of a 120 trading day estimation with the data he provided. Therefore, I used a 62 trading day estimation window instead for this scenario.

(3) ** Denotes statistical significance at the 95% confidence level or greater. *** Denotes statistical significance at the 99% confidence level or greater.

# Appendix A
# Documents Considered

**Prior Reports and Depositions in this Matter**

- Expert Report of Chad Coffman, CFA, dated June 4, 2024, including all data, documents, analyses and back-up materials provided in connection with that report.
- Deposition of Chad Coffman, July 19, 2024.
- Expert Report of Douglas J. Skinner, Ph.D., dated August 16, 2024, including all data, analyses and back-up materials provided by Dr. Skinner in connection with that report.
- Deposition of Douglas J. Skinner, Ph.D., September 13, 2024.

**Court Documents**

- Amended Class Action Complaint for Violations of the Federal Securities Laws filed October 7, 2022, in *John Harvey Schneider v. Natera, Inc., et. al.*, No. 1:22-cv-00398-DAE.
- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss filed September 11, 2023, in *John Harvey Schneider v. Natera, Inc., et. al.*, No. 1:22-cv-00398-DAE.

**News Articles**

- "Natera Expands Panorama™ Non-Invasive Prenatal Test to Screen for Clinically Significant Microdeletions," *Natera*, February 5, 2014.
- "Natera Reports Fourth Quarter and Year 2019 Financial Results" *PR Newswire*, February 26, 2020, 4:10 PM.
- "Federal Reserve issues FOMC statement," *Federal Reserve Bank*, March 15, 2020, 5:00 PM.
- "New York City to close schools; bars, restaurants around U.S. ordered closed over coronavirus," *NBC News*, March 15, 2020, 5:16 PM.
- "Natera: Company Uses Third Party Non-Profit to Increase Likelihood of Insurance Reimbursement; Non-Profit Has Limited Paper Trail, Close Connections with Natera," *The Capitol Forum*, July 1, 2020.
- "Natera: Charity Apparently Established to Process Insurance Prior Authorizations Has Close Ties to Former Senior VP of Natera," *The Capitol Forum*, December 14, 2020.
- "Natera: Pioneers In Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022.
- "BRIEF-Hindenburg Research Says Have Taken A Short Position In Shares Of Natera," *Reuters News*, March 9, 2022, 8:19 AM.
- "Natera Inc. (NTRA) Paused due to volatility," *Dow Jones Institutional News*, March 9, 2022 12:11 PM.

- "Natera Inc. (NTRA) Paused due to volatility," *Dow Jones Institutional News*, March 9, 2022 12:17 PM.
- "Natera Inc. (NTRA) Paused due to volatility," *Dow Jones Institutional News*, March 9, 2022 12:27 PM.
- "NATERA RESPONDS TO MISLEADING SHORT SELLER REPORT," *PR Newswire*, March 9, 2022, 2:33 PM.
- "So What's Happening With Natera Shares?," *Benzinga*, March 9, 2022, 3:48 PM.
- "Natera Loses More Than $1.7 Billion In Market Cap, Even After Company Calls Hindenburg Report 'misleading' – MarketWatch" *Dow Jones Institutional News*, March 9, 2022, 3:04 PM.
- "Natera Plunges After Hindenburg Short Report," *Investing.com*, March 9, 2022.
- "Natera Up Nearly 22%, on Pace for Largest Percent Increase Since March 2020 -- Data Talk," *Dow Jones Institutional News*, March 10, 2022 11:30 AM.
- "45 Stocks Moving In Thursday's Mid-Day Session," *Benzinga*, March 10, 2022, 12:25 PM.
- "Natera: Pioneers In Avoiding Talking About Deceptive Medical Billing," *Hindenburg Research*, March 11, 2022.

**Natera Inc. Analyst Reports**

- "4Q19 Above Expectations & Conservative 2020 Guidance," *Piper Sandler,* February 26, 2020.
- "Solid execution across the board; 2020 guide leaves room for upside; BUY; PT to $46," *Canaccord Genuity*, February 27, 2020.
- "NATERA CLOSES OUT SOLID 2019; STRONG MOMENTUM INTO 2020," *Cowen*, February 27, 2020.
- "Q4 Beat And 2020 Guide Upside Closes Out An Excellent 2019.  The Next Leg Higher Is When Cancer/Transplant Flow Into The Model.  Reiterate BUY, $49 Price Target.," *Craig-Hallum*, February 27, 2020.
- "Five companies we expect to weather the storm: EXAS, QTRX, GH, CSTL, NTRA; Chart on P. 2," *Canaccord Genuity*, March 10, 2020.
- "NTRA: Trading Below Signatera Value in Intraday," *Piper Sandler*, March 9, 2022.
- "Mgmt Feedback Addresses Key Questions Arising from the Short Seller Report," *SVB Leerink*, March 9, 2022.
- "Quick Take From Initial Management Comments on Short Report," *Raymond James,* March 9, 2022.
- "Thoughts on Short Report," *Baird*, March 9, 2022.
- "Natera - My Genome My Life Isn't Over, Natera Is Just Getting Started," *Piper Sandler*, March 10, 2022.

- "Effective short report rebuttal via conference call; prior authorization concerns are overblown; BUY," *Canaccord Genuity*, March 10, 2022.
- "SHORT REPORT WEAKNESS OVERBLOWN; REITERATE OUTPERFORM FOLLOWING BUSINESS UPDATE," *Cowen*, March 10, 2022.
- "Our Post Call Thoughts, NTRA Counters Short Report; Buy, PT to $100," *BTIG*, March 10, 2022.
- "Buy the Dip, Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022.
- "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.

## Investor Call Transcripts

- "Shareholder/Analyst Call," *S&P Global Market Intelligence*, March 10, 2022.
- "FQ2 2023 Earnings Call Transcripts," *S&P Global Market Intelligence,* August 3, 2023.
- "FQ4 2019 Earnings Call," *S&P Global Market Intelligence*, February 26, 2020.

## Academic Articles

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417, p. 388.
- Alexander Ljungqvist and Wenlan Qian, How Constraining are Limits to Arbitrage?, The Review of Financial Studies, August 2016, Vol. 29, No. 8, 1975, 1986.
- David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, (3rd ed.) (2001), Chapter 19.

## Bates Stamped Documents

- NTRA_0072821 – 23.
- NTRA 0247211–213.

## Other

- https://x.com/HindenburgRes/status/1502368509799682049
- https://www.cboe.com/tradable_products/vix/
- https://www.cboe.com/tradable_products/vix/vix_historical_data/
- https://fraser.stlouisfed.org/title/federal-open-market-committee-meeting-minutes-transcripts-documents-677/meeting-march-15-2020-unscheduled-587319
- https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020
- https://www.natera.com/wp-content/uploads/2020/11/Womens-Health-Clinical-UNIV-14-Panel-4-Sample-Collection-Form.pdf

- https://digiday.com/media/4-priciest-content-subscriptions-stack/
- https://www.nytimes.com/subscription
- https://hindenburgresearch.com/

Appendix B

**CHAD W. COFFMAN, MPP, CFA**

Peregrine Economics
125 South Wacker Drive
Suite 2610
Chicago, Illinois 60606
Mobile:         (815) 382-0092
Email:          ccoffman@peregrine-econ.com


## EMPLOYMENT:

**Peregrine Economics**
        President (2024 - Current)

        Peregrine Economics provides independent economic and financial analysis. Peregrine applies big picture thinking and proven economic tools to build a clear narrative around complex problems. Practice areas include: Data Science, General Damages, Labor & Employment, Regulatory Economics, and Securities Valuation.

**Global Economics Group, LLC**
        President (2008 - 2023)

**Market Platform Dynamics, LLC**
        Chief Financial Officer & Chief Operating Officer (2010 – 2023)

**Chicago Partners, LLC**
        Principal (2007 – 2008)
        Vice President (2003 – 2007)
        Director (2000 – 2003)
        Senior Associate (1999 – 2000)
        Associate (1997 – 1999)
        Research Analyst (1995 – 1997)


## EDUCATION:

   **CFA**    Chartered Financial Analyst, 2003

   **M.P.P.**  University of Chicago, 1997
            Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

   **B.A.**    Knox College, 1995
            Economics, Magna Cum Laude
            Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
            Dean's List Every Term
            Phi Beta Kappa

**PROFESSIONAL EXPERIENCE:**

Securities, Valuation, and Market Manipulation Cases:

- Testifying Expert in numerous high-profile class action securities matters.

- Expert Consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

**Testimony in the last four years:**

- Testifying Expert in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated, v. Esperion Therapeutics, Inc., et al., Defendants, No. 2:16-cv-10089-AJT-RSW, United States District Court for the Eastern Michigan of Michigan. Filed expert report June 6, 2019. Deposition July 26, 2019. Filed rebuttal reply report October 7, 2019. Filed expert report May 15, 2020. Deposition July 31, 2020.

- Testifying Expert in Eric Weiner, Individually and on Behalf of All Others Similarly Situated, vs. Tivity Health, Inc., Donato Tramuto, Glenn Hargreaves and, Adam Holland, Defendants, Case No.: 3:17-cv-01469 United States District Court for the Middle District of Tennessee. Filed expert report July 1, 2019. Deposition September 4, 2019. Filed rebuttal reply report December 20, 2019. Filed expert report July 30, 2020. Filed rebuttal reply report September 30, 2020. Deposition October 22, 2020.

- Testifying Expert in Peace Officers' Annuity and Benefit Fund of Georgia, Individually and On Behalf of All Others Similarly Situated, and Jacksonville Police and Fire Pension Fund, Individually and On Behalf of All Others Similarly Situated vs. DaVita, Inc. et al., No. 1:17-cv-00304-WJM-NRN, United States District Court for the District of Colorado. Filed expert report January 31, 2020. Deposition May 27, 2020.

- Testifying Expert in In Re Avon Securities Litigation, No. 19 Civ. 01420- CM, United States District Court for the Southern District of New York. Filed expert report February 13, 2020.

- Testifying Expert in In Re Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449 (KSH) (CLW), United States District Court for the District of New Jersey. Filed expert report March 20, 2020. Deposition July 16, 2020. Filed expert reply report November 25, 2020.

- Expert Declaration in Martin Cohen, Individually and On Behalf of All Others Similarly Situated, v. Luckin Coffee Inc., Jenny Zhiya Qian, and Reinout Hendrik Schakel, Case no. 1:20-cv-01293-LJL, United States District Court for the Southern District of New York. Filed declaration May 13, 2020.

- Testifying Expert in <u>In RE Navient Corporation Securities Litigation, No. 1:17-cv-08373-RBK-AMD, United States District Court of New Jersey.</u> Filed expert report May 15, 2020. Deposition July 23, 2020. Filed declaration August 21, 2020. Filed expert report April 16, 2021. Deposition June 3, 2021.

- Testifying Expert in <u>Yellowdog Partners, LP, Individually and on Behalf of All Others Similarly Situated, vs. CURO Group Holdings Corp., *et al*., Civil Action No. 2:18-cv-02662-JWL-KGG, United States District Court for the District of Kansas, Kansas City.</u> Filed expert report May 18, 2020.

- Testifying Expert in <u>Julian Keippel, Individually and On Behalf of All Others Similarly Situated, vs. Health Insurance Innovations, Inc., Gavin Southwell, and Michael D. Hershberger, No. 8:19-CV-00421-WFJ-CPT, United States District Court Middle District of Florida Tampa Division.</u> Filed expert report May 21, 2020. Deposition June 15, 2020.

- Testifying Expert in <u>In Re Perrigo Company plc Securities Litigation, No: 1:19-cv-00070-DLC, United States District Court for the Southern District of New York.</u> Filed expert report July 10, 2020. Deposition August 4, 2020. Filed expert report October 6, 2020. Filed expert rebuttal reply report December 4, 2020. Deposition March 4, 2021.

- Testifying Expert in <u>Plymouth County Retirement System, Individually and On Behalf of All Others Similarly Situated, vs. GTT Communications, Inc., Richard D. Calder, Jr., Chris Mckee, Michael Sicoli, And Gina Nomellini, Case No. 1:19-cv-00982-CMH-MSN, United States District Court for the Eastern District of Virginia Alexandria Division.</u> Filed expert report August 7, 2020. Filed expert report September 25, 2020.

- Testifying Expert in <u>Thomas W. Luczak, Individually and On Behalf of All Others Similarly Situated, vs. National Beverage Corp., Nick A. Caporella, and George R. Bracken, Case No. 0:18-cv-61631-KMM, United States District Court for the Southern District of Florida.</u> Filed expert report September 25, 2020. Deposition November 5, 2020.

- Expert Declaration in <u>In re: PG&E Corporation – and – Pacific Gas and Electric Company Debtors, Case No. 19-30088 (DM), United States Bankruptcy Court for the Northern District of California, San Francisco Division.</u> Filed declaration September 28, 2020.

- Testifying Expert in <u>Oklahoma Police Pension Fund and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Teligent, Inc. and Jason Grenfell-Gardner, Defendants, Case No. 1:19-cv-03354-VM, United States District Court for the Southern District of New York</u>. Filed expert report September 30, 2020. Deposition March 11, 2021.

- Testifying Expert in <u>John Utesch, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Lannett Company, Inc., Arthur P. Bedrosian, and Martin P. Galvan, Defendants, Civil Action No. 2:16-cv-05932-WB, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2020. Deposition December 10, 2020. Filed expert rebuttal report on May 13, 2021. Hearing testimony July 27, 2021. Filed expert report May 8, 2024. Deposition August 6, 2024.

- Testifying Expert in <u>City of Warren Police and Fire Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. World Wrestling Entertainment, Inc., Vincent K. McMahon, George A. Barrios and Michelle D. Wilson, Defendants, Civil Action No. 1:20-cv-02031-JSR, United States District Court for the Southern District of New York.</u> Filed expert report on October 6, 2020. Deposition October 14, 2020.

- Testifying Expert in <u>Employees' Retirement System of the Puerto Rico Electric Power Authority, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Conduent Inc., Ashok Vemuri, and Brian Webb-Walsh, Defendants, Case No. 2:19-cv-08237-SDW, United States District Court for the District of New Jersey.</u> Filed expert report on December 7, 2020. Deposition December 22, 2020.

- Testifying Expert in <u>The Police Retirement System of St. Louis, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. Granite Construction Incorporated, James H. Roberts, Jigisha Desai, and Laurel J. Krzeminski, Defendants, Case No. 3:19-cv-04744-WHA, United States District Court for the Northern District of California.</u> Filed expert report on November 25, 2020. Filed declaration re: Plan of Allocation May 25, 2021.

- Testifying Expert in <u>Plumbers & Pipefitters National Pension Fund and Juan Francisco Nieves, as Trustee of the Gonzalez Coronado Trust, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Kevin Davis and Amir Rosenthal (Performance Sports Group Ltd.), Defendants, Case No.: 1:16-CV-3591-GHW, United States District Court for the Southern District of New York.</u> Filed expert report on December 18, 2020. Deposition February 5, 2021. Filed expert rebuttal report on April 6, 2021. Filed declaration re: Plan of Allocation January 21, 2022.

- Testifying Expert in <u>Mayuko Holwill, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. AbbVie Inc., Richard A. Gonzalez, and William J. Chase, Defendants, Case No. 1:18-cv-6790, United States District Court for the Northern District of Illinois.</u> Filed expert report on February 1, 2021. Filed expert rebuttal report on September 20, 2021. Filed expert report on July 6, 2023. Filed expert rebuttal report on February 6, 2024.

- Testifying Expert in <u>Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Newell Brands Inc., Michael B. Polk, John K. Stipancich, Scott H. Garber, Bradford R. Turner, Michael T. Cowhig, Thomas E. Clarke, Kevin C. Conroy, Scott S. Cowen, Domenico De Sole, Cynthia A. Montgomery, Christopher D. O'Leary, Jose Ignacio Perez-Lizaur, Steven J. Strobel, Michael A. Todman, and Raymond G. Viault, Defendants, Case No: HUD-L-3492-18, Superior Court of New Jersey Law Division (Hudson County).</u> Filed expert report on May 3, 2021. Filed expert rebuttal report on June 15, 2021. Deposition July 21, 2021. Filed expert supplemental reply report on February 4, 2022. Deposition March 15, 2022.

- Testifying Expert in <u>Carmignac Gestion, S.A., Mason Capital L.P., et al., Pentwater Equity Opportunities Master Fund LTD., et al., First Manhattan Co., Nationwide Mutual Funds, on behalf of its series Nationwide S&P 500 Index Fund, et. al., WCM Alternatives: Event-Driven Fund, et al., Hudson Bay Master Fund LTD., et al., Schwab Capital Trust on behalf of its series Schwab</u>

S&P 500 Index Fund, et al., Sculptor Master Fund, LTD. f/k/a OZ Master Fund, Ltd., et al., Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al., Discovery Global Citizens Master Fund, LTD., et al., York Capital Management, L.P., et al., Burlington Loan Management DAC, Universities Superannuation Scheme LTD., Principal Funds, Inc., et al., Kuwait Investment Authority et al., BlackRock Global Allocation Fund Inc., et al., Plaintiffs, vs. Perrigo Company PLC, et al, Defendants, Civil Action No(s): 17-10467 (MCA) (LDW), 18-1119 (MCA) (LDW), 18-1121 (MCA) (LDW), 18-2291 (MCA) (LDW), 18-15382 (MCA) (LDW), 18-16204 (MCA) (LDW), 18-16206 (MCA) (LDW), 19-3973 (MCA) (LDW), 19-4900 (MCA) (LDW), 19-6560 (MCA) (LDW), 19-21502 (MCA) (LDW), 19-21732 (MCA) (LDW), 20-1484 (MCA) (LDW), 20-2262 (MCA) (LDW), 20-2410 (MCA) (LDW), 20-3431 (MCA) (LDW), 20-4748 (MCA) (LDW), United States District Court for the District of New Jersey. Filed expert report on June 23, 2021. Filed expert report on September 29, 2021. Deposition October 26, 2021.

- Testifying Expert in In Re Nielsen Holdings PLC Securities Litigation, Case No. 18-CV-07143-JMF, United States District Court Southern District of New York. Filed expert report on July 14, 2021. Deposition September 30, 2021. Filed expert report December 17, 2021.

- Testifying Expert in Allegheny County Employees Retirement System et al. v. Energy Transfer LP et al., Case No. 2:20-cv-00200-GAM, United States District Court for the Eastern District of Pennsylvania. Filed expert report on September 17, 2021. Deposition November 18, 2021. Filed expert rebuttal report on April 22, 2022. Filed expert report on September 15, 2023. Deposition December 13, 2023.

- Testifying Expert in Julia Junge and Richard Junge et al. v. Geron Corporation et al., Case No. 3:20-cv-00547-WHA, United States District Court for the Northern District of California, San Francisco Division. Filed expert report on September 30, 2021. Deposition October 15, 2021. Filed expert rebuttal report on November 4, 2021.

- Testifying Expert in In Re MINDBODY, Inc. Securities Litigation, Civil Action No. 1:19-cv-08331-VEC, United States District Court Southern District of New York. Filed expert report on October 15, 2021.

- Testifying Expert in Plymouth County Retirement System and Oklahoma Police Pension and Retirement System, Individually and On Behalf of All Others Similarly Situated, v. Evolent Health, Inc., Frank Williams, Nicholas McGrane, Seth Blackley, Christie Spencer, and Steven Wigginton, Case No. 1:19-cv-01031, United States District Court Eastern District of Virginia, Alexandria Division. Filed expert report on October 19, 2021. Filed expert report on April 8, 2022. Deposition May 9, 2022. Filed expert report on May 27, 2022. Deposition June 22, 2022.

- Testifying Expert in In re Uniti Group Inc. Securities Litigation, Case No. 4:19-cv-00756-BSM, United States District Court Eastern District of Arkansas, Central Division. Filed expert report on October 25, 2021. Deposition December 6, 2021. Filed declaration re: expert report on January 24, 2022. Filed expert rebuttal report on February 22, 2022.

- Testifying Expert in <u>David Kanefsky, Individually and On Behalf of All Others Similarly Situated, v. Honeywell International Inc., Darius Adamczyk, and Thomas A. Szlosek, Civ. No. 2:18-15536-WJM, United States District Court for the District of New Jersey</u>. Filed expert report on November 1, 2021.

- Testifying Expert in <u>In Re Pareteum Securities Litigation, No. 1:19-cv-09767-AKH-GWG, United States District Court for the Southern District of New York</u>. Filed expert report December 1, 2021.

- Expert Declaration in <u>Arkansas Teacher Retirement System and John A. Prokop, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. OSI Systems, Inc., Deepak Chopra, Alan Edrick, and Ajay Mehra, Defendants, Case No. 17-cv-08841-VAP-SKx, United States District Court for the Central District of California, Western Division.</u> Filed declaration re: Plan of Allocation and aggregate damages December 10, 2021.

- Testifying Expert in <u>Boston Retirement System, Individually and On Behalf of All Others Similarly Situated v. Alexion Pharmaceuticals, Inc., Leonard Bell, David L. Hallal, Vikas Sinha, David Brennan, David J. Anderson, Ludwig Hantson, and Carsten Thiel, Defendants, Civ. No. 3:16-cv-2127(AWT), United States District Court for the District of Connecticut</u>. Filed expert report December 15, 2021. Deposition March 8, 2022. Filed expert rebuttal report June 17, 2022.

- Testifying Expert <u>In Re Aphria, Inc. Securities Litigation, No. 1:18-cv-11376-GBD, United States District Court Southern District of New York.</u> Filed declaration January 28, 2022 re: class certification. Filed expert report January 28, 2022. Deposition May 19, 2022.

- Testifying Expert in <u>Discovery Global Citizens Master Fund, Ltd., et al., MSD Torchlight Partners, L.P., et al., Incline Global Master LP., et al., Valic Company I, et al., Okumus Opportunistic Value Fund, Ltd., The Boeing Company Employee Retirement Plans Master Trust, et al., Första Ap-Fonden, et al., GMO Trust, et al., Hound Partners Offshore Fund, LP, et al., Colonial First State Investments Limited As Responsible Entity For Commonwealth Global Shares Fund 1, et al., Bharat Ahuja, et al., Brahman Partners II, L.P., et al., The Prudential Insurance Company Of America, et al., 2012 Dynasty UC LLC, et al., BlackRock Global Allocation Fund, Inc., et al., Northwestern Mutual Life Insurance Co., et al., Bahaa Aly, et al., James M. Templeton, et al., GIC Private LTD., et al., USAA MUTUAL FUNDS TRUST On Behalf Of Its Series USAA Aggressive Growth Fund, et al., Maverick Select Fund, Ltd., et al., Plaintiffs, vs. Valeant Pharmaceuticals International, Inc. et al., Defendants, Civil Action No(s): 3:16-cv-07321-MAS-LHG, 3:16-cv-07324-MAS-LHG, 3:16-cv-07494, 3:16-cv-07496, 3:17-cv-06513-MAS-LHG, 3:17-cv-07636-MAS-LHG, 3:17-cv-12088-MAS-LHG, 3:18-cv-00089, 3:18-cv-08705-MAS-LHG, 3:18-cv-00383-MAS-LHG, 3:18-cv-00846-MAS-LHG, 3:18-00893, 3:18-cv-01223-MAS-LHG, 3:18-cv-08595-MAS-LHG, 3:18-cv-00343-MAS-LHG, 3:18-cv-15286-MAS-LHG, 3:18-cv-17393, 3:20-cv-05478, 3:20-cv-07460-MAS-LHG, 3:20-cv-07462-MAS-LHG, 3:20-02190-MAS-LHG, United States District Court for the District of New Jersey.</u> Filed expert report February 2, 2022. Filed expert rebuttal report on May 9, 2022. Deposition June 3, 2022. Filed declaration September 28, 2022 (related only to 3:20-cv-02190-MAS-LHG). Filed declaration November 10, 2022.

- Testifying Expert in <u>Roei Azar, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Grubhub Inc., et al., Defendants, Case No. 1:19-cv-07665, United States District</u>

Court Northern District of Illinois Eastern Division. Filed expert report June 1, 2022. Deposition July 14, 2022.

- Testifying Expert in In Re Peabody Energy Corp. Securities Litigation, Civil Action No. 1:20-cv-08024-PKC, United States District Court Southern District of New York. Filed expert report July 15, 2022.

- Testifying Expert in BlackRock Asset Management Canada Limited, et al., Plaintiffs, v. Valeant Pharmaceuticals International, Inc. (n/k/a Bausch Health Companies Inc.), et al. Defendants, Nos.: 500-11-054155-185, 500-17-103749-183, and California State Teachers' Retirement System, Plaintiff, v. Bausch Health Companies Inc. (f/k/a Valeant Pharmaceuticals International, Inc.), et al., Defendants, Nos.: 500-11-055722-181, 500-11-055722-181, Canada Superior Court, Province of Québec, District of Montreal. Filed expert report September 30, 2022. Filed expert rebuttal report on July 10, 2023.

- Testifying Expert in Sheet Metal Workers National Pension Fund and International Brotherhood of Teamsters Local No. 710 Pension Fund, individually and as Lead Plaintiffs on behalf of all others similarly situated, and International Union of Operating Engineers Pension Fund of Eastern Pennsylvania and Delaware, individually and as Named Plaintiff, on behalf of all others similarly situated, Plaintiffs v. Bayer Aktiengesellschaft, Werner Baumann, Werner Wenning, Liam Condon, Johannes Dietsch, and Wolfgang Nickl, Defendants, No. 3:20-cv-04737-RS, Northern District of California, San Francisco Division. Filed expert report October 28, 2022. Deposition December 21, 2022. Filed expert rebuttal report on March 21, 2023. Filed expert report June 11, 2024.

- Testifying Expert in In Re: Maxar Technologies, Inc. Shareholder Litigation, Lead Case No.:19CV357070, Superior Court of the State of California, County of Santa Clara. Filed expert report December 12, 2022.

- Testifying Expert in In Re FibroGen Inc., Securities Litigation, Case No. 3:21-cv-02623-EMC, United States District Court Northern District of California. Filed expert report January 27, 2023. Deposition April 4, 2023.

- Testifying Expert in Indiana Public Retirement System and Public School Teachers' Pension and Retirement Fund of Chicago, individually and on behalf of all others similarly situated, Plaintiffs, v. Pluralsight, Inc.; Aaron Skonnard; and James Budge, Defendants, Case No. 1:19-cv-00128, United States District Court for the District of Utah. Filed expert report March 3, 2023.

- Testifying Expert in Sothinathan Sinnathurai, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Novavax, Inc., Stanley C. Erck, Gregory F. Covino, John J. Trizzino, and Gregory M. Glenn, Defendants, Case 8:21-cv-02910-TDC, United States District Court for the District of Maryland. Filed expert report March 16, 2023. Deposition September 14, 2023. Filed expert rebuttal report November 13, 2023.

- Testifying Expert in Meysam Moradpour, Individually and On Behalf of All Others Similarly Situated, v. Velodyne Lidar, Inc., Anand Gopalan, Andrew Hamer, James A. Graf, Michael Dee,

and Joseph B. Culkin, Case No. 3:21-CV-01486-SI, United States District Court Northern District of California San Francisco Division. Filed expert report March 20, 2023.

- Testifying Expert in In Re Boston Scientific Corporation Securities Litigation, Case No. 1:20-cv-12225-DPW, United States District Court District of Massachusetts. Filed expert report April 21, 2023. Filed declaration June 22, 2023.

- Testifying Expert in In Re Okta, Inc. Securities Litigation, Case 3:22-cv-02990-SI, United States District Court Northern District of California. Filed expert report August 18, 2023.

- Testifying Expert in Carl Shupe and Matthew Pearlman, Individually and on Behalf of All Others Similarly Situated, vs. Rocket Companies, Inc., Jay D. Farner, Julie R. Booth, Robert Dean Walters, Daniel Gilbert, and Rock Holdings Inc., Civ. No. 1:21-cv-11528, United States District Court Eastern District of Michigan, Southern Division. Filed expert report August 30, 2023. Deposition November 8, 2023. Filed expert rebuttal report on January 26, 2024. Filed expert report February 12, 2024. Deposition February 22, 2024. Filed expert rebuttal report on March 8, 2024. Filed expert report April 5, 2024. Deposition June 18, 2024.

- Testifying Expert in Richard R. Weston, Individually and on Behalf of All Others Similarly Situated, Plaintiff v. DocuSign, Inc., Daniel D. Springer, Michael J. Sheridan, Cynthia Gaylor, and Loren Alhadeff, Defendants, Case No. 3:22-cv-0084-WHO, United States District Court, Northern District of California, San Francisco Division. Filed expert report September 15, 2023. Deposition January 4, 2024. Filed expert rebuttal report on April 17, 2024.

- Testifying Expert in John Brazinsky, Individually and on behalf of all other similarly situated, Plaintiff, vs. AT&T Inc., Randall L. Stephenson, John T. Stankey, Pascal Desroches, and John Stephens, Defendants, Case No. 2:23-cv-04064-KM-JBC, United States District Court for the District of New Jersey. Filed declaration October 23, 2023.

- Testifying Expert in In Re Concho Resources Inc. Securities Litigation, No. 4:21-cv-02473, United States District Court Southern District of Texas, Houston Division. Filed expert report December 7, 2023. Filed expert rebuttal report on May 8, 2024.

- Testifying Expert in Reginald T Allison, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Oak Street Health, Inc., et al., Defendants, Case No. 1:22-cv-00149, United States District Court, Northern District of Illinois. Filed expert report December 15, 2023. Deposition January 23, 2024. Filed expert rebuttal report April 22, 2024.

- Testifying Expert in Boston Retirement System, et al., Plaintiff, v. Uber Technologies, Inc., et al., Defendants, Case No. 3:19-cv-06361, United States District Court, Northern District of California. Filed expert report February 1, 2024. Filed expert rebuttal report March 12, 2024. Deposition April 12, 2024.

- Testifying Expert in In Re Plantronics, Inc. Securities Litigation, Case No. 4:19-cv-07481-JST, United States District Court Northern District of California Oakland Division. Filed expert report February 8, 2024.

**Chad Coffman**
**Page 9 of 10**

- Testifying Expert in <u>Robert Ciarciello, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Bioventus Inc., Kenneth M. Reali, Mark L. Singleton, Gergory O. Anglum, and Susan M. Stalnecker, Defendants, Case No. 1:23-cv-00032-CCE-JEP, United States District Court Middle District of North Carolina.</u> Filed expert report March 7, 2024. Filed expert report March 27, 2024. Deposition April 8, 2024. Filed expert rebuttal report May 10, 2024. Filed declaration re: Plan of Allocation August 5, 2024.

- Testifying Expert in <u>Michael Pardi, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Tricida, Inc. and Gerritt Klaerner, Defendants. Case No. 4:21-cv-00076-HSG, United States District Court, Northern District of California.</u> Filed expert report April 30, 2024. Filed expert rebuttal report August 15, 2024.

- Testifying Expert in <u>Miriam Edwards, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. McDermott International, Inc., David Dickson, and Stuart Spence, Defendants. Case No. 4:18-cv-04330, United States Southern District Court, Southern District of Texas, Houston Division.</u> Filed expert report April 30, 2024. Filed expert reply report September 30, 2024.

- Testifying Expert in <u>Humberto Lozada and Oklahoma Firefighters Pension and Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, v. Taskus Inc., Bryce Maddock, Jaspar Weir, Balaji Sekar, Amit Dixit, Mukesh Mehta, Susir Kumar, Jacqueline D. Reses, and BCP FC Aggregator L.P., Defendants, United States District Court, Southern District of New York</u>. Filed expert report May 10, 2024. Deposition June 20, 2024. Filed expert reply report August 23, 2024. Deposition September 13, 2024.

- Testifying Expert in <u>John Harvey Schneider, Individually and on Behalf of All Others Similarly Situated, Plaintiff, v. Natera, Inc., Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Ramesh Hariharan, Defendants, Case No. 1:22-cv-00398-DAE, United States District Court, Western District of Texas</u>. Filed expert report June 4, 2024. Deposition July 19, 2024.

- Testifying Expert in <u>Stadium Capital LLC, on Behalf of All Others Similarly Situated, Plaintiff, v. Co-Diagnostics, Inc., Dwight H. Egan, and Brian L. Brown, Defendants, Case No.: 22-cv-6978 (AS), United States District Court, Southern District of New York.</u> Filed expert report July 26, 2024.

- Testifying Expert <u>In Re Barclays PLC Securities Litigation, Case No 1:22-cv-08172-KPF, United States District Court Southern District of New York.</u> Filed expert report August 12, 2024.

<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert Consultant in various class action matters regarding race, age, or gender discrimination.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert Consultant in high-profile antitrust matters in the computer and credit card industries.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

## PUBLICATIONS:

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

## PROFESSIONAL AFFILIATIONS:

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

## PERSONAL ACTIVITIES:

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.
- Volunteer for Chicago Food Depository.
- Volunteer for Habitat for Humanity ReStore.