# EXHIBIT 2

Deposition of Douglas J. Skinner                                        John Harvey Schneider v. Natera, Inc., et al

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JOHN HARVEY SCHNEIDER,                )
Individually and on Behalf of         )
All Others Similarly Situated,        )
                                      )
          Plaintiff,                  )
                                      )Civil Action No.
v.                                    )1:22-cv-00398-DAE
                                      )
NATERA, INC.; STEVE CHAPMAN;          )
MICHAEL BROPHY; MATTHEW               )
RABINOWITZ; and RAMESH                )
HARIHARAN,                            )
                                      )
          Defendants.                 )

**********************************
REMOTE VIDEOTAPED DEPOSITION OF
DOUGLAS J. SKINNER
September 13, 2024
**********************************

DOUGLAS J. SKINNER was duly sworn and

deposed in the above-styled and numbered cause on

September 13, 2024, from 8:37 a.m. to

4:14 p.m. CST, stenographically reported remotely,

pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record.

Reported by:    Rebecca A. Graziano, CSR, RMR, CRR
                Texas CSR 9306
                California CSR 14407
                Illinois CSR 084.004659

A P P E A R A N C E S

(all attendees appearing via remote videoconference)


REPRESENTING THE LEAD PLAINTIFF, BRITISH AIRWAYS
PENSION TRUSTEES LIMITED:

  Mr. Joshua E. D'Ancona
  Mr. Nathan A. Hasiuk
  KESSLER TOPAZ MELTZER & CHECK, LLP
  280 King of Prussia Road
  Radnor, Pennsylvania  19087
  (610) 667-7706
  jdancona@ktmc.com
  nhasiuk@ktmc.com


REPRESENTING THE DEFENDANTS, NATERA, INC.; STEVE
CHAPMAN; MICHAEL BROPHY; MATTHEW RABINOWITZ; ROY
BAYNES; MONICA BERTAGNOLLI; ROELOF F. BOTHA; ROWAN
CHAPMAN; TODD COZZENS; JAMES I. HEALY; GAIL
MARCUS; HERM ROSENMAN; and JONATHAN SHEENA:

  Mr. Thomas Artaki
  KATTEN MUCHIN ROSENMAN, LLP
  50 Rockefeller Plaza
  New York City, New York  10020
  (212) 940-8800
  thomas.artaki@katten.com

        and

  Ms. Christina L. Costley
  KATTEN MUCHIN ROSENMAN, LLP
  2121 Avenue Of The Stars, Suite 1100
  Los Angeles, California  90067
  (310) 788-4485
  christina.costley@katten.com

A P P E A R A N C E S

(all attendees appearing via remote videoconference)


REPRESENTING THE UNDERWRITER DEFENDANTS, MORGAN
STANLEY & CO., LLC; GOLDMAN SACHS & CO., LLC;
COWEN AND COMPANY, LLC; SVB LEERINK, LLC;
ROBERT W. BAIRD & CO.; BTIG, LLC; and CRAIG-HALLUM
CAPITAL GROUP, LLC:

 Ms. Britta A. Nordstrom
 O'MELVENY & MYERS, LLP
 1301 6th Avenue, Suite 1700
 New York City, New York  10019
 (212) 326-2000
 bnordstrom@omm.com


THE VIDEOGRAPHER/VIDEOCONFERENCE TECHNICIAN:

 Mr. Paul D'Ambra

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

INDEX

                                                    PAGE

  EXAMINATION BY MR. D'ANCONA..................... 5



                        EXHIBITS

NUMBER          DESCRIPTION                         PAGE

Skinner 1    Expert Report of

             Douglas J. Skinner, August 16, 2024.. 10

Skinner 2    Piper Sandler report, 3/9/22;

             Bates SKINNER_0000469 through

             0000471............................. 187

Skinner 3    Piper Sandler report, 3/10/22;

             Bates SKINNER_0000408 through

             0000410............................. 190

Skinner 4    Hindenburg report (no Bates range)... 237

STENOGRAPHER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.

PROCEEDINGS

(On the record at 8:37 a.m. CST)

THE VIDEOGRAPHER:  We are on the record.  Today's date is September 13th, 2024.  The time is 8:37 a.m. Central.

This is the recorded video deposition of Douglas J. Skinner being taken in the matter of John Harvey Schneider versus Natera Incorporated, et al., before the United States District Court, Western District of Texas, Austin Division, Civil Action 1:22-cv-00398-DAE.

I'm Paul D'Ambra, the video technician.  Our court reporter today is Becky Graziano.  We are both with Everest Court Reporting.

All counsel appearing today will be noted on the stenographic record.

Will the court reporter please proceed.

(Witness duly sworn.)

DOUGLAS J. SKINNER, being first duly sworn, testified as follows:

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

EXAMINATION

BY MR. D'ANCONA:

Q      Good morning, Professor Skinner.  My name is Joshua D'Ancona, and I represent the plaintiffs in this action today, and I'm going to be asking you some questions through the course of this deposition.

Have you ever been deposed remotely before?

A      I have, yes.

Q      About how many times?

A      I think it's probably more than eight or ten times.

Q      And when was the last time you were deposed remotely, sir?

A      I believe it was earlier this year.

Q      Okay.  Well, then I'll spare you most of the ground rules, but there are just a couple I want to go over here.

The first is, as you just heard, you're under oath, which means the testimony you give here today is the same as if you were in a court under penalty of perjury.

Do you understand that?

A      I do, yes.

Q        Second, if you answer a question, I will assume that you understood my question.  So if you don't understand anything in one of my questions, please just let me know.  I'll try to rephrase it or clarify it so that you can understand.  Okay?

A        Yes.  Thanks.

Q        And then as this is a remote deposition, hopefully we will not have any technical issues, but to the extent we do, we will try to address those as quickly as possible.  We'll take a break as needed, and get back on the record.  Okay?

A        That makes sense.  Thank you.

Q        And where are you physically located today?

A        In Chicago.

Q        And is anybody else sitting in the room with you today during your testimony in this deposition?

A        No.

Q        Okay.  A further instruction is that you are not to communicate with your counsel or your staff at Cornerstone either verbally or nonverbally via phone or any text or messaging app during the course of your testimony on the record today.

Deposition of Douglas J. Skinner    John Harvey Schneider v. Natera, Inc., et al

Do you understand?

A    I do, yes.

Q    Okay.  Sir, is there any reason why you can't give truthful and accurate testimony today?

A    No, there's not.

Q    Did you do anything to prepare for your deposition today?

A    Yes, I did.

Q    What did you do?

A    I reviewed my report and various of the materials referenced in my report.  I met with counsel and Cornerstone.

Q    And when was the meeting with counsel?

A    Yesterday.

Q    Was there just -- was there just one meeting?

A    Yes, there was.

Q    And staff at Cornerstone participated in that same meeting?

A    They did, yes.

Q    Did you have a separate meeting with staff at Cornerstone?

A    I did.

Q    When was that?

A    That was a couple days ago.

Q       And there was just one additional meeting with the staff at Cornerstone, that one a couple of days ago?

A       I believe, or there may have been another one the prior week.  I think there was actually another one.  So probably two meetings with Cornerstone, and then one with counsel yesterday.

Q       And approximately how long was your meeting with counsel yesterday?

A       It was two to three hours.

Q       And the prior preparation calls with Cornerstone, how long were those?

A       I think they were each in the vicinity of two hours.

Q       What materials did you review in preparation for this deposition?

A       I reviewed my report, and I reviewed the various materials that I referenced and cited in my report, including certain of the materials on the "Documents Considered List."

Q       Did you review the complaint?

A       I did, yes.

Q       Did you review the Court's opinion on defendant's motion to dismiss?

A       I have reviewed that, yes.

Q      Did you review that in preparation for your deposition?

A      Yes, I did.

Q      Did you take any notes when you were preparing for your deposition?

A      No, I did not.

Q      And aside from what you've just described, did you do anything else to prepare?

A      No, I didn't.

MR. D'ANCONA:  So I'd like to mark the document that is at Tab Number 1 in the exhibits file.  I think we can put that up electronically.  That is going to be Skinner Exhibit Number 1.

(Skinner Exhibit 1 marked.)

THE WITNESS:  Is that in my Envelope Number 1?

BY MR. D'ANCONA:

Q      Yes.  When I refer to "tab," I'm talking about the envelope number as well as the tab number that the court reporter will have.

A      Do you want me to open these on camera?

Q      No.  You can just open it in a way that's convenient to you.

A      Okay.

Q      And let me know when you've got that out, please, Professor Skinner.  Or if you prefer, if it's just as easy, you can use the electronic version that's been put up on the screen.

A      All right.  I'd like to get the hard copy out, if I can, which I have done.

Q      Okay.

A      Okay.  I have it.  I have it in front of me.

Q      So this document has been marked as Skinner Exhibit 1, and this is a document entitled "Expert Report of Douglas J. Skinner" dated August 16, 2024.

Do you see that?

A      I do.

Q      And, Professor Skinner, do you recognize this document to be your expert report that you have served -- that you have provided in this action?

A      I do, yes.

Q      Please turn to Page 47 of your report.

A      I'm there.

Q      Is that your signature?

A      It is, yes.

Q      And when did you sign this report?

A       On the date indicated there, August 16 of this year.

Q       And does Skinner Exhibit 1 contain a complete and accurate statement of all of the opinions that you are offering in this matter as of today?

A       As of today, that's correct, yes.

Q       And since submitting this report in August, how many times have you reviewed it?

A       I would say several times.

Q       Please turn to Appendix C of your report. This is entitled "Documents Considered List."

Do you see that?

A       Yes.

Q       And these are the documents and materials that you considered in preparing this report?

A       That's correct, yes.

Q       Are there any other documents or materials that you've considered in preparing this report that are not listed here on Appendix C?

A       No, I don't believe so.  Although, as always, I think if there are materials or sources cited directly in one of the footnotes to my report, that would be included as well.

Q       Understood.

So based on your review of the report since you submitted it and your review of the materials considered that underlie it, is there anything in the report that you would like to correct at this time?

A    Yes, there is one minor item that I'd like to note.

Q    And what is that?

A    If we could turn to Exhibit 2b.

And what I'd like to mention with respect to Exhibit 2b is that there is a correction for the items listed in the Abnormal Dollar Change column.  Those numbers are not exactly correct.  The materials that we produced in the backup materials are correct in that column, but the one that we're seeing on the screen in the report was subject to a minor calculation error.

Q    All of the figures in the "Abnormal Dollar Change" column, as listed on Exhibit 2b, are not what you would put forward as your opinion, but instead, the "Abnormal Dollar Change" data in your backup materials that support Exhibit 2b should be understood as the entries for those line items?

A    That's correct, yes.  And the "Abnormal

Dollar Change" numbers, I don't believe I refer to in the report.

Q       Okay.  We will note that change.  Thank you.

Is that the only change you wish to make?

A       It is, yes.

Q       Okay.  In Appendix B of your report, you list certain expert reports and testimonies in the last four years.

Do you see that, sir?

A       I do, yes.

Q       And were any of those cases, cases proceeding under Section 10(b) and Rule 10b-5 securities fraud cases?

A       They were, yes.

Q       In how many of these cases have you offered an opinion on issues of price impact?

A       So I think the best way to answer that is to say that in certain of these cases, I have filed reports at the class certification stage. And in certain of those reports, I have rendered opinions that I believe provide economic evidence that may be helpful to a court in assessing what I believe the legal term is that you refer to as

"price impact."

Q      Which cases are those?

A      So let me just proceed down the list from the top there.

I believe the first case listed there, SEB Investment Management, et al., versus Symantec, I offered that type of opinion.

The second matter listed there, In re Allergan, also I did that type of analysis.

The third of these, Pelletier, et al., versus Endo International, I believe I also did that.

And then I believe we would move down to Gabby Klein, et al., versus Altria, and that, I believe, would be all of them.

Q      And in how many of the reports and testimonies listed here have you offered opinions about -- and, again, focusing on 10b-5 cases -- offered opinions about whether allegedly corrective information was, in fact, corrective?

A      Well, I think your framing is including the legal language regarding whether it's corrective.  In these cases, I think the wording would vary according to the specifics of the case.

But I will say in certain of these

cases, I have rendered opinions that relate to economic evidence about, for example, stock price changes on dates plaintiffs allege to be corrective disclosure dates.

Q     Which cases are those?

A     I believe they would be -- and this is subject to my recollection, but I believe they would be the same cases that I referenced before.

Although it could be the case that in one of those cases, but not all of those cases, I assessed stock price responses and did event study work on dates of alleged misrepresentations and not on alleged corrective disclosure dates.

But like I said, I think it's probably -- at least a couple of those cases I did work related to alleged corrective disclosure dates.

Q     And in any of those cases that you're referring to, did you offer an opinion that the corrective disclosure that the plaintiffs had alleged was, in fact, related to alleged misrepresentations or omissions in an economic sense?

A     I think there's a lot in your question.  I think, like I said, the best I can recall, sitting

here today, is that I did what I would characterize as event study type of analysis and other analysis with respect to certain alleged corrective disclosure dates, and I reached certain conclusions.  I'm not sure I could characterize those conclusions as being the same across all of those cases.  They were each somewhat different, I believe.

Q    In any of those cases, did you reach a conclusion that the alleged corrective disclosure event and the related stock price movement was, in fact, attributable to the cause that the plaintiff had alleged was the cause?

A    Well, again, I framed my opinions in each of those cases depending on the assignment that I was given in those various cases.  And I think all I'm able to say, sitting here today, and recalling what I did in those cases at a fairly high level, on certain of the alleged corrective disclosure dates, I did event study and other analyses that I believe would be helpful to the Court in making assessments of the various legal issues in the case.

Q    In each of those cases, you were retained by the defendant, or the defendant's counsel?

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

A       Correct, yes.

Q       And do you recall any of those cases in which you opined that the cause of the alleged stock price decline that was related to the corrective disclosure in plaintiffs' claim was, in fact, attributable to the cause that the plaintiff had claimed?

A       Did you say "was" or "wasn't"?  It cut out a little bit right on that word.

Q       Was.  Affirmatively was.

A       Well, again, I think -- it's difficult for me to, in broad brush, indicate what I concluded -- would then conclude in these cases as a whole.  I think I reached opinions in each of these cases that were somewhat different and based on the assignment that I had in those cases.

Q       I'm just asking if you recall any case, from among these, in which you opined that the stock price decline that related to the alleged corrective disclosure was, in fact, attributable to the cause the plaintiff had claimed?

A       Well, sitting here today, it's hard for me to recall exactly what my conclusions were.  In all of these cases, keeping in mind that I believe in some of these cases there were multiple alleged

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

corrective disclosure dates.  So if you think about all of the alleged corrective disclosure dates and a number of cases, some of which date back several years, it's hard for me to recall exactly what my conclusions were.

Q    Okay.  Looking at your report in the body of your report, if you'd turn generally to Paragraphs 8 and 9, that section.

Here you lay out your assignment.  You were retained by counsel for Natera in this matter; correct?

A    I believe that's correct, yes.

Q    And that is the Katten firm?

A    That's my understanding, yes.

Q    And your instructions were to evaluate the questions listed in Paragraph 8, and then additionally, as stated in Paragraph 9, to review and respond to one of the opinions stated by Mr. Coffman in the Coffman report; is that fair?

A    I believe that's a reasonable summary, yes.

Q    In looking at Paragraph 8, you lay out three topics on which you've been asked to offer an opinion by counsel; correct?

A    I do, yes.  There are three points there

in Paragraph 8.

Q       And you say -- in your assignment from counsel, you were instructed to assume that the market for Natera common stock was efficient during the class period; correct?

A       That's what I was asked to assume, yes.

Q       Are you offering an opinion as to whether the market for Natera common stock was efficient during the alleged class period?

A       I was not asked to evaluate that directly, no.

Q       And so you are not offering an opinion one way or the other on that question; correct?

A       That is correct, yes.

Q       And so you did not dispute Mr. Coffman's opinion that the market for Natera's common stock was efficient during the class period; correct?

A       The way I would say that is that I reviewed Mr. Coffman's report but wasn't asked to evaluate his opinions with respect to market efficiency.

Q       And because you were not asked to evaluate his opinions with respect to market efficiency, you don't dispute -- you don't offer an opinion disputing those opinions; correct?

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

A        I don't have an opinion one way or another on Mr. Coffman's opinion as to market efficiency.

Q        And you are not offering an opinion regarding the degree, if any, to which the market for Natera common stock was efficient during the class period; correct?

A        That's correct, yes.  I'm hesitating a little bit because I'm not sure exactly -- we can have a discussion about the -- whether the market is efficient to some degree or not that -- yes, I'm not offering an opinion about that.

Q        So looking at your Romanette Number ii in Paragraph 8, this is the second topic in your assignment from Natera's counsel; correct?

A        Are you referring to the little Roman ii on the screen here?  I'm --

Q        Yeah.

A        Your phrasing was a little different to what I'm familiar with.  Okay.  That's -- I think we're on the same point.

Q        I call those "romanettes," but maybe that's something new.  Maybe that's -- maybe that's, you know, just different.

Romanette Number ii, or little Roman Number ii, my question is, simply:  This is the

second topic in your assignment from Natera's

counsel; correct?

A     That is correct, again, subject to the

assumption that Natera's stock traded in an

efficient market during the proposed class period.

Q     And you refer to "publicly reported

information about Natera, such as that in articles

published by The Capitol Forum on July 1, 2020,

and December 14, 2020."

Correct?

A     That's in there, yes.

Q     So did your assignment in this case assume

that information in The Capitol Forum articles

that you referenced was publicly reported?

A     I don't believe that was an assumption

that I was given.

Q     Is -- this statement of your assignment in

little Roman Number ii, is this the way your

assignment was provided to you?

A     This is my understanding of the

assignment, yes.

Q     Okay.  Looking over Pages 9 through 12,

generally, of your opinion, this is where you

summarize plaintiffs' claims and allegations;

correct?

You know what?  I'm sorry.  I think I misstated the page numbers.  Let me strike that question.

You know, I had it right.  So let me say that again.

Looking at Pages 9 through 12 of your opinion, sir, this is where you summarize plaintiffs' claims and allegations; correct?

A     It is, yes.  I do provide a summary of plaintiff -- plaintiffs' allegations.

Q     And you understand, sir, that plaintiffs' claim that defendants alleged false statements and omissions that concern Natera's revenues from Panorama; right?

A     As a high-level summary, yes, I think that's correct.

Q     Plaintiffs allege that Natera's revenues were fueled in part by "deceptive and improper business practices" regarding Panorama; is that fair?

A     I think that's certainly part of what plaintiffs are alleging, as we can see there in Paragraph 20, I believe.

Q     And you note in Paragraph 21 that those alleged deceptive practices included Natera's

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

allegedly improper relationship with MGML, and Natera's microdeletion ordering processes; fair?

A    Again, I think that's a reasonable high-level summary, subject to the specific language there and obviously in the complaint as well.

Q    And so for purposes of analyzing the price impact and causation-related questions in your opinion, you assumed plaintiffs' fraud claims -- their claims of deceptive business practices that were misrepresented -- and then later revealed in the Hindenburg report to be true; correct?

A    Well, I'd just like to clarify the first part of the question.  I think you mentioned "causation" in there.  I don't believe I've been asked to do anything, as I understand it, with respect to causation, although that's a legal term.

I think I would just say that based on my assignment and what I've described that I do in the report, I took the plaintiffs' allegations at face value, as I understood them and I have described here.

Q    But in taking them as face value and analyzing different -- different questions, as

you've done in this report, whether -- you know,

evaluating price impact questions from the

fraudulent alleged misstatements, for example, you

assumed that the misstatements were, in fact,

fraudulent for purposes of that analysis in the

ways that plaintiffs alleged; correct?

A    Well, again, I think when you include the word "fraudulent" in there, it's a legal term. There's a legal assessment in there.

I think I'll just say -- and I think the report is clear -- that I take the allegations as my understanding of the allegations, which I take at face value, and I interpret them in an economic sense as best I can.

Q    Let me try it again.

So in evaluating whether there was evidence of price impact from the alleged false and misleading statements and misrepresentations, did you assume that the misstatements were, in fact, materially false and misleading in the ways that plaintiffs alleged?

A    Well, again, you're using the term "price impact" here.  I mean, I think we looked at my assignment before in the body of my report and opinions.  So my report describes the various

analyses I did and the conclusions I reached. It's not for me to make judgments about price impact.

But, again, I think I would just say that I took the allegations as plaintiffs had presented them and assessed them on that basis. So I took them at face value and proceeded accordingly.

Q    When you say you "took them at face value," for purposes of analyzing whether there was, for example, a price reaction to a disclosure of information that plaintiffs alleged was new as of a given date, did you accept as true, for purposes of that analysis, plaintiffs' allegations?

A    Well, I think it has to be a little nuanced, because plaintiffs' allegations are both about the alleged misrepresentations, including omissions, at the beginning of the class period. But plaintiffs also have allegations with respect to what they believe or argue or allege are corrective disclosures and the associated effects on the stock prices.

So it's hard for me to just generally agree that I took all of these as true or whatever

Deposition of Douglas J. Skinner                                        John Harvey Schneider v. Natera, Inc., et al

you were asking.  I took the various allegations that plaintiffs made of various aspects at face value, and I think my report is very clear at different points about what I'm assuming or taking at face value about the different plaintiff allegations.

Q      Did you take at face value and accept as true, for purposes of your analysis, the allegations that defendants engaged in deceptive business practices or improper business practices and made statements that did not disclose that or misstated that?  Did you accept that as true in your analysis?

A      Well, I certainly understood --

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I certainly understood the allegations with respect to the misrepresentations; for example, as I've summarized there in Paragraph 20, and my understanding of that then informs certain of the analyses that I did.

BY MR. D'ANCONA:

Q      And in performing the analyses that you did, based on your understanding of plaintiffs' allegations, did you accept allegations -- did you

accept those allegations regarding deceptive business practices, improper business practices, by defendants and the alleged misstatements by defendants, leaving aside the corrective disclosure at the end?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Could you repeat the question?  You cut out for a second or two right in the middle of the question, unfortunately.

MR. D'ANCONA:  Would you read back the question, please.

(Record read as requested.)

THE WITNESS:  So, again, I certainly understood the economic import of those allegations and took them at face value, and they, then, informed certain of my analyses.  And I think my report is specific in various places about the import of my making those assumptions.

BY MR. D'ANCONA:

Q      When you say you "took them at face value," what does that mean?

A      I think -- you know, it means that I understood what plaintiffs were alleging, as

stated in the complaint, in framing certain of my economic analyses.  So I certainly did not assess or analyze whether or not they were factually correct.  I took them at face value.  I accepted, "This is the allegation," and then I proceeded to my analysis.

Q        Professor Skinner, you identify in your report the alleged misstatements as well as the alleged corrective disclosure, which is the publication of the Hindenburg report on the morning of March 9, 2022; correct?

A        Yes.  To be specific, if we, for example, looking at the portion of the report that we're looking at now, as you indicated, Pages 9 through 12, I summarize, in Paragraph 22, the various statements that I understand plaintiffs allege were false or misleading.  And then in addition, I believe Paragraph 23 summarizes what plaintiffs allege about the corrective disclosure.

Q        Okay.  So in Paragraph 22a, for example, you note plaintiffs' allegation that Natera's statement of its revenue increase was driven primarily by sales of Panorama and was materially false or misleading -- strike that.  Let me restate this question.

In Paragraph 22a, you note plaintiffs' allegation that Natera's statement of its revenue increase "driven primarily by sales of Panorama and Horizon" was materially false or misleading; correct?

A       That's my understanding of that specific allegation.

I'll just note that I have a Footnote 19 that indicates "I have included the language that plaintiffs emphasized in the complaint.  The full statements that plaintiffs included in the complaint are available at various paragraphs indicated in the complaint."  So I'm just taking one of those statements in the complaint with respect to that particular date.

Q       So what is your understanding of what plaintiffs' claim was materially false or misleading about that statement?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So the statement that I've quoted there, which I believe is part of what plaintiffs are alleging is a misrepresentation, as you indicated, states that the increase in total revenues was driven primarily by sales of Natera's

Panorama and Horizon tests.  So that was the statement, among other statements, that defendants made on that date.

My understanding is that what plaintiffs are alleging is misleading about that, at least in part, is that it omitted certain information about what plaintiffs argue or allege are certain deceptive billing practices.

BY MR. D'ANCONA:

Q     That those -- would you agree that plaintiffs allege that those deceptive billing practice -- practices were allegedly propping up or boosting Natera's revenues from Panorama?

A     I think that's a reasonable summary of my understanding, and my understanding is that what plaintiffs are alleging is that by omitting allegedly the information about the purportedly deceptive billing practices, and so on, that defendants created an allegedly false impression of organic growth for Panorama that was exaggerated.

Q     And in looking at Paragraph 22e, concerning a statement on February 25, 2021, you note plaintiffs' allegation that Natera's claims

about the growth rate of microdeletion testing being "a rocket ship that's growing" was materially false or misleading; correct?

A     Again, my understanding is that, similar to the previous statement, this is the statement that the company made on this date during an earnings call.  And my understanding of what plaintiffs were alleging is that defendants omitted information about how those tests were generated through purportedly deceptive practices, and that gave a false impression of the growth rate of the company's revenue and demand for its products.

Q     And you endeavored to accurately summarize plaintiffs' allegations in this part of your report; correct?

A     As best I could, what I was trying to do in this part of my report is just give a summary of the various statements that plaintiffs allege has misrepresentations.

Q     You did not state in your recitation of plaintiffs' claims that plaintiffs allege that the subscription service, The Capitol Forum, provided information that was publicly available to investors during the class period; correct?

A     So I think there's two parts to your question, which I'll address separately.

First of all, as I've indicated, in this portion of my report, what I'm trying to do is provide an overview or a summary with some examples of what's in the complaint.  I think, obviously, if we wanted to get a fulsome understanding of what plaintiffs are alleging, then we should be looking at the complaint in its entirety.

With respect to The Capitol Forum articles, I believe the complaint does mention The Capitol Forum articles, but I don't recall exactly what the complaint states regarding The Capitol Forum articles.

Q     But you did not state anywhere in your report, here or anywhere else where you discuss plaintiffs' claim, that you understand that plaintiffs allege that The Capitol Forum published articles that were publicly available to investors during the class period.  That's not your understanding of plaintiffs' claim, is it?

MS. COSTLEY:  Objection; calls for a legal conclusion.

THE WITNESS:  Yes.  As best I can

recall, the complaint says relatively little about The Capitol Forum articles.

So I don't recall exactly what the complaint says about that.

BY MR. D'ANCONA:

Q    Is it your understanding of plaintiffs' claim that plaintiffs allege that The Capitol Forum articles were publicly available to investors during the class period?

A    I think the best way to answer that is just to say what I've presented in this section of my report is my understanding of plaintiffs' allegations at a high level.  And if plaintiff had allegations about Capitol Forum, I do not recall the specifics of those allegations.

Q    Based on your understanding of plaintiffs' claims, do you understand or believe that plaintiffs allege -- that plaintiffs allege that The Capitol Forum published information in 2020 that reached sufficient numbers of investors to inform the market about Natera's relationship with MGML?  Do you believe that is something that the plaintiffs alleged in this case?

A    That's not --

MS. COSTLEY:  Objection; asked and

answered.

MR. D'ANCONA:  I haven't asked that question at all before, Christina.

BY MR. D'ANCONA:

Q    Professor, you can answer.

A    So, again, I don't recall exactly what the complaint refers to with respect to The Capitol Forum articles.  My recollection is that the complaint may mention The Capitol Forum articles at some point; however, I'm not sure whether that relates to the allegations.

Again, I think this is what exactly are the allegations and what exactly are just observations in the complaint is, I think, more of a legal matter that's hard for me to assess.

Q    But in any event, in your summary of plaintiffs' claims, your recitation of what the plaintiffs alleged was false and what was corrective in the Hindenburg report, you did not note anywhere any reference to any allegation by plaintiffs that The Capitol Forum had provided information to the market that was publicly available during the class period about Natera's relationship with MGML.  That's not in your report; correct?

A       Well, I think there's a lot --

                MS. COSTLEY:  Objection as to form.

                THE WITNESS:  I think there's a lot embedded in your question.  I think what we do know -- and I'm not sure whether this is in the complaint or whether it's in the Hindenburg report -- is that the Hindenburg report itself mentions that it was based on public sources of information.  We also know from the Hindenburg report itself that one of those sources was articles from Capitol Forum.

                What I don't recall is whether that specific information is included in the complaint, and nor do I recall exactly what the complaint says about Capitol Forum and whether that would be part of the allegations or not, again, is, I think, more of a legal question.

BY MR. D'ANCONA:

Q       But you certainly don't state in your report that plaintiffs allege that The Capitol Forum information or articles regarding MGML and Natera were publicly available during the class period.  You do not state that that is something

that plaintiffs alleged; correct?

A      I certainly have not included that in my summary here of plaintiffs' allegations.  That's correct.

Q      Okay.  Professor, Mr. Coffman opines that the market for Natera common stock was efficient under the semi-strong form of efficiency during the class period; would you agree?

A      That's my understanding --

MS. COSTLEY:  Objection as to form.

BY MR. D'ANCONA:

Q      I'm sorry.  You can answer.

A      That's my understanding of his opinion, yes.

Q      And in his report, Mr. Coffman points to various factors, including analyses that he performed through an event study that he developed to study the movements of Natera common stock during the class period; correct?

A      Well, as I indicated and we discussed before, I was not asked to evaluate Mr. Coffman's event study conclusion or analysis.

I did, however, review his report in its entirety, and I do recall that as part of his Cammer Number 5 analyses, I believe, he did

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

perform an event study.

Q    And you were not asked to evaluate Mr. Coffman's event study, and you did not state any criticisms of Mr. Coffman's event study in your report; correct?

A    That's correct, yes.  I did not evaluate Mr. Coffman's event study.

Q    And your report does not state any criticisms of the results of Mr. Coffman's event study; correct?

A    Correct.  What -- to be specific, I referred to some of the results of Mr. Coffman's event study, but I did not evaluate his methodology or the results of his event study.  I just took those at face value.

Q    And you performed your own event study in connection with this report; correct?

A    I did, yes.

Q    And that's discussed at Paragraph 30 of your report and related footnotes; correct?

A    Yes.  Paragraph 30 contains part of the summary of my event study methodology, which is then reported, I believe, in Exhibits 2a and 2b, which is described in Paragraph 31.  And I'd also refer us to the footnotes to those exhibits for

further information about my event study

methodology.

Q        And explain, what is Exhibit 2b?  Or what

is reflected in Exhibit 2b?

A        Exhibit 2b contains, for each day during

the period from February 27, 2020, through

March 11, 2022, various information related to

Natera's stock price, its return market and

industry index returns, and then my calculated

abnormal returns and p-values.

So this is just very typical reporting

from an event study analysis.

Q        The only change that you wish to make to

your Exhibit 2b was to the column entitled

"Abnormal Dollar Change"; correct?

A        That is correct, yes.

Q        Your event study uses a fixed estimation

window for evaluating all days between

February 27th, 2020, and April 30th, 2020;

correct?

A        Yes.  Just to be clear, I used three

different estimation windows, as explained in my

report.  The first estimation window was, I

believe, for the period that you just indicated,

subject to removing the various dates, for

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

example, of alleged misrepresentations and so on.

Q      And so for that first period, February 27, 2020, through April 30, 2020, you used a fixed estimation window for evaluating all dates within that -- in that period; correct?

A      So just to be clear, when you use the term "fixed estimation period," I used -- for those dates during that period, I used that window, which I believe is February 27, 2020, through, as you said, April 30, 2020.  So, yes, I used that as the estimation period for the days in that period.

Q      And you used the same window for every day in that period; correct?

A      I did, yes.

Q      And this period of time in that particular window, that's the period during which there is heightened stock market volatility related to COVID; correct?

A      In fact, the reason that I chose the specific estimation periods that I did, including that approximately two-month period, was because, as indicated in one of my footnotes, my assessment was, based on the financial economics literature and just generally what we know about that period, was that was the first part of the COVID pandemic,

and market volatility was unusually high during that period.  So I chose to pull that out and use that as a separate estimation period from the periods that I looked at later on in the class period.

Q      And so for all days within this first period of February 2020 through April 2020, because you used a single estimation window, the threshold for an abnormal return to be statistically significant is constant; correct?

A      I think that's basically correct, yes.

Q      So is it your view that it is reasonable to assume constant volatility over this window?

A      I think I'll say it this way:  In conducting event studies, we make certain assumptions to implement the analysis and reach conclusions.  And so during a particular estimation window, yes, we're making an assumption that during this window, volatility was relatively homogeneous.

         The point being, as I mentioned, and as you've indicated, during this period, market volatility was unusually high, so we would want to account for that in a way that differentiates it from the subsequent estimation windows when

volatility had returned to more like normal levels.

Q       So is it reasonable, in your view, to assume constant volatility over this window?

A       I think that's consistent with standard event study methodology generally, is we make an assumption about volatility or about an estimation window; and once we've made an assumption about an estimation window, we're generally assuming that the volatility, which is an import to determining statistical significance of the abnormal returns, is constant.  That's just one of the conventional assumptions in any event study analysis.

Q       Are you generally aware of the pattern of volatility that actually occurred in the markets between February 27 and April 30, 2020?

A       Could you be specific about what you mean by the "actual volatility"?  Are you referring to the overall volatility of the market as a whole?

Q       Yeah, I am.  I'm referring to the pattern of volatility in the stock market that actually occurred from February 27 through April 30, 2020.

Are you generally aware of that?

A       So, yes, I'd say I'm generally aware of that.  That was a period when market volatility --

and this is indicated in, I think, the footnote I have in my report that discusses a couple of published academic articles that note that market volatility was unusually high during this period because of the outbreak of the COVID pandemic.

Q    Would you agree that there were COVID-related events that occurred after February 27th, 2020, but within your estimation window, that substantially impacted the volatility of all stocks, including Natera?

A    Well, I will say the following, which is: There were big moves in both directions in the S&P 500 during this period, so the market as a whole, that reflected various information that came to the market about how the world was going to be affected by COVID.

And, of course, there was a lot of uncertainty.  No one knew what was going to happen.  The pandemic news came to the market, caused certain big negative shocks to the market, and then as people began to figure things out, then there was something of a reversal.  Again, I'd refer us to these two academic articles, which discuss this in some detail.

Q    And my question is simply:  Would you

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

agree that there were COVID-related events that occurred after February 27th, 2020, but during your estimation window, that substantially impacted the volatility of the stock market?

MS. COSTLEY:  Objection; asked and answered.

THE WITNESS:  I would say there was a lot of information coming to the market during that period about the onset of COVID and its related effects on the economy and the world generally that caused a lot of volatility in stock prices, including for the market as well as individual stocks.

MS. COSTLEY:  Josh, we've been going for about an hour.  Can you let us know when we get to a point that would be good to take a break?

MR. D'ANCONA:  Yes, Christina.  You know, I think probably just a few more minutes, and then just to wrap up this particular line, and then it would be a great time for a break.

Does that work for you?

MS. COSTLEY:  Sounds good.

MR. D'ANCONA:  Okay.

MS. COSTLEY:  Is that all right with you, Dr. Skinner?

THE WITNESS:  Fine with me.

BY MR. D'ANCONA:

Q      So would you agree, sir, that some COVID-related events that occurred after February 27th, 2020, that substantially impacted volatility in the stock markets, included March 4th, the governor of California declaring a state of emergency?

A      So I don't recall the specifics of that event, nor have I analyzed the specifics of that event.  So it's hard for me to answer that, because I haven't evaluated that specific event and don't recall it exactly.

Q      Do you recall that in -- on March 11th, the NBA announced that the NBA season would be suspended due to COVID; and on March 12th, the MLS, the NHL, Major League Baseball announced the suspension of their seasons or the cancellation of all remaining games?

Do you remember that event on March 12th -- 11th and 12th?

A      I think you're referring to a series of

events.  Again, I don't recall the specifics of those.  I do recall at the beginning of COVID, although not the specific dates, that the various professional sports leagues canceled or postponed or adjusted their seasons.  I don't recall the specifics, and I don't recall -- and certainly didn't analyze the effect on the stock market.

Q    Do you recall that on March 12th, 2020, total US COVID cases passed 1,500; US deaths rose to 41; public school closures were announced in a dozen states, including Connecticut, Maryland, Massachusetts, Michigan, Ohio, Virginia, Washington state, and others?  Do you remember that on March 12th, 2020?

A    Again, I don't recall the specifics of that.  I recall, at a high level, those types of events happening around that period.  But the specific events on the specific dates, I don't recall exactly.  And, again, I have certainly not done any specific analysis day by day of those events or their effect on stock prices.

Q    Have you done any analysis of the effect on stock prices of a March 13th declaration of a national state of emergency by the United States president or the March 16th issuance of guidelines

to avoid social gatherings, restrict discretionary travel, and an acknowledgment by the president that the country may be headed for a recession? Have you analyzed those events for their effect on the stock market?

A     I have not specifically analyzed those events, no.

I think what I'll just say, at a high level, is that as indicated in my report and those specific papers that I referenced in the footnote that document the stock market effects of COVID generally, during this period from 2/27/20 through 4/30/20, is that there was a lot of information and events going on during the period, many of which related to COVID, including those you've mentioned, and that that contributed to unusually high levels of market volatility.

Q     So as of February 27th, 2020, there had been no major COVID shutdowns announced in the United States yet; right?

A     I think it's hard for me to recall exactly when the first COVID events occurred.  I think by February 27, 2020 -- and I may be wrong about this, because my recollection is not exact -- I think there was some news about a pandemic coming

out by the end of that month.  But exactly what --
when COVID and the pandemic news reached the
market, whether it was before or after February 27
of 2020, I don't recall the specifics of that.

Q      So focusing on the first day of your event
study, which is February 27th, 2020, by including
volatility-inducing events that had not yet
occurred in your estimation window for that day,
is it -- is it possible that you are overstating
the expected volatility and thus understating the
statistical significance of the abnormal return on
that day?

A      I think I'll just answer in the following
way, which is to say:  In conducting event
studies, there are various methodological choices
one makes.  And the first methodological choices,
including of the estimation window, can affect the
estimated volatility, if we like, as well as the
relevant
t-statistic and p-value.  And so your results are
going to vary somewhat depending on the choice of
the estimation window.

Q      And focusing on the question that I'm
trying to ask, is it possible that by including
volatility-inducing events that had not yet

occurred in your estimation window for February 27th, 2020, is it possible that you're overstating the expected volatility and thus understating the statistically significance of the abnormal return on that day?

A    Well, again, I'm hesitating a little bit because your language of "overstating" and "understating" implies something being correct or incorrect.

I would just say that if I had chosen a different estimation window -- for example, if I had chosen an estimation window for the 60 trading days that preceded February 27, 2020, it could well be that the estimated volatility was lower, and the statistical significance of the abnormal return on that day, along with the abnormal return itself, may have been different and may have been higher.

Q    Did you evaluate the statistical significance of that event, February 27th, 2020, using any alternative estimation windows that don't include volatility-inducing events that occurred weeks later?

A    Well, I'll -- again, I'll say it this way: There are different ways of performing event

studies, and there are different choices about estimation windows.  What Mr. Coffman chose to do was use the fixed 120-trading-day period, I believe, and it was based on 120 prior days.

What I wanted to be sure to account for, in performing my event study analysis, was the fact that in the first part of the class period, the two months, approximately, of the beginning of the class period, we did have unusually high volatility.

Had I made a different choice about estimation windows, yes, of course, as always, the estimated volatility, the estimated abnormal returns, and so on, would give me different results.

Q    And I'm simply asking:  Did you evaluate the statistical significance of February 27, 2020, using any alternative estimation windows that did not include the subsequent volatility-inducing events?

A     As always, I think in any event study analysis, I performed -- estimated the market model regressions, which are reported in Exhibit 2a, in various ways before actually conducting the analysis reported in Exhibit 2b.

So I believe I did examine different market models over different estimation periods, but I reported the ones that I chose to report based on the trade-offs that I made.

And like I said, I mean, in doing event study analysis, you have to make different types of judgments.  There are always trade-offs.  Mr. Coffman's method has certain disadvantages relative to mine, but there are trade-offs involved.  If you do the analysis in different ways, you're going to get different results.

Q     Okay.  The last two points here and then we can take a break.

With respect to the period of time after April 30th, 2020, you, as you mentioned, split your event study into two estimation periods:  May 1, 2020, to April 6, 2021, was one of them, and then the other was April 7, 2021, to March 11, 2022; correct?

A     That's correct, yes.

Q     And you don't provide any support or explanation for splitting up that time period into two estimation windows in your report, do you?

A     I think I do.  I think --

Q     Where is that?

A       Let's find the footnote.  It would be off Paragraph 30 or 31, I believe.

Q       Footnote 55?

A       Let me get there.  I'm working with a hard copy.

I think it's actually in Paragraph 30 itself.  So what I indicate in Paragraph 30 is the first estimation period is, as we've noted, February 27, 2020, through April 30, 2020, based on the fact, as supported by these academic studies, that that was a period of unusually high volatility because of COVID.

What I then did was to say let's take the rest of the proposed class period and split it approximately in two, which is what I did.  And so that's the justification for that.

Again, in doing any event study analysis, there's always trade-offs involved.  You don't want an estimation period which is too long, because you don't want to assume that the market model and the estimated coefficients and parameters from the market model regression are constant over too long of a period, because often various economic factors, including the nature of the company's business, can change.  On the other

hand, you don't want a period which is too short.

And so, again, a reasonable choice seemed to be to take the balance after April 30, 2020, of the -- of the proposed class period, and simply divide it approximately in two, which is what I did.

Q     So -- and let me see if you have anything to add to what you just stated.  I'm going to ask a question, and that is:  Just please tell me what support you have -- what basis you have for splitting that period from May 1, 2020, through March 11, 2022, into two different estimation windows?

A     Well, again, I mean I think -- I've done event studies for many, many years, and I've read a lot of event study work in the academic literature, including the work done by my colleague, Eugene Fama, and the trade-off in making these decisions is really one of statistical precision, meaning you need a decent number of observations to get good statistical estimates.  On the other hand, you don't want to assume periods that are too long.

And so there's always judgments involved here, but a perfectly reasonable

assumption is to say let's look at the balance of the proposed class period here, which is a period, I believe, of something less than two years, and let's split that period approximately in two.  So one of those periods has 226 trading days in it; the other has 227.  That is essentially saying you got 226, 227 observations.  That gives you good statistical power.  So that's one of the considerations that the literature tells us is important statistically and econometrically.

And the other thing, as I mentioned before that we want, is we don't want to assume that everything is constant over too long of a period, because things change.  And so my judgment was we don't want to include the entire balance of the estimation period, so it seems reasonable to split it into two.

I could -- another reasonable choice would be to split it into four, but that becomes -- you know, then creates additional effort in terms of doing the calculations.  And my judgment is:  At the end of the day, probably the results are not going to be that much different if I made different choices, if I did split that balance into four periods.

But, again, if you look at the relevant academic literature, you know, this is a very reasonable way to proceed.

Q       Thank you, Professor.

MR. D'ANCONA:  We can go off the record for a break.

THE VIDEOGRAPHER:  Off the record, 9:58 a.m.

(Recess from 9:58 a.m. to 10:12 a.m.)

THE VIDEOGRAPHER:  Back on the record, 10:12 a.m.

BY MR. D'ANCONA:

Q       Welcome back, Professor Skinner.

In Paragraph 24 of your report, you state that you "refer to semi-strong form efficiency when discussing market efficiency in this report"; correct?

A       Yes.  More specifically, I say:  "I understand that semi-strong form market efficiency is most relevant in the present context and refer to semi-strong form efficiency when discussing market efficiency in the report."

Q       And can we agree that when we refer to "efficiency" today, we're referring to "semi-strong form efficiency"?

A       We can, yes.

Q       Okay.  Thank you.

Would you please define "semi-strong form efficiency"?

A       I think the best way to do that, as indicated in my report, is to state that "under semi-strong form efficiency, stock prices react fully and rapidly to newly available public information."

Q       You are aware that Professor Eugene Fama articulated that "The hypothesis that security prices at any point in time fully reflect all available information is obviously an extreme null hypothesis, and we do not expect it to be literally true"; correct?

A       Are you quoting from a particular source here, can I ask?

Q       I'm referring to his 1970 paper, which you refer to in your materials considered.

A       Sure.  I'll take your word for it that that sounds like -- sounds to me like what could be coming from that article, and something that he would have written, but I just would be -- just wanted to know exactly where that quote was coming from.

Q       Would you agree that "The hypothesis that security prices at any point in time would fully reflect all available information is obviously an extreme null hypothesis, and we do not expect it to be literally true"?  Would you agree with that proposition?

A       Well, as described in my report, and as Professor Fama has indicated in various places, there is a theoretical statement of efficient markets, along the lines that you've indicated.

But if we think about the real world, as he discusses, where there are actually frictions or information costs, we tend to think about market efficiency and evaluate the evidence on market efficiency thinking about the real world.  So this is, for example, you know, part of what I quote in Paragraph 25.

Q       So you would agree -- if I take your answer correctly, you would agree that "The hypothesis that securities prices at any point in time fully reflect all available information is obviously an extreme null hypothesis that we would not expect to be literally true"?  You would agree with that?

A       Well, I -- so, I mean, I've had

Deposition of Douglas J. Skinner                                John Harvey Schneider v. Natera, Inc., et al

discussions with him and heard many discussions about market efficiency and more generally about economic hypotheses.  Usually hypotheses are stated in a specific form with specific assumptions, and then we test them with real-world data to see if they're predictive.

So, yes, when you think about certain assumptions that are behind the theoretically ideal version of market efficiency, as Professor Fama indicates, those assumptions are usually not true in the real world, and so we test the hypothesis using real-world data.

Q     Right.  And you mentioned that some of the real-world factors that cause those hypotheses to be challenged or not fully realized in the actual world would be positive information in trading costs?

A     So as Professor Fama and many others have discussed, there are, in the real world, positive information costs, positive transactions costs, and those have to be considered when evaluating the evidence on market efficiency.

Q     Okay.  So just -- strike that.

So just -- instead of just assuming that the hypothesized conditions of market

efficiency exist, economists in the real world must look to economic evidence to determine whether the market for a given security was efficient and how it was performing at a given time; is that correct?

A    I think that's largely correct.  We look at evidence to evaluate whether the market for a particular security is efficient.

Q    And does the evidence that you look to to evaluate efficiency, does that include evidence about the availability of information about the company to investors and how rapidly that information, when it's new and value relevant, is impounded into the company's stock price?

A    So as I mentioned, under semi-strong form efficiency, we expect that stock prices react fully and rapidly to newly available public information.  How quickly they react and how quickly market participants process and access new information depends, among other things, on transactions costs and information costs.

So, yes, we take those things into account.

Q    And what sort of places do economists look in this type of analysis to evaluate what

information about a company is available and what information about a company is new and important?

A       Well, I think since the late 1960s -- or maybe the mid-1960s, when market efficiency was first discussed and hypothesized by Gene Fama, among others, there have been hundreds, and probably thousands, of academic studies that test market efficiency in various ways, including semi-strong form efficiency.  And so people have looked in all types of different places to try and assess whether markets respond in a way that's consistent with market efficiency.

So there are lots of different places that people have looked.

Q       And I asked you what some of those may be.

A       Sure.

So given that one of my primary areas is accounting, I'm very familiar with studies of what we call "post-earnings announcement drift," which analyzed how quickly the market responds to publicly available information about firms' earnings.  And so there is a pretty substantial literature that looks just at earnings announcements and this phenomenon known as post-earnings announcement drift, which some

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

people interpret as evidence that's inconsistent

with market efficiency.

Q      So do economists look to investment

analyst reports to evaluate whether -- or what

information may be considered new and important?

A      So it depends on exactly what you're

assessing.  So there are certainly papers that

assess whether, for example, sell-side analysts

recommendations and sell-side analysts consensus

earnings estimates are actually seen as new

information to the market and move security

prices, if that's your question.

Q      Do you -- thank you.

Do economists look to analyst reports

and the topics and disclosures that the analysts

are commenting on to evaluate what information is

considered new and important to the market?

A      I think that's one of the pieces of

evidence that people look at.

So, for example, people will analyze

whether analysts change their consensus earnings

estimates in response to, say, new disclosures by

the company, including earnings announcements.

So, yes, people look at sell-side

analysts stock recommendations, their earnings

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

estimates, and their other outputs to assess whether there's new information that's come to the market.

Q     And is -- is another source that economists may look to, like, public news media or internet sources, concerning investment markets, to evaluate what information may be new and -- and value relevant?

A     Well, I think news media is potentially more of interest in assessing whether something has become publicly available as opposed to whether it has caused a change in market participants' belief and whether particular information is value relevant.

Q     And are you familiar with a service called "Factiva"?

A     Yes.  Factiva is a source of various kinds of data, including news stories.

Q     Right.  So Factiva allows access to sources of information, such as news and industry journals, analyst reports, and other sources; is that fair?

A     I'm no expert on Factiva, but, yes, it sounds like all of those things are something that could come from Factiva and are collected by

Factiva.  There are various sources for those types of information.

Q       And are such sources, such as Factiva, a place where economists might look for information that would allow them to -- or help them to evaluate what information was new and important to the market?

A       It could be one of the sources.  There are multiple sources.

Q       And forgive me if you mentioned this in a prior answer, but would you agree that economists look to statements by the company itself, such as statements on investor calls, to evaluate what information is new and important and available about the company?

A       Again, I differentiate between some of the things you're asking there.

Certainly earnings calls are what I would characterize, in most instances, as publicly available information.  The transcripts of earnings calls and the calls themselves are typically open to anyone who wishes to participate.  So I would characterize those, again, in most cases as publicly available information.

A different question is whether the content of those calls is actually value relevant and would ultimately move stock prices.

Q    When considering whether information is value relevant and may move stock prices, do economists consider information that is discussed on earnings calls or asked about on earnings calls by investment analysts covering the company and participating in the call as potentially informative to evaluate that question?

A    I'll put it this way, which is:  Certainly economists evaluate the content of earnings calls, including prepared remarks by management as well as the question and answer portion of the call, for potentially value-relevant information, yes.

Q    Okay.  You state in your Paragraph 25 that what is necessary for a semi-strong form-efficient market "is that some market participants have access to the information and trade on it to the point where that information is incorporated into the stock price."

Do you see that?

A    That's a correct rendering of the sentence in my report there, yes.  What I am doing is I'm summarizing something that Professor Fama had

stated about efficient markets, yes.

Q      I see.

And that's in your Footnote 42 where you footnote Professor Fama as stating that "The market may be efficient if 'sufficient numbers' of investors have ready access to available information."

Do you see that?

A      I do see that, although I think what I'm referring to in that last sentence of Paragraph 25 more is earlier in the paragraph, as I quote there, "According to Nobel laureate Eugene Fama, in an efficient market 'prices reflect information to the point where the marginal benefits are acting on information (the profits to be made) do not exceed the marginal costs.'  In other words, an efficient market does not require that the public information necessarily be widely disseminated or known to every market participant or that all investors trade on the publicly available information."

And then the sentence that you quoted, "What is necessary," is what I've included in that sentence.

So I was referring to the prior quote

from Professor Fama as opposed to specifically the one in the footnote.

Q    And you -- you cite the language in the footnote.  You -- you would agree with the language that you quoted in Footnote 42 from Professor Fama, that "The market may be efficient if 'sufficient numbers' of investors have ready access to available information"; is that fair?

A    It's certainly something that he wrote in his 1970 article, yes.

Q    And that you've cited in support of your assertion in -- in your report; correct?

A    Yeah.  I think it expands on the sentences that I just read out, which is -- as he says there, "The market may be efficient if 'sufficient numbers' of investors have ready access to the information."

Q    So where you say in the final sentence of Paragraph 25, that "What is necessary is that some market participants have access to the information," is that meant to be different in substance than what Professor Fama is quoted as saying in the language in Footnote 42?

A    I think what I'm pointing out in the sentence is, as the sentence says, "What is

necessary is that some market participants have access to the information and trade on it to the point where the information is incorporated into price."

I'm not sure exactly what the sufficient number is.  What I'm saying -- trying to be very clear is that if some market participants have access to the information and trade on it, then that's going to help it be impounded into the price.

And that's, I think, what Fama was saying in the sentence that I quote earlier in Paragraph 25, about "prices reflect information to the point where the marginal benefits do not exceed the marginal costs."

Q    And just to be clear, when you say that "What is necessary is that some market participants have access to the information," is that -- is -- that standard that you're -- that you're stating there, is that the same as Professor Fama's statement that "The market may be efficient if 'sufficient numbers' of investors have ready access to available information"?  Are you trying to say the same thing there?

A    I think at a high level, it's all the same

thing.  And, again, it goes back to the statement that I quote from Professor Fama in the middle of the paragraph.  And essentially, what it's saying is that if some market participants have access to a piece of information and that information is value relevant, they're going to trade on it to the point that the implications of that information get impounded into the stock price. And that's one of the mechanisms behind what makes the market semi-strong form efficient.

Q    And can you define what it means for an -- "investors to have ready access to available information"?

A    I'm not sure where the phrase "ready access" is coming from.

Q    I will direct your attention to Footnote 42 and the quoted language from Professor Fama's 1970 paper.

A    Yeah.  I see it.  Thank you.

I think it just means that market participants have access to and are aware of a particular piece of information.

Q    The concept of "ready access," can you -- can you define the concept of "ready access to information"?

A     Again, I think it's not different to saying that market participants are able to see, have access to a certain piece of information.

Q     Would you agree with the, sort of, converse of the -- of the quoted language from Professor Fama, that if sufficient numbers of investors do not have ready access to certain available information, then that information is not considered publicly available?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  No.  I would disagree with that.

BY MR. D'ANCONA:

Q     So in your view, if sufficient numbers of investors do not have ready access to certain available information, that information is still considered publicly available?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Well, let me put it this way:  I think what ultimately Fama is saying -- and this is very consistent with the literature that followed and many academic discussions of market efficiency. I think the way the market works, both the academic evidence and the real world tells

us, is that it only needs some investors -- maybe even as few as one investor -- to be aware of some information and trade on that information for its implications to be impounded into the stock price.

So I don't think there's any notion in the literature that there's a particular number, or lack thereof, that makes the market efficient or not.

BY MR. D'ANCONA:

Q     So you would disagree with the proposition that if sufficient numbers of investors do not have ready access to certain available information, then that information is not publicly available?  Have I got that right?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Well, I think we've got to, sort of, differentiate between a couple of different things, right, which is when we say information is publicly available, that means that it is available publicly, so to a certain spectrum of the market.  So it may be available at some cost, but it is available.

So that's what I would think about with respect to the public availability aspect of that.

Then there's another different part of this, which is:  To what extent is that information then impounded in the stock price, and how quickly does that happen?

BY MR. D'ANCONA:

Q     Would you agree with the proposition that semi-strong form-efficiency tests concern how quickly the price of a security responds to obviously public -- obviously publicly available information?

A     I think that could be a form of test of market efficiency.  If there is information which is obviously publicly available -- so I would think about earnings announcements as typically, obviously, publicly available -- and certainly we look at how quickly the market responds to earnings announcements as one way of assessing market efficiency.

Q     So looking again at the quoted language that you cite in Footnote 42 from Professor Fama, where he says "The market may be efficient if 'sufficient numbers' of investors have ready

access to available information," what do economists look at to determine whether sufficient numbers of investors have ready access to a given piece of information?

A    I don't think that's the way we typically conduct our tests.  I think, just to clarify the quote there, what Professor Fama is saying is, "The market may be efficient if 'sufficient numbers' of investors have ready access to available information."

So all he's really saying there is that one instance in which the market could be efficient is if sufficient numbers of people have access to the information.  He's not saying that's a necessary condition.  He's saying that's one situation in which the market may be efficient, if a bunch of people -- he doesn't specify how many, but say it's -- whatever he thinks of is a sufficient number -- have access to information.

But as he says there, "The market may be efficient."  He's not saying it is necessarily. He's saying it "may be efficient if 'sufficient numbers' of investors have access to the available information."

Q    And my -- and my question is:  What would

economists look at to determine whether sufficient numbers of investors do, in fact, have ready access to given information?

A     Well, as I alluded to in the example before, I think if you think about an earnings announcement, an earnings announcement is usually disseminated through a press release and an SEC filing on EDGAR.  And so if you see something that's made available through the SEC's EDGAR system, we would usually think about that as available to the public at large, which would be a sufficient number if we wanted to use that terminology.

But I think, in general, we don't -- in the academic literature, people don't talk about the number necessarily.  They just think about, "Well, is something publicly available?" If it's been posted to EDGAR and made available through EDGAR in the form of an SEC filing, we usually think of it as being publicly available.

Q     Would you also think of -- of a piece of information as being publicly available if it's noted or referenced in sell-side analyst reports or -- or news media or on Factiva -- in one of those sources on Factiva?

A        I mean, I wouldn't want to be making too general or blanket of a statement.  I would think that, generally, when you see something discussed in a sell-side analyst report, such as some of the sell-side analyst reports for Natera that we see in this case, that that information is publicly available.

And similarly, if you see something that is discussed in the media, say, in The Wall Street Journal, then we would also think about that as being publicly available.

Q        If, on the other hand, you -- you see that there's a piece of information that you -- that you know exists, but you don't see it referenced on an earnings call or on EDGAR, in the company filings, you don't see it referenced in an analyst report from a sell-side analyst, you don't see it referenced in newspapers or magazines, would that be an indicia -- would those be indicia to you that that piece of information was not publicly available?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  So when you're asking that question, if I can just clarify a little bit, when you say that I know of

some information, how would I know about the existence of the information?

BY MR. D'ANCONA:

Q    Let's say you are a board member of a -- of a firm, and you're aware of a certain piece of information, and you're trying to figure out if it's out or not.  You're an insider.

MS. COSTLEY:  Objection as to form.

THE WITNESS:  So I'm an insider, such as a board member at a public company.  I know a piece of information about that company, and I'm trying to figure out if it's been publicly disclosed by the company?

BY MR. D'ANCONA:

Q    I think you were asking for how there could be a piece of information that exists, but is not publicly available, what kind of information I was asking about in my question.

My question to you is:  As an economist, when you're looking to see whether a piece of information is or is not publicly available, the absence of any reference to that information -- to that piece of information in the EDGAR -- SEC EDGAR sources about the company,

sell-side analyst reports about the company, newspaper articles about the company, would that be indicia to you that the piece of information was -- a given piece of information was not publicly available at a given point in time?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think I'd have to know, as an economist -- so you changed your question a little bit, because previously I was envisioning being a board member, so I was knowledgeable about some information inside the company.

If, instead, I'm an external participant, if I am an economist studying market efficiency, I guess my question is: What type of information do you have in mind, and how would I know it exists to be able to assess whether it's publicly available?

BY MR. D'ANCONA:

Q    Suppose you were assigned by your client to examine whether a piece of information was or was not publicly available at a given point in time.  Would the absence of reference to that piece of information -- positive piece of

information, the absence of any reference to that positive piece of information that you've been asked to look for in the SEC EDGAR filings of a given company or analyst reports about the company, sell-side analyst reports, et cetera, would the absence of any reference to it be an indicia to you of whether it was or was not publicly available at a given point in time?

MS. COSTLEY:  Objection to form.

THE WITNESS:  Well, I think if I'm trying to figure out whether a specific piece of information that I'm aware of was publicly available, I would look at various places including, but not limited to, those places.

It could be there was some channel through which the information had been made available or some market participant became aware of the information and traded on that information, and it got impounded in the price, but it didn't show up, for example, in a sell-side analyst report or in The Wall Street Journal.

BY MR. D'ANCONA:

Q      Does your report, sir, reference -- excuse

me.

Does your report reference any empirical study that demonstrates that the market fully reacts to information to which only a small subset of investors has ready access?

A    So I'm not sure, without going through all of the references in my report, whether I specifically talk about that.  I would certainly say that the Fama 1970 article and the Fama 1991 article are both very extensive reviews of the academic literature and evidence on market efficiency, and they contain many different types of studies of market efficiency.

Q    Are you -- are you aware -- I'm sorry. Were you done with your answer, sir?

A    I was not done with the answer, but now I've --

Q    Please continue.

A    -- forgotten exactly where I was going to go.  So you can go ahead.

Q    Thank you.  I apologize.  I thought you were concluded.

My next question is:  Are you aware of any empirical study that evaluates stock price reactions to information to which only a few

non-insiders have accessed?

A        Yes.

Q        What are those studies?

A        So one example of such a study -- I haven't done an extensive literature review, as I sit here today, but I've written a paper myself which addresses that very question.

Q        Do you cite in your report -- well, strike that.

Can you identify that paper to which you've just referred?

A        Sure.  I have a paper that's coauthored with Rogers and Zechman and published in Journal of Accounting Research, I think in 2017, that addresses that type of question.

Q        Do you cite in your report any empirical studies of -- strike that.

Aside from the paper that you just referenced, sir, are you aware of any other study that you believe evaluates stock price reactions to information to which only a few non-insiders have access?

A        So a couple of different components to the answer here.

First of all, when you say "only a

few," I think we need to be more specific.  I would say -- I mentioned the study that I have done, and I would just say, more generally, as I've discussed in my report, when you think about market efficiency -- and what I've done is cite to these two Fama studies, the 1970 study and the 1991 study, and, of course, there's a tremendous amount of work on market efficiency done since the 1991 study, right, which is now decades old -- there's just a -- tremendously large literature in market efficiency.

And I'm very familiar, as a formal journal editor and someone who spends a lot of time sitting in workshops at the University of Chicago listening to discussions of academic work on market efficiency, there's a lot of work.  And there's certainly evidence that even when only a relatively small number of market participants have access to certain information, that information can be impounded quickly into security prices.

Q    So do you cite, in your report, to any empirical studies of specific situations where there was information accessible only to a few non-insiders and where the conclusion was that the

market fully incorporated that information?

A       I think I answered that question, but let me reiterate.

What I have cited here, which is very standard cites -- I think maybe even Mr. Coffman does it as well in his report.  The standard reference for market efficiency generally is the work done by Eugene Fama, and this is the work for which he won the Nobel Prize in Economics some years ago.

As I mentioned in the previous answer, there are hundreds, thousands of studies on market efficiency, and I can't recall off the top of my head all of the studies that fit into the bucket you're talking about.  But I am highly confident that one of the implications of all of this work is that, in general, we think of the market as being semi-strong form efficient.

And one of the pieces of evidence that we know, one of the things that we know, is, as I cite in this paragraph from Gene Fama, which is that if some investors or traders are aware of a piece of information that's value relevant, they have incentives to trade on that information and will do so until its implications are impounded in

the stock price, and that tends to happen very quickly.

In the study of mine that I mentioned, we find that when certain market participants have access to material public information, that they trade on that information, and it gets impounded in price within 30 seconds or so of them becoming aware of the information.  So it happens very fast, and it doesn't take many such investors for the information to be impounded.

Q     So my question is asking for specific cites to any studies or literature you may be able to direct me to, and I've noted your paper that you referenced earlier.

Aside from that paper that you referenced earlier, can you specifically cite to any empirical study of a situation where there was information that was accessible only to a few non-insiders, and where the conclusion was that the market fully incorporated that information?

MS. COSTLEY:  Objection.  This has been asked and answered.

THE WITNESS:  I think a good starting place -- and, again, I can't do this off the top of my head because I

don't remember -- forgive me -- the many hundreds of thousands of academic papers on market efficiency, but a good place to look would be in the set of references to the paper of mine that I just mentioned. Because our paper is not the only paper to have uncovered such evidence.

I will tell you that there are certainly papers that look at whether what people call "block trades" -- so, for example, I believe that Myron Scholes has some work at some point in the 1970s published in Journal of Financial Economics that talks about where -- the block trades, being trades that are done by large institutional investors, are -- reflect information that gets impounded into price.

The point being that people who are doing block trades are often large institutions -- like today we might think of BlackRock or State Street or Vanguard. These are large institutional investors who may come across a piece of public information and trade on that information,

and it gets impounded into price.

So it may only be that we had a small number of market participants who are aware of some information for it to be impounded into the price.

BY MR. D'ANCONA:

Q      Are you able to cite to any literature that defines what a sufficient number of investors would be for the market to fully reflect information possessed by those investors?

A      Well, again, I would go back to the point that when Fama is writing the sentence that we're looking at, he wrote "The market may be efficient if sufficient numbers of investors have ready access."

But, again, I would say that that is perhaps, no pun intended, a sufficient but not necessary condition.  There are other ways in which the market may be efficient.  And I think if you read all of what he's written, including what I've cited above, which I -- seems to me is a more general statement of market efficiency and why it works, we don't test it in terms of sufficient numbers.  We test it by looking at is an -- is a piece of information publicly available, and if

so, how quickly are its implications reflected in the stock price, regardless of how many people may or may not be aware of the information.

Q    And I appreciate that answer.  And my question is on the -- on that term, "the sufficient number of investors."

Are you aware of any literature that defines or explores what a sufficient number of investors would be for the market to fully reflect information that those investors possess?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Well, the way I would say this -- and I think I've said this in different ways in previous answers -- the definition of market efficiency is whether stock prices react fully and quickly to newly available public information.

So one way of testing that is simply to figure out, as we do, for example, with earnings releases, is the information publicly available, when is it publicly available, and then we look to see if that information moves a stock price in a way that we would expect. Right?

In fact, if we look at Mr. Coffman's report, this is exactly the approach that he takes and is the basis for the so-called Cammer Number 5 analyses that experts like him perform in trying to support opinions about market efficiency.

BY MR. D'ANCONA:

Q    So I'm -- taking that answer, am I correct in understanding that you did not, in your report, cite anywhere to literature that defines what a "sufficient number of investors" would be for the market to fully reflect information possessed by those investors?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So I think the point of my report, right -- at least in this section of my report, what I'm explaining is the notion of market efficiency, and the notion of market efficiency including the types of tests and evidence that we look at to assess whether a market is efficient doesn't really require that there be a so-called "sufficient number of investors."

Again, the statement that

Professor Fama made in 1970 is really, in my mind, a description of one way in which the market may be efficient, but it's certainly not a necessary condition for testing that, as, indeed, he points out in the language I've quoted elsewhere, and certainly in a bunch of other places where he's written on efficiency.

BY MR. D'ANCONA:

Q     Would you agree that as the cost of obtaining information increases, the extent to which investors have ready access to that information decreases?

A     So I certainly think that as the cost of something increases, right, it becomes obviously a different analysis for investors in terms of whether they're going to incur that cost to acquire something.

And certainly -- so, I mean, I think, as we mentioned before, information costs and transactions costs and other frictions are relevant to assessing market efficiency.  So the magnitude of information costs, including the cost of acquiring information, which is the information cost, that is certainly something that we think

about in assessing efficiency.

Q      And in that analysis, is it fair to say that as the cost of learning or acquiring information goes up, the extent to which that information is considered readily accessible or available to investors goes down?

A      Well, I -- again, I would certainly say that the cost of acquiring information is something that we think about in assessing the public availability of information.

So to go to the example that I mentioned before, if you think about the cost of accessing information on EDGAR, the SEC's website's for disseminating public filings, as long as you've got a connection to the internet and you're aware of EDGAR, you can go, at no charge, and access, say, a 10-K filing from EDGAR. If you want a sell-side analyst report on the same company that you're looking at the 10-K at, then there may be some cost to acquiring the sell-side analyst report.

And so in evaluating whether you incurred that cost, you would compare the cost to the benefit of acquiring the information and make a decision accordingly.

Q      Would you agree that, as the cost of acquiring or learning information increases, that information is less likely to be reflected in current market prices?

A      Not as a general proposition, no.

Q      Would you agree that there is some threshold cost for learning a piece of information above which that information would not be considered publicly available in the analysis?

MS. COSTLEY:  Objection; form.

THE WITNESS:  No, I wouldn't agree with that.  I mean -- and, again, I'd refer back to the sentence in Paragraph 25 quoted from Fama, where it basically says you compare the marginal benefits to the marginal costs, as is true in any economic situation, right, when you're talking about an economic decision by a market participant.

So what I'm trying to get to here is that even information that we might consider to be quite costly or expensive may be purchased by someone if they think the benefits outweigh those costs.  So even though a piece of information might

be costly to acquire, someone may have and does have incentives to acquire that information and pay the cost if they can potentially get a larger benefit by doing that, and basically make money.  Right?

And this is where Fama talks about the profits to be made.  Right?  As long as there are profits to be made, people will incur the necessary costs.

BY MR. D'ANCONA:

Q     But if it's a speculative question, if the piece of information -- if it's not known, you have to pay to find out what it is.  You're not acquiring the right to use the information, you're acquiring the ability to learn the information. Would you agree that the cost of acquiring or learning that information is relevant to whether that information is likely to be reflected in current market prices?

A     Well, certainly various market participants consider the costs as well as the benefits of acquiring information, and there's certain information that's relatively cheap or even no cost, like the EDGAR information I mentioned before.  There are other types of

information that might be relatively costly.

But if you're a large hedge fund or a large institutional investor, your business is trading on information and trying to generate abnormal returns.  And so at some point, you're probably going to be incurring the costs and acquiring access to information even when you don't necessarily know how value relevant that information is, because you're in the business of making money from trading on information that not everyone has.

So, yeah, I mean, that's what economists refer to as "informed traders" and "private information" and so on.

MS. COSTLEY:  Josh, we're getting to about an hour since the last break.  So if you can let us know if we get to a convenient stopping point.

MR. D'ANCONA:  Yeah.  I'll be to one shortly, Christina.  Thank you.

BY MR. D'ANCONA:

Q    So just so that I'm clear on the answers, Professor Skinner, you do not agree that as the cost of information increases, the extent to which investors have access to that information

decreases?

A      I think it's more nuanced than that. Right?  What I'm saying is that not all investors are the same.  There are some investors who we might think of individual investors who are not going to acquire certain information because the benefits don't exceed the costs, but there are other investors -- for example, large institutions -- who are willing to incur a higher cost of acquiring information because they believe that it is potentially value relevant and they could generate trading profits from generating that information.

So I think it's a little hard to make very general statements about this, except to say, as Professor Fama does, people trade to the point where the marginal benefits of acting on information don't exceed the marginal costs.

Q      So -- and the second answer -- I just want to make sure I'm clear on.

Is it your position that there is no threshold cost for information beyond which that information would not be considered publicly available?  In other words, there's no cost for information above which you say, "That's too

costly.  That information is not publicly available given its cost."

Is that your position?

A    And when you say a "threshold" -- I'm trying to interpret and be precise about -- so I can give you a good answer.

When you say a "threshold," are you envisioning a dollar amount as a threshold?

Q    Yes.

A    So it's hard to think about that.  Again, I would come back to the way we think of it as financial economists academically, which ultimately goes back to the discussions, as I've mentioned, and the quote from Professor Fama.

Like, when you think about this, right, at the high end, you have got institutional investors -- you know, I'm familiar with some of the -- some money managers, investment managers, these people are managing funds that have tens of billions of dollars under management.  And so for them, if they're trying to actively manage a portfolio, meaning trade on information and make abnormal returns or generate alpha, if you want to use that term, their budgets are substantial.

So, you know, I don't know exactly

what the dollar would be, but I will say that those very large institutional investors -- again, think about the largest institutional players in the market.  Right?  Some of the people Mr. Coffman talks about in his market efficiency analysis, some of those large institutions manage hundreds of billions of dollars a year if we're talking at the high end.  And so they would be willing to pay substantial amounts for value-relevant information.

Q     And so, in your mind, is there -- is there any limit -- any cost for information above which you would agree that information is not considered publicly available?  If to acquire or learn that information is above a certain cost, is it no longer publicly available, in your mind?

                MS. COSTLEY:  Objection; form.

                THE WITNESS:  Again, I think
          fundamentally we go back to the definition
          of market efficiency, including the
          discussion of efficiency that Fama has put
          forth, right, which is to say yes, there
          is going to be a limit, but it's defined
          by the potential benefits that a trader
          could get by acquiring the information.

So people are going to acquire information to the point where the marginal benefits equal the marginal costs.

So there is a threshold, right, which is defined by what is the potential magnitude, economically -- if you want to talk about it, as you do in dollars, what is the amount in dollars of the potential benefit that will set an upper bound on the costs someone would be willing to incur.

BY MR. D'ANCONA:

Q     So if information about a publicly traded company is new and important but is not publicly available, is it incorporated into the company's stock price?

A     So you're saying it's new and important -- so value relevant, but not publicly available? Well, I would say the evidence says probably not. Right?  Because essentially what you're asking there is not about semi-strong form efficiency, but about strong form efficiency.  And here, the evidence -- again, we can look at Professor Fama's work, but there's a lot of work on this -- it says

generally if information is inside information --
so if an insider has value-relevant information
about the company, but that information is not
publicly available, then it won't necessarily be
impounded in the market price.

Q      Okay.  And just a couple more questions
and then we can wrap this line up and take this
break.

So related to that answer, you expect
to see new and important information -- in a
semi-strong form efficient market, you expect to
see important information about a company affect
its stock price when it becomes publicly
available; correct?

A      So my report is clear about this.  Right?
I actually have a paragraph, and what I'm trying
to do is be responsive.  So this is Paragraph 26.

So just because a piece of information
is new and publicly available doesn't necessarily
mean it will move the stock price.  Right?
Because it might not be value relevant.  And so if
a piece of information, even though it's new to
the market, is not value relevant, or perhaps it's
simply not a surprise -- again, this is
Paragraph 26 of the report -- it will not -- it

may not move the stock price.  So not all new information that's publicly available will move the stock price.

Q    And my question is "new and important."

So you expect -- you would expect to see new and important information about the company affect its stock price when that information becomes publicly available; correct?

A    So I would just elaborate by -- or clarify by saying when you say it's new and important, in my language, new and value-relevant information that changes the market's expectation, say, about future cash flows, you would, yes, expect that to move the stock price.

An example being if the company reports surprisingly positive earnings news, so a positive earnings surprise, or upgraded guidance, we would, other things equal, expect a positive reaction in the stock price.

Q    And you would expect to see sell-side investment analysts and others covering the company remark on new and value-relevant information about a company when it becomes publicly available; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I think that answer has to be more nuanced.  I think, right, just because one investor or a few investors have access to some public information and trade on it, because it's value relevant and it gets into price, in some instances, yes, analysts -- sell-side analysts may comment on that.  In other instances, they may not be aware of that and they may not comment on it.

So I think it's a little more nuanced than that.

BY MR. D'ANCONA:

Q      You would expect to see sell-side analysts covering a company remark on new and value-relevant information when they become aware of the new and -- of the information; is that fair?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I mean, my experience, you know, reading academic papers and looking at analyst reports and seeing what they do is that in general, analysts do tend to issue reports when something important happens at the company

that they think is potentially value relevant.

So analysts will typically issue reports within a day or two of a company announcing its quarterly earnings, for example.  And certainly we see that in the case of Natera.

Do all analysts issue reports whenever there is new information and news about the company?  No.  It just varies by analysts.  It varies by the company.  It depends on how many analysts are covering the company and so on.

So there's a lot of variation and nuance in that that makes it hard to specifically say.  But I think as a general matter, analysts will tend to issue reports when there's some big important event, like quarterly earnings, happening for the company.

BY MR. D'ANCONA:

Q     If information is available only from a source that is considered not to be reputable or not to be a legitimate source of information, can that affect whether that information is deemed

publicly available in the economic sense?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I'm not sure it affects -- right, so the credibility or the reliability of the source of information, I think the market will take that into account.  Right?

So, I mean, one interesting branch of the academic literature now is assessing the role of social media in affecting securities prices.  Right?

And what's interesting about social media is that people who potentially are uninformed are able to spread their views about the stock.  And certainly the market will be skeptical if a random individual sitting in his basement has an opinion about a stock.  I think people will be justifiably skeptical about accepting that person's views about whether the stock is under- or overpriced.

So, yes, the market will analyze everything available to it in assessing whether information is value relevant, including its source.

BY MR. D'ANCONA:

Q       And in that scenario, if a source that is seemingly apparently non-credible, like the guy alone in his basement issuing a post, for example, in your example, states a piece of information at Time Number 1, and then at Time Number 2, a more credible source that has a better reputation for accuracy and integrity states the same piece of information -- and this is later in time -- would you expect to see a different market reaction or a different interpretation of the validity of the piece of information by the market in response to those two disclosures of the same piece of information?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So I think we've got to sort of get a little more specific about this example.

When you think about the person -- and this is -- I'm thinking about, again, people on social media such as Reddit. Right?  Someone sitting in their basement, right, is unlikely to have access to information.  They may issue an opinion about a stock, but it's unlikely they have

access to information -- hard information about a stock.

So I think we've got to differentiate a little bit between the type of information that's coming to light.  And of course what market efficiency tells us is that repetition of the exact same piece of information should not affect stock prices because the market would already be aware of that information.

So, you know, I think there's some nuance to this and we've got to differentiate.  Again, the market will look at all of the different pieces of information, including who it's coming from, the type of information this person is disseminating, and they will evaluate these things accordingly.  Right?  The market as a whole, meaning the set of market participants, is pretty good at figuring out, you know, what's value relevant and what's not.

BY MR. D'ANCONA:

Q     So in that example, if an anonymous poster

on Reddit says, "I work at the warehouse for this company; we are not moving any product despite what the company says all the time about our demand," and that's on Day 1.  And then on Day 100, The Wall Street Journal publishes an article saying, "We have investigated, and the company is not moving its product from its warehouses; it has been overstating its demand," so it's the same piece of information.  The source actually did have a basis to be making its claim, but it was an anonymous source on Reddit, and that's all the -- that's all the market knew about it until The Wall Street Journal came out 100 days later and said the same thing.  So that's the example to consider here.

Is -- that informational source difference, does that -- does that matter, in your mind, about whether the piece of information is treated as publicly available or received by the market differently between Day 1, when the anonymous poster says it, and Day 100, when The Wall Street Journal says it?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So this hypothetical -- it's an interesting

hypothetical, right?

But -- so on Day 1, when an individual makes this claim in a post, if that information is available publicly through Reddit, even, or whatever the social media forum is, that's publicly available, then it's publicly available, and the market will evaluate that.

So if that information was value-relevant information, then people will evaluate it, including large sophisticated institutions, and potentially they will trade on it or not accordingly.  But, of course, you know, if it's viewed just simply as speculative -- so part of the information is the source of the information.

So, yeah, you've -- you've -- again, it's hard to make general states -- statements here because it does -- the market's response is going to depend on the situation.  Right?

One thing that you could imagine happening is that some market participants did pay attention to the Day 1 revelation,

and they did investigate that, and they may trade on the basis of that information.  So there may be some people who did pay attention and trade on that information.

BY MR. D'ANCONA:

Q      But as part of that answer, you said that the source of the information is part of the information; is that right?

A      As I mentioned before, I think the market will assess all of the relevant information that's available to it in trying to figure out the implications of the value relevance of a piece of information.

Q      Okay.  If a piece of information can be acquired only behind a high paywall and with strict rules and restrictions about usage or reproduction or sharing, can that affect whether that information is deemed to be publicly available?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think this goes back to the discussion we had a little bit ago about the threshold or cost of information.  If information is sitting

behind a paywall with certain restrictions, if entities believe that that information is potentially value relevant, they will potentially access -- they will pay the cost of accessing the information, whatever it is, and acquire the information, and if it's value relevant, potentially trade on the information.

BY MR. D'ANCONA:

Q     And part of the assessment of whether information in the -- in the sole possession of a source is worth acquiring and will be value relevant is the assessment of the credibility of that source; is that fair?

A     Well, as I said before, I think certainly that is one of the factors.  The source of the information, the cost of the information is going to be something that the market takes into account.

If the post is by a kid who's in the fourth grade and the kid is claiming that the McDonald's stock price is undervalued because he went to McDonald's before and noticed that it wasn't very busy, right, the market is going to

take all of that information into account in deciding whether or not that information is value relevant and whether to trade on that information.

So, yeah, I mean, the market collectively -- meaning all of the market participants -- take everything into account in evaluating information or potential information.

But if we could, maybe think about the break, which I think we had talked about a while ago.

MR. D'ANCONA:  Yes.  Yes, yes. Let's take a break.

THE VIDEOGRAPHER:  Off the record, 11:32 a.m.

(Recess from 11:32 a.m. to 11:47 a.m.)

THE VIDEOGRAPHER:  Back on the record, 11:47 a.m.

BY MR. D'ANCONA:

Q      Welcome back, Professor Skinner.

Looking at your report at Paragraph 34, you opine in Paragraph 34 that "an event study cannot measure the stock price impact of omitted information"; is that fair?

A      Yes.  Generally, that's -- that's a fair summary.

Q      And you say that "any stock price changes associated with alleged omissions do not measure the impact of any allegedly omitted information"; right?

A      That is part of the sentence that's included there, correct.

Q      Can you define what you mean by "measure"?

A      Sure.

I think that in some instances, what some people might try and do is look at stock price changes that are associated with certain events.  For example, plaintiffs' experts might look at stock price changes with -- associated with certain events and use that as an input into measuring artificial price inflation.

Q      Okay.  Were you done with that answer?

A      Yes.

Q      Oh, okay.

You do not state an opinion that positive price changes associated with affirmative statements about a topic, but that omit important negative qualifying information about that same topic cannot be some evidence -- or even indirect of the price impact of the omitted information, do you?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I mean, I think it's clear enough as stated here.  It's hard for me to think about -- so just to recap, to make sure I understand your question, right, you're -- you are talking about a situation where the stock price has an abnormal positive movement on a particular day, and there's some statement made by the company that same day when the stock price abnormally moves upwards, and then there's some allegedly omitted information there.  Right?

It's hard for me to see how -- if the information is omitted, so it's not available to the market, how it can -- how the stock price movement can tell us anything about the economic value of that information.

BY MR. D'ANCONA:

Q     So if the positive statement is seen and determined by you to be the cause of the abnormal positive stock price return on that day, and the omitted negative statement is, in your determination, a material, important,

value-relevant fact that directly qualifies the positive statement that you saw and determined caused the stock price to react, is -- that positive stock price reaction, in regards to a statement about that selfsame topic, is that any evidence -- even indirect evidence -- of the fact that the omitted, but value-relevant, information would have had a stock -- a stock price impact had it been disclosed?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So there's a lot going on in your question there.

So, I mean, the thing that I would highlight, right, which is I think very important, is if we look at --

BY MR. D'ANCONA:

Q      May I ask you to pause for one minute? Did we just lose Christina?  I'm sorry to interrupt.

A      I think she just turned off her video.

Q      Okay.

MS. COSTLEY:  Correct.

THE WITNESS:  But she's still here.

BY MR. D'ANCONA:

Q      She's still there.  Okay.  Good.

A    She's always here.

Q    Okay.

A    She's omnipresent.

Q    Yes.

A    Okay.  So I think your question envisions something different from what my understanding is of many of the allegedly misleading or misrepresented disclosures here.

So just as an example, in the next paragraph I talk about the allegedly misleading statement made on the earnings release on August 5 of 2020.  As I note in that paragraph further down, consistent with your question, there's a positive abnormal return associated with that earnings release.

Now, your question, I think, envisions a statement that is allegedly misleading because of an omission, but the implication of the question was that we know for sure what moved the stock price -- if you can stop moving the screen around -- the text around, that's super distracting to me when I'm trying to talk, because it just breaks my train of thought entirely.

But the point I was going to make is that your question envisioned a situation where we

Deposition of Douglas J. Skinner                                          John Harvey Schneider v. Natera, Inc., et al

know that there was an affirmative statement made by the company, which moved the stock price upward.

The problem I have with that framing is that in the situations -- or at least many of the situations -- I think there are 11 alleged misrepresentations here -- in a number of those, the stock price moves upward at the time of an earnings release.  I have not formed any opinion about exactly what moves the stock price up on those dates.

There are -- as my report points out, earnings announcements contain a lot of information.  On those dates, meaning the earnings dates, when there was a stock price movement upwards, a positive abnormal return, as the example in Paragraph 35 illustrates, right, all we know is that the stock price moved upwards on an earnings date.

Now, presumably, what happened on that earnings date is the company announced good earnings news, potentially upward revision of its guidance, and some allegedly misleading statement. Right?  As is the case here, the statement -- the increase in total revenues was driven primarily by

sales of Natera's Panorama and Horizon tests.
Right?

So there's a statement the plaintiffs allege is misleading, as I understand it, because of the omitted information, but I don't know exactly what moved the stock price upward. And I certainly couldn't point to that upward stock price reaction and the positive abnormal return, and as the previous paragraph indicates, reach any conclusion about the value of that allegedly omitted information on that basis.

Q     You don't cite any literature in connection with Paragraph 34, where you're -- where you're stating these assertions in your opinion regarding the proposition that a positive stock price movement associated with a -- with a specific misrepresentation by material omission cannot be informative of any -- of whether there would be any price impact of the omitted material information, do you?

A     Okay. So there was -- there's a lot in your question. I'm not sure it was fully internally consistent, but let me make the following observation.

Q     Well, my question -- let me restate the

question.

It's simply:  Do you cite -- you do not cite any literature support for your assertion regarding whether a stock price movement associated with a misrepresentation by omission can be informative about the price impact of the omitted information, do you?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Two things I will say with respect to that:  One is your question included some legal terms, right, some legal conclusions about price impact and so on that is just not something that any academic literature would discuss at all.  So that's one thing.

I think, more generally, right, as the paragraph says -- this is Paragraph 34 -- "in an efficient market, event studies can be used to assess the stock price impact of newly available company-specific information."

However, I think it's very clear that -- almost self-evident from the literature -- that if there's an omission -- so if information is not

released, then clearly we can't use an event study or the stock price change to assess the effect of something that's omission -- omitted, because the market doesn't see the information.

BY MR. D'ANCONA:

Q     So the answer to that question is:  You do not cite literature in support of that paragraph, but in your view, from your position and experience and judgment, it's self-evident from the literature?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think not exactly. As I allude to at the beginning of the paragraph, right, I mean, I've -- when we get to this paragraph, I've discussed the efficient market literature, and I believe -- I'm just going to check here. Right.  What I'm referring to in Section VI.A, right, is what we can learn from an event study, including the literature on event studies and market efficiency, which are intrinsically linked.

But I think it's very clear,

implied by the literature, that if information is not publicly available to the market, which would include omitted information, then we can't analyze its effect by using an event study.

BY MR. D'ANCONA:

Q        Hypothetically, if a -- if a company announced higher-than-expected earnings, but omitted the fact that this higher-than-expected earnings, this increase in earnings, was just temporary, would a statistically significant price increase in response to the announcement provide some economic evidence for the proposition that the omitted information would be value relevant?

A        Well, I think in general, to your example, the company reports a positive earnings surprise. One of the things that the market is looking to assess -- whenever it sees a positive earning surprise or higher revenues than expected, the market is always looking to evaluate how persistent versus transitory that earnings increase is.

So one of the things that the company -- the analysts are going to ask on the earnings call is, if the company hasn't provided

relevant information to make that assessment, the company -- the analysts are going to ask about that, and that's going to create uncertainty.

But that will be reflected in the stock price reaction.  If the market is uncertain about the permanence of the increased earnings, then the stock price effect will be smaller than if the market's assessment is that that's an ongoing, more permanent increase in the earnings.

So it's just -- it's one of the -- it will be reflected in the market price in the response.

Q    You mentioned a minute ago that you do not state an opinion as to what information caused the statistically significant price increase in Natera stock on August 6th, 2020; correct?

A    Could you repeat the question?  Sorry.  I didn't quite catch the first part.

Q    Sure.

You do not state an opinion as to what information caused the statistically significant stock price increase for Natera on August 6th, 2020; correct?

A    I think that's generally correct.  I think what I've done for that date, as my event study

reports, is note that on August 6, which is the relevant event date, there was a plus 9.3 percent abnormal return, according to my event study analysis. The other thing we know is that the company announced its quarterly results after the close on August the 5th.

So I don't have a specific opinion. What seems likely is that the market was responding to the bundle of information or news that came out associated with the quarterly earnings release. What I think I indicate there, as I say, "An event study analysis could be used to move -- measure the collective effect on the stock price of the information the company released on this date, including its reported revenues."

But that's pretty much all -- as much as we can say.

Q    Right. You don't cite empirical evidence about what specific cause or causes there were underlying that increase in Natera stock price in this report; correct?

A    No. I mean, obviously there's no academic literature I could cite specifically with respect to Natera's stock price increase on this date.

But, no.  The point I'm making is that, in general, from the literature, we know that earnings news and the associated information that comes out in quarterly earnings tends to move stock prices.  Right?  Indeed, again, this is part of the motivation and evidence that Mr. Coffman offers in his Cammer Number 5 analysis.

What exactly it is that was released as part of the quarterly earnings that moved the stock price here, when we see the positive abnormal return, I haven't analyzed or reached an opinion on.

Q    Okay.  In looking at your Exhibit 2b -- I'll give you a minute to flip there.

A    Yup.  For August 6, I assume?

Q    Well, I'll direct you to a few different dates.

So looking at Exhibit 2b -- are you there, sir?

A    I'm there.

Q    Okay.  You also found that the misstatements that plaintiffs alleged on May 6, 2020, February 25th, 2021, May 6, 2021, and November 4, 2021 -- and I'll repeat those dates for you -- that those coincided with statistically

significant price increases.

So those were May 6, 2021 first.

A    Yeah.  Let's go through these.  So --
yeah.  So on May 7, 2020, we see a positive
abnormal return, which is statistically
significant.

Q    Right.

And then February 25, 2021.

A    So on February 26, 2021, which I believe
is the relevant event date, we do see a positive
abnormal return.

Q    Yeah.

And then May 6, 2021.

A    Correct.  So I think what we are looking
at here is May 7, 2021, when I do see a positive
abnormal return.

Q    Yes, sir.

And then November 4, 2021.

A    Yeah.  So the relevant event date here is
the next day, November 5, where we do have a
positive and statistically significant abnormal
return.

Q    And so while you note those returns in
your report, you do -- you offer no opinion about
what caused those statistically significant price

increases in your report; correct?

A    Correct.  I would go back to the paragraph we were looking at before, where I give the example of -- I think it was August 5, 2020 -- this is back to Paragraph 35.  Let me just make sure that's right.

Yeah, Paragraph 35.  Here we have an earnings announcement.  We have the positive abnormal return.  And so the same statement I make here about August 5, 2020, would apply to those other dates as well, I believe -- assuming they're all earnings dates -- that the positive abnormal return is presumably associated with the earnings news collectively on those dates.  What exactly within those earnings releases caused that information, I haven't analyzed.

It could also, of course, be there could be other information coming to the market on those days.  I haven't done that analysis either.

Q    So in light of that answer, what, if any, analysis did you do to determine that defendants' misstatements alleged by plaintiffs played no part in those price increases?

A    Well, I think your question speaks to an analysis which I think is more of a loss causation

analysis, and I think we should keep in mind the assignment I was given, which is laid out in Paragraph 8.

So I was not specifically asked to evaluate the question you just indicated.  I was asked to evaluate the questions that are listed in Paragraph 8 that we discussed before.

Q    Looking at your Paragraph 35 again, sir -- just read that over and let me know when you've had a chance to do that.

A    Okay.  Go ahead.

Q    So if, as plaintiffs allege, Natera's revenues "were propped up by Natera's deceptive practices," how can one exclude the impact of those deceptive practices from the "collective effect on Natera's stock price of the information" released on August 5th, including Natera's reported revenues?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Yeah, I think what I'm saying here is sort of economically quite simple.  What I'm saying is what plaintiffs are alleging is that there was an omission of certain information, which was important to the market.  So that's

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

the plaintiffs' allegation.

What I'm saying is the 9.3 percent abnormal return on that date is not informative regarding the impact on the stock price of -- as I say in that last sentence, "of a hypothetical alternative disclosure that, under plaintiffs' allegations, would have revealed that the reported revenues were propped up by the allegedly deceptive business practices."

Basically because the alleged misrepresentation is because of the omitted information and just the general point that I made before that you can't assess the effective omitted information through an event study.

BY MR. D'ANCONA:

Q      And here, sir, as you said, the omitted information is that the reported revenues were propped up by deceptive practices.  And if that's the case, and the reported revenues were what was revealed on the given date, and the collective effects of the revelation on this date included the reported revenues that were affected by this deceptive practice, how can you exclude the impact

Deposition of Douglas J. Skinner                John Harvey Schneider v. Natera, Inc., et al

of those deceptive practices that impacted --
allegedly impacted revenues?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I think it's really -- I think the point of the paragraph is that it's hard to draw any inference about the price effect or value of that allegedly omitted information about deceptive practices from the positive 9.3 percent abnormal return.  And there are at least a couple things going on that make it difficult, if not impossible, to make any inference from that.

One is the fact that that -- we don't know for sure what drove the positive 9.3 percent abnormal return. Your supposition seems to be because of the revenues, but we don't know that for sure.  There's a bunch of information that the company is disclosing with its quarterly earnings.  All we know, as this paragraph indicates, is that the collective effect of all of the information is to move the stock price

upwards abnormally by around 9.3 percent.

The other related point is that the information that you allege makes this misleading is omitted information, and so obviously being omitted, it didn't come to the market that day, and so it's not possible to use a stock price effect, or lack thereof, to draw any inference about the value of that information because it wasn't disclosed.

So it's just -- as the last sentence indicates, it's just not informative regarding the impact on the stock price, if any, of a hypothetical alternative disclosure that would have revealed the allegedly omitted information.

BY MR. D'ANCONA:

Q    So is what you're saying in the first part of that answer that one could not isolate the impact of the allegedly concealed deceptive practices that allegedly propped up Natera's revenues on Natera's reported revenue, and therefore on the stock price reaction?

A    No, I don't think so.

MS. COSTLEY:  Objection to form.

THE WITNESS:  No, I don't think so. What I'm saying is there are two separate things going on.  But if I am -- the problem with using the stock price response on this date to assess the value of the allegedly omitted information is that the information was omitted.  And as the previous paragraph indicates and sort of is -- sort of seems clear, as a matter of economics, based on event study and market efficiency, if information is not revealed to the market, it can't be reflected in a price movement that's captured by an event study.

So if information is omitted during an event window, the event study is obviously not able to pick it up.

BY MR. D'ANCONA:

Q     But if the information that's omitted concerns a practice which is alleged to have an impact on revenues, and those revenues are revealed, and those revenues cause a stock price reaction and some component of those revenues is alleged to be the impact of the practice, which

has been omitted and not revealed; if you have information about the revenue attributable to the deceptive practices, say, wouldn't that be a basis to infer or measure some effect of the information that plaintiffs allege was omitted?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I think now you are envisioning a situation which is not descriptive of what we have here.  Right?  You're sort of putting in your question we know exactly how much of the revenue was purportedly misstated.  And we could qualify that and the market could know that.  Right?

The basic problem -- again, I go back to this -- there's two complications here.  One is the abnormal return of plus 0.3 -- 9.3 percent is reflecting the effect of all of the earnings use, and, in fact, all of the information that came to the market during that window.  But presumably, mostly the information released.

But the market can't respond and we can't look at that stock price response to

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

get any sense of information that's allegedly omitted because that information simply wasn't revealed to the market.

BY MR. D'ANCONA:

Q        The impact of the information was allegedly revealed in combination with other factors influencing revenues in the revelation of the revenue number, because the impact of the omitted conduct was alleged to be that it propped up revenues.  Right?

So the impact of the deceptive conduct was in effect, in a bundle with some other things, disclosed to the market under our allegations; right?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So, I mean, I think a couple things here.

One is that -- I mean, if we look at the quoted statement, which I believe is at least in part what you're alleging is misleading, it's that the increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests.  It seems to me that information cannot be that value relevant to the

market on this date because that was the exact same sentence that was included in the prior earnings announcements.

More generally, I think at this point, the market and analysts knew that Natera's most important products were Panorama and Horizon. So -- right, but, again, it just gets back to the more general point that when you see the positive 9.3 abnormal return -- positive 9.3 percent abnormal return, it's very hard to attribute that to any specific thing.

It could be -- as you have, I think, tried to argue, it could be due to the revenues the company reported, which may -- I'd have to go back and check, but let's say the revenues the company reported that quarter were larger than what the market had expected.

So if there's a positive revenue surprise, potentially that explains at least part of the positive stock price response. But I don't know that for sure, and definitely it would be very hard to

extract from that stock price change not only that, but certainly the effect of any information that is omitted.  You'd have to do some other analysis to figure out the value of that omitted information, which is the entire point of the paragraph.

BY MR. D'ANCONA:

Q     So if you had information about the amount of revenue that was attributable to the allegedly undisclosed practices, and you could pull that out or isolate that in the overall revenue be -- that was announced on that day, would that be a basis to measure the effect of the information that plaintiffs allege was omitted?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I think there are a number of suppositions in your question there.  I mean, the one that I struggle with is that even if we take, right, the MGML type of allegation or the microdeletion, you force patients to opt into microdeletions as a deceptive practice, I'm not sure that the company's reported revenues would be different.  So

this is not a case that the revenues would be different from what they were.

Or even ultimately what I think my report shows in later sections is that even when what plaintiffs allege is corrective information was ultimately, according to plaintiffs, revealed in the Hindenburg report, analysts didn't change their estimates.  So I'm not entirely sure that your counterfactual there is something that I can buy into.

BY MR. D'ANCONA:

Q    In Paragraph 41, you cite to two articles by an entity called Capitol Forum, and then you define those two articles as "The Capitol Forum articles."

Do you see that?

A    Yes.

Q    And those two articles that you defined as "The Capitol Forum articles," those are dated July 1, 2020, and December 14, 2020; correct?

A    That's correct.

Q    And you assert that The Capitol Forum articles, the July 1 and December 14, 2020, Capitol Forum articles, make some claims that are

repeated in the Hindenburg report regarding

Natera's relationship with MGML, in which

plaintiffs allege were corrective of the fraud in

this case when disclosed by the Hindenburg report;

is that fair?

A     It sounds right, yes.

Q     In Footnote 78, you identify certain other

articles about Natera by The Capitol Forum;

correct?

A     Correct.

Q     But your opinion does not state that any

of those articles in Footnote 78 revealed

information that plaintiffs allege was omitted

from defendants' alleged misstatements; correct?

A     I think all I'm saying in the footnote is

what we know is The Capitol Forum published -- I

believe it's six other reports during the proposed

class period.  So there's the two that are

specifically mentioned, and then there are six

others.  So I believe there's a total of eight

during the class period.

I don't think I comment one way or

another on whether the other six articles reveal

information that plaintiffs allege ultimately was

corrective information revealed in the Hindenburg

report.

I will note, however, that having read a number of these articles -- I'm not sure all of them were available to me -- but they do make claims about alleged deficiencies, even illegalities, in the company's billing practices, and it wouldn't surprise me if some of those claims in those Capitol Forum articles overlap with some of the claims that ultimately were made in the Hindenburg report.

Q    You just stated that you believe that not all of The Capitol Forum articles listed in your Footnote 78 were available to you; correct, sir?

A    Correct.

Q    You cited each of those reports not only in this footnote, but in your materials considered in your report; correct?

A    Yes.  And so -- yes.  I misspoke.

I believe that these eight articles are the articles that I was available to get. What I think I believe may be true is we were not sure that these were the full set of Capitol Forum articles about Natera during the class period.  So there may be other Capitol Forum articles that we weren't -- or I wasn't privy to.

But I've -- I will say this, that I've certainly read some of the other Capitol Forum articles.

Q    Well, just to be clear, you did not actually have or review The Capitol Forum reports that you listed from August 14th, 2020, or August -- or October 29, 2020; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So sitting here today, I don't remember exactly which of The Capitol Forum articles I read.  I know for sure I read the two in question, as indicated in Paragraph 41.  I believe I've seen reference to some of the other ones.

Part of my confusion may be arising because, as you will know, later in the report I cite to emails among various participants that discusses The Capitol Forum articles, and some of those emails include some extracts from some of the other Capitol Forum articles.

BY MR. D'ANCONA:

Q    Just to nail this point down, you are aware that you did not produce copies of the August 14, 2020, or October 29, 2020, Capitol

Forum articles that you've cited to plaintiffs, and that your counsel represented to us that you did not review the actual underlying reports, but only certain marketing emails about those reports.

You're aware of that; right?

MS. COSTLEY:  Objection to form. This has been asked and answered.

THE WITNESS:  Like I said, sitting here today, I don't know exactly which of these I had full access to and which I didn't.  I know for sure that we produced everything that we had.

I also know for sure that when I asked about this whenever it was when I was initially working on the report, we did not have access to all of The Capitol Forum articles from the class period.  And so I think I'll leave it at that.

I know for sure I've read the two in question.  I know for sure I've read at least parts of some of the others.  Beyond that, I don't recall.  But we can certainly figure that out.

BY MR. D'ANCONA:

Q     Well, I just want to understand.  Why did

you cite the August 14, 2020, and October 29, 2020, reports if you did not review them?

MS. COSTLEY:  Objection; form; mischaracterizes his prior testimony.

THE WITNESS:  All the footnote says is that The Capitol Forum published a number of other reports during the proposed class period that raised questions about Natera's billing practices.  So I'm just listing that, as far as we're aware, there were at least six other Capitol Forum articles about Natera during the class period.

BY MR. D'ANCONA:

Q     Well, if you're citing the reports and claiming them as materials considered, you would no doubt want to read them and know what they say.  So why didn't you review these reports?

MS. COSTLEY:  Objection; form; mischaracterizes prior testimony.

THE WITNESS:  As I mentioned, these are the set of Capitol Forum, meaning in Paragraph 41 in Footnote 78, and listed in my "Documents Considered List," eight Capitol Forum articles published during

the course of the proposed class period.

I recall that not all of The Capitol Forum articles were available to us. And so I read the ones that were available to me, but I think it's useful to know about as many of these articles as possible, even though the contents and the specifics were not available.

I certainly would have reviewed and did review all of The Capitol Forum articles that were available to me.

BY MR. D'ANCONA:

Q      Why were some not available to you?

A      I presume because they weren't available from the company or they weren't available to counsel. I don't know exactly. As we know, it's a private entity. And I don't exactly know why, but I was told certain of the articles were not available to me.

Q      So you -- I believe you mentioned in a prior answer, sir, you're aware that Capitol Forum is a subscription-based service that sells access to its purportedly proprietary research and reports?

A      That's generally consistent with my

understanding, yes.  They sell subscriptions. They sit behind a paywall, yeah.

Q     And are you -- you're aware that The Capitol Forum sells access to its reports under strict reproduction and copyright terms?

MS. COSTLEY:  Objection; form.

THE WITNESS:  That doesn't surprise me, but I wasn't -- I'm not aware of the specifics of the restrictions or anything else.

BY MR. D'ANCONA:

Q     Do you know whether Capitol Forum has sued to enforce its copyright and usage terms and alleged violations of those?

A     I don't know one way or the other.  I simply don't know.

Q     The Capitol Forum is not an investment -- a sell-side investment analyst; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  As I understand it, Capitol Forum is certainly not associated with an investment bank or a bank the same way that many other sell-side analysts are.

Exactly what Capitol Forum's

business model is, I'm not entirely sure.

They seem to be an organization that

performs various types of investigations.

They have a team that seems to conduct

that activity, and there's a subscription

you can pay to get their reports.

So beyond what's available in my

report, you know, I don't know much about

Capitol Forum, but I would certainly not

be super surprised about what you just

mentioned.

BY MR. D'ANCONA:

Q        You acknowledge, then, Capitol Forum is

not a broker-dealer; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Again, I don't know

for sure.  I have not seen any reference

to them being a broker-dealer.

BY MR. D'ANCONA:

Q        And to your knowledge, Capitol Forum does

not provide investment advisory services to

clients; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Again, certainly not

to my knowledge.  But, again, I don't have

Deposition of Douglas J. Skinner                        John Harvey Schneider v. Natera, Inc., et al

a lot of detailed knowledge of, as I said,

Capitol Forum or its business model.

BY MR. D'ANCONA:

Q      And to your knowledge, is Capitol Forum itself an investment fund or a money manager?

A      Again, it's hard for me to assess that, because I simply don't know much about Capitol Forum.

As far as I know, which is not extensive knowledge, they're not an investment manager.  It could be -- based on some of the emails that I saw, it could be that they have investment managers as clients.  Maybe they even try and sell investment advice.  But, you know, I don't know any of that for sure.  I don't exactly know what their business model is, as I said.

Q      Well, what did a subscription to The Capitol Forum cost in 2020?

A      I do not know.

Q      Is that relevant to an assessment of whether articles by The Capitol Forum were or were not publicly available?

A      I think it's one of the pieces of information that we would want to consider.  I think what I point out later in my report is that

we know that at least three entities received The Capitol Forum reports.  One of them received multiple of The Capitol Forum articles about Natera.

So there were certainly market participants who presumably were subscribing to Natera -- to Capitol Forum, sorry.  I guess it's getting close to lunchtime.

So we know there were market participants that had seen this.  We know that there are a couple analysts -- sell-side analysts who had seen these reports, and so I think all of that is relevant to assessing the extent to which these were publicly available.

Q     And to be clear, in that answer, when you're referencing market participants receiving Capitol Forum reports, are you referencing the discussion in your -- in your report -- which we will get to shortly.  I don't want to dive into this quite yet, but just -- are you referencing the discussion in your report at Paragraphs 43 and 44 in principle?

A     I am, yes.

Q     Okay.

MS. COSTLEY:  Josh, is this a good

time to break for lunch?

MR. D'ANCONA:  Let me just ask one or two wrap-up questions, and then it's a -- we can -- we can pause.  Okay?

MS. COSTLEY:  Okay.

MR. D'ANCONA:  Yup.  Thank you.

BY MR. D'ANCONA:

Q    So going back to that prior answer, where you said a few times that you have the understanding that certain market participants received reports, in that answer were you meaning that they received underlying Capitol Forum full reports, or that they received marketing emails regarding -- or promoting Capitol Forum reports?

A    Well, again, this goes to the section of -- the subsequent sections of my report, where I discuss -- to Paragraphs 43, 44, where I discuss these investment funds, essentially, that apparently had seen the reports.  My understanding, certainly, is that they had been forwarded copies of the reports.

Q    Okay.  So we'll get to that further shortly after lunch.  After lunch.

Do you know whether a subscription to The Capitol Forum is required to enable someone to

have access to all of their reports?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I don't know for sure.  I mean, if you're alluding to -- I mean, as I think you pointed out, right, Capitol Forum sits behind a paywall, and that was my understanding that their articles, their content, sits behind a paywall.  You need a subscription to access that paywall.  Whether or not there was some other way of accessing the content without paying the subscription, I simply don't know.

MR. D'ANCONA:  Okay.  Let's take a break for lunch.  We can go off the record.

THE VIDEOGRAPHER:  Off the record, 12:39 p.m.

(Recess from 12:39 p.m. to 1:27 p.m.)

THE VIDEOGRAPHER:  Back on the record, 1:27 p.m.

BY MR. D'ANCONA:

Q      Welcome back, Professor Skinner.

In Paragraph 42 of your report, you note certain information that you say the two

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

Capitol Forum articles from July 1, 2020, and December 14, 2020, stated, and that the Hindenburg report, which plaintiffs allege was corrective of the fraud, later repeated; correct?

A     Just to be clear, yes.  I state, Paragraph 42, the two Capitol Forum articles "make a number of claims that are repeated in the Hindenburg report," and then I give some examples in that paragraph.

Q     Now, you do not state in your opinion, Professor Skinner, that all of the allegedly corrective information that plaintiffs claim the Hindenburg report disclosed about MGML and Natera was previously disclosed by The Capitol Forum; correct?

A     I believe that is correct, and I would point us to -- Footnote 81, I think, contains an example.

Q     Right.  So in Footnote 81, you identify certain information about MGML and Natera that plaintiffs allege was corrective of the fraud, but which you do not assert The Capitol Forum reported in any of its articles during the class period; correct?

A     I'd qualify that a little bit just to

say -- I wouldn't say any of The Capitol Forum articles.  I say what Paragraph 42 is specifically referencing, and is the main focus of my report, the two Capitol Forum articles that I reference in Paragraph 41.  So the July 1 and December 14, 2020, articles.

Q      Right.  And just further to the point that you are not opining that all of the allegedly corrective information that plaintiffs point to in the Hindenburg report was previously disclosed by The Capitol Forum, you pointed me to Footnote 81; correct?

A      Correct.  I think this is an example of something that, as the footnote says, something plaintiffs allege is corrective claims named in Hindenburg that were not necessarily in The Capitol Forum articles.

So I would -- yeah.

Q      And back in Paragraph 25 of your report, you stated in language that you referenced a few times today that "What is necessary for an efficient market is that some market participants have access to the information and trade on it to the point where that information was incorporated into the stock price"; correct?

A        Specifically we're talking about Paragraph 25 in the last sentence, yes, where I say:  "What is necessary is that some market participants have access to the information and trade on it to the point where the information is incorporated into the stock price."

Q        So what evidence have you seen that sufficient numbers of market participants had access to the information in the July 1 and December 14, 2020, Capitol Forum reports and traded on it to the point where that information was incorporated into the Natera stock price?

A        Well, what I think I'm saying in the report, my opinion -- and this, again, goes back to my assignment, as stated in Paragraph 8, the question is whether, in an efficient market, publicly reported information about Natera, such as that in articles published by The Capitol Forum on July 1, 2020, and December 14, 2020, would be rapidly incorporated into the company's stock price.

And so this section goes through some arguments for why I believe the information in The Capitol Forum articles was in the public domain, and any implications would have been reflected in

the stock price.

Q       Have you seen -- strike that.

What evidence do you see or do you cite to in your report that market participants traded on the information in the July 1 and December 14 Capitol Forum reports from 2020 to the point where that information was incorporated into the stock price?

A       Well, I think, again, I've been asked to assume that the market was efficient, and I believe Mr. Coffman's opinion is that the market was efficient.

So if the market was efficient and the information is publicly available, then it would have been incorporated into the stock price.

Q       In Footnote 79, you state that you reviewed public press and analyst reports from around the dates of the two relevant Capitol Forum reports, July 1 and December 14, 2020; correct?

A       That is correct.

Q       And those would include the reports that are specifically listed in Appendix C to your report, and also other reports covering Natera published between February 2020 and April '22 that you received from counsel or obtained from Eikon,

or S&P Capital IQ; correct?

A    So when you say "this would include," let me make sure I'm looking at exactly the right language.

So are you -- you're asking about Footnote 79, and then you're referring to what I stated as:  "I also reviewed public press and analyst reports from market close on the previous trading day through market close on the subsequent trading day."

Is that the sentence you were asking about?

Q    Right.  And I'm thinking about the sources of the analyst reports -- you know, let me back this up.  I'll strike -- I'll strike that.  I'll strike what I just started to say.

So, Professor Skinner -- let's take a couple steps back.

In Footnote 79, as you just confirmed, you note that you reviewed public press and analyst reports from around July 1, 2020, and December 14.  In your report, you do not identify any public press or analyst report that referenced either one of those Capitol Forum reports; correct?

A        That's correct, yes.  I did not come across any public press or analyst reports that reference The Capitol Forum articles based on the search that I did.

Q        And in preparing your report, to be clear, you considered numerous analyst reports and press reports about Natera from during and after the alleged class period; correct?

A        That's correct.  I reviewed all of the analyst reports during the proposed class period that were provided to me for review.  In addition, and specifically here, I reviewed public press for the specific event periods, as defined in the footnote, for those two articles.

Q        And for sources of press or other types of reports, you also considered -- referring to Appendix C, you also considered information from Bloomberg Law, Factiva, all of the materials cited by Mr. Coffman in his report and his backup materials as well; correct?

A        That's broadly correct.  And I'd just say that whenever I talk about doing a research of the public press during a certain period, as mentioned here in Footnote 79, essentially what that involves is going through a source like Factiva or

Bloomberg Law that captures all of the available press articles about a particular company or topic during a period of time.

So that's what would have been done. That very extensive news search was not done for the entire class period.

Q    So in your report, based on the analyst reports that you had access to and reviewed, and the press and internet and other source review that you performed, you did not identify any analyst report or press or internet commentary about Natera from any time during the class period that referenced The Capitol Forum reports on July 1 of 20 -- from July 1 of 2020 or December 14 of 2020; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I believe that is correct with the exception of what I describe in subsequent paragraphs.

BY MR. D'ANCONA:

Q    And so those are the -- those are the confidential Natera emails, and let's turn to those now.

In Paragraph 43, you cite email correspondence with Natera related to several

Capitol Forum reports; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Just to be clear, I think what I convey in Paragraph 43 is that there was correspondence between market participants, including security analysts buy-side, what I call institutional investors and Natera executives, that shows that those market participants were aware of claims by Capitol Forum at the time the articles were published.

So, yes, that's what I convey there.

BY MR. D'ANCONA:

Q    And in that paragraph, you're referring to "correspondence."  That correspondence is emails which you cite to in Footnotes 87, 88, 89, and 90; correct?

A    I believe it may also be Footnote 87.  But otherwise, I believe that is correct.

Q    Yes.

And the email communications that you cite in those footnotes, those enclose promotional emails sent by Capitol Forum about its reports on

Natera to various entities or individuals; is that correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Let me be very precise here.

So if we wanted the full set of relevant documents and emails, I would refer to the "Documents Considered List," and there's a set of produced documents which I believe are the full set of emails, which would include one, by the way, from an entity called CTS Solutions.

I think the other thing to be precise about here, you characterized the emails as "promotional emails."  It's not entirely clear to me what those emails were.  It looked to me like the emails were sent to, what I call, buy-side investors, so the institutional investors such as Bridger Capital, by Capitol Forum.

It's not clear to me whether those are the emails that they used to disseminate the reports to subscribers or whether they were otherwise disseminating these reports to large buy-side investors

in Natera, including to the three that we know about specifically here.

So I'm not sure how to characterize those emails.  I do know in some of the emails sent to the buy-side investors that The Capitol Forum representative is seeking a call with them.  But otherwise, the email -- I didn't -- I'm not sure I saw the entirety of those emails.  Maybe there was an attachment.

So I think that's what I know about those emails.

BY MR. D'ANCONA:

Q     Do you know if any of the recipients of these marketing emails that you cite in Footnotes 87, 88, 89, and 90 actually accessed the underlying Capitol Forum report that related to the email?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I do not know for sure whether they actually accessed those.  I will say that the emails themselves contained extracts of the reports.  They certainly contained the title of the reports.

And I will further say that the recipients of those emails -- meaning people like Mr. Goodner, who I reference in Footnote 87, who saw a number of these communications from Capitol Forum, was sufficiently familiar with the reports that he was able to capture and convey their essence to Mr. Brophy at Natera.

So these buy-side investors, as well as the sell-side securities analysts that I reference, certainly were very well aware of the main items of content from those Capitol Forum reports.

BY MR. D'ANCONA:

Q    So you're offering an opinion that Mr. Goodner -- about Mr. Goodner's awareness level about the underlying Capitol Forum reports based on what he said in emails to Natera?  I just want to make sure I understand what you just said in that answer.

MS. COSTLEY:  Objection; form.

BY MR. D'ANCONA:

Q    You can answer.

A    I don't think that's what I said.  I think I was quite specific about what I said.

What I know from reading the emails that Mr. Goodner sent to Mr. Brophy and similar emails that he sent later on, is that he was able -- he, in those emails, provided some information about the content of the Capitol Forum articles.

Q     And in your understanding, was that based on his review of the excerpted snippets from the articles in the email themselves, or are you -- are you saying that based on what you see in the emails from Mr. Goodner, you are of the opinion that he actually accessed the underlying report?

MS. COSTLEY:  Objection; asked and answered.

THE WITNESS:  It's hard for me to know for sure whether he --

BY MR. D'ANCONA:

Q     Right.

A     -- accessed the underlying report.  I do know, and I cite in the report here -- and it's evident in the emails -- that it wasn't only Mr. Goodner at Bridger Capital.  One of the earlier Capitol Forum articles -- the March 2nd article, I believe -- had gone to a person whose first name was Ian -- maybe Ian Flemming -- also

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

worked for Bridger Capital, and he had passed

along or forwarded the communication from Capitol

Forum to Mr. Brophy asking for some kind of

response to the article.

                    And so it seems like Bridger Capital

had some level of access to The Capitol Forum

content.  Whether or not they had a subscription,

they had read the entire articles, I don't think

is something I can ascertain from those emails.

Q       What we can ascertain is that they

received those emails about the Natera articles by

The Capitol Forum; correct?

A       We certainly have --

                    MS. COSTLEY:  Objection; form.

                    THE WITNESS:  We certainly have the

        emails that I have cited here and that

        have been produced.

                    I think I'll also make the

        observation that the Capitol Forum

        articles or reports had long titles which

        were reasonably descriptive of their

        content.

BY MR. D'ANCONA:

Q       You'll agree that the -- the marketing

emails from Capitol Forum to these various

recipients included the title of the underlying report and certain excerpts or snippeted language from the underlying report; correct?

A    So, again, I'm not sure I would characterize these as "marketing emails."  I don't really know the purpose of the emails or what was the genesis of the email communications from Capitol Forum to these buy-side investors.

What I do know is that those articles or the emails certainly made the recipients aware of the Capitol Forum article that was typically published the same day.  They had the title.  They had excerpts of the articles.  And in the body of the email the representative of Capitol Forum essentially summarized some of the most salient features of the article.

Q    Have you done a comparison of the underlying articles and the marketing emails about those articles to compare the contents of one, point by point, to the contents of the emails?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I have not done any type of detailed content analysis or comparison.  As I have indicated elsewhere in my report, I think, if I just step

back, the articles in question here, the two Capitol Forum articles on July 1 and December 14 of 2020, convey a number of allegations about MGML, its status as a nonprofit, the fact that Natera was extensively using MGML to obtain prior authorizations, as well as the purported relationship between the MGML official and the former Natera executive, as well as the purported connection between MGML and Natera.

So those points were, I believe, conveyed by these articles, but I didn't do a detailed content analysis.

BY MR. D'ANCONA:

Q      Do you know if any of the recipients who you identified in Paragraph 43 and the related footnotes, 87 through 90, had subscriptions to Capitol Forum?

A      I do not know that for sure.

MS. COSTLEY:  Objection; asked and answered.

BY MR. D'ANCONA:

Q      Have you seen evidence in this case of market participants stating that they did not have

access to the TCF reports because they did not have a subscription or because of their cost?

A     I have not seen that referenced.  I think the other observation I make is, you know, essentially the observation you made before, which is The Capitol Forum articles were restricted in various ways and sat behind a paywall.

And so it's unclear to me, from a business model side, why Capitol Forum would be sending these articles around to people who weren't subscribers.  But, again, I don't know for sure.

Q     Do you have any evidence that Capitol Forum did send the actual underlying articles to anybody in Footnote 87, Footnote 88, Footnote 89, or Footnote 90?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I don't believe I have direct evidence of that.  I will simply note that Bridger Capital received multiple emails and had been made aware of multiple of The Capitol Forum reports.

BY MR. D'ANCONA:

Q     Have been made aware through those emails?

A     Well, as those footnotes document, I

believe, that Bridger received emails with respect to more than one of The Capitol Forum reports.

Q    Okay.  So only one of the -- of the marketing emails that you cite in Paragraph 43 and all of the related footnotes, 87 through 90, only one of those emails relates to the MGML and Natera articles concerning -- published by The Capitol Forum; correct?

MS. COSTLEY:  Objection as to form. And I'd like to make a standing objection as to characterization of the emails as "marketing emails."

Are you okay with that standing objection?

MR. D'ANCONA:  Of course.  Noted.

MS. COSTLEY:  Okay.

THE WITNESS:  I'm sorry.  Can you repeat the question?

BY MR. D'ANCONA:

Q    Yes.

A    I've lost it now.

Q    Only one of the marketing emails that you cite in Paragraph 43 or any of the related footnotes relates to an article by The Capitol Forum regarding MGML or Natera; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  So, again, I would also, as I mentioned before, not be characterizing these necessarily as "marketing emails," but I believe the only email related to -- there's only -- I want to be careful here to make sure I get this right.  But I do know, as indicated in Paragraph 43, that the December 14, 2020, email, at least, went to the Bridger Capital people.

BY MR. D'ANCONA:

Q    Yes.

None of the emails that you note in Paragraph -- in Footnote 88 relate to a Capitol Forum -- relate to one of the Capitol Forum articles from either July 1, 2020, or December 14, 2020; correct?

A    I believe that's correct, yes.

Q    Similarly, none of the emails that you cite in Footnote 89 relate to a Capitol Forum article from July 1, 2020, or December 14, 2020; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  That is correct in

the sense that they don't specifically refer to the July 1 or December 14, 2020, Capitol Forum articles.

BY MR. D'ANCONA:

Q    And the Capitol Forum articles related -- strike that.

And in Footnote 90, the Capitol Forum article dates that are referenced in emails there are October 8, 2020?

A    Is that the end of your question, or are you --

Q    Well, it's simply October 8, 2020.

All of the emails related to a Capitol Forum article in Footnote 90 relate to the Capitol Forum article that was published on October 8, 2020; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I believe it's fair to say that Footnote 90 refers only to the -- that single Capitol Forum article, which I believe is October 8, 2020.

BY MR. D'ANCONA:

Q    Okay.

A    Just like you, it took me a while to read through the footnote and be sure.

Q    Fair enough.

So, again, the one Capitol Forum article that is -- one of the two relevant articles that you noted, the July 1, 2020, or December 14, 2020, that we see an email about is that which is referenced in Paragraph 43 from -- between Bridger Capital and Natera, and that regards the December 14, 2020, article; is that fair?

A    I believe that's fair.  And as I go on to point out there, "The email correspondence indicates that Bridger Capital received notification of at least some of the other Capitol Forum articles."

Q    Do you know -- with respect to that report, do you know if Bridger Health accessed the underlying December 14, 2020, Capitol Forum report that relates to that email?

MS. COSTLEY:  Objection.  This has been asked and answered.

THE WITNESS:  I think it's a similar response that I gave to the question before.

I do not know for sure that they received the full Capitol Forum

publication.  They received the email that included certainly a summary and the title of the article.  But whether the entire publication was included as an attachment to the email, I'm not sure.

It may also, of course, have been a hyperlink in the email that allowed the recipient to click on and obtain the entire article.

BY MR. D'ANCONA:

Q        But you're speculating about that.  You don't know that; correct?

A        I used the word "may" to indicate that there may well have been a hyperlink in there if there wasn't an attachment.

Q        Which is speculation on your part; correct?

MS. COSTLEY:  Objection; form; argumentative.

THE WITNESS:  Yes, it is speculation.

BY MR. D'ANCONA:

Q        And, sir, did you compare the contents of the Capitol Forum email regarding the December 14, 2020, report to the contents of the underlying

December 14 actual report from Capitol Forum?

A    It's a similar answer to what I conveyed previously when you asked me about comparing the content.  I did not formally compare the content. It's, in fact, not obvious what type of methodology you would use to do that.

I will say, as I said before, that there are certain salient pieces of information that seem -- based on the Capitol Forum articles and based on Hindenburg, that seem to be important about the Capitol Forum articles and that were highlighted, for example, in the title of the Capitol Forum articles, which I have put forth in Paragraph 42.

And so those salient features seem to have been captured in the title, and certainly the person who was forwarding -- or sending the email from Capitol Forum included some of that highlight information, if you like, in the email.

Q    Would you agree that there was information and -- well, strike that.

You reviewed -- according to your materials considered, you reviewed the December 14, 2020, Capitol Forum report; correct?

A    I did, yes.

Deposition of Douglas J. Skinner                                John Harvey Schneider v. Natera, Inc., et al

Q        And you would agree that that report is 11 pages long, whereas the email from The Capitol Forum to Mr. Goodner is roughly one page long; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think that's roughly correct.  My recollection of the second Capitol Forum article was it was about ten pages long.  And the email is a little hard to describe the length because it included the specific language, the message to Mr. Goodner, and then what I think is more like a summary of the Capitol Forum article.  Then some extracts of the content of Capitol Forum, the title of the Capitol Forum article, but then it included a list of other entities for which Capitol Forum had produced reports.

So, I mean, roughly a page is probably about right.

BY MR. D'ANCONA:

Q        So is it -- so you would agree that there was information and detail in the roughly ten-page Capitol Forum report that was -- that was not referenced in the roughly one-page marketing email

about that report; correct?

MS. COSTLEY:  Objection as to form; asked and answered.

THE WITNESS:  I think I'd say the following, which is:  There were certain, I would say, highlights or headlines that were common to both the types of things that I mentioned before, which was that MGML was a charity for IRS purposes, and Capitol Forum raised questions about the validity of its charitable status; that they further conveyed that MGML was used by Natera fairly extensively to process the prior authorizations; and they further conveyed this purported relationship between the two individuals, as well as the connection to Natera.

So, yes, there was a lot of detail in the Capitol Forum article.  But, for example, there were several pages, including pictures and Facebook extracts and so on, that were used to try and support the notion that there was a relationship between Mr. Kamath and the person known as Deepti Gupta or Vickie

Seth.

BY MR. D'ANCONA:

Q       Do you know, sir, if Bridger Health traded on the information in the December 14, 2020, email?

MS. COSTLEY:  Objection; form; calls for speculation.

THE WITNESS:  I do not know whether they traded on that information.  As my report conveys, I have provided some information on Bridger Capitol's holdings of Natera at two points in time during the class period.

BY MR. D'ANCONA:

Q       Now, in your report, you don't cite any document in which any market participant receives an email or anything from The Capitol Forum about the July 1, 2020, Capitol Forum report about Natera and MGML; correct?

A       That's correct, yes.

Q       And you don't cite any document from during the class period regarding any investor accessing the actual July 1, 2020, Capitol Forum report; correct?

A       I do not have any specific document or

other evidence that I cite on that, no.

Q    And in case I did not ask this before, you don't cite any evidence of any press or internet or -- or analyst report from prior to March 9, 2022, that mentions the Capitol Forum reports from July 1 or December 14, 2020; correct?

A    I believe that's correct, yes.

Q    And just to be clear, in Footnote 88 where you state that "Bridger Capital received reports from" -- strike that.  Strike that.

A    Okay.

Q    In Footnote 88, where you say "Bridger Capital received reports on Natera from The Capitol Forum throughout the proposed class period," is your support for that statement the fact that they received the emails regarding Capitol Forum reports that you note in that footnote?

A    It is, yes.  It's the emails that are cited under -- after each of the specific reports.

So just for example, when I mention in Footnote 88, March 2, 2020, there's a reference to NTRA 0247246 to 247, which I believe is the email.

Q    And so we're clear on Bridger Capital, do you -- beyond those emails, do you have any other

support for the proposition that Bridger Capital received the actual underlying Capitol Forum reports from The Capitol Forum regarding Natera during the proposed class period?

A     Again, I don't know that for sure.  The fact that they received Capitol Forum articles on a number of occasions could indicate they were a subscriber, in which case they would have presumably received all the" Capitol Forum" reports on Natera and more generally.

But what we do know for sure is they received the December 14, 2020, report, as well as the other ones listed in that footnote.

Q     In your last answer, you just said you "know for sure that they received the December 14, 2020, report" --

A     Oh.

Q     -- "as well as those noted in the footnote."  Do you want to correct that answer to say that they received the December 14, 2020, email, as well as the emails noted in that footnote?

A     I do, yes.

Q     Okay.  So if, hypothetically, no investor accessed the Capitol Forum reports from July 1,

2020, and December 14, 2020, would the information in those reports be reflected in Natera's stock price?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So my assignment was really to ascertain whether these reports -- and specifically the July 1, 2020, and December 14, 2020, reports -- were publicly available, which my opinion is that they were.

If that's the case, and if that information was value relevant to investors, and under the assumption which I was asked to assume, that the market was efficient, then that information would have been impounded into Natera's stock price at the time those articles became available to the market participants, so at the time they were published.

BY MR. D'ANCONA:

Q      And is -- does that hold even if no investor in Natera accessed the underlying July 1 and December 14, 2020, articles?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I think you're

now presenting a situation where you're saying that no one had access to those articles at all.  We -- what we know is that The Capitol Forum published these articles, sent the articles to its subscribers, and --

BY MR. D'ANCONA:

Q       What is your basis for that?

A       Excuse me?

Q       What's your basis for the fact that they sent the article to the subscriber?

A       Well, I think that the whole point of Capitol Forum was to write these reports, and then sell them to subscribers.  So once you subscribe, you would automatically receive the report.

So if they were -- if they had subscribers, they would have been sending these reports to those subscribers.  And so what I have been able to document is that at least emails with salient information about these reports were sent to three buy-side investors.

What I also document is that we have two sell-side security analysts who also had had access to Capitol Forum articles to Natera during the proposed class period.  In both of those

cases, my understanding is that those sell-side analysts became aware of the articles because they were being forwarded from their clients, so buy-side investors.  So potentially more than the three that we're looking at on the screen here, that I explicitly documented, more buy-side investors than these received those.

Although, of course, as you'll point out, potentially those could have been sent by the three buy-side investors that we have here.

I'll also observe that I think the Craig-Hallum analyst made a comment in forwarding the article or the Capitol Forum email to Mr. Brophy at Natera something along the lines of, "This is being sent around."

So the fact that Capitol Forum was a subscription service -- that is how they made their money -- reasonable inference is that they had subscribers and they were sending the emails and the reports to their various subscribers.

Q     And to be clear, in that last answer where you were describing the buy-side analysts commenting on articles --

A     I said sell-side analysts.

Q     I thought you said buy-side and sell-side.

Did I mishear you?  I thought you commented on --

A     No, I said both.  I did say both.  I thought you were just focused on the buy-side.

Q     Okay.  So when you see the sell-side analyst and the buy-side analysts commenting on Capitol Forum articles, aside from the one instance with Bridger Capital, none of those articles are the July 1, 2020, or December 14, 2020, article; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Correct.  And I think I was just observing that any entity that had been a subscriber to these articles -- to Capitol Forum -- would presumably have received the full set of articles, including the July 1, 2020, article.

BY MR. D'ANCONA:

Q     But as you said previously, you don't really know how The Capitol Forum works or distributes its articles to paying customers or on what basis or on what terms; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think what I said previously was I didn't know exactly what their business model was.  What I do know

is that they produced articles that they had subscribers who would pay a subscription, and presumably once you had a subscription to Capitol Forum, you would have been receiving the full set of articles.

BY MR. D'ANCONA:

Q     But you don't know that to be the case. You are making a presumption, which is why you said "presumably"; correct?

                MS. COSTLEY:  Objection; form.

                THE WITNESS:  That is correct.  I am presuming that if you're a subscriber service, you have subscribers.  And once people subscribe, they would receive the full set of reports that you issue.

BY MR. D'ANCONA:

Q     In Paragraphs 45 through 52 of your report, you discuss certain facts and opinions regarding Natera's microdeletion ordering and billing practices; correct?

A     I do.  I do.  Those paragraphs I would just characterize as talking about the company's microdeletion ordering and billing practices, yes.

Q     So is it your opinion, sir, that every

claim and fact that Hindenburg published, regarding Natera's microdeletions in its March 9, 2022, report, had been previously disclosed and was publicly available before March 9, 2022?

MS. COSTLEY:  Objection; form.

THE WITNESS:  What I am conveying in this section of the report is that, as the title of the section indicates, that certain information that I understand plaintiffs see as being corrective regarding Natera's microdeletion ordering and billing practices, and that was included in the Hindenburg report, had been published previously.  It could be some information about microdeletions included in the Hindenburg report that wasn't previously publicly available.

But the point is that the allegedly corrective information was publicly available well before the Hindenburg report was published.

BY MR. D'ANCONA:

Q      Is it your opinion that all of the allegedly corrective information was previously

publicly available before it was published in the Hindenburg, or just that some of it was?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, I think, if I understand and I've characterized, in various parts of my report, plaintiffs' allegations, including what plaintiffs allege to be corrective information regarding the microdeletions ordering and billing practices, I believe that much of that information had been in the public domain well before the Hindenburg report was published.

BY MR. D'ANCONA:

Q       But is it your opinion that all of the allegedly corrective information in Hindenburg about microdeletions that plaintiffs refer to in their claims, that 100 percent of that was previously publicly available and disclosed before the Hindenburg report?

MS. COSTLEY:  Objection --
objection; form.

THE WITNESS:  I would think I'd put it this way, which is:  The Hindenburg report contains a lot of different claims,

including about Natera's billing practices, including with respect to microdeletions.

My opinion is not that absolutely all of that information was necessarily in the public domain prior to that time.  But as I convey in this section, it seems like a lot of that information was in the public domain.

I think the other thing that I would point out is that if we look at the analyst reports on March 9 -- this is Paragraph 51 of my report -- many of the analysts essentially say -- well, "analyst commentary" -- this is reading from my report:  "Analyst commentary following the Hindenburg report indicated that the report's claims about Natera's microdeletion billing practices were previously known to the market."

So seems like the analysts saw this information as, as I just said, information that was previously known to the market.

One of the analysts said "not

necessarily a new debate," "generally 'old news.'"  "We view the report as highlighting multiple previously reported issues that the company has dealt with." "We believe the majority of the points made in the report are known to investors and have been transparently communicated by management," et cetera.

So there is evidence that I cite from analyst reports that what they see as coming out in the Hindenburg report regarding microdeletions was not new information.

BY MR. D'ANCONA:

Q     So do economists look to commentary by investment analysts in reports to evaluate whether information that comes out about a company was previously known?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Well, I think certainly, as I mentioned before, the financial economics and accounting literature spends a lot of time looking at sell-side analyst reports such as these. And certainly those are informative about

issues related to the value relevance of information.

BY MR. D'ANCONA:

Q      And in connection with Paragraph 51, in your view, if -- well, strike that.

So if an analyst responds to an information disclosure about a company by calling it "old news" or "novel news," that is meaningful economic evidence, in your view, about whether the information was, in fact, new to the market?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think it's hard to be very general about this.  But certainly analyst commentary is one of the pieces of information that we would look at to assess the value relevance of a piece of information.  If it's just one analyst saying something, then obviously that's not as persuasive as if we see multiple analysts saying this.  Right?

And I quoted some of the quotes, but in that paragraph we have, I think, quotes from three different analysts: Canaccord Genuity, Piper Sandler, Morgan Stanley.

And then in the Footnote 110, we have another analyst, Baird, saying similar things, and yet another analyst, Cowen, saying similar things and pointing out that some of this information had come out in The New York Times article at the beginning of 2022.

So I do think if you see multiple analysts, especially credible analysts -- and I think Mr. Coffman, in his deposition, pointed out these are well-known, credible analysts -- I think you give weight to that, yes.

BY MR. D'ANCONA:

Q    You did not cite any evidence in your report about whether analysts covering Natera considered the disclosures in the Hindenburg report about MGML to be new, do you?

A    So I think the analysts had a variety of comments on the Hindenburg report overall, and I think my report characterizes a lot of that commentary at different points.

Q    But to be clear, you cite no evidence that any analyst covering Natera said that the MGML disclosures in the Hindenburg report were old news

or were previously known by investors; correct?

A        So I don't think that the analysts were as familiar with the MGML issues and the allegations made by Hindenburg about those issues as they were about the microdeletions issues.  So I think the analysts were looking for more information, and then, of course, the next day the company came out and had its call.  Later in that day, the company issued a press release.  And then we do see some commentary from the analysts, which takes some comfort from the management response to the claims in the Hindenburg report with regard to MGML.

MS. COSTLEY:  We've been going on for about an hour since we broke for lunch -- actually a bit over.  Are we at a good breaking point?

MR. D'ANCONA:  I've got, like, two or three more questions here, Christina, but then absolutely.  So let me just -- let me just move through this and get through this little line of questioning and then we'll stop for a break.

MS. COSTLEY:  Okay.  Sounds good. Thank you.

MR. D'ANCONA:  Thank you.

BY MR. D'ANCONA:

Q      Professor Skinner, you are aware that some of the same analysts who you cite in Paragraph 51 actually commented that the MGML information that was disclosed in the Hindenburg report was novel, and that it raised questions and concerns for investors, and that it caused a major decline in Natera stock price; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Are you quoting there from some document?

BY MR. D'ANCONA:

Q      I'm asking you if you're aware of that response from some of the same analysts who you cite in Paragraph 51 to the MGML information disclosed in the Hindenburg report.

A      So my question, really, or clarification on your question was it sounds like you are quoting from analyst reports, and it would be useful for me to see those.

As I mentioned before, I think the analysts had various comments about the MGML claims, both immediately after the Hindenburg report, and then additional commentary, in some cases, after the management response.

Q       And my question for you, just right at this moment, is:  Are you aware of analysts who commented that the MGML information in the Hindenburg report was new or novel, and that it raised concerns for investors, and then it caused a major decline in Natera stock price?

MS. COSTLEY:  Objection as to form.

If you're reading from something, he's asked to be given it.

BY MR. D'ANCONA:

Q       I'm just asking if you're aware of any analyst report like that.

A       So there are --

MS. COSTLEY:  Objection as to form.

THE WITNESS:  -- a couple of pieces.

So I will say that I'm aware that some analysts had some questions about MGML and the allegations after the Hindenburg report was issued.  And as I mentioned before, some of them I know reacted favorably, as my report indicates, after the management response.

I do not recall seeing analyst reports that linked the MGML allegations

and claims in the Hindenburg report to a stock price decline.  In fact, what I remember and what I believe I quote elsewhere in my report is that a number of analysts saw the stock price response on March 9 to be an overreaction to the information or the claims made in the Hindenburg report.

BY MR. D'ANCONA:

Q       So in their view, it was an overreaction. An overreaction is a form of a reaction; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Well, let me be clear in case it's not clear as to what I believe the analysts were saying there. Again, maybe we should go to the relevant portion of my report.

But what we know is that a number of the analysts -- Piper Sandler being one, I believe -- saw the stock price response on March 9 to be too negative given the information that was conveyed in the Hindenburg report.  And a number of these analysts essentially wrote reports which said the stock price decline on

March 9 now presents a buying opportunity for investors.

BY MR. D'ANCONA:

Q    My question to you is simply:  Is an overreaction a form of reaction?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I don't know exactly what that means.  I think, as a financial economist, I can tell you about stock price movements and how they relate to information.

But the point I'm making here is I haven't analyzed the specific components or the magnitude of the stock price reaction.  I'm just conveying what evidence I was able to glean from analyst reports, and that certainly some of these analysts saw that stock price response as being more negative than justified by the fundamental information that they interpreted as being conveyed by the Hindenburg report.

MR. D'ANCONA:  So let's put before the witness what's at Tab 13.

This will be Skinner Exhibit

Number 2.

(Skinner Exhibit 2 marked.)

BY MR. D'ANCONA:

Q       Dr. Skinner, I know you prefer the hard copy.  Please let us know when you've got a Tab 13 envelope opened up, please.

A       You can't hear the scissors?

Q       No.

A       Go ahead.

Q       Skinner Exhibit Number 2 is a report from Piper Sandler dated March 9, 2022.

Professor Skinner, this is the report that you cite in Paragraph 51 and at Footnote 109 of your report; correct?

You see the Bates stamp at the bottom that shows us it was produced by you?

A       I'm just checking Footnote 51.

Q       No.  Paragraph 51 and Footnote 109. Paragraph 51.

A       I'm -- I'm there.  I'm just --

Q       Okay.

A       -- double-checking that we're talking about the same report.

Okay.

Q       To confirm, this is the report that you

reference in Paragraph 51 and Footnote 109 of your report; correct?

A        It is, I believe, yes.

Q        And you see the language there about microdeletions that you quote in Paragraph 51?

A        I do.

Q        Then in the next sentence, the Piper Sandler report goes on to say:  "Other issues brought up, such as the company's relationship with MGML, are more novel, but with an unknown degree of seriousness."

Do you see that?

A        I do, yes.

Q        So you clearly believe that this report is legitimate economic evidence about what was new or old news in the Hindenburg report; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  As I mentioned before, I think you like to see the more convincing evidence is when multiple analysts are saying essentially the same thing.  So I'd hesitate to take one sentence out of one analyst's report and rely on that too heavily.

BY MR. D'ANCONA:

Q     But my question is whether you -- is just asking you to confirm that you believe this report is legitimate economic evidence, given that you cited it in Paragraph 51 -- quoted it in Paragraph 51 of your report.

A     It's certainly one piece of information that I took into account.  I read this analyst report, among many other analyst reports.

Q     Yet you omit from your report and your opinion this analyst's statement that the MGML disclosures in the Hindenburg report were more novel; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I don't think it's for me to summarize all of what's in every analyst report.  I do think that, as this analyst has conveyed, analysts had questions about the MGML issue.  And as this analyst says, this was "more novel" -- not necessarily "novel," but "more novel" -- "but with an unknown degree of seriousness."

I think, though, the main point of this -- or one of the main points of this

analyst report is it goes on to say is:

"Overall, we view the decline" -- meaning

the decline in the stock price on

March 9 -- "as bringing the stock's value

below our view of what we think the

company's MRD offering is worth.  We

reiterate overweight."

So in other words, the company

thought the stock price had declined too

much relative to the fundamental value of

the company.

MR. D'ANCONA:  Let's put Tab 14

before the witness and mark that as

Skinner Exhibit Number 3.

(Skinner Exhibit 3 marked.)

BY MR. D'ANCONA:

Q     Skinner Exhibit Number 3 is a document

Bates-stamped SKINNER_0000408.  It's a copy of a

Piper Sandler report dated March 10th, 2022.

Dr. Skinner, have you got this

document, Skinner Number -- Exhibit Number 3,

before you?

A     I have.

Q     You would agree this is a report by the

same Piper Sandler analysts issued on March 10th,

the next day, from the report we were just looking at a moment ago; correct?

A       That is correct, yes.

Q       The first sentence under the headline -- the "Conclusion" reads:  "Yesterday we spoke to many investors who had concerns about Natera's relationship with a prior authorization company called My Genome My Life (MGML).  The concern sent the stock down 33 percent (and 50 percent intraday)."

I lied.  That was two sentences.  But that's what they said; right?

A       That's what they said.

MS. COSTLEY:  And if I may just interject, again, I wanted to raise the possibility of a break.  I think you said you had a few more questions and that was maybe 20 questions ago.

MR. D'ANCONA:  I'm sorry, Christina.  This did take a little longer than I expected.  I didn't mean to -- I was not trying to mislead at all.  I did not think it was going to take this long, but we're just -- we're just getting through it now.  But I appreciate --

MS. COSTLEY:  Okay.

MR. D'ANCONA:  I actually want to take a break, too, but I just don't want to stop right in the middle here.

MS. COSTLEY:  Okay.  I didn't mean to suggest you were misleading.

Do you have a sense of when we can break?

MR. D'ANCONA:  I would say within three minutes, although I'm one-half of the equation.

MS. COSTLEY:  Okay.

MR. D'ANCONA:  Yup.

BY MR. D'ANCONA:

Q     So, Dr. Skinner, looking at this report and that language at the -- at the top line of this report, this is the same Piper Sandler analyst stating that they'd spoken to many investors who had concerns about the MGML-Natera relationship, and that that concern sent the stock price down 33 percent the prior day.

Do you -- do you agree that that's what that says?

A     That's what that says, yes.

Q     So you don't cite this analyst report in

your -- in the body of your opinion, do you?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Not that I'm aware of.

I will go on to say that overall, it's a positive report.  They go on to say -- I've read this report, certainly, and it's similar to the previous Piper Sandler report in the sense they say "Revenue and growth of the company not expected to be impacted."

And so --

BY MR. D'ANCONA:

Q    Well --

A    -- it goes on to convey its interpretation based on the management response regarding MGML.

Q    Well, a primary part of your opinion is that the MGML information disclosed in the Hindenburg report was previously publicly available and could not have caused the Natera stock drop on March 9, 2022.

But your opinion didn't engage with this economic evidence from this analyst report that the MGML disclosures in Hindenburg were deemed by analysts to be novel information that

drove a large stock drop based on investor concerns about the MGML and Natera disclosure, did you?

MS. COSTLEY: Objection; form; argumentative; misstates the document.

THE WITNESS: So I would say the following, which is: As I've previously conveyed, my assignment was to assess whether, in an efficient market, the two Capitol Forum articles about MGML would have been impounded -- or the content of those articles, including the claims regarding MGML, would have been impounded in the stock price at the time those articles were published, so July and December of 2020.

And my opinion is that if the market was efficient, those articles were publicly available, and so their implications, including regarding MGML, would have been impounded in the stock price at that time.

That is one of the bases for my opinion that plaintiffs cannot point to the stock price decline on March 9 and use

that as evidence supporting their claims regarding the effect of the corrective disclosures.

This is one analyst report, and the analyst is making a single statement regarding talking to investors.  And then inferring from that, that's what affected the stock price.  But I'm not aware that there were many or other analysts who had that opinion.

I have -- again, I'd go back to all of the evidence that I point to in my report regarding the various economic factors that I considered as the basis for my conclusion.

BY MR. D'ANCONA:

Q     Well, I understand your recitation --

MS. COSTLEY:  Josh, it's been --

BY MR. D'ANCONA:

Q     -- of your --

MS. COSTLEY:  -- five minutes.  I'm going to let you get one more question in, and then we're going to insist on that break.

BY MR. D'ANCONA:

Q      Professor Skinner, I understand your recitation of your assignment and the assumptions that you were asked to take.

Do you agree that this Piper Sandler pair of articles, one of which you cite in your report and rely upon, is economic evidence that the disclosure of the MGML and Natera relationship in the Hindenburg report was novel, and that in the estimation of at least one analyst following the company, that disclosure sparked investor concerns and drove the stock price reaction on March 9th?

Would you agree that these articles are evidence that would support those points?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Well, first of all, you're only pointing to one analyst article.  What I was trying to convey in my previous question -- in my previous response and answer is that what I've marshalled in my report are a number of pieces of evidence that are inconsistent with plaintiffs' views about the allegedly corrective information and its

effective -- effect on the company stock price on March 9, among others, that this information, in an efficient market, was publicly available well before the Hindenburg report.

The other thing that I'm sure we'll get to is that the analysts, including Piper Sandler, did not revise downward their estimates of revenue after the Hindenburg report, which is what would -- one would have expected, if, under plaintiffs' allegations, that was what drove the stock price decline on that day.

In addition, what I also point out is that there are a number of other explanations that are supported by a bunch of analyst reports about other plausible explanations for the stock price decline on that day.

BY MR. D'ANCONA:

Q    I need you to try to focus on my question and answer the question that I'm asking you.  I am aware of the other things that you point to for related purposes in your -- in your report.

My question is whether you would

agree -- notwithstanding the existence, in your

mind, of other countervailing evidence that might

go the other way, but do you agree that the Piper

Sandler report from March 9th and March 10th,

2022, which have been put before you, and one of

which you cited in your report, are competent

economic evidence that would support the

proposition that the Hindenburg disclosures

regarding MGML and Natera's relationship were new

to the market, and that would support the

proposition that those disclosures sparked

investor concerns and contributed to the stock

price reaction seen on March 9th?

Would you agree that they are

competent evidence for that proposition?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I would, again, say

these are two reports by a single analyst,

and that as an economist, I want to gather

all of the available information,

including from all of the different

analyst reports, including from this same

analyst on March 21 of 2022.

So, yes, this is one piece of

evidence, but we have many other pieces of

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

evidence, including economic evidence of various kinds, that supports a different interpretation, as summarized in the opinions conveyed in my report.

MS. COSTLEY:  Okay.  We're going to take that break now.

MR. D'ANCONA:  Let's go off the record.

THE VIDEOGRAPHER:  Off the record, 2:51 p.m.

(Recess from 2:51 p.m. to 3:00 p.m.)

THE VIDEOGRAPHER:  Back on the record, 3:00 p.m.

BY MR. D'ANCONA:

Q      Welcome back, Professor Skinner.

You opine in Paragraph 55 of your report that the stock drop following the Hindenburg report cannot be used to reliably infer that the alleged misstatements impacted the stock price of Natera; correct?

A      Is that Paragraph 55?

Q      You know what?  So -- it's Paragraph 54.

Strike that.  Let me back up.  Thank you.

In Paragraphs 54 and 55, Professor,

Deposition of Douglas J. Skinner                     John Harvey Schneider v. Natera, Inc., et al

you offer an opinion that the stock drop following the Hindenburg report cannot be used to reliably infer that the alleged misstatements in plaintiffs' complaint impacted the stock price; is that fair?

A    I believe so, yes.

Q    Thank you.  And in support of that opinion, you cite several factors -- now I'm looking at Paragraph 62, for example.

You cite several factors, other than any alleged correction of the alleged misrepresentations, that likely affected Natera's stock price on March 9, 2022; correct?

A    Yeah.  Just to clarify, there are a number of subsections in this section, which is Section 8 of my report.  And then what you're asking about in Paragraph 62 is the opening paragraph for Subsection B, which contains one part of my argument for the conclusion you referenced before from Paragraph 54, just to put it in context.

Q    Thank you.

You identified various factors that you say likely affected Natera stock price on March 9, 2022, in Paragraph 62; right?

A    Yes.  Specifically what I say is:

"Several factors, other than the information plaintiffs allege to be corrective, likely affected Natera's stock price on March 9, 2022."

And then I go on to list the four romanettes, which each contain part of the arguments.

Q    I appreciate the use of the term "romanettes," Professor.

A    I hope you did.

Q    So, Professor, you do not state an affirmative opinion that any of the factors enumerated in Paragraph 62, in fact, did affect Natera stock price on March 9, 2022, did you?

A    I think the way I would say it is:  In my opinion, there is evidence to support all of these factors potentially, as I say there, likely affecting the stock price.

So I would say there's evidence to support each of those factors having an effect on the stock price on that day, as I say there, likely affecting the stock price on that day.

Q    And my question is:  While you assert that these factors likely affected the stock price, you do not assert or opine that any of them or all of them, in fact, did affect the stock price;

correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I mean, I would say it this way, right:  Is that no one can ever be 100 percent confident and sure that a certain factor affected a stock price in a certain period of time.  As economists, as scientists, you can never be 100 percent sure of what affects prices in the securities market.  So you can only offer evidence and reach probabilistic conclusions, as I have done here.

But in my opinion, each of these factors likely affected the stock price in a negative way on March 9 of 2022.

BY MR. D'ANCONA:

Q    So let's look at the few of the explanations and evidence that you say that you provided.

In Paragraph 64 -- 63 and 64, you discuss the first point, which is that Hindenburg Research's prominence and track record may explain some portion of the stock price decline; is that fair?

A    Let me say it to make sure that it

accurately captures what I'm trying to convey here, which is that whenever there is a short sale report issued about a company by a prominent short seller, such as Hindenburg, that the academic evidence says there is often a very significant negative stock price reaction upon issuance of the short seller report, regardless of its content.

Q       Does the academic literature support the proposition that if a short seller report contains concrete new information, there is a reaction, but that if it does not, there is not that sharp reaction that you just described?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  So I would say what the academic literature says, right, and there's a number of papers here that I cite, including the Lundquist paper.

And essentially what that literature says -- I think the Brendel paper is also making a similar claim -- is that for the short sale report to move the stock price significantly, it has to be seen, in some fashion, as being a credible report.

And so that's why, if you have a

report from an entity which is known as a prominent seller, such as Hindenburg, that has a track record of similar reports, that it's more likely to negatively affect the stock price.

BY MR. D'ANCONA:

Q      So you -- you assert, then, that Hindenburg's track record and reputation as a short seller may explain the negative and statistically significant abnormal return for Natera on March 9, 2022?

A      I think it's more than an assertion.  I think the academic literature --

Q      I wasn't done with my question.  I'm sorry.  It sounded, perhaps, like I was.

Is -- you do not assert an opinion in your report that Hindenburg's track record and reputation as a short seller affirmatively did explain the negative and statistically significant abnormal return for Natera or affirmatively explain even part of that return.  You don't assert that in your report; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I'm not sure that's correct.  I mean, what I conveyed in the

previous paragraph is that I think it's likely that when a short seller such as Hindenburg releases a short sale report about the company, regardless of whether the claims are founded or not, the stock price is going to decline, and it's going to decline significantly, as it did here. And I think there's the academic literature that I cite to support that.

BY MR. D'ANCONA:

Q    So in your opinion, how much of the stock price reaction would you assert is economically, empirically explained by Hindenburg's track record and reputation as a short seller?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I'm not sure how you could quantify exactly how much of a negative stock price reaction would be attributable to this factor, except for what I said in the previous answer, which is:  I think what you'd expect is a stock price decline that is significant both economically and statistically.

BY MR. D'ANCONA:

Q    So you did not put forth any economic

evidence demonstrating how much, if any, of the March 9th stock drop in Natera's stock price was caused by Hindenburg's track record and reputation; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I do not quantify the effect, no.

BY MR. D'ANCONA:

Q    And looking at Paragraphs 65 through 70, this is the second example or item that you enumerated that may have contributed to the stock price decline on March 9 for Natera.  And this factor is the risk of "heightened regulatory scrutiny or legal action, which are generally associated," you say, "with stock price declines"; is that fair?

A    I would add to that -- so I would say that what this second point is trying to convey is that when there is a short seller report -- and, again, especially from a recognized short seller with a track record such as Hindenburg, the short seller report itself, regardless of whether the claims are well-founded or not, is potentially going to expose the company to regulatory scrutiny or legal action.

So it's not just the stock price decline.  In fact, I think it's more the fact that there's this short seller report making all these claims that potentially exposes the company to various types of regulatory scrutiny, regulatory action, legal action, and so on, and I provide some examples of this.  And certainly this is one of the things that the analysts picked up on, as I discuss in Paragraph 67.

Q      You do not state a definitive opinion that some concern over regulatory or legal risk for Natera did, in fact, affect Natera's stock price on March 9th, do you?

A      I think it's a similar answer to what I indicated before, which is:  One can never definitively opine or know what caused a stock price to move and certainly not by a specific magnitude.

But what we know here is that the claims made by Hindenburg were the types of claims that potentially would lead to regulatory scrutiny.  In other words, it seems plausible that if they're making claims about alleged violations of industry practice, OIG guidelines, and so on, that potentially opens the company up for those

regulators to come in and look at them.  You've got potential SEC coming in to look, and we know that the SEC did come in and take a look.

So there's academic literature to support that being a factor, as well as, as I mentioned before, there's the analysts -- the number of the analysts made comments along these lines, as I cite in Paragraph 67 and the footnotes that come off of that.

Q     And you do not put forth economic evidence demonstrating how much, if any, of the March 9th stock drop was caused by heightened regulatory scrutiny or legal action risk, do you?

A     I do not quantify that.  No, I do not.

Q     And similarly, sir, you -- in the next instances that you enumerate, you point to negative effects such as "reputational harm and management distraction" and other potential issues identified in the Hindenburg report that you say are distinct from what plaintiffs allege was corrective; is that fair?

A     Yes.  Again, we know from the analysts their view of what, at least in part, caused the stock price decline was market concerns about potential reputational harm to the company, to the

company's management, to the company's products, to what they call "management distraction," which means that because of the Hindenburg report and its claims, even if those claims are completely unfounded, management is going to have to spend time and be distracted dealing with the fallout of that, including investigations and so on.  And analysts, including our friends at Piper Sandler, talked about the cost of this potential reputational damage.

Q     You did not affirmatively assert that concerns about reputational harm or management distraction, in fact, did affect Natera's stock price on March 9th, 2022, did you?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Similar to the answers with respect to the other factors, my opinion was that these four factors -- this is Paragraph 62 -- likely affected the stock price.

I don't think, as an economist, you can ever know for sure what caused a stock price decline.  The best you can do is marshal the evidence that you have.

BY MR. D'ANCONA:

Q     And begging your pardon, similarly, the final point -- the other negative claims that you identify in Paragraph 69, you do not affirmatively assert that those additional factors, in fact, caused any part of the stock price decline for Natera on March 9th, 2022; correct?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Well, again, I -- it's hard to know that for sure.  But what we do know is that the Hindenburg report made a number of negative claims about the company and its business that, as I understand it, were not part of what plaintiffs are alleging as being competitive information.

As Paragraph 69 indicates, Hindenburg made claims, for example, that the company did not have a so-called "competitive moat" around its products. It also made claims about its reliance or purported reliance on Illumina's sequencing platform, about some of its other products, and so on.

So to the extent we believe that

Deposition of Douglas J. Skinner                                John Harvey Schneider v. Natera, Inc., et al

claims in the Hindenburg report adversely

affected the stock price, I think it's

likely that those claims had some role in

explaining the stock price on March 9th.

BY MR. D'ANCONA:

Q      Did you do any analysis to determine

whether the information about Natera's reliance or

Illumina or its product moat had been previously

in the product domain prior to Hindenburg?

A      I did not, no.

Q      Are you assuming, for purposes of

Paragraph 69, that those were new disclosures and

newly public reaching the market for the first

time in the Hindenburg report?

A      I think I would simply convey that the

Hindenburg report included a bunch of negative

claims.  It included, of course, Hindenburg's

opinions about those claims, and I think it's

likely that those factors contributed to the stock

price decline.

Q      Did you put forth any empirical evidence

demonstrating that either the concerns noted in

Paragraph 68 by you or in your Paragraph 69

actually did impact Natera's stock price, and if

so, by how much?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Again, I didn't quantify those things.  And just to follow up on the other point, I will also note that I don't recall, having read a lot of the analyst reports, them discussing, previously, concerns about the company's, for example, competitive moat being an issue.

So it is potentially the case that claims like that were new claims in the Hindenburg report.

BY MR. D'ANCONA:

Q     You say that's "potentially the case."  Do you recall analysts discussing the relationship in former litigation with Illumina?

A     Vaguely.

I would also say that --

Q     Oh, I'm sorry.  Please go ahead.

A     I would also say regarding Illumina that I believe the company had, at various points, disclosures with respect to its relationship with Illumina at various points earlier in the class period.

Q     You do not assert, sir, in summary, that

the factors that you identify in Paragraphs 62 through 69 of your report fully explained Natera's entire stock price decline on March 9th, 2022, do you?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I think the report -- and we went through the language on Paragraph 62.  What my opinion is, as stated in Paragraph 62, with respect to these factors as opposed to the entire Section 8 of the report.

But if we're just focusing on Subsection B of the report, my opinion with respect to these factors is, as I said before, is that these factors likely affected Natera's stock price on March 9. I didn't quantify that effect, nor do I necessarily claim it accounts for the full stock price decline.

BY MR. D'ANCONA:

Q     Earlier today, we spoke about Footnote 81 of your report where, as we discussed, you note that plaintiffs allege corrective claims made in the Hindenburg report that MGML sought prior authorizations after a Panorama test was run.

And we discussed, sir, your observation that that fact -- that allegation by plaintiffs, that was not covered by The Capitol Forum reports on the relationship between MGML and Natera; is that fair?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  So I think what I'm trying to convey there is that it's certainly possible that some of the information that was conveyed by the Hindenburg report was not necessarily preempted by the information in The Capitol Forum articles.

BY MR. D'ANCONA:

Q      And, sir, with that information that you were just speaking about, did you take any steps to value that information about MGML that you just referenced that plaintiffs allege came out as new and corrective news in the Hindenburg report?

A      Again, I'm not sure I would agree that this was necessarily new and corrective information for all of the reasons I indicated in my report, but I did not affect -- attempt to quantify the effect, if any, of that information.

But I would, again, refer us to the

Deposition of Douglas J. Skinner                                John Harvey Schneider v. Natera, Inc., et al

conclusions of my report overall, including all of

the evidence that I have put forth in Sections VII

and VIII of my report.  All of those factors

should be considered and were the basis for my

opinions, including my opinion -- my third opinion

that's summarized in Paragraph 15, which is that

even if we set "aside that allegedly omitted

information had been publicly available before the

Hindenburg report was released, Natera's abnormal

stock price decline following the Hindenburg

report cannot be used to reliably infer that the

alleged misrepresentations affected the price of

the stock," and I give all of the factors there.

I summarize all of the relevant evidence there.

Q       And just focusing on the information that

you note in Footnote 81 of your report where you

identify that "Plaintiffs allege, as corrective

claims made in the Hindenburg report, that MGML

sought prior authorizations after a Panorama test

was run."  Nowhere in your report do you assert or

opine that information regarding that claim was

previously in the public domain before the

Hindenburg report.

And so my question to you is:  Did you

take any steps to value this allegedly new

information about MGML that plaintiffs alleged was corrective that you identified in Footnote 81?

A       I think I'd have --

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I think I'd have two responses to that.

One is I haven't done a full analysis of whether that particular claim, which is that MGML sought prior authorizations after a Panorama test was run, that may have been in the public domain somewhere.  There may have been a company disclosure that alerted investors to that possibility.

The second thing I'd note is what I also include in that same Footnote 81, where I say:  "However, the Hindenburg report itself noted that 'some payers permit a grace period after a procedure' and stated that Natera had previously disclosed risk to reimbursement associated with when prior authorization is completed."

BY MR. D'ANCONA:

Q       My question to you is:  Did you take any

steps to -- well, strike that.

So are you now attempting to offer an opinion that the information you identified in Footnote 81 was, in fact, previously on the market?  And if so, what is your evidentiary basis for offering that opinion?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  I think what I said, or tried to say, is that I haven't done the work to investigate that.

BY MR. D'ANCONA:

Q      Okay.  And you certainly do not state an opinion in your report that that allegedly corrective information was not new or had no measurable value, do you?

A      I think the opinions in the report are what they are.  But, yes, I have not assessed that specifically.

Q      So, Professor, in assessing whether these factors -- well, strike that.

You posit, sir, that the factors that you say possibly affected Natera stock price, such as the regulatory risk, were unrelated to the alleged correction of the misrepresentations that plaintiffs claim; correct?

A       I think that's part of my argument, yes.

Q       In assessing whether these factors were unrelated to the correction of the alleged misrepresentations, did you assume the truth of plaintiffs' allegations?

MS. COSTLEY:   Objection as to form.

THE WITNESS:   So as I understand plaintiffs' allegations, as we discussed before, the allegations are, in essence, that various of the company's statements regarding its revenues were misrepresentations, because the company omitted information regarding its allegedly deceptive billing practices, including with respect to MGML and the microdeletions.

And so under those allegations, plaintiffs argue that the related claims in Hindenburg, again, related to MGML and microdeletions, were then corrective.  My understanding is the plaintiffs are not making allegations about foreseeable undisclosed risk of regulatory investigations, for example.

BY MR. D'ANCONA:

Q    So if plaintiffs' allegations are taken as true, taken at face value, that would mean, then, that defendants did conceal that the revenues were inflated by undisclosed deceptive practices; is that fair?

MS. COSTLEY:  Objection; form; calls for a legal conclusion.

THE WITNESS:  As a nonlegal person, that sounds like a summary of -- similar to the summary I just gave about plaintiffs' allegations.  So plaintiffs are alleging that there was misrepresentations based on company's disclosures about its revenues largely because of omissions with respect to the allegedly deceptive billing practices.

BY MR. D'ANCONA:

Q    Right.  And if plaintiffs' allegations, again, are taken at face value, that would mean -- and accepted as true, that would mean defendants publicly misrepresented deceptive business practices in their public statements to the market; right?

MS. COSTLEY:  Objection as to form;

calls for a legal conclusion.

THE WITNESS:  Again, as a nonlawyer, that sounds like what you're alleging.

BY MR. D'ANCONA:

Q     So if that's the case, then Natera's being targeted by a short seller is a foreseeable consequence of their alleged misconduct; correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So I do not think I can agree with that.  There is an academic literature, including papers I've cited in my report, that has to do with short sellers and the types of companies they target.  I think what we know about that, for example, is that short sellers tend to target companies that they believe are systematically overvalued.

So I'm not sure I see any necessary connection between the alleged wrongdoing on the part of defendants and subsequent short seller report.

BY MR. D'ANCONA:

Q     Okay.  Well, let me ask you this:  If plaintiffs' allegations are taken as true and

taken at face value, isn't being subject to a heightened risk of regulatory and/or legal entanglements or enforcement a foreseeable consequence of the alleged misconduct?

MS. COSTLEY:  Objection; form. This is beyond the scope of his testimony, I think.

You can answer, but...

THE WITNESS:  I guess I would respond as follows, which is:  If you read the analyst reports, including the ones cited in the sections we were looking at a short while ago -- so in Section VIII B, I believe it was -- what the analysts convey regarding the legal and regulatory scrutiny and potential risk of regulatory actions -- none of which ultimately occurred, by the way, and I point that out in the report -- so there's nothing to support the validity of any of the claims made by Hindenburg here.

But what the analysts generally say is that it was not necessarily what the company did.  It was the fact that there was a short seller report that raised

concerns, including concerns that we now know were unfounded that caused or led to potential legal or regulatory scrutiny.

That's what the analysts were concerned about and pointed to as potentially explaining stock price decline.

BY MR. D'ANCONA:

Q     Are you under the impression that the internal investigation by the law firm for the board or the SEC investigation that you note in your opinion that occurred while after the class period, that those establish conclusively, for purposes of this case, that the federal court in this case has sustained and allowed to go forward that there is no liability or no risk of liability for Natera for the alleged misconduct?  Is that your understanding, sir?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think there's a bunch of stuff in your question that has to do with legal conclusions and what the federal court here is going to do or could potentially do.

I think this is Paragraph 79 of my

report.  My understanding is that Natera has not -- at this point, as of the date I wrote my report, has not faced any regulatory or legal action from any agency.  So that -- that's all I say.

And there was an SEC investigation. The company did an investigation, the board, with the assistance of WilmerHale. That investigation found no wrongdoing.

BY MR. D'ANCONA:

Q    Have you -- have you seen that investigation, sir?

A    Do you mean the report of that investigation?

Q    The investigation you were just referring to, have you seen the materials from that investigation?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I have not seen the result of the investigation, no.

BY MR. D'ANCONA:

Q    Have you seen any of the evidence or the materials that the investigating lawyers hired by the company to investigate the company reviewed?

MS. COSTLEY:  Objection; form;

calls for speculation.

THE WITNESS:  I have not, no.

BY MR. D'ANCONA:

Q       Okay.  So your statements in your last answer about what -- and in your report about what that investigation may or may not show or -- about whether any of the claims here are unfounded, the basis for that is a representation that Natera's lawyers made to you; am I correct?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I'll just point specifically to the relevant part of my report, which is Paragraph 80.

What I know, and as I convey in the report there, Natera's board did an independent investigation with assistance from WilmerHale, and then according to the company's Q3 2022 investor presentation, that investigation determined that the short seller allegations of wrongdoing against the company were unfounded.

That's what I know.  That's based on the company's public disclosure.  I don't know anything beyond that.

BY MR. D'ANCONA:

Q       Okay.  So your basis for saying in your prior answer that plaintiffs' allegations of misconduct here were completely unfounded is the company statement that you just cited in the 8-K, where it said it looked into certain things and in -- the Hindenburg report deems them unfounded?

MS. COSTLEY:  Objection; form.  The report speaks for itself.

THE WITNESS:  I think Paragraph 80 does speak for itself.  As I just mentioned, that's what I know.  That's the evidence that I cite, is the relevant 8-K filing.

I think the general point of that paragraph, as well as the other points I make, under "Fourth" beginning Paragraph 79, is that, as I understand it, none of the various channels, whether it's the board investigation, the SEC investigation, there's been no other investigations or adverse outcomes or findings against the company by any regulator.

So none of these claims or the claims made in the Hindenburg report have been borne out in terms of actual adverse consequences of the company.

That's the point I'm making in these paragraphs.

BY MR. D'ANCONA:

Q       Well, how do you know that?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Well, as the report says, what I know is what's conveyed in these couple of paragraphs.  I do not know beyond that.  I'm just, as I said, saying that based on what I know and what's conveyed in these paragraphs, there have not been any adverse findings or consequences for the company that I'm aware of.  That's all.

BY MR. D'ANCONA:

Q       So notwithstanding what the company and the company's lawyers have said about the merits of the Hindenburg report's contents and claims, if plaintiffs' allegations are taken at face value and taken as true, such that the company did engage in the misconduct and the deceptive

business practices that were alleged, isn't being subject to heightened risk of regulatory and legal costs and reputational harm and management distraction, aren't those all foreseeable consequences of engaging in the alleged deceptive and improper business practices in the complaint?

MS. COSTLEY:  Objection; form.  It calls for speculation.  He's an economist, not a fortune teller.  I -- where are we going with this?

BY MR. D'ANCONA:

Q      You can answer the question.

A      I think it's beyond the scope of what I was asked to evaluate here.

Q      Well, now you're just parroting the coaching of your lawyer, sir; correct?

MS. COSTLEY:  Objection; argumentative.

BY MR. D'ANCONA:

Q      Is your opinion --

A      As I've indicated --

Q      Is your opinion in Paragraph 62 through 69 of your report that these consequences that you identify in Romanettes i through iv were not related to the alleged deceptive business

practices in plaintiffs' claims, but were, in fact, instead only related to the Hindenburg report?  Isn't that -- isn't that your opinion?

MS. COSTLEY:  Objection; form.

THE WITNESS:  So what I have conveyed in my report, which is consistent with what analysts were saying at the time, which is the evidence that I point to here, is that there were other factors that explained the stock price decline. And what the analysts attribute this to is the attention generated by the Hindenburg report, which then exposes the company to these heightened risks, regardless of whether the claims in the Hindenburg report are founded or unfounded.

BY MR. D'ANCONA:

Q    And if the defendants actually engaged in the misconduct that was alleged in this case, the consequences of regulatory risk that you point to, legal risk that you point to, management distraction, and so forth, aren't those consequences not necessarily strictly a result of a short seller publishing a report, but instead also a consequence -- a foreseeable consequence of

the underlying alleged misconduct?

MS. COSTLEY:  Objection; form; asked and answered.

THE WITNESS:  I don't see how one could conclude that.  I think what I've tried to convey is that based on my experience and expertise and the relevant literature, including academic literature and evidence from analyst reports, including everything that I've conveyed in the report, is that when there is a short seller report from a well-known, arguably successful short seller like Hindenburg, there are various consequences, which is what the analysts were concerned about and pointed to in explaining, at least in part, the stock price decline.

BY MR. D'ANCONA:

Q    But it's your opinion that the asserted consequence of regulatory risk, legal risk, reputational harm, and so forth are only a consequence of the Hindenburg report being filed and are unrelated from the alleged underlying deceptive business practices and misconduct.

Is that your opinion?

MS. COSTLEY:  Objection; form.

THE WITNESS:  I think I was clear, or at least I tried to be clear in the last couple answers.  I don't know how to make the assessment that you're asking for.  It's beyond the scope of what I was asked to do in this report.

What I was able to, I believe, show and support is my opinion that on March 9, these four factors did likely affect the stock price.  And in my view, as I've conveyed, there are heightened risks, regulatory risks, legal costs, management distraction, and so on, as we see in the analyst reports, that were attributable to the Hindenburg report being a well-known short seller.

For example, the SEC investigation potentially, as we know from some of that literature that I cited, if there's a relatively large drop in the stock price, that's one of the things that will potentially get the SEC interested.

BY MR. D'ANCONA:

Q     So you claim that this is somehow outside

the scope of your report.  Just to be clear, you allege -- you assert that factors other than the information plaintiffs allege to be corrective likely affected Natera's stock price, and then you talk about these factors.

It is your opinion that we're talking about that says that it was not plaintiffs' alleged misconduct and the correction of that alleged misconduct that leads to regulatory risk or that leads to legal risk or that leads to reputational harm; it's these other factors, which are unrelated to plaintiffs' allegations about what was wrong and how that was allegedly corrected.

I'm looking at Paragraph 62.  Do you see that, sir?

A     Yeah, I --

MS. COSTLEY:  Objection; form.

THE WITNESS:  I'd just step back and say all of this is part of an overall opinion that I offer, for example, as conveyed in Section -- Paragraph 15 of my report, which is that:  "Natera's abnormal stock price decline following the Hindenburg report cannot be used to

reliably infer that the alleged misrepresentations affected the price of the company's stock for at least the following reasons."

Romanette b of that paragraph discusses the factors that we're talking about here, but there are other reasons that support that conclusion as well.

So what Paragraph 15 conveys is my opinion.  We've talked about my assignment.  I think you're asking questions that go beyond that.

BY MR. D'ANCONA:

Q     So let me ask you a question.  In your view as an economist, is a publicly traded company that -- strike that.

Assume a publicly traded company that engages in deceptive business practices, including deceptive billing for medical treatments.  Assume that.  Does that type of misconduct, if assumed, tend to subject that publicly traded company to a heightened risk of regulatory and/or legal risk?

MS. COSTLEY:  Objection; form.

THE WITNESS:  Again, I think you're going beyond my expertise here.  I'm not,

for example, an economist who specializes in, say, the pharmaceutical industry or in regulatory -- what attracts regulatory attention in the industry.  So I really can't speak to the question, nor have I done the analysis related to that.

All I can do is look at the evidence available to me from, for example, the analyst reports and how the analyst reports characterized and discussed what happened on March the 9th.

BY MR. D'ANCONA:

Q     Hypothetically, a publicly traded company engages in deceptive business practices, and those deceptive business practices are propping up its revenues, and this information is disclosed to the market subsequently.  Is that company, in your view as an economist, subject to heightened market concerns about reputational harm?

MS. COSTLEY:  Objection as to form.

THE WITNESS:  Again, I think this goes beyond my expertise in the sense -- and I'll also say that I think one would have to know a lot more about the deceptive -- so-called alleged deceptive

practices, including whether they violate

laws, whether they violate regulations,

and so on.  So I really can't speak to

that.

BY MR. D'ANCONA:

Q       So is it your opinion, sir, that if -- if

plaintiffs' allegations are accepted on face value

and taken as true, and the defendants engaged in

the alleged misconduct, and the alleged misconduct

came to light in the way the plaintiffs claim,

that being subject to heightened risk of

regulatory and/or legal costs and/or reputational

harm was not a foreseeable consequence for Natera?

                MS. COSTLEY:  Objection; form.

        This has been asked and answered a number

        of times.

                THE WITNESS:  Again, I would say it

        goes beyond the scope of what I was asked

        to evaluate, and it also goes beyond the

        opinions that I've offered here.

BY MR. D'ANCONA:

Q       Are you declining to answer the question?

You're a --

                MS. COSTLEY:  Objection.

BY MR. D'ANCONA:

Q    You're an -- you're an economic expert who's been put forward by defendants to discuss things, including regulatory scrutiny to Natera, reputational risk to Natera, on the basis of information that came out.  And in the context of plaintiffs' claims in this litigation, are you able to answer the question or not?

MS. COSTLEY:  Objection.  This has been asked and answered.  Look, if you have a study you want to ask him about that shows some correlation, ask him.  Otherwise, he has already responded on this.

MR. D'ANCONA:  No.  Christina, on your coaching, he's declined to answer as outside the scope, which I've never heard in an expert deposition before.  It's -- but, you know, here we are.

I'm asking your expert one last time if he'll agree to answer the question that's been asked, notwithstanding the coaching.

MS. COSTLEY:  Look --

BY MR. D'ANCONA:

Q    Can you answer the question or not, Professor?

A    I believe I've answered it previously, but let me just reiterate.

I have an assignment here which I was given. I have offered opinions as we can -- if -- as we can look at in the summary of opinions in my report overall. I believe the questions you're asking are questions that are beyond the scope of what I was asked to evaluate here and go to other questions beyond the scope.

Q    So you can't answer the question?

MS. COSTLEY:  Objection; asked and answered. I'm going to ask that we move on.

You can answer the pending question, but this is not fruitful.

THE WITNESS:  I think if you go back and review my answers, I have attempted to answer that question to the best of my ability, given my assignment here and the opinions that I've offered.

MR. D'ANCONA:  Okay. So let's put Exhibit -- what's at Tab 11 before the

witness.  This will be Skinner Exhibit Number 4.

(Skinner Exhibit 4 marked.)

MR. D'ANCONA:  This is a copy of the Hindenburg report.

And for the record, the first page of this Skinner Exhibit Number 4 has a slip sheet that says "Exhibit Number 10" with an ECF stamp across the top.  This is the copy of the Hindenburg report that was submitted to the Court on August 16th, 2024, by counsel for Natera.

THE WITNESS:  Okay.  I have it.

BY MR. D'ANCONA:

Q     Okay.  So please just look at the Hindenburg report itself and confirm that -- whether you recognize this report.

A     I do.

Q     Okay.  Sir, do you agree that the Hindenburg report discussed the purported drivers of Natera's revenues?

A     I don't recall specifically, but it would not surprise me if it did.

Q     So for --

MS. COSTLEY:  And, Josh, before you

get too far into this, I just want to flag

we've been going for an hour.  We are

going to request a break.  It doesn't have

to be at this moment, but if you're

starting on a line with this, I just

wanted to flag that --

        MR. D'ANCONA:  This line should

be fairly brief, I fully expect.

        MS. COSTLEY:  Okay.

        MR. D'ANCONA:  I just have a few

planned questions.  Then we can take a

break.

BY MR. D'ANCONA:

  Q     So drawing your attention, sir --

        MS. COSTLEY:  Okay.  Sounds good.

BY MR. D'ANCONA:

  Q     -- to Page -- internal Page 3 of the

report, for example, the second-to-the-last

paragraph on that page, Hindenburg discusses

drivers of Natera's revenue saying, for example:

"The narrative accompanying Natera's stock rally

has been that its Panorama Non-Invasive Prenatal

Test will drive sales growth and profitability

while the company works to develop additional

tests to broaden the scope of its business."

Do you see that, sir?

A      I do.

Q      And then turning to internal Page 24 of Skinner Exhibit Number 4, the Hindenburg report, in the middle of the page, we see reference to Natera's CEO, Steve Chapman, called microdeletions screening "a rocket ship that's growing.  We're running the tests.  If we can get reimbursements, it's going to be -- we're going to be off to the races."

Do you see that?

A      I do.

Q      And the headline of that page or that section says -- or includes the language:  "Natera Has Sold Investors on the Revenue Potential of Microdeletions Screening:  'A Rocketship That's Growing.'"

Do you see that?

A      I do see that at the top of the page, yes.

Q      And do you -- do you also agree, sir, that Hindenburg alleged or claimed that, in truth, Natera's revenues were -- were propped up by undisclosed deceptive practices?

A      I believe that's one of the claims in the Hindenburg report, yes.

Q      So, for example, Page 40 towards the top, Hindenburg writes:  "Our findings indicate Natera has engaged in a grab bag of deceptive billing practices on its quest to satisfy its shareholders' desires for ever-increasing revenue."

Do you see that?

A      I do see that.

MR. D'ANCONA:  All right.  We can take a break.  Should we go off the record?

MS. COSTLEY:  That's a good idea.

THE VIDEOGRAPHER:  Off the record. 4:02 p.m.

(Recess from 4:02 p.m. to 4:11 p.m.)

THE VIDEOGRAPHER:  Back on the record, 4:11 p.m.

BY MR. D'ANCONA:

Q      Welcome back, Professor Skinner.

Sir, you would agree that the plaintiffs, in plaintiffs' complaint, do not allege that the Hindenburg report merely repeated allegedly corrective information that was previously reported and in the public domain. That's not plaintiffs' allegation; correct?

A       As I understand it, no.  That's right.

Q       And you would agree, sir, that the plaintiffs allege, instead, that the market learned about the allegedly deceptive business practices by Natera, such as the allegedly improper relationship between MGML and Natera, through the publication of the Hindenburg report. That's what plaintiffs claim; correct?

A       I don't -- yes.  That's my high-level understanding of plaintiffs' allegations in part, yeah.

Q       And as you note in your report, sir, Mr. Coffman, at this juncture of the case, at least, has put forth a proposed damages methodology that he opines is consistent with plaintiffs' theory of liability; is that fair?

A       That's my understanding of Mr. Coffman's view, yes.

Q       Is it your understanding that Mr. Coffman must also propose a damages methodology at this stage that is consistent with defendants' factual defenses or asserted facts and versions of underlying events in the case?

            MS. COSTLEY:  Objection; calls for a legal conclusion.

THE WITNESS:  Yeah, that sounds like something that goes into the legal issues, which I am not equipped to answer. I think in Paragraph 82 of my report, I convey my understanding, which is similar to what you had conveyed regarding Mr. Coffman's assignment with respect to damages methodology.

MR. D'ANCONA:  Okay.  Pending any cross-examination -- or redirect, rather, by Ms. Costley, I have no further questions at this time.

MS. COSTLEY:  I have nothing.

MR. D'ANCONA:  Okay.  Well, I think we can go off the record.

THE VIDEOGRAPHER:  Thank you.

We are concluded.  Going off the record, 4:14 p.m. Central.

(Off the record at 4:14 p.m. CST)

Deposition of Douglas J. Skinner

John Harvey Schneider v. Natera, Inc., et al

---

– – –

E R R A T A   S H E E T

– – –

PAGE          LINE          CHANGE

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

_____        _____        _____

ACKNOWLEDGMENT OF DEPONENT


        I, DOUGLAS J. SKINNER, do hereby

certify that I have read the foregoing pages and

that the same is a correct transcription of the

answers given by me to the questions therein

propounded, except for the corrections or

changes in form or substance, if any, noted in

the attached Errata Sheet.




_____   _____
Date Signature

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JOHN HARVEY SCHNEIDER,            )
Individually and on Behalf of    )
All Others Similarly Situated,   )
                                 )
        Plaintiff,               )
                                 )Civil Action No.
v.                               )1:22-cv-00398-DAE
                                 )
NATERA, INC.; STEVE CHAPMAN;     )
MICHAEL BROPHY; MATTHEW          )
RABINOWITZ; and RAMESH           )
HARIHARAN,                       )
                                 )
        Defendants.              )

REPORTER'S CERTIFICATION
REMOTE VIDEOTAPED DEPOSITION OF
DOUGLAS J. SKINNER
September 13, 2024

I, Rebecca A. Graziano, Certified Shorthand

Reporter in and for the States of Texas,

California, and Illinois, hereby certify to the

following:

That the witness, DOUGLAS J. SKINNER, was

duly sworn and that the transcript of the oral

deposition is a true record of the testimony given

by the witness;

I further certify that pursuant to FRCP Rule

30(f)(1) that the signature of the deponent:

____ was requested by the deponent or a

party before the completion of the deposition and

returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor.

____ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken.

Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Certified on September 16, 2024

_____
Rebecca A. Graziano, CSR, RMR, CRR
Texas CSR 9306
Expiration: 07/31/26
California CSR 14407
Expiration: 09/30/25
Illinois CSR 084.004659
Expiration: 05/31/25

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

### WORD INDEX

**< 0 >**
**0.3**  127:*18*
**0000410**  4:*15*
**0000471**  4:*12*
**0247246**  169:*23*
**05/31/25**  246:*21*
**07/31/26**  246:*19*
**084.004659**  1:*25*
 246:*21*
**09/30/25**  246:*20*

**< 1 >**
**1**  4:*8*  10:*11, 14, 15,*
 *17*  11:*11*  12:*3*  22:*8*
 51:*17*  53:*11*  101:*6*
 103:*4, 20*  104:*2, 25*
 131:*21, 24*  144:*1*
 145:*5*  146:*9, 19*
 147:*5, 19*  148:*21*
 150:*14*  158:2  161:*17,*
 *22*  162:2  163:*4*
 168:*18, 23*  169:6
 170:*25*  171:*7, 22*
 174:*8, 16*
**1,500**  46:*9*
**1:22-cv-00398-DAE**
 1:*6*  5:*12*  245:*6*
**1:27**  143:*19, 21*
**10**  4:*9*  237:*8*
**10(b**  14:*14*
**10:12**  55:*9, 11*
**100**  103:*5, 13, 21*
 177:*18*  202:*5, 9*
**10019**  3:*8*
**10020**  2:*14*
**109**  187:*13, 18*  188:*1*
**10b-5**  14:*14*  15:*18*
**10-K**  88:*17, 19*
**10th**  190:*19, 25*
 198:*4*
**11**  39:*7*  51:*19*  53:*12*
 112:*6*  166:2  236:*25*
**11:32**  107:*14, 15*
**11:47**  107:*15, 17*
**110**  181:*1*
**1100**  2:*18*
**11th**  45:*17, 24*

**12**  22:*22*  23:6  29:*15*
**12:39**  143:*18, 19*
**120**  50:*4*
**120-trading-day**  50:*3*
**12th**  45:*19, 24*  46:*8,*
 *14*
**13**  1:*13, 18*  186:*24*
 187:*5*  245:*12*
**1301**  3:*7*
**13th**  5:*4*  46:*23*
**14**  22:*9*  131:*21, 24*
 134:*25*  136:*1*  144:*2*
 145:*5*  146:*10, 19*
 147:*6, 19*  148:*22*
 150:*14*  158:*3*  161:*9,*
 *17, 22*  162:2  163:*5, 8,*
 *17*  164:*24*  165:*1, 24*
 168:*4*  169:6  170:*12,*
 *15, 20*  171:*1, 8, 23*
 174:*8*  190:*12*
**14407**  1:*24*  246:*20*
**14th**  134:*6*
**15**  215:*6*  231:*22*
 232:*9*
**16**  4:*9*  11:*13*  12:*1*
 246:*15*
**16th**  46:*25*  237:*11*
**1700**  3:*7*
**187**  4:*12*
**19**  30:*9*
**190**  4:*15*
**19087**  2:*7*
**1960s**  60:*3*
**1970**  56:*18*  66:*10*
 68:*18*  78:*9*  80:*6*
 87:*1*
**1970s**  83:*12*
**1991**  78:*9*  80:*7, 9*

**< 2 >**
**2**  4:*10*  101:*6*  169:*22*
 187:*1, 2, 10*
**2/27/20**  47:*12*
**2:51**  199:*10, 11*
**20**  23:*23*  27:*19*
 150:*14*  191:*18*
**2017**  79:*14*
**2020**  22:*8, 9*  34:*19*
 39:*6, 19*  40:*3, 9, 10*
 41:*7*  42:*16, 22*  43:*8*

**44**:2  45:*8*  46:*8, 14*
 47:*18, 23*  48:*4, 6*
 49:*2, 13, 20*  50:*17*
 51:*15, 17*  52:*9*  53:*4,*
 *11*  111:*12*  117:*16, 23*
 119:*23*  120:*4*  121:*4,*
 *10*  131:*21, 24*  134:*6,*
 *7, 25*  136:*1, 2*  140:*18*
 144:*1, 2*  145:*6*
 146:*10, 19*  147:*6, 19,*
 *24*  148:*21*  150:*14, 15*
 158:*3*  161:*9, 17, 18,*
 *22*  162:*2, 9, 12, 16, 21*
 163:*4, 5, 8, 17*  164:*25*
 165:*24*  168:*4, 18, 23*
 169:*6, 22*  170:*12, 16,*
 *20*  171:*1, 8, 23*  174:*8,*
 *9, 16*  194:*16*
**2021**  31:*24*  51:*17, 18*
 119:*23, 24*  120:*2, 8, 9,*
 *13, 15, 18*
**2022**  29:*11*  39:*7*
 51:*19*  53:*12*  169:*5*
 176:*3, 5*  181:*7*
 187:*11*  190:*19*
 193:*21*  198:*5, 23*
 200:*13, 24*  201:*3, 13*
 202:*15*  204:*11*
 209:*14*  210:*7*  213:*3*
 224:*18*
**2024**  1:*13, 18*  4:*9*
 5:*5*  11:*13*  237:*12*
 245:*12*  246:*15*
**21**  23:*24*  198:*23*
**212**  2:*15*  3:*8*
**2121**  2:*18*
**22**  29:*15*  147:*24*
**226**  54:*5, 7*
**227**  54:*6, 7*
**22a**  29:*20*  30:*1*
**22e**  31:*23*
**23**  29:*18*
**237**  4:*16*
**24**  55:*14*  239:*3*
**247**  169:*23*
**25**  31:*24*  57:*17*
 64:*16*  65:*10*  66:*19*
 67:*13*  89:*13*  120:*8*
 145:*19*  146:*2*

**25th**  119:*23*
**26**  96:*17, 25*  120:*9*
**27**  39:*6*  40:*2, 9*
 42:*16, 22*  47:*23*  48:*3*
 49:*13*  50:*17*  52:*9*
**27th**  39:*19*  43:*8*
 44:*2*  45:*8*  47:*18*
 48:*6*  49:*2, 20*
**280**  2:*6*
**29**  134:*7, 25*  136:*1*
**2a**  38:*23*  50:*24*
**2b**  13:*9, 11, 20, 23*
 38:*23*  39:*3, 4, 5, 14*
 50:*25*  119:*13, 18*
**2nd**  155:*23*

**< 3 >**
**3**  4:*13*  190:*14, 15, 17,*
 *21*  238:*17*
**3/10/22**  4:*13*
**3/9/22**  4:*10*
**3:00**  199:*11, 13*
**30**  38:*19, 21*  40:*3, 10*
 42:*16, 22*  52:*2, 6, 7, 9*
 53:*3*  82:*7*  246:*1*
**30(f)(1**  245:*23*
**30th**  39:*19*  51:*15*
**31**  38:*24*  52:*2*
**310**  2:*19*
**326-2000**  3:*8*
**33**  191:*9*  192:*21*
**34**  107:*21*  113:*13*
 114:*18*
**35**  112:*17*  121:*5, 7*
 122:*8*

**< 4 >**
**4**  4:*16*  119:*24*
 120:*18*  237:*2, 3, 7*
 239:*4*
**4/30/20**  47:*13*
**4:02**  240:*14, 15*
**4:11**  240:*15, 17*
**4:14**  1:*19*  242:*18, 19*
**40**  240:*1*
**41**  46:*10*  131:*13*
 134:*13*  136:*23*  145:*5*
**42**  65:*3*  66:*5, 23*
 68:*17*  71:*23*  143:*24*
 144:*6*  145:*2*  165:*14*

John Harvey Schneider v. Natera, Inc., et al

**43** 141:*21* 142:*17* 150:*24* 151:*4* 158:*17* 160:*4, 23* 161:*9* 163:*6*
**44** 141:*22* 142:*17*
**45** 175:*18*
**47** 11:*21*
**4th** 45:*10*

**< 5 >**
**5** 4:*3* 37:*25* 86:*4* 111:*11* 119:*7* 120:*20* 121:*4, 10*
**50** 2:*14* 191:*9*
**500** 43:*13*
**51** 178:*13* 180:*4* 183:*3, 15* 187:*13, 17, 18, 19* 188:*1, 5* 189:*5, 6*
**52** 175:*18*
**54** 199:*22, 25* 200:*20*
**55** 52:*3* 199:*16, 21, 25*
**5th** 118:*6* 122:*17*

**< 6 >**
**6** 51:*17* 118:*1* 119:*15, 22, 23* 120:*2, 13*
**60** 49:*12*
**610** 2:*7*
**62** 200:*9, 17, 24* 201:*12* 209:*19* 213:*1, 8, 9* 227:*22* 231:*15*
**63** 202:*20*
**64** 202:*20*
**65** 206:*9*
**667-7706** 2:*7*
**67** 207:*9* 208:*8*
**68** 211:*23*
**69** 210:*4, 17* 211:*12, 23* 213:*2* 227:*22*
**6th** 3:*7* 117:*16, 22*

**< 7 >**
**7** 51:*18* 120:*4, 15*
**70** 206:*9*
**78** 132:*7, 12* 133:*13* 136:*23*
**788-4485** 2:*19*

**79** 147:*16* 148:*6, 19* 149:*24* 222:*25* 225:*19*

**< 8 >**
**8** 19:*8, 16, 22* 20:*1* 21:*13* 122:*3, 7* 146:*15* 162:*9, 12, 15, 21* 200:*15* 213:*11*
**8:37** 1:*18* 5:*2, 5*
**80** 224:*13* 225:*11*
**81** 144:*17, 19* 145:*11* 213:*21* 215:*16* 216:*2, 16* 217:*4*
**82** 242:*4*
**87** 151:*18, 20* 153:*16* 154:*4* 158:*18* 159:*15* 160:*5*
**88** 151:*18* 153:*16* 159:*15* 161:*15* 169:*8, 12, 22*
**89** 151:*18* 153:*16* 159:*15* 161:*21*
**8-K** 225:*5, 14*

**< 9 >**
**9** 19:*8, 17* 22:*22* 23:*6* 29:*11, 14* 169:*4* 176:*3, 5* 178:*12* 185:*6, 21* 186:*1* 187:*11* 190:*4* 193:*21* 194:*25* 197:*2* 200:*13, 24* 201:*3, 13* 202:*15* 204:*11* 206:*12* 213:*16* 230:*9*
**9.3** 118:*2* 123:*2* 124:*10, 17* 125:*1* 127:*18* 129:*10, 11*
**9:58** 55:*8, 9*
**90** 151:*18* 153:*16* 158:*18* 159:*16* 160:*5* 162:*7, 14, 19*
**90067** 2:*19*
**9306** 1:*24* 246:*19*
**940-8800** 2:*15*
**9th** 196:*13* 198:*4, 13* 206:*2* 207:*13* 208:*11* 209:*14* 210:*7* 211:*4* 213:*3* 233:*11*

**< A >**
**a.m** 1:*18* 5:*2, 5* 55:*8, 9, 11* 107:*14, 15, 17*
**ability** 90:*15* 236:*22*
**able** 17:*17* 69:*2* 76:*18* 82:*12* 84:*7* 100:*14* 126:*18* 154:*7* 155:*4* 172:*19* 186:*16* 230:*8* 235:*8*
**Abnormal** 13:*12, 19, 22, 25* 39:*10, 15* 41:*9* 42:*11* 48:*11* 49:*5, 15, 16* 50:*13* 91:*5* 93:*23* 109:*8, 22* 111:*14* 112:*16* 113:*8* 118:*3* 119:*11* 120:*5, 11, 16, 21* 121:*9, 12* 123:*3* 124:*10, 17* 127:*17* 129:*10, 11* 204:*10, 20* 215:*9* 231:*23*
**abnormally** 109:*11* 125:*1*
**above-styled** 1:*17*
**absence** 75:*23* 76:*24* 77:*1, 6*
**absolutely** 178:*4* 182:*19*
**academic** 43:*3, 23* 52:*10* 53:*16* 55:*2* 60:*7* 69:*23, 25* 73:*15* 78:*11* 80:*15* 83:*2* 98:*21* 100:*9* 114:*14* 118:*23* 203:*4, 8, 15* 204:*13* 205:*8* 208:*4* 220:*11* 229:*8*
**academically** 93:*12*
**accept** 26:*13* 27:*7, 12, 25* 28:*1*
**accepted** 29:*4* 219:*21* 234:*7*
**accepting** 100:*19*
**access** 59:*19* 62:*19* 64:*19* 65:*6* 66:*8, 16, 20* 67:*2, 8, 18, 23* 68:*4, 12, 15, 21, 23, 24* 69:*3, 7, 15* 70:*14* 72:*1, 3, 9, 14, 19, 23* 73:*3* 78:*5* 79:*22*

**80:*19* 82:*5* 84:*15* 87:*12* 88:*17* 91:*7, 25* 98:*4* 101:*23* 102:*1* 106:*4* 135:*10, 16* 137:*22* 138:*4* 143:*1, 10* 145:*23* 146:*4, 9* 150:*8* 156:*6* 159:*1* 172:*2, 24*
**accessed** 79:*1* 153:*16, 21* 155:*12, 19* 163:*16* 170:*25* 171:*22*
**accessible** 80:*24* 82:*18* 88:*5*
**accessing** 88:*13* 106:*5* 143:*11* 168:*23*
**accompanying** 238:*21*
**account** 41:*24* 50:*5* 59:*23* 100:*7* 106:*20* 107:*1, 6* 189:*8*
**accounting** 60:*18* 79:*14* 179:*22*
**accounts** 213:*18*
**accuracy** 101:*8*
**accurate** 8:*4* 12:*4*
**accurately** 32:*14* 203:*1*
**acknowledge** 139:*13*
**acknowledgment** 47:*2* 244:*1*
**acquire** 87:*18* 90:*1, 2* 92:*6* 94:*14* 95:*1* 106:*6*
**acquired** 105:*16*
**acquiring** 87:*24* 88:*3, 8, 20, 24* 89:*2* 90:*14, 15, 16, 22* 91:*7* 92:*10* 94:*25* 106:*13*
**acting** 65:*15* 92:*17*
**Action** 1:*5* 5:*12* 6:*5* 11:*19* 206:*14, 25* 207:*6* 208:*13* 223:*4* 245:*5* 246:*9, 13*
**actions** 221:*17*
**actively** 93:*21*
**activity** 139:*5*
**actual** 42:*18* 58:*15* 135:*3* 159:*14* 165:*1* 168:*23* 170:*2* 226:*3*
**add** 53:*8* 206:*17*

**addition** 29:*18* 149:*11* 197:*14*
**additional** 9:*1* 54:*20* 183:*24* 210:*5* 238:*24*
**additionally** 19:*17*
**address** 7:*9* 33:*2*
**addresses** 79:*7, 15*
**adjusted** 46:*5*
**adverse** 225:*23* 226:*3, 16*
**adversely** 211:*1*
**advice** 140:*14*
**advisory** 139:*21*
**affect** 48:*17* 96:*12* 97:*7* 99:*25* 102:*9* 105:*18* 201:*12, 25* 204:*4* 207:*12* 209:*13* 214:*23* 230:*10*
**affirmative** 108:*20* 112:*1* 201:*11*
**Affirmatively** 18:*10* 204:*18, 20* 209:*11* 210:*4*
**agency** 223:*5*
**ago** 8:*25* 9:*3* 81:*10* 105:*24* 107:*10* 117:*13* 191:*2, 18* 221:*13*
**agree** 26:*25* 31:*11* 37:*8* 43:*6* 44:*1* 45:*6* 55:*23* 57:*1, 5, 18, 19, 23* 63:*11* 66:*4* 69:*4* 71:*9* 87:*10* 89:*1, 6, 11* 90:*16* 91:*23* 94:*13* 156:*24* 165:*20* 166:*1, 22* 190:*24* 192:*22* 196:*5, 14* 198:*1, 3, 14* 214:*20* 220:*11* 235:*21* 237:*19* 239:*20* 240:*20* 241:*2*
**ahead** 78:*20* 122:*11* 187:*9* 212:*19*
**AIRWAYS** 2:*2*
**al** 5:*10* 15:*6, 10, 14*
**alerted** 216:*13*
**allegation** 29:*5, 21* 30:*2, 7* 31:*25* 35:*20* 123:*1* 130:*21* 214:*2* 240:*25*

**allegations** 22:*24* 23:*8, 10* 24:*21* 25:*11, 12* 26:*5, 15, 17, 20* 27:*1, 6, 9, 17, 25* 28:*1, 16* 32:*15* 34:*13, 14, 15* 35:*11, 13* 36:*18* 37:*3* 123:*8* 128:*13* 158:*4* 177:*7* 182:*3* 184:*19, 25* 197:*12* 218:*5, 8, 9, 17, 22* 219:*2, 12, 19* 220:*25* 224:*20* 225:*3* 226:*23* 231:*12* 234:*7* 241:*10*
**allege** 16:*3* 23:*17* 26:*21* 29:*17, 19* 31:*8, 12* 32:*19, 22* 33:*19* 34:*7, 18* 36:*22* 113:*4* 122:*12* 125:*3* 127:*5* 130:*15* 131:*5* 132:*3, 13, 24* 144:*3, 21* 145:*15* 177:*8* 201:*2* 208:*20* 213:*23* 214:*18* 215:*17* 231:*2, 3* 240:*22* 241:*3*
**alleged** 16:*12, 13, 16, 21* 17:*3, 10, 13, 19* 18:*3, 19, 25* 19:*2* 20:*9* 23:*12, 25* 25:*3, 6, 17, 21* 26:*12, 18* 28:*3* 29:*8, 9* 34:*23* 35:*18* 37:*1* 40:*1* 108:*2* 112:*6* 119:*22* 121:*22* 123:*11* 126:*21, 25* 128:*9* 132:*14* 133:*5* 138:*14* 149:*8* 199:*19* 200:*3, 11* 207:*23* 215:*12* 216:*1* 217:*24* 218:*3* 220:*8, 20* 221:*4* 222:*17* 227:*1, 5, 25* 228:*19* 229:*1, 23* 231:*8, 9* 232:*1* 233:*25* 234:*9* 239:*21*
**allegedly** 15:*19* 24:*1* 31:*13, 18, 20* 108:*3* 109:*12* 111:*7, 10, 17* 112:*23* 113:*10* 123:*10* 124:*2, 8* 125:*16, 21, 22* 126:*7* 128:*2, 6* 130:*10*

144:*11* 145:*8* 176:*19, 25* 177:*16* 196:*24* 215:*7, 25* 217:*13* 218:*14* 219:*17* 231:*13* 240:*23* 241:*4, 5*
**alleging** 23:*22* 28:*25* 30:*22* 31:*5, 17* 32:*8* 33:*8* 122:*23* 128:*20* 210:*15* 219:*13* 220:*4*
**Allergan** 15:*9*
**allow** 63:*5*
**allowed** 164:*7* 222:*15*
**allows** 62:*19*
**allude** 115:*14*
**alluded** 73:*4*
**alluding** 143:*4*
**alpha** 93:*23*
**alternative** 49:*21* 50:*18* 123:*6* 125:*15*
**Altria** 15:*14*
**amount** 80:*8* 93:*8* 95:*9* 130:*9*
**amounts** 94:*9*
**analyses** 17:*20* 26:*1* 27:*21, 23* 28:*18* 29:*2* 37:*16, 25* 86:*4*
**analysis** 15:*9* 17:*2, 3* 25:*5* 26:*14* 27:*8, 13* 29:*6* 37:*22* 39:*12* 41:*16* 42:*13* 46:*20, 22* 50:*6, 22, 25* 51:*6, 10* 52:*18* 59:*25* 87:*16* 88:*2* 89:*9* 94:*6* 118:*4, 12* 119:*7* 121:*19, 21, 25* 122:*1* 130:*4* 157:*23* 158:*14* 211:*6* 216:*8* 233:*6*
**analyst** 61:*4, 14* 62:*21* 73:*23* 74:*4, 5, 16, 17* 76:*1* 77:*4, 5, 22* 88:*18, 21* 98:*22* 138:*18* 147:*17* 148:*8, 14, 21, 23* 149:*2, 6, 10* 150:*7, 11* 169:*4* 173:*12* 174:*5* 178:*12, 14, 16* 179:*10, 24* 180:*6, 14, 17* 181:*2, 3, 24* 183:*19* 184:*12, 24* 186:*16* 189:*8, 9, 17,*

*18, 20* 190:*1* 192:*18, 25* 193:*23* 195:*4, 5* 196:*10, 18* 197:*17* 198:*18, 22, 23* 212:*6* 221:*11* 229:*9* 230:*15* 233:*9, 10*
**analysts** 61:*8, 9, 15, 21, 25* 64:*8* 97:*21* 98:*7, 8, 14, 24* 99:*3, 8, 11, 12, 17* 116:*24* 117:*2* 129:*5* 131:*8* 138:*23* 141:*11* 151:*7* 154:*10* 172:*23* 173:*2, 22, 24* 174:*5* 178:*14, 21, 25* 179:*16* 180:*20, 23* 181:*9, 12, 16, 19* 182:*2, 6, 10* 183:*3, 14, 22* 184:*2, 18* 185:*5, 15, 19, 24* 186:*18* 188:*21* 189:*18* 190:*25* 193:*25* 195:*9* 197:*7* 207:*8* 208:*6, 7, 22* 209:*8* 212:*15* 221:*14, 22* 222:*4* 228:*7, 11* 229:*15*
**analyst's** 188:*23* 189:*11*
**analyze** 29:*3* 46:*7* 61:*20* 100:*22* 116:*4*
**analyzed** 45:*13* 47:*4, 6* 60:*20* 119:*11* 121:*16* 186:*13*
**analyzing** 24:*7, 25* 26:*10*
**and/or** 221:*2* 232:*22* 234:*12*
**Angeles** 2:*19*
**announced** 45:*18, 20* 46:*10* 47:*19* 112:*21* 116:*8* 118:*5* 130:*13*
**announcement** 60:*19, 25* 73:*6* 116:*12* 121:*8*
**announcements** 60:*24* 61:*23* 71:*17, 20* 112:*13* 129:*3*
**announcing** 99:*5*
**anonymous** 102:*25* 103:*11, 21*

**answer** 7:*1* 14:*19* 34:*10* 35:5 37:*12* 45:*14* 48:*13* 57:*19* 63:*11* 64:*14* 78:*15, 16* 79:*24* 81:*11* 85:*4* 86:8 92:*19* 93:6 96:9 98:2 105:7 108:*16* 115:7 121:*20* 125:*20* 137:*21* 141:*15* 142:8, *11* 154:*20, 23* 165:2 170:*14, 19* 173:*21* 196:*21* 197:22 205:*20* 207:*14* 221:8 224:5 225:3 227:*12* 234:22 235:8, *16, 21* 236:2, *13, 17, 21* 242:3

**answered** 35:*1* 44:6 81:2 82:22 135:7 155:*14* 158:22 163:*20* 167:*3* 229:*3* 234:*15* 235:*10* 236:*4, 15*

**answers** 85:*14* 91:22 209:*17* 230:4 236:*20* 244:6

**anybody** 7:*16* 159:*15*

**apologize** 78:*21*

**app** 7:*23*

**apparently** 101:*3* 142:*19*

**appearing** 2:2 3:2 5:*17*

**Appendix** 12:*11, 20* 14:8 147:22 149:*17*

**apply** 121:*10*

**appreciate** 85:*4* 191:*25* 201:7

**approach** 86:*3*

**approximately** 9:8 40:*21* 50:8 52:*15* 53:5 54:*4*

**April** 39:*19* 40:*3, 10* 41:7 42:*16, 22* 51:*15, 17, 18* 52:9 53:*3* 147:*24*

**areas** 60:*17*

**arguably** 229:*12*

**argue** 26:*21* 31:8 129:*15* 218:*18*

**argument** 200:*19* 218:*1*

**argumentative** 164:*19* 194:5 227:*18*

**arguments** 146:*23* 201:6

**arising** 134:*15*

**Artaki** 2:*13*

**article** 56:22 66:*10* 78:9, *10* 103:6 155:*24* 156:*4* 157:*11, 16* 160:*24* 161:22 162:8, *14, 15, 20* 163:*3, 8* 164:*3, 9* 166:8, *14, 16* 167:*19* 172:*11* 173:*13* 174:9, *16* 181:6 196:*19*

**articles** 22:7, *13* 33:*12, 13, 15, 20* 34:2, 8 35:8, 9 36:*12, 23* 43:*3, 23* 76:2 131:*13, 15, 16, 19, 20, 24, 25* 132:8, *12, 23* 133:3, 8, *12, 19, 20, 23, 24* 134:3, *11, 19, 21* 135:*1, 17* 136:*12, 25* 137:*3, 6, 11, 18* 140:*21* 141:*3* 143:8 144:*1, 6, 23* 145:2, *4, 6, 17* 146:*18, 24* 149:*3, 14* 150:2 151:*11* 155:6, *9, 23* 156:8, *11, 20* 157:9, *13, 18, 19* 158:*1, 2, 13* 159:6, *10, 14* 160:7 161:*17* 162:*3, 5* 163:*4, 14* 165:9, *11, 13* 170:6 171:*17, 23* 172:*3, 5, 24* 173:2, *23* 174:*6, 8, 13, 15, 20* 175:*1, 6* 194:*10, 12, 15, 18* 196:6, *14* 214:*13*

**articulated** 56:*11*

**artificial** 108:*15*

**ascertain** 156:9, *10* 171:6

**aside** 10:7 28:*4* 79:*18* 82:*15* 174:*6* 215:7

**asked** 19:*23* 20:6, *10, 19, 22* 24:*16* 34:*25* 35:2 37:*21* 38:2 44:5 60:*15* 64:7 77:*3* 82:22 122:*4, 6* 135:*7, 14* 147:9 155:*13* 158:*21* 163:*20* 165:*3* 167:*3* 171:*14* 184:9 196:*4* 227:*14* 229:*3* 230:7 234:*15, 18* 235:*10, 22* 236:*11, 14*

**asking** 6:5 18:*17* 27:*1* 50:*16* 63:*17* 74:*23* 75:*16, 19* 82:*11* 95:*21* 148:5, *11* 156:*3* 183:*13* 184:*11* 189:*3* 197:22 200:*16* 230:5 232:*11* 235:*20* 236:*10*

**aspect** 71:*3*

**aspects** 27:*2*

**assert** 131:*23* 144:22 201:*22, 24* 204:7, *16, 22* 205:*12* 209:*11* 210:5 212:*25* 215:*20* 231:2

**asserted** 229:*19* 241:22

**assertion** 66:*12* 114:*3* 204:*12*

**assertions** 113:*14*

**assess** 29:2 35:*15* 60:*11* 61:8 62:*1* 76:*18* 86:*21* 105:*11* 114:*19* 115:*3* 116:*18* 123:*15* 126:6 140:*6* 180:*16* 194:*8*

**assessed** 16:*11* 26:6 217:*17*

**assessing** 14:*24* 61:7 62:*10* 71:*20* 87:22 88:*1, 9* 100:*10, 23* 141:*13* 217:*19* 218:2

**assessment** 25:*9* 40:22 106:*11, 14*

**assessments** 17:22

**assigned** 76:*21*

**assignment** 17:*15* 18:*16* 19:9 20:2 21:*14* 22:*1, 12, 17, 19, 21* 24:*20* 25:24 122:2 146:*15* 171:5 194:8 196:*3* 232:*11* 236:6, *22* 242:7

**assistance** 223:8 224:16

**associated** 26:22 108:2, *11, 13, 20* 111:*14* 113:*16* 114:5 118:*10* 119:*3* 121:*13* 138:*21* 206:*15* 216:*21*

**assume** 7:2 20:*3, 6* 22:*12* 25:*19* 41:*13* 42:4 52:*20* 53:23 54:*12* 119:*15* 147:*10* 171:*14* 218:4 232:*17, 19*

**assumed** 24:9 25:*4* 232:*20*

**assuming** 27:*4* 42:9 58:*24* 121:*11* 211:*11*

**assumption** 22:*4, 15* 41:*18* 42:7, *8* 54:*1* 171:*13*

**assumptions** 28:*20* 41:*16* 42:*13* 58:5, *8, 10* 196:*3*

**attached** 244:9 246:2

**attachment** 153:*10* 164:*4, 15*

**attempt** 214:*23*

**attempted** 236:*21*

**attempting** 217:*2*

**attendees** 2:2 3:2

**attention** 68:*16* 104:*25* 105:*4* 228:*12* 233:*4* 238:*14*

**attorney** 246:7, *12*

**attracts** 233:*3*

**attributable** 17:*12* 18:*6, 20* 127:*2*

117:*1, 8* 140:*20* 230:5

130:*10*  205:*19*
230:*15*
**attribute**  129:*12*
228:*11*
**August**  4:*9*  11:*13*
12:*1*, *9*  111:*11*
117:*16*, *22*  118:*1*, *6*
119:*15*  121:*4*, *10*
122:*17*  134:*6*, *7*, *25*
136:*1*  237:*11*
**AUSTIN**  1:*2*  5:*11*
245:*2*
**authorization**  191:*7*
216:*22*
**authorizations**  158:*7*
167:*14*  213:*25*
215:*19*  216:*10*
**automatically**  172:*15*
**availability**  59:*11*
71:*2*  88:*10*
**available**  30:*12*
32:*24*  33:*20*  34:8
35:*23*  36:*24*  56:*8*, *13*
57:*3*, *21*  59:*17*  60:*1*,
*21*  62:*11*  63:*14*, *20*,
*24*  65:*6*, *21*  66:8
67:*23*  68:*12*  69:*8*, *9*,
*16*, *17*  70:*14*, *16*, *22*,
*24*, *25*  71:*12*, *16*, *18*
72:*1*, *10*, *23*  73:*9*, *11*,
*17*, *18*, *20*, *22*  74:*7*, *11*,
*21*  75:*18*, *23*  76:*5*, *19*,
*23*  77:*8*, *13*, *18*  84:*25*
85:*17*, *21*, *22*  88:6
89:*9*  92:*24*  93:2
94:*14*, *16*  95:*16*, *19*
96:*4*, *14*, *19*  97:*2*, *8*,
*24*  99:*22*  100:*1*, *23*
103:*19*  104:*4*, *7*
105:*12*, *20*  109:*16*
114:*20*  116:*2*  133:*4*,
*13*, *20*  137:*3*, *5*, *8*, *11*,
*13*, *14*, *15*, *19*  139:*7*
140:*22*  141:*14*
147:*14*  150:*1*  171:*9*,
*18*  176:*4*, *18*, *21*
177:*1*, *19*  193:*20*
194:*19*  197:*4*  198:*20*
215:*8*  233:*8*

**Avenue**  2:*18*  3:*7*
**avoid**  47:*1*
**aware**  42:*14*, *23*, *24*
56:*10*  68:*21*  70:*3*
75:*5*  77:*12*, *19*  78:*14*,
*23*  79:*19*  81:*22*  82:*8*
84:*4*  85:*3*, *7*  88:*16*
98:*9*, *16*  102:*10*
134:*24*  135:*5*  136:*11*
137:*21*  138:*3*, *8*
151:*10*  154:*12*
157:*10*  159:*21*, *24*
173:*2*  183:*2*, *13*
184:*2*, *11*, *17*  193:*3*
195:*8*  197:*23*  226:*18*
**awareness**  154:*16*

**< B >**
**back**  7:*11*  19:*4*
28:*11*  55:*10*, *13*  68:*1*
84:*11*  89:*13*  93:*11*,
*13*  94:*19*  105:*23*
107:*16*, *19*  121:*2*, *5*
127:*16*  129:*8*, *17*
142:*8*  143:*20*, *23*
145:*19*  146:*14*
148:*14*, *18*  158:*1*
195:*11*  199:*12*, *15*, *23*
231:*19*  236:*20*
240:*16*, *19*
**backup**  13:*15*, *23*
149:*19*
**bag**  240:*3*
**BAIRD**  3:*5*  181:*2*
**balance**  53:*3*  54:*1*,
*15*, *25*
**bank**  138:*22*
**Baseball**  45:*20*
**based**  13:*1*  18:*15*
24:*19*  27:*24*  34:*16*
36:*9*  40:*23*  50:*4*
51:*3*  52:*9*  126:*11*
140:*11*  149:*3*  150:*7*
154:*17*  155:*7*, *10*
165:*9*, *10*  193:*16*
194:*1*  219:*14*  224:*22*
226:*14*  229:*6*
**basement**  100:*17*
101:*4*, *22*

**bases**  194:*23*
**basic**  127:*15*
**basically**  41:*11*
89:*14*  90:*5*  123:*11*
**basis**  26:*6*  53:*10*
86:*3*  103:*10*  105:*2*
113:*11*  127:*3*  130:*13*
172:*8*, *10*  174:*21*
195:*14*  215:*4*  217:*5*
224:*8*  225:*2*  235:*5*
**Bates**  4:*11*, *14*, *16*
187:*15*
**Bates-stamped**  190:*18*
**BAYNES**  2:*11*
**Becky**  5:*15*
**becoming**  82:*7*
**began**  43:*21*
**begging**  210:*2*
**beginning**  26:*19*
46:*2*  50:*9*  115:*14*
181:*7*  225:*18*
**Behalf**  1:*3*  245:*3*
**belief**  62:*13*
**believe**  6:*16*  9:*4*
12:*21*  14:*1*, *23*, *25*
15:*5*, *11*, *13*, *15*  16:*6*,
*7*  17:*8*, *21*  18:*24*
19:*12*, *20*  22:*15*
23:*23*  24:*15*  26:*21*
29:*18*  30:*21*  33:*12*
34:*17*, *22*  37:*25*
38:*23*  39:*24*  40:*9*
50:*4*  51:*1*  52:*2*  54:*3*
79:*20*  83:*11*  92:*10*
106:*2*  115:*18*  120:*9*
121:*11*  128:*19*
132:*17*, *20*  133:*11*, *19*,
*21*  134:*13*  137:*20*
144:*16*  146:*23*
147:*11*  150:*17*
151:*20*, *21*  152:*10*
155:*24*  158:*12*
159:*18*  160:*1*  161:*5*,
*19*  162:*18*, *21*  163:*10*
169:*7*, *23*  177:*10*
179:*5*  185:*3*, *15*, *20*
188:*3*, *14*  189:*3*
200:*6*  210:*25*  212:*21*
220:*17*  221:*14*  230:*8*
236:*4*, *9*  239:*24*

**benefit**  88:*24*  90:*4*
95:*10*
**benefits**  65:*14*  67:*14*
89:*15*, *24*  90:*22*  92:*7*,
*17*  94:*24*  95:*3*
**BERTAGNOLLI**
2:*11*
**best**  14:*19*  16:*25*
25:*14*  32:*17*  33:*25*
34:*10*  56:*5*  209:*23*
236:*22*
**better**  101:*7*
**beyond**  92:*22*
135:*21*  139:*7*  169:*25*
221:*6*  224:*24*  226:*13*
227:*13*  230:*6*  232:*12*,
*25*  233:*22*  234:*18*, *19*
236:*10*, *12*
**big**  43:*12*, *20*  99:*18*
**billing**  31:*9*, *12*, *19*
133:*6*  136:*9*  175:*21*,
*24*  176:*13*  177:*10*
178:*1*, *19*  218:*14*
219:*17*  232:*19*  240:*3*
**billions**  93:*20*  94:*7*
**bit**  18:*9*  21:*8*  49:*6*
74:*25*  76:*9*  102:*4*
105:*23*  144:*25*
182:*15*
**BlackRock**  83:*22*
**blanket**  74:*2*
**block**  83:*10*, *15*, *20*
**Bloomberg**  149:*18*
150:*1*
**bnordstrom@omm.com**
**m**  3:*9*
**board**  75:*4*, *10*  76:*10*
222:*11*  223:*8*  224:*15*
225:*21*
**body**  19:*6*  25:*24*
157:*13*  193:*1*
**boosting**  31:*14*
**borne**  226:*3*
**BOTHA**  2:*11*
**bottom**  187:*15*
**bound**  95:*10*
**branch**  100:*8*
**break**  7:*10*  44:*18*, *23*
51:*13*  55:*6*  91:*16*
96:*8*  107:*9*, *12*  142:*1*

143:*15*  182:*22*
191:*16*  192:*3, 8*
195:*24*  199:*6*  238:*3,*
*12*  240:*10*
**breaking**  182:*16*
**breaks**  111:*23*
**Brendel**  203:*19*
**Bridger**  152:*20*
155:*22*  156:*1, 5*
159:*20*  160:*1*  161:*10*
163:*7, 12, 16*  168:*3,*
*11*  169:*9, 12, 24*
170:*1*  174:*7*
**brief**  238:*8*
**bringing**  190:*4*
**BRITISH**  2:*2*
**Britta**  3:*5*
**broad**  18:*12*
**broaden**  238:*25*
**broadly**  149:*21*
**broke**  182:*14*
**broker-dealer**  139:*14,*
*18*
**BROPHY**  1:*7*  2:*10*
154:*8*  155:*2*  156:*3*
173:*14*  245:*7*
**brought**  188:*9*
**brush**  18:*12*
**BTIG**  3:*5*
**bucket**  81:*14*
**budgets**  93:*24*
**bunch**  72:*17*  87:*7*
124:*20*  197:*16*
211:*16*  222:*21*
**bundle**  118:*9*  128:*12*
**business**  23:*19*  24:*10*
27:*10*  28:*2*  52:*25*
91:*3, 9*  123:*10*  139:*1*
140:*2, 16*  159:*9*
174:*25*  210:*13*
219:*22*  227:*1, 6, 25*
229:*24*  232:*18*
233:*14, 15*  238:*25*
241:*4*
**busy**  106:*25*
**buy**  131:*11*
**buying**  186:*1*
**buy-side**  151:*7*
152:*18, 25*  153:*5*
154:*9*  157:*8*  172:*21*

173:*4, 6, 10, 22, 25*
174:*3, 5*

**< C >**
**calculated**  39:*9*
**calculation**  13:*18*
**calculations**  54:*21*
**California**  1:*24*  2:*19*
45:*10*  245:*16*  246:*20*
**call**  21:*21*  32:*7*
60:*19*  64:*9, 14*  74:*15*
83:*10*  116:*25*  151:*7*
152:*18*  153:*7*  182:*8*
209:*2*
**called**  62:*15*  131:*14*
152:*12*  191:*8*  239:*6*
**calling**  180:*7*
**calls**  9:*11*  33:*23*
63:*13, 18, 21*  64:*2, 7,*
*12*  168:*7*  219:*8*
220:*1*  224:*1*  227:*8*
241:*24*
**camera**  10:*22*
**Cammer**  37:*25*  86:*4*
119:*7*
**Canaccord**  180:*24*
**canceled**  46:*4*
**cancellation**  45:*21*
**CAPITAL**  3:*5*  148:*1*
152:*20*  155:*22*  156:*1,*
*5*  159:*20*  161:*11*
163:*7, 12*  169:*9, 13,*
*24*  170:*1*  174:*7*
**Capitol**  22:*8, 13*
32:*23*  33:*11, 13, 14,*
*19*  34:*2, 7, 14, 19*
35:*7, 9, 21*  36:*12, 16,*
*22*  131:*14, 15, 20, 23,*
*25*  132:*8, 16*  133:*8,*
*12, 22, 24*  134:*2, 5, 11,*
*18, 21, 25*  135:*16*
136:*6, 12, 22, 25*
137:*3, 10, 21*  138:*4,*
*12, 17, 21, 25*  139:*9,*
*13, 20*  140:*2, 4, 7, 18,*
*21*  141:*2, 3, 7, 17*
142:*12, 14, 25*  143:*6*
144:*1, 6, 14, 22*  145:*1,*
*4, 11, 17*  146:*10, 18,*
*24*  147:*6, 18*  148:*24*

149:*3*  150:*13*  151:*1,*
*11, 25*  152:*20*  153:*6,*
*17*  154:*5, 13, 17*
155:*5, 23*  156:*2, 6, 12,*
*19, 25*  157:*8, 11, 14*
158:*2, 19*  159:*6, 9, 13,*
*22*  160:*2, 7, 24*
161:*15, 16, 21*  162:*3,*
*5, 7, 13, 14, 20*  163:*2,*
*13, 17, 25*  164:*24*
165:*1, 9, 11, 13, 18, 24*
166:*2, 8, 14, 15, 16, 18,*
*24*  167:*10, 19*  168:*17,*
*18, 23*  169:*5, 14, 17*
170:*2, 3, 6, 9, 25*
172:*4, 13, 24*  173:*13,*
*16*  174:*6, 14, 19*
175:*4*  194:*10*  214:*3,*
*13*
**Capitol's**  168:*11*
**capture**  154:*7*
**captured**  126:*15*
165:*16*
**captures**  150:*1*  203:*1*
**careful**  161:*7*
**case**  15:*5, 24*  16:*9*
17:*23*  18:*17*  22:*12*
34:*23*  74:*6*  99:*7*
112:*24*  123:*21*  131:*1*
132:*4*  158:*24*  169:*2*
170:*8*  171:*11*  175:*8*
185:*14*  212:*10, 14*
220:*6*  222:*14, 15*
228:*19*  241:*13, 23*
**cases**  14:*13, 15, 17,*
*20*  15:*2, 18, 23*  16:*1,*
*5, 8, 10, 15, 18*  17:*7, 9,*
*15, 16, 18, 24*  18:*2, 13,*
*15, 16, 24, 25*  19:*3*
46:*9*  63:*24*  173:*1*
183:*25*
**cash**  97:*13*
**catch**  117:*18*
**causation**  24:*15, 17*
121:*25*
**causation-related**  24:*8*
**cause**  1:*17*  17:*12, 13*
18:*3, 6, 21*  58:*14*
109:*22*  118:*20*
126:*23*  246:*12*

**caused**  43:*20*  44:*12*
62:*12*  110:*3*  117:*14,*
*21*  120:*25*  121:*15*
183:*7*  184:*5*  193:*20*
206:*3*  207:*16*  208:*12,*
*23*  209:*22*  210:*6*
222:*2*
**causes**  118:*20*
**Central**  5:*5*  242:*18*
**CEO**  239:*6*
**certain**  9:*19*  14:*9, 20,*
*22*  15:*25*  17:*3, 4, 19*
27:*21*  28:*17*  29:*1*
31:*7, 8*  41:*15*  43:*20*
51:*8*  58:*7*  69:*3, 7, 15*
70:*14, 23*  75:*5*  80:*19*
82:*4*  90:*23*  92:*6*
94:*15*  106:*1*  108:*11,*
*14*  122:*24*  132:*7*
135:*4*  137:*18*  142:*10*
143:*25*  144:*20*
149:*23*  157:*2*  165:*8*
167:*5*  175:*19*  176:*10*
202:*6, 7*  225:*6*
**certainly**  23:*21*
27:*14, 16*  28:*15*  29:*2*
36:*21*  37:*2*  46:*6, 19*
61:*7*  63:*18*  64:*11*
66:*9*  71:*18*  78:*8*
80:*17*  83:*9*  87:*4, 7,*
*14, 19, 25*  88:*7*  90:*20*
99:*6*  100:*15*  106:*16*
113:*7*  130:*2*  134:*2*
135:*23*  137:*9*  138:*21*
139:*9, 24*  141:*5*
142:*20*  153:*24*
154:*11*  156:*13, 15*
157:*10*  164:*2*  165:*16*
179:*21, 25*  180:*13*
186:*17*  189:*7*  193:*7*
207:*7, 17*  214:*9*
217:*12*
**certification**  14:*21*
245:*11*
**Certified**  245:*14*
246:*15*
**certify**  244:*4*  245:*16,*
*22*  246:*7*
**cetera**  77:*5*  179:*8*

Deposition of Douglas J. Skinner                                      John Harvey Schneider v. Natera, Inc., et al

**challenged** 58:*15*
**chance** 122:*10*
**Change** 13:*13*, *20*, *22*
14:*1*, *3*, *5* 39:*13*, *15*
52:*25* 54:*14* 61:*21*
62:*12* 115:*2* 130:*1*
131:*8* 243:*5*
**changed** 76:*8*
**changes** 16:*3* 97:*12*
108:*1*, *11*, *13*, *20*
244:*8* 246:*2*, *3*
**channel** 77:*16*
**channels** 225:*20*
**CHAPMAN** 1:*7*
2:*10*, *11* 239:*6* 245:*7*
**characterization**
160:*11*
**characterize** 17:*2*, *5*
63:*19*, *23* 153:*3*
157:*5* 175:*23*
**characterized** 152:*14*
177:*5* 233:*10*
**characterizes** 181:*21*
**characterizing** 161:*4*
**charge** 88:*17*
**charitable** 167:*11*
**charity** 167:*9*
**cheap** 90:*23*
**CHECK** 2:*6* 115:*18*
129:*17*
**checking** 187:*17*
**Chicago** 7:*15* 80:*15*
**choice** 48:*21* 50:*11*
53:*2* 54:*18*
**choices** 48:*15*, *16*
50:*1* 54:*24*
**chose** 40:*19* 41:*2*
50:*2* 51:*3*
**chosen** 49:*10*, *12*
**Christina** 2:*15* 35:*3*
44:*19* 91:*20* 110:*18*
182:*18* 191:*20*
235:*15*
**christina.costley@katt
en.com** 2:*20*
**cite** 66:*3* 71:*23* 79:*8*,
*16* 80:*5*, *22* 81:*21*
82:*16* 84:*7* 86:*10*
113:*12* 114:*2*, *3*
115:*8* 118:*19*, *24*

131:*13* 134:*17* 136:*1*
147:*4* 150:*24* 151:*18*,
*24* 153:*15* 155:*20*
160:*4*, *23* 161:*21*
168:*15*, *21* 169:*1*, *3*
179:*9* 181:*15*, *23*
183:*3*, *15* 187:*13*
192:*25* 196:*6* 200:*8*,
*10* 203:*17* 205:*9*
208:*8* 225:*14*
**cited** 9:*18* 12:*23*
66:*11* 81:*4* 84:*21*
133:*15* 135:*1* 149:*18*
156:*16* 169:*20* 189:*5*
198:*6* 220:*12* 221:*12*
225:*5* 230:*20*
**cites** 81:*5* 82:*12*
**citing** 136:*15*
**City** 2:*14* 3:*8*
**Civil** 1:*5*, *20* 5:*12*
245:*5*
**claim** 18:*5* 23:*12*
30:*17* 33:*18*, *22* 34:*7*
103:*10* 104:*3* 144:*12*
176:*1* 203:*20* 213:*18*
215:*21* 216:*8* 217:*25*
230:*25* 234:*10* 241:*8*
**claimed** 18:*7*, *21*
239:*21*
**claiming** 106:*22*
136:*16*
**claims** 22:*24* 23:*8*
24:*9*, *10* 31:*25* 32:*22*
34:*17* 35:*17* 131:*25*
133:*5*, *8*, *9* 144:*7*
145:*15* 151:*10*
177:*18*, *25* 178:*18*
182:*11* 183:*23* 185:*1*,
*7* 194:*12* 195:*1*
205:*5* 206:*22* 207:*4*,
*20*, *23* 209:*4* 210:*3*,
*12*, *18*, *21* 211:*1*, *3*, *17*,
*18* 212:*11* 213:*23*
215:*18* 218:*18*
221:*20* 224:*7* 226:*1*,
*2*, *22* 228:*1*, *15* 235:*7*
239:*24*
**clarification** 183:*17*

**clarify** 7:*5* 24:*13*
72:*6* 74:*24* 97:*9*
200:*14*
**class** 14:*21* 20:*5*, *9*,
*17* 21:*6* 22:*5* 26:*19*
32:*25* 33:*21* 34:*9*
35:*23* 36:*24* 37:*8*, *19*
41:*4* 50:*7*, *9* 52:*14*
53:*4* 54:*2* 132:*18*, *21*
133:*23* 135:*17* 136:*8*,
*13* 137:*1* 144:*23*
149:*8*, *10* 150:*6*, *12*
168:*13*, *22* 169:*14*
170:*4* 172:*25* 212:*23*
222:*12*
**clear** 25:*11* 27:*3*
39:*21* 40:*6* 67:*7*, *16*
91:*22* 92:*20* 96:*15*
109:*3* 114:*22* 115:*25*
126:*10* 134:*4* 141:*15*
144:*5* 149:*5* 151:*3*
152:*16*, *21* 169:*8*, *24*
173:*21* 181:*23*
185:*13*, *14* 230:*2*, *3*
231:*1*
**clearly** 115:*1* 188:*14*
**click** 164:*8*
**client** 76:*21*
**clients** 139:*22*
140:*13* 173:*3*
**close** 118:*6* 141:*8*
148:*8*, *9*
**closures** 46:*10*
**coaching** 227:*16*
235:*16*, *23*
**coauthored** 79:*12*
**coefficients** 52:*21*
**Coffman** 19:*19* 37:*5*,
*15* 50:*2* 81:*5* 94:*5*
119:*6* 149:*19* 181:*10*
241:*13*, *19*
**Coffman's** 20:*15*, *19*
21:*2* 37:*21* 38:*3*, *4*, *7*,
*9*, *12* 51:*8* 86:*2*
147:*11* 241:*17* 242:*7*
**coincided** 119:*25*
**colleague** 53:*18*
**collected** 62:*25*

**collective** 118:*13*
122:*15* 123:*22*
124:*24*
**collectively** 107:*5*
121:*14*
**column** 13:*13*, *16*, *20*
39:*14*
**combination** 128:*6*
**come** 62:*2*, *25* 83:*24*
93:*11* 125:*5* 149:*1*
181:*5* 208:*1*, *3*, *9*
**comes** 119:*4* 179:*17*
**comfort** 182:*11*
**coming** 44:*8* 47:*25*
56:*22*, *24* 68:*15*
102:*5*, *16* 121:*18*
179:*11* 208:*2*
**comment** 98:*8*, *10*
132:*22* 173:*12*
**commentary** 150:*11*
178:*15*, *16* 179:*15*
180:*14* 181:*22*
182:*10* 183:*24*
**commented** 174:*1*
183:*4* 184:*3*
**commenting** 61:*16*
173:*23* 174:*5*
**comments** 181:*20*
183:*22* 208:*7*
**common** 20:*4*, *8*, *16*
21:*5* 37:*6*, *18* 167:*7*
**communicate** 7:*21*
**communicated** 179:*7*
**communication** 156:*2*
**communications**
151:*23* 154:*5* 157:*7*
**companies** 220:*14*, *17*
**COMPANY** 3:*4*
32:*6* 59:*12* 60:*1*, *2*
61:*23* 63:*12*, *15* 64:*8*
74:*15* 75:*11*, *12*, *14*,
*25* 76:*1*, *2*, *12* 77:*4*, *5*
88:*19* 95:*15* 96:*3*, *12*
97:*7*, *15*, *22*, *23* 98:*15*,
*25* 99:*4*, *10*, *11*, *13*, *20*
103:*2*, *3*, *7* 109:*10*
112:*2*, *21* 116:*7*, *16*,
*24*, *25* 117:*2* 118:*5*,
*14* 124:*21* 129:*16*, *18*
137:*15* 150:*2* 179:*4*,

*17* 180:*7* 182:*7*, *8* 190:*8*, *11* 191:*7* 193:*10* 196:*11* 197:*1* 203:*3* 205:*4* 206:*24* 207:*4*, *25* 208:*25* 210:*13*, *19* 212:*21* 216:*13* 218:*12* 221:*24* 223:*7*, *24* 224:*21* 225:*5*, *24* 226:*4*, *17*, *20*, *24* 228:*13* 232:*15*, *17*, *21* 233:*13*, *17* 238:*24*

**company's** 32:*12* 52:*25* 59:*14* 95:*16* 130:*24* 133:*6* 146:*20* 175:*23* 188:*9* 190:*6* 209:*1* 212:*7* 218:*10* 219:*14* 224:*18*, *23* 226:*21* 232:*3*

**company-specific** 114:*21*

**compare** 88:*23* 89:*15* 157:*19* 164:*23* 165:*4*

**comparing** 165:*3*

**comparison** 157:*17*, *24*

**competent** 198:*6*, *15*

**competitive** 210:*16*, *20* 212:*8*

**complaint** 9:*21* 24:*5* 29:*1* 30:*11*, *12*, *13*, *15* 33:*6*, *9*, *12*, *14* 34:*1*, *4* 35:*7*, *9*, *14* 36:*6*, *15*, *16* 200:*4* 227:*6* 240:*21*

**complete** 12:*4*

**completed** 216:*23*

**completely** 209:*4* 225:*4*

**completion** 245:*25* 246:*6*

**complications** 127:*16*

**component** 126:*24*

**components** 79:*23* 186:*13*

**conceal** 219:*4*

**concealed** 125:*21*

**concept** 68:*23*, *24*

**concern** 23:*13* 71:*10* 191:*8* 192:*20* 207:*11*

**concerned** 222:*5* 229:*15*

**concerning** 31:*24* 62:*6* 160:*7*

**concerns** 126:*21* 183:*6* 184:*5* 191:*6* 192:*19* 194:*2* 196:*12* 198:*12* 208:*24* 209:*12* 211:*22* 212:*7* 222:*1* 233:*19*

**conclude** 18:*13* 229:*5*

**concluded** 18:*13* 78:*22* 242:*17*

**conclusion** 17:*10* 33:*24* 37:*22* 80:*25* 82:*19* 113:*10* 191:*5* 195:*15* 200:*19* 219:*8* 220:*1* 232:*8* 241:*25*

**conclusions** 17:*5*, *6* 18:*23* 19:*5* 26:*1* 41:*17* 114:*12* 202:*12* 215:*1* 222:*22*

**conclusively** 222:*13*

**concrete** 203:*10*

**condition** 72:*15* 84:*18* 87:*4*

**conditions** 58:*25*

**conduct** 72:*6* 128:*9*, *11* 139:*4*

**conducting** 41:*15* 48:*14* 50:*25*

**confident** 81:*15* 202:*5*

**confidential** 150:*22*

**confirm** 187:*25* 189:*3* 237:*16*

**confirmed** 148:*19*

**confusion** 134:*15*

**Connecticut** 46:*11*

**connection** 38:*17* 88:*15* 113:*13* 158:*10* 167:*17* 180:*4* 220:*20*

**consensus** 61:*9*, *21*

**consequence** 220:*8* 221:*4* 228:*25* 229:*20*, *22* 234:*13*

**consequences** 226:*4*, *17* 227:*5*, *23* 228:*20*, *23* 229:*14*

**consider** 64:*6* 89:*22* 90:*21* 103:*15* 140:*24*

**considerations** 54:*9*

**Considered** 9:*20* 12:*12*, *16*, *19* 13:*3* 56:*19* 58:*21* 61:*5*, *17* 69:*9*, *17* 88:*5* 89:*9* 92:*23* 94:*13* 99:*23* 133:*16* 136:*16*, *24* 149:*6*, *16*, *17* 152:*8* 165:*23* 181:*17* 195:*14* 215:*4*

**considering** 64:*4*

**consistent** 42:*5* 60:*12* 69:*21* 111:*13* 113:*23* 137:*25* 228:*6* 241:*15*, *21*

**constant** 41:*10*, *13* 42:*4*, *12* 52:*23* 54:*13*

**contain** 12:*3* 78:*12* 112:*13* 201:*5*

**contained** 153:*23*, *24*

**contains** 38:*21* 39:*5* 144:*17* 177:*25* 200:*18* 203:*9* 246:*3*

**content** 64:*2*, *12* 143:*8*, *12* 154:*12* 155:*5* 156:*7*, *22* 157:*23* 158:*14* 165:*4* 166:*15* 194:*11* 203:*7*

**contents** 137:*7* 157:*19*, *20* 164:*23*, *25* 226:*22*

**context** 55:*20* 200:*20* 235:*6*

**continue** 78:*18*

**contributed** 47:*16* 198:*12* 206:*11* 211:*19*

**convenient** 10:*24* 91:*18*

**conventional** 42:*12*

**converse** 69:*5*

**convey** 151:*4*, *13* 154:*7* 158:*3* 178:*7* 193:*15* 196:*19* 203:*1* 206:*18* 211:*15* 214:*8*

221:*14* 224:*14* 229:*6* 242:*5*

**conveyed** 158:*13* 165:*2* 167:*12*, *15* 185:*22* 186:*21* 189:*18* 194:*8* 199:*4* 204:*25* 214:*10* 226:*11*, *15* 228:*6* 229:*10* 230:*12* 231:*22* 242:*6*

**conveying** 176:*7* 186:*15*

**conveys** 168:*10* 232:*9*

**convincing** 188:*20*

**copies** 134:*24* 142:*21*

**copy** 11:*5* 52:*5* 187:*5* 190:*18* 237:*4*, *10*

**copyright** 138:*5*, *13*

**Cornerstone** 7:*22* 8:*12*, *18*, *22* 9:*2*, *7*, *12*

**correct** 12:*7*, *17* 13:*5*, *14*, *15*, *25* 18:*1* 19:*11*, *12*, *24* 20:*5*, *13*, *14*, *17*, *25* 21:*6*, *7*, *14* 22:*2*, *3*, *10*, *25* 23:*8*, *16* 24:*12* 25:*6* 29:*4*, *11* 30:*5* 32:*3*, *16*, *25* 35:*25* 37:*1*, *4*, *19* 38:*5*, *6*, *10*, *11*, *17*, *20* 39:*15*, *16*, *20* 40:*5*, *13*, *18* 41:*10*, *11* 49:*8* 51:*19*, *20* 55:*17* 56:*15* 59:*5*, *6* 64:*23* 66:*12* 86:*8* 96:*14* 97:*8*, *24* 108:*6* 110:*22* 117:*16*, *23*, *24* 118:*22* 120:*14* 121:*1*, *2* 131:*21*, *22* 132:*9*, *10*, *14* 133:*13*, *14*, *17* 134:*7* 138:*18* 139:*14*, *22* 144:*4*, *15*, *16*, *24* 145:*12*, *13*, *25* 147:*19*, *20* 148:*1*, *25* 149:*1*, *8*, *9*, *20*, *21* 150:*15*, *18* 151:*1*, *19*, *21* 152:*2* 156:*12* 157:*3* 160:*8*, *25* 161:*18*, *19*, *23*, *25* 162:*16* 164:*12*, *17* 165:*24* 166:*4*, *7* 167:*1* 168:*19*, *20*, *24*

169:*6*, *7*  170:*19*
174:*9*, *11*, *21*  175:*10*,
*12*, *21*  182:*1*  183:*8*
185:*11*  187:*14*  188:*2*,
*16*  189:*13*  191:*2*, *3*
199:*20*  200:*13*  202:*1*
204:*22*, *25*  206:*4*
210:*7*  217:*25*  220:*8*
224:*9*  227:*16*  240:*25*
241:*8*  244:*5*
**corrected**  231:*14*
**correction**  13:*12*
200:*11*  217:*24*  218:*3*
231:*8*
**corrections**  244:*7*
**corrective**  15:*20*, *23*
16:*4*, *13*, *16*, *20*  17:*4*,
*10*, *19*  18:*5*, *20*  19:*1*,
*2*  26:*22*  28:*4*  29:*9*,
*19*  35:*19*  131:*6*
132:*3*, *25*  144:*3*, *12*,
*21*  145:*9*, *15*  176:*11*,
*20*, *25*  177:*8*, *16*
195:*2*  196:*25*  201:*2*
208:*21*  213:*23*
214:*19*, *21*  215:*17*
216:*2*  217:*14*  218:*20*
231:*3*  240:*23*
**correctly**  57:*19*
**correlation**  235:*12*
**correspondence**
150:*25*  151:*5*, *17*
163:*11*
**cost**  70:*25*  87:*10*, *14*,
*17*, *23*, *25*  88:*3*, *8*, *12*,
*20*, *23*  89:*1*, *7*  90:*3*,
*16*, *24*  91:*24*  92:*10*,
*22*, *24*  93:*2*  94:*12*, *15*
105:*24*  106:*5*, *18*
140:*18*  159:*2*  209:*9*
**Costley**  2:*15*  27:*15*
28:*6*  30:*19*  33:*23*
34:*25*  36:*2*  37:*10*
44:*5*, *15*, *25*  45:*2*
69:*10*, *18*  70:*17*
74:*22*  75:*8*  76:*6*
77:*9*  82:*21*  85:*11*
86:*14*  89:*10*  91:*15*
94:*17*  97:*25*  98:*19*
100:*2*  101:*15*  103:*23*

105:*21*  109:*1*  110:*10*,
*22*  114:*8*  115:*12*
122:*19*  124:*3*  126:*1*
127:*6*  128:*15*  130:*16*
134:*8*  135:*6*  136:*3*,
*19*  138:*6*, *19*  139:*15*,
*23*  141:*25*  142:*5*
143:*2*  150:*16*  151:*2*
152:*3*  153:*19*  154:*21*
155:*13*  156:*14*
157:*21*  158:*21*
159:*17*  160:*9*, *16*
161:*1*, *24*  162:*17*
163:*19*  164:*18*  166:*5*
167:*2*  168:*6*  171:*4*,
*24*  174:*10*, *22*  175:*11*
176:*6*  177:*3*, *21*
179:*19*  180:*11*
182:*13*, *23*  183:*9*
184:*7*, *14*  185:*12*
186:*6*  188:*17*  189:*14*
191:*14*  192:*1*, *5*, *12*
193:*2*  194:*4*  195:*18*,
*21*  196:*16*  198:*16*
199:*5*  202:*2*  203:*13*
204:*23*  205:*15*  206:*5*
209:*15*  210:*8*  212:*1*
213:*5*  214:*6*  216:*4*
217:*7*  218:*6*  219:*7*,
*25*  220:*9*  221:*5*
222:*19*  223:*18*, *25*
224:*10*  225:*9*  226:*9*
227:*7*, *17*  228:*4*
229:*2*  230:*1*  231:*18*
232:*23*  233:*20*
234:*14*, *24*  235:*9*, *24*
236:*14*  237:*25*  238:*9*,
*15*  240:*12*  241:*24*
242:*11*, *13*
**costly**  89:*22*  90:*1*
91:*1*  93:*1*
**costs**  57:*13*  58:*17*, *20*
59:*21*  65:*16*  67:*15*
87:*20*, *21*, *23*  89:*16*,
*24*  90:*9*, *21*  91:*6*
92:*7*, *18*  95:*4*, *11*
227:*3*  230:*13*  234:*12*
**counsel**  5:*17*  7:*21*
8:*12*, *13*  9:*7*, *9*  17:*25*
19:*10*, *24*  20:*3*  21:*14*

22:*2*  135:*2*  137:*16*
147:*25*  237:*12*  246:*8*
**counterfactual**  131:*10*
**countervailing**  198:*2*
**country**  47:*3*
**couple**  6:*18*  8:*25*
9:*2*  16:*15*  43:*2*
70:*20*  79:*23*  96:*6*
124:*11*  128:*17*
141:*11*  148:*18*
184:*15*  226:*12*  230:*4*
**course**  6:*6*  7:*24*
43:*17*  50:*12*  80:*7*
102:*6*  104:*14*  121:*17*
137:*1*  160:*15*  164:*6*
173:*8*  182:*7*  211:*17*
**COURT**  1:*1*  5:*11*,
*14*, *16*, *19*  6:*23*  10:*21*
14:*24*  17:*21*  222:*14*,
*23*  237:*11*  245:*1*
**Court's**  9:*23*
**covered**  214:*3*
**covering**  64:*8*  97:*21*
98:*15*  99:*12*  147:*23*
181:*16*, *24*
**COVID**  40:*18*, *25*
43:*5*, *16*  44:*10*  45:*19*
46:*2*, *9*  47:*11*, *15*, *19*,
*22*  48:*2*  52:*12*
**COVID-related**  43:*7*
44:*1*  45:*7*
**COWEN**  3:*4*  181:*4*
**COZZENS**  2:*11*
**CRAIG-HALLUM**
3:*5*  173:*12*
**create**  117:*3*
**created**  31:*20*
**creates**  54:*20*
**credibility**  100:*4*
106:*14*
**credible**  101:*7*  181:*9*,
*12*  203:*23*
**criticisms**  38:*4*, *9*
**cross-examination**
242:*10*
**CRR**  1:*21*  246:*18*
**CSR**  1:*21*, *24*, *25*
246:*18*, *19*, *20*, *21*
**CST**  1:*19*  5:*2*

242:*19*
**CTS**  152:*12*
**current**  89:*4*  90:*19*
**customers**  174:*20*
**cut**  18:*8*  28:*8*

**< D >**
**damage**  209:*10*
**damages**  241:*14*, *20*
242:*8*
**D'Ambra**  3:*12*  5:*13*
**D'Ancona**  2:*5*  4:*3*
6:*2*, *4*  10:*10*, *18*
27:*22*  28:*11*, *21*
31:*10*  34:*5*  35:*2*, *4*
36:*20*  37:*11*  44:*19*
45:*1*, *5*  55:*5*, *12*
69:*13*  70:*11*  71:*8*
75:*3*, *15*  76:*20*  77:*24*
84:*6*  86:*7*  87:*9*
90:*10*  91:*19*, *21*
95:*13*  98:*13*  99:*21*
101:*1*  102:*24*  105:*6*
106:*10*  107:*11*, *18*
109:*20*  110:*16*, *24*
115:*6*  116:*6*  123:*17*
125:*18*  126:*19*  128:*4*
130:*8*  131:*12*  134:*22*
135:*24*  136:*14*
137:*12*  138:*11*
139:*12*, *19*  140:*3*
142:*2*, *6*, *7*  143:*14*, *22*
150:*20*  151:*15*
153:*13*  154:*14*, *22*
155:*17*  156:*23*
158:*15*, *23*  159:*23*
160:*15*, *19*  161:*12*
162:*4*, *22*  164:*10*, *22*
166:*21*  168:*2*, *14*
171:*20*  172:*7*  174:*17*
175:*7*, *17*  176:*23*
177:*14*  179:*14*  180:*3*
181:*14*  182:*17*, *25*
183:*1*, *12*  184:*10*
185:*9*  186:*3*, *23*
187:*3*  189:*1*  190:*12*,
*16*  191:*19*  192:*2*, *9*,
*13*, *14*  193:*13*  195:*16*,
*19*  196:*1*  197:*20*
199:*7*, *14*  202:*16*

Deposition of Douglas J. Skinner                                      John Harvey Schneider v. Natera, Inc., et al

204:*6*  205:*10*, *24*
206:*8*  210:*1*  211:*5*
212:*13*  213:*20*
214:*14*  216:*24*
217:*11*  219:*1*, *18*
220:*5*, *23*  222:*8*
223:*10*, *21*  224:*3*
225:*1*  226:*7*, *19*
227:*11*, *19*  228:*17*
229:*18*  230:*24*
232:*13*  233:*12*  234:*5*,
*21*  235:*1*, *15*  236:*1*,
*24*  237:*4*, *14*  238:*7*,
*10*, *13*, *16*  240:*9*, *18*
242:*9*, *14*
**data**  13:*22*  58:*6*, *12*
62:*18*
**date**  5:*4*  12:*1*  19:*3*
26:*13*  30:*15*  31:*3*
32:*6*  112:*19*, *21*
117:*25*  118:*2*, *15*, *25*
120:*10*, *19*  123:*3*, *22*,
*23*  126:*6*  129:*1*
223:*2*  244:*15*  246:*1*
**dated**  11:*12*  131:*20*
187:*11*  190:*19*
**dates**  16:*3*, *4*, *12*, *13*,
*17*  17:*4*, *20*  19:*1*, *3*
39:*25*  40:*4*, *8*  46:*3*,
*18*  112:*11*, *14*, *15*
119:*17*, *24*  121:*11*, *12*,
*14*  147:*18*  162:*8*
**day**  39:*5*  40:*12*
46:*20*  48:*5*, *8*, *12*
49:*5*, *16*  54:*22*  99:*4*
103:*4*, *5*, *20*, *21*  104:*2*,
*25*  109:*9*, *10*, *23*
120:*20*  125:*6*  130:*13*
148:*9*, *10*  157:*12*
182:*7*, *8*  191:*1*
192:*21*  197:*13*, *19*
201:*20*, *21*
**days**  8:*25*  9:*3*  39:*18*
40:*11*  41:*6*  49:*13*
50:*4*  54:*5*  103:*13*
121:*19*  246:*1*
**dealing**  209:*6*
**dealt**  179:*4*
**deaths**  46:*9*

**debate**  179:*1*
**decades**  80:*9*
**December**  22:*9*
131:*21*, *24*  144:*2*
145:*5*  146:*10*, *19*
147:*6*, *19*  148:*22*
150:*14*  158:*3*  161:*9*,
*17*, *22*  162:*2*  163:*5*, *8*,
*17*  164:*24*  165:*1*, *24*
168:*4*  169:*6*  170:*12*,
*15*, *20*  171:*1*, *8*, *23*
174:*8*  194:*16*
**decent**  53:*20*
**deceptive**  23:*18*, *25*
24:*10*  27:*9*  28:*1*
31:*9*, *12*, *19*  32:*10*
122:*13*, *15*  123:*10*, *20*,
*25*  124:*1*, *9*  125:*21*
127:*3*  128:*11*  130:*23*
218:*14*  219:*5*, *17*, *22*
226:*25*  227:*5*, *25*
229:*24*  232:*18*, *19*
233:*14*, *15*, *25*  239:*23*
240:*3*  241:*4*
**deciding**  107:*2*
**decision**  88:*25*  89:*18*
**decisions**  53:*19*
**declaration**  46:*23*
**declaring**  45:*10*
**decline**  18:*4*, *19*
183:*7*  184:*6*  185:*2*,
*25*  190:*2*, *3*  194:*25*
197:*13*, *18*  202:*23*
205:*6*, *7*, *22*  206:*12*
207:*2*  208:*24*  209:*23*
210:*6*  211:*20*  213:*3*,
*19*  215:*10*  222:*7*
228:*10*  229:*17*
231:*24*
**declined**  190:*9*
235:*16*
**declines**  206:*15*
**declining**  234:*22*
**decreases**  87:*13*  92:*1*
**deemed**  99:*25*
105:*19*  193:*25*
**deems**  225:*7*
**Deepti**  167:*25*
**defendant**  17:*25*

**Defendants**  1:*9*  2:*10*
3:*2*  23:*12*  27:*9*  28:*3*,
*4*  31:*3*, *20*  32:*8*
121:*21*  132:*14*  219:*4*,
*21*  220:*21*  228:*18*
234:*8*  235:*3*  241:*21*
245:*9*
**defendant's**  9:*24*
17:*25*
**defenses**  241:*22*
**deficiencies**  133:*5*
**define**  56:*3*  68:*11*,
*24*  108:*7*  131:*15*
**defined**  94:*23*  95:*6*
131:*19*  149:*13*
**defines**  84:*8*  85:*8*
86:*10*
**definitely**  129:*25*
**definition**  85:*15*
94:*19*
**definitive**  207:*10*
**definitively**  207:*16*
**degree**  21:*4*, *10*
188:*11*  189:*23*
**demand**  32:*12*  103:*4*,
*8*
**demonstrates**  78:*3*
**demonstrating**  206:*1*
208:*11*  211:*22*
**denote**  4:*22*
**depend**  104:*21*
**depending**  17:*15*
48:*21*
**depends**  59:*20*  61:*6*
99:*12*
**DEPONENT**  244:*1*
245:*23*, *24*  246:*5*
**deposed**  1:*17*  6:*8*, *15*
**DEPOSITION**  1:*12*
5:*7*  6:*7*  7:*7*, *18*  8:*7*
9:*16*  10:*2*, *5*  181:*11*
235:*18*  245:*11*, *20*, *25*
246:*6*
**describe**  150:*19*
166:*10*
**described**  10:*7*
24:*20*, *23*  38:*24*  57:*7*
203:*12*
**describes**  25:*25*
**describing**  173:*22*

**DESCRIPTION**  4:*7*
87:*2*
**descriptive**  127:*9*
156:*21*
**desires**  240:*5*
**despite**  103:*2*
**detail**  43:*24*  166:*23*
167:*18*
**detailed**  140:*1*
157:*23*  158:*14*
**determination**  109:*25*
**determine**  59:*2*  72:*2*
73:*1*  121:*21*  211:*6*
**determined**  109:*22*
110:*2*  224:*19*
**determining**  42:*10*
**develop**  238:*24*
**developed**  37:*17*
**difference**  103:*17*
**different**  17:*7*  18:*15*
21:*18*, *23*  24:*25*  27:*4*,
*5*  39:*22*  49:*11*, *17*, *25*
50:*1*, *11*, *14*  51:*1*, *2*, *6*,
*10*, *11*  53:*12*  54:*23*,
*24*  60:*10*, *13*  64:*1*
66:*21*  69:*1*  70:*20*
71:*4*  78:*12*  79:*23*
85:*14*  87:*16*  101:*10*,
*11*  102:*15*  111:*6*
119:*16*  130:*25*  131:*2*
177:*25*  180:*23*
181:*22*  198:*21*  199:*2*
**differentiate**  63:*16*
70:*19*  102:*4*, *14*
**differentiates**  41:*24*
**differently**  103:*20*
**difficult**  18:*11*
124:*12*
**direct**  68:*16*  82:*13*
119:*16*  159:*19*
**directions**  43:*12*
**directly**  12:*23*  20:*10*
110:*1*
**disadvantages**  51:*8*
**disagree**  69:*11*  70:*12*
**disclose**  27:*11*
**disclosed**  75:*13*
110:*9*  125:*10*  128:*13*
132:*4*  144:*13*, *14*
145:*10*  176:*4*  177:*19*

183:*5*, *16*  193:*18*
216:*21*  233:*16*
**disclosing**  124:*21*
**disclosure**  16:*4*, *13*,
*16*, *20*  17:*4*, *10*, *19*
18:*5*, *20*  19:*1*, *2*
26:*11*  28:5  29:*9*, *19*
123:*7*  125:*15*  180:*7*
194:*2*  196:*8*, *11*
216:*13*  224:*23*
**disclosures**  26:*22*
61:*15*, *22*  101:*13*
111:*8*  181:*17*, *25*
189:*12*  193:*24*  195:*3*
198:*8*, *11*  211:*12*
212:*22*  219:*15*
**discretionary**  47:*1*
**discuss**  33:*17*  43:*24*
114:*14*  142:*17*
175:*19*  202:*21*  207:*9*
235:*3*
**discussed**  37:*20*
38:*19*  58:*19*  60:*5*
64:*6*  74:*3*, *9*  80:*4*
115:*16*  122:*7*  213:*22*
214:*1*  218:8  233:*11*
237:*20*
**discusses**  43:*2*  57:*12*
134:*18*  232:*6*  238:*19*
**discussing**  55:*16*, *21*
212:*6*, *15*
**discussion**  21:*9*
94:*21*  105:*23*  141:*18*,
*21*
**discussions**  58:*1*
69:*23*  80:*15*  93:*13*
**dismiss**  9:*24*
**dispute**  20:*15*, *24*
**disputing**  20:*25*
**disseminate**  152:*23*
**disseminated**  65:*19*
73:*7*
**disseminating**  88:*14*
102:*18*  152:*24*
**distinct**  208:*20*
**distracted**  209:*6*
**distracting**  111:*22*
**distraction**  208:*18*
209:*2*, *13*  227:*4*

228:*22*  230:*14*
**distributes**  174:*20*
**DISTRICT**  1:*1*  5:*10*,
*11*  245:*1*
**dive**  141:*19*
**divide**  53:*5*
**DIVISION**  1:*2*  5:*12*
245:*2*
**document**  4:*23*
10:*11*  11:*10*, *11*, *17*
47:*11*  159:*25*  168:*16*,
*21*, *25*  172:*19*, *22*
183:*11*  190:*17*, *21*
194:*5*
**documented**  173:*6*
**Documents**  9:*20*
12:*12*, *15*, *18*  136:*24*
152:*7*, *8*, *9*
**doing**  51:5  52:*17*
54:*21*  64:*24*  83:*20*
90:*4*  149:*22*
**Dollar**  13:*13*, *19*, *22*
14:*1*  39:*15*  93:*8*
94:*1*
**dollars**  93:*20*  94:*7*
95:*8*, *9*
**domain**  146:*24*
177:*12*  178:*6*, *9*
211:*9*  215:*22*  216:*12*
240:*24*
**double-checking**
187:*22*
**doubt**  136:*17*
**DOUGLAS**  1:*13*, *16*
4:*9*  5:*7*, *22*  11:*12*
244:*3*  245:*12*, *18*
**downward**  197:*8*
**dozen**  46:*11*
**Dr**  45:*3*  187:*4*
190:*20*  192:*15*
**draw**  124:*6*  125:*8*
**drawing**  238:*14*
**drift**  60:*19*, *25*
**drive**  238:*23*
**driven**  29:*22*  30:*3*,
*25*  112:*25*  128:*22*
**drivers**  237:*20*
238:*20*

**drop**  193:*21*  194:*1*
199:*17*  200:*1*  206:*2*
208:*12*  230:*21*
**drove**  124:*16*  194:*1*
196:*12*  197:*13*
**due**  45:*19*  129:*15*
**duly**  1:*16*  5:*21*, *23*
245:*19*

**< E >**
**earlier**  6:*16*  65:*11*
67:*12*  82:*14*, *16*
155:*23*  212:*23*
213:*21*
**earning**  116:*18*
**earnings**  32:*7*  60:*22*,
*23*  61:*10*, *21*, *23*, *25*
63:*18*, *21*  64:*7*, *12*
71:*17*, *20*  73:5, *6*
74:*15*  85:*20*  97:*16*,
*17*  99:*5*, *19*  111:*11*,
*15*  112:9, *13*, *14*, *19*,
*21*, *22*  116:*8*, *10*, *16*,
*21*, *25*  117:6, *9*
118:*11*  119:*3*, *4*, *9*
121:*8*, *12*, *13*, *15*
124:*22*  127:*19*  129:*3*
**easy**  11:*3*
**ECF**  237:*9*
**econometrically**  54:*10*
**economic**  14:*23*  16:*2*,
*22*  25:*14*  28:*15*  29:*2*
52:*24*  58:*3*  59:*2*
89:*16*, *18*  100:*1*
109:*18*  116:*13*  180:*9*
188:*15*  189:*4*  193:*23*
195:*13*  196:*7*  198:*7*
199:*1*  205:*25*  208:*10*
235:*2*
**economically**  95:*7*
122:*21*  205:*12*, *23*
**economics**  40:*23*
81:*9*  83:*14*  126:*11*
179:*22*
**economist**  75:*21*
76:*8*, *14*  186:*9*
198:*19*  209:*21*  227:*8*
232:*15*  233:*1*, *18*
**economists**  59:*1*, *24*
61:*3*, *14*  62:*5*  63:*4*,

*11*  64:*6*, *12*  72:*2*
73:*1*  91:*13*  93:*12*
179:*15*  202:*8*
**economy**  44:*11*
**EDGAR**  73:*8*, *9*, *18*,
*19*  74:*15*  75:*25*  77:*3*
88:*13*, *16*, *17*  90:*24*
**editor**  80:*13*
**effect**  46:*7*, *21*, *22*
47:*4*  115:*3*  116:*5*
117:*7*  118:*13*  122:*16*
124:*7*, *24*  125:*7*
127:*4*, *19*  128:*12*
130:*2*, *14*  195:*2*
197:*1*  201:*19*  206:*7*
213:*17*  214:*24*
**effective**  123:*15*
197:*1*
**effects**  26:*22*  44:*10*
47:*11*  123:*23*  208:*17*
**efficiency**  20:*21*, *23*
21:*2*  37:*7*  55:*16*, *19*,
*21*, *22*, *24*, *25*  56:*4*, *7*
57:*14*, *15*  58:*2*, *9*, *22*
59:*1*, *10*, *16*  60:*4*, *8*, *9*,
*12*  61:*2*  69:*23*  71:*15*,
*21*  76:*15*  78:*12*, *13*
80:*5*, *8*, *11*, *16*  81:*7*,
*13*  83:*3*  84:*22*  85:*15*
86:*6*, *18*, *19*  87:*8*, *22*
88:*1*  94:*5*, *20*, *21*
95:*22*, *23*  102:*7*
115:*23*  126:*12*
**efficient**  20:*4*, *8*, *17*
21:*5*, *10*  22:*5*  37:*6*
57:*9*  59:*4*, *8*  65:*1*, *5*,
*13*, *17*  66:*6*, *15*  67:*22*
68:*10*  70:*10*  71:*24*
72:*8*, *13*, *16*, *21*, *22*
81:*18*  84:*13*, *19*
86:*22*  87:*3*  96:*11*
114:*18*  115:*17*
145:*22*  146:*16*
147:*10*, *12*, *13*  171:*15*
194:*9*, *18*  197:*3*
**effort**  54:*21*
**eight**  6:*12*  132:*20*
133:*19*  136:*24*
**Eikon**  147:*25*

**either** 7:*22* 121:*19* 148:*24* 161:*17* 211:*22*

**elaborate** 97:*9*

**electronic** 11:*3*

**electronically** 10:*13*

**email** 150:*24* 151:*23* 153:8, *18* 155:*9* 157:7, *14* 161:6, *10* 163:5, *11, 18* 164:*1, 5, 7, 24* 165:*17, 19* 166:2, *9, 25* 168:5, *17* 169:*23* 170:*21* 173:*13*

**emails** 134:*17, 19* 135:*4* 140:*12* 142:*13* 150:*22* 151:*17, 25* 152:7, *11, 15, 16, 17, 22* 153:*4, 5, 9, 12, 15, 22* 154:2, *18* 155:*1, 3, 4, 11, 21* 156:9, *11, 16, 25* 157:5, *6, 10, 18, 20* 159:*21, 24* 160:*1, 4, 6, 11, 12, 22* 161:5, *14, 20* 162:8, *13* 169:*16, 19, 25* 170:2*1* 172:*19* 173:*19*

**embedded** 36:*4*

**emergency** 45:*11* 46:*24*

**emphasized** 30:*10*

**empirical** 78:*3, 24* 79:*16* 80:*23* 82:*17* 118:*19* 211:*21*

**empirically** 205:*13*

**employed** 246:*8*

**employee** 246:*11*

**enable** 142:*25*

**enclose** 151:*24*

**endeavored** 32:*14*

**Endo** 15:*11*

**enforce** 138:*13*

**enforcement** 221:*3*

**engage** 193:*22* 226:*25*

**engaged** 27:*9* 228:*18* 234:*8* 240:*3*

**engages** 232:*18* 233:*14*

**engaging** 227:*5*

**entanglements** 221:*3*

**entire** 54:*15* 130:*6* 150:*6* 156:*8* 164:*3, 9* 213:*3, 10*

**entirely** 111:*23* 131:*9* 139:*1* 152:*16*

**entirety** 33:*10* 37:*24* 153:*9*

**entities** 106:*2* 141:*1* 152:*1* 166:*17*

**entitled** 11:*11* 12:*12* 39:*14*

**entity** 131:*14* 137:*17* 152:*12* 174:*12* 204:*1*

**entries** 13:*24*

**enumerate** 208:*16*

**enumerated** 201:*12* 206:*11*

**Envelope** 10:*17, 20* 187:*6*

**envisioned** 111:*25*

**envisioning** 76:*10* 93:*8* 127:*8*

**envisions** 111:*5, 16*

**equal** 95:*3* 97:*18*

**equation** 192:*11*

**equipped** 242:*3*

**Errata** 244:*9*

**error** 13:*18*

**especially** 181:*9* 206:*20*

**essence** 154:*8* 218:*9*

**essentially** 54:*6* 68:*3* 95:*21* 142:*18* 149:*24* 157:*15* 159:*5* 178:*14* 185:*24* 188:*21* 203:*18*

**establish** 222:*13*

**estimated** 48:*18* 49:*14* 50:*13, 22* 52:*21*

**estimates** 53:*22* 61:*10, 22* 62:*1* 131:*9* 197:*9*

**estimation** 39:*17, 22, 23* 40:*4, 7, 11, 20* 41:*3, 8, 18, 25* 42:*7, 9* 43:*8* 44:*3* 48:*8, 17, 22* 49:*1, 11, 12, 21*

50:*2, 12, 18* 51:*2, 16, 23* 52:*8, 19* 53:*12* 54:*16* 196:*10*

**et** 5:*10* 15:*6, 10, 14* 77:*5* 179:*8*

**Eugene** 53:*18* 56:*10* 65:*12* 81:*8*

**evaluate** 19:*15* 20:*10, 20, 22* 37:*21* 38:*2, 6, 13* 49:*19* 50:*16* 57:*14* 59:*7, 10, 25* 61:*4, 16* 62:*7* 63:*6, 13* 64:*10, 12* 102:*18* 104:*8, 11* 116:*20* 122:*5, 6* 179:*16* 227:*14* 234:*19* 236:*11*

**evaluated** 45:*15*

**evaluates** 78:*24* 79:*20*

**evaluating** 25:*2, 16* 39:*18* 40:*4* 58:*21* 88:*22* 107:*7*

**event** 16:*11* 17:*2, 11, 20* 35:*16* 37:*17, 22* 38:*1, 3, 4, 7, 9, 13, 14, 16, 22* 39:*1, 12, 17* 41:*15* 42:*6, 13* 45:*13, 14, 15, 23* 48:*5, 14* 49:*20, 25* 50:*6, 21* 51:*6, 16* 52:*17* 53:*15, 16* 99:*19* 107:*22* 114:*19* 115:*2, 21, 22* 116:*5* 117:*25* 118:*2, 3, 12* 120:*10, 19* 123:*16* 126:*11, 15, 17* 149:*13*

**events** 43:*7* 44:*1* 45:*7* 46:*1, 17, 18, 21* 47:*4, 7, 14, 22* 48:*7, 25* 49:*22* 50:*20* 108:*12, 14* 241:*23*

**Everest** 5:*15*

**ever-increasing** 240:*5*

**evidence** 14:*23* 16:*2* 25:*17* 57:*14* 58:*22* 59:*2, 7, 9, 10* 61:*1, 19* 69:*25* 78:*11* 80:*17* 81:*19* 83:*7* 86:*20* 95:*20, 24* 108:*23*

110:*6* 116:*13* 118:*19* 119:*6* 146:*7* 147:*3* 158:*24* 159:*13, 19* 169:*1, 3* 179:*9* 180:*9* 181:*15, 23* 186:*16* 188:*15, 20* 189:*4* 193:*23* 195:*1, 12* 196:*7, 15, 23* 198:*2, 7, 15, 25* 199:*1* 201:*15, 18* 202:*11, 18* 203:*5* 206:*1* 208:*10* 209:*24* 211:*21* 215:*2, 14* 223:*22* 225:*14* 228:*8* 229:*9* 233:*8*

**evident** 155:*21*

**evidentiary** 217:*5*

**exact** 4:*22* 47:*24* 102:*8* 129:*2*

**exactly** 13:*14* 18:*23* 19:*5* 21:*8* 33:*13* 34:*3* 35:*6, 12, 13* 36:*15* 45:*16* 46:*19* 47:*21* 48:*1* 56:*24* 61:*6* 67:*5* 78:*19* 86:*2* 93:*25* 112:*10* 113:*6* 115:*13* 119:*8* 121:*14* 127:*11* 134:*10* 135:*9* 137:*16, 17* 138:*25* 140:*15* 148:*3* 174:*24* 186:*7* 205:*17*

**exaggerated** 31:*22*

**EXAMINATION** 4:*3* 6:*1*

**examine** 51:*1* 76:*22*

**example** 16:*2* 25:*3* 26:*11* 27:*18* 29:*12, 20* 40:*1* 49:*11* 57:*16* 61:*8, 20* 73:*4* 77:*22* 79:*4* 83:*11* 85:*20* 88:*11* 92:*8* 97:*15* 99:*6* 101:*4, 5, 18* 102:*25* 103:*15* 108:*12* 111:*9* 112:*17* 116:*15* 121:*4* 144:*18* 145:*13* 165:*12* 167:*20* 169:*21* 200:*9* 206:*10* 210:*18* 212:*8* 218:*24* 220:*16*

230:*18*  231:*21*  233:*1*, *9*  238:*18*, *20*  240:*1*
**examples**  33:*6*  144:*8*  207:*7*
**exceed**  65:*16*  67:*15*  92:*7*, *18*
**exception**  150:*18*
**excerpted**  155:*8*
**excerpts**  157:*2*, *13*
**exclude**  122:*14*  123:*25*
**excuse**  77:*25*  172:*9*
**executive**  158:*9*
**executives**  151:*9*
**Exhibit**  10:*14*, *15*  11:*11*  12:*3*  13:*9*, *11*, *20*, *23*  39:*3*, *4*, *5*, *14*  50:*24*, *25*  119:*13*, *18*  186:*25*  187:*2*, *10*  190:*14*, *15*, *17*, *21*  236:*25*  237:*1*, *3*, *7*, *8*  239:*4*
**EXHIBITS**  4:*6*, *20*  10:*12*  38:*23*, *25*
**exist**  59:*1*
**existence**  75:*2*  198:*1*
**exists**  74:*14*  75:*17*  76:*17*
**expands**  66:*13*
**expect**  56:*14*  57:*4*, *23*  59:*16*  85:*24*  96:*9*, *11*  97:*5*, *13*, *18*, *20*  98:*14*  101:*10*  205:*21*  238:*8*
**expectation**  97:*12*
**expected**  48:*10*  49:*3*  116:*19*  129:*20*  191:*21*  193:*11*  197:*11*
**expensive**  89:*22*
**experience**  98:*21*  115:*10*  229:*7*
**Expert**  4:*8*  11:*12*, *17*  14:*9*  62:*23*  235:*2*, *18*, *20*
**expertise**  229:*7*  232:*25*  233:*22*
**experts**  86:*5*  108:*12*
**Expiration**  246:*19*, *20*, *21*

**explain**  39:*3*  202:*22*  204:*9*, *19*, *21*
**explained**  39:*22*  205:*13*  213:*2*  228:*10*
**explaining**  86:*17*  211:*4*  222:*6*  229:*16*
**explains**  129:*22*
**explanation**  51:*22*
**explanations**  197:*16*, *18*  202:*18*
**explicitly**  173:*6*
**explores**  85:*8*
**expose**  206:*24*
**exposes**  207:*4*  228:*13*
**extensive**  78:*10*  79:*5*  140:*10*  150:*5*
**extensively**  158:*6*  167:*13*
**extent**  7:*9*  71:*5*  87:*11*  88:*4*  91:*24*  141:*13*  210:*25*
**external**  76:*13*
**extract**  130:*1*
**extracts**  134:*20*  153:*23*  166:*14*  167:*21*
**extreme**  56:*13*  57:*4*, *22*

**< F >**
**face**  24:*22*, *24*  25:*13*  26:*7*, *9*  27:*2*, *5*, *7*  28:*16*, *22*  29:*4*  38:*15*  219:*3*, *20*  221:*1*  226:*23*  234:*7*
**Facebook**  167:*21*
**faced**  223:*3*
**fact**  15:*20*  16:*21*  17:*12*  18:*6*, *20*  25:*4*, *20*  40:*19*  50:*7*  52:*10*  73:*2*  86:*1*  110:*1*, *6*  116:*9*  124:*15*  127:*20*  158:*5*  165:*5*  169:*16*  170:*6*  172:*10*  173:*16*  176:*1*  180:*10*  185:*2*  201:*12*, *25*  207:*2*, *12*  209:*13*  210:*5*  214:*2*  217:*4*  221:*24*  228:*2*

**Factiva**  62:*16*, *17*, *19*, *23*, *25*  63:*1*, *3*  73:*24*, *25*  149:*18*, *25*
**factor**  202:*6*  205:*19*  206:*13*  208:*5*
**factors**  37:*16*  52:*24*  58:*14*  106:*17*  128:*7*  195:*14*  200:*8*, *10*, *22*  201:*1*, *11*, *16*, *19*, *23*  202:*14*  209:*17*, *18*  210:*5*  211:*19*  213:*1*, *10*, *14*, *15*  215:*3*, *13*  217:*20*, *21*  218:*2*  228:*9*  230:*10*  231:*2*, *5*, *11*  232:*6*
**facts**  175:*19*  241:*22*
**factual**  241:*21*
**factually**  29:*3*
**fair**  19:*19*  23:*20*  24:*2*  62:*22*  66:*8*  88:*2*  98:*18*  106:*15*  107:*23*, *24*  132:*5*  162:*18*  163:*1*, *9*, *10*  200:*5*  202:*24*  206:*16*  208:*21*  214:*5*  219:*6*  241:*16*
**fairly**  17:*18*  167:*13*  238:*8*
**fallout**  209:*6*
**false**  23:*12*  25:*17*, *20*  29:*17*, *24*  30:*4*, *17*  31:*20*  32:*3*, *11*  35:*18*
**Fama**  53:*18*  56:*10*  57:*8*  58:*10*, *18*  60:*5*  64:*25*  65:*4*, *12*  66:*1*, *6*, *22*  67:*11*  68:*2*  69:*6*, *20*  71:*23*  72:*7*  78:*9*  80:*6*  81:*8*, *21*  84:*12*  87:*1*  89:*14*  90:*6*  92:*16*  93:*14*  94:*21*
**Fama's**  67:*21*  68:*18*  95:*24*
**familiar**  21:*19*  60:*18*  62:*15*  80:*12*  93:*17*  154:*6*  182:*3*
**far**  136:*11*  140:*9*  238:*1*
**fashion**  203:*23*

**fast**  82:*9*
**favorably**  184:*22*
**features**  157:*16*  165:*15*
**February**  31:*24*  39:*6*, *19*  40:*2*, *9*  41:*7*  42:*16*, *22*  43:*8*  44:*2*  45:*8*  47:*18*, *23*  48:*3*, *6*  49:*2*, *13*, *20*  50:*17*  52:*9*  119:*23*  120:*8*, *9*  147:*24*
**Federal**  1:*20*  222:*14*, *23*
**figure**  43:*21*  75:*6*, *13*  77:*11*  85:*19*  105:*12*  130:*4*  135:*23*
**figures**  13:*19*
**figuring**  102:*22*
**file**  10:*12*
**filed**  14:*21*  229:*22*
**filing**  73:*8*, *19*  88:*17*  225:*15*
**filings**  74:*16*  77:*3*  88:*14*
**final**  66:*18*  210:*3*
**financial**  40:*23*  83:*13*  93:*12*  179:*22*  186:*8*  246:*13*
**find**  52:*1*  82:*4*  90:*13*
**findings**  225:*24*  226:*16*  240:*2*
**Fine**  45:*4*
**firm**  19:*13*  75:*5*  222:*10*
**firms**  60:*21*
**first**  5:*23*  6:*20*  15:*5*  24:*13*  33:*3*  39:*23*  40:*2*, *25*  41:*6*  47:*22*  48:*5*, *16*  50:*7*  52:*8*  60:*5*  79:*25*  117:*18*  120:*2*  125:*19*  155:*25*  191:*4*  196:*17*  202:*21*  211:*13*  237:*6*
**fit**  81:*14*
**five**  195:*21*
**fixed**  39:*17*  40:*3*, *7*  50:*3*
**flag**  238:*1*, *6*
**Flemming**  155:*25*

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

flip  119:*14*
flows  97:*13*
focus  145:*3*  197:*21*
focused  174:*3*
focusing  15:*18*  48:*5,
23*  213:*12*  215:*15*
follow  212:*3*
followed  69:*22*
following  43:*11*
 48:*13*  113:*24*  167:*5*
 178:*16*  194:*7*  196:*10*
 199:*17*  200:*1*  215:*10*
 231:*24*  232:*4*  245:*17*
follows  5:*23*  221:*10*
Footnote  30:*9*  43:*1*
 47:*10*  52:*1, 3*  65:*3, 4*
 66:*2, 4, 5, 23*  68:*17*
 71:*23*  132:*7, 12, 15*
 133:*13, 16*  136:*5, 23*
 144:*17, 19*  145:*11, 14*
 147:*16*  148:*6, 19*
 149:*14, 24*  151:*20*
 154:*4*  159:*15, 16*
 161:*15, 21*  162:*7, 14,
19, 25*  169:*8, 12, 18,
22*  170:*13, 19, 22*
 181:*1*  187:*13, 17, 18*
 188:*1*  213:*21*  215:*16*
 216:*2, 16*  217:*4*
footnotes  12:*23*
 38:*20, 25*  40:*22*
 151:*18, 24*  153:*16*
 158:*18*  159:*25*  160:*5,
24*  208:*8*
force  130:*22*
foregoing  244:*4*
foreseeable  218:*22*
 220:*7*  221:*3*  227:*4*
 228:*25*  234:*13*
forgive  63:*10*  83:*1*
forgotten  78:*19*
form  27:*15*  28:*6*
 30:*19*  36:*2*  37:*7, 10*
 55:*15, 19, 21, 25*  56:*4,
7*  58:*4*  59:*15*  60:*9*
 68:*10*  69:*10, 18*
 70:*17*  71:*14*  73:*19*
 74:*22*  75:*8*  76:*6*
 77:*9*  81:*18*  85:*11*
 86:*14*  89:*10*  94:*17*

95:*22, 23*  96:*11*
 97:*25*  98:*19*  100:*2*
 101:*15*  103:*23*
 105:*21*  109:*1*  110:*10*
 114:*8*  115:*12*  122:*19*
 124:*3*  126:*1*  127:*6*
 128:*15*  130:*16*  134:*8*
 135:*6*  136:*3, 19*
 138:*6, 19*  139:*15, 23*
 143:*2*  150:*16*  151:*2*
 152:*3*  153:*19*  154:*21*
 156:*14*  157:*21*
 159:*17*  160:*9*  161:*1,
24*  162:*17*  164:*18*
 166:*5*  167:*2*  168:*6*
 171:*4, 24*  174:*10, 22*
 175:*11*  176:*6*  177:*3,
22*  179:*19*  180:*11*
 183:*9*  184:*7, 14*
 185:*11, 12*  186:*5, 6*
 188:*17*  189:*14*  193:*2*
 194:*4*  196:*16*  198:*16*
 202:*2*  203:*13*  204:*23*
 205:*15*  206:*5*  209:*15*
 210:*8*  212:*1*  213:*5*
 214:*6*  216:*4*  217:*7*
 218:*6*  219:*7, 25*
 220:*9*  221:*5*  222:*19*
 223:*18, 25*  224:*10*
 225:*9*  226:*9*  227:*7*
 228:*4*  229:*2*  230:*1*
 231:*18*  232:*23*
 233:*20*  234:*14*  244:*8*
formal  80:*12*
formally  165:*4*
formed  112:*9*
form-efficiency  71:*10*
form-efficient  64:*17*
former  158:*9*  212:*16*
forth  94:*22*  165:*13*
 205:*25*  208:*10*
 211:*21*  215:*2*  228:*22*
 229:*21*  241:*14*
fortune  227:*9*
Forum  22:*8, 13*
 32:*23*  33:*11, 13, 15,
19*  34:*2, 8, 14, 19*
 35:*8, 9, 21*  36:*12, 17,
23*  104:*6*  131:*14, 15,
20, 23, 25*  132:*8, 16*

133:*8, 12, 22, 24*
 134:*2, 5, 11, 19, 21*
 135:*1, 17*  136:*6, 12,
22, 25*  137:*3, 10, 21*
 138:*4, 12, 17, 21*
 139:*9, 13, 20*  140:*2, 4,
8, 18, 21*  141:*2, 3, 7,
17*  142:*12, 14, 25*
 143:*6*  144:*1, 6, 14, 22*
 145:*1, 4, 11, 17*
 146:*10, 18, 24*  147:*6,
18*  148:*24*  149:*3*
 150:*13*  151:*1, 11, 25*
 152:*20*  153:*6, 17*
 154:*5, 13, 17*  155:*5,
23*  156:*3, 6, 12, 19, 25*
 157:*8, 11, 14*  158:*2,
19*  159:*6, 9, 14, 22*
 160:*2, 8, 25*  161:*16,
21*  162:*3, 5, 7, 14, 15,
20*  163:*2, 14, 17, 25*
 164:*24*  165:*1, 9, 11,
13, 18, 24*  166:*3, 8, 14,
15, 16, 18, 24*  167:*10,
19*  168:*17, 18, 23*
 169:*5, 14, 17*  170:*2, 3,
6, 9, 25*  172:*4, 13, 24*
 173:*13, 16*  174:*6, 14,
19*  175:*4*  194:*10*
 214:*4, 13*
Forum's  138:*25*
forward  13:*21*
 222:*15*  235:*3*
forwarded  142:*21*
 156:*2*  173:*3*
forwarding  165:*17*
 173:*12*
found  119:*21*  223:*9*
founded  205:*5*
 228:*16*
four  14:*10*  54:*19, 25*
 201:*4*  209:*18*  230:*10*
fourth  106:*22*  225:*18*
framed  17:*14*
framing  15:*21*  29:*1*
 112:*4*
fraud  14:*15*  24:*9*
 132:*3*  144:*4, 21*
fraudulent  25:*3, 5, 8*

FRCP  245:*22*
frictions  57:*13*  87:*21*
friends  209:*8*
front  11:*8*
fruitful  236:*18*
fueled  23:*18*
full  30:*11*  133:*22*
 135:*10*  142:*12*  152:*6,
10*  163:*25*  174:*15*
 175:*5, 16*  213:*18*
 216:*7*
fully  56:*8, 12*  57:*2,
21*  58:*15*  59:*17*  78:*4*
 81:*1*  82:*20*  84:*9*
 85:*9, 16*  86:*12*
 113:*22*  213:*2*  238:*8*
fulsome  33:*7*
fund  91:*2*  140:*5*
fundamental  186:*20*
 190:*10*
fundamentally  94:*19*
funds  93:*19*  142:*18*
further  7:*20*  39:*1*
 111:*12*  142:*22*  145:*7*
 154:*1*  167:*12, 14*
 242:*11*  245:*22*  246:*7,
11*
future  97:*13*

< G >
Gabby  15:*14*
GAIL  2:*11*
games  45:*22*
gather  198:*19*
gatherings  47:*1*
Gene  60:*5*  81:*21*
general  73:*14*  74:*2*
 81:*17*  84:*22*  89:*5*
 92:*15*  98:*23*  99:*17*
 104:*19*  116:*15*  119:*2*
 123:*13*  129:*9*  180:*13*
 225:*16*
generally  19:*7*  22:*23*
 26:*24*  40:*24*  42:*6, 9,
14, 23, 24*  44:*11*
 47:*12*  58:*2*  74:*3*
 80:*3*  81:*7*  96:*1*
 107:*24*  114:*16*
 117:*24*  129:*4*  137:*25*

170:*10* 179:*1* 206:*14* 221:*22*

**generate** 91:*4* 92:*12* 93:*23*

**generated** 32:*10* 228:*12*

**generating** 92:*12*

**genesis** 157:*7*

**Genome** 191:*8*

**Genuity** 180:*24*

**getting** 91:*15* 141:*8* 191:*24*

**give** 6:*22* 8:*4* 32:*18* 50:*14* 93:*6* 119:*14* 121:*3* 144:*8* 181:*13* 215:*13*

**given** 17:*16* 22:*16* 26:*13* 59:*3*, *4* 60:*17* 72:*3* 73:*3* 76:*4*, *5*, *23* 77:*4*, *8* 93:*2* 122:*2* 123:*22* 184:*9* 185:*22* 189:*4* 236:*7*, *22* 244:*6* 245:*20*

**gives** 54:*7*

**glean** 186:*16*

**go** 6:*19* 55:*5* 78:*20* 84:*11* 88:*11*, *16* 94:*19* 120:*3* 121:*2* 122:*11* 127:*15* 129:*17* 143:*15* 163:*10* 185:*16* 187:*9* 193:*5*, *6* 195:*11* 198:*3* 199:*7* 201:*4* 212:*19* 222:*15* 232:*12* 236:*11*, *19* 240:*10* 242:*15*

**goes** 68:*1* 88:*4*, *6* 93:*13* 105:*22* 142:*15* 146:*14*, *22* 188:*8* 190:*1* 193:*15* 233:*22* 234:*18*, *19* 242:*2*

**going** 6:*5* 10:*13* 43:*15*, *18* 44:*16* 47:*14* 48:*21* 51:*11* 53:*8* 54:*23* 67:*9* 68:*6* 78:*6*, *19* 87:*17* 91:*6* 92:*6* 94:*23* 95:*1* 104:*21* 106:*18*, *25* 110:*12* 111:*24* 115:*18* 116:*24* 117:*2*,

*3* 124:*11* 126:*4* 142:*8* 149:*25* 182:*13* 191:*23* 195:*22*, *23* 199:*5* 205:*6* 206:*23* 209:*5* 222:*23* 227:*10* 232:*25* 236:*15* 238:*2*, *3* 239:*9* 242:*17*

**GOLDMAN** 3:*4*

**Good** 6:*3* 44:*18*, *25* 53:*21* 54:*7* 82:*23* 83:*3* 93:*6* 102:*21* 110:*25* 112:*21* 141:*25* 182:*16*, *23* 238:*15* 240:*12*

**Goodner** 154:*3*, *16* 155:*2*, *11*, *22* 166:*3*, *12*

**Goodner's** 154:*16*

**governor** 45:*10*

**grab** 240:*3*

**grace** 216:*19*

**grade** 106:*22*

**Graziano** 1:*21* 5:*15* 245:*14* 246:*18*

**great** 44:*23*

**ground** 6:*18*

**GROUP** 3:*5*

**growing** 32:*2* 239:*7*, *17*

**growth** 31:*21* 32:*1*, *11* 193:*10* 238:*23*

**guess** 76:*15* 141:*7* 221:*9*

**guidance** 97:*17* 112:*23*

**guidelines** 46:*25* 207:*24*

**Gupta** 167:*25*

**guy** 101:*3*

**< H >**

**hand** 53:*1*, *22* 74:*12*

**happen** 43:*19* 71:*7* 82:*1*

**happened** 112:*20* 233:*11*

**happening** 46:*17* 99:*20* 104:*24*

**happens** 82:*8* 98:*25*

**hard** 11:*5* 18:*22* 19:*4* 26:*24* 35:*15* 45:*14* 47:*21* 52:*4* 92:*14* 93:*10* 99:*15* 102:*1* 104:*19* 109:*3*, *14* 124:*6* 129:*12*, *25* 140:*6* 155:*15* 166:*10* 180:*12* 187:*4* 210:*10*

**HARIHARAN** 1:*8* 245:*8*

**harm** 208:*17*, *25* 209:*12* 227:*3* 229:*21* 231:*11* 233:*19* 234:*13*

**HARVEY** 1:*3* 5:*8* 245:*3*

**Hasiuk** 2:*5*

**head** 81:*14* 82:*25*

**headed** 47:*3*

**headline** 191:*4* 239:*13*

**headlines** 167:*6*

**Health** 163:*16* 168:*3*

**HEALY** 2:*11*

**hear** 187:*7*

**heard** 6:*20* 58:*1* 235:*17*

**heavily** 188:*24*

**hedge** 91:*2*

**heightened** 40:*17* 206:*13* 208:*12* 221:*2* 227:*2* 228:*14* 230:*12* 232:*22* 233:*18* 234:*11*

**he'll** 235:*21*

**help** 63:*5* 67:*9*

**helpful** 14:*24* 17:*21*

**HERM** 2:*12*

**hesitate** 188:*22*

**hesitating** 21:*7* 49:*6*

**high** 17:*18* 34:*13* 41:*1*, *23* 43:*4* 46:*16* 47:*8*, *17* 50:*10* 52:*11* 67:*25* 93:*16* 94:*8* 105:*16*

**higher** 49:*18* 92:*9* 116:*19*

**higher-than-expected** 116:*8*, *9*

**high-level** 23:*15* 24:*4* 241:*9*

**highlight** 110:*14* 165:*18*

**highlighted** 165:*12*

**highlighting** 179:*3*

**highlights** 167:*6*

**highly** 81:*15*

**Hindenburg** 4:*16* 24:*12* 29:*10* 35:*19* 36:*7*, *8*, *11* 131:*8* 132:*1*, *4*, *25* 133:*10* 144:*2*, *8*, *13* 145:*10*, *16* 165:*10* 176:*1*, *14*, *17*, *21* 177:*2*, *12*, *16*, *20*, *24* 178:*17* 179:*11* 181:*17*, *20*, *25* 182:*4*, *12* 183:*5*, *16*, *23* 184:*4*, *20* 185:*1*, *8*, *23* 186:*22* 188:*16* 189:*12* 193:*19*, *24* 196:*9* 197:*5*, *10* 198:*8* 199:*18* 200:*2* 202:*21* 203:*4* 204:*2* 205:*3* 206:*21* 207:*20* 208:*19* 209:*3* 210:*11*, *18* 211:*1*, *9*, *14*, *16* 212:*12* 213:*24* 214:*11*, *19* 215:*9*, *10*, *18*, *23* 216:*17* 218:*19* 221:*21* 225:*7* 226:*2*, *22* 228:*2*, *12*, *15* 229:*13*, *22* 230:*16* 231:*25* 237:*5*, *10*, *16*, *20* 238:*19* 239:*4*, *21*, *25* 240:*2*, *22* 241:*7*

**Hindenburg's** 204:*8*, *17* 205:*13* 206:*3* 211:*17*

**hired** 223:*23*

**hold** 171:*21*

**holdings** 168:*11*

**homogeneous** 41:*20*

**hope** 201:*9*

**hopefully** 7:*8*

**Horizon** 30:*4* 31:*1* 113:*1* 128:*23* 129:*7*

**hour** 44:*16* 91:*16* 182:*14* 238:*2*

**hours** 9:*10*, *14*

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

**hundreds** 60:*6* 81:*12* 83:*2* 94:*7*
**hyperlink** 164:*7, 14*
**hypotheses** 58:*3, 14*
**hypothesis** 56:*11, 14* 57:*1, 4, 20, 22* 58:*12*
**hypothesized** 58:*25* 60:*5*
**hypothetical** 103:*25* 104:*1* 123:*6* 125:*14*
**Hypothetically** 116:*7* 170:*24* 233:*13*

**< I >**
**Ian** 155:*25*
**idea** 240:*12*
**ideal** 58:*9*
**identified** 158:*17* 200:*22* 208:*19* 216:*2* 217:*3*
**identify** 29:*7* 79:*10* 132:*7* 144:*19* 148:*22* 150:*10* 210:*4* 213:*1* 215:*17* 227:*24*
**ii** 21:*12, 15, 24, 25* 22:*18*
**illegalities** 133:*6*
**Illinois** 1:*25* 245:*16* 246:*21*
**Illumina** 211:*8* 212:*16, 20, 23*
**Illumina's** 210:*22*
**illustrates** 112:*17*
**imagine** 104:*23*
**immediately** 183:*23*
**impact** 14:*18* 15:*1* 24:*8* 25:*2, 17, 23* 26:*3* 107:*22* 108:*3, 24* 110:*8* 113:*19* 114:*6, 12, 20* 122:*14* 123:*4, 25* 125:*13, 21* 126:*22, 25* 128:*5, 8, 11* 211:*24*
**impacted** 43:*9* 44:*4* 45:*8* 124:*1, 2* 193:*11* 199:*19* 200:*4*
**implement** 41:*16*
**implication** 111:*18*
**implications** 68:*7* 70:*5* 81:*16, 25* 85:*1*

105:*13* 146:*25* 194:*20*
**implied** 116:*1*
**implies** 49:*8*
**import** 28:*15, 20* 42:*10*
**important** 54:*10* 60:*2* 61:*5, 17* 63:*6, 14* 95:*15, 18* 96:*10, 12* 97:*4, 6, 10* 98:*25* 99:*19* 108:*21* 109:*25* 110:*15* 122:*25* 129:*6* 165:*10*
**impossible** 124:*13*
**impounded** 59:*14* 67:*10* 68:*8* 70:*5* 71:*6* 77:*20* 80:*20* 81:*25* 82:*6, 10* 83:*17* 84:*1, 5* 96:*5* 171:*16* 194:*11, 13, 21*
**impression** 31:*20* 32:*11* 222:*9*
**improper** 23:*18* 24:*1* 27:*10* 28:*2* 227:*6* 241:*6*
**incentives** 81:*24* 90:*2*
**include** 25:*7* 49:*22* 50:*19* 54:*15* 59:*10* 116:*3* 134:*20* 147:*21* 148:*2* 152:*11* 216:*16*
**included** 12:*24* 23:*25* 30:*9, 12* 36:*14* 37:*2* 45:*9* 65:*23* 108:*6* 114:*11* 123:*23* 129:*2* 157:*1* 164:*2, 4* 165:*18* 166:*11, 17* 176:*14, 17* 211:*16, 17*
**includes** 239:*14*
**including** 9:*19* 15:*21* 26:*18* 37:*16* 40:*20* 43:*10* 44:*13* 46:*11* 47:*15* 48:*6, 17, 24* 52:*24* 53:*17* 60:*8* 61:*23* 62:*18* 64:*13* 77:*14* 84:*20* 86:*19* 87:*23* 94:*20* 100:*25* 102:*16* 104:*11* 115:*21* 118:*15* 122:*17* 151:*6* 153:*1* 167:*21* 174:*16* 177:*7*

178:*1, 2* 194:*12, 20* 197:*7* 198:*21, 22* 199:*1* 203:*17* 209:*7, 8* 215:*1, 5* 218:*15* 220:*12* 221:*11* 222:*1* 229:*8, 10* 232:*18* 234:*1* 235:*4*
**inconsistent** 61:*1* 196:*23*
**Incorporated** 5:*9* 64:*20* 67:*3* 81:*1* 82:*20* 95:*16* 145:*24* 146:*6, 12, 20* 147:*7, 15*
**incorrect** 49:*9*
**increase** 29:*22* 30:*3, 24* 112:*25* 116:*10, 12, 22* 117:*9, 15, 22* 118:*21, 25* 128:*21*
**increased** 117:*6*
**increases** 87:*11, 15* 89:*2* 91:*24* 120:*1* 121:*1, 23*
**incur** 87:*17* 90:*9* 92:*9* 95:*12*
**incurred** 88:*23*
**incurring** 91:*6*
**independent** 224:*16*
**INDEX** 4:*1* 39:*9*
**indicate** 18:*12* 52:*7* 118:*11* 164:*13* 170:*7* 240:*2*
**indicated** 12:*1* 29:*14* 30:*13, 23* 33:*3* 37:*20* 39:*24* 40:*22* 41:*22* 43:*1* 47:*9* 56:*6* 57:*8, 10* 122:*5* 134:*13* 157:*24* 161:*8* 178:*17* 207:*15* 214:*22* 227:*21*
**indicates** 30:*9* 58:*10* 113:*9* 124:*23* 125:*12* 126:*9* 163:*12* 176:*9* 184:*22* 210:*17*
**indicia** 74:*19* 76:*3* 77:*7*
**indirect** 108:*23* 110:*6*
**individual** 44:*14* 92:*5* 100:*16* 104:*3*

**Individually** 1:*3* 245:*3*
**individuals** 152:*1* 167:*16*
**industry** 39:*9* 62:*20* 207:*24* 233:*2, 4*
**infer** 127:*4* 199:*18* 200:*3* 215:*11* 232:*1*
**inference** 124:*7, 13* 125:*8* 173:*18*
**inferring** 195:*7*
**inflated** 219:*5*
**inflation** 108:*15*
**influencing** 128:*7*
**inform** 34:*21*
**information** 15:*20* 22:*7, 13* 26:*12* 31:*7, 18* 32:*9, 24* 34:*19* 35:*22* 36:*10, 14, 23* 39:*1, 7* 43:*14* 44:*8* 47:*13* 56:*9, 13* 57:*3, 13, 21* 58:*16, 20* 59:*11, 13, 18, 20, 21* 60:*1, 2, 21* 61:*5, 11, 16* 62:*2, 7, 14, 20* 63:*2, 4, 6, 14, 20, 25* 64:*4, 6, 15, 19, 20* 65:*7, 13, 15, 18, 21* 66:*8, 17, 21* 67:*2, 3, 8, 13, 18, 23* 68:*5, 8, 13, 22, 25* 69:*3, 8, 16* 70:*4, 15, 21* 71:*6, 13, 15* 72:*1, 4, 10, 14, 19, 24* 73:*3, 22* 74:*6, 13, 20* 75:*1, 2, 6, 11, 17, 19, 22, 24* 76:*3, 4, 12, 16, 22, 25* 77:*1, 2, 12, 17, 19, 20* 78:*4, 25* 79:*21* 80:*19, 20, 24* 81:*1, 23, 24* 82:*5, 6, 8, 10, 18, 20* 83:*17, 25* 84:*4, 10, 25* 85:*3, 10, 17, 21, 23* 86:*12* 87:*11, 13, 20, 23, 24* 88:*4, 5, 8, 10, 13, 24* 89:*2, 3, 7, 8, 21, 25* 90:*3, 12, 14, 15, 17, 18, 22, 23, 24* 91:*1, 4, 7, 9, 10, 14, 24, 25* 92:*6, 10, 13, 18, 22, 23, 25* 93:*1,*

**22** 94:*10*, *12*, *13*, *15*, *25* 95:2, *14* 96:*1*, *2*, *3*, *10*, *12*, *18*, *22* 97:2, *6*, *8*, *11*, *23* 98:5, *16*, *17* 99:*9*, *22*, *24*, *25* 100:*6*, *24* 101:*5*, *9*, *12*, *14*, *24* 102:*1*, *5*, *8*, *11*, *16*, *17* 103:*9*, *18* 104:*4*, *9*, *10*, *16*, *17* 105:*3*, *5*, *8*, *9*, *11*, *14*, *15*, *19*, *25* 106:*3*, *6*, *7*, *9*, *12*, *18* 107:*1*, *2*, *3*, *7*, *23* 108:*3*, *22*, *24* 109:*12*, *15*, *19* 110:7 112:*14* 113:5, *11*, *20* 114:7, *21*, *25* 115:5 116:2, *4*, *14* 117:*1*, *14*, *21* 118:*9*, *14* 119:*3* 121:*16*, *18* 122:*16*, *24* 123:*13*, *15*, *19* 124:8, *20*, *25* 125:*3*, *4*, *9*, *17* 126:*7*, *8*, *12*, *16*, *20* 127:2, *4*, *20*, *22* 128:*1*, *2*, *5*, *24* 130:*3*, *5*, *9*, *14* 131:6 132:*13*, *24*, *25* 140:*24* 143:*25* 144:*12*, *20* 145:*9*, *23*, *24* 146:*4*, *5*, *9*, *11*, *17*, *23* 147:5, *7*, *14* 149:*17* 155:5 165:8, *19*, *20* 166:*23* 168:*4*, *9*, *11* 171:*1*, *12*, *15* 172:*20* 176:*10*, *16*, *20*, *25* 177:*8*, *11*, *16* 178:5, *8*, *22*, *23* 179:*13*, *17* 180:2, *7*, *10*, *15*, *17* 181:5 182:6 183:*4*, *15* 184:*3* 185:7, *22* 186:*11*, *20* 189:7 193:*18*, *25* 196:*25* 197:*3* 198:*20* 201:*1* 203:*10* 210:*16* 211:7 214:*10*, *12*, *15*, *17*, *22*, *24* 215:8, *15*, *21* 216:*1* 217:*3*, *14* 218:*13* 231:*3* 233:*16* 235:6 240:*23*
**informational** 103:*16*

**informative** 64:*10* 113:*18* 114:6 123:*4* 125:*13* 179:*25*
**informed** 28:*17* 91:*13*
**informs** 27:*20*
**initially** 135:*15*
**input** 108:*14*
**inside** 76:*12* 96:*1*
**insider** 75:7, *9* 96:*2*
**insist** 195:*23*
**instance** 72:*12* 174:7
**instances** 63:*19* 98:7, *9* 108:*9* 208:*16*
**institutional** 83:*16*, *23* 91:*3* 93:*16* 94:2, *3* 151:8 152:*19*
**institutions** 83:*21* 92:9 94:6 104:*12*
**instructed** 20:*3*
**instruction** 7:*20*
**instructions** 19:*15*
**integrity** 101:8
**intended** 84:*17*
**interest** 62:*10* 246:*13*
**interested** 230:*23*
**interesting** 100:8, *12* 103:*25*
**interject** 191:*15*
**internal** 222:*10* 238:*17* 239:*3*
**internally** 113:*23*
**International** 15:*11*
**internet** 62:6 88:*15* 150:*9*, *11* 169:*3*
**interpret** 25:*13* 61:*1* 93:*5*
**interpretation** 101:*11* 193:*15* 199:*3*
**interpreted** 186:*21*
**interrupt** 110:*19*
**intraday** 191:*10*
**intrinsically** 115:*23*
**investigate** 105:*1* 217:*10* 223:*24*
**investigated** 103:6
**investigating** 223:*23*
**investigation** 222:*10*, *11* 223:6, *7*, *9*, *12*, *14*,

*15*, *17*, *20* 224:6, *16*, *19* 225:*21*, *22* 230:*18*
**investigations** 139:*3* 209:7 218:*24* 225:*23*
**Investment** 15:*6* 61:*3* 62:6 64:8 93:*18* 97:*21* 138:*17*, *18*, *22* 139:*21* 140:*5*, *10*, *13*, *14* 142:*18* 179:*16*
**investor** 63:*13* 70:*3* 91:*3* 98:*3* 168:*22* 170:*24* 171:*22* 194:*1* 196:*11* 198:*12* 224:*18*
**investors** 32:*25* 33:*20* 34:*9*, *20* 59:*12* 65:6, *20* 66:*7*, *16* 67:*22* 68:*12* 69:*7*, *15* 70:2, *13* 71:*25* 72:*3*, *9*, *23* 73:2 78:5 81:22 82:9 83:*16*, *23* 84:8, *10*, *14* 85:6, *9*, *10* 86:*11*, *13*, *24* 87:*12*, *16* 88:6 91:*25* 92:*3*, *4*, *5*, *8* 93:*17* 94:2 98:*4* 151:8 152:*19*, *25* 153:5 154:*9* 157:8 171:*13* 172:*21* 173:*4*, *7*, *10* 179:6 182:*1* 183:7 184:5 186:2 191:6 192:*19* 195:6 216:*13* 239:*15*
**involved** 51:*10* 52:*18* 53:*25*
**involves** 149:*25*
**IQ** 148:*1*
**IRS** 167:9
**isolate** 125:*20* 130:*12*
**issuance** 46:*25* 203:6
**issue** 98:*24* 99:*3*, *8*, *18* 101:*24* 175:*16* 189:*19* 212:*9*
**issued** 182:9 184:*20* 190:*25* 203:*3*
**issues** 7:8 14:*18* 17:22 179:*4* 180:*1* 182:*3*, *4*, *5* 188:8

208:*18* 242:*3*
**issuing** 101:*4*
**item** 13:6 206:*10*
**items** 13:*12*, *24* 154:*12*
**its** 29:*22* 30:2 32:*12* 33:9 37:*24* 39:8 44:*10* 70:5 81:25 85:*1* 93:2 96:*13* 97:7 99:5 100:*25* 103:*7*, *8*, *10* 112:22 116:*4* 118:5, *15* 124:*21* 137:*23* 138:*4*, *13* 140:2 144:*23* 151:25 158:*4* 167:*11* 172:5 174:*20* 176:2 182:8 193:*15* 196:*25* 203:7 209:*4* 210:*13*, *20*, *21*, *23* 211:8 212:22 218:*11*, *13* 219:15 233:*15* 238:22, *25* 240:*4*
**iv** 227:*24*

**< J >**
**JAMES** 2:*11*
**jdancona@ktmc.com** 2:8
**JOHN** 1:*3* 5:8 245:*3*
**JONATHAN** 2:*12*
**Josh** 44:*15* 91:*15* 141:25 195:*18* 237:25
**Joshua** 2:5 6:4
**Journal** 74:*10* 77:23 79:*13* 80:*13* 83:*13* 103:5, *13*, *22*
**journals** 62:*21*
**judgment** 54:*14*, *22* 115:*10*
**judgments** 26:2 51:7 53:24
**July** 22:8 131:*21*, *24* 144:*1* 145:5 146:9, *19* 147:5, *19* 148:*21* 150:*14* 158:2 161:*17*, *22* 162:2 163:*4* 168:*18*, *23* 169:6 170:25 171:7, *22*

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

174:*8*, *16*  194:*15*
**juncture**  241:*13*
**justifiably**  100:*19*
**justification**  52:*16*
**justified**  186:*19*

**< K >**
**Kamath**  167:*24*
**KATTEN**  2:*13*, *18*
 19:*13*
**keep**  122:*1*
**keeping**  18:*24*
**KESSLER**  2:*6*
**kid**  106:*21*, *22*
**kind**  75:*18*  156:*3*
**kinds**  62:*17*  199:*2*
**King**  2:*6*
**Klein**  15:*14*
**knew**  43:*18*  103:*12*
 129:*5*
**know**  7:*4*  11:*1*
 21:*23*  23:*1*, *4*  25:*1*
 28:*24*  36:*5*, *10*  40:*24*
 44:*17*, *20*  54:*20*  55:*2*
 56:*24*  57:*16*  74:*14*,
 *25*  75:*1*, *11*  76:*8*, *17*
 81:*20*  91:*8*, *17*  93:*17*,
 *25*  98:*21*  102:*12*, *22*
 104:*14*  111:*19*  112:*1*,
 *18*  113:*5*  118:*4*
 119:*2*  122:*9*  124:*16*,
 *19*, *22*  127:*11*, *13*
 129:*24*  132:*16*
 134:*11*, *16*  135:*9*, *11*,
 *13*, *19*, *20*  136:*17*
 137:*6*, *16*, *17*  138:*12*,
 *15*, *16*  139:*8*, *16*
 140:*7*, *9*, *14*, *15*, *16*, *19*
 141:*1*, *9*, *10*  142:*24*
 143:*3*, *13*  148:*14*
 153:*2*, *4*, *11*, *14*, *20*
 155:*1*, *16*, *20*  157:*6*, *9*
 158:*16*, *20*  159:*4*, *11*
 161:*8*  163:*15*, *16*, *24*
 164:*12*  168:*3*, *8*
 170:*5*, *11*, *15*  172:*3*
 174:*19*, *24*, *25*  175:*8*
 184:*21*  185:*18*  186:*7*
 187:*4*, *5*  199:*22*
 207:*16*, *19*  208:*2*, *22*

209:*22*  210:*10*, *11*
 220:*15*  222:*2*  224:*14*,
 *22*, *23*  225:*13*  226:*8*,
 *11*, *12*, *14*  230:*4*, *19*
 233:*24*  235:*19*
**knowledge**  139:*20*, *25*
 140:*1*, *4*, *10*
**knowledgeable**  76:*11*
**known**  60:*24*  65:*19*
 90:*12*  167:*25*  178:*20*,
 *23*  179:*6*, *18*  182:*1*
 204:*1*

**< L >**
**lack**  70:*9*  125:*8*
**laid**  122:*2*
**language**  15:*22*  24:*5*
 30:*10*  49:*7*  66:*3*, *5*,
 *23*  68:*17*  69:*5*  71:*22*
 87:*6*  97:*11*  145:*20*
 148:*4*  157:*2*  166:*11*
 188:*4*  192:*16*  213:*7*
 239:*14*
**large**  73:*11*  80:*10*
 83:*16*, *20*, *23*  91:*2*, *3*
 92:*8*  94:*2*, *6*  104:*11*
 152:*25*  194:*1*  230:*21*
**largely**  59:*6*  219:*15*
**larger**  90:*4*  129:*19*
**largest**  94:*3*
**late**  60:*3*
**laureate**  65:*12*
**Law**  149:*18*  150:*1*
 222:*10*
**laws**  234:*2*
**lawyer**  227:*16*
**lawyers**  223:*23*
 224:*9*  226:*21*
**lay**  19:*9*, *22*
**LEAD**  2:*2*  207:*21*
**leads**  231:*9*, *10*
**League**  45:*20*
**leagues**  46:*4*
**learn**  90:*15*  94:*14*
 115:*20*
**learned**  241:*4*
**learning**  88:*3*  89:*2*, *7*
 90:*17*
**leave**  135:*18*

**leaving**  28:*4*
**led**  222:*2*
**LEERINK**  3:*4*
**legal**  14:*25*  15:*22*
 17:*22*  24:*17*  25:*8*, *9*
 33:*24*  35:*15*  36:*19*
 114:*11*, *12*  206:*14*, *24*
 207:*6*, *11*  208:*13*
 219:*8*  220:*1*  221:*2*,
 *15*  222:*3*, *22*  223:*4*
 227:*2*  228:*21*  229:*20*
 230:*13*  231:*10*
 232:*22*  234:*12*
 241:*25*  242:*2*
**legitimate**  99:*24*
 188:*15*  189:*4*
**length**  166:*10*
**level**  17:*18*  34:*13*
 46:*16*  47:*9*  67:*25*
 154:*16*  156:*6*
**levels**  42:*2*  47:*17*
**liability**  222:*16*
 241:*16*
**lied**  191:*11*
**Life**  191:*8*
**light**  102:*6*  121:*20*
 234:*10*
**limit**  94:*12*, *23*
**LIMITED**  2:*4*  77:*14*
**line**  13:*24*  44:*22*
 96:*7*  182:*21*  192:*16*
 238:*5*, *7*  243:*5*
**lines**  57:*10*  173:*14*
 208:*8*
**linked**  115:*24*  184:*25*
**List**  9:*20*  12:*12*
 14:*9*  15:*3*  136:*24*
 152:*8*  166:*17*  201:*4*
**listed**  12:*20*  13:*12*,
 *20*  15:*5*, *8*, *17*  19:*16*
 122:*6*  133:*12*  134:*6*
 136:*23*  147:*22*
 170:*13*
**listening**  80:*15*
**listing**  136:*10*
**literally**  56:*15*  57:*5*,
 *23*
**literature**  40:*23*
 53:*17*  54:*9*  55:*2*
 60:*23*  69:*22*  70:*8*

73:*15*  78:*11*  79:*5*
 80:*10*  82:*12*  84:*7*
 85:*7*  86:*10*  100:*9*
 113:*12*  114:*3*, *14*, *24*
 115:*8*, *11*, *17*, *22*
 116:*1*  118:*24*  119:*2*
 179:*23*  203:*8*, *15*, *19*
 204:*13*  205:*9*  208:*4*
 220:*12*  229:*8*  230:*20*
**litigation**  212:*16*
 235:*7*
**little**  18:*9*  21:*8*, *15*,
 *18*, *24*  22:*18*  26:*16*
 34:*2*  49:*6*  74:*25*
 76:*9*  92:*14*  98:*11*
 101:*17*  102:*4*  105:*23*
 144:*25*  166:*10*
 182:*21*  191:*20*
**LLC**  3:*4*, *5*
**LLP**  2:*6*, *13*, *18*  3:*7*
**located**  7:*13*
**long**  9:*8*, *12*  52:*19*,
 *23*  53:*23*  54:*13*
 88:*15*  90:*7*  156:*20*
 166:*2*, *3*, *9*  191:*23*
**longer**  94:*16*  191:*20*
**look**  54:*1*  55:*1*  59:*2*,
 *6*, *9*, *24*  61:*3*, *14*, *19*,
 *24*  62:*5*  63:*4*, *12*
 71:*19*  72:*2*  73:*1*
 77:*3*, *13*  83:*4*, *9*
 85:*22*  86:*1*, *21*  95:*24*
 102:*15*  108:*10*, *13*
 110:*15*  127:*25*
 128:*18*  178:*11*
 179:*15*  180:*15*
 202:*17*  208:*1*, *2*, *3*
 233:*7*  235:*10*, *24*
 236:*8*  237:*15*
**looked**  25:*23*  41:*4*
 60:*10*, *14*  152:*17*
 225:*6*
**Looking**  19:*6*, *22*
 21:*12*  22:*22*  23:*6*
 29:*13*, *14*  31:*23*  33:*9*
 71:*22*  75:*21*  84:*13*,
 *24*  88:*19*  98:*22*
 107:*20*  116:*17*, *20*
 119:*13*, *18*  120:*14*
 121:*3*  122:*8*  148:*3*

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

173:*5*  179:*23*  182:*6*
191:*1*  192:*15*  200:*9*
206:*9*  221:*12*  231:*15*
**looks**  60:*23*
**Los**  2:*19*
**lose**  110:*18*
**loss**  121:*25*
**lost**  160:*21*
**lot**  16:*24*  36:*1, 3*
43:*17*  44:*8, 12*  47:*13*
53:*16*  80:*13, 16*
95:*25*  99:*14*  110:*11*
112:*13*  113:*21*  140:*1*
167:*18*  177:*25*  178:*8*
179:*23*  181:*21*  212:*5*
233:*24*
**lots**  60:*13*
**lower**  49:*14*
**lunch**  142:*1, 23*
143:*15*  182:*15*
**lunchtime**  141:*8*
**Lundquist**  203:*17*

**< M >**
**magazines**  74:*18*
**magnitude**  87:*23*
95:*7*  186:*14*  207:*18*
**main**  145:*3*  154:*12*
189:*24, 25*
**Major**  45:*20*  47:*19*
183:*7*  184:*6*
**majority**  179:*5*
**making**  17:*21*  28:*20*
41:*18*  53:*19*  74:*1*
91:*10*  103:*10*  119:*1*
175:*9*  186:*12*  195:*5*
203:*20*  207:*3, 23*
218:*22*  226:*5*
**manage**  93:*21*  94:*6*
**Management**  15:*6*
64:*13*  93:*20*  179:*8*
182:*11*  183:*25*
184:*23*  193:*16*
208:*18*  209:*1, 2, 5, 12*
227:*3*  228:*21*  230:*13*
**manager**  140:*5, 11*
**managers**  93:*18*
140:*13*
**managing**  93:*19*
**manner**  4:*21*

**March**  29:*11*  39:*7*
45:*10, 17, 19, 24*  46:*8,*
*14, 23, 25*  51:*19*
53:*12*  155:*23*  169:*4,*
*22*  176:*3, 5*  178:*12*
185:*6, 21*  186:*1*
187:*11*  190:*4, 19, 25*
193:*21*  194:*25*
196:*13*  197:2  198:*4,*
*13, 23*  200:*13, 24*
201:*3, 13*  202:*15*
204:*11*  206:*2, 12*
207:*13*  208:*11*
209:*14*  210:*7*  211:*4*
213:*3, 16*  230:*9*
233:*11*
**MARCUS**  2:*12*
**marginal**  65:*14, 16*
67:*14, 15*  89:*15, 16*
92:*17, 18*  95:*3*
**mark**  10:*10*  190:*13*
**marked**  10:*15*  11:*10*
187:*2*  190:*15*  237:*3*
**market**  20:*4, 8, 16, 20,*
*23*  21:*2, 4, 9*  22:*5*
34:*21*  35:*22*  37:*6*
39:*8*  40:*17*  41:*1, 22*
42:*19, 21, 25*  43:*3, 13,*
*15, 19, 20*  44:*4, 8, 13*
46:*7*  47:*5, 11, 17*
48:*3*  50:*22*  51:*1*
52:*20, 22*  55:*16, 19,*
*22*  57:*14, 15*  58:*2, 9,*
*22, 25*  59:*3, 7, 19*
60:*4, 8, 12, 20*  61:*2,*
*11, 17*  62:*3, 12*  63:*7*
64:*18*  65:*5, 13, 17, 19*
66:*6, 15, 20*  67:*1, 7,*
*17, 21*  68:*4, 10, 20*
69:*2, 23, 24*  70:*10, 24*
71:*15, 19, 21, 24*  72:*8,*
*12, 16, 20*  76:*15*
77:*18*  78:*3, 11, 13*
80:*5, 8, 11, 16, 18*
81:*1, 7, 12, 17*  82:*4,*
*20*  83:*3*  84:*3, 9, 13,*
*19, 22*  85:*9, 15*  86:*6,*
*12, 18, 19, 21*  87:*3, 22*
89:*4, 18*  90:*19, 20*
94:*4, 5, 20*  96:*5, 11,*

*23*  100:*6, 15, 22*
101:*10, 12*  102:*6, 9,*
*14, 20, 21*  103:*12, 20*
104:*8, 24*  105:*10*
106:*19, 25*  107:*4, 5*
109:*16*  114:*18*  115:*4,*
*17, 22*  116:*3, 17, 20*
117:*5, 11*  118:*8*
121:*18*  122:*25*  125:*6*
126:*12, 13*  127:*13, 21,*
*24*  128:*3, 13*  129:*1, 5,*
*20*  141:*5, 9, 16*
142:*10*  145:*22*  146:*3,*
*8, 16*  147:*4, 10, 11, 13*
148:*8, 9*  151:*6, 9*
158:*25*  168:*16*
171:*14, 18*  178:*20, 24*
180:*10*  194:*9, 18*
197:*3*  198:*10*  202:*10*
208:*24*  211:*13*  217:*5*
219:*24*  233:*17, 18*
241:*3*
**marketing**  135:*4*
142:*13*  153:*15*
156:*24*  157:*5, 18*
160:*4, 12, 22*  161:*5*
166:*25*
**markets**  42:*15*  45:*9*
57:*10*  60:*11*  62:*6*
65:*1*
**market's**  97:*12*
104:*21*  117:*8*
**marshal**  209:*24*
**marshalled**  196:*22*
**Maryland**  46:*11*
**Massachusetts**  46:*12*
**material**  82:*5*  109:*25*
113:*17, 19*
**materially**  25:*20*
29:*23*  30:*4, 17*  32:*3*
**materials**  8:*11*  9:*15,*
*18, 19*  12:*15, 18, 22*
13:*3, 14, 15, 23*  56:*19*
133:*16*  136:*16*
149:*18, 20*  165:*23*
223:*16, 23*
**matter**  5:*8*  12:*5*
15:*8*  19:*11*  35:*15*
99:*17*  103:*17*  126:*10*

**MATTHEW**  1:*7*
2:*10*  245:*7*
**McDonald's**  106:*23,*
*24*
**mean**  25:*23*  28:*23*
42:*17*  51:*5*  53:*14*
57:*25*  74:*1*  87:*19*
89:*12*  91:*12*  96:*20*
98:*20*  100:*8*  107:*4*
108:*7*  109:*2*  110:*13*
115:*15*  118:*23*
128:*16, 18*  130:*19*
143:*4, 5*  166:*19*
191:*21*  192:*5*  202:*3*
204:*25*  219:*3, 20, 21*
223:*13*
**meaning**  53:*20*
93:*22*  102:*20*  107:*5*
112:*14*  136:*22*
142:*11*  154:*2*  190:*2*
**meaningful**  180:*8*
**means**  6:*21*  28:*24*
68:*11, 20*  70:*22*
186:*8*  209:*3*
**meant**  66:*21*
**measurable**  217:*15*
**measure**  107:*22*
108:*2, 7*  118:*13*
127:*4*  130:*14*
**measuring**  108:*15*
**mechanisms**  68:*9*
**media**  62:*5, 9*  73:*24*
74:*9*  100:*10, 13*
101:*21*  104:*6*
**medical**  232:*19*
**meeting**  8:*13, 16, 19,*
*21*  9:*1, 9*
**meetings**  9:*6*
**MELTZER**  2:*6*
**member**  75:*4, 10*
76:*11*
**mention**  13:*10*  33:*12*
35:*9*  169:*21*
**mentioned**  24:*14*
41:*21*  47:*16*  51:*15*
54:*11*  58:*13*  59:*15*
63:*10*  80:*2*  81:*11*
82:*3*  83:*5*  87:*20*
88:*12*  90:*25*  93:*14*
105:*10*  117:*13*

132:*19*  136:*21*
137:*20*  139:*11*
149:*23*  161:*3*  167:*8*
179:*21*  183:*21*
184:*21*  188:*18*  208:*6*
225:*13*
**mentions**  36:*8*  169:*5*
**merely**  240:*22*
**merits**  226:*21*
**message**  166:*12*
**messaging**  7:*23*
**met**  8:*11*
**method**  51:*8*
**methodological**  48:*15*,
*16*
**methodology**  38:*14*,
*22*  39:*2*  42:*6*  165:*6*
241:*15*, *20*  242:*8*
**MGML**  24:*1*  34:*22*
35:*24*  36:*23*  130:*21*
132:*2*  144:*13*, *20*
158:*4*, *6*, *8*, *10*  160:*6*,
*25*  167:*9*, *12*  168:*19*
181:*18*, *24*  182:*3*, *12*
183:*4*, *15*, *22*  184:*3*,
*19*, *25*  188:*10*  189:*11*,
*19*  191:*8*  193:*16*, *18*,
*24*  194:*2*, *10*, *13*, *20*
196:*8*  198:*9*  213:*24*
214:*4*, *17*  215:*18*
216:*1*, *9*  218:*15*, *19*
241:*6*
**MGML-Natera**
192:*19*
**MICHAEL**  1:*7*  2:*10*
245:*7*
**Michigan**  46:*12*
**microdeletion**  24:*2*
32:*1*  130:*22*  175:*20*,
*24*  176:*12*  178:*19*
**microdeletions**
130:*23*  176:*2*, *16*
177:*9*, *17*  178:*3*
179:*12*  182:*5*  188:*5*
218:*16*, *20*  239:*6*, *16*
**mid-1960s**  60:*4*
**middle**  28:*9*  68:*2*
192:*4*  239:*5*

**mind**  18:*24*  76:*17*
87:*2*  94:*11*, *16*
103:*18*  122:*1*  198:*2*
**mine**  51:*9*  82:*3*  83:*5*
**minor**  13:*6*, *17*
**minute**  110:*17*
117:*13*  119:*14*
**minutes**  44:*21*
192:*10*  195:*21*
**mischaracterizes**
136:*4*, *20*
**misconduct**  220:*8*
221:*4*  222:*17*  225:*4*
226:*25*  228:*19*  229:*1*,
*24*  231:*8*, *9*  232:*20*
234:*9*
**mishear**  174:*1*
**mislead**  191:*22*
**misleading**  25:*18*, *20*
29:*17*, *24*  30:*4*, *18*
31:*5*  32:*3*  111:*7*, *10*,
*17*  112:*23*  113:*4*
125:*4*  128:*21*  192:*6*
**misrepresentation**
30:*23*  113:*17*  114:*5*
123:*12*
**misrepresentations**
16:*12*, *22*  25:*18*
26:*18*  27:*18*  32:*20*
40:*1*  112:*7*  200:*12*
215:*12*  217:*24*  218:*4*,
*12*  219:*14*  232:*2*
**misrepresented**  24:*11*
111:*8*  219:*22*
**misspoke**  133:*18*
**misstated**  23:*2*  27:*12*
127:*12*
**misstatements**  25:*3*, *4*,
*19*  28:*3*  29:*8*  119:*22*
121:*22*  132:*14*
199:*19*  200:*3*
**misstates**  194:*5*
**MLS**  45:*20*
**moat**  210:*20*  211:*8*
212:*8*
**model**  50:*23*  52:*21*,
*22*  139:*1*  140:*2*, *16*
159:*9*  174:*25*
**models**  51:*1*

**moment**  184:*2*  191:*2*
238:*4*
**money**  90:*5*  91:*10*
93:*18*  140:*5*  173:*18*
**MONICA**  2:*11*
**month**  48:*1*
**months**  50:*8*
**MORGAN**  3:*2*
180:*24*
**morning**  6:*3*  29:*11*
**motion**  9:*24*
**motivation**  119:*6*
**move**  15:*13*  61:*11*
64:*3*, *5*  96:*20*  97:*1*, *2*,
*14*  118:*13*  119:*4*
124:*25*  182:*20*
203:*21*  207:*17*
236:*15*
**moved**  111:*19*  112:*2*,
*18*  113:*6*  119:*9*
**movement**  17:*11*
109:*8*, *17*  112:*15*
113:*16*  114:*4*  126:*14*
**movements**  37:*18*
186:*10*
**moves**  43:*12*  85:*23*
109:*11*  112:*8*, *10*
**moving**  103:*2*, *7*
111:*20*
**MRD**  190:*6*
**MUCHIN**  2:*13*, *18*
**multiple**  18:*25*  63:*9*
141:*3*  159:*21*, *22*
179:*3*  180:*19*  181:*8*
188:*20*
**MYERS**  3:*7*
**Myron**  83:*11*

**< N >**
**nail**  134:*23*
**name**  6:*3*  155:*25*
**named**  145:*15*
**narrative**  238:*21*
**NATERA**  1:*7*  2:*10*
5:*9*  19:*10*  20:*4*, *8*
21:*5*  22:*7*  36:*24*
37:*6*, *18*  43:*10*  74:*5*
99:*7*  117:*15*, *22*
118:*21*  132:*8*  133:*23*
136:*13*  141:*4*, *7*

144:*13*, *20*  146:*12*, *17*
147:*23*  149:*7*  150:*12*,
*22*, *25*  151:*8*  152:*1*
153:*1*  154:*8*, *18*
156:*11*  158:*5*, *9*, *11*
160:*6*, *25*  163:*7*
167:*13*, *17*  168:*12*, *19*
169:*13*  170:*3*, *10*
171:*22*  172:*24*
173:*14*  181:*16*, *24*
183:*8*  184:*6*  193:*20*
194:*2*  196:*8*  199:*20*
200:*23*  201:*13*
204:*11*, *20*  206:*12*
207:*12*  210:*7*  214:*5*
216:*20*  217:*22*
222:*17*  223:*1*  234:*13*
235:*4*, *5*  237:*12*
239:*14*  240:*2*  241:*5*,
*6*  245:*7*
**Natera's**  20:*16*  21:*14*
22:*1*, *4*  23:*13*, *17*, *25*
24:*2*  29:*21*  30:*2*, *25*
31:*14*, *25*  34:*21*
35:*23*  39:*8*  113:*1*
118:*25*  122:*12*, *13*, *16*,
*17*  125:*22*, *23*  128:*23*
129:*6*  132:*2*  136:*9*
171:*2*, *16*  175:*20*
176:*2*, *12*  178:*1*, *18*
191:*6*  198:*9*  200:*12*
201:*3*  206:*2*  207:*12*
209:*13*  211:*7*, *24*
213:*2*, *16*  215:*9*
220:*6*  224:*8*, *15*
231:*4*, *23*  237:*21*
238:*20*, *21*  239:*6*, *22*
**Nathan**  2:*5*
**national**  46:*24*
**nature**  52:*24*
**NBA**  45:*18*
**necessarily**  4:*22*
65:*18*  72:*21*  73:*16*
91:*8*  96:*4*, *19*  145:*16*
161:*4*  178:*5*  179:*1*
189:*21*  213:*18*
214:*11*, *21*  221:*23*
228:*23*
**necessary**  64:*17*
65:*23*  66:*19*  67:*1*, *17*

72:*15*  84:*18*  87:*4*
90:*9*  145:*21*  146:*3*
220:*19*
**need**  53:*20*  80:*1*
143:*9*  197:*21*
**needed**  7:*11*
**needs**  70:*1*
**negative**  43:*20*
108:*22*  109:*24*
185:*21*  186:*19*
202:*15*  203:*6*  204:*9,*
*19*  205:*18*  208:*17*
210:*3, 12*  211:*16*
**negatively**  204:*4*
**neither**  246:*7*
**never**  202:*8*  207:*15*
235:*17*
**New**  2:*14*  3:*8*  21:*22*
26:*12*  59:*13, 19*  60:*2*
61:*5, 10, 17, 22*  62:*2,*
*7*  63:*6, 14*  95:*15, 18*
96:*10, 19, 22*  97:*1, 4,*
*6, 10, 11, 22*  98:*15, 17*
99:*9*  179:*1, 12*
180:*10*  181:*6, 18*
184:*4*  188:*15*  198:*9*
203:*10*  211:*12*
212:*11*  214:*18, 21*
215:*25*  217:*14*
**newly**  56:*8*  59:*17*
85:*17*  114:*20*  211:*13*
**news**  43:*19*  47:*25*
48:*2*  62:*5, 9, 18, 20*
73:*24*  97:*16*  99:*9*
112:*22*  118:*9*  119:*3*
121:*14*  150:*5*  179:*2*
180:*8*  181:*25*  188:*16*
214:*19*
**newspaper**  76:*2*
**newspapers**  74:*18*
**nhasiuk@ktmc.com**
2:*8*
**NHL**  45:*20*
**Nobel**  65:*12*  81:*9*
**non-credible**  101:*3*
**non-insiders**  79:*1, 21*
80:*25*  82:*19*
**Non-Invasive**  238:*22*
**nonlawyer**  220:*3*

**nonlegal**  219:*9*
**nonprofit**  158:*5*
**nonverbally**  7:*23*
**Nordstrom**  3:*5*
**normal**  42:*1*
**NOTE**  4:*20*  13:*7*
14:*3*  23:*24*  29:*21*
30:*1, 8*  31:*25*  35:*20*
43:*3*  111:*12*  118:*1*
120:*23*  133:*2*  143:*25*
148:*20*  159:*20*
161:*14*  169:*17*  212:*4*
213:*22*  215:*16*
216:*15*  222:*11*
241:*12*
**noted**  5:*18*  52:*8*
73:*23*  82:*13*  160:*15*
163:*4*  170:*18, 21*
211:*22*  216:*18*  244:*8*
**notes**  10:*4*
**noticed**  106:*24*
**notification**  163:*13*
**notion**  70:*7*  86:*18,*
*19*  167:*23*
**notwithstanding**
198:*1*  226:*20*  235:*22*
**novel**  180:*8*  183:*5*
184:*4*  188:*10*  189:*13,*
*21, 22*  193:*25*  196:*9*
**November**  119:*24*
120:*18, 20*
**NTRA**  169:*23*
**nuance**  99:*15*  102:*13*
**nuanced**  26:*17*  92:*2*
98:*2, 12*
**null**  56:*13*  57:*4, 22*
**NUMBER**  4:*7*  10:*11,*
*14, 17, 20, 21*  19:*3*
21:*12, 24, 25*  22:*18*
37:*25*  53:*21*  67:*6*
70:*9*  72:*19*  73:*12, 16*
80:*18*  84:*3, 8*  85:*6, 8*
86:*4, 11, 23*  101:*6*
112:*7*  119:*7*  128:*8*
130:*18*  133:*3*  136:*7*
144:*7*  154:*4*  158:*3*
170:*7*  185:*4, 18, 23*
187:*1, 10*  190:*14, 17,*
*21*  196:*22*  197:*15*
200:*14*  203:*16*  208:*7*

210:*12*  234:*15*  237:*2,*
*7, 8*  239:*4*
**numbered**  1:*17*
**numbers**  13:*13*  14:*1*
23:*2*  34:*20*  65:*5*
66:*7, 16*  67:*22*  69:*6,*
*14*  70:*13*  71:*25*  72:*3,*
*9, 13, 23*  73:*2*  84:*14,*
*24*  146:*8*
**numerous**  149:*6*

**< O >**
**oath**  6:*21*
**Objection**  27:*15*
28:*6*  30:*19*  33:*23*
34:*25*  36:*2*  37:*10*
44:*5*  69:*10, 18*  70:*17*
74:*22*  75:*8*  76:*6*
77:*9*  82:*21*  85:*11*
86:*14*  89:*10*  94:*17*
97:*25*  98:*19*  100:*2*
101:*15*  103:*23*
105:*21*  109:*1*  110:*10*
114:*8*  115:*12*  122:*19*
124:*3*  126:*1*  127:*6*
128:*15*  130:*16*  134:*8*
135:*6*  136:*3, 19*
138:*6, 19*  139:*15, 23*
143:*2*  150:*16*  151:*2*
152:*3*  153:*19*  154:*21*
155:*13*  156:*14*
157:*21*  158:*21*
159:*17*  160:*9, 10, 14*
161:*1, 24*  162:*17*
163:*19*  164:*18*  166:*5*
167:*2*  168:*6*  171:*4,*
*24*  174:*10, 22*  175:*11*
176:*6*  177:*3, 21, 22*
179:*19*  180:*11*  183:*9*
184:*7, 14*  185:*12*
186:*6*  188:*17*  189:*14*
193:*2*  194:*4*  196:*16*
198:*16*  202:*2*  203:*13*
204:*23*  205:*15*  206:*5*
209:*15*  210:*8*  212:*1*
213:*5*  214:*6*  216:*4*
217:*7*  218:*6*  219:*7,*
*25*  220:*9*  221:*5*
222:*19*  223:*18, 25*
224:*10*  225:*9*  226:*9*

227:*7, 17*  228:*4*
229:*2*  230:*1*  231:*18*
232:*23*  233:*20*
234:*14, 24*  235:*9*
236:*14*  241:*24*
**observation**  113:*24*
156:*19*  159:*4, 5*
214:*2*
**observations**  35:*14*
53:*21*  54:*7*
**observe**  173:*11*
**observing**  174:*12*
**obtain**  158:*6*  164:*8*
**obtained**  147:*25*
**obtaining**  87:*11*
**obvious**  165:*5*
**obviously**  24:*5*  33:*7*
56:*13*  57:*3, 22*  71:*12,*
*16, 18*  87:*15*  118:*23*
125:*5*  126:*18*  180:*18*
**occasions**  170:*7*
**occurred**  42:*15, 22*
43:*7*  44:*2*  45:*7*
47:*22*  48:*8*  49:*1, 23*
221:*18*  222:*12*
**October**  134:*7, 25*
136:*1*  162:*9, 12, 15,*
*21*
**offer**  16:*19*  19:*23*
20:*24*  120:*24*  200:*1*
202:*11*  217:*2*  231:*21*
**offered**  14:*18*  15:*7,*
*17, 19*  234:*20*  236:*7,*
*23*
**offering**  12:*5*  20:*7,*
*12*  21:*3, 11*  154:*15*
190:*6*  217:*6*
**offers**  119:*7*
**official**  158:*8*
**Oh**  108:*18*  170:*17*
212:*19*
**Ohio**  46:*12*
**OIG**  207:*24*
**Okay**  6:*17*  7:*5, 11,*
*20*  8:*3*  10:*25*  11:*7, 8*
14:*3, 8*  19:*6*  21:*19*
22:*22*  29:*20*  37:*5*
45:*1*  51:*12*  56:*2*
58:*23*  64:*16*  96:*6*
105:*15*  108:*16, 18*

110:*21*, *25*  111:*2*, *5*
113:*21*  119:*13*, *21*
122:*11*  141:*24*  142:*4*,
*5*, *22*  143:*14*  160:*3*,
*13*, *16*  162:*23*  169:*11*
170:*24*  174:*4*  182:*23*
187:*21*, *24*  192:*1*, *5*,
*12*  199:*5*  217:*12*
220:*24*  224:*4*  225:*2*
236:*24*  237:*13*, *15*, *19*
238:*9*, *15*  242:*9*, *14*
**old**  80:*9*  179:*1*
180:*8*  181:*25*  188:*16*
**O'MELVENY**  3:*7*
**omission**  111:*18*
113:*17*  114:*5*, *25*
115:*4*  122:*24*
**omissions**  16:*22*
23:*13*  26:*19*  108:*2*
219:*16*
**omit**  108:*21*  189:*10*
**omitted**  31:*7*  32:*9*
107:*23*  108:*3*, *24*
109:*12*, *15*, *24*  110:*7*
113:*5*, *11*, *19*  114:*7*
115:*4*  116:*3*, *9*, *14*
123:*13*, *15*, *18*  124:*8*
125:*4*, *5*, *16*  126:*7*, *8*,
*16*, *20*  127:*1*, *5*  128:*2*,
*9*  130:*3*, *5*, *15*  132:*13*
215:*7*  218:*13*
**omitting**  31:*17*
**omnipresent**  111:*3*
**once**  42:*8*  172:*14*
175:*3*, *14*
**one-half**  192:*10*
**one-page**  166:*25*
**ones**  51:*3*  134:*14*
137:*4*  170:*13*  221:*11*
**ongoing**  117:*9*
**onset**  44:*9*
**open**  10:*22*, *23*  63:*22*
**opened**  187:*6*
**opening**  200:*17*
**opens**  207:*25*
**opine**  107:*21*  199:*16*
201:*24*  207:*16*
215:*21*
**opined**  18:*3*, *18*

**opines**  37:*5*  241:*15*
**opining**  145:*8*
**opinion**  9:*23*  13:*21*
14:*18*  15:*7*  16:*19*
19:*24*  20:*7*, *12*, *16*, *24*
21:*1*, *2*, *3*, *11*  22:*23*
23:*7*  24:*9*  37:*13*
100:*17*  101:*24*
108:*19*  112:*9*  113:*15*
117:*14*, *20*  118:*7*
119:*12*  120:*24*
132:*11*  144:*10*
146:*14*  147:*11*
154:*15*  155:*11*  171:*9*
175:*25*  176:*24*
177:*15*  178:*4*  189:*11*
193:*1*, *17*, *22*  194:*17*,
*24*  195:*10*  200:*1*, *8*
201:*11*, *15*  202:*13*
204:*16*  205:*11*
207:*10*  209:*18*  213:*8*,
*13*  215:*5*  217:*3*, *6*, *13*
222:*12*  227:*20*, *22*
228:*3*  229:*19*, *25*
230:*9*  231:*6*, *21*
232:*10*  234:*6*
**opinions**  12:*5*  14:*23*
15:*17*, *19*  16:*1*  17:*14*
18:*14*  19:*18*  20:*20*,
*23*, *25*  25:*25*  86:*6*
175:*19*  199:*4*  211:*18*
215:*5*  217:*16*  234:*20*
236:*7*, *8*, *23*
**opportunity**  186:*1*
**opposed**  62:*11*  66:*1*
213:*10*
**opt**  130:*22*
**oral**  245:*19*
**ordering**  24:*2*
175:*20*, *24*  176:*12*
177:*9*
**organic**  31:*21*
**organization**  139:*2*
**outbreak**  43:*5*
**outcomes**  225:*23*
**outputs**  62:*1*
**outside**  230:*25*
235:*17*
**outweigh**  89:*24*

**overall**  42:*19*  130:*12*
181:*20*  190:*2*  193:*5*
215:*1*  231:*20*  236:*9*
**overlap**  133:*8*
**overpriced**  100:*21*
**overreaction**  185:*6*,
*10*, *11*  186:*5*
**overstating**  48:*9*
49:*3*, *7*  103:*8*
**overvalued**  220:*18*
**overview**  33:*5*
**overweight**  190:*7*

**< P >**
**p.m**  1:*19*  143:*18*, *19*,
*21*  199:*10*, *11*, *13*
240:*14*, *15*, *17*  242:*18*,
*19*
**PAGE**  4:*1*, *7*  11:*21*
23:*2*  166:*3*, *19*  237:*6*
238:*17*, *19*  239:*3*, *5*,
*13*, *19*  240:*1*  243:*5*
246:*3*
**Pages**  22:*22*  23:*6*
29:*14*  166:*2*, *9*
167:*20*  244:*4*
**pair**  196:*6*
**pandemic**  40:*25*
43:*5*, *19*  47:*25*  48:*2*
**Panorama**  23:*14*, *19*
29:*23*  30:*3*  31:*1*, *14*,
*21*  113:*1*  128:*23*
129:*7*  213:*25*  215:*19*
216:*10*  238:*22*
**paper**  56:*18*  68:*18*
79:*6*, *10*, *12*, *18*  82:*13*,
*15*  83:*5*, *6*  203:*17*, *20*
**papers**  47:*10*  61:*7*
83:*2*, *9*  98:*22*  203:*16*
220:*12*
**Paragraph**  19:*16*, *17*,
*22*  20:*1*  21:*13*  23:*23*,
*24*  27:*19*  29:*15*, *18*,
*20*  30:*1*  31:*23*  38:*19*,
*21*, *24*  52:*2*, *6*, *7*
55:*14*  57:*17*  64:*16*
65:*10*, *11*  66:*19*
67:*13*  68:*3*  81:*21*
89:*13*  96:*16*, *17*, *25*
107:*21*  111:*10*, *12*

112:*17*  113:*9*, *13*
114:*17*, *18*  115:*8*, *15*,
*16*  121:2, *5*, *7*  122:*3*,
*7*, *8*  124:6, *23*  126:9
130:*7*  131:*13*  134:*13*
136:*23*  143:*24*  144:*6*,
*9*  145:*2*, *5*, *19*  146:*2*,
*15*  150:*24*  151:*4*, *16*
158:*17*  160:*4*, *23*
161:*9*, *15*  163:6
165:*14*  178:*13*  180:*4*,
*22*  183:*3*, *15*  187:*13*,
*18*, *19*  188:*1*, *5*  189:*5*,
*6*  199:*16*, *21*, *22*
200:*9*, *17*, *20*, *24*
201:*12*  202:*20*  205:*1*
207:*9*  208:*8*  209:*19*
210:*4*, *17*  211:*12*, *23*
213:*8*, *9*  215:6
222:*25*  224:*13*
225:*11*, *17*, *19*  227:*22*
231:*15*, *22*  232:*5*, *9*
238:*19*  242:*4*
**Paragraphs**  19:*8*
30:*13*  141:*21*  142:*17*
150:*19*  175:*18*, *22*
199:*25*  206:*9*  213:*1*
226:*6*, *12*, *15*
**parameters**  52:*22*
**pardon**  210:*2*
**parroting**  227:*15*
**part**  23:*18*, *21*  24:*14*
30:*21*  31:*6*  32:*15*, *18*
36:*17*  37:*24*  38:*21*
40:*25*  50:*7*  57:*16*
71:*4*  104:*16*  105:*7*, *8*
106:*11*  108:*5*  117:*18*
119:*5*, *9*  121:*22*
125:*19*  128:*20*
129:*23*  134:*15*
164:*16*  193:*17*
200:*18*  201:*5*  204:*21*
208:*23*  210:*6*, *14*
218:*1*  220:*21*  224:*12*
229:*17*  231:*20*
241:*10*
**participant**  65:*19*
76:*14*  77:*18*  89:*19*
168:*16*

**participants** 59:*19* 62:*13* 64:*18* 66:*20* 67:*1*, *8*, *18* 68:*4*, *21* 69:*2* 80:*18* 82:*4* 84:*3* 90:*21* 102:*21* 104:*24* 107:*6* 134:*18* 141:*6*, *10*, *16* 142:*10* 145:*22* 146:*4*, *8* 147:*4* 151:*6*, *10* 158:*25* 171:*18*

**participate** 63:*23*

**participated** 8:*18*

**participating** 64:*9*

**particular** 30:*15* 40:*15* 41:*17* 44:*22* 56:*16* 59:*8* 62:*13* 68:*22* 70:*9* 109:*8* 150:*2* 216:*8*

**parties** 246:*9*

**parts** 33:*1* 135:*21* 177:*6*

**party** 245:*25* 246:*6*

**passed** 46:*9* 156:*1*

**patients** 130:*22*

**pattern** 42:*14*, *20*

**Paul** 3:*12* 5:*13*

**pause** 110:*17* 142:*4*

**pay** 90:*3*, *13* 94:*9* 104:*25* 105:*4* 106:*5* 139:*6* 175:*2*

**payers** 216:*18*

**paying** 143:*12* 174:*20*

**paywall** 105:*16* 106:*1* 138:*2* 143:*6*, *9*, *10* 159:*7*

**Pelletier** 15:*10*

**penalty** 6:*23*

**pending** 236:*17* 242:*9*

**Pennsylvania** 2:*7*

**PENSION** 2:*4*

**people** 43:*21* 60:*9*, *14* 61:*1*, *19*, *20*, *24* 72:*13*, *17* 73:*15* 83:*10*, *19* 85:*2* 90:*8* 92:*16* 93:*19* 94:*4* 95:*1* 100:*13*, *18* 101:*21* 104:*10* 105:*3*

108:*10* 154:*3* 159:*10* 161:*11* 175:*15*

**percent** 118:*2* 123:*2* 124:*10*, *17* 125:*1* 127:*18* 129:*11* 177:*18* 191:*9* 192:*21* 202:*5*, *9*

**perfectly** 53:*25*

**perform** 38:*1* 86:*5*

**performed** 37:*17* 38:*16* 50:*22* 150:*10*

**performing** 27:*23* 49:*25* 50:*6* 59:*4*

**performs** 139:*3*

**period** 20:*5*, *9*, *17* 21:*6* 22:*5* 26:*19* 32:*25* 33:*21* 34:*9* 35:*23* 36:*25* 37:*8*, *19* 39:*6*, *24* 40:*2*, *5*, *7*, *8*, *11*, *13*, *15*, *16*, *21*, *24* 41:*2*, *3*, *5*, *7*, *22* 42:*25* 43:*4*, *13* 44:*9* 46:*17* 47:*12*, *14* 50:*3*, *8*, *9* 51:*14*, *22* 52:*8*, *11*, *14*, *19*, *23* 53:*1*, *4*, *11* 54:*2*, *4*, *14*, *16* 132:*18*, *21* 133:*23* 135:*17* 136:*8*, *13* 137:*1* 144:*23* 149:*8*, *10*, *23* 150:*3*, *6*, *12* 168:*13*, *22* 169:*15* 170:*4* 172:*25* 202:*7* 212:*24* 216:*19* 222:*13*

**periods** 40:*20* 41:*4* 51:*2*, *17* 53:*23* 54:*5*, *25* 149:*13*

**perjury** 6:*23*

**permanence** 117:*6*

**permanent** 117:*9*

**permit** 216:*19*

**persistent** 116:*21*

**person** 101:*19* 102:*17* 155:*24* 165:*17* 167:*25* 219:*9*

**person's** 100:*20*

**persuasive** 180:*19*

**pharmaceutical** 233:*2*

**phenomenon** 60:*24*

**phone** 7:*23*

**phrase** 68:*14*

**phrasing** 21:*18*

**physically** 7:*13*

**pick** 126:*18*

**picked** 207:*8*

**pictures** 167:*21*

**piece** 68:*5*, *22* 69:*3* 72:*4* 73:*21* 74:*13*, *20* 75:*5*, *11*, *17*, *22*, *24* 76:*3*, *4*, *22*, *25* 77:*2*, *12* 81:*23* 83:*24* 84:*25* 89:*7*, *25* 90:*12* 96:*18*, *22* 101:*5*, *8*, *12*, *13* 102:*8* 103:*9*, *18* 105:*13*, *15* 180:*16* 189:*7* 198:*24*

**pieces** 61:*18* 81:*19* 102:*15* 140:*23* 165:*8* 180:*14* 184:*16* 196:*23* 198:*25*

**Piper** 4:*10*, *13* 180:*24* 185:*19* 187:*11* 188:*7* 190:*19*, *25* 192:*17* 193:*8* 196:*5* 197:*8* 198:*3* 209:*8*

**place** 63:*4* 82:*24* 83:*3*

**places** 28:*19* 57:*8* 59:*24* 60:*10*, *13* 77:*14*, *15* 87:*7*

**Plaintiff** 1:*5* 2:*2* 17:*12* 18:*6*, *21* 23:*10* 27:*5* 34:*13* 245:*5*

**plaintiffs** 6:*4* 16:*3*, *20* 18:*5* 22:*24* 23:*8*, *10*, *11*, *17*, *22* 24:*9*, *21* 25:*6*, *21* 26:*5*, *12*, *14*, *17*, *20* 27:*2*, *24* 28:*25* 29:*16*, *19*, *21* 30:*1*, *10*, *11*, *17*, *22* 31:*5*, *8*, *12*, *17*, *25* 32:*8*, *15*, *19*, *22* 33:*8*, *18*, *19*, *22* 34:*6*, *7*, *12*, *16*, *18*, *23* 35:*17*, *18*, *21* 36:*22* 37:*1*, *3* 108:*12* 113:*3* 119:*22* 121:*22* 122:*12*, *23* 123:*1*, *7* 127:*5* 130:*15* 131:*5*, *7* 132:*3*, *13*, *24* 135:*1*

144:*3*, *12*, *21* 145:*9*, *15* 176:*11* 177:*6*, *7*, *17* 194:*24* 196:*24* 197:*12* 200:*4* 201:*2* 208:*20* 210:*15* 213:*23* 214:*3*, *18* 215:*17* 216:*1* 217:*25* 218:*5*, *8*, *18*, *21* 219:*2*, *12*, *19* 220:*25* 225:*3* 226:*23* 228:*1* 231:*3*, *7*, *12* 234:*7*, *10* 235:*7* 240:*21*, *25* 241:*3*, *8*, *10*, *16*

**planned** 238:*11*

**platform** 210:*23*

**plausible** 197:*17* 207:*22*

**played** 121:*22*

**players** 94:*3*

**Plaza** 2:*14*

**please** 5:*19* 7:*4* 11:*2*, *21* 12:*11* 28:*12* 53:*9* 56:*3* 78:*18* 187:*5*, *6* 212:*19* 237:*15*

**plus** 118:*2* 127:*17*

**point** 21:*20* 35:*10* 41:*21* 44:*17* 56:*12* 57:*2*, *20* 64:*20* 65:*14* 67:*3*, *14* 68:*7* 76:*5*, *23* 77:*8* 83:*12*, *19* 84:*11* 86:*15* 91:*5*, *18* 92:*16* 95:*2* 111:*24* 113:*7* 119:*1* 123:*14* 124:*5* 125:*2* 129:*5*, *9* 130:*6* 134:*23* 140:*25* 144:*17* 145:*7*, *9*, *24* 146:*5*, *11* 147:*7* 157:*20* 163:*11* 172:*12* 173:*8* 176:*19* 178:*11* 182:*16* 186:*12* 189:*24* 194:*24* 195:*12* 197:*14*, *23* 202:*21* 206:*18* 208:*16* 210:*3* 212:*4* 221:*18* 223:*2* 224:*11* 225:*16* 226:*5* 228:*8*, *20*, *21*

**pointed** 143:*5*
145:*11* 181:*11* 222:*5*
229:*16*
**pointing** 66:*24* 181:*4*
196:*18*
**points** 19:*25* 27:*4*
37:*15* 51:*12* 87:*5*
112:*12* 158:*12*
168:*12* 179:*5* 181:*22*
189:*25* 196:*15*
212:*21*, *23* 225:*17*
**portfolio** 93:*22*
**portion** 29:*13* 33:*4*
64:*14* 185:*17* 202:*23*
**posit** 217:*21*
**position** 92:*21* 93:*3*
115:*9*
**positive** 58:*16*, *19*, *20*
76:*25* 77:*2* 97:*16*, *17*,
*18* 108:*20* 109:*8*, *21*,
*23* 110:2, *4* 111:*14*
112:*16* 113:8, *15*
116:*16*, *18* 119:*10*
120:*4*, *10*, *15*, *21*
121:8, *12* 124:*10*, *17*
129:*10*, *21*, *23* 193:*6*
**possess** 85:*10*
**possessed** 84:*10*
86:*12*
**possession** 106:*12*
**possibility** 191:*16*
216:*14*
**possible** 7:*10* 48:9,
*24* 49:*2* 125:*7* 137:*7*
214:*9*
**possibly** 217:*22*
**post** 101:*4* 104:*3*
106:*21*
**post-earnings** 60:*19*,
*25*
**posted** 73:*18*
**poster** 102:*25* 103:*21*
**postponed** 46:*4*
**potential** 94:*24* 95:6,
*9* 107:*7* 208:2, *18*, *25*
209:*9* 221:*16* 222:*3*
239:*15*
**potentially** 62:*9* 64:9,
*15* 90:*4* 92:*11* 99:*1*
100:*13* 104:*13* 106:3,

*4*, *8* 112:*22* 129:*22*
173:*4*, *9* 201:*16*
206:*23* 207:*4*, *21*, *25*
212:*10*, *14* 222:*6*, *24*
230:*19*, *23*
**power** 54:*8*
**practice** 31:*13*
123:*25* 126:*21*, *25*
130:*24* 207:*24*
**practices** 23:*19*, *25*
24:*10* 27:*10* 28:*2*
31:9, *13*, *19* 32:*10*
122:*14*, *15* 123:*10*, *20*
124:*1*, *9* 125:*22*
127:*3* 130:*11* 133:*6*
136:*10* 175:*21*, *24*
176:*13* 177:*10* 178:2,
*19* 218:*14* 219:*5*, *17*,
*23* 227:*1*, *6* 228:*1*
229:*24* 232:*18*
233:*14*, *15* 234:*1*
239:*23* 240:*4* 241:*5*
**preceded** 49:*13*
**precise** 93:*5* 152:*5*,
*14*
**precision** 53:*20*
**predictive** 58:*6*
**preempted** 214:*12*
**prefer** 11:*2* 187:*4*
**Prenatal** 238:*22*
**preparation** 9:*11*, *16*
10:*1*
**prepare** 8:*6* 10:*8*
**prepared** 64:*13*
**preparing** 10:*5*
12:*16*, *19* 149:*5*
**present** 55:*20*
**presentation** 224:*18*
**presented** 26:*6* 34:*11*
**presenting** 172:*1*
**presents** 186:*1*
**president** 46:*25* 47:*2*
**press** 73:*7* 147:*17*
148:*7*, *20*, *23* 149:*2*, *6*,
*12*, *15*, *23* 150:*2*, *9*, *11*
169:*3* 182:*9*
**presumably** 112:*20*
121:*13* 127:*22* 141:*6*
170:*9* 174:*14* 175:3,

*10*
**presume** 137:*14*
**presuming** 175:*13*
**presumption** 175:*9*
**pretty** 60:*22* 102:*21*
118:*17*
**previous** 32:*5* 81:*11*
85:*14* 113:*9* 126:*9*
148:*8* 193:*8* 196:*20*
205:*1*, *20*
**previously** 76:*10*
144:*14* 145:*10* 165:*3*
174:*18*, *24* 176:*3*, *15*,
*18*, *25* 177:*19* 178:20,
*23* 179:*3*, *18* 182:*1*
193:*19* 194:*7* 211:*8*
212:*7* 215:*22* 216:*20*
217:*4* 236:*4* 240:*24*
**price** 14:*18* 15:*1*
16:2, *11* 17:*11* 18:*4*,
*19* 24:*7* 25:2, *17*, *22*
26:2, *11* 39:*8* 59:*14*
64:*21* 67:*4*, *10* 68:*8*
70:*6* 71:7, *11* 77:*21*
78:*24* 79:*20* 82:*1*, *7*
83:*18* 84:*1*, *5* 85:*2*,
*24* 95:*17* 96:*5*, *13*, *20*
97:*1*, *3*, *7*, *14*, *19* 98:*6*
106:*23* 107:*22* 108:*1*,
*11*, *13*, *15*, *20*, *24*
109:*7*, *11*, *17*, *23*
110:*3*, *4*, *8* 111:*20*
112:*2*, 8, *10*, *15*, *18*
113:*6*, 8, *16*, *19* 114:*4*,
*6*, *12*, *20* 115:*2*
116:*11* 117:*5*, *7*, *11*,
*15*, *22* 118:*14*, *21*, *25*
119:*10* 120:*1*, *25*
121:*23* 122:*16* 123:*5*
124:*7*, *25* 125:*7*, *14*,
*24* 126:*5*, *14*, *23*
127:*25* 129:*23* 130:*1*
145:*25* 146:*6*, *12*, *21*
147:*1*, *8*, *15* 171:*3*, *17*
183:*8* 184:*6* 185:*2*, *5*,
*20*, *25* 186:*10*, *14*, *18*
190:*3*, *9* 192:*21*
194:*14*, *22*, *25* 195:*8*
196:*12* 197:*2*, *13*, *18*
198:*13* 199:*20* 200:*4*,

*13*, *23* 201:*3*, *13*, *17*,
*20*, *21*, *23*, *25* 202:7,
*14*, *23* 203:6, *22*
204:*5* 205:*6*, *12*, *18*,
*22* 206:2, *12*, *15*
207:*1*, *12*, *17* 208:*24*
209:*14*, *20*, *23* 210:*6*
211:2, *4*, *20*, *24* 213:*3*,
*16*, *19* 215:*10*, *12*
217:*22* 222:*6* 228:*10*
229:*17* 230:*11*, *21*
231:*4*, *24* 232:*2*
**prices** 26:*23* 44:*13*
46:*21*, *23* 56:*7*, *12*
57:*2*, *20* 59:*16* 61:*12*
64:*3*, *5* 65:*13* 67:*13*
80:*21* 85:*16* 89:*4*
90:*19* 100:*11* 102:*9*
119:*5* 202:*9*
**primarily** 29:*23*
30:*3*, *25* 112:*25*
128:*22*
**primary** 60:*17*
193:*17*
**principle** 141:*22*
**prior** 9:*5*, *11* 50:*4*
63:*11* 65:*25* 129:*3*
136:*4*, *20* 137:*21*
142:*8* 158:*6* 167:*14*
169:*4* 178:*6* 191:*7*
192:*21* 211:*9* 213:*24*
215:*19* 216:*9*, *22*
225:*3*
**private** 91:*14* 137:*17*
**privy** 133:*25*
**Prize** 81:*9*
**probabilistic** 202:*11*
**probably** 6:*12* 9:*6*
16:*15* 44:*20* 54:*22*
60:*7* 91:*6* 95:*20*
166:*20*
**problem** 112:*4*
126:*5* 127:*15*
**Procedure** 1:*20*
216:*19*
**proceed** 5:*20* 15:*3*
55:*3*
**proceeded** 26:*7* 29:*5*
**proceeding** 14:*14*

Case 1:22-cv-00398-DAE   Document 161-3   Filed 10/04/24   Page 272 of 295
Deposition of Douglas J. Skinner
John Harvey Schneider v. Natera, Inc., et al

**PROCEEDINGS**  5:*1*
**process**  59:*19*  167:*13*
**processes**  24:*2*
**produce**  134:*24*
**produced**  13:*14*
135:*11*  152:*9*  156:*17*
166:*18*  175:*1*  187:*16*
**product**  103:*2, 7*
211:*8, 9*
**products**  32:*13*
129:*6*  209:*1*  210:*20,
24*
**professional**  46:*4*
**Professor**  6:*3*  11:*2,
16*  29:*7*  35:*5*  37:*5*
55:*4, 13*  56:*10*  57:*8*
58:*10, 18*  64:*25*  65:*4*
66:*1, 6, 22*  67:*21*
68:*2, 17*  69:*6*  71:*23*
72:*7*  87:*1*  91:*23*
92:*16*  93:*14*  95:*24*
107:*19*  143:*23*
144:*11*  148:*17*  183:*2*
187:*12*  196:*2*  199:*15,
25*  201:*8, 10*  217:*19*
236:*3*  240:*19*
**profitability**  238:*23*
**profits**  65:*15*  90:*7, 8*
92:*12*
**prominence**  202:*22*
**prominent**  203:*3*
204:*2*
**promoting**  142:*14*
**promotional**  151:*24*
152:*15*
**propose**  241:*20*
**proposed**  22:*5*  52:*14*
53:*4*  54:*2*  132:*17*
136:*8*  137:*1*  149:*10*
169:*14*  170:*4*  172:*25*
241:*14*
**proposition**  57:*6*
70:*12*  71:*9*  89:*5*
113:*15*  116:*13*  170:*1*
198:*8, 11, 15*  203:*9*
**propounded**  244:*7*
**propped**  122:*13*
123:*9, 20*  125:*22*
128:*9*  239:*22*

**propping**  31:*13*
233:*15*
**proprietary**  137:*23*
**provide**  14:*23*  23:*9*
33:*5*  51:*21*  116:*12*
139:*21*  207:*6*
**provided**  11:*18*
22:*19*  32:*23*  35:*21*
116:*25*  149:*11*  155:*4*
168:*10*  202:*19*
**provisions**  1:*21*
**Prussia**  2:*6*
**public**  36:*9*  46:*10*
56:*8*  59:*17*  62:*5*
65:*18*  71:*2, 12*  73:*11*
75:*10*  82:*5*  83:*24*
85:*17*  88:*10, 14*  98:*4*
146:*24*  147:*17*  148:*7,
20, 23*  149:*2, 12, 23*
177:*11*  178:*6, 9*
211:*13*  215:*22*
216:*11*  219:*23*
224:*23*  240:*24*
**publication**  29:*10*
164:*1, 4*  241:*7*
**publicly**  22:*6, 14*
32:*24*  33:*20*  34:*8*
35:*22*  36:*24*  60:*21*
62:*11*  63:*19, 24*
65:*20*  69:*9, 17*  70:*15,
21, 23*  71:*12, 16, 18*
73:*17, 20, 22*  74:*6, 11,
20*  75:*13, 18, 22*  76:*5,
18, 23*  77:*8, 13*  84:*25*
85:*21, 22*  89:*9*  92:*23*
93:*1*  94:*14, 16*  95:*14,
15, 19*  96:*4, 13, 19*
97:*2, 8, 24*  100:*1*
103:*19*  104:*4, 6, 7*
105:*19*  116:*2*  140:*22*
141:*14*  146:*17*
147:*14*  171:*9*  176:*4,
18, 20*  177:*1, 19*
193:*19*  194:*19*  197:*4*
215:*8*  219:*22*  232:*15,
17, 21*  233:*13*
**published**  22:*8*
33:*19*  34:*19*  43:*3*
79:*13*  83:*13*  132:*16*
136:*6, 25*  146:*18*

147:*24*  151:*12*
157:*12*  160:*7*  162:*15*
171:*19*  172:*4*  176:*1,
15, 22*  177:*1, 13*
194:*15*
**publishes**  103:*5*
**publishing**  228:*24*
**pull**  41:*2*  130:*11*
**pun**  84:*17*
**purchased**  89:*23*
**purported**  158:*7, 10*
167:*15*  210:*22*
237:*20*
**purportedly**  31:*18*
32:*10*  127:*12*  137:*23*
**purpose**  157:*6*
**purposes**  24:*7*  25:*5*
26:*10, 14*  27:*8*  167:*9*
197:*24*  211:*11*
222:*14*
**pursuant**  1:*20*
245:*22*
**put**  10:*12*  11:*4*
13:*21*  64:*11*  69:*19*
94:*21*  165:*13*  177:*23*
186:*23*  190:*12*  198:*5*
200:*20*  205:*25*
208:*10*  211:*21*  215:*2*
235:*3*  236:*24*  241:*14*
**putting**  127:*10*
**p-value**  48:*20*
**p-values**  39:*10*

**< Q >**
**Q3**  224:*18*
**qualifies**  110:*1*
**qualify**  127:*13*
144:*25*
**qualifying**  108:*22*
**quantify**  205:*17*
206:*6*  208:*14*  212:*3*
213:*17*  214:*24*
**quarter**  129:*19*
**quarterly**  99:*5, 19*
118:*5, 10*  119:*4, 9*
124:*22*
**quest**  240:*4*
**question**  7:*1, 2*
16:*24*  20:*13*  21:*25*
23:*3*  24:*14*  28:*8, 9,*

*12*  29:*25*  33:*2*  35:*3*
36:*4, 19*  43:*25*  48:*23*
53:*9*  61:*12*  64:*1, 10,
14*  72:*25*  74:*24*
75:*19, 20*  76:*9, 15*
78:*23*  79:*7, 15*  81:*2*
82:*11*  85:*5*  90:*11*
97:*4*  109:*5*  110:*12*
111:*5, 13, 16, 19, 25*
113:*22, 25*  114:*1, 11*
115:*7*  117:*17*  121:*24*
122:*5*  127:*10*  130:*19*
134:*12*  135:*20*
146:*16*  158:*1*  160:*18*
162:*10*  163:*23*
183:*17, 18*  184:*1*
186:*4*  189:*2*  195:*22*
196:*20*  197:*21, 22, 25*
201:*22*  204:*14*
215:*24*  216:*25*
222:*21*  227:*12*
232:*14*  233:*5*  234:*22*
235:*8, 21*  236:*2, 13,
18, 21*
**questioning**  182:*21*
**questions**  6:*6*  7:*3*
19:*16*  24:*8, 25*  25:*2*
96:*6*  122:*6*  136:*9*
142:*3*  167:*10*  182:*18*
183:*6*  184:*18*  189:*19*
191:*17, 18*  232:*12*
236:*9, 10, 12*  238:*11*
242:*12*  244:*6*
**quickly**  7:*10*  59:*18,
19*  60:*20*  71:*7, 11, 19*
80:*20*  82:*2*  85:*1, 16*
**quite**  89:*22*  117:*18*
122:*22*  141:*20*
154:*25*
**quotations**  4:*20*
**quote**  4:*23*  56:*24*
57:*17*  65:*11, 25*
67:*12*  68:*2*  72:*7*
93:*14*  185:*3*  188:*5*
**quoted**  30:*21*  65:*22*
66:*5, 22*  68:*17*  69:*5*
71:*22*  87:*6*  89:*14*
128:*19*  180:*21*  189:*5*
**quotes**  180:*21, 23*

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

**quoting** 56:*16* 183:*10*, *19*

**< R >**
**RABINOWITZ** 1:*8* 2:*10* 245:*8*
**races** 239:*10*
**Radnor** 2:*7*
**raise** 191:*15*
**raised** 136:*8* 167:*10* 183:*6* 184:*5* 221:*25*
**rally** 238:*21*
**RAMESH** 1:*8* 245:*8*
**random** 100:*16*
**range** 4:*16*
**rapidly** 56:*8* 59:*12*, *17* 146:*20*
**rate** 32:*1*, *12*
**reach** 17:*9* 41:*16* 113:*9* 202:*11*
**reached** 17:*4* 18:*14* 26:*1* 34:*20* 48:*2* 119:*11*
**reaching** 211:*13*
**react** 56:*7* 59:*16*, *18* 85:*16* 110:*3*
**reacted** 184:*22*
**reaction** 26:*11* 97:*19* 101:*10* 110:*4* 113:*8* 117:*5* 125:*24* 126:*24* 185:*11* 186:*5*, *15* 196:*12* 198:*13* 203:*6*, *10*, *12* 205:*12*, *18*
**reactions** 78:*25* 79:*20*
**reacts** 78:*4*
**read** 4:*21* 28:*11*, *13* 53:*15* 66:*14* 84:*20* 122:*9* 133:*2* 134:*2*, *11*, *12* 135:*19*, *20* 136:*17* 137:*4* 156:*8* 162:*24* 189:*8* 193:*7* 212:*5* 221:*10* 244:*4*
**readily** 88:*5*
**reading** 98:*21* 155:*1* 178:*15* 184:*8*
**reads** 191:*5*
**ready** 65:*6* 66:*7*, *16* 67:*23* 68:*12*, *14*, *23*, *24* 69:*7*, *15* 70:*14*

71:*25* 72:*3*, *9* 73:*2* 78:*5* 84:*14* 87:*12*
**real** 57:*11*, *15* 58:*11*, *19* 59:*1* 69:*25*
**realized** 58:*15*
**really** 53:*19* 72:*11* 86:*22* 87:*1* 124:*5* 157:*6* 171:*6* 174:*19* 183:*17* 233:*4* 234:*3*
**real-world** 58:*5*, *12*, *14*
**reason** 8:*3* 40:*19*
**reasonable** 19:*20* 24:*3* 31:*15* 41:*12* 42:*3* 53:*2*, *25* 54:*16*, *18* 55:*3* 173:*18*
**reasonably** 156:*21*
**reasons** 214:*22* 232:*4*, *7* 246:*4*
**Rebecca** 1:*21* 245:*14* 246:*18*
**recall** 16:*25* 18:*2*, *17*, *23* 19:*4* 33:*13* 34:*1*, *3*, *14* 35:*6* 36:*13*, *15* 37:*24* 45:*12*, *16*, *17* 46:*1*, *2*, *5*, *6*, *8*, *15*, *16*, *19* 47:*21* 48:*4* 81:*13* 135:*22* 137:*2* 184:*24* 212:*5*, *15* 237:*22*
**recalling** 17:*17*
**recap** 109:*4*
**receipt** 246:*1*
**receive** 172:*15* 175:*15*
**received** 103:*19* 141:*1*, *2* 142:*11*, *12*, *13* 147:*25* 156:*11* 159:*20* 160:*1* 163:*12*, *25* 164:*1* 169:*9*, *13*, *16* 170:*2*, *6*, *9*, *12*, *15*, *20* 173:*7* 174:*15*
**receives** 168:*16*
**receiving** 141:*16* 175:*5*
**Recess** 55:*9* 107:*15* 143:*19* 199:*11* 240:*15*
**recession** 47:*3*
**recipient** 164:*8*

**recipients** 153:*14* 154:*2* 157:*1*, *10* 158:*16*
**recitation** 32:*21* 35:*17* 195:*17* 196:*3*
**recognize** 11:*16* 237:*17*
**recognized** 206:*20*
**recollection** 16:*7* 35:*8* 47:*24* 166:*7*
**recommendations** 61:*9*, *25*
**record** 1:*21* 4:*22* 5:*2*, *4*, *18* 7:*11*, *24* 28:*13* 55:*6*, *7*, *11* 107:*13*, *17* 143:*16*, *17*, *21* 199:*8*, *9*, *13* 202:*22* 204:*3*, *8*, *17* 205:*13* 206:*3*, *21* 237:*6* 240:*11*, *13*, *17* 242:*15*, *18*, *19* 245:*20* 246:*12*
**recorded** 5:*6*
**Reddit** 101:*21* 103:*1*, *11* 104:*5*
**redirect** 242:*10*
**refer** 10:*19* 14:*1*, *25* 22:*6* 38:*25* 43:*23* 55:*15*, *20*, *23* 56:*19* 89:*13* 91:*13* 152:*8* 162:*2* 177:*17* 214:*25*
**reference** 35:*20* 75:*23* 76:*24* 77:*1*, *6*, *25* 78:*2* 81:*7* 134:*14* 139:*17* 145:*4* 149:*3* 154:*3*, *11* 169:*22* 188:*1* 239:*5*
**referenced** 8:*11* 9:*18* 16:*8* 22:*14* 47:*10* 73:*23* 74:*14*, *16*, *18* 79:*19* 82:*14*, *16* 145:*20* 148:*23* 150:*13* 159:*3* 162:*8* 163:*6* 166:*25* 200:*19* 214:*18*
**references** 78:*7* 83:*4*
**referencing** 141:*16*, *17*, *20* 145:*3*
**referred** 38:*12* 79:*11*

**referring** 16:*19* 21:*15* 42:*18*, *20* 45:*25* 55:*24* 56:*18* 65:*10*, *25* 115:*19* 148:*6* 149:*16* 151:*16* 223:*15*
**refers** 35:*7* 162:*19*
**reflect** 56:*12* 57:*3*, *21* 65:*13* 67:*13* 83:*17* 84:*9* 85:*9* 86:*12*
**reflected** 4:*21* 39:*4* 43:*14* 85:*1* 89:*3* 90:*18* 117:*4*, *11* 126:*14* 146:*25* 171:*2*
**reflecting** 127:*18*
**regard** 182:*12*
**regarding** 15:22 21:*4* 23:*19* 28:*1* 33:*14* 36:*23* 113:*15* 114:*4* 123:*4* 125:*13* 132:*1* 142:*14* 160:*25* 164:*24* 168:*22* 169:*16* 170:*3* 175:*20* 176:*2*, *12* 177:*9* 179:*12* 193:*16* 194:*13*, *20* 195:*2*, *6*, *13* 198:*9* 212:*20* 215:*21* 218:*11*, *13* 221:*15* 242:*6*
**regardless** 85:*2* 203:*7* 205:*4* 206:*22* 228:*14*
**regards** 110:*4* 163:*8*
**regression** 52:*22*
**regressions** 50:*23*
**regulations** 234:*2*
**regulator** 225:*25*
**regulators** 208:*1*
**regulatory** 206:*13*, *24* 207:*5*, *11*, *21* 208:*12* 217:*23* 218:*23* 221:*2*, *15*, *16* 222:*3* 223:*4* 227:*2* 228:*20* 229:*20* 230:*13* 231:*9* 232:*22* 233:*3* 234:*12* 235:*4*
**reimbursement** 216:*21*
**reimbursements** 239:*8*

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

**reiterate** 81:*3* 190:*7* 236:*5*

**relate** 16:*1* 161:*15*, *16*, *21* 162:*14* 186:*10*

**related** 16:*16*, *21* 17:*11* 18:*4*, *19* 38:*20* 39:*7* 40:*17* 44:*10* 47:*15* 96:*9* 125:*2* 150:*25* 153:*17* 158:*17* 160:*5*, *23* 161:*6* 162:*5*, *13* 180:*1* 197:*24* 218:*18*, *19* 227:*25* 228:*2* 233:*6* 246:*8*

**relates** 35:*11* 160:*6*, *24* 163:*18*

**relationship** 24:*1* 34:*21* 35:*24* 132:*2* 158:*8* 167:*15*, *24* 188:*9* 191:*7* 192:*20* 196:*8* 198:*9* 212:*15*, *22* 214:*4* 241:*6*

**relative** 51:*9* 190:*10* 246:*11*

**relatively** 34:*1* 41:*19* 80:*18* 90:*23* 91:*1* 230:*21*

**release** 73:*7* 111:*11*, *15* 112:*9* 118:*11* 182:*9*

**released** 115:*1* 118:*15* 119:*8* 122:*17* 127:*23* 215:*9*

**releases** 85:*20* 121:*15* 205:*3*

**relevance** 105:*13* 180:*1*, *16*

**relevant** 48:*19* 55:*2*, *20* 59:*13* 62:*8*, *14* 64:*2*, *5* 68:*6* 81:*23* 87:*22* 90:*17* 91:*8* 92:*11* 95:*19* 96:*21*, *23* 98:*6* 99:*2* 100:*24* 102:*23* 105:*11* 106:*4*, *8*, *14* 107:*3* 116:*14* 117:*1* 118:*2* 120:*10*, *19* 128:*25* 140:*20* 141:*13* 147:*18* 152:*7* 163:*3* 171:*12* 185:*16*

215:*14* 224:*12* 225:*14* 229:*7*

**reliability** 100:*5*

**reliably** 199:*18* 200:*2* 215:*11* 232:*1*

**reliance** 210:*21*, *22* 211:*7*

**rely** 188:*24* 196:*7*

**remaining** 45:*22*

**remark** 97:*22* 98:*15*

**remarks** 64:*13*

**remember** 45:*23* 46:*13* 83:*1* 134:*10* 185:*3*

**REMOTE** 1:*12* 2:*2* 3:*2* 7:*7* 245:*11*

**remotely** 1:*19* 6:*8*, *15*

**removing** 39:*25*

**rendered** 14:*22* 16:*1*

**rendering** 64:*23*

**repeat** 28:*7* 117:*17* 119:*24* 160:*18*

**repeated** 132:*1* 144:*4*, *7* 240:*22*

**repetition** 102:*7*

**rephrase** 7:*4*

**Report** 4:*8*, *10*, *13*, *16* 8:*10*, *11* 9:*17*, *19* 11:*12*, *17*, *21*, *25* 12:*8*, *11*, *16*, *19*, *24* 13:*1*, *4*, *17* 14:*2*, *8* 19:*6*, *7*, *19* 20:*19* 24:*12*, *21* 25:*1*, *11*, *24*, *25* 27:*3* 28:*18* 29:*8*, *10*, *13* 32:*16*, *18* 33:*4*, *17* 34:*12* 35:*19*, *25* 36:*7*, *8*, *11*, *22* 37:*15*, *23* 38:*5*, *8*, *17*, *20* 39:*23* 43:*2* 47:*9* 51:*3*, *23* 55:*14*, *17*, *22* 56:*6* 57:*7* 64:*24* 66:*12* 74:*4*, *17* 77:*22*, *25* 78:*2*, *7* 79:*8*, *16* 80:*4*, *22* 81:*6* 86:*2*, *9*, *16*, *17* 88:*18*, *21* 96:*15*, *25* 107:*20* 112:*12* 118:*22* 120:*24* 121:*1* 131:*4*, *8* 132:*1*, *4* 133:*1*, *10*, *17* 134:*17* 135:*15* 139:*8* 140:*25* 141:*18*,

21 142:*16* 143:*24* 144:*3*, *8*, *13* 145:*3*, *10*, *19* 146:*14* 147:*4*, *23* 148:*22*, *23* 149:*5*, *19* 150:*7*, *11* 153:*17* 155:*12*, *19*, *20* 157:*2*, *3*, *25* 163:*16*, *17* 164:*25* 165:*1*, *24* 166:*1*, *24* 167:*1* 168:*10*, *15*, *18*, *24* 169:*4* 170:*12*, *16* 172:*15* 175:*19* 176:*3*, *8*, *14*, *17*, *22* 177:*6*, *12*, *20*, *25* 178:*13*, *16*, *17* 179:*2*, *6*, *11* 181:*16*, *18*, *20*, *21*, *25* 182:*12* 183:*5*, *16*, *24* 184:*4*, *12*, *20*, *22* 185:*1*, *4*, *8*, *17*, *23* 186:*22* 187:*10*, *12*, *14*, *23*, *25* 188:*2*, *8*, *14*, *16*, *23* 189:*3*, *6*, *9*, *10*, *12*, *17* 190:*1*, *19*, *24* 191:*1* 192:*15*, *17*, *25* 193:*6*, *7*, *9*, *19*, *23* 195:*4*, *13* 196:*7*, *9*, *22* 197:*5*, *10*, *24* 198:*4*, *6* 199:*4*, *17*, *18* 200:*2*, *16* 203:*3*, *7*, *9*, *21*, *24* 204:*1*, *17*, *22* 205:*3* 206:*19*, *22* 207:*3* 208:*19* 209:*3* 210:*11* 211:*1*, *14*, *16* 212:*12* 213:*2*, *6*, *11*, *13*, *22*, *24* 214:*11*, *19*, *23* 215:*1*, *3*, *9*, *11*, *16*, *18*, *20*, *23* 216:*18* 217:*13*, *16* 220:*13*, *22* 221:*19*, *25* 223:*1*, *3*, *13* 224:*5*, *13*, *15* 225:*7*, *10* 226:*2*, *10* 227:*23* 228:*3*, *6*, *13*, *16*, *24* 229:*11*, *12*, *22* 230:*7*, *16* 231:*1*, *23*, *25* 236:*9* 237:*5*, *10*, *16*, *17*, *20* 238:*18* 239:*4*, *25* 240:*22* 241:*7*, *12* 242:*4*

**reported** 1:*19*, *21* 22:*6*, *14* 38:*23* 50:*23*, *25* 51:*2* 118:*15* 122:*18* 123:*9*, *19*, *21*,

24 125:*23* 129:*16*, *19* 130:*25* 144:*22* 146:*17* 179:*3* 240:*24*

**reporter** 5:*14*, *19* 10:*21* 245:*15*

**REPORTER'S** 245:*11*

**Reporting** 5:*16* 39:*11*

**reports** 14:*9*, *21*, *22* 15:*16* 61:*4*, *14* 62:*21* 73:*23* 74:*5* 76:*1* 77:*4*, *5* 97:*16* 98:*22*, *24* 99:*4*, *8*, *18* 116:*16* 118:*1* 132:*17* 133:*15* 134:*5* 135:*3*, *4* 136:*2*, *7*, *15*, *18* 137:*24* 138:*4* 139:*6* 141:*2*, *12*, *17* 142:*11*, *13*, *14*, *19*, *21* 143:*1* 146:*10* 147:*6*, *17*, *19*, *21*, *23* 148:*8*, *14*, *21*, *24* 149:*2*, *6*, *7*, *10*, *16* 150:*8*, *13* 151:*1*, *25* 152:*23*, *25* 153:*23*, *25* 154:*6*, *13*, *17* 156:*20* 159:*1*, *22* 160:*2* 166:*18* 169:*5*, *9*, *13*, *17*, *20* 170:*3*, *10*, *25* 171:*2*, *7*, *8* 172:*13*, *18*, *20* 173:*20* 175:*16* 178:*12* 179:*10*, *16*, *24* 183:*19* 184:*25* 185:*24* 186:*17* 189:*9* 197:*17* 198:*18*, *22* 204:*3* 212:*6* 214:*4* 221:*11* 229:*9* 230:*15* 233:*9*, *10*

**report's** 178:*18* 226:*22*

**represent** 6:*4*

**representation** 224:*8*

**representative** 153:*6* 157:*14*

**represented** 135:*2*

**REPRESENTING** 2:*2*, *10* 3:*2*

**reproduction** 105:*18* 138:*5*

**reputable** 99:*23*

Deposition of Douglas J. Skinner                                John Harvey Schneider v. Natera, Inc., et al

**reputation** 101:*7* 204:*8*, *18* 205:*14* 206:*4*
**reputational** 208:*17*, *25* 209:*10*, *12* 227:*3* 229:*21* 231:*11* 233:*19* 234:*12* 235:*5*
**request** 238:*3*
**requested** 28:*13* 245:*24* 246:*5*
**require** 65:*17* 86:*22*
**required** 142:*25*
**Research** 79:*14* 137:*23* 149:*22*
**Research's** 202:*22*
**respect** 13:*11* 17:*3* 20:*20*, *23* 24:*17* 26:*20* 27:*17* 30:*15* 33:*11* 35:*7* 51:*14* 71:*2* 114:*10* 118:*24* 160:*1* 163:*15* 178:*2* 209:*17* 212:*22* 213:*9*, *14* 218:*15* 219:*16* 242:*7*
**respond** 19:*18* 60:*11* 127:*24* 221:*10*
**responded** 235:*13*
**responding** 118:*9*
**responds** 60:*20* 71:*11*, *19* 180:*6*
**response** 61:*22* 101:*12* 104:*21* 116:*12* 117:*12* 126:*6* 127:*25* 129:*24* 156:*4* 163:*22* 182:*11* 183:*14*, *25* 184:*23* 185:*5*, *21* 186:*18* 193:*16* 196:*21*
**responses** 16:*11* 216:*6*
**responsive** 96:*17*
**rest** 52:*14*
**restate** 29:*25* 113:*25*
**restrict** 47:*1*
**restricted** 159:*6*
**restrictions** 105:*17* 106:*2* 138:*9*
**result** 223:*20* 228:*23*

**results** 38:*9*, *12*, *14* 48:*20* 50:*15* 51:*11* 54:*23* 118:*5*
**retained** 17:*24* 19:*10*
**return** 39:*8* 41:*9* 48:*11* 49:*5*, *16* 109:*23* 111:*14* 112:*16* 113:*8* 118:*3* 119:*11* 120:*5*, *11*, *16*, *22* 121:*9*, *13* 123:*3* 124:*10*, *17* 127:*17* 129:*10*, *11* 204:*10*, *20*, *21*
**returned** 42:*1* 246:*1*, *2*
**returns** 39:*9*, *10* 42:*11* 50:*14* 91:*5* 93:*23* 120:*23*
**reveal** 132:*23*
**revealed** 24:*11* 123:*8*, *22* 125:*16* 126:*13*, *23* 127:*1* 128:*3*, *6* 131:*7* 132:*12*, *25*
**revelation** 104:*25* 123:*23* 128:*7*
**revenue** 29:*22* 30:*2* 32:*12* 125:*23* 127:*2*, *11* 128:*8* 129:*21* 130:*10*, *12* 193:*10* 197:*9* 238:*20* 239:*15* 240:*6*
**revenues** 23:*13*, *17* 30:*24* 31:*14* 112:*25* 116:*19* 118:*16* 122:*13*, *18* 123:*9*, *19*, *21*, *24* 124:*2*, *19* 125:*23* 126:*22*, *23*, *24* 128:*7*, *10*, *22* 129:*16*, *18* 130:*25* 131:*1* 218:*11* 219:*4*, *15* 233:*16* 237:*21* 239:*22*
**reversal** 43:*22*
**review** 9:*15*, *21*, *23* 10:*1* 13:*1*, *2* 19:*17* 37:*23* 79:*5* 134:*5* 135:*3* 136:*2*, *18* 137:*10* 149:*11* 150:*9* 155:*8* 236:*20*

**reviewed** 8:*10* 9:*17*, *25* 12:*9* 20:*19* 137:*9* 147:*17* 148:*7*, *20* 149:*9*, *12* 150:*8* 165:*22*, *23* 223:*24*
**reviews** 78:*10*
**revise** 197:*8*
**revision** 112:*22*
**right** 11:*5* 18:*9* 23:*4*, *14* 28:*9* 45:*2* 47:*20* 58:*13* 62:*19* 70:*16*, *20* 80:*9* 85:*25* 86:*16* 87:*15* 89:*17* 90:*5*, *7*, *14* 92:*3* 93:*16* 94:*4*, *22* 95:*5*, *21* 96:*15*, *20* 98:*3* 100:*4*, *7*, *11* 101:*22*, *23* 102:*19* 104:*1*, *22* 105:*9* 106:*25* 108:*4* 109:*6*, *13* 110:*14* 112:*17*, *24* 113:*2* 114:*11*, *16* 115:*15*, *19*, *20* 118:*19* 119:*5* 120:*7* 121:*6* 127:*9*, *14* 128:*10*, *14* 129:*7* 130:*21* 132:*6* 135:*5* 143:*5* 144:*19* 145:*7* 148:*3*, *13* 155:*18* 161:*8* 166:*20* 180:*20* 184:*1* 191:*12* 192:*4* 200:*24* 202:*4* 203:*15* 219:*19*, *24* 240:*9* 241:*1*
**risk** 206:*13* 207:*11* 208:*13* 216:*21* 217:*23* 218:*23* 221:*2*, *16* 222:*16* 227:*2* 228:*20*, *21* 229:*20* 231:*9*, *10* 232:*22* 234:*11* 235:*5*
**risks** 228:*14* 230:*12*, *13*
**RMR** 1:*21* 246:*18*
**Road** 2:*6*
**ROBERT** 3:*5*
**Rockefeller** 2:*14*
**rocket** 32:*2* 239:*7*
**Rocketship** 239:*16*
**ROELOF** 2:*11*

**Rogers** 79:*13*
**role** 100:*10* 211:*3*
**Roman** 21:*15*, *24* 22:*18*
**Romanette** 21:*12*, *24* 232:*5*
**romanettes** 21:*21* 201:*5*, *8* 227:*24*
**room** 7:*16*
**rose** 46:*9*
**ROSENMAN** 2:*12*, *13*, *18*
**roughly** 166:*3*, *7*, *19*, *23*, *25*
**ROWAN** 2:*11*
**ROY** 2:*10*
**Rule** 14:*14* 245:*22*
**Rules** 1:*20* 6:*18* 105:*17*
**run** 213:*25* 215:*20* 216:*11*
**running** 239:*8*

**< S >**
**S&P** 43:*13* 148:*1*
**SACHS** 3:*4*
**sale** 203:*2*, *21* 205:*3*
**sales** 29:*23* 30:*3*, *25* 113:*1* 128:*23* 238:*23*
**salient** 157:*15* 165:*8*, *15* 172:*20*
**Sandler** 4:*10*, *13* 180:*24* 185:*19* 187:*11* 188:*8* 190:*19*, *25* 192:*17* 193:*9* 196:*5* 197:*8* 198:*4* 209:*8*
**sat** 159:*7*
**satisfy** 240:*4*
**saw** 110:*2* 140:*12* 153:*9* 154:*4* 178:*21* 185:*5*, *20* 186:*18*
**saying** 54:*6* 66:*23* 67:*6*, *12* 68:*3* 69:*2*, *21* 72:*7*, *11*, *14*, *15*, *21*, *22* 92:*3* 95:*18* 97:*10* 103:*6* 122:*21*, *22* 123:*2* 125:*19* 126:*3* 132:*15* 146:*13* 155:*10* 172:*2* 180:*18*,

*20*  181:*2, 4*  185:*15*  188:*21*  225:*2*  226:*13*  228:*7*  238:*20*

**says**  34:*1, 4*  36:*16*  66:*14, 25*  71:*24*  72:*20*  89:*14*  95:*20, 25*  103:*1, 3, 21, 22*  114:*17*  136:*5*  145:*14*  189:*20*  192:*23, 24*  203:*5, 15, 19*  226:*11*  231:*7*  237:*8*  239:*14*

**scenario**  101:*2*

**SCHNEIDER**  1:*3*  5:*9*  245:*3*

**Scholes**  83:*11*

**school**  46:*10*

**scientists**  202:*8*

**scissors**  187:*7*

**scope**  221:*6*  227:*13*  230:*6*  231:*1*  234:*18*  235:*17*  236:*10, 12*  238:*25*

**screen**  11:*4*  13:*17*  21:*16*  111:*20*  173:*5*

**screening**  239:*7, 16*

**scrutiny**  206:*14, 24*  207:*5, 22*  208:*13*  221:*16*  222:*3*  235:*4*

**search**  149:*4*  150:*5*

**season**  45:*18*

**seasons**  45:*21*  46:*5*

**SEB**  15:*6*

**SEC**  73:*7, 19*  75:*25*  77:*3*  208:*2, 3*  222:*11*  223:*6*  225:*21*  230:*18, 23*

**Second**  7:*1*  15:*8*  21:*13*  22:*1*  28:*8*  92:*19*  166:*8*  206:*10, 18*  216:*15*

**seconds**  82:*7*

**second-to-the-last**  238:*18*

**SEC's**  73:*9*  88:*13*

**Section**  14:*14*  19:*8*  34:*11*  86:*17*  115:*20*  142:*15*  146:*22*  176:*8, 9*  178:*7*  200:*15*  213:*11*  221:*13*  231:*22*  239:*14*

**sections**  131:*4*  142:*16*  215:*2*  221:*12*

**securities**  14:*15*  57:*20*  100:*11*  154:*10*  202:*10*

**security**  56:*11*  57:*2*  59:*3, 8*  61:*11*  71:*11*  80:*20*  151:*6*  172:*23*

**see**  11:*14*  12:*13*  14:*11*  23:*22*  53:*7*  58:*6*  64:*22*  65:*2, 8, 9*  68:*19*  69:*2*  73:*8*  74:*3, 5, 8, 12, 14, 16, 17*  75:*21*  85:*23*  96:*10, 12*  97:*6, 20*  98:*14*  99:*6*  101:*10*  109:*14*  115:*5*  119:*10*  120:*4, 10, 15*  129:*9*  131:*17*  147:*3*  155:*10*  163:*5*  174:*4*  176:*11*  179:*10*  180:*19*  181:*8*  182:*9*  183:*20*  187:*15*  188:*4, 12, 19*  220:*19*  229:*4*  230:*14*  231:*16*  239:*1, 5, 11, 18, 19*  240:*7, 8*

**seeing**  13:*16*  98:*23*  184:*24*

**seeking**  153:*7*

**seemingly**  101:*3*

**seen**  61:*10*  109:*21*  134:*14*  139:*17*  141:*10, 12*  142:*19*  146:*7*  147:*2*  158:*24*  159:*3*  198:*13*  203:*23*  223:*11, 16, 19, 22*

**sees**  116:*18*

**self-evident**  114:*23*  115:*10*

**selfsame**  110:*5*

**sell**  138:*1*  140:*14*  172:*14*

**seller**  203:*4, 7, 9*  204:*2, 9, 18*  205:*2, 14*  206:*19, 20, 21*  207:*3*  220:*7, 22*  221:*25*  224:*20*  228:*24*  229:*12, 13*  230:*17*

**sellers**  220:*14, 16*

**sells**  137:*22*  138:*4*

**sell-side**  61:*8, 9, 24*  73:*23*  74:*4, 5, 17*  76:*1*  77:*5, 22*  88:*18, 20*  97:*20*  98:*7, 14*  138:*18, 23*  141:*11*  154:*10*  172:*23*  173:*1, 24, 25*  174:*4*  179:*24*

**semi-strong**  37:*7*  55:*15, 19, 21, 25*  56:*3, 7*  59:*15*  60:*9*  64:*17*  68:*10*  71:*10*  81:*18*  95:*22*  96:*11*

**send**  159:*14*

**sending**  159:*10*  165:*17*  172:*17*  173:*19*

**sense**  7:*12*  16:*23*  25:*14*  100:*1*  128:*1*  162:*1*  192:*7*  193:*9*  233:*22*

**sent**  151:*25*  152:*18*  153:*5*  155:*2, 3*  172:*5, 11, 20*  173:*9, 15*  191:*8*  192:*20*

**sentence**  64:*23*  65:*10, 22, 24*  66:*18, 25*  67:*12*  84:*12*  89:*13*  108:*5*  123:*6*  125:*12*  129:*2*  146:*2*  148:*11*  188:*7, 23*  191:*4*

**sentences**  66:*13*  191:*11*

**separate**  8:*21*  41:*3*  126:*3*

**separately**  33:*2*

**September**  1:*13, 18*  5:*4*  245:*12*  246:*15*

**sequencing**  210:*23*

**series**  45:*25*

**seriousness**  188:*11*  189:*23*

**served**  11:*18*

**service**  32:*23*  62:*15*  137:*22*  173:*17*  175:*14*

**services**  139:*21*

**set**  83:*4*  95:*10*  102:*20*  133:*22*  136:*22*  152:*6, 9, 10*

174:*15*  175:*5, 16*  215:*7*

**Seth**  168:*1*

**shareholders**  240:*5*

**sharing**  105:*18*

**sharp**  203:*11*

**SHEENA**  2:*12*

**sheet**  237:*8*  244:*9*

**ship**  32:*2*  239:*7*

**shocks**  43:*20*

**short**  53:*1*  203:*2, 3, 7, 9, 21*  204:*9, 18*  205:*2, 3, 14*  206:*19, 20, 21*  207:*3*  220:*7, 13, 16, 22*  221:*13, 25*  224:*20*  228:*24*  229:*11, 13*  230:*17*

**Shorthand**  245:*14*

**shortly**  91:*20*  141:*19*  142:*23*

**show**  77:*21*  224:*6*  230:*8*

**shows**  131:*4*  151:*9*  187:*16*  235:*12*

**shutdowns**  47:*19*

**side**  159:*9*

**sign**  11:*25*

**signature**  11:*23*  244:*15*  245:*23*  246:*3*

**significance**  42:*11*  48:*11*  49:*4, 15, 20*  50:*17*

**significant**  41:*10*  116:*11*  117:*15, 21*  120:*1, 6, 21, 25*  203:*5*  204:*10, 19*  205:*22*

**significantly**  203:*22*  205:*7*

**similar**  32:*4*  155:*2*  163:*22*  165:*2*  181:*3, 4*  193:*8*  203:*20*  204:*3*  207:*14*  209:*16*  219:*10*  242:*5*

**Similarly**  1:*4*  74:*8*  161:*20*  208:*15*  210:*2*  245:*4*

**simple**  122:*22*

**simply**  21:*25*  43:*25*  50:*16*  53:*5*  85:*19*  96:*24*  104:*15*  114:*2*

128:*3* 138:*16* 140:7 143:*13* 159:2*0* 162:*12* 186:*4* 211:*15*

**single** 41:*8* 162:2*0* 195:5 198:*18*

**sir** 6:*15* 8:*3* 14:*11* 23:7, *11* 45:6 77:*25* 78:*15* 79:*19* 119:*19* 120:*17* 122:8 123:*18* 133:*13* 137:2*1* 164:*23* 168:*3* 175:*25* 208:*15* 212:*25* 214:*1*, *15* 217:2*1* 222:*18* 223:*12* 227:*16* 231:*16* 234:6 237:*19* 238:*14* 239:*1*, *20* 240:2*0* 241:2, *12*

**sit** 79:6 138:2

**sits** 143:6, *8*

**sitting** 7:*16* 16:*25* 17:*17* 18:*22* 80:*14* 100:*17* 101:*22* 105:*25* 134:9 135:8

**Situated** 1:*4* 245:*4*

**situation** 72:*16* 82:*17* 89:*17* 104:*22* 109:7 111:*25* 127:8 172:*1*

**situations** 80:*23* 112:5, *6*

**six** 132:*17*, *19*, *23* 136:*12*

**skeptical** 100:*16*, *19*

**SKINNER** 1:*13*, *16* 4:*8*, *9*, *10*, *13*, *16* 5:7, *22* 6:*3* 10:*14*, *15* 11:2, *11*, *12*, *16* 12:*3* 29:7 45:*3* 55:*13* 91:*23* 107:*19* 143:*23* 144:*11* 148:*17* 183:2 186:*25* 187:2, *4*, *10*, *12* 190:*14*, *15*, *17*, *20*, *21* 192:*15* 196:2 199:*15* 237:*1*, *3*, *7* 239:*4* 240:*19* 244:*3* 245:*12*, *18*

**SKINNER_0000408** 4:*14* 190:*18*

**SKINNER_0000469**

4:*11*

**slip** 237:8

**small** 78:*4* 80:*18* 84:*3*

**smaller** 117:7

**snippeted** 157:2

**snippets** 155:8

**so-called** 86:*4*, *23* 210:*19* 233:*25*

**social** 47:*1* 100:*10*, *12* 101:2*1* 104:6

**Sold** 239:*15*

**sole** 106:*12*

**Solutions** 152:*12*

**somewhat** 17:7 18:*15* 48:2*1*

**sophisticated** 104:*12*

**sorry** 23:*1* 37:*12* 78:*14* 110:*18* 117:*17* 141:7 160:*17* 191:*19* 204:*15* 212:*19*

**sort** 59:2*4* 69:*4* 70:*19* 101:*17* 122:2*1* 126:9, *10* 127:*10*

**sought** 213:2*4* 215:*19* 216:9

**sounded** 204:*15*

**Sounds** 44:*25* 56:2*1* 62:2*4* 132:6 182:*23* 183:*18* 219:*10* 220:*3* 238:*15* 242:*1*

**source** 56:*16* 62:*4*, *17* 99:*23*, *24* 100:5, *25* 101:2, *7* 103:9, *11*, *16* 104:*16* 105:8 106:*13*, *15*, *17* 149:*25* 150:9

**sources** 12:2*2* 36:9, *12* 62:6, *20*, *21* 63:*1*, *3*, *8*, *9* 73:*25* 75:*25* 148:*13* 149:*15*

**spare** 6:*17*

**sparked** 196:*11* 198:*11*

**speak** 225:*12* 233:5 234:*3*

**speaking** 214:*16*

**speaks** 121:2*4* 225:*10*

**specializes** 233:*1*

**specific** 24:*4* 28:*19* 29:*12* 30:6 36:*14* 38:*11* 40:2*0* 42:*17* 45:*15* 46:*3*, *18*, *20* 47:*10* 58:*4* 77:*11* 80:*1*, *23* 82:*11* 101:*17* 113:*17* 118:7, *20* 129:*12* 149:*13* 154:*25* 166:*11* 168:*25* 169:2*0* 186:*13* 207:*17*

**specifically** 47:6 55:*18* 66:*1* 78:8 82:*16* 99:*16* 118:2*4* 122:*4* 132:*19* 145:2 146:*1* 147:2*2* 149:*12* 153:2 162:*1* 171:7 200:*25* 217:*18* 224:*12* 237:2*2*

**specifics** 15:2*4* 34:*15* 45:*12*, *13* 46:*1*, *6*, *15* 48:*4* 137:8 138:9

**specify** 72:*17*

**spectrum** 70:2*3*

**speculating** 164:*11*

**speculation** 164:*16*, *21* 168:7 224:*1* 227:8

**speculative** 90:*11* 104:*15*

**spend** 209:5

**spends** 80:*13* 179:2*3*

**split** 51:*16* 52:*14* 54:*4*, *17*, *19*, *24*

**splitting** 51:2*2* 53:*11*

**spoke** 191:5 213:2*1*

**spoken** 192:*18*

**sports** 46:*4*

**spread** 100:*14*

**staff** 7:2*2* 8:*18*, *21* 9:2

**stage** 14:2*1* 241:2*1*

**stamp** 187:*15* 237:9

**standard** 42:5 67:*19* 81:5, *6*

**standing** 160:*10*, *13*

**STANLEY** 3:*4* 180:*25*

**Stars** 2:*18*

**started** 148:*16*

**starting** 82:2*4* 238:5

**state** 32:2*1* 33:*16* 36:2*1*, *25* 38:*3*, *8* 45:*11* 46:*13*, *24* 55:*15* 56:6 64:*16* 83:2*2* 108:*19* 117:*14*, *20* 132:*11* 144:5, *10* 147:*16* 169:9 201:*10* 207:*10* 217:*12*

**stated** 1:2*1* 19:*17*, *18* 29:*1* 53:8 58:*4* 65:*1* 109:*3* 133:*11* 144:2 145:2*0* 146:*15* 148:7 213:9 216:2*0*

**statement** 12:*4* 22:*17* 29:2*2* 30:2, *18*, *20* 31:2, *24* 32:5 57:9 67:2*1* 68:*1* 74:2 84:2*2* 86:2*5* 109:9, *21*, *24* 110:2, *5* 111:*11*, *17* 112:*1*, *23*, *24* 113:*3* 121:9 128:*19* 169:*15* 189:*11* 195:5 225:5

**statements** 23:*12* 25:*18* 27:*11* 29:*16* 30:*11*, *14* 31:2 32:*19* 63:*12*, *13* 92:*15* 104:2*0* 108:2*1* 218:*10* 219:2*3* 224:*4*

**STATES** 1:*1* 5:*10* 30:2*4* 33:*14* 46:*11*, *24* 47:2*0* 101:5, *8* 104:*19* 245:*1*, *15*

**stating** 65:*4* 67:2*0* 113:*14* 158:*25* 192:*18*

**statistical** 42:*11* 48:*11* 49:*15*, *19* 50:*17* 53:2*0*, *21* 54:8

**statistically** 41:*10* 49:4 54:*10* 116:*11* 117:*15*, *21* 119:*25* 120:5, *21*, *25* 204:*10*, *19* 205:2*3*

**status** 158:*4* 167:*11*

**STENOGRAPHER'S** 4:2*0*

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

stenographic  5:*18*
stenographically  1:*19*
step  157:*25*  231:*19*
steps  148:*18*  214:*16*
215:*25*  217:*1*
STEVE  1:*7*  2:*10*
239:*6*  245:*7*
stock  16:*2, 11*  17:*11*
18:*4, 19*  20:*4, 8, 16*
21:*5*  22:*4*  26:*23*
37:*6, 18*  39:*8*  40:*17*
42:*21*  44:*4, 12*  45:*9*
46:*7, 21, 23*  47:*5, 11*
56:*7*  59:*14, 16*  61:*25*
64:*3, 5, 21*  68:*8*  70:*6*
71:*6*  78:*24*  79:*20*
82:*1*  85:*2, 16, 23*
95:*17*  96:*13, 20*  97:*1,*
*3, 7, 14, 19*  100:*15, 18,*
*20*  101:*25*  102:*2, 9*
106:*23*  107:*22*  108:*1,*
*10, 13*  109:*7, 10, 17,*
*23*  110:*3, 4, 8*  111:*20*
112:*2, 8, 10, 15, 18*
113:*6, 7, 16*  114:*4, 20*
115:*2*  117:*5, 7, 16, 22*
118:*14, 21, 25*  119:*5,*
*10*  122:*16*  123:*5*
124:*25*  125:*7, 14, 24*
126:*5, 23*  127:*25*
129:*23*  130:*1*  145:*25*
146:*6, 12, 20*  147:*1, 8,*
*15*  171:*2, 16*  183:*8*
184:*6*  185:*2, 5, 20, 25*
186:*9, 14, 18*  190:*3, 9*
191:*9*  192:*20*  193:*21*
194:*1, 14, 21, 25*
195:*8*  196:*12*  197:*1,*
*13, 18*  198:*12*  199:*17,*
*19*  200:*1, 4, 13, 23*
201:*3, 13, 17, 20, 21,*
*23, 25*  202:*6, 14, 23*
203:*6, 22*  204:*5*
205:*5, 11, 18, 21*
206:*2, 11, 15*  207:*1,*
*12, 16*  208:*12, 24*
209:*13, 20, 22*  210:*6*
211:*2, 4, 19, 24*  213:*3,*
*16, 19*  215:*10, 13*
217:*22*  222:*6*  228:*10*

229:*17*  230:*11, 21*
231:*4, 24*  232:*3*
238:*21*
stocks  43:*10*  44:*14*
stock's  190:*4*
stop  111:*20*  182:*22*
192:*4*
stopping  91:*18*
stories  62:*18*
Street  74:*10*  77:*23*
83:*22*  103:*5, 13, 22*
strict  105:*17*  138:*5*
strictly  228:*23*
strike  23:*2*  29:*24*
58:*23*  79:*8, 17*  147:*2*
148:*15, 16*  162:*6*
165:*21*  169:*10*  180:*5*
199:*23*  217:*1, 20*
232:*16*
strong  95:*23*
struggle  130:*20*
studies  41:*15*  48:*15*
50:*1*  52:*11*  53:*15*
60:*7, 18*  78:*13*  79:*3,*
*17*  80:*6, 23*  81:*12, 14*
82:*12*  114:*19*  115:*22*
study  16:*11*  17:*2, 20*
37:*17, 18, 22*  38:*1, 3,*
*4, 7, 10, 13, 14, 16, 22*
39:*1, 12, 17*  42:*6, 13*
48:*6*  50:*6, 21*  51:*6,*
*16*  52:*17*  53:*16*  78:*3,*
*24*  79:*4, 19*  80:*2, 6, 7,*
*9*  82:*3, 17*  107:*22*
115:*2, 21*  116:*5*
117:*25*  118:*3, 12*
123:*16*  126:*11, 15, 17*
235:*11*
studying  76:*14*
stuff  222:*21*
subject  13:*17*  16:*7*
22:*3*  24:*4*  39:*25*
221:*1*  227:*2*  232:*21*
233:*18*  234:*11*
submitted  13:*2*
237:*11*
submitting  12:*8*
subscribe  172:*14*
175:*15*

subscriber  170:*8*
172:*11*  174:*13*
175:*13*
subscribers  152:*23*
159:*11*  172:*6, 14, 17,*
*18*  173:*19, 20*  175:*2,*
*14*
subscribing  141:*6*
subscription  32:*23*
139:*5*  140:*17*  142:*24*
143:*9, 12*  156:*7*
159:*2*  173:*17*  175:*3,*
*4*
subscription-based
137:*22*
subscriptions  138:*1*
158:*18*
Subsection  200:*18*
213:*13*
subsections  200:*15*
subsequent  41:*25*
50:*19*  142:*16*  148:*9*
150:*19*  220:*21*
subsequently  233:*17*
subset  78:*5*
substance  66:*22*
244:*8*
substantial  60:*22*
93:*24*  94:*9*
substantially  43:*9*
44:*3*  45:*8*
successful  229:*13*
sued  138:*12*
sufficient  34:*20*  65:*5*
66:*7, 15*  67:*6, 22*
69:*6, 14*  70:*13*  71:*25*
72:*2, 8, 13, 19, 22*
73:*1, 12*  84:*8, 14, 17,*
*23*  85:*6, 8*  86:*11, 23*
146:*8*
sufficiently  154:*6*
suggest  192:*6*
Suite  2:*18*  3:*7*
summarize  22:*24*
23:*7*  29:*15*  32:*14*
189:*16*  215:*14*
summarized  27:*19*
157:*15*  199:*3*  215:*6*
summarizes  29:*18*
summarizing  64:*25*

summary  19:*20*  23:*9,*
*15*  24:*4*  31:*15*  32:*18*
33:*5*  35:*16*  37:*3*
38:*22*  107:*25*  164:*2*
166:*13*  212:*25*
219:*10, 11*  236:*8*
super  111:*21*  139:*10*
support  13:*23*  51:*21*
53:*10*  66:*11*  86:*6*
114:*3*  115:*8*  167:*23*
169:*15*  170:*1*  196:*15*
198:*7, 10*  200:*7*
201:*15, 19*  203:*8*
205:*9*  208:*5*  221:*20*
230:*9*  232:*8*
supported  52:*10*
197:*16*
supporting  195:*1*
supports  199:*2*
Suppose  76:*21*
supposition  124:*18*
suppositions  130:*18*
sure  17:*5*  21:*8*
35:*10*  36:*5*  50:*5*
56:*20*  60:*16*  67:*5*
68:*14*  78:*6*  79:*12*
92:*20*  100:*3*  108:*8*
109:*5*  111:*19*  113:*22*
117:*19*  121:*6*  124:*16,*
*20*  129:*24*  130:*24*
131:*9*  133:*3, 22*
134:*12*  135:*11, 13, 19,*
*20*  139:*1, 17*  140:*15*
143:*4*  148:*3*  153:*3, 8,*
*21*  154:*19*  155:*16*
157:*4*  158:*20*  159:*12*
161:*7*  162:*25*  163:*24*
164:*5*  170:*5, 11, 15*
197:*6*  202:*5, 9, 25*
204:*24*  205:*16*
209:*22*  210:*10*
214:*20*  220:*19*
surprise  96:*24*  97:*17*
116:*16, 19*  129:*22*
133:*7*  138:*7*  237:*23*
surprised  139:*10*
surprisingly  97:*16*
suspended  45:*19*
suspension  45:*21*

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

sustained  222:*15*
SVB  3:*4*
sworn  1:*16*  5:*21, 23*
245:*19*
Symantec  15:*7*
system  73:*10*
systematically  220:*18*

**< T >**
Tab  10:*11, 19, 20*
186:*24*  187:*5*  190:*12*
236:*25*
take  7:*10*  10:*4*
25:*11, 13*  27:*7*  44:*18*
51:*13*  52:*13*  53:*3*
56:*20*  57:*18*  59:*22*
82:*9*  96:*7*  100:*6*
107:*1, 6, 12*  130:*20*
143:*14*  148:*17*
188:*22*  191:*20, 23*
192:*3*  196:*4*  199:*6*
208:*3*  214:*16*  215:*25*
216:*25*  238:*11*
240:*10*
taken  5:*8*  219:*2, 3,*
*20*  220:*25*  221:*1*
226:*23, 24*  234:*8*
246:*10*
takes  86:*3*  106:*19*
182:*10*
talk  73:*15*  78:*8*
95:*8*  111:*10, 22*
149:*22*  231:*5*
talked  107:*9*  209:*9*
232:*10*
talking  10:*19*  81:*15*
89:*17*  94:*8*  109:*6*
146:*1*  175:*23*  187:*22*
195:*6*  231:*6*  232:*6*
talks  83:*14*  90:*6*
94:*5*
target  220:*15, 17*
targeted  220:*7*
TCF  159:*1*
team  139:*4*
technical  7:*8*
TECHNICIAN  3:*11*
*5:14*
tell  53:*9*  83:*8*

109:*17*  186:*9*
teller  227:*9*
tells  54:*9*  69:*25*
102:*7*
temporary  116:*11*
ten  6:*13*  166:*9*
tend  57:*13*  98:*24*
99:*17*  220:*16*  232:*21*
tends  82:*1*  119:*4*
ten-page  166:*23*
tens  93:*19*
term  14:*25*  24:*18*
25:*8, 22*  40:*6*  85:*5*
93:*24*  201:*7*
terminology  73:*13*
terms  54:*21*  84:*23*
87:*16*  114:*11*  138:*5,*
*13*  174:*21*  226:*3*
test  58:*5, 11*  60:*7*
71:*14*  84:*23, 24*
213:*25*  215:*19*
216:*10*  238:*23*
testified  5:*23*
testimonies  14:*9*
15:*17*
testimony  6:*21*  7:*17,*
*24*  8:*4*  136:*4, 20*
221:*6*  245:*20*  246:*10*
testing  32:*1*  85:*18*
87:*5*
tests  31:*1*  32:*9*
71:*10*  72:*6*  86:*20*
113:*1*  128:*24*  238:*25*
239:*8*
TEXAS  1:*1, 24*  5:*11*
245:*1, 15*  246:*19*
text  7:*23*  111:*21*
Thank  7:*12*  14:*3*
55:*4*  56:*2*  61:*13*
68:*19*  78:*21*  91:*20*
142:*6*  182:*24, 25*
199:*23*  200:*7, 21*
242:*16*
Thanks  7:*6*
theoretical  57:*9*
theoretically  58:*8*
theory  241:*16*
therefor  246:*4*
thereof  70:*9*  125:*8*

thing  54:*11*  67:*24*
68:*1*  103:*14*  104:*23*
110:*13*  114:*15*  118:*4*
129:*13*  152:*13*
178:*10*  188:*22*  197:*6*
216:*15*
things  43:*21*  54:*14*
59:*20, 22*  62:*24*
63:*17*  70:*20*  81:*20*
97:*18*  102:*19*  114:*9*
116:*17, 23*  124:*11*
126:*4*  128:*12, 17*
167:*7*  181:*3, 4*
197:*23*  207:*8*  212:*3*
225:*6*  230:*22*  235:*4*
think  6:*12*  9:*5, 13*
10:*12*  12:*22*  14:*19*
15:*21, 23*  16:*14, 24,*
*25*  17:*16*  18:*11, 14*
19:*1*  21:*19*  23:*1, 15,*
*21*  24:*3, 14, 19*  25:*7,*
*10, 23*  26:*4, 16*  27:*3*
28:*18, 24*  31:*15*  33:*1,*
*6*  34:*10*  35:*12, 14*
36:*1, 3, 4, 19*  41:*11,*
*14*  42:*5*  43:*1*  44:*20*
45:*25*  47:*8, 21, 22, 25*
48:*13*  50:*21*  51:*24*
52:*6*  53:*14*  56:*5*
57:*11, 13*  58:*7*  59:*6*
60:*3*  61:*18*  62:*9*
65:*9*  66:*13, 24*  67:*11,*
*25*  68:*20*  69:*1, 20, 24*
70:*7, 18*  71:*1, 14, 17*
72:*5, 6*  73:*5, 10, 14,*
*16, 20, 21*  74:*2, 10*
75:*16*  76:*7*  77:*10*
79:*14*  80:*1, 4*  81:*2, 5,*
*17*  82:*23*  83:*21*
84:*19*  85:*13*  86:*15*
87:*14, 19, 25*  88:*9, 12*
89:*23*  92:*2, 5, 14*
93:*10, 11, 15*  94:*3, 18*
98:*1, 2, 11*  99:*1, 16*
100:*6, 18*  101:*16, 19*
102:*3, 12*  105:*10, 22*
106:*16*  107:*8, 9*
108:*9*  109:*2, 4*
110:*14, 20*  111:*5, 16*
112:*6*  114:*16, 22*

115:*13, 25*  116:*15*
117:*24*  118:*11*
120:*14*  121:*4, 24, 25*
122:*1, 20*  124:*4, 5*
125:*25*  126:*2*  127:*7*
128:*16*  129:*4, 15*
130:*17*  131:*3*  132:*15,*
*22*  133:*21*  135:*18*
137:*5*  140:*23, 25*
141:*12*  143:*5*  144:*17*
145:*13*  146:*13*  147:*9*
151:*4*  152:*13*  153:*11*
154:*24*  156:*8, 18*
157:*25*  159:*3*  163:*21*
166:*6, 13*  167:*4*
171:*25*  172:*12*
173:*11*  174:*11, 23*
177:*4, 23*  178:*10*
179:*20*  180:*12, 22*
181:*8, 10, 12, 19, 21*
182:*2, 5*  183:*21*
186:*8*  188:*19*  189:*15,*
*17, 24*  190:*5*  191:*16,*
*23*  201:*14*  203:*19*
204:*12, 13*  205:*1, 8,*
*21*  207:*2, 14*  209:*21*
211:*2, 15, 18*  213:*6*
214:*7*  216:*3, 5*  217:*8,*
*16*  218:*1*  220:*10, 15*
221:*7*  222:*20, 25*
225:*11, 16*  227:*13*
229:*5*  230:*2*  232:*11,*
*24*  233:*21, 23*  236:*19*
242:*4, 14*
thinking  57:*15*
101:*20*  148:*13*
thinks  72:*18*
third  15:*10*  215:*5*
Thomas  2:*13*
thomas.artaki@katten.
com  2:*15*
thought  78:*21*
111:*23*  173:*25*  174:*1,*
*3*  190:*9*
thousands  60:*7*
81:*12*  83:*2*
three  9:*10*  19:*23, 25*
39:*21*  141:*1*  153:*1*
172:*21*  173:*5, 10*

Deposition of Douglas J. Skinner                    John Harvey Schneider v. Natera, Inc., et al

180:*23*  182:*18*
192:*10*
**threshold**  41:*9*  89:*7*
92:*22*  93:*4, 7, 8*  95:*5*
105:*24*
**time**  5:*5*  6:*14*  13:*5*
40:*15*  44:*23*  51:*14,
22*  56:*12*  57:*2, 21*
59:*5*  76:*5, 24*  77:*8*
80:*14*  101:*6, 9*  103:*3*
112:*8*  142:*1*  150:*3,
12*  151:*11*  168:*12*
171:*17, 19*  178:*6*
179:*23*  194:*14, 22*
202:*7*  209:*6*  211:*14*
228:*8*  235:*21*  242:*12*
**times**  6:*11, 13*  12:*9,
10*  142:*9*  145:*21*
181:*6*  234:*16*
**title**  153:*24*  157:*1,
12*  164:*2*  165:*12, 16*
166:*15*  176:*9*
**titles**  156:*20*
**today**  5:*14, 17*  6:*5,
22*  7:*14, 17, 25*  8:*4, 7*
12:*6, 7*  17:*1, 17*
18:*22*  55:*24*  79:*6*
83:*21*  134:*10*  135:*9*
145:*21*  213:*21*
**Today's**  5:*4*
**TODD**  2:*11*
**told**  137:*18*
**top**  15:*4*  81:*13*
82:*25*  192:*16*  237:*9*
239:*19*  240:*1*
**TOPAZ**  2:*6*
**topic**  21:*13*  22:*1*
108:*21, 23*  110:*5*
150:*2*
**topics**  19:*23*  61:*15*
**total**  30:*24*  46:*9*
112:*25*  128:*22*
132:*20*
**track**  202:*22*  204:*3,
8, 17*  205:*13*  206:*3,
21*
**trade**  64:*19*  65:*20*
67:*2, 9*  68:*6*  70:*4*
81:*24*  82:*6*  83:*25*
92:*16*  93:*22*  98:*5*

104:*13*  105:*2, 4*
106:*8*  107:*3*  145:*23*
146:*5*
**traded**  22:*4*  77:*19*
95:*14*  146:*11*  147:*5*
168:*3, 9*  232:*15, 17,
21*  233:*13*
**trade-off**  53:*18*
**trade-offs**  51:*4, 7, 9*
52:*18*
**trader**  94:*24*
**traders**  81:*22*  91:*13*
**trades**  83:*10, 15, 20*
**trading**  49:*12*  54:*5*
58:*16*  91:*4, 10*  92:*12*
148:*9, 10*
**train**  111:*23*
**transactions**  58:*20*
59:*21*  87:*21*
**transcript**  245:*19*
246:*2*
**transcription**  244:*5*
**transcripts**  63:*20*
**transitory**  116:*21*
**transparently**  179:*7*
**travel**  47:*2*
**treated**  103:*19*
**treatments**  232:*19*
**tremendous**  80:*7*
**tremendously**  80:*10*
**tried**  129:*15*  217:*9*
229:*6*  230:*3*
**true**  24:*12*  26:*13, 25*
27:*8, 12*  56:*15*  57:*5,
23*  58:*11*  89:*16*
133:*21*  219:*3, 21*
220:*25*  226:*24*  234:*8*
245:*20*
**TRUSTEES**  2:*4*
**truth**  218:*4*  239:*21*
**truthful**  8:*4*
**try**  7:*4, 9*  25:*15*
60:*10*  108:*10*  140:*14*
167:*22*  197:*21*
**trying**  32:*17*  33:*4*
48:*24*  67:*6, 24*  75:*6,
12*  77:*11*  86:*5*  89:*20*
91:*4*  93:*5, 21*  96:*16*
105:*12*  111:*22*

191:*22*  196:*19*  203:*1*
206:*18*  214:*8*
**t-statistic**  48:*20*
**turn**  11:*21*  12:*11*
13:*9*  19:*7*  150:*22*
**turned**  110:*20*
**turning**  239:*3*
**two**  9:*6, 10, 14*  28:*8*
33:*1*  43:*23*  50:*8*
51:*12, 16, 23*  52:*15*
53:*5, 12*  54:*3, 4, 17*
80:*6*  99:*4*  101:*13*
114:*9*  126:*3*  127:*16*
131:*13, 15, 19*  132:*18*
134:*12*  135:*19*  142:*3*
143:*25*  144:*6*  145:*4*
147:*18*  149:*14*  158:*2*
163:*3*  167:*16*  168:*12*
172:*23*  182:*17*
191:*11*  194:*9*  198:*18*
216:*5*
**two-month**  40:*21*
**type**  15:*7, 9*  17:*2*
59:*25*  76:*16*  79:*15*
102:*5, 17*  130:*21*
157:*23*  165:*5*  232:*20*
**types**  46:*16*  51:*7*
60:*10*  63:*2*  78:*12*
86:*20*  90:*25*  139:*3*
149:*15*  167:*7*  207:*5,
20*  220:*14*
**typical**  39:*11*
**typically**  63:*22*
71:*17*  72:*5*  99:*3*
157:*11*

**< U >**
**ultimately**  64:*3*
69:*20*  93:*13*  131:*3, 6*
132:*24*  133:*9*  221:*17*
**uncertain**  117:*5*
**uncertainty**  43:*18*
117:*3*
**unclear**  159:*8*
**uncovered**  83:*7*
**underlie**  13:*3*
**underlying**  118:*21*
135:*3*  142:*12*  153:*17*
154:*17*  155:*12, 19*
157:*1, 3, 18*  159:*14*

163:*17*  164:*25*  170:*2*
171:*22*  229:*1, 23*
241:*23*
**understand**  6:*24*  7:*3,
5*  8:*1*  23:*11*  24:*16*
29:*16*  33:*18*  34:*17*
55:*19*  109:*5*  113:*4*
135:*25*  138:*20*
154:*19*  176:*10*  177:*5*
195:*17*  196:*2*  210:*14*
218:*7*  225:*19*  241:*1*
**understanding**  19:*14*
22:*20*  25:*12*  27:*20,
24*  30:*6, 16*  31:*4, 16*
32:*4, 7*  33:*8, 22*  34:*6,
12, 16*  37:*9, 13*  86:*9*
111:*6*  138:*1*  142:*10,
20*  143:*7*  155:*7*
173:*1*  218:*21*  222:*18*
223:*1*  241:*10, 17, 19*
242:*5*
**understating**  48:*10*
49:*4, 8*
**understood**  7:*2*
12:*25*  13:*24*  24:*22*
27:*14, 17*  28:*15, 25*
**undervalued**  106:*23*
**UNDERWRITER**  3:*2*
**undisclosed**  130:*11*
218:*23*  219:*5*  239:*23*
**unfortunately**  28:*10*
**unfounded**  209:*5*
222:*2*  224:*7, 21*
225:*4, 8*  228:*16*
**uninformed**  100:*14*
**UNITED**  1:*1*  5:*10*
46:*24*  47:*20*  245:*1*
**University**  80:*14*
**unknown**  188:*10*
189:*22*
**unrelated**  217:*23*
218:*3*  229:*23*  231:*12*
**unusually**  41:*1, 23*
43:*4*  47:*16*  50:*10*
52:*11*
**upgraded**  97:*17*
**upper**  95:*10*
**upward**  112:*3, 8, 22*
113:*6, 7*

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

**upwards** 109:*11* 112:*16, 18* 125:*1*
**usage** 105:*17* 138:*13*
**use** 11:*3* 40:*6* 41:*2* 50:*3* 73:*12* 90:*14* 93:*24* 108:*14* 115:*1* 125:*7* 127:*19* 165:*6* 194:*25* 201:*7*
**useful** 137:*5* 183:*20*
**uses** 39:*17*
**Usually** 58:*3, 11* 73:*6, 10, 20*

**< V >**
**Vaguely** 212:*17*
**validity** 101:*11* 167:*11* 221:*20*
**value** 24:*22, 24* 25:*13* 26:*7, 10* 27:*3, 5, 7* 28:*17, 23* 29:*4* 38:*15* 59:*13* 62:*8, 14* 64:*2, 5* 68:*6* 81:*23* 91:*8* 92:*11* 95:*19* 96:*21, 23* 98:*6* 99:*1* 100:*24* 102:*22* 105:*13* 106:*3, 7, 13* 107:*2* 109:*18* 113:*10* 116:*14* 124:*7* 125:*9* 126:*6* 128:*25* 130:*5* 171:*12* 180:*1, 16* 190:*4, 10* 214:*17* 215:*25* 217:*15* 219:*3, 20* 221:*1* 226:*23* 234:*7*
**value-relevant** 64:*15* 94:*10* 96:*2* 97:*11, 22* 98:*16* 104:*10* 110:*1, 7*
**Vanguard** 83:*22*
**variation** 99:*14*
**varies** 99:*10, 11*
**variety** 181:*19*
**various** 8:*10* 9:*18* 17:*16, 22* 25:*25* 27:*1, 2* 28:*19* 29:*16* 30:*12* 32:*19* 37:*16* 39:*7, 25* 43:*14* 46:*3* 48:*15* 50:*24* 52:*24* 57:*8* 60:*8* 62:*17* 63:*1* 77:*14* 90:*20* 134:*17*

139:*3* 152:*1* 156:*25* 159:*7* 173:*20* 177:*6* 183:*22* 195:*13* 199:*2* 200:*22* 207:*5* 212:*21, 23* 218:*10* 225:*20* 229:*14*
**vary** 15:*24* 48:*21*
**verbally** 7:*22*
**version** 11:*4* 58:*9*
**versions** 241:*22*
**versus** 5:*9* 15:*6, 11, 14* 116:*21*
**VI.A** 115:*20*
**vicinity** 9:*13*
**Vickie** 167:*25*
**video** 5:*6, 13* 110:*20*
**videoconference** 2:*2* 3:*2*
**VIDEOGRAPHER** 5:*3* 55:*7, 10* 107:*13, 16* 143:*17, 20* 199:*9, 12* 240:*13, 16* 242:*16*
**VIDEOGRAPHER/VIDEOCONFERENCE** 3:*11*
**VIDEOTAPED** 1:*12* 245:*11*
**view** 41:*12* 42:*3* 69:*14* 115:*9* 179:*2* 180:*5, 9* 185:*10* 190:*2, 5* 208:*23* 230:*11* 232:*15* 233:*18* 241:*18*
**viewed** 104:*15*
**views** 100:*14, 20* 196:*24*
**VII** 215:*2*
**VIII** 215:*3* 221:*13*
**violate** 234:*1, 2*
**violations** 138:*14* 207:*23*
**Virginia** 46:*12*
**volatility** 40:*17* 41:*1, 13, 19, 23* 42:*1, 4, 7, 10, 15, 18, 19, 21, 25* 43:*4, 9* 44:*4, 12* 45:*9* 47:*17* 48:*10, 18* 49:*3, 14* 50:*10, 13* 52:*12*
**volatility-inducing**

48:*7, 25* 49:*22* 50:*19*

**< W >**
**Wall** 74:*9* 77:*23* 103:*5, 13, 22*
**want** 6:*19* 10:*22* 41:*23* 52:*19, 20* 53:*1, 22* 54:*12, 15* 74:*1* 88:*18* 92:*19* 93:*23* 95:*7* 135:*25* 136:*17* 140:*24* 141:*19* 154:*18* 161:*6* 170:*19* 192:*2, 3* 198:*19* 235:*11* 238:*1*
**wanted** 33:*7* 50:*5* 56:*24* 73:*12* 152:*6* 191:*15* 238:*6*
**warehouse** 103:*1*
**warehouses** 103:*8*
**Washington** 46:*13*
**way** 10:*23* 14:*19* 20:*13, 18* 21:*1* 22:*18* 34:*10* 41:*14, 24* 48:*14* 49:*24* 55:*3* 56:*5* 60:*11* 64:*11* 69:*20, 24* 71:*20* 72:*5* 85:*12, 18, 24* 87:*2* 93:*11* 132:*22* 138:*15, 23* 143:*11* 152:*12* 177:*24* 198:*3* 201:*14* 202:*4, 15* 221:*18* 234:*10*
**ways** 25:*6, 20* 49:*25* 50:*24* 51:*11* 60:*8* 84:*18* 85:*14* 159:*7*
**website's** 88:*14*
**week** 9:*5*
**weeks** 49:*23*
**weight** 181:*13*
**Welcome** 55:*13* 107:*19* 143:*23* 199:*15* 240:*19*
**Well** 6:*17* 10:*20* 12:*24* 15:*21* 17:*14* 18:*11, 22* 24:*6, 13* 25:*7, 22* 26:*16* 27:*14* 29:*8* 36:*1* 37:*20* 43:*11* 44:*13* 48:*18* 49:*6, 14, 24* 53:*14* 57:*7, 25* 60:*3* 62:*9*

64:*13* 69:*19* 70:*18* 73:*4, 17* 77:*10* 79:*8* 81:*6* 84:*11* 85:*12* 88:*7* 90:*20, 21* 95:*20* 98:*1, 20* 100:*3* 106:*16* 113:*25* 116:*15* 119:*16* 121:*11, 24* 124:*4* 127:*7* 130:*17* 134:*4* 135:*25* 136:*15* 140:*17* 142:*15* 146:*13* 147:*9* 149:*20* 154:*10, 11* 158:*7, 9* 159:*25* 162:*12* 164:*14* 165:*21* 167:*16* 170:*12, 18, 21* 171:*25* 172:*12* 176:*21* 177:*4, 12* 178:*14* 179:*20* 180:*5* 185:*13* 193:*14, 17* 195:*17* 196:*17* 197:*4* 208:*5* 210:*9* 217:*1, 20* 220:*24* 225:*17* 226:*8, 10* 227:*15* 232:*8* 242:*14*
**well-founded** 206:*23*
**well-known** 181:*12* 229:*12* 230:*16*
**went** 106:*24* 161:*10* 213:*7*
**we're** 13:*16* 21:*20* 29:*13* 41:*18* 42:*9* 55:*24* 84:*12* 91:*15* 94:*7* 136:*11* 146:*1* 169:*24* 173:*5* 187:*22* 191:*24* 195:*23* 199:*5* 213:*12* 231:*6* 232:*6* 239:*7, 9*
**WESTERN** 1:*1* 5:*11* 245:*1*
**we've** 42:*8* 44:*15* 52:*8* 70:*18* 101:*16* 102:*3, 13* 182:*13* 232:*10* 238:*2*
**widely** 65:*18*
**willing** 92:*9* 94:*9* 95:*11*
**WilmerHale** 223:*8* 224:*17*

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

**window** 39:*18*, *23* 40:*4*, *8*, *12*, *16* 41:*8*, *13*, *18*, *19* 42:*4*, *8*, *9* 43:*9* 44:*3* 48:*8*, *17*, *22* 49:*1*, *11*, *12* 126:*17* 127:*21*
**windows** 39:*22* 41:*25* 49:*21* 50:*2*, *12*, *18* 51:*23* 53:*13*
**wish** 14:*5* 39:*13*
**wishes** 63:*22*
**Witness** 5:*21* 10:*16* 27:*16* 28:*7*, *14* 30:*20* 33:*25* 36:*3* 44:*7* 45:*4* 69:*11*, *19* 70:*18* 74:*23* 75:*9* 76:*7* 77:*10* 82:*23* 85:*12* 86:*15* 89:*11* 94:*18* 98:*1*, *20* 100:*3* 101:*16* 103:*24* 105:*22* 109:*2* 110:*11*, *23* 114:*9* 115:*13* 122:*20* 124:*4* 126:*2* 127:*7* 128:*16* 130:*17* 134:*9* 135:*8* 136:*5*, *21* 138:*7*, *20* 139:*16*, *24* 143:*3* 150:*17* 151:*3* 152:*4* 153:*20* 155:*15* 156:*15* 157:*22* 159:*18* 160:*17* 161:*2*, *25* 162:*18* 163:*21* 164:*20* 166:*6* 167:*4* 168:*8* 171:*5*, *25* 174:*11*, *23* 175:*12* 176:*7* 177:*4*, *23* 179:*20* 180:*12* 183:*10* 184:*15* 185:*13* 186:*7*, *24* 188:*18* 189:*15* 190:*13* 193:*3* 194:*6* 196:*17* 198:*17* 202:*3* 203:*14* 204:*24* 205:*16* 206:*6* 209:*16* 210:*9* 212:*2* 213:*6* 214:*7* 216:*5* 217:*8* 218:*7* 219:*9* 220:*2*, *10* 221:*9* 222:*20* 223:*19* 224:*2*, *11* 225:*11* 226:*10* 228:*5*

229:*4* 230:*2* 231:*19* 232:*24* 233:*21* 234:*17* 236:*19* 237:*1*, *13* 242:*1* 245:*18*, *21*
**won** 81:*9*
**word** 18:*9* 25:*8* 56:*20* 164:*13*
**wording** 15:*23*
**words** 65:*16* 92:*24* 190:*8* 207:*22*
**work** 16:*12*, *16* 44:*24* 53:*16*, *17* 80:*8*, *15*, *16* 81:*8*, *16* 83:*12* 95:*25* 103:*1* 217:*10*
**worked** 156:*1*
**working** 52:*4* 135:*15*
**works** 69:*24* 84:*23* 174:*19* 238:*24*
**workshops** 80:*14*
**world** 43:*15* 44:*11* 57:*11*, *16* 58:*11*, *16*, *19* 59:*1* 69:*25*
**worth** 106:*13* 190:*6*
**wrap** 44:*21* 96:*7*
**wrap-up** 142:*3*
**write** 172:*13*
**writes** 240:*2*
**writing** 84:*12*
**written** 56:*23* 79:*6* 84:*20* 87:*8*
**wrong** 47:*23* 231:*13*
**wrongdoing** 220:*20* 223:*9* 224:*20*
**wrote** 66:*9* 84:*13* 185:*24* 223:*3*

**< Y >**
**Yeah** 21:*17* 42:*20* 66:*13* 68:*19* 91:*12*, *19* 104:*18* 107:*4* 120:*3*, *4*, *12*, *19* 121:*7* 122:*20* 138:*2* 145:*18* 200:*14* 231:*17* 241:*11* 242:*1*
**year** 6:*16* 12:*2* 94:*7*
**years** 14:*10* 19:*4* 53:*15* 54:*3* 81:*10*
**Yesterday** 8:*14* 9:*7*, *9* 191:*5*
**York** 2:*14* 3:*8* 181:*6*

**Yup** 119:*15* 142:*6* 192:*13*

**< Z >**
**Zechman** 79:*13*

Deposition of Douglas J. Skinner

John Harvey Schneider v. Natera, Inc., et al

## WORD LIST

**< 0 >**
**0.3**  (*1*)
**0000410**  (*1*)
**0000471**  (*1*)
**0247246**  (*1*)
**05/31/25**  (*1*)
**07/31/26**  (*1*)
**084.004659**  (*2*)
**09/30/25**  (*1*)

**< 1 >**
**1**  (*39*)
**1,500**  (*1*)
**1:22-cv-00398-DAE**
 (*3*)
**1:27**  (*2*)
**10**  (*2*)
**10(b**  (*1*)
**10:12**  (*2*)
**100**  (*6*)
**10019**  (*1*)
**10020**  (*1*)
**109**  (*3*)
**10b-5**  (*2*)
**10-K**  (*2*)
**10th**  (*3*)
**11**  (*6*)
**11:32**  (*2*)
**11:47**  (*2*)
**110**  (*1*)
**1100**  (*1*)
**11th**  (*2*)
**12**  (*3*)
**12:39**  (*2*)
**120**  (*1*)
**120-trading-day**  (*1*)
**12th**  (*5*)
**13**  (*5*)
**1301**  (*1*)
**13th**  (*2*)
**14**  (*34*)
**14407**  (*2*)
**14th**  (*1*)
**15**  (*3*)
**16**  (*4*)
**16th**  (*2*)
**1700**  (*1*)

**187**  (*1*)
**19**  (*1*)
**190**  (*1*)
**19087**  (*1*)
**1960s**  (*1*)
**1970**  (*6*)
**1970s**  (*1*)
**1991**  (*3*)

**< 2 >**
**2**  (*6*)
**2/27/20**  (*1*)
**2:51**  (*2*)
**20**  (*4*)
**2017**  (*1*)
**2020**  (*96*)
**2021**  (*12*)
**2022**  (*23*)
**2024**  (*8*)
**21**  (*2*)
**212**  (*2*)
**2121**  (*1*)
**22**  (*2*)
**226**  (*2*)
**227**  (*2*)
**22a**  (*2*)
**22e**  (*1*)
**23**  (*1*)
**237**  (*1*)
**24**  (*2*)
**247**  (*1*)
**25**  (*10*)
**25th**  (*1*)
**26**  (*3*)
**27**  (*10*)
**27th**  (*8*)
**280**  (*1*)
**29**  (*3*)
**2a**  (*2*)
**2b**  (*12*)
**2nd**  (*1*)

**< 3 >**
**3**  (*6*)
**3/10/22**  (*1*)
**3/9/22**  (*1*)
**3:00**  (*2*)
**30**  (*13*)
**30(f)(1**  (*1*)

**30th**  (*2*)
**31**  (*2*)
**310**  (*1*)
**326-2000**  (*1*)
**33**  (*2*)
**34**  (*4*)
**35**  (*4*)

**< 4 >**
**4**  (*7*)
**4/30/20**  (*1*)
**4:02**  (*2*)
**4:11**  (*2*)
**4:14**  (*3*)
**40**  (*1*)
**41**  (*5*)
**42**  (*9*)
**43**  (*9*)
**44**  (*2*)
**45**  (*1*)
**47**  (*1*)
**4th**  (*1*)

**< 5 >**
**5**  (*8*)
**50**  (*2*)
**500**  (*1*)
**51**  (*12*)
**52**  (*1*)
**54**  (*3*)
**55**  (*4*)
**5th**  (*2*)

**< 6 >**
**6**  (*7*)
**60**  (*1*)
**610**  (*1*)
**62**  (*10*)
**63**  (*1*)
**64**  (*2*)
**65**  (*1*)
**667-7706**  (*1*)
**67**  (*2*)
**68**  (*1*)
**69**  (*6*)
**6th**  (*3*)

**< 7 >**
**7**  (*3*)

**70**  (*1*)
**78**  (*4*)
**788-4485**  (*1*)
**79**  (*6*)

**< 8 >**
**8**  (*14*)
**8:37**  (*3*)
**80**  (*2*)
**81**  (*8*)
**82**  (*1*)
**87**  (*7*)
**88**  (*7*)
**89**  (*4*)
**8-K**  (*2*)

**< 9 >**
**9**  (*27*)
**9.3**  (*8*)
**9:58**  (*2*)
**90**  (*8*)
**90067**  (*1*)
**9306**  (*2*)
**940-8800**  (*1*)
**9th**  (*11*)

**< A >**
**a.m**  (*11*)
**ability**  (*2*)
**able**  (*13*)
**Abnormal**  (*38*)
**abnormally**  (*2*)
**above-styled**  (*1*)
**absence**  (*4*)
**absolutely**  (*2*)
**academic**  (*24*)
**academically**  (*1*)
**accept**  (*5*)
**accepted**  (*3*)
**accepting**  (*1*)
**access**  (*55*)
**accessed**  (*8*)
**accessible**  (*3*)
**accessing**  (*4*)
**accompanying**  (*1*)
**account**  (*8*)
**accounting**  (*3*)
**accounts**  (*1*)
**accuracy**  (*1*)

accurate  (2)
accurately  (2)
acknowledge  (1)
acknowledgment  (2)
acquire  (7)
acquired  (1)
acquiring  (14)
acting  (2)
Action  (13)
actions  (1)
actively  (1)
activity  (1)
actual  (8)
add  (2)
addition  (3)
additional  (5)
additionally  (1)
address  (2)
addresses  (2)
adjusted  (1)
adverse  (3)
adversely  (1)
advice  (1)
advisory  (1)
affect  (13)
affirmative  (3)
Affirmatively  (5)
agency  (1)
ago  (9)
agree  (41)
ahead  (4)
AIRWAYS  (1)
al  (4)
alerted  (1)
allegation  (10)
allegations  (49)
allege  (36)
alleged  (67)
allegedly  (37)
alleging  (12)
Allergan  (1)
allow  (1)
allowed  (2)
allows  (1)
allude  (1)
alluded  (1)
alluding  (1)
alpha  (1)
alternative  (4)

Altria  (1)
amount  (4)
amounts  (1)
analyses  (9)
analysis  (38)
analyst  (67)
analysts  (72)
analyst's  (2)
analyze  (5)
analyzed  (7)
analyzing  (3)
and/or  (4)
Angeles  (1)
announced  (8)
announcement  (6)
announcements  (6)
announcing  (1)
anonymous  (3)
answer  (52)
answered  (14)
answers  (6)
anybody  (2)
apologize  (1)
app  (1)
apparently  (2)
appearing  (3)
Appendix  (5)
apply  (1)
appreciate  (3)
approach  (1)
approximately  (6)
April  (12)
areas  (1)
arguably  (1)
argue  (4)
argument  (2)
argumentative  (3)
arguments  (2)
arising  (1)
Artaki  (1)
article  (29)
articles  (108)
articulated  (1)
artificial  (1)
ascertain  (3)
aside  (6)
asked  (37)
asking  (22)
aspect  (1)

aspects  (1)
assert  (13)
asserted  (2)
assertion  (3)
assertions  (1)
assess  (16)
assessed  (3)
assessing  (12)
assessment  (8)
assessments  (1)
assigned  (1)
assignment  (21)
assistance  (2)
associated  (14)
assume  (16)
assumed  (3)
assuming  (5)
assumption  (7)
assumptions  (7)
attached  (2)
attachment  (3)
attempt  (1)
attempted  (1)
attempting  (1)
attendees  (2)
attention  (6)
attorney  (2)
attracts  (1)
attributable  (7)
attribute  (2)
August  (18)
AUSTIN  (3)
authorization  (2)
authorizations  (5)
automatically  (1)
availability  (3)
available  (114)
Avenue  (2)
avoid  (1)
aware  (42)
awareness  (1)

< B >
back  (35)
backup  (3)
bag  (1)
BAIRD  (2)
balance  (4)
bank  (2)

Baseball  (1)
based  (25)
basement  (3)
bases  (1)
basic  (1)
basically  (4)
basis  (17)
Bates  (4)
Bates-stamped  (1)
BAYNES  (1)
Becky  (1)
becoming  (1)
began  (1)
begging  (1)
beginning  (6)
Behalf  (2)
belief  (1)
believe  (84)
benefit  (3)
benefits  (9)
BERTAGNOLLI  (1)
best  (9)
better  (1)
beyond  (16)
big  (3)
billing  (15)
billions  (2)
bit  (9)
BlackRock  (1)
blanket  (1)
block  (3)
Bloomberg  (2)
bnordstrom@omm.com  (1)
board  (7)
body  (4)
boosting  (1)
borne  (1)
BOTHA  (1)
bottom  (1)
bound  (1)
branch  (1)
break  (20)
breaking  (1)
breaks  (1)
Brendel  (1)
Bridger  (17)
brief  (1)
bringing  (1)

**BRITISH**  (*1*)
**Britta**  (*1*)
**broad**  (*1*)
**broaden**  (*1*)
**broadly**  (*1*)
**broke**  (*1*)
**broker-dealer**  (*2*)
**BROPHY**  (*7*)
**brought**  (*1*)
**brush**  (*1*)
**BTIG**  (*1*)
**bucket**  (*1*)
**budgets**  (*1*)
**bunch**  (*6*)
**bundle**  (*2*)
**business**  (*26*)
**busy**  (*1*)
**buy**  (*1*)
**buying**  (*1*)
**buy-side**  (*14*)

**< C >**
**calculated**  (*1*)
**calculation**  (*1*)
**calculations**  (*1*)
**California**  (*5*)
**call**  (*13*)
**called**  (*5*)
**calling**  (*1*)
**calls**  (*16*)
**camera**  (*1*)
**Cammer**  (*3*)
**Canaccord**  (*1*)
**canceled**  (*1*)
**cancellation**  (*1*)
**CAPITAL**  (*15*)
**Capitol**  (*159*)
**Capitol's**  (*1*)
**capture**  (*1*)
**captured**  (*2*)
**captures**  (*2*)
**careful**  (*1*)
**case**  (*27*)
**cases**  (*32*)
**cash**  (*1*)
**catch**  (*1*)
**causation**  (*3*)
**causation-related**  (*1*)
**cause**  (*11*)

**caused**  (*18*)
**causes**  (*1*)
**Central**  (*2*)
**CEO**  (*1*)
**certain**  (*47*)
**certainly**  (*54*)
**certification**  (*2*)
**Certified**  (*2*)
**certify**  (*4*)
**cetera**  (*2*)
**challenged**  (*1*)
**chance**  (*1*)
**Change**  (*16*)
**changed**  (*1*)
**changes**  (*9*)
**channel**  (*1*)
**channels**  (*1*)
**CHAPMAN**  (*5*)
**characterization**  (*1*)
**characterize**  (*7*)
**characterized**  (*3*)
**characterizes**  (*1*)
**characterizing**  (*1*)
**charge**  (*1*)
**charitable**  (*1*)
**charity**  (*1*)
**cheap**  (*1*)
**CHECK**  (*3*)
**checking**  (*1*)
**Chicago**  (*2*)
**choice**  (*4*)
**choices**  (*4*)
**chose**  (*4*)
**chosen**  (*2*)
**Christina**  (*8*)
**christina.costley@katt en.com**  (*1*)
**cite**  (*46*)
**cited**  (*16*)
**cites**  (*2*)
**citing**  (*1*)
**City**  (*2*)
**Civil**  (*4*)
**claim**  (*18*)
**claimed**  (*3*)
**claiming**  (*2*)
**claims**  (*54*)
**clarification**  (*1*)
**clarify**  (*6*)

**class**  (*39*)
**clear**  (*29*)
**clearly**  (*2*)
**click**  (*1*)
**client**  (*1*)
**clients**  (*3*)
**close**  (*4*)
**closures**  (*1*)
**coaching**  (*3*)
**coauthored**  (*1*)
**coefficients**  (*1*)
**Coffman**  (*12*)
**Coffman's**  (*14*)
**coincided**  (*1*)
**colleague**  (*1*)
**collected**  (*1*)
**collective**  (*4*)
**collectively**  (*2*)
**column**  (*4*)
**combination**  (*1*)
**come**  (*10*)
**comes**  (*2*)
**comfort**  (*1*)
**coming**  (*10*)
**comment**  (*4*)
**commentary**  (*8*)
**commented**  (*3*)
**commenting**  (*3*)
**comments**  (*3*)
**common**  (*7*)
**communicate**  (*1*)
**communicated**  (*1*)
**communication**  (*1*)
**communications**  (*3*)
**companies**  (*2*)
**COMPANY**  (*92*)
**company's**  (*19*)
**company-specific**  (*1*)
**compare**  (*5*)
**comparing**  (*1*)
**comparison**  (*2*)
**competent**  (*2*)
**competitive**  (*3*)
**complaint**  (*22*)
**complete**  (*1*)
**completed**  (*1*)
**completely**  (*2*)
**completion**  (*2*)
**complications**  (*1*)

**component**  (*1*)
**components**  (*2*)
**conceal**  (*1*)
**concealed**  (*1*)
**concept**  (*2*)
**concern**  (*5*)
**concerned**  (*2*)
**concerning**  (*3*)
**concerns**  (*15*)
**conclude**  (*2*)
**concluded**  (*3*)
**conclusion**  (*13*)
**conclusions**  (*10*)
**conclusively**  (*1*)
**concrete**  (*1*)
**condition**  (*3*)
**conditions**  (*1*)
**conduct**  (*4*)
**conducting**  (*3*)
**confident**  (*2*)
**confidential**  (*1*)
**confirm**  (*3*)
**confirmed**  (*1*)
**confusion**  (*1*)
**Connecticut**  (*1*)
**connection**  (*7*)
**consensus**  (*2*)
**consequence**  (*7*)
**consequences**  (*7*)
**consider**  (*5*)
**considerations**  (*1*)
**Considered**  (*27*)
**considering**  (*1*)
**consistent**  (*9*)
**constant**  (*6*)
**contain**  (*4*)
**contained**  (*2*)
**contains**  (*7*)
**content**  (*15*)
**contents**  (*6*)
**context**  (*3*)
**continue**  (*1*)
**contributed**  (*4*)
**convenient**  (*2*)
**conventional**  (*1*)
**converse**  (*1*)
**convey**  (*15*)
**conveyed**  (*18*)
**conveying**  (*2*)

Deposition of Douglas J. Skinner                               John Harvey Schneider v. Natera, Inc., et al

conveys  (2)
convincing  (1)
copies  (2)
copy  (6)
copyright  (2)
Cornerstone  (7)
correct  (156)
corrected  (1)
correction  (5)
corrections  (1)
corrective  (45)
correctly  (1)
correlation  (1)
correspondence  (5)
cost  (30)
Costley  (146)
costly  (4)
costs  (23)
counsel  (17)
counterfactual  (1)
countervailing  (1)
country  (1)
couple  (15)
course  (14)
COURT  (13)
Court's  (1)
covered  (1)
covering  (7)
COVID  (14)
COVID-related  (3)
COWEN  (2)
COZZENS  (1)
CRAIG-HALLUM
 (2)
create  (1)
created  (1)
creates  (1)
credibility  (2)
credible  (4)
criticisms  (2)
cross-examination  (1)
CRR  (2)
CSR  (8)
CST  (3)
CTS  (1)
current  (2)
customers  (1)
cut  (2)

< D >
damage  (1)
damages  (3)
D'Ambra  (2)
D'Ancona  (166)
data  (4)
date  (23)
dated  (4)
dates  (24)
day  (34)
days  (11)
dealing  (1)
dealt  (1)
deaths  (1)
debate  (1)
decades  (1)
December  (32)
decent  (1)
deceptive  (37)
deciding  (1)
decision  (2)
decisions  (1)
declaration  (1)
declaring  (1)
decline  (28)
declined  (2)
declines  (1)
declining  (1)
decreases  (2)
deemed  (3)
deems  (1)
Deepti  (1)
defendant  (1)
Defendants  (20)
defendant's  (2)
defenses  (1)
deficiencies  (1)
define  (5)
defined  (4)
defines  (3)
definitely  (1)
definition  (2)
definitive  (1)
definitively  (1)
degree  (4)
demand  (3)
demonstrates  (1)
demonstrating  (3)
denote  (1)

depend  (1)
depending  (2)
depends  (3)
DEPONENT  (4)
deposed  (3)
DEPOSITION  (15)
describe  (2)
described  (6)
describes  (1)
describing  (1)
DESCRIPTION  (2)
descriptive  (2)
desires  (1)
despite  (1)
detail  (3)
detailed  (3)
determination  (1)
determine  (5)
determined  (3)
determining  (1)
develop  (1)
developed  (1)
difference  (1)
different  (46)
differentiate  (4)
differentiates  (1)
differently  (1)
difficult  (2)
direct  (4)
directions  (1)
directly  (3)
disadvantages  (1)
disagree  (2)
disclose  (1)
disclosed  (15)
disclosing  (1)
disclosure  (23)
disclosures  (15)
discretionary  (1)
discuss  (9)
discussed  (15)
discusses  (5)
discussing  (4)
discussion  (5)
discussions  (5)
dismiss  (1)
dispute  (2)
disputing  (1)
disseminate  (1)

disseminated  (2)
disseminating  (3)
distinct  (1)
distracted  (1)
distracting  (1)
distraction  (6)
distributes  (1)
DISTRICT  (6)
dive  (1)
divide  (1)
DIVISION  (3)
document  (16)
documented  (1)
Documents  (8)
doing  (7)
Dollar  (7)
dollars  (4)
domain  (8)
double-checking  (1)
doubt  (1)
DOUGLAS  (9)
downward  (1)
dozen  (1)
Dr  (4)
draw  (2)
drawing  (1)
drift  (2)
drive  (1)
driven  (5)
drivers  (2)
drop  (7)
drove  (4)
due  (2)
duly  (4)

< E >
earlier  (8)
earning  (1)
earnings  (49)
easy  (1)
ECF  (1)
econometrically  (1)
economic  (25)
economically  (4)
economics  (5)
economist  (10)
economists  (15)
economy  (1)
EDGAR  (12)

editor  (1)
effect  (23)
effective  (2)
effects  (5)
efficiency  (55)
efficient  (42)
effort  (1)
eight  (4)
Eikon  (1)
either  (5)
elaborate  (1)
electronic  (1)
electronically  (1)
email  (26)
emails  (56)
embedded  (1)
emergency  (2)
emphasized  (1)
empirical  (7)
empirically  (1)
employed  (1)
employee  (1)
enable  (1)
enclose  (1)
endeavored  (1)
Endo  (1)
enforce  (1)
enforcement  (1)
engage  (2)
engaged  (4)
engages  (2)
engaging  (1)
entanglements  (1)
entire  (8)
entirely  (4)
entirety  (3)
entities  (4)
entitled  (3)
entity  (5)
entries  (1)
enumerate  (1)
enumerated  (2)
Envelope  (3)
envisioned  (1)
envisioning  (3)
envisions  (2)
equal  (2)
equation  (1)
equipped  (1)

Errata  (1)
error  (1)
especially  (2)
essence  (2)
essentially  (11)
establish  (1)
estimated  (6)
estimates  (6)
estimation  (33)
et  (6)
Eugene  (4)
evaluate  (31)
evaluated  (1)
evaluates  (2)
evaluating  (7)
event  (56)
events  (18)
Everest  (1)
ever-increasing  (1)
evidence  (68)
evident  (1)
evidentiary  (1)
exact  (4)
exactly  (36)
exaggerated  (1)
EXAMINATION  (2)
examine  (2)
example  (48)
examples  (3)
exceed  (4)
exception  (1)
excerpted  (1)
excerpts  (2)
exclude  (2)
excuse  (2)
executive  (1)
executives  (1)
Exhibit  (29)
EXHIBITS  (5)
exist  (1)
existence  (2)
exists  (3)
expands  (1)
expect  (16)
expectation  (1)
expected  (7)
expensive  (1)
experience  (3)
Expert  (8)

expertise  (3)
experts  (2)
Expiration  (3)
explain  (5)
explained  (4)
explaining  (4)
explains  (1)
explanation  (1)
explanations  (3)
explicitly  (1)
explores  (1)
expose  (1)
exposes  (2)
extensive  (4)
extensively  (2)
extent  (7)
external  (1)
extract  (1)
extracts  (4)
extreme  (3)

< F >
face  (17)
Facebook  (1)
faced  (1)
fact  (37)
Factiva  (11)
factor  (4)
factors  (34)
facts  (2)
factual  (1)
factually  (1)
fair  (22)
fairly  (3)
fallout  (1)
false  (11)
Fama  (30)
Fama's  (3)
familiar  (7)
far  (3)
fashion  (1)
fast  (1)
favorably  (1)
features  (2)
February  (24)
Federal  (3)
figure  (8)
figures  (1)
figuring  (1)

file  (1)
filed  (2)
filing  (4)
filings  (3)
final  (2)
financial  (6)
find  (3)
findings  (3)
Fine  (1)
firm  (3)
firms  (1)
first  (25)
fit  (1)
five  (1)
fixed  (4)
flag  (2)
Flemming  (1)
flip  (1)
flows  (1)
focus  (2)
focused  (1)
focusing  (5)
follow  (1)
followed  (1)
following  (13)
follows  (2)
Footnote  (58)
footnotes  (12)
force  (1)
foregoing  (1)
foreseeable  (6)
forgive  (2)
forgotten  (1)
form  (129)
formal  (1)
formally  (1)
formed  (1)
form-efficiency  (1)
form-efficient  (1)
former  (2)
forth  (9)
fortune  (1)
Forum  (159)
Forum's  (1)
forward  (3)
forwarded  (3)
forwarding  (2)
found  (2)
founded  (2)

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

four  *(6)*
fourth  *(2)*
framed  *(1)*
framing  *(3)*
fraud  *(5)*
fraudulent  *(3)*
FRCP  *(1)*
frictions  *(2)*
friends  *(1)*
front  *(1)*
fruitful  *(1)*
fueled  *(1)*
full  *(12)*
fully  *(16)*
fulsome  *(1)*
fund  *(2)*
fundamental  *(2)*
fundamentally  *(1)*
funds  *(2)*
further  *(12)*
future  *(1)*

**< G >**
Gabby  *(1)*
GAIL  *(1)*
games  *(1)*
gather  *(1)*
gatherings  *(1)*
Gene  *(2)*
general  *(15)*
generally  *(25)*
generate  *(3)*
generated  *(2)*
generating  *(1)*
genesis  *(1)*
Genome  *(1)*
Genuity  *(1)*
getting  *(3)*
give  *(10)*
given  *(23)*
gives  *(1)*
glean  *(1)*
go  *(30)*
goes  *(15)*
going  *(50)*
GOLDMAN  *(1)*
Good  *(16)*
Goodner  *(7)*
Goodner's  *(1)*

governor  *(1)*
grab  *(1)*
grace  *(1)*
grade  *(1)*
Graziano  *(4)*
great  *(1)*
ground  *(1)*
GROUP  *(1)*
growing  *(3)*
growth  *(5)*
guess  *(3)*
guidance  *(2)*
guidelines  *(2)*
Gupta  *(1)*
guy  *(1)*

**< H >**
hand  *(3)*
happen  *(3)*
happened  *(2)*
happening  *(3)*
happens  *(2)*
hard  *(24)*
HARIHARAN  *(2)*
harm  *(8)*
HARVEY  *(3)*
Hasiuk  *(1)*
head  *(2)*
headed  *(1)*
headline  *(2)*
headlines  *(1)*
Health  *(2)*
HEALY  *(1)*
hear  *(1)*
heard  *(3)*
heavily  *(1)*
hedge  *(1)*
heightened  *(10)*
he'll  *(1)*
help  *(2)*
helpful  *(2)*
HERM  *(1)*
hesitate  *(1)*
hesitating  *(2)*
high  *(14)*
higher  *(3)*
higher-than-expected
  *(2)*
high-level  *(3)*

highlight  *(2)*
highlighted  *(1)*
highlighting  *(1)*
highlights  *(1)*
highly  *(1)*
Hindenburg  *(99)*
Hindenburg's  *(5)*
hired  *(1)*
hold  *(1)*
holdings  *(1)*
homogeneous  *(1)*
hope  *(1)*
hopefully  *(1)*
Horizon  *(5)*
hour  *(4)*
hours  *(2)*
hundreds  *(4)*
hyperlink  *(2)*
hypotheses  *(3)*
hypothesis  *(7)*
hypothesized  *(2)*
hypothetical  *(4)*
Hypothetically  *(3)*

**< I >**
Ian  *(2)*
idea  *(1)*
ideal  *(1)*
identified  *(5)*
identify  *(10)*
ii  *(5)*
illegalities  *(1)*
Illinois  *(3)*
Illumina  *(4)*
Illumina's  *(1)*
illustrates  *(1)*
imagine  *(1)*
immediately  *(1)*
impact  *(26)*
impacted  *(8)*
implement  *(1)*
implication  *(1)*
implications  *(8)*
implied  *(1)*
implies  *(1)*
import  *(3)*
important  *(21)*
impossible  *(1)*
impounded  *(18)*

impression  *(3)*
improper  *(6)*
incentives  *(2)*
include  *(11)*
included  *(22)*
includes  *(1)*
including  *(56)*
inconsistent  *(2)*
Incorporated  *(12)*
incorrect  *(1)*
increase  *(13)*
increased  *(1)*
increases  *(7)*
incur  *(4)*
incurred  *(1)*
incurring  *(1)*
independent  *(1)*
INDEX  *(2)*
indicate  *(6)*
indicated  *(22)*
indicates  *(10)*
indicia  *(4)*
indirect  *(2)*
individual  *(4)*
Individually  *(2)*
individuals  *(2)*
industry  *(5)*
infer  *(5)*
inference  *(4)*
inferring  *(1)*
inflated  *(1)*
inflation  *(1)*
influencing  *(1)*
inform  *(1)*
information  *(400)*
informational  *(1)*
informative  *(6)*
informed  *(2)*
informs  *(1)*
initially  *(1)*
input  *(1)*
inside  *(2)*
insider  *(3)*
insist  *(1)*
instance  *(2)*
instances  *(5)*
institutional  *(8)*
institutions  *(4)*
instructed  *(1)*

**instruction**  (*1*)
**instructions**  (*1*)
**integrity**  (*1*)
**intended**  (*1*)
**interest**  (*2*)
**interested**  (*1*)
**interesting**  (*3*)
**interject**  (*1*)
**internal**  (*3*)
**internally**  (*1*)
**International**  (*1*)
**internet**  (*5*)
**interpret**  (*3*)
**interpretation**  (*3*)
**interpreted**  (*1*)
**interrupt**  (*1*)
**intraday**  (*1*)
**intrinsically**  (*1*)
**investigate**  (*3*)
**investigated**  (*1*)
**investigating**  (*1*)
**investigation**  (*16*)
**investigations**  (*4*)
**Investment**  (*16*)
**investor**  (*11*)
**investors**  (*67*)
**involved**  (*3*)
**involves**  (*1*)
**IQ**  (*1*)
**IRS**  (*1*)
**isolate**  (*2*)
**issuance**  (*2*)
**issue**  (*8*)
**issued**  (*4*)
**issues**  (*11*)
**issuing**  (*1*)
**item**  (*2*)
**items**  (*3*)
**its**  (*54*)
**iv**  (*1*)

**< J >**
**JAMES**  (*1*)
**jdancona@ktmc.com**  (*1*)
**JOHN**  (*3*)
**JONATHAN**  (*1*)
**Josh**  (*5*)
**Joshua**  (*2*)

**Journal**  (*8*)
**journals**  (*1*)
**judgment**  (*3*)
**judgments**  (*3*)
**July**  (*26*)
**juncture**  (*1*)
**justifiably**  (*1*)
**justification**  (*1*)
**justified**  (*1*)

**< K >**
**Kamath**  (*1*)
**KATTEN**  (*3*)
**keep**  (*1*)
**keeping**  (*1*)
**KESSLER**  (*1*)
**kid**  (*2*)
**kind**  (*2*)
**kinds**  (*2*)
**King**  (*1*)
**Klein**  (*1*)
**knew**  (*3*)
**know**  (*134*)
**knowledge**  (*5*)
**knowledgeable**  (*1*)
**known**  (*10*)

**< L >**
**lack**  (*2*)
**laid**  (*1*)
**language**  (*20*)
**large**  (*14*)
**largely**  (*2*)
**larger**  (*2*)
**largest**  (*1*)
**late**  (*1*)
**laureate**  (*1*)
**Law**  (*3*)
**laws**  (*1*)
**lawyer**  (*1*)
**lawyers**  (*3*)
**lay**  (*2*)
**LEAD**  (*2*)
**leads**  (*3*)
**League**  (*1*)
**leagues**  (*1*)
**learn**  (*3*)
**learned**  (*1*)
**learning**  (*4*)

**leave**  (*1*)
**leaving**  (*1*)
**led**  (*1*)
**LEERINK**  (*1*)
**legal**  (*32*)
**legitimate**  (*3*)
**length**  (*1*)
**level**  (*7*)
**levels**  (*2*)
**liability**  (*3*)
**lied**  (*1*)
**Life**  (*1*)
**light**  (*3*)
**limit**  (*2*)
**LIMITED**  (*2*)
**line**  (*8*)
**lines**  (*3*)
**linked**  (*2*)
**List**  (*8*)
**listed**  (*13*)
**listening**  (*1*)
**listing**  (*1*)
**literally**  (*3*)
**literature**  (*38*)
**litigation**  (*2*)
**little**  (*20*)
**LLC**  (*6*)
**LLP**  (*4*)
**located**  (*1*)
**long**  (*13*)
**longer**  (*2*)
**look**  (*42*)
**looked**  (*6*)
**Looking**  (*33*)
**looks**  (*1*)
**Los**  (*1*)
**lose**  (*1*)
**loss**  (*1*)
**lost**  (*1*)
**lot**  (*23*)
**lots**  (*1*)
**lower**  (*1*)
**lunch**  (*5*)
**lunchtime**  (*1*)
**Lundquist**  (*1*)

**< M >**
**magazines**  (*1*)
**magnitude**  (*4*)

**main**  (*4*)
**Major**  (*4*)
**majority**  (*1*)
**making**  (*16*)
**manage**  (*2*)
**Management**  (*16*)
**manager**  (*2*)
**managers**  (*3*)
**managing**  (*1*)
**manner**  (*1*)
**March**  (*50*)
**MARCUS**  (*1*)
**marginal**  (*10*)
**mark**  (*2*)
**marked**  (*5*)
**market**  (*207*)
**marketing**  (*11*)
**markets**  (*6*)
**market's**  (*3*)
**marshal**  (*1*)
**marshalled**  (*1*)
**Maryland**  (*1*)
**Massachusetts**  (*1*)
**material**  (*4*)
**materially**  (*5*)
**materials**  (*19*)
**matter**  (*8*)
**MATTHEW**  (*3*)
**McDonald's**  (*2*)
**mean**  (*33*)
**meaning**  (*9*)
**meaningful**  (*1*)
**means**  (*7*)
**meant**  (*1*)
**measurable**  (*1*)
**measure**  (*6*)
**measuring**  (*1*)
**mechanisms**  (*1*)
**media**  (*8*)
**medical**  (*1*)
**meeting**  (*6*)
**meetings**  (*1*)
**MELTZER**  (*1*)
**member**  (*3*)
**mention**  (*4*)
**mentioned**  (*31*)
**mentions**  (*2*)
**merely**  (*1*)
**merits**  (*1*)

message  *(1)*
messaging  *(1)*
met  *(1)*
method  *(1)*
methodological  *(2)*
methodology  *(8)*
MGML  *(49)*
MGML-Natera  *(1)*
MICHAEL  *(3)*
Michigan  *(1)*
microdeletion  *(7)*
microdeletions  *(13)*
mid-1960s  *(1)*
middle  *(4)*
mind  *(8)*
mine  *(3)*
minor  *(2)*
minute  *(3)*
minutes  *(3)*
mischaracterizes  *(2)*
misconduct  *(13)*
mishear  *(1)*
mislead  *(1)*
misleading  *(16)*
misrepresentation  *(4)*
misrepresentations
  *(15)*
misrepresented  *(3)*
misspoke  *(1)*
misstated  *(3)*
misstatements  *(10)*
misstates  *(1)*
MLS  *(1)*
moat  *(3)*
model  *(8)*
models  *(1)*
moment  *(3)*
money  *(5)*
MONICA  *(1)*
month  *(1)*
months  *(1)*
MORGAN  *(2)*
morning  *(2)*
motion  *(1)*
motivation  *(1)*
move  *(15)*
moved  *(5)*
movement  *(7)*
movements  *(2)*

moves  *(5)*
moving  *(3)*
MRD  *(1)*
MUCHIN  *(2)*
multiple  *(9)*
MYERS  *(1)*
Myron  *(1)*

< N >
nail  *(1)*
name  *(2)*
named  *(1)*
narrative  *(1)*
NATERA  *(82)*
Natera's  *(57)*
Nathan  *(1)*
national  *(1)*
nature  *(1)*
NBA  *(2)*
necessarily  *(17)*
necessary  *(12)*
need  *(4)*
needed  *(1)*
needs  *(1)*
negative  *(14)*
negatively  *(1)*
neither  *(1)*
never  *(3)*
New  *(46)*
newly  *(5)*
news  *(21)*
newspaper  *(1)*
newspapers  *(1)*
nhasiuk@ktmc.com
  *(1)*
NHL  *(1)*
Nobel  *(2)*
non-credible  *(1)*
non-insiders  *(4)*
Non-Invasive  *(1)*
nonlawyer  *(1)*
nonlegal  *(1)*
nonprofit  *(1)*
nonverbally  *(1)*
Nordstrom  *(1)*
normal  *(1)*
NOTE  *(25)*
noted  *(11)*
notes  *(1)*

noticed  *(1)*
notification  *(1)*
notion  *(4)*
notwithstanding  *(3)*
novel  *(10)*
November  *(3)*
NTRA  *(1)*
nuance  *(2)*
nuanced  *(4)*
null  *(3)*
NUMBER  *(58)*
numbered  *(1)*
numbers  *(20)*
numerous  *(1)*

< O >
oath  *(1)*
Objection  *(124)*
observation  *(5)*
observations  *(3)*
observe  *(1)*
observing  *(1)*
obtain  *(2)*
obtained  *(1)*
obtaining  *(1)*
obvious  *(1)*
obviously  *(14)*
occasions  *(1)*
occurred  *(11)*
October  *(7)*
offer  *(8)*
offered  *(7)*
offering  *(8)*
offers  *(1)*
official  *(1)*
Oh  *(3)*
Ohio  *(1)*
OIG  *(1)*
Okay  *(63)*
old  *(5)*
O'MELVENY  *(1)*
omission  *(6)*
omissions  *(5)*
omit  *(2)*
omitted  *(38)*
omitting  *(1)*
omnipresent  *(1)*
once  *(4)*
one-half  *(1)*

one-page  *(1)*
ones  *(5)*
ongoing  *(1)*
onset  *(1)*
open  *(3)*
opened  *(1)*
opening  *(1)*
opens  *(1)*
opine  *(5)*
opined  *(2)*
opines  *(2)*
opining  *(1)*
opinion  *(73)*
opinions  *(22)*
opportunity  *(1)*
opposed  *(3)*
opt  *(1)*
oral  *(1)*
ordering  *(5)*
organic  *(1)*
organization  *(1)*
outbreak  *(1)*
outcomes  *(1)*
outputs  *(1)*
outside  *(2)*
outweigh  *(1)*
overall  *(8)*
overlap  *(1)*
overpriced  *(1)*
overreaction  *(4)*
overstating  *(4)*
overvalued  *(1)*
overview  *(1)*
overweight  *(1)*

< P >
p.m  *(15)*
PAGE  *(17)*
Pages  *(7)*
pair  *(1)*
pandemic  *(5)*
Panorama  *(14)*
paper  *(13)*
papers  *(7)*
Paragraph  *(121)*
Paragraphs  *(13)*
parameters  *(1)*
pardon  *(1)*
parroting  *(1)*

**part**  (*41*)
**participant**  (*5*)
**participants**  (*30*)
**participate**  (*1*)
**participated**  (*1*)
**participating**  (*1*)
**particular**  (*12*)
**parties**  (*1*)
**parts**  (*3*)
**party**  (*2*)
**passed**  (*2*)
**patients**  (*1*)
**pattern**  (*2*)
**Paul**  (*2*)
**pause**  (*2*)
**pay**  (*8*)
**payers**  (*1*)
**paying**  (*2*)
**paywall**  (*7*)
**Pelletier**  (*1*)
**penalty**  (*1*)
**pending**  (*2*)
**Pennsylvania**  (*1*)
**PENSION**  (*1*)
**people**  (*28*)
**percent**  (*13*)
**perfectly**  (*1*)
**perform**  (*2*)
**performed**  (*4*)
**performing**  (*4*)
**performs**  (*1*)
**period**  (*79*)
**periods**  (*8*)
**perjury**  (*1*)
**permanence**  (*1*)
**permanent**  (*1*)
**permit**  (*1*)
**persistent**  (*1*)
**person**  (*6*)
**person's**  (*1*)
**persuasive**  (*1*)
**pharmaceutical**  (*1*)
**phenomenon**  (*1*)
**phone**  (*1*)
**phrase**  (*1*)
**phrasing**  (*1*)
**physically**  (*1*)
**pick**  (*1*)
**picked**  (*1*)

**pictures**  (*1*)
**piece**  (*39*)
**pieces**  (*9*)
**Piper**  (*14*)
**place**  (*3*)
**places**  (*8*)
**Plaintiff**  (*9*)
**plaintiffs**  (*120*)
**planned**  (*1*)
**platform**  (*1*)
**plausible**  (*2*)
**played**  (*1*)
**players**  (*1*)
**Plaza**  (*1*)
**please**  (*13*)
**plus**  (*2*)
**point**  (*68*)
**pointed**  (*5*)
**pointing**  (*3*)
**points**  (*15*)
**portfolio**  (*1*)
**portion**  (*5*)
**posit**  (*1*)
**position**  (*3*)
**positive**  (*34*)
**possess**  (*1*)
**possessed**  (*2*)
**possession**  (*1*)
**possibility**  (*2*)
**possible**  (*7*)
**possibly**  (*1*)
**post**  (*3*)
**post-earnings**  (*2*)
**posted**  (*1*)
**poster**  (*2*)
**postponed**  (*1*)
**potential**  (*11*)
**potentially**  (*26*)
**power**  (*1*)
**practice**  (*6*)
**practices**  (*43*)
**preceded**  (*1*)
**precise**  (*3*)
**precision**  (*1*)
**predictive**  (*1*)
**preempted**  (*1*)
**prefer**  (*2*)
**Prenatal**  (*1*)
**preparation**  (*3*)

**prepare**  (*2*)
**prepared**  (*1*)
**preparing**  (*4*)
**present**  (*1*)
**presentation**  (*1*)
**presented**  (*2*)
**presenting**  (*1*)
**presents**  (*1*)
**president**  (*2*)
**press**  (*15*)
**presumably**  (*8*)
**presume**  (*1*)
**presuming**  (*1*)
**presumption**  (*1*)
**pretty**  (*3*)
**previous**  (*11*)
**previously**  (*25*)
**price**  (*178*)
**prices**  (*22*)
**primarily**  (*5*)
**primary**  (*2*)
**principle**  (*1*)
**prior**  (*22*)
**private**  (*2*)
**privy**  (*1*)
**Prize**  (*1*)
**probabilistic**  (*1*)
**probably**  (*9*)
**problem**  (*3*)
**Procedure**  (*2*)
**proceed**  (*3*)
**proceeded**  (*2*)
**proceeding**  (*1*)
**PROCEEDINGS**  (*1*)
**process**  (*2*)
**processes**  (*1*)
**produce**  (*1*)
**produced**  (*7*)
**product**  (*4*)
**products**  (*5*)
**professional**  (*1*)
**Professor**  (*42*)
**profitability**  (*1*)
**profits**  (*4*)
**prominence**  (*1*)
**prominent**  (*2*)
**promoting**  (*1*)
**promotional**  (*2*)
**propose**  (*1*)

**proposed**  (*12*)
**proposition**  (*11*)
**propounded**  (*1*)
**propped**  (*6*)
**propping**  (*2*)
**proprietary**  (*1*)
**provide**  (*7*)
**provided**  (*9*)
**provisions**  (*1*)
**Prussia**  (*1*)
**public**  (*33*)
**publication**  (*4*)
**publicly**  (*77*)
**published**  (*23*)
**publishes**  (*1*)
**publishing**  (*1*)
**pull**  (*2*)
**pun**  (*1*)
**purchased**  (*1*)
**purported**  (*5*)
**purportedly**  (*4*)
**purpose**  (*1*)
**purposes**  (*9*)
**pursuant**  (*2*)
**put**  (*19*)
**putting**  (*1*)
**p-value**  (*1*)
**p-values**  (*1*)

**< Q >**
**Q3**  (*1*)
**qualifies**  (*1*)
**qualify**  (*2*)
**qualifying**  (*1*)
**quantify**  (*6*)
**quarter**  (*1*)
**quarterly**  (*7*)
**quest**  (*1*)
**question**  (*85*)
**questioning**  (*1*)
**questions**  (*24*)
**quickly**  (*11*)
**quite**  (*5*)
**quotations**  (*1*)
**quote**  (*11*)
**quoted**  (*12*)
**quotes**  (*2*)
**quoting**  (*3*)

Deposition of Douglas J. Skinner                              John Harvey Schneider v. Natera, Inc., et al

**< R >**
**RABINOWITZ** *(3)*
**races** *(1)*
**Radnor** *(1)*
**raise** *(1)*
**raised** *(5)*
**rally** *(1)*
**RAMESH** *(2)*
**random** *(1)*
**range** *(1)*
**rapidly** *(4)*
**rate** *(2)*
**reach** *(4)*
**reached** *(6)*
**reaching** *(1)*
**react** *(5)*
**reacted** *(1)*
**reaction** *(18)*
**reactions** *(2)*
**reacts** *(1)*
**read** *(22)*
**readily** *(1)*
**reading** *(4)*
**reads** *(1)*
**ready** *(18)*
**real** *(6)*
**realized** *(1)*
**really** *(11)*
**real-world** *(3)*
**reason** *(2)*
**reasonable** *(11)*
**reasonably** *(1)*
**reasons** *(4)*
**Rebecca** *(3)*
**recall** *(33)*
**recalling** *(1)*
**recap** *(1)*
**receipt** *(1)*
**receive** *(2)*
**received** *(24)*
**receives** *(1)*
**receiving** *(2)*
**Recess** *(5)*
**recession** *(1)*
**recipient** *(1)*
**recipients** *(5)*
**recitation** *(4)*
**recognize** *(2)*
**recognized** *(1)*

**recollection** *(4)*
**recommendations** *(2)*
**record** *(35)*
**recorded** *(1)*
**Reddit** *(4)*
**redirect** *(1)*
**refer** *(16)*
**reference** *(17)*
**referenced** *(21)*
**references** *(2)*
**referencing** *(4)*
**referred** *(2)*
**referring** *(14)*
**refers** *(2)*
**reflect** *(9)*
**reflected** *(11)*
**reflecting** *(1)*
**regard** *(1)*
**regarding** *(35)*
**regardless** *(5)*
**regards** *(2)*
**regression** *(1)*
**regressions** *(1)*
**regulations** *(1)*
**regulator** *(1)*
**regulators** *(1)*
**regulatory** *(24)*
**reimbursement** *(1)*
**reimbursements** *(1)*
**reiterate** *(3)*
**relate** *(6)*
**related** *(28)*
**relates** *(4)*
**relationship** *(16)*
**relative** *(3)*
**relatively** *(6)*
**release** *(6)*
**released** *(6)*
**releases** *(3)*
**relevance** *(3)*
**relevant** *(43)*
**reliability** *(1)*
**reliably** *(4)*
**reliance** *(3)*
**rely** *(2)*
**remaining** *(1)*
**remark** *(2)*
**remarks** *(1)*
**remember** *(5)*

**REMOTE** *(5)*
**remotely** *(3)*
**removing** *(1)*
**rendered** *(2)*
**rendering** *(1)*
**repeat** *(4)*
**repeated** *(4)*
**repetition** *(1)*
**rephrase** *(1)*
**Report** *(301)*
**reported** *(22)*
**reporter** *(4)*
**REPORTER'S** *(1)*
**Reporting** *(2)*
**reports** *(108)*
**report's** *(2)*
**represent** *(1)*
**representation** *(1)*
**representative** *(2)*
**represented** *(1)*
**REPRESENTING** *(3)*
**reproduction** *(2)*
**reputable** *(1)*
**reputation** *(5)*
**reputational** *(10)*
**request** *(1)*
**requested** *(3)*
**require** *(2)*
**required** *(1)*
**Research** *(3)*
**Research's** *(1)*
**respect** *(24)*
**respond** *(4)*
**responded** *(1)*
**responding** *(1)*
**responds** *(4)*
**response** *(19)*
**responses** *(2)*
**responsive** *(1)*
**rest** *(1)*
**restate** *(2)*
**restrict** *(1)*
**restricted** *(1)*
**restrictions** *(3)*
**result** *(2)*
**results** *(8)*
**retained** *(2)*
**return** *(27)*
**returned** *(3)*

**returns** *(7)*
**reveal** *(1)*
**revealed** *(12)*
**revelation** *(3)*
**revenue** *(15)*
**revenues** *(33)*
**reversal** *(1)*
**review** *(18)*
**reviewed** *(16)*
**reviews** *(1)*
**revise** *(1)*
**revision** *(1)*
**right** *(81)*
**risk** *(20)*
**risks** *(3)*
**RMR** *(2)*
**Road** *(1)*
**ROBERT** *(1)*
**Rockefeller** *(1)*
**rocket** *(2)*
**Rocketship** *(1)*
**ROELOF** *(1)*
**Rogers** *(1)*
**role** *(2)*
**Roman** *(3)*
**Romanette** *(3)*
**romanettes** *(4)*
**room** *(1)*
**rose** *(1)*
**ROSENMAN** *(3)*
**roughly** *(5)*
**ROWAN** *(1)*
**ROY** *(1)*
**Rule** *(2)*
**Rules** *(3)*
**run** *(3)*
**running** *(1)*

**< S >**
**S&P** *(2)*
**SACHS** *(1)*
**sale** *(3)*
**sales** *(6)*
**salient** *(4)*
**Sandler** *(14)*
**sat** *(1)*
**satisfy** *(1)*
**saw** *(8)*
**saying** *(36)*

Deposition of Douglas J. Skinner                                  John Harvey Schneider v. Natera, Inc., et al

says  (27)
scenario  (1)
SCHNEIDER  (3)
Scholes  (1)
school  (1)
scientists  (1)
scissors  (1)
scope  (9)
screen  (5)
screening  (2)
scrutiny  (8)
search  (2)
season  (1)
seasons  (2)
SEB  (1)
SEC  (11)
Second  (10)
seconds  (1)
second-to-the-last  (1)
SEC's  (2)
Section  (16)
sections  (4)
securities  (5)
security  (9)
see  (62)
seeing  (3)
seeking  (1)
seemingly  (1)
seen  (17)
sees  (1)
self-evident  (2)
selfsame  (1)
sell  (3)
seller  (20)
sellers  (2)
sells  (2)
sell-side  (25)
semi-strong  (15)
send  (1)
sending  (4)
sense  (9)
sent  (12)
sentence  (19)
sentences  (2)
separate  (3)
separately  (1)
September  (5)
sequencing  (1)
series  (1)

seriousness  (2)
served  (1)
service  (5)
services  (1)
set  (12)
Seth  (1)
shareholders  (1)
sharing  (1)
sharp  (1)
SHEENA  (1)
sheet  (2)
ship  (2)
shocks  (1)
short  (26)
Shorthand  (1)
shortly  (3)
show  (3)
shows  (4)
shutdowns  (1)
side  (1)
sign  (1)
signature  (4)
significance  (6)
significant  (12)
significantly  (2)
similar  (13)
Similarly  (6)
simple  (1)
simply  (16)
single  (4)
sir  (35)
sit  (2)
sits  (2)
sitting  (10)
Situated  (2)
situation  (8)
situations  (3)
six  (4)
skeptical  (2)
SKINNER  (47)
SKINNER_0000408
  (2)
SKINNER_0000469
  (1)
slip  (1)
small  (3)
smaller  (1)
snippeted  (1)
snippets  (1)

so-called  (4)
social  (5)
Sold  (1)
sole  (1)
Solutions  (1)
somewhat  (3)
sophisticated  (1)
sorry  (10)
sort  (8)
sought  (3)
sounded  (1)
Sounds  (11)
source  (19)
sources  (14)
spare  (1)
sparked  (2)
speak  (3)
speaking  (1)
speaks  (2)
specializes  (1)
specific  (32)
specifically  (20)
specifics  (10)
specify  (1)
spectrum  (1)
speculating  (1)
speculation  (5)
speculative  (2)
spend  (1)
spends  (2)
split  (6)
splitting  (2)
spoke  (2)
spoken  (1)
sports  (1)
spread  (1)
staff  (4)
stage  (2)
stamp  (2)
standard  (4)
standing  (2)
STANLEY  (2)
Stars  (1)
started  (1)
starting  (2)
state  (24)
stated  (15)
statement  (33)
statements  (16)

STATES  (12)
stating  (5)
statistical  (8)
statistically  (13)
status  (2)
STENOGRAPHER'S
  (1)
stenographic  (1)
stenographically  (1)
step  (2)
steps  (4)
STEVE  (4)
stock  (187)
stocks  (2)
stock's  (1)
stop  (3)
stopping  (1)
stories  (1)
Street  (6)
strict  (2)
strictly  (1)
strike  (18)
strong  (1)
struggle  (1)
studies  (17)
study  (49)
studying  (1)
stuff  (1)
subject  (10)
submitted  (2)
submitting  (1)
subscribe  (2)
subscriber  (4)
subscribers  (10)
subscribing  (1)
subscription  (11)
subscription-based
  (1)
subscriptions  (2)
Subsection  (2)
subsections  (1)
subsequent  (6)
subsequently  (1)
subset  (1)
substance  (2)
substantial  (3)
substantially  (3)
successful  (1)
sued  (1)

sufficient  (26)
sufficiently  (1)
suggest  (1)
Suite  (2)
summarize  (6)
summarized  (4)
summarizes  (1)
summarizing  (1)
summary  (17)
super  (2)
support  (22)
supported  (2)
supporting  (1)
supports  (1)
Suppose  (1)
supposition  (1)
suppositions  (1)
sure  (61)
surprise  (8)
surprised  (1)
surprisingly  (1)
suspended  (1)
suspension  (1)
sustained  (1)
SVB  (1)
sworn  (4)
Symantec  (1)
system  (1)
systematically  (1)

< T >
Tab  (7)
take  (33)
taken  (10)
takes  (3)
talk  (7)
talked  (3)
talking  (11)
talks  (3)
target  (2)
targeted  (1)
TCF  (1)
team  (1)
technical  (1)
TECHNICIAN  (2)
tell  (4)
teller  (1)
tells  (3)
temporary  (1)

ten  (2)
tend  (5)
tends  (2)
ten-page  (1)
tens  (1)
term  (8)
terminology  (1)
terms  (8)
test  (10)
testified  (1)
testimonies  (2)
testimony  (9)
testing  (3)
tests  (9)
TEXAS  (6)
text  (2)
Thank  (15)
Thanks  (1)
theoretical  (1)
theoretically  (1)
theory  (1)
therefor  (1)
thereof  (2)
thing  (14)
things  (26)
think  (256)
thinking  (3)
thinks  (1)
third  (2)
Thomas  (1)
thomas.artaki@katten.
com  (1)
thought  (6)
thousands  (3)
three  (12)
threshold  (8)
time  (37)
times  (8)
title  (8)
titles  (1)
today  (21)
Today's  (1)
TODD  (1)
told  (1)
top  (7)
TOPAZ  (1)
topic  (6)
topics  (2)
total  (5)

track  (7)
trade  (19)
traded  (11)
trade-off  (1)
trade-offs  (4)
trader  (1)
traders  (2)
trades  (4)
trading  (8)
train  (1)
transactions  (3)
transcript  (2)
transcription  (1)
transcripts  (1)
transitory  (1)
transparently  (1)
travel  (1)
treated  (1)
treatments  (1)
tremendous  (1)
tremendously  (1)
tried  (4)
true  (17)
TRUSTEES  (1)
truth  (2)
truthful  (1)
try  (8)
trying  (21)
t-statistic  (1)
turn  (5)
turned  (1)
turning  (1)
two  (44)
two-month  (1)
type  (12)
types  (13)
typical  (1)
typically  (5)

< U >
ultimately  (8)
uncertain  (1)
uncertainty  (2)
unclear  (1)
uncovered  (1)
underlie  (1)
underlying  (18)
understand  (23)
understanding  (34)

understating  (3)
understood  (8)
undervalued  (1)
UNDERWRITER  (1)
undisclosed  (4)
unfortunately  (1)
unfounded  (7)
uninformed  (1)
UNITED  (5)
University  (1)
unknown  (2)
unrelated  (4)
unusually  (6)
upgraded  (1)
upper  (1)
upward  (5)
upwards  (4)
usage  (2)
use  (14)
useful  (2)
uses  (1)
Usually  (5)

< V >
Vaguely  (1)
validity  (3)
value  (54)
value-relevant  (9)
Vanguard  (1)
variation  (1)
varies  (2)
variety  (1)
various  (42)
vary  (2)
verbally  (1)
version  (2)
versions  (1)
versus  (5)
VI.A  (1)
vicinity  (1)
Vickie  (1)
video  (3)
videoconference  (2)
VIDEOGRAPHER
 (12)
VIDEOGRAPHER/VI
DEOCONFERENCE
 (1)
VIDEOTAPED  (2)

Deposition of Douglas J. Skinner                                    John Harvey Schneider v. Natera, Inc., et al

**view**  (*15*)
**viewed**  (*1*)
**views**  (*3*)
**VII**  (*1*)
**VIII**  (*2*)
**violate**  (*2*)
**violations**  (*2*)
**Virginia**  (*1*)
**volatility**  (*27*)
**volatility-inducing**  (*4*)

**< W >**
**Wall**  (*5*)
**want**  (*27*)
**wanted**  (*7*)
**warehouse**  (*1*)
**warehouses**  (*1*)
**Washington**  (*1*)
**way**  (*36*)
**ways**  (*9*)
**website's**  (*1*)
**week**  (*1*)
**weeks**  (*1*)
**weight**  (*1*)
**Welcome**  (*5*)
**Well**  (*98*)
**well-founded**  (*1*)
**well-known**  (*3*)
**went**  (*3*)
**we're**  (*23*)
**WESTERN**  (*3*)
**we've**  (*10*)
**widely**  (*1*)
**willing**  (*3*)
**WilmerHale**  (*2*)
**window**  (*23*)
**windows**  (*8*)
**wish**  (*2*)
**wishes**  (*1*)
**Witness**  (*123*)
**won**  (*1*)
**word**  (*4*)
**wording**  (*1*)
**words**  (*4*)
**work**  (*16*)
**worked**  (*1*)
**working**  (*2*)
**works**  (*4*)
**workshops**  (*1*)

**world**  (*9*)
**worth**  (*2*)
**wrap**  (*2*)
**wrap-up**  (*1*)
**write**  (*1*)
**writes**  (*1*)
**writing**  (*1*)
**written**  (*4*)
**wrong**  (*2*)
**wrongdoing**  (*3*)
**wrote**  (*4*)

**< Y >**
**Yeah**  (*20*)
**year**  (*3*)
**years**  (*5*)
**Yesterday**  (*4*)
**York**  (*5*)
**Yup**  (*3*)

**< Z >**
**Zechman**  (*1*)