# EXHIBIT 38

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| JOHN HARVEY SCHNEIDER, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:22-cv-00398-DAE |
| Plaintiff, | |
| vs. | |
| NATERA, INC., STEVE CHAPMAN, MICHAEL BROPHY, MATTHEW RABINOWITZ, and RAMESH HARIHARAN, | |
| Defendants. | |

**EXPERT REPLY REPORT OF DOUGLAS J. SKINNER**

**OCTOBER 25, 2024**

# Table of Contents

I.      Qualifications, Assignment, and Compensation ................................................................... 1

II.     Summary of Opinions ......................................................................................................... 2

III.    Mr. Coffman's Claims About Stock Price Changes Following an Alleged Omission Are
        Flawed and Misleading, and Mischaracterize My Opinions ............................................. 5

        A.    Stock Price Changes Following Alleged Omissions Cannot Be Used to Reliably
              Infer That the Alleged Omissions Affected Natera's Stock Price ......................... 5

        B.    Mr. Coffman's Analysis of the Alleged Misrepresentation on February 26, 2020
              (after Market Hours) Is Fundamentally Flawed ...................................................... 7

        C.    Mr. Coffman's Criticism of My Event Study Result for February 27, 2020 Is
              Misguided and Fundamentally Flawed .................................................................... 9

IV.     Mr. Coffman Inappropriately Dismisses My Opinion That, in an Efficient Market,
        Publicly Available Information in *The Capitol Forum* Articles Would Have Been
        Incorporated into Natera's Stock Price Prior to the Alleged Corrective Disclosure Date 11

V.      Mr. Coffman Fails to Reliably Support His Claim That "New" Information Regarding the
        Submission of Prior Authorization Requests and Microdeletion Testing Affected Natera's
        Stock Price on March 9, 2022 ......................................................................................... 14

        A.    Mr. Coffman Fails to Reliably Support His Claim That "New" Information
              Regarding the Submission of Prior Authorization Requests in the Hindenburg
              Report Affected Natera's Stock Price ................................................................... 15

        B.    Mr. Coffman Fails to Reliably Support His Claim That the Allegedly Corrective
              Information Regarding Natera's Microdeletion Ordering and Billing Practices
              Was First Disclosed in the Hindenburg Report and Affected Natera's Stock Price
              ................................................................................................................................ 17

VI.     Mr. Coffman's Analysis of Natera's Abnormal Stock Price Decline on March 9, 2022 Is
        Flawed and Unreliable, and Mischaracterizes My Opinions .......................................... 19

VII.    Mr. Coffman Still Fails to Provide a Methodology Capable of Reliably Measuring Class-
        Wide Damages for Natera Common Stock in a Manner Consistent with Plaintiffs' Theory
        of Liability ....................................................................................................................... 26

## I.      Qualifications, Assignment, and Compensation

1.      I am the Sidney Davidson Distinguished Service Professor of Accounting at the University of Chicago, Booth School of Business.  I previously submitted a report in this matter on August 16, 2024 (the "Skinner Report"),[1] which includes a summary of my qualifications.  A copy of my curriculum vitae, including my publications, is attached as Appendix A to the Skinner Report.  A list of my expert work over the last four years, including reports, depositions, and trial testimony, is attached as Appendix B to the Skinner Report.

2.      I have been asked by counsel for Natera, Inc. ("Natera" or "the Company"), Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Ramesh Hariharan (collectively, the "Defendants") to review and respond to the Expert Reply Report of Chad Coffman, CFA ("Mr. Coffman"), dated October 4, 2024 (the "Coffman Reply Report"), submitted on behalf of Plaintiffs.[2]

3.      In formulating my opinions, I have relied on my knowledge, prior experience, academic research on relevant topics, experience as a journal editor reviewing academic research articles, and formal training in economics, finance, and accounting.  A list of the materials I considered in preparing this report, in addition to the materials considered and listed in Appendix C of the Skinner Report is attached as **Appendix A**.

4.      I am being compensated at my standard billing rate of $1,125 per hour in this case.  I have been assisted in this matter by staff at Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the

---

[1] Terms defined in the Skinner Report retain their meaning in this report.

[2] Mr. Coffman states that the Skinner Report "does not address [his] opinion that the market for Natera Common Stock was efficient during the Class Period" and concludes "there is no dispute that Natera Common Stock traded in an efficient market during the Class Period."  Coffman Reply Report, ¶ 7.  In fact, as I explained in the Skinner Report and at deposition, I have been asked to assume, as Plaintiffs claim, that Natera's common stock traded in an efficient market during the Proposed Class Period and, accordingly, have not evaluated Mr. Coffman's opinions and analyses concerning market efficiency.  *See* Skinner Report, ¶ 8; Deposition of Douglas J. Skinner, Ph.D., dated September 13, 2024 ("Skinner Deposition"), 20:2–21:2.  In this report, I have again been asked to assume that Natera's common stock traded in an efficient market during the Proposed Class Period, as Plaintiffs claim.

outcome of this or any other matter.  My work on this case is ongoing; I reserve the right to modify or supplement my opinions in the event I become aware of additional information.

## II.    Summary of Opinions

5.    Based on my analysis to date, as well as my skills, knowledge, expertise, education, and training, I have formed the following opinions.

6.    None of the opinions or analyses in the Coffman Reply Report cause me to revise any of the opinions I reached and put forth in the Skinner Report.  In addition, having reviewed Mr. Coffman's opinions and analyses put forth in the Coffman Reply Report, I have formed the following opinions.

7.    *First*, Mr. Coffman's claims about stock price changes following alleged omissions, including specifically his analysis of Natera's stock return after the February 26, 2020 alleged misrepresentation, is flawed and misleading, and mischaracterizes my opinions.  Specifically:

    a.  Nothing Mr. Coffman has put forward takes away from the basic economic fact that, in an efficient market, event studies can be used to assess the stock price impact of newly available company-specific information, but *cannot* measure the price impact of information that is *not* revealed (not made publicly available) on a given date—put simply, market participants cannot respond to information that is not revealed.  Mr. Coffman's argument to the contrary is contradicted by his deposition testimony, and rests on a string of unsubstantiated assumptions that effectively assume his conclusion.

    b.  Mr. Coffman's analysis of the alleged misrepresentation on February 26, 2020 is fundamentally flawed.  Mr. Coffman ignores that Plaintiffs do not allege that Natera's reported revenues were misstated during the Proposed Class Period, and he fails to address that when Plaintiffs allege that the allegedly omitted information was eventually revealed to the market on March 9, 2022, securities analysts did not lower their revenue estimates.  Moreover, even assuming that reported (and/or guided) revenue and the overall number of tests performed exceeded analyst expectations and may have caused a stock price increase on February 27, 2020, that fact is uninformative for determining the impact, if any,

on Natera's stock price from a hypothetical alternative disclosure of the alleged improper business practices used to generate test volumes and revenue for Panorama.

c.  Mr. Coffman's criticism of my event study result for February 27, 2020 is misguided and fundamentally flawed.  As I explained in the Skinner Report, based on empirical evidence and supported by conclusions from the academic literature, my event study analysis takes into account that the period from February 27, 2020 through April 30, 2020 was particularly affected by COVID-19-related market disruptions, including heightened stock return volatility.  By contrast, Mr. Coffman's event study model fails to account for this heightened stock return volatility; as a result, his event study underestimates the volatility and so overstates the statistical significance of the abnormal return on this date.

8.      *Second*, Mr. Coffman inappropriately dismisses that in an efficient market, as he claims is the case for Natera common stock, publicly available information in *The Capitol Forum* published articles on July 1, 2020 and December 14, 2020 (together, "*The Capitol Forum* Articles") would have been incorporated into Natera's stock price prior to the alleged corrective disclosure date.  Mr. Coffman questions whether the cost of a subscription to *The Capitol Forum* prevented investors from accessing this information, and, as a result, whether the information was sufficiently "widely disseminated" to have been incorporated in Natera's stock price.  As discussed in the Skinner Report, however, in an efficient market (as that term is understood in the academic literature), economically rational investors seek out and trade on new information, such that its implications are quickly incorporated into the stock price.  Moreover, contrary to Mr. Coffman's claims, the lack of a statistically significant price movement following *The Capitol Forum* Articles is consistent with the fact that the content was not value-relevant to investors.

9.      *Third*, Mr. Coffman fails to establish that any new information included in claims made in the Hindenburg Report affected Natera's stock price on March 9, 2022.  Mr. Coffman ignores that securities analysts discussing the Hindenburg Report did not appear to focus on either of the pieces of information he claims had not previously been reported:  (i) claims that in some instances MGML submitted prior authorization requests after tests had been performed; and

(ii) claims that Natera improperly required physicians to opt out of microdeletion testing, and that testing was not covered by most insurance providers.  As I explained in the Skinner Report, (i) the Hindenburg Report itself acknowledged that "some payors permit a grace period [to submit prior authorizations] after a procedure" and stated that Natera had previously disclosed risks related to reimbursement associated with the timing of when prior authorizations were completed; and (ii) information about Natera's microdeletion ordering and billing practices had been disclosed well before the Hindenburg Report was published.

10.    *Fourth*, Mr. Coffman's analysis of Natera's stock price decline on March 9, 2022 is flawed and unreliable, and mischaracterizes my opinions.  Mr. Coffman is incorrect that I limited my analysis of analyst revenue forecast revisions to one week following the Hindenburg Report, and his claim that securities analysts do not quickly update their forecasts following short-seller reports is unsupported.  Instead, I show that securities analysts that issued reports on March 9, 2022 and March 10, 2022 following the Hindenburg Report generally commented that they did not expect the Company's revenues to decline based on the claims in the Hindenburg Report and they did not revise their forecasts until after the Company's next earnings announcement, on May 5, 2022, when 10 out of 11 contributors *increased* their FY 2022 revenue estimates within three trading days.  In addition, Mr. Coffman claims that factors I identified as likely to have affected Natera's stock price on March 9, 2022 are "an expected consequence of the type of misconduct alleged in this matter," but ignores that these consequences could result directly from the release of a short-seller report, independent of the report's contents, claims, or accuracy.

11.    *Fifth*, Mr. Coffman still fails to provide a methodology capable of reliably measuring class-wide damages for Natera common stock in a manner consistent with Plaintiffs' theory of liability.  Mr. Coffman fails to articulate a methodology that can reliably measure class-wide damages based on the repetition in the Hindenburg Report of information that had previously been publicly reported.  Moreover, if some or all of the allegedly corrective information was—as Mr. Coffman suggests—publicly available but not sufficiently widely disseminated to have been incorporated in Natera's stock price prior to March 9, 2022, Mr. Coffman fails to articulate a damages methodology that can reliably account for the fact that certain potential class members who received or otherwise were aware of the claims in *The Capitol Forum* Articles would have known some or all of the alleged relevant truth prior to the release of the Hindenburg Report.

Mr. Coffman fails to explain why it is appropriate to apply a common damages methodology to both groups of investors—that is, to both those who knew some or all of the alleged relevant truth and those who did not.

**III.    Mr. Coffman's Claims About Stock Price Changes Following an Alleged Omission Are Flawed and Misleading, and Mischaracterize My Opinions**

**A.    Stock Price Changes Following Alleged Omissions Cannot Be Used to Reliably Infer That the Alleged Omissions Affected Natera's Stock Price**

12.    In the Skinner Report, I explained that an event study analysis does not measure the stock price impact of information that was not released on a given date, including information alleged to have been omitted.[3]  At deposition, Mr. Coffman agreed, testifying that "generally speaking when people talk about omissions … they are talking about things that the company [could] have said, but didn't and, therefore, the market price isn't reacting on that information."[4]  Thus, any changes in the Company's stock price following alleged omissions do not measure the effect of any allegedly omitted information.[5]

13.    In this case, Plaintiffs allege that statements about Natera's reported revenues—amounts that I understand Plaintiffs have not alleged were misstated[6]—were misleading because they omitted information regarding "the Company's prior authorization scheme with MGML [and] opting patients into microdeletion testing [], both in contravention of established industry guidance."[7]  Similarly, according to Mr. Coffman, Plaintiffs allege that Defendants failed to disclose that Natera's revenue growth was "driven by deceptive practices."[8]

---

[3] Skinner Report, ¶ 34.
[4] Deposition of Chad Coffman, CFA, dated July 19, 2024 ("Coffman Deposition"), 105:7–21.
[5] Skinner Report, ¶ 13.
[6] Plaintiffs' Opposition to the Natera Defendants' Motion for Judgment on the Pleadings, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-DAE, June 21, 2024, p. 14 ("Plaintiffs' claims are not predicated upon an assertion that Defendants misstated their reported financial results or violated an accounting rule.").
[7] Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-LY, October 7, 2022 ("Complaint"), ¶ 163.
[8] Coffman Reply Report, ¶ 16.  According to Mr. Coffman, "[t]hese [purportedly deceptive practices] included allegedly failing to disclose the use of a closely related third-party company (i.e., My Genome My Life, Inc. 'MGML') to submit improper prior-authorization requests and setting microdeletion screening—a costly add-on for rare conditions often not covered by insurance—as the default option on order forms, requiring physicians to opt out rather than opt in."  Coffman Reply Report, ¶ 16.

14.     In the Coffman Reply Report, Mr. Coffman states that I am "suggesting that a price increase in response to an affirmative misstatement about a topic that leaves out important, negative, qualifying information about that topic cannot provide evidence of price impact."[9] Mr. Coffman mischaracterizes my opinion, and his statement essentially assumes his conclusion: that the omitted information is "important, negative, qualifying information about [the same] topic" that caused a price movement.[10]  In fact, Mr. Coffman's conclusion rests on a series of unsupported assumptions.

15.     Mr. Coffman identifies certain dates on which, according to his event study (and in certain instances, my own event study), an alleged misrepresentation is made and, on the relevant impact date, a statistically significant positive abnormal return is observed.  He then *assumes* that those stock price increases are "in response to [the] affirmative misstatement[s]" made on those dates.[11]  With the exception of February 26, 2020—which I discuss in **Sections III.B and III.C** below—Mr. Coffman performs no analysis to determine the cause of those statistically significant price movements.  Indeed, Mr. Coffman testified at deposition that he had no opinion about the specific factors that caused price increases on these dates, and only opined that the entire *set* of information released on each day caused the price increase.[12]  Mr. Coffman also *assumes* that the allegedly omitted information was "important, negative, qualifying" information related to an "affirmative misstatement"[13] and suggests that because this information is related to the information he claims caused the stock price to increase, this *omitted* information would have affected Natera's stock price.

16.     In a further attempt to support this argument, Mr. Coffman provides a hypothetical example that is irrelevant and misleading.  Mr. Coffman's stylized example involves "a cell phone company announces a groundbreaking new battery that allows phones to last a week

---

[9] Coffman Reply Report, ¶ 42.
[10] Coffman Reply Report, ¶ 42.
[11] Coffman Reply Report, ¶¶ 42, 53.
[12] Coffman Deposition, 129:17–130:12 ("Q. … You testified before the break that you have not done an analysis to attribute the abnormal return on February·26th, 2020 to any specific piece of information released that day; correct? A. If you mean a specific piece of information within the earnings announcement or earnings call, that's correct, yes. It's my opinion that the price clearly moved in response to the earnings announcement and information, but I haven't analyzed what part of the earnings announcement or what specific statements moved the price.  Q. And is that true for all days in your Exhibit 7? A. Yes. I have not made any effort to attribute the price movement on any of those days to a specific piece of information.").  Exhibit 7 in the Expert Report of Chad Coffman, CFA, dated June 4, 2024 (the "Coffman Report") contains his "Event Study Analysis of Natera Earnings Announcements and Pre-Announcements."
[13] Coffman Reply Report, ¶ 42.

without charging, causing its stock price to rise," while at the same time "fail[ing] to mention that it … is facing severe regulatory hurdles that will prevent the battery from ever being sold."[14] He suggests that the stock price increase due to the "groundbreaking new battery" can be used to infer that the "important, negative qualifying fact"—that the battery will never be sold—would also have affected the company's stock price.[15]  However, Mr. Coffman's misleading example only works if one assumes, as he does, the conclusion—that the omitted information was "important, negative, [and] qualifying" and would have impacted the stock price.  Consider an alternative situation in which the omitted fact was instead that the battery was manufactured by an independent company founded by a former employee of the cell phone company, or the omitted fact was instead that the battery (which is not visible to users of the phone) was painted white.  Upon learning the omitted information, the market may not have placed any value on it— particularly if that information would not affect the cell phone company's revenues or profits— in which case the information would not affect the stock price.  Thus, as these examples show, the fact that the company's stock price increased due to the announcement of a new battery, by itself, does not provide information about the stock price impact of any omitted information about the battery.

17.     In summary, nothing Mr. Coffman has put forward takes away from the basic economic fact that, in an efficient market, event studies can be used to assess the stock price impact of newly available company-specific information, but *cannot* measure the price impact of information that is *not* revealed (not made publicly available) on a given date—put simply, market participants cannot respond to information that is not revealed.[16]

### B.     Mr. Coffman's Analysis of the Alleged Misrepresentation on February 26, 2020 (after Market Hours) Is Fundamentally Flawed

18.     Mr. Coffman claims "there is evidence that Natera's positive statements about higher-than-expected revenue driven by Panorama impacted the stock price starting at the beginning of the Class Period" on February 27, 2020.[17]  To support his claim, Mr. Coffman states that

---

[14] Coffman Reply Report, ¶ 42.
[15] Coffman Reply Report, ¶ 42.
[16] *See* Skinner Report, Section VI.
[17] Coffman Reply Report, ¶ 43.

(i) Natera's revenue for Q4 2019, announced after market hours on February 26, 2020, "was higher than the analyst consensus estimate"; (ii) securities analysts generally commented on the financial results; and (iii) according to his event study analysis, Natera's stock price increased statistically significantly on February 27, 2020, the relevant impact date that followed the earnings release, earnings conference call, and related Company disclosures.[18]  However, as discussed below, Mr. Coffman's analysis is fundamentally flawed and, contrary to his claims, even if the abnormal stock price increase on February 27, 2020 were to be assessed as statistically significant, a question I address in **Section III.C** below, one still cannot use the stock price change on that date to infer that the allegedly omitted information affected Natera's stock price.

19.     Mr. Coffman states that on February 26, 2020, "Natera noted that '[t]he increase in total revenues [in Q4 2019] was driven primarily by sales of Natera's Panorama and Horizon tests'"[19] and that revenue and NIPT test volume exceeded analyst expectations.[20]  He further states that "[t]o the extent that Natera omitted the true extent of the improper business practices used to generate volumes and revenue for Panorama … that would suggest that [the stock price included] some artificial inflation."[21]  As discussed in **Section III.A** above, I understand that Plaintiffs do not allege that Natera's reported revenues were misstated during the Proposed Class Period and Mr. Coffman has not provided any evidence that the Company's reported revenues and/or number of overall tests performed should have been lower.  Moreover, the fact that reported (and/or guided) revenue and the overall number of tests performed exceeded analyst expectations and may have caused a stock price increase is uninformative for determining the impact, if any, on Natera's stock price from a hypothetical alternative disclosure of "the true extent of the improper business practices used to generate volumes and revenue for Panorama."[22]  Indeed, as I

---

[18] Coffman Reply Report, ¶¶ 43–47.

[19] Coffman Reply Report, ¶ 43.

[20] Coffman Reply Report, ¶¶ 44–45.

[21] Coffman Reply Report, ¶ 47.

[22] Coffman Reply Report, ¶ 47.  Mr. Coffman also fails to consider whether other news released that day as part of the Company's fourth-quarter and fiscal 2019 year-end earnings disclosures, other than the alleged misrepresentations, including positive news about other Natera products, may have affected its stock price on February 27, 2020.  For example, in the Complaint Plaintiffs point to positive statements about Prospera made on February 26, 2020.  *See* Complaint, ¶ 90 ("[O]ur clinical validation data compared favorably against the first-generation test across many aspects of performance...").  Indeed, securities analysts discussed positive news regarding Prospera, as well as Signatera, following the alleged misrepresentation.  *See, e.g.*, "4Q19 Above Expectations & Conservative 2020 Guidance," *Piper Sandler*, February 26, 2020 ("Management was upbeat about

understand Plaintiffs' allegations, Natera would have reported the exact same figures for revenue and tests performed even had Natera made an allegedly truthful disclosure.

20.     Similarly, the fact that securities analysts commented on Natera's revenue or growth, as Mr. Coffman notes,[23] is also not informative regarding the impact on Natera's stock price, if any, of a hypothetical alternative disclosure that the growth in Panorama revenues was "propped up by" purportedly improper billing practices.[24]  Indeed, as I discuss in **Section VI** below (and in the Skinner Report), when Plaintiffs allege that the allegedly omitted information was revealed to the market on March 9, 2022, securities analysts did not lower their revenue estimates.[25]

### C.     Mr. Coffman's Criticism of My Event Study Result for February 27, 2020 Is Misguided and Fundamentally Flawed

21.     Mr. Coffman's criticism that my event study result for February 27, 2020 uses an estimation window that "is not representative of the true firm-specific volatility as of February 27, 2020"[26] is misguided and fundamentally flawed.  As I explained in the Skinner Report, based on empirical evidence and conclusions from the academic literature, the period from February 27, 2020 through April 30, 2020 was particularly affected by COVID-19-related market disruptions, including heightened stock return volatility.[27]  Although Mr. Coffman now

---

oncology and transplant and said the timelines for commercializing both tests remain intact. We continue to believe Natera has a significant opportunity in oncology and the MRD market. We reiterate our Overweight rating with a $49 target based on ~10x 2021E market cap/revenue."); "Sets Attractive 2020 Outlook," *Baird*, February 26, 2020 ("With the Prospera (transplant) and colorectal Signatera launches on track for later this year, we continue to think 2020 could be a pivotal year for NTRA and see even more potential for upside in 2021/beyond as new products gain traction and the BGI/FMI partnerships start contributing commercially.").

[23] Coffman Reply Report, ¶¶ 44–46.

[24] Complaint, ¶ 163.

[25] *See* **Section VI**; Skinner Report, Exhibit 3a and 3b.

[26] Coffman Reply Report, ¶ 51.

[27] Skinner Report, ¶ 30, footnote 54; Baker, Scott R., et al., "The Unprecedented Stock Market Reaction to COVID-19," *The Review of Asset Pricing Studies* 10, no. 4 (2020): 742–758, p. 746 ("It's worth stressing that large daily stock market moves during this period were in both directions.  Indeed, the S&P 500 index plunged 33% from February 21 to its trough on March 23.  It then rose 30% from its bottom by the last trading day in April."); Pástor, Ľuboš, and M. Blair Vorsatz, "Mutual Fund Performance and Flows During the COVID-19 Crisis," *The Review of Asset Pricing Studies* 10, no. 4 (2020): 791–833, pp. 792–793 (emphasis added) ("In the equity market, the S&P 500 index experienced its steepest descent in living memory, losing 34% of its value in the 5-week period between February 19 and March 23, 2020, before bouncing back by over 30% by the end of April.… *We define the crisis period as the 10-week period between February 20 and April 30, 2020.*  We choose February 20 as the starting date because the stock market peaked on February 19 before its rapid descent.  We choose April 30 as the ending date because it is a month-end by which the market largely rebounded, and also because it puts the market bottom on March 23 roughly in the middle of the crisis period.").  *See also* Döttling, Robin, and Sehoon Kim, "Sustainability Preferences Under Stress: Evidence from COVID-19," *Journal of Financial and Quantitative Analysis* 59, no. 2

agrees with and acknowledges the finding of heightened volatility during this period, he fails to account for it in his event study analysis of February 27, 2020.[28] In fact, his analysis of that date is based on an event study that uses an estimation period that comprises the previous 120 trading days ("Coffman Event Study"), which was a period almost entirely unaffected by COVID-19 and had substantially lower volatility.[29]

22.    According to Mr. Coffman's own analysis in Exhibit 2 of the Coffman Reply Report, the stock market volatility, as measured by the VIX, is meaningfully higher (more than twice as high) on February 27, 2020 (39.2%) than the average observed during the Coffman Event Study estimation period (14.6%) *and* meaningfully higher than the average observed during the alternative estimation periods Mr. Coffman now proposes (17.2% and 29.5% for the 20 days before and the five days before and after February 27, 2020).[30] By failing to account for changes in stock price volatility between the estimation period and February 27, 2020, the Coffman Event Study underestimates the volatility of the residual return, which has the effect of overstating statistical significance. In fact, although on average one would expect approximately 5% of abnormal returns to be statistically significant with a well-specified model (using a 95% confidence level threshold), Mr. Coffman's model finds that approximately *half* of the days in the first month of the Proposed Class Period (i.e., February 27, 2020–March 27, 2020) are statistically significant, highlighting the flaw in Mr. Coffman's approach.[31] Moreover, Mr. Coffman's alternative estimation periods for his analysis of the abnormal return on February 27,

---

(2024): 435–473 (defining the "COVID period" as the "market crash" period from February 22, 2020 to March 21, 2020 along with the "market rebound" period from March 23, 2020 to April 25, 2020); John, Kose, and Jingrui Li, "COVID-19, Volatility Dynamics, and Sentiment Trading," *Journal of Banking & Finance* 133 (2021): 106162 (emphasis added) ("*[T]he overall volatility in both stock and option markets were very high from late-February to mid-April 2020*.").

[28] Mr. Coffman acknowledges there was "lower volatility observed in the period before February 27, 2020, which [he] used in [his] estimation window for the Coffman Event Study to obtain results for the same date." Coffman Reply Report, ¶ 50.

[29] Coffman Reply Report, ¶ 48 (emphasis in original) ("[T]he event study results for February 27, 2020 in the Coffman Event Study are based on the returns and volatility of the *prior* 120 trading days (roughly 6 months)."); Coffman Report, ¶ 52 ("For each trading day analyzed over the roughly two-year Class Period, I constructed a regression model using data from the prior 120 trading days.").

[30] Coffman Reply Report, Exhibits 2a and 2b. In contrast, the average value of the VIX index in the estimation period used in my event study was 49.6%.

[31] In comparison, my event study finds only three dates (13.6%) in that period to be statistically significant. The finding is similar for the period from February 27, 2020 through April 30, 2020 (i.e., the first estimation period used in my regression analysis): Mr. Coffman finds that 24.4% of the days are statistically significant, whereas I find 6.7% of the days to be so. Mr. Coffman has offered nothing to suggest that there was an unusual concentration of days with value relevant company-specific information in this period.

2020—"20 days prior" and "five days prior and five days after"[32]—contain only 20 or 10 observations, respectively.  He provides no analysis or support from the academic literature to suggest that an event study analysis of daily stock returns that relies on such short estimation periods is appropriate or reliable.

23.    Overall, Mr. Coffman's analysis of Natera's stock return on February 27, 2020 relies on an inappropriate estimation period, rendering his findings unreliable, and his criticisms of my event study model are misguided and fundamentally flawed.  Nevertheless, even if one accepts Mr. Coffman's unsupported conclusion that the stock price change on February 27, 2020 was positive and statistically significant, none of my opinions are affected because (i) the statistically significant abnormal return cannot be used to infer that the allegedly omitted information affected Natera's stock price (as explained in **Section III.A** above); and (ii) Mr. Coffman's analysis of the alleged misrepresentation is fundamentally flawed (as explained in **Section III.B** above).

**IV.    Mr. Coffman Inappropriately Dismisses My Opinion That, in an Efficient Market, Publicly Available Information in *The Capitol Forum* Articles Would Have Been Incorporated into Natera's Stock Price Prior to the Alleged Corrective Disclosure Date**

24.    In the Skinner Report, I explained that what Plaintiffs allege as corrective information had, in fact, been made publicly available in articles published on July 1, 2020 and December 14, 2020 by *The Capitol Forum* prior to the publication of the Hindenburg Report.[33]  Mr. Coffman claims that *The Capitol Forum* is "not an easily accessible source of information"[34] and as a result, questions whether the information was sufficiently "widely disseminated" to have been incorporated in Natera's stock price even though, according to him, Natera's stock traded in an efficient market.[35]  He primarily notes that (i) "the high cost of The Capitol Forum is a hindrance to investors obtaining information from this source, and the publication itself acknowledges it is

---

[32] Coffman Reply Report, ¶ 52.

[33] Skinner Report, Section VII.  As detailed therein, certain allegedly corrective information had also been made available through other sources, including Company disclosures and *The New York Times* article published on January 1, 2022.  *See* "When They Warn of Rare Disorders, These Prenatal Tests are Usually Wrong," *The New York Times*, January 1, 2022.

[34] Coffman Reply Report, ¶ 68.

[35] Coffman Reply Report, ¶ 62.

targeting a niche set of sophisticated readers;"[36] and (ii) the market did not react to the original publication of the allegedly corrective information in *The Capitol Forum* Articles.[37]

25.     Mr. Coffman's conception of market efficiency is flawed and unsupported by the peer-reviewed academic literature.[38]  Market efficiency does not require that information be "costless and instantaneously available to all investors" or that "'sufficient numbers' of investors have 'ready access' to information."[39]  Instead, as I explained in the Skinner Report, in an efficient market, economically rational investors seek out and trade upon information as long as the expected benefits from doing so are at least as large as the corresponding expected costs, because those investors would profit from obtaining and trading on the information.[40]  As a result, there is no basis for Mr. Coffman's suggestion that the cost of a subscription to *The Capitol Forum* would have prevented any new, value-relevant information published in *The Capitol Forum* Articles from being incorporated into Natera's stock price.

26.     Mr. Coffman questions whether information in articles published by *The Capitol Forum* could have been incorporated into securities prices because a subscription to *The Capitol Forum* "was estimated to cost $24,000 annually in 2017," which he deems "a hindrance to investors obtaining information from this source."[41]  Mr. Coffman fails to provide any support for his assertion that this cost would be prohibitive and prevented investors, including large buy-side

---

[36] Coffman Reply Report, ¶ 69.

[37] Coffman Reply Report, ¶ 70.

[38] Mr. Coffman's reliance on Fama (1970) is inapt and misleading.  *See* Coffman Reply Report, ¶ 62; Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417.  At deposition, I was asked about Professor Fama's statement, cited in the Skinner Report, that "the market may be efficient if 'sufficient numbers' of investors have ready access to available information."  I explained that "all [Professor Fama is] really saying there is that *one instance* in which the market could be efficient is if sufficient numbers of people have access to the information.  He's not saying that's a necessary condition."  Skinner Deposition, 72:5–24.  I further explained that "what ultimately [Professor] Fama is saying [which] is very consistent with the literature that followed and many academic discussions of efficiency [is that] the way the market works, both the academic evidence and the real world tell[] us, is that it only needs some investors -- maybe even as few as one investor -- to be aware of some information and trade on that information for its implications to be impounded into the stock price."  Skinner Deposition, 69:19–70:6.

[39] Coffman Reply Report, ¶ 62.

[40] Skinner Report, Section V.  In the Skinner Report, I cited a peer-reviewed academic article by Professor Fama who states:  "A weaker and economically more sensible version of the efficiency hypothesis says that prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs (Jensen (1978))."  *See* Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617 ("Fama (1991)"), p. 1575.

[41] Coffman Reply Report, ¶ 69.

investors and securities analysts, from accessing this information.[42]  Put differently, Mr. Coffman implies there is some threshold above which the cost of information is "too high," but fails to specify what this threshold is or how it could be determined.  In fact, there is evidence that several large investors with holdings in Natera had received notification and were aware of at least some of *The Capitol Forum*'s articles, including Bridger Capital LLC, RTW Investments, LP, and Gilder Gagnon Howe & Co. LLC.[43]  The cost of obtaining a subscription to *The Capitol Forum* would have been small relative to the value of these entities' investment positions in Natera.[44]  For example, Bridger Capital LLC owned approximately 700,000 shares of Natera common stock on December 31, 2020, when its stock price was $99.52 per share, an investment of approximately $70.1 million.[45]  If *The Capitol Forum* had information that could move Natera's stock price by even 1%, the implied value of the information would be around $700,671 for Bridger Capital LLC relative to the $24,000 subscription cost, implying a potential rate of return of more than *2,800*%.  Thus, there is no reason to believe that the cost of *The Capitol Forum* was a "hinderance" to all investors obtaining the information it published.  In addition, there were also at least two securities analysts—J.P. Morgan and Craig Hallum—that both published analyst reports covering Natera during the Proposed Class Period[46] and that communicated with Natera executives regarding *The Capitol Forum* articles about the Company.[47]

---

[42] In fact, institutional investors frequently invest substantial resources to seek out information from a variety of sources.  *See, e.g.*, Hendershott, Terrence, Dmitry Livdan, and Norman Schürhoff, "Are Institutions Informed About News?" *Journal of Financial Economics* 117, no. 2 (2015): 249–287, pp. 249–250 ("Potentially important drivers of institutional trading are superior information gathering and processing skills.  Superior information by institutions could arise from access to more information and greater resources to process information. Unlike retail investors, institutions often directly communicate with publicly traded firms as well as brokerage firms through their investment banking, lending, and asset management divisions.…  Their economies of scale allow institutions to monitor many sources of information.  Finally, institutions employ professionals and technologies with superior information processing skills.").

[43] Skinner Report, ¶ 43.

[44] Mr. Coffman also ignores the fact that a subscription to *The Capitol Forum* provides the user with access to research and analysis that it conducts for *all* companies in *The Capitol Forum* coverage universe, not just specifically for Natera, increasing the value of a subscription to investors, particularly large, sophisticated investors who actively manage portfolios that include multiple securities.

[45] *See CRSP*; *Eikon*.

[46] Note that both analysts were also considered by Mr. Coffman in the Coffman Report.  *See* Coffman Report, Exhibit 4.

[47] Skinner Report, ¶ 43.  As noted in the Skinner Report, one of these analysts indicated that they had received *The Capitol Forum* article from a client, presumably a buy-side investor, indicating that the articles were being circulated.

27.     Mr. Coffman also claims that "[g]iven the obviously explosive content of the Two Capitol Forum Articles,"[48] the lack of "a price response following the release" of those articles "undercut[s] the claim that the Two Capitol Forum Articles were publicly available in the economic sense" because the lack of a price response is "entirely consistent" with the articles *not* being publicly available.[49]  This is irrelevant and misleading; Mr. Coffman again assumes the conclusion he purports to analyze.  If one *assumes* that the articles contained "obviously explosive" content that is value-relevant to investors and so would move Natera's stock price, then, in an efficient market, the absence of a stock price reaction might be evidence that the information was not publicly available.  Here, however, the lack of a price response is "entirely consistent"[50] with the possibility that the content of *The Capitol Forum* Articles was not, in fact, value-relevant to investors, because it did not affect the market's expectations of the Company's future cash flows (i.e., the content of the articles was publicly available but simply not value-relevant).[51]  Indeed, as noted above, I showed in the Skinner Report that when Mr. Coffman asserts that this "explosive" information about Natera's purportedly deceptive practices was disclosed on March 9, 2022, analysts did not revise their forecasts of Natera's revenues (which is also consistent with the allegedly omitted information not being value-relevant).[52]  Furthermore, Mr. Coffman's assertion is inconsistent with the Hindenburg Report, which itself noted that its claims were drawn from "public sources" that Hindenburg "believe[s] to be accurate and reliable," including *The Capitol Forum* Articles.[53]

## V.     Mr. Coffman Fails to Reliably Support His Claim That "New" Information Regarding the Submission of Prior Authorization Requests and Microdeletion Testing Affected Natera's Stock Price on March 9, 2022

28.     Mr. Coffman argues that I do not attempt to demonstrate that *all* of the "information published in the Hindenburg Report that Plaintiffs allege was corrective" was previously reported in *The Capitol Forum* Articles and suggests that this previously unreported information

---

[48] Coffman Reply Report, ¶ 70.
[49] Coffman Reply Report, ¶¶ 62, 70.
[50] Coffman Reply Report, ¶ 70.
[51] *See, e.g.*, Skinner Report, ¶ 26.
[52] Skinner Report, ¶ 59, Exhibits 3a and 3b.
[53] *See* Hindenburg Report, pp. 19, 42, 45; Skinner Report, footnote 66.

caused or contributed to Natera's stock price decline on March 9, 2022.[54]  Specifically, he identifies two pieces of information in the Hindenburg Report that he claims were not previously reported.[55]  However, Mr. Coffman has provided no basis to conclude that these two purportedly new pieces of information (both claims made in the Hindenburg Report) affected Natera's stock price on March 9, 2022.

29.    First, Mr. Coffman discusses claims in the Hindenburg Report that in some instances MGML submitted prior authorization requests after tests had been performed.[56]  Second, Mr. Coffman discusses claims that Natera improperly required physicians to opt out of microdeletion testing, and that testing was not covered by most insurance providers.[57]  However, as I detail below, Mr. Coffman ignores earlier public commentary relating to this information that I summarized in the Skinner Report as well as evidence that securities analysts discussing the Hindenburg Report did not appear to focus on either of these claims.

### A.    Mr. Coffman Fails to Reliably Support His Claim That "New" Information Regarding the Submission of Prior Authorization Requests in the Hindenburg Report Affected Natera's Stock Price

30.    Mr. Coffman claims that "[t]he Hindenburg Report contained valuable information for investors and the market, such as … the improper and potentially illegal relationship that Natera had with MGML" and that "these allegations were not included in the Two Capitol Forum Articles."[58]  To the contrary, as I explained and detailed in the Skinner Report, *The Capitol Forum* Articles in fact make a number of claims that are repeated in the Hindenburg Report regarding Natera's purported relationship with MGML, including Natera's purported reliance on

---

[54] Coffman Reply Report, ¶ 11.  *See also* Coffman Reply Report, ¶ 56 ("[I]nformation contained in the Two Capitol Forum Articles[] did in fact contain new information that impacted the price of Natera Common Stock on March 9, 2022.").

[55] Coffman Reply Report, ¶¶ 58–59.

[56] Coffman Reply Report, ¶ 58 ("Indeed, the Hindenburg Report disclosed for the first time that "'prior authorizations' submitted by MGML were done after the test had already been performed,' which 'set patients up for unexpected out-of-pocket costs as they learn only after the screening whether insurance would have approved coverage.'").  *See also* Complaint, ¶ 135 (emphasis removed) ("Hindenburg also reported based on its sources that MGML would even conduct prior authorizations after a Panorama test was run.").

[57] Coffman Reply Report, ¶ 58 ("Additionally, the Hindenburg Report revealed that:  Natera surreptitiously pushes screening for microdeletions by requiring providers to specifically opt-out of the screen….  Around 75%-80% of Natera's key Panorama screenings include microdeletions, with the company hyping the potential revenue opportunity to investors.  Virtually no payors cover the test.").

[58] Coffman Reply Report, ¶ 61.

MGML for prior authorization requests before and during the Proposed Class Period, a relationship between an MGML official and a former Natera employee, and MGML's purported connection to Natera.[59]

31.     Mr. Coffman further claims "that the Hindenburg Report disclosed for the first time" that MGML submitted prior authorization requests "after the test[s] had already been performed."[60] However, as discussed below, Mr. Coffman's claim that this information affected Natera's stock price is unsupported.  As discussed in the Skinner Report, the Hindenburg Report itself acknowledged that "some payors permit a grace period after a procedure" and stated that Natera had previously disclosed risks related to reimbursement associated with the timing of when the prior authorization is completed.[61]

32.     Mr. Coffman also fails to acknowledge that securities analysts that published reports following the Hindenburg Report largely ignored this claim.[62]  Instead, analyst reports discussed, for example, Natera's use of and relationship with MGML, and noted that "[e]ven if it turns out that there was involvement in the setup of MGML, using MGML's prior authorization services isn't illegal."[63]  Analysts also commented that "[i]mportantly, providing administrative help with the [prior authorization] process, including via assistance of third-party organizations, is common practice in the industry,"[64] and that "the short report incorrectly portrayed third parties which are utilized industry wide."[65]  Furthermore, as explained in the Skinner Report, following the Hindenburg Report, securities analysts commented that they did not expect a valuation impact based on claims in the Hindenburg Report regarding Natera's business practices with respect to Panorama revenues.[66]  For example, Canaccord Genuity analysts stated "the company's fundamentals have not changed due to the emergence of the Hindenburg short

---

[59] Skinner Report, ¶ 42.

[60] Coffman Reply Report, ¶ 58.

[61] Hindenburg Report, p. 45; Skinner Report, ¶¶ 40, 42.

[62] A single report by Piper Sandler on March 21, 2022 mentioned prior authorization requests and noted that "[o]verall, [a former employee] considered MGML and all prior authorization organizations as providing a convenience and facilitating access to a service and saw no ethics issue with what was happening in the industry. The former employee also told us that testing wasn't done until it had been cleared."  "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.

[63] "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022.

[64] "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022.

[65] "Mgmt Feedback Addresses Key Questions Arising from the Short Seller Report," *SVB Leerink*, March 9, 2022.

[66] *See* Skinner Report, ¶¶ 60, 74.

report."[67]   Similarly, Morgan Stanley analysts commented that "we do not see these [allegations] as changing our fundamental view of the company,"[68] and Cowen analysts noted "MGML-related issue[s] (if any) could be resolved quickly and without any major impact to the business."[69]   Consistent with this view, analysts at Baird stated that because "MGML is a relatively small/declining portion of women's health volumes [and] isn't the only vendor NTRA works with," they did not "think future volumes/sales would be impacted if NTRA pivoted away from MGML."[70]

      **B.**      **Mr. Coffman Fails to Reliably Support His Claim That the Allegedly Corrective Information Regarding Natera's Microdeletion Ordering and Billing Practices Was First Disclosed in the Hindenburg Report and Affected Natera's Stock Price**

33.     Mr. Coffman claims that "the Hindenburg Report revealed" that "the order form [] defaulted to including microdeletion testing rarely covered by insurance" and that "these allegations were not included in the Two Capitol Forum Articles."[71]   However, as I explained in the Skinner Report, this information had previously been disclosed by Natera itself and reported on by *The New York Times*, among other sources, and Mr. Coffman's claim that this information affected Natera's stock price is unsupported.

34.     Indeed, well before the Hindenburg Report was published, (i) Natera had previously announced that microdeletion testing "would become standard on Panorama's prenatal panel";[72] (ii) Natera's Panorama order form was available online (at no cost) and used by physicians to prescribe the tests for their patients;[73] (iii) Natera had disclosed that microdeletion testing was

---

[67] "Effective Short Report Rebuttal Via Conference Call; Prior Authorization Concerns Are Overblown; BUY," *Canaccord Genuity*, March 10, 2022.

[68] "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022.

[69] "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022.

[70] "Highlights from Investor Call on Short Report," *Baird*, March 10, 2022. *See also* "Effective Short Report Rebuttal Via Conference Call; Prior Authorization Concerns Are Overblown; BUY," *Canaccord Genuity*, March 10, 2022 ("Overall, it appears clear that Natera's Women's Health business would remain well-positioned for continued solid performance even if its relationship with MGML were to change."); "Natera - My Genome My Life Isn't Over, Natera Is Just Getting Started," *Piper Sandler*, March 10, 2022 (emphasis removed) ("Revenue and growth not expected to be impacted…. MGML works with other companies…. NTRA noted that only a small portion of its total volumes were related to MGML").

[71] Coffman Reply Report, ¶¶ 58, 61.

[72] Skinner Report, ¶ 46.

[73] Skinner Report, ¶ 47. Mr. Coffman states that "[i]t is unlikely that an investor would seek out this medical form in the first place, find the one section listing '22.q.11.2 deletion' among numerous other medical codes, and decipher

rarely reimbursed by insurers;[74] (iv) analysts had commented on low rates of coverage and reimbursement for the microdeletion tests;[75] and (v) *The New York Times* had reported that microdeletion tests were not always covered by insurers.[76]

35.     Moreover, analyst reports published following the Hindenburg Report, including those referenced in the Coffman Reply Report,[77] generally stated that the issues regarding microdeletions raised by the Hindenburg Report were not new and were previously known.  For example, analysts at Canaccord Genuity stated on March 9, 2022 that the discussions about microdeletions are "not necessarily a new debate" and that the "extent of billing violations that the report mentioned are broad but are generally 'old news' with respect to Natera and the NIPT industry."[78]  Morgan Stanley analysts stated "the majority of the points made in the report are known to investors and have been transparently communicated … by management (including … that a majority of microdeletion testing volume is not currently reimbursed)."[79]  Similarly, Mr. Coffman himself also cites to an email from Craig Hallum on March 9, 2022 that states "[t]he report is largely a rehash of billing questions we have heard across the non-invasive prenatal space since NTRA's IPO in 2015 [and the] only piece that was new news is the [MGML] entity which requires further research."[80]

---

that a line reading 'I DO NOT want 22.q.11.2' meant that physicians had to opt out of the costly microdeletion testing rather than opt in."  Coffman Reply Report, ¶ 60.  Mr. Coffman's claims are speculative and unsupported. He does not provide any support or undertake any analysis to show that investors did not have access to or would not access this online form or that they could not "decipher" the information included therein.  Indeed, as discussed above in **Section IV**, institutional investors frequently invest substantial resources to seek out information from a variety of sources.  In an efficient market, as Mr. Coffman claims is the case for Natera common stock, investors will seek out and trade on information, incorporating it into the price, as long as the marginal expected benefits of acting on that information (the profits to be made) exceed the marginal costs.  *See* Fama (1991), p. 1575.  Mr. Coffman provides no support for his assumption that investors would not search for information on the internet generally or the Company's website specifically.

[74] Skinner Report, ¶¶ 48–49 ("[O]n May 6, 2021, Mr. Chapman noted that Natera was 'doing hundreds of thousands of these tests every year that are not [being] reimbursed' and on November 4 of that year, Mr. Brophy stated that 'percent paid rates on [microdeletions] are in that … single-digit percentage kind of range.'").

[75] Skinner Report, ¶ 49 (J.P. Morgan analysts noted that "coverage for the [microdeletion] test remains almost inexistent" while Cowen analysts stated that Natera "gets paid on this 'add-on' testing roughly 5% of the time.").

[76] Skinner Report, ¶ 50.

[77] Coffman Reply Report, ¶ 25.

[78] "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate BUY," *Canaccord Genuity*, March 9, 2022.  *See also* "Thoughts on Short Report," *Baird*, March 9, 2022 ("Microdeletions billing practices.  We don't give this much merit….  Our take:  Base NIPT and microdeletions have two separate codes, so it shouldn't be a surprise that they're billed separately.  We don't think there's much more to say there."); "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022 ("Microdeletion testing was recently featured in a scathing New York Times exposé that reported how high rates of false positives result in tragic consequences.").

[79] "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022.

[80] *See* Coffman Report, ¶ 25; NTRA_0072821–23.

**VI.    Mr. Coffman's Analysis of Natera's Abnormal Stock Price Decline on March 9, 2022 Is Flawed and Unreliable, and Mischaracterizes My Opinions**

36.    I explained in the Skinner Report that there are several reasons Natera's stock price decline on March 9, 2022 cannot be used to reliably infer that the alleged misrepresentations affected Natera's stock price.[81]  In response, the Coffman Reply Report mischaracterizes my opinions, but provides no basis to reject them.

37.    Mr. Coffman states in the Coffman Reply Report that Plaintiffs allege that "Defendants falsely attributed Natera's strong revenue growth to organic demand for Panorama, when in fact it was partly driven by deceptive practices."[82]  As described in the Skinner Report, Plaintiffs allege that the omitted information was revealed by the Hindenburg Report on March 9, 2022, but, inconsistent with what Plaintiffs claim, securities analysts did not lower their revenue estimates in response to this report.[83]  This finding is similarly inconsistent with Mr. Coffman's assertion that Defendants omitted "important, negative, [and] qualifying information"[84] that was value-relevant to investors from statements about the Company's revenue.  In the Coffman Reply Report, Mr. Coffman provides several criticisms in an attempt to undermine this finding, all of which are flawed and misleading and ultimately fail to address that the evidence is inconsistent with his opinion.

38.    Mr. Coffman claims that I examined "only analyst reports within a week of the Hindenburg Report, despite evidence that analysts do not always quickly update their forecasts following a short seller report."[85]  Mr. Coffman is incorrect.  There were at least eight securities analysts that issued reports on March 9, 2022 or March 10, 2022 following the Hindenburg Report, most of which commented that they did not expect a valuation impact based on the claims in the Hindenburg Report regarding the Company's purportedly deceptive business practices.[86]  None of these analysts stated that they expected the Company's Panorama revenues would decline based on claims made in the Hindenburg Report, and none revised their revenue

---

[81] Skinner Report, Section VIII.
[82] Coffman Reply Report, ¶ 16.
[83] Skinner Report, ¶ 59, Exhibits 3a and 3b.
[84] Coffman Reply Report, ¶ 42.
[85] Coffman Reply Report, ¶ 79.
[86] Skinner Report, ¶ 60; Skinner Report, Appendix C.

estimates downward.[87]  Moreover, as I reported in Exhibits 3a and 3b of the Skinner Report, of the 11 analysts that provided estimates of the Company's FY 2022 and FY 2023 revenues, there were no downward revisions.  Directly contradicting Mr. Coffman's mischaracterization of my analysis, this was true not just for one week after the Hindenburg Report, but for approximately *two months* after March 9, 2022 (the single exception is a Piper Sandler report two weeks later, which, as discussed in the Skinner Report, modestly reduced its revenue estimates "taking a conservative approach" to account for possible "reputational damages").[88]  In fact, the securities analysts covering Natera did not revise their forecasts until after the Company's next earnings announcement, on May 5, 2022, when 10 out of 11 contributors *increased* their FY 2022 revenue estimates within three trading days.[89]

39.    Mr. Coffman also fails to reliably support his claim that "it is normal for analysts to be slow to update their forecasts following a short report;" this claim is inconsistent with evidence from the academic literature and evidence in this case.[90]  The academic literature generally finds that securities analysts revise their estimates quickly following significant company news events.  For example, Livnat and Zhang (2012) report that "a significant percentage of analyst forecast

---

[87] Among the 11 securities analysts that issued reports covering Natera that are listed in Exhibits 3a and 3b of the Skinner Report, only Goldman Sachs and J.P. Morgan did not publish reports within a week of the Hindenburg Report.

[88] *See* Skinner Report, Exhibits 3a and 3b.  Exhibit 3a shows no changes through April 30, 2022, and Exhibit 3b shows estimates from March 8, 2022 through May 17, 2022.  Mr. Coffman states that Piper Sandler "did lower its revenue estimates for Natera twelve days after the Hindenburg Report."  Coffman Reply Report, ¶ 81.  In the Skinner Report, I show that Piper Sandler lowered its revenue estimates modestly on March 21, 2022 (by approximately 2% and 3% for FY 2022 and FY 2023, respectively), but attributed the decline to adding "conservatism" to its model to account for possible "reputational damages," rather than to adjusting for any impact to revenue from learning about alleged "deceptive and improper business practices within Natera" as Plaintiffs allege.  *See* "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022; Complaint, ¶ 12.  Indeed, the Piper Sandler analysts noted:  "[W]e've found historically that industry sales reps will aim to take advantage of bad [public relations].  We've spoken to sales reps that will target physicians with negative news articles about their competitors….  Net-net, we're lowering numbers to reflect conservatism in reputational damages and potential distractions."  "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.  While Mr. Coffman claims that "if the relevant truth was revealed earlier, any reputational impacts would have been incorporated into the price reaction earlier as well," and "thus the Piper Sandler forecast change due to reputational damages is in fact relevant to the alleged misstatements and omissions," "bad" public relations may have resulted from the publication of a short-seller report itself, regardless of its contents or accuracy.  *See* Coffman Reply Report, ¶ 81; "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022.

[89] The 11th analyst, Piper Sandler, increased its estimate on May 16, 2022.  *See Eikon.*

[90] Coffman Reply Report, ¶ 81.  Mr. Coffman's quote from Ljungqvist and Qian (2016) that analysts can be "slow to update their recommendations" is taken out of context and misleading, as it is in the context of analyst stock ratings (i.e. recommendations) and not revenue or other financial forecasts, which the authors do not analyze.  *See* Ljungqvist, Alexander, and Wenlan Qian, "How Constraining Are Limits to Arbitrage?," *The Review of Financial Studies* 29, no. 8 (2016): 1975–2028.

revisions are issued promptly after a broad set of corporate public disclosures," including SEC filings and "SEC inquiries, expansions, reorganizations, client announcements, corporate governance, dividends, earnings, M&A transactions, executive/board changes, litigations, labor relations, product announcements, investor relations, and strategic alliances."[91]  The authors find that the majority of analyst reports "refer to a newly released public disclosure that caused the analyst to revise the earnings forecast based on the analysts' interpretation of the disclosure" and that "investors attach even higher value to prompt revisions after non-structured or non-financial corporate information such as M&A announcements or product announcements than other prompt revisions."[92]  Nevertheless, even if it were correct (it is not) that securities analysts "do not always quickly update their forecasts,"[93] in this case securities analysts quickly increased their estimates following the Company's first quarter earnings announcement two months later.[94]

40.    Mr. Coffman also states that I ignored "financial indicators other than revenue following the Hindenburg Report" and that I "[do] not explain why [I] chose to ignore … financial indicators other than revenue."[95]  As an initial matter, I analyzed Natera's revenues because Plaintiffs claim that the alleged misrepresentations created a "misleading impression" regarding Natera's revenues, a characterization also made by Mr. Coffman.[96]  Further, among "financial indicators other than revenue," Mr. Coffman points only to analyst price targets but provides no support for his claims that these price targets are in any way relevant.[97]  Besides the fact that

---

[91] Livnat, Joshua, and Yuan Zhang, "Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More?" *Review of Accounting Studies* 17 (2012): 612–641.  The authors define "promptly" as analyst forecast revisions within three trading days of the public disclosure.

[92] Livnat, Joshua, and Yuan Zhang, "Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More?" *Review of Accounting Studies* 17 (2012): 612–641, p. 614. 632.  Similarly, Altınkılıç, Balashov, and Hansen (2013) state that "[f]orecasts are commonly updated based on significant events and other new public information" and "often follow recent events and news."  Altınkılıç, Oya, Vadim S. Balashov, and Robert S. Hansen, "Are Analysts' Forecasts Informative to the General Public?" *Management Science* 59, no. 11 (2013): 2550–2565.

[93] Coffman Reply Report, ¶ 79.

[94] *See* Skinner Report, Exhibit 3b.

[95] Coffman Reply Report, ¶ 82.

[96] Complaint, ¶ 12.  *See also* Coffman Reply Report, ¶ 79.

[97] *See* Coffman Reply Report, ¶ 82.  Moreover, a target stock price represents an analyst's estimate of what a company's future stock price will be, typically 12 months ahead.  *See* Asquith, Paul, Michael B. Mikhail, and Andrea S. Au, "Information Content of Equity Analyst Reports," *Journal of Financial Economics* 75, no. 2 (2005): 245–282.  Thus, a revision in target stock prices by analysts following changes in the stock price is not unusual and is consistent with findings in the academic literature.  For example, Brav and Lehavy (2003) find that target stock prices are generally higher than current market prices and that analysts revise price targets in response to changes in the current market prices.  *See* Brav, Alon, and Reuven Lehavy, "An Empirical Analysis of Analysts' Target Prices: Short-Term Informativeness and Long-Term Dynamics," *The Journal of Finance* 58, no. 5 (2003): 1933–1967.

Plaintiffs' allegations, as I understand them, relate directly to Natera's revenues, any change in price targets by securities analysts is not inconsistent with the other factors that likely affected Natera's stock price on March 9, 2022, as described below. For example, heightened risks of regulatory actions and possible reputational harm to the Company and/or its management associated with the Hindenburg Report could all cause a securities analyst to revise downward its price target for Natera even as they maintain their revenue forecasts.

41. Mr. Coffman also dismisses other evidence that I put forth to show that one cannot rely on Natera's stock price change on March 9, 2022 to infer that the alleged misrepresentations affected Natera's stock price. In the Skinner Report, I pointed to both the academic literature and to securities analyst commentary to identify several factors[98]—other than the alleged correction of the alleged misrepresentations—that likely affected Natera's stock price on March 9, 2022, including (i) the release of a report by a well-known short seller (i.e., Hindenburg Research); (ii) heightened risk of regulatory and/or legal costs triggered by the Hindenburg Report and claims therein (even if unfounded); (iii) market concerns regarding potential reputational harm to the Company, its products (including Panorama), and/or its management triggered by the Hindenburg Report and claims therein (even if unfounded); and (iv) confounding negative information conveyed by the Hindenburg Report that Plaintiffs do not alleged to be corrective (e.g., Hindenburg's claims about Horizon, among others).

42. Mr. Coffman appears to suggest that these factors are "connected" to Plaintiffs' allegations[99] and argues "they would [not] need to be treated as confounding information," suggesting instead that they are "an expected consequence of the type of misconduct alleged in this matter."[100] Mr. Coffman's claims are misleading and he appears to misunderstand my point

---

[98] In Section VIII.A of the Skinner Report I described why, even absent these other factors, one cannot attribute the price decline on March 9, 2022 to information that Plaintiffs allege as corrective: (i) in an efficient market, the publicly available information about Natera's business practices (including that reported by the Company or in *The New York Times*) would have previously been incorporated into Natera's stock price, and thus, republication of this information in the Hindenburg Report would not have affected Natera's stock price on March 9, 2022; and (ii) securities analysts that followed the Company did not lower their estimates of Natera's future revenues following the release of the Hindenburg Report, inconsistent with Plaintiffs' claims that the alleged misrepresentations created a misleading impression of demand for Panorama and that the truth regarding this demand and its implications for Natera revenues was revealed by the Hindenburg Report.

[99] Coffman Reply Report, ¶ 89 ("For Dr. Skinner to merely suggest, without any analysis or support, that regulatory and legal investigations or reputational harm are somehow disconnected or separate from the alleged corrective disclosures of deceptive business practice, is unfounded."). I note that, contrary to Mr. Coffman's characterization, I did support my opinions, including from securities analyst commentary and academic literature, in the Skinner Report.

[100] Coffman Reply Report, ¶ 89.

on this issue. As discussed in detail in the Skinner Report, academic research shows that the release of a short report by a prominent short seller like Hindenburg Research—independent of the content of that report or the accuracy of the claims made therein—can trigger these consequences and cause a stock price decline.[101]

43.     For example, Mr. Coffman suggests that "regulatory or legal scrutiny and reputational harm [could] be directly caused by the revelation of the truth allegedly concealed (i.e., deceptive and improper billing and business practices)."[102] But Mr. Coffman ignores that these consequences could result directly from the release of a short-seller report, independent of the report's contents, claims, or accuracy. For example, in the Skinner Report, I cited academic research showing that the SEC is more likely to investigate companies with higher visibility and media coverage (the implication being that a short-seller report may trigger SEC interest, again, regardless of its content).[103] I also referenced securities analyst reports that discussed the heightened risk of regulatory and legal actions as a consequence of the Hindenburg Report itself. For example, analysts at Piper Sandler attributed what they described as an "inevitable" "DOJ/OIG investigation" to "the level of attention *alone*."[104]

44.     Mr. Coffman also argues that I did "not empirically evaluate or measure any stock price impact of any of the potential confounding factors."[105] This claim suggests a misunderstanding of my assignment and opinion: I was asked to evaluate "whether Natera's stock price decline on March 9, 2022, after the release of … the Hindenburg Report … can be used to reliably infer that the alleged misrepresentations affected the price of Natera's common stock"[106] and concluded that it cannot, in part because that stock price decline was likely caused, at least in part, by other factors. There was no reason, in assessing that question or reaching that conclusion, to attempt to independently measure the effect of any or all of these factors.

---

[101] *See* Skinner Report, Section VIII.B. Consistent with this, an analyst at Canaccord Genuity noted on March 9, 2022 that "many of the 'points' made by the author [of the Hindenburg Report] are not entirely new information (albeit with a negative spin in the report)," suggesting the release of a report by Hindenburg, a known, prominent short seller, including the negative "spin" contained in its report on Natera, may have itself contributed to the price decline on March 9, 2022. *See* "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate Buy," *Canaccord Genuity*, March 9, 2022.
[102] Coffman Reply Report, ¶ 89.
[103] Skinner Report, ¶ 65.
[104] "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022 (emphasis added).
[105] Coffman Reply Report, ¶ 90.
[106] Skinner Report, ¶ 8 (iii).

45.    Furthermore, in the Skinner Report I identified various developments that occurred after the Proposed Class Period that further support my opinion that one cannot infer that the alleged misrepresentations affected Natera's stock price based on the decline in the Company's stock price on March 9, 2022.  For example, before market open on March 10, 2022, Natera management responded to the Hindenburg Report in a conference call in which they stated, among other things, that they "disagree with the characterization of the services [they] offer to physicians, as well as the law to which the Hindenburg report inaccurately cites," and that they believed there would be "no impact on volume" if the Company could no longer work with MGML.[107]  Following this call, securities analysts generally characterized the Company's response in positive terms[108] and, according to my and Mr. Coffman's event study analysis, the abnormal return on March 10, 2022 was positive and statistically significant.[109]  Mr. Coffman

---

[107] "Natera Special Investor Call in Response to Misleading Short Seller Report," March 10, 2022 ("Natera March 10, 2022 Investor Call").  With respect to MGML, the Company stated (Natera March 10, 2022 Investor Call, emphasis added):

> "There are other companies in the market that offer similar prior authorization services to those offered by MGML, and *if needed, we would be in a position to  cease using MGML with minimal, if any, impact to our business…. We feel strongly that there [would] be no impact on volume.*
>
> *We have no influence over MGML.*  They don't – there's nothing special that they're doing for Natera.  They're not directing traffic to us in any way.  *We don't have any control over their operations.*  So all of those allegations are completely false.
>
> [M]any companies, in fact, hire these employees [to handle prior authorizations] themselves and do the [prior authorization] services themselves.
>
> [Contrary to the implication that] MGML performed prior authorizations on 44% of Natera's volume[,] … [i]n reality, *MGML performed prior authorization services on roughly 11% of our volume in 2021, and we estimate less than 7% of our volumes going forward in 2022.*  The report also implies that Natera is the majority customer of MGML.  That allegation is also not correct.  Based on the volume of prior authorizations represented on MGML's website, we estimate that we make up approximately 25% of MGML's historical volume.
>
> With regards to MGML… we don't believe whether it's a non-profit or not has any implication. …[W]e don't believe whether it's a nonprofit or for-profit has anything to do with whether it's compliant or not."

Moreover, with respect to claims about microdeletion testing and billing, the Company stated (Natera March 10, 2022 Investor Call, emphasis added):

> Our requisition form was designed with expert physician input to accommodate demand for the addition of the single 22q microdeletion…. *We don't think there's any issue with the test order form.*  And as a reminder, every test Natera processes is ordered by a physician or other authorized healthcare provider.  There is no serious dispute about the appropriate CPT code.  The report is simply wrong."

[108] Skinner Report, ¶ 74.  Moreover, a number of securities analysts stated that any expected valuation impact of the Hindenburg Report claims related to Natera's business practices would be smaller than implied by the stock price reaction on March 9, 2022.  *See* Skinner Report, ¶ 77.

[109] Skinner Report, ¶ 75; Coffman Reply Report, Exhibit 1.

ignores that, taken together, these results suggest the stock price decline on March 9, 2022 was likely more negative than would have occurred from an earlier hypothetical disclosure of the alleged relevant truth by the Company, and as such, the price decline on March 9, 2022 cannot be used to infer the price effect of the allegedly omitted information.

46.    Mr. Coffman also states that "the price increase on March 10, 2022 did not fully offset the price decline on March 9, 2022 and the overall price movement from March 9 to March 10, 2022 was still negative, indicating that the market reacted statistically significantly negatively overall to the set of information released over these two days."[110]  However, even if one considers the combined stock price change over March 9, 2022 and March 10, 2022, one still cannot simply infer that the alleged misrepresentations affected Natera's stock price because the price change over that period includes consequences from a short-seller report as described above, independent of the actual contents of that report, as well as the other factors discussed above and in the Skinner Report.[111]

47.    Moreover, I understand that Natera has not faced any regulatory or legal action from any agency related to claims made in the Hindenburg Report and that the Board of Directors initiated an independent investigation into the claims of the Hindenburg Report and found them unfounded.[112]  Mr. Coffman incorrectly claims that this is "irrelevant" because he is "not aware of any requirement … that a company must re-state its financials in order to demonstrate that alleged misstatements and omissions impacted the stock price of the company."[113]  Mr. Coffman again mischaracterizes my opinion.  The point is that this additional evidence further supports that the abnormal stock price decline on March 9, 2022 reflects risks that likely would not have accompanied a hypothetical earlier disclosure of the alleged relevant truth by the Company, which means that the price decline cannot be used to reliably demonstrate that the alleged misrepresentations affected Natera's stock price.

48.    These reasons further support my conclusion that the stock price decline on March 9, 2022 (or over March 9–10, 2022) cannot be used to reliably infer that the alleged misrepresentations regarding Natera's revenues, expected revenue growth, and/or the demand for

---

[110] Coffman Reply Report, ¶ 95.
[111] *See* Skinner Report, Sections VIII.B and VIII.C.
[112] Skinner Report, ¶¶ 79–80.
[113] Coffman Reply Report, ¶ 99.

Panorama tests affected the price of Natera's common stock, notwithstanding the flawed, misleading, and incorrect claims of the Coffman Reply Report.

## VII.    Mr. Coffman Still Fails to Provide a Methodology Capable of Reliably Measuring Class-Wide Damages for Natera Common Stock in a Manner Consistent with Plaintiffs' Theory of Liability

49.    Mr. Coffman claims in the Coffman Reply Report, similar to claims he made in the Coffman Report, that "[c]ontemplating the appropriate methodologies to disaggregate any confounding information is premature, as this is part of a loss causation analysis."[114]  However, he still only offers a generic and formulaic description of the calculation implied by the "out-of-pocket" method without demonstrating whether or how it could actually be used to reliably measure damages attributable to Plaintiffs' claims in this matter.[115]

50.    In the Coffman Reply Report, Mr. Coffman also claims that his "proposed damages methodology is meant to correspond to Plaintiffs' theory of liability and alleged claims" and that the reasons I raised in the Skinner Report for why he failed to articulate a methodology that can reliably measure class-wide damages and artificial inflation "do not correspond to the claims Plaintiffs have asserted, as set forth in the Complaint, and to that extent they are not relevant to [his] assignment [of] proposing a damages methodology."[116]  Mr. Coffman's assessment is flawed and he has continued to fail to propose a damages methodology capable of reliably measuring class-wide damages.

51.    As discussed above, Mr. Coffman's view is that the information published in *The Capitol Forum* Articles was not incorporated into Natera's stock price until it was republished by Hindenburg Research on March 9, 2022.  Even if he is correct, as I explained in the Skinner Report, Mr. Coffman fails to offer a class-wide damages methodology capable of addressing the fact that certain potential class members who received or otherwise were aware of the claims in *The Capitol Forum* Articles would have known some or all of the alleged relevant truth prior to the release of the Hindenburg Report.  Under Mr. Coffman's proposed methodology, investors

---

[114] Coffman Reply Report, ¶ 102.  *See also* Coffman Report, ¶ 84.

[115] *See* Coffman Report, ¶ 81 ("There is a standard and well-accepted method for calculating class wide damages in cases under Section 10(b) of the Exchange Act and Rule 10b-5.  This method [is] typically referred to as the 'out-of-pocket' method."); Coffman Report, ¶¶ 7, 81–86.

[116] Coffman Reply Report, ¶ 105.

who knew some or all of the allegedly omitted truth (i.e., those with access to *The Capitol Forum* Articles and the relevant information reported therein) and investors who did not would be entitled to the same amount of damages. Mr. Coffman still offers no reliable explanation for why it is appropriate to apply a common damages methodology to investors in "the Class as a whole"[117]—that is, to both those who purportedly knew some or all of the alleged relevant truth and those who did not.

52.     Mr. Coffman similarly claims:

> [T]he relevant economic question is whether the price of Natera Common Stock reflected the public information available in the market, rather than whether all market participants had identical information. Not all holders of a company's stock give the same level of attention to information about a company; for any publicly traded company there can be sophisticated investors who comb through every piece of news related to that company and there can also be passive investors who are less focused on that company's news. I am not aware of a requirement to present a damages methodology that would somehow account for every individual investor's slightly different knowledge about a company.[118]

53.     Mr. Coffman again mischaracterizes my opinion. Indeed, if all public information is incorporated into a company's stock price, then no such analysis may be necessary. However, if—as Mr. Coffman suggests here—some or all of the allegedly corrective information was available but not sufficiently widely disseminated to have been incorporated in the stock price, his purported methodology would produce economically nonsensical results. For example, assume that Mr. Coffman is correct that claims in *The Capitol Forum* Articles were not incorporated into Natera's stock price, and consider any investor with access to *The Capitol Forum* Articles who purchased shares of Natera after December 14, 2020 (the day the second such article was published) but before the Hindenburg Report was released. Mr. Coffman's contention is that the market value of Natera's stock at the time of purchase was inflated by the alleged misstatements (including because the relevant truth had not been sufficiently "widely disseminated" to have been incorporated in the stock price). Under Mr. Coffman's purported methodology, that investor, who knew the allegedly corrective information that was reported by

---

[117] Coffman Reply Report, ¶¶ 104, 106.
[118] Coffman Reply Report, ¶ 104.

*The Capitol Forum*, would be entitled to the same damages as an investor who made the same purchase but did *not* know the allegedly corrective information.[119]

Submitted on October 25, 2024

_____
                    Douglas J. Skinner, Ph.D.

---

[119] Furthermore, as discussed in the Skinner Report, the stock price movement that followed the release of the Hindenburg Report cannot reliably serve as a measure of inflation absent additional analysis, which Mr. Coffman has not performed. *See* Skinner Report, ¶ 85. Although Mr. Coffman asserts that the abnormal return could be adjusted to reflect the stock price effects of "non-fraud related information (i.e., 'confounding information')," he provides no details of how one could actually make such an adjustment—particularly in light of the fact that, as noted in **Section VI** above, securities analysts did not reduce their prior estimates of Natera revenues following the allegedly corrective information despite Plaintiffs' claims that the alleged misrepresentations created a "misleading impression" regarding Natera's revenue growth. *See* Coffman Report, ¶ 84.

**Appendix A**

# Documents Considered List

## Academic Articles

- Altınkılıç, Oya, Vadim S. Balashov, and Robert S. Hansen, "Are Analysts' Forecasts Informative to the General Public?" *Management Science* 59, no. 11 (2013): 2550–2565

- Asquith, Paul, Michael B. Mikhail, and Andrea S. Au, "Information Content of Equity Analyst Reports," *Journal of Financial Economics* 75, no. 2 (2005): 245–282

- Baker, Scott R., et al., "The Unprecedented Stock Market Reaction to COVID-19," *The Review of Asset Pricing Studies* 10, no. 4 (2020): 742–758

- Brav, Alon, and Reuven Lehavy, "An Empirical Analysis of Analysts' Target Prices: Short-Term Informativeness and Long-Term Dynamics," *The Journal of Finance* 58, no. 5 (2003): 1933–1967

- Döttling, Robin, and Sehoon Kim, "Sustainability Preferences Under Stress: Evidence from COVID-19," *Journal of Financial and Quantitative Analysis* 59, no. 2 (2024): 435–473

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5 (1991): 1575–1617

- Hendershott, Terrence, Dmitry Livdan, and Norman Schürhoff, "Are Institutions Informed About News?" *Journal of Financial Economics* 117, no. 2 (2015): 249–287

- John, Kose, and Jingrui Li, "COVID-19, Volatility Dynamics, and Sentiment Trading," *Journal of Banking & Finance* 133 (2021): 106162

- Livnat, Joshua, and Yuan Zhang, "Information Interpretation or Information Discovery: Which Role of Analysts Do Investors Value More?" *Review of Accounting Studies* 17 (2012): 612–641

- Ljungqvist, Alexander, and Wenlan Qian, "How Constraining Are Limits to Arbitrage?" *The Review of Financial Studies* 29, no. 8 (2016): 1975–2028

- Pástor, Ľuboš, and M. Blair Vorsatz, "Mutual Fund Performance and Flows During the COVID-19 Crisis," *The Review of Asset Pricing Studies* 10, no. 4 (2020): 791–833

## Analyst Reports

- "4Q19 Above Expectations & Conservative 2020 Guidance," *Piper Sandler*, February 26, 2020

**Appendix A**

- "Sets Attractive 2020 Outlook," *Baird*, February 26, 2020

- "Mgmt Feedback Addresses Key Questions Arising from the Short Seller Report," *SVB Leerink,* March 9, 2022

- "Taking Some Air Out of Hindenburg Short Report; Share Weakness Appears Overdone; Reiterate BUY," *Canaccord Genuity*, March 9, 2022

- "Thoughts on Short Report," *Baird*, March 9, 2022

- "Buy the Dip; Short Report Concerns Likely Overblown," *Morgan Stanley*, March 10, 2022

- "Effective Short Report Rebuttal Via Conference Call; Prior Authorization Concerns Are Overblown; BUY," *Canaccord Genuity*, March 10, 2022

- "Highlights from Investor Call on Short Report," *Baird*, March 10, 2022

- "Natera - My Genome My Life Isn't Over, Natera Is Just Getting Started," *Piper Sandler*, March 10, 2022

- "Short Report Weakness Overblown; Reiterate Outperform Following Business Update," *Cowen*, March 10, 2022

- "Natera: Stock Trading Near Worst Case, Checks Suggest Modest Impacts," *Piper Sandler*, March 21, 2022

- Analyst reports covering Natera that were published from February 26, 2020 through April 30, 2022 and available from counsel, Eikon, or S&P Capital IQ

**Data**

- Center for Research in Security Prices (CRSP)

- Eikon

**Depositions**

- Deposition of Chad Coffman, CFA, dated July 19, 2024

- Deposition of Douglas J. Skinner, Ph.D., dated September 13, 2024

**Investor Presentation Transcripts**

- "Natera Special Investor Call in Response to Misleading Short Seller Report," March 10, 2022

**Appendix A**

**Expert Reports**

- Expert Report of Chad Coffman, CFA, dated June 4, 2024, including all documents cited therein and backup materials

- Expert Report of Douglas J. Skinner, Ph.D., dated August 16, 2024, including all documents cited therein and backup materials

- Expert Reply Report of Chad Coffman, CFA, dated October 4, 2024, including all documents cited therein and backup materials

**Legal Documents and Pleadings**

- Amended Class Action Complaint for Violations of the Federal Securities Laws, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-LY, October 7, 2022

- Plaintiffs' Opposition to the Natera Defendants' Motion for Judgment on the Pleadings, *In re Natera, Inc. Securities Litigation*, Case No. 1:22-cv-00398-DAE, June 21, 2024

**Produced Documents**

- NTRA_0072821–23

**Public Press**

- "Natera: Company Uses Third Party Non-Profit to Increase Likelihood of Insurance Reimbursement; Non-Profit Has Limited Paper Trail, Close Connections with Natera," *The Capitol Forum*, July 1, 2020

- "Natera: Charity Apparently Established to Process Insurance Prior Authorizations has Close Ties to Former Senior VP of Natera," *The Capitol Forum*, December 14, 2020

- "When They Warn of Rare Disorders, These Prenatal Tests Are Usually Wrong," *The New York Times*, January 1, 2022

- "Natera: Pioneers in Deceptive Medical Billing," *Hindenburg Research*, March 9, 2022

**In addition to the documents on this list, I considered all documents and data cited and referenced in my report, appendices, and exhibits to form my opinions.**