**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

JOHN HARVEY SCHNEIDER, *Individually* ) AU:22-CV-00398-DAE
*and on Behalf of All Others Similarly* )
*Situated*, KEY WEST POLICE & FIRE    )
PENSION FUND, UNIVERSITY OF PUERTO    )
RICO RETIREMENT SYSTEM, BRITISH       )
AIRWAYS PENSION TRUSTEES LIMITED,     )
                                      )
    plaintiffs,                       )
                                      )
v.                                    ) AUSTIN, TEXAS
                                      )
NATERA, INC., STEVE CHAPMAN,          )
MICHAEL BROPHY, MATTHEW RABINOWITZ,   )
RAMESH HARIHARAN, SVB LEERINK LLC,    )
ROY BAYNES, *C/O Natera Inc*., MONICA )
BERTAGNOLLI, *C/O Natera Inc*, JONATHAN )
SHEENA, *C/O Natera Inc*., ROW CHAPMAN, )
*C/O Natera Inc*., HERM ROSENMAN, *C/O* )
*Natera Inc*., ROBERT W. BAIRD, *C/O*   )
*Natera Inc*., MORGAN STANLEY & CO. LLC,)
GAIL MARCUS, *C/O Natera Inc*., JAMES I.)
HEALY, GOLDMAN SACHS & CO. LLC,       )
CRAIG-HALLUM CAPITAL GROUP LLC, TODD  )
CAZZENS, COWEN AND COMPANY LLC,       )
BTIG LLC, ROELOF F. BOTHA, *C/O Natera* )
*Inc*., PAUL R. BILINGS, ROBERT W.      )
BAIRD CO. INC,                        )
                                      )
    Defendants.                       ) NOVEMBER 19, 2024

        ***************************************************
        TRANSCRIPT OF HEARING ON MOTION TO CERTIFY CLASS
            BEFORE THE HONORABLE DUSTIN M. HOWELL
        ***************************************************


FOR THE PLAINTIFFS:   JOSHUA E. D'ANCONA
                      KESSLER TOPAZ MELTZER & CHECK, LLP
                      280 KING OF PRUSSIA ROAD
                      RADNOR, PENNSYLVANIA 19087

                      JEFFREY JOHN ANGELOVICH
                      NIX PATTERSON LLP
                      3600 N. CAPITAL OF TEXAS HWY, SUITE B350
                      AUSTIN, TEXAS 78722

                              JESSE L. JENSEN
                              BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP
                              1251 AVENUE OF THE AMERICAS, 44TH FLOOR
                              NEW YORK, NEW YORK 10020

FOR THE DEFENDANTS:   CHRISTINA L. COSTLEY
                      KATTEN MUCHIN ROSENMAN LLP
                      2121 AVENUE OF THE STAR, SUITE 1100
                      LOS ANGELES, CALIFORNIA 90067-5010

                      TED A. HUFFMAN
                      KATTEN MUCHIN ROSENMAN LLP
                      2121 NORTH PEARL STREET, SUITE 1100
                      DALLAS, TEXAS 75201

                      THOMAS ARTAKI
                      KATTEN MUCHIN ROSENMAN LLP
                      50 ROCKEFELLER PLAZA
                      NEW YORK, NEW YORK 10020

                      DANNY S. ASHBY
                      O'MELVENY & MYERS LLP
                      2801 NORTH HARWOOD STREET, SUITE 1600
                      DALLAS, TEXAS 75201-2692

TRANSCRIBER:          ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by electronic sound recording, transcript

produced by computer.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

(Proceedings began at 10:02 a.m.)

THE CLERK:  Now calling Case Number 1:22-CV-398, *John Harvey Schneider, et al. v. Natera.*

This is a Motion to Certify Class Hearing.

THE COURT:  Good morning.  If you'll give me just a second here to get set up at the bench, we can get started.

Okay.  So I'll introduce you to my team here, and then I'll have you introduce yourselves on the record.  So Natasha Martinez here is a courtroom deputy in San Antonio who has come up to help us with today's hearing.  And Natalie Bayer is my law clerk who is helping me with this class, recently graduated from University of Texas Law School and newly sworn into the Bar as of about a month ago.

Counsel, why don't you introduce yourselves and who you represent, starting with the plaintiff.

MR. D'ANCONA:  Thank you, Your Honor. Joshua D'Ancona from Kessler Topaz Meltzer & Check on behalf of lead plaintiffs and the class.  And I'm joined by our local counsel Jeff Angelovich from Nix Patterson and Jesse Jensen from Bernstein Litowitz, also on behalf of lead plaintiffs in the class.

MR. JENSEN:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. COSTLEY:  Good morning Your Honor. Christina Costley, Katten Muchin, here on behalf of the Natera defendants.  And I will allow my colleagues to introduce themselves.

MR. ARTAKI:  Good morning, Your Honor. Thomas Artaki from Katten Muchin Rosenman on behalf of the Natera defendants.

THE COURT:  Good morning.

MR. HUFFMAN:  And Ted Huffman, also Katten Muchin Rosenman, on behalf of the Natera defendants.

MR. ASHBY:  Good morning, Your Honor.  Danny Ashby on behalf of the underwriter defendant.

THE COURT:  Good morning.  So we've set today's hearing for a total of three hours, so I'd like to set a time limit up front just to make sure that -- I find that it focuses the arguments if we have a clock ticking.  I'm not going to keep time down to the second, but I think 90 minutes should be plenty for both sides.

I set these hearings to give the parties an opportunity to offer evidence if they wish.  I don't see any witnesses that are being called.  Are we going forward on the record with the attachments, or is there anything with respect to the record that we need to address up front?

MR. D'ANCONA:  I don't believe there's anything

we need to address up front, Your Honor.

THE COURT:  Okay.

MS. COSTLEY:  I agree.  Thank you, Your Honor.

THE COURT:  Very good.  Then one of the main impressions I have is the effect of this --these type of *Capitol Forum* articles, and should they be considered as widely disseminated enough to have been factored into the stock price.  And, if so or if not, to what extent factors other than the Hindenburg report affect -- led to that backend stock price.  I think those are kind of the -- or stock change.  I think those are the biggest questions in my mind as I approach this.

Obviously, there are a lot of factors that have to be addressed in connection with the decision to certify class, but those seem to be the lead issues.  And I do have questions for counsel, but I'll just kind of pose those along the way.  And so I guess with that, I'll turn it over to the plaintiffs.

MR. D'ANCONA:  Thank you, Your Honor.

Joshua D'Ancona on behalf of lead plaintiffs in the class.  I hope and expect I will not use all of the 90 minutes here today.  I'll be as efficient as possible, but I do have several points to cover and I will work quickly through those that are not those that Your Honor just highlighted, but I will touch upon them

briefly.  And I would like to reserve any remaining time I may have for rebuttal.

THE COURT:  Yes.

MR. D'ANCONA:  Just to start, I'll note that several things are not contested in the certification motion.  So -- commonality, numerosity, superiority, the efficiency of the market for Natera stock during the class period, these are all uncontested at this stage.  And if Your Honor has no questions on those, I'll just move on.

Okay.  Now I will turn to the issues that are teed up in Defendants' option brief and addressed in our reply and then their sur-reply.

These are, in order, adequacy and typicality, which Defendants attack under a market timing argument; predominance, where Defendants try to rebut the basic presumption of reliance by proving no price impact; the appropriateness of our damages methodology; and the Plaintiffs' standings -- standing, rather, to bring the Securities Act claims.

And this last point, Your Honor, will be addressed by my colleague, Mr. Jensen.

THE COURT:  Okay.

MR. D'ANCONA:  Very quickly on market timing, Your Honor, I think it's notable here that this argument

goes to typicality and adequacy. These are points under the Rule 23 analysis that courts universally recognize are not hard to prove. Defendants turn these inquiries into an extreme test of the viability of Plaintiffs' claims, and this is unprecedented.

They have no support in any case law. And that's what jumps up from their argument, Your Honor. They cite no case where a court found a failure of market timing precluded the application of the basic presumption of reliance or precluded a finding of typicality and adequacy. And they cite no case where a court does what they're asking Your Honor to do, which is find that such a failure at the class certification stage, based on contested materiality facts, calls for a dispositive ruling, eliminating much of the class, eliminating the Plaintiffs' claims, altogether.

These are great lawyers from top law firms. And if they had any cases on that point, no doubt they would have put them before Your Honor. So what we have is a request for an impermissible merits decision that's dispositive of Plaintiffs' claims, and it should be rejected.

And to be sure, Your Honor, in the *Goldman* decision, the Supreme Court, analyzing price impact arguments, said materiality considerations were fair

game.  But that was an exception and a carve-out to the basic rule established in the *Basic* case in *Amgen*, that materiality is a merits decision that is all up or all down for the class, and it is not to be proved and not to be assessed at class certification.

The *Goldman* court said the evaluation of materiality must not extend beyond the price impact inquiry and that courts must, quote, resist the temptations to rule on merits matters of materiality at this stage.

But that's what Defendants' arguments at the market timing stage do.  They go directly to core merits arguments, dispositive merits arguments, about materiality in this case.  And they don't get to do that here.  All the cases they cite, Your Honor, actually show what the real burden and what the real evidence the Court consider market timing is.  And that's the allegations in combination with the plaintiffs' trades.

So the *Signet* case that they cite in their sur-reply, the *Apache* case that they cite in their sur-reply, in those cases the courts look at the question of market timing and typicality based on the allegations of the definition of the class period and the plaintiffs' trades.  And there's other cases such as *Rougier v. Applied Optoelectronics*, *Pearlstein v. Blackberry*, where

you see the exact same thing. Those are the points and the evidence that the courts look to to determine market timing.

That's what all of the cases do in this area. So the relevant facts under this area are covered in our motion for class certification and our trades. We have what we need to establish adequacy and typicality and market timing and to avail ourselves of the basic presumption of reliance. We believe we've satisfied those questions.

Your Honor, if Your Honor has any questions, I'd be pleased to try to answer. Otherwise, I'll move into price impact.

THE COURT: You can move on to price impact.

MR. D'ANCONA: Thank you. So that brings us to predominance and the price impact arguments.

We've shown all of the *prima facie* requirements for the *Basic* presumption of reliance, and defendants now claim that they can rebut it. And to do that they have to prove that there was no price impact in connection with the alleged misstatements and the corrective disclosure that relates to those misstatements. It's the front end and the back end. And they have to do that by a preponderance of the evidence under the *Goldman* decision of the Supreme Court.

As *Goldman* stated, that means it's Defendants' burden to, in fact, sever the link with evidence between the misrepresentations and the price paid.  Merely showing a non-fraudulent cause for some of the price effect in question is not good enough.

THE COURT:  That's a question that arose in my mind, is they attribute this change in the stock price to news of short sellers getting into this market, and that's why you see this precipitous drop.  And that the price already reflected what was disclosed in the Hindenburg report because the Hindenburg report just regurgitated information that *The Capitol Forum* had already disclosed to the market participants two years before.

Is it their burden to prove -- for them to be right on this issue with respect to the short seller explanation for the drop in the stock price, how conclusive does that argument have to be?  I mean, do they have to basically say that is the only explanation?  Or if there is a mixed explanation, maybe this Hindenburg report did have some effect on the market but also this news of short sellers getting in, if it's a mix, I mean, then do you prevail?  Or how -- how does that rebutting of the presumption work, mechanically.

MR. D'ANCONA:  If they only show some

explanation for some of the -- of the stock price movement at the end, we prevail.  They have to show no price impact.  And case after case articulates it that way.  But the idea of showing that showing just some of an explanation is not enough, that's straight from the *Goldman* decision in the Supreme Court.

But if Your Honor looks, for example, at the *Cabot* decision by Judge Rosenthal in Houston from last year, the standard there was they have to prove no price impact.  And, in fact, Your Honor, in that case when defendants put forth an argument that Your Honor found persuasive to explain some of the price impact on one of the alleged corrective disclosures, the judge said:  I credit that.  But, nevertheless, it's not enough.  You have to exclude the alleged cause that Plaintiffs have claimed here for the stock price drop.  And you have not excluded that; and, therefore, you have not disproved price impact, which is the burden in question.

So case after case finds that.

There is also, Your Honor -- were you about to ask a question?  I apologize.

THE COURT:  No.  You have a good sense for that, though.  Not everybody does.  The -- and is it only -- I mean, the defendants will get a chance to correct my misimpression if I'm wrong here.  But, it

really comes down to whether this *Capitol Forum* article or report is already factored into the price, right, in that the market price at that time reflected everything that was -- that was disclosed correctively in the Hindenburg report?

MR. D'ANCONA:  That's what Defendants' expert contends.  That's their argument.  Our argument and our claim is not that at all.  Our argument and claim is that the Hindenburg report was the corrective disclosure, was the moment when the market apprehended the information that corrected the alleged fraud here.

And, again, we're not at the point of needing to prove falsity, needing to prove materiality, needing to prove loss causation.  But this is our claim, that it was the publication of the Hindenburg report disclosing myriad points of information about this MGML prior authorization entity, microdeletions information, and so forth.  That was the corrective moment of this fraud.

And that the *Capital Forum* reports, while they existed before, as Your Honor articulated a moment ago, they were not sufficiently in the -- in the marketplace because either behind this high pay wall.  They're subscription only.  This is a confidential, I believe, redacted point in the briefing, but no one else is here, as I understand it.  They had a tiny number of

subscribers who were even permitted to access and use that information which was highly restricted.

There's no market reaction at all from anybody of any of the economic sources that the expert admitted on their side that he would look to, to see if that information had entered the market.  There's none of that showing that that did enter the market.

So I would like to break down the evidence on both sides about whether that was in the market previously or not, but that's certainly Defendants' argument, that it was in the market; and, therefore, Hindenburg had to be -- the reaction to the Hindenburg report, Your Honor, had to be based on some other information.

Now, the most important point there, I think, if I could say nothing else today, it would be this: Their expert admitted freely and repeatedly that he did not believe and he did not find that all of the information that was disclosed in the Hindenburg report about MGML and about Plaintiffs' alleged corrective disclosures was covered in *Capital Forum.*

THE COURT:  That was going to be my next question, right.

MR. D'ANCONA:  So there's a gap.

THE COURT:  It only truly would -- could be

dismissed as regurgitating the Hindenburg report, that is, if -- if there was no new information in that report as compared to the *Capital Forum* report, right?  And that's assuming that the *Capital Forum* report were widely distributed enough to -- to be considered having already been factored into the market price, right?

MR. D'ANCONA:  That's exactly right, Your Honor.  And there are cases to that effect in our brief.  One is called *Energy Transfer*, and that's a case where -- another one in Defendants' briefing is called *Ramirez v. Exxon*.  *FirstEnergy Transfer* is one where the defendants argue that information had been previously disclosed such that the alleged later corrective disclosure couldn't have been corrective because of bad information.  It had to be something else.  They actually had an expert opinion who was opining about that, unlike Defendants here who say it didn't.  All of this information was not out before.

But the court found, nevertheless, that the subsequent disclosure contained new pieces of information.  It was later in time, and that was significant.  The timing was significant, that things had potentially changed and so forth.  There were factors that made it different.  It was not a one-to-one.  There were gaps, as there are here, admittedly, gaps between

the prior supposed disclosure the defendants were pointing to and the ultimate alleged corrective disclosure that made them different pieces of information.  And those gaps are here as well, and they preclude a finding of no price impact at the back end.

As for the question of -- as for the question of whether the *Capital Forum* reports were on the market, I mentioned a moment ago a case called *Ramirez v. Exxon*. That's interesting for both the question of the gaps between the prior disclosure and the alleged corrective disclosure and also for the idea of whether information was widely disseminated on the market.

In the *Ramirez* case, which is one Defendants actually rely on quite a bit, the court did find that some of the backend alleged disclosures did not have price impact associated with them.  But then he got to -- and this was up in the Northern District of Texas.  The court reached an October 2016 disclosure, and said this is where Defendants have problems.

Defendants argue that that disclosure -- and it was an Exxon disclosure about issues at certain energy plays up in Canada.  The defendants said that disclosure, the important information in that, well, that had come out previously.  That was previously available to people who knew how to look for it and to people who had access

to that information.  But it was out there.  Exxon just announced it to the market on their earnings call, so it was a bigger splash.  But it was out before.

And the court said:  First of all, evaluating the information -- evaluating the evidence that the parties put forth, we see analysts' reaction at the time of Exxon's disclosure, analysts whose job it is to follow this company and know all the information about it, crunch their numbers, come up with their earnings estimates and their price targets and make their recommendations to their targets.  That's their job.

These guys reacted at the time of Exxon's disclosure.  They hadn't mentioned it before.  So that reaction when this information came out, by the analysts who are professional in this business, that mattered to the court.

The court also said, Well, it doesn't make sense.  If this information caused this big reaction when it was received at the end, if it had come out earlier, you would look for that kind of reaction then.  You would look for some reaction in the market price or in the market -- people covering the stock earlier in time.  But we don't have that in *Exxon*.  We don't have that here, Your Honor.

THE COURT:  So a thought that occurs to me is

markets are highly complex, with countless variables factoring into any given company's stock price.  And any given disclosure, it doesn't happen in a vacuum.  On the day that *The Capitol Forum* report's release -- that those reports were released or the day that the Hindenburg report released, there are a lot of other things going on that affect the company's stock price, right?  So how do you account for that and isolate that, I mean, at this stage?

MR. D'ANCONA:  Yes, Your Honor.  And that is precisely the function of the event studies that both experts performed here.  Both experts performed event studies which are meant to compare the expected movement of Natera's stock price in this case in terms of what would be predicted based on an industry index of its peers and then also a broader market index.  The expected price movements on given days and then abnormal price movements are called out in that event study.  Abnormal go beyond what would be expected.

And when there are abnormal price movements in combination with disclosures of possibly new information related to the company, well, then the experts look into that and they say:  Can I assign -- do I assign some potential causative relationship between that information and the price movement?  So they look to see if the

direction -- the directionality question is consistent. This was good news. Did the stock price go up or did it go down? They explore it.

Now, a lot of that, Your Honor, is an analysis that happens at the loss causation stage. But both experts here did an expert -- I'm sorry -- did an event study. And the purpose of that is to isolate unusual company stock price movements versus what would be expected given factors that were affecting the industry broadly, the economy broadly, politics, regulation, all the rest, that's meant to come out in the wash in the event study. And if it's industry specific, it won't show up on the event study, but if it's company specific, it should.

And that's where this threshold of statistical significance comes into play. When there's statistical significance associated with a disclosure of information on the day or the following day, depending on the timing, well, that's a signal. It doesn't prove it conclusively, but it's a very strong signal suggesting that there was some association between a release of information and that particular stock price movement.

And so we look at the statistical significance here. And, of course, Your Honor, taking that point for a moment, at the back end and also at the front end,

which I would like to address briefly after we work through the back end, we have clear statistically significant stock price movements on the dates in question which we argue are in reaction to the disclosures of the information that were related to the fraud.

Now there, again, we don't need to show -- we don't have a burden with respect to price movement.  The burden is clearly theirs under all the precedence, starting with *Goldman Sachs* at the Supreme Court.  But, in any event, we do show that there are these statistically significant stock price movements in response or in the follow-on to the disclosure of the information that we point to.

And with respect to the Hindenburg report, we see a 39 percent abnormal negative return.  Around the time of *The Capitol Forum* reports, there's some 100 subscribers behind the 25-, 30,000 -- $25,000 pay wall, no evidence of anybody remarking on it, any analyst, any news, nothing in Factiva, nothing in the press, nothing on Seeking Alpha, and nothing on the Internet, nowhere.

Their expert looked, and he admitted again and again he found no mention of it at any time during the class period.  And this is textbook economic evidence that economists look to see whether something is on the

market.  He found none of that.  His opinion for why it was on the market was purely theoretical, as I'll get to in a moment.

But returning to the Hindenburg report, 39 percent negative abnormal return.  And the analysts at that time are saying -- unlike earlier when *The Capitol Forum* comes out the analysts -- Piper Sandler says:  Some of this stuff we've seen before.  The MGML allegations from Hindenburg, that's novel.  That's more novel.

Craig-Hallum -- and this is one of our experts -- they said a lot of this stuff we've seen before.  The MGML, that's new news.  You've got the analysts, again, whose job it is to know what is out there about this company.  And they're calling this stuff new, and that's coinciding with the stock price movement of negative 39 percent which wipes out a massive amount of shareholder value.

THE COURT:  And these are analysts saying this contemporaneously, not --

MR. D'ANCONA:  Yes.

THE COURT:  -- at the --

MR. D'ANCONA:  Yeah.  Those are both on March 9th.  Those are both on the same day of the disclosure.  On March the 10th, Piper Sandler comes out with their follow-on report after we see the company's

reaction, which itself is -- is evidence that this was new information.

The company calls a special share -- a special investor call for 7:00 a.m. the next morning.  And they get on the phone with the analysts who cover them and they answer questions.  And this is cited in our expert report.  I actually brought a copy of this, which I'd be happy to pass up for judicial notice if -- if Your Honor likes and if counsel don't object.  But I can take care of that at the end.  But, in any event, just to see what was said on the call, not for -- not for the truth of anything, of course.

But what you see on the call is that, I think it's seven out of eight or eight out of nine of the analysts, they each get one question.  And each one of them asks a question:  What's going on with MGML?  What was your reliance on MGML?  What about this with MGML?  It says MGML submitted prior authorizations after the tests were run.  That's not how it's supposed to work, is it?  What about that claim?

The analysts used their precious time with this company on this release that defendants say was all about all this different stuff and the stock price was reacting to all these different things.  They asked questions about what we said was the corrective part of this

disclosure.

So that's salient economic evidence. It's really kind of textbook economic evidence of what caused this stock price to move. And we cite a number of cases in our brief, and this is at our reply at 4 and 5 and 10. There's a number of cases, and there's many more -- we had tight page limits -- that find that that type of connection is really tough to overcome for Defendants in trying to prove no price impact. It basically overcomes any effort to prove an absence of price impact. It's evidence of price impact.

Now, I wanted to return to the *Ramirez* case with respect to the argument about whether *The Capitol Forum* was on the market, because that's an important argument for defendants. Kind of everything for them hinges on the idea that *The Capitol Forum* was on the market, so Hindenburg had to be something else -- the Hindenburg reaction had to be something else.

And we've run through the fact that nobody remarked on *The Capitol Forum* articles when they came out who would be expected to, and who economists would ordinarily look to, to see if there was something on the market or not.

What the *Ramirez* court looked to was, similarly, no reaction from analysts, no reaction in the

stock price, which would be expected.  In that case, unlike here, the defendant's expert actually had a proposed explanation for the stock price movement in question.  But the court said:  I don't think that that answers fully why the stock price moved on this day.  I'm not persuaded that that covers all of it.  I believe that the defendant's expert said it didn't necessarily cover all of it, as here.

And then, finally, the court said:  But even if I take you as -- as correct, that this information was technically available somewhere, through some source for people who knew how to access it, I am not persuaded -- and I'm paraphrasing here; I have the language.  But it's in the *Ramirez* case in the discussion of the October 2016 disclosure.

The court said that he is not persuaded that the information was sufficiently widely disseminated to have entered the market to a degree to affect the total mix of information.  So it's not enough to just say, hey, that existed somewhere in, as Your Honor said, this wide-wide realm of information in the world today.  You need to show that it entered the stream of information to a sufficient degree.

And that's exactly what the *Ramirez* court found and held, and it found that it was not previously

disclosed and found a failure to disprove price impact. And I think it's really on all fours with what we have here. It's a very similar factual situation, and I think a similar ruling would -- would be appropriate here.

THE COURT: One of the I think responses to this argument of, well, *Capitol Forum* has a small number of subscribers, it's behind a pay wall, it has an enormous subscription rate is, on the one hand, yes, 90-plus percent of the stock owned -- Natera stock is held by non-out -- non-insiders. But a lot of those are -- big chunks of those are my institutional investors, and that's who makes up this small pool of subscribers to *The Capitol Forum.*

And so while the number -- and I know it's under seal, so I'm not going to say it here. But if the number of subscribers to *The Capitol Forum* looks something, if you were to look at the individual people who are subscribers, they might indeed represent an influential number of the stockholders or people who provide information to the folks who are the stockholders.

MR. D'ANCONA: What we have on that point, Your Honor, is, well -- well, what we have on that point, Your Honor, is very limited and very circumstantial evidence. I think the fact is what it is, in their

declaration that they identified one institutional investor and said that they -- they referenced generically that they had some others.  We see certain emails which I want to get into in a minute that Defendants put in.

But we -- what we don't have in this record -- and, again, it comes down to the evidence and the proofs in each case, the proofs that are in the record here. What we don't have in this record is any of those institutional investors, any proof of any of those investors, actually accessing or possessing one of these reports.

Now, the fact that I have a subscription to something doesn't mean that I'm using it.  I mean, I think it's probably fair to say I have a great number of subscriptions that I haven't used in a long time and that I'm still paying for.  I think that's just a matter of course in life.  The fact that I have a subscription doesn't mean that I've accessed, and beyond that what really matters here, utilized and traded on information in a particular report at a particular point in time based on that subscription.  That's a leap that Defendants' expert takes here.

But he admitted when we just worked through it, Your Honor, that he had in evidence of anybody actually

trading on, even accessing and obtaining, either of the two *Capitol Forum* reports that really matter here. One's in July and one's in December of 2020.

He had an email where *Capitol Forum* sent a marketing email to a market participant saying here's our latest report. It concerns Natera. We have concerns about MGML, so forth and so on. It had a snippet of the report. But he admitted in his deposition the report was 10 pages long, the email was a few lines. It was maybe one page. There's no argument that everything in the report was in that marketing email. There's no evidence at all, most importantly, that anybody actually possessed that.

Now, I'm not asking Your Honor to make a finding that nobody did. I can't -- I can't prove that nobody did, but they can't prove that anybody did.

THE COURT: And I don't have to reach that conclusion --

MR. D'ANCONA: Right.

THE COURT: -- to agree with you, right?

MR. D'ANCONA: It's just -- it's just a balancing of the evidence. So they have those emails suggesting that some people knew that these reports existed. We have no evidence of actually anybody obtaining those reports that they're pointing to. We

have the fact that there's this tiny number of subscribers, but some of them are institutional investors.  That's fine.  So be it.

We have no evidence that any of those people actually accessed the reports in question, which is what matters here.  It doesn't matter if they had a report on somebody else or they had a subscription that allowed them to access information on some other company.  That would be completely irrelevant.

I mean, I think if we were thinking about this in terms of the courtroom, this evidence would -- might come in, but it would be -- it would be not very probative of the fact that somebody actually had this information and, more importantly, traded on it.

So what Defendants' expert says and what he admitted in his deposition is that he assumes that, because these reports existed and because there was some awareness at some level, a non-zero level, of their existence in the marketplace, the market is efficient and that's how the efficient market works.

It was a theoretical -- based on the proposition of the existence of these reports, it's this sort of theoretical-based opinion that the market -- that market efficiency works so cleanly that I just -- this was in the market, therefore, investors had it,

therefore, it was impounded into the stock price.

But there's a leap there that the federal courts, beginning with the Supreme Court, have not bought into, Your Honor. And this begins with the *Halliburton II* decision. It actually begins with the *Amgen* decision, but it's really articulated in the *Halliburton II* decision of the Supreme Court, where it says -- and, again, I'm paraphrasing, but I think we cited it in our brief.

It says that there's -- that federal courts are not to -- rather, that the *Basic* presumption of reliance does not -- does not presume and accept that there's one set definition of how rapidly and efficiently information is impounded into stock prices. The federal courts are not buying one or the other definition of just exactly how that works. That's for the economists.

What the federal -- what *Basic* established was a presumption that could be rebutted by proof, and what the courts are supposed to do is what they do best, which is look at the proofs in a given case to decide whether the information is out there or not.

And -- and so that's -- you know, bringing that to focus here, you know, what we have here in the proofs is -- actually, let me pause for a second.

But that's the problem that their expert steps

into.  He says, Well, I've got the existence of these articles and I've got the efficient market.  That means it was out there.  They exist, it's out there.  And that's just not good enough under this case law.  And the courts don't -- the courts don't accept that.

We just saw that in the *Ramirez* case.  It wasn't enough that, even if the court accepted that this information was accessible to people who knew how to get it, that that meant that the truth was on the market.

And I think that's -- that's really the way -- that's a great example of how the courts deal with these questions.  They weigh the proof.  They don't say that just because the efficient market was so, that this information was out there.

And, Your Honor, there's a quote, and it's -- it's by the economist Eugene Fama, who actually developed the efficient market hypothesis that everybody now follows and that we're talking about for so long here today.  And that quote is quoted by Defendants' expert, and it's repeated in our reply brief.  And there's a couple of them.

One is that the efficient market may be shown where there's evidence that a sufficient number of investors have ready access to information.  Now, that's from the source of the efficient markets.  Another one is

that evidence -- that information has to be obviously accessible.

So there's some qualifiers there. It's not the mere existence somewhere, at some point, of information. There has to be more. So I'll stop there. I -- I wonder if Your Honor has any questions on any of those points?

THE COURT: No.

MR. D'ANCONA: Okay. So I guess to sum it all up, Your Honor, we believe that the evidence is really on the classes's side and forecloses a finding of no price impact with respect to two key points that Defendants rely on.

One is this information from -- that the Hindenburg report disclosed. It was responded to by the market in clear ways that show that this was new and important information to the market at that time. We stack up the evidence earlier in this argument, and it's in the expert report, the reply report, of Mr. Coffman.

But the market reaction, the stock price reaction, the analysts' reaction, the company's reaction, the way that people behave on the company earnings call and so forth and so on, that shows that that's what the market was reacting to.

We also have their expert who says: Look, I am not of the opinion that all of the information that was

disclosed that you say was corrective was previously disclosed. He doesn't offer that opinion. There's no evidence of that. Defense counsel can argue it, but they don't have the evidence to sort of cross that bridge. They can't get all the way there.

On the other point, about *The Capitol Forum* and whether it was widely available, we think under the case law, clearly it was not. It's not enough that it merely existed and then some theory -- theoretical approach to the efficient market says that's good enough. *The Capitol Forum*, there's no evidence that anybody in the market responded to it at the time that it came out, none at all.

And just like in *Ramirez*, as the court worked through there, that's compelling evidence for a finding that it was not sufficiently on the market to matter here, and to preclude a finding of -- of no price impact where that argument is based on, well, *The Capitol Forum* said all this before.

THE COURT: A question about -- and, both parties, I don't think this is really a disputed point but just one that wasn't clear to me. It seems like both sides -- I think this goes to the front-end impact issue. But it seems like both sides agree this is not a, quote, pure omission claim.

What distinguishes this case from a, quote, pure omission claim?

MR. D'ANCONA:  So pure omission -- and thank you, Your Honor.  Pure omission cases -- and I agree that I don't believe that the -- that the arguments here have -- have kind of developed this into a being a pure omissions claim.

THE COURT:  And I guess I'll explain why I asked the question.  And I probably could have just dug into it more and figure it out for myself, but I've got you here to explain it to me.  Because it just, on its face -- and, again, maybe I'm confessing some ignorance about this area of the law.

But your allegation is they had information that was not included in their publicly filed reports and analyst calls and things like.  But, if it were, it would have depressed the stock price.  And that sounds like you're relying on an omission of information, but my sense is, I gather, that there is -- there's something more to a, quote, pure omission claim.

MR. D'ANCONA:  Sure.  So a pure omission case, Your Honor, is one where a defendant has a duty -- let's say it's under a statute -- to disclose a certain type of information.  And they don't.  They don't say anything about it, but they don't disclose what they need to

disclose.  Now, that's a pure omission.  And those are really a rare sort of species in -- in 10(b)(5) cases anymore.  And that's why there are really far and few between cases where the affiliated *Ute* presumption of reliance that's touched on briefly in the arguments by Defendants and by us rarely comes into play in these decisions, quite honestly.

Now, we have it in there because Defendants make a number of assertions that this is a pure omissions claim.  And if Your Honor were to accept that this is a pure omissions claim, well, then we are entitled to the affiliated *Ute* presumption of reliance and all this price impact argument can just be set to the side.

So we needed to protect ourselves on that eventuality.  But I think, Your Honor, this is a different species of 10(b)(5) case.  This is a misstatement by omission or misrepresentation by omission or a half-truth.  And these are types of cases, Your Honor, such as *Energy Transfer*, such as the *Homyk* case in our brief, such as the *Apache* case that both parties cite to, the *Chicago Bridge* case, these are cases, many of the cases, these are the most probably typical cases that you see, because it's rare that one of these sophisticated corporate actors will come out and just make a bald-faced lie.  Those are the pure

misrepresentations claims where literally the lie was -- was just, you know, complete.

Really what we normally have here is, for example, in the *Homyk* case, 2024, post-*Goldman*, district court opinion granting class certification, rejecting the argument of no price impact.  There it was discussions by the company about FDA applications and discussions that they were having.  The company disclosed rosy, positive discussion, true discussion as far as it went.  But it left out the bad part.  It left out the troubling part. That was a misrepresentation by omission like what we have here.

In *Apache* it was the announcement of this big, new, exciting oil play.  But they left out the fact that they didn't have data -- sufficient data to demonstrate that it was going to be any good.  And, sure enough, a couple of years later it wasn't.  They got out ahead of themselves.  That's *Apache*.  On and on.  There's a lot of cases like this in the brief.

That's what this case is, and let me explain exactly how.  Defendants are, in quarter after quarter, beginning in February 2020, talking about how the company is earning terrific revenues on the back of Panorama, as well as another product called Horizon.  But for our purposes we're focused on Panorama.

In February of 2020 it was -- we outperformed, we beat guidance. We beat the street expectation. And that was driven by performance -- out-performance by Panorama. The next quarters, May, August of 2020, it's we had a record-breaking quarter. We set revenue -- we set revenue records. We set volume records. Panorama was to thank for that.

Okay. So they're saying that Panorama is going gangbusters. And what we're saying is what they left out was the bad part, where the Panorama numbers that they were generating, the Panorama performance that they were generating, that this was in part -- and we don't have merits discovery yet, Your Honor, so I can't explain exactly how much at this point in time. We have bifurcated discovery, and we'll get to that if we get to that.

But that we are -- our allegation, which obviously was sustained here at the motion to dismiss stage, overcoming Defendants' arguments about all this, is that those numbers were -- were, to some extent, juiced by improper, deceptive business practices, including this reliance on prior authorization provider MGML. Prior authorization is a key link in the chain for their ability to earn revenues on these tests, because insurance, many -- as Your Honor no doubt knows,

insurance and other payers require prior authorizations for many types of procedures and tests.

And that's why it mattered. That's why MGML was a material point. And, of course, you see in the market reaction that MGML and their potential shenanigans or improper practices with respect to prior authorization, and MGML in particular, were -- were very noteworthy to the analysts that cover this company. They were very interested to know more. They had a lot of questions, and they wanted to be satisfied.

So that's our claim. They left out the part about the deceptive billing practices, in particular, to highlight the primary one, the MGML-related deceptive billing practices that were juicing, that was sort of turbo-charging their ability to perform.

THE COURT: Well, I guess to dig into that argument a little bit, I feel like they say, look, even if the Hindenburg -- you know the MGML stuff and the Hindenburg report wasn't in *The Capitol Forum* publications, that they downplay the significance of that by saying, Look, to the extent there's questions -- and maybe I'm kind of mixing up the facts a little bit -- about reimbursability from insurance or the doctor form that was misleading, I mean, you can't attribute much to that because it was already known in public that this

procedure was not widely reimbursed by insurance.  And the forms that the doctors filled out had not changed significantly, and whether or not a doctor paid attention to whatever box is being checked, that's -- there was no deception there.  The form is the form, and it was publicly available for anybody, doctor or analyst, to look at.

MR. D'ANCONA:  So if the argument is these statements weren't false, we -- I mean, based on the *Basic* decision, that's not something that we need to prove and they can disprove at class certification.

That's -- we don't have merits discovery in this case.  These are questions that I think go beyond, to some extent, although I understand it's a fair point that they're making the argument that it could not have had price impact.  So I don't want to stand only on this idea of it's falsity, so we can't go there.

I will say, Your Honor, that when courts and economic experts evaluate what did cause an abnormal stock price reaction, they go on not only the statistically significant reaction, but also what the immediate, real-time reaction in the marketplace is from sources that they look to on a regular basis, such as the professional investment analysts who cover the company and know everything about the company.  Those people said

some of this stuff was known before.

THE COURT:  And, yeah, I guess, I mean, is it -- should one of my takeaways be, whether or not these analysts who reacted and said this is significant information, whether or not they were themselves ill-informed about whether this is deceptive trade practices or not, what we see on this record as it stands here now is evidence that they reached that conclusion and that the stock price reacted accordingly?

MR. D'ANCONA:  I believe the answer to that is yes, Your Honor.  I mean, it's -- it's a preponderance of the evidence standard, based on the evidence that's in the record from -- from the contemporaneous reaction of the marketplace.  And nobody is perfect.  Nobody can conclusively say 100 percent what was known and what was not known.  But we can look at what they said at the time.

And what these analysts said at the time is that information is new.  That information is new news that information is novel.  And the stock price reacts enormously.  And the company scrambles to call a special investor call, and every question they're getting just about on that call is about these disclosures that we say those are the ones that corrected the fraud.

Now, that's evidence that maybe a jury will

find that that doesn't prove what we want it to prove. But the only question now is whether they disprove that there was any price impact from that, whether they prove that there was no price impact on that record. And we think, in light of the cases that we've pointed to, Your Honor, they just can't -- they can't carry that burden on that record at the back end.

Now, just briefly, if I may, I probably have -- well, actually, I have plenty of time. I'm not going to use all the time, I promise.

But, Your Honor, briefly, to go to the front-end price impact arguments, here again we need to look at the evidence. And what we see with respect to the statements in question is that, beginning with the February 2020 statement but then on the May statement, the August 2020 statement, that are sustained misstatements by Judge Ezra here, these are statements like, as I mentioned -- where, as I mentioned a minute ago, the company comes out and says -- well, really three things happen.

The company comes out and says we've had great performance in the prior quarter and currently, and that is based on -- that is driven by, in part, Panorama. That's the first thing that happens.

The second thing that happens is the analysts

pick up on that.  They say Natera is going great.  We are overweight.  We recommend buy.  We have, you know, a high price target for this company.  Part of the story here for investors is that Panorama is a dependable, growing source of revenues for this company.  The Panorama story is looking good.

We have that in the Coffman report with respect to the February 2020 disclosure and the market reaction to it, and we have it in our complaint at paragraphs 111 to 120 with respect to the May and the August 2020.

This is a part of the claim.  Those are front -- and, of course, the third point is a statistically significant stock price increase in reaction to the news that's disclosed on those days.

Now, again, here it is not our burden to prove anything, but it's certainly not our burden to prove that the entire stock price reaction was attributable to just one thing that they said that day, to just the fact that Panorama was doing great and carrying the company and driving revenues.

Even at the loss causation stage at trial, the jury would just be -- would not be bound to find that there's only loss causation if there's one cause and it's the only cause for the stock price movement.  They can assign some amount to the particular cause, and we're at

the same sort of level of proof here.

But all those three things happen at the front end. And those are, Your Honor, quintessential types of evidence for front-end price impact: a positive statement related to the product or the project or activity in question; analysts' reaction saying that's significant, I'm noting this, this is positive, I like it; and the stock price reaction going up by a statistically significant amount.

Now, front-end price impact cases are not terribly common, but there are several and several of them are noted in our brief, Your Honor. And they include *Chicago Bridge*, they include *Apache*, they include *Energy Transfer*, they include *Homyk*. And what you see in each of those cases, which all by the way had misrepresentations by omission. They all had positive statements about something that left out the bad part, that left out the negative qualifying information about the same topic. And then analysts saying that topic sounds good and the stock price goes up. Same formula that we have here.

The cases find that that -- that that series -- that sequence of events, that set of events, that's affirmative evidence of price impact. You know, in *Apache* the defendants didn't even contest it. They

conceded price impact on the positive announcement, analyst reaction, stock price going up, and saying here's why.  They didn't even contest it.

In *Energy Transfer* and in *Chicago Bridge*, they did, but the court found -- or in *Chicago Bridge* they didn't.  But in *Energy Transfer* they did, but the court found that there was affirmative evidence of price impact on exactly that combination of facts.  So that's what we have here.

What Defendants have on their side, again, is a theoretical opinion that omission -- omitted information can't affect a stock price.  Now, our expert disagrees with that opinion.  And, again, that opinion is pinned to a kind of pure economic understanding of -- of the efficient market, which we've already talked about how the Supreme Court says, you know, courts don't really try to bother themselves, roll up their sleeves, and get into different ideas of exactly how the efficient market operates.  That's the work of the economists.

But that's their -- that's really their only evidence to try to rebut the front-end price impact argument.  And it's just -- it's not enough.  We have contesting expert evidence where our expert says, Well, wait a minute.  As a matter of theory, that's not correct, and here's why.  And he gives an example that

tracks what happens in a lot of these cases.

But, most importantly, Your Honor, none of us here is an economist. But for the lawyers, and certainly the way that the courts have dealt with this, it's a question of -- it's a question of the proof and whether a theoretical opinion like that can overcome the affirmative evidence of price impact that our expert identified and that I've just laid out. And he also opined that that was affirmative evidence of front-end price impact. So that's another piece of evidence here.

It can't overcome it. It can't reduce it to a meaning -- a level of zero as far as how significant it is on the scales. There are no court -- no courts, Your Honor, there's no case in the record that defendants have put to Your Honor, where a theoretical opinion like the one that their expert put in here was enough to overcome front-end price impact arguments. There is -- there is no opinion that says, Well, wait a minute. Misrepresentations by omission, they can't have an effect on the stock price. This claim doesn't make any sense as a matter of economics. There's no front-end price impact.

But that's the kind of conclusion that they are either asking Your Honor to kind of break new ground and make here, really, for the first time. Again, if they

had a case that went that way at the class certification stage on front-end price impact, I think it would be in the briefs, but we don't see any case like that.

So that's our argument in a nutshell on front-end price impact, Your Honor.  Any -- if there are any questions from the Court on that, I would be happy to answer them.

THE COURT:  Nope.

MR. D'ANCONA:  Okay.  I should move quickly then, Your Honor, to the damages point.

THE COURT:  Yes.

MR. D'ANCONA:  On this point, and I think I can be very brief here, Your Honor, the Supreme Court in *Comcast*, the Fifth Circuit in *Ludlow v. BP*, made it crystal clear that the question when evaluating whether a damages methodology fits with a case and is appropriate for a given case, is whether it matches Plaintiff's theory of liability, whether it matches Plaintiff's claims that they are bringing forward.

The Fifth Circuit made that perfectly clear in *Ludlow v. BP*, and it is -- every federal court that we've seen says the same thing.  But the Fifth Circuit is what is most important for us here today.

Defendants' argument about the damages not being a fit kind of ignores that precedent.  I will say,

Your Honor, that what we have put forth is an out-of-pocket damages methodology that courts -- and Your Honor and Your Honor's law clerk will no doubt be aware of this -- that courts have almost universally accepted as appropriate for a classic 10(b)(5) securities fraud cause of action. There's really no question on whether that type of damages methodology is appropriate there. That's what we have. We argue it's sufficient. We're confident that it is sufficient.

Defendants' argument says, Well, hey, wait a minute. What if there were different facts? What if we prove something different here? What if, instead of what Plaintiffs claim, you substitute our version of the facts? And that Hindenburg report, that wasn't the corrective disclosure. That's not what the fraud ended.

The fraud ended -- (bumps microphone).

Pardon me. I'm waiving my hands around.

The fraud ended earlier. The fraud ended with -- with *The Capitol Forum* reports in 2020. Therefore, this class period is wrong and, furthermore, Plaintiffs can't show how their damages model matches our new class period that we're arguing should apply.

I think as the case law that I cited to at the top indicates, that's just not how this works. If that's all Defendants had to do, Your Honor, under *Comcast* or

under *Ludlow*, it would be the simplest thing in the world to come up with a different version of the facts that they say is supported by what they intend to prove eventually when it comes to falsity and materiality and loss causation and all the rest on the merits, and say: We think there's problems with your damages methodology based on what we're going to prove.  But no court accepts that line of attack, that line of reasoning, and for obvious reasons.  No plaintiff would be able to come up with a damages methodology that cleared the bar.

Lastly, to the extent Your Honor does think that there's, you know, perhaps an interesting problem with this idea of, well, what if they can identify class members who did have particular knowledge of *Capitol Forum* reports?  And there might be a way eventually, Your Honor, that they could do that.

The way the courts work that out is at the damages stage of the trial proceedings.  They allow -- and this happened in the *Vivendi* case.  This happens in virtually all of the cases that go to a jury where the plaintiffs prevail.  There's a damages proceeding stage where the defendants have every opportunity to identify and challenge individual members of the putative class, of the certified class at that point, and say we don't think you're a valid member of this class.  We don't

think you're entitled to damages.  And the reasons often are reasons of reliance, Your Honor.

And that's exactly what Defendants are talking about here.  If we get to that stage in this case, they'll have every opportunity to work with *Capitol Forum* to try to find out who had access to those articles to try to prove that key investors did.  They may call the top 10 investors in Natera and say:  Did you have -- give us all your documents on *Capitol Forum.*  Did you have it? Did you read it?  You had access.  You didn't rely.  You knew this before.  You're out.  And that's how they clear that up, Your Honor.  It's not by attacking or sort of torpedoing the entire damages methodology for the entire corpus of the class.

I have nothing further on that unless Your Honor has any questions.

THE COURT:  Nope.

MR. D'ANCONA:  Okay.  I'm going to cede the lectern to my colleague, Mr. Jensen, and reserve the rest of my time for rebuttal, potentially, Your Honor.

THE COURT:  Okay.

MR. JENSEN:  Good morning, Your Honor.  My name is a Jesse Jensen, counsel for plaintiffs from Bernstein Litowitz Berger & Grossmann.  I'm going to address Defendants' arguments concerning certification related

specific to the Securities Act claims and focus specifically on the arguments raised in their sur-reply.

Defendants' only challenge to certification of the Securities Act claims is their contention that Plaintiffs do not have standing to assert the claims. That challenge is meritless. There's no dispute that someone purchases directly in an offering, in other words, not in the aftermarket but participates directly in an offering, has standing for both Section 11 and Section 12(a)(2) claims, as are asserted here.

Named plaintiff Key West purchased directly in the July 2021 offering at issue, not in the aftermarket. You can see this. It's alleged in the complaint, Paragraph 300, that Key West purchased stock in the July 2021 SPO. Therefore, Key West has standing, and there's no need to resort to any traceability analysis. And this moots most of Defendants' arguments.

On the very last page of their sur-reply, Defendants claim that Key West's standing is not relevant at class certification. In other words, Defendants argue that the class can only be certified if the court-appointed lead plaintiff has standing.

That's not the law. And, indeed, the Court already addressed this issue in appointing lead plaintiff. In its order appointing lead plaintiff, the

Court specifically -- excuse me.  The Court observed that there was no requirement that a lead plaintiff have standing for every claim and expressly acknowledged that a named plaintiff might be added to assert Securities Act claims, as was done here.

Specifically, the Court rejected the argument from a competing movant that another lead plaintiff was necessary to avoid standing issues and ruled, quote:  If British Airways later chooses to amend the complaint to include claims under the 1933 Act, nothing in the Act indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action.

And, Your Honor, this wasn't cited in the briefing, so I'll give you the cite very quickly.  It's 2022 WL 22442715.  And that's at page 4.

And in making this ruling in the lead plaintiff appointment, the Court referred to the Second Circuit's decision *Hevesi v Citigroup*.  And the cite for that is 366 F.3d 70, Second Circuit, 2004.  And that decision is also very instructive on these issues.  There the Second Circuit rejected essentially what Defendants are arguing here, a per se rule that a class may not be certified where a lead plaintiff does not have standing to bring every available claim, and none of the named plaintiffs

who have standing to bring the additional claims has been vetted under the PSLRA, meaning, in other words, appointed lead plaintiff.

So the Second Circuit rejected that argument that Defendants are effectively advancing here. Defendants do not address either the Court's lead plaintiff appointment or the Second Circuit's decision. In fact, Defendants don't cite any authority that actually supports their contentions that Key West's standing is irrelevant or that certification must be denied without standing by a lead plaintiff.

Defendants cite one case on the last page of their sur-reply that they claim denied certification where the lead plaintiffs lacked standing, and that was *Congregation of Ezra Sholom v. Blockbuster*. But that case did not concern class certification; it was a motion to dismiss decision. And, by contrast, Defendants did not move to dismiss on standing grounds here. Moreover, the court in *Blockbuster* expressly contemplated the possibility of any named plaintiff could be added, and that would address standing.

So, therefore, Your Honor, Key West's standing and its participation in the offering is relevant here.

Defendants also claim that, even if Key West's standing is relevant, that Key West failed to meet its

burden to, quote, prove, end quote, standing.  This argument fails for at least three reasons.

First, defendants cite no law that requires standing be proved by Plaintiffs at class certification. The one case they cite to, *Krim v. pcOrder*, the Fifth Circuit's decision in 2005, was not a ruling on class certification but, again, was a ruling -- excuse me -- but was a ruling concerning dismissal under Rule 12(b)(1) which, again, Defendants are not arguing here.  And, again, I note Defendants did not raise any challenge to standing in their motion to dismiss.

But, second, even if Key West did have a burden on its standing at this class certification stage, Plaintiff has carried that burden, as Defendants acknowledge Key West has provided a sworn certification of its relevant transactions which corroborates its allegations.

Defendants themselves describe the certification as, quote, supporting evidence, end quote. And that's in Defendants' page 20 of their opposition brief.  So even to the extent there is a burden at class certification, Plaintiffs have provided evidence and defendants have provided no basis to undermine that evidence.

And that leads to the third and last point I

want to make, which is that there's something problematic about Defendants' arguments criticizing the evidence and the standing, when Defendants conspicuously did not seek any discovery from Key West or related to Key West's purchases in the offering. Not a single thing, no document requests, no deposition, no third-party subpoenas.

Had they done so, it would have confirmed the allegations exactly as alleged, that Key West purchased in the offering. But Defendants instead chose to bury their head in the sand and now criticize the supposed lack of evidence at class certification.

I submit, Your Honor, that does not provide any basis to deny class certification. And unless the Court has any questions, I have nothing further at this time.

THE COURT: No. No, thank you.

Counsel for Natera?

MS. COSTLEY: Your Honor, I would like to request to use seven minutes of my time to just take a little break, reorganize my thoughts, and go through our slides. Is that acceptable to the Court?

THE COURT: That's fine, yeah. So it's three after. We'll come back at 11:10.

MS. COSTLEY: Thank you.

THE COURT: All right.

(Recess from 11:03 to 11:13 a.m.)

THE COURT:  You-all can have a seat.

MR. JENSEN:  Your Honor, one small point out of housekeeping.  With Defendants' consent, if I may pass up a copy of the special investor call transcript?

THE COURT:  Yes.

MR. JENSEN:  Okay.

THE COURT:  Thank you.

Okay.  Ms. Costley?

MS. COSTLEY:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. COSTLEY:  First I just want to thank the Court for the time it has allotted to this hearing and its careful consideration covering these issues.

I'd like to start today by just giving a brief overview of the case and the parties.  I hope to not be too repetitive in that.  I'll then turn to a discussion of the Exchange Act claims.  Those are Section 10(b) and 20(a) claims, the fraud claims, so to speak.  I'll touch first on *Basic* and the efficient market, then turn to the reasons Plaintiff have failed to establish market timing, including the fact that *The Capitol Forum* reports discuss every fact in Hindenburg that Plaintiffs rely on as a, quote/unquote, corrective disclosure.

I'll then move on to a discussion of the

reasons that Defendants have met their burden of showing there was no price impact.  And then I will conclude with what I believe will be a short discussion of the Securities Act claims, the secondary [unintelligible] claims.

THE COURT:  Okay.

MS. COSTLEY:  Natera is a global leader in cell-free DNA testing.  It is dedicated to oncology, women's health, and organ health.  It's headquartered right here in Austin, Texas, and it employs about 3,000 people.

Natera's elite product is Panorama.  Panorama is a prenatal screening test that screens for full chromosome deletions, things like down syndrome.

Physicians and patients also have the option to order screening for microdeletions and primary microdeletion at issue in this case is 22q deletion syndrome, which occurs more frequently than other microdeletions.

Natera's stock is currently trading at about $153 a share, which is three times the price it was trading at before the stock price dropped that precipitated this lawsuit.

Some of the other parties.  We have already heard a lot today about My Genome My Life, or as we're

calling it, MGML.  MGML is a third-party payment processor.  It is one of several payment processors used by Natera, and it was responsible for less than 7 percent of Natera's -- that should say Natera's Panorama test volume as of 2022.  So we're talking about a very small percentage of Natera's overall revenue.

The Capitol Forum is, of course, an investigative news agency that is subscription-based, and Hindenburg research is an admitted short seller.

I want to start with the discussion of the alleged misstatements.  Your Honor, this is a weak case from our perspective.  Judge Ezra has already dismissed Plaintiffs' lead claims.  The remaining claims are what were in the complaint, the trading claims.  And they fall into two categories.  One has [unintelligible] Panorama. Two, we have statements about the microdeletions.

There is no dispute that all of these statements are literally correct.  Natera's increase in total revenue during the quarters on which it made the statement indisputably was driven by sales of Panorama and Horizon tests.

Same thing with the microdeletions.  There is no claim that physicians didn't order microdeletions about eight times out of every ten times they placed an order for Panorama.

So there's no dispute about the literal accuracy of these statements.  Plaintiffs claim the statements are misleading because, in connection with Panorama, Natera failed to disclose that it used MGML for about 7 percent of tax -- test revenue or test volume. And in connection with the microdeletion statement, Plaintiffs allege that Natera failed to disclose that the requisition form for Panorama forced physicians to check a box if they didn't also want the 22q deletion included.

These allegations have been thoroughly investigated and thoroughly debunked at this point.  The SEC has conducted a formal investigation into the allegations made first through *Capitol Forum* report and then in the Hindenburg report, and it has concluded after a formal investigation they would not recommend an enforcement action against Natera.

There have been similar investigations conducted by an independent outside committee of Natera's board of directors.  Natera's auditors have reviewed Natera's accounting for test revenue and concluded that it's materially accurate or it is accurate in all material respects.

I want to touch on one point that Plaintiffs made during their argument.  There was a claim that, well, they're arguing that Natera's statements about

revenue from Panorama and the number of microdeletions were false because the numbers were juiced. I think that was the phrase that was used.

Plaintiffs have already represented to this Court in connection with briefing on Natera's pending motion for judgment on the pleadings, that there are no claims based on accounting violations, and Plaintiffs do not contend Natera's disclosed financials were mistaken.

So I feel in some respects that we're sort of going back and forth here between, well, the statements are misleading because the numbers are juiced, but then when pushed on it, Plaintiffs have admitted over and over again, no, actually we're not saying the results were false.

And I think the reason we see this disconnect is that, as Your Honor alluded, this is at core an omissions case. Plaintiffs don't claim the statements are false. They are claiming the statements are, if anything, misleading by omission. But there's no hook between the affirmative statement and the omission.

And -- and this -- you know, this reversion to saying the numbers are juiced I think is an attempt to tie the omission into the misstatement when, really, one doesn't exist.

Now, these issues have been briefed thoroughly

in a motion for judgment on the pleadings that is currently pending in front of Judge Ezra.  We don't need to really get into a lot of those issues today, except to the extent that there is an overlap on the omissions issue and that that is relevant to the price impact argument.

Starting first with the reason class should not be certified as to the Exchange Act claims: Historically, a plaintiff could not bring a securities fraud claim as a class action.  The reason for that is that fraud always requires proof of reliant, and you can't show that thousands or hundreds of thousands of investors all saw the same statement and were deceived by it in the same way.

So it appears there were efforts to bring securities cases on a class-wide.  In 1988 the Supreme Court gave the plaintiff's bar a huge gift.  In *Basic v. Levinson*, the Supreme Court adopted the efficient market presumption and allowed the price of a security to serve as a substitute for a misrepresentation.

So a plaintiff only had to prove that it relied on the price of the stock when buying -- when investing in the company.  It no longer had to prove directly that it relied on the misstatement itself.

The idea behind an efficient market is that

competition among investors and other participants quickly eliminate opportunities to trade and profit on the *[unintelligible]* information. So the whole concept behind an efficient market is arbitrage and that these investors are seeking out any information. No matter how far-flung the information may be, they seek it out and they trade upon it.

The corollary to this is that, in an efficient market, you presume that if the information is available, investors see it, have access to it, and trade on it. You don't do an inquiry into which investors saw the information and traded on it. You just have to show that it was available to some or potentially even one active investor, and then that investor sees the information, trades on it, takes advantage of the difference between the price of the stock without the information and the information it knows. And, in so doing, the information is incorporated into the market.

It may be this doesn't make a lot of sense from a commonsense perspective. The efficient market hypothesis has been called a legal fiction, and it's been subject to a lot of criticism. But the Supreme Court has said we're using it. And, if we use it, we have to use it in whole. We can't pick and choose parts of it, which, from our perspective, is what Plaintiffs are

trying to do in this case.

If you don't have the efficient market hypothesis, if you don't rely on this idea from *Basic*, then there is no way to certify a class on the fraud claims at all.

So to invoke *Basic* and take advantage of the efficient market hypothesis, Plaintiffs have to prove certain things:  First, they have to prove market timing. Second, they have to prove market efficiency.

As Plaintiff said, Defendants have not disputed that the market for Natera stock was efficient in this case.  So this case really turns primarily on market timing.  Once Plaintiffs prove both timing and efficiency, the burden then shifts to Defendants to prove a lack of price impact.

What this means is that Plaintiff -- if Plaintiffs have failed to prove market timing, we don't even have to get into price impact.  The inquiry can end at market timing because, without market timing, there is no *Basic* presumption.

THE COURT:  Well, Plaintiffs' counsel assures me that no court has not reached a market timing -- favorable market timing decision for a plaintiff at this stage of the case.

MS. COSTLEY:  Yes, Your Honor.  I think that

that's an interesting point.  I believe Plaintiffs are right.  We would ask this Court to be the first to make a decision based on market timing and to hold that a failure to prove market timing prevents application of *Basic*.

However, it is clear that it is an element Plaintiffs must prove.  The Court does not have to be the first to hold that, to invoke *Basic*, a plaintiff has to prove market timing because the Supreme Court has already held that.  It has held that twice: in *Goldman*, which is the most recent class certification decision from the Supreme Court, and in *Halliburton II*.  And the court is quite clear the plaintiffs must prove this.

Now, we -- we did spend a lot of time discussing why are there analyses of cases on this point.  And the best I can come up with, Your Honor, is that market timing in most cases will not prevent a case from going forward altogether.  What it generally does is it shortens the class period.  And so my sense is, in many cases, defendants are loath to not hit for the home run and say, well, let's just do price impact, because price impact knocks out the entire class, whereas market timing just shortens the class.  I think that's one reason we don't see market timing used a lot.

I think the other reason could be that this is

a fairly rare factual scenario, so it is not common for there to have been a prior disclosure before the disclosure that Plaintiffs claim is the corrective disclosure.

THE COURT:  So you say that presumption is not really founded in common sense.  But, I mean, to hear Plaintiffs' counsel describe the *Ramirez* decision, it does seem that court's application of this consideration does seem to be more grounded in common sense, that we do consider how widely -- it's not did one market participant have this information and once that market participant acted on that information, then it is incorporated into this, you know, ethereal market knowledge base that you as a normal, rational person, considering the effect of information, you can consider how widely disseminated it was and how available it was to how many people.

MS. COSTLEY:  Yes, Your Honor.  I think that's an excellent question.  So to start I want to be very clear that the level of dissemination is not relevant to the Court's market timing analysis at all.  Plaintiffs have not taken the position that you have to get into this question of who saw what in connection with market timing.

THE COURT:  Right.  I guess I'm jumping ahead

of your outline here. Okay. We can stick to market timing, if that's what you want.

MS. COSTLEY: Oh, no. I'm happy to go into *Ramirez*. The other factor, though, Your Honor, is in *Ramirez* I don't read it the same way Plaintiffs' counsel does. So in *Ramirez* the court does not conduct an inquiry into how widely disseminated the information is. That's not why the court disregards the prior disclosure.

In *Ramirez* the court disregards the prior disclosure and does not treat it as corrective disclosure because it was just financial information. And the court said we wouldn't expect investors to understand how to interpret this financial information. So instead of -- Plaintiffs -- it's an adjacent issue, maybe. It's not the same issue.

In this case there is no dispute that the accusations made in *The Capitol Forum* reports are the same accusations made in the Hindenburg report, so I don't think there's any argument by Plaintiffs that investors didn't understand what *Capitol Forum* was saying. I think *[unintelligible]* argument is that, according to Plaintiffs, a certain threshold of investors didn't see *Capitol Forum*.

So turning then to Plaintiffs' argument today that market timing only relates to rule 23(a)(3) and (4),

which are *[unintelligible]*.  That is not accurate.  In *Amgen* this issue came up in the dissent.  The dissent was not disagreeing with the majority, but it was elaborating on the purpose of market timing.

And it says -- the court says very clearly that market timing is useful in a lot of ways.  First it functions as a limit on the definition of the class, meaning, the class ends when the disclosure is made *[unintelligible]*.  But it's also necessary under Rule 23(b)(3), because -- Plaintiffs also must establish under Rule 23(b)(3) because, if they don't establish it under 23(b)(3), they cannot use *Basic* at all.  And if they can't use *Basic* at all, then they can't certify a class on reliance.

And the reason the dissent says that we know that it's relevant under Rule 23(b)(3) is that, in a prior decision, in the first *Halliburton* decision, the court cites the language as part of an undisputed element a plaintiff must prove to invoke *Basic*.

So, yes, this language appears in the dissent, but then subsequent to the *Amgen* dissent, we have *Halliburton II* and *Amgen* -- and or *Goldman*.  And in both *Halliburton II* and *Goldman*, the Court reiterates the same language, this idea that it is a prerequisite to invoking *Basic*.  And, in so doing, it makes it clear that this is

not just relevant to adequacy, it is also equally important at class certification for purposes of establishing reliance under Rule 23(b) and (3) -- 23(b)(3).  This is flatly inconsistent with what Plaintiffs have argued here today.

And, you know, I think if we look at these class certification decisions over time, what we see is that the dissent in *Amgen* becomes the majority in *Halliburton II* and now the majority of *Goldman* and remains the majority of the court.

So we view this as fairly significant.  But even if you just accept Plaintiffs' argument that market timing is limited to individual -- is limited to this idea of adequacy, it is still clear from both the majority and the dissent's discussion in the *Amgen* decision that, one, if Plaintiffs don't establish market timing, they cannot serve as the lead plaintiff.  So they are not sufficiently representative to be the lead plaintiff.  And in this case Plaintiffs have not come up with any alternative lead plaintiffs who could represent the class of a shortened time period.

And the second point that emerges from all these Supreme Court decisions that all discuss market timing in the same way, is that the class period has to end when the first disclosure is made.

So, Your Honor, from our perspective, this case is really a market timing case. Market timing is our primary argument, and we feel very strongly Plaintiffs have not met their burden of proving market timing.

I think the Court's familiar with the timeline. I just put this up very quickly. The requisition form that's at issue was published on Natera's website for the putative class period. Then we have first *Capitol Forum* report July 1st, 2020, the second one, December 14th. The first report of buying stock, June 10th, 2021, the self-appointed lead plaintiff Key West buys stock in July, 2021. And then next year we have the Gindenburg short seller attack.

So they have significant market timing issues, unless they meet their burden of showing that *The Capitol Forum* reports did not -- that *The Capitol Forum* reports did not include everything that the Hindenburg report included, and that that information was corrected.

So, as I said before, I do want to be clear there is no argument from Plaintiffs that there had to be a certain threshold of dissemination for *Capitol Forum* in connection with market timing. And, in fact, their expert stating during his deposition that you don't have the same requirement of a threshold of dissemination when you're talking about a corrective disclosure.

So the question then becomes:  Were there new facts in the Hindenburg report that were not previously reported by *Capitol Forum*.  And I want to be careful on this because it is -- I hear Plaintiff saying one thing, but I see in their briefs a different thing.

To be clear, when we look at what is new in the Hindenburg report, we are only looking at corrective information.  So if there are new facts in the Hindenburg report, but those facts do not reveal that Natera's prior statements were false or misleading, those facts are not new for purposes of class certification analysis.

It is only those facts that reveal Natera's prior statements were false or misleading under the theory pled by Plaintiffs in the complaint that matter for class certification.

And we've cited two cases.  These are in our briefs as well.  But it's very clear revelations that are not corrective are not a corrective disclosure.  And if there is a theory that's not pled in the complaint the plaintiff tries to use at class certification, you can't do that either.

So how do we know there's no new factual information that is corrected in the Hindenburg report? First we have a declaration from Hindenburg in which they say we just recycled the information that was previously

on the market.  That's Hindenburg's own statement on the issue.

Second, we have in Plaintiffs' briefing what sticks out to us as a failure to identify new facts. Remember, on market timing it is Plaintiffs' burden.  We closely combed through Plaintiffs' briefing.  We did not see a single new fact identified by the plaintiffs.  We have put in this deck some examples of the many ways in which the *Capitol Forum* articles overlap with the Hindenburg.  *Cap Forum* is first to reveal that Vickie Seth, the name of the person who owned MGML, was an alias for Deepti Gupta; that this person had a relationship with a former Natera employee named Amar Kamath.  In some instances, I mean, it's a direct paraphrase.  That Gupta and Kamath owned an apartment together in Austin.  They both -- I think *Capitol Forum* posted Facebook articles or Facebook posts suggesting they went to India together.  And then Hindenburg researches that or repeats that.

There are similar allegations from individuals who were purportedly employed by MGML but didn't actually know they were employed or related with MGML.  That's revealed in both articles.  Some stuff about the IRS filing revealed in both reports.

In the -- in Plaintiffs' opposition, this was

actually what I thought they pointed to was the only new fact that they claimed was reported by Hindenburg, which was that the Natera sales reps would process prior authorization for MGML or for the physicians using the physicians' log-in credentials.  That was first reported by *Capitol Forum.*  The idea that this could violate anti-kickback practices, that was first reported by *Capitol Forum.*  All of this information appears first in *The Capitol Forum* reports.

So today Plaintiffs have said -- over and over I've heard them say Natera's expert wouldn't say that there was -- wouldn't say that there was nothing new in Hindenburg.  That's correct.  He did not say there was nothing new in Hindenburg.  But what he did say is that he doesn't think that there is new corrective information in the Hindenburg report.

Plaintiffs don't quote this in their brief, and I think it's because -- well, Plaintiffs' expert, Mr. Coffman, says in his report that he has identified one new fact in the Hindenburg report.  And this is this idea that -- that MGML processed prior authorizations after the fact.  So instead of processing the prior auths before the test was run, according to Hindenburg, the prior auths were being processed after the test was run by MGML.

Plaintiffs don't pick this back up and don't argue this in their brief.  And I think the reason they don't is because this isn't one of the facts that forms the basis for their complaint.  They do not allege in the complaint that Natera's statements were false or misleading because of this prior authorization issue.

And I believe the reason they don't make that argument because even Hindenburg admits that some insurance carriers permit retroactive prior authorizations, so it's actually not anything illegal or improper.

So that is, from our understanding, the only new fact that anyone has pointed to in Hindenburg that's not in the *Capitol Forum* reports, and that's not corrective because it's not a basis for the allegations in the complaint.

It's also just not improper, because it -- like, it seems to have been authorized by some of these insurance companies.  You can see that if you go back to the Hindenburg article about it.

Beyond that, I think it is unambiguous, Plaintiffs have not done any sort of red line, they have not put any sort of line-by-line analysis of the report pointing to new information.  They have been very careful to avoid being specific about what the new facts are

because they can't identify the new facts.

Your Honor, that's all I had on market timing with respect to the Panorama allegations.  Unless you have further questions about that, I'm going to talk about the requisition form.

THE COURT:  No.

MS. COSTLEY:  So this is the famous requisition form.  Plaintiffs allege in the compliant that this requisition form was misleading because of that line right there.  We put a yellow arrow.  Because if Plaintiffs don't check that box saying I don't want 22q, the 22q screening is performed.  And Plaintiffs allege in the complaint that it was the requisition form itself that, by default, caused patients to order the screening.

There is no question that this form was publicly available throughout the class period, and so that operates as a bar on Plaintiffs' ability to certify a class of investors really at any point in the putative class period, because it existed prior to the putative *[unintelligible].*

That's everything I have on market timing.  I'm ready to turn to price impact unless you have questions.

THE COURT:  Nope.

MS. COSTLEY:  Okay.  So price impact.  Any showing that covers the length between the price --

between either the misrepresentation and the price received or paid by the plaintiff, or his decision to trade at that market price, is sufficient to rebut the presumption of reliance.

What this means is that courts don't just look at whether or not the stock price moved. As we find in the recent *Goldman* decision, courts also conduct a pragmatic analysis to look at whether it seems likely that the movement is caused by the alleged -- by revelation of the alleged misstatement or omission.

Defendants have -- can rebut price impact in multiple ways. We can either rebut it by showing a lack of price impact on the front end, or can rebut it by showing a lack of price impact on the back end, either by showing that the price didn't react to the correction, that the information was already public, or that there was no correct -- no connection between the misrepresentation of the alleged corrective disclosure.

So a lack of impact on either side, either front-end or back-end, severs the link. I don't think Plaintiffs are seriously disputing that. But the requirement, the holding that you can rebut either front- or back-end, comes from *Halliburton*. Obviously it's a Supreme Court decision.

It does get a little tricky because, in

inflation maintenance cases, numerous courts held that an absence of price impact on the front end does not necessarily prevent certification of a class because, in inflation maintenance cases, you only look on the back end.  So it is a little tricky.  But absent an inflation maintenance case -- and I don't think Plaintiffs are saying this is an inflation maintenance case, you can rebut either by an absence of movement on the front end or an absence of movement on the back end.

So no price impact on the Panorama statements.

In *Goldman*, which is kind of the recent class cert decision, and the reason that we keep coming back to it is that it's new and there have not been a lot of cases interpreting it, but it also changed things a fair amount.

One way that it changed the standard significantly is by saying courts have to look at all of the probative evidence, including qualitative evidence, so it's not just quantitative that the stock price go up.  It is why did the stock price go down, and then why did the stock price go down?  And the court applies common sense.

So, look, the absence of front-end impact here is interesting.  And maybe in a pre-*Goldman* world it wouldn't be enough.  But we are in a post-*Goldman* world.

The experts have agreed that omissions do not cause a company's stock price to increase. Now, Plaintiffs think these are half-truths. I'm not sure I agree with that, because I don't see the connection between the alleged omission and the misrepresentation. But Plaintiffs are certainly correct that, in a securities fraud case, if they only have omissions, absent a statutory duty of disclosure, which is not alleged here, probably the claim shouldn't go forward.

But this is -- if you look critically at the alleged misstatement and why Plaintiffs say it is false, to us, it looks like an omission.

Common sense also just dictates that it's more likely than not that the other statements that are released on the same day as the alleged misstatements are the reason the price went up those days.

I mean, on these dates we have Natera saying things like the revenue results we just released blew through expectations, we beat expectations, we had record revenue. So of course the price is going to go up when you make that statement. It does not mean that the price went up because Natera on that day said "and revenue came from Panorama and Horizon."

Natera had been saying revenue was driven by Panorama and Horizon for years before the putative class

period.  Sometimes the stock went up on the same day, sometimes it didn't go up on the same day.  That's not what drove the stock price up in this case.  That's common sense, and it's borne out under *Goldman*.

I would also note that Plaintiffs have suggested we, Defendants, have the burden of completely ruling out another cause of the stock price increase.  That's not what *Goldman* requires.  It's more likely than not, aided by a good dose of common sense.

THE COURT:  So, if I can get a question in here, what makes this case different from the examples that Plaintiff cited, like *Apache*, or the other examples where the court concluded this omission or misstatement was -- could lead to a front-end impact, where you only report the positive information and suppress the negative information?

MS. COSTLEY:  So, Your Honor, I think a few things, the first being this is not a case where Natera was suppressing the negative information.  MGML was responsible for less than 7 percent of overall test revenue.  So it would not make sense when Natera says Panorama and Horizon has drove revenue to say, oh, and less than 7 percent of the Panorama tests, which is going to be less than 5 percent of overall revenue, came from MGML.  And MGML, who had this woman, who had this

relationship with this former intern, just wouldn't make sense.

They weren't suppressing something that was material. And I'm not saying materiality is something the court needs to decide at class certification. But I am explaining that I don't think any reasonable investor would expect a company, when talking about its sources of revenue, sort of globally at this high level, to then zero in on a source of revenue that's responsible for less than 7 percent of testing volume for one of those two tests. It's just not the level in which the statements were made.

Our view is that there's no back-end price impact for a couple of reasons. One is that the allegedly omitted information previously was disclosed by reports issued by *The Capitol Forum.* We've already gone on about that, so I won't cover it again.

The second question that Plaintiffs have raised on this is whether or not *The Capitol Forum* reports were publicly available. So other cases have recognized this idea that the efficient market theory is a Delphic sword. It cuts both ways. Plaintiffs can't do sort of what they're doing here and saying we want you to use the efficient market for purposes of certifying a class. We want the Court to not conduct an inquiry into who saw

what when in connection with the alleged misstatements, but we do want you to conduct that inquiry with respect to the corrective disclosures.

What they're trying to do is have it both ways, and they can't do it.  Plaintiffs have to take the bitter with the sweet.  And if they want to use efficient market theory for purposes of proving reliance, they cannot then turn around and say, Oh, but we have -- Defendants have to meet the standard of showing that every analyst saw the reports or that this many people saw it.  That is fundamentally inconsistent with the efficient market theory and the entire basis for this industry of securities class action cases.

Plaintiffs talk about the *Ramirez* case, and I think the Court asked about it previously.  We put this language in just to be clear that *Ramirez* was not decided based upon a finding that the information was not sufficiently disseminated.  It was based on a finding that the information was too confusing.

On this argument Plaintiffs have made *The Capitol Forum* reports are not publicly available because they're a $40,000 subscription hidden behind a pay wall. Look, many courts have already had to reach this issue and decide whether reports issued by *The Capitol Forum* were publicly available.

THE COURT:  And they say that these examples all were ones where *The Capitol Forum* reports were then disseminated through more widely available channels and, thus, were more public than the report here.

MS. COSTLEY:  Yes, Your Honor.  I think that that's a fair question.  I actually am not sure that they all were.  But the fact remains that, to have been picked up by the other channels, someone must have seen them. They must have been available to the market to be seen in that respect.  No court has ever held that the price of *The Capitol Forum* subscription prevents it from being publicly available.

I would also note we've heard a lot today from Plaintiffs about how speculative they think our expert Dr. Skinner's opinion is, but what we haven't heard from plaintiff is anything from their own expert definitively saying *The Capitol Forum* reports were not on the market.

Why is that?  Because he's an economist, and it is a basic principle of this area of academia that an efficient market incorporates anything that's publicly available.  This idea that it was behind a paid subscription it's not publicly available is inconsistent with an efficient market hypothesis itself.  It's -- it is unprecedented.  We're not going to see it in any of the cases.  That's why Plaintiffs cite these cases that

hold that private disclosures are not publicly available because they're confusing.  They're not citing any cases that hold information is not publicly available because of a certain threshold dissemination or because of the cost of the pay wall.

THE COURT:  Can you engage in a little economic thought exercise here?

MS. COSTLEY:  Yeah.

THE COURT:  So *The Capitol Forum* is publicly available because it is available, at the very least, to its however many subscribers it has.  And let's just say that it's arguable that, if we take that number of subscribers that they have, maybe that affects a lot of market participants or maybe it doesn't affect very many.

But, regardless of how many it affects, it I think is beyond dispute that it might have affected some of the consumers of *The Capitol Forum* and its information that it published in 2020.

So under the efficient market theory, it doesn't matter how many market participants consumed this information or whether they consumed it.  As long as it is provably public, then the -- because one of things Plaintiffs point to is there was no splash.  There was no market reaction to this coming out.  But I take it the economic model here would -- and I get we're kind of

dealing in the abstract a little bit.  But I kind of enjoy it.  I think this is interesting.

I take it your argument would be the reason the market didn't react is this was kind of a nothing burger.  And that, at the time that *The Capitol Forum* came out, the market reacted as much as it should have to what was disclosed publicly to *The Capitol Forum's* 2020 reports.

Is that right so far?

MS. COSTLEY:  100 percent.  That is exactly our argument.

THE COURT:  Okay.  I think I had a follow-on question to that, but it's -- I kind of forgot about it in my laying that out, so I may come back to it.

MS. COSTLEY:  That is -- that is the core of our argument, exactly.  And, you know, I think consistent with what you just said, right, is how the analysts and the Natera market makers react after Hindenburg is released, right?  We don't see them relying on these revenue estimates, which is how we know that the people -- it's how we know that it was a nothing burger.

We don't see a revision to revenue.  And if it had revealed new material information about the health of the company, we would have seen a revenue revision.  We just don't see how Plaintiffs point to one analyst who, I think like two or three weeks after the release of the

Hindenburg report, does have a slight revision.  But they revise it because they say dealing with these allegations that is going to distract management.  Not because the claims themselves are distracting, but because the fact that being hit with a short report is a burden on management.

And, of course, we know with the benefit of hindsight that it was a giant nothing burger, that none of the regulators have done anything about it.  And, moreover, Natera is trading at three times the price it was trading at prior to the -- prior to release of the Hindenburg report.

We have put evidence in the record about the effect of being targeted by an activist short seller.  It's a very significant event for a company.  And the reason is the whole point of being of a short seller is you're there to drive down the company's stock price.  That's their goal.  That's their entire purpose.

THE COURT:  If -- but, I mean, Plaintiff doesn't bear -- I mean, to hear them tell it, they don't bear the burden to prove at this stage that the entire 39 percent or 33 percent stock drop was attributable solely to the revelations of the Hindenburg report.  They just have to show that there was a statistically significant drop and the Hindenburg -- that new

information -- and I get that that's a debated fact, too -- but that at least some of the cause, even if concerns about short sellers wading into this might have had some effect, that the few facts revealed in the report were also present at the same time.

MS. COSTLEY: Yes. You're right, Your Honor. So what they have to show is that there's something in Hindenburg that's new and that's corrective that would yield that Natera's prior statements were false or misleading. And -- and if there is a stock price decline that follows that, that may be sufficient to -- for there not -- to show that there is a price impact.

But I want to stress it's not just new information, it's new corrective information. And new corrective information is information pled in the complaint that showed the company's prior statements were false or misleading.

I also want to touch on this idea that the stock price didn't react to the July -- to *The Capitol Forum* reports. This is the stock analysis performed by Natera's expert, Dr. skinner. The first *Capital Forum* report is released on July 1st, 2020. The stock price goes down by about 1 percent on July 1st. It goes down another 4 percent on the 2nd. It goes down another 5 percent on the 6th. So it's like a 9 percent decline

in the two days following.

Now, Defendants will always tell you in a case like this that the stock price reaction should be instantaneous, that they look it up one hour or maybe two hours, at the most, one-day window.

Plaintiffs in these cases are always going to say you have to look at a multiday window.  And Mr. Coffman, Plaintiffs' expert, during his deposition testified with information like this which is remote and far-flung, he said, well, I think a second -- a two-day or three-day window would be appropriate.

So, look, we're not saying that at two- or three-day window is appropriate.  But we are saying, if you accept Mr. Coffman's view that you're looking at multiday window, there is a 9 percent stock price decline over those multi-days following release of *The Capitol Forum* report.

So I don't think it is fair for Plaintiffs to say, if anybody had seen *The Capitol Forum* reports, the price would have went down because, if you accept their view that you can have a multiday window, there is that negative stock price decline.

THE COURT:  Okay.  So I thought I remember the other kind of follow-on to that question about market efficiency, and it's this:  If the market is truly

efficient, and you're distinguishing *Ramirez* on that court's conclusion that it wasn't so much about the dissemination of this report as it was the complexity and I guess, therefore, the ability of this, you know, theoretical market participant to understand and incorporate this information into their pricing decision.

If the market is this truly efficient, unknowable algorithm, why would the complexity of the information matter?

MS. COSTLEY:  Well, Your Honor, I --

THE COURT:  Because, you know, looking at the information in *The Capitol Forum* and the Hindenburg, a lot of it just seems like business gossip.  And I get that -- I understand what they're saying.  And just like when I'm a judge in a patent case, I don't understand everything the minute it comes out, I mean, the minute I'm reading the parties' briefs.  But I take the time and I consume it.  And I would think that -- and I come to an understanding that I think enables me to make a decision.

If we're talking about a theoretical market-omniscient market actor, I don't understand why the complexity of the information makes any difference in terms of whether or not it would affect the market -- the stock price.

MS. COSTLEY:  I think you're right to feel that

way, and I would be interested to ask economists if they think *Ramirez* was correct.

THE COURT:  Uh-huh.

MS. COSTLEY:  But I think that that is an issue with the decision.

So that was all I had on price impact with respect to the Panorama statements, unless the Court has further questions about Panorama.

I'm going to talk about the microdeletion statements very quickly.  First, there is no dispute that Natera's price did not increase when the microdeletion statements were made.  Plaintiffs do not seriously dispute a lack of front-end price impact with respect to the statements about the microdeletions.

There's also no back-end price impact.  There is really no dispute that the requisition form was publicly available.  Plaintiffs took the position in the complaint that information on Natera's website was incorporated into Natera's stock price.  It's paragraph 100 through 102.  There may be other examples as well.

So with respect to the requisition form, this is quite easy and straightforward.  And our view is there is plainly no price impact with respect to the statements about the microdeletion and the requisition form.

That concludes my presentation with respect to the 10(b) and 20(a) fraud claims. I will then move on to the Securities Act claims unless the Court has further questions.

THE COURT: Nope.

MS. COSTLEY: So, just very briefly, to bring a claim under Section 11, Lead Plaintiff has to provide evidence that they purchased shares that can be traced to the secondary. To bring a claim under Section 12, Lead Plaintiff has to produce evidence showing that they directly purchased in the secondary offering.

Lead Plaintiff -- the court-appointed lead plaintiff admits it didn't purchase in the SPO and can't trace shares to the SPO. So we're only looking at trades by the self-appointed additional plaintiff, Key West, who has produced no evidence whatsoever -- no declaration, no trading records, nothing -- showing that it purchased shares in or traceable to the secondary public offering.

The only evidence they have put forth is the verification that was submitted in connection with Key West's unsuccessful lead plaintiff motion. And the verification doesn't come out and say I purchased in the offering or I purchased traceable to the offering. It has one of those conclusory statements that, you know, kind of wouldn't be enough under *Iqbal* or *Twombly*, we

purchased in or we purchased traceable to the offering.

But that's not even a direct representation, and other courts have held that's insufficient. There were over 31 million shares at the time of the secondary public offering. Evidence that Key West purchased in the offering is distinctly in Key West's possession, right? They would have the trading records. They could have put in a declaration. It would have taken them 10 minutes for them to get a declaration from their client.

The absence of such evidence here is conclusive. They have not met their burden of establishing standing under section 11 and section 12.

THE COURT: So Mr. Jensen puts that on you and says, Well, all they had to do was seek discovery from us on this, and then they should show that our group is inadequate.

MS. COSTLEY: Yes, Your Honor. First of all, they're not a court-appointed lead plaintiff, so I think a determination was made that we weren't going to engage in discovery with an institute that was not a court-appointed lead plaintiff. But, beyond that, I know if there was information from my client I wanted to get into the record, I'd provide a declaration. It's not burdensome at all.

THE COURT: Okay.

MS. COSTLEY:  And unless Your Honor has any further questions, I'd like to reserve any time I might have remaining for rebuttal.

THE COURT:  Okay.  Thank you.

Mr. D'Ancona?

MR. ASHBY:  Your Honor, may I briefly address for the underwriters.

THE COURT:  Oh, yes.  Yes.  I'm sorry.

MR. ASHBY:  This won't take very long.  So the only cause of action against the seven underwriter defendants in this case is the section 12 claim which Ms. Costley just talked about.  That claim requires that the plaintiff had purchased shares directly in the offering at issue.  So in that case that means that the Plaintiffs have to establish that they made a direct purchase of Natera shares in the July 2021 secondary offering from the underwriters.

And that's a critical threshold issue that the plaintiffs do have the burden to prove in order to have standing to pursue a section 12 claim.  And neither plaintiff has met that burden here.  And for that reason the Court should deny class certification of the section 12 claim, and it should also dismiss that claim.

We cited two cases that say that the plaintiff does not have individual standing to assert a claim.

They may not do so even if they meet the other Rule 23(a) requirements. And we laid out in our papers the plaintiffs' failure to meet their burden.

BAPTL, the lead plaintiff here, admits that it did not purchase in the offering directly. And while Key West alleges in the amended complaint that it purchased shares of Natera stock from Morgan Stanley, it has not provided any evidence to support that allegation.

THE COURT: What about the cases that Plaintiffs cite saying that a lead plaintiff doesn't have to show standing, at least at the class certification stage, for every cause of action?

MR. ASHBY: So, again, in the Plains case, in the *Blockbuster* case, both of those courts there found that standing is a requirement that the plaintiffs must show. They have the burden. And certification where the plaintiffs lack standing is not appropriate.

THE COURT: Okay. So is this just a split of authority, then? Some courts have held that it's enough and others haven't?

MR. ASHBY: Well, I -- I think they absolutely have this burden. The cases do not say that you can proceed with a claim where you don't have standing. And that's the fundamental issue here. And the reality is that Key West could have submitted trading records. I

mean, they say we didn't ask for discovery, but it's their burden.  They could have submitted trading records showing the purchase of this stock from Morgan Stanley. They could have submitted declaration or an affidavit showing they purchased the stock from Morgan Stanley.

But, instead, all we have is a certification that says nothing more than 389 shares of stock were purchased on this date, not even who it was purchased from.  And the most they say is that they purchased from Morgan Stanley.  There are seven underwriters in this case.  They don't even make an allegation about the other six, that they purchased from them.

So for that reason we think that the underwriters should be out of the case, because there's no evidence of a purchase from any of the underwriters, there's not even an allegation of a purchase from six of the underwriters.  And because they lack standing, not only is class certification not appropriate, but the claim should be dismissed.

THE COURT:  Very good.

MR. ASHBY:  Thank you, Your Honor.

THE COURT:  Thank you.

Counsel?

MR. D'ANCONA:  Thank you, Your Honor. Apologies in advance for a bit of paper shuffling to

come.

To respond briefly, Your Honor, first of all, a number that you heard numerous times from my colleague is that MGML accounted for 7 percent of Natera's Panorama activities in the class period.  That -- I believe she just overlooked or perhaps is just focusing on 2022.  The class period ends in March of 2022.  The class period begins in the beginning of 2020.

Natera told investment analysts on the special investor conference call on March 10th, 2022 that in -- in the prior year, in 2021, MGML had handled 11 percent of the volumes.  And it didn't answer a question about -- or didn't get into an answer in its answer about how much it had done in years prior.  Analysts, including Hindenburg, were, based on their analyses, talking about volumes that would equal hundreds of millions of dollars, 400-plus million dollars of revenue.

And so the number was not 7 percent during the class period.  Maybe for the last couple of months of the class period, but it was much higher than that.  In any event, if we're talking about materiality on a quantitative basis, you know, something that's affecting revenues, first of all, it's not just a quantitative or qualitative question, of course.  But, I mean, there's a sort of general rubric that SEC looks at and things that

affect something that's around 5 percent of a company's revenues tend to qualify as material, if we're just purely looking at a numbers basis, which, again, we're not here. But all these numbers are well above that threshold. So that just addresses the 7 percent number that we heard a number of times.

I think it's very telling that -- that Defendants' lead argument here -- and counsel emphasized this. Their primary argument is this market timing argument that has absolutely no legal precedent. Counsel tried to sort of minimize what the -- what the blowback, what the consequence of approaching it in the way that she suggests would be on these cases by saying, oh, you know, it just shortens the class.

It would prevent the application of the *Basic* presumption of reliance as -- as was laid out. It's a prerequisite for the application of the *Basic* presumption. And as all these cases say and as Your Honor is no doubt well aware, without the *Basic* presumption, there is no predominance in these cases. There is no class action in these cases. That's what *Basic* was responding to.

So the idea that it just shortens the class if -- if they can disprove market timing for the -- for the proposed class representatives is -- is really not --

is an understatement.

THE COURT:  Well, one of the -- so one of the arguments that they make is, look, as a basic presumption beneficiary, you get to bring a case without having to show actual reliance or misrepresentation.  You are beneficiary of the *Basic* presumption.  And that presumption assumes an efficient market and that that efficient market is omniscient.

And so once we have publicly information -- publicly available information in the market, like *The Capitol Forum* publication, it doesn't matter how many people consumed it.  The market -- the market itself, as this amorphous, omniscient being, consumed that information and reacted accordingly.

And you can't go back and argue how broadly it was disseminated, who all got it.  You can't make that sort of qualitative analysis of the -- of that, because then you're getting into something that is an assumption that's not incorporated into this *Basic* assumption.  And that you're kind of leading me down the garden path by encouraging me to look at that.

And I get that there's -- that some of that argument goes both to market timing and price impact.  But at least in the context of the marketing timing, is the court permitted to consider how widely disseminated

this -- does it matter?

MR. D'ANCONA:  Well, I think clearly what's -- what's -- the gambit, the approach, that Defendants are taking here is to try to flip the burdens that the -- that the Supreme Court has clearly established through the *Amgen*, *Halliburton II*, *Goldman Sachs* line of cases where all these questions have been thoroughly raised and pressed by counsel on all sides of the bar on these issues.

Through those cases we know several things: Materiality is not to be proved at class certification, nor is falsity, nor is loss causation.  That's *Basic*, *Amgen*, and *Halliburton II*.  Those did not need to be proved for a class to be certified.

We also know from the majority decision in *Amgen*, counsel was citing to the dissent and then saying, well, maybe the dissent now controls the Court.  But the -- the majority's opinion in *Amgen* on this point has not been overturned and was directly responding to and rebutting the point from the dissent that counsel pointed to.  It said that the market timing question is one of 23(a), typicality and adequacy.  And, you know, to the extent it gets into materiality questions on the merits, that's going too far afield.

Now, *Goldman* more recently said courts can and

should get into materiality questions to the extent they overlap with price impact issues, but only to that extent at class certification. And there's the footnote 2 that I noted from *Goldman Sachs* where it cautioned lower courts to resist the temptation to make merits determinations at class certification that go beyond what's necessary for price impact.

Counsel is inviting Your Honor to do exactly that. And not just merits determinations on materiality at class certification, but also on falsity and also on loss causation. Because if Your Honor is going to determine as a matter of fact on this record, or considering determining as a matter of fact on this record, that the truth was actually on the market prior to the alleged corrective disclosure, that's a quintessential materiality decision in this case. That's a quintessential materiality question that's discussed in *Amgen*.

And, again, Your Honor can do that in the context of price impact. But that's the carve-out that the Court established in *Goldman Sachs*, and it was -- it was crystal clear about that.

Also in *Amgen*, in the majority decision, the one that controls, it said that market timing is a 23(a) -- not a 23(b)(3), a 23(a) question of typicality

and material -- and adequacy, rather.  And we know that the burden on typicality and adequacy is just not that high.

So Defendants are -- are asking Your Honor not to think about the consequences, which I want to get back to in a moment, but to ignore all of this well-considered, carefully crafted Supreme Court case law that says what is in a class certification as far as merits inquiries.  And that's really whatever is needed, whatever the Court wants to look at in terms of price impact.  All probative evidence is in play for price impact.

But for these other questions, market timing, those are materiality, falsity, loss causation, intertwined merits questions that are out of bounds at the class certification stage.  And I think the Supreme Court has made that very, very clear.

As for the -- as for the consequences, number one, they would be flipping the burden onto Plaintiffs to prove something that right now they have the obligation to disprove.  And it's -- it's a clever argument.  It's one, however, that has zero case law support in any case, ever.

And so it -- it should give us all pause to think that this is going to be a new frontier where they

can get around -- again, she said this is our primary argument.  Price impact is our secondary argument, implicitly.  They can get around the burdens that they have on price impact by saying, Well, ah-ha.  Got you.  You have to prove affirmatively market timing.  You have to affirmatively show materiality, falsity, loss causation is as you say and not as we say now.  Even though, by the way, you don't even have merits discovery yet.

There's a lot of problems with that -- with this argument, but the number one problem is that there is no case law support for it at all.  It's creative.  I've never seen it before, you don't see it in any of the cases, and there's probably a lot of good reasons why.

The idea, again, that it would just shorten the class period is also, I think, really understating the consequences.  It would undo the entire body of work that the Supreme Court has carefully developed in *Amgen,* through *Halliburton II* and *Goldman Sachs* in thinking about all of those issues by saying, well, here's an end around.

We now say that plaintiffs have to effectively prove their case and that nothing else affected the market during the class period, not in the price impact context where the Supreme Court has said, go, do it

there.  You have to do it there.  Defendants have to disprove it and Plaintiffs have to put in evidence to try to battle there, and so there's going to be a lot of evidence on these questions at price impact.  No.  Now you have to go to market timing, where the Supreme Court has said that's typicality and adequacy.  But now all of a sudden -- that's a new venue.  We're having these fights.  But now all of a sudden Plaintiffs have the burden.

There's no authority for any of those steps, and they're asking Your Honor to take a lot of steps and sort of going out on a limb with them.  And it's unprecedented.  There's no support for it.

I'll try to take a few things in order here. Counsel pointed to the Hindenburg declaration.  So that's a *post hoc*, irrelevant distraction in our view, Your Honor.  It was garnered apparently through negotiations with defense counsel after they served a document subpoena.  Hindenburg produced no documents, or at least that's the latest we heard.  And, instead, here we have a declaration where they said we relied on public information.

And Hindenburg is an investment-related firm. In my experience, and I think it's safe to say in industry practice, there is a very important and clear

distinction on whether you say your investment advice and your investment thesis is based on public information or private, inside information.  The distinction there is material, nonpublic information that insiders have, that outsiders are not allowed to have and that you are not allowed to trade on or everything else.

And I think that's the distinction that's being drawn there.  It sort of sounds good in the context of this.  But if you read the Hindenburg report, they say, We conducted this exhaustive investigation.  We talked to people one on one.  We did this, we did that.  We turned over every stone.  That's not inside information, and so that's public information.

I think that's the fairest way to read that statement.  But, in any event, it's a 2024 declaration, negotiated no doubt with counsel.  Its relevance to what the market was doing on March 9th, 2022 is really remote, and I think it has very little bearing on that question.

Counsel argued that -- that our claim does not involve -- that our claim does not involve any information that was allegedly corrective in the Hindenburg report.  And I'm sorry if I garbled that, but I think Your Honor recalls the argument I'm referring to.

In that regard, Defendants' own expert in footnote 81 of the report filed on August 16th, 2024, he

talks about -- and this is in the discussion of MGML, the Hindenburg report, and *The Capitol Forum* and what was covered in *Capitol Forum* and what was covered in Hindenburg and what was said about MGML.

He drops a footnote, and it's footnote 81, where he says:  In addition to these points that I say are in both, because he does a similar comparison to what counsel just did here.  In addition, Plaintiffs allege as corrective claims made in the Hindenburg report that MGML sought prior authorization after a test was run.  See the complaint at paragraph 135.

And in his deposition which is in the record as well, I asked him about that.  And he said, No.  I'm admitting that that is information that was not in *Capitol Forum* but was in Hindenburg, which you are pointing to in your complaint and you are saying is a part of your claim.

So there's a clear gap there.  Their expert admitted it.  I think counsel's arguments are not evidence, but this is evidence.  And he admits it in the evidence that we have.

Counsel suggests that in order to disprove price impact, they have only to show that, either at the front end or at the back end, there was no price impact. But then counsel also quickly noted that, well, there's

also a whole number of cases where that doesn't really work because there's no allegation of front-end price impact. And I think that kind of hasty qualification says a lot. And I think more importantly is that there's one case that counsel cited to for that proposition, the case was *Best Buy*. It was from the Eighth Circuit in 2016.

If Your Honor or Your Honor's law clerk researches that case, shepardizes that case, and looks at the prior or the subsequent history of that case, you will see numerous cases, six, seven, eight, nine cases, that distinguish that case and cabinet it to its facts. Even cases in the Eighth Circuit don't see that as standing for the proposition and the rule that Defendants are arguing. It's decided on its facts.

And the facts in that case were really strange. And unfortunately for Plaintiffs, Plaintiffs' expert admitted that before the -- before the start of the class period, the corrective information had already entered the market.

So it's got a bizarre, frankly factual wrinkle to it. And if I don't have that quite right, I mean to and I may be slightly off on the detail. But the facts were unique. All the courts that you will see distinguishing it point that out, and they cabinet it to

its facts.  Nobody sees it as standing for the proposition that in all of those, sort of, mine-run, ordinary price impact arguments.  All Defendants need to do is knock off price impact at one end or the other and they've carried their burden.  There's really no support for that.

THE COURT:  I want to go back to your previous point about even Defendants' own expert acknowledging that at least what he refers to in footnote 81 was new, corrective information that wasn't in *The Capitol Forum* report.  To be sure, your primary argument, though, is that it's all new, right?  That because *The Capitol Forum* report was not widely disseminated, the court can't necessarily conclude that it was in the market.  And that anything that's in the Hindenburg report I should consider as new to the market?

MR. D'ANCONA:  Yes, Your Honor.  That is our primary argument.  But as a fallback --

THE COURT:  But even if, right?

MR. D'ANCONA:  Yes, sir.

THE COURT:  Okay.

MR. D'ANCONA:  Yep.

THE COURT:  If I do -- if I reach the conclusion that I have to rely on your fallback argument, if I reach that point, well, do I then have to -- well,

if that's the only newly corrective information, that seems like it's a pretty thin read to base class certification on, right?

MR. D'ANCONA:  Well, again, Your Honor, the -- so, first of all, I would point out that, above all, the question is whether Defendants -- really, the only question right now is whether Defendants carry their burden to demonstrate no price impact.  The value, the -- the amount of the stock price reaction that could be attributed to one thing and desegregating other causes, that's loss causation.  That's an analysis that would happen at the expert merits stage of this case, after discovery is complete and all that work is done.  But that's not a proof that either side can actually make right now.

But I will say that, because neither side can make it right now, there's really only -- speculation would be the only way I could answer that question of whether that was important to investors or whether that was only driving a small part.  But even if it's only diving a small part, like Judge Rosenthal said in *Cabot*, Defendants have not excluded Plaintiffs' alleged cause, and they fail.  They fail on the price impact inquiry where they have to carry that burden to show no price impact.

But how much it was worth or how important it was, that's for another day.  That's loss causation.  And the Supreme Court made that clear, again, in *Goldman* and in *Halliburton II* originally.  That's where that ruling was set forth.

But on the facts, I mean, we certainly see analysts asking probing questions about what about this subsequent submission of prior authorization requests after tests are run?  We see them noting that in their commentary.  So the idea that it was sort of minor or sidelight point is not necessarily supported by the record.  It could turn out to be the case.  I just think we can't prejudge it.  We haven't done that step in the litigation yet.

THE COURT:  Okay.

MR. D'ANCONA:  That's a question for serious expert merits work on loss causation and damages.

So they're wrong on the law of price impact and what they have to show.  I just want to underscore that point.

They also made a point that's also in their brief that there's little reason to think that the front-end statements would have a price impact because they were just repeating things that have been said before.

Now, in rebuttal to that point, I think first of all this is just counsel's argument. They do not have expert sign-on to that point. That's not a point that their economic expert made about those statements, that they wouldn't be the type of statements that would -- experts do offer those types of opinions. He didn't. He didn't sign on to that. So that's not evidence, what we just heard about that point. It's an argument which is cognizable, but it's not evidence.

But, second of all, I don't think it holds up. If we look at the statements, if we look at, you know, Defendants' Exhibit Number 32, which is the February statement that kicks off the -- kicks off the class period, they say, you know, we had a terrific period. And, in part, this was driven by Natera's revenues.

If you see then our expert's review of the investment analyst commentary about that release, "Terrific, blockbuster period for Natera, driven by Panorama." So they're calling it out, too. They're not saying, "Ho-hum, same old, same old. Looks like Panorama is still around." They're saying Panorama is doing great. It's got out-performance. It's helping drive this exceptional growth for this company.

And you see the same kind of commentary -- and this is in our complaint at paragraphs 111 to 120. You

see the same kind of commentary in May of 2020, August of 2020.  In May of 2020 they -- they say that the -- that the company's outstanding performance was driven by record volume and revenue growth for the tests.  The tests are Panorama and Horizon.

So it's -- they're calling out new performance in this period that we're talking about today.  They're not saying, "Hey, just like it was three years ago," they're saying, "This continue to be a rocket ship that's growing.  And that's the growth story for this company.  That's the -- that's the story they're selling to investors about why they should invest.

They have a number of other products.  There's one called Signatera which the analysts start turning to in 2022.  And they say, Well, I think that's your growth story now.  And that explains, if you look at the -- if Your Honor looks at the analyst reports in 2022 where they don't change their revenue estimates, they say, Even if we -- even if we set Panorama revenues to zero, we're in love with Signatera.  We think Signatera is the story of the future for this company.  So going forward, we think in a year, which is what our price estimate is, we think it's going to be all about Signatera and they're going to be doing great.

So it doesn't -- you know, I think we heard

this argument that the revenue estimates didn't change. That means that nothing that happened in 2020, 2021, or early 2022 was meaningful to investors.  That -- it doesn't follow.  It doesn't follow from what we see in 2022.  The analysts say it's this other product that we're excited about now, and we can discount the value of Panorama going forward when we think about our revenue estimates over the periods to come.

So that's I think what's happening there.  But, in any event, this repetition argument I don't think it holds up.  It matters that Panorama continues to thrive and that it continues to drive revenue in the quarter that just happened and in the present.  And that's the story that they're selling to investors during the class period.

*The Capitol Forum* cases, the question that Your Honor asked gave me the impression that perhaps Your Honor was familiar with some of these cases.  Some of these are at the motion to dismiss stage, so there's no evidence at all.  Some of these are -- many of these are cases where some other entity, like Citron, which is another -- which is another investment firm, or even Bloomberg, obtains *The Capitol Forum* article in question somehow and basically, like, republishes it or republishes part of it.  And that's all bundled up in

what's being released.

And so these are not cases, by and large -- I can't recite the facts of all of them to you.  But, from my analysis of them, they're not cases by and large where, number one, there's evidence because some of them are motions to dismiss.  Some of them are summary judgment.  There's one that's summary judgment.  That's the *Walgreens* case.

But the court didn't make a ruling on whether *The Capitol Forum* report was an important factor or not.  It left it for the jury.  It said there's arguments on both sides.  It will go to the jury.  So that's not a decision on the merits of what the worth of a *Capitol Forum* report is.

But I think what the most important takeaway on these is, is it matters the situation in each case, the facts that are present that the court needs to analyze in each case.  Here we don't have Bloomberg picking it up.  We don't have Citron picking it up.  We don't have these other factors.

We've already made it past the motion to dismiss, where Defendants made some of the arguments you've heard today about the merit of the case.  Judge Ezra passed on the merit of the case and found that it should survive the motion to dismiss by able counsel.

Cleared PSLRA hurdle.

So we're already past the question of whether it's a meritorious case. They have filed their motion for judgment on the pleadings. Maybe they'll win. But those merits questions are outside the purview of what's at stake today on this narrow issue of whether they've defeated all the Rule 23 elements or whether we've shown them.

One -- a couple of last points, Your Honor. The idea that -- that the short seller academic article, the short seller proposed cause for the stock price decline, again, it's a 39 percent abnormal return. It's about a 33 percent just regular return on the day. The abnormal return compares it against the index like we were talking about before. The index actually went up that day, so they fell 33 percent. That's more like a 39 percent abnormal drop. So that's what happens on this day.

All of the proposed causes that -- that counsel is pointing to. They don't add up to anything like 39 percent. Even with a bounce-back the next day, when some analysts and investors take comfort in what the company says on the special investor call, you don't close the gap, you don't close out the whole number.

Now, I'm not an economist, so my rough math

doesn't really matter in this regard, but I'll just say that the 7.5 percent that they've said can be attributable to almost, like, generic short seller event, that doesn't get them anywhere near explaining the cause.

And, most importantly, we have what their expert said, which I clearly wanted to read into the record.  Yeah.  He said, So my opinion with respect to these factors -- and this is all of the factors that they and he pointed to as potential other causes of the stock price drop on March 9th.  I asked him whether he empirically tested any of them, as an economist would, to say that I actually believe that is the cause.

And he said, No.  He said, I'm just looking at them, and they're the type of things that can have that type of effect.

So he doesn't opine that they did cause it, just that they could.  And his language in his report is "it may have" or "they likely did."

And in his deposition I asked him about that, and he said:  My opinion with respect to these factors is that these factors likely affected Natera's stock price on March 9th.  I did not quantify that effect, nor do I necessarily claim it accounts for the full stock price decline.

So it's speculation, and it's incomplete at

best.  It doesn't get them all the way they need to be. That's their evidence as to what caused the stock price decline and their effort to exclude the cause that we had posited, Your Honor.  And it just doesn't go far enough.

Last point:  Counsel suggested that we have to show -- second-to-last point:  Counsel suggested that we have to show that there is new information and that there is a stock price decline, and that it's related to the clauses that we alleged at class certification.

I think a read of any of these cases on price impact and the burdens here would show that that's not the case.  When Defendants attempt to rebut the *Basic* presumption with their showing of price impact and whatever evidence they want to put forth, we are certainly entitled to bring that kind of evidence forward, but it never becomes our burden to prove that the cause is what we claim it is and that we intend to prove it will be once falsity and loss causation and damages are analyzed in the merit stage.  That never becomes our burden in price impact.  We have the opportunity to put in evidence, but the burden never shifts.  So I just want to correct that point.

And, finally, we saw a table of stock price declines from July of 2020 with some numbers over three days and a suggestion that our expert is comfortable with

a three-day event study or a three-day decline window. Their expert has no opinion like what you heard from counsel there.  That was pure speculation on counsel's part.  The idea that a lawyer can stand up here and point to sequential declines of stock prices over several days and say, well, that looks like a decline that could be attributed to a particular cause, that's not what lawyers are good at.  That's not what our job is in these cases.

There are economists whose job is specifically to make that kind of connection, and their economist did not.  There's no economic evidence from their economist that the stock price movement of Natera at the beginning of July of 2020 had anything to do with Capitol Forum. He made no analysis of that.  He did nothing empirical on that front.  And it's just not evidence, Your Honor. It's nothing but speculation.

So with that I will rest unless Your Honor has any questions for me.

THE COURT:  I do not.  Thank you.

MR. D'ANCONA:  Okay.

MR. JENSEN:  Your Honor, may I respond briefly on the Securities Act?

THE COURT:  Yes.

MR. JENSEN:  Your Honor, counsel for Defendants acknowledged the allegations that Key West purchased in

the offering.  They gave no reason to doubt the accuracy of those allegations.  And I believe counsel for Defendants admitted that they deliberately did not pursue any discovery from Key West.  They've provided no legal basis that Key West had a burden to prove at class certification its participation in the offering.

I think counsel for Defendants might have suggested that they cited some cases on this.  I would respectfully submit that, if you look at those cases, they're motion to dismiss decisions or otherwise not analogous here.

And then the last thing I wanted to say was it sounded as though counsel for the underwriters was tacking on a request for a dismissal on this basis.  Your Honor, they already had a chance to move to dismiss.  They didn't move to dismiss on this ground.  They shouldn't be provided another opportunity, another bite at the apple.  If they are making such a request, then we should be provided an opportunity to respond accordingly.  But, in the interim, they've already had their shot at that, Your Honor.

Unless you have any further questions, that's all I have.

THE COURT:  No.  Thank you.

Ms. Costley?

MS. COSTLEY:  Thank you, Your Honor.  I will be brief.  Your Honor, this is a very rare case.  This is -- in many years of doing security litigation, I don't know if I have ever seen a case where there was a prior disclosure of all of the information the plaintiff claims was corrective and the plaintiff chose to just ignore it and move forward with a lawsuit.

Plaintiffs made some interesting comments about how carefully the Supreme Court structured its decision in *Goldman* and in *Halliburton II*, and I agree completely. It is significant that when the Supreme Court issued these two very carefully worded decisions, it retained the requirement that, in order to invoke *Basic*, Plaintiffs first must prove market timing.

If that does not mean that Plaintiffs have to prove they bought stock before the truth was revealed, I don't know what it means.  I don't know why the Supreme Court would have included it twice.  Plaintiffs also make a showing of saying, Oh, well, she was reading from the dissent in *Amgen*, and then she says that the dissent is now the majority.  No.  The dissent is the majority in *Goldman*, and the dissent is the majority in *Halliburton II*.  And in -- and that is significant because, in both *Halliburton II* and in *Goldman*, the language that was pointed to in the dissent about the need to prove market

timing before invoking *Basic*, before getting the presumption of reliance, before certifying a class under Rule 23(e)(3) moves into the text of the decision, it moves into the opinion, and it becomes an element that Plaintiffs expressly have to prove before being able to invoke *Basic*. If they can't invoke *Basic*, they can't move forward. And if it wasn't intended to be their burden, the Supreme Court wouldn't have said that it was.

Plaintiffs also made the comment about -- I think they said something to the effect of *Goldman* said that the only time when the Court should get into the merits at class certification is on materiality. In fact, what the Supreme Court held in *Goldman* was that the Court must consider evidence relevant to the merits, like materiality. Not only materiality, but like materiality.

And then it goes on to hold: The court has an obligation before certifying a class to determine that Rule 23 is satisfied, even when that requires inquiry into the merits of the case. And that is exactly what we are asking for the Court to do. We are asking the Court to follow *Goldman* and follow *Halliburton II* and conduct this market timing inquiry that is expressly Plaintiffs' burden.

Your Honor asked previously about whether there was any cases -- in any of *The Capitol Forum* cases we

cited, whether *The Capitol Forum* report itself caused the stock price reaction in those cases.  Yes.  There are three.  *Chobat*, C-h-o-b-a-t.  That is a summary judgment case where there was evidence in the record about *The Capitol Forum* report causing a stock price drop. *Polarity* and the *Fleetcor* decision.  So there are at least three decisions where it was *The Capitol Forum* report alone that caused the price to drop.

My final point is just that Plaintiffs have said that Dr. Skinner -- that's our expert -- admitted that there were new -- that there were allegations in the complaint about this sort of retroactive prior authorization.  I agree with the Court that is a thin read to certify a class.

I also just want to be clear.  When you look at the Skinner report, paragraph 81, it references paragraph 135 of the complaint.  Paragraph 135 of the complaint is not talking about retroactive prior authorizations, and nowhere in the complaint did Plaintiffs allege Natera's statements were false or misleading because of this retroactive prior authorization issue.  So it's not just a thin read, it's not -- it's not corrective, it's not a basis for the claim.

Your Honor, I have nothing further unless you

have any questions.

THE COURT:  I do not.  Thank you.

MS. COSTLEY:  Thank you.

THE COURT:  So I will -- oh, yes.  Yes.
Mr. Ashby.

MR. ASHBY:  Okay if I respond quickly,
Your Honor?

THE COURT:  Of course.

MR. ASHBY:  So I just want to mention a couple
of cases.  So the Plaintiffs say, Oh, these were motions
to dismiss cases.  That doesn't -- but this is actually
worse.  We are in a situation where we are talking about
certifying a class where the fundamental issue that has
to be decided is, is there even subject matter
jurisdiction.  And that depends on the existence of
standing.  And in that situation they have the burden to
produce evidence establishing that there is subject
matter jurisdiction.

There was a Southern District of Ohio case, the
Fifth Third Bancorp litigation brought by the Local 295
Pension Trust.  And that was a motion to dismiss where
the plaintiff put in an affidavit of a purchase of stock
from UBS to establish section 12 standing.

But it offered no other evidence with respect
to any of the underwriters.  And even at the motion to

dismiss stage, the court said the claims of the class against all of the underwriter defendants other than UBS must be dismissed, because there was no evidence that the court had subject matter jurisdiction.

Then we have a Southern District of Texas case by Chief Judge Rosenthal, also a motion to dismiss, saying that -- which stands for the proposition that putative class representatives lack standing to litigate Securities Act claims against underwriters for misrepresentations in a securities offering in which the representatives did not purchase in the offering.

That was affirmed by the Fifth Circuit, and that case is very clear that the respondents must, quote, allege and show that they personally have been injured. What's missing here is the showing. They've alleged in the complaint that they purchased, but there's no showing. And they could have easily done that with trading records or a declaration.

Thank you, Your Honor.

THE COURT: Thank you. All right. I appreciate the parties' arguments today -- it was helpful and -- indulging my questions as we went through it. And so I found this to be a good use of my time. I hope you found it to be a good use of your time and travel to be here.

And so what I'm going to do is take this under advisement. And this has been referred to me for a report and recommendation, and so that is what I will issue once I feel like I've gotten to the bottom of it.

All right. So, with that, you are excused, and safe travels to you.

(Proceedings concluded at 12:46 p.m.)

**REPORTER'S CERTIFICATE**

I, Arlinda Rodriguez, do hereby certify that the foregoing was transcribed from an electronic recording made at the time of the aforesaid proceedings and is a correct transcript, to the best of my ability, made from the proceedings in the above-entitled matter, and that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

/S/ Arlinda Rodriguez                    November 27, 2024

ARLINDA RODRIGUEZ                        DATE