# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **JOHN HARVEY SCHNEIDER, ET AL.,** *Plaintiffs* | § § § § | |
| **v.** | § § | **No. 1:22-CV-00398-DAE** |
| **NATERA, INC., ET AL.,** *Defendants* | § § § § | |

### REPORT AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

TO:    THE HONORABLE DAVID A. EZRA
      SENIOR UNITED STATES DISTRICT JUDGE

Before the Court is Plaintiffs John Harvey Schneider, Key West Police & Fire Pension Fund, University of Puerto Rico Retirement System, and British Airways Pension Trustees Limited's ("Plaintiffs") motion to certify class, Dkt. 136, and all related briefing. After reviewing these filings and the relevant case law, as well as holding a hearing, the undersigned recommends that the District Judge grant Plaintiffs' motion.

## I.    BACKGROUND

Plaintiffs initiated this putative class action based on a series of alleged securities violations by Defendant Natera, Inc. ("Natera") and various other defendants. First, Plaintiffs allege violations of Section 10(b) of the Securities Exchange Act (the "Exchange Act") and SEC Rule 10b-5 against Defendants Natera, Steve Chapman, Michael Brophy, Matthew Rabinowitz, and Paul Billings. Dkt. 60,

1

at 69-71. The individuals subject to Exchange Act claims served as Natera executives throughout the class period. Dkt. 60, at 14-15. Plaintiffs also bring claims against Chapman, Brophy, Rabinowitz, and Billings for alleged violations of Section 20(a) of the Exchange Act. *Id.* at 71-72. Additionally, Plaintiffs sue Chapman, Brophy, and Rabinowitz for alleged violations of 20A of the Exchange Act. *Id.* at 72-75. Finally, Plaintiffs allege that Natera, Chapman, Brophy, Rabinowitz, nine Natera directors, and various other institutional defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act as described in the amended complaint. Dkt. 60, at 85-91.

For the purposes of this class certification motion, it is not necessary to distinguish the claims against each of the defendants. Therefore, the undersigned will refer to Natera and all other relevant defendants as simply "Defendants."

Natera is a diagnostics company offering genetic testing related to women's health, oncology, and organ health. Dkt. 60, at 5. One of its primary products is Panorama, a "non-invasive prenatal test" ("NIPT") screening for fetal chromosomal abnormalities. *Id.* at 8. Plaintiffs allege that Defendants made false or misleading statements regarding Panorama's accuracy as well as Natera's growth, saying that the company's recent success was driven by sales of Panorama. Dkt. 60, at 9. In reality, Plaintiffs claim Defendants "relied upon deceptive sales and billing practices" to drive Natera's growth, including colluding with a third-party company, My Genome My Life ("MGML"), to inflate Natera's revenue through improper billing and automatically opting-in patients to ordering NIPT. *Id.* at 7, 9-10. Plaintiffs allege that

because of these violations, they "purchased Natera common stock at artificially inflated prices" during the class period[1] and suffered damages. *Id.* at 13.

Plaintiffs moved for class certification. Dkt. 136. Defendants oppose the motion. In the hearing on Plaintiffs' motion, Dkt. 166, the parties' arguments primarily centered on the question of whether Plaintiffs could demonstrate trade-timing or that they purchased stock between the time of Natera's alleged misrepresentations and when the "truth" was revealed to the market regarding the representations. As described below, Defendants argue that Plaintiffs' failure to demonstrate trade-timing means this Court cannot certify the class for multiple reasons. Globally, Plaintiffs allege that the Defendants' misrepresentations began on February 26, 2020. Dkt. 60. As Plaintiffs see it, a March 9, 2022, report from Hindenburg Research (the "Hindenburg Report") first revealed the truth about Natera's allegedly deceptive practices related to MGML and the opt-out forms. *See id.* at 58. Accordingly, Plaintiffs argue that they can demonstrate trade-timing for any investor who traded Natera stock between February 27, 2020, and March 8, 2022, inclusive. *See* Dkt. 136, at 7.

In contrast, Defendants assert that the information disclosed via the Hindenburg Report was known to the market as early as July 1, 2020, and/or December 14, 2020, when *The Capitol Forum* ("TCF") published its own reports regarding Natera's practices. Dkt. 154, at 7-9. Defendants also argue that the truth about the opt-out forms was known to the market before the Plaintiffs purchased

---

[1] Plaintiffs' proposed class period is between February 27, 2020, and March 8, 2022, inclusive. Dkt. 136, at 7.

stock because the forms were publicly available on Natera's website as early as 2020. Dkt. 154, at 15. Because, Defendants argue, the representative parties did not purchase Natera stock until 2021,[2] they cannot demonstrate trade-timing.[3]

## II.    LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). The party seeking class certification "bear[s] the burden of proof to establish that the proposed class satisfies the requirements of Rule 23." *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). A district court must "look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination" of the certification issues. *Id.* at 837 (citation omitted).

Federal Rule of Civil Procedure 23 governs whether a proposed class falls within this limited exception. "To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2),

---

[2] Lead plaintiff British Airways Pension Trust Limited ("BAPTL") certifies that it first purchased Natera common stock on June 8, 2021. Dkt. 60-1, at 4. It last purchased Natera common stock on February 9, 2022. *Id.* Plaintiff Key West Police & Fire Pension Fund certifies that it first purchased Natera common stock on July 21, 2021. Dkt. 9-2, at 3. It last purchased Natera common stock on April 5, 2022. *Id.*

[3] Framed another way, the parties dispute whether the Hindenburg Report was "corrective." *See* Dkt. 154, at 11-14; 161, at 15-17. At the hearing, the parties agreed that if the report was corrective—if it disclosed *new* information correcting Natera's alleged misrepresentations and omissions—then Plaintiffs have satisfied the trade-timing predicate. Dkt. 166. If instead the report disclosed information previously known to the market through the TCF articles and was thereby *not* corrective, then Plaintiffs have not satisfied the trade-timing predicate. *Id.*

or (3)." *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 523 (5th Cir. 2007). Rule 23(a)'s four threshold requirements are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a); *see also Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020) (noting that Rule 23(a) requires "conditions commonly known as 'numerosity, commonality, typicality, and adequacy of representation'" (citation omitted)).

A plaintiff seeking certification under Rule 23(b)(3), as Plaintiffs do here, must also demonstrate that: (1) common questions predominate over any questions affecting only individual members and (2) class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); *see also Cruson v. Jackson Nat'l Life Ins.*, 954 F.3d 240, 252 (5th Cir. 2020). "Where the plaintiff seeks to certify a class under Rule 23(b)(3), the Rules demand a close look at the case before it is accepted as a class action." *Cruson*, 954 F.3d at 253 (citation omitted). Ultimately, "[t]he decision to certify is within the broad discretion of the court, but that discretion must be exercised within the framework of rule 23." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981)).

### III.    DISCUSSION

Plaintiffs have moved to certify a class of "[a]ll persons and entities who purchased or otherwise acquired Natera common stock between February 27, 2020, and March 8, 2022, inclusive, and were damaged thereby." Dkt. 136, at 7. Plaintiffs argue that class certification is warranted because they have satisfied the requirements of Rule 23. *See id.* Defendants oppose class certification, primarily arguing that Plaintiffs cannot demonstrate reliance on a class-wide basis as required for their Exchange Act claims under *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (*Halliburton II*). Dkt. 154, at 6-7. Defendants also argue Plaintiffs lack standing to pursue their Securities Act claims. *Id.* at 7, 24-25.

### A.    Rule 23(a)

As stated above, the threshold requirements set forth in Rule 23(a) are "numerosity, commonality, typicality, and adequacy of representation." *Flecha*, 946 F.3d at 766. The undersigned will address each of these conditions below.

#### 1.    *Numerosity*

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs argue that this condition is met because Natera common stock traded on the Nasdaq and there was "an average of 78.25 million shares of Natera common stock outstanding, with an average weekly trading volume of 4.48 million shares." Dkt. 136, at 14. Defendants do not contest that numerosity is satisfied. *See* Dkt. 154.

Given Natera's outstanding shares and average trading volume on the Nasdaq during the class period, the undersigned finds that numerosity is met. *See Mullen v.*

*Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (holding that a class of 100 to 150 members generally satisfies numerosity); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (finding numerosity met where more than 50 million shares were outstanding, with an average weekly trading volume on the Nasdaq of roughly 2.7 million shares); *Prause v. TechnipFMC, PLC*, No. 4:17-CV-2368, 2020 WL 3549686, at *2 (S.D. Tex. Mar. 9, 2020) (stating that numerosity "is generally assumed to have been met in a class action suit involving nationally traded securities").

### 2.    *Commonality*

Rule 23(a) next requires that Plaintiffs establish that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is "met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Lightbourn v. Cnty. of El Paso, Tex.*, 118 F.3d 421, 426 (5th Cir. 1997) (citation removed); *see also Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986) ("The threshold of 'commonality' is not high.").

Plaintiffs argue that commonality is satisfied here because numerous common questions exist, including, for example, "whether the Defendants omitted or misrepresented facts," "whether those facts were material," and "whether Natera's common stock price was artificially inflated." Dkt. 136, at 15. Defendants do not contest that commonality is met. *See* Dkt. 154.

The undersigned finds that Plaintiffs' proffered questions will affect all or a significant number of the putative class members. *See Lightbourn*, 118 F.3d at 426. Therefore, commonality is met.

### 3.     *Typicality*

Under Rule 23(a)(3), Plaintiffs must also show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the legal and remedial theories of those whom they purport to represent" and is "not [a] demanding" test. *Lightbourn*, 118 F.3d at 426; *Gomez*, 200 F.R.D. at 582 ("[C]lass representatives must possess the same interest and suffer the same injury as the class members.").

Here, Plaintiffs argue that typicality is met because plaintiffs "purchased or acquired Natera common stock during the class period at prices artificially inflated by Defendants' misconduct and suffered damages when the relevant, previously concealed truth was disclosed to the market and the price of Natera common stock declined." Dkt. 136, at 15. In a footnote, Defendants argue that "[s]ince neither Lead Plaintiff bought stock before the 'truth' was revealed," typicality is not met. Dkt. 154, at 14 n.7.

While Defendants fail to offer substantive argument on the point, the undersigned takes them to mean that if the Hindenburg Report was not corrective, a representative party who purchased stock after the TCF articles could be subject to a "truth-on-the-market" defense that did not apply to class members who purchased

8

stock before the TCF articles allegedly revealed the "truth." Therefore, that party may not be typical of the class.[4]

The typicality requirement exists "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). As Defendants admit, class certification is inappropriate where a putative class representative is "subject to a unique defense" that threatens to become the focus of the litigation. *See* Dkt. 154, at 14; *Hanon*, 976 F.2d at 508; *In re BP p.l.c. Sec. Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *10 (S.D. Tex. Dec. 6, 2013) (quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006)). If a representative party in this case did, as Defendants argue, purchase stock after a partial disclosure, that party's purchases would not necessarily make it unique. *See In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576-77 (N.D. Cal. 2009) (finding typicality satisfied where lead plaintiff purchased stock after partial adverse disclosures and other class members may have purchased stock after partial adverse disclosures). While some members of the putative class may have purchased stock before the TCF disclosures, the proposed class period spans at least 13 months from

---

[4] While the Supreme Court has raised doubts about whether a plaintiff's claims would be typical of the claims of the class if it failed show trade timing, it also concluded that such questions were not properly resolved at the class-certification stage. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 481-82 (2013) (finding that truth-on-the-market evidence was "no barrier to finding that common questions predominate" and was properly considered at a later stage). Defendants raised trade timing at the hearing, but it remains unclear whether the TCF report was corrective. Dkts. 154, at 11-16; 161, at 7-8; 166. In the absence of full briefing on the issue, the undersigned declines to resolve this dispute at the class-certification stage and finds that a plaintiff with such a claim would nonetheless be typical of the class. *Amgen*, 568 U.S. at 481-82. Moreover, given that the question of whether the TCF report was corrective—and therefore whether Plaintiffs purchased stock within the relevant period—is a question common to the class, it need not be decided at the class certification stage. *See id.*

the last alleged TCF disclosure in December 2020. *See* Dkts. 136, at 7; 154, at 7-9. Even if the representative parties in this case did not purchase their stocks at the same time as every member of the putative class, their post-disclosure purchase hardly makes them unique, as many members of the putative class will also have purchased their stocks post-disclosure. Therefore, it is unclear that any class representative will be subject to a *unique* defense.

Notably, the weight of authority demonstrates that the purchase of stock after a corrective disclosure—particularly when the effectiveness of that disclosure is contested—does not categorically bar a finding of typicality. In fact, most courts have found that a representative party that purchased stock after a corrective disclosure remained typical of the putative class. *See Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 501 (S.D. Tex. 2004) ("[P]urchases after partial curative disclosures do not necessarily render a proposed class representative atypical."); *In re FirstPlus Fin. Grp., Inc., Sec. Litig.*, No. Civ. A. 3:98-CV-2551-M, 2002 WL 31415951, at *6 (N.D. Tex. Oct. 28, 2002) (holding that a lead plaintiff was not atypical because he purchased stock after "accurate and negative disclosures were public"); *Hessefort v. Super Micro Comput., Inc.*, 317 F. Supp. 3d 1056, 1061 (N.D. Cal. 2018) ("The weight of authority is substantially against [defendant's] argument and 'favor[s] the position that the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement.'"); *Hufnagle v. Rino Int'l Corp.*, No. CV 10-8695-VBF (VBKx), 2011 WL 710704, at *8 (C.D. Cal. Feb. 14, 2011) ("Courts have ruled that purchases of stock by the class representatives after negative announcements during

the class period or even after the close of the class period do not destroy typicality." (internal quotation marks omitted)); *Connetics*, 257 F.R.D. at 577 (holding that "the purchase of stock after a partial disclosure is not a per-se bar to satisfying the typicality requirement"); *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 600 (C.D. Cal. 2009) (finding that representative party was typical despite possible truth-on-the-market defense against it because the corrective disclosures at issue would "presumably be analyzed at trial as part of classwide defenses"); *cf. In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1326-27 (N.D. Ga. 2007) (finding that named representatives who purchased shares of stock *prior* to the alleged curative disclosure were nonetheless typical of class members who purchased stock after the disclosure because "the claims of the named class representatives rel[ied] on the same allegations of misrepresentations and omissions and share[d] the same legal theory as those of the class"); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 92-93 (S.D.N.Y. 2018) (holding that a plaintiff who bought stock both before *and* after a possible partial disclosure was typical of the class); *In re Tronox, Inc. Sec. Litig.*, 262 F.R.D. 338, 345-46 (S.D.N.Y. 2009) (holding that a representative party's purchase of shares after partial disclosures did not render it atypical or subject to unique defenses); *Deitrich v. Bauer*, 192 F.R.D. 199, 125 (S.D.N.Y. 2000) (finding that a lead plaintiff was not atypical where he received information different from that of the rest of the class regarding purchased stock); *contra Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 135-36 (S.D.N.Y. 2007) (holding that the lead plaintiff was atypical because he made "numerous post-class purchases" of stock); *In re Valence Tech. Sec.*

*Litig.*, No. C 95-20459 JW, 1996 WL 119468, at *5 (N.D. Cal. Mar. 14, 1996) (holding that lead plaintiffs were atypical because they, unlike other members of the class, purchased stock post-disclosure).

Finally, because the claims of the representative parties and the putative class members "'arise from a similar course of conduct and share the same legal theory,'" potential factual differences among them do not bar class certification. *Ward v. Hellerstedt*, 753 F. App'x 236, 247 (5th Cir. 2018) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)). The representative parties' claims arise from the same alleged misrepresentations as the claims of the class, regardless of the existence of third-party corrective disclosures. *See* Dkt. 60, at 8-10. Additionally, the representative parties and the class share the legal theory that the Defendants made materially false and misleading statements regarding Panorama, which led to the artificial inflation of Natera's stock price. *See id.* at 8-11. The undersigned therefore concludes that typicality is met.

### 4.    *Adequacy of representation*

Finally, Rule 23(a)(4) demands that Plaintiffs demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The rule "mandates an inquiry into the zeal and competence of the representative's counsel and into the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Horton v. Goose Creek ISD*, 690 F.2d 470, 484 (5th Cir. 1982).

Defendants do not contest Plaintiffs' counsel's "zeal and competence,"[5] and as such, the undersigned will only address Plaintiffs' ability to serve as class representatives for the proposed class. Plaintiffs state that none has any conflicts with the proposed class members, and their counsel has confirmed that they have "demonstrated their willingness and ability to serve" as class representatives, have engaged appropriately in the litigation so far, and "will continue to vigorously litigate this case." Dkts. 60-1, at 2; 136-2, at 2.

Again, in a footnote, Defendants argue that "since neither [l]ead [p]laintiff bought stock before the 'truth' was revealed," Plaintiffs have not established that the proposed class representatives are adequate. Dkt. 154, at 14 n.7. As with typicality, a plaintiff who did not trade between the time the misrepresentation was made and the time the truth was revealed may not have relied on the misrepresentation and therefore may not "fairly and adequately protect the interests" of those who did trade within that window. *Amgen*, 568 U.S. at 473-74. Initially, even if Plaintiffs purchased stock after the market became aware of the TCF disclosures, it is not clear that doing so would limit Plaintiffs' ability to fairly and adequately protect the class's interests. Plaintiffs have demonstrated their willingness to serve and have served appropriately thus far. *See* Dkts. 136-4; 136-5. Additionally, Defendants do not

---

[5] Because Defendants do not oppose Plaintiffs' counsel's request to be appointed as class counsel, and a review of firm resumes provided by proposed class counsel demonstrates that each of the firms has experience in representing plaintiffs in collective and class actions, has knowledge of the applicable law, and has spent considerable time investigating the claims in this lawsuit, the undersigned will recommend appointing Kessler, Topaz, Meltzer & Check, LLP and Bernstein, Litowitz, Berger & Grossmann LLP as class counsel and Nix Patterson, LLP as liaison class counsel. *See* Fed. R. Civ. P. 23(c)(1)(B), (g); *see* Dkts. 136-2; 136-6; 136-7; 136-8.

explain why the class representatives' interests conflict with the interests of the class in light of the timing of their purchases. Dkt. 154, at 14 n.7.

Reading between the lines, Defendants' concern could be that the class representatives would be preoccupied with the TCF-disclosure issue to the detriment of class members who purchased stock before any allegedly corrective disclosure. *See Menaldi*, 328 F.R.D. at 92 (raising concerns that a lead plaintiff who purchased stock after a disclosure by the *Wall Street Journal* "would be preoccupied with the partial-disclosure issue to the detriment of class members who bought their stock before any corrective disclosure" (citing *Amgen*, 568 U.S. at 472-73)). As in *Menaldi*, and as explained in more detail below,[6] the TCF disclosure is debatably partial. Because the TCF disclosure may not have disclosed all the information contained in the Hindenburg Report—and therefore may not have given a full picture of the alleged fraud by Natera—the undersigned is unconvinced that the timing of the class representatives' purchases here render them inadequate. *See id.*; *see also Tronox*, 262 F.R.D. at 345.

The undersigned finds that Plaintiffs have satisfied the adequacy requirement. The undersigned thus recommends that Plaintiffs British Airways Pension Trustees Limited and Key West Police & Fire Pension Fund be appointed class representatives. The undersigned further recommends that Kessler Topaz Meltzer & Check, LLP and Bernstein Litowitz Berger & Grossmann LLP be appointed as class counsel and that Nix Patterson, LLP be appointed as liaison class counsel.

---

[6] *See infra* Part III.C.

\*      \*      \*

The undersigned finds that Plaintiffs have satisfied Rule 23(a)'s four conditions for class certification.

### B.      Rule 23(b)(3)

Plaintiffs moved to certify their class under Rule 23(b)(3). Dkt. 40, at 15. To certify a class under this section, the court must determine that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) identifies four factors that courts should consider in evaluating whether a class should be certified under this section: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). The aim of this inquiry is to identify cases where certification "would achieve economies of time, effort and expense, and promote … uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citation omitted).

#### 1.      *Predominance*

Regarding their Securities Act claims, Plaintiffs argue that common legal and factual issues predominate the claims of the proposed class members because they

15

"'need only show a material misstatement or omission'" in the offering documents. Dkt. 136, at 17-18. They contend that the common questions of (1) "whether there was an actionable misrepresentation or omission in the [o]ffering [d]ocuments" and (2) whether the misrepresentation or omission was material are "common to class members and susceptible to common evidence." *Id.* at 18. Defendants do not contest predominance with respect to the Securities Act claims. The undersigned agrees with Plaintiffs that common questions predominate the Securities Act claims.

As for the Exchange Act claims, Plaintiffs argue that predominance is met for the Rule 10b-5 claim because the falsity, materiality, scienter, and loss-causation elements all raise common questions of law and fact. Dkt. 136, at 18. Additionally, "[r]eliance is an element of a Rule 10b-5 cause of action," and it "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). Plaintiffs add that reliance, too, is a common question susceptible to class-wide proof in this case since they can invoke the fraud-on-the-market presumption of reliance from *Basic*. Like their arguments regarding typicality and adequacy, Defendants argue that the *Basic* presumption does not apply because "plaintiffs first must demonstrate that they purchased stock *before* the truth was revealed to the market." Dkt. 154, at 11 (citing *Halliburton II*, 573 U.S. at 279-80).

"'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business ....

16

Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[.]'" *Basic*, 485 U.S. at 241-42 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)). The "'causal connection'" in such a case is "'no less significant'" than in a case of direct reliance. *Id.* (quoting *Peil*, 806 F.2d at 1161). Noting concerns that requiring proof of individualized reliance would thwart any attempt to try securities-related cases as class actions, the Supreme Court held in *Basic* that securities plaintiffs could invoke a presumption of reliance supported by the fraud-on-the-market theory.[7]

To demonstrate that the *Basic* presumption applies, Plaintiffs first must show "(1) that the alleged misrepresentations were publicly known, (2) that they were material,[8] (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. However, Defendants have an opportunity to rebut Plaintiffs' showing. "[A]ny showing" by the defendant "that severs the link between the alleged misrepresentation and either price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Id.* at 269 (internal quotation marks omitted). For example, upon a showing that the alleged misrepresentation did not affect the market price, the presumption of reliance would be rebutted. *Id.*

---

[7] The Supreme Court reaffirmed *Basic* in *Halliburton II*.

[8] Under *Amgen*, while the party seeking class certification must prove materiality to prevail on the merits, "such proof is not a prerequisite to class certification." 568 U.S. at 459.

One way a defendant might try to defeat application of the *Basic* presumption is to present a "truth-on-the-market" defense. *See Basic*, 485 U.S. at 248-49 (treating truth-on-the-market evidence as rebuttal evidence). If a defendant demonstrates that "'news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements,'" any alleged misrepresentation would no longer be (2) material. *Amgen*, 568 U.S. at 481-82 (quoting *Basic*, 485 U.S. at 248-49); *see Halliburton II*, 573 U.S. at 268 (listing the elements required to apply the *Basic* presumption).

The Supreme Court has held that truth-on-the-market evidence—used to show absence of materiality—need not be considered at the class-certification stage. For example, in *Amgen*, the Court affirmed that the district court did not err by disregarding at the class-certification stage Amgen's truth-on-the-market evidence where the truth about Amgen's drug safety issues—misrepresentations concerning which plaintiffs claimed affected the stock price—was allegedly publicized. *Id.* at 482; *see Conn. Retirement Plans & Tr. Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011). Instead, the Court held that such evidence was "no barrier to finding that common questions predominate" and was properly considered at trial or summary judgment—not at the class-certification stage. *Amgen*, 568 U.S. at 481-82. Put differently, "just as a plaintiff class's inability to prove materiality creates no risk that individual questions will predominate, so even a definitive rebuttal on the issue of materiality would not undermine the predominance of questions common to the class." *Id.* at 481.

In this case, Natera characterizes its truth-on-the-market defense not as a defense to materiality but rather as a failure to demonstrate trade-timing.[9] Dkt. 154, at 11; *Amgen*, 568 U.S. at 459; *see Halliburton II*, 573 U.S. at 268. Arguing that "plaintiffs first must demonstrate that they purchased stock *before* the truth was revealed to the market," Defendants ask this Court to find that Plaintiffs fail to demonstrate reliance, and therefore predominance. Dkt. 154, at 11. In particular, Defendants argue that Plaintiffs purchased Natera stock after the disclosure of Natera's allegedly deceptive practices by TCF. Dkt. 154, at 7-9. If that were the case, and if there were no other corrective disclosures, then the market learned the "truth" and the effect of Natera's alleged misrepresentations would have dissipated. *See id.*

But a rose by any other name would smell as sweet, and a truth-on-the-market defense by any other name goes to materiality. As such, whether the TCF reports exposed the markets to the "truth," or the Hindenburg Report was corrective, is a matter for resolution at a later date after full briefing on the issue. *See Amgen*, 568 U.S. at 482; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 260-61 (N.D. Tex. 2015) (finding that class certification is not the proper procedural stage for the Court to determine whether the disclosures were corrective and that a "veiled attempt" to assert a truth-on-the-market defense was not properly before the court at the class certification stage). Indeed, the Supreme Court also held in *Amgen* that trade-timing "relates primarily to the Rule 23(a)(3) and (a)(4) inquiries into typicality and adequacy of representation, not to the Rule 23(b)(3) predominance inquiry." 568

---

[9] Defendants do not dispute that the misrepresentations were publicly known or that the stock was traded in an efficient market. Dkts. 154, 166; *see Halliburton II*, 573 U.S. at 268.

U.S. at 472. Here, "the pivotal inquiry is whether proof of materiality is needed to ensure that the *questions* of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Id.* at 467 (quoting Fed. R. Civ. P. 23(b)(3)) (emphasis in original). The undersigned finds that common questions will predominate here. Namely, the factfinder will need to determine whether the TCF report was publicly known, whether the TCF and Hindenburg reports were corrective, and whether Defendants' alleged misrepresentations were material as to the class as a whole. The same is true of the opt-out forms: common questions such as whether the opt-out forms were known to the market will need to be answered as to the class.

Defendants argue that they can rebut the *Basic* presumption because they can show it is more likely than not that there was no front-end or back-end price impact. Dkt. 154, at 16-22. As previously stated, a defendant may rebut the *Basic* presumption by "'in fact'" "'sever[ing] the link' between a misrepresentation and the price paid by the plaintiff." *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 594 U.S. 113, 125-26 (2021). On this point, the Defendant bears the burden of persuasion by a preponderance of the evidence, and "a defendant's mere production of *some* evidence relevant to price impact" will not defeat the presumption. *Id.* at 126 (emphasis in original). Under *Goldman*, the district court's task is to "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.* at 127.

20

In support of their argument that there was no price impact, Defendants offer the following: first, as "a matter of common sense," the challenged statements did not impact Natera's stock price on the front end because they were "not new"—in that Natera had been making similar omissions for a time before the putative class period. Dkt. 154, at 17-18. Defendants add that the statements did not impact the stock price because they were "not made alone"—that is, the challenged omissions were made at the same time Natera announced positive news regarding the company. *Id.* Plaintiffs respond that Defendants fail to demonstrate a lack of price impact, pointing to their own evidence that there were statistically significant price increases associated with Defendants' alleged misstatements. Dkts. 161, at 9; 161-2, at 27-33. As for Defendants' argument that the misstatements did not cause price increases because they were "not new," Plaintiffs point out that "on each of the dates with front-end price impact, Natera reported *continuing* revenue growth as a result of *growing* Panorama demand, ... which helped drive the price increases." Dkts. 161, at 10 (emphasis in original); 161-2, at 28-30; *see* Dkt. 60, at 53-56 (describing reporting).

The undersigned is unconvinced that it is more likely than not no front-end price impact occurred. The undersigned agrees with Plaintiffs that Natera's reports of continuing revenue growth and growing Panorama demand likely, as a "matter of common sense," impacted Natera stock price. *See* Dkt. 161, at 10. Confronted with limited evidence other than conflicting expert testimony on whether front-end price impact occurred, the undersigned concludes that on balance, Defendants have not carried their burden to rebut the *Basic* presumption of front-end price impact.

21

Since Defendants fail to show lack of front-end price impact, they fail to rebut the *Basic* presumption. However, the undersigned addresses the arguments with respect to back-end price impact as well.

With respect to back-end price impact, Defendants contend that Natera's stock did not react when the TCF reports first revealed the allegedly corrective information. Dkt. 154, at 18-19. They add that Natera analysts viewed the Hindenburg Report disclosures as merely confirmatory and that the "most likely explanation for the stock price drop that followed release of the Hindenburg Report was fear by the market that Natera was under attack by an activist short seller[.]" *Id.* at 19-20. Defendants conclude by arguing that since the alleged corrective disclosure by the Hindenburg Report was more generic than the alleged misstatements from Natera, there is no price impact. *Id.* at 20-22.

Plaintiffs do not address Defendants' first and second arguments on this point but respond by pointing out that the statements made in the Hindenburg Report were not significantly more generic than those they allegedly corrected. Dkt. 161, at 11. The undersigned agrees with Plaintiffs that the Hindenburg Report was specific enough to address Natera's alleged misstatements. For example, the assertion that "Natera's revenue growth has been fueled by deceptive sales and billing practices aimed at doctors, insurance companies[,] and expectant mothers" is not more generic than Natera's statements that its increase in revenues were driven by sales of the test subject to those deceptive billing practices. Dkt. 155-10, at 2; *see* Dkt. 60, at 53-56 (describing reporting).

22

Because the *Basic* presumption applies and Defendants have failed to rebut it, predominance is met.

      2.     *Superiority*

To establish superiority, the plaintiff must demonstrate that class certification is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23 sets forth several "matters pertinent" to a finding of superiority, including: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). Plaintiffs argue that the investors' small individual damages make individual litigation of the claims in this suit prohibitively expensive; there are no other pending individual actions concerning the claims in this case; concentrating the litigation in this forum is desirable, especially considering the geographic dispersal of investors and the fact that Natera is headquartered in Austin; and that there are no likely management difficulties. Dkt. 136, at 28; *See Amchem*, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (quoting reference omitted). Defendants do not put forward any argument in response, and the

23

undersigned concludes that Plaintiffs have established that class certification is superior to other available methods of adjudication here.

*    *    *

The undersigned finds that Plaintiffs have satisfied Rule 23(a)'s four conditions for class certification, as well as Rule 23(b)(3)'s requirements that common questions predominate over individualized ones and that a class action is the superior method of resolving the claims at issue here. The undersigned thus recommends that Plaintiffs' motion for class certification be granted.

## C.    Securities Act Claims

With respect to the Securities Act claims, Defendants assert that Plaintiffs cannot show "(i) a direct purchase in the July 2021 [Secondary Public Offering, or 'SPO'] (as required to establish standing for their Section 12(a)(2) claim), (ii) a purchase traceable to the July 2021 SPO (as required to establish standing for their Section 11 claim), or (iii) that they purchased shares before the allegedly omitted information was disclosed, as is necessary to establish standing to proceed under any claim based on alleged omissions." Dkt. 154, at 24.

Plaintiffs respond that they have adequately pleaded and put forward evidence that Key West purchased Natera shares on the day of the July 21 SPO. Dkts. 60, at 76; 9-2, at 3. This showing is sufficient to demonstrate standing under both Section 11 and 12(a)(2). *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 498 (5th Cir. 2005) ("Section 11 *is* available for anyone who purchased directly in the offering and any aftermarket purchasers who can demonstrate that their shares are traceable to the registration

statement in question[.]"); 15 U.S.C.A. § 77l(a) (creating a cause of action for purchasers); *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 736 (1975) ("Thus § 11(a) of the 1933 Act confines the cause of action it grants to 'any person acquiring such security' while the remedy granted by § 12 of that Act is limited to the 'person purchasing such security.'").

To allege Article III standing in a securities class action, a plaintiff "must allege that when the defendant's fraud was revealed, the plaintiff's stock price declined." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, No. 23-10696, 2024 WL 1674125, at *3 (5th Cir. Apr. 18, 2024) (citing *Martone v. Robb*, 902 F.3d 519, 524 n.11 (5th Cir. 2018)). "[I]f a plaintiff purchased a defendant's stock after the fraud was revealed, the plaintiff's injury in fact—the economic loss associated with a decline in stock price—is not fairly traceable to the defendant's fraud." *Id.* (citing *Amgen*, 568 U.S. at 472). But the Fifth Circuit has held that a plaintiff who purchases stock after a mere *partial* disclosure still has standing. In *Oklahoma Firefighters*, the Court held that a plaintiff who purchased stock after the defendant had "tempered" some of its misleading statements could still sue based on other claimed frauds that were not fully disclosed. *Id.* at *3-4. While "[a]s a theoretical matter" the Court agreed that "if a plaintiff purchased stock after the fraud was fully disclosed, the plaintiff's injury in fact would not be fairly traceable to the alleged misstatements," because in the case at bar no full disclosure occurred, the district court improperly dismissed the plaintiff's claims. *Id.*

As in *Oklahoma Firefighters*, the TCF disclosure in this case is likely partial. The TCF articles are not only third-party disclosures (unlike those in *Oklahoma Firefighters*) but also debatably accessible. *See, e.g.*, Dkt. 161-2, at 42, 43 (stating that TCF "is not an easily accessible source of information" and estimating that a TCF subscription costs $24,000 annually). Additionally, as in *Oklahoma Firefighters*, the TCF disclosures may not adequately address all of the claimed fraud. Plaintiffs argue that the Hindenburg report disclosed new information. *See, e.g.*, Dkt. 161, at 16. For example, they point to one analyst's email to Natera officials pointing out that Hindenburg's reporting on MGML is "new news." Dkt. 161-5, at 3.

Given that Plaintiffs have demonstrated that the TCF disclosures may not be "full" as that term is used in *Oklahoma Firefighters*, and given the Supreme Court's guidance that issues of trade timing are more properly "a matter for trial," the undersigned finds that Plaintiffs do not lack standing on the grounds that they fail to show that they purchased stock before any curative disclosures. *Basic*, 485 U.S. at 249 n.29; *see also Amgen*, 568 U.S. at 482. Therefore, Plaintiffs' motion for class certification should be granted.

## D.    Notice

Having found that certification of Plaintiffs' proposed class is warranted, the undersigned will address the proper means of providing notice of this lawsuit to proposed class members. Under Rule 23, "the court must direct to class members the best notice that is practicable under the circumstances," which may be achieved through "United States mail, electronic means, or other appropriate means." Fed. R.

Civ. P. 23(c)(2)(B). Here, Plaintiffs request that notice be provided to all potential class members who can be identified through reasonable effort through first-class U.S. mail. Dkt. 136-2, at 5. Plaintiffs also propose publishing a "summary notice in *The Wall Street Journal* and over *PR Newswire*, and establish a case website where the class notice and other relevant documents, including the class certification order and operative complaint, will be made available." *Id.* Defendants do not object to Plaintiffs' proposal. *See* Dkt. 154.

The undersigned finds that notice by first-class mail is sufficient to satisfy Rule 23(c)(2)(B). Notice via first-class mail is sufficient to provide notice to proposed class members under the plain language of Rule 23(c)(2)(B). Fed. R. Civ. P. 23(c)(2)(B) ("Notice may be by one or more of the following: United States mail[.]"); *see also Peters v. National R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) ("It is beyond dispute ... that notice by first class mail ordinarily satisfies rule 23(c)(2)'s requirement that class members receive 'the best notice practicable under the circumstances.'") (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974)). However, since Plaintiffs provide no evidence that the potential class members may not be identifiable or reachable by first-class mail, the undersigned finds that notice by publication would be superfluous here. *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1098 (5th Cir. 1977) ("[T]he type of notice to which a member of a class is entitled depends upon the information available to the parties about that person."); *see also DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 296 (W.D. Tex. 2007) (finding

27

notice by publication adequate where case involved "potential class members who could not be identified").

## IV.  RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Judge **GRANT** Plaintiffs' motion to certify class, Dkt. 136, and certify a class defined as "[a]ll persons and entities who purchased or otherwise acquired Natera common stock between February 27, 2020, and March 8, 2022, inclusive, and were damaged thereby." Dkt. 136, at 7. The undersigned further recommends that Plaintiffs British Airways Pension Trustees Limited and Key West Police & Fire Pension Fund be appointed class representatives, that Kessler Topaz Meltzer & Check, LLP and Bernstein Litowitz Berger & Grossman LLP be appointed as class counsel, and that Nix Patterson, LLP be appointed as liaison class counsel. Finally, the undersigned recommends that Plaintiffs be ordered to provide notice to potential class members through first-class U.S. mail.

## V.  WARNINGS

The parties may file objections to this report and recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Judge need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after the party is served with a copy of the report shall bar that party from *de novo* review by the District Judge of the proposed findings and recommendations in the report and,

except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED January 28, 2025.


DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE