```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3  JOHN HARVEY SCHNEIDER, Individually  ) AU:22-CV-00398-DAE
    and on Behalf of All Others Similarly )
 4  Situated, KEY WEST POLICE & FIRE      )
    PENSION FUND, UNIVERSITY OF PUERTO    )
 5  RICO RETIREMENT SYSTEM, BRITISH       )
    AIRWAYS PENSION TRUSTEES LIMITED,     )
 6                                        )
       Plaintiffs,                        )
 7                                        )
    v.                                    ) AUSTIN, TEXAS
 8                                        )
    NATERA, INC., STEVE CHAPMAN,          )
 9  MICHAEL BROPHY, MATTHEW RABINOWITZ,   )
    RAMESH HARIHARAN, SVB LEERINK LLC,    )
10  ROY BAYNES, c/o Natera Inc., MONICA   )
    BERTAGNOLLI, c/o Natera Inc, JONATHAN )
11  SHEENA, c/o Natera Inc., ROW CHAPMAN, )
    c/o Natera Inc., HERM ROSENMAN, c/o   )
12  Natera Inc., ROBERT W. BAIRD, c/o     )
    Natera Inc., MORGAN STANLEY & CO. LLC,)
13  GAIL MARCUS, c/o Natera Inc., JAMES I.)
    HEALY, GOLDMAN SACHS & CO. LLC,       )
14  CRAIG-HALLUM CAPITAL GROUP LLC, TODD  )
    CAZZENS, COWEN AND COMPANY LLC,       )
15  BTIG LLC, ROELOF F. BOTHA, c/o Natera )
    Inc., PAUL R. BILINGS, ROBERT W.      )
16  BAIRD CO. INC,                        )
                                          )
17     Defendants.                        ) JULY 1, 2025

18      **************************************************
                TRANSCRIPT OF MOTIONS HEARING
19           BEFORE THE HONORABLE DUSTIN M. HOWELL
        **************************************************
20
    FOR THE PLAINTIFFS:   JOSHUA E. D'ANCONA
21                        KESSLER TOPAZ MELTZER & CHECK, LLP
                          280 KING OF PRUSSIA ROAD
22                        RADNOR, PENNSYLVANIA 19087

23                        CODY L. HILL
                          JESSICA ELAINE UNDERWOOD
24                        NIX PATTERSON, LLP
                          8701 BEE CAVE ROAD, BUILDING 1, SUITE 500
25                        AUSTIN, TX 78746
```

```
 1  FOR THE DEFENDANTS:   CHRISTINA L. COSTLEY
                          KATTEN MUCHIN ROSENMAN LLP
 2                        2121 AVENUE OF THE STAR, SUITE 1100
                          LOS ANGELES, CALIFORNIA 90067-5010
 3
                          TED A. HUFFMAN
 4                        KATTEN MUCHIN ROSENMAN LLP
                          2121 NORTH PEARL STREET, SUITE 1100
 5                        DALLAS, TEXAS 75201

 6                        THOMAS ARTAKI
                          KATTEN MUCHIN ROSENMAN LLP
 7                        50 ROCKEFELLER PLAZA
                          NEW YORK, NEW YORK 10020
 8
                          BRUCE G. VANYO
 9                        KATTEN MUCHIN ROSENMAN LLP
                          2121 AVENUE OF THE STARS, SUITE 1100
10                        LOS ANGELES, CALIFORNIA 90067-5010

11  TRANSCRIBER:          ARLINDA RODRIGUEZ, CSR
                          501 WEST 5TH STREET, SUITE 4152
12                        AUSTIN, TEXAS 78701
                          (512) 391-8791
13

14

15

16

17

18

19

20

21

22

23

24  Proceedings recorded by electronic sound recording, transcript

25  produced by computer.
```

```
 1        (Proceedings began at 2:02 p.m.)

 2             THE CLERK:  The Court calls 22-CV-398, John

 3   Harvey Schneider v. Natera Inc., here for a Motions

 4   Hearing.

 5             THE COURT:  Thank you, Ms. Rivera.  Counsel, if

 6   you'll state your appearances for the record, starting

 7   with the plaintiff.

 8             MR. D'ANCONA:  Good afternoon, Your Honor.

 9   Joshua D'Ancona from Kessler Topaz Meltzer & Check on

10   behalf of class representatives, and I'll let my

11   cocounsel introduce themselves.

12             MR. HILL:  Good afternoon, Your Honor, Cody

13   Hill from Nix Patterson, also on behalf of the class

14   representatives.

15             MS. UNDERWOOD:  And Jessica Underwood from Nix

16   Patterson, also on behalf of the class representatives.

17             THE COURT:  Good afternoon.  And for our

18   defendants?

19             MS. COSTLEY:  Good afternoon, Your Honor.

20   Christina Costley from Katten Muchin.  Also from Katten

21   Muchin, we have Ted Huffman, a partner in our Dallas

22   office, Tom Artaki, and by phone, Bruce Vanyo.

23             THE COURT:  Very good.  Welcome.  And to

24   introduce you to my team, you've met Victoria Rivera.

25   She is a courtroom deputy assigned to my court.  And
```

1    Natalie Bayer is my law clerk sitting here, who has

2    helped me get ready for this hearing.

3            And I have two interns from UT Law School, Jin

4    and Maple, sitting in the jury box.  So be on your best

5    behavior so we can set a good example for them and not

6    scare them away from the practice of law.

7            So I've set this hearing for an hour and a

8    half.  I've reviewed the filings and the joint advisory.

9    Thank you for your attempts to confer just before the

10   hearing, and the joint advisory I felt was helpful.  And,

11   as I see it, the -- I mean, as I do at the beginning of

12   all these hearings, I like to share at least some of my

13   initial impressions up front.

14           And it seems to me that the defendants have

15   kind of taken a categorical, all-or-nothing approach in

16   terms of we think that the discovery requests are just

17   too broad.  And there's been, it looks like, some

18   discussion back and forth about potential narrowing, but

19   it's a pretty big gap.  And there's a lot of specific

20   matters raised by the plaintiffs in the filing that I

21   feel just aren't addressed by the defendants in their

22   response, which puts me in the position of, well, am I to

23   do that parsing for the defendants or do I just grant the

24   motion as a whole.

25           And, as I sit here right now, that's what I'm

1   inclined to do, is grant the motion to compel.  And, to

2   the extent that there is additional negotiation with

3   respect to how some of these searches are carried out,

4   that's fine.  But, as I read Plaintiffs' requests, they

5   are -- do appear to be reasonable.

6           The only question I have in my mind, and so

7   it's a question I would like for you to address up front,

8   Mr. D'Ancona, is -- but, again, Defendants don't I think

9   put a specific argument in support of this or any

10  suggested narrowing in support of this argument.  But a

11  question I have in mind is:  They say, well, post-motion

12  to dismiss, there's really only two narrow components to

13  the plaintiffs' case, Natera's use of MGML and the

14  requisition form used to order microdeletion tests.  And

15  so anything that goes beyond that is beyond the scope of

16  the case and, therefore, not relevant and not

17  discoverable.

18          I thought, in broad strokes, the plaintiffs did

19  a good job of explaining, category by category, why they

20  needed the docs they needed.  But I'd like for you to

21  specifically address that aspects of their argument,

22  which is the only one I found, frankly, to be somewhat

23  persuasive in terms of suggesting some narrowing of these

24  requests.

25          I suspect the defendants are ready to address

1  this argument, but I want to read a line from the

2  defendants' response.  This is on page 7:  Even absent

3  the Court's order limiting phase 2 discovery to, quote,

4  ancillary documents, the search parameters Plaintiffs are

5  attempting to impose on the Natera defendants extend well

6  beyond the scope of relevant and proportional discovery.

7           And, you know, when I get a motion, I read it.

8  I just read the filing, I read the response and I read

9  the reply, and then I start to kind of go back and

10 reacquaint myself with the authorities that are cited and

11 the record that's referenced.

12          And I remember presiding over the dispute in

13 the scheduling order, and this question of, well, did I

14 say in that scheduling order that phase 2 of the

15 discovery was going to be limited to ancillary documents?

16          And so I looked at the scheduling order.  And I

17 can pull it up.  But, I mean, essentially it says:

18 Class-related discovery and targeted merits discovery and

19 then the remainder of discovery to follow.  And that word

20 "ancillary," which is quoted probably a dozen times in

21 Defendants' 10-page document appears nowhere in the

22 Court's order.

23          And so when I looked back -- and the only place

24 I could find a spot where Defendant actually cite --

25 provided a record cite for the record "ancillary," it was

1 to their own filing, which -- so it -- and it was a

2 filing arguing that we bifurcate discovery such that the

3 initial class-related phase -- class certification phase

4 had limited discovery to address the question that the

5 Court was answering on certification.

6         And now it seems that Defendant wants to argue

7 that all of that discovery they got -- that they got then

8 was the primary discovery, and there's hardly anything

9 left to talk about.  I just -- I'm curious to see how

10 Defendant can justify that position based on anything

11 that -- even on their own prior arguments, much less

12 anything that the Court said.

13         But I've used up 10 of our 90 minutes.  So,

14 with that, I'll turn it over to the plaintiffs.

15         MR. D'ANCONA:  Thank you, Your Honor.  I'm

16 Joshua D'Ancona.  Thank you for hearing us today.

17         Your Honor directed me to jump right into the

18 question of the scope of what would be relevant in this

19 case in responding to Defendants' arguments, in

20 particular.  To start if I may with the law, as we cite

21 in our motion in *Hobbs* and *McDermott* and many other

22 cases, the scope of discovery under 26(b)(1) is broad.

23 Relevance is broadly and liberally construed in a motion

24 to compel setting, and the aim is to disclose all

25 pertinent information so litigation is not a game of

1  blind man's bluff, as the Court put it in *Hobbs*.

2          And to evaluate relevancy, courts look at

3  information sought and whether it bears upon any issue,

4  claim, or defense in the case.  There is an important

5  proportionality consideration under Rule 26, but that is

6  a different concept than relevance.

7          Now, in this case, Your Honor, until the class

8  was certified, there was in discovery no dispute apparent

9  about the relevant topics in discovery.  In 2024 the

10  Natera defendants affirmatively stated in their discovery

11  responses, including their verified interrogatory

12  responses, that relevant subject matters in discovery

13  here included, quote, revenues for Panorama, quote,

14  Natera's financial reporting, quote, the sale of

15  Panorama, quote, the third of -- the use of third-party

16  prior authorization vendors, quote, the statements at

17  issue in this litigation, and, finally, quote, the

18  Hindenburg report and the allegations therein.

19          Now, you can see that in Exhibit 9 to our

20  motion to compel, which is their verified interrogatory

21  responses, at pages 21 to 24.  They said the exact same

22  thing.  They identified the exact same areas and topics

23  in their initial disclosures.

24      (Telephone interruption)

25          THE COURT:  Whoever is listening in on the

1  phone, if you'll please mute.

2          If they're not going to listen, then we need to

3  hang up on them.  I think we just need to cut the line.

4          THE CLERK:  Okay.

5          MR. D'ANCONA:  I'm sorry, Your Honor.  I didn't

6  catch what you were saying.

7          THE COURT:  I'm looking at page 31 of

8  Judge Ezra's order, granting in part and denying in part

9  the motion to dismiss.

10          MR. D'ANCONA:  Yes.

11          THE COURT:  And it looks like he denied the

12  order to the extent there were, you know, what he refers

13  to in shorthand as the Panorama-related claims and

14  dismissed with prejudice the Prospera-related claims.

15          So to what extent does your -- should your

16  discovery that you're seeking be foreclosed because it's

17  really going to Prospera-related claims?

18          MR. D'ANCONA:  Thank you.  We seek no discovery

19  about Prospera.  We seek no discovery about another

20  product that they're -- that Natera was developing called

21  Signatera.  We are seeking discovery on the Panorama

22  product within the women's health business at Natera in

23  the relevant time period.  So Prospera is completely out.

24  We recognize that.  We're seeking no discovery on that

25  question.

1          So, Your Honor, as Natera recognized before the

2   Court granted class certification, and then thereby

3   obligated Natera to undertake full merits discovery under

4   the phased, bifurcated discovery sequence that was

5   ordered under the scheduling order, the topics I just

6   mentioned are directly relevant to the parties' claims

7   and defenses in this securities fraud class action about

8   alleged false statements by Defendants that demand for

9   Panorama was strong and growing, that Panorama sales were

10  driving record revenues for Natera as an enterprise.  We

11  allege those statements were materially misleading in

12  various ways, including with respect to alleged Panorama

13  revenues being propped up by improper and deceptive

14  business practices being carried out by Natera.

15          So the subject matter and the business context

16  of those misstatements, Your Honor, the sale of Panorama,

17  Natera's financial reporting underpinning or relating to

18  these public disclosures about revenues and about demand

19  and about where things were headed in the market, the

20  market share penetration that they were increasingly

21  getting on the back of Panorama, its Panorama revenues,

22  that is information that bears directly on understanding

23  the claims, the falsity of these misstatements.

24          While Defendants are correct that the two

25  principle ways that we've alleged that those

1    misstatements may be alleged to be false at the pleadings

2    stage of this litigation relate to the use of -- of a

3    prior authorization vendor called MGML and another

4    deceptive practice related to the microdeletion order

5    form -- those are the two things that we called out in

6    the complaint -- those cannot be simply discovered in

7    isolation outside the context of the operation of the

8    business, the practice of the business with respect to

9    prior authorization which relates to requesting payment

10   from insurers, as we all probably know, in advance of

11   treatments, billing, obtaining payments from payors, like

12   insurance companies, medical groups, working with medical

13   groups and clients on Panorama orders, and then

14   surrounding that, Your Honor, the revenues and the

15   analysis of revenues and the analysis of demand within

16   the company, how Natera's use of MGML compared to or

17   contrasted with its use of other prior authorization

18   vendors, which is a very important aspect of this

19   business, where payment would be quite complicated and

20   difficult, if not impossible, if prior authorization was

21   not properly accomplished.

22        So there's a context for the alleged bases for

23   falsity that I think, if those are just taken in

24   isolation, we won't be able to prove anything.  We won't

25   be able to show that these statements were false, that

1  the business was operating in a way that entailed the use

2  of deceptive business practices, compliance issues, and

3  the rest.

4         So our discovery requests go to strictly within

5  the women's health business with regard to Panorama.  And

6  then as it rolls up to the overall revenues of the

7  company that the company is talking about in the alleged

8  sustained false statements, the demand for the revenues

9  from the sales practices around Panorama in this time

10 period.  And that's what we focus on.

11        And we think we can't simply be asked to prove

12 our case -- where we're now fiduciaries to this class, to

13 try to prove this case simply with, sort of, keyhole

14 evidence about two alleged bases for falsity and nothing

15 else, no surrounding context.

16        THE COURT:  Why isn't the discovery that was

17 exchanged in this SEC investigation not enough?

18        MR. D'ANCONA:  Thank you.  The discovery that

19 we obtained from Defendants from phase 1, which I believe

20 Your Honor is referring to, was -- the bulk of it was

21 documents collected by the special committee of the board

22 of directors of Natera and their outside counsel, not

23 these counsel.  We obviously had no role in selecting

24 those documents, reviewing them, collecting them.

25        Apparently, 1,000 of those documents were then

1   shared with the SEC in support of the SEC's

2   investigation.  At least that's according to the

3   defendants' opposition brief here on this motion to

4   compel.  So, really, it's a special committee collection.

5          They are a good start, Your Honor.  They are.

6   They are 56,000 documents.  They are drawn from eight

7   custodians.  Eight custodians in a case of this scale and

8   complexity -- again, a two-year class period, seven

9   different causes of action under the federal securities

10  laws, 13 Natera defendants alone, not even getting to the

11  underwriters, insider trading, a public offering, all the

12  rest -- those documents are a fine start.

13         But to have eight custodians, where typically

14  in these cases we see 40, 50, 60, 70 -- and we cite those

15  cases -- that 56,000 documents, where typically in these

16  cases, by the end, you have hundreds of thousands of

17  documents that are turned over, it's a fair start, but it

18  should not be the end.  I think at no time in discovery

19  were we under the impression that that was going to be

20  the end of it, or we would have litigated this a long

21  time ago.  We thought that if we succeeded at class

22  certification, we would enter full merits discovery and

23  commence as we did, as is reflected in my March 4th

24  letter to defense counsel saying:  Full discovery is now

25  imminent.  Let's engage on search terms and custodians.

1          I guess one last point I'd make, Your Honor, on

2    those eight custodians who comprise fully the sources for

3    the special committee documents provided in phase 1, they

4    are the absolute top echelon of the company.  There's not

5    a middle.  There's nobody lower.  As the cases that we

6    put in our brief reflect, it is often the case that the

7    top echelon of the company, the emails are really not

8    sufficient to demonstrate and reflect what is going on in

9    the operations and the practice of the company.  And I

10   think that's for good reason.

11         So to have eight custodians, all of whom are

12   simply in this top tier, is insufficient on a number of

13   levels.  To have eight custodians, 56,000 documents,

14   again, it is a fair start.  We have learned some things

15   from those documents.  But to have to go through full

16   merits discovery on the back of just that, Your Honor, it

17   would be, in my experience, unprecedented to have eight

18   custodians and 56,000 documents on the core issues of the

19   case in a case of this sort of scale and complexity and

20   size.

21         THE COURT:  You correctly pointed out, and I

22   think it was your reply, that Defendant bears an

23   evidentiary burden to support its undue burden argument.

24   We didn't get evidence attached to the response, but

25   there was at least this hit rate chart that was included

1  with the joint advisory.

2          And I think it was in your portion of the joint

3  advisory you say the hit rate has no bearing on the

4  relevance of your searches or the custodians.  But it

5  certainly has bearing on the proportionality, which is

6  also part of 26(b).

7          So why shouldn't I be shocked at the hit rate

8  that shows up in that chart, and why is it proportional?

9  Give me an idea.  I mean, do you know what the damages

10  number is generally in what we're talking about in this

11  case and how big the class is and that sort of thing that

12  might give me some comfort that a search of this size is

13  unreasonable or unproportional?

14          MR. D'ANCONA:  Sure.  Thank you, Your Honor.

15          I will try to address all of those questions,

16  and if I forget one, please bring me back to it.

17          In -- in I think order why you should not be

18  shocked, Your Honor, at the hit rate, of course, we

19  proposed those search terms and custodians and those date

20  parameters four months ago.  Four days ago, for the first

21  time, Defendants came back with a hit rate on our

22  proposal.  It would seem to be a bit late, in my view,

23  for them to be raising an argument that they had a burden

24  to raise at any point along the way that they wanted to

25  claim burden.  But now it's in the record, and I

1   appreciate -- I appreciate that fact to respond to it on

2   its merits.

3           Defendants have taken our Plaintiffs' initial

4   search term proposal, custodian proposal, date parameter

5   proposal and applied it to certain custodians and

6   generated a hit count.  It does have some sticker shock

7   to it, 3.6 million hits.  There are some issues that I

8   think can be readily identified that hopefully will bring

9   some comfort to Your Honor's concerns.

10          One, it is never the case in a litigation like

11  this that Plaintiffs' proposed hit counts, Defendants'

12  simply applied them and run those documents, reviewed,

13  them and produced documents.  I think what Your Honor

14  will see reflected in the *McDermott* case, for example, or

15  in the *Hall* case, is that what conventionally and,

16  frankly, in my experience, almost automatically occurs

17  when Plaintiffs propose their initial search parameters,

18  Defendants counter-propose.  This commences a one-, two-,

19  three-month back-and-forth in which terms are taken one

20  by one, narrowed, accepted, the negotiations go on, until

21  there's a final deal.

22          THE COURT:  So tell me this, though.  I want to

23  interrupt you there because a concern of mine is, let's

24  say I grant your motion.  One-page order, motion granted.

25  Then you're in a pretty good place to go to Defendants

1   and say, You know what.  You had a chance to negotiate

2   with me, and now I insist that you produce every single

3   thing that is responsive to every search term and every

4   custodian, and the time for negotiating is over.  How is

5   this going to play out if you prevail in full on your

6   motion?

7             MR. D'ANCONA:  I've thought about that,

8   Your Honor.  And I think we understand -- we do not want

9   Defendants to have to sort through an unreasonable

10  quantum of documents in order to get to the documents

11  that are fair and proportional and reasonable for us to

12  receive in this case.  We're not interested in waiting

13  for how long that would take.  We're not interested in

14  bogging down the process in that way.

15            If Your Honor is inclined to grant our motion,

16  we would be more than willing to put some parameters

17  around what that means in terms of there will be X number

18  of custodians, Plaintiffs select those custodians,

19  Defendants will run them, Plaintiffs and Defendants will

20  hash out these search terms on an expedited, very

21  collaborative process with reports to the Court in two

22  weeks about -- that it's done, or whatever the time frame

23  maybe, a tight time frame, in order to narrow things

24  down, so that if Defendants have real concerns -- because

25  I saw some of those hit counts, too; I don't know why

1    some of them are so high.  This ordinarily would have

2    been aired out in this typical back-and-forth, this

3    conventional back-and-forth, that the lawyers would have.

4    It hasn't happened here yet.  This is just their initial

5    run of our search terms with no -- no discussion.

6          I would be willing to work with Defendants, of

7    course.  And -- and that could be a reasonable step to

8    allay any concerns that they're just going to be hit with

9    a -- with an undue burden for how many documents they

10   need to review in order to get us the documents.

11         However, if -- if we were to go that court --

12   that course, Your Honor, I would think it's appropriate,

13   given where we are in the case, to -- to put a real frame

14   around it in terms of an expedited process where we are

15   ordered to work collaboratively and expeditiously to get

16   the searches done.  I think it is -- it probably goes

17   without saying that Defendants will need some time to

18   accomplish that and then to produce documents to us.  I

19   think the parties should be -- should be -- should be

20   expected to come to the Court with a reasonable proposal

21   to allow this process to be accommodated.

22         But I can assure, Your Honor, that we're not

23   going to try to shove it down their throats and say

24   "gotcha."  We understand that there's a reasonable

25   process that needs to happen here.  We are -- we filed

1    this motion because we frankly had felt like we were

2    being stonewalled in trying to engage in that reasonable

3    process for the last four months.  But if we are here

4    now, we welcome it and we will work reasonably with them

5    to get to a workable and balanced outcome.

6            THE COURT:  Okay.  Anything more you'd like for

7    me to consider on proportionality?

8            MR. D'ANCONA:  Nothing now, Your Honor.

9    Although, if I may reserve, if there are no more

10   questions for me, perhaps if something comes up in the

11   argument, I can respond to it.

12           THE COURT:  What about the number of plaintiffs

13   and damages?

14           MR. D'ANCONA:  Yes, Your Honor.  So damages

15   will be -- damages will be subject to merits expert

16   calculations after the fact discovery phase of this case.

17   However, I understand that the sort of stake -- the

18   stakes in the litigation are a component of the

19   proportionality analysis.  And I was -- because we don't

20   have an expert damages analysis done yet, I was thinking

21   about how to respond in case this question came up.

22           What I can say is that we see that there were

23   78 million-plus shares in the public float during the

24   class period.  We see that there was an average weekly

25   trading volume of over 4 million shares traded.  So we

1  know that there is thousands and thousands of investors

2  in this class period and in this -- and in this certified

3  class.

4          We also know that, on the alleged corrective

5  disclosure, where, again, Defendants will argue about how

6  much of this is attributable to damages and this is what

7  the expert phase is for.  But on this alleged corrective

8  disclosure, by our rights, it's all attributable to the

9  alleged disclosure of facts relating to the fraud.  And

10 the nominal stock price drop on that day from close to

11 close was over $16 per share.

12         So at those numbers just -- and I'm estimating

13 here, Your Honor, because I don't have the expert reports

14 done yet, and we won't for some time -- but damages are

15 easily in the hundreds -- several hundreds of millions of

16 dollars for class-wide damages, if my experience is any

17 indication of what those types of stock volumes and stock

18 prices in the drops relate to.

19         I'm sorry I can't give a more technically sound

20 answer than that, but we don't have the expert phase

21 completed yet.

22         THE COURT:  Okay.  Thank you.

23         MR. D'ANCONA:  Thank you.  Ms. Costley.

24         MS. COSTLEY:  Thank you, Your Honor.  I want to

25 start by apologizing if we are creating misimpression

1  either, one, that we were not willing to engage in

2  discussions with Plaintiffs and we're making a blanket

3  objection, because we absolutely are not.  Or, two, that

4  the Court had said anything about it being limited to

5  ancillary discovery.

6          I think when I argued it, I felt I was saying

7  "ancillary discovery," And we read the Court's time

8  table, the very short time for closing document

9  discovery, as consistent with there not being much

10  discovery left to do.  But that's my misunderstanding,

11  and I own it.  And I apologize to the Court for that.

12          THE COURT:  Just to be clear, though, I mean,

13  it's not just impressions.  You affirmatively state that

14  the Court order says ancillary documents.

15          MS. COSTLEY:  We should not have said that.

16  That is a grave mistake, and I did not realize we had

17  said that, and we shouldn't have, absolutely.  I'm very

18  sorry that that was in there.  I apologize.  And my name,

19  I'm sure, was on it.  So it's my mistake, and I apologize

20  for it.

21          Beyond that, I think that the issue is -- it

22  was never our position that discovery was over, that they

23  were not entitled to anything other than what the

24  government got, that they weren't entitled to anything

25  other what the special committee got.

1           Our position has been throughout that both the

2    special committee and the SEC, in exonerating Natera,

3    took a measured and proportionate approach to discovery.

4    And that what was provided to them was the universe of

5    documents with some ancillary exceptions that was

6    relevant to the claims at issue in this case.

7           This is a reform act case, a case under the

8    Private Securities Litigation Reform Act.  And in a

9    reform act case, you only get discovery on the claims

10   that have been pled with particularity in the complaint

11   and as to which the Court has sustained the complaint.

12   And I think Your Honor was alluding to that when asking

13   Plaintiffs do these requests go to the first category

14   that was sustained or the second category that was

15   dismissed.

16          And it's not the general allegations in the

17   complaint.  It's the specific allegations in the

18   complaint.  So when we look at the complaint in this case

19   the specific allegations are about MGML and about

20   Natera's requisition form.

21          We have told Plaintiffs, and I am sure we

22   reiterated during our last meet and confer, we will give

23   you any documents you think that you need related to

24   those search terms.  So we have voluntarily produced -- I

25   mean, of course subject to search parameters, but we have

1  produced documents related to the MGML search term and

2  we've produced documents related to the microdeletion

3  above and beyond what was produced as part of the special

4  committee.

5          We remain and we have invited plaintiffs to

6  narrow those.  And it was sort of our perspective -- and

7  I think part of this is just being partisan -- but it was

8  our perspective that we felt like Plaintiffs were

9  stonewalling us and refusing to negotiate.

10          So our intent in coming to you with this

11  motion, and I think where we had left it during the meet

12  and confer, was that we needed guidance from the Court on

13  whether non-MGML, Panorama business practices were at

14  issue or not.  Because our perspective is that discovery

15  should be limited to the specific allegations in the

16  complaint, which is MGML and the microdeletion form.

17          And when we met and conferred with Plaintiffs

18  about this, we have said from the beginning, you know,

19  this is going to be millions of documents.

20          THE COURT:  So let me interrupt you there.

21  Just to pose what sounds like a practical problem raised

22  by Mr. D'Ancona on this point, which is:  I take his

23  argument on this to be -- and maybe it's the same thing

24  you-all talked about in the meet and confer -- is, look,

25  these two -- you know, the two components that you refer

1  to, the MGML and the check box, you can't parse the

2  Natera universe in a way to just focus, to just pull out,

3  docs related to just those two things; that it all is

4  permeated throughout the operation.  And to the extent

5  that there are components of their claim that are

6  specific to just those two things, they still are

7  entitled to discovery related to the overall operation

8  because it bears on how those two aspects of their

9  operation were carried out.  So they're still relevant.

10         MS. COSTLEY:  Yes, Your Honor.  So, we don't

11  agree with that perspective.  I think that -- so that is

12  sort of two buckets.  The first bucket is not the word

13  "MGML," but I guess somewhat related to what it ties

14  into, and then the other is context, generally.

15         MGML -- so Panorama I think is one of five or

16  six business units at Natera.  And then, within Panorama,

17  I think somewhere around 5 to 10 percent -- depending on

18  the year, 5 to 10 percent of Natera's Panorama revenue

19  came from MGML.  So we are talking about something that

20  affects a very small portion of Natera's overall revenue.

21  And even within Panorama, I mean, we're over the

22  materiality threshold for Panorama but not by a lot.

23  We're like 5 to 10 percent.

24         So I -- and the thing we have tried to get at

25  with Plaintiffs and, frankly, didn't make much

1  progress -- but I'm not pass -- I'm not suggesting it was

2  their fault; we just didn't get there -- was how these

3  other practices tie in with the allegation of MGML.  So

4  the MGML allegation, right, is that we were using --

5  Natera was using a prior authorization service, and the

6  prior authorization service was somehow impermissible or

7  revenue from it, we shouldn't have been using that

8  service.

9          It is unclear to me how search terms related to

10  non-prior authorization subject matters would be relevant

11  to that.  It is unclear to me even how -- the allegation

12  is not -- the allegation in the complaint is not that use

13  of prior authorization services is impermissible.  The

14  allegation is that use of this specific prior

15  authorization service was impermissible because the

16  founder had an undisclosed relationship with a former

17  Natera employee.

18          So that's not a situation where, you know, the

19  company is doing shipping to a warehouse in Taiwan and

20  when you say, oh, but shipping to the warehouse in

21  Mauritius, that's not relevant.  But that's sort of the

22  related conduct that you'd expect to see.

23          We're talking -- this situation is more it is a

24  specific category of conduct related to this one third

25  party, and there is no allegations in the complaint.  And

1    we haven't heard -- yes, I've heard them say during the

2    most recent meet and confer and today we think the other

3    issues are relevant to this one category.  But what --

4    what we have -- I don't -- just saying that doesn't make

5    them relevant.

6          And I -- and maybe this is my own

7    short-sightedness because they're my client, I don't see

8    the logical tie-in between -- certainly not between

9    non-prior auths, but also with the other third-party

10   prior authorization services.  I just don't see how it's

11   relevant to the permissibility of use of MGML.

12         And so that's sort of what we wanted guidance

13   from the Court on.  And -- and this is completely our

14   fault in not teeing it up properly.  But my hope and what

15   I thought we had intended to do was come to the Court for

16   guidance about whether the non-MGML categories were an

17   appropriate source of discovery.  And the same with

18   respect to the non -- the NIPT unrelated to the

19   requisition forms.

20         I had thought our purpose in coming was to find

21   out whether the Court thought those were appropriate

22   avenues of discovery.  And then I had thought we would go

23   with Plaintiffs and negotiate the search terms and the

24   custodians based on the guidance we got from the Court.

25         And so I guess my request today would be that

```
 1    the Court hold any hearing or any decision in abeyance
 2    while we continue those meet and confers, and perhaps we
 3    could get guidance on -- and I think we've gotten some
 4    guidance -- on your thoughts on these sort of third-party
 5    categories and whether this is at issue, and then give us
 6    another opportunity to meet and confer with Plaintiffs
 7    about the specific search terms and custodians.
 8            And I make that request, Your Honor, just
 9    looking at the documents.  So we told Plaintiffs
10    initially --
11            THE COURT:  What you're asking me to be,
12    though, is like a discovery special master, and I don't
13    want to do that.  You file motions, I rule on motions,
14    and that's what I've got here, right?
15            MS. COSTLEY:  Yes, Your Honor.  I understand.
16    And I completely understand if that's not how the Court
17    wants to do it.  I think our position is plaintiffs
18    have -- and we've told them you're asking for millions of
19    documents.  The exact number is 2.65 million documents.
20            So when you look at the cases Plaintiffs cite,
21    the number of documents they say are appropriate, even in
22    their cases, is something like 225,000 to 865,000
23    documents.  And that's footnote 4 of their brief.
24            THE COURT:  And in those cases are they
25    discussing hit rates or documents?
```

```
 1              MS. COSTLEY:  I think they're discussing
 2    documents.  But so, like, 225 is less than 10 percent of
 3    the total hits that they're looking for.  And I don't
 4    think there's any reasonable belief that we are ever
 5    going to get 3 point -- so we're not -- my understanding
 6    is the 3.65 million is documents, not hits.
 7              Is that correct as well?
 8              Okay.  So it's the hits.
 9              THE COURT:  It's your chart.
10              MS. COSTLEY:  What?
11              THE COURT:  It's your chart, isn't it?
12              MS. COSTLEY:  Yeah.  It's my chart.
13              So the 3.65 million hits, I don't think we ever
14    get that down to two hundred and -- I mean, I just don't
15    see how 3.65 million hits gets cut down by 90 percent.
16              And, in addition, these cases, this is not a
17    case where there's overstatement at the entire company.
18    It's not a case where there are allegations of fraud
19    permeating the company.  Right.  This is one-third party
20    entity, and it is a small percentage of overall revenue.
21              So you would expect the document count and the
22    hit counts to be on the lower end, not on this higher, I
23    mean, very large 3.65 million.  And when I say
24    3.65 million, I should add that that's running the search
25    terms over only half of the custodians that they've asked
```

1  for.  I don't think the actual number is 7 million

2  because there's going to be duplication, of course.  It's

3  something less than 7 million.  But it's certainly

4  something more than 3.65 million.  That is an extremely

5  large number of hits.

6         And even if that's not the final document

7  count, right, I mean, we're talking about dozens of

8  attorneys working full-time, 40 hours a week, reviewing

9  these documents.  And it's going to take months.  This is

10  a very large starting hit count.  And, frankly, from our

11  perspective, these search terms aren't relevant.

12         They're -- and it was never our intent to say

13  we won't give you additional documents related to MGML or

14  the microdeletions.  But our perspective has always been

15  that these additional subjects -- you know, I think they

16  said during the meet and confer that they think get

17  discovery into all of Natera's business practices.  And

18  that is incredibly burdensome when the motion to dismiss

19  was not sustained on all of Natera's business practices

20  or even all over Panorama's business practices.

21         And, you know, the same is -- well, I'll stop

22  there, Your Honor.

23         THE COURT:  Thank you, Ms. Costley.

24         MS. COSTLEY:  Thank you.

25         THE COURT:  Mr. D'Ancona?

1          MR. D'ANCONA:  Thank you, Your Honor.  Just a

2    couple of points, if I may.

3          First, a word that we've heard in the briefing

4    and today is "exonerated."  That the SEC "exonerated"

5    Natera.  That's not true.  The SEC no action letter

6    literally said that it should not be taken as a

7    conclusion that Natera was exonerated.  Judge Ezra quoted

8    that language in his ruling on Defendants' motion for

9    judgment on the pleadings.  That's Docket 177 at page 17.

10   I think the idea that Natera was exonerated is -- is just

11   unsupported.

12         The second point, Your Honor, briefly, regards

13   the number of hit counts.  There are tried and true,

14   well-established methods to lower those hit counts.  A

15   simple counterproposal from Defendants I think would have

16   gone a long way.  We have many terms, for example, not to

17   get too far into the weeds and with apologies, many terms

18   where we say "this term and that term."  A very

19   conventional way to lower that count is to say "this term

20   within 10 of that term," and only those documents will

21   now hit.  In practice, that tends to lower hit counts

22   dramatically on the first go-round of an exchange of a

23   counterproposal.

24         So I think this notion that Defendants are

25   going to sort of simply accept Plaintiffs' search terms

1 and there's no room for any negotiation on any of them, I

2 just stood up here and said that there was.  I reiterate

3 that.

4          In addition, the notion that the remaining

5 custodians who they have not included in this collection

6 will potentially double the count of documents, I think

7 eight or nine of them are the -- the director defendants.

8 Defendants elsewhere in their papers, I think in their

9 opposition briefs, say that they expect that director

10 defendants have no relevant documents.  So right there

11 most of the remaining custodians, according to

12 Defendants, are expected to have few to none in terms of

13 relevant documents.

14          One last point I'd like to make on the search

15 and hit count information that was provided, Your Honor.

16 It has to do with the Google Vault and the documents that

17 were actually included here.  I would like to point out

18 and just -- just note this on the record, that there are

19 seven or eight custodians, including most or all of the

20 defendants and most or all of the custodians from the

21 special committee collection for whom there are no Google

22 Vault documents, according to Defendants' chart.

23          This raises significant concerns from my

24 perspective of about where those documents are, whether

25 they were preserved.  We just got this information for

1   the first time last week.  We asked a question in

2   follow-up to it.  I haven't received a response to it yet

3   about what these Google documents in the Vault are.  But,

4   typically, in my experience, Google Vault is where the

5   working papers are.  It's not your emails, it's not your

6   chats.  It's your presentations, it's your spreadsheets,

7   it's your drafts.  It's your back-and-forths that you're

8   working on, your shared documents with your colleagues.

9         We have Defendant Brophy with Vault documents

10  only from after the class period, May of '22 through

11  September of '22.  We have Defendant Chapman with one

12  month of Vault documents, from August of '22 to September

13  of '22, many months after the class period.  We have

14  Grinnell, Hariharan, Kamath, Rabinowitz with no Vault

15  documents at all.  These were SLC custodians.  These were

16  some of the most senior people at the company, and they

17  have zero Vault documents at this time.

18        So I think we can lower the hit reports, we can

19  lower the hit counts, but we also need some answers on

20  what's going on with these documents that they seem to

21  have a limited capacity to review at this time.  I think

22  we need to understand what's going on with those

23  documents, and I just wanted to point that out, that it's

24  a serious concern.

25        THE COURT:  What about -- so let's go back one

1  more time to the -- their suggestion that, hey, this

2  MGML, the revenues from that and I guess NIPT or the

3  microdeletion test, that represented 5 to 10 percent of

4  the revenues of their operation, and your discovery

5  requests are seeking docs across 100 percent of the

6  operation, and that they should be given an opportunity

7  to suggest parameters that would just capture these two

8  more narrow categories?

9              MR. D'ANCONA:  The proposition that I am

10  seeking documents from across the entire operation, I

11  just stated it to Your Honor.  I've stated it in the meet

12  and confer.  The entire business of Natera, Prospera,

13  Signatera, their oncology drugs that they're developing,

14  I mean, these are not aspects of the business, which are

15  very important aspects of Natera's business, that I'm

16  seeking discovery on.  So if there is any

17  misunderstanding about what business I'm seeking

18  discovery on, it's not those aspects of the business

19  which, as time has gone on, have become some of the most

20  important aspects of the business.

21              THE COURT:  Where is it in Judge Ezra's

22  order -- you mentioned at the outset about this

23  "exonerated" Natera.  The SEC exonerated them.  Where was

24  that again?

25              MR. D'ANCONA:  Judge Ezra denied Defendants'

1  motion for judgment on the pleadings at Docket Number

2  177.  And at page 17 of that order, he reviewed -- this

3  is not the first time that Defendants said that SEC

4  exonerated Natera.  He reviewed that argument which we

5  responded to in our brief, and he ruled as I stated, that

6  the letter says it should not be taken as exonerating any

7  party.

8          Your Honor's characterization of what we see as

9  the scope of relevant discovery was -- was apt.  It is

10 the business -- the women's health business questions of

11 revenue to the extent they roll up into what the company

12 was stating to investors on these quarterly earnings

13 calls, what it was stating in its press releases and in

14 its SEC filings about its revenues.

15         But we're not trying to get into the weeds on

16 all of these other products that comprised parts of

17 Natera's portfolio.  We are trying to understand the

18 workings and the operations, the business practices --

19 both the standard business practices and the, by

20 comparison, deceptive business practices, that we say

21 were at play here in this fraud in the women's health

22 business surrounding the sale of Panorama, which was

23 certainly an important product of this company.  And

24 Judge Ezra reflects this in his motion to dismiss order,

25 that it's a core operation of the company because of its

1  significance.

2          Your Honor may recall the statements here are:

3  The company has had record-breaking revenues in the prior

4  quarter on the strength of Panorama sales, along with

5  Horizon sales, so it's bound to be quite important.  It's

6  bound to touch on a lot of documents in this company, but

7  that is the nature of the false statements that are at

8  issue here.  That is the nature of the business at this

9  time.

10          And we think, in order to contextualize the

11  alleged deceptive or improper business practices and

12  place them into a picture that could be presented to a

13  jury about why it mattered, how it worked, why we say it

14  was deceptive, why we say it was different from what they

15  were doing elsewhere, how it rolled up into the revenues,

16  how it made their statements about revenues and demand

17  and market penetration and organic demand and adoption by

18  clients and providers false, those are the things we're

19  going to have to present to a jury eventually, if we get

20  that far in this case.

21          We can't -- we can't be taking from context

22  these isolated issues, and only those isolated issues.

23  It would prevent -- it would block us from being able to

24  make a cogent presentation about what these practices

25  were, why they were improper or deceptive, and why it

1    mattered in the context of this business.

2            THE COURT:  You had mentioned suggesting or

3    that the order granting this motion include parameters in

4    terms of timing.  Let's say you were writing the order.

5    How would you -- how would you do that?

6            MR. D'ANCONA:  Thank you, Your Honor.  I think

7    the judge -- I think that Judge Edison in the

8    *McDermott* -- in the *Edwards v. McDermott* opinions from

9    2021 and 2022 has at least some indication of what I

10   would have in mind.

11           He directed the plaintiffs to select X number

12   of custodians from this disputed set of custodians.

13   Plaintiffs wanted 40.  Defendants said -- or Plaintiffs

14   wanted 70.  Defendants were willing to give 40.  He said

15   pick 50.

16           He then said, Go to the drawing board.  Get

17   back to work and then, you know, in an organized and

18   regulated process, work out the search terms given the

19   guidance that I've given about discovery here, and come

20   back to me.

21           They ended up having a second motion to compel

22   because Defendants wanted to run these search terms which

23   would hit on 700,000 documents, and Plaintiffs wanted

24   them to run these search terms which would hit on

25   1.3 million documents.  He ordered the plaintiff's search

1  terms to be run eventually after that process happened.

2          So the process that I would have in mind,

3  Your Honor, would be determine -- Plaintiffs get to

4  determine the custodians.  If Defendants identify that

5  somebody is just completely in left field, they can point

6  that out to us and we can adjust it.  Then we get to work

7  on the search terms.  We have a reasonable

8  back-and-forth.

9          The presumption is that Plaintiffs are getting

10  discovery on these topics that, again, Defendants in

11  their interrogatory responses and initial disclosures

12  were stating as relevant topics in this case: revenues

13  from Panorama, financial reporting by Natera, sales

14  practices for Panorama, the use of third-party prior

15  authorization vendors, the statements at issue, the

16  Hindenburg report allegations and related matters.

17          These are the broader definitions of the topics

18  at sort of the center of this case that we think we're

19  entitled to that we want.  So, with the guidance that

20  those are the relevant topics or the relevant scope for

21  the core of this case, we hammer out search terms.  And

22  Defendants have an opportunity to say, These are too

23  broad.  You're hitting on documents that don't make any

24  sense.  You're hitting on a lot of junk files.  Things

25  like that to narrow it down so that we're not asking them

1   to do make-work, empty work that's just going to bog down

2   this case and slow it down.

3          And, in conjunction with that, the parties come

4   to Your Honor with an adjustment to the schedule that's

5   as modest as possible, that allows them to do the work in

6   order to get us these documents so we can have a fair

7   opportunity to ask deposition -- ask deposition

8   questions, present this case through a final, you know,

9   and full installment of relevant documents, which are

10  just going to be the foundation of everything else that

11  happens in this case.

12          THE COURT:  Thank you.

13          MR. D'ANCONA:  Thank you.

14          THE COURT:  Anything more, Ms. Costley.

15          MS. COSTLEY:  Yeah.  Thank you, Your Honor.

16          Your Honor, I just want to reiterate that the

17  documents that have been produced to date was a

18  substantial production.  Close to 60,000 key documents

19  relied on by the special committee in thoroughly

20  examining these issues.  The documents that the SEC

21  deemed sufficient to investigate these same exact

22  allegations have already been produced to Plaintiffs.

23          And when we look at that number of documents,

24  that is commensurate with what you would expect to see in

25  a securities case where the allegations involve one

1  third-party entity responsible for a small portion of

2  overall revenue.

3        The numbers we're hearing from Plaintiffs now

4  are incredibly broad, and the topics are not confined to

5  issues that are likely to lead to discovery of

6  admissible, relevant evidence.  Frankly, from our

7  perspective, it's a fishing expedition.  The documents

8  that they have received are both voluminous and numerous.

9        And, again, I very much apologize because I

10  think our brief presented our argument in not the best

11  light.  And I just want to emphasize on the merits how

12  broad these search terms they are seeking are and how

13  completely untethered they are to the key issues in this

14  case in a way that we just generally do not see in a

15  securities class action, where they are subject to the

16  reform act particularity requirement.

17        THE COURT:  I'll give you a chance to address

18  the remark that Mr. D'Ancona raised about SEC exonerating

19  Natera.  Was -- what should I know about your statement

20  there?

21        MS. COSTLEY:  Yes, Your Honor.  I think that

22  the Court has rightly said that it's going to wait until

23  we get to summary judgment to decide whether it is

24  exoneration.  But from our perspective, I mean, look,

25  Natera was -- as Plaintiffs have said, was a big

1    *[unintelligible]*.  I think anyone who looks at these

2    cases, when the government has investigated a company and

3    chooses to take no action, the choice to take no action

4    in a case like this is in and of itself exoneration.

5            Yeah, sure there are cases --

6            THE COURT:  But the -- and the reason I'm

7    pinning you down on this is because you've already played

8    fast and loose with the language here earlier, right?

9    And so I'm trying to give you a chance to recover your

10   credibility.

11           MS. COSTLEY:  I understand.

12           THE COURT:  Because when I look at the

13   language -- and maybe Judge Ezra has it wrong.  But he's

14   quoting a letter, the no action letter -- and it sounds

15   like the very one you're invoking here -- that says:

16   This notice must in no way be construed as indicating

17   that the party has been exonerated.

18           And so when you come in, I just -- and you can

19   argue about the merits of whether you're liable in this

20   case.  But to say that there is a letter that exonerates

21   you when the letter explicitly says it doesn't exonerate

22   you, after already making an argument that -- saying that

23   I said that discovery was to ancillary documents, and

24   then you had to confess that, no, actually the order

25   which you said said it didn't actually say that, I guess

1   what I'm saying, Ms. Costley, I would encourage you to be

2   really careful about the language you use because now I'm

3   scrutinizing everything you say.

4           MS. COSTLEY:  Yes.  I understand.  And that's

5   totally fair.  Your Honor, I guess what I would say is I

6   will die on the hill that I think the SEC has exonerated

7   Natera.  And I think that there -- I -- that is a -- the

8   language is form language that goes on every document.

9   And my view is -- from conversations with the staff at

10  the SEC who conducted the investigation, my view is they

11  exonerated Natera.  And I would swear to you under oath

12  that the company was exonerated.

13          I would agree that that letter is not in and of

14  itself sufficient proof of exoneration.  I really meant

15  it when I tell you Natera was exonerated, and I'm not

16  going to back off that statement because I would swear to

17  you it's true.

18          It's fair to scrutinize what I'm saying because

19  we had the brief, I think, created an inaccurate

20  impression.  I apologize for that.  But I'll -- I think

21  this company has been exonerated.

22          THE COURT:  Thank you.  I considered the

23  parties filings and, ultimately, 26(b) charges the Court

24  with the determining whether the request for discovery is

25  relevant and that its production is proportional to the

1  needs of the case.

2          Here I felt like that plaintiffs' arguments in

3  support of the relevance of the various both custodians

4  and the search terms proposed to those custodians did go

5  to matters that were relevant to the case.

6          I hear Defendants' argument that they go beyond

7  the two core arguments of the plaintiffs' case.  But I

8  find Plaintiffs' rebuttal to be persuasive, that the

9  search terms, while yielding broad results, are indeed

10  tailored to both the specific core components of that

11  argument of their case, plus the necessary context that

12  accompanies those portions of Natera's business.

13          The -- as to the proportionality, the record

14  finally supplemented and defendants' contribution to the

15  joint advisory referencing 3.6 million hits to the

16  initial search terms to half of the custodians, certainly

17  that's a large number.  But what I don't have evidence of

18  is how many documents that might eventually yield, nor do

19  I have convincing argument that this -- from the

20  defendant that this scope is unduly burdensome, given the

21  scope of issues in this case and the potential damages

22  that might be at issue.

23          Not to mention the search terms such as they

24  are and were proposed by Plaintiffs could potentially be

25  narrowed.  And I think Plaintiffs have an incentive of

```
 1   their own to not -- to maybe further tailor these to the

 2   extent they see is appropriate to avoid an enormous

 3   document dump that they themselves are going to have to

 4   process once it is produced.

 5            And I trust Counsel's representation that they

 6   will work with Defendants in good faith to, once that

 7   initial run is done, determine if there can be some

 8   meaningful narrowing.  And it is my hope that this is my

 9   last hearing and order on this set of discovery.

10            My written order on this motion will be short,

11   and I will leave it to the parties to negotiate, as I

12   said, in good faith both the go forward in terms of how

13   the process is going to play out and the timing.  The --

14   I mean, this discovery was served before the close of --

15   before the close of the discovery deadline.  And I'm

16   trying to find the scheduling order here.

17            Either way, if it needs to be adjusted, whether

18   the discovery deadline or dispositive motion deadline

19   needs to by adjusted, then the parties can seek that

20   relief.  And I don't doubt that Judge Ezra or I, if it's

21   referred to me, can grant that relief.  There's no trial

22   date, so it would be -- it would not be difficult to

23   adjust the deadlines -- the remaining deadlines as needed

24   to ensure that everybody has enough time to produce these

25   documents and consider them.
```

1          Any further clarity needed from the parties on

2   the order from the plaintiffs?

3          MR. D'ANCONA:  No, Your Honor.  Thank you.

4          THE COURT:  From the defendants?

5          MS. COSTLEY:  No.  Thank you, Your Honor.

6          THE COURT:  That will conclude the hearing.

7       (Proceedings concluded at 3:04 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **REPORTER'S CERTIFICATE**

2          I, Arlinda Rodriguez, do hereby certify that the foregoing

3    was transcribed from an electronic recording made at the time

4    of the aforesaid proceedings and is a correct transcript, to

5    the best of my ability, made from the proceedings in the

6    above-entitled matter, and that the transcript fees and format

7    comply with those prescribed by the Court and Judicial

8    Conference of the United States.

9

10   /S/ Arlinda Rodriguez                    July 14, 2025

11

12   ARLINDA RODRIGUEZ                        DATE

13

14

15

16

17

18

19

20

21

22

23

24

25