# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| BRITISH AIRWAYS PENSION TRUSTEES LIMITED and KEY WEST POLICE & FIRE PENSION FUND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>NATERA, INC., et al.,<br><br>Defendants. | Case No. 1:22-cv-00398-DAE |

**LEAD PLAINTIFF BRITISH AIRWAYS PENSION TRUSTEES LIMITED'S AMENDED OBJECTIONS AND RESPONSES TO NATERA, INC.'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Federal Rules") and applicable Local Rules of the United States District Court for the Western District of Texas ("Local Rules"), and any other applicable rules or governing law, Lead Plaintiff and Class Representative British Airways Pension Trustees Limited ("Lead Plaintiff"), by and through its undersigned counsel, hereby objects and responds to Defendant Natera, Inc.'s ("Natera") First Set of Interrogatories (the "Interrogatories"), dated February 10, 2026.

## I. PRELIMINARY STATEMENT

Lead Plaintiff's responses to the Interrogatories are made solely for use in the above-captioned action (the "Action"). Lead Plaintiff's responses to the Interrogatories are based upon a reasonable investigation of the evidence currently available and reflect Lead Plaintiff's current knowledge, understanding, and belief based upon information known at this time. The merits phase of discovery in this Action is ongoing, and Natera has not substantially completed its document

production—and the deadline for it to do so is April 30, 2026. Additional contentions, facts, witnesses, documents, testimony, or other evidence may arise during the discovery process and during the review of discovery in preparation for trial. Lead Plaintiff is providing these responses based upon information available to date, and expressly reserves the right to modify its responses based upon further discovery or information it receives. By providing the objections and responses below, Lead Plaintiff does not waive and expressly reserves the right to: (i) modify its position based upon further discovery or information obtained; (ii) rely upon and use, at trial and otherwise, any other facts and information subsequently identified; (iii) supplement, clarify, revise, or correct any or all of the objections and responses herein; (iv) assert additional objections or privileges in subsequent supplemental responses; and (v) assert any and all objections as to the admissibility of such responses into evidence in this Action on any and all grounds, including, but not limited to, relevance, materiality, and admissibility, and on any ground that would require exclusion of any response herein if it were introduced in court.

No incidental or implied admissions are intended in these responses. Lead Plaintiff's response to all or any part of an Interrogatory should not be taken as an admission that: (i) Lead Plaintiff accepts or admits the existence of any facts set forth or assumed by the Interrogatory; or (ii) Lead Plaintiff's responses constitute admissible evidence. Lead Plaintiff's response to all or any part of an Interrogatory also is not intended to be, and shall not be, a waiver by Lead Plaintiff of all or any part of its objections to that Interrogatory. Lead Plaintiff's responses, including the identification of any document or thing, does not constitute an admission by Lead Plaintiff that such response, document, or thing, including any information contained therein, is relevant, authentic, or admissible, and are not intended to waive or prejudice any objections Lead Plaintiff may assert now or in the future. This includes, without limitation, objections to the use or

admissibility of any document or thing, including any information contained therein, at any trial or other proceeding in this or any other action.

## II. SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Lead Plaintiff objects to the definition of the terms "Communication(s)" and "Communicate(d)" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term "Communication(s)" and "Communicate(d)" different from the definition of those terms set forth in Local Rule CV-26(b)(1). For purposes of Lead Plaintiff's responses, Lead Plaintiff construes the terms "Communication(s)" and "Communicate(d)" consistent with the definitions of those terms set forth in Local Rule CV-26(b)(1).

2. Lead Plaintiff objects to the definition of the term "Concerning" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term "Concerning" different from the definition of that term set forth in Local Rule CV-26(b)(7). For purposes of Lead Plaintiff's responses, Lead Plaintiff construes the term "Concerning" consistent with the definition of that term set forth in Local Rule CV-26(b)(7).

3. Lead Plaintiff objects to the definition of the term "Hindenburg Research" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action because it includes "any of [Hindenburg Research LLC's] affiliates, subsidiaries, directors, members, employees, representatives, agents, attorneys, assigns, experts, consultants, current and former, including all other Persons acting or purporting to act on their behalf." For purposes of Lead Plaintiff's

responses, Lead Plaintiff construes the term “Hindenburg Research” to mean nonparty Hindenburg Research LLC.

4. Lead Plaintiff objects to the definition of the term “Identify (with respect to Persons)” as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party’s claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term “Identify (with respect to Persons)” different from the definition of that term set forth in Local Rule CV-26(b)(3). For purposes of Lead Plaintiff’s responses, Lead Plaintiff construes the term “Identify (with respect to Persons)” consistent with the definition of that term set forth in Local Rule CV-26(b)(3).

5. Lead Plaintiff objects to the definition of the term “Person(s)” as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party’s claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term “Person” different from the definition of that term set forth in Local Rule CV-26(b)(6). For purposes of Lead Plaintiff’s responses, Lead Plaintiff construes the term “Person” consistent with the definition of that term set forth in Local Rule CV-26(b)(6).

6. Lead Plaintiff objects to the definition of the term “Practice(s)” on the grounds that it is vague and ambiguous with respect to the terms and phrases “plan, scheme, course of conduct, device, act, practice, or course of business of Natera.” Lead Plaintiff further objects to the definition of “Practice(s)” as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party’s claim or defense and/or not proportional to the needs of this Action, and information that is not within Lead Plaintiff’s knowledge to the extent it includes without limitation “any plan, scheme, course of conduct, device, act, practice, or course of business of Natera.”

7. Lead Plaintiff objects to the definition of the terms "You," "Yours," and "Lead Plaintiff" on the grounds that they are overly broad and unduly burdensome because they include Lead Plaintiff's "officers, directors, employees, trustees, and any agent, representative, attorney, accountant, independent contractor, investment advisor, money manager, portfolio manager, or other Person, business advisor, or legal entity acting, or purporting to act, on behalf of Lead Plaintiff." For purposes of its responses, Lead Plaintiff construes the terms "You," "Yours," and "Lead Plaintiff" to mean Lead Plaintiff.

8. Lead Plaintiff objects to the statement in paragraph 17 of the Definitions that "[c]apitalized terms not defined herein shall have the same meaning as in the Complaint." For purposes of its responses, Lead Plaintiff will interpret any capitalized terms not defined in the Interrogatories consistent with ordinary usage and understanding of such terms. Similarly, in responding to these Interrogatories, Lead Plaintiff has interpreted the words and phrases used in the Interrogatories in accordance with their usual definitions and usages. To the extent Natera intended any word or phrase to have a meaning other than the generally accepted one, Lead Plaintiff objects on the grounds that those words and phrases are vague and ambiguous, and cannot be understood in context.

9. Lead Plaintiff objects to Instructions A-E to the extent they purport to impose burdens on Lead Plaintiff beyond those required by the Federal Rules, Local Rules, and any other applicable rules or governing law, demand information that is unduly burdensome to collect and prepare, or are duplicative or cumulative of other Interrogatories, or purport to require Lead Plaintiff to provide information that is not within its control, custody, or possession, that is not maintained in the normal course of its business, or that must be obtained from persons or entities other than Lead Plaintiff. Lead Plaintiff will provide information in the control, custody, or

possession of Lead Plaintiff only, consistent with its obligations under the Federal Rules, Local Rules, and any other applicable rules or governing law.

10. Lead Plaintiff objects to Instruction C to the extent it seeks to impose burdens or obligations that are different from or exceed the requirements of the Federal Rules, the Local Rules, and any other applicable rules or governing law.

11. Lead Plaintiff objects to Instruction D to the extent it seeks to impose burdens or obligations that are different from or exceed the requirements of the Federal Rules, the Local Rules, and any other applicable rules or governing law.

12. Lead Plaintiff objects to Instruction E as imposing a relevant time period that is overly broad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action by seeking information from January 1, 2019 through February 10, 2026. For purposes of its responses, Lead Plaintiff applies a relevant time period of the Class Period—i.e., February 27, 2020 through March 8, 2022, both dates inclusive—unless stated otherwise in a particular response.

13. Lead Plaintiff objects to the Definitions and Instructions to the extent they call for the disclosure of information that is not relevant to the parties' claims or defenses, or that is unduly burdensome, overbroad, and disproportionate to the needs of the case, including to the extent they seek information concerning transactions other than Lead Plaintiff's Class Period purchases and sales of Natera common stock, which are the only relevant transactions.

14. Lead Plaintiff objects to each Interrogatory to the extent that it purports to require the disclosure of information and/or communications protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the joint-prosecution privilege, the common-interest privilege, and/or any other applicable privilege or immunity from disclosure, regardless of

whether such privilege or immunity from disclosure is specifically identified in the response(s) to which it applies. Any inadvertent disclosure of privileged or otherwise protected information shall not be deemed to be a waiver by Lead Plaintiff of any applicable privilege or immunity from disclosure.

## III. SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning "unbundling" versions of its Panorama test both with and without microdeletion screening, as alleged in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**AMENDED RESPONSE TO INTERROGATORY NO. 1:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt.

No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others "alleged" in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning 'unbundling' versions of its Panorama test both with and without microdeletion screening." Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, My Genome My Life ("MGML"), and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practices and

conduct before and during the Class Period involving "unbundling"—which is not defined in the Interrogatories, but which Lead Plaintiff interprets for purposes of this response to mean utilizing multiple Current Procedural Terminology (or CPT) codes in connection with the claims and billing process for a single Panorama test—are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims. In particular, for example, Natera's practices involving unbundling CPT codes in the process of billing or submitting claims or prior authorizations—including those submitted by MGML and/or those that were ordered by default through the use of Natera's deceptively-designed Panorama requisition form—are relevant or related to Lead Plaintiff's claims.

**INTERROGATORY NO. 2:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning "doubl[ing] the cost of Panorama screenings by adding microdeletions," as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available,

including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice

Concerning 'doubl[ing] the cost of Panorama screenings by adding microdeletions.'" Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion

screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. The deceptive design of the Panorama requisition form automatically opted patients in to expensive microdeletion testing without regard for medical necessity. Natera's practices and conduct before and during the Class Period involving increasing the cost for Panorama tests by automatically including microdeletions are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims.

**INTERROGATORY NO. 3:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning "double billing" Panorama by charging both patients and insurers for same tests, as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**AMENDED RESPONSE TO INTERROGATORY NO. 3:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available,

including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice

Concerning 'double billing' Panorama." Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding

microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practices and conduct before and during the Class Period involving "double billing"—which is not defined in the Interrogatories, but which Lead Plaintiff interprets for purposes of this response to mean seeking substantially duplicative payments from patients and insurance payors for the same Panorama test—are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims. In particular, for example, Natera's practice of double billing claims—including claims for Panorama screens with microdeletions that were ordered by default without regard for medical necessity through the use of Natera's deceptively-designed Panorama requisition form and/or which MGML submitted for prior authorization—to further increase its Panorama revenue numbers is relevant or related to Lead Plaintiff's claims.

**INTERROGATORY NO. 4:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning the "Price Transparency Program," as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it

seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained

alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning the 'Price Transparency Program.'" Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless

the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practices and conduct before and during the Class Period involving its "Price Transparency Program"—which is not defined in the Interrogatories, but which Lead Plaintiff interprets for purposes of this response to mean Natera's program in which it allowed (i) patients who elected self-pay and paid within a particular time frame and (ii) patients with copays Natera estimated to be higher than the Price Transparency Program price to pay a preset cash price for Panorama—are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims. In particular, for example, Natera's Price Transparency Program was, at least in part, addressed to patients who were by default opted into Panorama tests with additional expensive microdeletion screens without regard for medical necessity through the use of Natera's deceptively-designed Panorama requisition form, and whose copay for the Panorama tests may not have been as expensive or may have been covered by their insurance had they opted out of the additional microdeletion screen. Natera's utilization of the Price Transparency Program allowed it to capitalize on an immediate cash payment for Panorama screens (while avoiding payor review of submitted claims or prior authorization requests), including those ordered with microdeletions by default without regard for medical necessity due to the misleading nature of the Panorama requisition form, contributing to the inflation of Panorama revenues, and is relevant or related to Lead Plaintiff's claims.

**<u>INTERROGATORY NO. 5</u>:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning retroactive offerings of discounted cash pay rates to customers resulting in insurance deductible discounts, as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**<u>AMENDED RESPONSE TO INTERROGATORY NO. 5</u>:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory

suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning the retroactive offerings of discounted cash pay rates to customers resulting in insurance deductible discounts." Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds

to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practice of resolving patients' complaints about surprise high bills for Panorama tests—including patient bills for Panorama screens with microdeletions that were ordered by default without regard for medical necessity through the use of Natera's deceptively-designed Panorama requisition form and/or which MGML submitted for prior authorization—by offering to bill a lower price to patients in exchange for a

cash payment, even after the patients' insurers were billed for the same Panorama test, is relevant or related to (and thus comprises a basis, in part, for) Lead Plaintiff's claims.

**INTERROGATORY NO. 6:**

Identify Each Practice of Natera described in the Hindenburg Report not specifically mentioned in Interrogatories 1–5 that Your claims and alleged damages in this Action are based [sic], in whole or in part. For Each Practice identified in response to this Interrogatory 6, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**AMENDED RESPONSE TO INTERROGATORY NO. 6:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often

best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, and ambiguous, and confusing with respect to the undefined phrase "based [sic], in whole or in part." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based [sic], in whole or in part" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a

closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. In addition to the conduct Lead Plaintiff has stated is relevant or related to its claims in its amended responses to Interrogatory Nos. 1-5 above, additional aspects of Natera's practices and conduct before and during the Class Period are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims, including but not limited to the following: its submission of prior authorizations after a test was run; its submission of claims for Panorama screens that were medically unnecessary; its submission of prior authorizations and insurance claims without supporting medical documentation; its failure to

collect on or zero-balancing patients' cost-sharing payments like copays and deductibles; and its use of the Panorama order form that automatically opted patients into receiving microdeletion screening unless they affirmatively opted out. Each of these practices was supported and facilitated by Natera's use of a deceptive requisition form to inorganically increase the number of microdeletion screenings ordered and Natera's improper utilization of MGML to, *inter alia*, indiscriminately submit prior authorizations.

**INTERROGATORY NO. 7:**

For Each Practice You identified in response to Interrogatories 1–6, state all facts supporting Your contention that the Practice supports a claim in this Action and that You suffered damages as a result of that Practice. In responding, to the extent known after a reasonable inquiry, identify: (a) the portion(s) of the Hindenburg Report (including page/section) that You contend disclosed the Practice to the market and contributed to Your damages suffered in this Action; (b) the date or dates on which the Practice occurred; (c) the Persons You contend were involved in the Practice (including but not limited to Persons You may rely upon in this Action in connection with the Practice); (d) which of Your claim(s) (e.g., Section 10(b), Section 11) this Practice supports; (e) how the Practice rendered any statement or omission You identified in response to Interrogatory 8 false or misleading; and (f) whether You contend the Practice violated any law, statute (including but not limited to the Anti-Kickback Statute), regulation, or industry standard, and, if so, identify Each specific law, statute, regulation, or industry standard You contend was violated.

**AMENDED RESPONSE TO INTERROGATORY NO. 7:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that

it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad and unduly burdensome as it seeks "all facts." Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory that requests that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6, which are also contention interrogatories. Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in a "portion(s) of the Hindenburg Report (including page/section)," which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff

interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the terms and phrases "disclosed the Practice to the market," "contributed to Your damages suffered," "involved in the Practice," "which of Your claim(s) . . . this Practice supports," and "violated any law, statute (including but not limited to the Anti-Kickback Statute), regulation, or industry standard."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104), and its responses to Interrogatory Nos. 1-6 above. Lead Plaintiff further states that it will provide its response to this contention Interrogatory at the close of fact discovery, and will supplement its response thereafter, if necessary, consistent with its obligations under the Federal Rules.

**INTERROGATORY NO. 8:**

Identify Each statement or omission on which Your Section 10(b) and Section 11 claims in this Action is based. For Each such statement or omission, state the date, speaker/author, forum (e.g., earnings call, press release, SEC filing), the specific language challenged (exact quote or provide a pinpoint citation sufficient to identify the specific statement), the applicable claims (e.g., Section 10(b), Section 11), and the paragraph(s) in the Complaint in which You allege the statement or omission.

**RESPONSE TO INTERROGATORY NO. 8:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the terms "speaker/author." Lead Plaintiff further objects to this Interrogatory as it is an improper compound Interrogatory, consisting of multiple subparts, each of which is a separate Interrogatory.

Subject to and without waiver of the foregoing objections and Lead Plaintiff's right to amend or supplement its response to this Interrogatory, Lead Plaintiff provides the following reference chart, which identifies the misstatements and omissions that Lead Plaintiff alleges violated Section 10(b) of the Exchange Act of 1934 and Section 11 of the Securities Act of 1933 and that have been sustained by the Court in its Motion to Dismiss Order. Dkt. No. 104.

| Date/Forum | Speaker/Author[1] | Alleged Misrepresentation and/or Omission[2] | Complaint Paragraph | Claim |
|---|---|---|---|---|
| February 26, 2020 Form 8-K | Natera, Michael Brophy ("Brophy") | "[t]otal revenues were $83.2 million in the fourth quarter of 2019 compared to $67.0 million for the fourth quarter of 2018, an | 150 | Section 10(b) |

[1] In providing a reference to the individual(s) or entity alleged as a "speaker" or "author" of an alleged misrepresentation or omission, Lead Plaintiff does not suggest that such person(s) or entity are the sole "makers" of the statement or omission for purposes of the federal securities laws.

[2] Bolding, italics, and alterations included in the quotations herein are as they appear in the Complaint. Plaintiffs endeavored to emphasize the materially false and misleading aspects of the Natera Defendants' Class Period statements in bold and italics in the Complaint. Additional text

| Date/Forum | Speaker/Author[1] | Alleged Misrepresentation and/or Omission[2] | Complaint Paragraph | Claim |
|---|---|---|---|---|
| | | increase of 24%. ***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests***." | | |
| May 6, 2020 Form 8-K | Natera, Brophy | "[t]otal revenues were $94.0 million in the first quarter of 2020 compared to $66.8 million for the first quarter of 2019, an increase of 41%. ***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests***." | 151 | Section 10(b) |
| August 5, 2020 Form 8-K | Natera, Brophy | "[t]otal revenues were $86.5 million in the second quarter of 2020 compared to $74.4 million for the second quarter of 2019. ***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests***." | 152 | Section 10(b) |
| January 12, 2021 JPMorgan Healthcare Conference | Natera, Steven Chapman ("Chapman") | "If you're conservative and you just say $250 a test, that puts you at $100 million in additional revenue and cash just from the book that we're running today. Now you shouldn't think about it as being capped at that level because ***we see doctors ordering the microdeletion test***. ***8 out of 10 times, they place an order for Panorama***. So as we penetrate that additional 3 million tests in the average risk space, that microdeletion number is going to go up significantly as well. And it's pretty baked into our COGS as well." | 153 | Section 10(b) |
| February 25, 2021 Earnings Call | Natera, Chapman | "The next slide demonstrates that revenue growth is tracking nicely with volume growth, once again, accelerating meaningfully over what we've seen in the past. If you just zero in on product revenues on the right-hand side, you'll see revenue growth rates of 43%. This removes development revenue from partners, which was larger in 2019 than it is now. We saw recurring ASPs step up again in Q4 versus prior periods, and blended COGS remain in the low 200 range. ***The combination of*** | 154 | Section 10(b) |

was provided for context that can also contribute to the false and misleading nature of the Natera Defendants' statements.

| Date/Forum | Speaker/Author[1] | Alleged Misrepresentation and/or Omission[2] | Complaint Paragraph | Claim |
|---|---|---|---|---|
| | | ***consistent gross profit per test and volume growth that we talked about in the past is working as expected, allowing us to get the women's health business to cash flow breakeven***, supporting even bigger investments in the oncology business." | | |
| February 25, 2021 Earnings Call | Natera, Chapman | "As we mentioned in the prepared remarks, last year, we did 400,000 microdeletion tests, and ***that was at a growth rate of 37% year-on-year versus 2019***. ***So this is really a rocket ship that's growing***. We're running the tests. If we can get reimbursement, it's going to be -- we're going to be off to the races." | 155 | Section 10(b) |
| May 6, 2021 Earnings Call | Natera, Chapman | "[a]s our base of business has grown substantially, our growth rates have still continued to accelerate. ***That acceleration is being driven by continued strong growth in the women's health business***, but also we are seeing some real benefit from oncology and organ health as well." | 156 | Section 10(b) |
| August 5, 2021 Earnings Call | Natera, Chapman | "[t]otal revenues and product revenues were both up 64% and approximately 71% respectively, over the same period last year. ***Net acceleration is being driven by continued strong growth in the Women's Health business*** and big contributions from oncology and transplant." | 157 | Section 10(b) |
| August 5, 2021 Earnings Call | Natera, Chapman | "[w]e were also very exciting [sic] to see the Women's Health business to go cash flow breakeven in the quarter. This was one of the top goals, I announced when I took over as CEO in 2019, and I'm proud that our team achieved this while simultaneously hitting record growth rates." | 158 | Section 10(b) |

| Date/Forum | Speaker/Author[1] | Alleged Misrepresentation and/or Omission[2] | Complaint Paragraph | Claim |
|---|---|---|---|---|
| August 11, 2021 Canaccord Genuity's 41st Annual Growth Conference | Natera, Brophy | "As a market leader we feel like we're very well position to get more than our fair share of that just natural increase in the NIPT testing market. When we grow the NIPT business, that gets amplified in our business by the fact that we very often also get a carrier screening ordered at the same time as the NIPTs. And ***we also get a microdeletion test ordered very frequently along with the NIPT*. *So for every 100 NIPTs***, there's something like a little more than 40 carrier screening tests that get ordered and for every 100 NIPT users, ***something like 75 microdeletion tests that get ordered***. So we're very well positioned to take this one kind of macro trend and see it really amplified in our business. So that's kind of about the women's health business." | 159 | Section 10(b) |
| September 10, 2021 Wells Fargo Virtual Healthcare Conference | Natera, Brophy | "Yes. I mean ***microdeletions continues to be a very popular product for us***. . . . roughly speaking, I mean, for every 100 NIPTs to get ordered, we get about a 80 or so microdeletions orders." | 160 | Section 10(b) |
| September 13, 2021 Morgan Stanley Global Healthcare Conference | Natera, Brophy | "as NIPTs penetrate, we have a couple of different ways to magnify the impact of that penetration in our business. One is for every 100 NIPTs that get run, something like 40 to 43 carrier screen test get run. ***The other is that for every 100 NIPTs that get run, something like 80 microdeletions test gets run***. So 1 trend 3 different products that can really drive a lot of outsized performance for us." | 161 | Section 10(b) |
| November 4, 2021 Earnings Call | Natera, Chapman | Total revenues and product revenues were both up 61% and 62%, respectively, over the same period last year. ***That acceleration is being driven by continued strong growth in the women's health products*** and big contributions from oncology and transplant products. | 162 | Section 10(b) |

| Date/Forum | Speaker/Author[1] | Alleged Misrepresentation and/or Omission[2] | Complaint Paragraph | Claim |
|---|---|---|---|---|
| July 2021 Offering Documents (as defined in ¶268 of the Complaint) | Natera, Chapman, Brophy, Matthew Rabinowitz, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herman Rosenman, Jonathan Sheena | The July 2021 Offering Documents omitted material information required to be stated therein, pursuant to 17 C.F.R. § 229.105, regarding risks associated with Natera's Panorama revenues, which in reality were propped up by Natera's deceptive practices, including using the Company's prior authorization scheme with MGML and opting patients into microdeletion testing. | 274-76 | Section 11 |
| July 2021 Offering Documents (as defined in ¶268 of the Complaint) | Natera, Chapman, Brophy, Matthew Rabinowitz, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herman Rosenman, Jonathan Sheena | The July 2021 Offering Documents failed to disclose, pursuant to 17 C.F.R. § 229.303, the fact that Natera relied on deceptive business practices to prop up revenue and inflate demand for Panorama. This constituted a known trend or uncertainty that had or was reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from Natera's continuing operations. | 282-84 | Section 11 |

**INTERROGATORY NO. 9:**

Identify Each purchase, acquisition, sale, or other disposition of Natera stock made by or for Your benefit from January 1, 2019 through present, including the date, quantity, price, the number of Natera shares you currently hold, and any profit (realized or unrealized) from that stock.

**RESPONSE TO INTERROGATORY NO. 9:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and purports to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action, including because it

seeks information concerning: (i) securities other than Natera common stock, the only security at issue in this Action; and (ii) transactions other than Lead Plaintiff's Class Period (and 90-day lookback period) purchases and sales of Natera common stock, the only relevant transactions in this Action. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the terms "other disposition," "by or for Your benefit," and "any profit (realized or unrealized)." Lead Plaintiff further objects to this Interrogatory as unreasonably cumulative or duplicative, as it seeks information that was already provided in response to prior discovery requests, including, without limitation, in response to Requests 1, 4, and 5 of the Natera Defendants' First Set of Requests for Production of Documents to Lead Plaintiff British Airways Pension Trustees Limited, served on May 14, 2024. Lead Plaintiff further objects to this Interrogatory to the extent it seeks information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including in Exhibit B to the Motion of British Airways Pension Trustees Limited, As Custodian Trustee of the New Airways Pension Scheme, for Appointment as Lead Plaintiff and Approval of Selection of Counsel (Dkt. No. 19-3). Lead Plaintiff further objects to this Interrogatory as it is an improper compound Interrogatory, consisting of multiple subparts, each of which is a separate Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privileges, protections, or immunities.

Subject to and without waiver of the foregoing objections and Lead Plaintiff's right to amend or supplement its response to this Interrogatory, pursuant to Federal Rule 33(d) Lead Plaintiff directs Natera to: (i) Exhibit B to Lead Plaintiff's Motion of British Airways Pension

Trustees Limited, As Custodian Trustee of the New Airways Pension Scheme, for Appointment as Lead Plaintiff and Approval of Selection of Counsel (Dkt. No. 19-3); and (ii) BAPTL-000242 and BAPTL-000315, marked confidential pursuant to the operative Confidentiality and Protective Order (Dkt. No. 131).

**INTERROGATORY NO. 10:**

Identify Each Person with whom You or any Person acting on Your behalf has Communicated with or from whom You have received factual information Concerning this Action, including but not limited to all interviews referenced in the second unnumbered paragraph on page 1 of the Complaint and any Persons referenced in Paragraph 172 of the Complaint ("The Hindenburg Report stated it was based on 'more than 2 dozen interviews….'"). If You are claiming privilege on any Communication, You shall comply with Instruction D.

**AMENDED RESPONSE TO INTERROGATORY NO. 10:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory because it seeks disclosure of information protected by the attorney work-product doctrine, the attorney-client privilege, or any other applicable privileges, protections, or immunities. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and purports to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this action because it seeks information: (i) about "Each Person" with whom Lead Plaintiff "or any Person acting on [its] behalf has Communicated"; (ii) without any subject matter limitation; (iii) regardless of whether such Communications were relied on in the Complaint; and (iv) regarding claims that were dismissed by the Court in its Motion to Dismiss Order (Dkt. No. 104). Lead Plaintiff further objects to this Interrogatory on the grounds that it

seeks information unknown to Lead Plaintiff. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the phrases "on Your behalf" and "factual information Concerning this Action." Lead Plaintiff further objects to this Interrogatory to the extent it seeks to impose burdens or obligations that are different from or exceed the requirements of the Federal Rules, the Local Rules, and/or governing law, including its request that Lead Plaintiff comply with Instruction D.

Dated: April 23, 2026

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

*/s/ Evan R. Hoey*
Evan R. Hoey (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Daniel A. Friedman (admitted *pro hac vice*)
Vanessa M. Milan (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
ehoey@ktmc.com
jdancona@ktmc.com
dfriedman@ktmc.com
vmilan@ktmc.com

*Counsel for Class Representative British Airways Pension Trustees Limited and Class Counsel*

**NIX PATTERSON, LLP**
Jeffrey J. Angelovich (Bar No. 00786988)
Cody Hill (Bar No. 24095836)
Jessica Underwood (Bar No. 24093291)
8701 Bee Cave Road
Building 1, Suite 500
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 495-1534
jangelovich@nixlaw.com
codyhill@nixlaw.com

junderwood@nixlaw.com

*Liaison Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2026, a true and correct copy of the foregoing Lead Plaintiff British Airways Pension Trustees Limited Amended Objections and Responses to Natera, Inc's First Set of Interrogatories was sent via electronic mail to the recipients listed below.

Bruce G. Vanyo (admitted *pro hac vice*)
Christina L. Costley (admitted *pro hac vice*)
Paul S. Yong (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: (310) 788-4400
Fax: (310) 788-4471
bruce@katten.com
christina.costley@katten.com
paul.yong@katten.com

Ted A. Huffman (State Bar No. 24089015)
**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
Tel: (214) 765-3600
Fax: (214) 765-3602
ted.huffman@katten.com

*Counsel for Defendant Natera, Inc.*

Dated: April 23, 2026

*/s/ Evan R. Hoey*
Evan R. Hoey

# VERIFICATION

I, Richard Pilsworth, declare that I serve as General Counsel for British Airways Pension Trustees Limited ("BAPTL"), as Custodian Trustee of the New Airways Pension Scheme. The General Counsel has the authority to act on behalf of BAPTL, one of the Court-appointed Class Representatives in *British Airways Pension Trustees Limited, et al. v. Natera, Inc. et al.*, Case No. 1:22-cv-00398-DAE (W.D. Tex.). I have reviewed BAPTL's Amended Objections and Responses to Natera, Inc.'s First Set of Interrogatories (the "Amended Interrogatory Responses"), which have been prepared by Kessler Topaz Meltzer & Check, LLP, Counsel for BAPTL and Class Counsel in this Action, and know its contents.

As to matters within my personal knowledge, I verify on behalf of BAPTL that the contents of the Amended Interrogatory Responses and the representations made as to BAPTL are true and correct to the best of my knowledge; and as to other matters, on information and belief I verify on behalf of BAPTL that the contents thereof are true and accurate.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 21st day of April, 2026.

DocuSigned by:

38CC2E379B28458...

Richard Pilsworth
*On behalf of British Airways Pension Trustees Limited, as Custodian Trustee of the New Airways Pension Scheme*