# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| BRITISH AIRWAYS PENSION TRUSTEES LIMITED and KEY WEST POLICE & FIRE PENSION FUND, individually and on behalf of all others similarly situated,<br>Plaintiffs,<br>v.<br>NATERA, INC., et al.,<br>Defendants. | Case No. 1:22-cv-00398-DAE |

**LEAD PLAINTIFF BRITISH AIRWAYS PENSION TRUSTEES LIMITED'S SECOND AMENDED OBJECTIONS AND RESPONSES TO NATERA, INC.'S <u>INTERROGATORIES 1-10</u>**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Federal Rules") and applicable Local Rules of the United States District Court for the Western District of Texas ("Local Rules"), and any other applicable rules or governing law, Lead Plaintiff and Class Representative British Airways Pension Trustees Limited ("Lead Plaintiff"), by and through its undersigned counsel, hereby objects and responds to Defendant Natera, Inc.'s ("Natera") Interrogatories 1-10 (the "Interrogatories"), dated February 10, 2026.

## I. PRELIMINARY STATEMENT

Lead Plaintiff's responses to the Interrogatories are made solely for use in the above-captioned action (the "Action"). Lead Plaintiff's responses to the Interrogatories are based upon a reasonable investigation of the evidence currently available and reflect Lead Plaintiff's current knowledge, understanding, and belief based upon information known at this time. The merits phase of discovery in this Action is ongoing, and additional contentions, facts, witnesses, documents, testimony, or other evidence may arise during the discovery process and during the review of discovery in preparation for trial. Lead Plaintiff is providing these responses based upon

information available to date, and expressly reserves the right to modify its responses based upon further discovery or information it receives. By providing the objections and responses below, Lead Plaintiff does not waive and expressly reserves the right to: (i) modify its position based upon further discovery or information obtained; (ii) rely upon and use, at trial and otherwise, any other facts and information subsequently identified; (iii) supplement, clarify, revise, or correct any or all of the objections and responses herein; (iv) assert additional objections or privileges in subsequent supplemental responses; and (v) assert any and all objections as to the admissibility of such responses into evidence in this Action on any and all grounds, including, but not limited to, relevance, materiality, and admissibility, and on any ground that would require exclusion of any response herein if it were introduced in court.

No incidental or implied admissions are intended in these responses. Lead Plaintiff's response to all or any part of an Interrogatory should not be taken as an admission that: (i) Lead Plaintiff accepts or admits the existence of any facts set forth or assumed by the Interrogatory; or (ii) Lead Plaintiff's responses constitute admissible evidence. Lead Plaintiff's response to all or any part of an Interrogatory also is not intended to be, and shall not be, a waiver by Lead Plaintiff of all or any part of its objections to that Interrogatory. Lead Plaintiff's responses, including the identification of any document or thing, does not constitute an admission by Lead Plaintiff that such response, document, or thing, including any information contained therein, is relevant, authentic, or admissible, and are not intended to waive or prejudice any objections Lead Plaintiff may assert now or in the future. This includes, without limitation, objections to the use or admissibility of any document or thing, including any information contained therein, at any trial or other proceeding in this or any other action.

## II. SPECIFIC OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Lead Plaintiff objects to the definition of the terms "Communication(s)" and "Communicate(d)" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term "Communication(s)" and "Communicate(d)" different from the definition of those terms set forth in Local Rule CV-26(b)(1). For purposes of Lead Plaintiff's responses, Lead Plaintiff construes the terms "Communication(s)" and "Communicate(d)" consistent with the definitions of those terms set forth in Local Rule CV-26(b)(1).

2. Lead Plaintiff objects to the definition of the term "Concerning" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term "Concerning" different from the definition of that term set forth in Local Rule CV-26(b)(7). For purposes of Lead Plaintiff's responses, Lead Plaintiff construes the term "Concerning" consistent with the definition of that term set forth in Local Rule CV-26(b)(7).

3. Lead Plaintiff objects to the definition of the term "Hindenburg Research" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action because it includes "any of [Hindenburg Research LLC's] affiliates, subsidiaries, directors, members, employees, representatives, agents, attorneys, assigns, experts, consultants, current and former, including all other Persons acting or purporting to act on their behalf." For purposes of Lead Plaintiff's responses, Lead Plaintiff construes the term "Hindenburg Research" to mean nonparty Hindenburg Research LLC.

4. Lead Plaintiff objects to the definition of the term "Identify (with respect to Persons)" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term "Identify (with respect to Persons)" different from the definition of that term set forth in Local Rule CV-26(b)(3). For purposes of Lead Plaintiff's responses, Lead Plaintiff construes the term "Identify (with respect to Persons)" consistent with the definition of that term set forth in Local Rule CV-26(b)(3).

5. Lead Plaintiff objects to the definition of the term "Person(s)" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action to the extent it purports to define the term "Person" different from the definition of that term set forth in Local Rule CV-26(b)(6). For purposes of Lead Plaintiff's responses, Lead Plaintiff construes the term "Person" consistent with the definition of that term set forth in Local Rule CV-26(b)(6).

6. Lead Plaintiff objects to the definition of the term "Practice(s)" on the grounds that it is vague and ambiguous with respect to the terms and phrases "plan, scheme, course of conduct, device, act, practice, or course of business of Natera." Lead Plaintiff further objects to the definition of "Practice(s)" as overly broad, unduly burdensome, and purporting to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action, and information that is not within Lead Plaintiff's knowledge to the extent it includes without limitation "any plan, scheme, course of conduct, device, act, practice, or course of business of Natera."

7. Lead Plaintiff objects to the definition of the terms "You," "Yours," and "Lead Plaintiff" on the grounds that they are overly broad and unduly burdensome because they include

Lead Plaintiff's "officers, directors, employees, trustees, and any agent, representative, attorney, accountant, independent contractor, investment advisor, money manager, portfolio manager, or other Person, business advisor, or legal entity acting, or purporting to act, on behalf of Lead Plaintiff." For purposes of its responses, Lead Plaintiff construes the terms "You," "Yours," and "Lead Plaintiff" to mean Lead Plaintiff.

8. Lead Plaintiff objects to the statement in paragraph 17 of the Definitions that "[c]apitalized terms not defined herein shall have the same meaning as in the Complaint." For purposes of its responses, Lead Plaintiff will interpret any capitalized terms not defined in the Interrogatories consistent with ordinary usage and understanding of such terms. Similarly, in responding to these Interrogatories, Lead Plaintiff has interpreted the words and phrases used in the Interrogatories in accordance with their usual definitions and usages. To the extent Natera intended any word or phrase to have a meaning other than the generally accepted one, Lead Plaintiff objects on the grounds that those words and phrases are vague and ambiguous, and cannot be understood in context.

9. Lead Plaintiff objects to Instructions A-E to the extent they purport to impose burdens on Lead Plaintiff beyond those required by the Federal Rules, Local Rules, and any other applicable rules or governing law, demand information that is unduly burdensome to collect and prepare, or are duplicative or cumulative of other Interrogatories, or purport to require Lead Plaintiff to provide information that is not within its control, custody, or possession, that is not maintained in the normal course of its business, or that must be obtained from persons or entities other than Lead Plaintiff. Lead Plaintiff will provide information in the control, custody, or possession of Lead Plaintiff only, consistent with its obligations under the Federal Rules, Local Rules, and any other applicable rules or governing law.

10. Lead Plaintiff objects to Instruction C to the extent it seeks to impose burdens or obligations that are different from or exceed the requirements of the Federal Rules, the Local Rules, and any other applicable rules or governing law.

11. Lead Plaintiff objects to Instruction D to the extent it seeks to impose burdens or obligations that are different from or exceed the requirements of the Federal Rules, the Local Rules, and any other applicable rules or governing law.

12. Lead Plaintiff objects to Instruction E as imposing a relevant time period that is overly broad, unduly burdensome, and seeking information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action by seeking information from January 1, 2019 through February 10, 2026. For purposes of its responses, Lead Plaintiff applies a relevant time period of the Class Period—i.e., February 27, 2020 through March 8, 2022, both dates inclusive—unless stated otherwise in a particular response.

13. Lead Plaintiff objects to the Definitions and Instructions to the extent they call for the disclosure of information that is not relevant to the parties' claims or defenses, or that is unduly burdensome, overbroad, and disproportionate to the needs of the case, including to the extent they seek information concerning transactions other than Lead Plaintiff's Class Period purchases and sales of Natera common stock, which are the only relevant transactions.

14. Lead Plaintiff objects to each Interrogatory to the extent that it purports to require the disclosure of information and/or communications protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, the joint-prosecution privilege, the common-interest privilege, and/or any other applicable privilege or immunity from disclosure, regardless of whether such privilege or immunity from disclosure is specifically identified in the response(s) to which it applies. Any inadvertent disclosure of privileged or otherwise protected information shall

not be deemed to be a waiver by Lead Plaintiff of any applicable privilege or immunity from disclosure.

## III. SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning "unbundling" versions of its Panorama test both with and without microdeletion screening, as alleged in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**RESPONSE TO INTERROGATORY NO. 1:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion

to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others "alleged" in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning 'unbundling' versions of its Panorama test both with and without microdeletion screening." Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings

filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, My Genome My Life ("MGML"), and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practices and conduct before and during the Class Period involving "unbundling"—which is not defined in the Interrogatories, but which Lead Plaintiff interprets for purposes of this response to mean utilizing

multiple Current Procedural Terminology (or CPT) codes in connection with the claims and billing process for a single Panorama test—are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims. In particular, for example, Natera's practices involving unbundling CPT codes in the process of billing or submitting claims or prior authorizations—including those submitted by MGML and/or those that were ordered by default through the use of Natera's deceptively-designed Panorama requisition form—are relevant or related to Lead Plaintiff's claims.

**INTERROGATORY NO. 2:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning "doubl[ing] the cost of Panorama screenings by adding microdeletions," as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**RESPONSE TO INTERROGATORY NO. 2:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff

state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning 'doubl[ing] the cost of Panorama screenings by adding microdeletions.'" Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined

phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's

utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. The deceptive design of the Panorama requisition form automatically opted patients in to expensive microdeletion testing without regard for medical necessity. Natera's practices and conduct before and during the Class Period involving increasing the cost for Panorama tests by automatically including microdeletions are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims.

**INTERROGATORY NO. 3:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning "double billing" Panorama by charging both patients and insurers for same tests, as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**RESPONSE TO INTERROGATORY NO. 3:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff

state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning 'double billing' Panorama." Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and

"based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues

were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practices and conduct before and during the Class Period involving "double billing"—which is not defined in the Interrogatories, but which Lead Plaintiff interprets for purposes of this response to mean seeking substantially duplicative payments from patients and insurance payors for the same Panorama test—are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims. In particular, for example, Natera's practice of double billing claims—including claims for Panorama screens with microdeletions that were ordered by default without regard for medical necessity through the use of Natera's deceptively-designed Panorama requisition form and/or which MGML submitted for prior authorization—to further increase its Panorama revenue numbers is relevant or related to Lead Plaintiff's claims.

**INTERROGATORY NO. 4:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning the "Price Transparency Program," as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**RESPONSE TO INTERROGATORY NO. 4:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from

sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this

Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning the 'Price Transparency Program.'" Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion

screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practices and conduct before and during the Class Period involving its "Price Transparency Program"—which is not defined in the Interrogatories, but which Lead Plaintiff interprets for purposes of this response to mean Natera's program in which it allowed (i) patients who elected self-pay and paid within a particular time frame and (ii) patients with copays Natera estimated to be higher than the Price Transparency Program price to pay a preset cash price for Panorama—are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims. In particular, for example, Natera's Price Transparency Program was, at least in part, addressed to patients who were by default opted into Panorama tests with additional expensive microdeletion screens without regard for medical necessity through the use of Natera's deceptively-designed Panorama requisition form, and whose copay for the Panorama tests may not have been as expensive or may have been covered by their insurance had they opted out of the additional microdeletion screen. Natera's utilization of the Price Transparency Program allowed it to capitalize on an immediate cash payment for Panorama screens (while avoiding payor review of submitted claims or prior authorization requests), including those ordered with microdeletions by default without regard for medical necessity due to the misleading nature of the Panorama requisition form, contributing to the inflation of Panorama revenues, and is relevant or related to Lead Plaintiff's claims.

**<u>INTERROGATORY NO. 5</u>:**

State whether You contend that Your claims and alleged damages in this Action are based, in whole or in part, on Natera's alleged Practice Concerning retroactive offerings of discounted cash pay rates to customers resulting in insurance deductible discounts, as described in the Hindenburg Report. To the extent You contend that Your claims and alleged damages are based on this Practice, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**<u>RESPONSE TO INTERROGATORY NO. 5</u>:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory

suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, ambiguous, and incomprehensible with respect to the phrase "Practice Concerning the retroactive offerings of discounted cash pay rates to customers resulting in insurance deductible discounts." Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the undefined phrases "based, in whole or in part, on" and "based on." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based, in whole or in part, on" and "based on" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds

to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. Natera's practice of resolving patients' complaints about surprise high bills for Panorama tests—including patient bills for Panorama screens with microdeletions that were ordered by default without regard for medical necessity through the use of Natera's deceptively-designed Panorama requisition form and/or which MGML submitted for prior authorization—by offering to bill a lower price to patients in exchange for a

cash payment, even after the patients' insurers were billed for the same Panorama test, is relevant or related to (and thus comprises a basis, in part, for) Lead Plaintiff's claims.

**<u>INTERROGATORY NO. 6</u>:**

Identify Each Practice of Natera described in the Hindenburg Report not specifically mentioned in Interrogatories 1–5 that Your claims and alleged damages in this Action are based [sic], in whole or in part. For Each Practice identified in response to this Interrogatory 6, quote the specific language or provide pinpoint citations to the Hindenburg Report (including page/section) describing the Practice.

**<u>RESPONSE TO INTERROGATORY NO. 6</u>:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory on the ground that it is a premature contention interrogatory. *See also* Interrogatory No. 7 (requesting that Lead Plaintiff state "all facts supporting" Lead Plaintiff's "contention[s]" in its responses to Interrogatory Nos. 1-6). Accordingly, no response is required at this time, when Natera has not substantially completed its document production, and, in accordance with the operative scheduling order (Dkt. No. 224), fact discovery will not be complete until October 27, 2026. *See, e.g.*, *Kaist IP US LLC v. Samsung Elecs. Co., LLC*, 2017 WL 9937763, at *1 (E.D. Tex. Dec. 15, 2017) (denying motion to compel interrogatory responses and noting "answers to contention interrogatories" are "often

best left until the close of discovery"). Lead Plaintiff further objects insofar as this Interrogatory suggests, assumes, or implies that all of the facts supporting liability or damages with respect to Lead Plaintiff's claims must be described in "specific language" or "pinpoint citations" in the Hindenburg Report, which serves as the alleged corrective disclosure in this case. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (corrective disclosure need reveal only a "relevant or related truth about the fraud"). Lead Plaintiff further objects to this Interrogatory insofar as it suggests, assumes, or implies that the conduct, practices, or actions of Natera and others described in the Hindenburg Report represent the only conduct, practices, or actions that may be proved to establish liability in this case. Lead Plaintiff further objects to this Interrogatory insofar as it requests Lead Plaintiff interpret and apply the understandings or language of Hindenburg Research—an independent nonparty—in answering the Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent it suggests, assumes, or implies that the sustained alleged fraud is somehow comprised of unrelated and separable activities, rather than interrelated activities that are aspects of one fraudulent scheme. Lead Plaintiff further objects to this Interrogatory as vague, and ambiguous, and confusing with respect to the undefined phrase "based [sic], in whole or in part." For purposes of its response to this Interrogatory, Lead Plaintiff interprets the phrases "based [sic], in whole or in part" to mean "relevant or related to."

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff directs Natera to the pleadings and rulings filed in this matter, including the Complaint and the Court's Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss (Dkt. No. 104). Lead Plaintiff further responds to this Interrogatory as follows: Lead Plaintiff's claims center on Natera's deceptive practices in its Panorama business prior to and during the Class Period involving its improper utilization of a

closely-related third-party prior authorization company, MGML, and the Natera-designed Panorama requisition form. Natera maintained an inappropriate, inadequately disclosed relationship with MGML, which provided free prior authorization services to practitioners in order to facilitate Panorama orders and submitted large volumes of prior authorization requests for Panorama tests, including many submissions that were materially faulty in various respects. *See* Complaint, ¶¶123, 127-41. As a direct benefit of this improper conduct and relationship, Natera propped up its Panorama revenues and also inflated the number of Panorama microdeletion screens ordered, creating misimpressions regarding Panorama revenues and demand. *See id.*, ¶¶132-35, 138. Moreover, contrary to industry guidance, Natera's Panorama requisition form by default opted patients into receiving microdeletion screening (a costly addition to the basic panel) unless the patient was affirmatively opted out. *See id.*, ¶¶145-46, 149. This inflated the number of Panorama microdeletion screens ordered and enabled Natera to pursue payment for microdeletion screening, and further padded Natera's Panorama revenues, creating misimpressions regarding microdeletion demand and the factors driving revenues from the test. *See id.*, ¶149. Natera's utilization of the Panorama requisition form and MGML to drive Panorama orders and revenues were central components of, and directly related to, Natera's sales (including market access), billing and collections processes related to Panorama. In addition to the conduct Lead Plaintiff has stated is relevant or related to its claims in its responses to Interrogatory Nos. 1-5 above, additional aspects of Natera's practices and conduct before and during the Class Period are relevant or related to (and thus comprise a basis, in part, for) Lead Plaintiff's claims, including but not limited to the following: its submission of prior authorizations after a test was run; its submission of claims for Panorama screens that were medically unnecessary; its submission of prior authorizations and insurance claims without supporting medical documentation; its failure to collect on or zero-

balancing patients' cost-sharing payments like copays and deductibles; and its use of the Panorama order form that automatically opted patients into receiving microdeletion screening unless they affirmatively opted out. Each of these practices was supported and facilitated by Natera's use of a deceptive requisition form to inorganically increase the number of microdeletion screenings ordered and Natera's improper utilization of MGML to, *inter alia*, indiscriminately submit prior authorizations.

**INTERROGATORY NO. 7:**

For Each Practice You identified in response to Interrogatories 1–6, state all facts supporting Your contention that the Practice supports a claim in this Action and that You suffered damages as a result of that Practice. In responding, to the extent known after a reasonable inquiry, identify: (a) the portion(s) of the Hindenburg Report (including page/section) that You contend disclosed the Practice to the market and contributed to Your damages suffered in this Action; (b) the date or dates on which the Practice occurred; (c) the Persons You contend were involved in the Practice (including but not limited to Persons You may rely upon in this Action in connection with the Practice); (d) which of Your claim(s) (e.g., Section 10(b), Section 11) this Practice supports; (e) how the Practice rendered any statement or omission You identified in response to Interrogatory 8 false or misleading; and (f) whether You contend the Practice violated any law, statute (including but not limited to the Anti-Kickback Statute), regulation, or industry standard, and, if so, identify Each specific law, statute, regulation, or industry standard You contend was violated.

**RESPONSE TO INTERROGATORY NO. 7:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that

it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the terms and phrases "disclosed the Practice to the market," "contributed to Your damages suffered," "involved in the Practice," "which of Your claim(s) . . . this Practice supports," and "violated any law, statute (including but not limited to the Anti-Kickback Statute), regulation, or industry standard."

Lead Plaintiff further objects to this Interrogatory on the grounds that it is an impermissible compound Interrogatory that contains twelve sub-parts, each of which contains an additional ten sub-parts. Under Federal Rule 33(a)(1), which provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts," Lead Plaintiff interprets Interrogatory 7 as twelve distinct Interrogatories.

Subject to and without waiver of the foregoing objections and the right to supplement or amend its response to this Interrogatory, Lead Plaintiff responds to this Interrogatory as follows:[1]

[1] Lead Plaintiff has also provided this information in tabular format in the attached Exhibit A, using the chart set forth in Defendants' June 3, 2026 email. The language in Exhibit A is identical to the language herein.

**1. Natera maintained an inappropriate, inadequately disclosed relationship with MGML.**

**a. Who was involved?**

**i. Who did it?**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Jennifer O'Neill, Lev Grodzinsky, Matthew Rabinowitz, Amar Kamath, Phil Grinnell, Nidhi Maheshwari, other individuals in Natera's Market Access, Compliance, and Sales divisions, and Natera, Inc. and MGML.

**ii. Who witnessed or otherwise knew:**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.A, other principal people who witnessed or knew were: Debra Rodriguez, Melissa Pizor, Andy Parkhill, Marina Bakreska, Jerry Diffley, each Clinical Field Specialist or other member of Natera's Sales teams who were instructed not to disclose details concerning Natera and MGML's relationship or the role of MGML in submitting prior authorizations, and other individuals in Natera's Market Access and Compliance divisions.

**iii. Who was deceived:**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and

patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. <u>Dates on which the practice occurred:</u>**

Based on information and belief, Plaintiffs state that this practice occurred from at least December 2017, when MGML was formed and Natera immediately started using its services, through March 9, 2022, when true facts regarding the relationship between MGML and Natera were sufficiently disclosed to the market.

**c. <u>Which individual defendants knew, how did they find out, and when?</u>**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under §10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendant Chapman was aware of this practice (or recklessly unaware of it) because he was personally involved in and informed of

Natera's actions and disclosures regarding its relationship with and utilization of MGML, including in 2019, 2020, and 2021. For example, Chapman attended meetings and/or participated in other communications regarding: Natera and MGML's relationship; MGML's impact on Natera's revenue; the volume of Natera's prior authorizations being submitted by MGML; and the potential disclosure of MGML to Health Insurance Providers. Defendant Chapman also spoke publicly, in detail, on March 10, 2022 regarding Natera's relationship with and utilization of MGML. Discovery indicates that Defendant Brophy was similarly personally involved in Natera's actions and disclosures regarding its relationship with and utilization of MGML in 2019, 2020, and 2021. For example, Brophy attended meetings regarding MGML registrations, personally worked on driving more providers to register with MGML, and monitored the cost and efficacy of MGML. Discovery similarly indicates that Rabinowitz was informed of MGML's operations, including specific targets for registrations of providers with MGML and of an investigation into Natera and MGML's relationship in late 2020, and attended meetings with Chapman, Brophy, and others to discuss MGML.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other

provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the '"total mix' of information" available to investors about the Company. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's undisclosed and inappropriate relationship with MGML allowed Natera to receive reimbursements for Panorama tests whose prior authorizations and claims were not in compliance with industry standards, applicable regulations, or Health Insurance Provider requirements, and for Panorama tests that were not medically necessary. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected by MGML depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than

disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. <u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-30 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's undisclosed relationship with MGML are: 1-2, 13-29.

**2. Natera's practice of "unbundling," or utilizing multiple CPT codes in connection with the claims and billing process for a single Panorama test.**

**a. <u>Who was involved?</u>**

**i. <u>Who did it:</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Jennifer O'Neill, Lev Grodzinsky, Nidhi Maheshwari, Sara Keese, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc. and MGML.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.B, other principal people who witnessed or knew were: Steve Chapman, Mike Brophy, Jordon Nevins, Andy Parkhill, and other individuals in Natera's Market Access, Billing, Sales, and Compliance divisions.

**iii. <u>Who was deceived:</u>**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. <u>Dates on which the practice occurred:</u>**

Based on information and belief, Plaintiffs state that this practice occurred from at least 2019, when discovery produced to date first indicates this practice occurred, through March 9, 2022, when true facts regarding Natera's practice of unbundling were sufficiently disclosed to the market.

**c. <u>Which individual defendants knew, how did they find out, and when?</u>**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman, Brophy, and Rabinowitz, were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding its practice of unbundling, including in 2019, 2020, and 2021. For example, Defendants were informed of Health Insurance Provider complaints,

audits, investigations, and recoupments as a result of improper unbundling, Defendant Brophy received inquiries into Natera's practice of unbundling in 2020 and 2021, and Defendant Chapman was informed through quarterly update presentations given by Sales personnel.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the

contracts, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received. Plaintiffs' determination of the amount of Panorama revenues affected by Natera's practice of unbundling depends upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the '"total mix' of information" available to investors about the Company. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's undisclosed and inappropriate relationship with MGML allowed Natera to receive reimbursements for Panorama tests whose prior authorizations and claims were not in compliance with industry standards, applicable regulations, or Health Insurance Provider requirements, and for Panorama tests that were not medically necessary. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs'

determination of the extent to which Natera's Panorama revenues were affected by MGML depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. <u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss

causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-30 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 563 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's practice of unbundling are: 1, 11, 33-36, 39-40.

**3. Natera's practice of "double billing," or seeking substantially duplicative payments from patients and insurance payors for the same Panorama test.**

**a. <u>Who was involved?</u>**

**i. <u>Who did it:</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Jennifer O'Neill, Lev Grodzinsky, Andy Parkhill, Kyle Prosen, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.C, other principal people who witnessed or knew were:

Steve Chapman, Mike Brophy, Olesya Anisimova, Oded Wohl, Nidhi Maheshwari, Christopher Kirby, Laura Cobb, Charlotte Nicholas, Deborah Pope, and other individuals in Natera's Market Access, Billing, Sales, and Compliance divisions.

**iii. <u>Who was deceived:</u>**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. <u>Dates on which the practice occurred:</u>**

Based on information and belief, Plaintiffs state that this practice occurred from at least 2020, when discovery produced to date first indicates this practice occurred, through March 9, 2022, when true facts regarding Natera's practice of double billing were sufficiently disclosed to the market.

**c. <u>Which individual defendants knew, how did they find out, and when?</u>**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding its practice of double billing, including in 2020 and 2021. For example, Defendants Brophy and Chapman were involved in tracking patient billing initiatives that resulted in double billing and were informed of issues with providers and patients caused by those billing procedures. Defendant Chapman also spoke publicly on March 10, 2022 regarding the allegations that Natera had a practice of double billing.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or

regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the contracts, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received. Plaintiffs' determination of the amount of Panorama revenues affected by Natera's practice of double billing depends upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations

regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the '"total mix' of information" available to investors about the Company. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's undisclosed and inappropriate relationship with MGML allowed Natera to receive reimbursements for Panorama tests whose prior authorizations and claims were not in compliance with industry standards, applicable regulations, or Health Insurance Provider requirements, and for Panorama tests that were not medically necessary. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected by MGML depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

f. **How is it actionable under Section 11?**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

g. **Specific lines and pages in the Hindenburg Report disclosing the practice:**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only

reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's practice of double billing are: 1-2, 24-31.

**4. Natera's Price Transparency Program ("PTP"), which allowed patients who elected self-pay and paid within a particular time frame to pay a present cash price for Panorama.**

**a. Who was involved?**

**i. Who did it:**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Lev Grodzinsky, Ramesh Hariharan, Matthew Mega, John Fesko, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc.

**ii. Who witnessed or otherwise knew:**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.D, other principal people who witnessed or knew were: Phil Grinnell, Sarah Elliott, Jerry Diffley, Laura Cobb, and other individuals in Natera's Market Access, Billing, Sales, and Compliance divisions.

**iii. Who was deceived:**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or

'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. <u>Dates on which the practice occurred:</u>**

Based on information and belief, Plaintiffs state that this practice occurred from at least 2017, when discovery first indicates the PTP was implemented, through March 9, 2022, when true facts regarding the PTP were sufficiently disclosed to the market.

**c. <u>Which individual defendants knew, how did they find out, and when?</u>**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding the PTP, including in 2019, 2020, and 2021. For example, Defendant Brophy directed the distribution of billing milestones, which contained information on the PTP and payors' objections to the program. Defendant Chapman was informed of PTP operations through presentations given by Sales personnel, and personally monitored the amounts collected from patients from the PTP. Defendants Chapman and Brophy were also involved in tracking patient billing initiatives that resulted involved the PTP and were informed of issues with providers and patients caused by those billing procedures, including personally working to address patient complaints.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the

Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. How is it actionable under Section 10(b)?**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the "'total mix' of information" available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's Panorama revenues were affected by Natera's use of the PTP, which allowed Natera to collect

revenues on Panorama tests from patients, often at high rates, for tests that would not otherwise be covered by Health Insurance Providers. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected by the PTP depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. Specific lines and pages in the Hindenburg Report disclosing the practice:**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific page relevant and related to Natera's PTP is: 33.

**5. Natera's PTP, which allowed patients with copays Natera estimated to be higher than the PTP price to pay a preset cash price for Panorama.**

**a. Who was involved?**

**i. Who did it:**

Based on information and belief, Plaintiffs state that the Principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Lev Grodzinsky, Ramesh Hariharan, Matthew Mega, John Fesko, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc.

**ii. Who witnessed or otherwise knew:**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.D, other principal people who witnessed or knew were: Phil Grinnell, Sarah Elliott, Jerry Diffley, Laura Cobb, and other individuals in Natera's Market Access, Billing, Sales, and Compliance divisions.

**iii. Who was deceived:**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. Dates on which the practice occurred:**

Based on information and belief, Plaintiffs state that this practice occurred from at least 2017, when discovery first indicates the PTP was implemented, through March 9, 2022, when true facts regarding the PTP were sufficiently disclosed to the market.

**c. Which individual defendants knew, how did they find out, and when?**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs

note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding the PTP, including in 2019, 2020, and 2021. For example, Defendant Brophy directed the distribution of billing milestones, which contained information on the PTP and payors' objections to the program. Defendant Chapman was informed of PTP operations through presentations given by Sales personnel, and personally monitored the amounts collected from patients from the PTP. Defendants Chapman and Brophy were also involved in tracking patient billing initiatives that resulted involved the PTP and were informed of issues with providers and patients caused by those billing procedures, including personally working to address patient complaints.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of

Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations

regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the '"total mix' of information" available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's Panorama revenues were affected by Natera's use of the PTP, which allowed Natera to collect revenues on Panorama tests from patients, often at high rates, for tests that would not otherwise be covered by Health Insurance Providers. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected by the PTP depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's

Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. Specific lines and pages in the Hindenburg Report disclosing the practice:**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts

"relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific page relevant and related to Natera's PTP is: 33.

**6. Natera's PTP, which allowed patients whose copay for the Panorama tests may not have been as expensive or may have been covered by their insurance had they opted out of the additional microdeletion screen to pay a preset cash price.**

**a. Who was involved?**

**i. Who did it:**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Lev Grodzinsky, Ramesh Hariharan, Matthew Mega, John Fesko, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc.

**ii. Who witnessed or otherwise knew:**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.D, other principal people who witnessed or knew were: Phil Grinnell, Sarah Elliott, Jerry Diffley, Laura Cobb, and other individuals in Natera's Market Access, Billing, Sales, and Compliance divisions.

**iii. Who was deceived:**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and

patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. <u>Dates on which the practice occurred:</u>**

Based on information and belief, Plaintiffs state that this practice occurred from at least 2017, when discovery first indicates the PTP was implemented, through March 9, 2022, when true facts regarding the PTP were sufficiently disclosed to the market.

**c. <u>Which individual defendants knew, how did they find out, and when?</u>**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding the PTP, including in 2019, 2020, and 2021. For example, Defendant

Brophy directed the distribution of billing milestones, which contained information on the PTP and payors' objections to the program. Defendant Chapman was informed of PTP operations through presentations given by Sales personnel, and personally monitored the amounts collected from patients from the PTP. Defendants Chapman and Brophy were also involved in tracking patient billing initiatives that resulted involved the PTP and were informed of issues with providers and patients caused by those billing procedures, including personally working to address patient complaints.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of

HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the '"total mix' of information" available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's Panorama revenues were affected by Natera's use of the PTP, which allowed Natera to collect revenues on Panorama tests from patients, often at high rates, for tests that would not otherwise be covered by Health Insurance Providers. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected depends in part upon documents concerning

audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. <u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation

and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F.3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud") (citation modified) (alteration in original). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific page relevant and related to Natera's PTP is: 33.

**7. Resolving complaints about surprise high bills by offering to bill a lower price to patients in exchange for a cash payment, even after the insurers were billed for the same Panorama test.**

**a. <u>Who was involved?</u>**

**i. <u>Who did it:</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Ramesh Hariharan, Phil Grinnell, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.G, other principal people who witnessed or knew were: Lev Grodzinskiy, Paul Greenland, Oded Wohl, Bryan Symmons, Laura Cobb, and other individuals in Natera's Market Access, Billing, and Sales divisions.

**iii. Who was deceived:**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. Dates on which the practice occurred:**

Based on information and belief, Plaintiffs state that this practice occurred from at least 2016, when discovery produced to date first indicates this practice occurred, through March 9, 2022, when true facts regarding Natera's practice of offering a discounted cash pay price to patients were sufficiently disclosed to the market.

**c. Which individual defendants knew, how did they find out, and when?**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud."') (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding Natera's practice of offering patients a discounted cash pay price, including in 2019, 2020, 2021, and 2022. For example, Defendant Brophy was informed of an investigation into issues with Natera's cash pay program in 2021. Defendants Chapman and Brophy were informed of the impact of the risks posed by Natera's cash pay program in presentations by Natera's Sales department. Defendants Brophy, Chapman, and Rabinowitz were informed of patient complaints involving the cash pay option.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

e. **<u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the '"total mix' of information" available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's Panorama revenues were affected by Natera's practice of offering a discounted cash pay price to patients with surprise high bills, which allowed Natera to collect on Panorama tests that were not covered by Health Insurance Providers and would otherwise have gone unpaid. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have

not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. <u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts

supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's cash pay program are: 28, 32, 34-37.

**8. Submission of prior authorizations after a test was run.**

**a. <u>Who was involved?</u>**

**i. <u>Who did it:</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Phil Grinnell, Lev Grodzinskiy, Jennifer O'Neill, Nidhi Maheshwari, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc., and MGML.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.H, other principal people who witnessed or knew were: Deb Rodriguez, Andy Parkhill, Jordon Nevins, and other individuals in Natera's Market Access, Billing, and Sales divisions.

**iii. <u>Who was deceived:</u>**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys,*

*Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. Dates on which the practice occurred:**

Based on information and belief, Plaintiffs state that this practice occurred from at least early 2018, after MGML was formed and Natera started using its services, through March 9, 2022, when true facts regarding the relationship between MGML and Natera were sufficiently disclosed to the market.

**c. Which individual defendants knew, how did they find out, and when?**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under Section 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to

the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding its practice of submitting prior authorizations after services had been rendered, including in 2019, 2020, and 2021. For example, Defendants were informed through a presentation from Natera's Billing department that Natera was submitting prior authorizations after services were rendered. Further, as discussed fully in 7.3.A, Defendants were deeply involved in and knowledgeable of MGML's operations, and therefore knew that MGML was submitting prior authorizations after services had been rendered.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the

Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. This theory has been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the "'total mix' of information" available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's Panorama revenues, and specifically those revenues related to MGML, were affected by Natera

and MGML's practice of submitting prior authorizations after services had been rendered, thereby ensuring that Natera could collect revenue from the patient if the test was not covered by insurance, often without fully informing patients of the potential cost.. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

g. **<u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's submission of prior authorizations after services had been rendered are: 20-21, 33.

**9. Submission of claims for Panorama screens that were medically unnecessary.**

a. **<u>Who was involved?</u>**

i. **<u>Who did it:</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Ramesh Hariharan, Walton Williams, Phil Grinnell, Lev Grodzinskiy, Jennifer O'Neill, Nidhi Maheshwari, and other

individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc., and MGML.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.I, other principal people who witnessed or knew were: Matthew Mega, John Fesko, Pete Malyak, Deb Rodriguez, Andy Parkhill, Jordon Nevins, Melissa Pizor, Marina Bakreska, and other individuals in Natera's Market Access, Billing, and Sales divisions.

**iii. <u>Who was deceived:</u>**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. <u>Dates on which the practice occurred:</u>**

Based on information and belief, Plaintiffs state that this practice occurred from at least early 2018, after MGML was formed and Natera started using its services, through March 9, 2022, when true facts regarding the relationship between MGML and Natera were sufficiently disclosed to the market.

**c. <u>Which individual defendants knew, how did they find out, and when?</u>**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding its practice of submitting claims for Panorama without regard to medical necessity, including in 2019, 2020, and 2021. For example, Defendant Brophy was personally informed that cases were being denied for lack of medical necessity and personally approved billing changes related to the billing of claims without regard to medical necessity, and Chapman was included on communications regarding the changes. Further, as discussed fully in 7.3.A, Defendants were deeply involved in and knowledgeable of MGML's operations, and therefore knew that MGML was submitting prior authorizations without regard to medical necessity.

**d. Underlying statute, state law, or industry guidance violated and when:**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. How is it actionable under Section 10(b)?**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the total mix of information available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's Panorama revenues, and particularly those revenues related to MGML, were affected by the submission of prior authorizations and claims for medically unnecessary tests, as well as submitting claims with CPT codes or diagnosis codes which did not match the true diagnosis or procedure, which allowed Natera to receive reimbursements that Health Insurance Providers would not otherwise have paid in the amounts that they paid and to collect from patients for non-covered services, often at high rates. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected by MGML depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to

Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. <u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss

causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's submission of prior authorizations without regard to medical necessity are: 7, 20-21, 40.

**10. Submission of claims without supporting medical documentation.**

**a. <u>Who was involved?</u>**

**i. <u>Who did it:</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Ramesh Hariharan, Walton Williams, Phil Grinnell, Lev Grodzinskiy, Jennifer O'Neill, Nidhi Maheshwari, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc., and MGML.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.J, other principal people who witnessed or knew were: Matthew Mega, John Fesko, Pete Malyak, Deb Rodriguez, Andy Parkhill, Jordon Nevins, Melissa Pizor, Marina Bakreska, and other individuals in Natera's Market Access, Billing, and Sales divisions.

**iii. Who was deceived:**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. Dates on which the practice occurred:**

Based on information and belief, Plaintiffs state that this practice occurred from at least early 2018, after MGML was formed and Natera started using its services, through March 9, 2022, when true facts regarding the relationship between MGML and Natera were sufficiently disclosed to the market.

**c. Which individual defendants knew, how did they find out, and when?**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr.*

*Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding its practice of submitting claims without supporting medical documentation, including in 2019, 2020, and 2021. For example, Defendants Chapman and Brophy were informed through multiple presentations from Natera's Sales and Billing divisions that supporting medical documentation was not being submitted for certain claims. Further, as discussed fully in 7.3.A, Defendants were deeply involved in and knowledgeable of MGML's operations, and therefore knew that MGML was submitting claims without supporting medical documentation.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and

satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the "'total mix' of information" available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011). Moreover, Plaintiffs believe that Natera's Panorama revenues, and particularly those revenues related to MGML, were affected by Natera's practice of causing the submission of prior authorizations and claims without supporting medical documentation, which was part of Natera and MGML's practice of submitting prior authorizations and claims without regard to medical necessity or proper billing procedure. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected by MGML depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. <u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than

disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. <u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's submission of prior authorizations without supporting medical documentation are: 7, 20-21, 40.

**11. Failure to collect on or zero-balancing patients' cost-sharing payments like copays and deductibles.**

**a. <u>Who was involved?</u>**

**i. <u>Who did it:</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Walton Williams, Lev Grodzinskiy, Jennifer O'Neill, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc., and MGML.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.K, other principal people who witnessed or knew were: Jerry Diffley, Charlotte Nicholas, Todd Trautner, Laura Cobb, Amy Green, Jordon Nevins, and other individuals in Natera's Compliance, Market Access, Billing, Sales, and Revenue Cycle Management divisions.

**iii. <u>Who was deceived:</u>**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. <u>Dates on which the practice occurred:</u>**

Based on information and belief, Plaintiffs state that this practice occurred from at least 2019, when discovery produced to date indicates the practice first occurred, through March 9, 2022, when true facts regarding Natera's practice of zero-balancing patient bills were sufficiently disclosed to the market.

**c. <u>Which individual defendants knew, how did they find out, and when?</u>**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.") (citation modified); *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants Chapman and Brophy were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding its practice of zero-balancing patient bills, including in 2019, 2020, and 2021. For example, Defendants Chapman and Brophy were informed of patient complaints that

were zero-balanced, and Defendant Brophy personally instructed that particular bills be zero-balanced.

**d. Underlying statute, state law, or industry guidance violated and when:**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the

respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the total mix of information available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's failure to collect cost-sharing payments like copayments and deductibles, including for Panorama tests where prior authorizations were submitted by MGML, allowed Natera to receive reimbursements from Health Insurance Providers in violation of Health Insurance Provider requirements and increased the risk of investigation, recoupment, and termination by Health Insurance Providers. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected by MGML depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated

May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f. How is it actionable under Section 11?**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. Specific lines and pages in the Hindenburg Report disclosing the practice:**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a

"fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific page relevant and related to Natera's practice of zero-balancing patient bills is: 35.

**12. The Panorama requisition form automatically opted patients in to expensive microdeletion testing without regard for medical necessity.**

**a. <u>Who was involved?</u>**

**i. <u>Who did it?</u>**

Based on information and belief, Plaintiffs state that the principal Natera personnel and entities engaged in this practice were: Steve Chapman, Mike Brophy, Ramesh Hariharan, Phil Grinnell, Lev Grodzinskiy, Jennifer O'Neill, Nidhi Maheshwari, and other individuals in Natera's Market Access, Compliance, Billing, and Sales divisions, and Natera, Inc.

**ii. <u>Who witnessed or otherwise knew:</u>**

Based on information and belief, Plaintiffs state that in addition to individuals and entities identified in Interrogatory Answer 7.1.1.L, other principal people who witnessed or knew were: Deb Rodriguez, Andy Parkhill, Jordon Nevins, Deborah Pope, Walton Williams, and other individuals in Natera's Market Access, Billing, and Sales divisions, and MGML.

**iii. Who was deceived:**

Plaintiffs' claim under the federal securities laws is that the market for Natera's common stock was misled regarding these material facts until it was provided with corrective information that "reveal[ed] to the market the pertinent truth that was previously concealed or obscured by" Defendants' misconduct beginning on March 9, 2022. *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014). *See also id.* (truth that emerged must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements."). Other individuals and entities may also have been deceived, such as certain Health Insurance Providers, Healthcare Providers, and patients, although Plaintiffs are not required to prove that others were deceived as an element of their claims.

**b. Dates on which the practice occurred:**

Based on information and belief, Plaintiffs state that this practice occurred from at least December 2017, when MGML was formed and Natera immediately started using its services, through March 9, 2022, when true facts regarding the relationship between MGML and Natera were sufficiently disclosed to the market.

**c. Which individual defendants knew, how did they find out, and when?**

Based on information and belief, Plaintiffs state that each individual defendant knew, or was reckless in not knowing, that his public representations related to Natera's business were materially misleading with regard to Natera's true practices. In providing this response, Plaintiffs note the scienter definition applicable for cases under Section 10(b). *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 ("To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'") (citation modified); *Indiana Elec. Workers' Pension Tr.*

*Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008) ("The required state of mind is an intent to deceive, manipulate, or defraud or severe recklessness.") (citation modified); and *Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) (same). That is the mental state Plaintiffs must prove at trial to establish liability on their Section 10(b) claims, and to the extent this interrogatory suggests or indicates that some additional mental state must also be shown, it is inconsistent with governing law.

That being said, specifically, discovery indicates Defendants were aware of this practice (or recklessly unaware of it) because they were informed of Natera's actions and disclosures regarding its practice of opting patients in to microdeletions testing, including in 2019, 2020, and 2021. For example, Defendants Chapman and Brophy were both part of discussions of the design of the requisition form. Defendant Rabinowitz received presentations including information on the design and implementation of a version of the requisition form with the opt-out for microdeletions testing. Defendant Chapman also spoke publicly on March 10, 2022 regarding Natera's requisition form.

**d. <u>Underlying statute, state law, or industry guidance violated and when:</u>**

Plaintiffs allege Defendants violated Section 10(b), Rule 10b-5, and Section 20(a), as well as Section 20A of the Exchange Act, and Sections 11, 12(b)(2), 15 and Items 105 and 303 of Regulation S-K of the Securities Act. Section 10(b), Rule 10b-5, Section 20A and the relevant Securities Act provisions do not require a predicate violation of any other law to state a claim. As such, Plaintiffs do not intend to voluntarily undertake an additional burden of proving that Defendants are liable under, and have violated all of the elements of, any other statute, law, or regulation. While Plaintiffs need not prove that Defendants' conduct gave rise to liability and satisfied every element of any statute, law, or regulation other than Section 10(b) and the other

provisions of the federal securities laws on which their claims are based, Plaintiffs do believe, however, that Defendants' conduct ran afoul of and constituted conduct prohibited under other sources of law, and intend to reference one or more of these at trial, including: Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), state law Anti-Kickback analogues, the Stark law or the Physician Self-Referral law (42 U.S.C. § 1395nn), the False Claims Act (31 U.S.C. §§ 3729-3733), Health care fraud (18 U.S.C. § 1347), and HIPAA (42 U.S.C § 1320d-6, *et seq.*), as well as conspiracy to violate these statutes. Plaintiffs also believe that Defendants' conduct ran afoul of HHS-OIG guidance and violated their agreements with certain Health Insurance Providers, and intend to reference these at trial.

Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of which specific contracts were violated depends in part upon review of all handbooks and manuals that are incorporated by reference in the respective contracts, documents which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received.

**e. <u>How is it actionable under Section 10(b)?</u>**

Plaintiffs allege that Defendants made material misrepresentations to the market regarding the Company's business activities and revenue sources that failed to disclose that they were supported in part by improper and deceptive business practices. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *9 (W.D. Tex. Sep. 11, 2023) ("Plaintiffs adequately allege that Defendants' repeated statements that Panorama was a key source of Natera's revenues . . . made while concealing that Panorama revenues were inflated by deceptive practices—such as the inappropriate submission of prior authorizations by MGML—rendered those statements false or misleading.").

Plaintiffs believe and intend to prove at trial that the practices addressed in this Interrogatory Response were forms of misconduct that were material, i.e., would have affected the "'total mix' of information" available to investors about the Company. *See Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 47 (2011) (citation modified). Moreover, Plaintiffs believe that Natera's Panorama revenues, particularly its revenues related to MGML, were affected by Natera's use of the Panorama requisition form to automatically opt patients into expensive and unnecessary microdeletions testing, thereby collecting additional revenue from the test. Further, Plaintiffs expect to amend this Response based on information Defendants have yet to produce. For example, Plaintiffs' determination of the extent to which Natera's Panorama revenues were affected depends in part upon documents concerning audits and investigations into overpayments by Health Insurance Providers, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 7, 2026, but have not yet received; claims data concerning Natera's claims to Medicare and Medicaid, which Plaintiffs requested on November 16, 2023, and included in a document production deficiency letter dated May 29, 2026, but have not yet received; and claims data concerning Natera's claims to private Health Insurance Providers, which Plaintiffs requested on June 1, 2026, but have not yet received.

**f.** **<u>How is it actionable under Section 11?</u>**

Plaintiffs allege that Defendants omitted material information from the Offering Documents required to be stated therein regarding risks associated with the facts that Natera's Panorama revenues and demand were propped up by deceptive practices, including Natera's relationship with MGML and opting patients into microdeletions testing in violation of Item 105 (17 C.F.R. § 229.105) and Item 303 (17 C.F.R. § 229.303). These undisclosed material facts made investing in Natera through its July 2021 secondary public offering substantially riskier than disclosed, and also constituted a known trend or uncertainty that had or was reasonably likely to

have a material unfavorable impact on net sales or revenues or income from Natera's continuing operations. Plaintiffs' claims and allegations regarding this theory have been upheld by the Court. *See Schneider v. Natera, Inc.*, 2023 WL 9958265, at *10 (W.D. Tex. Sep. 11, 2023) (finding that Plaintiffs stated an actionable omission based on "Natera's deceptive billing practices").

**g. <u>Specific lines and pages in the Hindenburg Report disclosing the practice:</u>**

In responding to this Interrogatory, Plaintiffs do not intend to impose a higher standard for loss causation than required under Supreme Court and Fifth Circuit precedent. To establish loss causation, Plaintiffs need only show "a causal connection between the material misrepresentation and the loss," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009) (same). A corrective disclosure need not be a "fact-for-fact disclosure" or "precisely mirror [an] earlier misrepresentation" to establish loss causation. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229-230 (5th Cir. 2009) (citation modified) (alteration in original). Plaintiffs also do not agree that all of the facts supporting liability or damages with respect to Plaintiffs' claims must be described in "specific lines" of the Hindenburg Report. *See Lormand*, 565 F. 3d at 258 (corrective disclosure need only reveal a "relevant or related truth about the fraud"). Plaintiffs allege that relevant corrective information was revealed through the Hindenburg Report on March 9, 2022, which revealed facts "relevant and related to" the alleged deceptive practices, surprising the market, and causing a massive stock price reaction. The specific pages relevant and related to Natera's opting patients in to microdeletions testing are: 1-2, 22-24.

**<u>INTERROGATORY NO. 8</u>:**

Identify Each statement or omission on which Your Section 10(b) and Section 11 claims in this Action is based. For Each such statement or omission, state the date, speaker/author, forum

(e.g., earnings call, press release, SEC filing), the specific language challenged (exact quote or provide a pinpoint citation sufficient to identify the specific statement), the applicable claims (e.g., Section 10(b), Section 11), and the paragraph(s) in the Complaint in which You allege the statement or omission.

**RESPONSE TO INTERROGATORY NO. 8:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and unreasonably cumulative or duplicative to the extent it seeks publicly available information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including the Complaint. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the terms "speaker/author." Lead Plaintiff further objects to this Interrogatory as it is an improper compound Interrogatory, consisting of multiple subparts, each of which is a separate Interrogatory.

Subject to and without waiver of the foregoing objections and Lead Plaintiff's right to amend or supplement its response to this Interrogatory, Lead Plaintiff provides the following reference chart, which identifies the misstatements and omissions that Lead Plaintiff alleges violated Section 10(b) of the Exchange Act of 1934 and Section 11 of the Securities Act of 1933 and that have been sustained by the Court in its Motion to Dismiss Order. Dkt. No. 104.

| Date/Forum | Speaker/Author | Alleged Misrepresentation and/or Omission | Complaint Paragraph | Claim |
|---|---|---|---|---|
| February 26, 2020 Form 8-K | Natera, Michael Brophy ("Brophy") | "[t]otal revenues were $83.2 million in the fourth quarter of 2019 compared to $67.0 million for the fourth quarter of 2018, an increase of 24%. ***The increase in total*** | 150 | Section 10(b) |

| Date/Forum | Speaker/Author | Alleged Misrepresentation and/or Omission | Complaint Paragraph | Claim |
|---|---|---|---|---|
| | | ***revenues was driven primarily by sales of Natera's Panorama and Horizon tests.*** " | | |
| May 6, 2020 Form 8-K | Natera, Brophy | "[t]otal revenues were $94.0 million in the first quarter of 2020 compared to $66.8 million for the first quarter of 2019, an increase of 41%. ***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests.*** " | 151 | Section 10(b) |
| August 5, 2020 Form 8-K | Natera, Brophy | "[t]otal revenues were $86.5 million in the second quarter of 2020 compared to $74.4 million for the second quarter of 2019. ***The increase in total revenues was driven primarily by sales of Natera's Panorama and Horizon tests.*** " | 152 | Section 10(b) |
| January 12, 2021 JPMorgan Healthcare Conference | Natera, Steven Chapman ("Chapman") | "If you're conservative and you just say $250 a test, that puts you at $100 million in additional revenue and cash just from the book that we're running today. Now you shouldn't think about it as being capped at that level because ***we see doctors ordering the microdeletion test***. ***8 out of 10 times, they place an order for Panorama***. So as we penetrate that additional 3 million tests in the average risk space, that microdeletion number is going to go up significantly as well. And it's pretty baked into our COGS as well." | 153 | Section 10(b) |
| February 25, 2021 Earnings Call | Natera, Chapman | "The next slide demonstrates that revenue growth is tracking nicely with volume growth, once again, accelerating meaningfully over what we've seen in the past. If you just zero in on product revenues on the right-hand side, you'll see revenue growth rates of 43%. This removes development revenue from partners, which was larger in 2019 than it is now. We saw recurring ASPs step up again in Q4 versus prior periods, and blended COGS remain in the low 200 range. ***The combination of consistent gross profit per test and volume growth that we talked about in the past is working as expected, allowing us to get the women's health business to cash flow*** | 154 | Section 10(b) |

| Date/Forum | Speaker/Author | Alleged Misrepresentation and/or Omission | Complaint Paragraph | Claim |
|---|---|---|---|---|
| | | ***breakeven***, supporting even bigger investments in the oncology business." | | |
| February 25, 2021 Earnings Call | Natera, Chapman | "As we mentioned in the prepared remarks, last year, we did 400,000 microdeletion tests, and ***that was at a growth rate of 37% year-on-year versus 2019***. ***So this is really a rocket ship that's growing***. We're running the tests. If we can get reimbursement, it's going to be -- we're going to be off to the races." | 155 | Section 10(b) |
| May 6, 2021 Earnings Call | Natera, Chapman | "[a]s our base of business has grown substantially, our growth rates have still continued to accelerate. ***That acceleration is being driven by continued strong growth in the women's health business***, but also we are seeing some real benefit from oncology and organ health as well." | 156 | Section 10(b) |
| August 5, 2021 Earnings Call | Natera, Chapman | "[t]otal revenues and product revenues were both up 64% and approximately 71% respectively, over the same period last year. ***Net acceleration is being driven by continued strong growth in the Women's Health business*** and big contributions from oncology and transplant." | 157 | Section 10(b) |
| August 5, 2021 Earnings Call | Natera, Chapman | "[w]e were also very exciting [sic] to see the Women's Health business to go cash flow breakeven in the quarter. This was one of the top goals, I announced when I took over as CEO in 2019, and I'm proud that our team achieved this while simultaneously hitting record growth rates." | 158 | Section 10(b) |

| Date/Forum | Speaker/Author | Alleged Misrepresentation and/or Omission | Complaint Paragraph | Claim |
|---|---|---|---|---|
| August 11, 2021 Canaccord Genuity's 41st Annual Growth Conference | Natera, Brophy | "As a market leader we feel like we're very well position to get more than our fair share of that just natural increase in the NIPT testing market. When we grow the NIPT business, that gets amplified in our business by the fact that we very often also get a carrier screening ordered at the same time as the NIPTs. And ***we also get a microdeletion test ordered very frequently along with the NIPT***. ***So for every 100 NIPTs***, there's something like a little more than 40 carrier screening tests that get ordered and for every 100 NIPT users, ***something like 75 microdeletion tests that get ordered***. So we're very well positioned to take this one kind of macro trend and see it really amplified in our business. So that's kind of about the women's health business." | 159 | Section 10(b) |
| September 10, 2021 Wells Fargo Virtual Healthcare Conference | Natera, Brophy | "Yes. I mean ***microdeletions continues to be a very popular product for us***. . . . roughly speaking, I mean, for every 100 NIPTs to get ordered, we get about a 80 or so microdeletions orders." | 160 | Section 10(b) |
| September 13, 2021 Morgan Stanley Global Healthcare Conference | Natera, Brophy | "as NIPTs penetrate, we have a couple of different ways to magnify the impact of that penetration in our business. One is for every 100 NIPTs that get run, something like 40 to 43 carrier screen test get run. ***The other is that for every 100 NIPTs that get run, something like 80 microdeletions test gets run***. So 1 trend 3 different products that can really drive a lot of outsized performance for us." | 161 | Section 10(b) |
| November 4, 2021 Earnings Call | Natera, Chapman | Total revenues and product revenues were both up 61% and 62%, respectively, over the same period last year. ***That acceleration is being driven by continued strong growth in the women's health products*** and big contributions from oncology and transplant products. | 162 | Section 10(b) |

| Date/Forum | Speaker/Author | Alleged Misrepresentation and/or Omission | Complaint Paragraph | Claim |
|---|---|---|---|---|
| July 2021 Offering Documents (as defined in ¶268 of the Complaint) | Natera, Chapman, Brophy, Matthew Rabinowitz, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herman Rosenman, Jonathan Sheena | The July 2021 Offering Documents omitted material information required to be stated therein, pursuant to 17 C.F.R. § 229.105, regarding risks associated with Natera's Panorama revenues, which in reality were propped up by Natera's deceptive practices, including using the Company's prior authorization scheme with MGML and opting patients into microdeletion testing. | 274-76 | Section 11 |
| July 2021 Offering Documents (as defined in ¶268 of the Complaint) | Natera, Chapman, Brophy, Matthew Rabinowitz, Roy Baynes, Monica Bertagnolli, Roelof F. Botha, Rowan Chapman, Todd Cozzens, James I. Healy, Gail Marcus, Herman Rosenman, Jonathan Sheena | The July 2021 Offering Documents failed to disclose, pursuant to 17 C.F.R. § 229.303, the fact that Natera relied on deceptive business practices to prop up revenue and inflate demand for Panorama. This constituted a known trend or uncertainty that had or was reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from Natera's continuing operations. | 282-84 | Section 11 |

**INTERROGATORY NO. 9:**

Identify Each purchase, acquisition, sale, or other disposition of Natera stock made by or for Your benefit from January 1, 2019 through present, including the date, quantity, price, the number of Natera shares you currently hold, and any profit (realized or unrealized) from that stock.

**RESPONSE TO INTERROGATORY NO. 9:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and purports to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this Action, including because it

seeks information concerning: (i) securities other than Natera common stock, the only security at issue in this Action; and (ii) transactions other than Lead Plaintiff's Class Period (and 90-day lookback period) purchases and sales of Natera common stock, the only relevant transactions in this Action. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the terms "other disposition," "by or for Your benefit," and "any profit (realized or unrealized)." Lead Plaintiff further objects to this Interrogatory as unreasonably cumulative or duplicative, as it seeks information that was already provided in response to prior discovery requests, including, without limitation, in response to Requests 1, 4, and 5 of the Natera Defendants' First Set of Requests for Production of Documents to Lead Plaintiff British Airways Pension Trustees Limited, served on May 14, 2024. Lead Plaintiff further objects to this Interrogatory to the extent it seeks information that is within Natera's possession, custody, or control, to which Natera has equal access and may obtain by equal effort, or which Natera may obtain from sources that are more convenient, less burdensome, less expensive, or more readily available, including in Exhibit B to the Motion of British Airways Pension Trustees Limited, As Custodian Trustee of the New Airways Pension Scheme, for Appointment as Lead Plaintiff and Approval of Selection of Counsel (Dkt. No. 19-3). Lead Plaintiff further objects to this Interrogatory as it is an improper compound Interrogatory, consisting of multiple subparts, each of which is a separate Interrogatory. Lead Plaintiff further objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privileges, protections, or immunities.

Subject to and without waiver of the foregoing objections and Lead Plaintiff's right to amend or supplement its response to this Interrogatory, pursuant to Federal Rule 33(d) Lead Plaintiff directs Natera to: (i) Exhibit B to Lead Plaintiff's Motion of British Airways Pension

Trustees Limited, As Custodian Trustee of the New Airways Pension Scheme, for Appointment as Lead Plaintiff and Approval of Selection of Counsel (Dkt. No. 19-3); and (ii) BAPTL-000242 and BAPTL-000315, marked confidential pursuant to the operative Confidentiality and Protective Order (Dkt. No. 131).

**INTERROGATORY NO. 10:**

Identify Each Person with whom You or any Person acting on Your behalf has Communicated with or from whom You have received factual information Concerning this Action, including but not limited to all interviews referenced in the second unnumbered paragraph on page 1 of the Complaint and any Persons referenced in Paragraph 172 of the Complaint ("The Hindenburg Report stated it was based on 'more than 2 dozen interviews….'"). If You are claiming privilege on any Communication, You shall comply with Instruction D.

**RESPONSE TO INTERROGATORY NO. 10:**

Lead Plaintiff incorporates by reference all of the Specific Objections to Definitions and Instructions set forth above. Lead Plaintiff further objects to this Interrogatory because it seeks disclosure of information protected by the attorney work-product doctrine, the attorney-client privilege, or any other applicable privileges, protections, or immunities. Lead Plaintiff further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, and purports to seek information that is not relevant to any party's claim or defense and/or not proportional to the needs of this action because it seeks information: (i) about "Each Person" with whom Lead Plaintiff "or any Person acting on [its] behalf has Communicated"; (ii) without any subject matter limitation; (iii) regardless of whether such Communications were relied on in the Complaint; and (iv) regarding claims that were dismissed by the Court in its Motion to Dismiss Order (Dkt. No. 104). Lead Plaintiff further objects to this Interrogatory on the grounds that it

seeks information unknown to Lead Plaintiff. Lead Plaintiff further objects to this Interrogatory as vague and ambiguous with respect to the phrases "on Your behalf" and "factual information Concerning this Action." Lead Plaintiff further objects to this Interrogatory to the extent it seeks to impose burdens or obligations that are different from or exceed the requirements of the Federal Rules, the Local Rules, and/or governing law, including its request that Lead Plaintiff comply with Instruction D.

Dated: July 13, 2026

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**

*/s/ Evan R. Hoey*
Evan R. Hoey (admitted *pro hac vice*)
Joshua E. D'Ancona (admitted *pro hac vice*)
Daniel A. Friedman (admitted *pro hac vice*)
Vanessa M. Milan (admitted *pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
ehoey@ktmc.com
jdancona@ktmc.com
dfriedman@ktmc.com
vmilan@ktmc.com

*Counsel for Class Representative British Airways Pension Trustees Limited and Class Counsel*

**NIX PATTERSON, LLP**
Jeffrey J. Angelovich (Bar No. 00786988)
Cody Hill (Bar No. 24095836)
Jessica Underwood (Bar No. 24093291)
8701 Bee Cave Road
Building 1, Suite 500
Austin, TX 78746
Telephone: (512) 328-5333
Facsimile: (512) 495-1534
jangelovich@nixlaw.com
codyhill@nixlaw.com

junderwood@nixlaw.com
*Liaison Class Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2026, a true and correct copy of the foregoing Lead Plaintiff British Airways Pension Trustees Limited Second Amended Objections and Responses to Natera, Inc's Interrogatories 1-10 was sent via electronic mail to the recipients listed below.

Bruce G. Vanyo (admitted *pro hac vice*)
Christina L. Costley (admitted *pro hac vice*)
Paul S. Yong (admitted *pro hac vice*)
**KATTEN MUCHIN ROSENMAN LLP**
2121 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Tel: (310) 788-4400
Fax: (310) 788-4471
bruce@katten.com
christina.costley@katten.com
paul.yong@katten.com

Ted A. Huffman (State Bar No. 24089015)
**KATTEN MUCHIN ROSENMAN LLP**
2121 N. Pearl Street, Suite 1100
Dallas, TX 75201
Tel: (214) 765-3600
Fax: (214) 765-3602
ted.huffman@katten.com

*Counsel for Defendant Natera, Inc.*

Dated: July 13, 2026

*/s/ Evan R. Hoey*
Evan R. Hoey